IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGEVITY CORPORATION and<br>INGEVITY SOUTH CAROLINA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1391 (RGA) |
| | ) | |
| BASF CORPORATION, | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| Defendant. | ) | |

**BASF'S ANSWERING BRIEF IN OPPOSITION TO INGEVITY'S
MOTION FOR A PRELIMINARY INJUNCTION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com
araucci@mnat.com

OF COUNSEL:

James P. Brogan
Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South California Avenue, Suite 100
Palo Alto, CA 94304
(650) 422-6700

Brian Eutermoser
Kevin Lake
Angela Tarasi
KING & SPALDING LLP
1515 Wynkoop Street Suite 800
Denver, CO 80202

*Attorneys for Defendant*

Original Filing Date: October 12, 2018
Redacted Filing Date: October 23, 2018

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 1

    A.  The '844 Patent .................................................................................... 1

    B.  ███████████████████████████████ ................................................... 2

    C.  BASF Developed Its Own Technology ................................................. 3

    D.  BASF Has Been Marketing the EvapTrap™ XC .................................. 4

III.  LEGAL STANDARD FOR PRELIMINARY INJUNCTION ........................... 4

IV.  ARGUMENT ..................................................................................................... 4

    A.  Ingevity Is Not Likely To Succeed on the Merits ................................ 4

        1.  Substantial Questions of Validity Preclude an Injunction ......... 4

            a.  The Asserted Claims Are Indefinite ............................. 5

            b.  The Claims Are Invalid For Lack of Enablement and Written Description ........................................................ 11

            c.  The Alleged Invention Was Disclosed in a Printed Publication ................................................................... 14

            d.  The Asserted Claims Are Invalid as Obvious .............. 16

        2.  The Asserted Claims Are Unenforceable for Patent Misuse ................... 18

    B.  Ingevity Failed to Show Irreparable Harm ........................................ 19

        1.  Ingevity's "Irreparable Harm" Is Predicated on Inapplicable Facts ........................................................................................ 20

        2.  Damages Are Calculable Using Standard Patent Damages Analyses ..................................................................................... 20

        3.  ██████████████████████████████████████████ .................... 22

        4.  The '844 Patent's 2022 Expiration Date Limits Any Harm ..................... 23

        5.  Ingevity's Delay in Filing Suit Undercuts Irreparable Harm ................... 24

    C.  The Balance of Hardships Weighs in Favor of BASF ........................ 25

    D.  An Injunction Would Harm the Public Interest ................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012).................................................................23

*Advanced Commc'n Design, Inc. v. Premier Retail Networks, Inc.*,
46 F. App'x 964 (Fed. Cir. 2002) .............................................................23

*Alcon Research, Ltd. v. Apotex Inc.*,
687 F.3d 1362 (Fed. Cir. 2012)................................................................13

*Amazon.com Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)............................................................5, 18

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012)................................................................25

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010)................................................................12

*Automated Merch. Sys., Inc. v. Crane Co.*,
357 F. App'x 297 (Fed. Cir. 2009) ...........................................................23

*Baxalta Inc. v. Genentech, Inc.*,
C.A. No. 17-509-TBD, 2018 WL 3742610 (D. Del. Aug. 7, 2018)............22, 23, 25

*Bristol-Myers Squibb Co. v. Ben Venue Labs, Inc.*,
246 F.3d 1368 (Fed. Cir. 2001)................................................................15

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
157 F.3d 1340 (Fed. Cir. 1998)................................................................20

*Celgard, LLC v. LG Chem, Ltd.*,
624 F. App'x 748 (Fed. Cir. 2015) ...........................................................24

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012)..................................................................24

*Chestnut Hill Sound Inc. v. Apple Inc.*,
C.A. No. 15-261-RGA, 2015 WL 6870037 (D. Del. Nov. 6, 2015)............21, 22, 25

*Delaware Display Group LLC v. VIZIO, Inc.*,
C.A. No. 13-2112-RGA, 2017 WL 784988 (D. Del. March 1, 2017)....................14

*eBay Inc. v. Merc Exch., LLC*,
   547 U.S. 388 (2006)..............................................................................................25

*Erica Int'l Corp. v. Vutec Corp.*,
   516 F.3d 1350 (Fed. Cir. 2008)..............................................................................5

*FieldTurf USA, Inc. v. Astroturf, LLC*,
   725 F. Supp. 2d 609 (E.D. Mich. 2010)..................................................................23

*Finjan, Inc. v. Blue Coat Sys., LLC*,
   No. 15-cv-03295, 2016 WL 6873541 (N.D. Cal. Nov. 22, 2016) ...........................24

*High Tech Med. Instruments, Inc. v. New Image Indus., Inc.*,
   49 F.3d 1551 (Fed. Cir. 1995) ........................................................................22, 23

*Honeywell Int'l, Inc. v. ITC*,
   341 F.3d 1332 (Fed. Cir. 2003)................................................................................5

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
   995 F.2d 1566 (Fed. Cir. 1993)................................................................................4

*Litton Sys., Inc. v. Sundstrand Corp.*,
   750 F.2d 952 (Fed. Cir. 1984)................................................................................26

*Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd*,
   814 F.3d 1343 (Fed. Cir. 2016)................................................................................4

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012)........................................................................12, 14

*Mallinckrodt, Inc. v. Medipart, Inc.*,
   976 F.2d 700 (Fed. Cir. 1992)................................................................................20

*Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*,
   878 F.3d 1336 (Fed. Cir. 2018)..............................................................................15

*Morton Salt v. G.S. Suppiger Co.*,
   314 U.S. 488 (1942)..........................................................................................20, 21

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014)......................................................................................5, 12

*Neology, Inc. v. Fed. Signal Corp.*,
   C.A. No. 11-672-LPS/MPT, 2012 WL 2308202 (D. Del. June 18, 2012) ..............21

*Nutrition 21 v. United States*,
   930 F.2d 867 (Fed. Cir. 1991)................................................................................23

*Par Pharm., Inc. v. TWi Pharm., Inc.*,
    120 F. Supp. 3d 468 (D. Md. 2015) ........................................................................13

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010)........................................................................19, 20

*Red Bend Ltd. v. Google Inc.*,
    No. 09-cv-11813-DPW, 2011 WL 1288503 (D. Mass. Mar. 31, 2011) ..................23

*Sprinturf, Inc. v. Sw. Recreational Indus., Inc.*,
    277 F. Supp. 2d 508 (E.D. Pa. 2003) ...................................................................26

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001)........................................................................15, 17

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)......................................................................5, 6, 11

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009)...............................................................................5

*Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*,
    329 U.S. 637 (1947).............................................................................................20

*Vir. Panel Corp. v. MAC Panel Co.*,
    133 F.3d 860 (Fed. Cir. 1997).............................................................................20

*Windsurfing Int'l Inc. v. AMF, Inc.*,
    782 F.2d 995 (Fed. Cir. 1986).............................................................................20

*Winter v. NRDC*,
    555 U.S. 7, 20–22 (2008) ....................................................................................25

*Yamashita v. Wilbur-Ellis Co.*,
    No. C 06-01690 WH, 2006 WL 1320470 (N.D. Cal. May 15, 2006) ....................27

**Statutes**

35 U.S.C. § 102...........................................................................................................15, 17

35 U.S.C. § 103.................................................................................................................19

35 U.S.C. § 112...........................................................................................................12, 15

## I.     INTRODUCTION

The '844 patent is invalid and unenforceable. Ingevity's irreparable harm argument lacks evidentiary support. Ingevity's copying and "surreptitious market[ing]" allegations have no basis in fact and are contradicted by Ingevity's own sworn testimony. Bottom line: this is a run-of-the-mill patent case where monetary damages would make Ingevity whole.

Using an activated carbon source like no other, BASF developed a honeycomb scrubber that outperforms any other honeycomb scrubber on the market, including Ingevity's competing product. Once BASF finalized its cutting-edge scrubber in November 2016, it announced the product on its public website, making the EvapTrap™ XC known to Ingevity and the world.

Faced with a superior competing product, Ingevity manufactures tales of surreptitious copying and a 2022 product rollout. But the facts are: (1) EvapTrap™ XC development was publicly disclosed on the BASF website in late 2016; (2) the EvapTrap™ XC is going to market *now* (not in 2022); and (3) any damages are readily determinable.

## II.     BACKGROUND

### A.     The '844 Patent

The patent is directed to canisters and methods for reducing vapor emissions from motor vehicle fuel systems. (D.I. 1-1, Abstract.) It claims to "sharply reduc[e] diurnal breathing loss emissions from automotive evaporative emissions control systems by providing multiple layers, or stages, of adsorbents." (*Id.*) The multiple layers include "high working capacity carbons on the fuel source-side and preferred lower working capacity adsorbent on the vent-side." (*Id.*)

The patent uses two metrics to quantify adsorption capacity. First, the patent uses the industry-standard "butane working capacity," or "BWC." (*Id.* at 6:2–4.) BWC measures a material's ability to adsorb and desorb butane, a proxy for gasoline vapors. (Lyons Decl. ¶ 57; *see* D.I. 1-1, 2:8–12.) Second, the patent discloses a made-up, non-standard metric for

quantifying the capacity of an adsorbent, variably called "incremental adsorption capacity" (*id.* at 9:5–42), "incremental n-butane capacity" (*id.*), or "incremental capacity" (*id.* at 2:12–21). The patent provides little description of how to measure this non-standard metric "IAC."

The patent discloses that conventional automotive adsorbents have a high IAC and that the vent-side adsorbents of the patent have a low IAC. (*id.*, Abstract.) All asserted claims require initial adsorbent volumes having an IAC greater than 35 g/L and a subsequent adsorbent volume having an IAC less than 35 g/L.



**B.**

(Ex. 2 at 37:3–7.)

(*Id.* at 117:9–118:15; Stamm Decl. ¶ 32.)

(Ex. 4 at 10.)

(Ex. 5.)

[1] Except where otherwise noted, all Exhibits are attached to the Declaration of James Brogan being filed concurrently.

. (*Id.*; Ex. 2 at 142:24–143:4.) ▮

▮. (Ex. 4 at 9.) ▮

▮

(*Id.*)

▮. (Ex. 6.) ▮

▮ (*Id.* at 10.) ▮

▮.

(*Id.*) ▮.

(Ex. 2 at 154:13–18; 157:24–158:2.)

### C.  BASF Developed Its Own Technology

BASF did not copy Ingevity's scrubber design.[2] BASF began developing the EvapTrap™

XC in 2015. ▮

▮

▮ (Ruettinger Decl. ¶ 2.) In June 2016, BASF

acquired EnerG2, Inc. (*Id.* ¶ 3.) EnerG2 developed new synthetic carbon materials sufficient to

create a carbon honeycomb that can meet EPA and CARB emissions standards with just a single

scrubber. (*Id.*) The use of synthetic carbons and meeting emissions standards with just a single

scrubber differentiates the EvapTrap™ XC from other scrubbers, including Ingevity's HCA and

HCA-LBE products. (*Id.* ¶ 3, 5.) Natural carbon honeycombs require multiple scrubbers to

achieve the results of a single EvapTrap™ XC, leading to higher emissions and higher costs for

---

[2] ▮

automobile manufacturers and consumers. (*Id.*) BASF continued developing the EvapTrap™ XC after the EnerG2 acquisition and began advertising the EvapTrap™ XC on its website at least by November 6, 2016. (*Id.* ¶ 4; *see also* Ex. 8.)

### D. BASF Has Been Marketing the EvapTrap™ XC

Throughout 2016 and 2017, BASF shipped EvapTrap™ XC samples to █████████ prospective international and domestic customers and testing facilities. (Ruettinger Decl. ¶ 14.) Those entities tested the product, confirming that it outperformed any carbon honeycomb on the market. (*Id.*) The customers therefore sought to purchase the EvapTrap™ XC. (*Id.* ¶ 14–15.) BASF began to negotiate sales terms in 2017. (*Id.*) Because of these successful tests and customer interest, BASF began to prepare for production, anticipating sales of █████████ ████████████████████. (*Id.*)

## III. LEGAL STANDARD FOR PRELIMINARY INJUNCTION

Ingevity bears the burden of establishing it is entitled to the "drastic and extraordinary relief" of a preliminary injunction. *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). Ingevity must establish that: (1) it is likely to succeed on the merits; (2) it will suffer immediate irreparable harm without an injunction; (3) the balance of hardships weighs in Ingevity's favor; and (4) the public interest is best served by granting the injunctive relief. *See Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd*, 814 F.3d 1343, 1352 (Fed. Cir. 2016).

## IV. ARGUMENT

### A. Ingevity Is Not Likely To Succeed on the Merits

#### 1. Substantial Questions of Validity Preclude an Injunction

A party may defeat a preliminary injunction by raising "a substantial question of invalidity to show that the claims at issue are vulnerable." *Erica Int'l Corp. v. Vutec Corp.*, 516

F.3d 1350, 1356 (Fed. Cir. 2008). This "requires less proof than the clear and convincing showing necessary to establish invalidity." *Amazon.com Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). The Court should assess whether "the alleged infringer has presented an invalidity defense that the patentee has not shown lacks substantial merit." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009). The patent claims are invalid for multiple reasons. Any one of the following defenses will invalidate the claims.

### a. The Asserted Claims Are Indefinite

A patent is indefinite "if its claims, read in light of the specification . . . and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1340–41 (Fed. Cir. 2015) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014)). In *Teva*, the Federal Circuit invalidated a claim that recited "molecular weight" because the term had no plain meaning and because the specification did not define the term or disclose which of three possible measurements to use. *Id.* at 1344–45; *see also Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1342 (Fed. Cir. 2003).

The '844 patent claims draw a critical and highly-precise line. The initial adsorbent material must have an IAC above 35 g/L, and the second adsorbent material must have an IAC below 35 g/L. Despite allowing no margin for error regarding this critical determination, the '844 patent fails to inform those skilled in the art how to reliably determine IACs. Like "molecular weight" in *Teva*, the '844 patent does not define "incremental adsorption capacity" or disclose how to measure it.[3] (*See, e.g.*, Ex. 9 at 53:3–7, 56:5–11.) "Incremental adsorption capacity" was

---

[3]    Even if Ingevity were correct that a skilled artisan would have recognized that IAC refers to "the difference between: (1) the adsorption capacity of the adsorbent at a vapor concentration of 50 vol % n-butane and (2) the adsorption capacity of the adsorbent at a vapor concentration of

not a term of art and was not known in the field when the '844 patent application was filed. (Ex. 7 at 28:10–21; Ex. 9 at 48:31–25.) ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████ (Ex. 9 at 49:2–17, 50:4–8.) ████████████████████████████████████

████████████████████████████████████████ (Ex. 10 at NGVT0001061.) Unlike the related property "butane working capacity," or "BWC," there were no industry-standard tests for measuring IAC, and the '844 patent specification discloses none.[4]

This shortcoming in the claims caused the European Patent Office ("EPO") to revoke the European counterpart of the '844 patent.[5] (Ex. 11 at 7–11.) As the EPO explained, "there are many different methods of measuring the adsorption (i.e. static volumetric method, flow volumetric method, gravimetric method and carrier gas method), each relying on a very detailed measurement protocol." (*Id.* at 10.) And even "after obtaining adsorption values, the skilled person has to decide which isotherm model should be applied." (*Id.*) Thus, "irrespective of the amount of work put into trying to characterize adsorbent volumes by incremental adsorption capacity . . . [,] the skilled person gains no certainty[] as to whether he works within the scope of the patent and whether or not the technical problem is solved." (*Id.* at 11.) As discussed below, even the limited discovery BASF has obtained to date confirms that the EPO's decision was

---

[5] vol % n-butane" (Mot. at 15 n.3), the specification does not disclose how to measure adsorption capacity at a particular vapor concentration.

[4] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

[5]      Ingevity's appeal of the EPO's decision is still pending.

correct, and that the '844 patent claims are indefinite.[6]

 Ingevity's expert, Dr. Ritter, asserts that a skilled artisan would have known to calculate IAC by (1) experimentally measuring the volume (in cm$^3$) of n-butane adsorbed per gram of a sample adsorbent material at various pressures; (2) converting the data to the units disclosed in the specification using the Ideal Gas Law; (3) using a mathematical model to fit an isotherm curve to the experimental data; (4) analyzing the resulting isotherm curve to determine the mass (in grams) of n-butane adsorbed per liter of the sample adsorbent material at n-butane concentrations of both 5% and 50% by volume; and (5) subtracting the result at 5% from the result at 50% to get an IAC value.[7] (D.I. 14, Ex. A, ¶¶ 17–21, 38–65; Ex. 9 at 56:12–62:12.) Even if a skilled artisan would have known to perform each step—which BASF disputes—there were multiple ways to perform at least steps (1), (3), and (4), each rendering different IAC values.

 Uncertainty regarding the first step—experimentally measuring adsorption capacity—by itself renders the claims indefinite. ███████████████████████████████████████████
██████████████████████████████████████████ (Ex. 7 at 83:22–25; Ex. 9 at 104:6–106:3.) ███████████████████████████████████████████████████████████████.
(Ex. 9 at 101:11–104:5.) Consistent with the EPO's findings, ███████████████████

---

[6] Ingevity apparently recognized the deficiencies in the '844 patent specification. In a later-filed patent with claims that also recite "incremental adsorption capacity," the inventors explicitly defined both "nominal" and "effective" IACs. (Ex. 12, at 8:51–9:2, 10:27–30.) The specification of the later-filed patent—U.S. Patent No. 9,732,649 ("the '649 patent")—includes a section titled "Determination of Incremental Adsorption Capacity," which provides instructions for measuring "butane adsorption capacity" and discloses at least two different methods for "determining the incremental adsorption capacity." (*Id*. at 13:38–14:32.) Thus, the '649 patent not only confirms that there were multiple possible definitions of IAC and multiple test procedures for measuring it, but also that the '844 patent disclosure was insufficient.

[7] ███████████████████████████████████████████████████████████████████
████████ (Ex. 7 at 37:25–38:3.)



. (Ex. 7 at 44:18–45:8; Ex. 13, at 9–11.)

” (Ex. 7 at 38:9–19.)

. (Ex. 1 at 96:15–98:8.)

. (Ex. 9 at 92:3–94:9.)

The third step—fitting an isotherm curve to the data—introduces even more uncertainty.

(Ex. 9 at 40:11–23; Ex. 7 at 51:20–54:4, 82:10–12; Ex. 14 at 1–2; Ex. 15 at 260.) . (Ex. 7 at 55:16–18; Ex. 9 at 41:3–5.)

(Ex. 7 at 54:5–55:4.)

. (Ex. 9 at 41:6–43:8.) In other words, a skilled artisan would need to analyze the experimental data to determine which model to use, but the '844 patent does not disclose how to generate an adsorption isotherm based on experimental data. (*See, e.g.*, Ex. 7 at 49:18–21, 56:6–8.)

Even if a skilled artisan could reliably generate an adsorption isotherm based on the disclosure in the specification, the fourth step in Dr. Ritter's analysis introduces still more uncertainty. In calculating the IAC for BASF's EvapTrap™ XC, Dr. Ritter used a standard least-squares function in Microsoft Excel to generate a linear equation for the experimental data. (Ex.

9 at 121:12–123:17.) He solved that equation at volume concentrations of 5% and 50%, and then subtracted the former result from the latter to get an IAC of approximately 5.1 g/L. (D.I. 14, Ex. A ¶ 57.) Setting aside the fact that the '844 patent says nothing about whether or when to use a linear fit equation in Microsoft Excel, ███████████████████████████████████

███████████████████████████████████████████████████████████████████. (Ex. 9 at 131:17–136:20; 141:18–143:9.) ███████████████████████████████████████

███████████████ (*Id.* at 136:21–25.) ██████████████████████████████████████

█████████████████████████ (*Id.* at 137:12–15.)

Moreover, Dr. Ritter admitted that Ingevity uses a different method for determining IAC. (D.I. 14, Ex. A ¶ 59.) In particular, Ingevity performs "two different regressions . . . using the data around 5 volume % and 50 volume %." (*Id.*) Dr. Ritter used Ingevity's method to generate two different "fitted equations" for the adsorption capacities at 5% and 50%, solved both, and then subtracted to get an IAC of approximately 4.9 g/L. (*Id.* at ¶¶ 60–64.) The patent discloses neither method for calculating IAC based on experimental isotherm data. Nor does it foreclose other possible methods, or teach a skilled artisan how to select which method to use in which circumstances. (Lyons Decl. ¶ 89.)

Dr. Ritter admitted that there was a 4% difference between his and Ingevity's IAC calculations, and that this 4% deviation does not account for possible differences related to test procedures. (D.I. 14, Ex. A ¶ 65; Ex. 9, at 150:17–151:3.) █████████████████████████████

████████████████████████████████████████████████████████. (*Id.* at 143:17–145:7.) ████████████████████████████████████████████████████████████████

██████████████████████████████████████████. (*Id.* at 145:9–20, 148:2–149:11.) ██████████████

████████████████████████████████████████████████████████ (*Id.* at 143:24–

144:2.) Subjective determinations of acceptable deviation would not have helped a skilled artisan determine whether her own calculations were sufficiently reliable to determine the precise 35 g/L cutoff.



(Ex. 1 at 210:9–212:2; Ex. 16 at 6–9.)

(*Id.*)

(Ex. 1 at 212:3–9.)

(Ex. 1 at 231:3–234:5; Ex. 17 at 1–5.) Nowhere does the '844 patent disclose whether or when to use such drastically different methods to calculate IAC.

(Ex. 1 at 100:2–101:16; Ex. 18 at 31, 33.)

[8] (Ex. 7 at 98:14–99:10.)

[9] . (Ex. 9 at 180:13–181:24.)

(Ex. 1 at 101:7–25.) ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ (*Id*. at 108:8–109:2.) Claims susceptible to such conflicting results do not define

the invention with reasonable certainty. *See Teva*, 789 F.3d at 1340–41.

This uncertainty is especially concerning because the claims allow no margin of error to

account for variations in tests and test methods, IAC calculations, or both. ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ (Ex. 1 at 235:12–236:20, 241:7–242:17; Ex. 19 at

4.) ██████████████████████████████████████████████████████████████

██████████████████████████ (Ex. 9 at 145:22–146:18, 149:18–150:15.)

████████████████████████████████████████ (Ex. 9 at 65:13–

67:9, 69:7–72:13, 152:2–153:13), ███████████████████████████████████

████████████████████████████████████. Data submitted to the EPO

regarding prior art adsorbents confirms that this problem is not merely theoretical. (Lyons Decl.

¶¶ 106–112.)

Simply put, the claims fail to define the scope of the invention with reasonable certainty,

and are therefore indefinite. *See Nautilus*, 134 S. Ct. at 2124.

### b. The Claims Are Invalid For Lack of Enablement and Written Description

To satisfy the enablement requirement of 35 U.S.C. § 112, the specification "must teach

those skilled in the art how to make and use ***the full scope*** of the claimed invention without

undue experimentation." *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377,

1380 (Fed. Cir. 2012) (internal quotations omitted, emphasis added).[10] "[A] patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *MagSil*, 687 F.3d at 1381. Ingevity's predecessor did exactly that, broadly claiming adsorbent volumes with no upper or lower IAC limit but failing to teach a skilled artisan how to make or use an adsorbent volume with IAC greater than 80 g/L.

The independent claims all require an "initial" adsorbent volume with an IAC greater than 35 g/L, with no upper bound. (*E.g.*, '844 patent, claim 1.) ███████████████████
████████████████████████████████████████████████████████████ (Ex. 9 at 72:14–
74:5.) ██████████████████████████ Ingevity advocated for a broad construction, arguing that the claims "should be given their plain and ordinary meaning." (D.I. 14 at 15 n.3.) In any event, Ingevity could not save its claims by now disavowing the infinite upper IAC range. *See Par Pharm., Inc. v. TWi Pharm., Inc.*, 120 F. Supp. 3d 468, 478 (D. Md. 2015) (citing *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (Fed. Cir. 2012)).

Despite the infinite IAC range for the initial adsorbent, there is no dispute that the specification does not enable adsorbents with IAC greater than 80 g/L. ██████████████████ :

- ████████████████████████████████████████████ (Ex. 9 at 164:11–20, 172:5–11);

- ████████████████████████████████████████████
  *id.* at 162:5–8, 164:21–24);

- ████████████████████████████████████████████
  (*id.* at 162:22–163:12);

- ████████████████████████████████████████████
  (*id.* at 163:13–17, 172:12–19);

---

[10]     Similarly, the written description requirement of § 112 requires that the specification demonstrate that the inventors had possession of the full scope of the claimed subject matter as of the filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The '844 patent claims lack written description support for the same reasons they fail to enable the full IAC range recited in the claims.

- ████████████████████████████████ (*id.* at 164:25–165:8, 171:11–18);

- ████████████████████████████████ (*id.* at 165:9–166:25).

Later developments by Ingevity's predecessor confirm that a skilled artisan did not know how to make or use adsorbent materials with higher IACs as of the filing date. ████████

████████████████████████████████████████████████████

████████████████████████████████████████ (Ex. 1 at 196:16–198:22, 199:22–12); Ex. 20 at 5; Ex. 16 at 5.) Thus, even now, a person of ordinary skill in the art cannot practice the full scope of the claims.

The facts of *MagSil* are instructive. Similar to the claims at issue here, the challenged *MagSil* patent required "a change in the resistance *by at least 10%* at room temperature." *MagSil*, 687 F.3d at 1379 (emphasis added). The plaintiff argued for a broad construction of this term, and its expert testified that the claim covered "resistive changes of 100% or more," notwithstanding the specification's disclosure of a far smaller "maximum change in resistance of only 11.8% at room temperature." *Id.* at 1381. The *MagSil* court also found—similar to Ingevity's continued IAC efforts—that the *MagSil* inventors' post-patent development of much higher resistive changes showed the original range was not enabled. *Id.* at 1382. The Federal Circuit thus affirmed the finding that the claims were invalid. *Id.* at 1383.

Although Ingevity may try to minimize the importance of the initial adsorbent,[12] the

---

[11] ████████████████████████████████████████████████████████
████████████████████████████ (Ex. 7 at 59:11–60:4);
████████ (*Id.* at 57:25–58:9); and
████████████████████ (D.I. 14, Ex. B ¶ 22; Ex. 7 at 60:5–15).

[12]    This Court rejected an enablement challenge to patent claims that recited a "light source" among several components unrelated to any novel aspect of the patent. *Delaware Display Group LLC v. VIZIO, Inc.*, C.A. No. 13-2112-RGA, 2017 WL 784988, at *4–6 (D. Del. March 1, 2017).

alleged invention is the combination of multiple adsorbent layers with different capacities. ('844 patent, Abstract.) An evaporative emissions control system with only the initial adsorbent would be ineffective at reducing emissions.. (Ex. 1 at 170:15–21; Lyons Decl. ¶ 123.) Even Ingevity recognizes that an initial adsorbent volume with IAC greater than 35 g/L is an important feature of the claimed invention. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████. (Exs. 3, 5, 6.) Accordingly, there is no basis for exempting the claimed "initial adsorbent" from the enablement requirement.

The '844 patent claims are invalid under § 112 for lack of enablement and written description. Ingevity's Motion should be denied.

### c.     The Alleged Invention Was Disclosed in a Printed Publication

A patent claim is invalid under the pre-AIA version of 35 U.S.C. § 102(a) if the alleged invention was "known or used by others in this country" or "described in a printed publication" before the alleged conception date. A claim is anticipated if every limitation "is found either expressly or inherently in a single prior art reference." *Bristol-Myers Squibb Co. v. Ben Venue Labs, Inc*., 246 F.3d 1368, 1374 (Fed. Cir. 2001). Extrinsic evidence may be used to show that a feature is "necessarily present in a reference." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1328 (Fed. Cir. 2001). The "extrinsic evidence need not antedate the critical date of the patent at issue." *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1345 (Fed. Cir. 2018). Nor must the inherent feature have been recognized in the art. *Id.*

---

Unlike in that case, an "initial adsorbent" with IAC greater than 35 g/L is a key component of Ingevity's alleged invention, rather than a "tangential limitation." *See id.*

In March 2001, months before the alleged August 2001 conception date (*see* Ex. 4; Ex. 1 at 41:23–42:15), named inventor Roger Williams published an article (the "Williams Article") that discloses the alleged invention by describing DBL testing he performed on an "in-use canister" that was "equipped with an auxiliary canister." (Ex. 21 at 9–10.) The article discloses that "the addition of an auxiliary chamber to the vent side of the primary canister substantially reduces bleed emissions" and "may help achieve canister emissions targets." (*Id.* at 10.) The article also discloses that the auxiliary canisters used in the tests included "carbon honeycombs" developed by Westvaco (*id.*), and that the in-use canister was tested with "Wood-Based 15 BWC" carbon (*id.* at 9), which Ingevity admits has IAC much greater than 35 g/L (D.I. 14, Ex. C ¶ 6). ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ (Ex. 1 at 37:15–39:11.) Mr. Williams's testimony and Ingevity's documents prove that Westvaco's carbon honeycombs inherently had IACs of less than 35 g/L.

████████████████████████████████████████████████████ (Ex. 1 at 41:23–42:4), ████████████████████████████████████████████ (*id.* at 39:15–19). ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ (*Id.* at 137:10–15). ████████████████████████████████████████████████. (*See, e.g.*, Ex. 9 at 162:5–8, 164:21–24.) ████████████████████████████████

████████████████████████████████████████████████. (*See e.g.*, Ex. 1 at 76:10–24, 145:12–146:23; Ex. 22 at 1; Ex. 23.) ████████████████████████

████████████████████████████████████████" (Ex. 1 at 137:2–8 (emphasis added).) ████.



(*Id.* at 137:24–138:24.)

(*See, e.g.*, Ex. 1 at 76:5–79:3; Ex. 24 at NGVT0019374.)

. (*See, e.g.*, Ex. 16 at 3.)

This evidence suggests that ***any*** activated carbon honeycomb made around the time of the alleged invention—or at least any made by Westvaco—***necessarily*** had an IAC of less than 35 g/L. (Lyons Decl. ¶ 152.) In other words, the honeycombs disclosed in the Williams Article inherently satisfied the "subsequent adsorbent" limitations. *See Telemac*, 247 F.3d at 1328. BASF expects that additional discovery will invalidate the claims under § 102(a).[13] At the preliminary injunction stage, the evidence Ingevity has already produced is more than sufficient to show a "substantial question" of the invalidity of the asserted claims. *See Amazon.com*, 239 F.3d at 1350.

### d. The Asserted Claims Are Invalid as Obvious

Prior art fuel vapor canisters were filled with granular or pelletized carbons to capture fuel vapor emissions from fuel tanks. (D.I. 1-1 at 1:32–39, 2:27.) They were prone to leaking

---

[13]     Additional discovery will likely bolster additional § 102 defenses. (Ex. 1 at 127:13–131:23; Ex. 25 at 1–3.)

(*Id.* at 133:16–136:3, 139:5–23, 143:2–144:24, 156:19–157:16, 159:1–166:25; Ex. 22 at 1–3; Ex. 26; Ex. 27 at NGVT0002630, -2699, -2700, -2705, -2706, -2710, -2711.) Delphi filed multiple patent applications disclosing a canister system with a honeycomb scrubber with BWC < 8 g/dL (i.e., IAC < 35 g/L)                . (*See, e.g.*, Lyons Ex. C; Ex. 1 at 167:16–169:22.) Thus, the claimed invention was in public use under § 102(a) or (b) and/or described in a patent or application under § 102(e) before Ingevity's alleged August 2001 conception date.

vapors when the automobile's engine was turned off for more than a day. (*Id*. at 2:44–47.) This well-known problem is referred to as "diurnal breathing loss," or "DBL." (*Id*.) The '844 patent purports to solve the DBL problem by adding a second stage of vapor capture to the conventional canister. (*Id*. at 3:43–64.)

The addition of a second stage to solve the DBL problem was not new. For example, the same solution was disclosed in 1998 in Japanese Patent Application Publication No. 10-37812 to Abe et al. ("Abe"). (Lyons Decl. ¶¶ 134–138; Lyons Ex. A, F–I.) Abe also disclosed the same adsorbent—a honeycomb made of activated carbon—that the '844 patent discloses as a preferred second stage. (E.g. Lyons Ex. A ¶¶ 9, 16, 22, 30, 37.) The two-stage solution was also disclosed in the Williams Article, as well as in multiple U.S. patents or applications filed before the '844 patent's priority date.

The '844 patent's alleged novelty rests solely on its metric for the two adsorbent stages. The patent eschewed conventional metrics in favor of a new one that it called IAC. (E.g. '844 patent claim 1, 18.) All of the '844 claims require the initial stage to have an IAC of greater than 35 g/L, and the second stage to have an IAC of less than 35 g/L. (*See id.*) Because IAC is an Ingevity-created term, it does not appear in the prior art. (Lyons Decl. ¶ 166.)

The prior art achieves the recited IAC values. Ingevity's commercially-available BAX carbons had an IAC of greater than 35 g/L well before the '844 patent created that term—a fact that Ingevity admits. (*See* D.I. 1-1, 8:5–60.) To achieve an IAC of lower than 35 g/L for the second stage, the '844 patent teaches diluting a conventional material by forming it into a honeycomb shape—the same structure disclosed by several prior art references. (*Id*. at 7:26–43; Lyons Decl. ¶¶ 54, 64.) The inventors did not create a new honeycomb for this purpose or use conventional honeycombs in a new way. In fact, the patent admits that it used the method for

creating honeycombs disclosed in U.S. Patent No. 5,914,294 ("Park"), which issued in 1999. (D.I. 7:26–55, Lyons Ex. B.) And multiple patent applications filed before the '844 patent's priority date explicitly disclosed using Park to create a honeycomb as the second stage to solve the DBL problem. U.S. Patent No. 6,896,852 ("Meiller") also discloses adding a honeycomb scrubber to a canister to solve the DBL problem. (Lyons Decl. ¶¶ 128–133, Lyons Ex. C.) Applying an Ingevity-coined IAC metric does not make these known structures novel.

As BASF's expert Jim Lyons explains in the attached declaration and claim charts, the claims are obvious over the prior art combination of Meiller and/or Abe, in view of Park, under 35 U.S.C. § 103(a), which a person of ordinary skill would have been motivated to combine. Ingevity's alleged support for nonobviousness lacks factual or legal basis. Ingevity fails to identify a nexus between the secondary considerations it cites and the claimed invention. (Lyons Decl. ¶ 177.)

## 2. The Asserted Claims Are Unenforceable for Patent Misuse

███████████████████████████████████████████████████████████████. (Exs. 3, 5, 6.) This improper tying constitutes patent misuse and renders the patent unenforceable. *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1327 (Fed. Cir. 2010) (quoting *Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 643 (1947)). The most common form of patent misuse is "requiring the purchase of an unpatented product as a condition for obtaining a license to the patent." *Princo*, 616 F.3d at 1327. This reflects a policy "to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed. Cir. 1992). The "key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998).

In 1986, the Federal Circuit identified a few "specific practices as constituting per se patent misuse, including so-called 'tying arrangements' in which a patentee conditions a license under the patent on the purchase of a separable, staple good." *Vir. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860 (Fed. Cir. 1997) (citing *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1001 (Fed. Cir. 1986)). It identified the *Morton Salt* case as a "typical 'tying' case in which the patentee leveraged its patent to a machine by insisting that its licensees purchase unpatented goods, to be used in connection with the machine, from the patentee." *Princo*, 616 F.3d at 1333.

The facts here are analogous to *Morton Salt*. Morton had a patent on a machine for depositing unpatented salt tablets into canned food, and patent licensees were required to purchase Morton's salt tablets to obtain a license. *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 491 (1942). The Supreme Court held the patent unenforceable for patent misuse. *Id.* at 494.

Activated carbon is not covered by the claims of the '844 patent. (D.I. 1-1 at 1:46–49.) In fact, ███████████████████████████████████████████████████████████

███████████████████████████████████." (Ex. 1 at 37:9–14.) ████████████████

██████████████████████████████████████████████████████████████████████.

(Exs. 3, 5, 6; Ex. 3.)[14] ████████████████████████████████████████

██████████████████████. The '844 patent is therefore unenforceable, and the Court should deny Ingevity's Motion. *See Morton Salt*, 314 U.S. at 491.

### B.      Ingevity Failed to Show Irreparable Harm

"Although irreparable harm is only one of four factors a court considers when evaluating a preliminary injunction motion, inability of the movant to establish this factor is, by itself, fatal

---

[14] ███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████ (Ex. 2 at 135:8–140:15.)

to the motion." *Neology, Inc. v. Fed. Signal Corp.*, C.A. No. 11-672-LPS/MPT, 2012 WL 2308202, at *17 (D. Del. June 18, 2012) (internal citation omitted). "[D]eciding whether a plaintiff would suffer irreparable harm absent an injunction involves an inquiry into whether money damages would adequately make the plaintiff whole." *Chestnut Hill Sound Inc. v. Apple Inc.*, C.A. No. 15-261-RGA, 2015 WL 6870037, at *6 (D. Del. Nov. 6, 2015) (citations omitted).

### 1. Ingevity's "Irreparable Harm" Is Predicated on Inapplicable Facts

The premise of Ingevity's irreparable harm argument is that "BASF hopes to achieve an unlawful head start into Ingevity's industry-leading business once the '844 patent expires" by beginning to sell the EvapTrap™ XC after March 18, 2022. (Mot. at 12). According to Ingevity, "money damages are inadequate to compensate Ingevity" because it cannot obtain damages for post-expiration sales and BASF will not have made any sales before the expiration of the '844 patent. (*Id*.) at 13. But the premise is false. BASF is selling the EvapTrap™ XC ███████ ███████████████████████████████████████ (Ruettinger Decl. ¶ 18.) BASF anticipated selling ███████████████ before Ingevity's lawsuit and, should Ingevity's Motion be denied, anticipates selling ██████████████. (*Id*. ¶ 15.) The entire factual premise of Ingevity's irreparable harm theory is wrong. (Stamm Decl. ¶¶ 9, 56–62.)

The evidence shows that BASF already has products to sell, has tested them, and has sold them. (*Id.*) Thus, Ingevity's imagined 24–36 month "head start" is just that—imagined. Ingevity's bold and surprising argument that it will lose 24–36 months of sales after the patent expires if a preliminary injunction is not granted is wrong in light of the facts.

### 2. Damages Are Calculable Using Standard Patent Damages Analyses

Ingevity's claim that "[m]oney damages are inadequate to compensate Ingevity" is unsupported attorney argument. (Mot. at 13.) Ingevity does nothing more than use "buzzwords"

of irreparable harm (e.g., "loss of market share," "price erosion," "lose goodwill," "lose business opportunities") without providing evidence. (*Id*. at 12.) "Although the Federal Circuit has occasionally found these kinds of harms irreparable, it has done so in the presence of other unique factual circumstances—such as ecosystem and network effects or the danger of employee layoffs—not present here." *Baxalta Inc. v. Genentech, Inc*., C.A. No. 17-509-TBD, 2018 WL 3742610, at *34 (D. Del. Aug. 7, 2018) (citations omitted).

Ingevity failed to provide evidentiary support for its irreparable harm theory, relying entirely on attorney argument. Ingevity provided no expert testimony that "[m]oney damages are inadequate to compensate Ingevity." (Mot. at 13.) Nor did Ingevity produce documents supporting its claims. The only "evidence" Ingevity cited was a declaration listing Ingevity's sales of and alleged investments in all honeycomb products. (D.I. 14, Ex. D ¶ 7.) Mr. Woodcock does not even claim that Ingevity will lose market share, suffer price erosion, lose goodwill, or lose business opportunities as a result of BASF's actions. (*See id.*) This is particularly problematic for Ingevity because BASF has been marketing and testing its EvapTrap™ XC products since 2016.

Lack of evidence exposes the irreparable harm claims as insufficient. *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009) ("lost market share must be proven (or at least ***substantiated with some evidence***)") (emphasis added). Even if Mr. Woodcock had provided some evidence to support irreparable harm, it would be insufficient to carry Ingevity's "burden of showing an entitlement to the extraordinary relief of a preliminary injunction." *Advanced Commc'n Design, Inc. v. Premier Retail Networks, Inc.*, 46 F. App'x 964, 979 (Fed. Cir. 2002) (reversing preliminary injunction where evidence of infringement was

based on conclusory assertion of CEO); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339 n.7 (Fed. Cir. 2012).

Finally, even assuming that Ingevity could support its attorney argument about lost sales, which it cannot, mere loss of sales or market share is insufficient to support a claim for injunctive relief. *See, e.g., FieldTurf USA, Inc. v. Astroturf, LLC*, 725 F. Supp. 2d 609, 616–17 (E.D. Mich. 2010); *Red Bend Ltd. v. Google Inc.*, No. 09-cv-11813-DPW, 2011 WL 1288503, at *19 (D. Mass. Mar. 31, 2011). There is no presumption that money damages are inadequate. *High Tech Med. Instruments, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). Instead, "[s]ome evidence and reasoned analysis for that inadequacy should be proffered." *Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991).

Ingevity provides nothing other than attorney argument to claim that monetary damages would be inadequate to make it whole. BASF's expert, Laura Stamm, confirms that damages can be readily quantified as lost profits and/or a reasonable royalty. (Stamm Decl. ¶¶ 28–35.)

**3.** ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████. (Exs. 3, 5, 6.)

"[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). "Prospective harm that can already be priced is not [irreparable harm]." *Finjan, Inc. v. Blue Coat Sys., LLC*, No. 15-cv-03295, 2016 WL 6873541, at *7 (N.D. Cal. Nov. 22, 2016).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

"any injury suffered . . . would be compensable in damages assessed as part of the final judgment in the case." *High Tech.*, 49 F.3d at 1557; *see also Celgard, LLC v. LG Chem, Ltd.*, 624 F. App'x 748, 753 (Fed. Cir. 2015); *Finjan*, 2016 WL 6873541, at *7; (Stamm Decl. ¶¶ 31–35.)



(Ex. 1 at 154:13–18; *see also id.* at 179:14–16 ███████ 180:2–5; 181:6–13 ████████

████████████ that monetary damages are calculable to compensate for infringement is fatal to its Motion. *See eBay Inc. v. Merc Exch., LLC*, 547 U.S. 388, 391 (2006).

### 4. The '844 Patent's 2022 Expiration Date Limits Any Harm

The patent expires March 18, 2022, greatly undermining any irreparable harm. (*See* Stamm Decl. ¶¶ 39–40.) Judge Dyk, sitting by designation in the District of Delaware, found that when a patent will expire in a short period of time, that cuts against a finding of price erosion, because price erosion will most certainly occur upon expiration, and a patentee can be compensated with damages in the intervening period preceding expiration. *Baxalta*, 2018 WL 3742610 at *35 (Dyk, J., sitting by designation). The *Baxalta* court considered a patent set to expire on December 20, 2021, less than four months before the expiration date of the '844 patent. Just as in *Baxalta*, Ingevity "will almost certainly lose market share in the near future

after patent expiration, and it can be compensated for any lost sales that occur in the intervening period before patent expiration." (*Id.*)

### 5. Ingevity's Delay in Filing Suit Undercuts Irreparable Harm

Prolonged or undue delay in commencing legal proceedings and seeking injunctive relief evinces a lack of irreparable harm. *Apple, Inc. v. Samsung Elecs. Co.,* 678 F.3d 1314, 1325–26 (Fed. Cir. 2012); *Chestnut Hill Sound Inc. v. Apple Inc.*, C.A. No. 15-261-RGA, 2015 WL 6870037 at *6 (D. Del. Nov. 6, 2015). BASF publicized its entry into this field in late 2016. Ingevity did not file its initial complaint until July 19, 2018, ████████████████████

████████████████████████████████████████████

████████████████████ (No. 1:18-cv-01072-RGA, D.I. 1 (D. Del. July 19, 2018); Ex. 1 at 256:2–5; Ex. 3.) Ingevity did not file the operative Motion until September 14, 2018.[15] Ingevity does not explain the long delay, which appears to have been timed to disrupt BASF sales.

In its infringement actions against MAHLE, it appears that Ingevity has never even served MAHLE with a complaint. *See Ingevity Corp. v. MAHLE Filter Sys.*, No. 18-cv-04290 (N.D. Ill.); *see also Ingevity Corp. v. MAHLE Filter Sys.*, No. 18-cv-01391 (N.D. Ill.) Nor has Ingevity sought a preliminary injunction against MAHLE. (*See id.*) This lack of urgency confirms there is no emergency here. *See Winter v. NRDC*, 555 U.S. 7, 20–22 (2008); *Sprinturf, Inc. v. Sw. Recreational Indus., Inc.*, 277 F. Supp. 2d 508, 516–17 (E.D. Pa. 2003).

---

[15] ████████████████████████████████████████ Ingevity apparently did not do its due diligence to determine ownership of the '844 patent. Ingevity filed a new complaint and re-filed its Motion because it realized that Ingevity Corporation lacked standing.

### C. The Balance of Hardships Weighs in Favor of BASF

"An injunction should not be granted if its impact on the enjoined party would be more severe than the injury the moving party would suffer if it is not granted." *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 959 (Fed. Cir. 1984). Granting an injunction and removing the EvapTrap™ XC from BASF's product portfolio would disrupt the *status quo* and remove from the market a product that outperforms Ingevity's products. BASF has made a substantial investment in designing and building the best scrubber in the industry, and precluding BASF from further marketing that scrubber works substantial harm not only on the company, but also on those who would use that scrubber to meet CARB and EPA standards and reduce consumer costs. Moreover, damages to BASF for the wrongful grant of an injunction may be difficult to measure, due to lack of established sales. Denial would leave Ingevity in the same position it is in now—competing with BASF and others in selling products that reduce automobile emissions. (Stamm Decl. ¶¶ 28–30, 49–55.)

### D. An Injunction Would Harm the Public Interest

The public interest is served by permitting consumers to purchase high-quality products at reasonable prices and by promoting fair competition in the marketplace. *See Yamashita v. Wilbur-Ellis Co.*, No. C 06-01690 WH, 2006 WL 1320470, *8 (N.D. Cal. May 15, 2006). Throughout its Motion, Ingevity stresses the importance of the patented technology to meeting CARB and EPA standards and to protect our environment and thus the public. ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ the EvapTrap™ XC has outperformed Ingevity's products. (Ex. 1 at 254:5–10.) Better performance requires fewer honeycombs to meet CARB and EPA guidelines, lowering consumer costs and environmental impacts from DBL emissions. The public interest is served by availability of BASF's superior EvapTrap™ XC. (Stamm Decl. ¶ 63.)

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Rodger D. Smith II

_____

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com
araucci@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

James P. Brogan
Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South California Avenue, Suite 100
Palo Alto, CA 94304
(650) 422-6700

Brian Eutermoser
Kevin Lake
Angela Tarasi
KING & SPALDING LLP
1515 Wynkoop Street Suite 800
Denver, CO 80202

October 12, 2018