IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGEVITY CORPORATION and<br>INGEVITY SOUTH CAROLINA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1391 (RGA) |
| | ) | |
| BASF CORPORATION, | ) | **Redacted -**<br>**Public Version** |
| | ) | |
| Defendant. | ) | |

**DEFENDANT BASF CORPORATION'S**
**FIRST AMENDED ANSWER AND COUNTERCLAIMS**

Defendant BASF Corporation ("BASF" or "Defendant"), by and through its attorneys, respectfully submits this First Amended Answer and Counterclaims to Plaintiffs' Complaint for Patent Infringement (the "Complaint") filed September 6, 2018 (D.I. 1), by Plaintiffs Ingevity Corporation ("Ingevity Corp.") and Ingevity South Carolina, LLC ("Ingevity LLC") (collectively, "Plaintiffs").

The headings below track those used in the Complaint and are for convenience only. They do not constitute any part of BASF's Answer to the Complaint or any admission by BASF as to the truth of the matters asserted. BASF further states that anything in the Complaint that is not expressly admitted is hereby denied.

## ANSWER TO FIRST AMENDED COMPLAINT

### Nature of the Action

1.      BASF admits that the Complaint purports to state an action for patent infringement arising under the patent laws of the United States. BASF is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 1 and therefore denies all such allegations.

**The Parties**

2.      BASF is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 2 and, on that basis, denies all such allegations.

3.      BASF is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3 and, on that basis, denies all such allegations.

4.      BASF admits that the document attached as Exhibit A to the Complaint purports to be a copy of U.S. Patent No. RE38,844. BASF is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 4 and, on that basis, denies all such allegations.

5.      BASF admits the allegations in Paragraph 5.

## JURISDICTION AND VENUE

6.      BASF admits that the Complaint is styled as an action for patent infringement arising under Title 35 of the United States Code and 28 U.S.C. §§ 1331 and 1338(a). BASF denies the remaining allegations of Paragraph 6.

7.      BASF does not contest that this Court has personal jurisdiction over BASF for purposes of this action. BASF denies the remaining allegations of Paragraph 7.

8.      BASF admits that BASF is a Delaware corporation. BASF does not contest venue in the current litigation. BASF denies the remaining allegations of Paragraph 8.

## BACKGROUND

9.      BASF is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 9 and, on that basis, denies the allegations.

10.      Admitted.

11.       BASF is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 11 and, on that basis, denies the allegations.

12.     BASF admits that it is currently manufacturing, testing, and marketing a hydrocarbon scrubber that adsorbs gasoline vapor emissions under the trade name "EvapTrap$^{TM}$ XC." BASF admits that the diagram in Paragraph 12 of the Complaint depicts a fuel vapor canister and EvapTrap$^{TM}$ XC that was publicly available on BASF's website. To the extent that there are remaining allegations in Paragraph 12, BASF denies them.

13.     BASF admits that it is currently manufacturing, testing, and marketing a single product under the trade name "EvapTrap$^{TM}$ XC." BASF also admits that the EvapTrap$^{TM}$ XC can be used a fuel vapor canister to adsorb gasoline vapor emissions, and that third parties have tested EvapTrap$^{TM}$ XC with a fuel vapor canister. BASF is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 13 relating to a "New EvapTrap XC" and, on that basis, denies the allegations. To the extent that there are remaining allegations in Paragraph 13, BASF denies them.

**PATENT-IN-SUIT**

14.     BASF admits the '844 Patent is entitled "Method for Reducing Emissions From Evaporative Emissions Control Systems," and that the '844 Patent is a reissue of U.S. Patent No. 6,540,815. BASF admits that the language quoted in Paragraph 14 appears in the '844 Patent. BASF denies the remaining allegations in Paragraph 14.

**COUNT FOR INFRINGEMENT OF U.S. PATENT NO. RE38,844**

15.     BASF reasserts the admissions and denials to the preceding paragraphs in this Answer and incorporates its responses by reference as if fully set forth herein.

16.     Denied.

17.     Denied.

18.     Denied.

3

**Direct Infringement (35 U.S.C. § 271(a))**

19.     Denied.

**Indirect Infringement**

20.     BASF admits Ingevity Corp. filed a complaint on July 19, 2018. BASF admits that U.S. Patent Nos. 7,531,029; 7,578,285; 7,753,034; and 8,372,477 cite U.S. Patent No. 6,540,815. BASF admits it had knowledge of the '844 patent prior to filing of the Complaint in this case, filed September 6, 2018. BASF denies the remaining allegations in Paragraph 20.

21.     Denied.

22.     Denied.

**Infringement Under 35 U.S.C. § 271(f)**

23.     Denied.

24.     Denied.

**Willfulness**

25.     BASF admits U.S. Patent Nos. 7,531,029; 7,578,285; 7,753,034; and 8,372,477 cite U.S. Patent No. 6,540,815. BASF denies the remaining allegations in Paragraph 25.

**RESPONSE TO PLAINTIFF'S PRAYER FOR RELIEF**

BASF denies Plaintiffs' prayer for relief in its entirety. Plaintiffs are not entitled to relief and should take nothing. Judgment should be entered against Plaintiffs in favor of BASF, and Plaintiffs should pay BASF's costs and attorneys' fees.

**GENERAL DENIAL**

BASF further denies each allegation in Plaintiffs' Complaint that is not specifically admitted, denied, or otherwise responded to in this Answer.

## AFFIRMATIVE DEFENSES

BASF asserts the following affirmative defenses to the Complaint. In doing so, BASF does not assume or shift any burden of proof on any issue that is Plaintiffs' burden as a matter of law. BASF reserves the right to amend or supplement these defenses as additional facts become known.

## FIRST AFFIRMATIVE DEFENSE
(Failure to State a Claim)

1.      The Complaint and each count fails to state a claim or cause of action upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE
(Non-Infringement)

2.      BASF does not infringe and has not infringed, literally or by the doctrine of equivalents, any valid and enforceable claim of the '844 patent, either directly, contributorily, by inducement, jointly, willfully, or in any other manner.

## THIRD AFFIRMATIVE DEFENSE
(Invalidity)

3.      The claims of the '844 patent are invalid pursuant to one or more of the provisions of Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 102, 103, and 112. For example, the claims of the patents-in-suit are anticipated and/or rendered obvious by one or more prior art references and are thus invalid under 35 U.S.C. §§ 102 and/or 103. Additionally, one or more claims of the patents-in-suit are invalid for failing to satisfy the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112.

## FOURTH AFFIRMATIVE DEFENSE
(Limitation of Damages)

4.      Plaintiffs' claims for damages are limited pursuant to 35 U.S.C. § 286, which prohibits recovery for activities committed more than six years before the filing of the

Complaint. To the extent Plaintiffs or its licensees have failed to comply with the marking requirement of 35 U.S.C. § 287(a), or otherwise give proper notice that BASF's actions allegedly infringed any claim of the patents-in-suit, Plaintiffs' claims for damages are limited. Additionally, to the extent that Plaintiffs accuse products or services that are or were provided by or for the government of the United States of America, there is no jurisdiction over such claims, pursuant to 28 U.S.C. § 1498(a), outside of the U.S. Court of Federal Claims.

### FIFTH AFFIRMATIVE DEFENSE
(No Injunctive Relief)

5.      Plaintiffs are not entitled to injunctive relief as they have suffered and will suffer no irreparable injury, and have an adequate remedy at law for the alleged infringement.

### SIXTH AFFIRMATIVE DEFENSE
(Waiver, Implied Waiver, and Equitable Estoppel)

6.      Plaintiffs' claims are barred by the doctrines of waiver, implied waiver, and/or equitable estoppel.

### SEVENTH AFFIRMATIVE DEFENSE
(Unclean Hands)

7.      The assertion of the '844 patent is barred by the doctrine of unclean hands. For example, Plaintiffs sought to obtain and enforce patents they knew were invalid and unpatentable to preserve and expand Ingevity's market position. In addition, BASF refers to, and incorporates, Ingevity's alleged violations of the federal antitrust laws as set forth in BASF's Counterclaims.

### EIGHTH AFFIRMATIVE DEFENSE
(Patent Misuse)

8.      The assertion of the '844 patent is barred by the doctrine of patent misuse. In addition, BASF refers to, and incorporates, Ingevity's alleged violations of the federal antitrust laws as set forth in BASF's Counterclaims.

**PRAYER FOR RELIEF**

WHEREFORE, BASF seeks the following relief:

A.     Judgment for BASF and against Plaintiffs, dismissing the Complaint in its entirety, with prejudice, with Plaintiffs taking nothing by way of their claims;

B.     Declaration that each and every claim of the '844 patent is not infringed and invalid and/or unenforceable;

C.     Finding that no damages or royalties, injunction, attorneys' fees, costs, pre- or post-judgment interest, or any other compensation, damages, or relief are due or owed by BASF to Plaintiffs for any of the acts alleged in the Complaint;

D.     A finding that this case stands out from others and is exceptional under 35 U.S.C. § 285 and that BASF be awarded its attorneys' fees incurred in connection with this action under 35 U.S.C. § 285 and/or other applicable laws;

E.     An award to BASF of its cost of suit; and

F.     An award to BASF of any other and further relief as the Court deems just and proper.

**COUNTERCLAIMS**

BASF Corporation ("Counterclaim Plaintiff" or "BASF"), by and through its undersigned counsel, hereby files its Counterclaims to obtain relief for violations of the federal antitrust laws and state law against Ingevity Corporation and Ingevity South Carolina, LLC (collectively, "Counterclaim Defendants" or "Ingevity").  In support of its Counterclaims, BASF states as follows.

**NATURE OF THE ACTION**

1.    Ingevity describes itself as "***the leading supplier***" of automotive components called carbon adsorbents used to capture evaporative emissions.[1]  BASF has developed a carbon adsorbent product referred to as a "honeycomb scrubber" featuring distinct advantages over Ingevity's existing product.  With these advantages, BASF offers customers a more effective solution at a much lower price.  Ingevity's solution is significantly more expensive and, in some platforms, requires multiple honeycomb scrubbers versus a single honeycomb scrubber if customers were to use BASF's product.

2.    Facing BASF's entry and seeking to cut off the nascent competition, Ingevity has aggressively pursued a multi-step and multi-faceted strategy to strongarm customers to purchase honeycomb scrubbers exclusively from Ingevity and to the exclusion of BASF.

3.    Ingevity's strategy includes a combination of:

    (a) Exclusive long-term supply agreements obligating customers to purchase honeycomb scrubbers from Ingevity alone.

    (b) Coercive agreements, under which Ingevity has conditioned ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

4.    Ingevity's efforts have succeeded.  BASF's sales of its competing honeycomb scrubber have been stymied because of Ingevity's exclusionary conduct.  Although potential

---

[1] Ingevity Verified Compl., ITC Investigation No. 337-TA-3351, ❡ 12 (Nov. 8, 2018) ("ITC Complaint").

customers have successfully tested EvapTrap™ XC, they have declined to proceed with initial orders due to fears of Ingevity's coercion.

## THE PARTIES

5.      BASF Corporation is a Delaware corporation and maintains its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.  BASF is a producer and marketer of chemicals and related products in North America.  BASF produces and markets products for use in the automotive industry, including carbon adsorbents like EvapTrap$^{TM}$ XC, a honeycomb scrubber utilizing activated carbon to control automotive evaporative emissions.

6.      Upon information and belief, Ingevity Corporation is a Delaware corporation and maintains its principal place of business at 5255 Virginia Avenue, North Charleston, South Carolina 29406.  Ingevity Corporation is the leading manufacturer of carbon materials used in the capture and reuse of automotive evaporative emissions.  Ingevity's activated carbon products include "Standard HCA" and "HCA-LBE," which are honeycomb scrubbers designed to control automotive evaporative emissions.

7.      Upon information and belief, Ingevity South Carolina, LLC is a Delaware corporation with its principal place of business at 5255 Virginia Avenue, North Charleston, South Carolina 29406.  Ingevity South Carolina, LLC is a wholly-owned subsidiary of Ingevity Corporation and the assignee of the intellectual property at issue in this case.[2]

## JURISDICTION, VENUE, AND STANDING

8.      BASF brings this action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 16 of the Clayton

---

[2]   Ingevity Corporation 2017 Annual Report, Exhibit 21.1, *available at* https://ir.ingevity.com/sites/ingevity.investorhq.businesswire.com/files/doc_library/file/2017_N GVT_Annual_Report_and_Form_10-K.pdf.

Act, 15 U.S.C. § 26, to enjoin Ingevity's anticompetitive conduct and other violations of the law, and to recover treble damages associated with the injuries to BASF caused by Ingevity's antitrust violations, together with the costs of this suit and reasonable attorneys' fees.

9.      This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. §§ 1331, 1337; and 15 U.S.C. §§ 15, 26.  This Court has subject matter jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a) because it forms part of the same case or controversy.

10.     Ingevity Corporation is subject to personal jurisdiction in Delaware and in this judicial district because Ingevity Corporation is a Delaware corporation.  In addition, Ingevity Corporation regularly transacts business in this judicial district, has caused injury by an act or omission in this judicial district, and has submitted to personal jurisdiction by bringing its Complaint for Patent Infringement ("the Complaint") in this district.

11.     Ingevity South Carolina, LLC is subject to personal jurisdiction in Delaware and in this judicial district because Ingevity South Carolina, LLC is a Delaware entity.  In addition, Ingevity South Carolina, LLC regularly transacts business in this judicial district, has caused injury by an act or omission in this judicial district, and has submitted to personal jurisdiction in bringing the Complaint in this district.

12.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c), and 15 U.S.C. §§ 22 and 26 because Ingevity Corporation and Ingevity South Carolina, LLC are Delaware entities and have transacted business in this judicial district.  Ingevity has excluded and will continue to exclude BASF, also a resident of this judicial district, from competing in the market for LEV III/Tier 3 carbon adsorbents.

## FACTUAL BACKGROUND

### A.  LEV III/Tier 3 Environmental Regulations

13.     In 2012, the State of California adopted new emissions standards for light-duty vehicles.  These standards were developed by the California Air Resources Board ("CARB") and are referred to as the Low Emission Vehicle III program ("LEV III").   In 2014, the U.S. Environmental Protection Agency ("EPA") finalized a similar set of regulations known as the Tier 3 Motor Vehicle Emission and Fuel Standards program ("Tier 3").  Both LEV III and Tier 3 (collectively, "LEV III/Tier 3") have the common objective of reducing air pollution from motor vehicles and have been harmonized with each other to better facilitate implementation by the industry.  Canada has also implemented a set of environmental regulations harmonized with the LEV III/Tier 3 regulations.[3]

14.     LEV III/Tier 3 regulations address different types of vehicle emissions and include one set of standards specifically addressing diurnal breathing loss emissions ("DBLs"). DBLs are evaporated gasoline emissions generated by the daily fluctuations in temperature while a vehicle is parked and not in operation.  As the fuel tank and other residual gasoline warms during the day, the gasoline vapors contained within the tank expand and escape into the atmosphere.  The LEV III/Tier 3 regulations require "near-zero" DBLs and established new testing methodology measuring DBLs emitted from just the fuel tank and fuel vapor canister. The regulations also specifically require some form of bleed emissions control device on new vehicles to capture the DBLs.  The test procedure measures DBLs without measuring "hot soak,"

---

[3]  The Canadian regulations, entitled Canada's On-Road Vehicle and Engine Emissions Regulations, are referred to for purposes of these Counterclaims collectively with the United States regulations, as "LEV III/Tier 3."  Canada has likewise aligned its testing protocols for automobile hydrocarbon emissions with those outlined by the EPA and CARB.  See On-Road Vehicle and Engine Emission Regulations, SOR/2003-2, c 12(a)-(a)(ii) (Can.).

and requires that the emissions not exceed 0.020 g for light duty vehicles and trucks, or 0.030 g for heavy-duty vehicles.[4]

15.     The phase-in schedule for the LEV III/Tier 3 evaporative emissions regulations in the United States requires 40% compliance by model year 2017, 60% compliance by model year 2018, 80% compliance by model year 2020, and 100% compliance by model year 2022.[5] Canada follows a similar phase-in schedule, with 100% compliance required by model year 2022.

16.     Ingevity was instrumental in behind-the-scenes lobbying for the adoption of the LEV III/Tier 3 regulations, and even developed some of the testing protocols required under those standards. ████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████ Ingevity touts its lobbying influence over regulatory bodies in statements to its investors, describing itself as "a valued resource with government and regulatory agencies around the world . . . . We work directly with such bodies, in support of our customers, to help them develop sensible standards based on the availability of technological solutions that make such standards commercially achievable."[6]

17.     Not surprisingly, Ingevity's lobbying activities for stricter regulatory standards are self-serving because these standards generate greater sales of its products and solutions: "Despite softening light vehicle production in the U.S., our business grew largely on sales of our

---

[4] 40 C.F.R. §§ 86.1813-17(a)(2)(iii).
[5] Ingevity Corporation 2017 Annual Report at 8–9.
[6] Ingevity Corporation 2017 Annual Report at 7.

'honeycomb' scrubbers used by the automotive industry to comply with U.S. Environmental Protection Agency (EPA) Tier 3 and California LEV III standards."[7]

**B.  Carbon Adsorbents for Fuel Vapor Canisters**

18.     Adsorption is the chemical process by which a molecule from a gas or liquid is attracted and attached to a material surface.  Activated carbon products ("carbon adsorbents") are used within fuel vapor canisters to adsorb the smog-forming hydrocarbons that would otherwise be emitted into the atmosphere.  Fuel vapor canisters are by far the most common and cost-effective solutions implemented by original equipment manufacturers ("OEMs") such as Ford, Honda, Subaru, Hyundai, and others to meet the near-zero DBL emissions standards of LEV III/Tier 3.

19.     Activated carbon has been traditionally produced by processing a natural carbon source, such as wood chips, through chemical and/or thermal reactions to create nanoscale pores within the carbon.  The fine pores facilitate the adsorption process.  Ingevity uses this traditional production process, while BASF uses a new synthetic source of activated carbon.

20.     Modern fuel vapor canisters complying with LEV III/Tier 3 environmental regulations generally feature different types of carbon adsorbents, arranged in multiple "stages." Pelletized carbon typically serves as the first stage adsorbent.  Pelletized carbon is manufactured by shaping activated carbon into pellets designed to sit in the "carbon bed" of the fuel vapor canister and continuously adsorb automotive evaporative emissions.  Granular carbon could also be potentially used as the first stage adsorbent, but it is not commonly used because its shape greatly restricts the flow of air and gasoline vapors, thus limiting vehicle performance. Honeycomb scrubbers are a second stage adsorbent installed at the canister outlet to trap bleed emissions.

---

[7] Ingevity Corporation 2017 Annual Report, "A Message from the CEO."

21.     The '844 Patent purports to claim methods and systems for reducing DBL emissions—specifically by employing multiple stages of adsorbents, each with particular ranges of adsorptive capacities within the fuel vapor canister. ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████[8]

22.     Ingevity produces the carbon adsorbents used in fuel vapor canisters (including pelletized carbon, granular carbon, and honeycomb scrubbers), but not fuel vapor canisters. The vast majority of fuel vapor canister systems are manufactured by Tier 1 manufacturers, with a minimal amount produced by OEMs. Thus, Ingevity mainly sells carbon adsorbents to Tier 1 manufacturers, who then produce the fuel vapor canisters and sell them to OEMs. For example, some of the largest Tier 1 manufacturers of fuel vapor canisters include Delphi Automotive Systems, LLC ("Delphi") and MAHLE Filter Systems North America, Inc. ("MAHLE").

## C. BASF Has Created a Superior Honeycomb Scrubber

23.     BASF has developed a honeycomb scrubber, marketed as EvapTrap™ XC. With superior synthetic carbon materials, BASF's honeycomb scrubber is more effective than Ingevity's product at reducing evaporative emissions, allowing vehicles to meet strict United States and Canadian emission standards at a lower cost for customers. Unfortunately, Ingevity's exclusionary conduct has limited BASF's ability to sell the EvapTrap™ XC to customers.

24.     In 2015, BASF began developing the EvapTrap™ XC, which has two main advantages over Ingevity's honeycomb scrubber. First, BASF gained access to a superior source of carbon via its acquisition of EnerG2, Inc. ("EnerG2") in June 2016. EnerG2, a manufacturer of specialty carbon materials, developed technology for synthesizing high purity activated

---

[8] ████████████████████████████████████████████████████████████████
████████████████████████████████████████.

carbon.  Compared with Ingevity's natural carbon (usually made from raw materials like wood chips and olive pits), BASF's synthetic carbon is purer and offers highly consistent pore size distribution, total pore volume, and other properties.

25.     Second, BASF utilizes a different production method for its honeycomb scrubber than Ingevity.   Ingevity uses extrusion, the typical—and more expensive—method of manufacturing honeycomb scrubbers.   With several decades of experience with coating technology, BASF employs a coating process instead of extruding its honeycomb scrubber like Ingevity.  BASF's method of coating its honeycomb scrubber provides customers with greater design flexibility.

26.     With its synthetic carbon and coating technology, BASF has developed a superior honeycomb scrubber that is significantly less expensive than Ingevity's product.  Further, for certain platforms,[9] customers can use a *single BASF scrubber* per canister whereas they require *two or more Ingevity scrubbers* per canister.

27.     In 2016 and 2017, BASF provided samples of its honeycomb scrubber to ███████ ██ prospective international and domestic customers and testing facilities.  These prospective customers tested the EvapTrap™ XC and confirmed that it outperformed Ingevity's product. ████████████████████████████ █████ ████████████████████████████ ████████████████████████████████████████████████████████

---

[9] Vehicle "platforms" are distinct from "models." A "platform" refers to a shared set of design, engineering and manufacturing elements that may be present in many types of automobiles made by any number of manufacturers.  These common elements may include the floorplan, axles, wheelbases, steering mechanisms, and engine components.  In contrast, a vehicle "model" is the name given by a certain manufacturer to market a range of similar vehicles.  Many automobile manufacturers engage in "platform sharing," where different brands use the same components to make their own "model" of that base design.

███████████████   As a result, the prospective customers sought to purchase the EvapTrap$^{TM}$ XC for use in fuel vapor canister systems, and BASF began to negotiate sales terms in 2017.

28.     Due to these successful tests and substantial customer interest, BASF prepared for production of the EvapTrap$^{TM}$ XC with anticipated sales of ████████████████████ ██████████

## INGEVITY'S ANTICOMPETITIVE CONDUCT

29.     Recognizing the competitive threat posed by BASF's honeycomb scrubber— ████████████████████████████████████████████████████████ ██████—Ingevity pursued an anticompetitive campaign designed to impede the entry of BASF's product.

### A. Exclusive Agreements

30.     Ingevity has entered into express and *de facto* exclusive contracts with customers, thus substantially foreclosing BASF's access to sales outlets for its honeycomb scrubber.

#### i.     *Long-Term Express Exclusive Supply Agreements*

31.     Ingevity focused on long-term exclusive supply agreements as one solution for securing and expanding its monopoly, ████████████████████████████████ ████████████████████████████████████████

32.     Ingevity's efforts paid off. ████████████████████████████ ████████████████████████████████████████████████████ ██████████

33.     ████████████████████████████████████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

34.   ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

35.   The coercive intent and impact of the ████████████████████ is well-illustrated by its own terms and structure. ███████████████████████

██████████████████████████████████████████████████████

██████   ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

36. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

These conditions make it impractical for ████ to terminate the agreement.

37. ██████████████████████████████████████

████████████████████████████████████████████

███████████ ████████████████████████████████

████████████████████████████████████████████

██████████████████████

38. ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████



### ii.  *Coercive Agreements*

39.     In addition to its express exclusive agreements, Ingevity has a long history of deliberately preventing downstream customers from purchasing competing carbon adsorbents

---

10 ████████████████████████████

(including pelletized carbon, granular carbon, and honeycomb scrubbers) through *de facto* exclusive agreements.

40. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ One particular implementation of this broader strategy involves a multi-step process:

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

41. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

42. The purpose and effect of this strategy is to lock Tier 1 manufacturers into purchasing their requirements for carbon adsorbents exclusively from Ingevity.

43. As an example of how this strategy has played out, ██████████████ ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[11] References to Ingevity's agreements with its customers also include agreements with Ingevity's predecessor companies. Upon information and belief, all of these agreements have been assigned to, and adopted by, Ingevity.



44.

45.

46.

47.



48.

49.     Through these contractual schemes, Ingevity has already foreclosed at least 50% of the total available sales outlets of carbon adsorbents (including pelletized carbon, granular carbon, and honeycomb scrubbers) for LEV III/Tier 3 compliant fuel vapor canisters.[13]

In the automotive industry, suppliers of carbon adsorbents like Ingevity and BASF sell the vast majority of carbon adsorbents directly to Tier 1 manufacturers of fuel vapor canisters, with

---

[13] This percentage is limited to foreclosure directly attributable to the anticompetitive agreements at issue. In reality, Ingevity has foreclosed even more than 50% of the total available sales outlets in that customers have declined to make initial orders from BASF due to Ingevity's reputation for retaliatory tactics.

[14]

OEMs rarely purchasing carbon adsorbents.  Distributors or other intermediaries are not commonly used in the automotive supply chain for multiple reasons, including the engineering and technical sales support provided by carbon adsorbent suppliers.  Therefore, due to the absence of alternative sales channels and by ensuring that large customers of LEV III/Tier 3 compliant fuel vapor canisters— ██████████████████████████ —exclusively purchase carbon adsorbents from it alone, Ingevity has substantially foreclosed BASF from access to the customer base necessary to effectively grow and compete.

50.    There are no procompetitive justifications for Ingevity's express exclusive long-term supply agreements or its coercive agreements.  Rather, the intent and effect is to drive competitors like BASF out of the market and to further entrench Ingevity as the dominant supplier.  Ingevity's leadership has ████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ Even if Ingevity were to assert procompetitive justifications for its conduct, those justifications would be outweighed by the harm to customers and to the competitive process.

**B.  <u>Tying Arrangements</u>**

51.    In jointly-issued guidance, the Antitrust Division of the Department of Justice and the Federal Trade Commission have recognized the potential competitive harms posed by a firm "[c]onditioning the ability of a licensee to license one or more items of intellectual property on the licensee's purchase of another . . . good."[15]

52.    ████████████████████████████████████████  ████████████████████████████████████████

---

[15] U.S. Department of Justice and Federal Trade Commission, Antitrust Guidelines for the Licensing of Intellectual Property § 5.3 (2017).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

53.     Specifically, as discussed in detail above in Paragraphs 39 to 50, ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

54.     There is distinct demand for honeycomb scrubbers, separate and apart from demand for ████████████████████████  As asserted by Ingevity in its Complaint, "[a]ctivated carbon has numerous uses."  Further, honeycomb scrubbers are only a single component of the fuel vapor canister system and they are sold by different entities at different levels of the supply chain.  Ingevity and BASF illustrate these circumstances—both produce honeycomb scrubbers, but not canister systems.

55.     Ingevity holds market power ███████████████████████████████████████ ████████████  As stated in Ingevity's complaint filed before the ITC, "The '844 Patent is *the* leading solution to meet the latest diurnal emissions requirements."[17]  Ingevity contends, and tells customers, that the '844 Patent is necessary to comply with the near-zero evaporative emissions standards instituted by LEV III/Tier 3.  Specifically, Ingevity states in its Complaint that fuel vapor canisters must practice the '844 Patent "to function correctly and comply with U.S. emissions standards."  Thus, in the face of a small, but significant, non-transitory increase

---

[16] ████████████████████████████████████████████████████████

[17] ITC Compl. ¶ 45 (emphasis in original).

in the ████████, Tier 1 manufacturers and OEMs could not reasonably substitute other technologies to comply with LEV III/Tier 3 regulations.

56.    Ingevity successfully executed upon its plan to leverage its intellectual property to coerce customers into purchasing unpatented honeycomb scrubbers from Ingevity.  Tellingly, although BASF's honeycomb scrubber is more effective at reducing evaporative emissions and has been successfully qualified by customers, none of the ████████████ have purchased honeycomb scrubbers from BASF.  Not only are customers paying more for honeycomb scrubbers, they have been denied access to the superior quality of BASF's product.

## RELEVANT PRODUCT AND GEOGRAPHIC MARKETS

57.    As described below, Ingevity holds a monopoly in the market for carbon adsorbents for use in LEV III/Tier 3 compliant automotive fuel vapor canisters ("LEV III/Tier 3 carbon adsorbents").

### A.  The Product Market

58.    As recognized by the EPA, carbon adsorbents are the industry-standard adsorbent material for use in automotive fuel vapor canisters.  As part of the Federal Register notice establishing the Tier 3 standards, the EPA identified the standard technologies expected to be used in systems complying with the new regulations.  It wrote: "Control of hot soak plus diurnal emissions is primarily achieved by routing fuel vapors to a canister filled with activated carbon."[18]

59.    The United States and Canada have some of the strictest environmental standards for automotive emissions in the world.  The latest LEV III/Tier 3 regulations require near-zero

---

[18] Control of Air Pollution From Motor Vehicles: Tier 3 Motor Vehicle and Emission and Fuel Standards, 79 Fed. Reg. 23505 (Apr. 28, 2014).

evaporative emissions, meaning that vehicles must include systems to capture nearly all hydrocarbons that might escape from the fuel system.

60.     The LEV III/Tier 3 evaporative emissions regulations are currently being phased-in with 80% of all model year 2020 vehicles and 100% of all model year 2022 vehicles required to comply.  OEMs make purchasing commitments for components like fuel vapor canisters for a particular platform well ahead of vehicle launch.  Accordingly, Tier 1 manufacturers and OEMs currently demand carbon adsorbents meeting LEV III/Tier 3 requirements.

61.     Pelletized carbon, granular carbon, and honeycomb scrubbers are the carbon adsorbent products available for use in fuel vapor canisters satisfying LEV III/Tier standards. The physical attributes of those products permit fuel vapor canisters containing them to capture nearly all evaporative emissions.  Notably, in its Federal Register notice establishing the Tier 3 regulations, the EPA specifically identified honeycomb scrubbers as a product expected to be used in new regulation-compliant vehicles.

62.     No alternative materials (other than pelletized carbon, granular carbon, and honeycomb scrubbers) are reasonably interchangeable for use within LEV III/Tier 3 compliant fuel vapor canisters.  In response to a small but significant, non-transitory increase in price of pelletized carbon, granular carbon, and/or honeycomb scrubbers, there would be minimal, if any, substitution to other products (whether carbon-based or otherwise) for fuel vapor canisters complying with LEV III/Tier 3 standards.

63.     Even if a company were to develop an alternative material to achieve compliance with LEV III/Tier 3 standards, the feasibility of implementation and cost of such a material would be unknown and unlikely to be reasonably substitutable.  This is especially true in light of the stringent qualification standards and specifications implemented by Tier 1 manufacturers and

25

OEMs.  Customers are generally reluctant to take on the risk of unproven materials and require new products and suppliers to undergo extensive testing to qualify.

64.   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

**B.   Barriers to Entry**

65.   New entrants, as well as existing firms in any potential adjacent markets, face stringent regulatory standards as well as high sunk and fixed costs to sell alternative products to LEV III/Tier 3 carbon adsorbents.  Ingevity's exclusionary conduct discussed above in Paragraphs 31 to 56 serve to further dissuade new entry.

66.   In addition to the near-zero evaporative emissions standards discussed above, regulatory standards in the United States and Canada require fuel vapor canisters to remain effective for the entire life of the vehicles on which they are installed (referred to as "life-of-vehicle performance").  For example, the current life-of-vehicle performance standards in the United States for most vehicles is 10 years or 120,000 miles, but it will soon increase to 15 years or 150,000 miles.

67.   These life-of-vehicle performance specifications pose challenges for firms attempting to develop an alternative technology to LEV III/Tier 3 carbon adsorbents.  As explained in Ingevity's 2017 Annual Report: "Given the imperative for automotive manufacturers to produce vehicles capable of meeting these long-term requirements, or

potentially face expensive recalls and unfavorable publicity, there is an increased risk to use the products of other producers who do not have a comparable, proven history and technical capability, particularly given the significant costs associated with noncompliance should a competitor's product fail to maintain its effectiveness over vehicle lifetimes."[19]

C. **The Geographic Market**

68.     The relevant geographic market is the United States and Canada.  Environmental regulations drive the design and sourcing of evaporative emissions systems by OEMs seeking to sell in specific markets, and in turn impact the demand for carbon adsorbents.  OEMs typically design and source the fuel vapor canisters tailored to meet each market's standards.  █████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████

69.     The demand for carbon adsorbents therefore naturally corresponds to the varying country or region-specific environmental regulations.  Specifically, LEV III/Tier 3 regulations have significantly increased demand in the United States and Canada for pelletized carbon, granular carbon, and honeycomb scrubbers.

70.     Within the United States and Canada, sales of LEV III/Tier 3 carbon adsorbents are generally not limited to any single geographic area.  Ingevity has the ability to, and does, sell LEV III/Tier 3 carbon adsorbents to customers who make fuel vapor canisters for vehicles sold across the two countries.

---

[19] Ingevity Corporation 2017 Annual Report at 5.

[20] ████████████████████████████████

## INGEVITY'S MONOPOLY POWER

### A. Market Share

71.     Ingevity is the dominant manufacturer and seller of LEV III/Tier 3 carbon adsorbents in the United States and Canada.   BASF is the other potentially significant manufacturer but, as described above, Ingevity has taken steps to ensure that BASF does not develop into an effective competitor.

72.     From at least 2015 to present, Ingevity has held nearly 100% of the market for LEV III/Tier 3 carbon adsorbents. █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

73.     Tier 1 canister manufacturer MAHLE produces some limited amounts of carbon adsorbents for its own internal captive use, but it does not typically sell carbon adsorbents to external customers.  Other producers may have capacity to produce competing products, but their sales volumes and market shares are minimal in comparison to Ingevity's, and their ability to meet LEV III/Tier 3 regulations and life-of-vehicle standards is uncertain.

74.     Ingevity has boasted of its dominance in numerous public statements.   For example, Ingevity states in its 2017 Annual Report: "We are a global leader in automotive

---

21 ████████████████████████

22 ████████████████████████████████

applications."[23]   In its own complaint filed before the U.S. International Trade Commission ("ITC") seeking to exclude imports of competing carbon products, Ingevity touted "its high market shares."[24]   The same pleading claimed that Ingevity enjoys a "position as ***the leading supplier*** of activated carbon for evaporative emission control canister systems in the United States."[25]

### B.  Barriers to Entry

75.    There are significant barriers to entry for suppliers of LEV III/Tier 3 carbon adsorbents in the United States and Canada.

76.    As stated in Ingevity's own securities filings, the production of carbon adsorbents is "a highly technical and specialized process."[26]   For example, the production of honeycomb scrubbers requires a multi-step process, where activated carbon is either processed or synthesized, and then either extruded by machinery into the requisite shape (like Ingevity) or evenly coated onto a ceramic honeycomb base (like BASF).

77.    The existing regulatory standards constitute another barrier to entry.  Specifically, all new vehicles sold in the United States and Canada will be required to comply with near-zero evaporative emissions standards by model year 2022.

78.    A firm seeking to sell LEV III/Tier 3 carbon adsorbents would face multiple hurdles to acquire the necessary production capacity.  First, a hypothetical new entrant would need to secure sources of raw materials—whether natural (like Ingevity) or through synthetic technology (like BASF).  Second, the new entrant would need to invest in costly production facilities and machinery to produce activated carbon.  Third, the firm would need to obtain the

---

[23] Ingevity Corporation 2017 Annual Report at 8.
[24] ITC Compl. ¶ 4.
[25] ITC Compl. ¶ 45 (emphasis added).
[26] Ingevity Corporation 2017 Annual Report at 8.

requisite technical expertise to produce carbon adsorbents to the precise specifications required by Tier 1 manufacturers and OEMs. This, in turn, entails recruitment from a finite pool of experienced personnel and managers as well as acquisition of the necessary institutional knowledge. Fourth, the production of honeycomb scrubbers would require investments in additional facilities and machinery, such as kilns and cutting equipment—extruded honeycombs require extrusion presses and dies, while coated honeycombs require equipment or commercial arrangements to produce or acquire the ceramic base, as well as to coat it with activated carbon. Similarly, to produce pelletized carbon a firm would need to invest in separate machinery to shape the activated carbon.

79.     Ingevity's own investments in its honeycomb scrubber are instructive—it ███████████████████████████████████████████████████████ ███████ Ingevity also acknowledges that the production of carbon adsorbents requires unique and specialized technical capabilities.

80.     Even if a new entrant were able to produce LEV III/Tier 3 carbon adsorbents, there would be additional challenges to successfully selling the products. Part of the high barriers to entry are attributable to testing and qualification costs—specifically, the lengthy process for a supplier to become an approved supplier to a given Tier 1 manufacturer or OEM. It can be challenging for new entrants to be considered for qualification, because testing and verification can be time-consuming and expensive. To overcome these hurdles, BASF has made significant investments to ensure that its honeycomb scrubbers are qualified by customers, meet regulatory requirements, and satisfy quality control standards. Ingevity's contracts and other conduct preventing customers from purchasing competing sources of carbon adsorbents also contribute to the barriers to entry.

C. **Ingevity's Pricing Power**

81.     Unchecked by competition, Ingevity has had the ability to dictate supracompetitive prices for LEV III/Tier 3 carbon adsorbents.  As explained above, Ingevity's honeycomb scrubber is significantly more expensive than BASF's competing honeycomb scrubber.  Further, upon information and belief, Ingevity has imposed large annual price increases ███████████████ for LEV III/Tier 3 carbon adsorbents upon customers without any contemporaneous increase in demand or value.

82.



## **COMPETITIVE HARMS AND ANTITRUST INJURIES**

83.     Ingevity has achieved and maintained monopoly power through a pattern and practice of conduct to exclude competition.  BASF has suffered, and is continuing to suffer, injury to its business and property.

84.     Through its exclusionary conduct, Ingevity has ensured that it is the one dominant supplier of LEV III/Tier 3 carbon adsorbents in the United States and Canada.  This monopoly power allows it to extract supracompetitive prices from its customers.

85.     Ingevity's anticompetitive conduct has also artificially limited consumer choice by preventing customers from selecting preferred alternatives to Ingevity's carbon adsorbents.  BASF's honeycomb scrubber, EvapTrap™ XC, has been tested by customers and has performed better than Ingevity's products in head-to-head testing.  Importantly, the superior performance of

---

27 ███████████████████████████████.
28 ████████████████████████████████

BASF's product means that some fuel vapor canisters would require only a single honeycomb scrubber, compared to the multiple Ingevity honeycomb scrubbers necessary for the same applications.  Although BASF's honeycomb scrubber is a less costly and more effective option, customers subject to Ingevity's exclusive supply agreements and coercive agreements are locked into purchasing Ingevity's products.

86.    There is clear demand for BASF's honeycomb scrubber.  Throughout 2016 and 2017, BASF shipped EvapTrap™ XC samples to ███████ prospective international and domestic customers.   Those customers tested the EvapTrap™ XC, confirming that it outperformed Ingevity's honeycomb scrubber.  Many of these customers have since sought to purchase EvapTrap™ XC for use in their fuel vapor canisters.  BASF began to negotiate sales terms for EvapTrap™ XC in 2017.

87.    Because of these successful tests and customer interest, BASF began to prepare for production, anticipating sales of ███████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ █████████████

88.    Upon information and belief, BASF's prospective customers have refrained from placing initial orders due to Ingevity's actions and BASF has thus suffered injuries directly resulting from Ingevity's anticompetitive conduct.  Ingevity's conduct has foreclosed BASF from selling its competing honeycomb scrubber, resulting in lost sales and profits.  Unless permanently enjoined, the unlawful conduct has caused and will continue to cause injury to competition, consumers, and the public interest.

**COUNT I**
**EXCLUSIVE DEALING:**
**IN VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 2**
**AND SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14**

89.     BASF incorporates by reference the allegations set forth in Paragraphs 1 through 88 as though repeated and realleged here in full.

90.     At least as early as 2015, and continuing to the present, the exact dates being unknown to BASF, Ingevity has engaged in a course of conduct that amounts to exclusive dealing in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as Section 3 of the Clayton Act, 15 U.S.C. § 14.

91.     The anticompetitive acts were intentionally directed at commerce in the United States and had a substantial and foreseeable effect on interstate commerce by artificially raising prices and excluding competitive alternatives for LEV III/Tier 3 carbon adsorbents throughout the United States.

92.     Ingevity has monopoly power in the market for LEV III/Tier 3 carbon adsorbents in the United States and Canada.  As Ingevity itself has repeatedly stated, it holds a near 100% share of that market, and it commands supracompetitive prices and maintains high profits in that market.

93.     Ingevity has entered into express and/or *de facto* exclusive agreements with purchasers of LEV III/Tier 3 carbon adsorbents, thereby precluding BASF from selling its competing products to those customers.  These exclusive agreements have foreclosed access to at least 50% of the potential sales for LEV III/Tier 3 carbon adsorbents in the United States and Canada.  Ingevity either has achieved, or has a dangerous probability of achieving, a monopoly in the LEV III/Tier 3 carbon adsorbents market in the United States and Canada.

33

94.     Ingevity's conduct has no procompetitive benefit or justification.     The anticompetitive effects of its behavior outweigh any purported procompetitive justifications. Purchasers of LEV III/Tier 3 carbon adsorbents have paid supracompetitive prices for LEV III/Tier 3 carbon adsorbents and their access to alternative products has been restricted by Ingevity's conduct.

95.     As a direct and proximate result of the unlawful conduct of Ingevity in furtherance of the violations alleged, BASF has been injured in its business and property in an amount to be proved at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

96.     BASF is also entitled to recover from Ingevity the cost of suit, including its reasonable attorneys' fees, as provided by 15 U.S.C. § 15(a).

97.     BASF will suffer further irreparable injury and loss to its business and property, for which there is no adequate remedy at law, unless the Court enjoins Ingevity from its unlawful conduct and continuing violations of the antitrust laws.   An injunction is thus necessary to remedy the continuing violation.

## COUNT II
## TYING:
## IN VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 2

98.     BASF incorporates by reference the allegations set forth in Paragraphs 1 through 88 as though repeated and realleged here in full.

99.     At least as early as 2015, and continuing to the present, the exact dates being unknown to BASF, Ingevity has engaged in a course of conduct that amounts to a tying arrangement in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 by requiring customers to purchase LEV III/Tier 3 carbon adsorbents in order to receive a ███████████ ████

100.    The anticompetitive acts were intentionally directed at commerce in the United States and had a substantial and foreseeable effect on interstate commerce by artificially raising prices and excluding competitive alternatives for LEV III/Tier 3 carbon adsorbents throughout the United States.

101.    Through the ███████████████ and the other actions described above, Ingevity has achieved and maintained a near 100% share in the LEV III/Tier 3 carbon adsorbents market in the United States and Canada, and as a natural and intended consequence of that monopoly power is able to charge supracompetitive prices and exclude competitors.

102.    Ingevity has willfully obtained and maintained, or attempted to obtain, monopoly power in the LEV III/Tier 3 carbon adsorbents market through overt exclusionary acts, including ████████████████████████████████████████████████████ ███████████████████████████████████████████ Ingevity either has achieved, or has a dangerous probability of achieving, a monopoly in the LEV III/Tier 3 carbon adsorbents market in the United States and Canada.

103.    Ingevity's conduct has no procompetitive benefit or justification.    The anticompetitive effects of its behavior outweigh any purported procompetitive justifications. Purchasers of LEV III/Tier 3 carbon adsorbents have paid supracompetitive prices for LEV III/Tier 3 carbon adsorbents and have been limited from access to alternative products due to Ingevity's conduct.

104.    As a direct and proximate result of the unlawful conduct of Ingevity in furtherance of the violations alleged, BASF has been injured in its business and property in an amount to be proved at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

105.    BASF is also entitled to recover from Ingevity the cost of suit, including its reasonable attorneys' fees, as provided by 15 U.S.C. § 15(a).

106.    BASF will suffer further irreparable injury and loss to its business and property, for which there is no adequate remedy at law, unless the Court enjoins Ingevity from its unlawful conduct and continuing violations of the antitrust laws.   An injunction is thus necessary to remedy the continuing violation.

**COUNT III**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS,**
**IN VIOLATION OF DELAWARE STATE LAW**

107.    BASF incorporates by reference the allegations set forth in Paragraphs 1 through 88 as though repeated and realleged here in full.

108.    BASF enjoyed a reasonable probability of a business opportunity for the sale of honeycomb scrubbers, successfully qualifying under customers' specifications and also having negotiated terms for purchase orders.  As explained in detail above, customers were prepared to place initial orders, up until the time of Ingevity's conduct at issue.  At all relevant times herein, Ingevity had actual knowledge of these business opportunities and knew that these opportunities constituted valuable business for BASF.

109.    Ingevity acted improperly and without justification in its tortious interference with BASF's business opportunities for the sale of honeycomb scrubbers.   Ingevity's actions constitute a tort under the common law of the state of Delaware.

110.    Ingevity's tortious interference with BASF's business opportunities includes locking BASF's customers into exclusive, long-term, purchase ████████████ precluding customers from purchasing honeycomb scrubbers from BASF, improper threats of litigation, and other acts intended to coerce and intimidate customers to do business with Ingevity and not with BASF.

36

111.     Ingevity, purposely and with malice and specific intent to injure BASF, disrupted and interfered with, and continue to disrupt and interfere with, BASF's business opportunities, which carry with them a future economic benefit to BASF.

112.     As a direct and proximate result of Ingevity's wrongful conduct, BASF has lost revenue and profit from sales of honeycomb scrubbers that it would have otherwise earned but for Ingevity's conduct, and has also suffered other injuries to its business and investments.

113.     Ingevity has acted willfully, maliciously, oppressively, with full knowledge of the adverse effects of its actions on BASF, with willful and deliberate disregard of the consequences to BASF, and with specific intent.  Accordingly, BASF seeks exemplary and punitive damages pursuant to Delaware law.

114.     BASF is entitled to recover from Ingevity the cost of suit, including its reasonable attorneys' fees, pursuant to Delaware law because Ingevity has acted in bad faith, has been stubbornly litigious, and/or has caused BASF unnecessary trouble and expense.

115.     BASF will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court permanently enjoins Ingevity from its tortious conduct.  BASF is thus entitled to injunctive relief against Ingevity.

## PRAYER FOR RELIEF

WHEREFORE, BASF respectfully urges the Court to enter the following relief:

A.     Adjudge Ingevity to have violated and to be in continuing violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

B.     Adjudge Ingevity to have violated and to be in continuing violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

C.     Adjudge Ingevity to have tortuously interfered with BASF's business opportunities in continuing violation of the common law of the state of Delaware.

D.     Enter judgment for BASF against Ingevity, for three times the amount of damages sustained by BASF due to Ingevity's violations of the federal antitrust laws, together with the expenses of litigation and cost of this action, including a reasonable attorneys' fee under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and such other relief as appropriate.

E.     Enter judgment for BASF against Ingevity for actual and punitive damages attributable to their intentional interference with BASF's business relationships.

F.     Granting BASF pre- and post-judgment interest under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

G.     Pursuant to Federal Rule of Civil Procedure 65 and Section 16 of the Clayton Act, 15 U.S.C. § 26, enter an injunction against further anticompetitive and unlawful conduct, including without limitation by: (i) enjoining Ingevity from offering or entering exclusive supply agreements to purchasers of carbon adsorbents; (ii) declaring any such existing exclusive supply agreements for carbon adsorbents unlawful and unenforceable; (iii) ███████████████

████████████████████████████████████████████████████████

██████████████████████████████████; and (iv) ███████████████

█████████████████████████████████████

H.     Grant such other equitable relief, including disgorgement of all unlawfully obtained profits that the Court finds just and proper to address and to prevent recurrence of Ingevity's unlawful conduct.

I.     Grant such other and further equitable or legal relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, BASF hereby demands a jury trial as to all issues triable to the jury.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ *Anthony D. Raucci*
Rodger D. Smith, II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 351-9205
rsmith@mnat.com
araucci@mnat.com

*Attorneys for Defendant BASF Corporation*

OF COUNSEL:

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 California Street, Suite 100
Palo Alto, CA 94304
(650) 422-6741

James P. Brogan
Brian Eutermoser
Angela C. Tarasi
Kevin Lake
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street, Suite 800
Denver, CO 80202
(720) 535-2310

Bobby R. Burchfield
Norman Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 737-0500

Original Filing Date:  February  13, 2019
Redacted Filing Date:  February 28, 2019