## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGEVITY CORPORATION and | ) | |
| INGEVITY SOUTH CAROLINA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-1391-RGA-SRF |
| | ) | |
| BASF CORPORATION, | ) | **UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.     INTRODUCTION

Presently before the court in this patent infringement action are the following motions:

(1) the motion to dismiss defendant BASF Corporation's ("BASF") counterclaims, filed by

plaintiffs Ingevity Corporation and Ingevity South Carolina, LLC (together, "Ingevity") (D.I.

71); and (2) BASF's motion for leave to amend its first amended answer, affirmative defenses,

and counterclaims (D.I. 99).[1]  For the following reasons, I recommend that the court deny

Ingevity's motion to dismiss BASF's counterclaims, and deny BASF's motion for leave to

amend its first amended answer, affirmative defenses, and counterclaims.

---

[1] The briefing and associated filings for the pending motions to dismiss and amend are located at
D.I. 72, D.I. 73, D.I. 81, D.I. 83, and D.I. 100, D.I. 101, D.I. 105, D.I. 106, and D.I. 116,
respectively.

## II.    BACKGROUND[2]

Ingevity Corporation manufactures specialty chemicals and high-performance activated carbon materials for use as adsorbents in fuel vapor canisters for automotive vehicles. (D.I. 65 at ¶¶ 6, 22)  Ingevity does not manufacture the fuel vapor canisters themselves.  (*Id.* at ¶ 22) Ingevity South Carolina, LLC is a wholly-owned subsidiary of Ingevity Corporation, and is the assignee of United States Patent No. RE38,844 ("the '844 patent").  (*Id.* at ¶ 7)  The '844 patent lists Roger S. Williams as a named inventor, among others.  ('844 patent)  The '844 patent has a priority date of November 21, 2001, and will expire on March 18, 2022.  (*Id.*; D.I. 65 at ¶ 34)

The '844 patent discloses methods and systems for reducing evaporative emissions from diurnal breathing loss emissions ("DBLs")[3] in vehicles by providing fuel vapor canisters with multiple layers of adsorbents to satisfy the fuel emissions standards established by the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB"). ('844 patent, Abstract; D.I. 65 at ¶¶ 13-14, 21)  The emissions standards are referred to as the Tier 3 Motor Vehicle Emission and Fuel Standards program ("Tier 3") and the Low Emission Vehicle III program ("LEV III"), respectively (collectively, "LEV III/Tier 3 regulations").  (D.I. 65 at ¶ 13)  The LEV III/Tier 3 regulations establish a testing methodology to measure DBLs emitted from the fuel vapor canister, and new vehicles implement a form of bleed emissions

---

[2] The facts in this section are based upon allegations in BASF's first amended answer and counterclaims, which the court accepts as true for the purposes of the pending motion to dismiss. *See Umland v. Planco Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).  In connection with the facts relevant to the court's analysis of BASF's motion to amend its answer, affirmative defenses, and counterclaims, the court identifies facts alleged in BASF's proposed second amended complaint.  (D.I. 99, Ex. A)

[3] According to BASF's first amended answer and counterclaims, "DBLs are evaporated gasoline emissions generated by the daily fluctuations in temperature while a vehicle is parked and not in operation.  As the fuel tank and other residual gasoline warms during the day, the gasoline vapors contained within the tank expand and escape into the atmosphere."  (D.I. 65 at ¶ 14)

control device to capture the DBLs using two stages of carbon adsorbents. (*Id.* at ¶¶ 14, 20)

The '844 patent provides that:

> [o]n the fuel source-side of an emissions control system canister, high working capacity carbons are preferred in a first canister (adsorb) region. In subsequent canister region(s) on the vent-side, the preferred adsorbent should exhibit a flat or flattened adsorption isotherm on a volumetric basis and relatively lower capacity for high concentration vapors as compared with the fuel source-side adsorbent.

('844 patent, Abstract) In a preferred embodiment, the '844 patent discloses an adsorbent

formed in the shape of a carbon-containing honeycomb to achieve volumetric dilution in a fuel

vapor canister. ('844 patent, col. 7:26-55, 10:17-19) These "honeycomb scrubbers" are a

second-stage adsorbent specially designed for use in multi-stage fuel vapor canisters to satisfy

the requisite emissions standards by trapping bleed emissions. (*Id.*, col. 4:31-5:55; D.I. 65 at ¶¶

17, 20) The '844 patent also discloses other carbon adsorbent products, including pelletized and

granular-shaped carbon, which can be used in the fuel vapor canisters. (*Id.*, col. 4:20-25) Each

independent claim of the '844 patent requires a subsequent adsorbent volume having an

incremental adsorption capacity at 25° C of less than 35 g n-butane/L between vapor

concentrations of 5 vol % and 50 vol % n-butane ("low IAC limitations"). (*Id.*, col. 10:36-44,

11:42-58, 12:40-13:11, 13:58-14:19)

On March 31, 2010, Ingevity licensed the '844 patent to Denso Corporation ("Denso"), a

manufacturer of fuel vapor canisters. (D.I. 65 at ¶ 43) In 2013 and 2015, Ingevity executed

similar license agreements with fuel vapor canister manufacturers Korea Fuel-Tech Corporation

("KFTC") and MAHLE Filter Systems North America, Inc. ("MAHLE"), respectively. (*Id.* at ¶¶

46-48) These limited license agreements apply to designated vehicle platforms,[4] and their terms

---

[4] In its first amended answer and counterclaims, BASF defines vehicle "platforms" as distinct from "models":

run concurrent with, or expire before, the term of the '844 patent. (*Id.* at ¶¶ 43-48) Each of the three limited license agreements provides that the licensee will pay a royalty to Ingevity for the manufacture of any future fuel vapor canisters using adsorbents not purchased from Ingevity, but the licensee will not owe a royalty if the fuel vapor canisters use Ingevity's activated carbon products. (*Id.* at ¶¶ 43, 47-48) The licensees are subject to random checks to ensure they are using only Ingevity's carbon adsorbents. (*Id.* at ¶¶ 41, 45, 47-48)

In 2015, BASF developed a honeycomb scrubber which was subsequently marketed as EvapTrap™ XC. (D.I. 65 at ¶ 23) BASF's honeycomb scrubber competes with Ingevity's product as a less expensive alternative. (*Id.* at ¶¶ 23-26) In 2017, BASF began to negotiate sales terms with prospective customers for anticipated sales of 50,000 units of its honeycomb scrubbers in the fourth quarter of 2018, and 400,000 units in 2019. (*Id.* at ¶¶ 27-28)

On January 1, 2017, Ingevity entered into a nine-year exclusive supply agreement with Delphi Automotive Systems, LLC ("Delphi"), a fuel vapor canister manufacturer, which required Delphi to purchase 100% of its honeycomb scrubbers from Ingevity for use in canisters to be manufactured or sold by Delphi in the United States, Canada, and Mexico (the "Delphi Agreement"). (D.I. 65 at ¶¶ 32-34) In the Delphi Agreement, Delphi reserved an option to terminate the license when the '844 patent expires on March 18, 2022. (*Id.* at ¶ 35) However,

---

A "platform" refers to a shared set of design, engineering and manufacturing elements that may be present in many types of automobiles made by any number of manufacturers. These common elements may include the floorplan, axles, wheelbases, steering mechanisms, and engine components. In contrast, a vehicle "model" is the name given by a certain manufacturer to market a range of similar vehicles. Many automobile manufacturers engage in "platform sharing," where different brands use the same components to make their own "model" of that base design.

(D.I. 65 at ¶ 26 n.9)

the termination option requires Delphi to provide a "make whole" payment to Ingevity, which reverses the benefits Delphi receives under the Delphi Agreement and returns the parties to the position they would have been in absent execution of the Delphi Agreement in the first instance. (*Id.*)  Ingevity is pursuing similar exclusive license agreements with Kayser Automotive Group ("Kayser") and MAHLE. (*Id.* at ¶ 38)

On September 6, 2018, Ingevity filed a complaint against BASF, alleging infringement of the '844 patent.[5]  (D.I. 1)  On February 14, 2019, BASF filed an amended answer to the complaint, which included antitrust counterclaims and counterclaims alleging violations of Delaware state law against Ingevity. (D.I. 65 at ¶¶ 89-115)  Specifically, BASF contends that Ingevity violated the Sherman Act and the Clayton Act by tying the availability of licenses to the '844 patent to the purchase of Ingevity's unpatented honeycomb scrubbers, and by entering into the allegedly anticompetitive Delphi Agreement. (*Id.* at ¶¶ 29-30, 51-52)  BASF also asserts a cause of action for tortious interference with prospective business relations. (*Id.* at ¶¶ 107-10) Ingevity moved to dismiss BASF's counterclaims on March 18, 2019. (D.I. 72)

On November 5, 2018, BASF petitioned the Patent Trial and Appeal Board ("PTAB") for *inter partes* review ("IPR") of the '844 patent.[6]  (D.I. 106, Ex. 1)  According to BASF, the '844

---

[5] Ingevity filed a prior complaint against BASF on July 19, 2018, alleging direct and induced infringement of the '844 patent and seeking injunctive relief. (C.A. No. 18-1072-RGA, D.I. 1) Because the instant action was filed on September 6, 2018 naming Ingevity South Carolina, LLC as a plaintiff, Ingevity voluntarily dismissed without prejudice Civil Action No. 18-1072-RGA on October 11, 2018. (D.I. 30)

[6] BASF discusses the IPR proceeding in its proposed second amended complaint (D.I. 99, Ex. A at ¶ 40), and Ingevity attaches the IPR petition to its declaration in support of its motion to dismiss (D.I. 106, Ex. 1). Neither party opposes the court's consideration of the IPR petition on the motion to dismiss. *See Immunex Corp. v. Sanofi*, 2017 WL 5641116, at *3 (C.D. Cal. June 21, 2017) (finding it appropriate to consider an IPR petition on a Rule 12(b)(6) motion in light of the parties' lack of opposition to the court's review, the document's public availability, and the judicial/quasi-judicial nature of the document). The court may consider the IPR petition without

patent is invalid because new evidence produced by Delphi suggests that Delphi inventors Thomas Meiller, Charles Covert, and Susan LaBine conceived and reduced to practice the claimed canister system in October 1999, and Delphi offered its canister system for sale more than one year before the '844 patent's earliest filing date. (D.I. 99, Ex. A at ¶¶ 10-11, 21) According to BASF, the evidence establishes that a named inventor of the '844 patent, Roger Williams, was present when Delphi's inventors conceived of the prior art canister system, but did not disclose his knowledge of Delphi's prior conception. (*Id.* at ¶¶ 12-16) The PTAB declined to institute IPR proceedings on BASF's petition. (D.I. 91, Ex. A at 21)

Ingevity's motion for a preliminary injunction was denied on June 3, 2019.[7] (D.I. 96) On July 23, 2019, BASF moved for leave to file a second amend answer and counterclaims to add affirmative defenses of inequitable conduct and unclean hands, as well as counterclaims for *Walker Process* fraud and sham litigation in violation of the Sherman Act. (D.I. 99, Ex. A) Pursuant to the operative scheduling order, the deadline to amend the pleadings expired on April 30, 2019. (D.I. 41 at ¶ 2) Fact discovery in this matter is scheduled to close on December 6, 2019. (*Id.* at ¶ 3(a)) Trial will commence on or after September 14, 2020. (*Id.* at ¶ 18)

---

converting the motion to dismiss to a motion for summary judgment because it is a matter of public record. *See Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 682 (D. Del. 2013) (quoting *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)).
[7] The court reasoned that the use of multiple adsorbents having different adsorption characteristics is key to the claimed invention. (D.I. 95 at 3) Each claim of the '844 patent requires the use of materials with a certain "incremental adsorption capacity." (*Id.*) Because the intrinsic record provides no direction on which measurement methods should apply to "incremental adsorption capacity," the court found that BASF raised a substantial question of invalidity based on indefiniteness. (*Id.* at 8-9) Therefore, the court concluded that Ingevity failed to show a reasonable likelihood of success on the merits at this stage of the proceedings. (*Id.*)

## III.   MOTION TO DISMISS

### A. Legal Standard

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim

upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6)

motion to dismiss, the court must accept as true all factual allegations in the complaint and view

them in the light most favorable to the plaintiff. *See Umland v. Planco Fin. Servs., Inc.*, 542

F.3d 59, 64 (3d Cir. 2008). "Courts use the same standard in ruling on a motion to dismiss a

counterclaim under Rule 12(b)(6) as they do in assessing a claim in a complaint." *Goddard Sys.,*

*Inc. v. Gondal*, C.A. No. 17-1003-CJB, 2018 WL 1513018, at *4 (D. Del. Mar. 27, 2018).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint

must contain a "short and plain statement of the claim showing that the pleader is entitled to

relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the

complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that

is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft*

*v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations

allow the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail,"

but whether that party is "entitled to offer evidence to support the claims." *In re Burlington Coat*

*Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal citations and quotation marks

omitted). This "does not impose a probability requirement at the pleading stage," but instead

"simply calls for enough facts to raise a reasonable expectation that discovery will reveal

evidence of [the necessary element]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir.

7

2008) (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. 663-64.

### B. Analysis

#### 1. Tying

In support of the motion to dismiss BASF's tying counterclaim, Ingevity asks the court to apply the standard set forth in the Supreme Court's decision in *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176 (1980), which addresses tying in the context of a claim for patent misuse. In the framework of whether the tied product is a staple or a non-staple good, Ingevity contends that its honeycomb scrubbers are specialty, non-staple goods which have no uses outside of fuel vapor canisters, and BASF's counterclaims do not allege that the honeycomb scrubbers have any noninfringing uses. (D.I. 72 at 12; D.I. 83 at 1) Accordingly, Ingevity contends that it has a statutory right to control the honeycomb scrubber market. (D.I. 72 at 12-13; D.I. 83 at 1-2)

In response, BASF maintains that its tying counterclaim is brought pursuant to the Sherman Act, 15 U.S.C. §§ 1 and 2, and the analysis for patent misuse under 35 U.S.C. § 271(d) does not apply. Accordingly, BASF represents that the relevant inquiry is whether there is a separate demand in the market for the tied product. BASF contends that the honeycomb scrubbers have a separate demand from the fuel vapor canisters.[8] (D.I. 81 at 15-16) BASF maintains that the '844 patent does not require the use of honeycomb scrubbers, and honeycomb scrubbers have uses other than for fuel vapor canister systems. (*Id.* at 16-17) BASF further

---

[8] For purposes of BASF's counterclaim, the typing product is a license for the canisters. (D.I. 65 at ¶¶ 99-102) Ingevity does not manufacture the canisters.

contends that honeycomb scrubbers are a distinct product from the patented fuel vapor canisters, as evidenced by the demand for the purchase of the tied product separate from the tying product. (*Id.* at 17)

I recommend that the court deny Ingevity's motion to dismiss BASF's tying counterclaim. BASF brings its tying counterclaim pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. (D.I. 65 at ¶¶ 98-106) "Tying is selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 213 (3d Cir. 2005) (citing *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir.), *cert. denied*, 506 U.S. 868 (1992)). In a tying arrangement, the seller exploits its control over the tying product "to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at 214 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11 (1984)). The elements of a tying claim are: "(1) the defendant seller must sell two distinct products; (2) the seller must possess market power in the tying product market; and (3) a substantial amount of interstate commerce must be affected." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 512-13 (3d Cir. 1998).

BASF's pleading adequately establishes that there is a distinct demand for the non-patented honeycomb scrubbers, separate from the market demand for the fuel vapor canisters of the '844 patent. BASF pleads that "the '844 Patent does not cover pelletized carbon, granular carbon, honeycomb scrubbers, or any other carbon adsorbents themselves." (D.I. 65 at ¶ 21) BASF's pleading further alleges that "[t]here is distinct demand for honeycomb scrubbers, separate and apart from demand for licenses to the '844 patent," explaining that "honeycomb scrubbers are only a single component of the fuel vapor canister system and they are sold by

9

different entities at different levels of the supply chain," as evidenced by the fact that both Ingevity and BASF produce honeycomb scrubbers, but not canister systems. (*Id.* at ¶ 54) These allegations, taken as true, sufficiently plead that the honeycomb scrubber is a separate product from the patented fuel vapor canister having a distinct demand in the marketplace.

BASF's tying counterclaim also sufficiently pleads the elements of market power in the tying product market and the effect on interstate commerce. BASF alleges that "Ingevity holds market power over licenses to LEV III/Tier 3 compliant canister design patents," and "[t]he '844 Patent is *the* leading solution to meet the latest diurnal emissions requirements.'" (D.I. 65 at ¶ 55) (emphasis in original) The pleading alleges that Ingevity's anticompetitive acts "artificially rais[ed] prices and exclud[ed] competitive alternatives for LEV III/Tier 3 carbon adsorbents throughout the United States." (*Id.* at ¶ 91) These allegations are sufficient to raise questions of fact to be explored through discovery. Consequently, I recommend that the court deny Ingevity's motion to dismiss BASF's cause of action for tying under the Sherman Act.

In support of its motion to dismiss BASF's tying claim, Ingevity primarily relies on *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176 (1980), in which the Supreme Court held that patent owner Rohm & Haas had not engaged in patent misuse under 35 U.S.C. § 271(d) by linking its licenses to practice the patented process to the sale of propanil. In *Rohm & Haas*, the Supreme Court concluded that patent owners may control the sale of non-staple goods[9] with

---

[9] A non-staple good is "one which was designed to carry out the patented process and has little or no utility outside of the patented process." *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 576 (E.D. Pa. 1989). A staple good is a good "that was not specifically designed for use with a patented process and has substantial, efficient and feasible uses outside of the patent." *Id.* Even if the court were to conduct the analysis under Ingevity's proposed standard according to § 271(d), the outcome would remain the same because "[w]hether an item is a staple or not is a question of fact." *Jac USA, Inc. v. Precision Coated Prods., Inc.*, 2003 WL 1627043, at *14

infringing uses, but they may not tie the purchase of a staple product to the license for a patented

process. *Id.* at 201. However, BASF does not assert a counterclaim for patent misuse pursuant

to 35 U.S.C. § 271(d). Instead, BASF pleads a cause of action for tying under Sections 1 and 2

of the Sherman Act. The requirements of each cause of action are distinct: "An antitrust action

requires proof of elements such as antitrust injury and market power. A patent misuse claimant

must establish the patentee's bad faith and anticompetitive purpose." *Eurand Inc. v. Mylan

Pharms. Inc.*, C.A. No. , 2009 WL 3172197, at \*2 (D. Del. Oct. 1, 2009) (acknowledging that,

"while a finding of patent misuse does not mandate a similar finding of antitrust violation, the

issues are closely aligned as both inquire into anticompetitive behavior."); *see also Performance

Aftermarket Parts Grp., Ltd. v. TI Grp. Auto. Sys., Inc.*, 2006 WL 8449931, at \*4-5 (S.D. Tex.

Aug. 11, 2006) (separately analyzing patent misuse and antitrust tying causes of action).

### 2. Exclusive dealing

An exclusive dealing claim may be pursued under Section 1 or Section 2 of the Sherman

Act, or Section 3 of the Clayton Act. *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394

(3d Cir. 2016); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012). "An

exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods

or services only from a particular seller for a certain period of time." *ZF Meritor, LLC v. Eaton

Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). Exclusive dealing agreements are not unlawful if they

are "entered into for entirely procompetitive reasons, and generally pose little threat to

competition." *Id.* The legality of an exclusive dealing agreement is assessed under the rule of

reason to determine "whether [the agreement] will foreclose competition in such a substantial

---

(N.D. Ill. Mar. 25, 2003) (citing *Hodosh v. Block Drug Co., Inc.*, 833 F.2d 1575, 1579 n.12 (Fed.
Cir. 1987)).

share of the relevant market so as to adversely affect competition." *Id.* at 271 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961)). The exclusion of competitors is actionable under the antitrust laws only when "it impairs the health of the competitive process itself." *Roland Mach. Co. v. Dressler Indus.*, 749 F.2d 380, 394 (7th Cir. 1984); *see also ZF Meritor*, 696 F.3d at 271, 281.

In conducting the rule of reason analysis, "courts consider not only the percentage of the market foreclosed, but also take into account the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *ZF Meritor*, 696 F.3d at 271 (quotation marks omitted). To state a claim, a plaintiff must generally show "significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *Id.* at 271-72 (internal citations omitted). Courts may also consider whether "the dominant firm engaged in coercive behavior," "the ability of customers to terminate the agreements," and "[t]he use of exclusive dealing by competitors." *Id.* at 272 (internal citations omitted). Agreements that do not contain an express exclusivity provision may still be exclusive in operation. *See GN Netcom, Inc. v. Plantronics, Inc.*, 278 F. Supp. 3d 824, 827 (D. Del. 2017); *ZF Meritor*, 696 F.3d at 281-82.

### a.    Licenses during the term of the '844 patent

In support of its motion to dismiss BASF's counterclaim for exclusive dealing, Ingevity contends that its licenses with Denso, KFTC, and MAHLE comport with its right to exclude under § 271(d) because the license agreements all expire before or simultaneously with the expiration of the '844 patent. (D.I. 72 at 13-14) Accordingly, Ingevity takes the position that it

12

may permissibly exclude competitors and control the market for honeycomb scrubbers. (*Id.* at 14)

In response, BASF contends that Ingevity exploited the license agreements to coerce Denso, KFTC, and MAHLE to purchase carbon adsorbent products exclusively from Ingevity. (D.I. 81 at 11) BASF alleges that the license agreements impose such punitive terms on purchases of non-Ingevity carbon adsorbents that any contracted right to purchase competitive products is illusory. (*Id.* at 11-12) In this regard, BASF maintains that Ingevity deliberately designed its license agreements to prevent customers from purchasing competing carbon adsorbent products. (*Id.*)

I recommend that the court deny Ingevity's motion to dismiss BASF's exclusive dealing counterclaim as it pertains to the license agreements with Denso, KFTC, and MAHLE. BASF's pleading alleges that "Ingevity has already foreclosed at least 50% of the total available sales outlets of carbon adsorbents (including pelletized carbon, granular carbon, and honeycomb scrubbers) for LEV III/Tier 3 compliant fuel vapor canisters." (D.I. 65 at ¶ 49) BASF's allegation of 50% market foreclosure, taken as true at this stage of the proceedings, is sufficient to state a claim for exclusive dealing in accordance with the relevant case authorities. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."). "There is no fixed percentage at which foreclosure becomes 'substantial' and courts have varied widely in the degree of foreclosure they consider unlawful." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) (internal quotation marks and citations omitted).

13

BASF's pleading also highlights how the "absence of alternative sales channels" and the exclusive nature of the agreements "has substantially foreclosed BASF from access to the customer base necessary to effectively grow and compete." (D.I. 65 at ¶¶ 49, 93)  Other producers with the capacity to produce competing carbon adsorbents do not have the market share to compete with Ingevity's dominance over "nearly 100% of the market for LEV III/Tier 3 carbon adsorbents." (*Id.* at ¶¶ 71-74)  BASF's counterclaim posits that Ingevity's conduct has no procompetitive benefit, and "[p]urchasers of carbon adsorbents have paid supracompetitive prices for LEV III/Tier 3 carbon adsorbents" due to Ingevity's restrictive conduct. (*Id.* at ¶ 94)

Although BASF's counterclaim does not represent that the terms of the license agreements expressly require exclusive dealing with Ingevity for the purchase of carbon adsorbents, the Third Circuit has held that supply agreements threatening to impose large financial penalties for the purchase of competing products can operate as *de facto* exclusive dealing arrangements. *See LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) ("all-or-nothing" discounts induced customers to deal "exclusively with the dominant market player . . . to avoid being severely penalized financially.").  In this regard, "[a] license that does not explicitly require exclusive dealing may have the effect of exclusive dealing if it is structured to increase significantly a licensee's cost when it uses competing technologies." U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property § 4.1.2 (2017).  BASF adequately pleads that the challenged license agreements would have the effect of exclusive dealing because the license agreements are structured to permit the imposition of punitive fees in the event that a fuel vapor canister manufacturer chooses to use non-Ingevity carbon adsorbents, and Ingevity may conduct random checks to cut open canisters on finished vehicles and inspect the carbon products inside. (D.I. 65 at ¶¶ 40-41, 44-45)

14

### b.   Delphi Agreement

#### i.   Market foreclosure

Ingevity contends that BASF fails to plead a cognizable antitrust claim regarding the

Delphi Agreement because Ingevity has the right to exclude competitors from the market during

the term of the '844 patent for the reasons previously explained. (D.I. 72 at 15) Moreover,

Ingevity argues that BASF's counterclaim fails to allege that the Delphi Agreement forecloses a

substantial portion of the post-patent expiration market from competition, separate and apart

from the other license agreements, in accordance with the rule of reason in antitrust cases. (*Id.* at

16) Ingevity cites BASF's admission that it shipped EvapTrap™ samples to prospective

customers who subsequently sought to purchase BASF's products, and its negotiation of sales

terms in 2017, despite its alleged inability to enter the market. (D.I. 83 at 6 n.2)

In response, BASF contends that the court must look at Ingevity's conduct as a whole,

and its counterclaims allege that BASF has been foreclosed from a large percentage of the

market as a result of Ingevity's exclusive dealing arrangements. (D.I. 81 at 12-13) Even taking

the Delphi Agreement in isolation, BASF contends that the exclusive license agreement

substantially forecloses access to the customer base because Delphi is one of the largest

purchasers of LEV III/Tier 3 carbon adsorbents. (*Id.* at 13)

I recommend that the court deny Ingevity's motion to dismiss BASF's exclusive dealing

counterclaim as it pertains to the Delphi Agreement. As discussed at § III.B.2.a, *supra*, "[t]here

is no fixed percentage at which foreclosure becomes 'substantial' and courts have varied widely

in the degree of foreclosure they consider unlawful." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821

F.3d 394, 403 (3d Cir. 2016) (internal quotation marks and citations omitted). Although BASF's

counterclaims do not separately identify the amount of foreclosed access to the customer base

resulting from the Delphi Agreement, the pleading expressly identifies Delphi as "one of the largest Tier 1 manufacturers of fuel vapor canisters in the world." (D.I. 65 at ¶ 32) A determination of whether the Delphi Agreement alone constituted a "substantial foreclosure" of the relevant market is a fact-intensive inquiry to be explored through fact discovery.

### ii. Price-cost test

Ingevity contends that BASF's exclusive dealing counterclaim also fails as a matter of law because BASF does not allege that the post-expiration provisions of the Delphi Agreement result in below-cost pricing. (D.I. 72 at 17) Ingevity contends that the price-cost test governs BASF's allegations because BASF pleads that Ingevity's pricing will prevent Delphi from exercising its termination option. (*Id.* at 18) As long as Ingevity's pricing is above cost, Ingevity contends that it can be matched by a competitor and cannot foreclose competition. (*Id.*)

In response, BASF contends that the price-cost test does not apply because the counterclaims do not allege price discrimination, and the Third Circuit has rejected attempts to apply the price-cost test to exclusive dealing claims. (D.I. 81 at 7) According to BASF, the terms and structure of the Delphi Agreement are exclusionary, as opposed to the low price. (*Id.* at 8)

Courts use the price-cost test to determine the existence of predatory pricing, defined as "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *ZF Meritor*, 696 F.3d at 272 (internal quotation marks and citations omitted). Pursuant to Third Circuit precedent, "when pricing predominates over other means of exclusivity" in the context of exclusive dealing, "the price-cost test applies." *Eisai*, 821 F.3d at 409 (citing *ZF Meritor*, 696 F.3d at 275). To satisfy the price-cost test, a plaintiff must show that a competitor has priced its product below an

appropriate measure of its costs. *Id.* at 408. When the alleged wrongdoer prices its products above cost, "the balance always tips in favor of allowing above-cost pricing practices to stand" such that "the above-cost pricing at issue is *per se* legal." *Id.* at 409.

The price-cost test does not apply to the Delphi Agreement in the present case because the terms and structure of the Delphi Agreement are exclusionary irrespective of price. The Delphi Agreement requires Delphi to purchase 100% of its honeycomb scrubbers from Ingevity both before and after the expiration of the '844 patent, in contravention of Ingevity's usual practice of entering into annual supply agreements. (D.I. 65 at ¶¶ 33-34)

### iii.   "Meet or release" clause

Ingevity contends that the court need not consider BASF's allegations regarding the "meet or release" clause because BASF fails to allege that the Delphi Agreement forecloses a substantial portion of the market. (D.I. 72 at 18) In addition, Ingevity contends that the "meet or release" clause demonstrates that the Delphi Agreement does not violate the rule of reason because it expressly allows for competition to take place based on price after the expiration of the '844 patent. (*Id.*) Ingevity distinguishes the "meet or release" clause from an exclusive dealing agreement because it is akin to a right of first refusal, which does not have the anticompetitive effect of foreclosing opportunity to competitors. (*Id.* at 19) Ingevity further contends that allegations regarding the post-patent expiration terms of the Delphi Agreement, including the "meet or release" clause, are not ripe because they are based on contingent future events after the expiration of the '844 patent in March 2022. (*Id.*)

In response, BASF contends that, while Delphi ostensibly has an option to terminate the Delphi Agreement in March 2022, the terms of the agreement create strong economic disincentives to do so. (D.I. 81 at 10) BASF notes that Delphi is subject to unilateral price

17

increases by Ingevity in the event that Delphi terminates the agreement, and substituting a

competing supplier of honeycomb scrubbers is impractical under the conditions set forth in the

agreement. (*Id.*) BASF contends that the antitrust claims are ripe because exclusive dealing

agreements excluding competitors violate antitrust laws as soon as they are agreed to by the

parties, and Ingevity currently coerces customers to exclusively purchase its honeycomb

scrubbers. (*Id.* at 11 n.2)

BASF's pleading describes the "meet or release" provision of the Delphi Agreement as

"giv[ing] Ingevity the right to meet a competitive offer for honeycomb scrubbers after March 18,

2022" if Delphi first satisfies a series of onerous conditions. (D.I. 65 at ¶ 36) The provision

requires a competitor to "submit its best and final offer up front, with no prospect of 'bidding'

against Ingevity," because Delphi can only pursue one bidder per platform who must supply

100% of Delphi's requirements for a given platform. (*Id.*) If Ingevity meets the competitive

offer and Delphi accepts, Delphi must continue purchasing all of its requirements for that

platform from Ingevity until at least 2025, without seeking competitive bids during that time.

(*Id.*) Although this provision facially permits competition after the expiration of the '844 patent,

BASF adequately pleads that the conditions imposed on future competition are anticompetitive.

### 3. Tortious interference with prospective business relations

Ingevity contends that BASF's state law counterclaim for tortious interference with

business relations must be dismissed because there is no underlying tortious conduct where, as

here, BASF relies on the same Ingevity customer agreements asserted in support of its antitrust

claims. (D.I. 72 at 19-20) Ingevity argues that BASF's counterclaim fails to plead the existence

of a reasonable probability of a business opportunity with Delphi, Denso, KFTC, MAHLE, or

18

any other prospective customers, and does not plead how Ingevity's conduct may have intentionally interfered with such business opportunities. (*Id.*)

In response, BASF contends that its tortious interference counterclaim is sufficiently pleaded independent of the antitrust counterclaims, observing that the elements of the cause of action have little overlap with the elements for antitrust exclusive dealing or tying. (D.I. 81 at 18) BASF contends that the tortious interference counterclaim sufficiently alleges that prospective customers refrained from ordering BASF's honeycomb scrubber after being dissuaded by Ingevity's anticompetitive conduct. (*Id.*) Moreover, BASF alleges facts showing Ingevity's efforts to lock manufacturers of fuel vapor canisters into anticompetitive exclusive supply agreements and license agreements were purposeful. (*Id.* at 19)

I recommend that the court deny Ingevity's motion to dismiss BASF's counterclaim for tortious interference with business relations under Delaware law. To state a claim for tortious interference with business relations under Delaware law, BASF must plead: "(1) the reasonable probability of a business opportunity; (2) the intentional interference by [Ingevity] with that opportunity; (3) proximate causation; and (4) damages, all of which must be considered in light of [Ingevity's] privilege to compete or protect [its] business interests in a fair and lawful manner." *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981)).

The pleading identifies a reasonable probability of a business opportunity by alleging that "BASF provided samples of its honeycomb scrubber to at least eight prospective international and domestic customers and testing facilities," who tested BASF's product, confirmed that it outperformed Ingevity's product, and sought to purchase BASF's EvapTrap™. (D.I. 65 at ¶¶ 27, 85-88) Moreover, BASF's EvapTrap™ XC had passed its validation tests for Ford and began

preparing for production of 50,000 units in the fourth quarter of 2018 and 400,000 units for sale in 2019. (*Id.* at ¶ 87) Although "[t]he only remaining step for Ford to enter a purchase agreement with BASF [was] for its chief engineer to sign off on the product," Ford was discouraged from doing so because of Ingevity's anticompetitive conduct. (*Id.* at ¶¶ 87-88)

The pleading further alleges sufficient facts regarding Ingevity's exclusive supply agreements and license agreements to plausibly show that Ingevity's interference was intentional. (D.I. 65 at ¶¶ 31-50) Specifically, the pleading describes the terms of the nine-year exclusive supply agreement Ingevity executed with Delphi in 2017, asserting that "[t]he coercive intent and impact of the Delphi Exclusive Supply Agreement is well-illustrated by its own terms and structure." (*Id.* at ¶ 35) In particular, the pleading cites the obstacles and penalties associated with terminating the agreement before the full term, including payback of rebates, payment of a "market price concession," and exposure to over two months of unilateral price hikes. (*Id.*) The agreement also gives Ingevity the right to meet competitive offers and places restrictions on the number of competitive offers given. (*Id.* at ¶ 36) The complaint alleges that "Ingevity's own executive openly confirms that Ingevity's business strategy is to leverage its '844 patent to ensure that customers purchase all of their carbon adsorbents from Ingevity," citing Ingevity's procedure of threatening competitors with litigation to coerce entry into a license agreement with terms favorable to Ingevity. (*Id.* at ¶ 40) These allegations plausibly suggest that Ingevity's interference with potential business opportunities was intentional.

#### 4. Bifurcation and stay

In the alternative, Ingevity asks the court to bifurcate BASF's counterclaims[10] if the court

is not inclined to grant the motion to dismiss. (D.I. 83 at 10) According to Ingevity, bifurcation

of the counterclaims would serve the interests of judicial economy because it is likely that

resolution of issues regarding the scope and validity of the '844 patent will eliminate or simplify

BASF's antitrust counterclaims. (*Id.*)

Having recommended that the court deny the motion to dismiss, I further recommend that

the court bifurcate BASF's counterclaims. *See Eagle Pharms., Inc. v. Eli Lilly & Co.*, 18-1121-

MSG, 2018 WL 6201704, at *2 n.3 (D. Del. Nov. 27, 2018) ("[I]t is common practice for courts

to stay an antitrust case until after resolution of a related patent case."); *Apotex, Inc. v. Senju

Pharm. Co.*, 921 F. Supp. 2d 308, 314 (D. Del. 2013) (noting that "resolution of underlying

patent claims could moot, narrow, or otherwise simplify antitrust claims"). Bifurcation of

BASF's counterclaims will not result in prejudice to BASF in the event that BASF prevails on its

invalidity defenses pursuant to 35 U.S.C. §§ 102, 103, and 112. (D.I. 65 at 5, ¶ 3)

### IV. MOTION TO AMEND

#### A. Legal Standard

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party may amend its

pleading after a responsive pleading has been filed "only with the opposing party's written

consent or the court's leave," and "[t]he court should freely give leave when justice so requires."

Fed. R. Civ. P. 15(a)(2). The decision to grant or deny leave to amend lies within the court's

---

[10] In its reply brief, Ingevity asked the court to bifurcate and stay BASF's counterclaims in the
event that the motion to dismiss is denied. (D.I. 83 at 10) ("If the Court does not dismiss
BASF's counterclaims, the Court should bifurcate and stay the claims."). However, at oral
argument on September 17, 2019, Ingevity represented that it sought only bifurcation, and not a
stay.

discretion. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). The Third Circuit has adopted a liberal approach to the amendment of pleadings. *See Dole v. Arco*, 921 F.2d 484, 487 (3d Cir. 1990). In the absence of undue delay, bad faith, or dilatory motives on the part of the moving party, the amendment should be freely granted, unless it is futile or unfairly prejudicial to the non-moving party. *See Foman*, 371 U.S. at 182; *In re Burlington*, 114 F.3d at 1434.

If a party seeks to extend a deadline imposed by the scheduling order, the court must apply the "good cause" standard in accordance with Rule 16 of the Federal Rules of Civil Procedure. *Carrier Corp. v. Goodman Global, Inc.*, 49 F. Supp. 3d 430, 433 (D. Del. 2014). Pursuant to Rule 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent." "The good cause element requires the movant to demonstrate that, despite diligence, the proposed claims could not have been reasonably sought in a timely manner." *Venetec Int'l v. Nexus Med.*, 541 F. Supp. 2d 612, 618 (D. Del. 2010). The focus of the "good cause" inquiry is on the diligence of the moving party, rather than on prejudice, futility, bad faith, or any of the other Rule 15 factors.[11] *See Glaxosmithkline LLC v. Glenmark Pharms. Inc.*, C.A. No. 14-877-LPS-CJB, 2016 WL 7319670, at *1 (D. Del. Dec. 15, 2016). The court considers whether the proposed amended pleading meets the Rule 15(a) standard only after finding the requisite showing of good cause under Rule 16(b)(4). *See E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000).

---

[11] Although both parties discuss prejudice in the briefing, prejudice does not factor into the good cause analysis under Rule 16(b)(4). *See Sonos, Inc. v. D&M Holdings Inc.*, C.A. No. 14-1330-RGA, 2017 WL 476279, at *1 (D. Del. Feb. 3, 2017) (citing *Glaxosmithkline LLC v. Glenmark Pharm. Inc.*, C.A. No. 14-877-LPS-CJB, 2016 WL 7319670, at *1 (D. Del. Dec. 15, 2016)).

## B. Analysis

BASF seeks leave to amend its first amended answer, affirmative defenses, and counterclaims to add the affirmative defense of inequitable conduct and amend its affirmative defenses for patent misuse and unclean hands. (D.I. 99, Ex. B at 6-14) The amended pleading further seeks to add counterclaims for *Walker Process* fraud and sham litigation in violation of the Sherman Act, 15 U.S.C. § 2. (*Id.* at 48-50)

### 1. Inequitable Conduct

In support of its motion to amend, BASF contends that its motion is timely because discovery produced by Delphi Technologies, Inc. on May 6, May 28, and June 6, 2019 revealed new information that Roger Williams, an inventor of the '844 patent, made false and misleading statements to the U.S. Patent and Trademark Office ("PTO") amounting to inequitable conduct. (D.I. 100 at 9-10) Specifically, BASF alleges that the newly-disclosed evidence shows that Delphi inventors conceived of the claimed canister system two years before Ingevity, reduced it to practice using activated carbon honeycomb scrubbers, and offered the canister systems for sale more than one year before the '844 patent's earliest filing date. (*Id.* at 4-5) According to BASF, its *Walker Process* and sham litigation counterclaims are based on the same underlying facts as its allegations of inequitable conduct and, therefore, BASF could not have brought these counterclaims at an earlier time. (*Id.* at 10)

In response, Ingevity contends that BASF's motion to amend is untimely, and BASF cannot establish good cause because Ingevity produced documents to BASF in late 2018 showing that Delphi made and sold canister systems using honeycomb scrubbers more than one year before the filing date of the '844 patent. (D.I. 105 at 7) Ingevity directs the court to BASF's October 12, 2018 opposition to Ingevity's motion for a preliminary injunction, which

cites documentation describing an October 1999 meeting between Delphi employees and the inventors of the '844 patent to discuss the use of carbon honeycomb scrubbers in canister systems, and documents showing the public use of the claimed invention before Ingevity's conception date. (*Id.* at 8)

I recommend that the court deny BASF's motion to amend to add the affirmative defense of inequitable conduct because BASF has failed to satisfy the good cause requirement in accordance with Rule 16(b)(4). The deadline for amended pleadings expired on April 30, 2019. (D.I. 41 at ¶ 2) The record before the court shows that, prior to the deadline for amended pleadings, BASF had sufficient information to allege inequitable conduct. The affirmative defense of inequitable conduct in BASF's proposed second amended answer and counterclaims states that,

> [m]onths before Plaintiffs' February 14, 2019 submission to the PTAB, Plaintiffs' counsel collected from Ingevity and produced to BASF documents confirming that Delphi made and sold canister systems using low-capacity Westvaco-supplied honeycomb scrubbers more than one year before the '844 patent's filing date. Accordingly, Plaintiffs' counsel knew or should have known that statements in Ingevity's POPR concerning "industry wisdom" and the state of the art in 2001 were false.

(D.I. 99, Ex. A at 12 ¶ 43) In BASF's October 12, 2018 opposition to Ingevity's motion for a preliminary injunction, BASF described "Ingevity documents indicat[ing] that Delphi employees met with the '844 patent inventors to discuss the use of carbon honeycombs in canister systems to reduce DBL emissions as far back as 1999." (D.I. 21 at 16 n.13) BASF further indicated that "Delphi filed multiple patent applications disclosing a cannister system with a honeycomb scrubber," and "the claimed invention was in public use . . . and/or described in a patent application . . . before Ingevity's alleged August 2001 conception date." (*Id.*) In this regard, BASF's own statements demonstrate that BASF possessed documents showing conception and

reduction to practice by Delphi employees months before the productions made in May and June of 2019. Consequently, BASF's delay in asserting its inequitable conduct allegations after the expiration of the amended pleadings deadline precludes a finding of good cause. Because BASF failed to satisfy the good cause requirement with respect to the affirmative defense of inequitable conduct, the court need not proceed to the Rule 15(a) factors. *See E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000).

### 2. Unclean Hands

In support of its motion to amend, BASF contends that it has good cause to amend its unclean hands defense because it is based on the same underlying conduct as the defense of inequitable conduct. (D.I. 100 at 16) According to BASF, the proposed amended pleading provides additional details underlying the existing defense of unclean hands. (*Id.*)

In response, Ingevity contends that BASF's unclean hands defense is not based on the same underlying conduct as the inequitable conduct defense, but is instead based on purported misrepresentations made to the court and in Ingevity's interrogatory responses. (D.I. 105 at 18) Ingevity refutes BASF's position that the proposed amended pleading merely provides additional details underlying the existing defense. (*Id.* at 18-19) Specifically, Ingevity argues that BASF's unclean hands defense was originally based on its exclusive dealing and tying antitrust allegations and, in this regard, the proposed amended pleading's reliance on misrepresentations represents an entirely new basis for the unclean hands defense which is not supported by good cause. (*Id.*)

I recommend that the court deny BASF's motion to amend its affirmative defense for unclean hands. To the extent that the proposed amended defense of unclean hands "incorporates Plaintiffs' alleged inequitable conduct," BASF has failed to establish good cause to amend for

the reasons set forth at § IV.B.1, *supra*. (D.I. 99, Ex. 2 at 13, ¶ 47) The proposed amended

defense of unclean hands also makes factual assertions based on alleged misrepresentations made

to the court and contained in Ingevity's interrogatory responses. (*Id.* at ¶¶ 49-51) BASF fails to

satisfy its burden to show good cause to add these allegations after the deadline for amended

pleadings. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir.

2010) (observing that the burden is on the moving party to "demonstrate good cause and due

diligence" under Rule 16(b)(4)). Instead, BASF alleges only that its proposed amended

affirmative defense of unclean hands is not futile. (D.I. 116 at 10) Consequently, I recommend

that the court deny leave to amend the affirmative defense of unclean hands.

### 3. *Walker Process* & Sham Litigation

BASF contends that its proposed *Walker Process* and sham litigation counterclaims are

not futile because the proposed counterclaims sufficiently allege that the asserted patents were

procured through knowing and willful fraud, and the lawsuit is a sham to cover up Ingevity's

efforts to interfere directly in BASF's business relationships. (D.I. 100 at 17-19) In response,

Ingevity contends that BASF's *Walker Process* and sham litigation amendments should be

rejected for failure to satisfy the good cause requirement based on the same reasoning applied to

the inequitable conduct defense. (D.I. 105 at 20)

I recommend that the court deny BASF's motion to amend to the extent that it applies to

the proposed amended *Walker Process* and sham litigation counterclaims. BASF's proposed

amended *Walker Process* and sham litigation counterclaims are based on the same conduct

asserted in support of the inequitable conduct defense. Specifically, BASF alleges that Delphi

first conceived of the invention and reduced it to practice, but Ingevity deliberately withheld this

fact from the PTO during prosecution of the '844 patent. (D.I. 99, Ex. 2 at 48) BASF further

alleges that Ingevity knows the litigation is objectively baseless due to its awareness of "the prior

art, invention, conception, and offer for sale/sales by Delphi that were material to patentability."

(*Id.* at 49)  For the reasons set forth at § IV.B.1, *supra*, the record reflects that BASF was aware

of the facts underlying these assertions prior to the deadline for amended pleadings.  Therefore,

BASF has failed to establish the requisite good cause to amend its pleading to add *Walker*

*Process* and sham litigation counterclaims.

## V.    CONCLUSION

For the foregoing reasons, I recommend that the court deny Ingevity's motion to dismiss

BASF's counterclaims, and deny BASF's motion for leave to amend its first amended answer,

affirmative defenses, and counterclaims.  (D.I. 71; D.I. 99)

Given that the court has relied upon material that technically remains under seal, the

court is releasing this Report and Recommendation under seal, pending review by the parties.  In

the unlikely event that the parties believe that certain material in this Report and

Recommendation should be redacted, the parties shall jointly submit a proposed redacted version

by no later than **October 29, 2019**, for review by the court, along with a motion supported by a

declaration that includes a clear, factually detailed explanation as to why disclosure of any

proposed redacted material would "work a clearly defined and serious injury to the party seeking

closure."  *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d

Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation

marks omitted)).  If the parties do not file a proposed redacted version and corresponding

motion, or if the court determines the motion lacks a meritorious basis, the documents will be

unsealed within thirty (30) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: October 22, 2019

Sherry R. Fallon
United States Magistrate Judge