IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGEVITY CORPORATION and | ) | |
| INGEVITY SOUTH CAROLINA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1391 (RGA) |
| | ) | |
| BASF CORPORATION, | ) | **REDACTED -** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

## DEFENDANT BASF CORPORATION'S OPENING BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE OPINIONS OF INGEVITY'S DAMAGES EXPERT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
araucci@mnat.com

OF COUNSEL:

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South California Avenue, Suite 100
Palo Alto, CA  94304
(650) 422-6700

*Attorneys for Defendant BASF Corporation*

James P. Brogan
Brian Eutermoser
Kevin Lake
Angela Tarasi
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street Suite 800
Denver, CO  80202

Bobby R. Burchfield
Norman Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 200
Washington, DC  20006

Joseph D. Eng., Jr.
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY  10036-2601
(212) 556-2205

Original Filing Date: June 12, 2020
Redacted Filing Date: June 19, 2020

# TABLE OF CONTENTS

Page

I.   The '844 Patent is Indefinite Because it Fails to Inform a POSITA as to the
     Scope of the Claims with reasonable Certainty .............................................................. 1

     A.   Statement of Facts ........................................................................................... 2

          1.   The Term "Incremental Adsorption Capacity" Was Coined by
               the '844 Patent Inventors ....................................................................... 2

          2.   Multiple Methods for Measuring Adsorption Capacity Existed at
               the Time the '844 Patent Was Filed ....................................................... 2

          3.   The Patent Does Not Specify Which Method to Use to Determine
               IAC ............................................................................................................ 3

          4.   Different Methods for Measuring Adsorption Capacity Result in
               Different IAC Values ................................................................................ 3

          5.   Different Methods for Analyzing Adsorption Isotherm Data and
               Calculating IAC Result in Different IAC Values ................................... 6

     B.   Argument ......................................................................................................... 6

          1.   Ingevity Admits There Are Multiple Methods for Measuring
               Adsorption Capacity and Calculating IAC ........................................... 8

          2.   Ingevity Does Not Dispute that the '844 Patent Fails to Specify a
               Particular Method for Measuring IAC .................................................. 8

          3.   Different Methods Produce Different Results ........................................ 8

II.  The '844 Patent is Invalid Under 35 U.S.C. §112 for Failure to Provide Written
     Description OF or Enable the Invention ....................................................................... 11

     A.   Statement of Facts ......................................................................................... 11

          1.   The '844 Patent Claims, But Does Not Disclose, an Initial
               Adsorbent Volume Having a Very High IAC ...................................... 11

          2.   The '844 Patent Claims, But Does Not Disclose, a Subsequent
               Adsorbent Volume Having a Very Low IAC ....................................... 12

     B.   Argument ....................................................................................................... 13

          1.   The '844 Patent Fails to Describe or Enable the Full Upper
               Range of Claimed IAC Values and Is Invalid ..................................... 13

2.      The '844 Patent Fails to Describe or Enable the Full Lower Range of Claimed IAC Values and Is Invalid ...................................... 13

III.    If The '844 Patent Is Not Found Invalid, BASF Cannot Infringe Based On Ingevity's Admissions Regarding Claim Scope ............................................ 14

A.      Statement of Facts ............................................................................ 14

B.      Argument ........................................................................................... 15

IV.    The '844 Patent is Invalid Because Delphi Made the Alleged Invention before Westvaco ................................................................................................................... 15

A.      Statement of Facts ............................................................................ 15

1.      Delphi Conceived of the Alleged Inventions in October 1999 ............. 15

2.      ██████████████████████████ ................................. 16

3.      Westvaco's Early Honeycombs Were Designed for Air-Intake Systems, and Not Fuel Tanks ............................................................... 19

4.      Ingevity's Conception on ████████ Was Too Late ................... 19

B.      Argument ........................................................................................... 19

1.      Delphi's Reduction to Practice of the Delphi Scrubber Anticipates the '844 Patent ............................................................... 19

2.      The Delphi Inventor's Conception and Diligence Also Anticipates the '844 Patent ........................................................................................ 22

3.      The ITC Has Found the Asserted Claims Invalid; This Decision Is Persuasive ............................................................................................ 24

V.    The '844 Patent Is Unenforceable Due to Patent Misuse ............................................. 24

A.      Statement of Facts ............................................................................ 25

B.      Argument ........................................................................................... 27

1.      A Patentee With Market Power that Conditions a License on the Purchase of a Separate, Staple Good Is Guilty of *Per Se* Misuse ....... 27

2.      Ingevity Has Repeatedly Tied Licenses to Practice the '844 Patent to the Purchase of Carbon Adsorbents, a Staple Article of Commerce .......................................................................................... 27

      3.      Ingevity Cannot Avoid This Conclusion by Attempting to Limit the Patent Misuse Inquiry to Specific, Branded Honeycomb Products ........................................................................................ 29

VI.    VANDER VEEN'S DAMAGES OPINIONS SHOULD BE EXCLUDED AS UNRELIABLE, AND BASF IS ENTITLED TO SUMMARY JUDGMENT OF NO DAMAGES ......................................................................................... 31

    A.    Statement of Facts ................................................................................. 32

    B.    Vander Veen's Reasonable Royalty Is Unreliable Because It Is Not Tied to Ingevity's Economic Harm ................................................................. 33

    C.    Vander Veen's Reasonable Royalty Is Unreliable Because He Does Not Apply the Required Assumptions of the Hypothetical Negotiation Construct ............................................................................................... 35

    D.    Vander Veen's Avoided Cost Opinions Do Not Reliably Apply Economic Principles to the Facts .......................................................................... 37

    E.    Ingevity Cannot Prove It Is Entitled to Any Damages ..................................... 38

VII.    CONCLUSION .......................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Aqua Shield v. Inter Pool Cover Team,*
   774 F.3d 766 (Fed. Cir. 2014)..................................................................32, 35, 36

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
   598 F.3d 1336 (Fed. Cir. 2010)..................................................................11, 13, 14

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
   377 U.S. 476 (1964)..................................................................................32

*AVM Techs., LLC v. Intel Corp.,*
   C.A. No. 10-610-RGA, 2013 WL 656745 (D. Del. Mar. 29, 2013)........................40

*Bioverativ Inc. v. CSL Behring LLC,*
   C.A. No. 17-914-RGA, 2020 WL 1047755 (D. Del. Mar. 4, 2020)........................37

*Brown v. Barbacid,*
   436 F.3d 1376 (Fed. Cir. 2006)..................................................................23

*Carucel Investments, L.P. v. Novatel Wireless, Inc.,*
   No. 16-CV-118-H-KSC, 2017 WL 1215838 (S.D. Cal. Apr. 3, 2017), *aff'd*,
   730 F. App'x 938 (Fed. Cir. 2018) ..............................................................35, 36

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)..................................................................................24, 39

*Cooper v. Goldfarb,*
   154 F.3d 1321 (Fed. Cir. 1998)..................................................................19

*Creative Compounds, LLC v. Starmark Labs.,*
   651 F.3d 1303 (Fed. Cir. 2011)..................................................................23

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993)..................................................................................31, 35

*Dawson Chem. Co. v. Rohm & Haas Co.,*
   448 U.S. 176 (1980)..................................................................................28, 29

*Dow Chem. Co. v. Astro-Valcour, Inc.,*
   267 F.3d 1334 (Fed. Cir. 2001)..................................................................22

*Dow Chemical Co. v. Nova Chems. Corp.,*
   803 F.3d 620 (Fed. Cir. 2015)..................................................................*passim*

*Hodosh v. Block Drug Co.*,
    833 F.2d 1575 (Fed. Cir. 1987)................................................................................31

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006).........................................................................................................30

*Jutrowski v. Township of Riverdale*,
    904 F.3d 280 (3d Cir. 2018)..........................................................................................39

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
    687 F.3d 1377 (Fed. Cir. 2012).....................................................................11, 13, 14

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996).........................................................................................................7

*Masimo Corp. v. Philips Elecs. N. Am. Corp.*,
    742 F. Supp. 2d 492 (D. Del. 2010)..............................................................................31

*Monsanto Co. v. Scruggs*,
    459 F.3d 1328 (Fed. Cir. 2006).....................................................................................25

*Morton Salt v. G.S. Suppiger Co.*,
    314 U.S. 488 (1942)................................................................................................30, 31

*Mycogen Plant Sci. v. Monsanto Co.*,
    243 F.3d 1316 (Fed. Cir. 2001)...............................................................................15, 20

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)......................................................................................................7

*Price v. Symsek*,
    988 F.2d 1187 (Fed. Cir. 1993).....................................................................................22

*Princo Corp. v. Int'l Trade Comm'n*,
    563 F.3d 1301 (Fed. Cir. 2009), *reinstated in relevant part after reh'g en
    banc*, 616 F.3d 1318 (Fed. Cir. 2010 (en banc) ......................................................27

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010) (en banc)..............................................................27, 30

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
    989 F. Supp. 547 (D. Del. 1997)...................................................................................37

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)............................................................................ *passim*

*Rhodia Chimie v. PPG Indus. Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005).....................................................................................14

*Riles v. Shell Exploration & Production Co.*,
   298 F.3d 1302 (Fed. Cir. 2002)...................................................................................31

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
   264 F.3d 1344 (Fed. Cir. 2001)...................................................................................20

*Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP*,
   661 F.3d 1378 (Fed. Cir. 2011)...................................................................................22

*Teva Pharma. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015).....................................................................................7

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
   90 F.3d 1558 (Fed. Cir. 1996).....................................................................................24

*U.S. Philips Corp. v. Int'l Trade Comm'n*,
   424 F.3d 1179 (Fed. Cir. 2005)...................................................................................31

*Unicom Monitoring, LLC v. Cencom, Inc.*,
   No. 06-1166 (MLC), 2013 WL 1704300 (D.N.J. Apr. 19, 2013)...........................40

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)...................................................................................35

*Va. Panel Corp. v. MAC Panel Corp.*,
   133 F.3d 860 (Fed. Cir. 1997)...............................................................................27, 30

**Rules and Statutes**

35 U.S.C. § 102(g) ...............................................................................................1, 20, 22

35 U.S.C. § 102(g)(2) ......................................................................................................15

35 U.S.C. § 112 ...........................................................................................................11, 14

35 U.S.C. § 112, ¶2 ............................................................................................................7

35 U.S.C. § 284...........................................................................................................34, 38

Fed. R. Civ. P. 56(a) .........................................................................................................1

Fed. R. Evid. 702 .....................................................................................31, 37, 38, 39

## TABLE OF ABBREVIATIONS

| Abbreviation | Document |
|---|---|
| AIA | American Invents Act |
| AIPLA | American Intellectual Property Law Association |
| Delphi Inventors | Thomas C. Meiller, Susan LaBine and Charles H. Covert |
| EPO | European Patent Office |
| IAC | Incremental Adsorption Capacity |
| Ingevity Inventors | Larry Hiltzik, Don Tolles, Jacek Jagiello and Roger Williams |
| MWV | MeadWestvaco |
| POSITA | person of ordinary skill in the art |
| RoI | Record of Invention |
| SHC | strain hardening coefficient |
| USPTO | United States Patent and Trademark Office |

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 2 | Deposition Transcript of James A. Ritter dated September 20, 2018 |
| 3 | Deposition Transcript of Sam R. Reddy, Ph.D. dated September 19, 2018 |
| 4 | Expert Report of Dr. David A. Rockstraw Regarding Validity of U.S. Patent No. RE38,844 |
| 5 | Deposition Transcript of Mitsunori Hitomi dated June 13, 2019 |
| 6 | Deposition Transcript of Mitsunori Hitomi dated June 14, 2019 |
| 7 | Deposition Transcript of Susan LaBine dated July 19, 2019 |
| 8 | Summary of Facts and Submissions dated April 22, 2015 |
| 9 | Summary of Facts and Submissions dated April 22, 2015 |
| 10 | Deposition Transcript of James Miller dated October 11, 2019 |
| 11 | Yu, et al., "Adsorption Isotherms of VOCs onto an Activated Carbon Monolith: Experimental Measurement and Correlation with Different Models," J. Chem. Eng. Data 2002 |
| 12 | Reddy, Evaporative Emission Control Training/Workshop Manual |
| 13 | Correspondence to Futaba Industrial Co., Ltd. dated November 1, 2012 |
| 14 | Delphi/Ingevity, September 27, 2018 |
| 15 | Email from Peter McCrae to multiple persons re Delphi Krakow dated February 12, 2014 |
| 16 | Email from Laurence Hiltzik to multiple persons dated between August 20 - September 6, 2018 |
| 17 | Deposition Transcript of Roger S. Williams dated October 2, 2019 |
| 18 | Technical Memorandum dated June 30, 2014 |
| 19 | Supplemental Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 20 | Exhibit D to the Supplemental Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 21 | Supplemental Reply Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 22 | Deposition Transcript of James A. Ritter, Ph.D. dated September 20, 2018 |
| 23 | Anson, et al., "Hydrogen adsorption on a single-walled carbon nanotube material: a comparative study of three different adsorption techniques," Inst. of Phy. Publ., 2004 |
| 24 | Deposition Transcript of Sam R. Reddy, Ph.D. dated September 19, 2018 |
| 25 | Supplemental Reply Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844, Exhibit J |
| 26 | Ingevity New Product Development dated June 2017 |
| 27 | Deposition Transcript of Roger S. Williams dated September 28, 2018 |
| 28 | BASF Opposition in European Proceeding |
| 29 | BASF Opening Claim Construction Brief, May 22, 2020 |
| 30 | EPO Decision dated April 15, 2020 |

| Exhibit No. | Description |
|---|---|
| 31 | MeadWestvaco Intracompany Correspondence dated March 8, 2002 |
| 32 | Deposition Transcript of Lawrence Hiltzik, Ph.D. dated December 20, 2019 |
| 33 | Deposition Transcript of Dr. Wolfgang F. Ruettinger, Ph.D. dated October 19, 2018 |
| 34 | Opening Expert Report of Dr. David A. Rockstraw Regarding Infringement of U.S. Patent No. RE38,844 |
| 35 | Rebuttal Expert Report of James M. Lyons Regarding U.S. Patent No. RE38,844 |
| 36 | Deposition Transcript of Thomas C. Meiller dated October 23, 2019 |
| 37 | Delphi-Engine Air Intake Folder and Contents |
| 38 | Delphi Record of Invention |
| 39 | Photographs Exhibit 21 to Deposition of Susan LaBine dated July 19, 2019 |
| 40 | Draft Patent Specification – Hydrocarbon Bleed Emission Scrubber With Low Restriction |
| 41 | Provisional Application No. 60/192,917 |
| 42 | U.S. Patent No. 6,896,852 to Meiller et al. |
| 43 | Deposition Transcript of Robert K. Beckler dated July 31, 2019 |
| 44 | Ingevity First Supplemental Responses and Objections to Interrogatory No. 1 |
| 45 | Supplemental Direct Witness Statement of James M. Lyons |
| 46 | Lawrence Hiltzik Notebook No. 6614 |
| 47 | ITC Notice of Commission Determination to Review in Part, Take no Position on the Issues Under Review, and Affirm in part a Final Initial Determination Finding No Violation of Section 337; Termination of Investigation |
| 48 | ITC Initial Determination on Violation of Section 337 and Recommended Determination and Remedy and Bond dated January 28, 2020 |
| 49 | Handwritten notes re Carbon Research |
| 50 | Appendix 1 to the Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 51 | Ingevity Performance Materials Market and CHX Scenario Analysis dated October 2, 2018 |
| 52 | Ingevity Automotive LEV III Bleed Segment Strategy |
| 53 | Spreadsheet - NGVT0504180 |
| 54 | Deposition Transcript of Mohan Rao dated May 29, 2020 |
| 55 | Deposition Transcript of Ed Woodcock dated September 25, 2018 |
| 56 | ITC Witness Statement of Ed Woodcock |
| 57 | Deposition Transcript of Ed Woodcock dated December 2, 2019 |
| 58 | Rebuttal Expert Report of Mohan Rao, Ph.D. |
| 59 | Correspondence to MeadWestvaco dated April 6, 2010 NGVT0000015 |
| 60 | Correspondence to Korea Fuel-Tech Corp dated July 24, 2013 NGVT0000022 |
| 61 | Memorandum of Understanding Between Westrock MWV, LLC and Mahle Filter Systems North America, Inc. dated March 19, 2015 NGVT0040004 |
| 62 | ITC Witness Statement of Roger S. Williams |

| Exhibit No. | Description |
|---|---|
| 63 | ITC Complainants' Seventh Supplemental Responses to Respondents' First Set of Interrogatories |
| 64 | Ingevity Automotive Carbon Segment Board Information Package dated October 2016 |
| 65 | Deposition Transcript of Peter McCrae dated October 17, 2019 |
| 66 | Declaration of Thad O'Brien dated January 17, 2020 |
| 67 | Deposition Transcript of William Hamilton dated June 25, 2019 |
| 68 | Ingevity's Resp. to BASF's First Set of Requests for Admissions |
| 69 | ITC Expert Report of Dr. David A. Rockstraw re Infringement of U.S. Patent No. RE43,844 |
| 70 | Complaint, *Ingevity Corp. v. MAHLE Filter Systems North America*, D.I. 1, 1:18-cv-06158 (N.D. Ill.) |
| 71 | Section 337 Petition, *In re Certain Multi-Stage Fuel Vapor Canister Systems and Activated Carbon Components Thereof*, Inv. No. 337-TA-1140 |
| 72 | Auto Engine Air folder and contents - NGVT0002774 |
| 73 | Rebuttal Expert Report of David A. Rockstraw Regarding Validity of U.S. Patent No. RE38,844 |
| 74 | Deposition Transcript of Robert K. Beckler dated October 17, 2019 |
| 75 | Expert Report of Thomas D. Vander Veen, Ph.D. |
| 76 | Ingevity Sixth Supplemental Responses to Interrogatory No. 12 |
| 77 | Rebuttal Expert Report of Laura B. Stamm dated March 20, 2020 |
| 78 | Ingevity Sixth Supplemental Responses to Interrogatory No. 4 |
| 79 | Email from James Miller to Erin McNeill and others dated between December 7-14, 2017 - NGVT0355142 |

Discovery in this case has made clear that BASF is entitled to judgment as a matter of law on Ingevity's patent infringement claims on several independent grounds.  *See* Fed. R. Civ. P. 56(a). ***First***, the '844 patent is invalid for indefiniteness because there are multiple ways to measure "incremental adsorption capacity" that yield different results, and the patent does not specify which method to use.  ***Second***, the patent is invalid for lack of written description and enablement because the specification does not disclose or teach a POSITA to practice the full scope of the claims.  ***Third***, if the claims were valid, they would not be infringed, because BASF's honeycombs have adsorptive properties that Ingevity has admitted are not taught by the '844 patent.  ***Fourth***, the patent is invalid under 35 U.S.C. § 102(g) because a third party, Delphi, made the alleged invention well before Ingevity's alleged conception date.  ***Fifth***, the '844 patent is unenforceable because Ingevity committed patent misuse by requiring customers to purchase its unpatented carbon adsorbents in order to obtain licenses.  ***Sixth***, Ingevity's claim for monetary damages is speculative and unsupported because BASF has made no sales of the allegedly infringing honeycomb.

I.    **THE '844 PATENT IS INDEFINITE BECAUSE IT FAILS TO INFORM A POSITA AS TO THE SCOPE OF THE CLAIMS WITH REASONABLE CERTAINTY**

All asserted claims of U.S. Patent RE38,844 (D.I. 1-1, "the '844 patent") require two adsorbent volumes—one with an "incremental adsorption capacity" (IAC) above 35 g/L and one with an IAC below 35 g/L.  Undisputed evidence establishes that:  (1) multiple methods for measuring adsorption capacity were known at the time of the '844 patent filing; (2) the '844 patent does not specify which method should be used; and (3) different methods produce different IACs.  Where, as here, multiple known approaches for assessing a physical characteristic may yield different results, and a specific approach is not required by the claims or made clear to a POSITA by the patent specification, the claims are indefinite.  *See Dow Chemical Co. v. Nova Chems. Corp.*, 803 F.3d 620, 630, 634-35 (Fed. Cir. 2015).

### A.      Statement of Facts

###      1.      The Term "Incremental Adsorption Capacity" Was Coined by the '844 Patent Inventors

Experts of both parties agree:  IAC is a term coined by the inventors and not previously

known in the art coined by the inventors.  (Ex. 1, ¶ 150 

; Ex. 2 at 48:21-25, 50:4-8

); Ex. 3 at 28:10-30:10; Ex. 4, ¶ 72.)  Third parties also agree.  (Ex. 5 at 11:19-25:16

(                                                ); Ex. 6 at 177:6-178:10 (

); Ex. 7 at 261:16-19, 262:12-14.)  Thus, at filing there was no known, standard

method for measuring IAC.  (Ex. 1, ¶ 150; Ex. 8 at -22136

); Ex. 6 at 177:6-178:10.)

###      2.      Multiple Methods for Measuring Adsorption Capacity Existed at the Time the '844 Patent Was Filed

While the terms "incremental" and "adsorption capacity" were known in the art when the

'844 patent was filed, there were multiple known methods for measuring adsorption capacity and

generating and analyzing adsorption isotherms.  First, Ingevity's expert confirmed "there are

multiple ways of measuring adsorption capacity" (Ex. 4, ¶¶ 76, 82-94), including gravimetric

methods and volumetric methods, among others.  (Ex. 1, ¶¶ 152-65; Ex. 2 at 22:3-25 (gravimetric

method); Ex. 9 at -512386 (gravimetric, volumetric, flow volumetric, and carrier gas methods); *see

also* Ex. 10 at 171:18-172:11 (dynamic flow method).)

Second, there are different methods for analyzing the adsorption isotherm data generated by

any one of these measurement techniques.  Ingevity's expert testified that IAC may be determined

through direct or indirect methods of analysis—that is, measuring adsorption capacity directly at

5 vol% and 50 vol%, or estimating based on a fitted curve.  (Ex. 4, ¶¶ 100-11.)  There are different

methods for interpolating (or estimating) the adsorption capacity data at 5 vol% and 50 vol%.  For

example, an equation may be fitted to the data using least squares, linear, or quadratic functions. (Ex. 4, ¶¶ 103, 144; *see also* Ex. 2 at 40:11-23; Ex. 3 at 51:20-55:22, 82:10-12; Ex. 24 at 55:16-18; Ex. 11 at -45195-196 ("Isotherm Models"); Ex. 12 at -50152-155.)

3. **The Patent Does Not Specify Which Method to Use to Determine IAC**

The '844 patent contains no discussion of which adsorption capacity measurement method to use or how to analyze adsorption isotherm data to calculate IAC.  Third parties have confirmed this flaw in the '844 patent.  For example, during meetings with Ingevity's predecessor, MeadWestvaco ("MWV"), ████████████████████████████████ (Ex. 10 at 179:23-180:22; Ex. 13 at -714.) ████████████████████████████ ████████████████████████████████ (Ex. 14 at -60257; Ex. 15 at -257938; Ex. 16 at -295837; Ex. 17 at 87:6-88:21.)  Ingevity's expert, Dr. Rockstraw, does not dispute this lack of disclosure—arguing only that this "point [is] irrelevant … since adsorption capacity can be measured by many different techniques."  (Ex. 4, ¶ 97.)

4. **Different Methods for Measuring Adsorption Capacity Result in Different IAC Values**

There is no dispute that different methods for measuring adsorption capacity have resulted in different IAC values.  Dr. Guo, an Ingevity research engineer who is at least a POSITA (even under Dr. Rockstraw's definition), ████████████████████████████████ ████████████████████████████████ ████████████████ ██████ ████████████ (Ex. 18 at -264661-662.) ██████ ████████████████████████████ ██████████████████████████ (Ex. 18 at -264661.)  Dr. Guo reported that

---

[1]     BASF's expert, Mr. Lyons, explained that the ASAP 2020 is functionally equivalent to the predecessor ASAP 2010 available at the time the '844 patent was filed.  (Ex. 1, ¶¶ 190-93.)

███████████████████████████████████████████████████████

███████████████████████ (Ex. 18 at -264661-662.) For a sample with an incremental

butane working capacity in the critical range described by Dr. Guo, a███████████████████

████████████████████████████████████████████████████. (*See id.*)

In particular, Dr. Guo noted that ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████" (*Id.* at -264665.)

To obtain additional data quantifying the differences between McBain and ASAP 2020,

BASF commissioned testing through independent lab Intertek, which revealed significant

variations in measured adsorption capacities—*i.e.*, adsorption isotherms—between the two

methods for all three test materials:



| Sample | Adsorption Isotherm Data | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 38 Torr | | | | 380 Torr | | | |
| | McBain, g/l | ASAP 2020, g/l | Δ, g/l | Δ, % | McBain, g/l | ASAP 2020, g/l | Δ, g/l | Δ, % |
| 1. Cabot CN115LB | 64.39 | 54.44 | 9.95 | 18.28% | 116.21 | 112.32 | 3.89 | 3.46% |
| 2. BAX1100 | 50.81 | 44.62 | 6.19 | 13.87% | 102.49 | 95.84 | 6.65 | 6.94% |
| 3. Carbon Honeycomb | 25.51 | 22.27 | 3.24 | 14.54% | 40.47 | 39.33 | 1.13 | 2.88% |

(Ex. 1, ¶¶ 194-200; Ex. 19, ¶¶ 6-7; Ex. 20.)  These results show that at the lower pressure level

(38 torr)[2] corresponding to 5% concentration as recited in the claims, the McBain method produced

3 to 10 g/L (14% to 18%) higher adsorption capacities than the ASAP 2020 method.  (Ex. 20.)

Even at the higher-pressure level (380 torr) corresponding to 50% concentration as recited in the

claims, where a given adsorption difference produces a lower percentage change, the McBain

method produced 1 to 7 g/L (3% to 7%) higher adsorption capacity measurements than ASAP

---

[2]     A 2-point linear interpolation—which is just one of many possible choices for analyzing the
adsorption isotherm data—was used to estimate the values at precisely 38 torr and 380 torr.

2020. (*Id.*)  There is no meaningful correlation between these results, and thus no way to convert from one measurement method to the other.  That is, although the McBain method resulted in consistently higher adsorption capacity measurements, the differences between McBain and ASAP 2020 were not consistent either by absolute values (g/L) or by percentages.

The varying measurements between McBain and ASAP 2020 directly impacted IACs:



(Ex. 19, ¶¶ 6-7; Ex. 20.)  For the carbon honeycomb that Intertek tested, the ASAP 2020 method produced a 14% (2 g/L) higher IAC than McBain; for the Cabot carbon pellets, ASAP 2020 produced a 12% (6 g/L) higher IAC.  (Ex. 1, ¶¶ 194-200.)  For the BAX1100 carbon pellets, the two methods gave an IAC within about 1%, but only because the McBain method happened to overstate adsorption capacity by roughly the same amount (~6 g/L) at both 38 torr and 380 torr relative to ASAP 2020.  (*Id.*, ¶ 197.)  In other words, the two different methods produced significantly different adsorption capacity measurements at concentrations of both 5% and 50% by volume.

(Ex. 21, ¶¶ 19-25.)  Intertek's results again confirmed substantial variations:



(Ex. 21, ¶¶ 19-25.)

     5.    **Different Methods for Analyzing Adsorption Isotherm Data and Calculating IAC Result in Different IAC Values**

Ingevity's expert Dr. Ritter admitted that, even where only one set of data was obtained using one adsorption capacity measurement technique, IACs vary because there exist "different ways to analyze the same set of data." (Ex. 22 at 150:17-151:3; D.I. 6-1, Ritter Decl. ¶ 65.)  In analyzing BASF's EvapTrap<sup>TM</sup> XC honeycomb, ███████████████████ █████████████████████████████████████████████████████████ ██████████████████████ ██████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████ (D.I. 6-1, Ritter Decl. ¶ 59, ¶ 65; Ex. 22 at 143:12-16, 150:17-151:3; *see also* Ex. 23 at -505509 (demonstrating markedly different adsorption results depending on whether one analyzes the adsorption or desorption phase of the adsorption isotherm).)  That is not disclosed in the patent.

    **B.**    **Argument**

The '844 patent claims distinguish between adsorbent volumes, claiming an initial adsorbent volume with an IAC above 35 g/L and a subsequent adsorbent volume with an IAC below 35 g/L.

(*E.g.*, '844 patent, cl. 1.)  Despite the patent drafter allowing no margin for error at 35 g/L, the specification fails to inform a POSITA how to determine IAC.

A specification must contain "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. §112, ¶ 2.[3] A patent is indefinite "if its claims, read in light of the specification … and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Teva Pharma. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1340-41, 1344-45 (Fed. Cir. 2015) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014)) (invalidating a claim reciting "molecular weight" because the term had no plain meaning and the specification did not disclose which of three measurement methods to use).  The patent must "'appris[e] the public of what is still open to them.'"  *Nautilus*, 134 S. Ct. at 2129 (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996)).

Although "[s]ome modicum of uncertainty" may be tolerated when assessing claimed physical properties, the patent and prosecution history must establish a single known approach or establish that, where multiple known approaches exist, a POSITA would know which approach to select.  *Dow Chemical Co. v. Nova Chems. Corp.*, 803 F.3d 620, 630 (Fed. Cir. 2015).  Where multiple known approaches for assessing a physical characteristic may yield different results, and a specific approach is not required by the claims or made clear to a POSITA by the patent specification, the claims are indefinite.  *Id.* at 630, 634-35.

Here, it is undisputed that:  (1) multiple methods existed at the time of the '844 patent filing for measuring adsorption capacity; (2) the different methods produce different resulting IACs; and

---

[3]    Because the '844 patent was filed before March 16, 2013, pre-AIA patent law applies.

(3) the '844 patent does not specify which method should be used. Accordingly, summary judgment of invalidity should be granted. *Dow Chemical*, 803 F.3d at 630, 634-35.

### 1.   Ingevity Admits There Are Multiple Methods for Measuring Adsorption Capacity and Calculating IAC

Ingevity does not dispute that "there are multiple ways of measuring adsorption capacity, including at least gravimetric and volumetric methods, among others." (Ex. 4, ¶¶ 76, 82-94; Ex. 2 at 22:3-25 (gravimetric); *see also* Ex. 10 at 171:18-172:11 ("dynamic flow method"); *see* Section I.A(2), *supra*.) Ingevity also does not dispute that there are multiple methods for analyzing an adsorption isotherm. (Ex. 4, ¶¶ 100-11; D.I. 6-1, Ritter Decl. ¶¶ 59, 65; Ex. 2 at 40:11-23; Ex. 3 at 51:20-54:4, 82:10-12; Ex. 11 at -45195-196; Ex. 12 at -50154; *see* Section I.A(2), *supra*.) Accordingly, there is no dispute that multiple methods exist for determining IAC.

### 2.   Ingevity Does Not Dispute that the '844 Patent Fails to Specify a Particular Method for Measuring IAC

Dr. Rockstraw did not dispute this fact—rather, he asserted this point was "irrelevant." (Ex. 4, ¶ 97.) However, his assertion of irrelevance contradicts the law. *See Dow Chemical*, 803 F.3d at 633-35 (finding that where multiple measurement methods existed that could produce different results, the patent's failure to specify the applicable method rendered the claims indefinite).

### 3.   Different Methods Produce Different Results

All testing evidence in the record confirms that different methods for measuring adsorption capacity produce different adsorption isotherms and, therefore, different resulting IACs. (*See* Section I.A(4), *supra*.) ████████████████████████████████████████

████████████████████████████████████████████████████

(Ex. 18 at -264661-662.) For the sample tested, ████████████████████████████

████████████████████████████████████ (*See id.*)



(Ex. 20.)

(Ex. 25 at p. 3; Ex. 21, ¶ 21; *see also* Ex. 79 at -355145-46 ("

).)  Accordingly, application of different methods for measuring adsorption capacity results in large differences in IAC values, and thus uncertainty as to claim coverage for any sample.

Testing by Ingevity's expert, Dr. Ritter, confirms that different methods for analyzing adsorption isotherm data and calculating IAC produce different IAC values.  (*See* Section I.A(5), *supra*.)

Dr. Ritter was asked who determines how much deviation is acceptable, he responded, "I do."  (Ex. 2 at 143:24-144:2.)  Accordingly, application of different methods for analyzing adsorption isotherms results in different IAC values and different claim scope.

These facts render the '844 patent claims indefinite.  In *Dow Chemical*, 803 F.3d at 631, the patent coined the term "strain hardening coefficient" ("SHC") and claimed "a slope of strain hardening coefficient greater than or equal to 1.3."  To ascertain the coined SHC, a material was tested using a prior art device, and the resulting measurements were plotted on a graph to create the

"stress/strain curve." *Id.* The slope was used to calculate the coined SHC. *Id.* Like in this case, different methods existed to ascertain SHC. *Id. Dow Chemical* found three different methods for determining the maximum slope and that each method "may produce different results, i.e., a different slope." *Id.* at 633. The claims were invalid.

Just as methods for determining maximum slope resulted in different SHCs, different methods for measuring adsorption capacity and for analyzing adsorption isotherms result in different IACs. Because the '844 patent lacks guidance on which method to apply—just as the patent did in *Dow Chemical*—the claims are invalid as indefinite for failing to inform a POSITA about the scope of the invention with reasonable certainty. *Dow Chemical*, 803 F.3d at 633-35.

Dr. Rockstraw asserts that "adsorption capacity" is a fundamental property of adsorbent volumes and that all measurement methods yield the same result, but there is no evidence supporting his bare opinion. (*See* Ex. 4, ¶¶ 76, 78.) If true, testing data would support it. The data does not. The record is full of evidence from both Ingevity and BASF, and their experts, showing different IAC values result from gravimetric and volumetric methods for measuring adsorption capacity and from different methods for analyzing adsorption isotherms. (*See* Section I.A(4)-(5), *supra*.)

The failure to disclose a definitive method for determining IAC makes it impossible to determine whether an adsorbent volume falls within the scope of the claims with reasonable certainty. ████████████████████████ ████████████████████████

███████████████. ██████████████████████ ████████████████████

████████████████████████████████████████████

██████████████████████. (*Id.*) ████████████████████

████████████████████████████████████████.

Accordingly, because the '844 patent fails to disclose how to measure IAC and different measurement techniques result in different IAC values, summary judgment of invalidity for indefiniteness should be granted.  *See Dow Chemical*, 803 F.3d at 633-35.

## II.   THE '844 PATENT IS INVALID UNDER 35 U.S.C. §112 FOR FAILURE TO PROVIDE WRITTEN DESCRIPTION OF OR ENABLE THE INVENTION

All asserted claims require two adsorbent volumes—one with an IAC above 35 g/L (with no upper bound) and one with an IAC below 35 g/L (with no lower bound other than zero).  There is no dispute, and even Ingevity has represented, that the specification fails to enable or describe the full scope of these claimed ranges.  The claims are therefore invalid for lack of enablement and written description.  *See MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012); *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).

### A.   Statement of Facts

#### 1.   The '844 Patent Claims, But Does Not Disclose, an Initial Adsorbent Volume Having a Very High IAC

The '844 patent claims an initial adsorbent volume having an IAC "greater than 35 g n-butane/L" with no upper bound, which Ingevity's expert, Dr. Ritter, confirmed.  (Ex. 2 at 71:10-74:5.)  However, the highest IAC disclosed in the '844 patent specification is 80 g/L.  ('844 patent, col. 8 Table; Ex. 2 at 164:11-20, 172:5-11.)  The specification is silent regarding how to obtain or manufacture adsorbent materials with higher IACs.  (Ex. 2 at 163:13-17, 172:12-19.)

Dr. Ritter admitted that, even as a POSITA at the time of the '844 patent, he was unaware of adsorbent volumes with IACs higher than 80 g/L and would not have known how to manufacture or obtain such adsorbent materials.  (*Id.* at 162:22-164:24.)  An adsorbent volume with an IAC greater than 80 g/L was not commercially available until 2010, when MWV began selling BAX 1700.  (*Id.* at 162:5-8, 164:21-24; D.I. 6-2, Reddy Decl., ¶ 22.)  It was only after filing the '844 patent that

███████████████████████████████████████████████████████████████

██████████████████████████████████████████     ███████████████████

██████    Even today, adsorbent materials with IACs higher than 85 g/L are not commercially

available, nor would a POSITA know how to make them.  (Ex. 2 at 165:9-166:25.)

        2.    **The '844 Patent Claims, But Does Not Disclose, a Subsequent Adsorbent Volume Having a Very Low IAC**

The '844 patent claims a subsequent adsorbent volume having an IAC "less than 35 g n-butane/L" with no lower bound, which Dr. Ritter confirmed as "between zero and 34.4 [sic] grams per liter."  (Ex. 2 at 67:10-68:16.)  Dr. Rockstraw agreed, identifying "any IAC less than 35 g/L that is achieved by a practitioner."   (Ex. 4, ¶ 288.)   However, the lowest IAC disclosed in the specification is 16 g/L.  ('844 patent, col. 8 Table.)  Drs. Rockstraw and Ritter both opined that an IAC of 0 g/L is impossible.  (Ex. 4, ¶ 287.)

As detailed in BASF's Opening Claim Construction Brief, in arguing for the validity of its European Patent No. 2,906,811, Ingevity represented as a fact to the European Patent Office ("EPO")—and the EPO accepted—that the '844 patent "simply does not disclose, broadly or otherwise, the use of an adsorbent in the 'subsequent' canister with a BWC of less than 3 g/dL."  (Ex. 28 at -54753; *see also* Ex. 29 at pp. 4-6; Ex. 30 at pp. 16, 20.)  ██████████████

████████████████████████████████████████████████████████  (Ex. 31

at -432608; Ex. 1, ¶ 296.)  ████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████  (Ex. 32 at 184:15-191:17.)

B.      Argument

1.      **The '844 Patent Fails to Describe or Enable the Full Upper Range of Claimed IAC Values and Is Invalid**

It is undisputed that the patent fails to describe or enable the full upper range of claimed IAC values, so the claims are invalid.  *See Ariad Pharmas.,* 598 F.3d at 1351; *MagSil*, 687 F.3d at 1380-81.  It is undisputed that the '844 patent covers an initial adsorbent volume with IACs above 35 g/L, with no upper bound, but does not describe initial adsorbents with an IAC above 80 g/L.  (*E.g.*, '844 patent, cl. 1; Ex. 2 at 71:14-74:5, 172:5-19.)  Even Dr. Ritter's testimony shows a POSITA would not have known how to make or obtain adsorbents with IACs greater than 80 g/L and ███████████ ████████████████████████████████████████████████████ (*Id.* at 162:5-165:24, 170:8-171:18.)  Accordingly, a POSITA would not understand the '844 patent inventors possessed the claimed invention, and the claims are invalid for lack of written description.  *See Ariad Pharmas.*, 598 F.3d at 1351.  Furthermore, a POSITA would not have been able to make or use the full scope of the claimed invention without undue experimentation, and the claims are invalid for lack of enablement.  *See MagSil*, 687 F.3d at 1380-81 ("[A] patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage.").

2.      **The '844 Patent Fails to Describe or Enable the Full Lower Range of Claimed IAC Values and Is Invalid**

There is no dispute that the claims require a subsequent adsorbent volume with an IAC less than 35 g/L, with no lower bound, (*e.g.*, '844 patent, cl. 1; Ex. 2 at 67:10-20; Ex. 4, ¶ 288).  Ingevity has represented to the EPO that the patent "simply does not disclose, broadly or otherwise, the use of an adsorbent in the 'subsequent' canister with a BWC of less than 3 g/dL."  (Ex. 28 at -54753.)  Ingevity's representations are consistent with the testimony of Ingevity's corporate representative that the patent does not teach the use of such adsorbents.  (Ex. 32 at 184:15-191:17.)  Ingevity therefore admits it claimed more than the '844 patent teaches, and the claims are invalid.

*See MagSil*, 687 F.3d at 1380-81 (affirming the invalidation of claims requiring a "resistance change" above 10% with no upper bound where the highest resistance change disclosed in the specification was only 11.8%).

Furthermore, there is no evidence that a canister system with a subsequent adsorbent volume having an IAC less than 1 g/L would have worked, nor is there evidence that a POSITA would have expected such an adsorbent to work, at the time of the '844 patent. ██████████

███████████████████████████████████████████ ███

███████████████████████████ (Ex. 32 at 184:15-191:17).) Thus, a POSITA would not have understood the inventors to have been in possession of the full scope of the claimed subject matter, *Ariad*, 598 F.3d at 1351, nor would a POSITA have been able to practice the full scope of the claims without undue experimentation. *See MagSil*, 687 F.3d at 1380-81.

## III.   IF THE '844 PATENT IS NOT FOUND INVALID, BASF CANNOT INFRINGE BASED ON INGEVITY'S ADMISSIONS REGARDING CLAIM SCOPE

To the extent the claims are construed to avoid Section 112 invalidity—that is, to exclude the subject matter Ingevity has conceded is not covered—BASF's honeycombs cannot infringe, and summary judgment of non-infringement should be granted. *See Rhodia Chimie v. PPG Indus. Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005) (construing claims to exclude what was disclaimed by Plaintiff to "ensure[ ] that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers" and granting summary judgment of non-infringement).

### A.   Statement of Facts

*See* Section II.A(2), *supra*.

**B.** **Argument**

BASF's honeycombs have ████████████████████████████████████

which Ingevity admits is not taught by the '844 patent.  (Ex. 33 at 195:11-196:14.)  Ingevity's

expert's IAC calculations for BASF's honeycombs ████████████████████████████

████████████████████████████████████████, based on Ingevity's admissions

concerning an IAC-to-BWC correlation.  (Ex. 34, ¶¶ 188-89; Ex. 35, ¶¶ 67-68.)  Thus, there is no

dispute BASF's honeycombs do not infringe, because they are well below the 3 g/dL BWC (and

7.2 g/L IAC) threshold Ingevity admitted is outside the '844 patent teachings.

## IV.   THE '844 PATENT IS INVALID BECAUSE DELPHI MADE THE ALLEGED INVENTION BEFORE WESTVACO

A patent is invalid if the claimed subject matter was first made by another inventor.

35 U.S.C. §102(g)(2) (pre-AIA). Prior invention is shown by being first to (1) reduce the invention

to practice, or (2) conceive the invention and then exercise reasonable diligence in reducing the

invention to practice.  *See Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1332 (Fed. Cir.

2001).  Here, Delphi was first *both* to conceive and exercise diligence *and* to reduce to practice.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

### A.   Statement of Facts

#### 1.   Delphi Conceived of the Alleged Inventions in October 1999

████████████████████████████████████████████████████

████████████████████████████████████████████████████

15



(*Id.* at 7:25-12:23.)

(*Id.* at 11:7-13, 62:2-20.)

(*Id.* at 7:25-12:23.)

(*Id.*)

(*Id.*; Ex. 7 at 56:21-57:7.)

(Ex. 36 at 7:25-12:23.)

(*Id.* at 7:25-12:23, 15:10-17:13.)

(Ex. 37 at -3072-73, -3085-86; Ex. 36 at 15:10-17:13, 45:22-47:5.)

(Ex. 36 at 45:22-49:2, 52:23-55:7.)

████████████████ (Ex. 38 at -2119; Ex. 36 at 45:22-49:2, 66:2-19.) ████████████

████████



(Ex. 39; Ex. 7 at 137:23-138:17, 294:6-296:7.)

(Ex. 38 -2117.)

(Ex. 38 at -2119.) (Id.)

(Id. at -2117-2118.)



(Ex. 38 at -2120.) ████████████████████████████████████

████████████████████████████████ (*Id.*)

████████████████████████████████████████████

(Ex. 36 at 73:3-75:15; Ex. 40.) ████████████████████████

████████████████████████████████████████████ (Ex. 41; Ex. 36

at 73:3-75:15, 76:21-80:4; Ex. 7 at 84:22-89:4.)  Figure 6 of this provisional patent shows a drawing

of a Delphi scrubber (100) in line with a standard canister (50) in an evaporative emissions system:



FIGURE 6: HC scrubber in evaporative emissions system

(Ex. 41 at -536964.)

This application later issued as U.S. Patent No. 6,896,852, titled "Hydrocarbon Bleed

Emission Scrubber with Low Restriction," naming the Delphi Inventors and assigned to Delphi

Technologies, Inc.  (Ex. 42.) ████████████████████████████

████████████████████████████████████████████

(Ex. 36 at 76:21-77:25; Ex. 7 at 84:22-89:4.)

18

3.    **Westvaco's Early Honeycombs Were Designed for Air-Intake Systems, and Not Fuel Tanks**

Although Westvaco was making activated carbon honeycombs by 1999, Westvaco's honeycombs at that time were intended for use in engine air intakes.  (Ex. 43 at 22:10-34:24, 51:15-25.)  There is no evidence that Westvaco used honeycombs in fuel tank systems until well after January 2000.

4.    **Ingevity's Conception on ▇▇▇▇▇ Was Too Late**

On ▇▇▇▇▇▇, Larry Hiltzik, Don Tolles, Jacek Jagiello, and Roger Williams ("Ingevity Inventors") conceived of the alleged '844 patent inventions.  (Ex. 27 at 42:5-19; Ex. 44.)



(*Id.*)

(*Id.* (citing NGVT0020387 at Sheet 2).)  None of the Ingevity Inventors alleges conception in 1999 or diligence thereafter. Ingevity does not claim priority conception before ▇▇▇▇▇ .  (*See id.*)

**B.    Argument**

1.    **Delphi's Reduction to Practice of the Delphi Scrubber Anticipates the '844 Patent**

Reduction to practice is a question of law based on factual findings.  *See Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).  When a prior inventor has:  (1) constructed an embodiment or performed a process that met all the claim limitations; and (2) determined that the invention worked for its intended purpose, the inventor has sufficiently reduced the invention to

practice and established priority under § 102(g). *See Mycogen Plant Sci.*, 243 F.3d at 1332.  Third-party Delphi Inventors' testimony, ▮▮▮▮▮▮▮▮▮ shows that by ▮▮▮▮▮▮▮▮▮ the Delphi Inventors built the Delphi Scrubber and established by testing that it reduced canister bleed emissions.  "Documentary or physical evidence that is made contemporaneously with the inventive process"—such as the Delphi RoI and Delphi Scrubber—provides "the most reliable proof" that conception and reduction to practice has been corroborated. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001).

The asserted claims are directed to systems and methods "for reducing fuel vapor emissions in automotive evaporative emissions control systems"—the exact utility of the Delphi Scrubber.  The three asserted independent claims—1, 18, and 43—were treated coextensively by BASF and Ingevity's technical witnesses and include just two key limitations.  As discussed the Delphi Scrubber met all limitations of the asserted claims.  (Ex. 50.)

          a.     **The Delphi Scrubber had *an initial adsorbent volume having incremental adsorption capacity at 25° C. of greater than 35 g n-butane/L***

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 7 at 189:4-190:1, 257:19-258:18; Ex. 36 at 48:2-49:2, 66:2-19, 73:3-75:15, 100:5-16.)  The BAX 1100 or BAX 1500 carbon in the standard canister is the initial adsorbent volume, and there is no dispute that both BAX 1100 and BAX 1500 have IACs greater than 35 g/L as claimed.  ('844 patent, 2:16-21; 8:5-60 (table reflecting IAC of 52 for BAX 1100 and 80 for BAX 1500).)

          b.     **The Delphi Scrubber had *at least one subsequent adsorbent volume having an incremental adsorption capacity of less than 35 g n-butane/L***

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 36 at 64:15-66:25; Ex. 38 at -2120.) ▮

20



(Ex. 45 at -503044.)

(*Id.* at -503044-050.)  The IAC is

within a range from 14 to 17 g/L—under the claimed 35 g /L threshold.  (*Id.* at -503050-051.)

### c.   The Delphi Inventors appreciated the Delphi scrubber worked

(Ex. 38 at -2119.)

(Ex. 7 at 74:20-77:1; Ex. 36 at 66:2-19; Ex. 38 at -2120.)

(Ex. 4, ¶¶ 17-18; '844 patent,

4:31-32; *see also* Ex. 46 at -19415

).)

(Ex. 36 at 66:2-19.)

(Ex. 7 at 192:25-193:14.)

A "prior inventor does not need to know everything about how or why its invention

worked.  Nor must it conceive of its invention using the same words as the patentee would later use

21

to claim it." *Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP*, 661 F.3d 1378, 1384 (Fed. Cir.

2011). Thus, even though the Delphi Inventors did not recite the "IAC"—because "IAC" had not

yet been coined—they appreciated the benefits. *See id.* at 1384-1385. (*See also* Ex. 47 (No. 337-

TA-1140 April 7, 2020 Final Decision); Ex. 48 at -545669 (ITC Initial Determination) ("the Delphi

Inventors certainly appreciated the bleed emissions benefit a honeycomb in a subsequent, auxiliary

position gave the [Delphi Scrubber], even if they did not appreciate which property of the

honeycomb to credit").)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████     (Ex. 38; *see also* Ex. 7 at 69:12-70:19 (low flow restriction); Ex. 36

at 61:7-25 (same); Ex. 7 at 71:6-22 (scrubbing efficacy); Ex. 37 at -3085-86 (████████████████

████████████████████████).) Delphi therefore reduced the alleged inventions of the

'844 patent to practice before the Ingevity Inventors, anticipating the claims under § 102(g). *See*

*Teva*, 661 F.3d at 1384-85 (finding prior inventor must show compound was "stable" but did not

"need to appreciate which component was responsible for the stabilization" to anticipate claim for

"stabilizing effective amount"); *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 (Fed.

Cir. 2001) (testimony that "beautiful foam" "surprised" and "elated" them established appreciation

of prior invention of claimed process using isobutane to manufacture foam).

      2.    **The Delphi Inventor's Conception and Diligence Also Anticipates the '844 Patent**

"Priority goes to the first party to reduce an invention to practice unless the other party can

show that it was the first to conceive the invention and that it exercised reasonable diligence in

later reducing that invention to practice." *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993).

By Ingevity's own admissions, it did not conceive of the alleged inventions in the '844 patent until

August 17, 2001. █████████████████████████████████████  ████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████  Thus, in this case, Delphi was not only first to reduce the Delphi

Scrubber to practice, it was also the first to conceive of the invention and exercise diligence to

reduce it to practice.

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████  (Ex. 36 at 7:25-12:23, 15:2-16:20.)  This "specific, settled idea" was "a particular

solution to the problem at hand."  *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303,

1312 (Fed. Cir. 2011). ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

(Ex. 38 at -2119.)

   After conception, ████████████████████████████████████████████████

██████████████████████  Diligence and its corroboration may be shown by a variety of

activities, including inventor testimony, preparation of patent applications or other records

describing the invention, or activity to obtain necessary supplies or manufacturing. *See Brown v.*

*Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006).  The evidence shows ██████████████████████

██████████████████████████████████████████████████████████████████:

- ██████████████████████████████████████████. (Ex. 36
  at 11:20-12:23, 16:2-15, 38:7-24, 69:4-70:24, 71:6-74:7; Ex. 49 at -3842.)

- █████████████████████████████████████████ (Ex. 37 at -3083-
  086, -3072; Ex. 36 at 45:22-50:11; Ex. 38 at -2120.)

- █████████████████████  (Ex. 36 at 47:6-20, 52:23-54:12; Ex. 38 at -2123-
  125; Ex. 7 at 81:16-82:11, 129:3-137:19.)

- ███████████████████████████████ (Ex. 36 at 48:2-49:2, 64:21-65:16, 135:25-137:13; Ex. 37 at -3072; Ex. 38 at -2120; Ex. 7 at 135:8-137:19.)

- █████████████████ (Ex. 38; Ex. 36 at 58:2-20; Ex. 7 at 66:2-67:16, 77:17-79:25.)

- ████████████████████████████ (Exs. 41, 42; Ex. 7 at 84:3-89:4; Ex. 36 at 72:24-78:13.)

There is no genuine dispute of material fact that the Delphi Inventors were both the first to conceive of the inventions in the '844 patent and were diligent in reducing the invention to practice, so summary judgment is warranted for this additional reason. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### 3.    The ITC Has Found the Asserted Claims Invalid; This Decision Is Persuasive

Ingevity filed a complaint on November 8, 2018, in the International Trade Commission seeking to enforce the same patent asserted in this case against MAHLE and others.  After an evidentiary hearing, the ALJ issued an Initial Determination ("ID") of no violation.  (Ex. 48.)  The ALJ found all of the patent claims invalid on numerous grounds.  (*Id.* at -45759.)  All asserted claims were either anticipated by the Delphi invention or obvious in view of the Delphi invention and other prior art.  (*Id.* at -45660-5678.)  Ingevity's petition for review of the ID did not change the outcome.  (Ex. 47.)  Ingevity filed a notice of appeal.  While decisions of the ITC involving patent issues have no preclusive effect in district courts, district courts can "attribute whatever persuasive value to the prior ITC decision that it considers justified."  *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996).

## V.    THE '844 PATENT IS UNENFORCEABLE DUE TO PATENT MISUSE

The undisputed record supports summary judgment for BASF on its defense of patent misuse.  As shown below, Ingevity █████████████████████████████

████████████████████████████████████████████████████████. This
is precisely the type of conduct that courts have long condemned as *per se* patent misuse.[4]

### A.      Statement of Facts

*Through its '844 patent, Ingevity has market power for the tying product—technologies to meet current bleed emissions standards issued by the U.S. Environmental Protection Agency and the California Air Resources Board, referred to as "LEV III / Tier 3."* ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████ (Ex. 51 at -243331 and -343; *see also* Ex. 52 at -39894; Ex. 53.) ██████████████████████████████████████

████████████████████████████████ (Ex. 54 at 37:2-21) and conceded that Ingevity has market power (*id.* 39:7-14).

*Ingevity used its market power to require manufacturers of fuel canisters allegedly covered by the '844 patent to purchase all carbon adsorbents (the tied product) used in those canisters—including pelletized carbons, carbon honeycombs, and other carbon products—from Ingevity.*

████████

. (Ex. 55 at 118:5-10; Ex. 56 at -498756; *see also* Ex. 57 at 12:14-13:10; Ex. 58, ¶ 20.) ████████████████████████████

████████████████████████████████████████████████████████████

(Exs. 59, 60, 61.)

*Carbon adsorbents have many uses other than practicing the '844 patent.* Activated carbons were used in fuel vapor canister systems for about 30 years before the alleged invention.

---

[4]      Because Ingevity's tying is *per se* misuse, no rule-of-reason analysis is needed.  Although BASF's misuse defense shares some elements with its antitrust counterclaim, "misuse is a broader wrong than an antitrust violation." *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1339 (Fed. Cir. 2006).

('844 patent at 1:32-40.) ███████████████████████████████████

███████████████████████████████ (Ex. 62 at -503315; *see also* '844 patent 5:46-

49.) Ingevity sells its

███████████████ (Ex. 63 at -432213), ████████████████████████████

████████ (Ex. 62 at -503316), ████████████████████████ (Ex. 64 at -237484;

Ex. 55 at 39:2-25).

     ***Carbon honeycombs also have uses that do not practice the '844 patent.*** For example, they

can be used to ███████████████████████ (Ex. 65 at 32:23-35:23), ███████

████████ (*id.* at 36:16-37:9; Ex. 7 at 229:15-230:16). ███████████████████████

████████████████████████ (Ex. 64 at -237484; Ex. 65 at 32:23-35:23;

Ex. 55 at 39:2-25.) Although it claims to sell "HCA"-branded honeycombs only for use in fuel

canisters, it has also sold them for use in ████████. (Ex. 66 at 1; Ex. 56 at -498730.) ███

████████████████████████████████████████████████████

████.

(Ex. 57 at 234:15-235:19; Ex. 67 145:8-146:3, 159:5-15.)

     ***The '844 patent does not require the use of carbon honeycombs.*** It states that the preferred

embodiment can be made from a variety of raw materials, including porous silica, and can take

different forms and shapes. ('844 patent at 4:15.) Ingevity admits that "

██████████████████████." (Ex. 68; *see also* Ex. 55 at 23:17-25:1; Ex. 52 at -398880.)

Ingevity also concedes that a

█████████████████████████████████████████████████████

██████████ (Ex. 56 at -498730; *see also* Ex. 69 at ¶¶ 269, 283.) ███████████████

█████████████████████████████████████████████████████

████   (Exs. 70, 71.)

**B.      Argument**

1.      **A Patentee With Market Power that Conditions a License on the Purchase of a Separate, Staple Good Is Guilty of *Per Se* Misuse**

Patent misuse is a complete defense to patent infringement.  *See Va. Panel Corp. v. MAC Panel Corp.*, 133 F.3d 860, 868 (Fed. Cir. 1997).  It reflects the bedrock principle that a patentee may not leverage its patent to "obtain market benefit beyond that which inheres in the statutory patent right."  *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1327 (Fed. Cir. 2010) (en banc).  A patent that is misused to restrict lawful competition "become[s] unenforceable, and the patentee loses its right to sue for infringement."  *Id.* at 1328.

Certain practices are deemed patent misuse *per se* because "[e]xperience has taught" that they "are sufficiently anticompetitive so as to warrant condemnation on their face."  *Princo Corp. v. Int'l Trade Comm'n*, 563 F.3d 1301, 1307 (Fed. Cir. 2009), *reinstated in relevant part after reh'g en banc*, 616 F.3d at 1326 n.1.  Tying arrangements, where "a patentee having market power conditions a license upon the purchase of a separate, staple good," are the classic example of *per se* patent misuse.  *Id.*; *see Va. Panel*, 133 F.3d at 869.  When a patentee with market power ties licensees to the purchase of an unpatented product, it can avoid a finding of *per se* patent misuse only by showing that the unpatented product is a "nonstaple" good.

2.      **Ingevity Has Repeatedly Tied Licenses to Practice the '844 Patent to the Purchase of Carbon Adsorbents, a Staple Article of Commerce**

There is no genuine dispute that Ingevity has conditioned both express and implied licenses to practice the '844 patent on the licensees' agreement to purchase unpatented carbon adsorbents, including pelletized carbon, granular carbon, and carbon honeycombs (the tied products), exclusively from Ingevity.  (*See* Section V.A, *supra*.)  Nor is there any genuine dispute that Ingevity

27

has market power in the market for technologies to meet LEV III / Tier 3 regulatory requirements,

the tying product;                                              . (*See* Section V.A, *supra*.)  Thus,

Ingevity's only possible defense is to show that carbon adsorbents are a "nonstaple" good.

Ingevity cannot make that showing.  To qualify as a nonstaple good, a product must be *both* (1) "capable only of infringing use in [the] patented invention;" *and* (2) "essential to that invention's advance over prior art."  *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980).  If the tied product (here, carbon adsorbents) has no uses outside of the patented invention *and* is "the heart of [the] invention," then the tying arrangement "affects only the market for the invention itself" and does not restrain competition in any separate market.  *Id.* at 214, 220.  In *Dawson*, the patentee licensed its patent, which claimed a method of using the chemical propanil as an herbicide, only to those who purchased propanil from the patentee.  The Court deemed propanil a nonstaple good because (1) it had no use other than practicing the patented method, and (2) it was essential to the patent's claimed advance over prior art.  *Id.* at 213.

Here, by contrast, the evidence is overwhelming that carbon adsorbents have many uses that predate and do not infringe the '844 patent, and the patent does not claim them as essential to the practice of the patented method.  (*See* Section V.A, *supra*.)  Even if one were to focus only on carbon honeycombs, the result would be the same.  Carbon honeycombs were developed many years prior to the '844 patent and have many                                    , and other noninfringing applications.  (*See* Section V.A, *supra*; Ex. 72 at -2785.)

Nor are carbon adsorbents or even carbon honeycombs "essential to [the '844 patent's] advance over prior art."  *Dawson*, 448 U.S. at 213.  The patent itself states that the adsorbents in the preferred embodiment can be made from a variety of raw materials and can take many different forms, and Ingevity admits that                                          . (*See* Section V.A, *supra*.)

The inventors did not come up with the idea of using carbon adsorbents to capture fuel vapor emissions, nor did they claim to have discovered the adsorptive properties of either activated carbon in general or carbon honeycombs in particular.  ('844 patent at 3:45.)  Contrast this with *Dawson*, where propanil was deemed a nonstaple good in part because "the heart of respondent's invention" lay in the recognition of propanil's "herbicidal property."  448 U.S. at 214.  Ingevity thus cannot show that carbon honeycombs, or other carbon adsorbents, are "essential to [the '844 patent's] advance over prior art."  *Id.* at 213.

### 3.   Ingevity Cannot Avoid This Conclusion by Attempting to Limit the Patent Misuse Inquiry to Specific, Branded Honeycomb Products

Because it cannot show that carbon adsorbents, or even carbon honeycombs, are a nonstaple good, Ingevity argues that

. (Ex. 57 at 11:8-12:11.)  While not disputing that "

" (Ex. 73, ¶ 981 (emphasis in original)), Ingevity's technical expert, Dr. David Rockstraw, insists that

(*id.* ¶ 976).  For example, Dr. Rockstraw

(Ex. 66 at 1), ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 34, ¶ 327).

These arguments miss the mark.  For one thing, even assuming that certain HCA-branded honeycombs have only infringing uses, Ingevity does not argue that the same is true of *all* the carbon adsorbents it required patent licensees to purchase exclusively from Ingevity.  (*See, e.g.*, Ex. 63 at -432213; Ex. 62 at -503316.)  Ingevity thus cannot avoid the conclusion that it has misused the patent with regard to carbon adsorbents other than honeycombs.  More fundamentally, Ingevity is

wrong to focus on a narrow subset of its own HCA-branded honeycomb products.  If the patent misuse inquiry asked only whether specific branded products sold by the patentee have been put to noninfringing uses, it would be toothless.  The patentee can control what its own branded, non-patented products are used for, both by choosing to whom and under what circumstances to sell them and by tailoring them in superficial ways.  The relevant question is whether the tied product *category* comprises staple or nonstaple goods.  As explained above, there is no genuine dispute that both carbon adsorbents and carbon honeycombs are staple goods.

The Supreme Court's seminal decision in *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488 (1942), illustrates the correct approach.  There, the owner of a patent on a machine for adding salt tablets to canned goods tied licenses to the purchase of salt tablets.  The tablets had "a particular configuration rendering them capable of convenient use in [the] patented machines." *Id.* at 490.  The Court nonetheless held that the patentee was guilty of misuse for "making use of its patent monopoly … to suppress competition in the sale of an unpatented article," namely, salt. *Id.* at 491.[5]  Here, too, Ingevity cannot avoid a finding of misuse by arguing that certain of its HCA-branded honeycombs have a particular configuration that makes them suited for use in fuel vapor canisters.  Like salt, carbon adsorbents (including carbon honeycombs) are a staple article of commerce with countless noninfringing uses.  Ingevity

. (*See*

---

[5]      The Supreme Court has abrogated *Morton Salt* to the extent it did not require proof that the patentee had market power, *see Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006), but it explicitly left intact *Morton Salt*'s holding that "the defendant's patents did not confer any right to restrain competition in unpatented salt," *id.* at 39; *see also Princo*, 616 F.3d at 1333.  And the Federal Circuit regards *Morton Salt* as "a typical 'tying' case" that exemplifies an "unlawful condition on [a] patent license." *Princo*, 616 F.3d at 1333; *see also Va. Panel*, 133 F.3d at 869.

Section V.A, *supra*.)

.”  (Ex. 74 at 15:11-17:22.)

Ingevity’s argument that, with minimal modifications, it fashions some of its carbon honeycombs into a size and shape that “render[s] them capable of convenient use in” fuel canisters, *Morton Salt*, 314 U.S. at 490, would nullify the patent-misuse doctrine.  The reason tying has long been deemed *per se* misuse is that it allows the patentee to “use[] the market power conferred by the patent to compel customers to purchase a product in a separate market that the customer might otherwise purchase from a competitor.”  *U.S. Philips Corp. v. Int’l Trade Comm’n*, 424 F.3d 1179, 1189 (Fed. Cir. 2005).  Just as the patentee in *Morton Salt* misused its patent by requiring its licensees to purchase branded salt tablets of a particular size and shape, Ingevity has misused the ’844 patent by requiring its licensees to purchase branded honeycombs of a particular size and shape.  Accordingly, summary judgment for BASF on the patent misuse defense is appropriate.[6]

## VI.   VANDER VEEN’S DAMAGES OPINIONS SHOULD BE EXCLUDED AS UNRELIABLE, AND BASF IS ENTITLED TO SUMMARY JUDGMENT OF NO DAMAGES

Expert testimony is admissible only if it “is the product of reliable principles and methods” and “the expert has reliably applied the principles and methods to the facts of the case.”  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  “Sound economic and factual predicates” are required for that analysis.  *Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) (citation omitted).  Dr. Vander Veen,

---

[6]       Similarly, whether *BASF’s* EvapTrap$^{TM}$ XC branded honeycomb has noninfringing uses has no bearing on whether *Ingevity* has engaged in patent misuse.  Unlike the contributory infringement inquiry, which asks whether *BASF’s* products have noninfringing uses, the patent misuse inquiry “focuses on the conduct of the patentee”—here, Ingevity.  *Masimo Corp. v. Philips Elecs. N. Am. Corp.*, 742 F. Supp. 2d 492, 498-99 (D. Del. 2010); *see Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1577 (Fed. Cir. 1987).

Ingevity's damages expert, offers opinions that fail to meet these basic reliability standards for three reasons.

*First*, Dr. Vander Veen identifies no economic harm to Ingevity.  After noting potential future harms that Ingevity may suffer, he concedes that no quantifiable harm has occurred. Lacking any damages from the alleged infringement, Dr. Vander Veen then relies on data unrelated to this case and foundationally at odds with the hypothetical negotiation construct.

*Second*, Dr. Vander Veen's damages theory is supposedly based on a hypothetical negotiation, but he does ***not*** assume "infringement and validity of the patent[] and willingness of the parties to negotiate an agreement." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 (Fed. Cir. 2014).  This legal flaw renders his opinions unreliable and unhelpful to the jury.

*Finally*, Dr. Vander Veen's cost analysis and paid-up royalty resulting from the hypothetical negotiation are economically flawed, failing to apply reliable methodology to the facts.

But even if Dr. Vander Veen's opinions are not excluded, summary judgment of no damages is appropriate because damages are compensation for the economic harm caused by the infringement and must be tied to sound economic proof.  *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  But Ingevity cites ***no*** quantifiable economic harm.  Accordingly, there is no triable issue of fact on damages, and BASF requests that the Court grant summary judgment of no damages. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964) ("only 'damages' may be recovered").

### A.    Statement of Facts

Dr. Vander Veen offers two conflicting opinions:  (1) Ingevity is entitled to a reasonable royalty of no less than ██████; and (2) the extent of any future harm due to prospective lost market share, price erosion, or diminished brand reputation and goodwill can only be calculated if and when

32

BASF enters the market—i.e., sells the accused product—and therefore ███████████████████

██████████████████████████████ (Ex. 75, ¶93.)

Dr. Vander Veen opines that BASF would have paid at least ██████ for a license that

covered ███████████████████████████████████████████. (*Id.,* ¶ 9.)

Dr. Vander Veen's hypothetical license would not allow BASF to sell or offer to sell the accused

product.  (*Id.,* ¶ 92.)

Ingevity responded to an interrogatory seeking a description of all bases for Ingevity's

damages claims against BASF, and all evidence and calculations supporting damages.  (Ex. 76.)

Ingevity responded only with speculative damages for potential lost profits and price erosion.

Ingevity states: ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ (*Id.*)  Neither Ingevity nor its expert

identified any evidence to support—much less quantify—any alleged market confusion or price

stagnation.  (*See id.*; *supra* Part V.B.1.)

**B.    Dr. Vander Veen's Reasonable Royalty Is Unreliable Because It Is Not Tied to Ingevity's Economic Harm**

"At all times, the damages inquiry must concentrate on compensation for the economic

harm caused by infringement of the claimed invention."  *ResQNet.com*, 594 F.3d at 869.  Yet

Dr. Vander Veen does not identify any economic harm Ingevity has suffered from BASF's alleged

infringement.  ███████████████████████████████████

███████████████████████████████████████████████



(Ex. 75, ¶ 9.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, ¶¶ 37-55.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, ¶¶ 59-63.)  Neither number reflects compensation for economic harm caused by infringement.  35 U.S.C. § 284 (a prevailing claimant is entitled to "damages adequate to compensate for the infringement....").  Dr. Vander Veen simply picked an approximate cost for patent litigation and alleges that BASF would pay that much to avoid litigation.

Dr. Vander Veen opined that his limited license would allow Ingevity ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 75, ¶ 66.)  But the law does not permit damages for post-patent expiration sales.

Moreover, the hypothetical negotiation would not resolve infringement.  The license would not cover the accused importing and exporting of honeycombs, or offers or contracts for sale (▮▮▮▮▮▮▮▮▮▮▮▮▮▮), and so litigation would not have been avoided (▮▮▮ ▮▮▮▮▮).  No licensee to a hypothetical negotiation would agree to such a useless license.  As for the testing costs Dr. Vander Veen claims, basing damages on an accused infringer's increased costs to infringe is nonsensical; cost savings, on the other hand, might make economic sense, but that would lead to $0 here.  Further BASF had a less expensive non-infringing alternative: foreign testing.  Dr. Vander Veen's royalty opinion does not account for this.  Thus, Dr. Vander Veen's basis for damages is not "sound economic proof" concentrated on "compensation for the economic harm caused by infringement." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

Dr. Vander Veen's ████████ starting point for his reasonable royalty analysis is flawed for an additional reason. (Ex. 75, ¶¶ 61-63.) This number is the "low end" of a range of "litigation fees in patent infringement matters," which Dr. Vander Veen pulled from a 2017 report by the AIPLA. (*Id.,* ¶¶ 61-63; *cf. id.* ¶ 90 ("the starting point … is not derived from the profits generated by either Ingevity's carbon honeycomb products or BASF's Accused Products").) This arbitrary starting point unrelated to the facts of the case, is unreliable, and should be excluded. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

In *Uniloc*, the Federal Circuit held a damages expert's use of the 25% rule—a scheme used to approximate a reasonable royalty starting point—was "a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation." *Id.* at 1312-13, 1315. Like the 25% rule in *Uniloc*, Dr. Vander Veen's use of generic litigation cost information is a "fundamentally flawed" scheme to determine a starting point; the ████████ has no relation to this case and does not reflect any harm to Ingevity. *See id.* at 1317-18 ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion."). Dr. Vander Veen's opinion "fails to pass muster under *Daubert* and taints the jury's damages calculation." *Id.* at 1317.

## C. Dr. Vander Veen's Reasonable Royalty Is Unreliable Because He Does Not Apply the Required Assumptions of the Hypothetical Negotiation Construct

The hypothetical negotiation "assumes infringement and validity of the patents and willingness of the parties to negotiate an agreement." *Aqua Shield*, 774 F.3d at 771. Vander Veen failed to apply the required "hypothetical negotiation" construct, ignoring the presumption that: (1) Ingevity is a willing licensor; and (2) the parties presume the patent to be valid and infringed, rendering his reasonable royalty opinions legally flawed and therefore unreliable. *See Carucel Investments, L.P. v. Novatel Wireless, Inc.*, No. 16-CV-118-H-KSC, 2017 WL 1215838, at *9

(S.D. Cal. Apr. 3, 2017) (excluding expert opinions where expert failed to apply hypothetical negotiation construct), *aff'd*, 730 F. App'x 938 (Fed. Cir. 2018).

(Ex. 75, ¶¶ 61-63.)  But if both BASF and Ingevity assume the patent is both valid and infringed, there would be nothing for BASF to litigate, so BASF would not contemplate litigation costs in the hypothetical negotiation.

**Second**, Dr. Vander Veen improperly assumes Ingevity is ***not willing*** to license the patent:



- (Ex. 75, ¶ 9 (emphasis added).)

- (*Id.,* ¶ 60 (emphasis added).)

Dr. Vander Veen opines that Ingevity's bargaining position at the hypothetical negotiation was so strong that there was ***no*** "

." (Ex. 75, ¶ 8; *see also id.*, ¶¶ 32, 92.)  But the hypothetical negotiation construct presumes "a willing licensor and licensee." *Aqua Shield*, 774 F.3d at 771.  Whether Ingevity would have actually negotiated with BASF is irrelevant to the hypothetical negotiation. *Carucel Investments*, 2017 WL 1215838, at *9 (S.D. Cal. Apr. 3, 2017).

Although experts may consider a patentee's no-license policy and bargaining power in calculating the reasonable royalty, a key "assumption underlying the hypothetical negotiation is that the patent owner would have granted the infringer a license at a rate that would have enabled

the infringer to utilize the invention." *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 609-10 (D. Del. 1997). Here, Dr. Vander Veen opines Ingevity would ***not*** negotiate with BASF for a license to sell the accused product. Thus, he did not properly apply the law requiring a "willing licensor," and his opinions are legally flawed, unreliable, and unhelpful to the jury. *See Bioverativ Inc. v. CSL Behring LLC*, C.A. No. 17-914-RGA, 2020 WL 1047755, at *3 (D. Del. Mar. 4, 2020) (excluding damages expert's convoyed sales opinion because expert failed to apply correct legal test).

### D.     Dr. Vander Veen's Avoided Cost Opinions Do Not Reliably Apply Economic Principles to the Facts

In addition to violating the required assumptions of the hypothetical negotiation, Dr. Vander Veen's opinion should be excluded because he does not reliably apply economic methods to the facts in the case. Dr. Vander Veen's royalty is based in part on BASF's avoided costs. (Ex. 75, ¶¶ 26-32.) But rather than evaluating the incremental cost of a non-infringing alternative—here, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓—Vander Veen uses: (1) ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; and (2) ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (*Id.*) Both of these inputs are based on flawed economics.



▓▓▓▓▓ (Ex. 75, ¶¶ 28-29.) Thus, if BASF pays Ingevity for a license, ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The higher U.S. personnel costs are not an avoided cost but an additional cost. Dr. Vander Veen's opinions to the contrary are economically flawed, failing to reliably apply cost avoidance principles to the facts, and should be excluded. *See* Fed. R. Evid. 702.



(Ex. 77, ¶ 43), and Dr. Vander Veen's opinions to the contrary fail to apply reliable economic methodology or common sense.

Dr. Vander Veen's reasonable royalty opinion is based on an incorrect application of the required hypothetical negotiation construct, as well as unsound economic and factual predicates. Rule 702 requires exclusion of his unreliable opinions.

### E.   Ingevity Cannot Prove It Is Entitled to Any Damages

Ingevity is only entitled to "damages adequate to compensate for the infringement." 35 U.S.C. § 284.  Since there is no harm that requires compensation, summary judgment of no damages is warranted.  Ingevity alleges harm based on lost market share, price erosion, and diminished brand reputation and customer goodwill.  (Ex. 76 at 86; Ex. 75, ¶ 9.)  But Ingevity and its expert concede these are *potential* harms that *might* occur *if* BASF makes an infringing sale—which it has not.  (Ex. 75, ¶¶ 44, 51, 54; Ex. 76 at 66

); Ex. 78 at 26

██████████████████████████████████████████ (Ex. 75, ¶¶ 44, 51, 54.)

Given these admissions and Ingevity's representation that ██████████████████████

███████████████████████████████████████████████████████████████████

███████████████████" there is no genuine dispute that Ingevity's damages claims lack "sound

economic proof." *ResQNet.com*, 828 F. Supp. 2d at 692.

Additionally, these ***potential*** damages are not tied to any ***actual*** harm to Ingevity and are,

therefore, further unsupported. *Id.* For example, neither Ingevity nor its expert has calculated—or

even estimated—any economic harm Ingevity has incurred from the alleged infringement, which

includes only a small number of tests and does ***not*** include any sale or accelerated market entry.

███████████████████████████████████████████████████████████████████

████████████████████████████████████ (*E.g.* Ex. 75, ¶¶ 92-93.) Instead,

Dr. Vander Veen concedes there is no economic harm that can be calculated or quantified based on

the infringement to date.  Thus, there is no genuine dispute of material fact regarding the amount of

economic harm to Ingevity based on BASF's alleged infringement.  There is none.  Ingevity's

speculative allegations of possible future harm cannot survive summary judgment.  *See Jutrowski v.*

*Township of Riverdale*, 904 F.3d 280, 288-89 (3d Cir. 2018) ("Speculation, conclusory allegations,

suspicions, or mere denials do not suffice to raise a genuine dispute of material fact.").

Dr. Vander Veen's ███████ royalty should be excluded as unreliable under Rule 702.

(Section VI.B-D.)  And in the absence of Dr. Vander Veen's testimony, the jury has no basis to

award or quantify any damages.  *See Celotex*, 477 U.S. at 322 (a court must grant summary

judgment "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof").

But even if Dr. Vander Veen's opinions are not excluded, summary judgment is still appropriate because his ███████ royalty is not tied to the economic harm caused by the alleged infringement, and nothing in his analysis ties "proof of damages to the claimed invention's footprint in the market place" as required.  *ResQNet.com*, 594 F.3d at 869.  On this record, no reasonable trier of fact could find that the alleged infringement cost Ingevity ███████, or that BASF would pay ███████ for a license with no economic benefit.  *See AVM Techs., LLC v. Intel Corp.*, C.A. No. 10-610-RGA, 2013 WL 656745, at *15-16 (D. Del. Mar. 29, 2013) (excluding expert and granting summary judgment of no damages because plaintiff had no evidence with which to prove damages); *Unicom Monitoring, LLC v. Cencom, Inc.*, No. 06-1166 (MLC), 2013 WL 1704300, at *7-8 (D.N.J. Apr. 19, 2013) (granting summary judgment of no damages due to plaintiff's "dearth of evidence" supporting its reasonable royalty).

## VII.   CONCLUSION

For the foregoing reasons, BASF respectfully requests that the Court grant it summary judgment on Ingevity's patent infringement claims.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

OF COUNSEL:

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South California Avenue, Suite 100
Palo Alto, CA  94304
(650) 422-6700

James P. Brogan
Brian Eutermoser
Kevin Lake
Angela Tarasi
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street, Suite 800
Denver, CO  80202

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
araucci@mnat.com

*Attorneys for Defendant BASF Corporation*

40

Bobby R. Burchfield
Norman Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W., Suite 200
Washington, DC  20006

Joseph D. Eng., Jr.
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY  10036-2601
(212) 556-2205

June 12, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 12, 2020, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered

participants.

I further certify that I caused copies of the foregoing document to be served on June 12,

2020, upon the following in the manner indicated:

John W. Shaw, Esquire                                          *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
Nathan R. Hoeschen, Esquire
Jeffrey T. Castellano, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs*

Jeffrey T. Thomas, Esquire                                    *VIA ELECTRONIC MAIL*
Frank P. Coté, Esquire
Eric T. Syu, Esquire
Taylor W. King, Esquire
Nathaniel R. Scharn, Esquire
GIBSON DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612
*Attorneys for Plaintiffs*

Brian M. Buroker, Esquire                                     *VIA ELECTRONIC MAIL*
Omar F. Amin, Esquire
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
*Attorneys for Plaintiffs*

Stuart M. Rosenberg, Esquire                          *VIA ELECTRONIC MAIL*
GIBSON DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304
*Attorneys for Plaintiffs*

Rustin K. Mangum, Esquire                             *VIA ELECTRONIC MAIL*
Spencer W. Ririe, Esquire
MANGUM RIRIE LLP
999 Corporate Drive, Suite 260
Ladera Ranch, CA  92694
*Attorneys for Plaintiff*

                                        */s/ Rodger D. Smith II*

                                        _____
                                        Rodger D. Smith II (#3778)