IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGEVITY CORPORATION, and | ) | |
| INGEVITY SOUTH CAROLINA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1391-RGA |
| | ) | |
| BASF CORPORATION, | ) | REDACTED - |
| | ) | PUBLIC VERSION |
| Defendant. | ) | |

**PLAINTIFFS' OPENING MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
<u>AND TO EXCLUDE EXPERT TESTIMONY</u>**

OF COUNSEL:
Jeffrey T. Thomas
Frank P. Coté
Eric T. Syu
Taylor W. King
Nathaniel R. Scharn
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612
(949) 451-3800

Brian M. Buroker
Omar F. Amin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500

Stuart M. Rosenberg
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304

Karen E. Keller (No. 4489)
John W. Shaw (No. 3362)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

Rustin K. Mangum
Spencer W. Ririe
MANGUM RIRIE LLP
999 Corporate Dr. #260
Ladera Ranch, CA 92694
(949) 298-5590


Dated: June 12, 2020

# TABLE OF CONTENTS

Page

I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................... 1

II.  STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ................................. 1

III.  STATEMENT OF UNDISPUTED FACTS ................................................................. 2

    A.  Facts Relevant to BASF's Patent Misuse Defense ................................................. 2

    B.  Facts Relevant to BASF's Sixth Affirmative Defense for Waiver, Implied Waiver and Equitable Estoppel ................................................................................. 3

    C.  Facts Relevant to BASF's Unclean Hands Defense ............................................... 3

    D.  Facts Relevant to BASF's Enablement Defense...................................................... 4

    E.  Facts Relevant to Whether EvapTrap XC Is a Staple Article of Commerce .......... 4

IV.  LEGAL STANDARD.................................................................................................... 5

    A.  Summary Judgment ................................................................................................ 5

    B.  Exclusion of Expert Testimony .............................................................................. 6

V.  ARGUMENT IN FAVOR OF SUMMARY JUDGMENT............................................. 6

    A.  BASF's Equitable Defenses All Fail as a Matter of Law and Should be Dismissed on Summary Judgment to Avoid the Need for a Bench Trial................................. 6

    B.  BASF's Equitable Defense of Patent Misuse Should be Dismissed on Summary Judgment ................................................................................................................ 6

        1.  BASF's Tying Theory of Patent Misuse Contradicts Supreme Court Precedent..................................................................................................... 7

        2.  Ingevity's Supply Agreements with ██████████ Do Not Render the '844 Patent Unenforceable ...................................................... 11

        3.  Ingevity's License Agreement with MAHLE Is Not Patent Misuse ........ 13

        4.  BASF's Other Allegations of Antitrust Violations Are Not Cognizable Theories of Patent Misuse......................................................................... 14

        5.  Ingevity's Alleged Past Tying Involving Base Carbon Products Does Not Render the '844 Patent Unenforceable ...................................................... 18

    C.  BASF's Unclean Hands Equitable Defense Should Be Dismissed on Summary Judgment .............................................................................................................. 20

    D.  BASF's Equitable Defenses Pled as Its Sixth Affirmative Defense for Waiver, Implied Waiver and Equitable Estoppel Are Deficient as a Matter of Law ......... 22

    E.  Ingevity Is Entitled to Summary Judgment on BASF's Enablement Defenses.... 26

        1.  BASF Does Not Contest That the Novel Aspect Is Enabled................... 26

        2.  BASF Misconstrues the Law .................................................................. 27

    F.  Ingevity Is Entitled to Partial Summary Judgment that EvapTrap XC Is Not a Staple Article of Commerce................................................................................. 29

VI.  ARGUMENT IN SUPPORT OF REQUESTS TO EXCLUDE TESTIMONY.............. 30

## TABLE OF CONTENTS
### (*continued*)

**Page**

A.  The Court Should Preclude Testimony of Dr. Mathur Related to Patent Misuse. 30

    1.  Dr. Mathur's Opinions Are Unreliable as to Patent Misuse Because She Never Addresses Patent Misuse in Rendering Her Opinions ................... 31

    2.  Dr. Mathur's Report Fails to Provide Opinions Regarding BASF Theories of Patent Misuse......................................................................................... 33

B.  The Court Should Preclude Testimony of Mr. James Lyons under *Daubert* ....... 34

    1.  The Court Should Preclude Mr. Lyons's Testimony On Topics For Which He Has No Expertise, Including Commercial Offers For Sale................. 35

    2.  The Court Should Preclude Mr. Lyons's Testimony Applying Incorrect Legal Standards......................................................................................... 36

VII.  CONCLUSION.............................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed.Cir.1992) (en banc)..............................................................................25

*Advanced Med. Optics, Inc. v. Alcon, Inc.*,
  2005 WL 782809 (D. Del. Apr. 7, 2005)..............................................................................34

*Automotive Techs. Int'l v. BMW*,
  501 F.3d 1274 (Fed. Cir. 2007)......................................................................................26, 27

*Bowman v. Monsanto Co.*,
  569 U.S. 278 (2013)..............................................................................................................14

*In re C.R. Bard, Inc.*,
  948 F. Supp. 2d 589 (S.D.W. Va. 2013)...............................................................................33

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998)...........................................................................15, 16, 20

*Carella v. Starlight Archery*,
  804 F.2d 135 (Fed.Cir. 1986)...............................................................................................37

*In re ChanBond, LLC Patent Litigation*,
  2019 WL 6910284 (D. Del. Dec. 19, 2019)...........................................................31, 32, 36

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)..........................................................................................................6, 34

*Dawson Chem. Co. v. Rohm & Haas*,
  448 U.S. 176 (1980)..................................................................................7, 8, 9, 11, 14

*Delaware Display Grp. LLC v. Vizio, Inc.*,
  2017 WL 784988 (D. Del. Mar. 1, 2007) ............................................................................28

*Dow Chem. Canada Inc. v. HRD Corp.*,
  909 F. Supp. 2d 340 (D. Del. 2012).....................................................................................17

*Schneider ex rel. Estate of Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003).................................................................................................31

*In re Facius*,
  408 F.2d 1396 (1969).............................................................................................................37

*Gilead Sciences, Inc. v. Merck & Co., Inc.*,
  888 F.3d 1231 (Fed. Cir. 2018)...........................................................................20, 21, 22

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    645 F.3d 1336 (Fed. Cir. 2011)........................................................................23, 24, 25

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006)....................................................................................................32

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
    137 S.Ct. 1523 (2017)...............................................................................................14

*Inline Connection Corp. v. AOL Time Warner Inc.*,
    2007 WL 275928 (D. Del. Jan. 29, 2007).........................................................31, 32

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
    424 F.3d 1374 (Fed. Cir. 2005)..........................................................................37, 39

*Invitrogen Corp. v. Clontech Labs. Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005)................................................................................28

*Keystone Driller Co. v. General Excavator Co.*,
    290 U.S. 240 (1933)...........................................................................................20, 22

*Kia v. Imaging Scis. Int'l, Inc.*,
    2010 WL 3431745 (E.D. Pa. Aug. 30, 2010) ..........................................................33

*Kimble v. Marvel Entertainment, LLC*,
    135 S.Ct. 2401 (2015)...............................................................................11, 12, 13, 32, 33

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)..................................................................................................34

*LG Elecs. v. Hitachi, Ltd.*,
    655 F. Supp. 2d 1036 (N.D. Cal. 2009) ....................................................................8

*Medicines Co. v. Hospira, Inc.*,
    827 F.3d 1363 (Fed. Cir. 2016) ..........................................................................35, 38

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011).............................................................................................26

*Morton Salt Co. v. G.S. Suppiger Co.*,
    314 U.S. 488 (1942)..................................................................................................32

*Nox Medical Ehf v. Natus Neurology Inc.*,
    15-cv-00709-RGA, 2018 WL 4062626 (Aug. 27, 2018).............................................6

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Pfaff v. Wells Elecs., Inc.*
525 U.S. 55 (1998)..................................................................................................35, 38, 39

*Princo Corp. v. ITC*,
616 F.3d 1318 (Fed. Cir. 2010)....................................................................................7, 15

*Qualcomm Inc. v. Broadcom Corp.*,
548 F.3d 1004 (Fed. Cir. 2008).........................................................................................24

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
553 U.S. 617 (2008)....................................................................................8, 13, 14, 32

*Safas Corp. v. Etura Premier, LLC*,
293 F. Supp. 2d 442 (D. Del. 2003).................................................................................18

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011).........................................................................................21

*TQ Delta, LLC v. ADTRAN, Inc.*,
2019 WL 5677539 (D. Del. Oct. 31, 2019) ...........................................................31

*United States v. Univis Lens Co.*,
316 U.S. 241 (1942).........................................................................................................14

*Va. Panel Corp. v. Mac Panel Co.*,
1996 WL 335381 (W.D. Va. May 29, 1996), *rev'd on other grounds*, 133 F.3d
860 (Fed. Cir. 1997)..................................................................................................16, 20

*Vehicle IP, LLC v. Werner Enters., Inc.*,
2013 WL 4786119 (D. Del. Sept. 9, 2013) ...........................................................19

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009)..................................................................................29, 30

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988)...........................................................................................26

*Wi-LAN Inc. v. Sharp Elecs. Corp.*,
362 F. Supp. 3d 226 (D. Del. 2019)..................................................................................18

*Wireless Licensing S.A.R.L. v. Apple Inc.*,
899 F.3d 1356 (Fed. Cir. 2018)..................................................................................23, 24

*Woodland Trust v. Flowertree Nursery*,
148 F.3d 1368 (Fed. Cir. 1998).........................................................................................37

## TABLE OF AUTHORITIES
### (*continued*)

<u>Page(s)</u>

**Statutes**

35 U.S.C. § 102 ................................................................................................35, 36, 37, 38, 39, 40

35 U.S.C. § 271(c) ...................................................................................................................29

35 U.S.C. § 271(d)(5) ..............................................................................................................32

**Rules**

Fed. R. Civ. P. 26(a)(2)(B) .................................................................................................33, 34

Fed. R. Civ. P. 37(c)(1) ...........................................................................................................19

Fed. R. Civ. P. 56(a) .................................................................................................................5

Fed. R. Evid. 702 ........................................................................................................6, 32, 35, 36

## I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs Ingevity Corporation and Ingevity South Carolina, LLC ("Ingevity") move for summary judgment on multiple grounds:

1.      BASF's equitable defense of patent misuse is legally insufficient under Supreme Court and other binding precedent under all of the theories that BASF presented during discovery.

2.      BASF's equitable defense of unclean hands similarly is deficient under the limited scope of that doctrine.

3.      BASF's equitable defenses of waiver, implied waiver and equitable estoppel based on lobbying activities is contrary to the law.

4.      BASF's enablement defense relies on a misapplication of the law.

5.      Ingevity also moves for partial summary judgment that the accused EvapTrap XC product is a non-staple article of commerce under Ingevity's contributory infringement allegations.

This motion also seeks to preclude expert testimony.

6.      BASF's economic expert should be precluded from testifying on the equitable defense of patent misuse because she did not address patent misuse in her report and failed to even understand the legal standard to be applied.

7.      BASF's technical expert should be precluded from testifying on commercial issues for which he has no expertise and from offering testimony using the wrong legal standards for some invalidity grounds.

## II.     STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Ingevity sued BASF on July 18, 2018 and voluntarily dismissed in favor of this action against BASF that was filed on September 6, 2018, alleging that BASF infringes U.S. Patent No.

RE38,844 (the "'844 Patent"). D.I. 1. BASF answered on October 12, 2018, D.I. 19, and on

February 14, 2019, filed an amended answer and counterclaims. D.I. 65. On March 23, 2020, the

Court bifurcated BASF's counterclaims. D.I. 246. Fact and expert discovery are complete, and

Ingevity now moves for summary judgment and to exclude testimony. The final pretrial

conference is scheduled for August 28, 2020, and a jury trial on Ingevity's patent infringement

claims is scheduled to begin on September 14, 2020. D.I. 41.

## III.    STATEMENT OF UNDISPUTED FACTS

### A.    Facts Relevant to BASF's Patent Misuse Defense

1.      Ingevity's fuel vapor canister honeycombs ("FVC Honeycombs")—those having

29 mm, 35 mm, or 41 mm diameters and 200 cells per square inch—do not have any use except

in fuel vapor canisters practicing the claims of the '844 Patent. Ex. A1 (Woodcock Tr. (9/25/18))

at 40:3-5; Ex. A2 (Woodcock Tr. (12/2/19)) at 304:6-14; Ex. A3 (Williams Tr. (5/14/20)) at

14:19-25.

2.      Ingevity's customers do not use an HCA 65x25-16 honeycomb as an adsorbent in

a fuel vapor canister. Ex. A4 (NGVT0430486) at 371:11-23 (non-FVC Honeycombs, including

the HCA 65x25-16, have different cells per square inch and "distinctly different" uses); Ex. A2

at 237:11-25.

3.      Ingevity has not required any customer to purchase a honeycomb used for air

intake systems (including the HCA 65x25-16), cabin air filtration, industrial filtration, or kitchen

hoods to receive a license (express or implied) to the '844 Patent. Ex. A2 at 54:24-55:6, 304:6-

14; Ex. A4 at 304:20-305:3; Ex. A3 at 14:19-25.

4.      BASF's technical expert Mr. Lyons opined in signed trial testimony to the ITC

that the "only reasonable and intended use" of Ingevity's FVC Honeycombs is in fuel vapor

canisters. Ex. A5 (NGVT0503524 (Lyons Witness Statement)) at Q/A 700, 703.

5.      Ingevity has allowed customers to purchase carbon adsorbents with an incremental adsorption capacity ("IAC") greater than 35 g/L ("high-IAC") for use in fuel vapor canisters as a first stage adsorbent from sources other than Ingevity without asserting the '844 Patent since late-2018. Ex. A2 at 23:9-12 (change occurred 12-18 months prior to the deposition); 15:12-19; 15:20-23.

6.      Ingevity entered into a supply agreement with Delphi ███████████████████ ███; a supply agreement with ████████████████████████; and a supply agreement with ████████████████████████. Ex. A6 (NGVT0000029 (Delphi Agreement)); Ex. A7 (NGVT0543176 (███████████)); Ex. A8 (NGVT0498821 (████████████)).

7.      Ingevity's Delphi, ████████████ supply agreements do not provide ███████ ████████████. *See generally* Ex. A6; Ex. A7; Ex. A8.

8.      Ingevity's Delphi, ████████████ supply agreements do not require ████████ ████████████████████. *See generally* Ex. A6; Ex. A7; Ex. A8.

9.      Ingevity and MAHLE entered into a license agreement on ████████████ ████████████████████████████████████ ████████████████████. Ex. A9 (NGVT0040004 (MAHLE License)).

**B.      Facts Relevant to BASF's Sixth Affirmative Defense for Waiver, Implied Waiver and Equitable Estoppel**

10.      The California and U.S. governments are not open standards-setting organizations with members that vote on standards.

**C.      Facts Relevant to BASF's Unclean Hands Defense**

11.      BASF's assertions of antitrust violations and patent misuse do not allege conduct between Ingevity and BASF; all alleged conduct is between Ingevity and a third party.

12.      The Court denied BASF leave to amend its pleadings to add an affirmative

defense of inequitable conduct. D.I. 147 at 23-25; D.I. 246 at 6.

13.     An inequitable conduct defense is not asserted in this matter. D.I. 65; Ex. A17.

**D.     Facts Relevant to BASF's Enablement Defense**

14.     The '844 Patent discloses "a method for sharply reducing diurnal breathing loss emissions from automotive evaporative emissions control systems by providing multiple layers or stages, of adsorbents." Ex. A21 ('844 Patent) at Abs.; *see also id.* at 4:9-13 ("The disclosed invention relates to the use of multiple beds … of adsorbent materials, which, in combination, significantly reduce DBL emissions.").

15.     The Asserted Claims each require an initial adsorbent volume with an IAC "greater than 35 g n-butane/L" and a subsequent adsorbent volume with an IAC "less than 35 g n-butane/L." *E.g.*, *id.* at cls. 1, 18, 43.

16.     Examples 1-3 in the Table of column 8 were each tested in a canister where they were preceded by an initial adsorbent volume of BAX 1500, which is reported as having an IAC greater than 35 g/L. *Id.* at 6:50-57, 8:42.

17.     Examples 1-3 of the Table of column 8 are subsequent adsorbent volumes reported to have IACs less than 35 g/L. *Id.* at 8:42.

**E.     Facts Relevant to Whether EvapTrap XC Is a Staple Article of Commerce**

18.     The shape and dimensions of BASF's EvapTrap XC match Ingevity's HCA scrubbers used as subsequent adsorbent volumes in fuel vapor canisters so that EvapTrap XC can be used as a drop-in replacement. Ex. A11 at 24:6-15, 43:3-15, 45:4-11, 48:20-49:2, 55:12-20; Ex. A18 (BASF_INGV000406) at 415; Ex. A19 (BASF_INGV001831) at 854; Rockstraw Decl.; Ex. R1 (Rockstraw Opening Rep.) ¶338.

19.     BASF's EvapTrap XC is intended for use as a subsequent adsorbent volume in a fuel vapor canister. Ex. A11 at 185:13-15, 188:1-19; Ex. A12 at 81:8-23, 82:18-83:22, 84, 84:7-

21; Ex. A20 (Abraham Tr.) at 50-55, 59:7-21; Ex. R1 ¶¶320-327; Ex. R2 (Rockstraw Rebuttal Rep.) ¶¶976-986; Ex. R3 (Rockstraw Reply Rep.) ¶¶115-121.

20.     BASF identified no evidence during discovery that EvapTrap XC has any substantial uses other than as a subsequent adsorbent volume in a fuel vapor canister. *See, e.g.*, Ex. A11 at 185:13-15 (testifying that EvapTrap XC "doesn't have any other use outside of fuel canister in that shape and form that it has for fuel canister, that is correct"); Ex. A14 at Interrog. No. 18; Ex. A23 (Lyons Opening Rep.) ¶722-733; Ex. A24 (Lyons Rebuttal Rep.) ¶¶89-99; Ex. A25 (Lyons Reply Rep.) ¶¶790-797; Ex. R1 ¶¶320-326; Ex. R2 ¶¶976, 980-981, 986; Ex. R3 ¶¶115-121.

21.     BASF's response to an interrogatory requiring a description of "all facts and circumstances supporting or contradicting" BASF's contention that "EvapTrap XC honeycombs are staple articles or commodities of commerce suitable for substantial noninfringing use," identified no instance where EvapTrap XC was used, offered for sale, or sold for a use other than as a subsequent adsorbent volume in a fuel vapor canister. Ex. A14 at Interrog. No. 18.

22.     BASF's expert, Mr. Lyons, opined only that carbon honeycombs as a category of products have substantial uses other than as a subsequent adsorbent volume in a fuel vapor canister, but did not opine that BASF's accused EvapTrap XC product has any other substantial use. Ex. A23 ¶722-733; Ex. A24 ¶¶89-99; Ex. A25 ¶¶790-797.

## IV.     LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is appropriate when the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). "A party may move for summary judgment" on a "claim or defense" or on "part of" a "claim or defense." *Id.*

### B.      Exclusion of Expert Testimony

Under Federal Rule of Evidence 702, the party offering evidence has the burden to show that: 1) the expert is qualified due to having knowledge, skill, experience, training, or education in the relevant field of the testimony; 2) such testimony will assist the trier of fact to understand evidence or determine a fact in issue; 3) the testimony is based on sufficient facts or data; 4) the testimony is the product of reliable principles and methods; and, 5) the witness has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993).

## V.      ARGUMENT IN FAVOR OF SUMMARY JUDGMENT

### A.      BASF's Equitable Defenses All Fail as a Matter of Law and Should be Dismissed on Summary Judgment to Avoid the Need for a Bench Trial

BASF pled several equitable defenses (sixth, seventh and eighth affirmative defenses) alleging patent misuse, unclean hands, waiver, implied waiver and equitable estoppel. Summary judgment on each equitable defense should be entered to avoid the need for a bench trial, since equitable issues should not be tried to the jury. *See, e.g.*, *Nox Med. Ehf v. Natus Neurology Inc.*, 15-cv-00709-RGA, 2018 WL 4062626 (Aug. 27, 2018).

### B.      BASF's Equitable Defense of Patent Misuse Should be Dismissed on Summary Judgment

BASF offers four legally-flawed patent misuse theories: (1) alleged tying of licenses to the '844 Patent to purchases of Ingevity's FVC Honeycombs; (2) supply agreements with Delphi, ███████████ extending past the '844 Patent's expiration; (3) ███████████ ███████ after the '844 Patent allegedly was exhausted; and (4) alleged exclusive dealing antitrust violations. In addition, any attempt by BASF to raise a patent misuse defense based on Ingevity allegedly tying licenses to the '844 Patent to purchases of high-IAC base carbon

products also would be legally flawed.[1] The Court should grant summary judgment on BASF's

eighth affirmative defense addressing patent misuse because all theories BASF identified fail

because Ingevity acted within its patent rights or engaged in activity disconnected from the

Patent. *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010).

### 1.    BASF's Tying Theory of Patent Misuse Contradicts Supreme Court Precedent

BASF's first theory fails because Congress and the Supreme Court have explicitly stated

that Ingevity's precise alleged conduct is not patent misuse. In *Dawson Chemical Co. v. Rohm &*

*Haas Co.*, the Supreme Court addressed the same situation that BASF alleges here—whether the

owner of a patent on a chemical process committed patent misuse by "exploit[ing] the patent

only in conjunction with the sale of an unpatented article that constitutes a material part of the

invention and is not suited for commercial use outside the scope of the patent claims." 448 U.S.

176, 179 (1980).

Rohm & Haas patented a method for applying a chemical called propanil as an herbicide,

but the patent claims did not cover the chemical propanil itself. *Id.* at 181-82. Rohm & Haas did

not practice its patent, but instead allowed farmers to practice the patent only if they bought

propanil from Rohm & Haas. *Id.* at 183, 186. The Court concluded that, "by enacting §§ 271(c)

and (d), Congress granted to patent holders a statutory right to control non-staple goods that are

capable only of infringing use in a patented invention, and that are essential to that invention's

advance over prior art." *Id.* at 213. Even though Rohm & Haas had tied licenses to its patent to

purchases of propanil, the Court held that Rohm & Haas had "done nothing that would extend its

right of control over unpatented goods beyond the line that Congress drew." *Id.* at 213-14.

---

[1] As addressed below, BASF did not properly raise or address this potential theory of misuse, but
Ingevity covers it here out of an abundance of caution.

BASF's tying theory of patent misuse fails as a matter of law for the same reasons. Ingevity's FVC Honeycombs are specialty, non-staple goods that have no noninfringing use— they are used only in fuel vapor canisters that practice the claims of the '844 Patent. Statement of Undisputed Fact ("SUF") 1. Ingevity sells its FVC Honeycombs[2] only for use in fuel vapor canisters. SUF 1. BASF has no evidence (and there is none) that Ingevity has ever allegedly tied a license (express or implied) to the '844 Patent to the purchase of any honeycomb other than a FVC Honeycomb. SUF 3.

Indeed, BASF even admits that Ingevity's FVC Honeycombs are non-staple goods that have no noninfringing use, just like the propanil in *Rohm & Haas*. In its Second Amended Invalidity Contentions, BASF argues that Ingevity has engaged in patent misuse by requiring ████████████████████████████████████ (an allegation addressed further below). *See* Ex. A10 at 87-88. BASF contends that Ingevity's sale of its FVC Honeycombs to ████ exhausted Ingevity's patent rights, and BASF cites *LG Electronics v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1043 (N.D. Cal. 2009), which states that exhaustion applies if a product is "an inventive aspect of the patent" as shown by it being "a unique feature of the patented system." Ex. A10 at 87 n.22. Indeed, the exhaustion standard is well established and applies only to products "capable of use only in practicing the patent." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 631 (2008). By asserting that *LG Electronics* applies in this case and specifically quoting the above sentence in footnote 22 of its contentions, BASF concedes that Ingevity's FVC Honeycombs are a "unique feature" of the '844 Patent.

---

[2] An example of Ingevity's FVC Honeycombs is the 29x100-200. The first number (29) refers to the diameter in millimeters, the second number (100) refers to the length in millimeters, and the third number (200) refers to the cells per square inch—the number of holes (cells) in each square inch of a cross section of the honeycomb.

Moreover, BASF identified no evidence (and there is none) that Ingevity's FVC Honeycombs are used for anything other than fuel vapor canisters—rather, the evidence introduced in discovery shows they are used only in fuel vapor canisters. SUF 1. Indeed, BASF's technical expert Mr. Lyons provided direct trial testimony in a signed witness statement to the ITC that the "only reasonable and intended use" of Ingevity's FVC Honeycombs is in fuel vapor canisters (which necessarily practice the claims of the '844 Patent since Ingevity's commercial FVC Honeycombs have an IAC less than 35), forming the basis of his opinion that Ingevity had exhausted its patent. SUF 4. And BASF even admits that its own honeycomb used in fuel vapor canisters—EvapTrap XC—has no uses other than in a fuel vapor canister. Ex. A11 (Ruettinger Tr. (10/19/18)) at 185:9-15; Ex. A12 (Ruettinger Tr. (10/30/19)) at 84:7-21.

Because Ingevity's FVC Honeycombs are non-staple products used only to practice the '844 Patent, Ingevity has "a statutory right" to control the honeycomb scrubber market for systems practicing the '844 Patent, even if it would "suppress competition in the market." *Rohm & Haas*, 448 U.S. at 202, 213. Ingevity's alleged actions do not constitute patent misuse because they fall within the scope of Ingevity's patent rights, and the Court should grant summary judgment on BASF's tying theory of patent misuse. *Id.* at 213-15, 223.

Because Ingevity's FVC Honeycombs have no other uses, BASF improperly attempts to shift from the actual product at issue to a broader category of carbon honeycombs generally, including those designed for very different purposes. Effectively, BASF is trying to equate a Formula 1 racing tire to a bicycle tire simply because they are both tires. A Formula 1 racing tire and a bicycle tire are both tires made of rubber and used on modes of transportation, but they are different products with different uses and sold into different markets. Similarly, Ingevity's FVC Honeycombs are a different product with different characteristic make-up, a different use, and

sold into a different market than the other carbon honeycombs Ingevity sells.

BASF's attempt at lumping disparate honeycomb products together fails for two reasons. First, BASF has no evidence that Ingevity has ever required customers to purchase any non-FVC Honeycomb to practice the '844 Patent's claims. SUF 3. These non-FVC Honeycombs therefore have no bearing on Ingevity's alleged tying.

Second, even if the Court were to consider Ingevity's non-FVC Honeycombs despite Ingevity never having tied authorization to practice the patent to purchases of these other honeycombs, BASF has no evidence that Ingevity's non-FVC Honeycombs are actually used by any customer in fuel vapor canisters or have ever been qualified/tested to do so (a necessary prerequisite to use as an environmental agent in an automobile), so their uses are inapposite. Indeed, even by BASF's antitrust expert's standard, BASF's theory fails. BASF's expert states that that the market definition "primarily is focused on demand substitution factors" and "customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service." Ex. A13 (Mathur Report) ¶36. Ingevity's non-FVC Honeycombs are irrelevant to BASF's allegations of tying, as BASF has no evidence that they have been used by a customer in fuel vapor canisters.

BASF's reliance on Ingevity's HCA 65x25-16 honeycomb sold to Minnesota Rubber for use in air intake systems on vehicles does not support its position. BASF attempts to create confusion simply because this honeycomb's SKU includes "HCA," like Ingevity's FVC Honeycombs—the HCA 29, 35, and 41 products with 200 cells per square inch. *See* Ex. A3 at 14:19-25 (Ingevity's FVC Honeycombs are classified by having cell density of 200 cells per square inch). But BASF has no evidence that this 65 mm (diameter) x 25 mm (length), puck-

shaped *air intake* honeycomb with 16 cells-per-square-inch (the 16 in 65x25-16 tells the cells per

square inch) has ever been used in a fuel vapor canister. And that is not surprising given the

distinct differences between honeycombs with 16 cells per square inch and those with 200 cells

per square inch.[3] SUF 2. Nor is there any evidence the HCA 65x25-16 has ever been qualified

for use in a fuel vapor canister, as would be required for it to be used in one. The evidence is to

the contrary. *Id.*

No reasonable fact finder could conclude that Ingevity has tied authorization to practice

the Patent to customers' purchase of the HCA 65x25-16 or any other non-FVC Honeycombs, or

that the HCA 65x25-16 or any other non-FVC Honeycomb is otherwise relevant to the tying

allegations in this case because they were never used in fuel vapor canisters.

Because Ingevity's FVC Honeycombs are non-staple products used only to practice the

'844 Patent, Ingevity has "a statutory right" to control the honeycomb scrubber market for fuel

vapor canisters. *Rohm & Haas*, 448 U.S. at 213. BASF's tying theory of misuse relating to

Ingevity's FVC Honeycombs fails as a matter of law.

**2.      Ingevity's Supply Agreements with Delphi, ████████████   Do
              Not Render the '844 Patent Unenforceable**

BASF's second patent misuse theory, based on Ingevity's supply agreements extending

beyond the expiration of the '844 Patent, is also legally foreclosed by Supreme Court precedent.

The basis for BASF's theory is its contention that "[a]greements effectively extending the

limited period of patent exclusivity constitute patent misuse." Ex. A10 at 88-89. But in *Kimble v.*

*Marvel Entertainment, LLC*, the Supreme Court addressed its previous holding in *Brulotte*,

---

[3] Indeed, BASF's 30(b)(6) witness, Wolfgang Ruettinger, testified that BASF's EvapTrap XC
has 200 cells per square inch—like Ingevity's FVC Honeycombs—because honeycombs with
lower cells per square inch, such as 100 cells per square inch, "didn't pass the test." Ex. A11 at
43:3-15.

which stated that a royalty agreement extending beyond the expiration date of a patent could constitute patent misuse, and identified a limit of that previous holding: "*Brulotte* poses no bar to business arrangements other than royalties." 135 S.Ct. 2401, 2408 (2015). The Court further explained that the "decision is simplicity itself to apply" because a court "need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* at 2411.

Here, BASF has no evidence that the supply agreements it cites are license agreements providing for royalties at all, let alone royalties after the expiration of the '844 Patent. None of the agreements grants ███████████████. SUF 7. The agreements also do not contain any provision for █████s; they are strictly supply agreements that ██████████████████ ███. SUF 8. Moreover, the Court should not credit BASF's theory because it would prevent patentees from entering into any business relationship involving products relating to a patent if the agreement extended beyond the patent's expiration date, which runs contrary to the Supreme Court's conclusion that "*Brulotte* poses no bar to business arrangements other than royalties." *Kimble*, 135 S.Ct. at 2408. Because Ingevity's Delphi, Kayser, and KFTC supply agreements do not grant a license to the '844 Patent and do not provide for royalties, let alone post-patent-expiration royalties, the agreements do not constitute patent misuse under *Brulotte* and *Kimble*.

Even if BASF could make an argument that patent misuse applies to these agreements, the agreements would not make the patent unenforceable during the term of the Patent. Nothing in *Brulotte* or *Kimble* suggests that a license agreement extending beyond the expiration of a patent makes the patent unenforceable during the term of the patent. Instead, *Brulotte* only bars "royalties for using an invention after it has moved into the public domain." *Kimble*, 135 S. Ct. at 2408. The relief granted and affirmed in *Kimble* rendered the royalty provision unenforceable

after the expiration of the patent at issue. *Id.* at 2406. Similarly, these supply agreements, even if read to include ███████████████ would not render the patent unenforceable prior to the Patent's expiration. Indeed, a patentee's receipt of royalties during the term of a patent is expressly allowed by the patent laws. Instead, such an interpretation (with which Ingevity disagrees) would only make the alleged "royalty" provision in the agreements unenforceable after the '844 Patent expires. *Id.* Thus, the Court should grant summary judgment that the supply agreements do not render the Patent unenforceable during the '844 Patent's term.

### 3. Ingevity's License Agreement with MAHLE Is Not Patent Misuse

BASF's third patent misuse theory is explained in only two sentences in its Second Amended Invalidity Contentions and alleges patent misuse based on Ingevity allegedly exhausting its patent rights by selling its FVC Honeycomb to MAHLE and then ████████ ████████████████. Ex. A10 at 87-88. MAHLE's canister ██████████████ had a high-IAC base carbon product and two low-IAC carbon adsorbents: MAHLE's MPAC and Ingevity's FVC Honeycomb. SUF 9. BASF's theory of patent misuse based on exhaustion is legally unfounded because MAHLE's canister infringed the '844 Patent without consideration of Ingevity's FVC Honeycomb—thereby requiring a license.

The standard for patent exhaustion is well established: "the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly *with respect to the article sold*."[4] *Quanta Computer*, 553 U.S. at 631 (emphasis added). Ingevity's FVC Honeycombs are only used to practice the claims of the '844 Patent. SUF 1. But

---

[4] As explained above, BASF's contention that patent exhaustion applies to the MAHLE canister is an admission that Ingevity's FVC Honeycombs are nonstaple products because exhaustion applies only to products capable of use only in practicing the patent. Separately, Ingevity's high-IAC products have uses outside of fuel vapor canisters practicing the claims of the '844 Patent, so they do not exhaust Ingevity's patent rights and are irrelevant to BASF's patent misuse theory.

the Supreme Court has explained that patent exhaustion applies only to *the article sold*. *Quanta*, 553 U.S. at 631, 638; *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942); *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S.Ct. 1523, 1531 (2017); *Bowman v. Monsanto Co.*, 569 U.S. 278, 286 (2013).

Separate from Ingevity's FVC Honeycomb to which patent exhaustion would have applied, MAHLE's ███████████████ included an unauthorized subsequent adsorbent volume—MAHLE's MPAC. Because MAHLE's canister infringed the '844 Patent by its use of MPAC, Ingevity was within its rights to accuse the canister of infringement and ████████████ ███████████. Under BASF's theory, Ingevity would have no recourse for infringement if customers manufactured fuel vapor canisters using one or more of BASF's honeycomb and then attached a single Ingevity honeycomb to the end because the Ingevity honeycomb supposedly would exhaust Ingevity's patent rights for the entire canister—not just the honeycomb sold. *Quanta* does not stand for such a proposition, and BASF did not identify any case that supports that theory in its two-sentence explanation. This theory also contradicts the explanation in *Monsanto* that the Court has "always drawn the boundaries of the exhaustion doctrine" so that "the patentee retains an undiminished right to prohibit others from making the thing his patent protects." 569 U.S. at 287. BASF's theory also would nullify *Rohm & Haas*'s conclusions that a patentee has "a limited power to exclude others from competition in nonstaple goods" and "may sell a nonstaple article himself while enjoining others from marketing that same good without his authorization." 448 U.S. at 201-02. The Court should grant summary judgment because BASF's third patent misuse theory lacks legal foundation and contradicts Supreme Court precedent.

    **4.**      **BASF's Other Allegations of Antitrust Violations Are Not Cognizable Theories of Patent Misuse**

        **a)**      **Exclusive Dealing Under Antitrust Law is Not Patent Misuse**

While Ingevity disputes BASF's allegations of exclusive dealing, those allegations cannot be raised as patent misuse. BASF cites no case in support of doing so. Instead, the Federal Circuit has "emphasized that the defense of patent misuse is not available to a presumptive infringer simply because a patentee engages in some kind of wrongful commercial conduct, even conduct that may have anticompetitive effects." *Princo*, 616 F.3d at 1329. Patent misuse is confined to "a handful of specific practices" and "does not include a general notion of 'wrongful' use." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1373 (Fed. Cir. 1998). "[T]he body of misuse law and precedent need not be enlarged into an open-ended pitfall for patent-supported commerce." *Id.* (reversing patent misuse verdict when the defendant "did not propose any of the classic grounds of patent misuse, such as tying or enforced package licensing or price restraints or extended royalty terms"). The Court therefore should grant summary judgment on BASF's theory that Ingevity's "antitrust violations render the '844 Patent unenforceable" (Ex. A10 at 89-97) because it does not qualify as a patent misuse theory.

Even if the Court were to consider BASF's arguments, the cases cited by BASF in its contentions do not support—and instead contradict—its attempt to address exclusive dealing under the Sherman Act as patent misuse. BASF cites to *Princo*, but as explained above, the page cited by BASF explains that patent misuse has a "narrow scope" and does not apply generally to allegedly wrongful conduct. 616 F.3d at 1329. Indeed, the court states, "[w]hile proof of an antitrust violation shows that the patentee has committed wrongful conduct having anticompetitive effects, that does not establish misuse of the patent in suit unless the conduct in question restricts the use of that patent and does so in one of the specific ways that have been held to be outside the otherwise broad scope of the patent grant." *Id.* "What that requires, at a minimum, is that the patent in suit must 'itself significantly contribute[] to the practice under

attack'" because patent misuse "will not be found when there is 'no connection' between the patent right and the misconduct in question or no 'use' of the patent." *Id.* at 1331 (citations omitted).

Here, BASF fails to cite any evidence that the Patent "significantly contributes" to the supply agreements it identifies as supporting its theory of exclusive dealing. None of the agreements grants ███████████████, and the patent is never addressed as a basis for entering the agreements. SUF 7. BASF has no evidence to the contrary to raise a factual dispute. Because the '844 Patent has "no connection" to the misconduct in question relating to the supply agreements, BASF cannot support a patent misuse theory based on this conduct.[5]

BASF also cites *Virginia Panel*, but it cites a part of the decision that specifically addresses antitrust claims, *not patent misuse*. 133 F.3d at 872. Indeed, there is a separate section of the decision not cited by BASF that addresses patent misuse theories and rejects them, but that section does not involve any claims of exclusive dealing. *Id.* at 868-871. BASF's final case, *Altana*, addressed patent misuse relating to a patentee allegedly charging royalties for an expired patent. 2012 WL 2068611, at *2-3. The case is therefore inapposite to the conduct that BASF attempts to frame as patent misuse here—BASF's theory relating to Ingevity's extension of the '844 Patent past expiration is a *separate theory* already addressed above.

Because patent misuse is confined to "a handful of specific practices" and "does not include a general notion of 'wrongful' use," *C.R. Bard*, 157 F.3d at 1373, BASF's attempt to frame its exclusive dealing Sherman Act claims as patent misuse fails as a matter of law.

      **b)**      **BASF's Exclusive Dealing Theories Rely on Incorrect Interpretations of Ingevity's Agreements and Are Otherwise Unsupported by Admissible Evidence**

---

[5] To the extent BASF relies on Ingevity's license agreements for its exclusive dealing theory, those allegedly relate to the patent based on BASF's tying theory, which is addressed above.

To the extent the Court does not reject BASF's attempt to extend patent misuse beyond the limits of current case law, BASF's exclusive dealing theory of misuse relies upon incorrect interpretations of the agreements and contentions unsupported by admissible evidence. Under Delaware law, "the interpretation of a contract is a question of law." *Dow Chem. Canada Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 343 (D. Del. 2012).

First, in arguing that the termination provision in the Delphi ███████████████ agreements is anticompetitive, BASF contends that the parties' █████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████ Ex. A10 at 90. The plain language of the agreements contradicts BASF's interpretation. The agreements state that Ingevity will ████████████████████████████████ ████████████████. *See* Ex. A6 ¶5(d) (█████████████████████████████████ █████████████████); Ex. A7 ¶9(e) (███████████████████████████████ ████████████████████████████████); Ex. A8 ¶9(e) (same). Ingevity cannot set ███ █████████████ if Delphi, █████████████████████ the supply agreement; instead, Ingevity must ██████████████████████████████.

Second, BASF contends that Ingevity has threatened to withhold supply of base carbons from customers unless the customers agree to purchase FVC Honeycombs exclusively from Ingevity. BASF points to the ██████████████ for this contention, but BASF has no evidence that Ingevity threatened to withhold supply of base carbon from ████. Dr. Mathur admits that the basis for the ██████████████ was Ingevity's desire to reduce production of ████████████ ██████████████████████████████████, whereas █████████████████████ ████████████████████████████████████. Ex. A13 ¶86 n.289; *see also*

Ex. A2 at 43:23-47:11, 51:12-52:11, 246:17-247:5. In fact, █████ makes few, if any, canisters using honeycombs, so BASF's allegation that Ingevity threatened to withhold supply of base carbon to force █████ to purchase honeycombs only from Ingevity is without merit. Ex. A2 at 107:7-17. BASF cited no evidence that the basis for the █████ Agreement was an alleged plan by Ingevity to withhold base carbon supply to force Aisan to purchase honeycombs from Ingevity.

The only other evidence BASF cites regarding an alleged threat to withhold base carbon supply is hearsay testimony from BASF witnesses that customers allegedly were concerned they might lose their supply of carbon granule from Ingevity if they were to purchase carbon honeycombs from BASF. Ex. A13 ¶100(c)-(d). This hearsay testimony from BASF's witnesses is inadmissible—BASF has no factual evidence supporting its testimony. Summary judgment is appropriate when a party's hearsay evidence would not be admissible at trial. *See, e.g.*, *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 362 F. Supp. 3d 226, 231-34 (D. Del. 2019) (granting summary judgment because a party's only evidence was inadmissible hearsay); *Safas Corp. v. Etura Premier, LLC*, 293 F. Supp. 2d 442, 446 (D. Del. 2003) (granting summary judgment because a party's evidence would not be admissible at trial). BASF has no admissible evidence that Ingevity ever threatened to withhold supply of base carbons from customers to urge customers to purchase honeycombs from Ingevity, and the court should grant summary judgment against BASF's corresponding patent misuse theory.

### 5.    Ingevity's Alleged Past Tying Involving Base Carbon Products Does Not Render the '844 Patent Unenforceable

As an initial matter, BASF did not clearly contend in its interrogatory responses or invalidity contentions that it was alleging patent misuse based on a tying theory relating to high-IAC base carbon products—products that BASF does not intend to manufacture or sell. *See* Ex. A10 at 86-89; Ex. A16 at 19-24. Although BASF's patent misuse theory refers generally to

allegations that "licensees are required to purchase all activated carbon from Ingevity," there is

no mention of tying high-IAC base carbon products (e.g., pelletized carbons like BAX 1100 or

BAX 1500) to authorization to practice the claims of the '844 Patent.[6] Dr. Mathur, BASF's

antitrust expert (that BASF now claims offered opinions relevant to patent misuse) does not offer

any opinions relating to tying that involves Ingevity's high-IAC base carbon products and

instead states—repeatedly—that the conduct forming the basis for BASF's allegations and her

opinions relates only to carbon honeycombs. Ex. A13 ¶58 ("[T]he alleged conduct is limited to

carbon honeycombs."); Ex. A15 (Mathur Reply Report) ¶17 ("[T]he tying arrangements and

exclusive LTAs are limited to carbon honeycombs."); *id.* ¶33 ("Ingevity's tying of its sale of

carbon honeycombs … to the license for the '844 Patent … is the at-issue conduct underlying

BASF's theory of antitrust harm and resulting damages."). Because BASF failed to identify and

address a tying theory of patent misuse based on high-IAC base carbon products, the Court

should grant summary judgment to prevent any attempt by BASF to introduce a new theory of

patent misuse. *See* Fed. R. Civ. P. 37(c)(1); *Vehicle IP, LLC v. Werner Enters., Inc.*, 2013 WL

4786119, at *2-3 (D. Del. Sept. 9, 2013) (precluding defendant's invalidity theory that was not

properly disclosed in its invalidity contentions).

To the extent BASF alleges that it addressed this tying theory of patent misuse and the

Court allows it to proceed with this fifth patent misuse theory, BASF's theory fails as a matter of

law. Ingevity does not require customers to purchase base carbon products to practice the claims

of the '844 Patent. SUF 5. Because Ingevity does not tie licenses to the '844 Patent to customers'

purchase of high-IAC products, BASF has no basis for a claim that patent misuse based on tying

---

[6] When BASF served these contentions, BASF was well aware that Ingevity did not require
customers to purchase high-IAC base carbon products from Ingevity.

of high-IAC base carbon products renders the '844 Patent unenforceable.

Moreover, "a holding of misuse renders the patent unenforceable until the misuse is purged; it does not, of itself, invalidate the patent." *C.R. Bard, Inc.*, 157 F.3d at 1372. There is no factual dispute that Ingevity has not required customers to purchase base carbon products from Ingevity to practice the claims of the '844 Patent at any time in the last 16 months. SUF 5. Any potential misuse that BASF might attempt to prove thus has been purged, and BASF did not allege otherwise in its interrogatory responses or invalidity contentions, so it cannot do so at trial. *See, e.g.*, *Va. Panel Corp. v. Mac Panel Co.*, 1996 WL 335381, at *11 (W.D. Va. May 29, 1996), *rev'd on other grounds*, 133 F.3d 860 (Fed. Cir. 1997) (concluding that the patentee's steps to "affirmatively cease[] all conduct" purged the alleged misuse). The Court should preclude and/or dismiss this theory altogether.

### C.   BASF's Unclean Hands Equitable Defense Should Be Dismissed on Summary Judgment

BASF failed to identify any facts sufficient to maintain its equitable defense of unclean hands (BASF's seventh affirmative defense), and thus judgment on that defense should be entered. The Federal Circuit, quoting the Supreme Court, has explained that "a determination of unclean hands may be reached when 'misconduct' of a party seeking relief 'has *immediate and necessary relation* to the equity that he seeks in respect of the matter in litigation.'" *Gilead Sciences, Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)) (emphasis added). The defense of unclean hands is reserved "for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court." *Id.* (quoting *Keystone*, 290 U.S. at 245). BASF asserted no such violation.

Specific to patent cases, courts have recognized two circumstances that might support an

unclean hands defense. The first involves assertions of inequitable conduct including allegations of deficient communications with the PTO during patent prosecution. *Gilead*, 888 F.3d at 1240; *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). BASF was denied leave to amend its pleadings to include inequitable conduct. D.I. 147 at 23-25; D.I. 246 at 6. While BASF alleged unclean hands based on alleged conduct before the Patent Office in its interrogatory response purporting to identify "all factual and legal bases for [its] contention that Ingevity's assertion of the '844 patent is barred by the doctrine of unclean hands," Ex. A16 at 8 (Response to Interrogatory No. 15), BASF's interrogatory response cannot circumvent the Court's order denying BASF's motion for leave to amend its pleadings. Moreover, the Response identifies only alleged conduct "before the Patent Office" and alleged conduct that corresponds to BASF's allegations of antitrust violations and patent misuse. *Id.* at 8-19. Regarding alleged conduct before the Patent Office, BASF's allegations mirror those BASF presented in its proposed inequitable conduct defense, which the Court denied BASF leave to add as a defense. *Compare* Ex. A16 at 18-19 (Response to Interrogatory No. 15) *with* D.I. 100 (Proposed Second Amended Answer) at 6-12. The Court should give no weight to assertions relating to inequitable conduct because BASF was barred from bringing them and BASF agreed not to proceed with inequitable conduct if the Court adopted the Report and Recommendation. Ex. A17. Inequitable conduct is not properly before the court and to permit BASF to raise the same allegations under the guise of "unclean hands" is improper.

The second circumstance courts have recognized for unclean hands involves allegations of business or litigation misconduct that "would enhance the claimant's position regarding legal rights that are important to the litigation if the impropriety is not discovered and corrected." *Gilead*, 888 F.3d at 1240. The courts have never recognized that patent misuse or antitrust

allegations fall within that rubric, and for good reason. Patent misuse has its own developed body

of law. Courts do not need to fit it under the construct of unclean hands. Further, antitrust

allegations should not qualify either. As explained in *Keystone*, and reiterated in *Gilead*, the

doctrine applies "only where some unconscionable act of one coming for relief has immediate

and necessary relation to the equity [being sought] in respect to the matter in litigation."

*Keystone*, 290 U.S. at 245; *Gilead*, 888 F.3d at 1239. None of the alleged antitrust conduct has

"immediate and necessary relation" to the equity Ingevity is seeking (injunctive relief to preclude

BASF's patent infringement), affect the relationship "between the parties" or "enhance

[Ingevity's] position regarding legal rights" in whether it should obtain an injunction in this

matter. *Gilead*, 888 F.3d at 1239-40; *Keystone*, 290 U.S. at 245. The Federal Circuit cautioned

against the potential misuse of the unclean hands doctrine similar to BASF's assertions here.

*Gilead*, 888 F.3d at 1240 (cautioning against "the potential for misuse of this necessarily flexible

doctrine by parties who would prefer to divert attention away from dry, technical, and complex

merits issues toward allegations of misconduct based on relatively commonplace disputes over

credibility"). Thus, the Court should enter summary judgment on the unclean hands defense.

### D.      BASF's Equitable Defenses Pled as Its Sixth Affirmative Defense for Waiver, Implied Waiver and Equitable Estoppel Are Deficient as a Matter of Law

BASF failed to plead a legally cognizable claim for waiver, implied waiver or equitable

estoppel. BASF's sixth affirmative defense literally just uses the phrases waiver, implied waiver

and equitable estoppel. D.I. 19 at 6; D.I. 65 at 6. Ingevity's Interrogatory No. 14 asked for all

factual and legal bases for that "defense." BASF responded on April 18, 2019 with an answer

that provides no legal support or factual support for those equitable defenses. Ex. A16 at 4-8.

**Waiver**. For waiver, BASF's response identified a legal premise that "[a] participant in a

standards-setting organization may waive its right to assert infringement claims against products

that practice the standard. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1347-48 (Fed. Cir. 2011)." But BASF does not present any basis that Ingevity was a "participant" in a "standards-setting organization" and that is because it is not true. As *Hynix* makes clear, standards-setting organizations are open organizations that develop standards for interoperability of products from different manufacturers with its "participants" being members that have a vote in what standards the SSO adopts. *Id.* at 1341-42.

Instead of identifying any such SSO in its response, BASF asserts that Ingevity "lobbied" the state of California and the United States Government in support of clean air regulations.[7] The state of California and the U.S. Government are not standards-setting organizations that have voting members, and Ingevity obviously is not a voting member in the state or federal government. To the extent BASF is asserting that the patent waiver doctrine should be extended to cover assisting or lobbying a government, it cites no authority for such a drastic proposition. And there is none. No court has extended the waiver defense to such a situation for good reason. The premise behind a waiver finding in *Hynix* and other cases is a contractual agreement among the members of the SSO to disclose IP rights because those members get a vote in what standard is developed. *Id.* Further, as BASF's own interrogatory response states, waiver/implied waiver can be found only when "(1) the patentee had a duty of disclosure to the standard setting organization, and (2) the patentee breached that duty." *Hynix*, 645 F.3d at 1347-48. A party assisting or even lobbying the government has no "duty of disclosure" of its patent rights and BASF identifies no basis for such a duty either. BASF's unsupported allegation that Ingevity had a duty to disclose is insufficient. Other than *Hynix*, BASF cites to Core *Wireless Licensing*

---

[7] Ingevity disputes lobbying California or the U.S. on these issues. The materials cited by BASF only show that Ingevity was a technical resource. Regardless, this motion should be granted regardless of whether Ingevity's activities are technical assistance or lobbying.

*S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1356-69 (Fed. Cir. 2018), but that case also involved a standards-setting organization—not the government.

Moreover, even if BASF identified a legal duty to disclose, waiver requires a voluntary or intentional relinquishment of a known right. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1019 (Fed. Cir. 2008). Yet BASF identifies no voluntary or intentional relinquishment by Ingevity. Indeed, BASF's interrogatory response expressly says that Ingevity did not inform California or the EPA of its patents and therefore, it most certainly could not have expressly informed California or the EPA that it would not assert the '844 Patent. *Id.* at 1020 (party that did not inform an SSO of its patent did not intentionally relinquish its rights).

Having failed to cite any case law that would support a waiver based on lobbying the government and having failed to identify any voluntary or intentional relinquishment of its '844 Patent rights by Ingevity, BASF is not entitled to pursue a waiver defense in a bench trial.

**Implied Waiver.** BASF's allegations also fail under implied waiver. Implied waiver requires participation as a member in an open standard setting organization and a duty to disclose patents to that SSO that was breached. *Hynix*, 645 F.3d at 1348. BASF fails to identify facts on all three requirements for implied waiver for the same reason it fails to provide those three requirements of waiver. Ingevity was not a participant in any SSO, the government is not an SSO, and BASF does not identify any duty that the government imposes on those lobbying it to identify potential patent rights. Further, even if *Hynix* and *Qualcomm* were extended to cover assisting or lobbying of the government, implied waiver requires evidence of conduct by Ingevity "so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished." *Qualcomm*, 548 F.3d at 1020. BASF cites no such evidence. Indeed, BASF's interrogatory responses allege that Ingevity required parties to take a license

24

under the '844 Patent and used its patent rights to its commercial advantage. A16 at 11-14. Those admissions by BASF demonstrate that there could be no reasonable belief that Ingevity intended to relinquish its '844 Patent rights.

**Equitable Estoppel**. BASF's equitable estoppel defense also fails. BASF does not cite a single case in response to Interrogatory No. 14 related to equitable estoppel and only includes the phrase "equitable estoppel" at the very end of its Interrogatory response in saying:  "For additional instances of Ingevity's misconduct that constitute waiver, implied waiver, and/or equitable estoppel …." A16 at 8. But it had not even mentioned equitable estoppel previously in its response, so there was nothing discussed to which "additional instances" could be provided. BASF's failure to plead any facts related to equitable estoppel is for good reason—because that concept requires evidence that "'[t]he patentee [Ingevity], through misleading conduct, led the alleged infringer [BASF] to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer.'" *Hynix*, 645 F.3d at 1348 (quoting from *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc)). Nowhere does BASF allege that Ingevity ever communicated to BASF prior to filing this lawsuit or that BASF relied on any express communications. To the extent BASF is relying on allegations regarding Ingevity's lobbying activities, again, just as such a theory fails under waiver and implied waiver, there is no case law finding that lobbying can support an equitable estoppel defense. Specifically, as the Federal Circuit has said, the two elements of implied waiver (duty to disclose and breach of that duty) must also be shown to prove equitable estoppel. *Hynix*, 645 F.3d at 1348. BASF failed to substantiate any basis for a duty to disclose patents during lobbying activities and thus, its equitable estoppel defense fails for this additional reason.

**BASF's Incorporation by Reference Fails to Cure These Deficiencies.** Recognizing

the deficiency of the content in Interrogatory No. 14, BASF asserts that alleged "misconduct" by Ingevity recited in its preliminary injunction opposition papers and its invalidity contentions as allegedly supporting waiver, implied waiver, and equitable estoppel. But none of those papers even mention waiver, implied waiver, or equitable estoppel defenses or plead facts or law that cure any of the deficiencies identified above. Similarly, BASF's attempt to incorporate by reference its response to Interrogatories 15 and 16 into its response to interrogatory 14 cannot support a waiver, implied waiver, or equitable estoppel defense either. BASF's responses to interrogatories 15 and 16 identify facts and allegations related to unclean hands, patent misuse and antitrust—none of which have ever been recognized by any court as a basis for a "waiver," "implied waiver," or "equitable estoppel" defense.

> **E.    Ingevity Is Entitled to Summary Judgment on BASF's Enablement Defenses**

The asserted claims of the '844 Patent all require an initial adsorbent volume with an IAC greater than 35 g/L and a subsequent adsorbent volume with an IAC less than 35 g/L. BASF contests enablement of these limitations. Ex. A10 (BASF's 2nd Am. Invalidity Contentions) at 78-80. Enablement is a question of law with underlying facts. *In re Wands,* 858 F.2d 731, 735 (Fed. Cir. 1988). BASF bears the burden of proving enablement by clear and convincing evidence, including that undue experimentation was required to practice the Patent. *Id.* at 735; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

> **1.    BASF Does Not Contest That the Novel Aspect Is Enabled**

"[T]he novel aspect of an invention must be enabled in the patent." *Automotive Techs. Int'l v. BMW*, 501 F.3d 1274, 1283 (Fed. Cir. 2007). BASF's expert acknowledges that the alleged novelty of the '844 Patent "lies in the combination of 'multiple layers, or stages, of adsorbents,' one made up of 'high working capacity carbons' and one with 'a relatively lower capacity.'" Ex. A23 (Lyons Opening Rep.) ¶289 (quoting Ex. A21 ('844 Patent) at Abs).

Ingevity's expert will testify that Examples 1-3 of the Patent provide just such combinations where an initial adsorbent volume of high working capacity BAX 1500 is combined with various subsequent adsorbents of low working capacity. Ex. R2 (Rockstraw Rebuttal Rep.) ¶¶277-279. Ingevity's expert will further testify that two of these examples required little more than purchasing and combining commercially available materials. *Id.* ¶280. POSITA could make these combinations at the time of the Patent without undue experimentation. *Id.* ¶281. This evidence is unrebutted by BASF. The only evidence BASF adduces concerns whether IACs greater than 80 g/L and less than 16 g/L are enabled—not whether the claimed novelty of combining adsorbent volumes with IACs greater than and less than 35 g/L are enabled. *E.g.*, Ex. A23 ¶¶285-288, 292, 294-299. Thus, although it is BASF's burden to prove invalidity, there is no question of fact that Ingevity has proven enablement of the combination of high- and low-IAC adsorbent volumes that is the novel aspect of the Patent.

## 2.     BASF Misconstrues the Law

In regard to the high- and low-IAC limitations, BASF emphasizes the principle that the "full scope of the claimed invention" must be enabled by the '844 Patent. Ex. A10 at 77-80; Ex. A23 ¶283. BASF argues that the Patent only enables IAC values from 16 g/L (the lowest IAC explicitly disclosed in the Patent) to 80 g/L (the highest explicitly disclosed) and therefore does not enable the "full scope." *E.g.*, Ex. A23 ¶¶283-284, 292, 303. As such, BASF improperly assumes that the full scope of the invention requires that the Patent enable *all* IAC values greater than 35 g/L (including 80 g/L to infinity) and *all* IAC values less than 35 g/L (including 16 g/L to zero). *Id.* ¶¶284, 292; Ex. A25 (Lyons Reply Rep.) ¶¶143, 145, 149-150.

BASF's argument is legal error because the "full scope" that must be enabled under §112 is that "of the invention." Hence the Federal Circuit's admonition in *Automotive Techs.* that the "novel aspect" of a patent must be enabled, which distinguishes between that which is the

27

invention and other teachings that place the invention into context but do not constitute its advance over the prior art. 501 F.3d at 1283. Likewise, this Court has distinguished an invention's novel aspects from "tangential" concepts. *Delaware Display Grp. LLC v. Vizio, Inc.*, 2017 WL 784988, at *4-6 (D. Del. Mar. 1, 2007). As this Court's hypothetical in *Delaware Display* aptly explained, although a patent claim may recite limitations that are not the focus of its invention, the law does not require enablement of every possible iteration of such limitations. *Id.* at *5. Similarly, in *Invitrogen Corp. v. Clontech Labs. Inc.*, the Federal Circuit noted that "[e]nablement does not require the inventor to foresee every means of implementing an invention at pains of losing his patent franchise. Were it otherwise, claimed inventions would not include improved modes of practicing those inventions. Such narrow patent rights would rapidly become worthless as new modes of practicing the invention developed, and the inventor would lose the benefit of the patent bargain." 429 F.3d 1052, 1071 (Fed. Cir. 2005).

Having acknowledged, as it must, that the alleged novelty of the '844 Patent is its *combination* of high- and low-IAC adsorbent volumes, BASF's argument that IACs of infinity and zero must be enabled because they are, respectively, greater than and less than 35 g/L misapplies the law by requiring enablement of something that is not the novel aspect of the patent. The Patent is about new ways of combining adsorbent volumes—not new ways of *making* adsorbent volumes or new *types* of adsorbent volumes. Yet BASF's defense purports to require enablement of those tangential concepts. *E.g.,* Ex. A25 ¶145 ("[A] PHOSITA would not have been able to make" an adsorbent volume with IAC "significantly higher than 80 g/L."). Nor were the inventors required to prophetically anticipate every possible mode of implementing and improving their invention. But again, BASF's defense purports to require just that. *Id.* ¶157 ("The inventors might also have claimed a range of IAC values that did not extend above or

below the highest and lowest values associated with the adsorbents they identified, leaving room

for later improvements based on higher- or lower-capacity adsorbents."). BASF's enablement

defense therefore misconstrues what § 112 requires and fails as a matter of legal error.

### F.  Ingevity Is Entitled to Partial Summary Judgment that EvapTrap XC Is Not a Staple Article of Commerce

Ingevity alleges that defendant BASF Corporation ("BASF") has indirectly infringed the

claims of U.S. Patent No. RE38,844 (the "'844 Patent") by contributing to the infringement of

others (35 U.S.C. § 271(c)).[8] To simplify issues for trial, and because the record contains no

evidence sufficient to create a genuine dispute of material fact, Ingevity requests partial summary

judgment that EvapTrap XC is especially made for use as a subsequent adsorbent volume in a

fuel vapor canister, and is not a staple or commodity of commerce capable of other substantial

uses. The record shows that BASF's EvapTrap XC is designed and marketed as a subsequent

adsorbent volume in a fuel vapor canister, and includes no evidence from which a reasonable

juror could conclude that EvapTrap XC is a staple article of commerce suitable for any other

substantial use.

"The patent laws provide that whoever sells an apparatus for use in practicing a patented

method, knowing it to be 'especially made or especially adapted for use in an infringement of

such patent, and not a staple article or commodity of commerce *suitable for substantial non-*

*infringing use*, shall be liable as a contributory infringer.'" *Vita-Mix Corp. v. Basic Holding, Inc.*,

581 F.3d 1317, 1327 (Fed. Cir. 2009) (citing 35 U.S.C. § 271(c)). Even if a device is "capable of

non-infringing use, the question of contributory infringement turns on whether the non-infringing

use is substantial." *Id.* "[N]on-infringing uses are substantial when they are not unusual, far-

---

[8] Ingevity will prove at trial that BASF directly infringed one or more claims of the '844 Patent under 35 U.S.C. § 271(a) and induces infringement under 35 U.S.C. § 271(b).

fetched, illusory, impractical, occasional, aberrant, or experimental." *Id.*

Based on the evidence in the record, no reasonable juror could find that EvapTrap XC has a substantial use other than as a subsequent adsorbent volume in a fuel vapor canister *See* SUF 18-22. EvapTrap XC is designed to be a drop-in replacement for Ingevity's own FVC Honeycombs designed for use as subsequent adsorbent volumes in fuel vapor canisters. SUF 18. The geometry of EvapTrap XC together with BASF's attempts to get ███████████████ ███████████████████████████ show that it is "made or especially adapted for" such use. *Vita-Mix*, 581 F.3d at 1327; SUF 18-20.

In fact and expert discovery, BASF identified no evidence that EvapTrap XC had any substantial use other than as a subsequent adsorbent volume in a fuel vapor canister. SUF 20-22. Instead, BASF's tactic was to attempt to reframe the discussion away from EvapTrap XC and onto carbon honeycombs generally, *i.e.*, honeycombs not accused of infringement in this case. A14 at Interrogatory No. 18; A23 ¶722-733; A24 ¶¶89-99; A25 ¶¶790-797. There is no evidence in the record that EvapTrap XC, as opposed to carbon honeycombs generally, has alternative uses that are not "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp.*, 581 F.3d at 1327.

Accordingly, there is no evidence from which a reasonable juror could find that EvapTrap XC has any substantial use other than as a subsequent adsorbent volume in a fuel vapor canister. Ingevity is therefore entitled to partial summary judgment that EvapTrap XC is especially made for use as a subsequent adsorbent volume in a fuel vapor canister, and is not a staple or commodity of commerce.

## VI.   ARGUMENT IN SUPPORT OF REQUESTS TO EXCLUDE TESTIMONY

### A.   The Court Should Preclude Testimony of Dr. Mathur Related to Patent Misuse

Ingevity moves to preclude testimony from BASF's expert witness Dr. Mathur on the issue of patent misuse because her report does not address patent misuse or apply any applicable standard, which makes her opinions unreliable in addressing patent misuse issues. Even if the Court allows Dr. Mathur to testify regarding patent misuse, the Court should preclude any testimony from Dr. Mathur regarding BASF's patent misuse theories that she did not address in presenting her opinions in her expert report.

### 1.    Dr. Mathur's Opinions Are Unreliable as to Patent Misuse Because She Never Addresses Patent Misuse in Rendering Her Opinions

Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *TQ Delta, LLC v. ADTRAN, Inc.*, 2019 WL 5677539, at *1-2 (D. Del. Oct. 31, 2019) (quoting *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003)). When addressing the reliability of an expert's opinion, the Court has considered whether the expert used an erroneous legal standard when analyzing the relevant information in the case. *In re ChanBond, LLC Patent Litigation*, 2019 WL 6910284, at *5-7 (D. Del. Dec. 19, 2019) (excluding as unreliable an expert's opinions regarding written description of a claim term because the expert did not apply the correct standard while allowing opinions as to another claim term because the expert applied the correct standard); *Inline Connection Corp. v. AOL Time Warner Inc.*, 2007 WL 275928, at *4-5 (D. Del. Jan. 29, 2007) (excluding as unreliable an expert's opinion regarding enablement because the expert applied the incorrect standard).

Here, Dr. Mathur should not be allowed to testify regarding patent misuse issues because she has failed to identify *any* patent misuse legal standard applicable to her opinions. Dr. Mathur identifies only BASF's counterclaims regarding Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act as allegations for which she provides expert opinions. A13 ¶6-7. Dr. Mathur never identifies any of BASF's allegations regarding patent misuse. Indeed, Dr. Mathur does not

address patent misuse or any patent misuse standard relevant to her opinions at any point of her opening or reply reports.

Dr. Mathur's failure to identify any patent misuse standard is notable here because BASF has applied the wrong legal standard in its Interrogatory Responses and Invalidity Contentions when addressing its patent misuse theories. For example, BASF applied a per se patent misuse standard for tying, relying on cases such as *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488 (1942). Ex. A16 at 17; Ex. A9 at 88. But Congress and the Supreme Court have rejected the per se standard for patent misuse. 35 U.S.C. § 271(d)(5) (tying is not patent misuse "unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned"); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006) ("[T]ying arrangements involving patented products should be evaluated under the standards applied in cases like *Fortner II* and *Jefferson Parish rather than under the per se rule applied in* Morton Salt *and* Loew's." (emphasis added)).

BASF also failed to apply the standard in *Brulotte* and *Kimble* for the types of agreements that are allowed to extend past a patent's expiration, and BASF misapplied the exhaustion standard of *Quanta*. Without identifying any patent misuse standard, Dr. Mathur has not distinguished her opinions from the incorrect legal standards applied by BASF, rendering her opinions unreliable. *See In re ChanBond*, 2019 WL 6910284, at *5-6; *Inline Connection*, 2007 WL 275928, at *4-5. Moreover, Rule 702 requires that testimony be the product of "reliable principles and methods" and that the expert "applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Without any understanding of the patent misuse standard applied by Dr. Mathur—because she failed to identify any such standard and did not even mention BASF's patent misuse allegations as relevant to her opinions or assignment—Dr. Mathur's opinions fail

to satisfy Rule 702 in relation to patent misuse. The Court thus should preclude testimony from Dr. Mathur regarding patent misuse issues.

> ### 2. Dr. Mathur's Report Fails to Provide Opinions Regarding BASF Theories of Patent Misuse

Even if Dr. Mathur is allowed to testify regarding patent misuse issues despite never addressing patent misuse or BASF's allegations in her expert reports, the Court should preclude Dr. Mathur from testifying about BASF's extension of patent rights theory of misuse and any potential theory of tying relating to high-IAC base carbon products because Dr. Mathur did not offer any expert opinions potentially relevant to these issues.

Regarding BASF's extension of patent rights beyond expiration theory, Dr. Mathur does not offer any relevant opinions. Instead, Dr. Mathur merely identifies that the agreements extend beyond the patent's expiration date, which is not helpful testimony for the jury under Rule 702. *See Kia v. Imaging Scis. Int'l, Inc.*, 2010 WL 3431745, at *5 (E.D. Pa. Aug. 30, 2010) ("[N]or may expert testimony 'be used merely to repeat or summarize what the jury independently has the ability to understand.'"); *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 608 (S.D.W. Va. 2013) ("Expert testimony which 'merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness' is properly excluded."). Moreover, as explained above, the Supreme Court concluded in *Kimble* that an agreement extending beyond the term of a patent constitutes patent misuse only if it involves royalty payments for use of the patent after the patent expires. Because Dr. Mathur does not analyze the agreements to determine whether they require royalty payments after the patent expires or provide any related opinions, any testimony from Dr. Mathur regarding this theory is unhelpful to the jury under Rule 702. Additionally, Federal Rule of Civil Procedure 26(a)(2)(B) requires that an expert's report "shall contain a complete statement of all opinions to be

expressed," so Dr. Mathur's failure to present an opinion on this issue in her report means that she "may not offer one at trial." *Advanced Med. Optics, Inc. v. Alcon, Inc.*, 2005 WL 782809, at *5 (D. Del. Apr. 7, 2005).

Similarly, Dr. Mathur did not provide any analysis or opinions relating to any alleged theory by BASF that Ingevity allegedly tied licenses (express or implied) to the '844 Patent to sales of high-IAC base carbon products. In explaining her assignment in rendering her opinions, Dr. Mathur states that she was asked to analyze allegations of tying and exclusive dealing "relating to sales of carbon honeycombs." Ex. A13 ¶8(b). Dr. Mathur further explained that her opinions relate only to carbon honeycombs, with no specific analysis relating to high-IAC base carbon products. Ex. A13 ¶58 ("[T]he alleged conduct is limited to carbon honeycombs."); Ex. A15 ¶17 ("[T]he tying arrangements and exclusive LTAs are limited to carbon honeycombs."); *id.* ¶33 ("Ingevity's tying of its sale of carbon honeycombs … to the license for the '844 Patent … is the at-issue conduct underlying BASF's theory of antitrust harm and resulting damages."). Dr. Mathur's failure to provide an opinion regarding this theory means that, pursuant to Rule 26(a)(2)(B), the Court should preclude Dr. Mathur from offering any opinions relating to this theory at trial. *See* Fed. R. Civ. P. 26(a)(2)(B); *Advanced Med. Optics*, 2005 WL 782809, at *5.

### B.     The Court Should Preclude Testimony of Mr. James Lyons under *Daubert*

Ingevity moves this Court to preclude certain testimony of BASF's expert witness, Mr. James M. Lyons, under *Daubert*, 526 U.S. 579, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and rule 702 of the Federal Rules of Evidence. Expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. To that end, BASF has not established that its technical expert, Mr. Lyons, is qualified to offer testimony regarding what constitutes a commercial offer for sale and should be precluded from presenting such testimony. Additionally, Mr. Lyons's failed to apply the correct legal standard for multiple

issues in his expert reports. Such testimony cannot assist the trier of fact to understand evidence or determine a fact in issue and Mr. Lyons should also be precluded from presenting such testimony. Fed. R. Evid. 702.

### 1. The Court Should Preclude Mr. Lyons's Testimony On Topics For Which He Has No Expertise, Including Commercial Offers For Sale

In *Pfaff v. Wells Elecs., Inc.*, the Supreme Court identified two conditions that determine whether the on-sale bar of 35 U.S.C. § 102(b)[9] applies: (1) the product was the subject of a commercial offer for sale, and (2) the claimed invention was ready for patenting. 525 U.S. 55, 67-68 (1998). In *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363 (Fed. Cir. 2016) (en banc), the Federal Circuit clarified a commercial offer for sale stating "[w]e conclude that, to be 'on sale' under § 102(b), a product must be the subject of a commercial sale or offer for sale, and that a commercial sale is one that bears the general hallmarks of a sale pursuant to Section 2-106 of the Uniform Commercial Code." 827 F.3d at 1365. Mr. Lyons offers testimony and opinions regarding offers for sale that satisfy § 102(b), but he presents no qualifications for doing so.

In Mr. Lyons's opening report regarding validity, he presents his qualifications including his "Educational Background" and "Relevant Professional Experience." Ex. A23 ¶¶10-20. His educational background is limited to a bachelor's degree in chemistry and a master's degree in chemical engineering. *Id.* ¶10. And his relevant professional experience all relates to his work as a regulator with the California Air Resource Board and as an engineer or consultant related to chemical engineering issues. *Id.* ¶¶10-20. Mr. Lyons identifies no experience related to commercial offers for sale or the Uniform Commercial Code. Further, he identifies no expertise in the law and admits he is not a lawyer. *Id.* ¶22.

Notwithstanding his lack of qualifications, Mr. Lyons offers testimony and opinions

---

[9] Unless otherwise specified, all references to § 102 herein are to 35 U.S.C. § 102.

regarding what constitutes a sale or offer for sale under § 102(b). Among many examples, Mr.

Lyons alleges "it is my opinion that the alleged inventions of the Asserted Claims were publicly

used and sold, or offered for sale, by Westvaco and by canister and automobile manufacturers

before ███████████." Ex. A23 ¶429. He also alleges "████████████████

████████████████████████████████████████

████████████████████████" *Id.* ¶438. Putting aside the failings of Mr.

Lyons's purported evidence, such testimony cannot assist the trier of fact because Mr. Lyons is

not qualified to offer such opinions and testimony.

Ingevity thus asks the Court to preclude Mr. Lyons from offering testimony regarding

whether any certain activity met the requirements of a sale or offer for sale under § 102(b).

### 2.    The Court Should Preclude Mr. Lyons's Testimony Applying Incorrect Legal Standards

Mr. Lyons provides testimony and opinions on a number of topics for which he does not

apply the correct legal standard. Such testimony is not admissible under Rule 702 because it is

irrelevant, unreliable, and cannot assist the trier of fact in understanding evidence or determining

any fact in issue. Fed. R. Evid. 702; *In re ChanBond*, 2019 WL 6910284, at *6 (excluding as

unreliable testimony that failed to conduct a correct legal analysis). The Court should preclude

Mr. Lyons from testifying on topics for which he failed to apply the correct legal standard. As

evidenced in his reports and deposition testimony, Mr. Lyons failed to apply the correct legal

standard to at least the following terms: 1) "known or used by others" under § 102(a); 2)

"commercial offer for sale" under § 102(b); 3) "ready for patenting" under § 102(b); and 4)

"public use" under § 102(b).

**102(a)'s "known or used by others":** As the Federal Circuit has explained, this term

necessarily excludes "an inventor's own work," which "cannot be used to invalidate patents

protecting his own later inventive activities" unless a statutory bar applies. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380-81 (Fed. Cir. 2005); *In re Facius,* 408 F.2d 1396, 1406 (1969) ("[C]ertainly one's own invention, whatever the form of disclosure to the public, may not be prior art against oneself, absent a statutory bar."). Additionally, what is "known or used by others" must "have been available to the public." *Woodland Trust v. Flowertree Nursery*, 148 F.3d 1368, 1370 (Fed. Cir. 1998) (citing *Carella v. Starlight Archery,* 804 F.2d 135, 139, (Fed. Cir. 1986) (the § 102(a) language "known or used by others in this country" means knowledge or use that is accessible to the public)).

Mr. Lyons failed to apply these legal standards. In identifying the law in his report, Mr. Lyons merely recited the language of the statute and then added only that "I understand that even a single, non-confidential use in the ordinary course of business qualifies as a 'use[] by others' pursuant to this statute." Ex. A23 ¶38. He provided no further discussion or analysis. When asked for clarification at deposition, Mr. Lyons stated simply that "I used my understanding of what known and used by others means." *See* Ex. A22 at 215:9-218:10. And his analysis applicable to § 102,[10] illustrates his failings. For example, in asserting alleged industry knowledge of the '844 Patent, Mr. Lyons acknowledged that disclosure to the canister and automobile manufactures came from Westvaco "including inventors of the '844 patent," but he offered no analysis regarding the impact on the "known or used by others" requirement. Ex. A23 ¶378. Mr. Lyons did not apply the correct legal standard, and the Court should preclude him from testifying regarding what was "known or used by others" under § 102(a).

---

[10] Mr. Lyons combines (and conflates) analysis under multiple sections of § 102 making it difficult to distinguish between these separate theories. E.g., Ex. A23 ¶¶ 305, 427 (combining factual analyses for multiple subsections of § 102). This too illustrates improper application of legal standards as each section has distinct and independent legal requirements and application to facts.

**102(b)'s "on sale":** In *Pfaff*, the Supreme Court identified two conditions necessary to establish the on-sale bar of § 102(b): 1) the product was the subject of a commercial offer for sale, and 2) the claimed invention was ready for patenting. 525 U.S. at 67-68. Each of these conditions have specific legal meaning. While Mr. Lyons correctly identified the two-part test expressed in *Pfaff*, he did not identify and failed to apply the correct legal standard for determining whether an interaction qualifies as a "commercial offer for sale" or when an invention is "ready for patenting." *See* Ex. A23 ¶39.

**"Commercial offer for sale":** In *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363 (Fed. Cir. 2016) (en banc), the Federal Circuit concluded "to be 'on sale' under § 102(b), a product must be the subject of a commercial sale or offer for sale, and that a commercial sale is one that bears the general hallmarks of a sale pursuant to Section 2-106 of the Uniform Commercial Code." 827 F.3d at 1365. Further, "when no actual sale is present, only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration) triggers the on-sale bar." *Id.* at 1378 (internal quotations omitted).

In his expert report, Mr. Lyons failed to identify or apply any legal standard relating to a commercial offer for sale. When asked at deposition what the term means, Mr. Lyons stated "that someone is taking an item and offering it for sale to another company, private party" and "[c]ommercial would mean for automotive parts and for use in the automotive business." Ex. A22 at 221:8-24. Clearly, Mr. Lyons did not know or apply the legal standard as specified by the Federal Circuit. Thus, the Court should preclude Mr. Lyons from providing testimony relating to what was "for sale" or "offered for sale" with respect to § 102(b).

**"Ready for patenting":** In *Pfaff*, the Supreme Court provided that "ready for patenting"

may be shown "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions … that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68. Mr. Lyons failed to identify any requirement for satisfying the ready for patenting prong of the on-sale bar. The only reference in Mr. Lyons's reports is in identifying it as a prong of the on-sale bar test. Ex. A23 ¶39. He provided no additional explanation, nor did he conduct any analysis to apply any legal standard. At deposition, when asked what standard he applied for "ready for patenting," Mr. Lyons was unable to recall the "criteria" he "had in [his] mind when … performing [his] analysis." Ex. A22 at 227:13-228:4. After reviewing his reports to refresh his recollection, Mr. Lyons could only point to a section of his report regarding § 102(g)'s requirement of conception and reduction to practice. *Id.* at 228:21-229:4; Ex. A25 (Lyons Reply Report) ¶¶160-161. He could not elaborate further. Ex. A22 at 227:7-229:21. Mr. Lyons failed to apply or even identify the correct legal standard applicable to the "ready for patenting" requirement of the on-sale bar. Thus, the Court should preclude Mr. Lyons from testifying regarding what was "ready for patenting" in relation to the on-sale bar under § 102(b).

**102(b)'s "public use":** "[T]he proper test for the public use prong of the § 102(b) statutory bar is whether the purported use: (1) was accessible to the public; or (2) was commercially exploited. *Invitrogen Corp.*, 424 F.3d at 1380. Additionally, the alleged public use must not be experimental use. *Id.* at 1379-80 ("This court notes that in applying the *Pfaff* two-part test in the context of a public use bar, evidence of experimental use may negate either the 'ready for patenting' or 'public use' prong."). Mr. Lyons did not identify or apply these standards (or any others) in his analysis. For "public use" under § 102(b), Mr. Lyons only reiterates the language of the statute itself. Ex. A23 ¶39. At deposition, Mr. Lyons admitted he did not identify

any legal standard for public use under § 102(b). Ex. A22 at 220:3-16. And he stated that his understanding is limited to what is stated in his report (i.e., the language of the statute), which he applied "using [his] knowledge of the field." *Id.* Because Mr. Lyons failed to identify or apply the correct legal standard in analyzing "public use," the Court should preclude Mr. Lyons from testifying regarding what was in "public use" under § 102(b).

## VII.    CONCLUSION

Ingevity respectfully requests that the Court grant summary judgment on BASF's equitable and enablement defenses, partial summary judgment that EvapTrap XC is not a staple article, and preclude the identified testimony from Dr. Mathur and Mr. Lyons.

<table>
<tr><td></td><td><i>/s/ Karen E. Keller</i></td></tr>
<tr><td></td><td>Karen E. Keller (No. 4489)</td></tr>
<tr><td></td><td>John W. Shaw (No. 3362)</td></tr>
<tr><td></td><td>Nathan R. Hoeschen (No. 6232)</td></tr>
<tr><td></td><td>SHAW KELLER LLP</td></tr>
<tr><td></td><td>I.M. Pei Building</td></tr>
<tr><td></td><td>1105 North Market Street, 12th Floor</td></tr>
<tr><td>OF COUNSEL:</td><td>Wilmington, DE 19801</td></tr>
<tr><td>Jeffrey T. Thomas</td><td>(302) 298-0700</td></tr>
<tr><td>Frank P. Coté</td><td>jshaw@shawkeller.com</td></tr>
<tr><td>Eric T. Syu</td><td>kkeller@shawkeller.com</td></tr>
<tr><td>Taylor W. King</td><td>nhoeschen@shawkeller.com</td></tr>
<tr><td>Nathaniel R. Scharn</td><td><i>Attorneys for Plaintiffs</i></td></tr>
<tr><td>GIBSON, DUNN & CRUTCHER LLP</td><td></td></tr>
<tr><td>3161 Michelson Drive</td><td></td></tr>
<tr><td>Irvine, CA 92612</td><td></td></tr>
<tr><td>(949) 451-3800</td><td></td></tr>
<tr><td></td><td></td></tr>
<tr><td>Brian M. Buroker</td><td></td></tr>
<tr><td>Omar F. Amin</td><td></td></tr>
<tr><td>GIBSON, DUNN & CRUTCHER LLP</td><td></td></tr>
<tr><td>1050 Connecticut Avenue, N.W.</td><td></td></tr>
<tr><td>Washington, DC 20036</td><td></td></tr>
<tr><td>(202) 955-8500</td><td></td></tr>
<tr><td></td><td></td></tr>
<tr><td>Stuart M. Rosenberg</td><td></td></tr>
<tr><td>GIBSON, DUNN & CRUTCHER LLP</td><td></td></tr>
<tr><td>1881 Page Mill Road</td><td></td></tr>
<tr><td>Palo Alto, CA 94304</td><td></td></tr>
</table>

Rustin K. Mangum
Spencer W. Ririe
MANGUM RIRIE LLP
999 Corporate Dr. #260
Ladera Ranch, CA 92694
(949) 298-5590


Dated: June 12, 2020

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on June 12, 2020, this document was served on the

persons listed below in the manner indicated:

**BY EMAIL**

Rodger D. Smith, II
MORRIS, NICHOLS, ARHST & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South Carolina Avenue
Suite 100
Palo Alto, CA 94304
(650) 422-6700
tfriel@kslaw.com

Joseph D. Eng, Jr.
KING & SPALDING LLP
1185 Avenue of the Americas
35th Floor
New York, NY 10036-2601
(212) 556-2250
jeng@kslaw.com

James P. Brogan
Brian Eutermoser
Angela C. Tarasi
Mikala Stone
KING & SPALDING LLP
1515 Wynkoop Street, Suite 800
Denver, CO 80202
(720) 535-2300
jbrogan@kslaw.com
beutermoser@kslaw.com
atarasi@kslaw.com
mikaela.stone@kslaw.com

Bobby R. Burchfield
Norman A. Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
bburchfield@kslaw.com
narmstrong@kslaw.com
cyook@kslaw.com

*/s/ Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
*Attorneys for Plaintiffs*