IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INGEVITY CORPORATION and       )
INGEVITY SOUTH CAROLINA, LLC,  )
                               )
            Plaintiffs,        )
                               )      C.A. No. 18-1391 (RGA)
      v.                       )
                               )      REDACTED - PUBLIC VERSION
BASF CORPORATION,              )
                               )
            Defendant.         )

**BASF'S ANSWERING BRIEF IN OPPOSITION TO INGEVITY'S MOTION FOR
SUMMARY JUDGMENT AND TO STRIKE EXPERT OPINIONS**

                                     MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                     Rodger D. Smith II (#3778)
                                     Anthony D. Raucci (#5948)
OF COUNSEL:                          1201 North Market Street
                                     P.O. Box 1347
Thomas J. Friel, Jr.                 Wilmington, DE  19899
KING & SPALDING LLP                  (302) 658-9200
601 South California Avenue, Suite 100   rsmith@mnat.com
Palo Alto, CA  94304                 araucci@mnat.com
(650) 422-6700

James P. Brogan                      *Attorneys for Defendant BASF Corporation*
Brian Eutermoser
Kevin Lake
Angela Tarasi
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street Suite 800
Denver, CO  80202

Bobby R. Burchfield                  Joseph D. Eng., Jr.
Norman Armstrong, Jr.                KING & SPALDING LLP
Christopher C. Yook                  1185 Avenue of the Americas, 35th Floor
KING & SPALDING LLP                  New York, NY  10036-2601
1700 Pennsylvania Avenue NW, Suite 200   (212) 556-2205
Washington, DC  20006

Original Filing Date: June 19, 2020
Redacted Filing Date: June 26, 2020

## TABLE OF CONTENTS

I.  INGEVITY IS NOT ENTITLED TO SUMMARY JUDGMENT ON PATENT MISUSE ................................................................................................... 1

    A.  Ingevity's Tying Arrangements Are *Per Se* Patent Misuse ................................... 2

        1.  Ingevity Misused the '844 Patent by Tying Licenses to the Purchase of Base Carbons, and It Has Not Purged That Misuse ............... 2

        2.  Ingevity Is Still Misusing the '844 Patent by Tying Licenses to the Purchase of Carbon Honeycombs ............................................................. 6

    B.  Ingevity Has Also Committed Patent Misuse Through Its Exclusive Dealing Contracts ........................................................................................... 10

    C.  If Ingevity Is Correct That Its "FVC Honeycombs" Have Only Infringing Uses, Then Ingevity Has Also Committed Patent Misuse Through Its Licensing Agreement With MAHLE ................................................................... 14

II.  Ingevity's Motion Regarding Waiver, Implied Waiver, and Equitable Estoppel IS Moot ........................................................................................................................ 15

III. the '844 patent fails to enable the full scope of the claimS ............................................. 15

    A.  Statement of Facts .................................................................................................. 16

    B.  Argument ................................................................................................................ 17

        1.  The Full Scope of the Claims Must Be Enabled ....................................... 17

        2.  Ingevity's Motion Fails Because Ingevity Does Not Dispute That Adsorbents with High or Low IACs Are Not Taught by the Specification, nor Were They within the Knowledge of a POSITA ......... 20

        3.  Even If Ingevity Were Correct as to the Law (Which It Is Not), Its Motion Should Be Denied Because There Is a Dispute as to the "Novel Aspect" of the Invention ................................................................ 22

IV.  INGEVITY IS NOT ENTITLED TO SUMMARY JUDGMENT THAT EVAPTRAP XC IS NOT A STAPLE ARTICLE OF COMMERCE ............................ 23

V.  INGEVITY'S REQUESTS TO EXCLUDE EXPERT TESTIMONY SHOULD BE DENIED ...................................................................................................................... 25

A.  The Court Should Deny Ingevity's Request to Exclude Testimony of Dr. Mathur ......................................................................................................... 25

B.  The Court Should Deny Ingevity's Motion to Exclude Mr. Lyons's Testimony .................................................................................................... 28

   1.  Mr. Lyons Is Qualified to Opine That the Claims Are Anticipated Under § 102(b)'s On-Sale Bar ................................................................ 29

   2.  Mr. Lyons Applied the Correct Legal Standards ..................................... 30

VI.  Conclusion ..................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
   299 F.3d 1336 (Fed. Cir. 2002)......................................................................................32

*Ansul Co. v. Uniroyal, Inc.*,
   306 F. Supp. 541 (S.D.N.Y. 1969), *aff'd in relevant part*, 448 F.2d 872 (2d
   Cir. 1971) ......................................................................................................................3

*Automotive Techs. Int'l Inc. v. BMW of North Am., Inc.*,
   501 F.3d 1274 (Fed. Cir. 2007)....................................................................15, 17, 18

*Bayer Healthcare LLC v. Baxalta Inc.*,
   407 F. Supp. 3d 462 (D. Del. Aug. 23, 2019) ............................................................19

*Berckley Inv. Group, Ltd.  v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006)..............................................................................27, 29, 30

*Brulotte v. Thys Co.*,
   379 U.S. 29 (1964) ...........................................................................11, 12, 13, 26

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
   157 F.3d 1340 (Fed. Cir. 1998).......................................................................................1

*Conceptus, Inc. v. Hologic, Inc.*,
   2012 WL 44237 (N.D. Cal. Jan. 9, 2012) ................................................................18

*Crowley v. Chait*,
   322 F. Supp. 2d 530 (D. Del. 2004)..........................................................................29

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993).......................................................................................................28

*Dawson Chem. Co. v. Rohm & Haas Co.*,
   448 U.S. 176 (1980)...................................................................................................1, 8, 9

*Delaware Display Grp. LLC v. Vizio, Inc.*,
   C.A. No. 13-2112-RGA, 2017 WL 784988 (D. Del. Mar. 1, 2017)...........................16, 18, 19

*Genentech, Inc. v. Novo Nordisk A/S*,
   108 F.3d 1361 (Fed. Cir. 1997)....................................................................................18

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
   438 F. 3d 1354 (Fed. Cir. 2008)..................................................................................23

*Hodosh v. Block Drug Co.*,
833 F.2d 1575 (Fed. Cir. 1987)..........................................................................................22

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
681 F.3d 1323 (Fed. Cir. 2012)...........................................................................................23

*In re Certain Integrated Circuits & Products Containing the Same*,
No. 337-TA-1148, slip op. (ITC May 22, 2020) ..................................................................18

*In re ChanBond, LLC Patent Litig.*,
C.A. No. 15-842-RGA, 2019 WL 6910284 (D. Del. Dec. 19, 2019) ..........................27, 32, 33

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ....................................30

*In re TMI Litig.*,
193 F.3d at 664–65 ............................................................................................................33

*In re Wellbutrin XL Antitr. Litig. Indirect Purchaser Class*,
868 F.3d 132 (3d Cir. 2017)................................................................................................13

*In re Yarn Processing Patent Validity Litig.*,
472 F. Supp. 180 (S.D. Fla. 1979) .....................................................................................3, 4

*Inline Connection Corp. v. AOL Time Warner Inc.*,
C.A. No. 02–272-MPT, 2007 WL 275928 (D. Del. Jan. 29, 2007).......................................27

*Insight Equity v. Transitions Optical, Inc.*,
252 F. Supp. 3d 382 (D. Del. 2017).....................................................................................24

*Intellectual Ventures I LLC v. Symantec Corp.*,
C.A. No. 13–440–LPS, 2014 WL 4773954 (D. Del. Sept. 24, 2014) ...................................26

*Invitrogen Corp. v. Clontech Labs Inc.*,
429 F.3d 1052 (Fed. Cir. 2005)..............................................................................16, 19, 21

*Kimble v. Marvel Entertainment, LLC*,
135 S. Ct. 2401 (2015).................................................................................................12, 13

*LG Elecs., Inc. v. Hitachi, Ltd.*,
655 F. Supp. 2d 1036 (N.D. Cal. 2009) ...............................................................................10

*Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*,
C.A. No. 07-CV-127, 2014 WL 547712 (D. Del. Feb. 7, 2014) ...........................................31

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
687 F.3d 1377 (Fed. Cir. 2012)...............................................................................17, 20, 21

*Masimo Corp. v. Philips Elecs. N. Am. Corp.*,
    742 F. Supp. 2d 492 (D. Del. 2010).........................................................22

*Metals Disintegrating Co. v. Reynolds Metals Co.*,
    228 F.2d 885 (3d Cir. 1956)..................................................................5

*MONEC Holding AG v. Motorola Mobility, Inc.*,
    897 F. Supp. 2d 225 (D. Del. 2012)......................................................23

*Morton Salt v. G.S. Suppiger Co.*,
    314 U.S. 488 (1942)...........................................................................7

*Pfaff v Wells Electronics, Inc.*,
    525 U.S. 55 (1998).......................................................................29, 31

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008)................................................................28

*Princo Corp. v. Int'l Trade Comm'n*,
    563 F.3d 1301 (Fed. Cir. 2009), *reinstated in relevant part after reh'g en
    banc*, 616 F.3d.................................................................................2

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010) (en banc)..........................................1, 14

*Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*,
    C.A. No. 04–940–JJF, 2006 WL 2241018 (D. Del. Aug. 4, 2006) .........27

*Promega Corp. v. Life Techs. Corp.*,
    773 F.3d 1338 (Fed. Cir. 2014), *rev'd on other grounds, Life Techs. Corp. v.
    Promega Corp.*, 137 S. Ct. 734 (2017) ...............................................17

*Qualcomm Inc. v. Broadcom Corp.*,
    548 F.3d 1004 (Fed. Cir. 2008)............................................................3

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
    553 U.S. 617 (2008).....................................................................14, 15

*Scott Paper Co. v. Marcalus Mfg. Co.*,
    326 U.S. 249 (1945)..........................................................................12

*Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*,
    623 F. Supp. 2d 518 (D. Del. 2009).....................................................27

*Va. Panel Corp. v. MAC Panel Corp.*,
    133 F.3d 860 (Fed. Cir. 1997).....................................................2, 11, 13, 27

*Vita-Mix Corp. v. Basic Holding, Inc.*,
    581 F.3d 1317 (Fed. Cir. 2009)..................................................................................22, 23

**Rules and Statutes**

35 U.S.C. § 102(a) ..................................................................................................................31

35 U.S.C. § 102(b). ..........................................................................................................28, 29

35 U.S.C. § 271(c) ..................................................................................................................23

Fed. R. Civ. P. 56(a) ..............................................................................................................22

Fed. R. Evid. 702 ..............................................................................................................24, 28

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|:---:|:---|
| 80 | NGVT0082454 |
| 81 | Excerpts from the Deposition Transcript of Ed Woodcock dated December 2, 2019 |
| 82 | Excerpts from the Expert Report of Divya Mathur, Ph.D. |
| 83 | Excerpts from Defendant BASF Corporation's Second Amended Invalidity and Unenforceability Contentions |
| 84 | Excerpts from the Deposition Transcript of David A. Rockstraw dated May 21, 2020 |
| 85 | NGVT0502869 |
| 86 | NGVT0502871 |
| 87 | NGVT0543176 |
| 88 | NGVT0498821 |
| 89 | NGVT0000029 |
| 90 | Excerpts from the Deposition Transcript of Bethany Toldo dated December 17, 2019 |
| 91 | Excerpts from the Deposition Transcript of Stefan Schutte dated January 14, 2020 |
| 92 | Excerpts from the Deposition Transcript of Erik Ripple dated December 18, 2019 |
| 93 | NGVT0498834 |
| 94 | NGVT0087853 |
| 95 | Excerpts from the Expert Report of Dr. David A. Rockstraw Regarding Validity of U.S. Patent No. RE38,844 |
| 96 | *In re Certain Integrated Circuits & Products Containing the Same*, No. 337-TA-1148 |
| 97 | Excerpts from the Reply Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 98 | Excerpts from the Deposition Transcript of Diana Rowe dated November 8, 2019 |
| 99 | Excerpts from the Expert Report of Thomas D. Vander Veen Ph.D. |
| 100 | Excerpts from the Deposition Transcript of Akash Abraham dated October 15, 2019 |

| Exhibit No. | Description |
|---|---|
| 101 | BASF_INGV022905 |
| 102 | Excerpts from the Deposition Transcript of Jim Peterson dated January 9, 2020 |
| 103 | Excerpts from the Deposition Transcript of Wolfgang Ruettinger dated October 19, 2018 |
| 104 | Excerpts from the Expert Reply Report of Divya Mathur, Ph.D. |
| 105 | Excerpts from Defendant BASF Corporation's Initial Invalidity and Unenforceability Contentions |
| 106 | Excerpts from BASF Corporation's Objections and Responses to Plaintiffs' Third Set of Interrogatories dated April 18, 2019 |
| 107 | Excerpts from the Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 108 | Appendix 1 to Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 109 | Appendix 15 to Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |

## I.   INGEVITY IS NOT ENTITLED TO SUMMARY JUDGMENT ON PATENT MISUSE

When a patent owner misuses its patent to "obtain market benefit beyond that which inheres in the statutory patent right," the patent "become[s] unenforceable, and the patentee loses its right to sue for infringement." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1327-28 (Fed. Cir. 2010) (en banc). As BASF explained in its motion for summary judgment (D.I. 290), the undisputed evidence shows that Ingevity has committed patent misuse by conditioning licenses to practice the '844 patent on customers' purchase of unpatented carbon adsorbents from Ingevity. (*See* D.I. 290 at 24-31; Section I.A, *infra*.) If required to go to trial, BASF would also show that Ingevity has committed patent misuse by leveraging its patent to coerce customers into long-term contracts that require them to purchase carbon adsorbents exclusively from Ingevity even after the '844 patent expires. (*See* Section I.B, *infra*.) And Ingevity's own positions, if accepted by the factfinder, would mean that it also committed patent misuse by extracting royalties from a customer despite having exhausted its patent rights. (*See* Section I.C, *infra*.)[1]

As explained below, Ingevity misapprehends the relevant legal standards, and the facts it identifies as supposedly "undisputed" (D.I. 293 at 2-5) are either disputed or legally irrelevant. BASF should be granted judgment as a matter of law on its patent misuse defense. But even if factual disputes prevented the Court from entering summary judgment in favor of BASF, there would be no basis to enter summary judgment on this issue in favor of Ingevity.

---

[1]    Ingevity also moved for summary judgment on BASF's unclean hands defense. (D.I. 293 at 20-22.) The Supreme Court has "explicitly linked the doctrine of patent misuse to the 'unclean hands' doctrine." *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 193 (1980); *see id.* at 186 & n.7; *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) (the "defense of patent misuse arises from the equitable doctrine of unclean hands"). BASF relies on the same conduct by Ingevity as a basis for asserting the defenses of both patent misuse and unclean hands.

A.      **Ingevity's Tying Arrangements Are *Per Se* Patent Misuse**

Tying arrangements—when a patentee having market power conditions a license upon the purchase of an unpatented, staple good—are the classic example of *per se* patent misuse. *Princo Corp. v. Int'l Trade Comm'n*, 563 F.3d 1301, 1307 (Fed. Cir. 2009), *reinstated in relevant part after reh'g en banc*, 616 F.3d at 1326 n.1; *Va. Panel Corp. v. MAC Panel Corp.*, 133 F.3d 860, 869 (Fed. Cir. 1997).  Here, it is undisputed that:  (1) Ingevity, through the '844 patent, has market power in the market for technology to meet LEV III / Tier 3 bleed emission standards (the tying product); and (2) Ingevity has used its market power to require licensees to purchase unpatented carbon adsorbents (the tied product)—including both pelletized and granular carbons (known as "base carbons") and carbon honeycombs—from Ingevity.  (*See* D.I. 290 at 25.)

Ingevity's motion does not claim that these facts are in dispute.  Instead, Ingevity makes two arguments as to why its tying arrangements are not patent misuse.  First, it argues that it recently stopped tying licenses to the purchase of carbon adsorbents *other than* honeycombs and thus "purged" its past misuse.  Second, it argues that its tying of licenses to the purchase of carbon honeycombs is not misuse because carbon honeycombs with certain specific dimensions are not "staple goods."  To obtain summary judgment, Ingevity must prevail on both arguments.  BASF addresses each argument in turn.

1.      **Ingevity Misused the '844 Patent by Tying Licenses to the Purchase of Base Carbons, and It Has Not Purged That Misuse**

Ingevity's unlawful tying arrangements have not been limited to carbon honeycombs.


(*See* D.I. 290 at 25; *see also* Ex. 80 at -82462.)  Ingevity granted implied licenses only to customers who purchased its carbon adsorbents, and it entered into written license

agreements with ███ MAHLE, and ███ requiring them to purchase carbon adsorbents (including base carbons) from Ingevity.  (D.I. 290 at 25.)  Ingevity's motion does not deny that base carbons are a staple good with many noninfringing uses or that Ingevity's tying arrangements, insofar as they involved base carbons, amount to *per se* patent misuse.  Instead, Ingevity asserts that it has not tied licenses to the purchase of base carbons "in the last 16 months," and thus any misuse involving those products "has been purged."  (D.I. 293 at 20.)  Ingevity's conclusory assertion is incorrect as a matter of law and fact.  Indeed, Ingevity's assertion that its anticompetitive conduct has ceased (*id.* at 3) is refuted by the undisputed record.

A misused patent is "unenforceable until the misuse is purged."  *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1025 (Fed. Cir. 2008).  "Once misuse of a patent has been established, … the burden is upon the patentee to show that the misuse has ceased ***and its effects dissipated*** before he will be permitted to resume enforcement of his patent."  *Ansul Co. v. Uniroyal, Inc.*, 306 F. Supp. 541, 560 (S.D.N.Y. 1969) (emphasis added), *aff'd in relevant part*, 448 F.2d 872 (2d Cir. 1971).  "Courts have uniformly applied a two-prong test to determine" whether patent misuse has been purged:  "The patent holder must demonstrate [1] a complete abandonment of the improper practices found to constitute the particular misuse and [2] that ***the consequences of the misuse have been fully dissipated***."  *In re Yarn Processing Patent Validity Litig.*, 472 F. Supp. 180, 183-84 (S.D. Fla. 1979) (emphasis added).

Ingevity cannot show that its misuse has been purged.  Ingevity claims it "has not required customers to purchase base carbon products from Ingevity" as a condition of licensing the '844 patent ███████████ (*See* D.I. 293 at 20.)  It points (*id.* at 3) to the deposition of an Ingevity executive, Ed Woodcock, who testified that ███████████

███████████████████████

███████████████████████

(Ex. 81 at 24:24-25:3, 29:23-30:1.)  Mr. Woodcock was

███████████████████████ (*Id.* at 24:22-24.)  He was also

███████████████████████ .  (*Id.* at 25:22-26:11.)[2]

      This vague testimony falls far short of carrying Ingevity's burden to show that it

has affirmatively purged its patent misuse.  In fact, it shows just the opposite.  According to

Mr. Woodcock, Ingevity's message to customers ████████████████████████

█████████████████████████████████████████████

██████████████████████████████████ (Ex. 81 at 10:1-

5.) ████████████████████████████████████████

█████████████████████████████████████████████

████████████████████.

    .  (*Id.* at 25:22-26:11.)  So there is no evidence that customers with implied licenses, who

had been receiving Ingevity's old message for many years, were even informed about the new

policy.  Moreover, Ingevity's written license agreements with █████ and MAHLE are ██████

████, and there is no evidence that Ingevity amended those agreements to reflect the supposed

new policy.  Ingevity thus cannot show that it has "complete[ly] abandon[ed]" its prior misuse.

*Yarn Processing*, 472 F. Supp. at 183-84.

      Nor can Ingevity show that the consequences of its misuse have "fully

dissipated."  *Id.*  Again, Mr. Woodcock's testimony shows that the opposite is true: Ingevity

---

[2]    Ingevity characterizes Mr. Woodcock's testimony as stating that the ████████████████

███████████ █ ████████████████████████████████████████

████████ (Ex. 81 at 29:23-30:1, 30:24-31:3.)

knew its new policy would not affect sales of its base carbons for several years.  He explained:



(Ex. 81 at 20:1-7; *see id.* at 22:16-21 (███████████████████████

███████); *see also* Ex. 82, ¶ 16 n.29 (according to Ingevity's own estimates, "██████████

████████████).)

     For all these reasons, BASF is entitled to summary judgment that Ingevity misused the '844 patent by tying licenses to the purchase of base carbons and that Ingevity has not purged that misuse.  At a minimum, factual questions about whether and when any purge occurred preclude summary judgment for Ingevity on this issue.  Moreover, even if Ingevity *had* purged its misuse sometime in the ████████████, its past misuse would still prevent it from recovering damages for any infringement of the '844 patent that occurred before the date on which the misuse was fully purged.  *See, e.g.*, *Metals Disintegrating Co. v. Reynolds Metals Co.*, 228 F.2d 885, 889 (3d Cir. 1956) (patentee that purged past misuse could not recover damages for infringement during period when misuse remained unpurged).

     Ingevity tries to escape this conclusion by arguing that BASF's invalidity contentions did not identify "a tying theory of patent misuse based on high-IAC base carbon products" (D.I. 293 at 19), but even a cursory review of the contentions shows that to be incorrect.  The contentions clearly state that Ingevity committed patent misuse by requiring licensees "to purchase its (unpatented) activated carbon products," without limiting the tied

products to honeycombs alone.  (Ex. 83 at 86; *see also id.* at 87 

) (emphasis added);

Ex. 82, ¶¶ 72, 77.)

(D.I. 50-1 at 15; *see also* Ex. 106 at 20 (incorporating briefing by reference).)  Thus, Ingevity's suggestion that it was unaware of BASF's contentions is untenable.

### 2.    Ingevity Is Still Misusing the '844 Patent by Tying Licenses to the Purchase of Carbon Honeycombs

Even if Ingevity could show that its misuse relating to ***base carbons*** had been entirely purged, BASF would still be entitled to prevail on its patent misuse defense based on Ingevity's ongoing misuse relating to ***carbon honeycombs***.  (*See* D.I. 290 at 27-31.)  Ingevity does not deny that, even today, it is still tying licenses to practice the '844 patent to the purchase of unpatented carbon honeycombs.  Its only ground for claiming that this tying is not patent misuse is its assertion that a certain subset of a certain brand of honeycombs sold by Ingevity are "non-staple goods."  (D.I. 293 at 7.)  This argument fails for several reasons.

***First***, even setting aside Ingevity's misuse involving base carbons and looking only at its misuse involving honeycombs, Ingevity cannot artificially limit the staple/nonstaple inquiry to what it calls its "FVC Honeycombs."  (D.I. 293 at 2.)  The term "FVC Honeycombs" does not appear in any document or witness testimony in this case; Ingevity appears to have coined the term specifically for use in its summary judgment motion.  Solely for summary judgment purposes, Ingevity (with no citation) defines "FVC Honeycombs" narrowly as "those having 29 mm, 35 mm, or 41 mm diameters and 200 cells per square inch."  (*Id.*)  But the evidence shows that Ingevity conditions express and implied licenses on customers' commitment

to purchase **all** honeycombs for use in fuel vapor canisters from Ingevity, with no limitation to particular brands, sizes, or dimensions.  (D.I. 290 at 25.)  Ingevity does not dispute that it has sold carbon honeycombs with other dimensions and cell densities for noninfringing applications, and it does not identify any fundamental difference between those honeycombs and the "FVC Honeycombs."  Indeed, when presented with evidence

(D.I. 292-4 (Ex. 66)),

Ingevity's technical expert

. (Ex. 84 at 218:8-220:8.)

Armed with its gerrymandered definition, Ingevity asserts that because it has never sold honeycombs with the specific dimensions and cell densities of "FVC Honeycombs" for a noninfringing use, those specific honeycombs are a nonstaple good.  (*See* D.I. 293 at 8.)  As BASF explained in its motion for summary judgment, the patent misuse doctrine is not so easily evaded.  (*See* D.I. 290 at 29-31.)  The Supreme Court rejected a similar gambit in *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488 (1942).  There, the patentee was guilty of misuse for refusing to license its patented machine for adding salt tablets to canned goods unless licensees also purchased its unpatented salt tablets, which had "a particular configuration rendering them capable of convenient use in [the] patented machines."  *Id.* at 490.  The same conclusion should apply here.  Like salt tablets, carbon honeycombs are a staple good with many noninfringing uses, and their dimensions can be adjusted with minimal effort.  (*See* D.I. 290 at 26, 28, 30-31.)  While Ingevity may not have sold honeycombs with the specific dimensions of its "FVC Honeycombs" for noninfringing uses, it **has** sold other honeycombs for such uses—honeycombs

." (*Id.*)  Under these circumstances, Ingevity cannot avoid a finding of

patent misuse by pointing to the "particular configuration" of its carbon honeycombs.  *See Morton Salt*, 314 U.S. at 490.

> ***Second***, even if the patent misuse inquiry were limited to Ingevity's so-called "FVC Honeycombs," Ingevity still could not show that those honeycombs are a nonstaple good. The Supreme Court has held that to qualify as a nonstaple good, a product must satisfy a two-pronged test:  It must be both: (1) "capable only of infringing use in [the] patented invention" and (2) "essential to that invention's advance over prior art."  *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980).  Although Ingevity quotes this test (*see* D.I. 293 at 7), it fails to show that either element is satisfied.

> With respect to the first element, which requires that the tied product be capable ***only*** of infringing use, Ingevity fails to address evidence that it has sold honeycombs with the specific dimensions of "FVC Honeycombs" for noninfringing uses in air intake systems.  In particular, Ingevity's sales records show that it: ███████████████████████████████████

████████████████████████████████████████████████████████████

███████████ (*see* Ex. 85); (2) ███████████████████████████████

███████████████████████████████████████████████ (*see* Ex. 86); and (3)███████████████████████████████████████

███████████████████████ (*id.*).  All these products meet Ingevity's definition of "FVC Honeycombs."  (*See* D.I. 293 at 2 (defining "FVC Honeycombs" as "those having 29 mm, 35 mm, or 41 mm diameters and 200 cells per square inch").)  Thus, Ingevity's own records contradict its statement that "FVC Honeycombs" have no use other than in fuel vapor canisters (D.I. 293 at 2), and Ingevity cannot show that even "FVC Honeycombs" are capable only of infringing uses.

Worse yet, Ingevity completely ignores the second element of the Supreme Court's test for nonstaple products, which requires that the product be "essential" to the patented invention's "advance over prior art." *Dawson*, 448 U.S. at 213. Ingevity's "FVC Honeycombs" cannot satisfy this element either. As BASF's summary judgment motion explained, the '844 patent states that the adsorbents in the preferred embodiment can be made from a variety of raw materials (not just carbon) and can take a variety of forms (not just honeycombs). (*See* D.I. 290 at 28-29.) Ingevity itself admits                                                        . (*Id.*) And even if they did, the patent acknowledges that carbon honeycombs and their adsorptive properties were known decades before the invention and were ***not*** part of the patent's advance over prior art. (*Id.*)

Ingevity's motion confirms that carbon honeycombs, including "FVC Honeycombs," are not essential to the '844 patent's claimed advance over prior art. Ingevity asserts that "the alleged novelty of the '844 patent" and "its advance over the prior art" lies in "its ***combination*** of high- and low-IAC adsorbent volumes." (D.I. 293 at 28 (emphasis in original).) Ingevity goes on to state that because the '844 patent "is about new ways of combining adsorbent volumes—not new ways of ***making*** adsorbent volumes or new ***types*** of adsorbent volumes"—the adsorbent volumes can consist of materials (such as carbon honeycombs) that were already "commercially available" and well understood at the time of the invention. (*Id.* at 27-28 (emphasis in original).) In this way, Ingevity's own characterization of its patent establishes that carbon honeycombs, including "FVC Honeycombs," are not essential to the '844 patent's advance over prior art and thus do not qualify as a nonstaple good under *Dawson*.

Finally, Ingevity claims that BASF has "admit[ted] that Ingevity's FVC Honeycombs are non-staple goods that have no noninfringing use." (D.I. 293 at 8.) That is

wrong:  BASF has consistently maintained that carbon honeycombs, including Ingevity's honeycombs, are staple goods.  (*See, e.g.*, D.I. 81 at 1, 15-17.)  BASF's supposed "admission" is nothing but Ingevity's misreading of

.  (Ex. 83 at 87 n.22.)  The clear implication was that ***Ingevity's own claims*** about the centrality of its honeycombs could support an exhaustion argument, just as in the case BASF cited.  *See LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1044 (N.D. Cal. 2009) ("[A]ccording to LGE's own theory of infringement, the parts substantially embody the patents, and LGE cannot claim otherwise.").  (*See* Section I.C, *infra*.)

For the avoidance of doubt: BASF maintains, as it has throughout this litigation, that Ingevity's honeycombs are staple goods.  (*See* D.I. 246, at 2-3 (holding that BASF's "pleading sufficiently establishes that [Ingevity's] honeycomb scrubbers are a staple product").)  As demonstrated above, the evidence confirms that BASF, not Ingevity, is entitled to summary judgment on this issue.

**B.     Ingevity Has Also Committed Patent Misuse Through Its Exclusive Dealing Contracts**

Ingevity has also misused the '844 patent in another way:  It has leveraged its market power, derived from the patent, to pressure customers into signing long-term contracts that require them to purchase carbon adsorbents exclusively from Ingevity (or pay onerous penalties) even after the patent expires in March 2022.  For example, Ingevity's agreements with Kayser and KFTC,

."  (Ex. 87; Ex. 88.)

And Ingevity's agreement with Delphi,

███████████████████████████████████████████████████████

████████████████████████████████ (Ex. 89.)  These agreements are not beneficial

for customers,

.  (Ex. 90

at 20:3-21:8; Ex. 91 at 49:1-18; 80:14-18.) ████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ (*See* Ex. 91 at 44:3-

20; Ex. 92 at 49:2-51:24; Ex. 82 at ¶¶ 9(d), 79, & 128 n.454.) ██████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ (*See* Ex. 93

at -498835; Ex. 94 at -87854.)

      These post-expiration exclusive dealing agreements constitute a separate and independent basis for BASF's patent misuse defense.[3]  "[A]rrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties" are a form of *per se* patent misuse.  *Va. Panel*, 133 F.3d at 869 (citing *Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964)).  Under *Brulotte*'s reasoning, Ingevity's long-term contracts are also *per se* misuse.  True, Ingevity did not use its patent monopoly to strong-arm customers into agreeing to post-expiration ***royalties***.  Ingevity has always eschewed royalties and has tried to monetize its patent by tying its technology to purchase of its carbon products—a practice it continued by strong-arming customers into post-expiration exclusive purchase agreements.  But Ingevity offers no reason why its behavior should be viewed more favorably than the conduct *Brulotte* condemned.

---

[3]    BASF did not move for summary judgment on this ground, as Ingevity's tying arrangements provide a sufficient basis for the Court to grant BASF judgment as a matter of law on its patent misuse defense. At trial, BASF would raise Ingevity's exclusive dealing agreements as an additional ground for holding that Ingevity cannot enforce the '844 patent.

As *Brulotte* explained, the law has long held that "***any*** attempted reservation or continuation in the patentee … of the patent monopoly, after the patent expires, ***whatever the legal device employed***, runs counter to the policy and purpose of the patent laws."  *Brulotte*, 379 U.S. at 31 (emphasis added) (quoting *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945)).  Ingevity's long-term contracts, like the agreements condemned in *Brulotte*, are "on their face a bald attempt" to "project [Ingevity's] monopoly beyond the patent period" and exercise "monopoly power in the post-expiration period when … the patent has entered the public domain."  *Id.* at 32-33.  They are therefore *per se* patent misuse.

Ingevity protests that its exclusive dealing arrangements do not run afoul of *Brulotte* because they "do not contain any provision for royalties."  (D.I. 293 at 12.)  It suggests that *Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401 (2015), holds that any agreement not providing for royalties is allowed by *Brulotte*.  That is incorrect.  *Kimble* declined to overrule *Brulotte*, stressing that "*Brulotte*'s statutory and doctrinal underpinnings"—including *Scott Paper*—"have not eroded over time."  *Id.* at 2410-11.  And it emphasized that *Brulotte* "applied a categorical principle that all patents, ***and all benefits from them***, must end when their terms expire."  *Id.* at 2413 (emphasis added).  True, *Kimble* also recognized that "parties can often find ways around *Brulotte*," such as by entering into "business arrangements other than royalties—all kinds of joint ventures, for example—that enable [them] to share the risks and rewards of commercializing an invention."  *Id.* at 2408.  But that statement blessing "joint ventures" does not suggest that a patentee is free to leverage its patent to extract post-expiration benefits other than royalties from its customers.  On the contrary, *Kimble*'s embrace of *Brulotte*'s "categorical" rule that "all benefits from [patents] must end when their terms expire," *id.* at 2413, confirms that such leveraging is impermissible.

Suppose, however, that Ingevity were right that its post-expiration exclusive dealing agreements are not *per se* misuse under *Brulotte* because they do not involve royalties. That would not mean that the agreements cannot be condemned as misuse. It would mean only that the agreements must be evaluated under the rule of reason. When a challenged practice "has the effect of extending the patentee's statutory rights" but is not *per se* misuse, the practice "must then be analyzed in accordance with the 'rule of reason,'" which requires the factfinder to "decide whether the questioned practice imposes an unreasonable restraint on competition." *Va. Panel*, 133 F.3d at 869. Ingevity does not argue that the Court can hold as a matter of law that Ingevity's post-expiration exclusive dealing agreements pass muster under the rule of reason. Nor could it, having submitted no evidence (much less undisputed evidence) on the effect of the agreements on competition. In any event, "the rule of reason inquiry is fact intensive and is not easy to resolve at the summary judgment stage." *In re Wellbutrin XL Antitr. Litig. Indirect Purchaser Class*, 868 F.3d 132, 170 n.64 (3d Cir. 2017); *see Va. Panel*, 133 F.3d at 869 (noting wide "variety of factors" that figure in rule-of-reason analysis).

Ingevity next contends that a patentee's attempt to leverage its patent to obtain post-expiration benefits may be unenforceable but does not amount to patent misuse. That, too, is incorrect. True, the remedy provided in *Brulotte* and *Kimble* was to declare the royalty provision in those cases unenforceable after the patent expired. But that was only because both cases involved a licensee's attempt to avoid paying post-expiration royalties rather than (as here) a patentee's attempt to enforce its patent against a third party. The Federal Circuit, however, has made clear that when a patentee has used its patent to extract post-expiration benefits, the patentee is guilty of *per se* misuse and the patent is unenforceable. *See Va. Panel*, 133 F.3d at 869.

**C.      If Ingevity Is Correct That Its "FVC Honeycombs" Have Only Infringing Uses, Then Ingevity Has Also Committed Patent Misuse Through Its Licensing Agreement With MAHLE**

As explained above, BASF disputes that what Ingevity calls its "FVC Honeycombs" are nonstaple goods.  But if Ingevity were correct on that point, then it would have committed yet another form of patent misuse.  Specifically, Ingevity required MAHLE

.  (Ex. 81 at 91:12-93:19.)  If, as Ingevity contends, "FVC Honeycombs" are nonstaple goods that embody the '844 patent's advance over prior art and have no noninfringing uses, then Ingevity's sale of those honeycombs to MAHLE exhausted Ingevity's patent rights, and Ingevity had no right to ███████████████ MAHLE following the sale.  By doing so, Ingevity misused the patent.  *See, e.g.*, *Princo*, 616 F.3d at 1328 (it is misuse for a patentee to attempt to obtain a "market benefit" beyond that to which the patent entitles him).

In its summary judgment motion, Ingevity does not dispute that demanding royalties after exhausting its patent rights would qualify as patent misuse.  Nor does Ingevity deny that it ████████████████ MAHLE for fuel canisters that incorporated "FVC Honeycombs" purchased from Ingevity.  And Ingevity acknowledges that, based on its view (which BASF disputes) that ████████████████████████████████████ ████████████████████████████████████████████ ████████  (D.I. 293 at 13-14.)  Ingevity's only argument on this issue is its assertion that "patent exhaustion applies only to *the article sold*."  (*Id.* at 14 (emphasis in original).)  According to Ingevity, because  MAHLE

—Ingevity was within its rights to ███████████████ MAHLE.  (*Id.*)

That is wrong.  When a patentee exhausts its patent rights by selling an item that embodies the patent, the buyer is free to combine that item with other parts in a way that practices the patent—and the patentee "has no postsale right to require that the patents be practiced using only" authorized parts.  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 630 (2008).  Thus the petitioner in *Quanta*, having purchased parts from Intel that embodied the asserted patents, was free to manufacture computers "using [the] Intel parts in combination with non-Intel memory and buses in ways that practice[d] [those] patents."  *Id.* at 624.  By the same logic, if Ingevity is right that its "FVC Honeycombs" embody the '844 patent, then MAHLE

, and Ingevity committed misuse by interfering with MAHLE's ability to exercise that right.  Ingevity's motion for summary judgment should be denied on this ground as well.

## II.   INGEVITY'S MOTION REGARDING WAIVER, IMPLIED WAIVER, AND EQUITABLE ESTOPPEL IS MOOT

BASF will not present defenses of waiver, implied waiver, or equitable estoppel at trial.[4]  Ingevity's motion for summary judgment on BASF's sixth affirmative defense should therefore be denied as moot.

## III.   THE '844 PATENT FAILS TO ENABLE THE FULL SCOPE OF THE CLAIMS

Ingevity does not and cannot dispute that the '844 patent specification does not enable the use of adsorbents with low or high IACs that fall within the claimed ranges and that the use of such adsorbents was not within the knowledge of a POSITA.  To avoid invalidity,

---

[4]    Ingevity did not confer with BASF or otherwise indicate that it would seek summary judgment on these defenses before filing its motion.

Ingevity asserts that only the "novel aspect" of the invention must be enabled.  (D.I. 293 at 27-28.)  That is not the law, and *none* of the cases Ingevity cites support its argument.

While these cases distinguish between novel aspects of an invention, which must be enabled by the specification, and tangential limitations, which must be enabled either by the specification or by knowledge of a POSITA, each of these cases requires that the full scope of the claimed invention be enabled.  *Automotive Techs. Int'l Inc. v. BMW of North Am., Inc*., 501 F.3d 1274, 1280-84 (Fed. Cir. 2007) (affirming district court's rejection of patentee's argument that "the claims are enabled because one embodiment or mode of practicing the invention … is enabled"); *Delaware Display Grp. LLC v. Vizio, Inc.*, C.A. No. 13-2112-RGA, 2017 WL 784988, at *5 (D. Del. Mar. 1, 2017) (noting that for a tangential limitation, it is appropriate "to supplement the specification on how to use [the limitation] with the knowledge of one skilled in the art"); *Invitrogen Corp. v. Clontech Labs Inc.*, 429 F.3d 1052, 1070-71 (Fed. Cir. 2005) (requiring enablement of "those skilled in the art to make and use the full scope of the claimed invention without 'undue experimentation' in order to … advance the technical arts").  The claims of the '844 patent are invalid for lack of enablement.

A.    **Statement of Facts**

All asserted claims include an initial adsorbent with an IAC "greater than 35 g n-butane/L" and a subsequent adsorbent with an IAC "less than 35 g n-butane/L."  (D.I. 293 at 4.)  The '844 patent discloses BAX 1500, which was a known adsorbent volume at the time of the invention and which has an IAC greater than 35 g/L, as well as three exemplary subsequent adsorbent volumes, having IACs of 16 g/L, 18 g/L, and 24 g/L.  (*Id.*; '844 patent, 8:42.)

As set forth in BASF's Motion for Summary Judgment, there is no dispute that the specification combined with the knowledge of a POSITA fails to enable the full scope of the claimed invention, as further discussed below.  (*See* D.I. 290 at Section II.)

16

Ingevity argues that the "novel aspect" of the invention that must be enabled is limited to the combination of adsorbents expressly disclosed in the specification, and other claimed combinations are just "tangential" to the invention and need not be enabled.  (D.I. 293 at 27-28.)  As explained below, Ingevity's argument is inconsistent with its expert's opinion that the alleged inventive contribution is the recognition that adsorbents with flat isotherm shapes (*i.e.*, with IACs of or approaching 0 g/L) were effective for reducing canister bleed emissions.  (Ex. 95, ¶¶ 20-23.)  Moreover, the use of very high- and very low-capacity adsorbents was not "tangential" to the alleged invention.  (*See* Section III(B)(3), *infra*.)

**B.    Argument**

**1.    The Full Scope of the Claims Must Be Enabled**

All asserted claims of the '844 patent include open-ended ranges, and ***the full scope*** of the claimed invention must be enabled.  *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1383-84 (Fed. Cir. 2012) (affirming lack of enablement where the patent claimed an open-ended range of percentage values but did not enable the entire range); *Automotive*, 501 F.3d at 1283 (affirming summary judgment of non-enablement, where the specification failed to enable both of the mechanical and electronic sensors covered by the claims and, therefore, failed to enable "the full scope of the claims").

The Federal Circuit specifically addressed claims with open-ended ranges in *MagSil*, holding that*,* for claims with open-ended ranges, "the specification at the time of filing must teach one of ordinary skill in the art to fully perform this method ***across that entire scope***."  687 F.3d at 1381 (emphasis added).  The claims in *MagSil* recited "a change in the resistance by at least 10%," and an expert testified that this range extended even to 100% or 1000%.  *Id.*  The court noted resistance changes of 100-120% were not achieved until years later.  *Id.* at 1382.  Lacking "sufficient disclosure to present even a remote possibility that an

ordinarily skilled artisan could have achieved the modern dimensions of th[e] art," the claims were invalid. *Id.* Whether specific examples within the claimed range were enabled is not enough; the full scope of the claimed invention must be enabled. *See id.* at 1382-83; *see also Promega Corp. v. Life Techs. Corp.*, 773 F.3d 1338, 1348-49 (Fed. Cir. 2014), *rev'd on other grounds*, *Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734 (2017) ("[A]s in *MagSil*, we need not delineate the precise boundary at which [Plaintiff]'s claims are no longer enabled."); Ex. 96, *In re Certain Integrated Circuits & Products Containing the Same*, No. 337-TA-1148, slip op. at pp. 110-15 (ITC May 22, 2020) (finding a lack of enablement where claims including a range with no lower bound were, first, construed to have a lower bound and then determined to be non-enabled, because values within that range could not be practiced without undue experimentation).

Ingevity relies on statements relating to novelty that do not overrule the holdings of these cases. Rather, they relate to "[t]he rule that a specification need not disclose what is well known in the art [which] is 'merely a rule of supplementation, not a substitute for basic enabling disclosure.'" *Automotive,* 501 F.3d at 1283 (quoting *Genentech*, *Inc. v. Novo Nordisk A/*S, 108 F.3d 1361, 1366 (Fed. Cir. 1997)). For example, *Delaware Display* and *Automotive* do not hold that certain limitations need not be enabled; rather, these cases merely note that it may be appropriate "to supplement the specification on how to use [the limitation] with the knowledge of one skilled in the art." *Delaware Display,* 2017 WL 784988, at *5 (citing *Conceptus, Inc. v. Hologic, Inc.*, 2012 WL 44237, at *6 (N.D. Cal. Jan. 9, 2012)); *Automotive Techs. Int'l Inc. v. BMW of North Am., Inc.*, 501 F.3d at 1280 (Fed. Cir. 2007) (affirming district court's rejection of patentee's argument that "the claims are enabled because one embodiment or mode of practicing the invention … is enabled"). As explained below, a

POSITA's knowledge could not have filled the gaps in the '844 patent's disclosure, and nothing in these cases overrules the requirement that the specification teach a POSITA how to practice the full scope of the claim.  Ingevity's interpretation of the law would mean the specification need not enable the very "subsequent adsorbent" it accuses of infringement, BASF's honeycomb, for which Ingevity's own expert calculated IACs of approximately 5 g/L. (D.I. 300 (Ex. I), ¶¶ 188-89.)

This Court's decision in *Bayer Healthcare LLC v. Baxalta Inc.* is instructive. 407 F. Supp. 3d 462, 470-72 (D. Del. Aug. 23, 2019).  In that case, the Court first looked to the claim language to define the boundaries of what must be enabled, finding that the claims covered two different embodiments of a "polypeptide conjugate."  *Id.*  Next, the Court determined that, because the specification sufficiently disclosed one of these embodiments, it sufficiently disclosed the "novel aspect" of the invention; therefore, it was "appropriate to consider the knowledge in the art to determine whether, in view of the [existing] disclosure, undue experimentation was required to practice" the invention's full scope, including the second embodiment.  *Id.* at 472-73.  Thus, Ingevity's argument that the enablement requirement is limited to the so-called "novel aspect" of an invention is incorrect.  (D.I. 293 at 27-28.)  The law requires enablement of *the full scope* of the claims.  *Bayer*, 407 F. Supp. 3d at 472-73; *Delaware Display,* 2017 WL 784988, at *5 (noting case law showing that where a feature is "only a portion of the invention and not the entire novel aspect … it was therefore appropriate for the jury to supplement the specification on how to use [the feature] with the knowledge of one skilled in the art").

Although a patentee is not required to foresee every means of implementing an invention, "[t]he scope of the [patent] claims must be less than or equal to the scope of the

enablement." *Invitrogen*, 429 F.3d at 1071.  It is undisputed that is not the case with the '844 patent's broadly claimed ranges.  *Invitrogen* further elaborates that "[t]he scope of enablement, in turn, is that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation."  *Id.*  Thus, even the cases Ingevity relies on require that the full scope of the claims be enabled.  *See id.*; *Delaware Display,* 2017 WL 784988, at *5.

Similar to the claims in *MagSil*, the '844 patent claims two open-ended ranges: (1) an initial adsorbent volume with an IAC "greater than 35 g n-butane/L," and (2) a subsequent adsorbent volume with an IAC "less than 35 g n-butane/L."  (*E.g.*, '844 Patent, cl. 1; D.I. 290 at 11-12.)  There is no dispute that these claims are open-ended; Ingevity's expert confirmed no upper bound and that the lower bound extends to zero.  (D.I. 292-1 (Ex. 2) at 67:10-68:16, 71:10-74:5.)  Accordingly, the holdings of *MagSil* and the other cited cases require that the full scope of these ranges be enabled.

> **2.    Ingevity's Motion Fails Because Ingevity Does Not Dispute That Adsorbents with High or Low IACs Are Not Taught by the Specification, nor Were They within the Knowledge of a POSITA**
>
> **a.    Ingevity Does Not Dispute That Use of High- or Low-IAC Adsorbents Was Not Taught by the Specification**

Ingevity's motion fails, because all evidence demonstrates that adsorbents with IACs above 80 g/L and adsorbents with IACs approaching 0 g/L are not taught by the '844 patent specification.  (D.I. 290 at 11-14.)  The highest IAC disclosed in the '844 specification is 80 g/L.  ('844 patent, col. 8 Table; D.I. 292-1 (Ex. 2) at 164:11-20, 172:5-11.)  The specification is silent regarding how to obtain or manufacture adsorbent materials with higher IACs.  (D.I. 292-1 (Ex. 2) at 163:13-17, 172:12-19.)

The lowest IAC disclosed in the specification is 16 g/L.  ('844 patent, col. 8 Table.)  Ingevity represented to the European Patent Office—and the EPO accepted—that the '844 patent "simply does not disclose, broadly or otherwise, the use of an adsorbent in the 'subsequent' canister with a BWC of less than 3 g/dL."  (D.I. 292-1 (Ex. 28) at -54753; *see also* D.I. 297 at 4-6.) ████████████████████████████

████████████████████████████████

████████████████ (D.I.  292-2  (Ex. 32)  at  184:15-191:17.)  ████████████

████████████████████████ (D.I. 292-2 (Ex. 31) at -432608; D.I. 292-1 (Ex. 1), ¶ 296.)

Thus, undisputed evidence shows a POSITA wishing to make a fuel canister having an initial adsorbent with an IAC above 80 g/L and a subsequent adsorbent with an IAC approaching 0 g/L would not have been able to do so based on the '844 patent's teachings.

> **b.**    **Ingevity Does Not Dispute That Use of High- or Low-IAC Adsorbents Was Not within the Knowledge of a POSITA**

The evidence shows a POSITA at the time the '844 patent was filed would not have known how to make or use high- or low-IAC adsorbents without undue experimentation. Ingevity's expert admitted that, even as a POSITA at the time of the '844 patent, he was unaware of adsorbent volumes with IACs higher than 80 g/L and would not have known how to manufacture or obtain such adsorbent materials.  (D.I. 292-1 (Ex. 2) at 162:22-164:24.)   An adsorbent volume with an IAC greater than 80 g/L was not commercially available until 2010, when MeadWestvaco began selling BAX 1700.  (*Id.* at 162:5-8, 164:21-24; D.I. 6-2, Reddy Decl., ¶ 22.) ████████████████████████

████████████████████████████████████

(D.I. 292-1 (Ex. 1) at ¶ 292.)

Thus, unlike in *Invitrogen*, the specification cannot be supplemented with knowledge of a POSITA, because the relevant knowledge did not exist. *See Invitrogen*, 429 F.3d at 1070-71 (claims requiring a mutated gene were enabled where it was undisputed that both covered methods for mutating the gene were known to a POSITA); *see also MagSil*, 687 F.3d at 1381 (claims were not enabled where a POSITA did not achieve resistance changes within the claimed, open-ended range until after the filing of the patent). Accordingly, Ingevity's motion should be denied.

### 3. Even If Ingevity Were Correct as to the Law (Which It Is Not), Its Motion Should Be Denied Because There Is a Dispute as to the "Novel Aspect" of the Invention

Contrary to Ingevity's assertions, BASF's expert will testify that the combination of adsorbents disclosed in the '844 patent was not the "novel aspect" of the invention and that the use of very high- and very low-capacity adsorbents was not "tangential" to the alleged invention. (*See*, *e.g.*, Ex. 97, ¶¶ 147-48.) ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (Ex. 95, ¶¶ 20-23.) ████████████████

████████████████████████████████████████████████████████

████████████████████ (Ex. 95, ¶¶ 707, 734, 750.) ████████████

████████████████████████████████████████████████████████

██████ ██ ██ ██ ██ ███ █ ████ ██ ████ ████ ████ (*See* Section III(B)(2)(b), *supra*.) Accordingly, Ingevity's motion should be denied. *See* Fed. R. Civ. P. 56(a).

## IV.    INGEVITY IS NOT ENTITLED TO SUMMARY JUDGMENT THAT EVAPTRAP XC IS NOT A STAPLE ARTICLE OF COMMERCE

Ingevity argues that BASF's carbon honeycomb product, EvapTrap XC, is not "suitable for substantial non-infringing use" and is therefore not a staple good for purposes of contributory infringement.  (D.I. 293 at 29 (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009)).)  It bears emphasis that this is a different question from whether Ingevity has misused the '844 patent by tying licenses to the purchase of a separate, staple good.  "The contributory infringement and misuse inquiries … require analysis of the actions of different entities":  Whereas contributory infringement asks whether the accused product has noninfringing uses, the patent misuse inquiry "centers on the patentee and [its] actions."  *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1577 (Fed. Cir. 1987); *see also Masimo Corp. v. Philips Elecs. N. Am. Corp.*, 742 F. Supp. 2d 492, 498-99 (D. Del. 2010).  In any event, Ingevity has not shown as a matter of law that EvapTrap XC is not suitable for noninfringing uses.

To establish its claim for contributory infringement, Ingevity has the burden of proving, among other things, that EvapTrap XC is "not a staple article or commodity of commerce suitable for substantial noninfringing use."  35 U.S.C. § 271(c); *see MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012) (citing *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F. 3d 1354, 1365 (Fed. Cir. 2008)).  Determining whether a product is a staple good for purposes of § 271(c) requires examining not only the product's actual uses, but also its potential applications.  *See, e.g.*, *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012) (affirming dismissal of contributory infringement claim where allegations showed the accused product was "capable of" of noninfringing uses).  ████████████████████████

███████ (Ex. 98 at 46:21-23; Ex. 99, ¶ 19.)[5]

Ingevity fails to show that EvapTrap XC, when it is brought to market, will not be capable of noninfringing uses. As detailed in BASF's Opening Brief, several different manufacturers (including Ingevity) sell carbon honeycombs for a wide variety of applications, ranging from automotive air intake systems to kitchen hoods to factory air filtration. (*See* D.I. 290 at 26.) Such uses are "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix*, 581 F.3d at 1327-29. BASF's other carbon honeycombs, too, have been marketed and used for noninfringing applications,

. (Ex. 100 at 51:7-13, 52:18-53:22, 58:18-23; Ex. 101 at -22912; Ex. 102 at 80:13-81:5.)

Ingevity does not identify any fundamental difference between these other carbon honeycombs and EvapTrap XC that would prevent customers from using EvapTrap XC for noninfringing applications. ███████

███████

███████ (Ex. 102 at 77:22-78:12.) While EvapTrap XC does not have any "current commercial application" other than in fuel vapor canisters, there are "many applications" that it could potentially be used for—

—with only minor adjustments to its size and shape. (Ex. 103 at 188:1-18.) And Ingevity's technical expert

---

[5]   Ingevity contends that BASF "designed" EvapTrap XC to be used in fuel vapor canisters, (D.I. 293 at 30); but that is a separate question from whether EvapTrap XC is *capable of* or *suitable for* noninfringing uses.

. (Ex. 84 at 213:7-23.)

Ingevity has thus failed to show that it is entitled to judgment as a matter of law that EvapTrap

XC is suitable only for infringing uses.

## V. INGEVITY'S REQUESTS TO EXCLUDE EXPERT TESTIMONY SHOULD BE DENIED

### A. The Court Should Deny Ingevity's Request to Exclude Testimony of Dr. Mathur

Dr. Divya Mathur is a qualified economist whose opinions address issues relevant

to both BASF's antitrust counterclaims and its patent misuse defense.  Her testimony readily

satisfies the elements of qualification, reliability, and fit required under Rule 702.  *See Insight*

*Equity v. Transitions Optical, Inc.*, 252 F. Supp. 3d 382, 385 (D. Del. 2017).  Dr. Mathur's

opinions address, among other topics, the definition of the relevant markets, Ingevity's market

power in those markets, and the anticompetitive effects of Ingevity's tying and exclusive dealing.

(Ex. 82, ¶ 8; Ex. 104, ¶ 3.)  Based on her economic analysis, Dr. Mathur concluded that Ingevity

holds market power in the tying product market (technologies to meet LEV III / Tier 3 emissions

regulations) as well as in the tied product market (carbon adsorbents used in LEV III / Tier 3-

compliant fuel vapor canisters).  (Ex. 82, ¶¶ 61-68; Ex. 104, ¶¶ 2-3, 6, 18.)  She also concluded

that Ingevity has leveraged its market power as the owner of the '844 patent to require licensees

to purchase unpatented carbon adsorbents and to enter into exclusive supply agreements that

prevent customers from purchasing competing carbon adsorbents.[6]  (Ex. 82, ¶¶ 70-87, 128 n.454;

---

[6]     Ingevity claims that Dr. Mathur does not offer any opinions relevant to BASF's "theory of tying relating to high-IAC base carbon products," as opposed to carbon honeycombs. (D.I. 293 at 33.)  To the contrary, Dr. Mathur opines that Ingevity's tying arrangements involved not only carbon honeycombs, but also pelletized carbons and other carbon adsorbents.  (*See, e.g.*, Ex. 82, ¶¶ 9, 21, 55-73; Ex. 104, ¶¶ 30-36, 40-47.)  Her definition of the tied product market for "carbon adsorbents" explicitly includes pelletized carbons and other types of carbons used in LEV III / Tier 3 compliant canisters.  (Ex. 82, ¶¶ 55-60.)  In fact, Dr. Mathur's discussion of the

Ex. 104, ¶¶ 8, 60-69.)   Finally, Dr. Mathur examined the competitive harm resulting from Ingevity's behavior, including increased prices to customers, decreased customer choice, and BASF's lost profits and other economic injuries.  (Ex. 82, ¶¶ 88-117; Ex. 104, ¶¶ 70-106.)

Ingevity seeks to exclude Dr. Mathur's testimony from the trial on patent misuse, claiming that it understood her testimony would be relevant only to BASF's antitrust counterclaims.  (D.I. 293 at 31-32.)  That claim is baseless.  The pleadings and discovery in this case have made clear that the antitrust counterclaims and patent misuse defense rest on the same anticompetitive conduct by Ingevity.   For instance, BASF's First Amended Answer and Counterclaims asserted the defense of patent misuse and, in doing so, explicitly "refer[red] to, and incorporate[d], Ingevity's alleged violations of the federal antitrust laws as set forth in BASF's Counterclaims."   (D.I. 65 at 6.)   BASF's initial invalidity and unenforceability contentions likewise described Ingevity's tying and exclusive dealing arrangements (the basis for the antitrust counterclaims) and explicitly asserted that those arrangements also constitute patent misuse.   (Ex. 105 at 65-68.)   BASF's interrogatory responses reiterated those contentions. (Ex. 106 at 20-24.)  Further, there is no dispute that Dr. Mathur's opinions on topics such as Ingevity's market power and anticompetitive conduct are relevant to the patent misuse defense. And finally, any suggestion that Dr. Mathur's report did not notify Ingevity of her intent to address patent misuse is demonstrably incorrect:   Ingevity's counsel deposed Dr. Mathur for more than four hours on the issue of patent misuse.

---

product market definition in her opening report devotes an entire subsection to pelletized carbon. (*Id.* ¶ 55(a).)   She also states that Ingevity holds market power over the tied product market, observing that "Ingevity supplies nearly 100 percent of the pelletized carbon purchased for use in fuel canisters in vehicles sold in the United States and Canada."   (*Id.*)   Ingevity may have confused Dr. Mathur's opinions regarding tying with her calculations of BASF's monetary damages caused by Ingevity's antitrust violations; those damages are limited to carbon honeycombs because BASF does not produce other types of carbon adsorbents.

Ingevity also makes the baffling assertion that Dr. Mathur's opinions should be excluded because BASF—**not Dr. Mathur**—supposedly cited the wrong legal standards for patent misuse in its discovery responses. (D.I. 293 at 32.)  Putting aside the dubious logic of this argument, Dr. Mathur's opinions correctly address the elements of the patent misuse at issue in this case. ***First***, a patentee with market power commits *per se* misuse by tying licenses to the purchase of an unpatented, staple good. *See Intellectual Ventures I LLC v. Symantec Corp.*, C.A. No. 13-440-LPS, 2014 WL 4773954, at *2 (D. Del. Sept. 24, 2014).  Here, Dr. Mathur opines that Ingevity has market power over the tying product and that the tying and tied products are indeed separate products. (Ex. 82 at ¶¶ 9, 55-68; Ex. 104, ¶¶ 2-3, 6, 18, 20-28.) ***Second***, a patentee's extension of its market power into the post-patent expiration period through exclusive long-term agreements is also *per se* patent misuse. *Brulotte*, 379 U.S. at 32-33.  Dr. Mathur's testimony addresses Ingevity's market power and explains that Ingevity's long-term agreements .

(Ex. 82, ¶¶ 79-87; Ex. 104, ¶¶ 60-69.) ***Third***, if the Court were to apply the rule of reason to determine whether Ingevity's practices amount to misuse, then BASF would demonstrate that the conduct "imposes an unreasonable restraint on competition." *Va. Panel*, 133 F.3d at 869. Dr. Mathur states that the anticompetitive harms of Ingevity's tying and exclusive dealing far outweigh any purported procompetitive effects. (Ex. 82, ¶¶ 104-107; Ex. 104, ¶¶ 70-86.)

Finally, Ingevity argues that Dr. Mathur's testimony should be excluded because her reports do not contain the words "patent misuse" or recite the legal standards applicable to patent misuse. (D.I. 293 at 31-33.)  But Ingevity cites no authority for the proposition that an expert report must recite the governing legal standard.  To the contrary, an expert is generally precluded from "rendering a legal opinion" or "testify[ing] as to the governing law of the case." *Berckley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006); *see also Transportes Aereos*

*Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*, 623 F. Supp. 2d 518, 533 (D. Del. 2009) ("[A]n expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." (citation omitted)); *Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, No. 04-940-JJF, 2006 WL 2241018, at *1 (D. Del. Aug. 4, 2006).  It is not surprising, then, that Ingevity's expert economist does not use the words "patent misuse" or recite the relevant legal standards in his report, either.  The two cases cited in Ingevity's motion both involved an expert assuming an *erroneous* legal standard that rendered the expert's opinions unreliable.  *See In re ChanBond, LLC Patent Litig.*, C.A. No. 15-842-RGA, 2019 WL 6910284, at *6 (D. Del. Dec. 19, 2019); *Inline Connection Corp. v. AOL Time Warner Inc.*, No. 02-272-MPT, 2007 WL 275928, at *4-5 (D. Del. Jan. 29, 2007). Ingevity does not contend that Dr. Mathur recited an incorrect legal standard, and as explained above, her opinions are plainly relevant to BASF's patent misuse defense.

### B.     The Court Should Deny Ingevity's Motion to Exclude Mr. Lyons's Testimony

Ingevity alleges that:  (1) Lyons is unqualified to opine on the "on sale" bar under § 102(b); and (2) his opinions are unreliable because he does not recite certain legal standards for anticipation under § 102.  The question of fitness "goes primarily to relevance," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993), and Rule 702 embraces a "liberal policy of admissibility," under which it is preferable to admit any evidence that may assist the factfinder, *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).  At most, Ingevity's concerns with Mr. Lyons's statements of the law go to the weight of his opinions, not admissibility.  Mr. Lyons's opinions have sufficient qualification, reliability, and fit, and will help the jury understand the technology and decide whether the claimed inventions were on sale, in public use, and known or used by others under § 102.

1.     **Mr. Lyons Is Qualified to Opine That the Claims Are Anticipated Under § 102(b)'s On-Sale Bar**

In opining that the '844 patent is anticipated under the on-sale bar, Mr. Lyons compared the technical aspects of Westvaco's honeycomb technology and the commercial Delphi canister systems to the asserted claims and concluded that these systems met every claim limitation.  (*E.g.* Ex. 107, ¶¶ 336-369, 547-554; Ex. 108; Ex. 109.)  Mr. Lyons also reviewed documents Westvaco and Delphi witness testimony regarding the offer and sale of Westvaco honeycombs and Delphi systems and concluded that the systems anticipated the asserted claims.  (*E.g. id.*; Ex. 97, ¶¶ 272-286, 516-522.)  The phrase "commercial offer for sale" appears only once in Lyons's Opening Report—in the recitation of the legal standard for 35 U.S.C. § 102(b).  (Ex. 107, ¶ 39.)

Ingevity does not dispute that Mr. Lyons's technical background qualifies him to opine on the relevant technology and the asserted claims, and Ingevity admits that he states the correct legal standard.  (D.I. 293 at 38 ("Mr. Lyons correctly identified the two-part test [for the on-sale bar] expressed in *Pfaff*").)  Instead, Ingevity disputes that Mr. Lyons is qualified to discuss the evidence linking anticipatory systems to a sale or offer for sale.  He is.

Ingevity's complaints that Mr. Lyons has "no experience related to commercial offers for sale or the Uniform Commercial Code" and "no expertise in the law" are of no moment.  BASF is not offering him as an expert on the UCC or the law.  Mr. Lyons will not offer opinions on the legal question of whether the Westvaco and Delphi offers are "commercial offers for sale" under 102(b) if Ingevity's expert is held to the same limitation.[7]

---

[7]     To the extent the Court limits or strikes Mr. Lyons's opinions regarding anticipation under the on-sale bar of 35 U.S.C. § 102(b), it should also strike Ingevity's expert's responsive opinions (*e.g.* Ex. 95, ¶¶ 420, 426-428), which contain numerous improper legal opinions.  *See*

As to Mr. Lyons's opinions connecting Westvaco and Delphi offers and sales of the prior art technology and systems, Mr. Lyons's education and experience qualifies him to review the evidence, analyze and compare the technology to the asserted claims, and conclude the art anticipates the asserted claims, just as he does in his other invalidity opinions.  To the extent his on-sale bar opinions are based on the facts and his practical experience, rather than technical knowledge, those opinions are also admissible, and any risk can be controlled with vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.  *See Crowley v. Chait*, 322 F. Supp. 2d 530, 535-36 (D. Del. 2004).

### 2.      Mr. Lyons Applied the Correct Legal Standards

Ingevity asks the Court to exclude Mr. Lyons's opinions—without specifying which—because Mr. Lyons did not discuss § 102 case law defining:  (1) "others" for anticipation by prior art known or used by others; (2) "commercial offer for sale" or "ready for patenting" for anticipation under the on-sale bar; and (3) "public use" for the public use bar.

Importantly, Ingevity's complaint is that Mr. Lyons's discussion of the law is *too brief*; Ingevity does not cite any of Mr. Lyons's statements or application of the law that is *incorrect*.  (*See, e.g.*, D.I. 293 at 37 ("Lyons merely recited the language of the statute"), 38 (Lyons did not "identify or apply any legal standard relating to a commercial offer for sale" and "failed to identify any requirement for satisfying the ready for patenting prong of the on-sale bar"), 39 ("Lyons only reiterates the language of the statute itself").)  Mr. Lyons is a technical expert, does not offer legal opinions, and should not instruct the jury on the law.  *See Berckeley*, 455 F.3d at 217.  As discussed below, Mr. Lyons's opinions are based on his technical experience and review of the record and are consistent with the legal standards for

---

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (experts "usurp the District Court's pivotal role in explaining the law to the jury").

§ 102; they are thus sufficiently reliable and will help the jury determine the anticipation issues. *See In re TMI Litig.*, 193 F.3d 613, 664-65 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000).

      **Section 102(a)'s "known or used by others"**:  Mr. Lyons understands that to be prior art under 102(a), anticipating knowledge or use must be "by others."  (*E.g.* Ex. 107, ¶¶ 38, 305, 427.)  In his analysis, Mr. Lyons identifies and discusses anticipatory knowledge and use of Delphi, Chrysler, Mercedes, Ford, Visteon, Toyota, Aisan, Kayser, BMW, and Volvo.  (*E.g.* Ex. 107, ¶¶ 427-531.)  This is not the Ingevity inventors' "own work," and to the extent that Ingevity argues otherwise, its complaint is not about misapplication of the law, but Mr. Lyons's conclusion, which is subject to cross-examination.  Regarding Ingevity's statement that anticipatory knowledge and use must be "public," Lyons correctly states this requirement in his Reply.  (Ex. 97, ¶ 299 ("…anticipating prior knowledge or use under 35 U.S.C. § 102(a) must be accessible to the public…").)  And he consistently applies this requirement in his opinions, for example:



-                                                          (Ex. 107, ¶ 381 (emphasis added).)

-                                                     (Ex. 97, ¶ 281 (emphasis added).)

      **Section § 102(b)'s "sale"**:  As explained above, Mr. Lyons is not offered as a UCC expert, and thus properly does not offer opinions on applying Section 2-106 of the Uniform Commercial Code.

███████████████████ (*E.g.* Ex. 107, ¶¶ 547-554; Ex. 97, ¶¶ 276-79, 516-522); *see generally Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, C.A. No. 07-127-MPT, 2014 WL 547712, at *10-14 (D. Del. Feb. 7, 2014) (commercial offer for sale was evidenced by proposal, quote notes, and letters implying payment).

Section § 102(b)'s "ready for patenting": ████████████████

████████████████████████████████████

████████████████████████ (*E.g.* Ex. 107, ¶¶ 346-51, 547-54; Ex. 97, ¶¶ 272-86, 516-22.)  Mr. Lyons is not required to cite or discuss *Pfaff*—it is not his role to explain the law to the jury.  It is sufficient that his opinions are consistent with the law.  *See Pfaff v Wells Electronics, Inc.*, 525 U.S. 55, 67-68 (1998) ("ready for patenting" shown by of reduction to practice or specific drawings or descriptions).

Section § 102(b)'s "public use":  Mr. Lyons discusses both accessibility to the public and commercial exploitation of the alleged inventions more than a year before Ingevity's alleged invention.  (*E.g.* Ex. 107, ¶ 336-69 (Section titled "Delphi's Development of Commercial Canister Systems")).  He specifically articulates that "public use "means any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." (Ex. 97, ¶ 299.)  His opinions are therefore consistent with the case law cited by Ingevity.  (*See* D.I. 293 at 39.) ████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████

████████████████████████████████
████████ ████ ████ ██████ █████████ ████ ████ ████ ████████
████████████████ █ ████████████████████████
█████████████████████████████████

██████████████████████████████████████
██  ████████████████  ██████████████████
████████████████████████████

(Ex. 97, ¶ 317; *see id.* ¶¶ 512-15; Ex. 107, ¶¶ 336-69, 442-85.)   His opinions are therefore consistent with factors considered when determining that use is "public use" and not experimental.  *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1353 (Fed. Cir. 2002).

The single case Ingevity cites to support its request to exclude Mr. Lyons's opinions is inapposite.  *See In re ChanBond, LLC Patent Litig.*, C.A. No. 15-842-RGA, 2019 WL 6910284, at *6 (D. Del. Dec. 19, 2019).  Unlike the expert in *ChanBond*—whose opinion was excluded as unreliable because she violated the legal standard by analyzing the accused products and not the asserted claims to render her written description opinion—Mr. Lyons has recited and applied the correct legal standards for anticipation and used his depth of relevant technical expertise to conclude that the asserted claims are anticipated.  *See id.*  Mr. Lyons properly provides reliable factual analysis, based on his technical experience, research, and review of the record, that will help the jury reach its own conclusion as to each of the anticipation issues.  *See In re TMI Litig.*, 193 F.3d at 664-65.  To the extent Ingevity disagrees with the facts forming the basis of his opinions, the remedy is cross examination, not exclusion. *See id.*

## VI.     CONCLUSION

For the reasons discussed above, Ingevity's request for summary judgment regarding BASF's equitable defenses and that the accused EvapTrap XC product is a non-staple article of commerce, and Ingevity's requests to exclude opinions of BASF experts, Dr. Mathur and Mr. Lyons, should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
araucci@mnat.com

*Attorneys for Defendant BASF Corporation*

OF COUNSEL:

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South California Avenue, Suite 100
Palo Alto, CA  94304
(650) 422-6700

James P. Brogan
Brian Eutermoser
Kevin Lake
Angela Tarasi
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street Suite 800
Denver, CO  80202

Bobby R. Burchfield
Norman Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 200
Washington, DC  20006

Joseph D. Eng., Jr.
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY  10036-2601
(212) 556-2205

June 19, 2020