IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INGEVITY CORPORATION, and<br>INGEVITY SOUTH CAROLINA, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BASF CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REDACTED- PUBLIC VERSION**

C.A. No. 18-1391-RGA

**PLAINTIFFS' OPPOSITION TO BASF'S MOTIONS FOR SUMMARY JUDGMENT
AND TO EXCLUDE OPINIONS OF INGEVITY'S DAMAGES EXPERT**

OF COUNSEL:
Jeffrey T. Thomas
Taylor W. King
Nathaniel R. Scharn
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Dr.
Irvine, CA 92612-4412
(949) 451-3800

Brian M. Buroker
Omar F. Amin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500

Stuart M. Rosenberg
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
(650) 849-5389

Rustin K. Mangum
Spencer W. Ririe
MANGUM RIRIE LLP
999 Corporate Dr. #260
Ladera Ranch, CA 92694
(949) 298-5590

Karen E. Keller (No. 4489)
John W. Shaw (No. 3362)
Jeff Castellano (No. 4837)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
jcastellano@shawkeller.com
*Attorneys for Plaintiffs*

Dated: June 19, 2020

# TABLE OF CONTENTS

Page

I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................... 1

II.  STATEMENT OF NATURE AND STAGE OF PROCEEDINGS .................................. 1

III. RESPONSES TO BASF'S STATEMENTS OF FACTS ............................................... 1

IV.  ARGUMENT ..................................................................................................................... 2

    A.   BASF's Indefiniteness Motion Misconstrues the Law and Rests on Disputed Evidence ................................................................................................................ 2

        1.   *Dow* Does not Support BASF's Position ..................................................... 2

        2.   This Case is Not *Dow* Because There is No Dispute That IAC and Adsorption Capacity Each Refer to a Single Thing................................. 3

        3.   BASF's Evidence Is Disputed .................................................................... 4

    B.   BASF's Written Description/Enablement Motion Should Be Denied ................. 10

        1.   BASF's Motion Applies the Wrong Legal Standards................................ 11

        2.   Factual Disputes Preclude Summary Judgment on Written Description.. 12

        3.   BASF's Motion Relating to Enablement Should be Denied Because it Fails to Address Enablement's Underlying Factual Questions................ 12

    C.   BASF Is Not Entitled to Summary Judgment of Non-Infringement ................... 14

    D.   BASF Is Not Entitled to Summary Judgment of Invalidity over Delphi's Purported Prior Invention (A Question of Fact) ................................................... 14

        1.   Genuine Factual Disputes Preclude Summary Judgment ......................... 15

        2.   Delphi's Alleged Reduction to Practice Theory Is Unsupported by the Law and Fails to Show the Absence of Disputed Facts.................................... 18

        3.   Delphi's Alleged Conception and Diligence ............................................. 22

        4.   The ITC's Final Determination Should Be Excluded................................ 23

    E.   BASF's Patent Misuse Argument Fails Because It Conflates Products and Facts and Misapplies the Law ................................................................................... 23

        1.   Facts Demonstrating No Patent Misuse .................................................... 24

        2.   Ingevity's Alleged Tying Involving FVC Honeycombs Falls Within the Scope of the '844 Patent and Cannot Constitute Patent Misuse.............. 25

        3.   BASF Has Failed to Show Patent Misuse Relating to Allegations of Tying Involving High-IAC Base Carbon Products ............................................. 29

        4.   BASF's Purported Per Se Standard Is Contradicted by Supreme Court Precedent................................................................................................. 31

    F.   BASF's Request to Exclude Dr. Vander Veen's Reasonable Royalty Opinions Should Be Denied ................................................................................................. 31

## TABLE OF CONTENTS
*(continued)*

Page

1. Dr. Vander Veen's Reasonable Royalty is Sufficiently Related to Ingevity's Economic Harm ................................................................... 32

2. Dr. Vander Veen Applies Reliable Economic Principles to the Available Data Points Linked to BASF's Infringement to Determine the Amount BASF Would Have Been Willing to Pay for a License ........................... 33

3. Dr. Vander Veen Applies the Required Assumptions for the Hypothetical Negotiation ............................................................................................... 37

G. BASF Is Not Entitled to Summary Judgment on Damages Even if BASF's Motion to Exclude Is Granted ............................................................................. 39

V. CONCLUSION ............................................................................................................ 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acumed LLC v. Stryker Corp.*,
   551 F.3d 1323 (Fed. Cir. 2008).................................................................34, 39

*Amgen Inc. v. Hospira, Inc.*,
   944 F.3d 1327 (Fed. Cir. 2019).................................................................32, 34

*Apotex USA, Inc. v. Merck & Co.*,
   254 F.3d 1031 (Fed. Cir. 2001).......................................................................14

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds by Williamson v.*
   *Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ......................................40, 41

*Aqua Shield v. Inter Pool Cover Team*,
   774 F.3d 766 (Fed. Cir. 2014)....................................................................33, 34

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010)..................................................................11, 12

*ART+COM Innovationpool GmbH v. Google Inc.*,
   155 F. Supp. 3d 489 (D. Del. 2016)..................................................................35

*Automotive Techs. Int'l v. BMW*,
   501 F.3d 1274 (Fed. Cir. 2007)..................................................................11, 13

*Breen v. Henshaw*,
   472 F.2d 1398 (C.C.P.A. 1973) ......................................................................19

*Carucel Investments, L.P. v. Novatel Wireless, Inc.*,
   No. 16-CV-118-H-KSC, 2017 WL 1215838 (S.D. Cal. Apr. 3, 2017) ..................38

*Dawson Chem. Co. v. Rohm & Haas Co.*,
   448 U.S. 176 (1980)..............................................................24, 26, 27, 29

*Delaware Display Grp. LLC v. Vizio, Inc.*,
   2017 WL 784988 (D. Del. Mar. 1, 2007) ....................................................11, 13

*Dow Chem. Co. v. Mee Indus., Inc.*,
   341 F.3d 1370 (Fed. Cir. 2003).......................................................................39

*Dow Chem. Co. v. Nova Chems. Corp.*,
   803 F.3d 620 (Fed. Cir. 2015)..........................................................................2

*Dow Chem. Co. v. Astro-Valcour, Inc.*,
   267 F.3d 1334 (Fed. Cir. 2001).................................................................20, 21

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Hahn v. Wong*,
 892 F.2d 1028 (Fed. Cir. 1989) ............................................................. 23

*Heard v. Burton*,
 333 F.2d 239 (C.C.P.A. 1964) ............................................................... 19

*Hitzeman v. Rutter*,
 243 F.3d 1345 (Fed. Cir. 2001) .............................................................. 22

*Hodosh v. Block Drug Co.*,
 833 F.2d 1575 (Fed. Cir. 1987) .......................................................... 26, 27

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
 397 F. Supp. 2d 537 (D. Del. 2005) ..................................................... 35, 39

*i4i Ltd. P'ship v. Microsoft Corp.*,
 598 F.3d 831, 851 (Fed. Cir. 2010) ......................................................... 29

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
 547 U.S. 28 (2006) ............................................................................... 31

*In re Indep. Serv. Orgs. Antitrust Litig.*,
 203 F.3d 1322 (Fed. Cir. 2000) .............................................................. 29

*Int'l Salt Co. v. United States*,
 332 U.S. 392 (1947) .............................................................................. 31

*Invitrogen Corp. v. Clontech Labs. Inc.*,
 429 F.3d 1052 (Fed. Cir. 2005) .......................................................... 13, 19

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
 466 U.S. 2 (1984) ................................................................................ 28

*McRo, Inc. v. Bandai Namco Games Am.*,
 959 F.3d 1091 (Fed. Cir. 2020) .............................................................. 12

*Monsanto Co. v. McFarling*,
 363 F.3d 1336 (Fed. Cir. 2004) .............................................................. 26

*In re Morsa*,
 713 F.3d 104 (Fed. Cir. 2013) ................................................................ 11

*One-E-Way, Inc. v. ITC*,
 859 F.3d 1059 (Fed. Cir. 2017) ............................................................... 2

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Princo Corp. v. ITC,*
  616 F.3d 1318 (Fed. Cir. 2010).........................................................................24

*Rhodia Chimie v. PPG Indus. Inc.,*
  402 F.3d 1371 (Fed. Cir. 2005)..........................................................................14

*Robocast, Inc. v. Apple Inc.,*
  39 F. Supp. 3d 552 (D. Del. 2014)......................................................................40

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.,*
  953 F.2d 1360 (Fed. Cir. 1991)..........................................................................36

*Takeda Pharm. Co. Ltd. v. Zydus Pharm.,*
  743 F.3d 1359 (Fed. Cir. 2014)............................................................................3

*Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP,*
  661 F.3d 1378 (Fed. Cir. 2011)..........................................................................20

*U.S. Philips Corp. v. ITC,*
  424 F.3d 1179 (Fed. Cir. 2005).....................................................................28, 30

*Uniloc USA, Inc. v. Microsoft Corp.,*
  632 F.3d 1292 (Fed. Cir. 2011)..........................................................................37

*Vehicle IP, LLC v. Werner Enters., Inc.,*
  2013 WL 4786119 (D. Del. Sept. 9, 2013).....................................................28, 29

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.,*
  Case No. 11-515, 2015 WL 12831300 (D. Del. Sept. 28, 2015)............................2

*In re Wands,*
  858 F.2d 731 (Fed. Cir. 1988)............................................................................12

**Statutes**

35 U.S.C. § 271(d)(1)-(3) ...................................................................................24

35 U.S.C. § 271(d)(5) .........................................................................................24

35 U.S.C. §284.......................................................................................32, 34, 39

**Other Authorities**

https://www.tylervigen.com/spurious-correlations (last visited June 17, 2020) .........................21

**TABLE OF AUTHORITIES**
(*continued*)

<u>Page(s)</u>

**Rules**

Fed. R. Civ. P. 37(c)(1)...............................................................................................................28, 29

## I.        INTRODUCTION AND SUMMARY OF THE ARGUMENT

BASF's desperate attempt to avoid a jury trial for its willful patent infringement should be denied. *First,* the '844 Patent claims are not indefinite because adsorption capacity is a singular property that a POSITA knew how to measure using different methods that do not yield different outcomes, unlike the *Dow* precedent BASF relies upon. *Second,* the Patent enables and describes the full scope of the inventive aspect of the claims; full scope does not mean "full range" as BASF contends. *Third*, BASF's "non-infringement" argument that the '844 Patent cannot cover lower IAC values that fall squarely within the claims is contrary to the law. *Fourth*, Delphi is not a prior inventor of claims related to incremental adsorption capacity (IAC) under the law because it failed to appreciate that concept, and further, genuine material factual disputes preclude summary judgment on BASF's factual 102(g)(2) defense. *Fifth*, BASF's patent misuse theory improperly shifts from what was pled during discovery, relies on an improper analysis of the caselaw, and misconstrues and overlooks facts, including Ingevity's cure. *Sixth*, Ingevity is entitled to at least a reasonable royalty for BASF's infringing "uses" in the U.S. by statute. Factual evidence and Ingevity's economist's expert opinion, whose testimony should not be excluded because he adheres to reliable methods, establish what that royalty amount should be.

## II.       STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This action was filed in 2018 because BASF infringes U.S. Patent No. RE38,844 (the "'844 Patent"). D.I. 1. BASF's antitrust counterclaims are bifurcated. D.I. 246. Fact and expert discovery on patent issues are complete. The final pretrial conference is set for August 28, 2020, and a jury trial set for September 14, 2020 on Ingevity's patent infringement claims. D.I. 41.

## III.      RESPONSES TO BASF'S STATEMENTS OF FACTS

Because BASF did not provide a separate statement of facts section per the local rules, Ingevity responds in its argument identifying disputed facts that preclude summary judgment.

## IV.   ARGUMENT

### A.   BASF's Indefiniteness Motion Misconstrues the Law and Rests on Disputed Evidence

BASF's indefiniteness motion in view of the "incremental adsorption capacity" (IAC) limitations should be denied because it misreads the law and rests on disputed issues of fact. D.I. 290 at 1-11. The entire premise of BASF's argument is flawed because it misreads *Dow*. And even if BASF's reading of *Dow* were correct, indefiniteness is a question of law with underlying facts, *One-E-Way, Inc. v. ITC*, 859 F.3d 1059, 1062 (Fed. Cir. 2017), and disputed issues of fact preclude summary judgment. Indeed, other *un*disputed facts refute BASF.

#### 1.   *Dow* Does not Support BASF's Position

BASF relies on *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620 (Fed. Cir. 2015) for the proposition that where "multiple known approaches for assessing a physical characteristic may yield different results, and a specific approach is not required by the claims or made clear to POSITA by the patent specification, the claims are indefinite." D.I. 290 at 1. That is not what *Dow* holds. The problem with the claims in *Dow* was not that they required figuring out which method to use to measure a single "physical characteristic," but rather that they did not specify which of several different physical characteristics to measure. More particularly, *Dow* concerned claims directed to the slope of a curved line (the "slope of strain hardening"). 803 F.3d at 631-33. Because the line is curved, "it does not have a single slope." *Id.* at 632. Rather, there are multiple slopes, each of which required measurement at different parts of the curved line and thus provided unique values. *Id.* at 633. *Dow* held the claims invalid because of ambiguity as to which of these things (the different slopes) needed to be measured. *Id.* at 634-35.

In contrast to BASF's reading of *Dow*, claims reciting a physical property that can be measured in multiple ways are not indefinite. *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, Case

No. 11-515, 2015 WL 12831300, at *3 (D. Del. Sept. 28, 2015) (claim reciting thickness not indefinite where there were "multiple methods of measuring thickness"). Indeed, claims reciting physical properties are not indefinite even where different methods of measuring the property can produce different results. *Takeda Pharm. Co. Ltd. v. Zydus Pharms.*, 743 F.3d 1359, 1366-67 (Fed. Cir. 2014) (claim reciting average particle diameter not indefinite where patent failed to specify measurement method, different methods can lead to different results, but differences were not shown to be significant). "That there is more than one way of determining [the recited property] of a particular sample does not render that clear claim language indefinite." *Id.* at 1367.

With a proper understanding of *Dow*, BASF's entire defense misses the mark. BASF contends that two different methods for measuring adsorption capacity (the gravimetric and volumetric methods) result in different IAC values. D.I. 290 at 3-6. But *Dow* requires that BASF prove that IAC refers to multiple mutually incompatible things, which BASF fails to do.

### 2. This Case is Not *Dow* Because There is No Dispute That IAC and Adsorption Capacity Each Refer to a Single Thing

Rather than referring to multiple mutually incompatible things, unrebutted evidence proves that IAC and adsorption capacity in fact refer to one thing each. It is undisputed that "incremental adsorption capacity" ("IAC") refers to the difference between two adsorption capacities measured at different conditions. Ex. R4 (Rockstraw Rebuttal Expert Rep.) ¶¶64-70; Ex. B1 (Lyons Opening Rep.) ¶145 (IAC tied to "differential adsorption of n-butane on materials at 25°C" at "5 and 50% butane concentrations"). It is also undisputed that "[a]n adsorbent's adsorption capacity for a specific gas (e.g., n-butane) can be defined as the amount (mass) of the gas that a unit (volume or mass) of the adsorbent can adsorb." Ex. B1 ¶80. BASF's expert concurred that "in theory," "'adsorption capacity' is a physical property with a single value for a given set of conditions." Ex. B2 (Lyons Reply Rep.) ¶54; Ex. B3 (Lyons Tr. (10/30/18)) at

40:10-12; Ex. B4 (Lyons Tr. (5/28/20)) at 121:24-122:6.

As BASF's expert explained, the relevant conditions that specify an adsorbent's (the thing adsorbing) adsorption capacity are the identity of the adsorbate (the thing adsorbed), the adsorbate's concentration, and the temperature at which adsorption occurs. Ex. B1 ¶81; Ex. B3 at 38:13-39:15, 40:15-41:18. Asserted independent claims 1, 18, and 43 specify all the necessary conditions: the adsorbate is n-butane, the adsorbate concentrations are 5 and 50 vol%, and the temperature is 25°C. Ex. B4 at 132:9-133:22. Ingevity's expert concurs. Ex. R4 ¶¶60-70, 77. Literature in the field also shows that adsorption capacity refers to a single thing for a given set of conditions. Ex. B5 at 1504 ("Anson"); Ex. R6 (Rockstraw June 3 Supp. Expert Rep.) ¶26.

In sum, as BASF's expert previously conceded, there is nothing indefinite or unclear about what the IAC limitations require: The "claims draw a clear line between the initial adsorbents with an IAC above 35 g/L and subsequent adsorbents with an IAC below 35 g/L." Ex. B6 (Lyons Decl.) ¶74. Ingevity's witnesses concur that IAC does not render the claims indefinite. Exs. R4 ¶¶53-126, R5 ¶¶8-30, R6 ¶¶8-40, R7 ¶¶17-28, R8 ¶¶36-51; Ex. B41 at 18-22.

### 3.     BASF's Evidence Is Disputed

Even if BASF's construction of the law were correct, BASF still must show that it can meet its clear and convincing burden and that there is no material dispute of fact that the methods for measuring adsorption capacity it focuses on—gravimetric and volumetric (also called manometric)—provide different results. D.I. 290 at 8-11. It cannot meet that burden because its evidence is disputed and because it fails to address contrary evidence in the record.

### a)     Peer-Reviewed Scientific Papers Refute BASF's Position

Contrary to BASF's evidence discussed below, peer-reviewed papers support Ingevity's expert's opinion that gravimetric and volumetric methods for measuring adsorption capacity are recognized in the field as capable of doing so accurately and providing mutually compatible

measurements when accurate instruments are used and proper experimental protocols are observed. Ex. R4 ¶76 ("[A]lthough there are multiple ways of measuring adsorption capacity … each of the methods can reveal the adsorption capacity when performed properly. That is, each of the methods give the same result."); *see also id.* ¶¶76-81, Ex. R7 ¶22 ("[T]he different techniques for measuring adsorption capacity are all measuring the same thing (adsorption capacity), and their results are equivalent, accounting for inherent differences in instruments' capabilities…"); Ex. R6 ¶¶24-27 (same).

Anson supports that conclusion. It compares measurements of adsorption capacity made according to the gravimetric and volumetric methods. Ex. B5. Anson concluded that gravimetric and volumetric measurements were "compatible with each other" and showed "good agreement." *Id.* at Abs., 1507. Anson observed that while there were "some slight differences [] between data from Autosorb-1 [volumetric] and IGA-001 [gravimetric]" instruments, the "differences fall within a permissible experimental error." *Id.* at 1507 (emphasis added). Anson cautioned that such complementary gravimetric and volumetric measurements of adsorption capacity require, *inter alia*, "use of "[w]ell calibrated and high-precision devices." *Id.*

Likewise, Belmabkhout compared gravimetric and volumetric instruments for measuring adsorption capacity. Ex. B7 at Abs ("Belmabkhout"). Belmabkhout noted that the gravimetric method "is considered as a well-established and accurate technique," and that "following a strict experimental procedure, we have not observed important discrepancies between" the gravimetric and volumetric methods. *Id.* at 854, 857. Belmabkhout concluded that "both methods give similar results except at very high pressure which could be explained by the influence of the error in the volumes on the volumetric results." *Id.* at 856. BASF's expert agrees that this conclusion "accurately characterize[s]" Belmabkhout's data. Ex. B4 at 146:5-18. Thus, BASF's

5

assertion that "[a]ll testing evidence" supports its position is wrong. D.I. 290 at 8. Both Anson and Belmabkhout are peer-reviewed scientific papers based on actual testing of gravimetric and volumetric instruments for measuring adsorption capacity. Ex. B4 at 138:4-24, 156:11-17.

> **b)   BASF's Testing Data Does Not Show That Gravimetric and Volumetric Instruments Provide Different Results**

BASF's reliance on a memorandum by an Ingevity engineer (the "Guo Memo") and three testing reports procured by BASF from the Intertek laboratory in an attempt to prove that gravimetric and volumetric methods yield different adsorption capacity values is misplaced and, at most, creates a factual dispute when compared to the peer-reviewed Anson and Belmabkhout papers that prove the gravimetric and volumetric methods of measuring adsorption capacity are equivalent because they both can accurately measure adsorption capacity if performed properly.

BASF bears the burden to prove invalidity by clear and convincing evidence. Thus, it is BASF's burden to show that the testing data it relies upon reflect accurate instruments and correct laboratory methodologies. Absent such a showing, this data simply proves that inaccurate instruments used incorrectly produce different results.

> **(1)   Adsorption Capacity Measurements Require Accurate Instruments and Careful Technique**

While the Anson and Belmabkhout papers and Ingevity's expert recognize that gravimetric and volumetric measurements of adsorption capacity both can be accurate and, therefore, equivalent, all three also caution that compatible gravimetric and volumetric measurements require accurate instruments and proper laboratory techniques. Anson, for example, observed that "compatible results of [] adsorption can be found if the following hold: … (ii) Well calibrated and high-precision devices are used for measuring [] adsorption." Ex. B5 at 1507. Belmabkhout likewise cautioned that "good adequacy between the two techniques can only be obtained if the complete experimental procedure is properly achieved especially for the

volumetric measurements." Ex. B7 at 857. Ingevity's expert also explained that limitations in instruments' accuracies and errors in experimental protocol can introduce deviations in gravimetric and volumetric adsorption capacity measurements. Ex. R4 ¶95; Ex. R6 ¶¶22-27.

### (2)   Guo Memorandum

BASF relies on a memo comparing adsorption capacities measurements made by particular volumetric and gravimetric instruments in Ingevity's laboratory prepared by its researcher, Dr. Guo. BASF Ex. 18. The Guo Memo concludes that ██████████████ ████████████████████████████████████████████████ ███████████████████ R4 ¶132. This is unsurprising because, whereas ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* ¶134. Again, useful comparison of gravimetric and volumetric instruments requires in the first instance that those instruments be accurate and precise. That measurements on particular gravimetric and volumetric instruments in ████████████████ were different simply suggests that one or more of them were inaccurate. *Id.* ¶133. Dr. Guo's memo does not conclude that ████████████████████████████████████████████████ *Id.*

### (3)   Intertek Testing Reports

BASF advances three testing reports it procured from the Intertek laboratory. D.I. 290 at 4-6. The three reports concern adsorption capacity measurements of various samples by both gravimetric and volumetric instruments at Intertek. According to BASF, this testing "revealed significant variations in measured adsorption capacities [] between the two methods." D.I. 290 at 4. But this evidence, and BASF's conclusions drawn therefrom, are erroneous.

Intertek's first testing report concerns three adsorbent samples, each measured on gravimetric and volumetric/manometric instruments. D.I. 290 at 4-5. Intertek's report noted

differences between its gravimetric and volumetric measurements of adsorption capacity, but concluded that "[t]his difference is believed to result from differences in the activation protocols from the instruments used." Ex. B8 (Intertek Analytical Rep. (BASF_INGV108903)) at 3. Intertek's own report thus contradicts BASF's assertion—the observed differences in gravimetric and volumetric measurements were not the result of them measuring fundamentally different things, but rather a consequence of different experimental protocols between the two sets of measurements. Regarding those differences, Ingevity's expert explained that the "activation" (sample preparation) protocol used by Intertek in this report appeared to be insufficient for these samples, thus negating any value in comparing the gravimetric and volumetric measurements. Ex. R5 ¶¶14-26.

Intertek's second two reports concern two adsorbent samples, each again measured on its gravimetric and volumetric/manometric instruments. D.I. 290 at 5-6. When Intertek's reported inaccuracies of its instruments are considered (i.e., that one instrument may be overstating adsorption capacity and the other understating it), there are hardly any differences at all between the reported adsorption capacity measurements. Ex. R6 ¶¶16-21. The minor discrepancies that do exist appear to be exactly what would be expected in view of inherent limitations in the accuracies of volumetric instruments, as reported in the literature including Belmabkhout. *Id.* ¶¶22-30. Thus, Intertek's later two reports actually tend to prove that gravimetric and volumetric instruments indeed measure the same adsorption capacity.

For his part, BASF's expert was unable to even vouch for the accuracy of Intertek's measurements. With regard to Intertek's gravimetric instrument, BASF's expert acknowledged that assessment of its accuracy requires comparisons of measured adsorption capacities for reference materials, but was unaware of any such assessments being done. Ex. B4 at 164:6-

165:16. He further testified that "he had no reason to question" Intertek's gravimetric measurements, but was unable to provide any evidence actually supporting his reliance on the data. *Id.* at 166:5-18.

In sum, Intertek's results actually show that gravimetric and volumetric measurement of adsorption capacity using its particular instruments are largely congruent when the instruments' reported relative inaccuracies are taken into account. And to the extent minor incongruence exists, it could simply reflect that the instruments' true inaccuracies are greater than what Intertek reports and/or are compounded by errors in Intertek's laboratory protocols.

### (4)  Differences In Measurements Do Not Prove That Gravimetric and Volumetric Methods Measure Different Adsorption Capacities

Not only is BASF's purported evidence disputed by Ingevity, but more fundamentally it is simply insufficient to prove that the gravimetric and volumetric methods of measuring adsorption capacity measure fundamentally different things. As BASF's expert acknowledges, "[w]hen you measure things in general, like adsorption capacity, you will generally get numbers that are somewhat different." Ex. B4 at 133:23-136:13 (emphasis added). Thus, the mere fact that different instruments implementing different techniques (e.g., gravimetric and volumetric) can provide different measurements of adsorption capacity proves nothing since even using the same technique can provide different results because of natural variations in the measurements arising, for example, as a result of instrumental imprecision and inaccuracy and experimental error. *Id.*; Ex. R4 ¶95. As Ingevity's expert explained, "[w]hile some techniques and some instruments may be more accurate than others, the mere presence of inaccuracy in any measurement of adsorption capacity does not prove that adsorption capacity is indefinite, unknowable, or dependent upon measurement technique." Ex. R6 ¶30. BASF, which bears the burden of proof on invalidity, has wholly failed to show that the differences BASF observes in

the foregoing data are not merely the result of inherent imprecisions and inaccuracies in the

instruments themselves and how the instruments were used.

### c)   BASF's Other Evidence Is Irrelevant

BASF refers to a smattering of other atmospheric "evidence" that is wholly irrelevant.

BASF cites to hearsay statements by ███████████████████████████████████

███████████████████ D.I. 290 at 3. █████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████ Delphi was a litigant seeking to invalidate an

Ingevity European patent reciting IAC limitations. Ex. R4 ¶¶166-69. BASF cites no case law

finding hearsay statements by self-interested parties relevant to the definiteness inquiry. BASF

cites to inadmissible testimony from Dr. Ritter (Ingevity's expert during the PI phase who will

not be testifying at trial), regarding ways of mathematically estimating adsorption capacity at 5

and 50 volume% from adsorption capacities measured at different concentrations. D.I. 290 at 6,

8-9. As Ingevity's expert Dr. Rockstraw explained, BASF's argument here is wholly irrelevant

because adsorption capacity can be measured directly at 5 and 50 volume%, thus negating any

need to estimate it from other adsorption capacity measurements. Ex. R4 ¶¶94, 101, 144; Ex. R6

¶¶39-40. And even if adsorption capacity were estimated, what the claims *require* is definite and

clear. *Id.* ¶¶108-09. Finally, BASF cites an Ingevity presentation that describes a ██████████

██████████████████████████████████ D.I. 290 at 10. But that just shows that values vary

sample-to-sample, not that the reported range is a result of different testing methods. Ex. R4

¶177.

### B.   BASF's Written Description/Enablement Motion Should Be Denied

BASF's enablement/written description motion should be denied for three independent

reasons: (1) it applies the wrong legal standard for both enablement and the separate written

description requirement, (2) factual disputes preclude summary judgment on written description (a question of fact), and (3) BASF failed to even address the factual underpinnings necessary to determine enablement (a legal question but based on underlying questions of fact). Contrary to BASF's contention, Ingevity has never represented that the Patent fails to enable the full scope of the claims, as that legal requirement is properly understood, or lacked a written description.

### 1.    BASF's Motion Applies the Wrong Legal Standards

BASF's brief improperly conflates two separate legal requirements in alleging that both written description and enablement require showing "possession of the full scope of the claimed subject matter." D.I. 290 at 14. Written description is a question of fact that requires the moving party to prove by clear and convincing evidence that "the disclosure of the application relied upon [failed to] reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). Because a disclosure as to the "full scope of the claims" is not required, as BASF alleges, its entire written description argument fails. Ex. R4 ¶¶277-92.

As for enablement, while BASF states that "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation," it fails to explain that enablement is a separate inquiry from written description and "a question of law based on underlying factual findings." *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013). Importantly, BASF also fails to explain that the term "full scope of the claimed invention" means only that the specification must teach how to practice "the novel aspects of an invention." *Automotive Techs. Int'l v. BMW*, 501 F.3d 1274, 1283 (Fed. Cir. 2007); *Delaware Display Grp. LLC v. Vizio, Inc.*, 2017 WL 784988, at *4-6 (D. Del. Mar. 1, 2007) (distinguishing novel aspects from "tangential" concepts). BASF improperly assumes that the full scope of the invention requires that the Patent enable all IAC values greater than 35 g/L

11

(including 81 g/L to infinity) and all IAC values less than 35 g/L (including 15 g/L to zero). But the law does not require disclosure of how to make every example that falls within a range or grouping or else every use of "plurality" or "more than one" in a claim would require a vast number of examples. Neither *Ariad* or *MagSil* stand for that unsupported proposition. And such a holding would be directly contrary to *Automotive Techs. See also McRo, Inc. v. Bandai Namco Games Am.*, 959 F.3d 1091, 1102 (Fed. Cir. 2020). Further, BASF does not even address the factual question of whether a POSITA would be able to practice the claims without undue experimentation. D.I. 290 at 13, 14; *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). Under the proper standard, the enablement requirement is met. D.I. 293 at 26-29; Ex. R6 ¶76.

### 2.  Factual Disputes Preclude Summary Judgment on Written Description

Because written description is a question of fact, at best, material factual disputes preclude summary judgment. As Ingevity has shown, the Patent's specification identifies multiple specific examples of adsorbent volumes that meet the initial adsorbent volume limitations (IAC greater than 35 g/L) and those that meet the subsequent adsorbent volume limitations (IAC less than 35 g/L) of the claims. Ex. R4 ¶¶277-92. The Patent also teaches that additional subsequent adsorbent volumes can be made using volumetric dilution. *Id.* ¶280. And the Patent explains how to combine the two types of adsorbent volumes (high IAC and low IAC) to reduce bleed emissions, as claimed in the Patent. *Id.* ¶282; Ex. B9 ('844 Patent) at 6:50-8:67; Ex. R6 ¶¶76-77. Thus, the '844 Patent's specification "reasonably conveys to [POSITA] that the inventor had possession of the claimed subject matter." *Ariad*, 598 F.3d at 1351. At the very least, this is a disputed question of fact, which is fatal to BASF's Motion.

### 3.  BASF's Motion Relating to Enablement Should be Denied Because it Fails to Address Enablement's Underlying Factual Questions

In addition to misapplying the law, BASF failed to present facts that actually address the

underlying factual question of whether undue experimentation is necessary (*Wands*, 858 F.2d at 737). D.I. 290 at 13, 14. And, contrary to BASF's assertions, Ingevity identified unrebutted factual evidence showing the full scope of the claimed invention can be practiced without undue experimentation. D.I. 293 at 26-29; Ex. R4 ¶¶277-292; Ex. R6 ¶¶72-80.

Further, BASF's factual assertions do not relate to "the novel aspect of [the] invention" and are thus irrelevant. *Automotive Techs.*, 501 F.3d at 1283. The '844 Patent's novelty is in new ways of combining adsorbent volumes—not new ways of *making* adsorbent volumes or new *types* of adsorbent volumes. As BASF's expert conceded, the alleged novelty of the '844 Patent "lies in the combination of 'multiple layers, or stages, of adsorbents,' one made up of 'high working capacity carbons' and one with 'a relatively lower capacity.'" Ex. B1 ¶289. BASF does not dispute the Patent enables this novel aspect of the invention. D.I. 293 at 26-27.

Ignoring the novel aspect, BASF instead focuses on tangential aspects of the claims, leading to absurd results. Under BASF's theory, Ingevity is entitled to patent claims spanning only IAC values of examples presented in the specification. Thus, if an adsorbent is created (by any entity including Ingevity) that results in an IAC of 81 g/L, such could be used in the claimed combination without infringing the patent. The same would be true for an adsorbent that results in an IAC of 15 g/L (even though the Patent teaches how to obtain lower IAC values through dilution). Thus, a potential infringer could practice the claimed combination and avoid an infringement claim simply by waiting for new technologies that provide adsorbents with IAC values outside those identified in the Patent. That is not the law. *Invitrogen Corp. v. Clontech Labs. Inc.*, 429 F.3d 1052, 1071 (Fed. Cir. 2005) ("Such narrow patent rights would rapidly become worthless as new modes of practicing the invention developed, and the inventor would lose the benefit of the patent bargain."); *Delaware Display*, 2017 WL 784988, at *4-6.

BASF also presents factual assertions based on statements by Dr. Ritter and statements during EPO proceedings, neither of which are admissible evidence at trial and both of which are irrelevant to the proper legal inquiry. As explained in Ingevity's Claim Construction briefs, BASF's assertions do not relate to the novel aspects of the invention—the claimed combination, and are thus irrelevant. They also mischaracterize what was stated in the EPO. Ex. R6 ¶¶72-80. Ingevity did not state that the '844 Patent's scope is limited. It is simultaneously true that the '844 Patent enables the novel combination claimed and also does not disclose a system for meeting specified bleed requirements with low purge through focusing on a subsequent volume "with a BWC of less than 3 g/dL" among other characteristics. *Id.*; D.I. 297 at 16-20, 32-34.

### C.    BASF Is Not Entitled to Summary Judgment of Non-Infringement

BASF's non-infringement argument rests entirely on its flawed claim construction arguments, which must be rejected for the reasons discussed in Ingevity's claim construction briefs. D.I. 297. BASF's new citation to *Rhodia Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) does not change the analysis, as *Rhodia* involved prosecution disclaimer, a claim construction doctrine BASF has not even argued for in its claim construction briefs and that the record does not support. D.I. 297. Accordingly, BASF's request should be denied.

### D.    BASF Is Not Entitled to Summary Judgment of Invalidity over Delphi's Purported Prior Invention (A Question of Fact)

Unlike (pre-AIA) Sections 102(a) or 102(b), which prohibit a patentee from claiming a monopoly over something already in the public domain, "Section 102(g) operates to ensure that a patent is awarded only to the 'first' inventor in law," *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1035 (Fed. Cir. 2001)). BASF alleges that the purported "Delphi Inventors" ██████ ████████████████ were the first inventors of the '844 Patent's claims because they allegedly were (1) the first to reduce the '844 Patent claims to practice and (2) the first to conceive of the

'844 Patent claims and exercised diligence. D.I. 290 at 15. Both theories fail because the purported Delphi Inventors did not understand IAC, and therefore could not have appreciated or conceived of the claimed requirement of a subsequent adsorbent volume with an IAC < 35 g/L and further because BASF's theories turn on numerous factual disputes.

### 1.     Genuine Factual Disputes Preclude Summary Judgment

BASF alleges that "[t]here is no genuine dispute of material fact that the Delphi Inventors were both the first to conceive of the inventions in the '844 patent and were diligent in reducing the invention to practice." D.I. 290 at 24. That is false. Through its expert Dr. Rockstraw, Ingevity has disputed all of BASF's allegations regarding conception and reduction to practice. *See* Ex. R4 at ¶¶ 382-418. For example, as described below, Ingevity genuinely disputes at least four fundamental factual issues, each of which precludes summary judgment.

### a)     ▮▮▮▮ Did Not Conceive of the Honeycomb Scrubber Idea



Central to BASF's arguments is its account of what happened at the ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. BASF alleges that, at the meeting, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ D.I. 290 at 16. BASF adds that ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ D.I. 290 at 23. That is false—the record thoroughly rebuts BASF's allegations.[1]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ disputes BASF's account. She testified that the ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. B10 (LaBine Tr. (7/19/2019)) at 55:12-57:10. ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *E.g.*, *id.* at 67:24-

---

[1] For convenience alone, Ingevity will refer to the idea that BASF says ▮▮▮▮ came up with as the "Honeycomb Scrubber Idea."

68:4. Dr. Robert Beckler—a former Westvaco employee who was at the ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████ Ex. B11 (Beckler Tr. (7/31/19)) at 68:3-20,

78:25-82:1; Ex. B12 (Beckler Witness Statement) at Q/A 66.

    Additionally, Westvaco, not Delphi, had the expertise needed to conceive of the

Honeycomb Scrubber Idea. For example, shortly after the ████████████████████

████████████████████████████████ Ex. B13 at 102. ████

███████████████████████████████████████████

██████████ *Id.* ████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████.” *Id.* at 103.

███████████████████████████████████████████ Ex.

B10 at 276:14-21. ████████████████████████████

██████████ Ex. B14 (Meiller Tr. (10/23/19)) at 121:9-12. ████████████

███████████████████████████████████████████████

██████████ *Id.* at 113:14-114:5.

        **b)**    **Westvaco Conceived of Canister Scrubbers before the Meeting**

    BASF cites ███████████████████████████████████████

███████████████████████████████████████ D.I. 290 at 19. BASF

further alleges ██████████████████████████████████████████

██████████████████ *Id.* What BASF leaves out is that ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ Ex. B11 at 37:16-17. ████████████████████████████

█████████████████████████████████ *Id.* at 32:19-39:11; Ex. B12 at Q/A 39-50.

████████████████████████████████████████████

██████████████ Ex. B12 at Q/A 51. ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████ Ex. B15 (Emails between Volvo and

Westvaco) at 952. ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ Ex. B12 at Q/A 51-59.

     Thus, even if BASF is ultimately able to prove that ████████████████████████

████████████████████████████████ that is irrelevant because substantial

evidence will show that Westvaco conceived of the Honeycomb Scrubber Idea ***before*** the meeting,

and thus Westvaco has priority to the Honeycomb Scrubber Idea.

        **c)**     **Purported Delphi Inventors Did Not Appreciate IAC or BWC**

     While BASF alleges that ██████████████████████████████████████

████████████████████████████████████ it is undisputed that no one at

████ knew the IAC of the honeycomb or even what the IAC property meant. D.I. 290 at 22;

Ex. B16 (ITC Hr'g Tr.) at 513:6-9, 513:11-12, 513:23-514:1, 514:11-20. Recognizing this fatal

flaw (since the claims require knowing the IAC), BASF attempts to shift the focus to whether the

purported Delphi Inventors "knew the approximate BWC (an adsorption measure correlated to

IAC) of the honeycomb." D.I. 290 at 22. But the record does not even support that allegation.

██████████████████████████████████████████



Ex. B14 at 49:12-19.

Ex. B10 at 190:16-17.

*Id.* at 95:13-21; *see also id.* at 112:1-22, 277:5-10, 301:20-25. Indeed, BASF does not even contend that

D.I. 290 at 22. BASF also cites the

Ex. B16 at 512:24-513:5. Finally, BASF cites a letter from

D.I. 290 at 22. But

*See* Ex. B17 (NGVT0503139 (Miller Witness Statement)) at Q/A 41-56.

     **d)**    **Appreciation of BWC Does Not Show Appreciation of IAC**

    As noted, BASF alleges that BWC is "an adsorption measure correlated to IAC," thus implying that knowledge of BWC is equivalent to knowledge of IAC. D.I. 290 at 22. But Ingevity's expert disputes that allegation, stating that "BWC … is not the same as IAC." Ex. R4 ¶25. Ingevity's expert identifies several differences between IAC and BWC, which show that there is "not a fundamental relationship between BWC and IAC." *Id.* ¶¶26-30. And while there may be a correlation between BWC and IAC for some samples, that does not mean that there is an empirical correlation for BWC and IAC. *Id.* ¶¶32-39. Thus, Ingevity has established at least a factual dispute over whether knowledge of BWC shows knowledge of the claimed IAC and also a dispute about whether Delphi even appreciated the relevance of BWC (which it did not).

     **2.**    **Delphi's Alleged Reduction to Practice Theory Is Unsupported by the**

**Law and Fails to Show the Absence of Disputed Facts**

BASF asserts that the purported Delphi Inventors reduced the '844 Patent's claimed

inventions to practice by constructing and testing the Delphi Scrubber, which BASF says "met

all limitations of the asserted claims." D.I. 290 at 20. But to establish reduction to practice,

BASF must still show that the purported Delphi Inventors ***appreciated*** the claimed inventions, a

factual issue about which Ingevity at least has established a genuine dispute.

### a)      Appreciation of the Claimed Invention

The C.C.P.A.'s and Federal Circuit's precedent over the last 50 years explicitly holds that

a party cannot reduce to practice a claim under 35 U.S.C. § 102(g)(2) without appreciating ***the***

***invention recited in the claim***. *See, e.g.*, *Breen v. Henshaw*, 472 F.2d 1398, 1401 (C.C.P.A.

1973) ("It is well-settled that conception and reduction to practice cannot be established nunc pro

tunc. There must be contemporaneous recognition and appreciation of the invention represented

by the counts."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1074 (Fed. Cir. 2005)

("the material factual dispute we perceive regarding appreciation affects not only the proper date

of conception, but also the date of reduction to practice."). For example, in *Heard v. Burton*, 333

F.2d 239 (C.C.P.A. 1964), the invention at issue related to a "process for reforming naphthas"

involving the use of "eta alumina." *Id.* at 240. Critically for BASF's arguments here, the

purported prior inventor (Heard) recognized the same benefit that Burton did, *i.e.*,

"effective[ness] in reforming naphtha." *Id.* Yet C.C.P.A. held that Heard's failure to appreciate a

limitation recited in the invention at issue (eta alumina) was "fatal" to the challenger's case. *Id.*

at 243. Accordingly, the "appellant has proved neither conception nor reduction to practice prior

to appellees' filing date." *Id.* at 244.

BASF's argument that the Delphi Inventors nevertheless met the appreciation

requirement because they allegedly "appreciated the benefits" of the claimed invention is

contrary to the law. D.I. 290 at 22. For support, BASF relies on *Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP*, 661 F.3d 1378 (Fed. Cir. 2011) ("*AstraZeneca*"). In *AstraZeneca*, the patentee (Teva) argued that "the district court implicitly construed the claims to encompass stabilized statin formulations containing an AGCP compound, irrespective of whether the AGCP compound acted as the sole stabilizer" and that "this overbroad 'construction' of the asserted claims effectively relieved AstraZeneca of its burden of proving that it created the claimed subject matter and appreciated that it had done so." *Id.* at 1382. The Federal Circuit rejected Teva's argument because, under Teva's infringement read, the "stabilizing effective amount" claim limitation did not require the AGCP compound to be the drug's stabilizer:

> There is no question that AstraZeneca appreciated that AstraZeneca's drug contained an "amount" of crospovidone. And ***because of AstraZeneca's limited concession of infringement***, there is no question that the amount of crospovidone AstraZeneca's drug contained ***falls within the scope of the asserted claims as defined by the limitation "stabilizing effective amount."***

*Id. at* 1384–85 (emphases added). Indeed, the Court reasoned that "Teva's entire argument turns on the [claim] phrase 'stabilizing effective amount.'" *Id.* at 1385. Thus, the reason the prior inventor (AstraZeneca) did not need to appreciate the stabilizing property of the AGCP compound was Teva's contention that its invention did not require the AGCP to be the drug's stabilizer, not because Section 102(g)(2) permits appreciation of benefits in the place of appreciation of the claimed invention.

BASF also relies on *Dow Chemical Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334 (Fed. Cir. 2001) ("*Astro-Valcour*") (D.I. 290 at 22), but that decision fully supports Ingevity. In *Astro-Valcour*, the Federal Circuit put to rest any notion that assembling something that anticipates the challenged claims is sufficient to invalidate the claims under Section 102(g)(2). The Court noted that the challenger made a foam that "anticipates the relevant claims," but added the production of the foam would only invalidate the claims if "other requirements of § 102(g) were met." *Id.* at

1339-40. The Court reaffirmed that those "other requirements" include the "Heard rule," which requires appreciation of the invention to show "conception or reduction to practice." *Id.* at 1341. And while Court held that a prior inventor need not "appreciate the patentability of the invention" (*id.* at 1341), Ingevity is not faulting Delphi for not appreciating patentability.

Accordingly, BASF's allegations that the purported Delphi Inventors appreciated certain benefits of the Delphi Scrubber—*e.g.*, reduced bleed emissions, low flow restriction, and/or high scrubbing efficacy (D.I. 290 at 22-23)—are insufficient to meet the appreciation requirement because they fail to establish appreciation of the inventions defined by the '844 Patent's claims.

### b)    Ingevity At Least Disputes Delphi's Appreciation

BASF cannot dispute that the inventions defined by the '844 Patent claims at least require a subsequent adsorbent volume having an IAC < 35 g/L. *See, e.g.*, Ex. B16 at 535:16-18. But as described above, the purported Delphi Inventors could not have appreciated a subsequent adsorbent volume having an IAC < 35 g/L. For that reason alone, the Court should reject BASF's reduction-to-practice theory. To the extent BASF asserts the purported Delphi Inventors met the appreciation requirement because they allegedly "knew the approximate BWC" of the honeycomb and because BWC allegedly correlates with IAC (*see* D.I. 290 at 22-23), that argument should be rejected. A correlation between two metrics does not establish that they are synonymous.[2] BASF cites no authority that appreciating something that merely correlates with a claimed metric establishes appreciation of the claimed invention. And as described above, there is a genuine factual dispute as to the nature of the correlation between BWC and IAC and whether the purported Delphi Inventors knew the approximate BWC of the Delphi Scrubber's honeycomb. Moreover, even if the purported Delphi Inventors appreciated the IAC or BWC of

---

[2] *See, e.g.*, https://www.tylervigen.com/spurious-correlations (last visited June 17, 2020).

the Delphi Scrubber's honeycomb, the purported Delphi Inventors failed to disclose IAC or BWC to the public—BASF's expert conceded that "[t]here's not a measurement of BWC reported" in the Meiller Patent. Ex. B16 at 516:3-11. Thus, there is a dispute over whether the purported Delphi Inventors "abandoned, suppressed, or concealed" the '844 Patent inventions.

### 3. Delphi's Alleged Conception and Diligence

BASF asserts that "unrebutted and corroborated ████ testimony shows he conceived of the alleged inventions of the '844 patent on ████████████████ before the Ingevity Inventors' alleged conception." D.I. 290 at 23. BASF is wrong for at least three reasons.

*First*, BASF cites no evidence that ████ conceived of the "inventions of the '844 patent." The inventions of the '844 Patent, as explicitly defined by its claims, require a subsequent adsorbent volume with an IAC < 35 g/L. The Delphi Inventors did not understand IAC at all, and therefore could not have conceived of a system including, or a method using, a subsequent adsorbent volume defined by its IAC. At most, ████ allegedly conceived of a different invention, *i.e.*, the Honeycomb Scrubber Idea. D.I. 290 at 15-16, 23. And Ingevity has established, at the very least, a genuine dispute over whether the Honeycomb Scrubber Idea is the same as the inventions recited in the '844 Patent claims. Ex. R4 ¶¶20-24.

If BASF argues in reply that, by allegedly conceiving of the use of a honeycomb, ████ inherently conceived of a subsequent adsorbent volume with an IAC < 35 g/L, that argument should be rejected. The Federal Circuit has held that "inherent conception" cannot apply to limitations that are "material to the patentability of the invention." *Hitzeman v. Rutter*, 243 F.3d 1345, 1355 (Fed. Cir. 2001). The requirement of a subsequent adsorbent volume with an IAC < 35 g/L is unquestionably material—that limitation is the reason the PTAB rejected BASF's attempt to invalidate the '844 Patent. *See* Ex. B18 (PTAB Institutional Denial); Ex. B19 (PTAB Rehearing Denial). And Ingevity at least disputes whether an activated carbon honeycomb in fact

inherently meets the claimed requirement of an IAC < 35 g/L. Ex. R4 ¶¶487, 661-690.

*Second*, as noted, Ingevity at least disputes whether Westvaco was the first to conceive, and whether ████ conceived at all, of the Honeycomb Scrubber Idea. And Westvaco diligently reduced the Honeycomb Scrubber Idea to practice. *E.g.*, Ex. B12 at Q/A 72-131.

*Third*, BASF's assertion that ████████████████ is corroborated is legally insufficient. The only corroboration that BASF proffers for ████████████████ ████████████████████ *See* D.I. 290 at 20. ████████████████ ████████████ Ex. B14 at 58:12-14; *see also* Ex. B10 at 66:2-12. The ████ ████████ therefore does not prove conception with "***independent*** corroborating evidence," *i.e.*, evidence other than the purported inventor's "own statements and documents." *Hahn v. Wong*, 892 F.2d 1028, 1032-33 (Fed. Cir. 1989) (emphasis added). And the existence of the ████████████, at most, may corroborate that someone at Delphi created it—its existence says nothing about who conceived of the Honeycomb Scrubber Idea.

### 4.  The ITC's Final Determination Should Be Excluded

BASF's argument that the ITC's Final Determination is "[p]ersuasive" (D.I. 290 at 24) is wrong. The ITC Determination is inadmissible at trial as a non-final government ruling and also should be excluded as highly prejudicial under FRE 403. The ITC Determination certainly did not decide the question that BASF asks this Court to decide—whether the record in this case supports summary judgment of invalidity. Ingevity appealed the ITC's Final Determination because it reaches an erroneous ***legal conclusion*** that a purported prior inventor need not appreciate the claimed invention if he or she appreciates benefits of the claimed invention and also reaches incorrect factual conclusions as a result. D.I. 290, Ex. 48 at -545665-66.

### E.  BASF's Patent Misuse Argument Fails Because It Conflates Products and Facts and Misapplies the Law

23

"Where the patentee has not leveraged its patent beyond the scope of rights granted by the Patent Act, misuse has not been found." *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010). A patentee does not engage in patent misuse through tying unless the patentee has market power in a relevant market for a tying product. 35 U.S.C. § 271(d)(5). A patentee also does not engage in patent misuse when restricting competition in non-staple goods used only to practice the claims of a patent. 35 U.S.C. § 271(d)(1)-(3); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 201-15 (1980) (interpreting § 271(d)(1)-(3)).

BASF attempts to sidestep these precedents by conflating products—BASF refers to "carbon adsorbents" without any indication as to what products Ingevity allegedly tied to the '844 Patent. BASF's argument fails as a matter of law or, at best, raises factual questions that preclude BASF from obtaining summary judgment. (As explained in Ingevity's Opening Brief, D.I. 293, BASF has no evidence creating a genuine dispute of material fact relating to these potential issues such that Ingevity's motion should be granted.) Ingevity's alleged tying relating to FVC Honeycombs is expressly allowed under the '844 Patent, and Ingevity's alleged past tying of high-IAC base carbon products does not constitute misuse.

### 1.    Facts Demonstrating No Patent Misuse

1.      Dr. Rao did not admit Ingevity has market power; he explained that BASF's purported measure of market power—the ability to price above marginal cost—does not show market power because "every company has the ability to price above marginal cost," even companies that do not have market power, or else the company will not stay in business. Ex. B20 (Rao Tr. (5/29/20)) at 20:22-22:15, 24:8-23, 25:6-26:11, 35:20-39:5. The identification of technologies to meet LEV III and Tier 3 regulations as an alleged market distinct from fuel vapor canister honeycombs ("FVC Honeycombs") is incorrect. Ex. Rao1 ¶¶ 44-49.

2.      Ingevity does not require customers to purchase high-IAC base carbon products[3] from Ingevity. *See* D.I. 293 at 3 (SUF 5). Ingevity's customers are impliedly licensed when they use Ingevity-only carbon products as the subsequent adsorbent volume in fuel vapor canisters practicing the '844 Patent's claims. Ex. B21 (Woodcock Tr. (12/2/19)) at 54:24-55:6; Ex. B22 (Woodcock Tr. (7/10/19)) at 304:20-305:3. Ingevity's license agreements—entered before LEV III/Tier 3 regulations were phased in (2018 and 2017, respectively)— ████████████████

████████████████████  Ex. B23 ████  Ex. B24 ████  Ex. B25 (MAHLE).

3.      Ingevity's FVC Honeycombs are used only in fuel vapor canisters to practice the claims of the '844 Patent. D.I. 293 at 2 (SUF 1, 4). Ingevity has never required customers to purchase non-FVC Honeycombs to receive a license to the '844 Patent. D.I. 293 at 2 (SUF 3).

4.      The '844 Patent requires the use of a subsequent adsorbent volume having an IAC less than 35 g/L. D.I. 293 at 4 (SUF 15). Ingevity's FVC Honeycombs have an IAC less than 35 g/L. Ex. R4 ¶974. That the '844 Patent can be practiced using other subsequent adsorbents with an IAC less than 35 g/L (e.g., Ingevity's BAX-LBE or MAHLE's MPAC) has no impact on FVC Honeycombs having no uses outside of practicing the claims of the '844 Patent.

**2.      Ingevity's Alleged Tying Involving FVC Honeycombs Falls Within the Scope of the '844 Patent and Cannot Constitute Patent Misuse**

Ingevity's alleged conduct falls within the rights afforded by the Patent. As Ingevity has explained, Ingevity's alleged conduct is covered by *Rohm & Haas* because Ingevity's FVC Honeycombs are non-staple goods used only to practice the claims of the Patent and they are essential to the invention's advance over the prior art. D.I. 293 at 2 (SUF 1, 4), 7-11.

---

[3] Ingevity refers to high-IAC base carbon products rather than "pelletized" products to avoid BASF's confusion between high-IAC pellets, such as BAX 1100, which are used as initial stage adsorbents or in canisters that do not practice the Patent's, and BAX-LBE and MPAC, which are used only as low-IAC subsequent stage adsorbents in canisters practicing the Patent.

BASF attempts to avoid this reality by arguing that FVC honeycombs are part of a product category that includes "automotive, residential, industrial, and other noninfringing applications." D.I. 290 at 28. Without any legal support, BASF contends that the relevant question is "whether the tied product *category* comprises staple or nonstaple goods." D.I. 290 at 30. That theory is unsupported in the law. Instead, courts focus on the actual tied products at issue, not some broader "category" of products. *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1341-42 (Fed. Cir. 2004) (tying can constitute misuse "under certain condition" if a licensor conditions a license "on a patentee's *purchase of an unpatented material for use in the invention*" (emphasis added)); *Rohm & Haas*, 448 U.S. at 185-87 (focusing on the actual tied product propanil rather than some broader category of herbicides). Simply put, BASF has not identified any legal support for its purported "tied product category" theory of misuse.

BASF's attempt to focus on a product "category" rather than the actual products Ingevity allegedly tied—FVC Honeycombs—is similar to the position the Federal Circuit rejected in *Hodosh v. Block Drug Co.*, 833 F.2d 1575 (Fed. Cir. 1987). In *Hodosh*, the defendant attempted to focus the "staple/nonstaple inquiry" on potassium nitrate rather than the actual material sold by the patentee—toothpaste. *Id.* at 1576-77. The Federal Circuit rejected this argument and explained that the district court needed to analyze "the material actually sold by the accused and the uses made of it by its purchasers." *Id.* at 1578. Similarly, the Court should reject BASF's attempt to focus on a broad "category" of honeycombs rather than "the material actually sold" (FVC Honeycombs) and "the uses made of it by its purchasers" (use in fuel vapor canisters).

BASF's argument that Ingevity is "wrong to focus on a narrow subset of its own HCA-branded honeycomb products" fails for the same reason—the Court must analyze the actual products allegedly tied, not other products that have no relationship to the alleged tying at issue

here. BASF has not identified any evidence that Ingevity has tied licenses to the '844 Patent to purchases of non-FVC Honeycombs. D.I. 293 at 2 (SUF 3). Nor has BASF identified any evidence showing that any customer ever qualified or otherwise attempted to use a non-FVC Honeycomb for use in a fuel vapor canister in place of a FVC Honeycomb.[4] Indeed, ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████. *Id.* at 2 (SUF 4).

BASF's reliance on non-FVC Honeycombs is inapposite and contrary to precedent because non-FVC Honeycombs have no relation to the alleged tying at issue here.[5]

Even if BASF had evidence that Ingevity's FVC Honeycombs have minimal use other than in fuel vapor canisters (which they do not) or the Court were to credit BASF's attempts to rely on non-FVC Honeycombs, BASF at most would create a factual dispute as to whether such uses constitute "substantial noninfringing use" under § 271(c). *Rohm & Haas*, 448 U.S. at 200-201 (explaining § 271(d)'s relationship to § 271(c)); *Hodosh*, 833 F.2d at 1578-80 (analyzing staple/nonstaple question by applying the standard of § 271(c)). Again, non-FVC Honeycombs are not relevant to showing noninfringing uses of FVC Honeycombs because there is no evidence customers have used them in fuel vapor canisters or even qualified them for use in fuel vapor canisters—they are merely different products with different uses disconnected from FVC Honeycombs. If considered, however, ████████████████████████████████████

---

[4] BASF's argument regarding ████████████████████████████████████ is not relevant to any legal test it cites. Moreover, BASF's contention that non-FVC Honeycombs have "minimal modifications" is belied by BASF's own witness ████████████████████████████████████████████████████████

████████████████████████████████████████. Ex. B27 (Ruettinger Tr. (10/19/18)) at 43:3-15.

[5] When addressing market share and market power, BASF's focus on market share of FVC Honeycombs rather than some broader category of *all* carbon honeycombs further demonstrates the irrelevance of non-FVC Honeycombs, even to BASF. Ex. B30 ¶¶ 61-68.

███████████████████████████████████ and would not be substantial noninfringing

uses. Ex. B26 (Waynesboro Production) at N50, O50, P50; *i4i Ltd. P'ship v. Microsoft Corp.*,

598 F.3d 831, 851 (Fed. Cir. 2010). BASF's motion also, at most, creates a material dispute of

fact as to whether Ingevity's alleged tying involved two separate markets. *See Jefferson Parish*

*Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984) ("[A] tying arrangement cannot exist unless two

separate product markets have been linked."); *U.S. Philips Corp. v. ITC*, 424 F.3d 1179, 1194

(Fed. Cir. 2005) (conduct is not patent misuse "unless there is sufficient demand for the purchase

of [the tied product] separate from the [tying product] to identify a distinct product market in

which it is efficient to offer [the tied product]"); Ex. Rao1 ¶¶ 44-49 (BASF failed to identify two

separate markets); Ex. R4 ¶¶ 974-86. BASF's motion should be denied because BASF at most

identifies factual disputes that cannot be decided at summary judgment.

BASF's argument regarding advancements over the prior art similarly fails at summary

judgment.[6] BASF contends that "carbon honeycombs" are not essential to the '844 Patent's

advance over the prior art because subsequent adsorbent volumes can take "many different

forms." D.I. 290 at 28-29. This argument is irrelevant because it is undisputed that the '844

Patent's advance over the prior art is the addition of a low-IAC adsorbent in combination with a

high-IAC adsorbent that was used in prior art canisters. Ex. B9 at 1:58-2:33, 3:43-4:63. The '844

Patent's disclosure of low-IAC adsorbents permits Ingevity a "statutory right to control" these

non-staple goods used to satisfy the low-IAC component in fuel vapor canisters.[7] *Rohm & Haas*,

---

[6] The Court should preclude BASF's new argument that FVC Honeycombs are not essential to the '844 Patent's advance over the prior art because it was not presented during fact discovery (Ex. B28 at 86-89; Ex. B29 at 19-24). Fed. R. Civ. P. 37(c)(1); *Vehicle IP, LLC v. Werner Enters., Inc.*, 2013 WL 4786119, at *2-3 (D. Del. Sept. 9, 2013).

[7] To the extent BASF attempts to broaden consideration of low-IAC adsorbents to include products such as BAX-LBE and MPAC, BASF has identified no evidence that these subsequent adsorbent volume products are used for anything other than practicing the claims of the '844 Patent.

448 U.S. at 213-14. Ingevity's FVC Honeycombs are a commercial embodiment of these low-IAC adsorbents that Ingevity has a right to control. *Id.* Indeed, even if the Court were to credit BASF's attempt to characterize BAX-LBE and MPAC as constituting a different product market rather than considering them alongside FVC Honeycombs as low-IAC subsequent adsorbent volumes used to practice the '844 Patent's claims, the Federal Circuit has "expressly held" that "a patent may confer the right to exclude competition altogether in more than one antitrust market" as long as the conduct falls within the scope of the patent grant. *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327 (Fed. Cir. 2000). At most, BASF's arguments would create a question of fact as to whether subsequent adsorbent volumes having an IAC less than 35 are essential to the '844 Patent's invention over the prior art (as explained specifically in the '844 Patent).

Because BASF's arguments fail under the proper legal standard, are unsupported by the relevant facts, and at most create genuine disputes of material fact, BASF's motion for summary judgment should be denied on BASF's tying theory of misuse relating to FVC Honeycombs.

### 3. BASF Has Failed to Show Patent Misuse Relating to Allegations of Tying Involving High-IAC Base Carbon Products

BASF never identified a specific theory of patent misuse based on tying of high-IAC base carbon products, such as BAX 1100 or BAX 1500 during discovery. D.I. 293 at 18-20. Thus, the Court should reject BASF's attempted improper introduction of this theory in its motion for summary judgment. Fed. R. Civ. P. 37(c)(1); *Vehicle IP*, 2013 WL 4786119, at *2-3.

Even if considered, the theory fails because it ignores critical facts that contradict BASF's theory of misuse. Ingevity does not require customers to purchase high-IAC base carbon products in order to receive a license (express or implied) to the '844 Patent, and it is undisputed that Ingevity has not required any such purchases since late-2018. D.I. 293 at 3 (SUF 5), 19-20.

Any potential misuse that allegedly could have existed under BASF's theory has been purged. *Id.* at 20 (citing cases). BASF presented no evidence that any potential misuse has not been purged and even if it did, that would, at most, raise a factual question because Ingevity contends that it has been purged to allow competition.[8] E.g., Ex. B21 at 23:9-12, 15:12-17:16; D.I. 293 at 19-20.

Moreover, BASF's failure to address Ingevity's change in business practices in late-2018 presents further reason to deny BASF's motion. A court must analyze market power at the time the alleged tying took place. *U.S. Philips*, 424 F.3d at 1186. But BASF makes no attempt to analyze Ingevity's market power in the alleged market of technologies to satisfy LEV III and Tier 3 regulations in 2018 or earlier. BASF's expert does not analyze when Ingevity allegedly gained market power or when the alleged technology market formed. Ex. B30 (Mathur Opening Rep.) ¶¶47-62. This lack of analysis is critical here because LEV III and Tier 3 standards did not require compliance until 2018 and 2017, respectively.[9] *Id.* ¶ 16. The license agreements BASF cites—or other conduct during that period—were entered before the regulations went into effect. *Id.*; Ex. B23; Ex. B24; Ex. B25. BASF's tying theory fails because BASF cannot rely on an alleged technology market as the "tying market" when the relevant regulations supposedly creating that market had not even gone into effect, and the Court should deny BASF's motion.

Even setting aside BASF's lack of analysis and supporting facts, BASF's arguments, at most, raise genuine disputes of material fact, including disputes as to when the alleged technology market formed and when Ingevity allegedly obtained market power (compared to when Ingevity changed its business practices). The Court should deny BASF's motion on the

---

[8] Ingevity recently learned that ███████████████████████████████████████████
███████████████████████████████████ Ex. Rao1 ¶23 n.105; see also Ex. B10 at 209:1-210:3.

[9] As explained previously, Ingevity changed its business practices shortly after compliance with these standards went into effect to avoid, or at least purge, any potential misuse.

theory of tying relating to high-IAC base carbon products.

### 4. BASF's Purported Per Se Standard Is Contradicted by Supreme Court Precedent

BASF improperly relies on per se patent misuse cases despite the Supreme Court explicitly holding that "tying arrangements involving patented products should be evaluated under the standards applied in cases like *Fortner II* and *Jefferson Parish rather than under the per se rule applied in* Morton Salt *and* Loew's." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006). The Supreme Court's rejection of the per se framework for tying cases involving patented products renders BASF's reliance on a per se standard unsupported by law. BASF's assertion that the Court "left intact *Morton Salt*'s holding" points to a portion of the Court's opinion describing how the Court treated *Morton Salt* in *International Salt Co. v. United States*, 332 U.S. 392 (1947)—not any portion of the opinion actually upholding *Morton Salt*. *See* D.I. 290 at 30 n.5 (citing *Ill. Tool Works*, 547 U.S. at 39). Instead, the Court's decision in *Illinois Tool Works* abrogated *International Salt*, further undermining BASF's claim that the Court upheld some semblance of a per se standard for patent misuse.

### F. BASF's Request to Exclude Dr. Vander Veen's Reasonable Royalty Opinions Should Be Denied

BASF's asserts three reasons for excluding Dr. Vander Veen's reasonable royalty opinions; all should be rejected. First, BASF incorrectly contends Dr. Vander Veen's reasonable royalty is not tied to economic harm. As he explains, BASF's infringing "use" in the form of tests is a statutory harm under 271(a) that gave BASF an improper head-start in entering a market worth hundreds of millions of dollars annually (Ex. B31 (Stamm Rebuttal Rep.) at 6, Table 1). That use significantly impacts both Ingevity and BASF, and notwithstanding BASF's lack of sales, Ingevity is entitled to damages "adequate to compensate for [BASF's] infringement, but *in no event less than a reasonable royalty for the use made* of the invention

31

by" BASF. 35 U.S.C. §284 (emphasis added). Damages, including lump sum royalties like the one Dr. Vander Veen identifies, are appropriate for infringement that puts the infringer "in a place to launch" even where no sales have occurred. *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1341 (Fed. Cir. 2019). Second, BASF argues Dr. Vander Veen does not apply the required assumptions for the hypothetical negotiation. That is belied by the reports themselves, which clearly say otherwise. Third, BASF contends that Dr. Vander Veen does not reliably apply economic principles to the facts by mischaracterizing his analysis. Dr. Vander Veen applied proper principles—BASF is free to cross-examine him at trial regarding the quality of the evidence on which he relies. Dr. Vander Veen's expert analysis will assist the jury in the task of determining the appropriate royalty for BASF's infringing head-start testing. (Conversely, BASF's expert, Laura Stamm, offers no calculation related to the harm Ingevity has suffered or the royalty BASF would be willing to pay. Ex. B31.

> ### 1. Dr. Vander Veen's Reasonable Royalty is Sufficiently Related to Ingevity's Economic Harm

BASF's infringing testing provided BASF "a significant 'head start' in the long and complex certification and approval process that is required for evaporative emissions systems used in automobiles." Ex. B32 (Vander Veen Opening Rep.) ¶58. Dr. Vander Veen's reasonable royalty is explicitly tied to the statutory harm of infringing use and for which Ingevity is statutorily entitled to a royalty that it has not received. In reality, Ingevity—a profit-seeking enterprise—would have never granted BASF a license to gain such a head start because the economic consequences of losing exclusivity are so significant. *E.g.*, Ex. B32 ¶21, 60; Ex. B33 (Vander Veen Reply Rep.) ¶¶8, 10. Nonetheless, under the construct of the hypothetical negotiation, and per § 284, Dr. Vander Veen analyzes the value of the "use made of the invention"—BASF's infringing acts.

Because there is no overlap between the amount BASF would be willing to pay for a license and the amount Ingevity would accept, for purposes of the hypothetical negotiation Dr. Vander Veen makes a *conservative* assumption favoring BASF— that Ingevity would accept an amount BASF was willing to pay. Ex. B32 ¶92; Ex. B33 ¶11.

BASF's argument that Dr. Vander Veen's analysis is not linked to economic harm is an attempt to mischaracterize Dr. Vander Veen's conservative assumption—made for purposes of the hypothetical negotiation construct—that Ingevity would accept the amount BASF would have been willing to pay. As BASF acknowledges, "the hypothetical negotiation construct presumes," often counterfactually, "a willing licensor and licensee." D.I. 290 at 36 (quoting *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 (Fed. Cir. 2014)). As noted in *Aqua Shield*, this "often involves 'approximation and uncertainty,'" as it "asks about a comparative business prediction in an uncertain, complex world, and many variables may affect the hypothetical forecast." 774 F.3d at 771. Here, Dr. Vander Veen conservatively accepts the amount BASF would be willing to pay, which *reduces* any additional approximation and uncertainty, and also observes the legal fiction that Ingevity would have willingly licensed BASF's infringement.[10] As such, BASF's argument that Dr. Vander Veen's opinions are not linked to Ingevity's harm ignores key points in the analysis and must be rejected.

### 2. Dr. Vander Veen Applies Reliable Economic Principles to the Available Data Points Linked to BASF's Infringement to Determine the Amount BASF Would Have Been Willing to Pay for a License

The hypothetical negotiation involves considering not only the harm to the patentee, but

---

[10] If, instead, Dr. Vander Veen had applied a less conservative assumption reflecting the fact that Ingevity would have been highly reluctant, if not completely unwilling, to grant a license, it would have driven the royalty far higher.

also the amount the infringer, "as a business proposition, would be willing to pay." *Aqua Shield*,

774 F.3d at 770. In arguing that Dr. Vander Veen's reasonable royalty opinions are not

sufficiently linked to Ingevity's harm, BASF attempts to decontextualize Dr. Vander Veen's

analysis of what BASF would have been willing to pay. [11] Dr. Vander Veen considers two data

points: (1) a highly conservative measure of the litigation costs BASF would face as a result of

infringing and (2) the additional costs BASF was willing to incur to infringe. Because these data

points relate to the value of infringement to BASF, they are probative of the amount it would be

willing to pay in the hypothetical negotiation. BASF's argument that "[n]either … reflects

compensation for economic harm caused by infringement" (D.I. 290 at 34) is wrong – a

competitor's gain at a patentee's expense is naturally a harm to the patentee.

*First*, BASF's arguments regarding Dr. Vander Veen's consideration of litigation costs

are wrong. BASF argues the license in question would not avoid litigation for future infringing

sales, and that BASF therefore would not have agreed to it. D.I. 290 at 34. But the royalty for the

jury to decide is limited to the actual acts of infringement – not damages for future infringing

sales. *See, e.g.*, *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (upholding

permanent injunction where a reasonable royalty "constituted adequate compensation only for

Stryker's past infringement and that no adequate remedy at law existed for Stryker's future

infringement"); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 546

(D. Del. 2005) (granting permanent injunction after jury award of reasonable royalties because

"while a monetary award is often an adequate remedy for past infringement, it does not follow

---

[11] BASF's argument assumes, wrongly, that to show the economic harm entitling a patentee to damages, the patentee must have evidence of a lost sale. That is not the law. 35 U.S.C. § 284; *Amgen Inc.*, 944 F.3d at 1341 (affirming damages where patentee had not lost sales). Indeed, in many cases, such as those involving non-practicing entities, the economic harm could be nothing more than the infringer's failure to take a license.

that mone[tary] relief is a sufficient remedy against future infringement").

The data in question showed litigation costs of $400,000 to $5 million in 2015 and $250,000 to $3 million in 2017. Ex. B32 ¶32. Dr. Vander Veen explains that because the license "would *only* provide BASF with the right to perform the Infringing Acts[]—and not the right to sell any EvapTrap XC products—I have considered the lower end of this range, or $400,000, as the amount that BASF would have expected to pay in litigation costs." *Id.* Further, BASF's argument relates, at most, to the weight the jury should afford Dr. Vander Veen's opinions, not their admissibility. *E.g.*, *ART+COM Innovationpool GmbH v. Google Inc.*, 155 F. Supp. 3d 489, 515 (D. Del. 2016) (damages expert's apportionment goes to weight and credibility). Nor is it correct that "because both Ingevity and BASF face similar potential litigation costs, the outcome of a negotiation could not be biased by those potential litigation costs." D.I. 290 at 38. Because the value to Ingevity of excluding BASF from the market would be so high, the amount it would be willing to accept to fall below $400,000 because of prospective litigation costs. Ex. B33 ¶11.

*Second,* BASF's arguments regarding Dr. Vander Veen's consideration of increased costs for domestic testing are wrong. BASF argues that Dr. Vander Veen's reasonable royalty opinion does not account for BASF's "less expensive non-infringing alternative," and that Dr. Vander Veen improperly treats the price difference for the alternative as an avoided cost. D.I. 290 at 34, 37. Neither point is correct. Dr. Vander Veen considers BASF's contention that it could have performed development and testing abroad to avoid infringement, noting that "[w]hile this scenario would provide BASF with a non-infringing alternative to the Infringing Acts defined above, BASF has not shown that such an alternative was feasible."[12] Ex. B32 ¶27. Dr. Vander

---

[12] Non-infringing alternatives must be "acceptable." *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991). BASF's infringing acts were often performed

Veen further observes that, BASF ███████████████████████████████████████

███ and notes the fact that such an option was purportedly available, but BASF nonetheless

chose to infringe, shows "that BASF foresaw an economic disadvantage that was at least equal to

or likely greater than ██████ for this non-infringing alternative." Ex. B32 ¶28. Thus, Dr.

Vander Veen takes this cost difference for what it is: evidence that BASF valued performing the

infringing testing in the United States ████████████████████████████████████████

████████████████████████ as BASF contends. *Id.* As Dr. Vander Veen explained in his

Reply, "BASF would still be spending this amount under the hypothetical license with Ingevity,"

and BASF's willingness "to spend more for R&D and assume the risk of costly litigation" shows

that "it placed particular value on performing the Infringing Acts in the United States." Ex. B33

¶13. BASF identifies no fundamental unreliability in Dr. Vander Veen's methodology that would

justify exclusion. At best, they are points for cross-examination.

Lastly, BASF's contention that Dr. Vander Veen's use of $400,000 as a starting point is

"arbitrary" and "unrelated to the facts of the case" (D.I. 290 at 35) is wrong. Dr. Vander Veen

used available data points to assess the amount BASF would be willing to pay as of the time of

the hypothetical negotiation, but the $400,000 was never used as the starting point. BASF does

not cite any passage in his report that says that value was his "starting point." Thus, BASF's

---

at customers' U.S. facilities or at U.S. facilities selected by BASF's prospective customers who
oversaw the testing. *E.g.*, Ex. B35 (Schutte Tr. (1/14/20)) 60-62 ██████████████████
██████; Ex. B36 ██████████████████████████████████████████████████████████
██████████████████████ Likewise, BASF ████████████████████████████████████
████████████████████. Ex. B37 (Alden Tr. (11/5/19)) 126:17-24. BASF's expert did not
consider this evidence, but nonetheless offered an opinion that performing all testing abroad would
have been "acceptable," relying only on a 30 minute conversation with BASF employees, where
none of these details were actually discussed. Ex. B40 (Stamm Tr. (5/26/20)) 31-34, 44-70, 51:22
████████████ 55:8-13 ██████████████████████████████████████
███████████████████████████ 65:17-18 ███████████████████████
██████████████████████████████████████

reliance on *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) is misplaced, as that case held using the 25% rule as a starting point was improper because it was untethered to the facts of the case. Dr. Vander Veen performed a *Georgia Pacific* analysis and used the litigation costs and the avoided costs as data points—not starting points. And those data points are related to this case. The additional cost BASF incurred for U.S.-based testing of at least hundreds of thousands of dollars shows the value in the choice to infringe in the U.S. and thus ties the $400,000 litigation costs to the facts of this case. Ex. B32 ¶31 ("[B]y pursuing the Infringing Acts in the U.S., BASF chose ███████████████████████████ ███ it also chose to incur the risk of future patent litigation costs—a significant risk given Ingevity's reputation as an 'aggressive' protector of its intellectual property rights."). While BASF may argue about the proper weight for Dr. Vander Veen's data points, it can cross-examine him on those issues. BASF identifies no flaws in his methodology that justify exclusion.

### 3.      Dr. Vander Veen Applies the Required Assumptions for the Hypothetical Negotiation

BASF's remaining scattershot arguments also fail. *First,* BASF wrongly argues that "Dr. Vander Veen does not assume infringement and validity of the patents as required." D.I. 290 at 36. As stated in ¶17 of Dr. Vander Veen's Opening Report, he performs his analysis "assuming that the patent-in-suit is found valid and infringed by BASF." Ex. B32 ¶17. BASF's follow-on argument that "if both BASF and Ingevity assume the patent is both valid and infringed, there would be nothing for BASF to litigate" (D.I. 290 at 36) is similarly incorrect. Of course, the parties would still need to litigate damages. But more fundamentally, it simply does not follow that, because findings of validity and infringement were inevitable, BASF would not consider in the hypothetical negotiation the litigation costs it would face if it walked away from the negotiating table (only to later be found to infringe). If anything, the inevitability of validity and

infringement verdicts would make BASF more eager to pay a lump sum royalty to avoid litigation, *which would also result in an award of damages*. (And even if Ingevity received nominal damages of $1, a rational economic actor would pay $400,000 instead of $400,001.)

*Second*, BASF argues that "Dr. Vander Veen improperly assumes Ingevity is *not willing* to license the patent." D.I. 290 at 36. Again, this statement is simply wrong. BASF attempts to blur the lines between statements about reality (where Ingevity is in fact not willing to license the patent to BASF) with analysis under the legal construct of the hypothetical negotiation (where, applying the required presumptions, Dr. Vander Veen conservatively assumes *Ingevity would accept* the amount BASF would be willing to pay, (Ex. B32 ¶92)). BASF's reliance on *Carucel Investments, L.P. v. Novatel Wireless, Inc.*, No. 16-CV-118-H-KSC, 2017 WL 1215838, at *9 (S.D. Cal. Apr. 3, 2017), is misplaced. There, the damages expert opined that the patentee would simply refuse to engage in the hypothetical negotiation. Here, Dr. Vander Veen's analysis assumes Ingevity would engage in a hypothetical negotiation and ultimately grant a license, and further applies the assumption that Ingevity would accept a modest royalty of $400,000.

BASF's argument that Dr. Vander Veen does not treat Ingevity as a "willing licensor" because the license does not cover future infringement is wrong. Experts are not to opine on acts of infringement that are not part of the jury's decision. *E.g.*, *Acumed LLC*, 551 F.3d at 1328; *Honeywell Int'l*, 397 F. Supp. 2d at 546. Here Dr. Vander Veen assumes under the hypothetical negotiation construct that Ingevity would license only BASF's infringing testing since that is the only issue for the jury to decide and thus, his testimony targets the task the jury must perform. Indeed, BASF's position would preclude patentees from obtaining royalties for past infringement and an injunction because a "willing licensor" would have to license future infringement. Such reasoning is rejected by the numerous cases granting royalties and an injunction.

Thus, BASF identifies no proper basis for excluding Dr. Vander Veen's reasonable royalty opinions, and its request should be denied.

**G.     BASF Is Not Entitled to Summary Judgment on Damages Even if BASF's Motion to Exclude Is Granted**

Although Dr. Vander Veen's reasonable royalty opinions should not be excluded, even if they are, BASF's damages summary judgment argument ignores (and omits from its quotation) key language from § 284 and disregards other damages evidence in the record.

*First*, BASF argues Ingevity is not entitled to any damages because § 284 only entitles Ingevity to "damages adequate to compensate for the infringement" (D.I. 290 at 38.), but the statute makes clear that Ingevity is entitled to "damages adequate to compensate for the infringement, ***but in no event less than a reasonable royalty for the use made of the invention by the infringer***." 35 U.S.C. § 284 (emphasis added). "The statute is unequivocal that the district court must award damages in an amount no less than a reasonable royalty." *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003).

*Second*, BASF also argues Ingevity's damages "are not tied to any *actual* harm to Ingevity" because "neither Ingevity nor its expert has calculated—or even estimated—any economic harm." (D.I. 290 at 39.) As explained above, Ingevity's proofs are tied to Ingevity's harm in facing a competitor in a head-start position, including technical validation with major customers. Ex. B34 (Rowe Tr. (11/8/19)) 50:8-9, 60:20-25, 69:25-70:11. In any case, Ingevity is entitled to a royalty for infringement and has not received one, which is an economic harm.

*Third*, BASF argues that, "in the absence of Dr. Vander Veen's testimony, the jury has no basis to award or quantify any damages." (Mot. at 39.) Wrong again. Even if Dr. Vander Veen's reasonable royalty opinions are excluded, there is other damages evidence in the record. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326-30, (Fed. Cir. 2014) (reversing summary

judgment of no damages where the district court excluded damages expert's testimony, noting "[i]f a patentee's evidence fails to support its specific royalty estimate, the fact finder is still required to determine what royalty is supported by the record."), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *Robocast, Inc. v. Apple Inc.*, 39 F. Supp. 3d 552, 567 (D. Del. 2014) (denying summary judgment of no damages even after damages expert's testimony was stricken).

Ingevity explained in discovery and will present at trial that it "is entitled to damages for the infringement that has already occurred, including not less than a reasonable royalty for the current acts of infringement," "has suffered damages because of testing in the United States of canisters containing the Accused Product and supplying from the United States the Accused Product for testing in canisters abroad," and "has suffered damages because BASF's offers for sale in the United States and supplying of the Accused Product from the United States have caused confusion about Ingevity's market position." Ex. B38 at Rog. 12 (incorporating evidence cited in the Vander Veen report); Ex. B21 at 272:18-273:10 (BASF's infringing testing gave BASF a head start); *id.* at 283:4-9 ███████████████████████████ ███████████████████████████████████ Ex. B23; Ex. B24; Ex. B25. Additionally, BASF's witnesses' testimony shows BASF has benefitted from its infringement (e.g., Ex. B34 50:8-9, 60:20-25, 69:25-70:11; Ex. B39) and a benefit to a competitor like BASF is harm to Ingevity. Expert witness or not—the jury will be required to determine a reasonable royalty for BASF's infringement and could do so based on the factual evidence identified herein. *Apple Inc*, 757 F.3d at 1327. BASF's summary judgment of no damages should be denied.

## V.   CONCLUSION

BASF's summary judgment and Daubert challenges fail and should be denied.

/s/ Jeff Castellano_____
Karen E. Keller (No. 4489)
John W. Shaw (No. 3362)
Jeff Castellano (No. 4837)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
jcastellano@shawkeller.com
*Attorneys for Plaintiffs*

OF COUNSEL:
Jeffrey T. Thomas
Taylor W. King
Nathaniel R. Scharn
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Dr.
Irvine, CA 92612-4412
(949) 451-3800

Brian M. Buroker
Omar F. Amin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500

Stuart M. Rosenberg
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
(650) 849-5389

Rustin K. Mangum
Spencer W. Ririe
MANGUM RIRIE LLP
999 Corporate Dr. #260
Ladera Ranch, CA 92694
(949) 298-5590

Dated: June 19, 2020

## <u>CERTIFICATE OF SERVICE</u>

I, Jeff Castellano, hereby certify that on June 19, 2020, this document was served on the

persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

Rodger D. Smith, II
Anthony D. Raucci
MORRIS, NICHOLS, ARHST & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
araucci@mnat.com

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South Carolina Avenue
Suite 100
Palo Alto, CA 94304
(650) 422-6700
tfriel@kslaw.com

Joseph D. Eng, Jr.
KING & SPALDING LLP
1185 Avenue of the Americas
35th Floor
New York, NY 10036-2601
(212) 556-2250
jeng@kslaw.com

James P. Brogan
Brian Eutermoser
Angela C. Tarasi
Mikala Stone
KING & SPALDING LLP
1515 Wynkoop Street, Suite 800
Denver, CO 80202
(720) 535-2300
jbrogan@kslaw.com
beutermoser@kslaw.com
atarasi@kslaw.com
mikaela.stone@kslaw.com

Bobby R. Burchfield
Norman A. Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
bburchfield@kslaw.com
narmstrong@kslaw.com
cyook@kslaw.com

*/s/ Jeff Castellano*
Jeff Castellano (No. 4837)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jcastellano@shawkeller.com
*Attorneys for Plaintiffs*