IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| INGEVITY CORPORATION and | ) | |
| INGEVITY SOUTH CAROLINA, LLC, | ) | |
| | ) | C.A. No. 18-1391 (RGA) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| BASF CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT BASF CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS
MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE OPINIONS OF
INGEVITY'S DAMAGES EXPERT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
OF COUNSEL:
Wilmington, DE  19899
(302) 658-9200
Thomas J. Friel, Jr.
rsmith@mnat.com
KING & SPALDING LLP
araucci@mnat.com
601 South California Avenue, Suite 100
Palo Alto, CA  94304
(650) 422-6700
*Attorneys for Defendant BASF Corporation*

James P. Brogan
Brian Eutermoser
Kevin Lake
Angela Tarasi
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street Suite 800
Denver, CO  80202

Bobby R. Burchfield
Norman Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 200
Washington, DC  20006

Joseph D. Eng., Jr.
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY  10036-2601
(212) 556-2205

Original Filing Date: June 24, 2020
Redacted Filing Date: July 1, 2020

## Table of Contents

I.     **The '844 Patent is Indefinite Because it Fails to Inform a POSITA as to the Scope of the Claims with reasonable Certainty** ............................................................. 1

    A.    **Ingevity Misconstrues *Dow Chemical*** ....................................................... 1

    B.    **Different Methods of Measuring IAC Produce Different Results** .................... 2

         1.    **Ingevity's Technical Papers Do Not Create a Fact Dispute** ................. 2

         2.    **Ingevity Does Not Dispute that Both Dr. Guo and Intertek Obtained Different IAC Results Using Different Test Methods** .......... 2

         3.    **Ingevity Does Not Dispute that Different Methods for Analyzing Adsorption Isotherms Produce Different IAC Results** ......................... 4

II.    **The '844 Patent is Invalid for Failure to Enable OR DESCRIBE the Invention** ....... 5

    A.    **The '844 Patent Fails to Enable the Full Scope of the Claims** .......................... 5

         1.    **Ingevity Misinterprets the Law** ............................................................. 5

         2.    **Undisputed Facts Show Lack of Enablement for Adsorbent Volumes With IACs Above 80 g/L or Approaching 0 g/L** .................... 5

    B.    **The '844 Patent Fails to Provide Written Description of the Invention** .......... 7

III.   **Based On Ingevity's Prior Admissions, BASF Is Entitled to Summary Judgment of Non-Infringement** ............................................................................................................ 8

IV.   **Delphi Invented First** ............................................................................................................ 8

    A.    **The Delphi Inventors** ████████████████████████ **First** ............ 8

         1.    **Prior Invention Did Not Require Knowledge of IAC** ............................ 9

         2.    ████████████████████ **Was Not Accidental** ....................... 10

         3.    **Delphi Did Not Abandon, Suppress or Conceal Its Invention** ............ 11

         4.    **The Delphi Inventors' Knowledge of BWC Further Shows They Appreciated the Invention** ..................................................................... 11

    B.    **The Delphi Inventors Anticipated the Asserted Claims by Conceiving of** ████████████████████████████ ......................... 12

      1.      **Ingevity's New Invention Story Is Inadequate and Uncorroborated** ................................................................. 12

      2.      **Delphi's Conception and Diligence Is Corroborated and Shows Priority** ................................................................................... 13

**V.**     **The '844 Patent Is Unenforceable Due to Patent Misuse** ............................................ 14

     **A.**     **Ingevity Has Market Power Over the Tying Product** ..................................... 14

     **B.**     **Ingevity Has Tied Licenses to the Purchase of Base Carbons** ........................ 15

     **C.**     **Ingevity Has Tied Licenses to the Purchase of Carbon Honeycombs** ............ 15

          1.      **Ingevity Cannot Limit the Staple/Nonstaple Inquiry to "FVC Honeycombs"** ........................................................................ 15

          2.      **In Any Event, "FVC Honeycombs" Do Not Qualify as Nonstaple Goods** .............................................................................. 16

     **D.**     **Ingevity's Tying Is *Per Se* Misuse** ............................................................. 17

**VI.**    **The Court should exclude Vander Veen's opinions and Grant Summary Judgment of No Damages** ....................................................................................... 17

     **A.**     **Vander Veen's Opinion Is Unreliable and Should Be Excluded** ................... 17

          1.      **Vander Veen Excluded Any Harm Based on BASF's Alleged "Head Start" From His Royalty** ............................................... 17

          2.      **Vander Veen's $400,000 Royalty Is Not Tied to the Facts of the Case** ................................................................................... 18

          3.      **Vander Veen's "Increased Costs" Theory Is Unreliable and Irrelevant** ....................................................................... 19

     **B.**     **There Is No Evidence of Any Damages** ........................................................ 19

## Table of Authorities

**Cases**

*Amgen Inc. v. Hospira, Inc.*,
    944 F.3d 1327 (Fed. Cir. 2019)........................................................................18

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014)........................................................................19

*Ariad Pharms., Inc. v. Eli Lilly and Co.*,
    598 F.3d 1336 (Fed. Cir. 2010)........................................................................7, 8

*Breen v. Henshaw*,
    472 F.2d 1398 (C.C.P.A. 1973) .......................................................................10, 11

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
    40 F.3d 1223 (Fed. Cir. 1994).........................................................................12, 13

*Correge v. Murphy*,
    705 F.2d 1326 (Fed. Cir. 1983)........................................................................11

*Creative Compounds, LLC v. Starmark Labs.*,
    651 F.3d 1303 (Fed. Cir. 2011)........................................................................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).......................................................................................19

*Dawson Chem. Co. v. Rohm & Haas Co.*,
    448 U.S. 176 (1980).......................................................................................16

*Devex Corp. v. Gen. Motors Corp.*,
    667 F.2d 347 (3d Cir. 1981)............................................................................19

*Dow Chem. Co. v. Astro-Valcour, Inc.*,
    267 F.3d 1334 (Fed. Cir. 2001)........................................................................14

*Dow Chem. Co. v. Nova Chems. Corp.*,
    803 F.3d 620 (Fed. Cir. 2015)..........................................................................1, 2

*Estee Lauder Inc. v. L'Oreal, S.A.*,
    129 F.3d 588 (Fed. Cir. 1997).........................................................................8, 9

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*,
    100 F. Supp. 3d 357 (D. Del. 2015)..................................................................13

*Heard v. Burton*,
    333 F.2d 239 (C.C.P.A. 1964) .........................................................................10, 11

*Hodosh v. Block Drug Company*,
  833 F.2d 1575 (Fed. Cir. 1987)................................................................................16

*Huey v. Walgreen Co.*,
  C.A. No. 09-0209-RBK-AMD, 2010 WL 3825676 (D. Del. Sept. 23, 2010)...................4, 6, 7

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
  547 U.S. 28 (2006)........................................................................................17

*In re Kao*,
  639 F.3d 1057 (Fed. Cir. 2011)..........................................................................10

*Invitrogen Corp. v. Clontech Labs., Inc.*,
  429 F.3d 1052 (Fed. Cir. 2005)......................................................................10, 11

*McRO, Inc. v. Bandai Namco Games America*,
  959 F.3d 1091 (Fed. Cir. 2020)............................................................................5

*Morton Salt v. G.S. Suppiger Company*,
  314 U.S. 488 (1942)....................................................................................15, 16

*Mycogen Plant Sci. v. Monsanto Co.*,
  243 F.3d 1316 (Fed. Cir. 2001)........................................................................9, 12

*Princo Corp. v. ITC*,
  563 F.3d 1301 (Fed. Cir. 2009), *reinst. in relev. part after reh'g en banc*,
  616 F.3d 1318 (Fed. Cir. 2010)..........................................................................17

*Riles v. Shell Exploration and Production Co.*,
  298 F.3d 1302 (Fed. Cir. 2002)..........................................................................20

*Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*,
  264 F.3d 1344 (Fed. Cir. 2001)..........................................................................13

*Scott v. Harris*,
  550 U.S. 372 (2007)......................................................................................13

*Shelton v. Univ. of Medicine & Dentistry of N.J*,
  223 F.3d 220 (3d Cir. 2000)..............................................................................6

*Takeda Pharmaceutical Co. v. Zydus Pharmaceuticals USA, Inc.*,
  743 F.3d 1359 (Fed. Cir. 2014)............................................................................1

*Teva Pharm. Indus., Ltd v. AstraZeneca Pharms. LP*,
  661 F.3d 1378 (Fed. Cir. 2011)......................................................................9, 10, 11

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996)............................................................................10

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)......................................................................................................................14

*W.L. Gore & Assoc., Inc. v. C.R. Bard, Inc.*,
    C.A. No. 11-515-LPS, 2015 WL 12815315 (D. Del. Sept. 28, 2015)...............................1, 4, 6

**Rules and Statutes**

Fed. R. Civ. P. 32(a)(4).............................................................................................................4, 6

Fed. R. Evid. 702 .............................................................................................................................6

Fed. R. Evid. 801(d)(2)(B)-(C)........................................................................................................4

Fed. R. Evid. 804(b)(1).................................................................................................................4, 6

**Table of Exhibits**

| Exhibit No. | Description |
|---|---|
| 110 | Exhibit L to Supplemental Reply Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 111 | Exhibit M to Supplemental Reply Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 112 | Excerpts from the Reply Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 113 | Excerpts from the Expert Report of James M. Lyons Regarding the Invalidity and Unenforceability of U.S. Patent No. RE38,844 |
| 114 | Excerpts from the Deposition Transcript of James A. Ritter, Ph.D. dated September 20, 2018 |
| 115 | Bates No. NGVT0040374 |
| 116 | Bates No. NGVT0503053 |
| 117 | Excerpts from the Deposition Transcript of Robert K. Beckler dated July 31, 2019 |
| 118 | Bates No. NGVT0002941 |
| 119 | Bates No. NGVT0019284 |
| 120 | Excerpts from the Deposition Transcript of Mohan Rao dated May 9, 2020 |
| 121 | Excerpts from the Deposition Transcript of Ed Woodcock dated December 2, 2019 |
| 122 | Cal. Air Res. Bd., Final Regulation Order, "LEV III" Amendments (Mar. 22, 2012) |
| 123 | 79 Fed. Reg. 23,414 (Apr. 28, 2014) |
| 124 | Excerpts from the Deposition Transcript of Peter McCrae dated October 17, 2019 |
| 125 | Bates No. NGVT0039859 |
| 126 | Bates No. NGVT0082377 |
| 127 | Bates No. NGVT0264997 |
| 128 | Bates No. DELPHI-001702 |
| 129 | Bates No. DELPHI-001772 |
| 130 | Bates No. DELPHI-001805 |

I.    **THE '844 PATENT IS INDEFINITE BECAUSE IT FAILS TO INFORM A POSITA AS TO THE SCOPE OF THE CLAIMS WITH REASONABLE CERTAINTY**

There is no dispute that: (1) multiple methods exist to measure IAC; (2) they produce different results; and (3) the patent does not specify which method to use. Ingevity's arguments to distinguish *Dow Chemical* are flawed. Accordingly, the claims are indefinite.

A.    **Ingevity Misconstrues *Dow Chemical***

Ingevity characterizes the indefiniteness in *Dow* as the patent's failure to specify where the "slope of strain hardening" should be measured on the strain hardening line. (D.I. 309 at 2-4.) This is wrong. The Court's holding was not based on the patent's failure to specify where to "measure[] at different parts of the curved line." (D.I. 309 at 2). Rather, the Court assumed that a POSITA "would know that the slope of the strain hardening curve ***would have to be measured at its maximum value***," but still found indefiniteness, because "three methods existed to determine the maximum slope"—"all typically occur[ing] ***at the same place***—at the end of the curve where the maximum slope is located." *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620, 633 (Fed. Cir. 2015) (emphasis added). Indefiniteness resulted because: (1) at least "three methods existed to determine the maximum slope"; (2) "each of these four methods may produce different results, i.e., a different slope"; and (3) "[n]either the patent claims nor the specification here discusses the four methods or provides any guidance as to which method should be used." *Id.* at 633-34.

Ingevity's cases do not contradict *Dow*. In *W.L. Gore & Assoc., Inc. v. C.R. Bard, Inc.*, "Defendants [did] not show[] any method-driven differences in the results in this case, in contrast to *Dow*, and the specifications of the patents-in-suit provide guidance as to how to perform the measurement at issue here." C.A. No. 11-515-LPS, 2015 WL 12831300, at *4 (D. Del. Sept. 28, 2015). In *Takeda Pharmaceutical Co. v. Zydus Pharmaceuticals USA, Inc.*, there was no evidence "that different measurement techniques in fact produced significantly different results for the same

sample." 743 F.3d 1359, 1367 (Fed. Cir. 2014).  In contrast, different IAC measurement methods produce significantly different values that cannot be correlated.  (D.I. 290 at 3-6.)  *Dow* is directly analogous, and the claims are indefinite.

### B.     Different Methods of Measuring IAC Produce Different Results

#### 1.     Ingevity's Technical Papers Do Not Create a Fact Dispute

Ingevity's cited publications confirm that different "adsorption capacity" methods yield different results.  (D.I. 310-5 ("Anson") at -512-13; D.I. 310-7 ("Belmabkhout") at Abstract.)  While Anson suggests "good" agreement between volumetric and gravimetric methods for measuring hydrogen adsorption (not n-butane), the authors do not explain "good" quantitatively.  (D.I. 310-5 at -512-13.)  Figures 2-5 and Table 3 show the results can differ by more than 3% and that testing adsorption and desorption phases yields markedly different results.  (*Id.* at -511-12.)  "It is very often difficult to find good correlation between adsorption data obtained by different measurement techniques for the same material."  (*Id.* at -509, col. 1.)  Belmabkhout confirms that even with extraordinary efforts to minimize errors in nitrogen isotherms, results deviated by "3% in the whole measurement range."  (D.I. 310-7 at Abstract, -022.)  Results that differ by 3% are not "the same," and the '844 patent claims allow no variation.

Moreover, these articles were authored by persons of extraordinary skill years after filing, and do not show a POSITA's knowledge in 2001.  Dr. Rockstraw's opinion based on these articles does not create a fact dispute.  (D.I. 311-1 at ¶¶ 76-81; D.I. 311-3 at ¶¶ 24-27.)

#### 2.     Ingevity Does Not Dispute that Both ▮▮▮▮ and Intertek Obtained Different IAC Results Using Different Test Methods

Ingevity dismisses testing evidence showing different methods produce different results, arguing flawed testing procedure or equipment.  But if persons of extraordinary skill in the art could not measure IAC with reasonable certainty years after the patent was filed, how could a POSITA be expected to do so?  The unrefuted fact is that different techniques produce different IAC results.

### a.    Guo Memo



(*See* Ex. 18 at -662.)

### b.    Intertek Testing

Ingevity similarly speculates that Intertek's testing was flawed, arguing that Intertek's differing results are attributable to activation protocols used in the first round of testing, and not different methods. (D.I. 309 at 8.) But Intertek's second round of testing disproves this. In the second round, Intertek applied two sample preparation protocols and tested the samples using both McBain and ASAP 2020 methods. (Ex. 21 at ¶¶ 19-25; Ex. 110 (activation #1); Ex. 111 (activation #2).) Intertek's results confirmed substantial variation between gravimetric and volumetric methods, under either activation method, confirming both Dr. Guo's results and Intertek's first round of testing. (Ex. 21 at ¶¶ 23-25.) Ingevity's argument merely highlights another point of uncertainty, as the patent is silent about activation methods.

Ingevity and Dr. Rockstraw also dismiss Intertek's report as showing "hardly any differences" between the two methods, but only after allowing for the largest possible error due to "inherent limitations in the accuracies of volumetric instruments." (D.I. 309 at 8.) This argument is not consistent with Intertek's results showing variations of ▇▇▇ between methods. (Ex. 112 at ¶¶ 83-85.) Dr. Rockstraw's "hardly any differences" opinion contradicts the specification, which does not allow for "inherent limitations in the accuracies of volumetric instruments."

Finally, Ingevity faults Mr. Lyons for relying on a specialized testing facility rather than testing himself. (D.I. 309 at 8-9.) If testing by Intertek or persons of extraordinary skill is

unacceptable, and Ingevity's in-house experts' data are flawed, then a POSITA could not reliably determine whether an adsorbent volume falls above or below the claimed line of 35 g/L.

### 3. Ingevity Does Not Dispute that Different Methods for Analyzing Adsorption Isotherms Produce Different IAC Results

Not only do the methods of measuring the data produce different results, but also different known methods of analyzing that data to calculate IAC lead to different IAC results. (D.I. 290 at 6, 9.)  Ingevity contends that this evidence is "irrelevant because adsorption capacity can be measured directly at 5 and 50 volume%, thus negating any need to estimate it from other adsorption capacity measurements." (D.I. 309 at 10.)  But the '844 patent does not instruct a POSITA to measure IAC using this method, and does not exclude other methods.  (See Ex. 4 at ¶¶ 101-05.)  Accordingly, the undisputed evidence shows that different methods for analyzing adsorption isotherm data and determining IAC produce different IAC results.  (D.I. 290 at 6, 9.)

Ingevity cites no legal basis for disregarding Dr. Ritter and does not indicate he is unavailable to testify at trial. (D.I. 309 at 10.)  "[H]earsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."  *W.L. Gore & Assoc., Inc. v. C.R. Bard, Inc.*, C.A. No. 11-515-LPS, 2015 WL 12815315, at *n.8 (D. Del. Nov. 20, 2015) (citation omitted).  If Dr. Ritter cannot be subpoenaed, his deposition testimony will be admissible at trial.  *See* Fed. R. Civ. P. 32(a)(4); Fed. R. Evid. 804(b)(1); *Huey v. Walgreen Co.*, C.A. No. 09-0209-RBK-AMD, 2010 WL 3825676, at *n.3 (D. Del. Sept. 23, 2010).  Dr. Ritter's declaration would also be admissible as non-hearsay.  *See* Fed. R. Evid. 801(d)(2)(B)-(C).

███████████████████████████████████████████

███████████████████████████████   (D.I. 6-1 at ¶ 65.)  Ingevity fails to identify any facts showing otherwise.  Accordingly, under *Dow Chemical*, the claims are indefinite.

## II.    THE '844 PATENT IS INVALID FOR FAILURE TO ENABLE OR DESCRIBE THE INVENTION

Undisputed evidence confirms that the full scope of the claims is neither enabled nor adequately described.  Ingevity seeks to rewrite controlling case law to avoid summary judgment

### A.    The '844 Patent Fails to Enable the Full Scope of the Claims

#### 1.    Ingevity Misinterprets the Law

Ingevity argues that only the "novel aspect" of an invention must be enabled.  (D.I. 309 at 11-14.)  Ingevity misinterprets and misapplies the law (including the case law cited in its own brief), which requires that *the full scope* of the claims be enabled.  (D.I. 305 at 15-20.)  Ingevity's reliance on *McRO, Inc. v. Bandai Namco Games America* is unavailing, as *McRO* plainly supports BASF's position.  959 F.3d 1091, 1102 (Fed. Cir. 2020).  *McRO* holds that "when a range is claimed, there must be reasonable enablement of the scope of the range" and that "[t]o qualify as 'reasonable,' 'the specification … must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.'"  *Id.* at 1100 (citations omitted).  While *McRO* acknowledges that knowledge of a POSITA may be used to show enablement of conventional limitations, the full scope of the claims must still be enabled.  *Id.*

#### 2.    Undisputed Facts Show Lack of Enablement for Adsorbent Volumes With IACs Above 80 g/L or Approaching 0 g/L

Ingevity identified no evidence that a POSITA at the time the '844 patent was filed would have been able to make and use adsorbent volumes with IACs above 80 g/L or approaching 0 g/L.  (D.I. 309 at 13-14.) ███████████████████████████████████████████ ████████████████████████████████████████████████████████ (Ex. 2 at 164:25-165:8; *see also* D.I. 290 at 11-12; *see also* Ex. 2 at 162:5-163:17; Ex. 113 at ¶¶ 284-91.)

Ingevity also does not dispute that its corporate witness and inventor, █████████ ████████████████████████████████████████████████████████████

███████████. (Ex. 32 at 191:4-17, 190:10-17

██████████████████████"); Ex. 113 at ¶¶ 292-303.)

████████████████████████

███████████████ (Ex. 114 at 177:25-178:24.)  Accordingly, a POSITA

would not have been able to use an IAC approaching 0 g/L without undue experimentation.

Rather than dispute this evidence, Ingevity objects to it. (D.I. 309 at 14.)  But Ingevity

does not explain why Dr. Ritter's testimony would not qualify under Fed. R. Evid. 702.  His testimony

should be considered in determining summary judgment because it is capable of being admitted at

trial.  *See W.L. Gore*, 2015 WL 12815315, at *n.8 (citing *Shelton v. Univ. of Medicine & Dentistry of*

*N.J*, 223 F.3d 220, 223 n.2 (3d Cir. 2000)).  There is no reason why experts cannot testify at trial based

on personal knowledge, and if he could not be subpoenaed, his deposition testimony would be

admissible.  *See* Fed. R. Civ. P. 32(a)(4); Fed. R. Evid. 804(b)(1); *Huey*, 2010 WL 3825676, at *n.3.

Ingevity also objects to its EPO admissions regarding the '844 patent. (D.I. 309 at 14.)

Yet, Ingevity's statements could not be clearer:  "D1 [the '844 patent] does not disclose, broadly or

otherwise, the use of an adsorbent in the 'subsequent' canister with a BWC of less than 3 g/dL."

(D.I. 299 at -753.)  These prior admissions are admissible, and Ingevity should be held to them.

(D.I. 297 at 2-3, 6-8.)

Thus, the record evidence shows that:  (1) the '844 patent does not teach the

manufacture or use of adsorbent materials having high or low IACs; (2) ██████████████

██████████████████████; and (3) █████████

███████████████████. (D.I. 290 at 11-12.)  Accordingly, a POSITA could not have made or used the full scope of the claimed invention without undue experimentation.[1]

## B.     The '844 Patent Fails to Provide Written Description of the Invention

Ingevity cites no case to support its argument that the written description requirement does not apply to the full scope of the claimed invention.  (D.I. 309 at 11.)  In fact, Ingevity provides no support for its claim that BASF misconstrued or misapplied *Ariad*.  (*Id.*)

"Requiring a written description of the invention plays a vital role in curtailing claims that do not require undue experimentation to make and use, and thus satisfy enablement, but that have not been invented, and thus cannot be described."  *Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010).  The '844 patent does not describe adsorbents with IACs above 80 g/L and IACs approaching 0 g/L, because the inventors did not invent and were not in possession of such adsorbents.  (D.I. 290 at 11-13.) ███████████████████████████

████████████████████████████████████████ (Ex. 27 at 197:7-200:12; Ex. 1 at ¶ 288.) ██████████████████████

███████████████████ (Ex. 32 at 191:4-17.)

The exemplary adsorbent materials disclosed in the specification did not convey to a POSITA that the inventors had possession of adsorbent volumes with IACs approaching 0 g/L or adsorbent volumes with IACs above 80 g/L.  As in *Ariad*, the claims of the '844 patent "cover any [adsorbent volume] later actually invented and determined to fall within the claim's functional boundaries—leaving it to the [] industry to complete an unfinished invention."  *Ariad*, 598 F.3d at 1353.  It is undisputed that the specification fails to disclose adsorbent volumes with IACs above

---

[1]     Ingevity's conclusory statement that BASF fails to address the question of whether a POSITA would be able to practice the claims without undue experimentation is wrong.  (*See* D.I. 290 at 13-14 (analyzing facts that show adsorbent volumes with very high or very low IACs were not within a POSITA's capability and could not have been made "without undue experimentation").)

80 g/L or IACs approaching 0 g/L, or convey to a POSITA that the inventors had possession of such adsorbent volumes.  The patent lacks written description.  (*See id.* at 1355.)

Ingevity argues that the specification's description of volumetric dilution "teaches that additional subsequent adsorbent volumes can be made using volumetric dilution." (D.I. 309 at 12.) However, this is insufficient to meet the written description requirement under *Ariad,* 598 F.3d at 1352-53.  Even if the specification rendered obvious the use of adsorbents with IAC values approaching zero, which it does not, "[a] description which renders obvious a claimed invention is not sufficient to satisfy the written description requirement of that invention."  *Id.* at 1356.

## III.   BASED ON INGEVITY'S PRIOR ADMISSIONS, BASF IS ENTITLED TO SUMMARY JUDGMENT OF NON-INFRINGEMENT

Ingevity does not dispute that, to the extent the claims are construed to preserve validity (*i.e.*, to exclude adsorbent volumes that Ingevity has admitted are not taught by the '844 patent), BASF does not infringe.  (D.I. 309 at 14.)  Accordingly, should the claims be narrowed based on Ingevity's own prior admissions, BASF's motion for summary judgment of non-infringement should be granted. (D.I. 290 at 14-15.)

## IV.   DELPHI INVENTED FIRST

Ingevity raises no genuine fact issue and confirms that the sole dispute is a legal one: Did Delphi sufficiently appreciate its invention to establish it was first to (1) reduce to practice via the ▮▮▮▮▮▮, or (2) conceive and diligently reduce to practice.  *See Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 592 (Fed. Cir. 1997).  The answer to both is yes.

### A.   The Delphi Inventors Reduced ▮▮▮▮▮▮ to Practice First

Ingevity does not and cannot contest the facts evidencing the Delphi Inventors'



. (D.I. 309 at 15-22.)

████████████████████████ (D.I. 290 at 16-22.) ████████████████████

████████████████████████████████████████ (*Id.*)

   To demonstrate actual reduction to practice, a prior inventor must have (1) constructed an embodiment or performed a process meeting all claim limitations, and (2) determined that the invention would work for its intended purpose. *See Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1332 (Fed. Cir. 2001). The prior inventor need not recognize or describe the invention in the same terms as the patentee. *Id.*

### 1. Prior Invention Did Not Require Knowledge of IAC

The Delphi Inventors ████████████████████████████████████

████████████████████████████████. Reduction to practice does not require that the prior inventor "know everything about how or why" the invention worked. *Teva Pharm. Indus., Ltd v. AstraZeneca Pharms. LP*, 661 F.3d 1378, 1384-85 (Fed. Cir. 2011).

   Ingevity argues that *AstraZeneca* is distinguishable because claim construction in that case read out a key limitation. But the outcome did not hinge on claim construction. The Federal Circuit specifically held "[Plaintiff's] 'claim construction' argument [was] … without merit." *AstraZeneca*, 661 F.3d at 1385. The limitation at issue required a "stabilizing effective amount" of crospovidone and was not read out of the claim. *Id.* at 1384-85. In finding the claims anticipated, the Federal Circuit held that the prior inventors were not required to understand why the resulting composition was stable to show reduction to practice; it was sufficient that the prior inventors understood the components of the compound and that it was stable. *Id.* at 1382-85.

████████████████████████████████████████████

██████████████████ (D.I. 290 at 16-22.) Thus, they reduced the invention to practice. *See AstraZeneca*, 661 F.3d at 1385. Contrary to Ingevity's argument, the Delphi Inventors were not required to know that the subsequent adsorbent had an IAC less than 35 g/L. ████████████████

9

████████████████████████████████████████████████████, the Delphi

Inventors "did not need to appreciate which component was responsible for" reduced bleed emissions.

*See id.* at 1384-85.  Appreciation of the adsorptive metric IAC, as opposed to the overall reduction of

bleed emissions, was not required.  *See id.*; *see also* '844 patent, claim 1.[2]

## 2.    Invention of the Delphi Scrubber Was Not Accidental

While Ingevity cites accidental invention cases—*Invitrogen*,[3] *Heard*,[4] and *Breen*[5]—to

argue the Delphi Inventors were required to know the IAC of the ███████████, each is inapposite.

The alleged invention is not "IAC," but a system using multiple adsorbents with particular adsorptive

properties (specified IAC values) to reduce bleed emissions.  IAC was, at best, a new way of

describing a preexisting physical property of prior art adsorbents.  *See, e.g.*, '844 patent at 7:26-54

(carbon honeycomb with IAC of 16 g/L was prepared according to prior art method known in 1996);

*see also In re Kao*, 639 F.3d 1057, 1066 (Fed. Cir. 2011) ("The claimed subject matter is not presumed

to change as a function of how one elects to measure it.").  At worst, IAC was coined to describe a

preexisting physical property with a new term to avoid prior art.

███████████████████████████████████████████████████

████████████████ (Ex. 38 at -2119-20.)  They did not simply perform a prior art process like

the prior inventor in *Heard* or experiment generally in the same field like the prior inventor in

*Invitrogen*.  *See Heard*, 333 F.2d at 242; *Invitrogen*, 429 F.3d at 1066. T███████████████████████

████████████████████████████████████████████  This is unlike the prior inventors of

---

[2] ███████████████████████████████████████████████████████████████████████████████████████████████████
(D.I. 290 at 24; Ex. 48 at 141-45.)  The ITC's decision is persuasive.  *See Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996).

[3]    *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1074 (Fed. Cir. 2005).

[4]    *Heard v. Burton*, 333 F.2d 239, 243 (C.C.P.A. 1964).

[5]    *Breen v. Henshaw*, 472 F.2d 1398, 1401 (C.C.P.A. 1973).

*Invitrogen*, *Heard*, or *Breen*, who never confirmed the inventions worked for the intended purpose. *See Invitrogen*, 429 F.3d at 1066; *Heard*, 333 F.2d at 243; *Breen*, 472 F.2d at 1402.

### 3.    Delphi Did Not Abandon, Suppress or Conceal Its Invention



. This makes no sense, as the term did not exist.

. (*E.g.* D.I. 290 at 18; Exs. 41-42 (Delphi application and patent); Ex. 7 at 77:17-79:25 (                                        ).)  That is more than sufficient. *See Correge v. Murphy*, 705 F.2d 1326, 1330 (Fed. Cir. 1983).

### 4.    The Delphi Inventors' Knowledge of BWC Further Shows They Appreciated the Invention

As discussed above, the Delphi Inventors were not required to know which component(s) of the [REDACTED] reduced bleed emissions. *See AstraZeneca*, 661 F.3d at 1384-85. Even so, the Delphi Inventors appreciated the adsorptive properties of the Westvaco honeycombs at least because they knew the butane working capacity ("BWC") of the honeycombs.



First,

(Ex. 37 at -3072-73, -3085-86.)

(Ex. 37 at -3086),

(*Id.* at -3072).  While

testified that the honeycomb samples

(D.I. 310-17 at Q53.)

(Ex. 127 at -264997; Ex. 128, Ex. 129 at -1785; Ex. 130; *see also* Ex. 115 at -40639



███████████████████████████████████████████████████████.)

A███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████ (Ex. 115 (setting ███████████████████████

████████████ ).)

**B.**   **The Delphi Inventors Anticipated the Asserted Claims by Conceiving of the ████████████ and Diligently Reducing It to Practice**

Delphi's reduction to practice anticipates the asserted claims, so the Court need not

reach the question of whether ██████ conceived first.  *See Mycogen*, 243 F.3d at 1332 (prior invention

is shown by *either* first to reduce to practice *or* first to conceive and exercise diligence).  Nonetheless,

because Ingevity failed to adduce evidence that Westvaco conceived before ██████ and has no

evidence of diligence, summary judgment is also appropriate because the Delphi Inventors conceived

and reduced to practice first.

**1.**   **Ingevity's New Invention Story Is Inadequate and Uncorroborated**

██████████████████████████████████████████████████████

██████ (D.I. 309 at 16-17.)  But ████████████████████ does not evidence any "definite and

permanent idea," much less diligent reduction to practice.  *See Burroughs Wellcome Co. v. Barr*

*Labs., Inc.*, 40 F.3d 1223, 1228-29 (Fed. Cir. 1994).  Moreover, it is completely uncorroborated.

No evidence shows that ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████ (D.I. 310-13.) ████████████████████████████████████

Ingevity's contention that ██████████████████████████████

██████████████████████████████████████████████████████

███████████████████████ (Ex. 116 at 503061-62; Ex. 117 at 37:6-12.)

Critically, ████████████████████████████. *See Burroughs*,

40 F.3d at 1229. █████████████████████████

██████████████████████████████████

████████████ (Ex. 118 at -2952.) ████████████████████

██████████████████ Speculative musings do not create a fact issue. *See Creative*

*Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1312-13 (Fed. Cir. 2011) (email about

speculative viability of invention did not create genuine fact issue).

████████████████ is insufficient to establish conception and diligence. *See*

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, 100 F. Supp. 3d 357, 368 (D. Del. 2015)

(interested party testimony regarding conception must be corroborated). And his testimony is

contrary to ████████████████████████.

(*E.g.*, Ex. 27 at 42:5-19 (████████████████████); Ex. 44

(████████████████); *see also* Ex. 119 ██████████████

██████████████████████████).) While ***no***

Ingevity documents show that ████████████████████

██████████████████████████████████

████████████████. (*E.g.* Ex. 37 at -072-073, -083-086.) Because

Ingevity's alleged conception is unsupported and, in fact, contradicted by the record, Ingevity's

attempt to create an issue of fact should be rejected. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

### 2.    Delphi's Conception and Diligence Is Corroborated and Shows Priority

Ingevity's remaining arguments that ████████ testimony lacks sufficient corroboration

and reference to "IAC" both fail. ***First***, ████████████████████████

████████████████████████. *See Sandt Tech., Ltd. v. Resco*

*Metal and Plastics Corp.*, 264 F.3d 1344, 1351-53 (Fed. Cir. 2001) (███████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████); (D.I. 290 at 15-18, 22-24).  ***Second***, whether Delphi Inventors used the later-coined term

"IAC" is irrelevant to whether they appreciated the invention.  *Supra*, Section IV.A.1, A.4; *see Dow*

*Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 (Fed. Cir. 2001).

## V.    THE '844 PATENT IS UNENFORCEABLE DUE TO PATENT MISUSE

BASF is entitled to summary judgment on its patent misuse defense.  It is undisputed

that Ingevity leveraged the market power provided by the '844 patent to compel licensees to buy

unpatented carbon adsorbents—both base carbons and carbon honeycombs—exclusively from

Ingevity.  Ingevity argues that it recently stopped its misconduct involving base carbons to avoid a

misuse charge and asserts that it can require that customers purchase carbon honeycombs because they

are nonstaple goods.  Its arguments fail as a matter of law and undisputed fact.

### A.    Ingevity Has Market Power Over the Tying Product

There is no genuine dispute that Ingevity, through the '844 patent, has market power in

the market for technologies to satisfy LEV III / Tier 3 emission regulations (the tying market).  (*See*

D.I. 290 at 25.)  Ingevity does not deny this fact, nor could it credibly do so.  As Ingevity and its expert

agree, the '844 patent is ███████████████████████████████████, which has

allowed Ingevity to capture a ███████ share of the market.  (D.I. 6 at 6 (emphasis in original); *see*

D.I. 290 at 25; Ex. 120 at 34:22-35:19; Ex. 121 at 37:5-10; Ex. 104 at ¶¶ 61-62.)  Such market share

"leaves no doubt" of market power.  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

Ingevity now protests that the LEV III / Tier 3 standards did not take effect until 2017-2018.  (D.I. 309

at 30).  But California's LEV III standards were adopted in 2012 and phased in starting in 2015, while

the EPA's Tier 3 standards were adopted in 2014 and phased in starting in 2017.  (*See* Ex. 122;

Ex. 123; *see also* Ex. 104 at ¶ 16.)  As confirmed by Ingevity's own documents, ████████████

███████████████████████████████████████████

(*See* Ex. 124 at 74:17-75:1; Ex. 125 at -39894; Ex. 126 at -82384.)  Ingevity has thus had market

power for many years, more than long enough to have committed patent misuse.

### B.    Ingevity Has Tied Licenses to the Purchase of Base Carbons

There is no genuine dispute that for many years Ingevity tied licenses to the purchase of

unpatented base carbons, which Ingevity does not even argue are a staple good.  (*See* D.I. 290 at 25,

29; D.I. 305 at 2-3.)  Contrary to Ingevity's suggestion, BASF raised this theory repeatedly during

discovery.  (*See* D.I. 305 at 5-6.)  Ingevity thus bears the burden of proving that its misuse involving

base carbons "has been purged" (D.I. 309 at 29), which requires evidence that the misconduct has

completely stopped and its consequences dispelled.  No reasonable jury could find that Ingevity has

met that burden based on vague testimony from a single executive about a supposed policy change in

late 2018 or early 2019 that █████████████████████████████████████

███████████████████████████████████████.  (D.I. 305 at 3-5.)  Ingevity has failed

to produce probative evidence of "purging," and the record supports summary judgment for BASF on

patent misuse.

### C.    Ingevity Has Tied Licenses to the Purchase of Carbon Honeycombs

It is also undisputed that, even today, Ingevity ties licenses to the purchase of

unpatented carbon honeycombs.  (*See* D.I. 290 at 27-29; D.I. 305 at 6.)  Ingevity's only defense is to

claim that Ingevity's "FVC Honeycombs"—a term Ingevity coined for the first time in its summary

judgment motion to refer to honeycombs manufactured with specific physical dimensions—are a

nonstaple good.  (D.I. 309 at 25.)  As BASF has explained, that claim fails for several reasons.

#### 1.    Ingevity Cannot Limit the Staple/Nonstaple Inquiry to "FVC Honeycombs"

Ingevity has no answer to *Morton Salt v. G.S. Suppiger Company*, which makes clear

that Ingevity cannot convert carbon honeycombs, which have numerous noninfringing uses (D.I. 290

15

at 26, 28), into a nonstaple good simply by giving them a "particular configuration rendering them capable of convenient use in" its patented method. 314 U.S. 488, 490 (1942). Although *Morton Salt* would trump any contrary lower court decision, there is no tension between it and *Hodosh v. Block Drug Company*, 833 F.2d 1575 (Fed. Cir. 1987). *Hodosh* held that the proper subject of the staple/nonstaple inquiry was toothpaste rather than potassium nitrate, "a mere ingredient" in the toothpaste that neither party sold. *Id.* at 1578, 1580. But carbon honeycombs are not an "ingredient" in "FVC Honeycombs"—like the toothpaste in *Hodosh*, they are the product at issue. *Hodosh* does not suggest that Ingevity can change its carbon honeycombs from a staple to a nonstaple by slightly altering their size and dimensions.

2.      **In Any Event, "FVC Honeycombs" Do Not Qualify as Nonstaple Goods**

Ingevity agrees that to qualify as nonstaple, "FVC Honeycombs" must be both (1) "capable only of infringing use in [the] patented invention," and (2) "essential to that invention's advance over prior art." (D.I. 293 at 7 (quoting *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980)).) With respect to the first element, Ingevity's own records show ██████████ ██████████████████████████████████████████. (D.I. 305 at 8.) With respect to the second element, there is no dispute that a carbon honeycomb is not needed to practice the '844 patent, and Ingevity contends that the patent's claimed advance over prior art was not a new type of honeycomb but a new way of ***combining*** adsorbents (which might or might not include honeycombs) that were already well known in the art. (D.I. 290 at 26-27, 28-29; D.I. 305 at 9.)[6]

---

[6]      In a one-sentence footnote, Ingevity asks the Court to ignore this supposedly "new" argument. (D.I. 309 at 28 n.2). But Ingevity fails to identify any interrogatory it served that would have required BASF to present this argument, and also ignores that BASF raised this argument in response to Ingevity's motion to dismiss. (D.I. 174 at 6-7.) Trying a different tack, Ingevity—after insisting that the staple/nonstaple inquiry should be confined to its "FVC Honeycombs"—argues that it can satisfy *Dawson*'s second element by focusing ***not*** on those specific honeycombs, which

16

**D.     Ingevity's Tying Is *Per Se* Misuse**

Contrary to Ingevity's claim (D.I. 309 at 31), *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006), did not "reject[] the per se framework for tying cases." That case simply held that, because Congress eliminated the "presumption of market power in a patented product," the presumption of market power could not survive in antitrust cases. *Id.* at 31. In this case, undisputed evidence shows that Ingevity has power in the market for technologies to meet LEV III / Tier 3 bleed emissions standards. The Federal Circuit has long held, including in cases after *Illinois Tool Works*, that a patentee with market power who ties licenses to the purchase of an unpatented staple good commits "per se misuse." *Princo Corp. v. ITC*, 563 F.3d 1301, 1307 (Fed. Cir. 2009), *reinst. in relev. part after reh'g en banc*, 616 F.3d 1318, 1326 n.1 (Fed. Cir. 2010).

## VI.     THE COURT SHOULD EXCLUDE VANDER VEEN'S OPINIONS AND GRANT SUMMARY JUDGMENT OF NO DAMAGES

There is no evidence that Ingevity has been harmed and thus no evidence to support even a nominal royalty. Ingevity repeatedly asserted that any harm is prospective and unquantifiable. Dr. Vander Veen ***expressly excludes*** the only harm Ingevity identifies as caused by the alleged infringement—a supposed "head start." To avoid a no-damages case, Ingevity's expert resorts to a flawed hypothetical negotiation that is improperly based on ███████████████████████ ███████████████████████████████████████████████████████████████████. His opinion is untethered to the facts, defies common sense, and is unreliable.

**A.     Dr. Vander Veen's Opinion Is Unreliable and Should Be Excluded**

**1.     Dr. Vander Veen Excluded Any Harm Based on BASF's Alleged "Head Start" From His Royalty**

---

everyone agrees are not necessary to practice the '844 patent, but on ***all*** "subsequent adsorbent volumes having an IAC less than 35." (D.I. 309 at 29.) Ingevity cannot have it both ways.

The only harm Ingevity identified is BASF's alleged "head start" in entering the market.  (D.I. 309 at 31-32.)  But Dr. Vander Veen excludes any "head start" from his analysis:



(Ex. 75 at ¶ 92 (emphasis added); *see also id.* at ¶61.)

(*Id.* at ¶¶ 33-36.)

(*Id.* at ¶ 36 (emphasis added).)  His "head start" royalty opinion should be excluded on that basis alone.[7]

### 2.    Vander Veen's $400,000 Royalty Is Not Tied to the Facts of the Case

Basing reasonable royalty on generic cost-of-litigation data is unreliable and inconsistent with the assumption that the asserted patent is valid and infringed.  No authority permits use of such data as a royalty amount.  Dr. Vander Veen's reliance on avoided litigation costs also defies common sense.  If one side's avoided litigation costs are relevant, so also are the other side's, such that cost savings wash out.  And of course, arguing about litigation costs (estimated or actual) at trial would be a prejudicial free-for-all, with lawyer testimony and legal bills suddenly relevant.

Even if litigation costs were relevant to the hypothetical negotiation, no evidence in this case supports the $400,000 Dr. Vander Veen pulled from an AIPLA publication.  Whether $400,000 is a starting point (Ex. 75 at ¶ 62) or an "available data point" (D.I. 309 at 36-37), the number is

---

[7]    Ingevity's reliance on *Amgen* (D.I. 309 at 32) is misplaced.  Unlike Dr. Vander Veen, Amgen's expert calculated a detailed lump-sum royalty based on the profit the defendant could have earned because of its accelerated market entry.  *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1341 (Fed. Cir. 2019).  Dr. Vander Veen did the opposite, expressly excluding "head start."

untethered to the facts of this case and is therefore unreliable.  *See, e.g.*, *Uniloc*, 632 F.3d at 1317 (excluding starting point based on generic 25% rule); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1324 (Fed. Cir. 2014) (affirming exclusion of expert as inherently unreliable because expert failed to tie generic rate for standard-essential patents to patents-in-suit's technological contribution). Moreover, Dr. Vander Veen's narrow license fails to presume Ingevity would willingly license the patent for all past acts of infringement, and therefore would not resolve all of Ingevity's claims.  The hypothetical negotiation require that the parties negotiate a license—not litigate past damages.

### 3.  Dr. Vander Veen's "Increased Costs" Theory Is Unreliable and Irrelevant

Dr. Vander Veen's opinion that "



" (Ex. 75 at ¶ 28) is pure speculation, unsupported *ipse dixit*, and defies common sense.  He fails to explain why

. In any event, Dr. Vander Veen abandons the              number for an alleged $400,000 litigation cost to calculate damages. Accordingly, the former is irrelevant to his opinion and should be excluded for this additional reason. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92 (1993).

### B.  There Is No Evidence of Any Damages

Ingevity is not entitled to damages because the record lacks any reliable evidence as to what a reasonable royalty would be for the allegedly infringing tests, rendering summary judgment of no damages appropriate.  *See Devex Corp. v. Gen. Motors Corp.*, 667 F.2d 347, 361 (3d Cir. 1981) ("In the absence of any evidence as to what would constitute a reasonable royalty in a given case, a fact finder would have no means of arriving at a reasonable royalty….").

**Ingevity's interrogatory response** identified only *potential* harms if sales occur. (Ex. 76 at 66; *see also* D.I. 290 at 33.)  Since BASF made no sales, there are no lost profit damages.

Ingevity disclosed no damages calculation or evidence of harm from the alleged infringement, and the only document cited in the response is an Excel file showing Ingevity's honeycomb sales. (*Id.*) There is also no discussion of a reasonable royalty or the *Georgia-Pacific* factors.



. (Ex. 121 at 282:4-20.)

(*Id.* at 278:5-279:11.) As we now know, Dr. Vander Veen did not.

**Ingevity's agreements** with ██████████████ were not identified in Ingevity's interrogatory responses and should be excluded for that reason alone. Moreover, Ingevity does not explain how the jury could use these agreements to calculate or award damages.

(D.I. 37 at ¶¶31, 34-37.)

**BASF testimony** ██████████████████████████████

████████ does not quantify any such benefit. *See Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1311-13 (Fed. Cir. 2002) (reasonable royalty must be supported by concrete economics and evidence). Ingevity also failed to disclose this testimony in its interrogatory responses.

Ingevity cites *Acumed* and *Honeywell* for the proposition that a plaintiff can obtain both a permanent injunction against future infringement and damages for past infringement. But the issue here is Ingevity has not produced evidence of past damages. Royalties are not required when the evidence does not support such an award. Ingevity consistently claims that damages cannot be quantified. (Ex. 76.) It should be held to its contentions. Simply put, Ingevity has presented no evidence of damages, and its claim for damages should be struck.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
araucci@mnat.com

*Attorneys for Defendant BASF Corporation*

OF COUNSEL:

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South California Avenue, Suite 100
Palo Alto, CA  94304
(650) 422-6700

James P. Brogan
Brian Eutermoser
Kevin Lake
Angela Tarasi
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street Suite 800
Denver, CO  80202

Bobby R. Burchfield
Norman Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 200
Washington, DC  20006

Joseph D. Eng., Jr.
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY  10036-2601
(212) 556-2205

June 24, 2020