IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGEVITY CORPORATION and | ) | |
| INGEVITY SOUTH CAROLINA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 18-1391 (RGA) |
| | ) | |
| v. | ) | **FILED UNDER SEAL** |
| | ) | |
| BASF CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## PROPOSED FINAL JURY INSTRUCTIONS

Pursuant to D. Del. L.R. 51.1(a) and the Court's Order (D.I. 428), the parties submit the attached Joint Proposed Final Jury Instructions. Where there is disagreement, separate proposed instructions are provided. These instructions are also being submitted via email to the Court in Word format.

SHAW KELLER LLP

/s/ Nathan Hoeschen
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan Hoeschen (No. 6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Anthony D. Raucci
Rodger D. Smith II (No. 3778)
Anthony D. Raucci (No. 5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

OF COUNSEL:

Jeffrey T. Thomas
Rod J. Stone
Taylor W. King
Nathaniel R. Scharn
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Dr.
Irvine, CA 92612-4412
(949) 451-3800
Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500

Stuart M. Rosenberg
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
(650) 849-5389

Rustin K. Mangum
Spencer W. Ririe
MANGUM RIRIE LLP
999 Corporate Dr. #260
Ladera Ranch, CA 92694
(949) 298-5590

*Attorneys for Ingevity Corporation and
Ingevity South Carolina, LLC*

August 5, 2021

OF COUNSEL:

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 California Street, Suite 100
Palo Alto, CA 94304
(650) 422-6741

James P. Brogan
Brian Eutermoser
Angela C. Tarasi
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street, Suite 800
Denver, CO 80202
(720) 535-2300

Norman Armstrong, Jr.
Paul Alessio Mezzina
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 737-0500

Joseph D. Eng, Jr.
Emily T. Chen
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100

*Attorneys for BASF Corporation*

## TABLE OF CONTENTS

**Page**

1.    GENERAL INSTRUCTION ................................................................................1

    1.1    INTRODUCTION ...............................................................................1

    1.2    JURORS' DUTIES ..............................................................................2

    1.3    BURDENS OF PROOF [DISPUTED] ................................................2

    1.4    EVIDENCE DEFINED .......................................................................3

    1.5    CONSIDERATION OF EVIDENCE ...................................................4

    1.6    DIRECT AND CIRCUMSTANTIAL EVIDENCE ..............................5

    1.7    STATEMENTS OF COUNSEL ...........................................................6

    1.8    CREDIBILITY OF WITNESSES ........................................................6

    1.9    NUMBER OF WITNESSES ................................................................7

    1.10    EXPERT WITNESSES .......................................................................8

    1.11    LAY OPINION TESTIMONY ............................................................8

    1.12    DEPOSITIONS AS SUBSTANTIVE EVIDENCE ..............................9

    1.13    RULE 30(B)(6) DEPOSITION TESTIMONY ...................................10

    1.14    DEMONSTRATIVE EXHIBITS ......................................................10

    1.15    USE OF NOTES ...............................................................................10

2.    THE PARTIES AND THEIR CONTENTIONS ...........................................11

    2.1    THE PARTIES ..................................................................................11

    2.2    SUMMARY OF CONTENTIONS [DISPUTED] ...............................11

3.    ANTITRUST AND PATENT LAW ...............................................................12

    3.1    THE PURPOSE OF THE ANTITRUST LAWS ................................12

    3.2    THE PURPOSE OF THE PATENT LAWS [DISPUTED] .................13

4.    COMMON ELEMENTS – OVERVIEW .......................................................14

# TABLE OF CONTENTS
(continued)

**Page**

4.1    COMMON ELEMENT – PATENT ENFORCEMENT AND PETITIONING ACTIVITY [DISPUTED]....................................................15

4.2    COMMON ELEMENT – PATENTEE'S RIGHT TO CONTROL THE MARKET FOR NON-STAPLE GOODS [DISPUTED] ......................................16

4.3    COMMON ELEMENT – RELEVANT MARKET IN GENERAL.....................19

4.4    COMMON ELEMENT – RELEVANT PRODUCT MARKET [DISPUTED]..............................................................................................19

4.5    COMMON ELEMENT – RELEVANT GEOGRAPHIC MARKET..................21

4.6    COMMON ELEMENT – MARKET POWER [DISPUTED]..............................21

4.7    COMMON ELEMENT – RULE OF REASON [DISPUTED]...........................23

4.8    COMMON ELEMENT – RULE OF REASON – PROOF OF SUBSTANTIAL COMPETITIVE HARM..............................................24

4.9    COMMON ELEMENT – RULE OF REASON – EVIDENCE OF COMPETITIVE BENEFITS ..............................................................25

4.10   COMMON ELEMENT – RULE OF REASON – BALANCING THE COMPETITIVE EFFECTS ..............................................................25

5.    ANTITRUST CLAIMS – OVERVIEW ....................................................26

5.1    SHERMAN ACT SECTION 1 – UNREASONABLE RESTRAINT OF TRADE – ELEMENTS [DISPUTED] ....................................................26

5.2    SHERMAN ACT SECTION 2 – MONOPOLIZATION – ELEMENTS [DISPUTED]..............................................................................................29

     5.2.1    SHERMAN ACT SECTION 2 – MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER ..................................31

     5.2.2    SHERMAN ACT SECTION 2 – MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER ..............................................................33

5.3    CLAYTON ACT SECTION 3 CLAIM – ELEMENTS [DISPUTED]................35

     5.3.1    CLAYTON ACT SECTION 3 CLAIM – SUBSTANTIAL LESSENING OF COMPETITION..............................................37

5.4    TYING – ELEMENTS [DISPUTED] ....................................................39

# TABLE OF CONTENTS
### (continued)

**Page**

      5.4.1   TYING – PRESENCE OF TWO PRODUCTS [DISPUTED] .................42

      5.4.2   TYING – PROOF OF CONDITIONING [DISPUTED] ..........................45

5.5   TYING – EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT [DISPUTED] ...................................................46

      5.5.1   TYING – FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT [DISPUTED] ..................................................................................48

5.6   TYING – INTEREST OF DEFENDANT IN MARKET FOR TIED PRODUCT [DISPUTED] ......................................................................49

5.7   EXCLUSIVE DEALING – ELEMENTS ................................................49

5.8   EXCLUSIVE DEALING – PROOF OF SUBSTANTIAL COMPETITIVE HARM UNDER RULE OF REASON [DISPUTED] ...........................53

5.9   EXCLUSIVE DEALING – FORECLOSURE [DISPUTED] ...............55

6.   ANTITRUST INJURY AND CAUSATION ........................................57

6.1   ANTITRUST INJURY AND CAUSATION – ELEMENTS [DISPUTED] ........58

6.2   DEFINITION OF BUSINESS OR PROPERTY ..................................59

7.   COMPENSATORY DAMAGES ..........................................................60

7.1   COMPENSATORY DAMAGES – ANTITRUST ...............................60

      7.1.1   COMPENSATORY DAMAGES – ANTITRUST– PURPOSE ..............60

      7.1.2   COMPENSATORY DAMAGES – ANTITRUST – CALCULATION ................................................................................61

      7.1.3   COMPENSATORY DAMAGES – ANTITRUST – CAUSATION AND DISAGGREGATION [DISPUTED] ................................62

      7.1.4   COMPENSATORY DAMAGES – ANTITRUST – LOST PROFITS ......................................................................................64

8.   INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS   [DISPUTED] ......................................................65

8.1   INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS – "WRONGFUL MEANS" [DISPUTED] ...........................67

**TABLE OF CONTENTS**
(continued)

**Page**

8.2 COMPENSATORY DAMAGES – INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS ......................................67

9. PUNITIVE DAMAGES ................................................................................68

9.1 PUNITIVE DAMAGES – GENERALLY [DISPUTED] ....................................68

9.2 PUNITIVE DAMAGES – CALCULATION [DISPUTED] ...............................71

10. DELIBERATION AND VERDICT ..................................................................72

10.1 DELIBERATION AND VERDICT – INTRODUCTION ...................................72

10.2 UNANIMOUS VERDICT ..........................................................................73

10.3 DUTY TO DELIBERATE ..........................................................................74

10.4 SOCIAL MEDIA ....................................................................................75

10.5 COURT HAS NO OPINION ......................................................................75

## 1.      GENERAL INSTRUCTION[1]

## 1.1      INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case.  Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.  In following my instructions, you must follow all of them and not single out some and ignore others.  They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the questions that you must answer to decide this case.

### Source

Final Jury Instruction 1.1, *Alarm.com, Inc. v. Securenet Techs.*, LLC, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 1, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

---

[1] The parties reserve the right to object to, revise, amend, supplement, or modify jury instructions based upon any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence or other developments in the case, including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions (including the pending cross-motions for summary judgment (D.I. 441, 444, 455, 456, 468, and 470)), and similar developments.  Further, because BASF served a revised version of these Proposed Final Jury Instructions several hours before the filing deadline, and Ingevity has not had the opportunity to review BASF's revisions in detail, Ingevity reserves the right to propose further modifications. BASF responds that the revisions it served on August 5 largely consisted of accepting Ingevity's proposed changes, that Ingevity also served substantive revisions on August 4 and 5, and that BASF reserves the right to propose further modifications in response to those revisions.

**1.2     JURORS' DUTIES**

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on any given issue.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly.  Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

**Source**

Final Jury Instruction 1.2, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 2, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 2, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

**1.3     BURDENS OF PROOF [DISPUTED]**

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof."  This is a civil case in which BASF Corporation (whom I will refer to as "BASF" or "Plaintiff") claims that Ingevity Corporation and Ingevity South Carolina, LLC (whom I will refer to as "Ingevity" or "Defendants") violated the antitrust laws of the United States and tortiously interfered with BASF's prospective business relations in violation of Delaware law. Those of you who are familiar with criminal cases will have heard the term "proof beyond a

reasonable doubt." That burden does not apply in a civil case and you should, therefore, put it out of your mind in considering whether or not either party has met its burden of proof. In this antitrust case, the burden of proof is called "preponderance of the evidence."

BASF has the burden of proving its claims and the amount of monetary damages, if any, by what is called a preponderance of the evidence. That means BASF has to provide evidence which, when considered in light of all the facts, leads you to believe that what BASF alleges is more likely true than not. To put it differently, if you were to put BASF's and Ingevity's evidence on the opposite sides of a scale, the evidence supporting BASF's claims would have to make the scales tip slightly on BASF's side. If the evidence is evenly balanced, the party has not proven the element by a preponderance of the evidence, and you must find against that party. If BASF fails to meet this burden, your verdict must be for Ingevity. **[BASF's Proposal: If BASF tips the scale slightly in its favor and carries its burden, your verdict must be for BASF.]**

### Source

Final Jury Instruction 3, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction I.K, *AgroFresh Inc. v. Essentiv LLC et al.*, C.A. No. 1:16-cv-00662-MN (D. Del. Oct. 11, 2019).

## 1.4    EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, deposition testimony that was presented to you, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and any other evidence that I have judicially noticed.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts.  Their questions and objections are not evidence.  My legal rulings are not evidence.  My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked.  I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see.  And sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record.  You must completely ignore all of these things.  Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

If I have instructed you that I admitted certain testimony and certain exhibits for a limited purpose, you may consider such evidence only for the specific limited purposes for which it was admitted.  When I give instructions regarding that limited purpose, you must follow it.

You must not seek out or rely upon any materials other than those you receive here in court.  In particular, you must not conduct internet searches or otherwise attempt to find information about the case or the parties other than what you are given in court.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

**Source**

Final Jury Instruction 1.4, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 4, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 1.5    CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence.  Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe

it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

**Source**

Final Jury Instruction 1.5, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 6, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 8, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

## 1.6    DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two kinds of evidence: direct evidence and circumstantial evidence.  Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  For example, if a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is indirect proof of a fact, *i.e.*, proof of facts from which you may infer or conclude that other facts exist.  For example, if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

The law makes no distinction between the weight that you should give to either direct or circumstantial evidence, but simply requires that you find facts from all the evidence in the case.

You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

**Source**

Final Jury Instruction 1.6, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 7, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 9, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

**1.7    STATEMENTS OF COUNSEL**

A further word about statements and arguments of counsel: The attorneys' statements and arguments are not evidence.  Instead, their statements and arguments are intended to help you review the evidence presented.  If you remember the evidence differently from the attorneys, you should rely on your own recollection.

The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law.  An attorney may argue all reasonable conclusions from evidence in the record.  It is not proper, however, for an attorney to state an opinion as to the truth or falsity of any testimony or evidence.  What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence that an attorney has offered during opening or closing statements, or at any other time during the course of the trial.

**Source**

Final Jury Instruction 8, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**1.8    CREDIBILITY OF WITNESSES**

You are the sole judges of each witness's credibility.  You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all.  But if you cannot do this, then it is your

duty and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he or she gave at the trial.  You have the right to distrust such witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.  If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

This instruction applies to all witnesses, including expert witnesses.

**<u>Source</u>**

Final Jury Instruction 1.7, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 9, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 10, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

## 1.9   NUMBER OF WITNESSES

One more point about the witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.  Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

**<u>Source</u>**

Final Jury Instruction 10, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 11, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

## 1.10   EXPERT WITNESSES

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—called an expert witness—is permitted to state his or her opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness.  The fact that an expert states a fact or an opinion does not mean that the testimony is correct or supported by the factual evidence.  Expert testimony is a guide to interpreting the evidence.  What the facts are is for you to decide.

Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.  You are free to accept or reject the testimony of experts, just as with any other witness.

### Source

Final Jury Instruction 11, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017; Final Jury Instruction 12, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 6.B.13 (2016).

## 1.11   LAY OPINION TESTIMONY

Witnesses who were not testifying as experts may have given their opinions during the trial.  The fact that a witness has stated an opinion does not mean you are required to accept it.  You may give the opinion whatever weight you think appropriate.  Consider the extent of the

witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion. You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence. You should remember that lay witnesses may not testify to hypothetical situations or respond to hypothetical questions and should therefore disregard any opinions relating to hypotheticals.

**Source**

Final Jury Instruction 12, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 1.12   DEPOSITIONS AS SUBSTANTIVE EVIDENCE

During this trial, you have heard testimony from the playing of videotape excerpts or the reading of written excerpts from depositions. If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony. However, the parties and the Court have conferred regarding what portions of deposition videos are to be played. You should therefore not attribute any significance to the fact that deposition videos may appear to have been edited.

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

Deposition testimony is entitled to the same consideration and is to be judged, as much as possible, in the same way as if the witness testified in person here in the courtroom.

**Source**

Final Jury Instruction 13, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**1.13    RULE 30(B)(6) DEPOSITION TESTIMONY**

In this trial, there were certain witnesses identified as "Rule 30(b)(6)" witnesses. These witnesses were designated to speak on certain topics at depositions on behalf of the entities which designated them as 30(b)(6) witnesses. Rule 30(b)(6) witnesses are required to testify about information known or reasonably available to the designating entity. For answers within the designated topics, the entity is bound by the answers of its Rule 30(b)(6) deponents.

**<u>Source</u>**

Final Jury Instruction 14, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**1.14    DEMONSTRATIVE EXHIBITS**

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. The other exhibits (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses. These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

**<u>Source</u>**

Final Jury Instruction 1.8, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 15, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**1.15    USE OF NOTES**

You may use notes taken during trial to assist your memory. However, you should use caution in consulting your notes. There is always a tendency to attach undue importance to matters that you have written down. Some testimony that is considered unimportant at the time presented,

and thus not written down, takes on greater importance later on in the trial in light of all the evidence presented.  Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

### Source

Final Jury Instruction 1.9, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 16, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 2.    THE PARTIES AND THEIR CONTENTIONS

## 2.1    THE PARTIES

I will now review for you the parties in this action, and the positions that you will have to consider in reaching your verdict.  I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

The parties are BASF Corporation, who is the Plaintiff, and Ingevity Corporation and Ingevity South Carolina, LLC, who are the Defendants.

### Source

Final Jury Instruction 2.1, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

## 2.2    SUMMARY OF CONTENTIONS [DISPUTED]

BASF alleges that Ingevity's tying of [**Ingevity's Proposal: fuel vapor canister**] carbon honeycombs to [**Ingevity's Proposal: implied**] licenses to the '844 Patent and Ingevity's entering into [**BASF's Proposal:  long-term**] supply agreements with Delphi, Kayser, and KFTC

11

unreasonably restrained trade in violation of Section 1 of the Sherman Act.  BASF asserts that Ingevity's conduct allowed it to acquire and maintain monopoly power in the market for carbon adsorbents used in LEV III/Tier 3-compliant fuel vapor canisters in the United States and Canada and to impede competition in that market in violation of Section 2 of the Sherman Act.  BASF further alleges that the **[BASF's Proposal: long-term]** supply agreements violate Section 3 of the Clayton Act.  In addition to the antitrust claims, BASF alleges that Ingevity tortiously interfered with its prospective business relations with Kayser in violation of Delaware common law.

Ingevity denies the allegations.  Ingevity contends that it has not restrained trade or unlawfully acquired or maintained monopoly power in any relevant market.  Further, Ingevity contends that it did not tie **[Ingevity's Proposal: implied]** licenses to the '844 Patent to the sale of fuel vapor canister carbon honeycombs, and that its **[BASF's Proposal: long-term]** supply agreements with Delphi, Kayser, and KFTC did not substantially foreclose competition or result in harm to competition, did not cause injury to BASF, and did not cause any alleged damages. Ingevity contends that its sales of fuel vapor canister carbon honeycombs and resulting **[Ingevity's Proposal: implied]** licensing from those sales and its supply agreements with customers promoted competition.  Ingevity also contends that it did not know about or intentionally interfere in any improper way with BASF's prospective business relationship with Kayser.

**Source**

Final Jury Instruction 17, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 3.    ANTITRUST AND PATENT LAW

## 3.1    THE PURPOSE OF THE ANTITRUST LAWS

The primary purpose of the antitrust laws is to preserve and promote our system of free and open competition and to secure everyone an equal opportunity to engage in business, trade,

and commerce, by preventing unreasonable restraints or monopolization of any business or industry so that consumers may receive better goods and services at lower cost. These laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not unlawful. The antitrust laws do not prohibit, without more, colorful, vigorous or aggressive language; the law does not require polite or "commercially correct" speech within corporate memoranda and business plans.

### Source

Final Jury Instruction 18, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); ABA Model Jury Instructions in Civil Antitrust Cases 1.A (2016).

### 3.2    THE PURPOSE OF THE PATENT LAWS[2] [DISPUTED]

[Ingevity's Proposal:

**The primary purpose of the patent laws is to promote the progress of science and useful arts by securing for limited times to inventors the exclusive right to their respective discoveries. The patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time. Patent law seeks to foster and reward invention and to promote disclosure of inventions, to stimulate further innovation, and to permit the public to practice the invention once the patent expires. A patent grants the patent owner the right to exclude others from profiting from use of that patent owner's patented invention and includes the right to allow a patent owner to exclude others from**

---

[2] BASF objects to this instruction being provided to the jury because Ingevity has no legally valid patent-based defense. It would therefore be inappropriate to instruct the jury regarding patent law.

selling non-staple components of a patented invention where such components do not have substantial non-infringing uses.]

[**BASF's Proposal**:

The primary purpose of the patent laws is to promote the progress of science and useful arts by securing for limited times to inventors the exclusive right to their respective discoveries. The patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly on the patented invention for a limited period of time. A patent includes the right to exclude others from selling nonstaple goods that are capable only of infringing use in a patented invention and that are essential to that invention's advance over prior art.

However, invalid patent claims do not shield anticompetitive conduct from liability under the antitrust laws. And even possession of a valid patent or patents does not give the patentee any exemption from the antitrust laws beyond the limits of the patent monopoly.]

**Source**

*Dawson Chemical Co. v. Rohm and Haas Co.*, 448 U.S. 176, 213 (1980); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–51 (1989); *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979); *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 35 (1923); *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 63 (1998); *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 271 F.3d 1081, 1088 (Fed. Cir. 2001); *FTC v. Actavis, Inc.*, 570 U.S. 136, 147 (2013); *United States v. Line Material Co.*, 333 U.S. 287, 308 (1948); *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 250, 263 (3d Cir. 2017); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1338 (Fed. Cir. 2006); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 893 (5th Cir. 2016); *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1576-77 (Fed. Cir. 1990); *In re Indep. Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1454, 1460 (D. Kan. 1997); *Beal Corp. Liquidating Trust v. Valleylab, Inc.*, 927 F. Supp. 1350, 1361 (D. Colo. 1996).

**4.      COMMON ELEMENTS – OVERVIEW**

I will now turn to the portion of my instructions that will guide you in assessing BASF's claims and applying the law to the facts you find. Because BASF's claims have certain

overlapping components, I am going to first instruct you on concepts that may appear as "common elements" so that you have the information you need in one place.

Each of BASF's antitrust claims under Sections 1 and 2 of the Sherman Act has an element regarding interstate commerce. BASF's claim for exclusive dealing under Section 3 of the Clayton Act has an element regarding "use, consumption, or resale in the United States." I am instructing you, for purposes of each of these claims, that BASF has met its burden of proof on these elements.

**Source**

Final Jury Instruction 19, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 14, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2019).

## 4.1   COMMON ELEMENT – PATENT ENFORCEMENT AND PETITIONING ACTIVITY[3] [DISPUTED]

Ingevity has the right under the patent laws to enforce its patents, including through communications about its patent rights to customers and competitors and through litigation. Additionally, Ingevity has the right to petition the government, such as through filing a lawsuit and threatening litigation. Ingevity has this right even if a court or other adjudicator later determines that one or more (or even all) of the previously granted patent claims is invalid.

**[BASF's Proposal: However, Ingevity has no right to engage in private commercial conduct, such as tying or exclusive dealing, that goes beyond merely communicating about its patent rights and that unlawfully restricts competition beyond the scope of the patent monopoly.]**

Evidence of lawful patent enforcement activity and petitioning activity cannot form the basis for BASF's antitrust claims or BASF's tortious interference claim. If you determine that

---

[3] BASF and Ingevity agree that the determination of whether conduct amounts to patent enforcement or petitioning activity that is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but include the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

**[BASF's Proposal: Ingevity has shown that]** the activity that BASF contends amounts to antitrust violations and tortious interference is in fact an **[BASF's Proposal: a lawful]** effort by Ingevity to enforce its patents or threaten or engage in litigation, **[BASF's Proposal: rather than private commercial activity such as tying or exclusive dealing,]** you must return a verdict for Ingevity **[BASF's Proposal: with respect to conduct during the term of the '844 Patent].**

### Source

35 U.S.C. § 271(c)-(d); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 221 (1980); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); E. *R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1001 (Fed. Cir. 2007); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869, 873 (Fed. Cir. 1997); *Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013); *Lannett Co. Inc. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *7 (N.D. Cal. Aug. 13, 2007); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 505 (1988); *United States v. Line Material Co.*, 333 U.S. 287, 308 (1948); *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 264-65 (3d Cir. 2017); *Andrx Pharms. v. Elan Corp.*, 421 F.3d 1227, 1233-34 (11th Cir. 2005); *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327 (Fed. Cir. 2000); *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576-77 (Fed. Cir. 1990); *Performance Aftermarket Parts Grp., Ltd. v. TI Grp. Auto. Sys., Inc.*, 2006 WL 8449931, at *3 & n.3 (S.D. Tex. Aug. 11, 2006); *IGT v. Alliance Gaming Corp.*, 2006 WL 8441916, at *4 (D. Nev. Jan. 10, 2006); *In re Indep. Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1454, 1460 (D. Kan. 1997); *Beal Corp. Liquidating Trust v. Valleylab, Inc.*, 927 F. Supp. 1350, 1361 (D. Colo. 1996); *Quinn v. Kent Gen. Hosp., Inc.*, 617 F. Supp. 1226, 1241 (D. Del. 1985); *Campbell v. Pa. Sch. Bds. Ass'n*, 336 F. Supp. 3d 482, 499 (E.D. Pa. 2018); *Cascades Computer Innovation LLC v. RPX Corp.*, 2013 WL 6247594, at *17 (N.D. Cal. Dec. 3, 2013); *AFB Constr. Mgmt. of Trumbull, Inc. v. Herbst*, 2015 WL 4380112, at *8 (Ct. Super. Ct. June 16, 2015).

## 4.2    COMMON ELEMENT – PATENTEE'S RIGHT TO CONTROL THE MARKET FOR NON-STAPLE GOODS [DISPUTED]

**[Ingevity's Proposal:**

A patent owner has the right to control the market for non-staple goods that do not have substantial uses other than to practice the patent.

BASF contends that honeycombs used in fuel vapor canisters are staple articles of commerce with substantial uses that do not infringe the '844 Patent.  Ingevity contends that carbon honeycombs used in fuel vapor canisters, particularly those with 200 cells per square inch and typical widths of 29, 35, or 41 mm, are nonstaple goods, or goods that have no substantial use other than practicing the claims of the '844 Patent.

To meet its burden of showing Ingevity may be liable under the antitrust laws and Delaware tort law for exerting control over the market for fuel vapor canister honeycombs, such as through an alleged requirement that customers purchase unwanted fuel vapor canister activated carbon honeycombs in order to receive implied licenses to the '844 Patent and entering supply agreements with Delphi, Kayser, and KFTC regarding the sale of fuel vapor canister honeycombs, BASF must prove by a preponderance of the evidence that the carbon honeycombs used in fuel vapor canisters have substantial noninfringing uses outside of practicing the claims of the '844 Patent.

In making this determination, you must consider the fuel vapor canister carbon honeycombs actually sold by Ingevity and the uses made of it by its customers.  In other words, you must consider whether Ingevity's fuel vapor canister carbon honeycombs were actually used in a noninfringing way or that end-users actually assembled the honeycombs in a noninfringing way.  Substantial noninfringing uses are those that are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.  In assessing whether an asserted noninfringing use is "substantial," you must consider the use's frequency, the use's practicality, the invention's intended purpose, and the invention's intended market; the occasional aberrant use of a product that is designed to be used in a particular manner

does not qualify as a substantial noninfringing use.  The asserted noninfringing use must be qualitatively and quantitatively significant.

If you determine that Ingevity's fuel vapor canister honeycombs do not have actual substantial noninfringing uses outside of practicing the '844 Patent, you must return a verdict for Ingevity.]

[**BASF's Proposal**:

A patent owner has the right to control the market for nonstaple goods that are capable only of infringing use in a patented invention and that are essential to that invention's advance over prior art.  A patent owner has no right to control the market for staple goods.

To establish that the honeycomb products at issue are nonstaple goods, Ingevity must prove each of the following elements by a preponderance of the evidence:

*First*, the carbon honeycombs are capable only of use that would infringe upon valid claims of the '844 Patent; and

*Second*, the carbon honeycombs are essential to the '844 Patent's advance over prior art.

In making this determination, you must consider both actual and potential uses of carbon honeycombs.  Substantial noninfringing uses are those that are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.  A staple good cannot be converted to a nonstaple one by simply giving it a particular size and shape so that it can be used in a patented combination.]

## Source

35 U.S.C. §§ 271(c), 271(d); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980); *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 490 (1942); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010); *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *IOENGINE, LLC v. PayPal Holdings, Inc.*, 2019 WL 330515, at *5 (D. Del. Jan. 25, 2019);

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir. 2009); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012); *Hoffman-La Roche Inc. v. Promega Corp.*, 1994 WL 761241, at *11 (N.D. Cal. June 13, 1994); *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 578 (E.D. Pa. 1989); *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979).

### 4.3    COMMON ELEMENT – RELEVANT MARKET IN GENERAL

You will see that each of BASF's antitrust claims requires you to analyze whether the accused conduct had anticompetitive effects.  These effects must occur with respect to a relevant market; BASF must prove the relevant market(s) by a preponderance of the evidence.

There are two aspects you must consider in determining whether BASF has met its burden to prove the relevant market(s).  The first is the relevant *product* market.  The second is the relevant *geographic* market.

#### Source

Final Jury Instruction 21, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

### 4.4    COMMON ELEMENT – RELEVANT PRODUCT MARKET [DISPUTED]

BASF must prove, by a preponderance of the evidence, the existence of a relevant product market.  The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.

In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test based on the actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable so long as they are reasonable substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of

flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products would be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant sustained increase in the price of one product would result in a substantial number of consumers switching from that product to another.  In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn?  Generally speaking, a small but significant increase in price is approximately a 5% increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue.  If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and the sales of another; (3) the presence or absence of specialized vendors; (4) the perceptions of either the industry or the public as to whether the products are in separate markets; (5) the views of BASF and Ingevity regarding which products compete against each other; (6) the existence or absence of different customer groups or distribution channels; (7) disadvantages to using other products that might deter customers from substituting to products outside of the market; and (8) differences in prices for particular products.

In this case, BASF contends that a relevant product market for its antitrust claims is the market for carbon adsorbents used in LEV III / Tier 3-compliant fuel vapor canisters.  Ingevity contends that BASF has not correctly defined this alleged product market because pelletized base

carbon is not **[Ingevity's Proposal: typically]** a **[BASF's Proposal: reasonable]** substitute for automotive honeycomb in LEV III / Tier 3-compliant fuel vapor canisters.  BASF also contends that a relevant product market is the market for technologies to meet LEV III / Tier 3 regulations. Ingevity contends that BASF has not correctly defined this alleged product market. **[BASF's Proposal:  BASF contends that even if the relevant product market were limited to automotive honeycombs in LEV III / Tier 3-compliant fuel vapor canisters, Ingevity has market power.]**

> **Source**

Final Jury Instruction 23, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 4.5     COMMON ELEMENT – RELEVANT GEOGRAPHIC MARKET

In this case, the relevant geographic market is the United States and Canada.

> **Source**

Final Jury Instruction 22, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 20, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

## 4.6     COMMON ELEMENT – MARKET POWER [DISPUTED]

In determining if Ingevity's challenged conduct substantially harmed competition, you should consider whether Ingevity had market power.

Market power is defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market.  A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.  **[Ingevity's Proposal: The ability to charge higher prices for better products or services, however, is not market power.]**

In determining whether Ingevity has market power, you may consider Ingevity's share or portion of the relevant market; that is, its percentage of the products or services sold in the relevant market by all competitors.  The mere possession of market power is not unreasonable or illegal.  If you find that Ingevity possesses market power, you must still consider other elements of BASF's claims that I will discuss further below.

Factors you may consider in determining whether Ingevity has market power include whether there are any durable barriers to entry by new firms in the market, and evidence concerning the intensity of competition within that market.  In addition, if you decide that the buyers are sophisticated businesses themselves that have countervailing power in negotiating contracts, this may offset any market power Ingevity might otherwise have.  If BASF cannot show that Ingevity had the power to force buyers to enter into exclusive contracts or purchasing **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs they did not want, this would be an indication that Ingevity lacks market power.  You should consider whether the process in which Ingevity secured its **[BASF's Proposal: exclusive]** supply contracts and sales of **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs itself involved competition.  If you determine that buyers considered purchasing products from other suppliers as substitutes for Ingevity's **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs, and that other competitors had an equal opportunity to compete against Ingevity for sales of **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs, this is also evidence that Ingevity does not have market power.

**<u>Source</u>**

Final Jury Instruction 25, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**4.7     COMMON ELEMENT – RULE OF REASON [DISPUTED]**

In this case, BASF claims that Ingevity's alleged tying and exclusive dealing conduct was an unreasonable restraint of trade that resulted in an adverse effect on competition under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, which I will explain in more detail later.  **[BASF's Proposal: As I will explain later, some restraints of trade are unlawful "per se," which means that they are definitely unlawful and BASF does not have to offer specific proof of an adverse effect on competition.  For restraints that are not unlawful "per se," it]** **[Ingevity's Proposal: It]** is your job to determine whether the challenged conduct was unreasonable under what is known as the "rule of reason."

A restraint of trade **[BASF's Proposal: that is not unlawful "per se"]** is illegal only if it is found to be unreasonable.  **[Ingevity's Proposal: You must determine, therefore, whether the alleged restraints challenged here – (1) arrangements involving an alleged requirement that, to receive an implied license to Ingevity's '844 Patent, customers must also purchase unwanted activated fuel vapor canister carbon honeycombs from Ingevity and (2) supply agreements – were unreasonable restraints of trade.]**  In making this determination, you must first determine whether BASF has proven that the challenged restraint resulted in substantial harm to competition in the relevant market.  If you find that BASF has proven that the challenged restraint resulted in substantial harm to competition in the relevant market, then you must consider whether the restraint produced countervailing competitive benefits.  If you find that it did, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

**Source**

Final Jury Instruction 27, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).]

**4.8     COMMON ELEMENT – RULE OF REASON ‒ PROOF OF SUBSTANTIAL COMPETITIVE HARM**

To prove that the challenged conduct unreasonably restrained competition, BASF first must demonstrate that it resulted in a substantial harm to competition.  Although it may be relevant to the inquiry, harm that occurs merely to the individual business of BASF is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single competitor does not necessarily mean that there has been harm to competition.

A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, more product options, increased output, or higher product quality.  If the challenged conduct did not result in higher prices, fewer product choices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged conduct produced competitive harm, you may look at the following factors:

- the effect of the conduct on prices, output, product quality, and service;

- the purpose and nature of the conduct;

- the nature and structure of the relevant market, both before and after the conduct occurred;

- the number of competitors in the relevant market and the level of competition among them;

- whether new competitors entered the market, both before and after the conduct occurred; and

- whether Ingevity possesses market power.

**<u>Source</u>**

Final Jury Instruction 28, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 21, *ZF Meritor LLC v. Eaton Corp.*, C.A. No.

1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 1.C.2, 2.D.6, 3.B (2016); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005); *United States v. Microsoft, Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004); *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, C.A. No. 17-1258, 2019 WL 1109868, at *8 (D. Del. Mar. 8, 2019).

**4.9     COMMON ELEMENT – RULE OF REASON ‑ EVIDENCE OF COMPETITIVE BENEFITS**

If you find that BASF has proved that Ingevity's conduct resulted in substantial harm to competition in a relevant market, then you next must determine whether the conduct also benefited competition in other ways.  You may only credit benefits that are related to competition or that advantage consumers.  If you find that Ingevity has proved that the conduct did result in competitive benefits, then you also must consider whether the conduct was reasonably necessary to achieve the benefits.  If BASF proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the conduct.

**Source**

Final Jury Instruction 29, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 22, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases (2016); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 462 (1986); *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 438 (3d Cir. 2016); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010); *United States v. Brown Univ.*, 5 F.3d 658, 678-79 (3d Cir. 1993); *United States v. Microsoft, Corp.*, 253 F.3d 34, 46-47 (D.C. Cir. 2001); *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1349-51 (9th Cir. 1987) (upholding jury verdict for defendant based on quality control defense; although there may have been alternative ways of protecting quality, court would not disturb jury verdict because tie-in may have been found to be the least expensive and most effective means of protecting product quality).

**4.10    COMMON ELEMENT – RULE OF REASON ‑ BALANCING THE COMPETITIVE EFFECTS**

If you find that the challenged conduct was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same conduct.

If the competitive harm substantially outweighs the competitive benefits, then the challenged conduct is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged conduct is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor.

BASF bears the burden of proving that the anticompetitive effect of the conduct, if any, substantially outweighs its benefits.

**Source**

Final Jury Instruction 30, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 22a, 36, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 1.C.4 (2016); *United States v. Microsoft, Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004); *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, C.A. No. 17-1258, 2019 WL 1109868, at *8 (D. Del. Mar. 8, 2019).

## 5.     ANTITRUST CLAIMS – OVERVIEW

Now that we have covered some of the common concepts and statutes that apply to BASF's antitrust claims, I am going to turn to instructing you further on the specific elements of the claims. For elements that are not covered by the common elements I just described, I will provide you with the information you need in the following instructions.

**Source**

Final Jury Instruction 31, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 5.1     SHERMAN ACT SECTION 1 – UNREASONABLE RESTRAINT OF TRADE – ELEMENTS [DISPUTED]

BASF claims that Ingevity required customers to purchase **[Ingevity's Proposal: unwanted fuel vapor canister activated]** carbon honeycombs to receive a **[Ingevity's Proposal:**

**an implied]** license to the '844 Patent and entered supply agreements that unreasonably restrained trade in violation of Section 1 of the Sherman Act.   Ingevity denies these allegations.

Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade.  To establish a violation of Section 1 of the Sherman Act, BASF must prove the following by a preponderance of the evidence:

> *First*, the existence of a contract or combination between or amongst at least two separate entities;
>
> *Second*, that the contract or combination unreasonably restrained trade;
>
> *Third*, that the restraint affected interstate or foreign commerce; and
>
> *Fourth*, that the restraint caused BASF to suffer an injury to its business and property.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

 **[Ingevity's Proposal: As I instructed you previously, Ingevity has the right under the patent laws to enforce its patents, including through communications about its patent rights to customers and competitors and through litigation, and to petition the government, such as through filing a lawsuit and threatening litigation.  A contract or combination entered as a result of patent enforcement or petitioning activity does not unreasonably restrain trade.[4] Additionally, if you find that fuel vapor canister honeycombs are not staple articles of commerce because they have no substantial uses other than to infringe the '844 Patent, then**

---

[4] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

you must find that any actual or attempted control by Ingevity over the market for fuel vapor canister honeycombs does not unreasonably restrain trade.

BASF contends that Ingevity violated Sherman Act Section 1 by allegedly engaging in tying and exclusive dealing.  I will instruct you on the elements of tying and exclusive dealing later.  If you find that BASF has proven each element of tying and each element of a violation of Sherman Act Section 1 by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.  If you find that BASF has proven each element of exclusive dealing and each element of a violation of Sherman Act Section 1 by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.  If you find that the evidence is not sufficient to prove any one or more of the elements a violation of Sherman Act Section 1 or that the evidence is not sufficient to prove any one or more of the elements the elements of unlawful tying and exclusive dealing, then you must find for Ingevity and against BASF on this claim.]

<u>Source</u>

Final Jury Instruction 32, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instructions 15-16, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 1.B (2016); 35 U.S.C. § 271(c)-(d); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 221 (1980); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 490 (1942); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir. 2009); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1001 (Fed. Cir. 2007); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869, 873 (Fed. Cir. 1997); *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987); *Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed.

Cir. 1985); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012); *Lannett Co. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *7 (N.D. Cal. Aug. 13, 2007). *Hoffman-La Roche Inc. v. Promega Corp.*, 1994 WL 761241, at *11 (N.D. Cal. June 13, 1994); *Dennison Mfg. Co. v. Ben Clements & Sons*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979); *Kellam Energy v. Duncan*, 668 F. Supp. 861, 881 (D. Del. 1987) ("As a precondition to a tying claim, the buyer must actually purchase or lease the unwanted product.").

## 5.2    SHERMAN ACT SECTION 2 – MONOPOLIZATION – ELEMENTS [DISPUTED]

BASF's second claim is that Ingevity unlawfully monopolized the North American and Canadian market for carbon adsorbents used in fuel vapor canisters through an alleged requirement that customers purchase **[Ingevity's Proposal: unwanted fuel vapor canister activated]** carbon honeycombs to receive **[Ingevity's Proposal: implied]** licenses to the '844 Patent and through use of **[Ingevity's Proposal: three]** supply agreements, in violation of Section 2 of the Sherman Act.  Ingevity denies these allegations.

To prevail on its monopolization claims under Section 2 of the Sherman Act, BASF has the burden of proving each of the following elements by a preponderance of the evidence:

*First*, that the alleged market is a valid relevant market;

*Second*, that Ingevity possessed monopoly power in that market;

*Third*, that Ingevity willfully maintained monopoly power in that market by engaging in anticompetitive conduct;

*Fourth*, that Ingevity's conduct occurred in or affected interstate or foreign commerce; and

*Fifth*, that BASF was injured in its business or property because of Ingevity's anticompetitive conduct.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

[Ingevity's Proposal: As I instructed you previously, Ingevity has the right under the patent laws to enforce its patents, including through communications about its patent rights to customers and competitors and through litigation, and to petition the government, such as through filing a lawsuit and threatening litigation.  Enforcement of patent rights and petitioning activity are not anticompetitive conduct.[5]  Additionally, if you find that fuel vapor canister honeycombs are not staple articles of commerce because they have no substantial uses other than to infringe the '844 Patent, then you must find that any actual or attempted control by Ingevity over the market for fuel vapor canister honeycombs is not anticompetitive conduct.

BASF contends that Ingevity violated Sherman Act Section 2 by allegedly engaging in tying and exclusive dealing.  I will instruct you on the elements of tying and exclusive dealing later.  If you find that BASF has proven each element of tying and each element of a violation of Sherman Act Section 2 by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.  If you find that BASF has proven each element of exclusive dealing and each element of a violation of Sherman Act Section 2 by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.  If you find that the evidence is not sufficient to prove any one or more of the elements a violation of Sherman Act Section 2 or that the evidence is not sufficient to prove any one or more of the elements the elements of unlawful tying and exclusive dealing, then you must find for Ingevity and against BASF on this claim.]

---

[5] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

**Source**

Final Jury Instruction 33, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 23, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 3.A.1 (2016); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 221 (1980); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 490 (1942); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir. 2009); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1001 (Fed. Cir. 2007); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869, 873 (Fed. Cir. 1997); *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987); *Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012); *Lannett Co. Inc. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *7 (N.D. Cal. Aug. 13, 2007). *Hoffman-La Roche Inc. v. Promega Corp.*, 1994 WL 761241, at *11 (N.D. Cal. June 13, 1994); *Dennison Mfg. Co. v. Ben Clements & Sons*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979); *Kellam Energy v. Duncan*, 668 F. Supp. 861, 881 (D. Del. 1987) ("As a precondition to a tying claim, the buyer must actually purchase or lease the unwanted product.").

## 5.2.1   SHERMAN ACT SECTION 2 – MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER

To prevail on its monopolization claims, BASF must prove by a preponderance of the evidence that Ingevity had monopoly power in the relevant market.  Monopoly power is the power to control prices or exclude competition in a relevant antitrust market.  More precisely, Ingevity is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  However, possession of monopoly power, in and of itself, is not unlawful.

If you do not find that Ingevity is able to profitably raise prices above those that would be charged in a competitive market, monopoly power can be alternatively established through

circumstantial evidence in the form of Ingevity's market share, market share trends, entry and exit by other companies, the number and size of other alleged competitors.  I will now discuss these types of circumstantial evidence of monopoly power.

***Market Share.***  The first factor you may consider is Ingevity's share of the relevant market. Based on the evidence you have heard about Ingevity's market share, you may determine its market share as a percentage of total sales in the relevant market.  Ingevity must have a significant share of the market in order to possess monopoly power.  Market share alone is not sufficient to establish monopoly power.

***Market Share Trends.***  The trend in Ingevity's market share in the valid relevant market also is something you may consider.  A market share that increases over time may strengthen an inference that a company has monopoly power, particularly where that company has a high market share.  A decreasing market share may indicate the absence of monopoly power.

***Barriers to Entry.***  You may also consider whether there are durable barriers to entry into the relevant market.  Durable barriers to entry make it difficult for new competitors to enter the valid relevant market in a meaningful and timely way.  Barriers to entry might include government regulations, the large financial investment required to build a plant, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of high barriers to entry along with high market share may support an inference that Ingevity had monopoly power.  By contrast, evidence of low or no entry barriers may be evidence that Ingevity did not have monopoly power, regardless of its market share, because new competitors could enter easily if Ingevity attempted to raise prices for a substantial period of time.

***Entry and Exit by Other Companies.***  The history of entry and exit in the valid relevant market may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that Ingevity lacked monopoly power.  On the other hand, departures from the market, or the failure of firms to enter the market, may support an inference that Ingevity has monopoly power.

***Number and Size of Competitors.***  You may consider whether Ingevity's competitors were capable of effectively competing.  In other words, you should evaluate whether the financial strength, market shares, and number of competitors in the valid relevant market acted as a check on Ingevity's ability to price its products.  If Ingevity's competitors were vigorous or had large or increasing market shares, this may be evidence that Ingevity lacked monopoly power.  On the other hand, if you determine that Ingevity's competitors were weak or had small or declining market shares, this may support an inference that Ingevity had monopoly power.

### Source

Final Jury Instruction 34, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 25, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 3.A.4 (2016); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 335 (1961); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).

### 5.2.2   SHERMAN ACT SECTION 2 – MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER

The next element BASF must prove for its monopolization claim is that Ingevity willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.  Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to

competition.  Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.  The maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws.  A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine.  This is because all companies have a desire to increase their profits and increase their market share.  These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In this case, BASF contends that Ingevity had monopoly power and used it to enter into anticompetitive tying arrangements and exclusive long-term supply agreements to prevent or exclude competition or frustrate the efforts of other companies to compete in the relevant market. In determining whether Ingevity's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

**<u>Source</u>**

Final Jury Instruction 35, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 26, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases

3.A.9 (2016); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *Roxul USA, Inc. v. Armstrong World Indus.*, C.A. No. 17-1258, 2019 WL 1109868, at *8 (D. Del. Mar. 8, 2019).

**5.3    CLAYTON ACT SECTION 3 CLAIM – ELEMENTS [DISPUTED]**

BASF's third claim is under Section 3 of the Clayton Act.  BASF alleges that Ingevity used exclusive long-term supply agreements with customers to foreclose competition in [**Ingevity's Proposal:  a substantial portion of**] the relevant market, and that BASF was injured as a result of these exclusive dealing arrangements.  Ingevity denies these allegations.

To succeed on this claim, BASF must prove the following [**BASF's Proposal: four**] [**Ingevity's Proposal: five**] elements by a preponderance of the evidence:

*First*, that Ingevity sold [**Ingevity's Proposal: fuel vapor canister**] carbon honeycombs, or entered into contracts for the sale of [**Ingevity's Proposal: fuel vapor canister**] carbon honeycombs, for use, consumption, or resale in the United States;

*Second*, that in its sales or contracts for such [**Ingevity's Proposal: fuel vapor canister**] carbon honeycombs, Ingevity established an agreement or understanding that the customer would exclusively purchase Ingevity's products;

*Third*, the effect of such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in the relevant market for carbon adsorbents used in fuel vapor canisters;

[**BASF's Proposal:** *Fourth*, **BASF was injured in its business or property as a proximate result of Ingevity's conduct.**]

[**Ingevity's Proposal:** *Fourth*, **that Ingevity had no valid business justification for entering into those contracts; and**

***Fifth***, **BASF was injured in its business or property as a proximate result of those contracts.**]

As to the second element of BASF's Clayton Act Section 3 claim, you need not find that the agreement contained a specific, express agreement to use or purchase only Ingevity's products to conclude that it was an exclusive dealing arrangement because a condition, agreement or understanding may be either expressly stated or inferred from the circumstances.

Ingevity's agreements may be found to be exclusive dealing arrangements if they had the practical effect of substantially preventing the purchase of BASF's [**Ingevity's Proposal: fuel vapor canister**] carbon honeycombs.  An agreement may be an exclusive dealing arrangement even if it does not require a 100% commitment to deal only in Ingevity's products.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

**[Ingevity's Proposal: As I instructed you previously, Ingevity has the right under the patent laws to enforce its patents, including through communications about its patent rights to customers and competitors and through litigation, and to petition the government, such as through filing a lawsuit and threatening litigation.  Enforcement of patent rights and petitioning activity may not form the basis for a Clayton Act Section 3 claim.[6]  Additionally, if you find that fuel vapor canister honeycombs are not staple articles of commerce because they have no substantial uses other than to infringe the '844 Patent, then you must find that any actual or attempted control by Ingevity over the market for fuel vapor canister honeycombs may not form the basis for a Clayton Act Section 3 claim.**

**BASF contends that Ingevity violated Clayton Act Section 3 by allegedly engaging in exclusive dealing.  I will instruct you on the elements of exclusive dealing later.  If you find that BASF has proven each element of exclusive dealing and each element of a violation of**

---

[6] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

Clayton Act Section 3 by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.  If you find that the evidence is not sufficient to prove any one or more of the elements a violation of Clayton Act Section 3 or that the evidence is not sufficient to prove any one or more of the elements the elements of unlawful exclusive dealing, then you must find for Ingevity and against BASF on this claim.]

### Source

Final Jury Instruction 40, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instructions 33 & 35, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1239 (3d Cir. 1975); *United States v. Microsoft, Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, C.A. No. 17-1258, 2019 WL 1109868, at *8 (D. Del. Mar. 8, 2019); Areeda & Hovenkamp, Antitrust Law ¶ 1800c4 (5th ed. 2020); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 221 (1980); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 490 (1942); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir. 2009); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1001 (Fed. Cir. 2007); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869, 873 (Fed. Cir. 1997); *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987); *Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012); *Lannett Co. Inc. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *7 (N.D. Cal. Aug. 13, 2007); *Hoffman-La Roche Inc. v. Promega Corp.*, 1994 WL 761241, at *11 (N.D. Cal. June 13, 1994); *Dennison Mfg. Co. v. Ben Clements & Sons*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979).

### 5.3.1   CLAYTON ACT SECTION 3 CLAIM – SUBSTANTIAL LESSENING OF COMPETITION

If you find that BASF has proven that Ingevity entered into exclusive dealing contracts, you should then consider whether BASF has proven, by a preponderance of the evidence, that

those contracts substantially lessened competition in the relevant market. Only if you find that BASF has proven a substantial lessening of competition in a relevant market due to Ingevity's contracts can you find in favor of BASF on its Clayton Act Section 3 claim.

In deciding this issue, you should consider the structure of the relevant market and the percentage of the relevant market closed off by, or tied up because of, the contracts. In this regard, you may consider how many companies were in the market and whether the contracts significantly limited the opportunities for competing sellers to enter or remain in the market.

You must consider the probable effect that the contracts had on competition in the market. If you find that Ingevity's contracts did not substantially lessen competition, then you must find in favor of Ingevity.

If you find that BASF has proven that Ingevity's contracts substantially lessened competition in the relevant market, then you must go on to consider whether there is any legitimate business justification for the contracts and whether they are reasonable. Only unreasonable restraints of this type are unlawful. In this regard, you should consider such factors as:

- The circumstances under which Ingevity set up these contracts and what reasons it had for doing so;

- The relative bargaining strength of the parties to the contracts. If the parties had relatively equal bargaining strength, then the contracts are less likely to be unreasonable;

- How long in time the contracts were effective. If the contracts lasted a relatively short time and did not significantly limit the opportunity for competing sellers to enter or remain in the market, then they were less likely to be unreasonable;

- Any favorable effects on competition that the contracts produce; and

- Any alternative channels of distribution that may have been available to BASF.

If you find that the contracts foreclosed competition in a substantial portion of the relevant market, and that the anticompetitive effects of those contracts outweigh any procompetitive

effects, you must consider whether BASF was injured as a result of these contracts, consistent with Instructions 6.1 and 6.2.

**Source**

Final Jury Instruction 36, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1239 (3d Cir. 1975); AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1800c4 (5th ed. 2020).

## 5.4   TYING – ELEMENTS [DISPUTED]

As I have mentioned, BASF's first and second claims depend, in part, on BASF's allegation that Ingevity engaged in an unlawful tying arrangement.  Ingevity denies this allegation.

A tying arrangement is one in which the seller will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product), or at least agree that they will not purchase the tied product from any other supplier.  In this case, BASF claims that **[Ingevity's Proposal: implied]** licenses to the '844 Patent are the tying product and **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs are the tied product.

**[Ingevity's Proposal: Not all tying arrangements are unlawful.  The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product to force buyers to purchase a tied product that buyers either did not want at all or might have preferred to purchase elsewhere.]** To prevail on its claim that Ingevity's tying arrangement is a violation of the antitrust laws, BASF has the burden of proving each of the following elements by a preponderance of the evidence:

> *First*, **[Ingevity's Proposal: implied]** licenses to the '844 Patent and **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs are separate and distinct products;

> *Second*, Ingevity will grant **[Ingevity's Proposal: implied]** licenses to the '844 Patent only on the condition that the customer also purchase **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs, or that the customer not purchase such **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs from any other supplier;

*Third*, Ingevity has sufficient market power with respect to technologies to meet LEV III / Tier 3 regulations to enable it to restrain competition as to the [**Ingevity's Proposal: fuel vapor canister**] carbon honeycombs;

*Fourth*, the alleged tying arrangement has affected a substantial volume of commerce as to the [**Ingevity's Proposal: fuel vapor canister**] carbon honeycombs;

[**BASF's Position**: *Fifth*, **Ingevity's conduct occurred in or affected interstate or foreign commerce; and**

*Sixth*, **BASF was injured in its business or property because of the tying arrangement.**]

[**Ingevity's Position**: *Fifth*, **the tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition as to fuel vapor canister carbon honeycombs;**

*Sixth*, **Ingevity has a financial interest in the relevant market;**

*Seventh*, **Ingevity's conduct occurred in or affected interstate or foreign commerce; and**

*Eighth*, **BASF was injured in its business or property because of the tying arrangement.**]

[**BASF's Proposal: If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim. If you find that BASF has proven each of these elements by a preponderance of the evidence, then the tying arrangement is "per se" unlawful—which means that the tying arrangement is definitely unlawful and you may not consider whether the tying arrangement also benefits competition to justify the restraint.**

**If you find that BASF has not proven that Ingevity has market power with respect to technologies to meet LEV III / Tier 3 regulations, but has proven the other elements, then you may still find the tying arrangement unlawful under the rule of reason. As I have previously explained, in making this determination, you must first determine whether BASF has proven that the contracts resulted in substantial harm to competition in the relevant markets. If you find that BASF has proven that the contracts resulted in substantial harm**

to competition in the relevant market, then you must consider whether the contracts produced countervailing competitive benefits.  If you find that they did, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.]

[**Ingevity's Proposal**: As I instructed you previously, Ingevity has the right under the patent laws to enforce its patents, including through communications about its patent rights to customers and competitors and through litigation, and to petition the government, such as through filing a lawsuit and threatening litigation.  Enforcement of patent rights and petitioning activity may not form the basis for a tying claim.[7]  Additionally, if you find that fuel vapor canister honeycombs are not staple articles of commerce because they have no substantial uses other than to infringe the '844 Patent, then you must find that any actual or attempted control by Ingevity over the market for fuel vapor canister honeycombs may not form the basis for a tying claim.

If you find that the fuel vapor canister honeycombs are staple articles of commerce with substantial uses other than infringing the '844 Patent and that the evidence is sufficient to prove all eight of these elements based on Ingevity's conduct other than patent enforcement and petitioning activity, then you must find for BASF and against Ingevity on BASF's tying claim.  If you find that fuel vapor canister honeycombs are not staple articles of commerce with no substantial uses other than infringing the '844 Patent, then you must

---

[7] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

find for Ingevity and against BASF on BASF's tying claim.  Likewise, if you find that the

evidence based on Ingevity's conduct other than patent enforcement and petitioning activity

is insufficient to prove any one of these elements, then you must find for Ingevity and against

BASF on BASF's tying claim.]

**<u>Source</u>**

ABA Model Jury Instructions in Civil Antitrust Cases 2.E.1, 2.E.3 (2016); 35 U.S.C. § 271; *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 35 (2006); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461, 477-78 (1992); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978); *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958); *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15-16, 19 (1984); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 74 (3d Cir. 2010); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 214 (3d Cir. 2005); *United States v. Dentsply Int'l Inc.*, 399 F.3d 181, 188 (3d Cir. 2005); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992); *Tic-X Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1420-21 (11th Cir. 1987); *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62 (1993); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 221 (1980); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); E. *R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1001 (Fed. Cir. 2007); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869, 873 (Fed. Cir. 1997); *Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013); *Lannett Co. Inc. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *7 (N.D. Cal. Aug. 13, 2007).

### 5.4.1   TYING – PRESENCE OF TWO PRODUCTS [DISPUTED]

**[<u>Ingevity's Proposal</u>:**

BASF contends that honeycombs used in fuel vapor canisters are separate unpatented

products from implied licenses to the '844 Patent, and that honeycombs used in fuel vapor

canisters are staple articles of commerce with substantial uses that do not infringe the '844

Patent.  Ingevity contends that carbon honeycombs used in fuel vapor canisters, particularly those with 200 cells per square inch and typical widths of 29, 35, or 41 mm, are nonstaple goods, or goods that have no substantial use other than practicing the claims of the '844 Patent, such that fuel vapor canister honeycombs are not separate products that can be tied to sales of implied licenses to the '844 Patent.

To meet its burden of showing that implied licenses to the '844 Patent and fuel vapor canister honeycombs are separate products, BASF must prove by a preponderance of the evidence that the carbon honeycombs used in fuel vapor canisters have substantial noninfringing uses outside of practicing the claims of the '844 Patent.

In making this determination, you must consider the carbon honeycombs used in fuel vapor canisters actually sold by Ingevity and the uses made of it by its customers.  In other words, you must consider whether the carbon honeycombs used in fuel vapor canisters were actually used in a noninfringing way or that end-users actually assembled the honeycombs in a noninfringing way.  Substantial noninfringing uses are those that are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.  In assessing whether an asserted noninfringing use is "substantial," you must consider the use's frequency, the use's practicality, the invention's intended purpose, and the invention's intended market; the occasional aberrant use of a product that is designed to be used in a particular manner does not qualify as a substantial noninfringing use.  The asserted noninfringing use must be qualitatively and quantitatively significant.

Another way to determine whether implied licenses to the '844 Patent and fuel vapor canister carbon honeycombs are separate and distinct products is by considering whether there would be demand for each of them if they were offered separately. If enough customers

43

would want to purchase implied licenses to the '844 Patent alone and fuel vapor canister carbon honeycombs alone to induce sellers generally to provide implied licenses to the '844 Patent alone and fuel vapor canister carbon honeycombs alone, then implied licenses to the '844 Patent and fuel vapor canister carbon honeycombs are separate products. On the other hand, if there is very little demand for one of the products by itself, that is, without the other product, then implied licenses to the '844 Patent and fuel vapor canister carbon honeycombs are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.]

[**BASF's Proposal**:

BASF contends that honeycombs are separate products from licenses to the '844 Patent.  Ingevity disputes this.  In making this determination, you must consider the carbon honeycombs and licenses to the '844 Patent.  Two products are distinct if they are distinguishable in the eyes of buyers such that they could be provided separately, and could be selected by individual buyers, if the defendant did not insist on packaging them together.]

**Source**

ABA Model Jury Instructions in Civil Antitrust Cases 2.E.5 (2016); 35 U.S.C. §§ 271(c), 271(d); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 35 (2006); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984); 35 U.S.C. §§ 271(c), 271(d); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980); *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 490 (1942); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010); *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327-

29 (Fed. Cir. 2009); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012); *Hoffman-La Roche Inc. v. Promega Corp.*, 1994 WL 761241, at *11 (N.D. Cal. June 13, 1994); *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 578 (E.D. Pa. 1989); *Dennison Mfg. Co. v. Ben Clements & Sons*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979).

### 5.4.2   TYING – PROOF OF CONDITIONING [DISPUTED]

You may find that a tying arrangement exists between **[Ingevity's Proposal: implied]** licenses to the '844 Patent and **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs if defendant either refused to grant **[Ingevity's Proposal: implied]** licenses to the '844 Patent unless purchasers also agreed to buy **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs (or not to buy **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs from another supplier), or effectively coerced purchasers into buying **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs in addition to **[Ingevity's Proposal: implied]** licenses to the '844 Patent.  To prove coercion, BASF must prove by a preponderance of the evidence that Ingevity exploited its control over the market for technologies to meet LEV III / Tier 3 regulations to force the buyer into the purchase of **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs, which the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms**,** and that any appearance of choice was illusory.  Additionally, mere sales pressure or persuasion is not coercion.

**[Ingevity's Proposal: BASF contends that Ingevity conditioned sales of implied licenses to the '844 Patent on a requirement that customers also purchase unwanted fuel vapor canister carbon honeycombs.  Ingevity contends that it has not granted implied licenses to the '844 Patent on the condition that customers purchase fuel vapor canister carbon honeycombs, but instead that customers purchase fuel vapor canister honeycombs, for which the only reasonable intended use is to practice the patent, and that such sales grant as a matter of patent law—not as a matter of any term or requirement imposed by the**

**patentee—an implied license to the purchaser.  Ingevity contends that, with several limited exceptions, it does not otherwise grant licenses (or offer to grant licenses) to the '844 Patent. If you find that fuel vapor canister honeycombs are not staple goods, you must conclude that Ingevity's sales of fuel vapor canister honeycombs granted purchasers an implied license. Ingevity also contends that, even if you determine that fuel vapor canister honeycombs are staple goods capable of substantial uses other than infringing the claims of the '844 Patent, that it did not condition the grant of implied licenses to the '844 Patent on a requirement that customers purchase fuel vapor canister carbon honeycombs, but instead implied licenses were the natural legal consequence when because it believed that sales of fuel vapor canister honeycombs were not staple goods and that its customers would then receive an implied license as a matter of law.]**

If you find that BASF has not proven that Ingevity has conditioned the granting of **[Ingevity's Proposal: implied]** licenses to the '844 Patent on a requirement that customers purchase **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs, you must find that Ingevity has not engaged in tying.

### Source

ABA Model Jury Instructions in Civil Antitrust Cases 2.E.7 (2016); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 202 (1980); *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S.Ct. 1523, 1531 (2017); *Bowman v. Monsanto Co.*, 569 U.S. 278, 286 (2013); *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 631 (2008); *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942); *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1350 (Fed. Cir. 2003).

### 5.5   TYING – EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT [DISPUTED]

**[Ingevity's Proposal:**

**You may find that defendant has market power with respect to technologies to meet LEV III / Tier 3 regulations if, by reason of some advantage, defendant has the power to**

raise its prices for technologies to meet LEV III / Tier 3 regulations without losing an appreciable amount of its business or otherwise to force a purchaser of technologies to meet LEV III / Tier 3 regulations to do something that the purchaser would not do in a more competitive market.

Plaintiff may prove power over price with respect to technologies to meet LEV III / Tier 3 regulations by establishing that the price of the tied package is higher than the price of components sold in competitive markets.

In the alternative, you may determine whether defendant has market power with respect to technologies to meet LEV III / Tier 3 regulations by considering whether defendant has a high share of that market for technologies to meet LEV III / Tier 3 regulations such that purchasers do not have alternative sources of technologies to meet LEV III / Tier 3 regulations or a reasonably interchangeable substitute readily available. If defendant's market share of the market for technologies to meet LEV III / Tier 3 regulations is below 30 percent, defendant does not have market power.  But if defendant's market share of the market for technologies to meet LEV III / Tier 3 regulations is above 30 percent, you may consider that in determining whether defendant has market power.  Whether a high market share is an indicator of defendant's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing competitors to expand production, and the ease (or difficulty) with which new competitors can enter the market and make a price increase unprofitable. If you find that purchasers of technologies to meet LEV III / Tier 3 regulations do not have readily available alternative sources of supply and are forced as a practical matter to buy technologies to meet LEV III / Tier 3 regulations, you may find that defendant has market

power. You may also consider in your market power determination the presence of any unique features or costs associated with technologies to meet LEV III / Tier 3 regulations that effectively prevent others from offering a comparable product.]

**Source**

ABA Model Jury Instructions in Civil Antitrust Cases 2.E.8 (2016); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 35, 46 (2006) ("requir[ing] a showing of market power in the tying product" even when tying product is patented).

### 5.5.1   TYING – FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT [DISPUTED]

If you determine that **[Ingevity's Proposal: implied]** licenses to the '844 Patent and **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs are separate products that have been tied to one another and that Ingevity has market power for technologies to meet LEV III / Tier 3 regulations, then you must determine whether BASF has proven that Ingevity has foreclosed a substantial amount of interstate commerce with respect to **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs.

In determining whether Ingevity has foreclosed a substantial amount of commerce with respect to **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs, you should first consider the total dollar amount of Ingevity's sales of **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs in interstate commerce achieved by the tying arrangement in absolute terms.

**[Ingevity's Proposal: If the dollar amount of defendant's sales of fuel vapor canister carbon honeycombs was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to fuel vapor canister carbon honeycombs due to the tying arrangement. If there was not a substantial adverse effect on competition with respect to fuel vapor canister carbon honeycombs due to the tying arrangement, then you must find in favor of Ingevity on the tying claim.]**

There is no substantial foreclosure if only a **[Ingevity's Proposal: small percentage]** **[BASF's Proposal:** *de minimis* **amount]** of sales in the market for **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs were affected by the tying arrangement.  There also is no substantial foreclosure if you find that purchasers would not have bought **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs at all in the absence of the tying arrangement.

**[BASF's Proposal:  BASF has the burden of proving the foreclosure of a substantial volume of commerce by a preponderance of the evidence.  In this case, I am instructing you that BASF has met its burden of proof on this element.]**

<u>Source</u>

ABA Model Jury Instructions in Civil Antitrust Cases 2.E.9 (2016); *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 512-13 (3d Cir. 1998).

## 5.6   TYING – INTEREST OF DEFENDANT IN MARKET FOR TIED PRODUCT [DISPUTED]

**[<u>Ingevity's Proposal</u>:**

**In determining whether defendant has an economic interest with respect to fuel vapor canister carbon honeycombs, you should consider whether defendant has a financial interest in the seller of fuel vapor canister carbon honeycombs or received any economic benefit from the sales of fuel vapor canister carbon honeycombs.**

<u>**Source**</u>

**ABA Model Jury Instructions in Civil Antitrust Cases 2.E.10 (2016).]**

## 5.7   EXCLUSIVE DEALING – ELEMENTS

**[<u>Ingevity's Proposal</u>: All three of BASF's claims depend on BASF's allegation]** **[<u>BASF's Proposal</u>: BASF claims]** that Ingevity's three supply agreements with Delphi, Kayser, and KFTC constitute unlawful exclusive dealing.  Ingevity denies this allegation.

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time.  There are several forms of exclusive dealing arrangements.  The arrangement may take the form of a requirements contract committing the buyer to purchase at least a substantial share of its requirements of specific products or services from the supplier, which I will refer to as an "express" exclusive dealing contract.

[**BASF's Proposal**: **But you need not find that the agreement contained a specific, express term to use or purchase only Ingevity's products to conclude that it was an exclusive dealing arrangement because a condition, agreement, or understanding may be either expressly stated or inferred from the circumstances.  I will refer to such agreements as "de facto" exclusive dealing contracts.**]

If you find that BASF has proven that Ingevity entered into exclusive dealing contracts, you should then consider whether those contracts unreasonably restrained competition.  As I have previously explained, in making this determination, you must first determine whether BASF has proven that the contracts resulted in substantial harm to competition in the relevant markets.  If you find that BASF has proven that the contracts resulted in substantial harm to competition in the relevant market, then you must consider whether the contracts produced countervailing competitive benefits.  If you find that they did, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

[**Ingevity's Proposal**: **BASF contends that Ingevity's supply agreements with Delphi, Kayser, and KFTC are exclusive dealing arrangements.  For exclusive dealing, there are two relevant time periods you must consider.  First, you must consider the time period from when**]

50

Ingevity and Delphi, Kayser, and KFTC entered into the supply agreements until March 22, 2022, when the '844 Patent expires. Second, you must consider the time period from when the '844 Patent expires until the termination of each supply agreement.

As I instructed you previously, Ingevity has the right under the patent laws to enforce its patents, including through communications about its patent rights to customers and competitors and through litigation, and to petition the government, such as through filing a lawsuit and threatening litigation. Enforcement of patent rights and petitioning activity may not form the basis for an exclusive dealing claim.[8]

Additionally, if you find that fuel vapor canister honeycombs are not staple articles of commerce because they have no substantial uses other than to practice the '844 Patent, then you must find that any actual or attempted control by Ingevity over the market for fuel vapor canister honeycombs, such as the agreements with Delphi, Kayser, and KFTC, are not unlawful exclusive dealing. BASF contends that fuel vapor canister honeycombs are staple articles of commerce with substantial uses that do not infringe the '844 Patent, such that Ingevity does not have the right under the '844 Patent to control the market for fuel vapor canister carbon honeycombs used in fuel vapor canisters. Ingevity contends that fuel vapor canister carbon honeycombs, particularly those with 200 cells per square inch and typical widths of 29, 35, or 41 mm, are nonstaple goods, or goods that have no substantial use other than practicing the claims of the '844 Patent, such that fuel vapor canister honeycombs are not separate products that can be tied to sales of licenses to the '844 Patent, and such that

---

[8] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

Ingevity does have the right to control the market for fuel vapor canister carbon honeycombs used in fuel vapor canisters.

To meet its burden of showing conduct that amounts to exclusive dealing in the time period from when Ingevity and Delphi, Kayser, and KFTC entered into the supply agreements until March 22, 2022, BASF must prove by a preponderance of the evidence that the fuel vapor canister carbon honeycombs used in fuel vapor canisters have substantial noninfringing uses outside of practicing the claims of the '844 Patent.

In making this determination, you must consider the fuel vapor canister carbon honeycombs used in fuel vapor canisters actually sold by Ingevity and the uses made of it by its customers.  In other words, you must consider whether the fuel vapor canister carbon honeycombs used in fuel vapor canisters were actually used in a noninfringing way or that end-users actually assembled the honeycombs in a noninfringing way.  Substantial noninfringing uses are those that are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.  In assessing whether an asserted noninfringing use is "substantial," you must consider the use's frequency, the use's practicality, the invention's intended purpose, and the invention's intended market; the occasional aberrant use of a product that is designed to be used in a particular manner does not qualify as a substantial noninfringing use.  The asserted noninfringing use must be qualitatively and quantitatively significant.]

### Source

Final Jury Instruction 27, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 35, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 1.C.1, 2.D.5 (2016); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326-28 (1961) (explaining that even a contract that does not include an exclusivity clause can be de facto exclusive if its practical effect is to prevent purchases of competing products); *LePage's, Inc. v.*

*3M Co.*, 324 F.3d 141, 158 (3d. Cir 2003); Aᴿᴱᴱᴅᴀ & Hᴏᴠᴇɴᴋᴀᴍᴘ, Aɴᴛɪᴛʀᴜsᴛ Lᴀᴡ ¶ 768b2 (2d ed. 2002); 35 U.S.C. § 271(c)-(d); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 221 (1980); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 490 (1942); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir. 2009); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1001 (Fed. Cir. 2007); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Nobelpharma AB v. Implant Innovations Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869, 873 (Fed. Cir. 1997); *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987); *Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012); *Lannett Co. Inc. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *7 (N.D. Cal. Aug. 13, 2007); *Hoffman-La Roche Inc. v. Promega Corp.*, 1994 WL 761241, at *11 (N.D. Cal. June 13, 1994); *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 578 (E.D. Pa. 1989); *Dennison Mfg. Co. v. Ben Clements & Sons*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979).

**5.8    EXCLUSIVE DEALING – PROOF OF SUBSTANTIAL COMPETITIVE HARM UNDER RULE OF REASON [DISPUTED]**

To determine whether the supply agreements had a substantial harmful effect on competition, you should consider, with respect to the relevant market: the nature and history of the use of exclusive dealing contracts in the relevant market; whether customers had independent reasons for entering into exclusive dealing contracts or were coerced into entering into them; whether other competing suppliers also offered exclusive contracts; the extent of competition among competing suppliers for exclusive contracts with customers; Ingevity's position in the relevant market; the competitive alternatives to Ingevity's products or services; the reasons Ingevity and the customers entered into the long term agreements at issue; the effect of the use of long term agreements on the ability of new firms to enter the relevant market and on price and

other competition in the relevant market; [**Ingevity's Proposal: whether the exclusive dealing contracts served to enforce Ingevity's patents;**] as well as whether Ingevity had market power.

You may also consider:

- The circumstances under which Ingevity set up supply agreements and what reasons it had for doing so;

- The relative bargaining strength of the parties to the contracts.  If the parties had relatively equal bargaining strength, then the contracts are less likely to be unreasonable;

- How long in time the contracts were effective.  If the contracts lasted a relatively short time and did not significantly limit the opportunity for competing sellers to enter or remain in the market, then they were less likely to be unreasonable;

- Any favorable effects on competition that the contracts produce; and

- Any alternative channels of distribution that may have been available to BASF.

In determining the extent to which the supply agreements foreclosed competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure.  [**BASF's Proposal: If an exclusive dealing contract forecloses less than 20 percent of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives available.  Similarly, the**] [**Ingevity's Proposal: The**] shorter the duration of the contract, the less likely it is to harm competition.  The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty.  In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

However, these are simply factors for you to consider, they are not dispositive.  In the end, the key question is whether it was practical for customers to terminate the exclusive dealing

arrangement with Ingevity, and if it was not, whether **[BASF's Proposal: the anticompetitive effects of that arrangement outweighed any competitive benefits.] [Ingevity's Proposal: any coercion to exclusively deal with Ingevity foreclosed a substantial share of the relevant market such that competition was harmed.] [Ingevity's Proposal: In considering all these facts, you should determine whether the exclusive dealing contracts adversely affected the price paid by customers, the quality of the product offered in the relevant market, or output.]**

### Source

Final Jury Instruction 28, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instructions 21, 36, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 1.C.2, 2.D.6, 3.B (2016); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005); *United States v. Microsoft, Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004); *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, C.A. No. 17-1258, 2019 WL 1109868, at *8 (D. Del. Mar. 8, 2019).

## 5.9    EXCLUSIVE DEALING – FORECLOSURE [DISPUTED]

**[Ingevity's Proposal:**

Foreclosure means that rivals are prevented from competing in the relevant market. Total foreclosure is not required for the challenged conduct at issue to be unlawful, nor is complete exclusivity required with each customer.  In determining whether the challenged conduct foreclosed competition on the merits, it is also relevant to consider the percentage of the market foreclosed.  Where the exclusive dealing arrangements foreclosed more than 50 percent of the market, this is an indicator that the harm from the foreclosure of competition could be substantial.  Where the exclusive dealing arrangements foreclosed less than 20 percent of the market, this tends to indicate that the harm from the foreclosure of competition is not substantial because alternatives are available.

Foreclosure is considered substantial only when it weakens competition to such an extent that the competitors cannot constrain the power of the defendant, here Ingevity, to raise prices, lessen buying options, restrict output, or lessen quality.  If there are sufficient alternative ways for competing suppliers to effectively reach end users with their products, then a restraint does not foreclose competitors' access to the market.

If you conclude that Ingevity's honeycombs used in fuel vapor canisters are not staple articles of commerce, such that Ingevity has the right to control the market during the life of the '844 Patent, or that Ingevity's conduct that led to the alleged exclusive dealing arrangements was Ingevity's patent enforcement,[9] you may not consider foreclosure during the time period from when Ingevity and Delphi, Kayser, and KFTC entered into the supply agreements until the March 22, 2022.  You should consider foreclosure only from the time period from when the '844 Patent expires until the termination of each supply agreement.  If BASF has not shown by a preponderance of the evidence that purchasers in the relevant market will be substantially foreclosed from the time period from when the '844 Patent expires until the termination of each supply agreement, you must enter a verdict for Ingevity on BASF's exclusive dealing claim.  However, if you conclude that Ingevity's honeycombs used in fuel vapor canisters are staple articles of commerce, such that Ingevity does not have the right to control the market during the life of the '844 Patent, you should consider foreclosure during both the time period from when Ingevity and Delphi, Kayser, and KFTC entered into the supply agreements until the March 22, 2022 and the time period from when

_____

[9] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

the '844 Patent expires until the termination of each supply agreement.  If BASF has not

shown by a preponderance of the evidence that purchasers in the relevant market are or will

be substantially foreclosed in the relevant time periods, you must enter a verdict for Ingevity

on BASF's exclusive dealing claim.

> **Source**

Final Jury Instruction 26, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017);  35 U.S.C. § 271(c)-(d); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 221 (1980); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 490 (1942); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir. 2009); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1001 (Fed. Cir. 2007); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Nobelpharma ABImplant Innovations*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869, 873 (Fed. Cir. 1997); *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987); *Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012); *Lannett Co. Inc. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *7 (N.D. Cal. Aug. 13, 2007). *Hoffman-La Roche Inc. v. Promega Corp.*, 1994 WL 761241, at *11 (N.D. Cal. June 13, 1994); *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979).]

## 6.   ANTITRUST INJURY AND CAUSATION

If you find that Ingevity violated the Sherman Act and/or the Clayton Act, then you must

decide if BASF has been injured by Ingevity's conduct and, if so, if it is entitled to recover damages

from Ingevity for that injury.

> **Source**

Final Jury Instruction 42, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**6.1     ANTITRUST INJURY AND CAUSATION – ELEMENTS [DISPUTED]**

BASF is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation by a preponderance of the evidence:

*First*, that BASF was in fact injured as a result of the accused violation of the antitrust laws;

*Second*, that the alleged illegal conduct was a material cause of BASF's injury; and

*Third*, that BASF's injuries are injuries of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage."  For BASF to establish that it is entitled to recover damages, it must prove that it was injured as a result of the alleged violation of the antitrust laws.  **[<u>BASF's Proposal</u>:  Proving causation does not require BASF to prove the precise dollar value of its injury.  It requires only that BASF prove that it was in fact injured by the alleged antitrust violation.]**

If you find that BASF has established that it was in fact injured by an antitrust violation, you may then consider the amount of BASF's damages.  It is important to understand, however, that the fact of injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that BASF has established that it was in fact injured.

BASF must also offer evidence that establishes as a matter of fact and with a fair degree of certainty the alleged illegal conduct was a material cause of BASF's injury.  This means that BASF must prove that some damage occurred to it as a result of the alleged antitrust violation and not some other cause.  BASF is not required to prove that the accused conduct was the sole cause of its injury; nor is BASF required to eliminate all other possible causes of injury.  It is enough if BASF has proven that the alleged antitrust violation materially contributed, or substantially contributed, to BASF's injury, even if other factors also contributed.

Finally, BASF must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If BASF's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then BASF's injuries are antitrust injuries.  On the other hand, [**Ingevity's Proposal: if the acts that injured BASF and that led to a reduction in competition or otherwise harmed consumers were enforcement of a party's patent rights, then BASF's injuries are not antitrust injuries.  Further,**] if BASF's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then BASF's injuries are not antitrust injuries and BASF may not recover damages for those injuries under the antitrust laws.

### Source

Final Jury Instruction 42, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 37, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 6.A.1 (2016).

## 6.2    DEFINITION OF BUSINESS OR PROPERTY

BASF must establish that the injury it claims to have suffered was an injury to its "business or property."  The term "business" includes any commercial interest or venture, and you are instructed that BASF has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of Ingevity's alleged antitrust violation.  The term "property" includes anything of value BASF owns, possesses, or in which BASF has a protectable legal interest.  You are instructed that BASF has been injured in its property if you find that anything of value that it owns, possesses, or has a legal interest in has been damaged as a result of Ingevity's alleged antitrust violation.  You are further instructed to find that BASF has been

injured in its "business or property" if you find it has lost money as a result of Ingevity's alleged antitrust violation.

**Source**

Final Jury Instruction 43, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 38, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 6.A.2 (2016).

**7.     COMPENSATORY DAMAGES**

**7.1    COMPENSATORY DAMAGES – ANTITRUST**

**7.1.1   COMPENSATORY DAMAGES – ANTITRUST– PURPOSE**

If you find that Ingevity violated the Sherman Act and/or the Clayton Act and that this violation caused injury to BASF, then you must determine the amount of damages, if any, that BASF is entitled to recover.

The fact that I am giving you instructions concerning the issue of BASF's damages does not mean that I believe BASF should, or should not, prevail in this case.  If you reach a verdict for Ingevity on the issue of liability on the antitrust claims, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that BASF should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible to the position in which it would have been if the alleged antitrust violation had not occurred.  The antitrust laws do not permit you to award damages to punish a wrongdoer—what we sometimes refer to as "punitive damages"—or to deter a defendant from particular conduct in the future, or to provide a windfall to someone who has been the victim of an

antitrust violation.  This instruction is specific to a violation of the federal antitrust laws and punitive damages with regard to BASF's tortious interference with prospective business relations claim under Delaware common law will be addressed separately.  You are also not permitted to award BASF an amount for attorneys' fees or the cost of maintaining this lawsuit.

**Source**

Final Jury Instruction 44, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); ABA Model Jury Instructions in Civil Antitrust Cases 6.B.1 (2016).

### 7.1.2   COMPENSATORY DAMAGES – ANTITRUST – CALCULATION

You are permitted to make just and reasonable estimates in calculating damages.  You are not required to calculate damages with mathematical certainty or precision.  However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates.  Damages may not be based on guesswork or speculation.  BASF must prove the reasonableness of each of the assumptions upon which the damages calculation is based.  If you find that a damages calculation cannot be based on evidence and reasonable inference, and instead can only be reached through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages.  So long as there is a reasonable basis in the evidence for a damages award, BASF should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.

If you find that BASF has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.  If you find that BASF has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

**Source**

Final Jury Instruction 45, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); ABA Model Jury Instructions in Civil Antitrust Cases 6.B.3 (2016); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981); *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 124 (1969); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 487 (3d Cir. 1998); *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984); *Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206, 213 (3d Cir. 1983); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 351 (E.D. Pa. 1976) ("The proper question before this Court, therefore, is not whether the amount of damages can be established with absolute certainty, but whether plaintiff's proof allows a just and reasonable inference that damage in an approximate amount occurred in this litigation should defendants ultimately be found liable.").

### 7.1.3   COMPENSATORY   DAMAGES – ANTITRUST – CAUSATION   AND DISAGGREGATION [DISPUTED]

If you find that Ingevity violated the Sherman Act and/or the Clayton Act and that BASF was injured by that violation, BASF is entitled to recover damages for such injury that was the direct result or likely consequence of the illegal acts of Ingevity.  BASF bears the burden of showing that its injuries were caused by Ingevity's antitrust violation, as opposed to any other factors.  If you find that BASF's alleged injuries were caused in part by Ingevity's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of BASF's alleged injuries that was caused by Ingevity's alleged antitrust violation.

BASF claims that it suffered injury because it lost sales and profits as a result of Ingevity's tying of **[Ingevity's Proposal: fuel vapor canister]** carbon honeycombs to licenses to the '844 Patent and exclusive long-term supply agreements.  Ingevity contends that any profits or sales lost by BASF occurred as a result of other factors that have nothing to do with the tying arrangements or exclusive dealing agreements.  **[Ingevity's Proposal: These other factors include (1) BASF's decision in 2020 to shut down its in-house manufacturing department for base carbon, referred to as EnerG2, and (2) Ingevity's assertions in litigation and in the marketplace that use of BASF's fuel vapor canister carbon honeycomb had violated and would violate**

Ingevity's patent rights and customers' resulting unwillingness to purchase from BASF. BASF is not entitled to recover for changes in price that resulted solely from these or other causes arising from the normal course of business activity.  BASF only may recover for damages caused by the alleged antitrust violation.]

[**Ingevity's Proposal**: **BASF only may recover for damages caused by the challenged conduct – the alleged tying arrangements and exclusive dealing agreements.]**  BASF is not entitled to recover for lost profits that resulted solely from causes other than the tying arrangements and exclusive dealing agreements.  The presence of these factors does not mean BASF did not suffer antitrust injury, but BASF is not entitled to recover any damages caused by them.  BASF only may recover for damages caused by the alleged antitrust violation.

[**Ingevity's Proposal**: **BASF bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that BASF was injured by Ingevity's alleged antitrust violation, and there is a reasonable basis to apportion BASF's alleged injury between lawful and unlawful causes, then you may award damages.**

**If you find that BASF's alleged injuries were caused by factors other than Ingevity's alleged antitrust violation, then you must return a verdict for Ingevity.  If you find that there is no reasonable basis to apportion BASF's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.]**

<u>Source</u>

Final Jury Instruction 47, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); ABA Model Jury Instructions in Civil Antitrust Cases 6.B.4 (2016).

### 7.1.4   COMPENSATORY DAMAGES – ANTITRUST – LOST PROFITS

BASF claims that it was harmed because it lost profits as a result of Ingevity's alleged antitrust violation.  If you find that Ingevity committed an antitrust violation and that this violation caused injury to BASF, you now must calculate the profits, if any, that BASF lost as a result of Ingevity's antitrust violation.  To calculate lost profits, you must calculate net profits: the amount by which BASF's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.

BASF claims that, had it not been for Ingevity's alleged antitrust violation, BASF would have earned profits into the future; this is called "future lost profits."  You are not required to award future lost profits if you determine that they are too speculative.  But, if you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money.  For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year—you would then have something more than $1,000 in a year from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year.  This lower amount is known as an amount discounted to present value.

**<u>Source</u>**

Final Jury Instruction 46, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); ABA Model Jury Instructions in Civil Antitrust Cases 6.B.8, 6.B.9 (2016).

8.  **INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS[10] [11] [12] [DISPUTED]**

In addition to BASF's claims under the antitrust laws, BASF alleges that Ingevity violated Delaware common law by intentionally interfering with BASF's prospective business relationship with Kayser.  Ingevity denies these allegations.

To prove its claim for intentional interference with a prospective business relationship with Kayser, BASF must prove each of the following elements by a preponderance of the evidence:

*First*, the existence of a prospective contractual or business relationship between BASF and Kayser;

*Second*, an intent on the part of Ingevity to harm BASF by interfering with that prospective relationship **[Ingevity's Proposal: prior to that prospective business relationship becoming an actual contract]**;

*Third*, knowledge of the **[BASF's Proposal: prospective]** relationship or expectancy on the part of Ingevity;

*Fourth*, the absence of a privilege or justification on the part of Ingevity;

---

[10]  Ingevity objects to this instruction being given to the jury because, following BASF's concessions during summary judgment briefing, BASF's factual allegations are limited to alleged interference with a contract, not interference with a prospective business relationship.  It is undisputed that Ingevity did not tortiously interfere with a prospective business relationship between BASF and Kayser because BASF and Kayser formalized the business relationship in question through a contract.  The parties have not performed under the contract, but BASF has not alleged tortious interference with contract, which includes additional and different elements.

[11]  BASF responds that Ingevity did not make this argument in its summary judgment briefing and, in any event, the argument is meritless.  Under Delaware law, "[t]ortious interference with business expectancy is largely the same as tortious interference with a contract, except a showing of an actual contract is not *required*."  *Wagenhoffer v. VisionQuest Nat'l Ltd.*, 2016 WL 4053117, at *1 n.14 (Del. Sup. Ct. July 27, 2016) (emphasis added).  Ingevity cites no case holding that the existence of a written contract *precludes* a claim for interference with a prospective business relationship.

[12]  Ingevity responds that BASF itself cites a case holding that if a prospective business relationship becomes a contract, then the intentional interference with prospective business relations claim fails as a matter of law.  *See U.S. Bank Natl Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)) ("To meet the reasonable probability of a business opportunity prong, a plaintiff 'must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant.'").

65

*Fifth*, actual damage to BASF caused by Ingevity's interference; and

*Sixth*, a reasonable likelihood that the prospective relationship between BASF and Kayser would have occurred if not for Ingevity's interference.

A "prospective" relationship is something less than an actual contract but more than just hope on BASF's part that it would enter into the relationship with Kayser.  The reasonable likelihood that a relationship would have formed cannot be met based merely upon evidence of an existing contractual relationship.

In determining whether Ingevity intentionally interfered with BASF's prospective contractual or business relationship with Kayser, you must consider whether the purpose of Ingevity's conduct was to protect a legitimate interest and evaluate that against BASF's interests. In evaluating these interests, you will consider:

- The expectations of Ingevity and BASF;

- The relations between Ingevity and BASF;

- The interest Ingevity sought to advance;

- Whether Ingevity's conduct was done for the purpose of causing the interference or whether it was merely incidental to another purpose; and

- Whether Ingevity's conduct is sanctioned by the "rules of the game" which society has adopted for business competition.

**[<u>Ingevity's Proposal</u>: You must also find that Ingevity had knowledge of the existence of a contractual relationship between BASF and Kayser at the time of Ingevity's conduct.]**

You cannot find in favor of BASF unless you find Ingevity employed "wrongful means" to interfere with BASF's prospective contractual or business relationship with Kayser.

[**Ingevity's Proposal: If the prospective business relationship resulted in a contract, then you must find against BASF.**]

**Source**

Final Jury Instruction IV.B, *AgroFresh Inc. v. Essentiv LLC et al.*, C.A. No. 1:16-cv-00662-MN (D. Del. Oct. 11, 2019); *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) (noting that a business opportunity need only be "something more than a mere hope or the innate optimism of the salesman or a mere perception of a prospective business relationship") ("To meet the reasonable probability of a business opportunity prong, a plaintiff 'must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant."); *Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *14 (Del. Ch. Oct. 31, 2012) ("The interferer must also have 'knowledge of the relationship or expectancy.'"); *Ameripack, Inc. v. ILC Dover, Inc.*, 1999 WL 669315, at *1 (Del. Ch. July 28, 1999) ("Knowledge of the existence of a contractual or fiduciary relationship . . . is a crucial element of the claims.").

## 8.1   INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS – "WRONGFUL MEANS" [DISPUTED]

"Wrongful means" as used in these instructions can include conduct in violation of statutory provisions, such as the alleged tying and exclusive dealing that BASF alleges here, or other tortious or illegal actions.  If you find that Ingevity did not engage in such conduct, you should find in favor of Ingevity on the Intentional Interference With Prospective Business Relationships claim.  [**Ingevity's Proposal: Enforcement of a party's patent rights cannot be "wrongful means."**]

**Source**

Final Jury Instruction IV.C, *AgroFresh Inc. v. Essentiv LLC et al.*, C.A. No. 1:16-cv-00662-MN (D. Del. Oct. 11, 2019); *ASDI, Inc. v. Beard Research., Inc.*, 11 A.3d 749, 751 n.4 (Del. 2010).

## 8.2   COMPENSATORY DAMAGES – INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS

BASF claims lost profits that BASF allegedly would have earned but for Ingevity's intentional interference with BASF's prospective business relations with Kayser.  To recover

damages for lost profits, BASF must prove it is reasonably certain that it would have earned profits but for Ingevity's conduct.

To decide the amount of damages for lost profits, you must determine the gross amount BASF would have received but-for Ingevity's conduct and then subtract from that amount the expenses BASF would have had if Ingevity's conduct had not occurred.  You are not required to award future lost profits if you find that they are too speculative.  But, if you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money.  For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year—you would then have something more than $1,000 in a year from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year.  This lower amount is known as an amount discounted to present value.

The amount of lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.

**Source**

Final Jury Instruction 11.13, *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, C.A. No. 1:09-cv-00598-LPS (D. Del. Apr. 11, 2014).

## 9.   PUNITIVE DAMAGES

## 9.1   PUNITIVE DAMAGES – GENERALLY [DISPUTED]

You may only award punitive damages for the tortious interference claim.

If you find that Ingevity **[Ingevity's Proposal: proximately caused actual damages to BASF] [BASF's Proposal: tortiously interfered with BASF's prospective business relations in violation of Delaware common law]** and you have determined that Ingevity must pay damages because of that conduct, then you should consider whether the conduct that led to your decision also subjects Ingevity to punitive damages.

If you find that the conduct of Ingevity was outrageous, you may award punitive damages to punish Ingevity for its conduct and to deter it and others from committing similar acts.

A person's conduct is outrageous when it is malicious, wanton, willful, or oppressive, or shows reckless indifference to the interests of others.

In other words, you may award punitive damages against Ingevity only if BASF proves that Ingevity engaged in intentional interference with BASF's prospective business relationship with Kayser, and that Ingevity did so with malice, oppression, or fraud.  To do this, BASF must prove one of the following by a preponderance of the evidence:

1. That the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of Ingevity, who acted on behalf of Ingevity; or

2. That the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of Ingevity; or

3. That one or more officers, directors, or managing agents of Ingevity knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

"Malice" means that Ingevity acted with intent to cause injury or that Ingevity's conduct was despicable and was done with a willful and knowing disregard for BASF's rights.  A person acts with knowing disregard when he or she is aware of the probable harmful consequences of his or her conduct and deliberately fails to avoid those consequences.

"Oppression" means that Ingevity's conduct was despicable and subjected BASF to cruel and unjust hardship in knowing disregard of BASF's rights. "Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people. "Fraud" means that Ingevity intentionally misrepresented or concealed a material fact and did so intending to harm BASF.

An employee is a "managing agent" if he or she exercises substantial independent authority and judgment in his or her corporate decision-making such that his or her decisions ultimately determine corporate policy.

[**Ingevity's Proposal**: **There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages. If you decide to award punitive damages, you should consider all of the following factors in determining the amount:**

**(a) How reprehensible was Ingevity's conduct? In deciding how reprehensible Ingevity's conduct was, if at all, you may consider, among other factors:**

**1. Whether Ingevity's conduct involved a pattern or practice; and**

**2. Whether Ingevity acted with trickery or deceit.**

**(b) Is there a reasonable relationship between the amount of punitive damages and BASF's harm?**

**(c) In view of Ingevity's financial condition, what amount is necessary to punish it and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because Ingevity has substantial financial resources. Any award you impose may not exceed Ingevity's ability to pay.**]

Punitive damages may not be used to punish Ingevity for the impact of its alleged misconduct on persons other than BASF.

### Source

Final Jury Instruction IX.A, *AgroFresh Inc. v. Essentiv LLC et al.*, C.A. No. 1:16-cv-00662-MN (D. Del. Oct. 11, 2019); Final Jury Instruction 11.14, *Ateliers de la Haute-Garonne v.*

*Broetje Automation-USA Inc.*, C.A. No. 1:09-cv-00598-LPS (D. Del. Apr. 11, 2014); *Jardel Co. v. Hughes*, 523 A.2d 518, 529-30 (Del. 1987).

**9.2    PUNITIVE DAMAGES – CALCULATION [DISPUTED]**

If you decide that BASF is entitled to an award of punitive damages, it is your job to

**[Ingevity's Proposal: fix] [BASF's Proposal: determine]** the amount of such damages.

**[Ingevity's Proposal: In doing so, you may consider any or all of the following factors:**

- ▪ **The character of Ingevity's act;**

- ▪ **The nature and extent of the harm to BASF that Ingevity caused or intended to cause; and**

- ▪ **The wealth of Ingevity insofar as it is relevant in fixing an amount that will punish it, and deter it and others from like conduct in the future.**

**It is not necessary that you award compensatory damages to BASF in order to assess punitive damages against Ingevity, as long as you find in favor of BASF and against Ingevity on the question of liability for tortious interference.**

**The amount of punitive damages awarded must not be the result of passion or prejudice against Ingevity on the part of the jury.  The sole purpose of punitive damages is to punish Ingevity's conduct and to deter Ingevity and others from similar acts.**

**You have heard evidence of Ingevity's financial condition.  You are not to consider Ingevity's financial condition in deciding whether to award punitive damages, but you may consider it in determining the amount of punitive damages to the extent that the actual damages are insufficient to justly punish Ingevity for its behavior or dissuade Ingevity or others from acting the same way in future, similar situations.]**

**[BASF's Proposal: There is no fixed formula for determining the amount of punitive damages.  It is not necessary that you award compensatory damages to BASF in order to**

assess punitive damages against Ingevity, as long as you find in favor of BASF and against Ingevity on the question of liability for tortious interference.

If you decide to award punitive damages, you should consider all of the following factors in determining the amount:

(a) How reprehensible was Ingevity's conduct?  In deciding how reprehensible Ingevity's conduct was, if at all, you may consider, among other factors:

   1.   Whether Ingevity's conduct involved a pattern or practice; and

   2.   Whether Ingevity acted with trickery or deceit.

(b) Is there a reasonable relationship between the amount of punitive damages and BASF's harm?

(c) In view of Ingevity's financial condition, what amount is necessary to punish it and discourage future wrongful conduct?  You may not increase the punitive award above an amount that is otherwise appropriate merely because Ingevity has substantial financial resources.]

**Source**

Final Jury Instruction IX.B, *AgroFresh Inc. v. Essentiv LLC et al.*, C.A. No. 1:16-cv-00662-MN (D. Del. Oct. 11, 2019); *Sterner v. Wesley Coll., Inc.*, 747 F. Supp. 263, 270 (D. Del. 1990).

**10.   DELIBERATION AND VERDICT**

**10.1   DELIBERATION AND VERDICT – INTRODUCTION**

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence.  Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have

asked, so it may take me some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages:  Do not ever write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

**Source**

Final Jury Instruction 7.1, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 50, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 39, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

**10.2    UNANIMOUS VERDICT**

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson

fill in, date and sign the form.  You will then return to the courtroom and your foreperson will give your verdict.

**<u>Source</u>**

Final Jury Instruction 7.2, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 50, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 40, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

## 10.3   DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.  Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that—your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

**<u>Source</u>**

Final Jury Instruction 7.3, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 50, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 41, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

**10.4   SOCIAL MEDIA**

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or website such as Facebook, Instagram, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.  In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

<u>**Source**</u>

Final Jury Instruction 50, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 7.4, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

**10.5   COURT HAS NO OPINION**

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case yourselves based on the evidence presented.

<u>**Source**</u>

Final Jury Instruction 7.5, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019); Final Jury Instruction 50, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 42, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 5, 2021, upon the following in the manner indicated:

John W. Shaw, Esquire                                  *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
Nathan R. Hoeschen, Esquire
Jeffrey T. Castellano, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs*

Jeffrey T. Thomas, Esquire                             *VIA ELECTRONIC MAIL*
Frank P. Coté, Esquire
Eric T. Syu, Esquire
Taylor W. King, Esquire
Nathaniel R. Scharn, Esquire
GIBSON DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612
*Attorneys for Plaintiffs*

Brian M. Buroker, Esquire                              *VIA ELECTRONIC MAIL*
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
*Attorneys for Plaintiffs*

Stuart M. Rosenberg, Esquire                          *VIA ELECTRONIC MAIL*
GIBSON DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
*Attorneys for Plaintiffs*

Rustin K. Mangum, Esquire                             *VIA ELECTRONIC MAIL*
Spencer W. Ririe, Esquire
MANGUM RIRIE LLP
999 Corporate Drive, Suite 260
Ladera Ranch, CA  92694
*Attorneys for Plaintiffs*

*/s/ Anthony D. Raucci*
_____
Anthony D. Raucci (#5948)

2