# EXHIBIT 1

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEY'S EYES ONLY**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| INGEVITY CORPORATION, INGEVITY SOUTH CAROLINA, LLC, | |
| Plaintiffs-Counterclaim Defendants, | |
| v. | C.A. No. 18-1391-RGA |
| BASF CORPORATION, | |
| Defendant-Counterclaim Plaintiff. | |

**COUNTERCLAIM PLAINTIFF BASF CORPORATION'S STATEMENT OF ISSUES OF FACT REMAINING TO BE LITIGATED**

## TABLE OF CONTENTS

**Page**

I.      LIABILITY...................................................................................................................1

II.     DAMAGES / REMEDIES..................................................................................................2

III.    ISSUES ON WHICH INGEVITY BEARS THE BURDEN OF PROOF...........................2

Counterclaim Plaintiff BASF Corporation ("BASF") respectfully submits the following Statement of Facts Remaining to Be Litigated based on BASF's current understanding of the defenses asserted by Counterclaim Defendants Ingevity Corporation and Ingevity South Carolina LLC (collectively, "Ingevity").

BASF reserves the right to revise, amend, supplement, or modify its statement based upon any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence or other developments in the case, including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments. BASF further reserves the right to supplement this statement to rebut or otherwise address the contested facts identified by Ingevity. Should the Court determine that any issue identified in this statement is more properly considered an issue of law, it shall be so considered and BASF incorporates it by reference into its Statement of Issues of Law Remaining to Be Litigated (Exhibit 3). BASF contends that the issues of fact (or mixed questions of fact and law) that remain to be litigated at trial and decided by the jury are as follows:

## I.     LIABILITY[1]

1.     Whether BASF has proven by preponderance of the evidence that Ingevity's tying of carbon honeycombs to licenses to the '844 patent violates Sections 1 and 2 of the Sherman Act.

---

[1] BASF has moved for summary judgment that Ingevity violated the antitrust laws, namely Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and that Ingevity tortiously interfered with BASF's prospective business relations in violation of Delaware common law. D.I. 444. It is therefore BASF's position that there are no disputed facts remaining to be litigated for these issues. Should the Court deny BASF's motion for summary judgment, the following statements identify the facts BASF intends to prove at trial.

2.     Whether BASF has proven by a preponderance of the evidence that Ingevity's exclusive long-term supply agreements violate Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.

3.     Whether BASF has proven by a preponderance of the evidence that Ingevity has tortiously interfered with BASF's prospective business relations.

## II.     DAMAGES / REMEDIES

4.     If Ingevity is found to have violated the antitrust laws and/or Delaware common law, whether BASF is entitled to monetary damages, and the amount of damages based on a just and reasonable estimate.

5.     If Ingevity is found to have violated the antitrust laws and/or Delaware common law, whether BASF is entitled to an award of prejudgment interest, post-judgment interest, costs, and/or attorney's fees, and the amount of such awards.

6.     If Ingevity is found to have violated the antitrust laws and/or Delaware common law, whether BASF is entitled to a permanent injunction against further unlawful conduct.

7.     If Ingevity is found to have tortiously interfered with BASF's prospective business relations, whether BASF is entitled to punitive damages for Ingevity's willful, malicious, and/or otherwise outrageous conduct.

## III.     ISSUES ON WHICH INGEVITY BEARS THE BURDEN OF PROOF

8.     If Ingevity is permitted to rely on unasserted claims of the '844 patent, whether Ingevity can prove by a preponderance of the evidence that carbon honeycombs are nonstaple goods and that its tying and exclusive dealing arrangements are within the scope of any valid claims of the '844 patent.

9.      Whether Ingevity has proven by a preponderance of the evidence that Ingevity's tying of carbon honeycombs to patent licenses and Ingevity's exclusive long-term supply agreements are petitioning activities protected by the *Noerr-Pennington* doctrine.

10.     In the event of a finding that carbon honeycombs are nonstaple goods, whether BASF has proven by a preponderance of the evidence that the patent claims are unenforceable due to patent misuse.

11.     In the event of a finding that carbon honeycombs are nonstaple goods, whether BASF has proven by a preponderance of the evidence that the patent claims are unenforceable due to patent exhaustion.

# EXHIBIT 2

## EXHIBIT 2

### INGEVITY'S STATEMENT OF FACTS THAT REMAIN TO BE LITIGATED[1]

Counter-Defendant Ingevity respectfully submits the following Statement Of Facts Remaining That Remain To Be Litigated based on Ingevity's current understanding of BASF's counterclaims.  Ingevity reserves the right to revise, amend, supplement, or modify its statement of facts that remain to be litigated based upon any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence, or other developments in the case, including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments.  The following statement of issues of fact is not exhaustive, and Ingevity reserves the right to prove any matters identified in the pleadings, interrogatory responses, and/or expert reports.  Should the Court determine that any issue identified here is more appropriately considered an issue of law, Ingevity incorporates such issues by reference into its Statement Of Issues Of Law That Remain To Be Litigated.  Likewise, to the extent that Ingevity's Statement Of Issues Of Law That Remain To Be Litigated contains issues that the Court deems to be issues of fact, those issues are incorporated herein by reference.

1.      **Patent Enforcement and Petitioning Activity[2]**

1.      In connection with its tying claim, whether BASF can prove by a preponderance of the evidence that Ingevity engaged in conduct that is not patent enforcement or petitioning activity, which are immune from antitrust and tort liability.

---

[1] Ingevity contends that many, if not all, of the statements of fact that remain to be litigated contained herein should be mooted by the Court granting Ingevity's motion for summary judgment on BASF's antitrust and tortious interference claims.  Ingevity includes the issues here in case the Court disagrees.

[2] Ingevity believes the determination of whether conduct amounts to patent enforcement activity is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

2.     In connection with its exclusive dealing claim, whether BASF can prove by a preponderance of the evidence that Ingevity engaged in conduct during the life of U.S. Patent No. RE38,844 (the "'844 Patent") that is not patent enforcement or petitioning activity, which are immune from antitrust and tort liability.

3.     In connection with its tortious interference with prospective business relations claim, whether BASF can prove by a preponderance of the evidence that Ingevity engaged in conduct that is not patent enforcement or petitioning activity, which are immune from antitrust and tort liability.

**2.     Patentee's Right to Control the Market for Non-Staple Goods**

4.     Whether BASF can prove by a preponderance of the evidence that Ingevity's fuel vapor canister honeycombs ("FVC honeycombs") are staple goods that have actual and substantial noninfringing uses other than practicing the '844 Patent.

**3.     The Relevant Market**

5.     Whether BASF can prove by a preponderance of the evidence that a relevant product market for BASF's antitrust claims is carbon adsorbents used in LEV III/Tier 3-compliant fuel vapor canisters.  Ingevity contends that BASF has not correctly defined the relevant product market because granular and pelletized base carbon is a complement, not a substitute, for automotive honeycomb and other subsequent adsorbent volumes in LEV III / Tier 3-compliant fuel vapor canisters.

6.     Whether BASF can prove by a preponderance of the evidence that a relevant product market for BASF's antitrust claims is technologies to meet LEV III/Tier 3 regulations.

7.     Whether BASF can prove by a preponderance of the evidence that the relevant geographic market is the United States and Canada.

4.      **Exclusive Dealing**

8.      Whether BASF can prove by a preponderance of the evidence that Ingevity engaged in anticompetitive conduct (as opposed to good faith patent enforcement activity or petitioning activity).[3]

9.      Whether BASF can prove by a preponderance of the evidence that Ingevity's FVC Honeycombs are staple goods with substantial noninfringing uses.

10.     If BASF can prove that FVC honeycombs are staple goods, whether BASF can prove by a preponderance of the evidence that Ingevity's supply agreements with Delphi, Kayser, and KFTC resulted in substantial foreclosure in the relevant market  (OEMs that purchase technologies for meeting LEV III/Tier 3 regulations) and a substantial adverse effect on competition in that market during the life of the '844 Patent.

11.     If BASF can prove that a relevant product market in this case is carbon adsorbents used in LEV III / Tier 3-compliant fuel vapor canisters, whether BASF can prove by a preponderance of the evidence that Ingevity has market power in that market.

12.     If BASF can prove that FVC honeycombs are staple goods, whether BASF can prove by a preponderance of the evidence that Ingevity's supply agreements with Delphi, Kayser, and KFTC had a substantial adverse effect on competition in the relevant market during the life of the '844 Patent, and, additionally, whether BASF can also prove by a preponderance of the evidence that the alleged anticompetitive effects of Ingevity's supply agreements with

---

[3] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine, is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

Delphi, Kayser, and KFTC outweigh the pro-competitive benefits during the life of the '844 Patent.

13.     Whether BASF's claims for exclusive dealing for purported foreclosure after expiration of the '844 Patent are ripe for adjudication.[4]

14.     Whether BASF can prove by a preponderance of the evidence that Ingevity's supply agreements with Delphi, Kayser, and KFTC will result in substantial foreclosure in the relevant market and will have a substantial adverse effect on competition in that market after expiration of the '844 Patent.

15.     If BASF can prove a relevant market, whether BASF can prove by a preponderance of the evidence that Ingevity had substantial market power in that market, such that Ingevity had the power to force buyers to enter into exclusive contracts they did not want, and that Ingevity's supply agreements with Delphi, Kayser, and KFTC adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market.

16.     If BASF can prove that Ingevity engaged in anticompetitive conduct (as opposed to good faith patent enforcement activity or petitioning activity), whether BASF can prove by a preponderance of the evidence that BASF was in fact injured in its business or property as a result of Ingevity's alleged anticompetitive conduct, that BASF's alleged injury is an injury of the type the antitrust laws were intended to prevent, that Ingevity's alleged anticompetitive conduct was a material cause of BASF's alleged antitrust injury, that any claimed injury was not the result of lawful competition, including lawful patent enforcement activity in the marketplace

---

[4] Ingevity contends that any claim for post-expiration exclusive dealing is not ripe and that the Court should enter judgment for lack of standing and that both questions are questions of law for the Court to decide, but to the extent that the Court does not agree, then Ingevity has identified this issue here.

and through litigation, and that BASF properly disaggregated its claimed lost profit damages between the alleged unlawful and lawful effects of competition.  In other words, whether BASF has properly and reasonably attributed its claimed lost profits to the alleged anticompetitive acts, and not to lawful competition, including lawful patent enforcement and/or petitioning activity.

**5.    Tying**

17.    Whether BASF can prove by a preponderance of the evidence that Ingevity engaged in anticompetitive conduct (as opposed to good faith patent enforcement activity or petitioning activity).[5]

18.    Whether BASF can prove by a preponderance of the evidence that Ingevity's FVC Honeycombs are staple goods with substantial noninfringing uses.

19.    If BASF can prove that a relevant product market in this case is technologies to meet LEV III / Tier 3 regulations, whether BASF can prove by a preponderance of the evidence that Ingevity has market power in that market.

20.    Whether BASF can prove by a preponderance of the evidence that implied licenses to the '844 Patent and FVC Honeycombs are separate and distinct products.

21.    If BASF can prove that a relevant product market in this case is the market for technologies to meet LEV III/Tier 3 regulations, whether BASF can prove that demand for FVC honeycombs is distinct from the demand for Ingevity's Lev III / Tier 3 technology.

---

[5] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

22.     Whether BASF can prove by a preponderance of the evidence that Ingevity has conditioned the granting of implied licenses to the '844 Patent on a requirement that customers purchase fuel vapor canister carbon honeycombs.

23.     If BASF can prove that Ingevity's conduct amounts to unlawful activity rather than lawful conduct, whether BASF can prove that Ingevity's conduct impacts a substantial amount of interstate commerce.

24.     If BASF can prove that Ingevity's conduct amounts to unlawful activity rather than lawful conduct, whether BASF can prove that the competitive harms caused by Ingevity's conduct outweigh the procompetitive benefits of that conduct.

25.     If BASF can prove that Ingevity engaged in anticompetitive conduct (as opposed to good faith patent enforcement activity or petitioning activity), whether BASF can prove by a preponderance of the evidence that BASF was in fact injured in its business or property as a result of Ingevity's alleged anticompetitive conduct, that BASF's alleged injury is an injury of the type the antitrust laws were intended to prevent, that Ingevity's alleged anticompetitive conduct was a material cause of BASF's alleged antitrust injury, that any claimed injury was not the result of lawful competition, including lawful patent enforcement activity in the marketplace and through litigation, and that BASF properly disaggregated its claimed lost profit damages between the alleged unlawful and lawful effects of competition.  In other words, whether BASF has properly and reasonably attributed its claimed lost profits to the alleged anticompetitive acts, and not to lawful competition, including lawful patent enforcement and/or petitioning activity.

6.     **Common Issues – Antitrust Injury, Causation, And The Rule of Reason**

26.     Whether BASF can prove by a preponderance of the evidence that it has suffered an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

27.     Whether BASF can prove by a preponderance of the evidence that the alleged anticompetitive conduct was a material and proximate cause of the alleged injury and damage.

28.     Whether BASF can prove by a preponderance of the evidence that Ingevity's alleged conduct caused or was likely to cause anticompetitive effects in the relevant market and that any pro-competitive benefits are outweighed by the alleged anticompetitive effects of Ingevity's alleged anticompetitive conduct.

7.     **Intentional Interference With Prospective Business Relationships[6]**

29.     Whether BASF can prove by a preponderance of the evidence that Ingevity engaged in tortious conduct (as opposed to good faith patent enforcement activity or petitioning activity).[7]

30.     Whether BASF has proven by a preponderance of the evidence that Ingevity's FVC Honeycombs are staple goods with substantial noninfringing uses.

---

[6]Ingevity disagrees that there are any issues to be litigated with respect to this claim because, following BASF's concessions during summary judgment briefing, BASF's factual allegations are limited to alleged interference with a contract, not interference with a prospective business relationship.  It is undisputed that Ingevity did not tortiously interfere with a prospective business relationship between BASF and Kayser because BASF and Kayser formalized the business relationship in question through a contract.  The parties have not performed under the contract, but BASF has not alleged tortious interference with contract, which includes additional and different elements.

[7] Ingevity believes the determination of whether conduct amounts to patent enforcement or petitioning activity, and is therefore immune under the patent laws and/or the *Noerr-Pennington* doctrine is a question of law for the Court, but includes the issue here in case the Court disagrees and determines the matter is a question of fact for the jury.

31.     Whether BASF can prove by a preponderance of the evidence that Ingevity tortiously interfered with a prospective business relationship between BASF and Kayser that did not result in a contract.

**8.     Damages**

32.     If BASF can prove that Ingevity is liable for either of BASF's antitrust claims or BASF's tortious interference claim, whether BASF can prove by a preponderance of the evidence that it suffered damages in the form of lost profits.

33.     If BASF can prove that Ingevity is liable for either of BASF's antitrust claims and that it suffered damages in the form of lost profits, whether BASF can prove by a preponderance of the evidence that Ingevity's alleged anticompetitive conduct caused BASF's alleged damages, rather than Ingevity's lawful competitive conduct, Ingevity's lawful patent enforcement activity, Ingevity's lawful petitioning activity (including Ingevity's filing of patent infringement litigation against BASF), intervening decisions by OEMs and Tier 1 suppliers, BASF's decision to close EnerG2, BASF's decision to use ███████ as a carbon source for its carbon slurry used to coat EvapTrap XC, and/or poor customer service.

34.     If BASF can prove that Ingevity is liable for either of BASF's antitrust claims or BASF's tortious interference claim and that it suffered damages in the form of lost profits, whether BASF can prove by a preponderance of the evidence that it properly disaggregated its claimed lost profit damages between the alleged unlawful activity and lawful patent enforcement activity, petitioning activity, or competition.

35.     If BASF can prove that Ingevity is liable for either of BASF's antitrust claims or BASF's tortious interference claim and that it suffered damages in the form of lost profits,

whether BASF can prove by a preponderance of the evidence that the amount of lost profits it seeks is just and reasonable, non-speculative, and supported by the evidence.

36.     In the event of a finding of tortious interference with BASF's prospective business relations with Kayser, whether Ingevity's conduct is outrageous, because of evil motive or reckless indifference to BASF's rights, so as to warrant punitive damages, and if so, the amount of punitive damages BASF should be awarded.

37.     If BASF can prove that Ingevity is liable for any of BASF's claims, whether Ingevity can prove by a preponderance of the evidence that BASF acted unreasonably in failing to take specific steps to minimize or limit its losses.

38.     If BASF can prove that Ingevity is liable for any of BASF's claims, whether Ingevity can prove, by a preponderance of the evidence, that BASF's failure to take specific steps to minimize or limit its losses resulted in its losses being greater than they would have been had it taken such steps, and the amount by which BASF's alleged loss would have been reduced had BASF taken those steps.

# EXHIBIT 3

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEY'S EYES ONLY**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INGEVITY CORPORATION, INGEVITY SOUTH CAROLINA, LLC, | |
| Plaintiffs-Counterclaim Defendants, | |
| v. | C.A. No. 18-1391-RGA |
| BASF CORPORATION, | |
| Defendant-Counterclaim Plaintiff. | |

**COUNTERCLAIM PLAINTIFF BASF CORPORATION'S STATEMENT OF ISSUES
OF LAW REMAINING TO BE LITIGATED**

## <u>TABLE OF CONTENTS</u>

I.     ISSUES ON WHICH BASF BEARS THE BURDEN OF PROOF ..................................1

    A.     Liability for the Counterclaims ................................................................1

         1.     Issues ..........................................................................................1

              a.     Unlawful Tying .................................................................2

              b.     Unlawful Exclusive Dealing ............................................4

              c.     Tortious Interference with Prospective Business Relations .............7

         1.     Issues ..........................................................................................7

              a.     Causation ...........................................................................8

              b.     Antitrust Damages ............................................................9

              c.     Punitive Damages for Tortious Interference .................10

              d.     Injunctive Relief .............................................................10

              e.     Interest, Costs, and Fees .................................................11

II.     ISSUES ON WHICH INGEVITY BEARS THE BURDEN OF PROOF .......................12

    A.     Affirmative Defenses to the Counterclaims ...........................................12

         1.     Issues ........................................................................................12

              a.     The Patent Defense ........................................................14

              b.     The *Noerr-Pennington* Doctrine ...................................19

              c.     Patent Misuse ..................................................................20

              d.     Purging of Patent Misuse ...............................................21

              e.     Patent Exhaustion ...........................................................22

Counterclaim Plaintiff BASF Corporation ("BASF") respectfully submits the following Statement of Issues of Law Remaining to Be Litigated based on BASF's current understanding of the defenses asserted by Counterclaim Defendants Ingevity Corporation and Ingevity South Carolina LLC (collectively, "Ingevity").

To the extent BASF's Statement of Issues of Fact Remaining to Be Litigated (Exhibit 1) contains issues of law, those issues are incorporated herein by reference. Likewise, should the Court determine that any issue identified in this statement is more appropriately considered an issue of fact, BASF incorporates such issue by reference into Exhibit 1. By including a fact herein, BASF does not assume the burden of proof or production with regard to that fact. BASF reserves the right to revise this statement in light of the Court's rulings and in light of Ingevity's identification of issues of law and fact to be litigated. To the extent that Ingevity intends or attempts to introduce different or additional legal arguments to those identified below, BASF reserves its right to contest those legal arguments and to present any and all rebuttal evidence in response to those arguments without being bound by this summary of remaining legal issues.

## I.   ISSUES ON WHICH BASF BEARS THE BURDEN OF PROOF

### A.   Liability for the Counterclaims

#### 1.   Issues

1.      Whether BASF has proven by a preponderance of the evidence that Ingevity's tying of carbon honeycombs to licenses to the '844 patent violates Sections 1 and 2 of the Sherman Act.

2.      Whether BASF has proven by a preponderance of the evidence that Ingevity's exclusive long-term supply agreements violate Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.

3.      Whether BASF has proven by a preponderance of the evidence that Ingevity has tortiously interfered with BASF's prospective business relations.

a.      **Unlawful Tying**

Tying arrangements are characterized by a "seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds*, *Ill. Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28 (2006). Tying is a per se violation of the antitrust laws if the plaintiff establishes: (1) the existence of at least two distinct products; (2) the sale of one product conditioned upon the purchase of another; (3) market power in the tying product market; and (4) a substantial amount of interstate commerce affected by the arrangement. *See id.* at 15-16; *Gordon v. Lewistown Hosp*., 423 F.3d 184, 214 (3d Cir. 2005).

Two distinct products exist for purposes of tying where they are distinguishable in the eyes of buyers such that the two products "could be provided separately" from different sources "if the [defendant] did not insist" on packaging them together. *Jefferson Par*., 466 U.S. at 19.

Market power is "the power to control prices or exclude competition." *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S. Ct. 994, 1005 (1956); *accord Race Tires Am., Inc. v. Hoosier Racing Tire Corp*., 614 F.3d 57, 74 (3d Cir. 2010) (defining market power "as the ability to raise prices above those that would exist in a competitive market"). Market power can be established through direct evidence or circumstantial evidence. Direct evidence of market power may include supracompetitive prices or the exclusion of competitors from a market. *Eastman Kodak Co. v. Image Tech. Servs*., 504 U.S. 451, 477-78 (1992); *Broadcom Corp. v. Qualcomm Inc*., 501 F.3d 297, 307 (3d Cir. 2007). Circumstantial evidence of market power is typically presented in the form of high market shares and barriers to entry. *See United States v. Grinnell Corp*., 384 U.S. 563, 571 (1966). There is no bright-line numeric threshold for a defendant's market share to establish market power, but the Supreme Court has described an 80%

2

share as a "substantial monopoly," *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946), and has said that an 87% share "leaves no doubt" of market domination, *Grinnell Corp.*, 384 U.S. at 571; *see also United States v. Dentsply Int'l Inc.*, 399 F.3d 181, 188 (3d Cir. 2005) (holding that defendant's 75-80% was "more than adequate" to establish market power). Regulatory requirements, high capital costs, and technological challenges are examples of barriers to entry. *Broadcom*, 501 F.3d at 307.

For a tying arrangement to be per se unlawful, it must also affect a "not insubstantial" volume of interstate commerce. *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958). The analysis is straightforward: "[N]ormally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie." *Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969). Sales volumes as small as $10,091 ($22,990 in today's dollars) have been deemed "certainly more than de minimis." *Tic-X Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1420-21 (11th Cir. 1987).

Restraints subject to the per se rule are those "whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). When the elements of a per se unlawful tying arrangement are established, the plaintiff is "relieved of proving actual harm to competition and of rebutting justifications for the tie-in." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992); *accord United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221-22 (1940).

A tying arrangement with these characteristics is per se unlawful as an anticompetitive restraint under Section 1 of the Sherman Act. *Eastman Kodak*, 504 U.S. at 461-62; *Gordon*, 423

F.3d at 214. In addition, a tying arrangement violates Section 2 of the Sherman Act if adopted by a monopolist as part of a scheme to acquire or maintain monopoly power. *Eastman Kodak*, 504 U.S. at 481, 483. To prevail in a monopolization claim under Section 2 of the Sherman Act, a plaintiff must establish: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

### b.     Unlawful Exclusive Dealing

An arrangement by which a customer is required to exclusively purchase the products of a supplier to the exclusion of the supplier's competitors may run afoul of the antitrust laws. Exclusive dealing agreements harm competition by forcing an "all-or-nothing choice" and impeding the development of competitors. *See LePage's, Inc. v. 3M Co*., 324 F.3d 141, 158 (3d. Cir 2003) (citing AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 768b2 (2d ed. 2002)). Exclusive dealing arrangements are analyzed under the rule of reason and are deemed unlawful if their "probable effect is to substantially lessen competition in the relevant market." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 268 (3d Cir. 2012) (quotation marks omitted). The following factors, among others, help determine whether an exclusive arrangement is anticompetitive under the rule of reason: "[S]ignificant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *ZF Meritor*, 696 F.3d at 271.

Whether an agreement constitutes exclusive dealing in violation of the antitrust laws depends on its "practical effect" in light of economic realities, not a formalistic interpretation of the contract language. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326-28 (1961)

(explaining that even a contract that does not include an exclusivity clause can be de facto exclusive if its practical effect is to prevent purchases of competing products).

There is no set threshold percentage for market foreclosure to be considered "substantial" for purposes of exclusive dealing. Some courts have required at least 40% foreclosure, but a lower amount is sufficient where an exclusive arrangement involves a monopolist or when the claim is brought under Section 3 of the Clayton Act. *See United States v. Microsoft, Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *see also Roxul USA, Inc. v. Armstrong World Indus., Inc.*, C.A. No. 17-1258, 2019 WL 1109868, at *8 (D. Del. Mar. 8, 2019) (citing *McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015)). The substantial foreclosure inquiry also takes into account other existing foreclosures in the market. *See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004). Although the availability of alternative sales outlets for a plaintiff's product is to be considered in the substantial foreclosure inquiry, the outlet must be "practical or feasible in the market as it exists and functions." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005). The relevant foreclosure inquiry is not whether sales to the alternative outlet would "enable a competitor to 'survive' but rather whether direct selling 'poses a real threat' to defendant's monopoly." *Id.* (citing *Microsoft*, 253 F.3d at 71). Further, whether foreclosure is "substantial" depends on more than the percentage of foreclosure. Courts must also consider other factors, such as the relative strength of the parties, the volume of commerce involved in proportion to the total volume, and immediate and future effects on competition. *See Tampa Elec. Co.*, 365 U.S. at 329.

The coercion of a customer to accept exclusivity suggests that the arrangement is anticompetitive. *See ZF Meritor*, 696 F.3d at 272. Also, exclusive agreements of long duration are more likely to be anticompetitive than short-term arrangements. *Compare ZF Meritor*, 696 F.3d.

at 286-87 (characterizing five- and seven-year supply agreements as indicative of anticompetitive effects), *with Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1994) (upholding contract that was terminable in 90 days).

Under the burden-shifting approach of the rule of reason, once the plaintiff establishes a prima facie case that the arrangement had an anticompetitive effect, the burden shifts to the defendant to present valid procompetitive justifications for its conduct, which may be rebutted as invalid or pretextual. *See Microsoft*, 253 F.3d at 46-47; *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 438 (3d Cir. 2016). As part of establishing a prima facie case: "Due to the difficulty of isolating the market effects of the challenged conduct . . . the courts allow proof of the defendant's market power instead" as "a surrogate for detrimental effects." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996) (quoting *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993)). Further, an anticompetitive restraint "only survives a rule of reason analysis if it is reasonably necessary to achieve the legitimate objectives proffered by the defendant." *Brown Univ.*, 5 F.3d at 678-79; *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010). And "[t]o determine if a restraint is reasonably necessary, courts must examine first whether the restraint furthers the legitimate objectives, and then whether comparable benefits could be achieved through a substantially less restrictive alternative." *Brown Univ.*, 5 F.3d at 679.

An exclusive dealing arrangement that is anticompetitive under the rule of reason is unlawful as an anticompetitive agreement under Section 1 of the Sherman Act (15 U.S.C. § 1). Such an arrangement is also unlawful under Section 2 of the Sherman Act (15 U.S.C. § 2) if used as a vehicle to monopolize. *See Tampa Elec.*, 365 U.S. at 335. In addition, Section 3 of the Clayton Act prohibits a seller of goods from conditioning the sale on the customer's commitment to

exclusively purchase the seller's goods, "*whether patented or unpatented*," where the effect of that condition "may be to substantially lessen competition or tend to create a monopoly." 15 U.S.C. § 14 (emphasis added). A violation of the Clayton Act thus requires a lesser showing of anticompetitive effects. *See Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1239 (3d Cir. 1975); *see also* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1800c4 (5th ed. 2020).

### c. Tortious Interference with Prospective Business Relations

Tortious interference with prospective business relations has the following elements: "(1) the reasonable probability of a business opportunity; (2) the intentional interference by defendant with that opportunity; (3) proximate causation; and (4) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) (citing *DeBonaventura v. Nationwide Mut. Ins. Co*., 428 A.2d 1151, 1153 (Del. 1981)). The plaintiff does not need to show that the defendant was aware of an executed contract; rather, "to be reasonably probable," a business opportunity need only be "something more than a mere hope or the innate optimism of the salesman or a mere perception of a prospective business relationship." *U.S. Bank Nat'l Ass'n*, 23 F. Supp 3d at 436.

### B. Damages

#### 1. Issues

1. If Ingevity is found to have violated the antitrust laws and/or Delaware common law, whether BASF is entitled to monetary damages based on a just and reasonable estimate.

2. If Ingevity is found to have violated the antitrust laws and/or Delaware common law, whether BASF is entitled to an award of prejudgment interest, postjudgment interest, costs, and/or attorney's fees.

3.       If Ingevity is found to have tortiously interfered with BASF's prospective business relations, whether BASF is entitled to punitive damages for Ingevity's willful, malicious, and/or otherwise outrageous conduct.

4.       If Ingevity is found to have violated the antitrust laws and/or Delaware common law, whether BASF is entitled to a permanent injunction against further unlawful conduct.

### a.    Causation

As explained by the Supreme Court: "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114 n.9 (1969); *see also Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206, 209-10 (3d Cir. 1983). In *Danny Kresky*, the district court erroneously required that plaintiff's injury be a "direct and certain result of defendant's conceded antitrust violation." 716 F.2d at 213. Holding that the causation standard applied by the district court was inconsistent with the one established in *Zenith*, the Third Circuit reversed and remanded for the reinstatement of the jury's verdict on damages. *Id.*

A court may "infer from . . . circumstantial evidence" the necessary causal connection between the defendant's conduct and the plaintiff's injury. *Zenith*, 395 U.S. at 125 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696-701 (1962)). Where "the injury alleged was precisely the type of loss that the claimed violations would be likely to cause, [the court is] entitled to infer that the requisite causation has been established." *Fla. Sugar Mktg. & Terminal Ass'n v. Local No. 3, Int'l Longshoremen's Assoc.*, 668 F. Supp. 173, 182 (S.D.N.Y. 1987) (citation omitted).

b.    **Antitrust Damages**

Antitrust damages are not required to be measured with certainty; rather, "the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances, 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.'" *Zenith*, 395 U.S. at 124 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 561-64 (1931)); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 487 (3d Cir. 1998); *see also In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 351 (E.D. Pa. 1976) ("The proper question before this Court, therefore, is not whether the amount of damages can be established with absolute certainty, but whether plaintiff's proof allows a just and reasonable inference that damage in an approximate amount occurred in this litigation should defendants ultimately be found liable.").

The "traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury" is well established. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981). As the Supreme Court explained: "Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *Id.* at 566. In *Zenith*, the Court held that the plaintiff's damages award was sufficiently supported by estimates of plaintiff's expected sales absent the anticompetitive conduct. 395 U.S. at 123 ("Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are  rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.").

In estimating profits in "the but-for world" absent a defendant's anticompetitive conduct, "plaintiffs are given some latitude in calculating damages, so long as their theory is not wholly speculative." *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984). This is true especially where there are no historic sales data available because the defendant has successfully excluded competitors from the market. As the Supreme Court explained: "[W]here the defendant by his own wrong has prevented a more precise computation . . . juries are allowed to act on probable and inferential as well as upon direct and positive proof." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (quoting *Story Parchment*, 282 U.S. at 564). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Id.*; *see also J. Truett Payne*, 451 U.S. at 566-567 ("[I]t does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted."); *Danny Kresky*, 716 F.2d at 213.

### c.      Punitive Damages for Tortious Interference

Under Delaware law, punitive damages may be awarded where a defendant's tortious behavior "is 'outrageous,' because of 'evil motive' or 'reckless indifference to the rights of others.'" *Sterner v. Wesley Coll., Inc.*, 747 F. Supp. 263, 270 (D. Del. 1990) (quoting *Jardel Co. v. Hughes*, 523 A.2d 518, 529-30 (Del. 1987)). The Delaware Supreme Court has explained that this standard "parallel[s] the willful and wanton standard[s]," which "involve an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences." *Jardel Co.*, 523 A.2d at 529-30.

### d.      Injunctive Relief

Section 16 of the Clayton Act permits private parties to obtain injunctions "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The statute also

states that where a plaintiff obtains an injunction, "the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff." 15 U.S.C. § 26. Injunctions against anticompetitive conduct are issued "under the same conditions as injunctions are granted by 'courts of equity.'" *Weiss v. York Hosp.*, 745 F.2d 786, 829 (3d Cir. 1984). The focus of the inquiry is on "threatened loss or damage" to the plaintiff. *Id.*; *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 409 (D. Del. 2007). For standing to seek injunctive relief, a plaintiff must show: "(1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust violation." *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996).

Courts have wide discretion in fashioning injunctive relief that can effectively address the competitive harms posed by a particular arrangement. *Int'l Salt Co. v. United States*, 332 U.S. 392, 400-01 (1947). The Supreme Court said in *International Salt*: "In an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices. A public interest served by such civil [antitrust] suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints." *Id.* at 401. There are three primary objectives of injunctive relief: "(1) putting an end to illegal conduct, (2) depriving violators of the benefits of their illegal conduct, and (3) restoring competition in the marketplace." *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1059 (6th Cir. 1984) (citing *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 234 (9th Cir. 1976)).

### e.    Interest, Costs, and Fees

Prejudgment interest on damages awarded under state law is governed by the law of the forum state. *Glick v. White Motor Co.*, 458 F.2d 1287, 1293 (3d Cir. 1972). In Delaware, "pre-judgment interest is awarded as a matter of right." *Well Thrive Ltd. v. SemiLEDs Corp.*, 2021 WL 1318131, at *2 (D. Del. Apr. 8, 2021) (citing *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011)). Under the Delaware Code, prejudgment interest is awarded

11

in tort actions from the date of injury, provided that the plaintiff extended a settlement demand for a minimum of 30 days in an amount less than the damages awarded. DEL. CODE ANN. tit. 6, § 2301(d). The statutory rate of interest is "5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due." *Id.* § 2301(a).

Section 4 of the Clayton Act also permits a court to award prejudgment interest in antitrust actions, considering the following factors: "(1) Whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith; (2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and (3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof." 15 U.S.C. § 15(a)(1)-(3).

"Postjudgment interest is awarded on monetary judgments recovered in all civil cases." *Transmatic, Inc. v. Gulton Indus., Inc.*, 180 F.3d 1343, 1347 (Fed. Cir. 1999). Pursuant to 28 U.S.C. § 1961, interest is computed daily to the date of payment and compounded annually.

Under Section 4 of the Clayton Act, a plaintiff who prevails in an action for monetary damages under the federal antitrust laws "shall recover . . . the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Federal Rule of Civil Procedure 54(d) also states that "costs should be allowed to the prevailing party." Allowable costs are identified in 28 U.S.C. § 1920 and Rule 54.1 of the Court's Local Rules.

## II.    ISSUES ON WHICH INGEVITY BEARS THE BURDEN OF PROOF

### A.    Affirmative Defenses to the Counterclaims

#### 1.    Issues

1.     Whether Ingevity can rely on claims of the '844 patent that: (a) have not been asserted; (b) were asserted but later dropped by Ingevity; or (iii) have been found by the Court to be invalid.

2.     If Ingevity is permitted to rely on unasserted claims of the '844 patent or on claims that the Court has ruled invalid, whether Ingevity can prove by a preponderance of the evidence that carbon honeycombs are nonstaple goods with respect to those claims and that Ingevity's tying and exclusive dealing arrangements are within the scope of Ingevity's patent rights under those claims.

3.     Whether Ingevity has proven by a preponderance of the evidence that Ingevity's tying of carbon honeycombs to patent licenses and Ingevity's exclusive long-term supply agreements are insulated from antitrust liability by the patent laws or the *Noerr-Pennington* doctrine.

4.     If Ingevity has proven that its anticompetitive conduct is within the scope of certain claims of the '844 patent, whether BASF has proven by a preponderance of the evidence that those claims are unenforceable due to Ingevity's misuse of the '844 patent.

5.     If BASF has proven that Ingevity has committed patent misuse, whether Ingevity can prove by a preponderance of the evidence that it has purged that misuse by proving that it completely abandoned the improper practice and that the consequences of the misuse have fully dissipated.

6.     In the event of a finding that carbon honeycombs are nonstaple goods, whether BASF has proven by a preponderance of the evidence that the patent claims are unenforceable due to patent exhaustion.

### a.  The Patent Defense

### i.  *Antitrust Laws Not Preempted*

A patent holder may enjoy antitrust immunity for acting in good faith to publicize the patent and enforce it through litigation, even if the patent is later ruled invalid. *See Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999). But invalid patent claims do not shield anticompetitive commercial conduct from liability under the antitrust laws. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 147 (2013) ("[S]imply to refer to what the holder of a valid patent could do does not by itself answer the antitrust question" because while "[a] *valid* patent" may immunize a contractual restraint on competition, "an *invalidated* patent carries with it no such right."); *Edward Katzinger Co. v. Chi. Metallic Mfg. Co.*, 329 U.S. 394, 398 (1947) ("if the patent were invalid, the [patent holder's contractual] price-fixing provision violated the federal anti-trust laws," regardless of whether the provision would have been lawful if the patent were valid); *FTC v. AbbVie Inc.*, 976 F.3d 327, 352 (3d Cir. 2020) (noting Supreme Court's rejection of a test that would immunize all conduct within the scope of the patent regardless of validity); *Beal Corp. Liquidating Trust v. Valleylab, Inc.*, 927 F. Supp. 1350, 1361 (D. Colo. 1996) ("[T]he exercise of a patent privilege does not immunize concerted and contractual behavior that threatens competition").

Moreover, even the holder of a valid patent has no immunity from antitrust liability for engaging in anticompetitive conduct beyond the limits of the patent monopoly. Because the "scope of the patent monopoly" defines and limits the "antitrust law immunity . . . that is conferred by [the] patent," conduct *outside* the scope of the patent monopoly enjoys no immunity from the antitrust laws. *Actavis*, 570 U.S. at 148 (quotation marks omitted); *see United States v. Line Material Co.*, 333 U.S. 287, 308 (1948) ("It is . . . well settled that the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act

beyond the limits of the patent monopoly."); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1338 (Fed. Cir. 2006) ("Antitrust laws may be violated if a patent holder's conduct falls outside . . . the scope of the patent grant."); *accord* Herbert Hovenkamp, *The Rule of Reason and the Scope of the Patent*, 52 SAN DIEGO L. REV. 515, 519 (2015) ("When a practice is not authorized by the Patent Act, general antitrust provisions such as those contained in the Sherman Act should have relatively free rein."). It has also been long recognized that: "[A] patentee may not prevent the individual manufacture, use, and sale of a single unpatented element, which the world is free to make, use, and sell, by simply including it as an element in a new patented combination." *Radio Corp. of Am. v. Lord*, 28 F.2d 257, 260 (3d Cir. 1928) (affirming determination that license agreements requiring licensees to exclusively purchase unpatented component violated Section 3 of the Clayton Act and was unenforceable).

35 U.S.C. § 271(d) states: "No patent owner *otherwise entitled to relief for infringement or contributory infringement* of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by . . . condition[ing] the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, *unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned*" (emphasis added). Therefore, the conditioning of patent licenses on the purchase of staple goods is unlawful if the patentee holds market power over the tying product. *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006). Market power over the tying product can be established through direct evidence or circumstantial evidence. *See supra* pp. 2-3.

### ii.     *Burden of Proof on Patent Affirmative Defense*

A defendant raising patent exclusivity as an affirmative defense in an antitrust suit bears the burden to prove that the anticompetitive conduct lies within the scope of valid patent claims.

*In re Glumetza Antitrust Litig.*, 2021 WL 1817092, at *9 (N.D. Cal. May 6, 2021). This is consistent with "the general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *Fed. Trade Comm'n v. Morton Salt Co*., 334 U.S. 37, 44-45 (1948). In *Glumetza*, the court held that, once a prima facie case of an antitrust violation is established, the defendant-patentee bears the burden "to show [the restraints] go no further than their patents authorized." 2021 WL 1817092, at *9. Rejecting defendants' argument that it should "presume infringement and place the burden on plaintiffs to show otherwise," the court said: "True, we presume a patent's validity. But we also presume noninfringement." *Id.* (citation omitted).

Accordingly, a defendant who asserts that a patent permits it to exclude the sale of competing products must explain and prove how the products infringe the patent claims. In *Medtronic v. Mirowski Fam. Ventures*, 571 U.S. 191 (2014), the Supreme Court addressed the question of whether a patentee or alleged infringer in a declaratory judgment action bears the burden to prove that certain products are within or outside the scope of a patent. The Court held that "the burden of persuasion is with the patentee, just as it would be had the patentee brought an infringement suit," applying the "well established" principle. *Id.* at 198-99. The decision was also based on a practical consideration: "[T]o shift the burden can, at least on occasion, create unnecessary complexity by making it difficult for the licensee to understand upon just what theory the patentee's infringement claim rests. A complex patent can contain many pages of claims and limitations. A patent holder is in a better position than an alleged infringer to know, and to be able to point out, just where, how, and why a product (or process) infringes a claim of that patent." *Id.* at 200. Further, the Court reasoned: "[T]he public also has a paramount interest in seeing that patent monopolies are kept within their legitimate scope. A patentee should not be allowed to exact

royalties for the use of an idea that is beyond the scope of the patent monopoly granted." *Id.* at 851-52 (quotations omitted).

### iii.   *Proving Infringement*

"[I]t is axiomatic that the *patentee* bears the burden of proving infringement." *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1364 (Fed. Cir. 2000) (emphasis in original). Infringement must be proven by a preponderance of the evidence. *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004). To determine whether a patentee has met this burden, courts apply a two-part test: "First, the claim must be properly construed to determine its scope and meaning." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998) (citation omitted). Second, "[t]o show infringement of a patent, a patentee must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim." *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999). The patentee fails to carry its burden "when two scenarios are equally likely" because "no jury could determine which one was more likely than not." *Mosel Vitelic Corp. v. Micron Tech., Inc.*, No. C.A. 98-449-GMS, 2000 WL 1728346, at *2 (D. Del. Mar. 14, 2000).

### iv.   *Staple Goods*

The Supreme Court has held that to qualify as a nonstaple good, a product must satisfy a two-pronged test: It must be both: (1) "capable only of infringing use in [the] patented invention" and (2) "essential to that invention's advance over prior art." *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980). If the tied product has no uses outside of the patented invention *and* is "the heart of [the] invention," then the tying arrangement "affects only the market for the invention itself" and does not restrain competition in any separate market. *Id.* at 214, 220. The patentee bears the burden to prove that the accused product is "not a staple article or commodity

of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c); *see MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 231 (D. Del. 2012) (citing *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F. 3d 1354, 1365 (Fed. Cir. 2008)); *accord Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1353 (Fed. Cir. 2010).

A staple good cannot be converted to a nonstaple one by simply giving it a particular size and shape so that it can be used in a patented combination. *Morton Salt v. G.S. Suppiger Co.*, 314 U.S. 488, 490 (1942). In *Morton Salt*, the patentee refused to license its patented machine for adding salt tablets to canned goods unless licensees also purchased its unpatented salt tablets. The Supreme Court held this tying was outside the scope of the rights conferred by the patent. The patentee's salt tablets had "a particular configuration rendering them capable of convenient use in [the] patented machines," but that did not alter the Court's conclusion that the patentee had committed patent misuse. *Id.* at 490. The Supreme Court has abrogated *Morton Salt* to the extent it did not require proof that the patentee had market power, *see Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006), but it explicitly left intact *Morton Salt*'s holding that "the defendant's patents did not confer any right to restrain competition in unpatented salt," *id.* at 39; *see also Princo*, 616 F.3d at 1333. And the Federal Circuit regards *Morton Salt* as "a typical 'tying' case" that exemplifies an "unlawful condition on [a] patent license." *Princo*, 616 F.3d at 1333; *see also Va. Panel*, 133 F.3d at 869.

Substantial noninfringing uses are those that are "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir. 2009). The determination of whether a product is a staple good for purposes of § 271(c) requires examining not only the product's actual uses, but also its potential applications. *See, e.g., In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d

1323, 1339 (Fed. Cir. 2012) (affirming dismissal of contributory infringement claim where allegations showed the accused product was "capable of" of noninfringing uses).

### b.      The *Noerr-Pennington* Doctrine

A defendant bears the initial burden of proving that the plaintiff's claims implicate petitioning activity protected by the *Noerr-Pennington* doctrine. *Campbell v. Pa. Sch. Bds. Ass'n*, 336 F. Supp. 3d 482, 499 (E.D. Pa. 2018); *Cascades Comput. Innovation LLC v. RPX Corp.*, 2013 WL 6247594, at *17 (N.D. Cal. Dec. 3, 2013); *AFB Constr. Mgmt. of Trumbull, Inc. v. Herbst*, 2015 WL 4380112, at *8 (Conn. Super. Ct. June 16, 2015); *see also WE, Inc. v. City of Phila., Dep't of Licenses & Inspections*, 174 F.3d 322, 326 (3d Cir. 1999); *Quinn v. Kent Gen. Hosp., Inc.*, 617 F. Supp. 1226, 1236 (D. Del. 1985). If the defendant meets its burden of demonstrating that the *Noerr-Pennington* doctrine applies, the burden then shifts to the plaintiff to show that the petitioning activity falls within an exception to *Noerr-Pennington*. *Campbell*, 336 F. Supp. at 499; *Cascades*, 2013 WL 6247594, at *17; *Herbst*, 2015 WL 4380112, at *8. The *Noerr-Pennington* doctrine is based on the First Amendment right to petition, so it protects "activity ostensibly directed toward influencing governmental action." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993). In the litigation context, *Noerr-Pennington* protects "acts reasonably and normally attendant upon effective litigation." *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983); *see NRT Tech. Corp. v. Everi Holdings Inc.*, 2020 WL 3403091, at *5 (D. Del. June 19, 2020) ("[U]nder the *Noerr-Pennington* doctrine, . . . a patent owner is generally immune from antitrust liability for merely bringing an infringement lawsuit.").

The *Noerr-Pennington* doctrine does not extend to private, out-of-court tying and exclusive dealing arrangements. Settlement agreements resolving patent infringement claims but excluding competition have been held not to be *Noerr-Pennington* protected. *In re Lipitor Antitrust*

*Litigation*, 868 F.3d 231 (3d Cir. 2017) (holding that settlements entered via consent decree are not protected because they "closely resemble contracts" in that "it is the agreement of the parties . . . that creates the obligations"); *accord Andrx Pharms. v. Elan Corp.*, 421 F.3d 1227, 1233-34 (11th Cir. 2005) (holding that, while patent infringement suits were *Noerr-Pennington* protected, settlement agreements were not). Likewise, courts have held that tying arrangements are not entitled to protection as petitioning activity. *See, e.g.*, *Performance Aftermarket Parts Grp., Ltd. v. TI Grp. Automotive Sys., Inc.*, 2006 WL 8449931, at *3 & n.3 (S.D. Tex. Aug. 11, 2006) ("[T]he tying and monopoly power antitrust claims are not based on the [plaintiff's lawsuit] and, therefore, are not barred by the *Noerr-Pennington* doctrine.").

### c.   Patent Misuse

Patent misuse is a complete defense to patent infringement. *See Va. Panel Corp. v. MAC Panel Corp.*, 133 F.3d 860, 868 (Fed. Cir. 1997). It reflects the bedrock principle that a patentee may not leverage its patent to "obtain market benefit beyond that which inheres in the statutory patent right." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1327 (Fed. Cir. 2010) (en banc). Because patent misuse is an affirmative defense, the alleged patent infringer bears the burden of proving misuse by a preponderance of the evidence. *See Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1118 (N.D. Ill. 2015); *GFI, Inc. v. Franklin Corp.*, 88 F. Supp. 2d 619, 621 (N.D. Miss. 2000). A patent that is misused to restrict lawful competition "become[s] unenforceable, and the patentee loses its right to sue for infringement." *Id.* at 1328.

Certain practices are deemed patent misuse *per se* because "[e]xperience has taught" that they "are sufficiently anticompetitive so as to warrant condemnation on their face." *Princo Corp.*, 563 F.3d at 1307. Tying arrangements, where "a patentee having market power conditions a license upon the purchase of a separate, staple good," are a classic example of *per se* patent misuse. *Id.*; *see Va. Panel*, 133 F.3d at 869.

20

Patent misuse is characterized by "the patentee's act of impermissibly broadening the physical or temporal scope of the patent grant with anticompetitive effect." *Princo Corp.*, 616 F.3d 1328 (citations omitted). "[A]rrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties" are a form of *per se* patent misuse. *Va. Panel*, 133 F.3d at 869 (citing *Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964)); *see also Cordance Corp. v. Amazon.com. Inc.*, 631 F. Supp. 2d 484, 496-97 (D. Del. 2009). The law has long held that "any attempted reservation or continuation in the patentee . . . of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." *Brulotte*, 379 U.S. at 31 (quoting *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945)); *see also Kimble v. Marvel Ent., LLC*, 135 S. Ct. 2413 (2015).

### d.    Purging of Patent Misuse

A misused patent is "unenforceable until the misuse is purged." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1025 (Fed. Cir. 2008). "Once misuse of a patent has been established, . . . the burden is upon the patentee to show that the misuse has ceased and its effects dissipated before he will be permitted to resume enforcement of his patent." *Ansul Co. v. Uniroyal, Inc.*, 306 F. Supp. 541, 560 (S.D.N.Y. 1969), *aff'd in relevant part*, 448 F.2d 872 (2d Cir. 1971). "Courts have uniformly applied a two-prong test to determine" whether patent misuse has been purged: "The patent holder must demonstrate [1] a complete abandonment of the improper practices found to constitute the particular misuse and [2] that the consequences of the misuse have been fully dissipated." *In re Yarn Processing Patent Validity Litig.*, 472 F. Supp. 180, 183-84 (S.D. Fla. 1979). Even if a patentee can prove that it has purged its misuse, the patent is still unenforceable with respect to conduct that occurred before the date on which the misuse was fully purged. *See, e.g.*, *Metals Disintegrating Co. v. Reynolds Metals Co.*, 228 F.2d 885, 889 (3d Cir.

1956) (patentee that purged past misuse could not recover damages for infringement during period when misuse remained unpurged).

### e.   Patent Exhaustion

The authorized sale of a product which "embodies the essential features" of a method patent exhausts the patentee's rights with respect to the product sold. *See United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942); *LifeScan Scotland, Ltd. v. Shasta*, 734 F.3d 1361, 1367 (Fed. Cir. 2013). When a patentee exhausts its patent rights by selling an item that embodies the patent, the buyer is free to combine that item with other parts in a way that practices the patent—and the patentee "has no postsale right to require that the patents be practiced using only" authorized parts. *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 630 (2008). In *Quanta*, the Court held that the petitioner, having purchased parts from Intel that embodied the asserted patents, was free to manufacture computers "using [the] Intel parts in combination with non-Intel memory and buses in ways that practice[d] [those] patents." *Id.* at 624.

# EXHIBIT 4

**EXHIBIT 4**

**INGEVITY'S STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED[1]**

Counter-Defendant Ingevity respectfully submits the following Statement of Issues of Law that Remain to be Litigated based on Ingevity's current understanding of BASF's counterclaims.  Ingevity reserves the right to revise, amend, supplement, or modify its statement of issues of law that remain to be litigated based upon any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence, or other developments in the case, including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments.  To the extent BASF intends or attempts to introduce different or additional legal arguments, Ingevity reserves the right to supplement this Statement and contest those legal arguments and to present any and all rebuttal evidence in response to those arguments. By providing this Statement, Ingevity does not concede that all of the recited issues are appropriate for trial. In particular, Ingevity does not waive any of its motions in limine, *Daubert* motions, or motions for summary judgment which, if granted, would render some of these issues moot.

The following statement of issues of law is not exhaustive, and Ingevity reserves the right to prove any matters identified in the pleadings, interrogatory responses, and/or expert reports. Should the Court determine that any issue identified here is more appropriately considered an issue of fact, Ingevity incorporates such issues by reference into its Statement of Facts that Remain to be Litigated.  Likewise, to the extent that Ingevity's Statement of Facts that Remain to

---

[1] Ingevity contends that many, if not all, of the statements of law that remain to be litigated contained herein should be mooted by the Court granting Ingevity's motion for summary judgment on BASF's antitrust and tortious interference claims.  Ingevity includes the issues here in case the Court disagrees.

be Litigated contains issues that the Court deems to be issues of law, those issues are incorporated herein by reference.

## Issues on Which BASF Bears the Burden of Proof

### Patent Enforcement and Petitioning Activity

1)   <u>Issues to be Litigated</u>

In connection with its tying claim, whether BASF can prove that Ingevity engaged in conduct that is not patent enforcement or petitioning activity, which are immune from antitrust and tort liability.

In connection with its exclusive dealing claim, whether BASF can prove that Ingevity engaged in conduct during the life of U.S. Patent No. RE38,844 (the "'844 Patent") that is not patent enforcement or petitioning activity, which are immune from antitrust and tort liability.

In connection with its tortious interference with prospective business relations claim, whether BASF can prove that Ingevity engaged in conduct that is not patent enforcement or petitioning activity, which are immune from antitrust and tort liability.

2)   <u>Legal Authority</u>

"As a general rule, behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004) (citing *Simpson v. Union Oil Co.*, 377 U.S. 13, 24 (1964)), *rev'd on other grounds*, 546 U.S. 394 (2006); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 221 (1980) ("The policy of free competition runs deep in our law . . . . But the policy of stimulating invention that underlies the entire patent system runs no less deep."). It is well settled that the exercise of patent rights that does not constitute patent misuse cannot violate the antitrust law. *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 873 (Fed. Cir. 1997) (when conduct does not amount to misuse, "the same conduct cannot support a

judgment that [a patentee's] conduct violated the Sherman Act"); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006) ("It would be absurd to assume that Congress intended to provide that the use of a patent that merited punishment as a felony [for violating the antitrust laws] would not constitute 'misuse.'"). Under 35 U.S.C. § 271(d), a patentee may enforce his patent rights "without fear that his doing so will be regarded as an unlawful attempt to suppress competition." *Rohm & Haas*, 448 U.S. at 201. Indeed, "the essence of a patent grant is the right to exclude others from profiting by the patented invention." *Id.* at 215.

Patentees' activity "oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws." *Unitherm*, 375 F.3d at 1356; *see also Lannett Co. Inc. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009). This immunity derives from the patent laws and the First Amendment right to petition the government. *Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (citing *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)); *Unitherm*, 375 F.3d at 1356.

"[A] patent owner has the right to . . . enforce its patent, and that includes threatening alleged infringers with suit." *Concrete Unlimited, Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985). Likewise, "federal patent law bars the imposition of liability [under federal or state law] for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith." *Golan v. Pingel Enter.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002) (quoting *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999)); *id.* at 1372 ("[A] patentee may elect to attempt to enforce the patent—for example by aggressively asserting its patent rights—and never intend to file suit."); *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, 2011 WL 678707, at *2 n.2 (D. Del. Feb. 18, 2011) ("[A] patentee has the right to

3

inform a potential infringer of the existence of the patent, whereby the recipient of the information may adjust its activities, perhaps seek a license, or otherwise act to protect itself." (citing *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998))); *Mikohn Gaming*, 165 F.3d at 897 ("[C]ommunication to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication."). As explained by the Federal Circuit in *Virginia Panel*, "a patentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction." *Va. Panel*, 133 F.3d at 869; *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013) (holding aggressive campaign to enforce certain Wi-Fi patents by threatening end users of the technology with patent infringement litigation if they did not agree to take a license was "protected petitioning activity under the First Amendment and *Noerr-Pennington*").

Patent enforcement in both the marketplace and in court is immune from liability even where a patent is later found invalid. *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1000-01 (Fed. Cir. 2007) (affirming summary judgment on antitrust claims even after patent found invalid where plaintiff lacked sufficient evidence of sham litigation); *Golan*, 310 F.3d at 1370-73 (affirming grant of summary judgment as to state and federal tort claims related to statements about invalid, expired patent); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) ("Neither the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability.").

There are only two recognized exceptions to this immunity, and BASF did not plead either. Those exceptions are where an antitrust plaintiff can show the patent was obtained

through "knowing[] and willful[]" fraud, referred to as *Walker-Process* fraud (*Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965))), or that an "infringement action was 'so baseless that no reasonable litigant could realistically expect to secure favorable relief,'" referred to as sham litigation.[2]  *Honeywell*, 488 F.3d at 1001 (quoting *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62 (1993) ("*PRE*")); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, 2007 WL 2318903, at *7 (N.D. Cal. Aug. 13, 2007) ("If neither exception applies, then a patentee is immune from antitrust liability for enforcing its patent rights.  Only if an antitrust claimant can prove that an exception to the doctrine applies can the substantive antitrust analysis proceed.").  Because patent immunity from antitrust laws is unique to patent law, it is governed by Federal Circuit law.  *Unitherm*, 375 F.3d at 1349; *Nobelpharma AB*, 141 F.3d at 1068 (en banc in relevant part).

**Nonstaple Goods Under *Rohm & Haas***

1)    <u>Issues to be Litigated</u>

Whether BASF can prove by a preponderance of the evidence that Ingevity's fuel vapor canister honeycombs ("FVC honeycombs") are staple goods that have actual and substantial noninfringing uses other than practicing the '844 Patent.

2)    <u>Legal Authority</u>

Ingevity incorporates by reference its discussion above regarding enforcement of patent rights and petitioning activity.

---

[2] Sham litigation is defined narrowly as conduct that is "objectively baseless in the sense that no reasonable [person] could realistically expect success on the merits," and that subjectively was "an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process." *PRE*, 508 U.S. at 60-61.

It is well settled that the exercise of patent rights that does not constitute patent misuse cannot violate the antitrust law. *Va. Panel*, 133 F.3d at 873 (when conduct does not amount to misuse, "the same conduct cannot support a judgment that [a patentee's] conduct violated the Sherman Act"); *Ill. Tool Works*, 547 U.S. at 42 ("It would be absurd to assume that Congress intended to provide that the use of a patent that merited punishment as a felony [for violating the antitrust laws] would not constitute 'misuse.'"). Although patent misuse is a judge-made equitable doctrine, Congress has identified certain types of actions that do not constitute patent misuse:

> No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

35 U.S.C. § 271(d).

The Supreme Court has explained that "the provisions of § 271(d) effectively confer upon the patentee, as a lawful adjunct of his patent rights, a limited power to exclude others from competition in nonstaple goods." *Rohm & Haas*, 448 U.S. 176, 201 (1980). A patentee "may sell a nonstaple article himself while enjoining others from marketing that same good without his authorization. By doing so, he is able to eliminate competitors and thereby to control the market for that product." *Id.* Even though this conduct may "suppress competition in the market for an unpatented commodity," the conduct "is no different from that which the statute expressly protects." *Id.* at 202. "[B]y enacting §§ 271(c) and (d), Congress granted to patent holders a

6

statutory right to control nonstaple goods that are capable only of infringing use in a patented invention, and that are essential to that invention's advance over prior art." *Id.* at 213; *see also Ill. Tool Works*, 547 U.S. at 41 ("Congress included a provision in its codification [of the Patent Act] that excluded some conduct, such as a tying arrangement involving the sale of a patented product tied to an 'essential' or 'nonstaple' product that has no use except as part of the patented product or method, from the scope of the patent misuse doctrine."). Moreover, "[a] patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers." *Va. Panel*, 133 F.3d at 869.

A "nonstaple" product in this context is "a component as defined in 35 U.S.C. § 271(c), the unlicensed sale of which would constitute contributory infringement," whereas a "staple" product "is one that does not fit this definition." *Rohm & Haas*, 448 U.S. at 186 n.6. The relevant product subject to consideration is "the material actually sold by the accused and the uses made of it by its purchasers." *Hodosh v. Block Drug Co., Inc.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987). A defendant must "introduce some evidence that end-users actually assembled the [relevant products] in a non-infringing way." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *see also Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 576 (E.D. Pa. 1989) (concluding a product was a non-staple when it had "little or no use outside of the [relevant] patent" and when the opposing party had "presented no evidence that there were other economically feasible uses for its [relevant product]").

The use in question also must be "substantial" and not "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010). Factors for consideration include "the use's frequency," "the use's practicality, the invention's intended purpose, and the intended market." *Id.* "[O]ccasional

aberrant use of a product that is clearly designed to be used in a particular manner, namely, in the manner specified in the method claims, does not make [the product] 'a staple article or commodity of commerce suitable for substantial noninfringing use.'" *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979) (quoting 35 U.S.C. § 271(c)); *see also Hoffmann-La Roche Inc. v. Promega Corp.*, 1994 WL 761241, at *11 (N.D. Cal. June 13, 1994) ("[O]ccasional aberrant use of a product does not make that use 'substantial.'"); *WesternGeco LLC v. ION Geophysical Corp.*, 876 F. Supp. 2d 857, 903-04 (S.D. Tex. 2012) (evidence of one noninfringing use did not demonstrate substantial noninfringing use); *Mendenhall v. Astec Indus., Inc.*, 1988 WL 188449, at *59 (E.D. Tenn. Oct. 31, 1988) (evidence of three instances of noninfringing use was "not substantial").

### The Relevant Market

1) <u>Issues to be Litigated</u>

Whether BASF can prove by a preponderance of the evidence that a relevant product market for BASF's antitrust claims is carbon adsorbents used in LEV III/Tier 3-compliant fuel vapor canisters. Ingevity contends that BASF has not correctly defined the relevant product market because granular and pelletized base carbon is a complement, not a substitute, for automotive honeycomb and other subsequent adsorbent volumes in LEV III / Tier 3-compliant fuel vapor canisters.

Whether BASF can prove by a preponderance of the evidence that a relevant product market for BASF's antitrust claims is technologies to meet LEV III/Tier 3 regulations.

Whether BASF can prove by a preponderance of the evidence that the relevant geographic market is the United States and Canada.

2)      Legal Authority

As the plaintiff, BASF bears the burden of proving a relevant product and geographic market by a preponderance of the evidence.  *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998).  Furthermore, BASF must prove by a preponderance of the evidence that the "'commercial realities faced by consumers'" justify its market definition. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)).  A relevant product market means that the products within it are reasonably interchangeable or reasonable substitutes for each other from the buyer's point of view.  *U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305, 309-11 (3d Cir. 2010) (holding that plaintiff had not satisfied its evidentiary burden to define the relevant product market because the outer boundaries of a product market are determined by the reasonable interchangeability of use and the cross-elasticity of demand between the product itself and substitutes for it).

Courts require alleged "submarkets" to meet the same requirements of a relevant market. IIB Phillip E. Areeda, John L. Solow & Herbert Hovenkamp, ANTITRUST LAW ¶ 533c (3d ed. 2007); *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1540 (8th Cir. 1989) ("In other words, the same proof which establishes the existence of a relevant product market also shows (or in this case, fails to show) the existence of a product submarket").

**Exclusive Dealing**

1)      Issues to be Litigated

Whether BASF can prove that Ingevity engaged in anticompetitive conduct (as opposed to good faith patent enforcement activity or petitioning activity).

Whether BASF can prove by a preponderance of the evidence that Ingevity's FVC Honeycombs are staple goods with substantial noninfringing uses.

If BASF can prove that FVC honeycombs are staple goods, whether BASF can prove by a preponderance of the evidence that Ingevity's supply agreements with Delphi, Kayser, and KFTC resulted in substantial foreclosure in the relevant market (OEMs that purchase technologies for meeting LEV III/Tier 3 regulations) and a substantial adverse effect on competition in that market during the life of the '844 Patent.

If BASF can prove that a relevant product market in this case is the carbon adsorbents used in LEV III / Tier 3-compliant fuel vapor canisters, whether BASF can prove by a preponderance of the evidence that Ingevity has market power in that market.

If BASF can prove that FVC honeycombs are staple goods, whether BASF can prove by a preponderance of the evidence that Ingevity's supply agreements with Delphi, Kayser, and KFTC had a substantial adverse effect on competition in the relevant market during the life of the '844 Patent, and, additionally, whether BASF can also prove by a preponderance of the evidence that the alleged anticompetitive effects of Ingevity's supply agreements with Delphi, Kayser, and KFTC outweigh the pro-competitive benefits during the life of the '844 Patent.

Whether BASF's claims for exclusive dealing for purported foreclosure after expiration of the '844 Patent are ripe for adjudication.

Whether BASF can prove by a preponderance of the evidence that Ingevity's supply agreements with Delphi, Kayser, and KFTC will result in substantial foreclosure in the relevant market and will have a substantial adverse effect on competition in that market after expiration of the '844 Patent.

If BASF can prove a relevant market, whether BASF can prove by a preponderance of the evidence that Ingevity had substantial market power in that market, such that Ingevity had the power to force buyers to enter into exclusive contracts they did not want, and that Ingevity's

supply agreements with Delphi, Kayser, and KFTC adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market.

If BASF can prove that Ingevity engaged in anticompetitive conduct (as opposed to good faith patent enforcement activity or petitioning activity), whether BASF can prove by a preponderance of the evidence that BASF was in fact injured in its business or property as a result of Ingevity's alleged anticompetitive conduct, that BASF's alleged injury is an injury of the type the antitrust laws were intended to prevent, that Ingevity's alleged anticompetitive conduct was a material cause of BASF's alleged antitrust injury, that any claimed injury was not the result of lawful competition, including lawful patent enforcement activity in the marketplace and through litigation, and that BASF properly disaggregated its claimed lost profit damages between the alleged unlawful and lawful effects of competition.  In other words, whether BASF has properly and reasonably attributed its claimed lost profits to the alleged anticompetitive acts, and not to lawful competition, including lawful patent enforcement and/or petitioning activity.

2)   <u>Legal Authority</u>

Exclusive dealing is often pro-competitive, and is therefore analyzed under the rule of reason, not under a rubric of per se illegality.  *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("[I]t is widely recognized that in many circumstances, [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (noting that both buyers and sellers often benefit from exclusive arrangements).  A plaintiff must show that an exclusive dealing arrangement "will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition."  *Id.* at 271 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)).

BASF bears the burden of proving all of the following elements of exclusive dealing by a preponderance of the evidence: (1) an agreement between the relevant buyer(s) and the supplier that substantially forecloses the buyer(s) from purchasing the product from competing suppliers; (2) the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in a relevant market; (3) defendant had substantial market power in the market; (4) the agreement occurred in or affected interstate and foreign commerce; and (5) plaintiff was injured in its business or property because of the agreement. *ZF Meritor LLC v. Eaton Corp.*, Civ. No. 06-623-SLR (D. Del. Oct. 7, 2009), D.I. 214; 15 U.S.C. § 14; *Tampa Elec.*, 365 U.S. at 325-328; *Standard Oil Co. v. United States*, 337 U.S. 293 (1949); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991); *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). *ZF Meritor*, 696 F.3d at 254; *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 404 n.31 (3d Cir. 2016); *Race Tires Am.*, 614 F.3d at 57; *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *32-33 (D.N.J. 2014), *aff'd*, 821 F.3d 394 (3d Cir. 2016).

Ingevity incorporates by reference the discussion of the rule of reason above. Additionally, "in applying the rule of reason calculus to exclusive dealing arrangements, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy." *Sterling Merchandising, Inc. v. Nestle, S.A.*, 656 F.3d 112, 123-24 (1st Cir. 2011); *CDC Techs. v. IDEXX Lab'ys*, 186 F.3d 74, 77, 80-81 (2d Cir. 1999) (holding that 80 percent share in context of exclusive dealing with distributors that provided only "qualified leads" was not anticompetitive); *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-65 (9th Cir. 1997) (upholding series of exclusive dealing arrangements with distributors by firm with a 55 percent

market share that foreclosed 38 percent of relevant market); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1212-14 (W.D.N.C. 1988) (even market share of 40 percent would not enable bottling cooperative to increase prices profitably above the competitive level), *aff'd*, 912 F.2d 463 (4th Cir. 1990).

Market power has been defined as an ability to profitably to raise prices, for a sustained period of time, above those that would be charged in a competitive market for a sustained period of time. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n.46 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Race Tires Am.*, 614 F.3d at 74; *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996); *State Oil*, 522 U.S. at 10; *Tunis Bros.*, 952 F.2d at 728; *Verizon Commc'ns, Inc.*, 540 U.S. at 407. *ZF Meritor*, 696 F.3d at 254.  The ability to charge higher prices for better products or services, however, is not market power.  *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 209 (3d Cir. 1994) ("Market share is just a way of estimating market power, which is the ultimate consideration.  When there are better ways to estimate market power, the court should use them.").

Ripeness is a "jurisdictional limitation[] imposed by Art[icle] III" aimed at "(p)roblems of prematurity and abstractness that may prevent adjudication in all but the exceptional case," (*Buckley v. Valeo*, 424 U.S. 1, 114 (1976)), and, even where a controversy is sufficiently ripe to satisfy the injury-in-fact requirement of Article III, ripeness includes a prudential component touching on "reasons for refusing to exercise jurisdiction," (*Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)).  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United*

*States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).

**Tying**

1)   <u>Issues to be Litigated</u>

Whether BASF can prove that Ingevity engaged in anticompetitive conduct (as opposed to good faith patent enforcement activity or petitioning activity).

Whether BASF can prove by a preponderance of the evidence that Ingevity's FVC Honeycombs are staple goods with substantial noninfringing uses.

If BASF can prove that a relevant product market in this case is technologies to meet LEV III / Tier 3 regulations, whether BASF can prove by a preponderance of the evidence that Ingevity has market power in that market.

Whether BASF has proven by a preponderance of the evidence that implied licenses to the '844 Patent and FVC Honeycombs are separate and distinct products.

If BASF can prove that a relevant product market in this case is technologies to meet LEV III/Tier 3 regulations, whether BASF can prove that demand for FVC honeycombs is distinct from the demand for Ingevity's Lev III / Tier 3 technology.

Whether BASF can prove by a preponderance of the evidence that Ingevity has conditioned the granting of implied licenses to the '844 Patent on a requirement that customers purchase fuel vapor canister carbon honeycombs.

If BASF can prove that Ingevity's conduct amounts to unlawful activity rather than lawful conduct, whether BASF can prove that Ingevity's conduct impacts a substantial amount of interstate commerce.

If BASF can prove that Ingevity's conduct amounts to unlawful activity rather than lawful conduct, whether BASF can prove that the competitive harms caused by Ingevity's conduct outweigh the procompetitive benefits of that conduct.

If BASF can prove that Ingevity engaged in anticompetitive conduct (as opposed to good faith patent enforcement activity or petitioning activity), whether BASF can prove by a preponderance of the evidence that BASF was in fact injured in its business or property as a result of Ingevity's alleged anticompetitive conduct, that BASF's alleged injury is an injury of the type the antitrust laws were intended to prevent, that Ingevity's alleged anticompetitive conduct was a material cause of BASF's alleged antitrust injury, that any claimed injury was not the result of lawful competition, including lawful patent enforcement activity in the marketplace and through litigation, and that BASF properly disaggregated its claimed lost profit damages between the alleged unlawful and lawful effects of competition.  In other words, whether BASF has properly and reasonably attributed its claimed lost profits to the alleged anticompetitive acts, and not to lawful competition, including lawful patent enforcement and/or petitioning activity.

2)    <u>Legal Authority</u>

A tying arrangement is unlawful when:

> (1) the scheme in question involves two distinct items and provides that one (the tying product) may not be obtained unless the other (the tied product) is also purchased . . . ; (2) the tying product possesses sufficient economic power to appreciably restrain competition in the tied product market . . . ; and (3) a "not insubstantial" amount of commerce, must be affected by the arrangement.

*Medtronic Minimed Inc. v. Smiths Med. MD Inc.*, 371 F. Supp. 2d 578, 585 (D. Del. 2005).

"[A] tying arrangement cannot exist unless two separate product markets have been linked."  *Jefferson Par.*, 466 U.S. at 21; *see also U.S. Philips Corp. v. ITC*, 424 F.3d 1179, 1194 (Fed. Cir. 2005) (explaining that "the main purpose of the separate-products inquiry in tying cases generally" is to "ensure that conduct is not condemned as anticompetitive 'unless there is

15

sufficient demand for the purchase of [the tied product] separate from the [tying product] to identify a distinct product market in which it is efficient to offer [the tied product]'" (alterations in original)).

A patentee's sale of a non-staple product that substantially embodies the claims of a patent because its "only reasonable and intended use [is] to practice the patent" exhausts the patentee's right as to the product sold. *Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 631 (2008). This exhaustion applies only to the product sold and does not immunize other similar products sold by non-authorized sources. *Id.* at 625, 638; *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S.Ct. 1523, 1531 (2017) ("When a patentee chooses to sell an item, *that product* 'is no longer within the limits of the monopoly' and instead becomes the 'private, individual property' of the purchaser, with the rights and benefits that come along with ownership. . . . The sale 'terminates all patent rights to *that item*.'" (emphases added)); *Bowman v. Monsanto Co.*, 569 U.S. 278, 286 (2013) ("The exhaustion doctrine is limited to the *'particular item' sold* to avoid just such a mismatch between invention and reward." (emphasis added)); *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942) ("Our decisions have uniformly recognized that the purpose of the patent law is fulfilled with respect to any *particular article* when the patentee has received his reward for the use of his invention by the sale of *the article*, and that once that purpose is realized the patent law affords no basis for restraining the use and enjoyment *of the thing sold*." (emphases added)).

The exhaustion doctrine and an implied license are "closely related." *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1350 (Fed. Cir. 2003). Indeed, the Supreme Court has suggested that "an implied license stems from the exhaustion of a patent right." *Id.* (citing *Univis*, 315 U.S. at 249). Therefore, a patentee's sale of a non-staple good that substantially embodies the claims

16

of a patent because its only reasonable and intended use is to practice the patent necessarily

grants an implied license for the use of *the product sold* (which is the extent to which exhaustion

applies). *See id.*

"[A] competitor's standing to sue is premised on that competitor's having manifested an

intention to enter the business and . . . [having] demonstrated his preparedness to do so."

*Medtronic Minimed*, 371 F. Supp. 2d at 583 (alterations in original) (internal quotation marks

omitted). A party also must show that its alleged harm was caused by the conduct it complains

about in order to have suffered antitrust injury to establish standing. *In re Wellbutrin XL*

*Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 164-65 (3d Cir. 2017); *see also* 15

U.S.C. § 15 (requiring that private plaintiffs prove injury in their business or property "by reason

of" the alleged antitrust violation).

When analyzing alleged tying involving patented products, courts should not follow the

per se tying analysis of *Morton Salt* and *Loew's* but should instead apply the standards used in

cases such as *Fortner II* and *Jefferson Parish*. *Illinois Tool Works*, 547 U.S. at 42.

"Tying arrangement need only be condemned if they restrain competition on the merits

by forcing purchases that would not otherwise be made." *Jefferson Parish*, 466 U.S. at 27;

*Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016) ("[T]he essential

characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over

the tying product to force the buyer into the purchase of a tied product that the buyer either did

not want at all, or might have preferred to purchase elsewhere on different terms." (quoting

*Jefferson Parish*, 466 U.S. at 12)). "In order to prevail in the absence of per se liability," a party

must prove that the alleged conduct "unreasonably restrained competition." *Jefferson Parish*,

466 U.S. at 29. "[A] plaintiff may not proceed to trial simply because it presents some evidence

that the defendant is engaged in tying and some evidence that some injury is occurring.  A plaintiff must link the two showings with a theory of causation that is both plausible and cognizable by the antitrust laws." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 486-87 (3d Cir. 1992).

**Common Elements - Antitrust Injury, Rule Of Reason, Causation**

3) <u>Issues to be Litigated</u>

Whether BASF can prove by a preponderance of the evidence that it has suffered an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

Whether BASF can prove by a preponderance of the evidence that the alleged anticompetitive conduct was a material and proximate cause of the alleged injury and damage.

Whether BASF can prove by a preponderance of the evidence that Ingevity's alleged conduct caused or was likely to cause anticompetitive effects in the relevant market and that any pro-competitive benefits are outweighed by the alleged anticompetitive effects of Ingevity's alleged anticompetitive conduct.

4) <u>Legal Authority</u>

To establish an antitrust violation under either Section 1 or 2 of the Sherman Act or Section 3 of the Clayton Act, BASF bears the burden of proving by a preponderance of the evidence that Ingevity engaged in anticompetitive conduct that caused anticompetitive harm, and that BASF suffered an antitrust injury as a result. *See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Eisai, Inc. v. Sanofi Aventis, US, LLC*, 821 F.3d 394, 402 (3d Cir. 2016) (citing A*tl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 339-40 (1990); *ZF Meritor*, 696 F.3d at 269 n.9).

Here, BASF asserts that the alleged anticompetitive conduct is an alleged requirement that, to receive an implied license to Ingevity's '844 Patent, customers must also purchase unwanted activated carbon honeycombs from Ingevity (an alleged tying arrangement) and supply agreements with Delphi, Kayser, and KFTC.  Those arrangements are evaluated under the "rule of reason." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992); *Jefferson Parish*, 466 U.S. at 29; *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 486-87 (3d Cir. 1992); *see also Eisai*, 821 F.3d at 403 ("[A]n exclusive dealing arrangement does not constitute a per se violation of the antitrust laws and is instead judged under the rule of reason." (citing *ZF Meritor*, 696 F.3d at 271)).  Arrangements of this type are illegal under the rule of reason "only if the probable effect of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals." *ZF Meritor*, 696 F.3d at 271 (internal quotation marks omitted).

To succeed on a violation of the federal antitrust law, BASF must also show that buyer resellers and end buyers have faced "substantial foreclosure of the market for the relevant product." *Eisai*, 821 F.3d at 403.  BASF also must show that such substantial foreclosure from the challenged arrangements has caused likely or actual anticompetitive effects such as reduced output, increased price, or reduced quality in goods or services.  *Id.*  To show "substantial foreclosure," BASF must prove that Ingevity's alleged requirement that, to receive a license to Ingevity's '844 Patent, customers must also purchase unwanted activated carbon honeycombs from Ingevity (an alleged tying arrangement), and supply agreements with Delphi, Kayser, and KFTC, "bar a substantial number of rivals or severely restrict the market's ambit." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d. Cir. 2005).  The relevant inquiry focuses on which products are reasonably available to a consumer.  *Eisai*, 821 F.3d at 403. "For example, if

customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted — even if a competitor remains unable to increase its market share." *Id.* Importantly, a single competitor's "inability to compete does not automatically mean that competition has been foreclosed." *Id.* at 403-04. There mere fact that a sale is covered by a contract is not foreclosure. Foreclosure, rather, is proven only when a sale to buyer reseller or end buyer has been effectively prevented. *Id.* at 404. Tying up a set of distributors is not proof of foreclosure where effective alternative means of reaching end buyers are reasonably available. *See, e.g.*, *Int'l Constr. Prods. v. Caterpillar, Inc.*, 2016 WL 264909, at *5 (D. Del. Jan. 21, 2016), *motion for reconsideration denied*, 2016 WL 4445232, at *5 (D. Del. Aug. 22, 2016); *CDC Techs., Inc. v. IDEXX Labs.*, 186 F.3d 74, 80 (2d Cir. 1999), *aff'g* 7 F. Supp. 2d 119, 121 (D. Conn. 1998); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997); *ZF Meritor*, 696 F.3d at 283.

In addition, BASF must show that Ingevity's conduct, as a whole, caused or was likely to cause anticompetitive effects in the relevant market. *Eisai*, 821 F.3d at 403. A failure to demonstrate that the "probable effect" of the allegedly wrongful conduct is to "substantially lessen competition in the relevant market, rather than to merely disadvantage rivals" means that there can be no antitrust violation. *Id.* The existence of legitimate business justifications for exclusive dealing agreements supports a finding that the exclusive dealing agreement is lawful and does not violate the antitrust laws. *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 111 (3d Cir. 1992) (citing *Tampa Electric*, 365 U.S. at 334-35). Furthermore, BASF must ultimately prove any pro-competitive benefits are outweighed by the alleged anticompetitive effects of Ingevity's alleged anticompetitive conduct. *See, e.g.*, *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 412 (3d Cir. 2015) (explaining that if the plaintiff

20

establishes anti-competitive effects of alleged unlawful activities, the burden shifts to the defendant to demonstrate their pro-competitive effects; the burden then shifts back to the plaintiff to rebut these pro-competitive effects).

BASF must also show injury in fact caused by the alleged antitrust violation.  Injuries caused by other factors, such as lawful competition, bad management, quality, or service, or other factors, are not compensable.  *See, e.g.*, *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41-44 (2d Cir. 1986).  As the plaintiff, BASF bears the burden of separating out the damages attributable to Ingevity's allegedly unlawful conduct from damages attributable to other causes. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35–36 (2013).  A failure to specify which conduct caused which damage means that any damages recovery would be based on impermissible speculation.  *Id.*; *see also In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 311 (3d Cir. 2008).

Additionally, BASF must prove by a preponderance of the evidence that its claimed injury qualifies as an injury recognized by the antitrust laws. The requirement that a plaintiff show that it suffered an antitrust injury "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990). Therefore, a private plaintiff may not recover damages merely by showing "injury causally linked to an illegal presence in the market."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Instead, a plaintiff must prove the existence of "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Id.*  An injury that is "causally related" to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anticompetitive

21

aspect of the practice under scrutiny, since "it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 109-110 (1986) (internal quotation marks and alteration omitted); *see also Associated General Contractors of California, Inc. v. Carpenters*, 459 U.S. 519, 539-42 (1983).

Furthermore, BASF must prove that the alleged anticompetitive conduct was a material and proximate cause of the alleged injury and damage. *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 98-99 (3d Cir. 1976); *Insight Equity A.P. X, LP v. Transitions Optical, Inc*, 2016 WL 3610155, at *9 (D. Del. July 1, 2016) ("[P]laintiff must prove the defendant's violation was a 'material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage.'" (quoting *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 788-89 (6th Cir. 2002))).

**Tortious Interference with Prospective Business Relations[3]**

1) <u>Issues to be Litigated</u>

Whether BASF can prove that Ingevity engaged in tortious conduct (as opposed to good faith patent enforcement activity or petitioning activity).

Whether BASF has proven by a preponderance of the evidence that Ingevity's FVC Honeycombs are staple goods with substantial noninfringing uses.

---

[3]Ingevity disagrees that there are any issues to be litigated with respect to this claim because, following BASF's concessions during summary judgment briefing, BASF's factual allegations are limited to alleged interference with a contract, not interference with a prospective business relationship. It is undisputed that Ingevity did not tortiously interfere with a prospective business relationship between BASF and Kayser because BASF and Kayser formalized the business relationship in question through a contract. The parties have not performed under the contract, but BASF has not alleged tortious interference with contract, which includes additional and different elements.

Whether BASF can prove by a preponderance of the evidence that Ingevity tortiously interfered with a prospective business relationship between BASF and Kayser that did not result in a contract.

2)      Legal Authority

Tortious interference with prospective business relations under Delaware law requires: "(1) the reasonable probability of a business opportunity; (2) the intentional interference by defendant with that opportunity; (3) proximate causation; and (4) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.,* 428 A.2d 1151, 1153 (Del. 1981)).

To meet the reasonable probability of a business opportunity element, a plaintiff "must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm." *Agilent Techs., Inc. v. Kirkland,* 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009) (internal quotation marks and alteration omitted).

To meet the intentional interference element, "a plaintiff must prove that the defendant's interference with a business opportunity was intentional and wrongful or improper" and that the interferer had "knowledge of the relationship or expectancy." *U.S. Bank*, 23 F. Supp. 3d at 436 (citing *Agilent Techs.*, 2009 WL 119865, at *8; *In re Frederick's of Hollywood, Inc.*, 1998 WL 398244, at *5 (Del. Ch. July 9, 1998), *aff'd sub nom.*, *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)).

"When considering whether a defendant's actions were improper, the Court must assess these actions 'in light of a defendant's privilege to compete or protect [his] business interests in a

fair and lawful manner.'" *U.S. Bank*, 23 F. Supp. 3d at 436 (alteration in original) (quoting *DeBonaventura*, 428 A.2d at 1153).

To show that the interferer had knowledge of the relationship or expectancy, a plaintiff must prove that the interferer knew of the specific "contractual or fiduciary relationship" at issue. *Ameripack, Inc. v. ILC Dover, Inc.*, 1999 WL 669315, at *2-3 (Del. Ch. July 28, 1999) (granting summary judgment where there was no evidence in the record "that Oxford knew or had any reason to know that ILC had a contractual or fiduciary relationship with Ameripack"); *Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *16-17 (Del. Ch. Oct. 31, 2012) (granting summary judgment where plaintiffs "failed to carry their burden to prove that the [defendants] were aware of the relationship or expectancy with which they [were] alleged to have interfered intentionally"). General knowledge about a competitor's activities in the marketplace fails to establish the knowledge requirement. *Soterion Corp.*, 2012 WL 5378251, at *17 n.156.

To meet the proximate causation element, a plaintiff must show that the defendant's alleged interference was "the proximate cause of their damages"—in other words, a plaintiff must prove that the alleged interference was "the proximate cause of their loss of business." *DeBonaventura*, 428 A.2d at 1153-54.

**Damages**

1) <u>Issues to be Litigated</u>

If BASF can prove that Ingevity is liable for either of BASF's antitrust claims or BASF's tortious interference claim, whether BASF can prove by a preponderance of the evidence that it suffered damages in the form of lost profits.

If BASF can prove that Ingevity is liable for either of BASF's antitrust claims and that it suffered damages in the form of lost profits, whether BASF can prove by a preponderance of the

evidence that the amount of lost profits it seeks was a direct result or likely consequence of Ingevity's alleged unlawful conduct, and not a result of Ingevity's patent enforcement or petitioning activity.

If BASF can prove that Ingevity is liable for either of BASF's antitrust claims and that it suffered damages in the form of lost profits, whether BASF can prove by a preponderance of the evidence that

If BASF can prove that Ingevity is liable for either of BASF's antitrust claims and that it suffered damages in the form of lost profits, whether BASF can prove by a preponderance of the evidence that Ingevity's alleged anticompetitive conduct caused BASF's alleged damages, rather than Ingevity's lawful competitive conduct, Ingevity's lawful patent enforcement activity, Ingevity's lawful petitioning activity (including Ingevity's filing of patent infringement litigation against BASF), intervening decisions by OEMs and Tier 1 suppliers, BASF's decision to close EnerG2, BASF's decision to use ████████ as a carbon source for its carbon slurry used to coat EvapTrap XC, and/or poor customer service.

If BASF can prove that Ingevity is liable for either of BASF's antitrust claims or BASF's tortious interference claim and that it suffered damages in the form of lost profits, whether BASF can prove by a preponderance of the evidence that it properly disaggregated its claimed lost profit damages between the alleged unlawful activity and lawful patent enforcement activity, petitioning activity, or competition.

If BASF can prove that Ingevity is liable for either of BASF's antitrust claims or BASF's tortious interference claim and that it suffered damages in the form of lost profits, whether BASF can prove by a preponderance of the evidence that the amount of lost profits it seeks is just and reasonable, non-speculative, and supported by the evidence.

In the event of a finding of tortious interference with BASF's prospective business relations with Kayser, whether Ingevity's conduct is outrageous, because of evil motive or reckless indifference to BASF's rights, so as to warrant punitive damages, and if so, the amount of punitive damages BASF should be awarded.

If BASF can prove that Ingevity is liable for any of BASF's claims, whether Ingevity can prove by a preponderance of the evidence that BASF acted unreasonably in failing to take specific steps to minimize or limit its losses.

If BASF can prove that Ingevity is liable for any of BASF's claims, whether Ingevity can prove, by a preponderance of the evidence, that BASF's failure to take specific steps to minimize or limit its losses resulted in its losses being greater than they would have been had it taken such steps, and the amount by which BASF's alleged loss would have been reduced had BASF taken those steps.

If BASF can prove that Ingevity is liable for any of BASF's antitrust claims, whether BASF can prove, by a preponderance of the evidence, that its alleged antitrust injury flows from that which makes Ingevity's acts allegedly unlawful and that BASF's alleged antitrust injury is not too remote such that it may seek its costs under 15 U.S.C. § 15(a).

If BASF can prove that Ingevity is liable for any of BASF's antitrust claims, whether BASF can prove, by a preponderance of the evidence, that its alleged antitrust injury flows from that which makes Ingevity's acts allegedly unlawful and that BASF's alleged antitrust injury is not too remote such that it may seek its attorney's fees under 15 U.S.C. § 15(a).

If BASF can prove that Ingevity is liable for any of BASF's antitrust claims, whether BASF can prove, by a preponderance of the evidence, that it is entitled to pre-judgment interest

on alleged damages suffered before judgment is entered and post-judgment interest under 15
U.S.C. § 15(a).

If BASF can prove that Ingevity is liable for BASF's tortious interference claim, whether
BASF can prove, by a preponderance of the evidence, that it is entitled to pre-judgment and post-
judgment interest, costs, and/or attorney's fees.

If Ingevity is the prevailing party, whether Ingevity can seek its costs and attorney's fees.

2)      Legal Authority

Damages must be based on reasonable methodologies and cannot be speculative.  The
Supreme Court has made clear that a damage award may not be based on "speculation or
guesswork."  *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("[E]ven where
defendant by his own wrong has prevented a more precise computation, the jury may not render
a verdict based on speculation or guesswork."); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483,
1493, 1495 (8th Cir. 1992) (plaintiff failed to provide sufficient evidence to support damages
claim); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1350-51 (9th Cir.
1985) (no damages may be awarded where jury required to speculate).

BASF bears the burden of proving damages with reasonable certainty, including
apportioning damages between lawful and unlawful causes.  *R.S.E., Inc. v. Pennsy Supply, Inc.*,
523 F. Supp. 954, 964 (M.D. Pa. 1981) ("In private antitrust actions, the burden is placed upon
the plaintiff to show that the damage claimed was in fact caused by the unlawful acts of the
defendant and did not result from some other factor, such as management problems, a recession
in the economy or lawful competition by the defendant.").  Proof of the amount of damage may
be insufficient if it fails to provide the jury with any reasonable basis on which to estimate how
much plaintiff's income or profit was reduced by factors wholly separate from the antitrust
violation.  *See MCI Commc'ns Corp. v. AT&T*, 708 F.2d 1081, 1162-63 (7th Cir. 1983) ("When

27

a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of 'speculation or guesswork' not permitted for antitrust jury verdicts." (quoting *Bigelow*, 327 U.S. at 264)); *Associated Gen. Contractors of California*, 459 U.S. at 542 (damages were 'highly speculative' because plaintiff's injury was indirect and the 'alleged effects' on plaintiff "may have been produced by independent factors").

If an antitrust violation and injury has been shown but damages cannot be calculated except through guesswork or speculation, a jury may award nominal or zero damages to plaintiff. *See U.S. Football League v. NFL*, 842 F.2d 1335, 1376-77 (2d Cir. 1988) (affirming nominal damages instruction, explaining that "[w]e also reject the USFL's claim that the award of nominal damages in antitrust cases is somehow 'suspect'" because "courts routinely approve the award of such damages"); *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1147 (8th Cir. 1981) ("Under the circumstances, we think an award of nominal damages is justified and remand to the district court with directions to award appellant nominal damages in the amount of $ 3.").

Furthermore, in certain instances, treble damages may not be awarded where (1) there is the possibility of multiple treble damages awards or unduly difficult damages analyses or (2) where the alleged injury sustained by the plaintiff is too remote to justify this award, analogous to the proximate causation analysis that is often done in tort law. *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 94-95 (3d Cir. 1986).  In *Brunswick*, the Supreme Court held that a plaintiff seeking treble damages under § 4 must show more than simply an "injury causally linked" to a particular merger; instead, "plaintiffs must prove antitrust injury, which is to say

28

injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick*, 429 U.S. at 489 (denying treble damages because plaintiffs did not prove such injury).

Under Delaware law, punitive damages may be "imposed only after a close examination of whether the defendant's conduct is 'outrageous,' because of 'evil motive' or 'reckless indifference to the rights of others.'" *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529 (Del. 1987) (quoting Restatement (Second) of Torts § 908, cmt. b (1979)). "[T]he imposition of punitive damages has been sanctioned only in situations where the defendant's conduct, though unintentional, has been particularly reprehensible, *i.e.* reckless, or motivated by malice or fraud." *Id.* "Evil motive" and "reckless indifference" "parallel the willful and wanton standard," which "involve[s] an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences." *Id.* at 529-30. Where there is no contention that the defendant's conduct was intentional or malicious, the defendant's actions must "be tested under the standard of recklessness, *i.e.*, a conscious indifference to the rights of others." *Id.* at 530. There are "[t]wo significant elements [that] must be present for recklessness to exist." *Id.* The first is "the act itself," and the second, which "involves the actor's state of mind and the issue of foreseeability," is the "perception the actor had or should have had of the risk of harm which his conduct would create." *Id.* "In either setting, the focus is upon the defendant's state of mind. If the defendant's conduct reflects a conscious indifference to a foreseeable result punitive damages may be imposed to punish such indifference and to deter others from similar conduct." *Littleton v. Young*, 608 A.2d 728 (Del. 1992) (Table).

"Punitive damages are fundamentally different from compensatory damages both in purpose and formulation. Compensatory damages aim to correct private wrongs, while

assessments of punitive damages implicate other societal policies." *Jardel*, 523 A.2d at 528. "An award of punitive damages must therefore subsist on grounds other than making the plaintiff 'whole.'" *Id.*

The obligation to mitigate damages in an antitrust case is clear. *See, e.g.*, *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 436 (5th Cir. 1977). The law requires a plaintiff to use its best efforts to minimize the damages caused by a defendant's wrongful conduct. *See, e.g.*, *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 436 (5th Cir. 1977) ("An antitrust plaintiff has a duty to mitigate damages."). In most cases, a court can determine the amount by which a plaintiff's damages should be reduced by looking to the actual experience of the plaintiff and determining whether the plaintiff's mitigation efforts were reasonable. *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 46-47 (5th Cir. 1972).

Under the Clayton Act, prejudgment interest is generally unavailable to private antitrust plaintiffs. *See Masters v. Wilhelmina Model Agency*, 473 F.3d 423, 435-36 (2d Cir. 2007) ("[T]he Clayton Act does not allow for prejudgment interest in the absence of a finding of bad faith on the part of defendants causing a material delay in the adjudication of the dispute."); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 561-62 (7th Cir. 1986) ("While we agree . . . that prejudgment interest is necessary in some cases if a plaintiff is to be made whole, Congress has not yet provided that [it] can be awarded as a matter of course to private litigants in antitrust suits."). Courts have been reluctant to award prejudgment interest to private plaintiffs. *See Zapata Gulf Marine Corp. v. P.R. Mar. Shipping Auth.*, 133 F.R.D. 481, 487 n.4 (E.D. La. 1990) (denying prejudgment interest); *Seven Gables Corp. v. Sterling Recreation Org. Co.*, 686 F. Supp. 1418, 1427 (W.D. Wash. 1988) (same).

Under Section 4 of the Clayton Act, "the court *may* award . . . [prejudgment] interest . . . *if* the court finds that the award of such interest for such period is *just* in the circumstances."  15 U.S.C. § 15(a) (emphases added).  Such interest is limited to damages suffered from the time the claim accrues until judgment is entered, and may not be awarded on prospective damages.  *See, e.g.*, *W. Virginia v. United States*, 479 U.S. 305, 311 n.2 (1987); *see also William A. Graham Co. v. Haughey*, 646 F.3d 138, 146-47 (3d Cir. 2011).  In determining whether an award of prejudgment interest is just, "the court shall consider only—(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith; (2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and (3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."  15 U.S.C. § 15(a)(1)-(3).

"[P]ost-judgment interest is mandatory for damages awarded in civil cases.  Consistent with § 1961(a), the rate . . . is the weekly average one-year constant maturity Treasury yield for the week preceding entry of judgment[.]"  *Agrofresh Inc. v. Essentiv LLC*, 2020 WL 7024867, at *28 (D. Del. Nov. 30, 2020) (citing 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.")).

A prevailing plaintiff is also entitled to "the cost of suit, including a reasonable attorney's fee," under Section 4 of the Clayton Act.  15 U.S.C. § 15(a).  Federal Rule of Civil Procedure 54(d) and Local Rule 54.1(a) also state that the prevailing party (whether a plaintiff or defendant)

shall be entitled to costs.  Fed. R. Civ. P. 54(d)(1); D. Del. LR 54(a)(1).  Allowable costs are

identified in 28 U.S.C. § 1920 and Local Rule 54.1(b).

For claims brought in federal court under state law (i.e., the tortious interference claim),

"federal courts in diversity cases should apply state law with respect to prejudgment interest."

*Jarvis v. Johnson*, 668 F.2d 740, 746 (3d Cir. 1982).  "[P]rejudgment interest in Delaware cases

is awarded as a matter of right."  <u>*Brandywine Smyrna, Inc. v. Millennium Builders, LLC*</u>, 34 A.3d

482, 486 (Del. 2011).  However, the "determination of the appropriate interest rate to apply" is

left to the discretion of the district court.  *Agrofresh*, 2020 WL 7024867, at *26.  This includes

whether to award prejudgment interest either at the prime rate or post-judgment rate prescribed

by 28 U.S.C. § 1961(a).  *Id.* (citing *In re Frescati Shipping Co.*, 886 F.3d 291, 315 (3d Cir.

2018)).

**Injunction**

3) <u>Issues to be Litigated</u>

Whether BASF proves is entitled to injunctive relief.

If BASF proves it is entitled to injunctive relief, the scope of injunctive relief to which

BASF is entitled.

4) <u>Legal Authority</u>

An injunction is only authorized under the Clayton Act if BASF "demonstrate[s] a

significant threat of injury from an impending violation of the antitrust laws or from a

contemporary violation likely to continue or recur."  *Weiss v. York Hosp.*, 745 F.2d 786, 829 (3d

Cir. 1984); *Law v. National Collegiate Athletic Ass'n*, 185 F.R.D. 324, 350 (D. Kan. 1999)

(holding that injunctive relief was unwarranted where there was no evidence that plaintiff would

be threatened with or subjected to an impending antitrust violation; there was no cognizable

danger that defendants would re-impose anti-competitive compensation limits, and factually the

prospect was remote).  Injunctive relief should be ordered only when legal remedies are

nonexistent or inadequate.  *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of

injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal

remedies[.]").

      To justify permanent injunctive relief, a plaintiff must establish that there is a significant

threat of injury from impending violations.  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S.

100, 130 (1969); *Mid-West Paper Prods. Co. v. Cont'l Grp.*, 596 F.2d 573, 591-92 (3d Cir.

1979) ("[Section] 16 [of the Clayton Act] does not ground injunctive relief upon a showing that

'injury' has been already sustained, but instead makes it available 'against [t]hreatened loss or

damage.'" (quoting 15 U.S.C. § 26).

      A court should not issue an injunction that is unrelated or contradictory to the underlying

injury.  *Omega World Travel v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997).  The

injunction should be specific in its terms and describe in reasonable detail the act sought to be

restrained.  *City of Mishawaka, Ind. v. American Elec. Power Co.*, 616 F.2d 976, 991 (7th Cir.

1980).

# EXHIBIT 5



























# EXHIBIT 5A

| Code | Ingevity Objections Key |
|------|-------------------------|
| AA | Asked and Answered |
| AC | Improper Attorney Commentary |
| AR | Argumentative |
| B | Improper Bolstering (of the credibility of a witness, such as before credibility is attacked) |
| BER | Best Evidence Rule (prohibits introduction) |
| BS | Beyond the Scope of the 30(b)(6) |
| BSD | Beyond the Scope of Direct |
| BSE | Beyond Scope of Expert Testimony |
| C | Improper Compilation of Separate Documents |
| CE | Calls for Expert Testimony |
| CQ | Compound Question |
| CV | Cumulative |
| D | Improper Designation (designation is neither a question nor testimony; includes attorney colloquy or objection; otherwise improper designation) |
| DOC | Requirement of Original (Rule 1002) |
| E | Improper Opinion Testimony by Expert (e.g., speculation, lacks sufficient basis, improper hearsay, calls for legal conclusion) |
| F | Lack of Foundation, Assumes Facts Not in Evidence |
| H | Hearsay (Rule 801, Rule 802) |
| HH | Hearsay within Hearsay (Rule 805) |
| I | Incomplete answer/question/document/hypothetical |
| ICC | Improper counter-counter designation |
| IEW | Improper reliance on undisclosed expert witness |
| ID | Incomplete Designation |
| IFH | Incomplete file history |
| ILL | Exhibit is illegible |
| IIUE | Improper Invalidity/Unenforceability Evidence |
| LC | Legal Conclusion |
| LIT | Other Litigation |
| LQ, L | Leading Question |
| M | Offer of Discussion for Settlement or Compromise |
| MIL | Subject to Motions *in Limine* |
| MIS | Misrepresents Prior testimony or Evidence (including assuming fact not in evidence) |
| NA | Authentication |
| NARR | Calls for Improper Narrative Response |
| ND | This exhibit is a deposition transcript or discovery response of the offering party, and thus is not properly admitted into evidence |
| NP | Exhibit Not Produced in Discovery |
| NRS | Evidence not restricted to its proper scope |

| NTP | Violation of Scheduling Order – Not Timely Produced. All or part of the proposed exhibit is objected to because the proposed exhibit was not timely produced during discovery. |
|---|---|
| OB | Overbroad |
| OP, O | Opinion Testimony By Fact Witness (e.g., calls for expert opinion, calls for legal conclusion) |
| P | Unfairly prejudicial, confuses the issues, misleading, would cause undue delay, would waste time, or cumulative (Rule 403) |
| PK | Lacks Personal Knowledge (Rule 602) |
| PO | Violates Protective Order Entered in This Case |
| PR | Privileged |
| R | Relevance (Rule 401, Rule 402) |
| SP | Calls for Speculation |
| SUM | Improper summary exhibit. The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court |
| UK | Designation or exhibit unknown because it has not been adequately identified by BASF, and as such, Ingevity cannot evaluate its substance |
| UN | Unresponsive |
| V | Vagueness/Misleading |
| W | Withdrawn Question |

# EXHIBIT 6







































































































# EXHIBIT 6A

| Code | BASF's Objection Key |
|---|---|
| 402 | Not Relevant: This exhibit is objectionable because it is not relevant to any claim or defense (*see* FRE 402) |
| 403 | Confusing and Unduly Prejudicial: This testimony is objectionable because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence (*see* FRE 403) |
| 408 | Compromise and offer to compromise (*see* FRE 408) |
| 602 | Lack of Personal Knowledge: This exhibit is objectionable because it constitutes testimony on a matter as to which the witness lacks personal knowledge (*see* FRE 602) |
| 801/802 | Hearsay: This exhibit is objectionable because it is a statement made by one other than the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted and not subject to any hearsay exception (*see* FRE 801 and 802) |
| 901 | Lacks Authenticity |
| A | Argumentative |
| AA | Asked and Answered |
| AC | Improper Attorney Commentary |
| BER | Best Evidence Rule prohibits introduction |
| Compound | Compound |
| D | Improper Designation (*i.e.*, designation is neither a question nor testimony, includes attorney colloquy or objection, is otherwise improper) |
| ES | Exceeds the scope of or is unrelated to opening designation |
| F | Lacks Foundation |
| ID | Incomplete Designation |
| LC | Legal Conclusion |
| L | Leading Question |
| MIL | Subject to Motion *in Limine* |
| MIS | Misrepresents prior testimony or evidence (including assuming fact not in evidence) |
| NRS | Evidence is not restricted to its proper scope |
| SP | Calls for Speculation |
| V | Vague, ambiguous, or misleading |

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INGEVITY CORPORATION, INGEVITY SOUTH CAROLINA, LLC, <br><br> Plaintiffs-Counterclaim Defendants, <br><br> v. <br><br> BASF CORPORATION, <br><br> Defendant-Counterclaim Plaintiff. | C.A. No. 18-1391-RGA |

**COUNTERCLAIM PLAINTIFF BASF CORPORATION'S WITNESS LIST**

Pursuant to L.R. 16.3(c)(7), Counterclaim Plaintiff BASF Corporation ("BASF") identifies the following witnesses whom it may call live or by deposition at trial.

**I.  EXPERT WITNESSES**

- Divya Mathur, Ph.D.*

- James Lyons*

**II.  FACT WITNESSES**

- Wolfgang Ruettinger, Ph.D.*

- Diana Rowe*

- Akash Abraham*

- Kirill Bramnik, Ph.D.* †

- Edward Woodcock*

- Peter McCrae (by deposition or live if he appears for Ingevity)

- Erik Ripple (by deposition or live if he appears for Ingevity)

- Robert K. Beckler, Ph.D.

- Stefan Schutte

1

- Bethany Toldo

- Frank Gregor

- Susan LaBine*†

- Kaish Listiawan

- James Peterson

The witnesses BASF intends to call live, based on discussions with the witnesses or representations by Ingevity Corporation and Ingevity South Carolina ("Ingevity"), are designated with an asterisk (*). BASF has designated the deposition testimony of witnesses designated with (†) pending discussions about their availability to testify live.

The above list is not a commitment that BASF will call any particular witness at trial, or a representation that any of the witnesses listed are available or will appear for trial. If any witness listed as a person whom BASF intends to call to testify in person is unavailable, BASF reserves the right to offer remote testimony or deposition testimony from such witness in lieu of in-person examination. BASF further reserves the right to introduce testimony through deposition or live examination of any witness that Ingevity identified on its list; of any expert witness that submitted testimony, a declaration, or an expert report on behalf of Ingevity in this action; or as necessary to establish authenticity or admissibility of any trial exhibit if the authenticity or admissibility of the exhibit is challenged by Ingevity. Finally, BASF reserves the right to present the live testimony of any witness called live by Ingevity.

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INGEVITY CORPORATION, INGEVITY SOUTH CAROLINA, LLC,<br><br>                Plaintiffs,<br><br>      v.<br><br>BASF CORPORATION,<br><br>                Defendant. | C.A. No. 18-1391-RGA |

## COUNTERCLAIM DEFENDANTS' WITNESS LIST

Pursuant to L.R. 16.3(c)(7), Counterclaim Defendants Ingevity Corporation and Ingevity South Carolina, LLC ("Ingevity") identify the following witnesses whom it may call live or by deposition at trial.

**I.      EXPERT WITNESSES**

- David Rockstraw, Ph.D. (live)
- Mohan Rao, Ph.D. (live)
- Thomas Vander Veen, Ph.D. (live)

**II.     FACT WITNESSES**

- Edward Woodcock (live)
- Roger Williams (live)
- Lawrence Hiltzik, Ph.D. (live)
- Peter McRae (live)
- Erik Ripple (live)
- James Miller, Ph.D. (live)
- Akash Abraham (by deposition or live if he appears for BASF)

1

- Laif Alden (by deposition or live if he appears for BASF)

- Robert Beckler, Ph.D. (live)

- Achim Rauber (live or by video)

- Sebastian Bunzendahl (live or by video)

- Scott Garcia (live or by video)

- Julie Baugh (live or by video)

- Susan LaBine, Ph.D. (deposition)

- Kirill Bramnick (deposition or live if he appears for BASF)

- Steve Chin (by deposition or live if he appears for BASF)

- Frank Gregor (deposition)

- Kasih Listiawan (deposition)

- Doug Mancini (deposition)

- James Peterson (deposition or live if he appears for BASF)

- Diane Rowe (deposition or live if she appears for BASF)

- Wolfgang Ruettinger (by deposition or live if he appears for BASF)

- Stefan Schutte (deposition)

- Bethany Toldo (deposition)

- Heather Widgren (deposition)

The above list is not a commitment that Ingevity will call any particular witness at trial, or a representation that any of the witnesses listed are available or will appear for trial. If any witness listed as a person whom Ingevity intends to call to testify in person is unavailable, Ingevity reserves the right to offer deposition testimony from such witness in lieu of live examination. Ingevity further reserves the right to introduce testimony through deposition or live examination for any witness that Defendant BASF Corporation ("BASF") identifies on its list; or as necessary to establish authenticity or admissibility of any trial exhibit if the authenticity or admissibility of the exhibit is challenged by BASF.  Due to the ongoing uncertainty regarding

COVID-19 and witnesses' willingness and/or availability to travel to Wilmington for the trial, Ingevity also reserves the right to call witnesses to testify via live video, including third party witnesses.

/s/ Karen E. Keller

OF COUNSEL:

Jeffrey T. Thomas
Taylor W. King
Nathaniel R. Scharn
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Dr.
Irvine, CA 92612-4412
(949) 451-3800

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-850

Rod J. Stone
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7256

Stuart M. Rosenberg
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
(650) 849-5389

Rustin K. Mangum
Spencer W. Ririe
MANGUM RIRIE LLP
999 Corporate Dr. #260
Ladera Ranch, CA 92694
(949) 298-5590

Dated: July 1, 2021

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, Delaware 19801
kkeller@shawkeller.com
jcastellano@shawkeller.com

*Attorneys for Plaintiffs*

3

## <u>CERTIFICATE OF SERVICE</u>

I, Jeff Castellano, hereby certify that on July 1, 2021, this document was served on the persons listed below in the manner indicated:

### <u>BY EMAIL</u>

Rodger D. Smith, II
MORRIS, NICHOLS, ARHST & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
Thomas J. Friel, Jr.

KING & SPALDING LLP
601 South Carolina Avenue, Suite 100
Palo Alto, CA 94304
(650) 422-6700
tfriel@kslaw.com

Joseph D. Eng, Jr.
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY 10036-2601
(212) 556-2250
jeng@kslaw.com

James P. Brogan
Brian Eutermoser
Angela C. Tarasi
Mikala Stone
KING & SPALDING LLP
1400 16th Street
16 Market Square, Suite 400 Denver, CO 80202
(720) 535-2300
jbrogan@kslaw.com
beutermoser@kslaw.com
atarasi@kslaw.com
mikaela.stone@kslaw.com

Norman A. Armstrong, Jr.
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
narmstrong@kslaw.com
cyook@kslaw.com

*/s/ Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
jcastellano@shawkeller.com
*Attorneys for Plaintiff*

EX. 8 - INGEVITY'S WITNESS LIST.DOCX

# EXHIBIT 9

**EXHIBIT 9**

**BASF'S DEPOSITION DESIGNATIONS**

In addition to the counter-designations identified herein, Ingevity also reserves the right to rely on testimony designated by BASF, subject to admissibility.

**Robert Beckler, Ph.D., October 17, 2019**

| Robert Beckler Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 6:8-23 | | 18:15-24 | | 19:22-24 | ICC, R |
| 8:5-12:25 | D, PK, R, P, W | 19:18-21 | | | |
| 15:11-17:22 | AC, D, ID, P, PK, R | 36:25-37:2 | | | |
| 21:1-24:19 | D, F, ID, P, PK, R | 37:5-38:18 | | | |
| 38:23-40:2 | ID, P, PK, R | | | | |

**Kirill Bramnik, January 14, 2020**

| Kirill Bramnik Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 6:14-23 | | 12:9-16 | | 39:20-40:1 | ICC, PK, SP |
| 9:5-20 | | 13:12-24 | | 41:1-3 | ICC, PK |
| 13:4-10 | | 15:12-20 | | | |
| 15:1-11 | | 33:6 | | | |
| 16:1-3 | | 34:8-15 | | | |
| 16:5-13 | | 37:9-10 | F, 602 | | |

| Kirill Bramnik Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 33:7-14 | I, ID | 37:12-17 | F, 602 | | |
| 33:23-34:7 | | 38:17-20 | | | |
| 34:16-22 | | 39:3-11 | | | |
| 37:6-8 | PK, SP | 40:18-25 | | | |
| 37:20-38:16 | PK, SP | 41:14-22 | | | |
| 44:15-45:4 | PK, SP | 72:21-73:5 | | | |
| 45:6-10 | | 74:8-75:18 | | | |
| 48:5-49:14 | D, P, UN | | | | |
| 51:2-21 | P, PK, SP | | | | |
| 51:23 | PK | | | | |
| 52:1-23 | | | | | |
| 55:4-56:11 | PK, SP | | | | |

**Frank Gregor, January 7, 2020**

| Frank Gregor Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 9:3-9 | | 25:18–20 | | 10:11-13 | ICC |
| 14:22-17:9 | LQ, V | 25:22–24 | | 38:20-23 | H, ICC |
| 17:14-18:11 | H, BER, LQ, SP | 33:25 | | 41:14-42:4 | F, ICC |
| 18:13-18:25 | LQ, SP, PK | 37:9–17 | | 61:20 | ICC |
| 19:2-19:22 | P, SP, PK | 38:24–39:6 | | | |
| 19:24-21:4 | LQ | 39:8–9 | | | |
| 21:21-22:21 | LQ, SP | 41:3–10 | | | |
| 22:24-23:4 | V | 42:17–19 | | | |

| Frank Gregor Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 23:6-24:19 | LQ, H, CQ | 42:21 | | | |
| 24:21-25:17 | P, CQ, H | 42:23–43:1 | | | |
| 26:1-4 | CQ | 43:4–5 | | | |
| 26:6-29:10 | V, AC, MIS, F, SP, PK | 59:12–17 | | | |
| 29:13-17 | SP | 59:24–60:4 | | | |
| 29:20-25 | F, V, BS, AC | 61:18–19 | | | |
| 30:6-16 | UN, PK, SP | 63:1–21 | | | |
| 30:18-31:8 | PK, F, P | 65:6–11 | | | |
| 31:12-32:2 | LQ | | | | |
| 32:4-33:24 | PK, LQ, BER, H | | | | |
| 34:3-35:10 | BER, H, P, LQ, F, MIS | | | | |
| 35:12-37:8 | AC, MIS, CQ, SP, LQ, V, PK | | | | |
| 37:18-38:19 | V, BER, LQ, H | | | | |
| 39:11-40:17 | BER, H, LQ | | | | |
| 57:15-58:17 | BER, H | | | | |
| 59:6-11 | AC, LQ, H | | | | |
| 60:18-61:17 | LQ | | | | |
| 61:21-62:8 | F, PK, D | | | | |

**Susan LaBine, July 19, 2019**

| Susan LaBine Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 23:7-24:16 | | 52:18-53:23 | | 27:3-8 | ICC |
| 26:14-17 | | 54:7-23 | | 103:24-25 | ICC, P, PK, R, SP |
| 28:15-30:3 | | 55:5-20 | | 104:10-15 | ICC, P, PK, R, SP |
| 55:21-57:10 | AA, F, H, P, PK, R, SP | 78:20-79:21 | | 105:15 | ICC, P, PK, R, SP |
| 57:20-58:3 | P, R | 95:13-21 | | 113:2-17 | ICC, P, PK, R, SP |
| 79:22-80:10 | P, R | 99:19-21 | | 113:22-25 | ICC, P, PK, R, SP |
| 87:2-17 | BER, P, R | 101:15-102:13 | | 117:15-19 | ICC, P, PK, R, SP |
| 98:2-99:17 | F, I, P, PK, R, SP | 102:25-103:23 | | 144:15-145:1 | BER, ICC, P, PK, R, SP |
| 114:11-115:13 | F, P, PK, R, SP | 104:1-9 | | 225:22-25 | ICC, PK, SP |
| 116:16-117:10 | F, P, PK, R, SP | 104:16-105:12 | | 280:12-13 | ICC |
| 123:3-18 | F, H, P, PK, R, SP | 109:16-113:1 | | 310:4-311:4 | AC, ICC, P, PK, R, SP, V |
| 130:16-137:22 | AA, F, H, P, PK, R, SP | 113:18-21 | | | |
| 138:9-17 | D | 115:14-116:15 | | | |
| 139:10-142:9 | F, P, PK, R, SP, V | 117:11-14 | | | |
| 142:23-143:13 | P, PK, R, SP | 121:10-123:2 | | | |
| 194:13-195:2 | F, PK, SP | 123:19-24 | 602 | | |
| 200:22-201:11 | F, P, PK, SP | 124:6-15 | | | |
| 204:16-19 | OB, V | 124:20-24 | | | |
| 204:22-205:5 | D | 127:1-3 | | | |
| 205:9-16 | | 127:18-128:1 | | | |
| 206:4-7 | I, ID | 143:119-144:2 | | | |
| 206:20-24 | | 144:5-14 | | | |

| Susan LaBine Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 207:17-208:3 | BS, MIS, PK, SP | 147:7-148:7 | | | |
| 208:7-12 | BS, D, F, PK, SP | 148:22-149:11 | | | |
| 208:16-20 | BS, D, F, PK, SP | 149:22-25 | | | |
| 215:20-216:16 | F, PK, SP | 156:11 | | | |
| 217:20-25 | BER | 156:14-21 | | | |
| 220:10-22 | OB, V | 157:24-158:8 | | | |
| 221:5-8 | | 158:17-159:4 | | | |
| 222:13-223:1 | BER, H | 159:14-24 | | | |
| 223:9-20 | BER, H, PK, SP | 164:15-17 | | | |
| 224:3-21 | BER, D, F, H, P, PK, SP | 164:24-165:23 | | | |
| 224:23-225:1 | F, P, PK, SP | 166:5-20 | | | |
| 227:6-16 | ID, PK, SP | 192:25-193:3 | | | |
| 227:20-228:5 | OB, PK, SP, V | 193:6-18 | | | |
| 228:15-17 | | 193:21-194:12 | | | |
| 229:15-230:16 | BER, F, H, PK, SP | 195:3-9 | | | |
| 243:17-244:9 | PK, SP | 200:10-13 | | | |
| 264:8-265:10 | D, F, P, PK, R, SP | 201:12-15 | | | |
| 284:7-285:9 | BER, D, H, P, PK, R, SP | 202:11-19 | | | |
| 285:12 | P, R | 205:17-25 | | | |
| 285:22-286:4 | P, PK, R, SP | 206:9-12 | | | |
| 286:19-287:25 | P, R | 206:13-15 | | | |
| 288:6-16 | P, R | 206:17-19 | | | |
| 288:19-289:9 | D, P, PK, R, SP | 206:25-207:2 | | | |
| | | 207:7-8 | | | |
| | | 207:10-15 | | | |

| Susan LaBine Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| | | 208:24-210:8 | | | |
| | | 211:24-212:4 | | | |
| | | 212:11-213:15 | | | |
| | | 213:17-215:19 | | | |
| | | 217:2-19 | 602 | | |
| | | 218:1-9 | | | |
| | | 220:23-221:4 | | | |
| | | 221:9-15 | | | |
| | | 223:21-224:2 | | | |
| | | 225:2-10 | | | |
| | | 225:13-14 | | | |
| | | 226:21-227:5 | | | |
| | | 227:17-19 | | | |
| | | 228:18-229:1 | | | |
| | | 229:4-14 | | | |
| | | 233:8-234:25 | | | |
| | | 276:14-25 | F, L, V, SP, 402, 403, 602 | | |
| | | 277:5-10 | F, L, V, SP, 402, 403, 602 | | |
| | | 277:14-24 | F, L, V, SP, 402, 403, 602 | | |
| | | 280:2-4 | AA, F, V, SP, 402, 403, 602 | | |
| | | 280:9-10 | AA, F, V, SP, 402, 403, 602 | | |
| | | 281:7-11 | F, V, SP, 402, 403, 602 | | |

| Susan LaBine Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| | | 281:15-17 | F, V, SP, 402, 403, 602 | | |
| | | 281:20-282:7 | F, V, SP, 402, 403, 602 | | |
| | | 282:10-24 | F, V, SP, 402, 403, 602 | | |
| | | 283:1-12 | F, V, SP, 402, 403, 602 | | |
| | | 283:14-21 | F, V, SP, 402, 403, 602 | | |
| | | 298:9-16 | | | |
| | | 299:2-21 | F, V, SP, 402, 403, 602, 802, 803 | | |
| | | 299:25-300:19 | F, V, SP, 402, 403, 602, 802, 803 | | |
| | | 301:3-6 | 402, 403, BER | | |
| | | 301:10-15 | 402, 403, BER | | |
| | | 301:17-302:4 | 402, 403, BER | | |
| | | 307:11-23 | F, 602 | | |
| | | 307:25 | F, 602 | | |
| | | 309:4-19 | L | | |
| | | 309:22-310:3 | | | |
| | | 311:5-7 | F, LC, 402, 403, 602 | | |
| | | 311:12-22 | | | |
| | | 313:13-314:9 | F, L | | |
| | | 314:12 | F, L | | |
| | | 319:22-320:8 | V, 602 | | |
| | | 320:10-321:1 | F, 602 | | |

| Susan LaBine Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| | | 321:3-322:2 | 402, 403, 602, V | | |

**Susan LaBine, September 4, 2019**

| Susan LaBine Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 13:14-20 | | 25:7-9 | | 36:22-24 | F, ICC, P, PK, R, SP |
| 17:4-18:22 | BER, H, PK, SP | 29:4-30:3 | | 105:5 | ICC |
| 21:20-22:7 | PK, SP | 34:17-24 | | | |
| 24:2-25:6 | BER, H, P, PK, R, SP | 36:25-39:11 | | | |
| 25:10-14 | P, R | 40:7-41:17 | | | |
| 25:16-26:6 | F, P, PK, R, SP | 44:6-7 | | | |
| 26:9-15 | F, P, PK, R, SP | 44:9-14 | | | |
| 26:17-27:11 | F, P, PK, R, SP | 44:17-20 | | | |
| 27:13-28:4 | F, P, PK, R, SP | 44:22-45:4 | | | |
| 28:6-12 | F, P, PK, R, SP | 49:25-50:1 | | | |
| 34:25-36:21 | F, P, PK, R, SP | 52:16-20 | F, SP, 602 | | |
| 43:2-44:5 | BER, D, H, P, R | 52:22-53:10 | F, SP, 602 | | |
| 45:5-16 | P, PK, R, SP | 53:13-54:22 | F, SP, 602 | | |
| 46:14-47:4 | BER, H, P, PK, R, SP | 57:15-58:1 | 402, 403 | | |
| 48:4-20 | PK, SP | 61:20-62:6 | | | |
| 48:22-24 | PK, SP | 101:14-105:1 | ID | | |

| Susan LaBine Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 49:1-24 | | 105:7-15 | | | |
| 50:2-19 | | 112:13-22 | | | |
| 55:1-10 | PK, SP | 113:15-18 | | | |
| 55:12-56:10 | PK, SP | 120:24-121:2 | | | |
| 105:16-106:15 | F, H, PK, SP | 125:6-12 | | | |
| 111:1-8 | | 130:8 | | | |
| 112:8-12 | | 159:16 | 402, 403 | | |
| 112:23-113:5 | BER, H | 159:18-160:11 | 402, 403 | | |
| 113:15-18 | ID, PK, SP | 160:13 | 402, 403 | | |
| 114:5-9 | H, ID, PK, SP | | | | |
| 120:1-14 | ID | | | | |
| 125:13-126:10 | BER, F, H, PK, SP | | | | |
| 128:11-25 | BER, F, H, PK, SP | | | | |
| 129:4-130:7 | BER, H, ID, PK, SP | | | | |
| 130:15-132:2 | BER, F, H, PK, SP | | | | |
| 157:14-158:17 | BER, CQ, F, H, P, PK, R, SP, V | | | | |

**Kasih Listiawan, January 16, 2020**

| Kasih Listiawan Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 5:13-6:11 | | 8:16-22 | | 8:7-9 | ICC |
| 17:11-23 | | 17:24-18:1 | | 33:24-34:15 | ICC |
| 20:1-21:1 | F, SP, PK, H | 22:13-23:10 | | | |

| Kasih Listiawan Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 22:1-12 | F, SP, PK, H | 24:5 | | | |
| 23:23-24:4 | F, SP, PK, H | 25:2-6 | | | |
| 24:8-14 | F, SP, PK, H | 25:8 | | | |
| 24:16-21 | F, SP, PK, H | 33:15-23 | | | |

**Peter McCrae, October 17, 2019**

| Peter McCrae Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 8:6-11 | | 10:2-9 | | 8:15-22 | ICC |
| 10:10-11:6 | | 11:7-10 | | | |
| 12:6-12 | LQ | 28:16-22 | | | |
| 13:7-14:22 | PK, SP | 30:8-18 | | | |
| 17:22-18:16 | | 32:13-22 | | | |
| 28:23-29:19 | | 37:10-15 | | | |
| 30:19-24 | PK, SP | 42:21-24 | | | |
| 32:23-37:9 | PK, SP | 44:20-21 | D | | |
| 39:24-42:20 | BER, D, H, PK, SP | 53:18-54:4 | | | |
| 42:25-43:21 | BER, H, PK, SP | 64:8-65:18 | 801/802, ES | | |
| 44:2-14 | | 66:4-8 | 801/802, ES | | |
| 44:22-46:6 | BER, H, I, ID, PK, SP | 67:10-12 | | | |
| 49:20-50:3 | BER, H | 71:8-72:4 | 801/802, ES | | |
| 52:3-16 | BER, H, PK, SP | 77:3-5 | | | |
| 52:23-53:10 | | 78:5-12 | | | |

| Peter McCrae Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 53:13-17 | | 78:15-16 | | | |
| 55:17-56:11 | BER, H, OB, PK, SP, V | 79:2-5 | | | |
| 56:14-22 | OB, PK, SP, V | 79:22-80:1 | | | |
| 56:24-60:2 | H, PK, SP | 82:8-9 | D | | |
| 60:15-25 | | 85:8-9 | D | | |
| 61:12-63:9 | D, H, OB, PR, V | 92:11-19 | | | |
| 63:12-64:7 | H | 92:21-93:22 | 801/802, ES | | |
| 66:23-67:5 | OB, PK, SP, V | 97:6-11 | | | |
| 67:7-20 | OB, PK, SP, V | 100:23-103:13 | 801/802, ES | | |
| 67:22-69:1 | AA, PK, SP | 103:23-104:3 | | | |
| 69:22-70:5 | BER, F, H | 108:1-3 | | | |
| 70:8-14 | CE, F, OP | 112:19-22 | | | |
| 70:18-71:3 | BER, CE, F, H, OP, PK, SP | 121:16-18 | 402, 403, 801/802, ES | | |
| 71:5-6 | PK, SP | 121:21-23 | 402, 403, 801/802, ES | | |
| 72:5-8 | CE, I, ID, OB, OP, SP, V | 127:1-2 | | | |
| 72:12-15 | CE, OB, OP, PK, SP, V | 127:8-14 | | | |
| 72:17-74:21 | OB, PK, SP, V | 127:17-19 | | | |
| 74:24-75:1 | PK, SP | 130:1-3 | | | |
| 75:11-22 | | 130:6-11 | | | |
| 76:13-77:2 | I, ID, PK, SP | 131:3-6 | | | |
| 77:6-9 | PK, SP | 159:24-160:1 | | | |
| 77:18-78:3 | PK, SP | 161:11-20 | | | |
| 78:18-79:1 | BER, H, PK, SP | 167:6-8 | | | |

| Peter McCrae Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 79:6-21 | BER | 168:18-24 | 402, 403, 602, 801/802 | | |
| 82:10-11 | I, ID, OB, PK, SP, V | 169:2-4 | 402, 403, 602, 801/802 | | |
| 82:14-22 | OB, PK, SP, V | 171:4-23 | 402, 403, 602, 801/802 | | |
| 82:25-83:10 | OB, PK, SP, V | 172:1-14 | 402, 403, 602, 801/802, ES | | |
| 83:25-84:1 | OB, PK, SP, V | 172:19-173:11 | 402, 403 602, 801/802, ES | | |
| 84:3-8 | PK, SP | 173:14-18 | 801/802, ES | | |
| 84:11-85:2 | PK, SP | 173:20-174:20 | 801/802, ES | | |
| 85:6-7 | PK, SP | 175:2-176:15 | 402, 403, 602, 801/802, ES | | |
| 85:10-16 | I, ID, PK, SP | 188:3-12 | 402, 403, 602, 801/802 | | |
| 85:19-86:7 | AR, F, OB, PK, SP ,V | 188:19-189:3 | 402, 403, 602, 801/802 | | |
| 86:10-16 | PK, SP | 189:17-19 | 402, 403, 602, 801/802 | | |
| 86:19-21 | PK, SP | 190:23 | | | |
| 87:8-9 | V | 194:10-19 | 602, 801/802 | | |
| 87:11-22 | F, PK, SP | 201:9 | | | |
| 88:1-21 | CE, F, OP, PK, SP | 202:12-14 | | | |
| 89:6-16 | PK, SP | 203:11-12 | | | |
| 89:22-91:18 | CE, OP, PK, SP | 208:2-7 | 402, 403, 602, 801/802 | | |
| 91:21 | PK, SP | 209:7-11 | 801/802 | | |

12

| Peter McCrae Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 93:23-94:15 | CE, OP, PK, SP | 209:15-21 | 801/802 | | |
| 94:19-97:5 | F, I, ID, PK, SP | 211:15-25 | 402, 403, 602, 801/802 | | |
| 99:25-100:22 | LQ, PK, SP | 212:16-25 | 402, 403, 602, 801/802 | | |
| 103:14-22 | PK, SP | 213:21-23 | 402, 403, 602, 801/802 | | |
| 105:6-9 | PK, SP | 214:21-215:3 | 402, 403, 602, 801/802 | | |
| 105:17-19 | PK, SP | 215:20-24 | 801/802 | | |
| 105:22 | PK, SP | 216:6-217:18 | 402, 403, 602, 801/802 | | |
| 105:24-106:15 | PK, SP | 217:21-25 | 402, 403, 602, 801/802 | | |
| 106:23-107:25 | BER, H, PK, SP | 218:3-219:15 | 402, 403, 602, 801/802 | | |
| 108:4-20 | OB, PK, SP, V | 219:21-24 | 402, 403, 602, 801/802 | | |
| 108:22-25 | PK, SP | | | | |
| 110:19-111:8 | BER, H, PK, SP | | | | |
| 112:5-18 | BER, H, I, ID | | | | |
| 112:23-25 | | | | | |
| 113:3 | | | | | |
| 117:2-10 | | | | | |
| 118:7-11 | | | | | |
| 119:21-24 | | | | | |
| 120:4-15 | BER, F, H, PK, SP | | | | |
| 120:18-121:1 | F, PK, SP | | | | |

| Peter McCrae Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 121:4-5 | F, PK, SP | | | | |
| 121:25-122:8 | BER, F, H, PK, SP | | | | |
| 122:11-22 | F, H, PK, SP | | | | |
| 126:18-25 | H | | | | |
| 127:21-128:18 | PK, SP | | | | |
| 129:17-19 | H, OB, V | | | | |
| 129:21-24 | H | | | | |
| 130:21-131:2 | I, ID | | | | |
| 147:14-19 | D | | | | |
| 151:15-152:11 | CE, F, OP, PK, SP | | | | |
| 152:14-153:4 | BER, F, H, PK, SP | | | | |
| 153:7-20 | PK, SP | | | | |
| 156:5-21 | PR | | | | |
| 157:1 | | | | | |
| 158:23-159:23 | BER, H, PK, SP | | | | |
| 160:2-161:10 | BER, H, PK, SP | | | | |
| 161:21-25 | PR | | | | |
| 162:7-18 | OB, PK, SP, V | | | | |
| 162:21-163:14 | F, H, OB, PK, SP, V | | | | |
| 163:17-22 | PK, SP | | | | |
| 166:20-167:4 | D | | | | |
| 167:9-15 | NARR, V | | | | |
| 167:18-168:17 | BER, H | | | | |
| 169:6-170:20 | BER, H, PK, PR, SP | | | | |
| 171:2-3 | PK, SP | | | | |
| 181:3-18 | BER | | | | |
| 184:12-21 | BER, F, H, PK, SP | | | | |

| Peter McCrae Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 185:1-15 | BER, H, PK, PR, SP | | | | |
| 185:21-186:1 | OB, PK, SP, V | | | | |
| 187:21-188:2 | PK, SP | | | | |
| 190:17-192:13 | BER, D, H, PK, SP, V | | | | |
| 192:17-193:9 | BER, H, PK, SP, V | | | | |
| 193:12-22 | PK, SP | | | | |
| 193:25-194:9 | PK, SP | | | | |
| 195:19-197:24 | BER, H, PK, SP | | | | |
| 200:22-201:11 | D | | | | |
| 201:18-202:11 | | | | | |
| 202:15-203:11 | I, ID, PK, PR, SP | | | | |
| 203:21-208:1 | BER, D, H, PK, SP | | | | |
| 209:22-210:1 | AA, CE, OP | | | | |
| 210:13-211:14 | CE, OP | | | | |
| 213:1-20 | BER, D, H | | | | |
| 214:11-20 | BER, H | | | | |
| 215:4-6 | CE, OB, OP, PK, SP, V | | | | |
| 215:9-19 | CE, OP, H | | | | |
| 215:25-216:5 | BER, H | | | | |

**James Peterson, January 9, 2020**

| James Peterson Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 27:16-20 | H | 35:1-14 | 402, 403 | 35:15-37:18 | BER, H, HH, ICC, R |
| 29:12-30:20 | H | 76:7-22 | | 76:23-77:2 | H, ICC, R, UN |
| 46:6-19 | H, HH, R | 77:3-10 | | 77:11-21 | H, ICC |
| 78:8-12 | ID, H | 77:22-78:7 | | 118:12-15 | H, ICC |
| 115:15-116:5 | H | 118:6-11 | | 148:17-25 | H, ICC, UN |
| 117:8-118:5 | H, ID | 138:6-25 | | 155:10-156:6 | H, ICC, PK, R |
| 118:16-119:17 | BER, H, ID | 143:20-146:4 | | 156:18-157:9 | H, ICC, PK, R, UN |
| 124:17-126:1 | H | 148:2-16 | | 157:14-157:19 | H, ICC |
| 129:1-11 | H | 153:17-154:19 | | | |
| 133:5-136:3 | H, PK, R | 154:20-155:9 | | | |
| 136:12-137:23 | BER, H, PK, R, UN | 156:7-17 | | | |
| 163:24-165:18 | BER, H, HH, PK | 169:15-17 | | | |
| 166:14-19 | BER, H, PK | 170:19-171:3 | 801/802, 602 | | |
| 169:7-17 | BER, H, ID | 174:24-175:3 | | | |
| 170:3-18 | H | 177:2-21 | | | |
| 174:5-24 | H, ID, PK | 178:5-8 | | | |
| 175:4-14 | H, ID, PK | 180:4-10 | | | |
| 176:2-177:1 | H | | | | |
| 177:22-178:4 | H, ID | | | | |
| 178:9-179:12 | H, PK, UN | | | | |
| 180:23-186:5 | D, H, HH, ID, P, PK, R | | | | |

**Erik Ripple, December 18, 2019**

| Erik Ripple Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 9:3-6 | ID | 9:7 | | 9:15-17 | ICC |
| 11:10-12:7 | | 12:8-14:5 | | 10:16-18 | ICC |
| 14:16-15:8 | | 30:18-19 | | 88:18-89:3 | ICC, PK, SP |
| 17:14-17 | | 31:10-19 | | 103:6 | ICC |
| 24:22-25:10 | | 41:7-8 | D | | |
| 30:3-5 | | 41:15-24 | 801/802 | | |
| 30:10-17 | I, ID | 42:5-7 | 801/802 | | |
| 31:20-33:12 | V | 42:9-10 | 801/802 | | |
| 33:15-24 | | 42:18-45:16 | 801/802 | | |
| 36:7-22 | PK | 48:4-9 | | | |
| 37:21-39:8 | | 52:1-17 | 801/802 | | |
| 39:22-24 | OB, PK, V | 53:5-23 | 801/802 | | |
| 40:1-17 | PK, SP, V | 54:1-7 | 801/802 | | |
| 40:20-41:6 | | 57:6 | | | |
| 41:9-14 | I, ID, LQ | 57:8 | | | |
| 45:17-47:6 | PK, SP | 67:12-68:9 | 801/802 | | |
| 47:11-13 | PK, SP | 68:23-25 | | | |
| 47:15-25 | CQ, PK, SP | 69:1 | | | |
| 48:2-9 | PK, SP | 75:12 | | | |
| 48:12-50:22 | PK, SP | 75:14-19 | | | |
| 50:25-51:10 | MIS, PK, SP | 79:2-4 | 801/802 | | |
| 51:12-24 | PK, SP | 79:20-80:8 | 801/802 | | |
| 54:9-55:1 | OB, V | 80:11-12 | 801/802 | | |
| 55:4-57:3 | ID, PK, SP, V | 89:4-15 | 402, 403, 602, 801/802 | | |

17

| Erik Ripple Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 57:9-59:8 | ID, PK, PR | 90:11-19 | 801/802 | | |
| 59:17-62:12 | PK, PR, SP | 94:23-24 | | | |
| 63:11-67:3 | BER, D, H, PK, SP | 101:17-19 | | | |
| 67:6-11 | PK, SP | 103:7-21 | | | |
| 68:11-22 | ID | 104:10 | | | |
| 69:2-19 | ID, PK, SP | 106:13-107:6 | 402, 403, 602, 801/802 | | |
| 69:22-70:4 | PK, SP | 107:9-21 | 402, 403, 602, 801/802 | | |
| 75:2-9 | ID | 108:10-109:22 | 402, 403, 602, 801/802 | | |
| 75:20-77:4 | BER, H, OB, PK, SP, V | 116:8-11 | | | |
| 77:7-78:3 | H, PK, SP | 127:12-24 | 801/802 | | |
| 82:15-22 | | 128:2-13 | 801/802 | | |
| 83:5-10 | D | 154:9-12 | | | |
| 87:9-24 | BER, H, PK, SP | 159:6-8 | 602, 801/802 | | |
| 88:2-17 | H, PK, SP | 159:11-18 | 602, 801/802 | | |
| 89:16-25 | BER, H, PK, SP, V | 160:1-25 | 801/802 | | |
| 90:2-10 | H | 162:6-164:5 | 801/802 | | |
| 94:9-21 | D | 164:14 | | | |
| 94:25-98:1 | BER, H, NARR, PK, SP | 165:5-166:1 | 402, 403, 602, 801/802 | | |
| 100:20-101:16 | D | 168:2-25 | 801/802 | | |
| 101:20-102:9 | BER, H, PK, SP | 171:7-173:4 | 801/802 | | |
| 102:12-22 | F, H, PK, SP, V | 185:2-8 | | | |
| 102:24-103:5 | | 185:11 | | | |
| 104:6-8 | F, ID, MIS, V | 189:13-190:18 | 801/802 | | |

| Erik Ripple Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 104:10-105:1 | BER, H | 193:11-17 | 801/802 | | |
| 105:8-106:1 | AA, BER, H, SP | 193:20-194:24 | 801/802 | | |
| 106:4-12 | PK, SP | 201:6-18 | | | |
| 113:5-114:24 | F | 202:10-203:10 | 801/802 | | |
| 115:21-116:7 | | 216:5-11 | | | |
| 116:16-21 | | 218:14-219:7 | 801/802 | | |
| 152:9-14 | | 220:1-10 | 801/802 | | |
| 152:21-24 | | 220:19-25 | 801/802 | | |
| 153:6-154:8 | BER | 222:21-223:22 | 801/802 | | |
| 154:14-23 | CE, OP, PK, SP | 231:24-232:7 | 801/802 | | |
| 158:13-22 | PK, SP, W | 234:12-13 | | | |
| 158:25-159:5 | BER, H | 236:20-22 | | | |
| 159:20-25 | BER, H | 237:11-12 | | | |
| 164:6-11 | ID | 237:15-21 | | | |
| 164:16-165:4 | PK, SP | 238:25-239:5 | | | |
| 166:2-168:1 | BER, H, NARR, PK, SP | 241:16-22 | 402, 403, 602, 801/802 | | |
| 169:1-22 | | 242:1-243:5 | 402, 403, 602, 801/802 | | |
| 170:8-171:6 | I, ID | 243:9-244:22 | 402, 403, 602, 801/802 | | |
| 181:19-185:1 | BER, H, PK, SP | 245:7-13 | 402, 403, 602, 801/802 | | |
| 185:13-19 | BER, H, LC, OP | 245:16-246:12 | 402, 403, 602, 801/802 | | |
| 186:2-188:7 | BER, H, LC, OP | 247:5-248:9 | 402, 403, 602, 801/802 | | |

| Erik Ripple Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 188:24-189:8 | BER, H, PK, SP | 249:19-250:6 | 402, 403, 602, 801/802 | | |
| 189:11 | PK, SP | 250:9-251:5 | 402, 403, 602, 801/802 | | |
| 190:19-21 | AA, AR, PK, SP | 251:8-253:22 | 801/802 | | |
| 190:24-192:19 | AA, D, PK, SP, V, W | 254:6-255:4 | 801/802 | | |
| 192:22-193:10 | PK, SP | 255:6-257:2 | 801/802 | | |
| 194:25-195:16 | BER, H, LC, OP | 261:23-262:2 | 402, 403, 602, 801/802 | | |
| 195:23-196:18 | PK, SP | 262:13 | | | |
| 197:1-198:19 | BER, H, LC, OP | 262:15-20 | | | |
| 198:24-201:5 | BER, D, H, I, ID, PK, SP | 266:5-267:11 | 801/802 | | |
| 201:19-202:9 | | 267:14-268:11 | 801/802 | | |
| 203:11-204:6 | CQ, PK, SP, V | 272:4-7 | | | |
| 204:9-206:4 | AA, PK, SP | 272:19 | | | |
| 206:7-16 | PK, SP | 273:18-19 | 402, 403, 602, 801/802 | | |
| 213:11-25 | | 273:22-25 | 402, 403, 602, 801/802 | | |
| 215:4-216:4 | PK, SP | | | | |
| 216:12-13 | ID | | | | |
| 217:20-218:13 | BER, H, PK, SP | | | | |
| 219:8-11 | PK, SP, V | | | | |
| 219:15-25 | PK, SP | | | | |
| 220:11-18 | AA, BER, H | | | | |

| Erik Ripple Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 221:6-222:20 | BER, CE, H, OP, PK, SP | | | | |
| 223:23-224:16 | PK, SP | | | | |
| 225:6-228:17 | AA, BER, D, H, OB, PK, SP, V | | | | |
| 228:20-230:10 | BER, H, V | | | | |
| 231:7-23 | BER, H | | | | |
| 233:8-234:9 | D, F, ID | | | | |
| 234:15-236:19 | BER, H, PK, SP | | | | |
| 236:23-237:10 | BER, H | | | | |
| 237:23-238:24 | PK, SP | | | | |
| 239:6-8 | V | | | | |
| 239:11-240:14 | H, PK, SP | | | | |
| 244:23-245:6 | | | | | |
| 257:13-258:17 | D | | | | |
| 260:16-261:22 | BER, H | | | | |
| 262:3-10 | ID | | | | |
| 262:21-263:12 | I, ID | | | | |
| 264:5-265:16 | BER, F, H, PK, SP | | | | |
| 265:20-266:3 | PK | | | | |
| 268:12-271:5 | BER, CE, H, OP, SP, V | | | | |
| 271:9-18 | CE, OP, V | | | | |
| 271:22-272:4 | CE, OP | | | | |
| 272:8-10 | | | | | |
| 272:15-16 | ID | | | | |
| 272:21-273:17 | BER, H | | | | |

| Erik Ripple Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 274:2-7 | PK, SP | | | | |

**Stefan Schutte, January 14, 2020**

| Stefan Schutte Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations[1] | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 8:5-10 | | 40:7-18 | | 68:13-15 | ICC |
| 10:14-11:12 | | 46:23-47:12 | | 80:21-81:6 | ICC, PK |
| 12:6-23 | | 47:14-48:7 | | 81:11 | ICC |
| 14:21-15:10 | BER, F, H | 48:9-12 | | 118:24-119:7 | F, ICC, LQ, PK, SP, V |
| 16:1-21 | F, PK, SP | 65:10-22 | | 120:14-121:14 | F, ICC, LQ, MIS, V |
| 17:23-18:1 | F, LQ, P, V | 67:10-68:12 | | 121:17-122:3 | F, ICC, LQ, MIS, V |
| 18:3-20 | F, LQ, P, V | 70:10-71:10 | | 122:5-10 | F, ICC, LQ, MIS, V |
| 19:9-10 | F, H, LQ, P, V | 71:21-72:6 | | 122:12-13 | F, ICC, MIS, V |
| 19:12-25 | F, H, LQ, P, V | 76:21-24 | | | |
| 20:1-6 | F, LQ, V | 77:1-3 | | | |
| 20:8-22:22 | F, H, LQ, P, V | 77:6 | | | |
| 23:4-24:23 | BER, H, LQ | 78:18-79:2 | | | |

[1] BASF highlighted in red 65:23-66:17, 69:7-25, 72:7-13, 110:18, and 110:21-111:6, but those lines are not in BASF's opening or counter-counter designations.

| Stefan Schutte Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations[1] | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 25:4-26:14 | BER, F, H, LQ, V | 81:7-10 | ID | | |
| 27:12-28:10 | F, V | 81:21-82:6 | | | |
| 29:10-32:19 | F, PK, SP, V | 116:15-117:7 | AA, 602 | | |
| 32:21-34:22 | F, LQ, P, PK, SP, V | 117:9-11 | AA, 602 | | |
| 35:4-37:6 | F, LQ, P, PK, SP, V | 117:13-14 | AA, 602 | | |
| 37:8-38:23 | F, H, LQ, P, PK, SP, V | 118:2-15 | | | |
| 38:25-40:6 | F, H, LQ, P, PK, SP, V | 118:17-23 | | | |
| 40:19-41:2 | F, LQ, P, V | 119:8-17 | | | |
| 42:1-14 | F, H, LQ, PK, SP | | | | |
| 42:19-25 | F, H, LQ, PK, SP | | | | |
| 43:3-46:1 | BER, F, H, LQ, PK, SP, V | | | | |
| 46:12-22 | BER, F, H, LQ, PK, SP, V | | | | |
| 48:17-49:18 | E, F, H, LC, O, V | | | | |
| 52:10-53:14 | E, O, R | | | | |
| 54:14-20 | E, O, LQ, V | | | | |
| 55:7-58:1 | F, H, LQ, PK, SP, V | | | | |
| 58:3-62:13 | F, H, LQ, P, PK, SP, V | | | | |
| 62:15-64:1 | F, LQ, P, PK, SP, V | | | | |
| 72:14-73:1 | BER, P, PK, SP | | | | |
| 93:15-94:21 | BER, F, LQ, PK, SP, NA | | | | |
| 99:9-100:18 | F, PK, SP, V | | | | |
| 101:3-102:25 | F, LQ, PK, SP, V | | | | |

| Stefan Schutte Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations[1] | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 104:4-15 | F, PK, R, SP | | | | |

**Bethany Toldo, December 17, 2019**

| Bethany Toldo Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 8:1-18 | | 12:23–13:10 | | 6:25-7:6 | ICC |
| 9:8-10:14 | D, LQ | 25:10–25 | | 13:11-14 | ICC, D, R |
| 11:18-12:14 | | 26:3–8 | | 33:9-15 | ICC, LQ |
| 13:15-22 | LQ, | 27:19–22 | | 35:16-20 | ICC, LQ |
| 14:19-15:2 | V, I | 27:24–28:12 | | 36:11-14 | ICC, LQ, V |
| 17:21-18:10 | PK, SP | 29:24–30:7 | | 85:5-10 | ICC, UN |
| 18:15-19:9 | U, PK, SP, V | 32:10–14 | | 186:24-187:3 | ICC |
| 19:24-21:8 | I, SP, PK, LQ | 34:1–7 | | | |
| 21:12-22:6 | LQ, V | 51:11–19 | | | |
| 22:13-23:11 | H | 52:6–7 | | | |
| 23:17-24:2 | BER, PK, SP | 52:9–12 | | | |
| 24:4-25:9 | PK, F, V, D | 53:18–54:2 | | | |
| 26:11-27:17 | V, H, LQ, AC, D | 76:10–15 | | | |
| 28:14-29:9 | H | 81:24–82:4 | | | |
| 29:19-23 | | 84:13–85:4 | | | |
| 30:8-17 | AA, D | 95:23–96:7 | | | |
| 33:16-24 | AA, D | 123:21–124:2 | | | |
| 35:21-36:1 | AC, V, LQ, D, ID | 124:4–16 | | | |
| 36:3-9 | ID, H | 124:18–125:5 | | | |

| Bethany Toldo Deposition | Ingevity Objections | Ingevity Counter-Designations | BASF's Objections to Ingevity's Counter Designations | BASF's Counters to Ingevity's Counter Designations | Ingevity's Objections to BASF's Counter-Counter Designations |
|---|---|---|---|---|---|
| 37:5-39:18 | AA, LQ, V, D, PK, BER, SP | 130:9–16 | | | |
| 39:22-40:14 | H, BER, SP, PK | 130:20–131:1 | | | |
| 40:18-43:21 | AC, D, F, HH, LQ, PK, BER | 132:2–9 | | | |
| 43:24-44:15 | F, PK, D | 150:15–151:10 | | | |
| 50:19-51:10 | | 186:6–23 | | | |
| 51:20 | F; PK | 187:4–19 | | | |
| 51:22-25 | ID | | | | |
| 54:3-25 | P, H | | | | |
| 59:7-13 | LQ | | | | |
| 66:11-18 | | | | | |
| 69:7-71:7 | F, PK, MIS, LQ | | | | |
| 71:9-73:8 | BER, SP, F, H, LQ | | | | |
| 73:11-76:9 | H, HH, LQ, BER, F | | | | |
| 77:13-24 | LQ | | | | |
| 78:22-79:10 | ID | | | | |
| 80:1-6 | | | | | |
| 81:3-23 | SP, PK, V, F | | | | |
| 93:22-95:20 | LQ, AC, V, P, PK | | | | |
| 203:22-204:15 | LQ, LC, V, OP | | | | |
| 2014:18-205:1 | V, OP | | | | |
| 205:4-12 | V, OP | | | | |
| 205:14-206:3 | P, F, LQ, V | | | | |
| 206:6-11 | MIS, LQ, AR, P, V | | | | |
| 206:14 | | | | | |

# EXHIBIT 10

**EXHIBIT 10**

**INGEVITY'S DEPOSITION DESIGNATIONS**

In addition to the counter-designations identified herein, BASF also reserves the right to rely on testimony designated by Ingevity, subject to admissibility.

**I. Abraham, Akash**

| Akash Abraham Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 5:20-22 | | | |
| 14:3-8 | | | |
| 14:14-17 | | | |
| 16:18-20 | | | |
| 18:11-24 | | | |
| 25:12-18 | ID | | |
| 27:17-28:22 | | | |
| 29:5-30:20 | | | |
| 32:6-17 | | | |
| 32:23-33:22 | | | |
| 37:19-38:7 | | | |

| Akash Abraham Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 43:6-44:17 | | | |
| 45:9-17 | L | | |
| 45:25-46:17 | | | |
| 47:7-10 | F, 602 | | |
| 47:12-48:1 | | | |
| 50:3-55:25 | 602 | | |
| 57:21-58:17 | L | | |
| 59:12-20 | | | |
| 59:25-61:1 | V | | |
| 61:4-62:11 | | | |
| 63:24-64:7 | | | |
| 68:19-69:4 | 602 | | |
| 71:22-72:14 | | | |
| 72:20-73:20 | | | |
| 76:10-77:2 | | | |
| 79:4-14 | | | |

| Akash Abraham Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 84:8-15 | | | |
| 84:19-24 | | | |
| 85:8-13 | | | |
| 85:23-86:16 | SP | | |
| 86:23-87:10 | | | |
| 87:17-88:3 | | | |
| 94:4-95:10 | L | | |
| 98:10-14 | | | |
| 98:18-25 | | | |
| 99:9-100:3 | | | |
| 103:9-20 | | | |
| 105:6-16 | | | |
| 107:8-13 | | | |
| 107:20-108:3 | 402 | | |
| 108:7-12 | | | |
| 109:22-110:1 | | | |

| Akash Abraham Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 110:18-111:4 | | | |
| 111:12-112:10 | | | |
| 114:18-115:8 | | | |
| 118:6-119:8 | | | |
| 120:15-121:2 | | | |
| 121:6:20 | | | |
| 121:24-122:4 | | | |
| 122:14-123:7 | | | |
| 123:21-124:19 | | | |
| 124:23-125:2 | | | |
| 127:6-14 | | | |
| 130:7-131:12 | | | |
| 132:12-133:13 | L, V, 602 | | |
| 135:13-136:3 | | | |
| 137:6-17 | F, 602 | | |
| 137:19 | | | |

| Akash Abraham Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 137:24-138:19 | F, 602 | | |
| 138:21-139:1 | V | | |
| 139:3 | | | |
| 140:1-7 | | | |
| 141:1-142:7 | | | |
| 144:5-15 | | | |
| 146:1-147:12 | | | |
| 147:22-148:23 | | | |
| 149:11-19 | | | |
| 150:4-12 | L | | |
| 150:19-151:11 | V | | |
| 151:17-20 | | | |
| 152:4-9 | | | |
| 152:13-153:19 | F | | |
| 153:22-23 | 602, F | | |
| 154:6-155:9 | SP | | |

| Akash Abraham Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 155:20-156:8 | 801/802 | | |
| 156:14-157:3 | F, 801/802 | | |
| 157:5-21 | 602, F, SP | | |
| 157:25-158:21 | | | |
| 159:9-160:1 | 402, 403 | | |
| 160:5-161:15 | 602, F | | |
| 161:19-25 | | | |
| 162:21-165:5 | D, 801/802 | | |
| 166:17-22 | | | |
| 167:14-23 | F, SP | | |
| 168:1-13 | | | |
| 168:20-169:4 | | | |
| 171:6-172:1 | F, 602, 801/802 | | |
| 172:3-10 | 801/802, F, 602, SP | | |
| 172:22-173:7 | 602 | | |
| 173:14-24 | | | |

| Akash Abraham Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 174:21-23 | V, L | | |
| 175:1-176:18 | | | |
| 177:5-20 | | | |
| 178:4-17 | F | | |
| 178:20-179:16 | | | |
| 179:18-180:8 | | | |
| 180:25-181:7 | | | |
| 188:23-189:1 | | | |
| 190:9-191:7 | | | |
| 191:23-192:3 | | | |
| 192:7-16 | | | |
| 193:19-194:10 | | | |
| 194:17-23 | | | |
| 199:10-200:11 | SP, 602, F | | |
| 200:25-202:12 | 801/802, SP, 602, F | | |
| 203:11-21 | | | |

| Akash Abraham Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 204:16-24 | | | |
| 206:2-12 | | | |
| 206:19-207:3 | | | |
| 207:14-23 | | | |
| 208:4-7 | | | |

## II.  Bramnik, Kirill

| Kirill Bramnik Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 15:1-6 | | | |
| 37:6-17 | F, 602 | | |
| 39:4-11 | F, 602 | | |
| 40:18-25 | | | |
| 41:14-22 | | | |
| 48:10-21 | | | |
| 51:9-21 | F, 602 | | |
| 53:5-22 | | | |

| Kirill Bramnik Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 54:11-13 | | | |
| 72:21-23 | | | |
| 74:17-75:18 | 402 | | |

### III. Chin, Steve

| Steve Chin Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 7:18-21 | | 25:14-19 | |
| 8:1-2 | | 74:24-75:12 | |
| 16:23-25 | | 108:4-109:22 | W, UN |
| 17:20-18:20 | | 109:25-110:9 | UN |
| 25:20-26:5 | | 116:5-117:10 | |
| 75:13-76:10 | | 119:1-10 | V, LC, OP, OB |
| 107:10-18 | | | |
| 110:10-22 | 602, 801/802 | | |
| 111:2-5 | 602, 801/802 | | |
| 111:11-112:1 | 602, 801/802 | | |

| Steve Chin Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 113:15-19 | | | |
| 113:25-114:3 | | | |
| 117:11-21 | | | |

**IV. Gregor, Frank**

| Frank Gregor Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 8:20-22 | | | |
| 9:5-9 | | | |
| 35:20-37:17 | 602 | | |
| 41:3-13 | 602 | | |
| 42:17-19 | | | |
| 42:21 | | | |
| 42:23-43:1 | | | |
| 43:4-5 | | | |
| 65:6-11 | | | |

**V. LaBine, Susan**

| Susan LaBine Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| **VOLUME 1** | | | |
| 23:10-24:9 | | 229:7-12 | BER |
| 25:7-25 | | 236:21-24 | BER |
| 26:14-17 | | 240:13-15 | BER, PK, SP |
| 27:3-8 | | | |
| 28:15-29:15 | | | |
| 194:13-195:9 | | | |
| 199:9-18 | | | |
| 199:21 | | | |
| 200:10-13 | | | |
| 201:4-15 | | | |
| 202:11-14 | | | |
| 202:16-19 | | | |
| 209:1-210:6 | | | |
| 212:13-213:5 | | | |

| Susan LaBine Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 213:8-15 | | | |
| 213:19-215:12 | | | |
| 215:16-216:16 | | | |
| 225:2-10 | F, 602 | | |
| 225:13-14 | F, 602 | | |
| 226:21-227:5 | | | |
| 230:17-24 | | | |
| 233:19-234:25 | | | |
| 235:10-23 | | | |
| 235:25-236:1 | | | |
| 236:3-7 | | | |
| 236:13-15 | | | |
| 236:17-20 | | | |
| 237:12-24 | | | |
| 238:3-239:8 | | | |
| 239:13-14 | | | |

| Susan LaBine Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 239:18-19 | | | |
| 239:21-23 | | | |
| 240:1-12 | F, 602 | | |
| 240:16-20 | | | |
| **VOLUME 2** | | | |
| 17:3-11 | | 56:24-57:11 | |
| 17:13-18:22 | | 123:20-124:8 | |
| 37:2-39:11 | | 125:13-126:10 | |
| 49:25-50:7 | | | |
| 50:9-19 | | | |
| 52:16-20 | F, 402, 403 | | |
| 52:22-25 | F, 402, 403 | | |
| 53:2-10 | F, 402, 403 | | |
| 55:1-10 | | | |
| 55:12-13 | | | |
| 55:15-56:23 | | | |

| Susan LaBine Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 57:15-58:1 | | | |
| 61:20-62:6 | | | |
| 125:9-12 | | | |

## VI.  Peterson, James

| James Peterson Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 74:18-23 | | 155:10-13 | |
| 154:20-155:9 | | 156:18-157:9 | |
| 156:7-17 | | 173:18-175:3 | H, R, PK |
| 170:7-171:3 | | 204:10-205:21 | ID [206:7-14] |
| 202:6-17 | | | |
| 203:19-204:9 | 602, F | | |

## VII. Rowe, Diane

| Diane Rowe Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 9:19-23 | | | |

| Diane Rowe Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 10:8-15 | | | |
| 15:19-16:5 | | | |
| 17:2-5 | | | |
| 22:4-23:8 | | | |
| 23:16-24:9 | | | |
| 24:15 | | | |
| 26:1-7 | | | |
| 26:14-18 | | | |
| 26:23-27:8 | | | |
| 27:25-28:8 | | | |
| 28:12-20 | | | |
| 30:22-31:9 | | | |
| 31:24-32:3 | | | |
| 35:8-36:1 | | | |
| 36:15-21 | | | |
| 37:13-38:8 | | | |

| Diane Rowe Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 39:6-40:5 | | | |
| 42:16-43:6 | | | |
| 45:21-46:12 | | | |
| 46:21-48:13 | | | |
| 49:13-51:13 | F | | |
| 51:17-18 | | | |
| 51:22-25 | | | |
| 53:18-54:3 | 602 | | |
| 54:13-19 | F, V | | |
| 54:21-56:13 | 602, V | | |
| 56:16-58:22 | 602 | | |
| 59:19-62:5 | 602 | | |
| 64:2-15 | F, V, SP | | |
| 64:20-68:6 | F, 602, L | | |
| 68:9-25 | 602 | | |
| 69:7-8 | | | |

| Diane Rowe Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 69:25-70:15 | | | |
| 70:19-71:1 | | | |
| 71:6-16 | F, 602 | | |
| 71:19-20 | | | |
| 71:23-25 | F | | |
| 72:3-4 | | | |
| 72:9-13 | | | |
| 73:3-19 | F, V | | |
| 73:21-74:24 | D, A, V | | |
| 75:1-5 | | | |
| 75:7-14 | | | |
| 75:22-76:20 | F, Compound, V | | |
| 76:23-77:10 | | | |
| 85:19-23 | L | | |
| 87:21-88:24 | 602, A, AC | | |
| 90:14-20 | | | |

| Diane Rowe Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 90:23-91:4 | 602, V | | |
| 99:18-20 | | | |
| 105:9-12 | V, MIS | | |
| 105:20-106:2 | | | |
| 111:9-11 | F, V | | |
| 111:15-112:18 | | | |
| 113:1-114:5 | | | |
| 117:9-21 | | | |
| 118:15-17 | | | |
| 125:19-126:13 | Compound | | |
| 126:15-19 | | | |
| 126:23-127:5 | | | |
| 127:19-128:3 | | | |
| 129:10-15 | V | | |
| 129:18-20 | | | |
| 132:1-14 | 602 | | |

| Diane Rowe Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 141:12-23 | | | |
| 146:8-16 | | | |
| 146:25-147:20 | | | |
| 154:11-155:1 | | | |
| 155:7-156:16 | | | |
| 157:18-159:1 | SP | | |
| 162:17-163:5 | L | | |
| 163:17-164:9 | | | |
| 166:2-21 | | | |
| 168:3-169:8 | | | |
| 169:14-17 | | | |
| 179:9-17 | F, 602, SP | | |
| 182:10-16 | F | | |
| 184:12-24 | 602 | | |
| 185:3-10 | | | |
| 206:15-208:7 | | | |

| Diane Rowe Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 210:7-211:9 | | | |
| 213:3-17 | SP, V | | |
| 213:20-22 | | | |
| 215:11-21 | SP | | |
| 217:6-18 | | | |
| 220:1-7 | | | |
| 222:23-223:5 | | | |
| 226:25-227:10 | | | |
| 228:1-230:1 | | | |
| 231:4-13 | | | |
| 231:19-233:24 | F, 602 | | |
| 234:23-235:3 | | | |
| 235:10-236:8 | | | |
| 239:25-240:13 | | | |
| 245:3-11 | | | |
| 245:21-246:17 | | | |

| Diane Rowe Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 248:9-18 | V, A | | |
| 248:21-24 | | | |
| 250:20-251:3 | | | |
| 251:21-253:8 | | | |
| 254:15-22 | | | |
| 257:19-258:8 | | | |
| 259:9-18 | | | |
| 259:23-260:20 | | | |
| 261:17-19 | | | |
| 263:17-22 | SP | | |
| 263:25-264:8 | | | |

## VIII. Ruettinger, Wolfgang (2018)

| Wolfgang Ruettinger 2018 Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 5:7-6:2 | | | |

| Wolfgang Ruettinger 2018 Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 8:1-4 | | | |
| 14:5-8 | | | |
| 21:10-19 | 602 | | |
| 22:7-17 | | | |
| 23:20-24:20 | | | |
| 24:24-26:8 | | | |
| 26:15-17 | F, 602 | | |
| 28:3-9 | | | |
| 31:17-25 | | | |
| 32:8-33:8 | V | | |
| 33:12-14 | | | |
| 41:5-42:3 | | | |
| 47:1 | 402, 403 | | |
| 48:20-25 | | | |
| 50:4-15 | | | |
| 52:13-53:23 | | | |

| Wolfgang Ruettinger 2018 Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 55:12-20 | 602 | | |
| 59:13-21 | | | |
| 66:3-13 | | | |
| 68:6-69:10 | | | |
| 70:24-71:9 | | | |
| 72:1-5 | | | |
| 77:11-78:9 | | | |
| 79:20-80:2 | | | |
| 80:8-14 | | | |
| 84:4-85:4 | 801/802, F, 602 | | |
| 87:1-88:2 | | | |
| 90:10-91:7 | | | |
| 91:13-18 | | | |
| 91:22-92:20 | 602 | | |
| 94:3-16 | | | |
| 112:11-25 | | | |

| Wolfgang Ruettinger 2018 Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 113:14-17 | | | |
| 139:8-19 | | | |
| 140:1-141:1 | 602 | | |
| 142:6-15 | | | |
| 143:18-23 | | | |
| 146:9-16 | 602, V, L, AA | | |
| 158:15-23 | | | |
| 159:2-11 | | | |
| 160:10-22 | | | |
| 161:21-162:6 | | | |
| 162:16-163:8 | | | |
| 163:13-16 | | | |
| 163:21-164:5 | | | |
| 164:10-17 | | | |
| 164:23-166:6 | | | |
| 175:13-176:8 | | | |

| Wolfgang Ruettinger 2018 Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 176:12-15 | | | |
| 185:9-15 | | | |
| 188:19-189:6 | | | |
| 189:21-190:10 | | | |

## IX. Ruettinger, Wolfgang (2019)

| Wolfgang Ruettinger 2019 Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 35:19-37:9 | | | |
| 47:16-22 | | | |
| 50:3-9 | | | |
| 50:24-51:1 | | | |
| 54:3-6 | ID | | |
| 54:18-23 | ID | | |
| 67:4-14 | | | |
| 79:19-80:1 | | | |
| 81:8-23 | 602 | | |

| Wolfgang Ruettinger 2019 Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 84:9-21 | | | |
| 94:22-25 | | | |
| 96:1-5 | | | |
| 97:11-98:1 | | | |
| 131:9-11 | | | |
| 131:19-132:2 | | | |
| 132:12-16 | | | |
| 164:8-15 | | | |
| 187:14-188:9 | | | |
| 188:20-190:4 | | | |
| 193:23-195:4 | | | |
| 201:22-202:1 | | | |
| 203:13-204:5 | | | |
| 223:2-18 | F, 602 | | |
| 226:22-227:1 | | | |
| 227:19-228:18 | 602 | | |

| Wolfgang Ruettinger 2019 Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 228:22-229:3 | | | |

## X. Schutte, Stefan

| Stefan Schutte Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 8:5-10 | | 65:23-66:17 | |
| 12:6-23 | | 69:7-25 | BER, H |
| 65:10-22 | | 72:7-73:1 | BER, H, LQ, V |
| 67:10-68:15 | | 110:18 | PK, F |
| 68:17-69:6 | | 110:21-111:6 | BER, H |
| 70:6-71:10 | | 120:14-121:14 | H, F, LQ, P, V |
| 71:12-72:6 | | 121:17-25 | H, F, LQ, P, V |
| 110:5-17 | | | |
| 111:7-10 | | | |
| 111:12 | | | |

## XI. Toldo, Bethany

| Bethany Toldo Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 6:22-23 | | 15:10-16 | |
| 6:25-7:6 | | 17:7-12 | |
| 8:1-11 | | 17:20 | |
| 8:22-24 | | 28:13-29:4 | H |
| 9:16-10:9 | | 31:10-15 | D, LQ |
| 10:11-20 | | 32:15-17 | OB, V |
| 11:18-12:14 | | 32:20-33:3 | |
| 15:17-16:14 | | 33:9-15 | LQ |
| 16:23-17:6 | | 34:8-10 | V |
| 17:13-19 | | 34:12-35:13 | |
| 18:21-19:4 | | 35:16-36:1 | LQ, AC |
| 19:10-23 | 602, 801/802 | 36:3-16 | LQ, V |
| 23:22-25 | | 36:18-37:16 | LQ, H |
| 27:19-22 | | 45:18-24 | LQ |
| 27:24-28:12 | | 48:2-4 | |

| Bethany Toldo Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 29:24-30:7 | | 52:13-22 | D, LQ, LC, V, OP |
| 31:16-19 | | 52:25-53:7 | BER, LC, OP |
| 32:10-14 | | 53:15-17 | |
| 34:1-7 | | 55:1-3 | |
| 41:18-42:4 | | 56:9-12 | PK, F, SP |
| 42:7-43:2 | | 56:19-57:9 | |
| 45:25-46:20 | | 57:23-59:6 | BER, LC, OP |
| 47:21-48:1 | 801/802, 402, 403, 602 | 60:4-25 | BER, V, P |
| 48:5-13 | | 61:23-62:4 | P |
| 50:18-51:10 | | 66:19-67:12 | PK, F, D |
| 51:20 | | 85:5-13 | LQ, UN |
| 51:22-52:7 | | 113:19-114:10 | R |
| 52:9-12 | | 122:2-9 | |
| 53:18-25 | | 123:4-20 | |
| 55:4-56:8 | | 136:19-137:2 | |
| 64:7-14 | | 137:4-138:12 | UN, LC, OP |

| Bethany Toldo Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 67:13-18 | | 146:4-9 | W |
| 68:13-24 | | 147:4-18 | I |
| 69:1-3 | | 150:4-8 | |
| 75:24-76:15 | | 150:23-151:4 | H |
| 80:1-6 | | 151:22-153:5 | H, PK |
| 81:7-11 | | 166:6-16 | |
| 81:24-82:4 | | 202:23-203:3 | LQ, AA |
| 84:13-85:4 | | 203:5-9 | |
| 85:14-86:3 | | 203:14-15 | F, PK, SP |
| 86:5-8 | | 203:18-21 | |
| 86:10-12 | | 207:16-19 | R, P |
| 86:18-20 | | 207:21 | R, P |
| 89:2-20 | | | |
| 90:20-25 | | | |
| 105:6-16 | | | |
| 113:3-18 | | | |

| Bethany Toldo Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 122:10-16 | | | |
| 122:18-123:3 | | | |
| 130:13-16 | | | |
| 130:20-131:1 | | | |
| 131:6-12 | | | |
| 132:2-9 | | | |
| 132:21-24 | SP | | |
| 133:2-15 | | | |
| 146:10-22 | 402, 403 | | |
| 149:4-12 | | | |
| 150:15-22 | 801/802 | | |
| 151:5-10 | 801/802 | | |
| 203:10-13 | | | |

## XII. Widgren, Heather

| Heather Widgren Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 14:8-24 | | 7:17-19 | |
| 15:13-16:22 | | 9:11-20 | |
| 21:12-24 | | 15:7-12 | |
| 22:14-24:11 | | 17:3-9 | |
| 31:22-32:8 | | 21:3-6 | |
| 38:14-22 | | 22:8-12 | R, UN |
| 40:25-42:5 | | 32:9-33:25 | R, P |
| 79:12-80:24 | | 38:23-39:7 | R, P |
| 82:14-83:21 | | 39:22-40:24 | R, P |
| 84:24-85:17 | | 81:2-23 | R, P |
| 103:14-106:1 | F, 602 | 84:18-23 | R, P |
| 130:12-131:7 | F, 602 | 85:18-25 | |
| 143:4-23 | | 106:2-19 | R, P, PK, SP |

## XIII. Rebuttal Deposition Designations

Ingevity designates the following witnesses' testimony in rebuttal to BASF's opening deposition designations.[1]

### A.      Alden, Laif

| Laif Alden Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 8:10-11 | | 7:25-8:3 | H, P, R |
| 9:7-9 | | 15:11-25 | |
| 10:1-15 | | 19:8-18 | |
| 11:25-12:14 | | 22:25-23:7 | |
| 14:13-20 | | 34:21-35:23 | H, P, R |
| 19:19-25 | | 44:4-10 | |
| 20:7-21 | | 44:25-45:3 | |
| 22:11-21 | | 53:20-21 | |
| 24:18-21 | | 55:19-21 | |
| 26:8-27:11 | | 59:15-60:1 | |

---

[1] BASF objects to Ingevity's rebuttal designations for Laif Alden and Doug Mancini as improper.  Ingevity did not propose, and BASF did not agree to, rebuttal designations as part of the process of counter-designating deposition testimony for prospective use at trial. Subject to the foregoing objection, BASF has included objections and counter-designations to Ingevity's rebuttal designations.

| Laif Alden Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 28:11-29:12 | | 75:17-76:6 | |
| 33:16-34:20 | | 79:8-24 | H, P, R |
| 38:16-39:20 | D | 81:13-23 | H, P, R |
| 44:1-3 | | 82:10-18 | H, P, R |
| 45:4-11 | | 95:24-96:3 | |
| 46:14-16 | | 96:9-23 | H, P, R |
| 46:19-25 | | 97:3-8 | H, P, R |
| 49:16-50:10 | | 126:4-127:4 | H, P, R |
| 50:12-51:10 | | 154:2-9 | |
| 52:1-19 | | 156:12-24 | H, P, R |
| 53:11-19 | | 165:3-6 | H, P, R |
| 55:14-18 | | 165:9-166:2 | H, P, R |
| 55:22-56:7 | | 204:10-205:7 | H, IIUE, LC, LQ, P, R |
| 56:9-57:57:5 | | 205:11 | H, IIUE, LC, LQ, P, R |
| 57:8-9 | | | |
| 58:6-22 | | | |

| Laif Alden Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 59:16-24 | | | |
| 60:2-6 | | | |
| 61:6-21 | | | |
| 68:9-23 | | | |
| 69:23-70:12 | | | |
| 71:9-18 | | | |
| 72:6-24 | | | |
| 73:4-14 | | | |
| 73:19-75:16 | | | |
| 76:17-77:15 | | | |
| 77:21-24 | | | |
| 78:2-5 | | | |
| 78:14-79:4 | | | |
| 81:3-12 | | | |
| 83:4-7 | | | |
| 83:19-84:3 | | | |

| Laif Alden Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 84:11-86:15 | | | |
| 87:3-90:16 | | | |
| 93:5-94:2 | | | |
| 95:11-23 | ID | | |
| 96:4-8 | | | |
| 96:24-97:2 | | | |
| 97:18-98:9 | | | |
| 98:22-99:16 | | | |
| 100:13-17 | | | |
| 101:2-14 | | | |
| 102:15-103:4 | | | |
| 103:14-17 | AA | | |
| 105:24-106:22 | | | |
| 107:8-17 | | | |
| 107:22-25 | | | |
| 108:3-6 | | | |

| Laif Alden Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 108:9-12 | | | |
| 108:16-19 | | | |
| 108:24-109:6 | | | |
| 109:9-12 | | | |
| 109:14-110:1 | | | |
| 110:3-9 | | | |
| 110:11 | | | |
| 110:19-111:13 | | | |
| 112:3-8 | | | |
| 112:24-113:11 | | | |
| 113:15-22 | | | |
| 114:2-13 | | | |
| 115:12-16 | | | |
| 123:11-124:5 | | | |
| 125:8-22 | | | |
| 127:5-13 | | | |

| Laif Alden Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 127:22-128:3 | | | |
| 128:9-12 | | | |
| 128:17-25 | | | |
| 130:16-131:11 | | | |
| 131:19-23 | | | |
| 132:2-25 | | | |
| 133:6-134:23 | | | |
| 135:18:137:8 | | | |
| 137:15-18 | | | |
| 138:25-139:7 | | | |
| 140:12-141:7 | | | |
| 141:15-19 | | | |
| 141:24-143:10 | | | |
| 143:13-16 | | | |
| 145:23-146:19 | | | |
| 147:13-148:3 | | | |

| Laif Alden Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 148:8-15 | | | |
| 151:19-152:11 | | | |
| 153:10-153:21 | | | |
| 154:1-18 | | | |
| 154:25-155:1 | | | |
| 155:10-21 | | | |
| 156:2-11 | | | |
| 157:4-10 | | | |
| 157:19-158:11 | | | |
| 158:16-159:8 | | | |
| 159:13-160:13 | | | |
| 160:18-161:12 | | | |
| 163:11-17 | | | |
| 163:25-164:6 | | | |
| 164:11-165:2 | | | |
| 167:11-170:6 | 402, 403 | | |

| Laif Alden Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 171:19-172:2 | | | |
| 181:10-23 | 402, 403 | | |
| 183:7-12 | 402, 403 | | |
| 184:24-185:5 | 402, 403 | | |
| 185:10-186:6 | 402, 403 | | |
| 186:11-187:1 | 402, 403 | | |
| 187:25-188:18 | 402, 403 | | |
| 189:2-190:23 | 402, 403 | | |
| 192:22-193:6 | 402, 403, 801/802, 602, F | | |

**B.      Mancini, Douglas**

| Douglas Mancini Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 7:3-14 | | 9:23-10:1 | R, P |
| 8:14-22 | | 12:17-24 | |
| 12:25-13:10 | | 37:12-15 | CE, F, H, IIUE, LQ, P, R, SP, V |

| Douglas Mancini Deposition | BASF Objections | BASF Counter-Designations | Ingevity's Objections to BASF Counter-Designations |
|---|---|---|---|
| 28:9-11 | 402, 403 | 37:17-38:1 | CE, F, H, IIUE, LQ, P, R, SP, V |
| 28:18-29:9 | 402, 403 | 38:3-5 | CE, F, H, IIUE, LQ, P, R, SP, V |
| 30:21-31:10 | 402, 403, 602, F, SP | 65:21-22 | ID |
| 37:5-11 | 402, 403 | | |
| 65:13-16 | 402, 403 | | |
| 66:1-17 | 402, 403, 801/802 | | |