IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INGEVITY CORPORATION, et al., | : |
| Plaintiffs, | : |
| v. | : Civil Action No. 18-1391-RGA |
| BASF CORPORATION, | : |
| Defendant. | : |

**ORDER ON SUMMARY JUDGMENT MOTIONS**

BASF raises numerous grounds for partial summary judgment. (D.I. 443, 444). Ingevity raises numerous grounds for partial summary judgment. (D.I. 440, 441). The motions for summary judgment (D.I. 440, 443) are **DENIED**. We discussed some of the issues at the pretrial conference and/or summary judgment argument on August 20th. Since time is short, I give the briefest of explanations for my denials.

Both parties raise one argument about tortious interference with a prospective business opportunity. The briefing is so skimpy that no one even says what the elements of the offense are. The Delaware Supreme Court previously described the "elements of this cause of action" as:

> A showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner.

*DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981) (cleaned up). I think it is understood that the interference has to be "wrongful" interference.

The claim is limited to BASF trying to sell the EvapTrap XC to Kayser. (D.I. 456 at 22 n.6). Kayser and BASF entered into a supply agreement on February 26, 2018. (D.I. 456 at 21; Ex. 21 [D.I. 445-2 at 27 of 142]). The contract provided for a minimum amount of orders in 2019 and beyond, but BASF never supplied Kayser with any EvapTraps.

As best I can tell, the tortious interference is supposed to be "a series of unprecedented price increases" and the exclusive long term agreement ("LTA") between Ingevity and Kayser in January 2020. (D.I. 456 at 21-22 – citing as support D.I. 444 at 26, 30, in turn citing the record).

I don't think there's any evidence that Ingevity knew about the 2018 supply agreement, but I think there is sufficient evidence that Ingevity knew BASF wanted to sell the EvapTrap XC to Kayser and was attempting to make that happen. Thus, I think BASF has alleged the right tort—tortious interference with a prospective business relationship.

The briefing does not make clear to me whether any interference was "wrongful," and thus both motions are denied as to tortious interference.

Both parties raise arguments related to tying. At the pretrial conference, both parties identified tying as the most important summary judgment issue, principally because about two-thirds of the damages BASF seeks are completely dependent upon the tying claim. I think the tying arguments mostly depend on whether what Ingevity was selling, which I would describe as carbon honeycombs—an undisputedly staple article of commerce—cut to particular sizes and densities that correspond with what works in a fuel vapor canister that practices the patented method. I think the parties agree that the theory is that the tying product is the (implied) '844 patent license and the tied product is the carbon honeycomb. I think there is a disputed material fact whether the carbon honeycomb as sold is a staple article of commerce.[1] I think the fact that

---

[1] BASF cites *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488 (1942) (*see* D.I. 444 at 15; D.I. 468 at 4) for its description of "unpatented" salt tablets that "have a particular configuration rendering them capable of convenient

carbon honeycombs generally may be a staple article of commerce with many uses is irrelevant. I think the issue is whether the products actually tied (which are described as fuel vapor canister honeycombs with 29 mm, 35 mm, or 41 mm diameters and 200 cells per square inch (D.I. 441 at 3)) are staple articles of commerce, or whether, as sold, they are not. *See Hodosh v. Block Drug Co.*, 833 F.2d 1575 (Fed. Cir. 1987). On that there is a disputed issue of material fact, based on Ingevity's records, which suggest that Ingevity has sold the same articles to others for other uses. I understand Ingevity says the records are inconclusive, contain mistakes, etc., but all that means is that there is a jury issue. Ingevity also says any such sales are *de minimis*, but I think that is an issue better put to the jury.

I think it is a question of fact for the jury whether what Ingevity sells is a staple article of commerce or not, and therefore both motions as to tying are denied.

Both parties raise arguments relating to exclusive dealing. I think it is undisputed that exclusive dealing is evaluated under the rule of reason. The three contracts are with Delphi, Kayser, and KFTC. Delphi, Kayser, and KFTC were supposedly infringing the '844 patent, but whether they were or they weren't, I don't see how that resolves the reasonableness of the LTAs. I think, among other things, there is a disputed material fact as to whether the LTAs effectively extend well beyond the life of the '844 patent (March 2022).[2] I am also quite uncertain whether the Kayser contract, which was not signed until 2020, has any relevance to 2019. And the parties dispute the amount of foreclosure.

---

use in respondent's patented machines." 314 U.S. at 490. I do not think this snippet is as persuasive or controlling as BASF seems to assert. I cannot tell from the opinion whether the salt tablets were uniquely configured, or, as configured, were sold to others. And "convenient" is not the adjective that comes to mind to describe the use of Ingevity's product in the fuel vapor canisters.

[2] Ingevity argues that the post-March 2022 disputes are not ripe because the counterparties to the agreements have not yet decided whether to terminate the agreements then. BASF through its expert makes a sufficient case that the termination provisions are sufficiently onerous as to be illusory. I think the disputes are ripe.

The parties argue about whether foreclosure is at the OEM level or the "Tier 1" level. I think the argument by Ingevity is that the Tier 1 level are like distributors, and the OEMs are the consumers, so they have to be the ones feeling the anticompetitive impact. But BASF says the consumer is the Tier 1 level, which seems to make sense to me. Nonetheless, I think this is an issue the jury should determine.

Since the rule of reason requires consideration of all relevant circumstances, and I think the underlying facts are in some instances properly disputed, I do not think that I can resolve the exclusive dealing dispute in this case on summary judgment. Thus, I will deny summary judgment on all exclusive dealing issues.

Both parties raise miscellaneous arguments concerning Ingevity's position that all its conduct is protected by the so-called *Noerr-Pennington* doctrine. Both parties agree that I should decide the *Noerr-Pennington* issue. (D.I. 496 at 15 n.3). They reiterated that position at the pretrial conference. I have no reason to disagree with them that I should decide the issue, but I do not think I can decide it more than tentatively on the present record.

Essentially, the issue is that certain patent enforcement activities are immune from antitrust liability. Thus, for example, Ingevity's suit against BASF is protected patent enforcement activity, notwithstanding that various adjudicators have recently been finding all asserted claims of the '844 patent to be invalid. Or, perhaps, more relevantly, if one of the consequences of the lawsuit against BASF is that a Tier 1 distributor (say, Kayser) decides not to purchase the EvapTrap XC since it would prefer not to become embroiled in litigation, Ingevity has not committed an antitrust violation when Kayser decides to purchase Ingevity's competing product instead. At some point, though, Ingevity crosses the line from being the beneficiary of its patent litigation strategies to being an antitrust violator. Refusal to license the patent unless

the licensee purchases a staple good as a part of the license goes beyond patent enforcement activities. Long term exclusive dealing contracts go beyond patent enforcement activities. But, just because Ingevity is engaging in valid patent enforcement activities does not mean that it cannot violate the antitrust laws.

I do not think the *Noerr-Pennington* doctrine eradicates the boundaries that the Supreme Court has described in similar contexts. In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969), a decision that post-dates both *Noerr* (1961) and *Pennington* (1965), the Court stated, "[T]here are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee. Among other restrictions upon him, he many not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent monopoly." *Id.* at 136. I think that is what the liability issue boils down to in this case.

As I think I said at the pretrial conference, I think a definitive *Noerr-Pennington* ruling must await hearing the evidence at trial. But as I understand the likely evidence, I do not think the *Noerr-Pennington* doctrine will help Ingevity if BASF proves the Ingevity product that competes with the EvapTrap XC is a staple article of commerce.

IT IS SO ORDERED this 24th day of August 2021.

/s/ Richard G. Andrews
United States District Judge