IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BASF CORPORATION,

     Plaintiff,

     v.

INGEVITY CORPORATION ,

     Defendant.

C.A. No. 18-1391-RGA

## PROPOSED FINAL JURY INSTRUCTIONS

The parties respectfully submit the attached Joint Proposed Final Jury Instructions. Disagreements between the parties are indicated in bold text, with the parties' positions indicated following the proposed instruction and in footnotes. These instructions are also being submitted via email to the Court in Word format.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Rodger D. Smith II
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

SHAW KELLER LLP

/s/ Karen E. Keller
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com

OF COUNSEL:

Thomas J. Friel, Jr.
KING & SPALDING LLP
601 South Carolina Avenue, Suite 100
Palo Alto, CA 94304
(650) 422-6700

James P. Brogan
Brian Eutermoser
Angela C. Tarasi
Mikaela Stone
KING & SPALDING LLP
1515 Wynkoop Street, Suite 800
Denver CO 80202
(720) 535-2300

Norman A. Armstrong, Jr.
Paul Alessio Mezzina
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500

Joseph D. Eng., Jr.
Emily T. Chen
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY 10036
(212) 556-2205

*Attorneys for BASF Corporation*

September 12, 2021

OF COUNSEL:

Jeffrey T. Thomas
Rod Stone
Blaine H. Evanson
Taylor W. King
Nathaniel R. Scharn
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Dr.
Irvine, CA 92612
(949) 451-3800

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500

Stuart M. Rosenberg
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304
(650) 849-5389

Rustin K. Mangum
Spencer W. Ririe
MANGUM RIRIE LLP
999 Corporate Dr. #260
Ladera Ranch, CA 92694
(949) 298-5590

*Attorneys for Ingevity Corporation and Ingevity South Carolina, LLC*

1.      GENERAL INSTRUCTION ............................................................................1

        1.1     INTRODUCTION ............................................................................1

        1.2     JURORS' DUTIES ...........................................................................2

        1.3     BURDENS OF PROOF [DISPUTED]..............................................3

        1.4     EVIDENCE DEFINED .....................................................................5

        1.5     CONSIDERATION OF EVIDENCE ................................................7

        1.6     DIRECT AND CIRCUMSTANTIAL EVIDENCE ..............................8

        1.7     STATEMENTS OF COUNSEL .........................................................9

        1.8     CREDIBILITY OF WITNESSES ...................................................10

        1.9     NUMBER OF WITNESSES ...........................................................12

        1.10    EXPERT WITNESSES ...................................................................13

        1.11    LAY OPINION TESTIMONY........................................................14

        1.12    DEPOSITIONS AS SUBSTANTIVE EVIDENCE ...........................15

        1.13    DEMONSTRATIVE EXHIBITS .....................................................16

        1.14    USE OF NOTES ............................................................................17

2.      THE PARTIES AND THEIR CONTENTIONS ...............................................18

        2.1     THE PARTIES.................................................................................18

        2.2     SUMMARY OF CONTENTIONS [DISPUTED]...............................19

3.      ANTITRUST AND PATENT LAW ................................................................21

        3.1     THE PURPOSE OF THE ANTITRUST LAWS...................................21

        3.2     THE PURPOSE OF THE PATENT LAWS.........................................22

4.      COMMON ELEMENTS – OVERVIEW ........................................................23

        4.1     COMMON IMMUNITY – PATENT ENFORCEMENT AND
                PETITIONING ACTIVITY [DISPUTED]..........................................24

        4.2     COMMON IMMUNITY – PATENTEE'S RIGHT TO CONTROL THE
                MARKET FOR NONSTAPLE GOODS [DISPUTED]........................26

4.3    COMMON ISSUE – IMPLIED LICENSE [DISPUTED] ....................................31

4.4    COMMON ISSUE –HONEYCOMB PRODUCTS AT ISSUE [DISPUTED]........................................................................................34

4.5    COMMON ELEMENT – RELEVANT MARKET IN GENERAL.....................35

4.6    COMMON ELEMENT – RELEVANT PRODUCT MARKET...........................36

4.7    COMMON ELEMENT – RELEVANT GEOGRAPHIC MARKET...................38

4.8    COMMON ELEMENT – MARKET POWER [DISPUTED]...............................39

4.9    COMMON ELEMENT – RULE OF REASON [DISPUTED]............................41

    4.9.1    COMMON ELEMENT – RULE OF REASON – PROOF OF SUBSTANTIAL COMPETITIVE HARM..................................................44

    4.9.2    COMMON ELEMENT – RULE OF REASON – EVIDENCE OF COMPETITIVE BENEFITS ........................................................45

    4.9.3    COMMON ELEMENT – RULE OF REASON – BALANCING THE COMPETITIVE EFFECTS ................................................46

5.    ANTITRUST CLAIMS – OVERVIEW ...........................................................47

    5.1    SHERMAN ACT SECTION 1 – UNREASONABLE RESTRAINT OF TRADE – ELEMENTS [DISPUTED] ........................................................48

    5.2    SHERMAN ACT SECTION 2 – MONOPOLIZATION – ELEMENTS [DISPUTED]........................................................................................49

        5.2.1    SHERMAN ACT SECTION 2 – MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER ..................................................50

        5.2.2    SHERMAN ACT SECTION 2 – MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER............................................................52

    5.3    CLAYTON ACT SECTION 3 CLAIM – ELEMENTS [DISPUTED]................54

        5.3.1    CLAYTON ACT SECTION 3 CLAIM – SUBSTANTIAL LESSENING OF COMPETITION..........................................................56

    5.4    TYING – ELEMENTS [DISPUTED] ..................................................58

        5.4.1    TYING – REQUIREMENT OF TWO PRODUCTS [DISPUTED] .........60

        5.4.2    TYING – PROOF OF CONDITIONING [DISPUTED]..........................63

    5.4.3   TYING – FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT [DISPUTED]...........................................................................................64

5.5    EXCLUSIVE DEALING – ELEMENTS...............................................66

    5.5.1   EXCLUSIVE DEALING – PROOF OF SUBSTANTIAL COMPETITIVE HARM UNDER RULE OF REASON [DISPUTED]...........................................................................................67

5.6    ANTITRUST INJURY AND CAUSATION .........................................70

    5.6.1   ANTITRUST INJURY AND CAUSATION – ELEMENTS ..................71

    5.6.2   ANTITRUST INJURY AND CAUSATION – DEFINITION OF BUSINESS OR PROPERTY......................................................73

6.    INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS [DISPUTED].........................................................................74

6.1    INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS – "WRONGFUL MEANS" ....................................77

7.    COMPENSATORY DAMAGES ....................................................................78

7.1    COMPENSATORY DAMAGES – ANTITRUST...............................78

    7.1.1   COMPENSATORY DAMAGES – ANTITRUST– PURPOSE ..............78

    7.1.2   COMPENSATORY DAMAGES – ANTITRUST – CALCULATION ..................................................................79

    7.1.3   COMPENSATORY DAMAGES – ANTITRUST – CAUSATION AND DISAGGREGATION [DISPUTED] ...............................80

    7.1.4   COMPENSATORY DAMAGES – ANTITRUST – LOST PROFITS...........................................................................83

7.2    COMPENSATORY DAMAGES – INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS......................................84

7.3    COMPENSATORY DAMAGES – TIME VALUE OF MONEY .......................85

8.    PUNITIVE DAMAGES ................................................................................86

8.1    PUNITIVE DAMAGES – GENERALLY ...........................................86

8.2    PUNITIVE DAMAGES – BURDEN OF PROOF IS CLEAR AND CONVINCING EVIDENCE [DISPUTED] ...........................................89

8.3    PUNITIVE DAMAGES – ERRORS AND MISTAKES INSUFFICIENT [DISPUTED]..................................................................................90

8.4    PUNITIVE DAMAGES – FAIR NOTICE REQUIRED [DISPUTED] ...............91

8.5    PUNITIVE DAMAGES – SPECIFIC HARM TO PLAINTIFF [DISPUTED]..................................................................................92

8.6    PUNITIVE DAMAGES – NO OUT OF STATE CONDUCT [DISPUTED]..................................................................................93

8.7    PUNITIVE DAMAGES – AMOUNT ....................................................................94

9.    DELIBERATION AND VERDICT ..................................................................................95

9.1    DELIBERATION AND VERDICT – INTRODUCTION ....................................95

9.2    UNANIMOUS VERDICT.........................................................................................96

9.3    DUTY TO DELIBERATE .......................................................................................97

9.4    SOCIAL MEDIA .......................................................................................................98

9.5    COURT HAS NO OPINION....................................................................................99

## 1.    GENERAL INSTRUCTION[1]

### 1.1    INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case.  Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.  In following my instructions, you must follow all of them and not single out some and ignore others.  They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the questions that you must answer to decide this case.

**Source**:   Final Jury Instruction 1.1, *Alarm.com, Inc. v. Securenet Techs.*, *LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

---

[1]     The parties reserve the right to object to, revise, amend, supplement, or modify jury instructions to address any additional issues, arguments, evidence or other developments in the case, including any meet and confers or other negotiations between the parties and similar developments.

## 1.2    JURORS' DUTIES

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on any given issue.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly.  Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

**Source**:  Final Jury Instruction 1.2, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

### 1.3    BURDENS OF PROOF [DISPUTED]

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." This is a civil case in which BASF, the Plaintiff, claims that Ingevity, the Defendant, violated the antitrust laws of the United States and tortiously interfered with BASF's prospective business relations in violation of Delaware law. Those of you who are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt." That burden does not apply in a civil case and you should put it out of your mind in considering whether or not either party has met its burden of proof.

BASF has the burden of proving its claims and the amount of **[Ingevity's Proposal: compensatory]** damages, if any, by what is called a preponderance of the evidence. That means BASF has to provide evidence which, when considered in light of all the facts, leads you to believe that what BASF alleges is more likely true than not. To put it differently, if you were to put BASF's and Ingevity's evidence on the opposite sides of a scale, the evidence supporting BASF's claims would have to make the scales tip slightly on BASF's side. If the evidence is evenly balanced, the party has not proven the element by a preponderance of the evidence, and you must find against that party. If BASF fails to meet this burden, your verdict must be for Ingevity. If BASF tips the scale slightly in its favor and carries its burden, your verdict must be for BASF.

**[Ingevity's Proposal: BASF has also asserted a claim for punitive damages. On that claim, the burden of proof is "clear and convincing" evidence. I will explain that burden of proof in connection with the punitive damages instructions.]**

**Ingevity's Position:** Although *Kanaga* did involve both media and non-media defendants, the court explicitly notes that one of the defendants, Kane, is a "non-media defendant" and goes on to state that, "[t]o be awarded punitive damages against *any defendant*, Dr. Kanaga must prove, by "clear and convincing" evidence, that [requirements for punitive damages]." *Kanaga v. Gannett Co.*, 1998 WL 729585, at *4 (Del. Super. Ct. July 10, 1998), *aff'd in part, rev'd in part on other grounds*, 750 A.2d 1174 (Del. 2000). BASF claims that the court in *Kanaga* applied the clear and convincing standard "without explanation or discussion," but the cases BASF cites

similarly apply the preponderance of the evidence standard without explanation or discussion.  At most, they simply cite the Delaware Pattern Jury Instructions.  The Delaware Supreme Court has noted that the "Disclaimer on the title page of those pattern instructions provides [that] [t]he following civil jury instructions were compiled as a reference guide for the benefits of practitioners in Superior Court [and] are merely advisory." *Russell v. K-Mart Corp.*, 761 A.2d 1, 4 (Del. 2000). The Supreme Court further stated that "[a] party is entitled to an instruction that is legally accurate, but is not entitled to have the jury instructed in a particular format, *even if the requested format set forth is the Pattern Jury Instructions for Civil Practice*." *Id.* (emphasis added).

 **BASF's Position**:  In Delaware, the burden of proof for awarding punitive damages is a preponderance of the evidence.  *See, e.g.*, Del. Civil Pattern Jury Instructions § 22.27 (pattern punitive damages instruction requiring proof "by a preponderance of the evidence"); *Ferrari v. Helsman Mgmt. Servs., LLC*, 2021 WL 1235199, at *1 (Del. Super. Ct. Mar. 31, 2021) ("Pursuant to current Delaware law, the burden of proof for punitive damages is preponderance of the evidence."); *Meyers v. Intel Corp.*, 2015 WL 227824, at *4 (Del. Super. Ct. Jan. 15, 2015) ("In Delaware exemplary or punitive damages are recoverable where the defendant's conduct exhibits a wanton or willful disregard for the rights of the plaintiff.  This proof must be by the preponderance of the evidence."); *Simon v. Beebe Med. Ctr., Inc.*, 2004 WL 692647, at *1 (Del. Super. Ct. Mar. 15, 2004) ("[I]t is the practice in Delaware to impose the usual civil standard, *preponderance of the evidence*, in the determination of punitive damages, [and] that practice is reflected in the Pattern Jury Instructions. … I find no basis in public policy or in statutory language to support the adoption of a different standard of proof.").  Ingevity's only authority for the clear-and-convincing standard is *Kanaga*, a decision that was reversed on other grounds on appeal (the jury instructions in *GN Netcom* do not address punitive damages or the standard for awarding them).  *Kanaga* involves the special First Amendment rule that "[t]o recover punitive damages against … media defendants" in a defamation case, the plaintiff "must show by clear and convincing evidence that they knew of the falsity of the statements and recklessly disregarded the truth."  1998 WL 729585, at *13.  That the trial court, without explanation or discussion, seems also to have applied the clear-and-convincing standard to defamation claims against the lone non-media defendant in that case does not detract from the ample authority, including the Delaware pattern jury instructions, stating that the correct standard is a preponderance.

**1.4**    **EVIDENCE DEFINED**

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, deposition testimony that was presented to you, the exhibits that I allowed into evidence, and any other evidence that I have judicially noticed.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence.  My legal rulings are not evidence.  My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked.  I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see.  And sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record.  You must completely ignore all of these things.  Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

If I have instructed you that I admitted certain testimony and certain exhibits for a limited purpose, you may consider such evidence only for the specific limited purposes for which it was admitted.  When I give instructions regarding that limited purpose, you must follow it.

You must not seek out or rely upon any materials other than those you receive here in court. In particular, you must not conduct internet searches or otherwise attempt to find information about the case or the parties other than what you are given in court.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

**Source:**   Final Jury Instruction 1.4, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

**1.5     CONSIDERATION OF EVIDENCE**

You should use your common sense in weighing the evidence.  Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

**Source:**   Final Jury Instruction 1.5, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

## 1.6    DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two kinds of evidence: direct evidence and circumstantial evidence.  Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  For example, if a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is indirect proof of a fact, *i.e.*, proof of facts from which you may infer or conclude that other facts exist.  For example, if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

The law makes no distinction between the weight that you should give to either direct or circumstantial evidence, but simply requires that you find facts from all the evidence in the case.

You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

**Source:**   Final Jury Instruction 1.6, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

## 1.7    STATEMENTS OF COUNSEL

A further word about statements and arguments of counsel: The attorneys' statements and arguments are not evidence.  Instead, their statements and arguments are intended to help you review the evidence presented.  If you remember the evidence differently from the attorneys, you should rely on your own recollection.

The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law.  An attorney may argue all reasonable conclusions from evidence in the record.  It is not proper, however, for an attorney to state an opinion as to the truth or falsity of any testimony or evidence.  What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence that an attorney has offered during opening or closing statements, or at any other time during the course of the trial.

**Source:**  Final Jury Instruction 8, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**1.8     CREDIBILITY OF WITNESSES**

You are the sole judges of each witness's credibility.  You should consider each witness's means of knowledge, strength of memory, and opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all.  But if you cannot do this, then it is your duty and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he or she gave at the trial.  You have the right to distrust such witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.  If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

This instruction applies to all witnesses, including expert witnesses.

**Source:**   Final Jury Instruction 1.7, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

**1.9     NUMBER OF WITNESSES**

One more point about the witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.  Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

**Source:**  Final Jury Instruction 10, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 1.10   EXPERT WITNESSES

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—called an expert witness—is permitted to state his or her opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness.  The fact that an expert states a fact or an opinion does not mean that the testimony is correct or supported by the factual evidence.  Expert testimony is a guide to interpreting the evidence.  What the facts are is for you to decide.

Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.  You are free to accept or reject the testimony of experts, just as with any other witness.

**Source:**  Final Jury Instruction 11, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 1.11   LAY OPINION TESTIMONY

Witnesses who were not testifying as experts may have given their opinions during the trial.  The fact that a witness has stated an opinion does not mean you are required to accept it.  You may give the opinion whatever weight you think appropriate.  Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion.  You must decide whether information on which the witness relied was true and accurate.  You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence.  You should remember that lay witnesses may not testify to hypothetical situations or respond to hypothetical questions, and you should therefore disregard any opinions relating to hypotheticals.

**Source:**  Final Jury Instruction 12, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**1.12    DEPOSITIONS AS SUBSTANTIVE EVIDENCE**

During this trial, you have heard testimony from the playing of videotape excerpts from depositions.  The deposition videos may have been edited or cut to exclude irrelevant testimony.  The parties and the Court have conferred regarding what portions of deposition videos are to be played.  You should therefore not attribute any significance to the fact that deposition videos may appear to have been edited.

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  A court reporter is present and records the questions and answers.

Deposition testimony is entitled to the same consideration and is to be judged, as much as possible, in the same way as if the witness testified in person here in the courtroom.

**Source:**  Final Jury Instruction 13, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**1.13   DEMONSTRATIVE EXHIBITS**

During the course of the trial, you have seen many exhibits.  Many of these exhibits were admitted as evidence.  You will have these admitted exhibits in the jury room for your deliberations.  The other exhibits (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses.  These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence.  Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

**Source**:   Final Jury Instruction 1.8, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

**1.14   USE OF NOTES**

You may use notes taken during trial to assist your memory.  However, you should use caution in consulting your notes.  There is always a tendency to attach undue importance to matters that you have written down.  Some testimony that is considered unimportant at the time presented, and thus not written down, takes on greater importance later on in the trial in light of all the evidence presented.  Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

**Source**:   Final Jury Instruction 1.9, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

2.      **THE PARTIES AND THEIR CONTENTIONS**

2.1     **THE PARTIES**

I will now review for you the parties in this action, and the positions that you will have to consider in reaching your verdict.  I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

The parties are BASF, who is the Plaintiff, and Ingevity, who is the Defendant.

**<u>Source</u>:**  Final Jury Instruction 2.1, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

**2.2     SUMMARY OF CONTENTIONS [DISPUTED]**

BASF alleges that Ingevity's tying of carbon honeycombs **[Ingevity's Proposal: with 29 mm, 35 mm, or 41 mm diameters and 200 cells per square inch]** to **[Ingevity's Proposal: implied]** licenses to the '844 Patent[2] and Ingevity's entering into long-term supply agreements with Delphi, Kayser, and KFTC unreasonably restrained trade in violation of Section 1 of the Sherman Act.  BASF asserts that Ingevity's conduct allowed it to acquire and maintain monopoly power in the market for carbon adsorbents used in LEV III/Tier 3-compliant fuel vapor canisters in the United States and Canada and to impede competition in that market in violation of Section 2 of the Sherman Act.  BASF further alleges that the long-term supply agreements violate Section 3 of the Clayton Act.  In addition to the antitrust claims, BASF alleges that Ingevity tortiously interfered with its prospective business relations with Kayser in violation of Delaware common law.

Ingevity denies the allegations.  Ingevity contends that it has not restrained trade or unlawfully acquired or maintained monopoly power in any relevant market.  Further, Ingevity contends that it did not tie implied licenses to the '844 Patent to the sale of its **[Ingevity's Proposal: 200 CPSI]** honeycombs, and that its supply agreements with Delphi, Kayser, and KFTC did not substantially foreclose competition or result in harm to competition, did not cause injury to BASF, and did not cause any alleged damages.  Ingevity contends that its sales of **[Ingevity's Proposal: 200 CPSI]** honeycombs and resulting implied licensing from those sales and its supply agreements with customers promoted competition.  Ingevity also contends that it did not know

---

[2]     BASF objects to this narrow definition of the products at issue and maintains, as it argued at summary judgment, that the inquiry should focus on carbon honeycombs in general rather than honeycombs with these particular dimensions.  BASF recognizes that the court has decided otherwise (D.I. 525 at 2-3) but preserves its objection for appeal.

about or intentionally interfere in any improper way with BASF's prospective business relationship with Kayser.

**Source**: Final Jury Instruction 17, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Order on Summary Judgment  Motions (D.I. 525) at 2-3.

## 3.    ANTITRUST AND PATENT LAW

## 3.1    THE PURPOSE OF THE ANTITRUST LAWS

The primary purpose of the antitrust laws is to preserve and promote our system of free and open competition and to secure everyone an equal opportunity to engage in business, trade, and commerce, by preventing unreasonable restraints or monopolization of any business or industry so that consumers may receive better goods and services at lower cost.  These laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not unlawful.  The antitrust laws do not prohibit, without more, colorful, vigorous or aggressive language; the law does not require polite or "commercially correct" speech within corporate memoranda and business plans.

**Source**:  Final Jury Instruction 18, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 3.2    THE PURPOSE OF THE PATENT LAWS

The primary purpose of the patent laws is to promote the progress of science and useful arts by securing for limited times to inventors the exclusive right to their respective discoveries. The patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.  Patent law seeks to foster and reward invention and to promote disclosure of inventions, to stimulate further innovation, and to permit the public to practice the invention once the patent expires.  A patent grants the patent owner the right to exclude others from profiting from use of that patent owner's patented invention and includes the right to allow a patent owner to exclude others from selling nonstaple goods.  You will be instructed separately on what constitutes a nonstaple good.

4.      **COMMON ELEMENTS – OVERVIEW**

I will now turn to the portion of my instructions that will guide you in assessing BASF's claims and applying the law to the facts you find.   Because BASF's claims have certain overlapping components, I am going to first instruct you on concepts that may appear as "common elements" so that you have the information you need in one place.

**Source:**   Final Jury Instruction 19, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

## 4.1   COMMON IMMUNITY – PATENT ENFORCEMENT AND PETITIONING ACTIVITY [DISPUTED]

Ingevity has the right under the patent laws to enforce its patents, including through licensing, through communications about its patent rights to customers and competitors, and through litigation.  Additionally, Ingevity has the right to petition the government, such as through filing a lawsuit, threatening litigation, and communicating with customers about litigation. Evidence of lawful patent enforcement activity and petitioning activity cannot form the basis for BASF's antitrust claims or BASF's tortious interference claim.

**[BASF's Proposal:  However, Ingevity has no right to engage in conduct, such as tying or exclusive dealing, that unlawfully restricts competition beyond the scope of the patent monopoly, and such conduct can form the basis for BASF's antitrust claims and its tortious interference claim.]**

**Source**:  *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961);  *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1001 (Fed. Cir. 2007); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002); *Concrete Unlimited, Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004).

**Ingevity's Position**:  BASF seeks to tack on a repetitive qualification to the immunity instruction that is argumentative, confusing, and unnecessary.  There are several instructions below outlining the tying, exclusive dealing, and intentional interference claims.  BASF is simply attempting to reiterate its themes and arguments through the instructions, and to imply that if BASF accuses the underlying conduct of being "tying," "exclusive dealing," or "tortious interference," that accusation is enough to sidestep immunity under the patent laws and *Noerr-Pennington*.  But BASF's labels must not control the analysis.

Further, BASF attempts to rely on the Court's discussion in its Order On Motions for Summary Judgment of *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969).  *Zenith* can fairly be characterized as standing for the proposition that licenses can be tying products.  Ingevity does not dispute that concept.  However, in *Zenith*, use of a patent was unlawful only where "the patentee seeks to extend the monopoly of his patent to derive a benefit not attributable to use of the patent's teachings."  *Id.*  In *Rohm & Haas*, the Supreme Court cited *Zenith*, then in the next sentence stated that "[i]f petitioner's argument were accepted, it would force patentees either to grant licenses or forfeit their statutory protection against contributory infringement.  Compulsory licensing is a rarity in our patent system, and we decline to manufacture such a requirement out of § 271(d)."  *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980); *see also Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 668 (Fed. Cir. 1986) (citing *Zenith*

for the proposition that "the Supreme Court has said, the patentee's act may constitute patent misuse without rising to the level of an antitrust violation"). A patentee who alleges contributory infringement against products believed to be non-staple goods and believes its own products to be non-staple goods is not guilty of misusing the patent if he turns out to be incorrect about the staple non-staple article nature of the products as a factual matter. *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1372 (Fed. Cir. 2002) (patentees "are allowed to make representations that turn out to be inaccurate provided they make them in good faith"). A contrary rule would invite tying allegations against any party who alleges contributory infringement.

Federal Circuit authority interpreting *Zenith* further supports Ingevity's position. In *Virginia Panel Corp. v. MAC Panel Co.*, the patentee proposed "a licensing agreement conditioned on ASCOR's purchase of unpatented products, and . . . explicitly threatened to enforce its '005 patent against ASCOR and GDE Systems." 133 F.3d 860, 868 (Fed. Cir. 1997). The Federal Circuit, citing *Zenith*, observed that the patentee and ASCOR "never entered into any license agreement that required ASCOR to purchase unpatented, staple goods," and therefore did not misuse the patent. *Id.* at 871. The Federal Circuit went on to state that "[t]he antitrust laws do not preclude patentees from putting suspected infringers on notice of suspected infringement." *Id.* at 873 (reversing jury finding of antitrust violations and noting that, "[w]hile the district court and the jury viewed VP's aggressive conduct as anti-competitive and as the cause of MAC's market losses, VP's enforcement of the patent rights was not unlawful.").

**BASF's Position:**  The Court has ruled that "[r]efusal to license the patent unless the licensee purchases a staple good as part of the license" and "[l]ong term exclusive dealing contracts" "go beyond patent enforcement activities" and therefore are not "immune from antitrust liability." D.I. 525 at 4-5. If the jury is instructed on patent-enforcement immunity, then it is critical that the jury also be told the limits of that immunity. BASF's short proposal is not duplicative of any other proposed instruction. While the instructions below outline the elements of BASF's claims, they do not specify how patent immunity applies to those claims. This instruction is the appropriate place to provide that information.

**4.2    COMMON IMMUNITY – PATENTEE'S RIGHT TO CONTROL THE MARKET FOR NONSTAPLE GOODS [DISPUTED]**

A patent owner has the right to control the market for what are called "nonstaple goods." But a patent owner has no right to control the market for what are called "staple goods."  Ingevity contends that its **[Ingevity's Proposal: 200 CPSI]** carbon honeycombs are nonstaple goods, and that Ingevity's '844 patent therefore gives it the right to control the market for these honeycombs during the life of the patent.  BASF contends that these honeycombs are staple goods, and that Ingevity therefore has no right to control the market for these honeycombs.

**[Ingevity's Proposal: BASF bears the burden of proving by a preponderance of the evidence that the 200 CPSI carbon honeycombs Ingevity actually sells are staple goods and therefore beyond the scope of Ingevity's right to exclude.  To establish that the 200 CPSI carbon honeycombs Ingevity actually sells are staple, BASF must prove that those honeycombs have actual and substantial non-infringing uses other than in fuel vapor canisters.  A non-infringing use of Ingevity's 200 CPSI honeycomb would be a use outside of fuel vapor canisters.]**

**[BASF's Proposal: Ingevity bears the burden of proving by a preponderance of the evidence that the honeycombs at issue are nonstaple goods.  To establish that the honeycombs are nonstaple goods, Ingevity must prove by a preponderance of the evidence that:**

**1. They have no substantial use that would not infringe the '844 Patent, and**

**2. They are essential to the '844 Patent's claimed advance over what was previously known in the art.]**

To qualify as a substantial non-infringing use, the product must have been actually (not hypothetically) used in a non-infringing manner.  In addition, substantial noninfringing uses are those that are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

26

In assessing whether an asserted noninfringing use is "substantial," you must consider the use's frequency, the use's practicality, the invention's intended purpose, and the invention's intended market; the occasional aberrant use of a product that is designed to be used in a particular manner does not qualify as a substantial noninfringing use. The asserted noninfringing use must be qualitatively and quantitatively significant.

**Source**: 35 U.S.C. § 271(c)-(d); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *In re Glumetza Antitrust Litig.*, 2021 WL 1817092, at *9 (N.D. Cal. May 6, 2021).

**Ingevity's Position**:  "The provisions of [35 U.S.C.] § 271(d) effectively confer upon the patentee, as a lawful adjunct of his patent rights, a limited power to exclude others from competition in nonstaple goods."  *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 201 (1980); *see also Ill. Tool Works*, 547 U.S. at 41 ("Congress included a provision in its codification [of the Patent Act] that excluded some conduct, such as a tying arrangement involving the sale of a patented product tied to an 'essential' or 'nonstaple' product that has no use except as part of the patented product or method, from the scope of the patent misuse doctrine.").

BASF is wrong that Section 271(d) and *Rohm & Haas* require Ingevity to prove that the nonstaple article is essential to the patent's advance over the prior art.  BASF has not identified, and Ingevity is unaware of, *any* case interpreting or applying *Rohm & Haas* as imposing such a requirement in order to assert the patent rights set forth in *Rohm & Haas* and Section 271(d).  The Supreme Court has analyzed Section 271(c) without reference to the "material part of the invention" language: "One who makes and sells articles which are only adapted to be used in a patented combination will be presumed to intend the natural consequences of his acts; he will be presumed to intend that they shall be used in the combination of the patent.  In sum, where an article is 'good for nothing else' but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005).

BASF quotes language from the Court's opinion in *Rohm & Haas* discussing the advance over the prior art, but ignores the context of that opinion.  The Court's sole inquiry was whether the article was nonstaple, and the language about a product being essential to the advance of the prior art was simply one reason the Court articulated in determining the article in that case was nonstaple.  It was not an additional requirement imposed on patent holders.  BASF also cites *Enthone Inc. v. BASF Corp.*, 126 F. Supp. 3d 281 (N.D.N.Y. 2015), but the court there simply referenced the "material part of the invention" language from Section 271(c) without any application of Section 271(d) or *Rohm & Haas*.

The courts that have applied Section 271(d) and *Rohm & Haas* have not grafted on the requirement BASF proposes.  In *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 576 (E.D. Pa. 1989), the court explained that "Congress has mandated, therefore, that if [the relevant products] are non-staple articles of commerce, then plaintiffs cannot be guilty of either antitrust violations

or patent misuse by controlling the sale of equipment used in conjunction with the patented process" because a determination that a product "is a non-staple article of commerce is dispositive of [a party's] counterclaim based on allegations of illegal tying."  Similarly, in *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987), the party alleging patent misuse claims based on tying argued that the court should focus on the product constituting the "material part of the invention, or the alleged advance over the prior art."  The Federal Circuit, however, rejected that argument by focusing on "the material actually sold by the accused and the uses made of it by its purchasers" with the non-staple inquiry.  *Id.* at 1578.

Despite the cases identifying Section 271(d) as focused on the non-staple inquiry, if the Court were to include the essential to the advance language, BASF has not identified any case analyzing Section 271(d) that explains what "essential to the advance over the prior art" means. Instead, BASF compares this language to Section 271(c)'s "material part of the invention" language.  To the extent "material part of the invention" is a separate inquiry under Section 271(c), it is met when an identified product satisfies at least one essential element or method step of the relevant claims.  *See Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1378 (Fed. Cir. 2011) (explaining that a patentee's allegations that a product "satisf[ied] at least one essential element or method step" in the asserted claims was sufficient to constitute a "material part" of the invention); *see also Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 444, 466 (D. Del. 2004) (concluding that a component used by defendant's customers to infringe "is a material part of the invention because it is the support upon which the claimed methods of use are performed").

The existence of these carbon honeycombs prior to the filing date of the '844 patent is not relevant to the current inquiry because propanil existed prior to Rohm & Haas obtaining a patent, and that did not affect the Supreme Court's analysis.  *Rohm & Haas*, 448 U.S. 181-83 (explaining that propanil existed prior to the Rohm & Haas patent and that Monsanto's patent on propanil was invalidated because it was known in the art for at least 50 years).  Moreover, the existence of more than one non-staple product that can contributorily infringe does not nullify the existence of contributory infringement.  *See, e.g., Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009).  Indeed, interpreting *Hodosh*, the Federal Circuit observed that the claim in *Hodosh* was directed to "a method for desensitizing teeth with a composition containing an alkali metal nitrate." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1321 (Fed. Cir. 2009) (quoting *Hodosh*, 833 F.2d at 1576). The Federal Circuit further observed that "[t]he accused infringer sold toothpaste, e.g., 'Sensodyne–F,' containing potassium nitrate, an alkali metal nitrate." *Id.*  Thus, one could practice the claim in *Hodosh* by selling toothpaste containing *another* alkali metal nitrate.  Nor was there a singular way for the "date picker tool"—a software product—to be programmed to practice the claims in question in *Lucent*.  Yet, there is no suggestion in either *Hodosh* or *Lucent* that the fact that there are other ways to practice the claims means that a non-staple article could not contributorily infringe.  BASF's interpretation of "essential to the advance" and "material part of the invention" would unnecessarily restrict a patentee's rights under Section 271(c) and Section 271(d) to protect against contributory infringement, and BASF has provided no legal authority supporting such a limiting of patent rights.[3]

---

[3]   If the Court nonetheless decides to instruct on "essential to the advance," Ingevity proposes the following:

As to the burden of proof, BASF bears the burden of proof in establishing that Ingevity's conduct was illegal, and that includes establishing that Ingevity was not acting within the scope of its patent rights. *See*, *e.g.*, *Ungar v. Dunkin' Donuts of Am., Inc.*, 531 F.2d 1211, 1225 (3d Cir. 1976) (reversing district court for "relieving the plaintiff of his burden to prove illegality and imposing on the defendant the burden of proving illegality"). Nothing in the Patent Act shifts that burden to Ingevity; it remains with BASF.

If the Court were to adopt a burden-shifting framework, Ingevity's burden would be only to come forward with *prima facie* evidence that fuel vapor canister honeycombs with 200 cpsi are not intended for use other than to practice the claims of the patent. At that point, the burden would shift to BASF to prove that Ingevity's fuel vapor canister honeycombs are "actually used in [a] non-infringing way" or that "end-users actually assembled the [honeycombs] in a non-infringing way." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006).

Fewer than 20 minutes before these instructions were due for filing, BASF added an argument that "[t]he jury received testimony and documentary evidence that BAX-LBE (which is a pelletized carbon) is used as a low-IAC component. There is no dispute that pelletized carbons, like honeycombs, have non-infringing uses and are thus staple goods." There is no such testimony in the record that applies to BAX LBE, a specialty low IAC product. Rather, the testimony shows that BAX LBE is used only as a subsequent adsorbent, not an initial adsorbent, and that other forms of pelletized carbon with high IACs have non-infringing uses. The record contains no evidence that BAX LBE has actually been implemented in any canister or other application in a way that does not practice the subsequent adsorbent volume limitations of the claims of the '844 Patent.

**BASF's Position:** To qualify as a nonstaple good under *Rohm & Haas*, the product must be "essential to [the] invention's advance over prior art." *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980). This requirement comes directly from the controlling Supreme Court decision and has been cited by other courts. *See*, *e.g.*, *Beal Corp. Liquidating Tr. v. Valleylab, Inc.*, 927 F. Supp. 1350, 1362 (D. Colo. 1996). Ingevity has repeatedly acknowledged this requirement, even describing it as a "critical question[]" under *Rohm & Haas*. D.I. 83 at 2; *see also* D.I. 441 at 8-9, 14 (arguing that "Ingevity's FVC Honeycombs are non-staple products used only to practice the '844 Patent and *are essential to the '844 Patent's advance over the prior art*" (emphasis added)). The "essential to the advance" requirement also mirrors § 271(c)'s requirement that the accused product in a contributory-infringement case must be "a material part of the invention." *See*, *e.g.*, *Enthone Inc. v. BASF Corp.*, 126 F. Supp. 3d 281, 289 (N.D.N.Y.

---

[If the 200 CPSI honeycombs are nonstaple goods, BASF must prove that they are not essential to the '844 Patent's advance over the prior art. A product is essential to the advance over the prior art if it is used to practice an essential claim element or method step of the claims in the '844 patent. To establish that the 200 CPSI honeycombs are not essential to the '844 patent's advance over the prior art, BASF must prove that the honeycombs do not practice the limitation in the '844 patent requiring a subsequent adsorbent volume with an incremental adsorption capacity less than 35 g/L. Whether 200 CPSI honeycombs existed before the '844 patent or the '844 patent can be practiced with subsequent adsorbent volumes other than these honeycombs is not relevant to whether they are essential to the advance over the prior art.]

2015) (to satisfy this requirement, the accused product must be "necessary to fulfill the patented process").

Ingevity argues that "the existence of more than one nonstaple product that can contributorily infringe does not nullify the existence of contributory infringement." But this mistakenly assumes that the other products are also nonstaples. The jury received testimony and documentary evidence that BAX-LBE (which is a pelletized carbon) is used as a low-IAC component. There is no dispute that pelletized carbons, like honeycombs, have non-infringing uses and are thus staple goods.

Ingevity bears the burden of proof on the staple/nonstaple issue. Once a plaintiff establishes a prima facie case of an antitrust violation, the defendant-patentee bears the burden "to show [the restraints] go no further than their patents authorized." *In re Glumetza Antitrust Litigation*, 2021 WL 1817092, at *9 (N.D. Cal. May 6, 2021). This is consistent with "the general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948). It is also consistent with the rule that in a contributory-infringement case, the patentee bears the burden of proving that the accused products have no substantial non-infringing uses. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006). Ingevity mischaracterizes *Golden Blount*, which states that once the patent holder makes "a *prima facie* showing" that a product has no non-infringing use, the "burden of *production*" shifts to the other party "to introduce *some* evidence" that the product was used in a non-infringing way. *Id.* at 1363-64 (emphasis added). BASF has met its burden of production by introducing "some evidence" of non-infringing uses, and *Golden Blount* states that the ultimate "burden of proving" the absence of such uses rests on the patent holder. *Id.* at 1363.

**4.3    COMMON ISSUE – IMPLIED LICENSE [DISPUTED]**

**[Ingevity's Proposal:  You have heard discussion of both express and implied licenses to practice the '844 Patent.  An express license is a written agreement between a patent owner licensor and a licensee in which the patent owner expressly promises not to sue the licensee for infringing the patent.  An implied license is likewise a promise not to sue, but it arises by operation of law and not by an express agreement.**

**BASF asserts antitrust claims based only on implied licenses, and does not claim that any of the express licenses mentioned in the trial were unlawful.]**

**Ingevity's Position**:  The jury heard evidence on both express and implied licenses.  But it is undisputed that the only licenses accused in BASF's tying claim are implied licenses.  Having been told about the express licenses, the jury should be instructed on the distinction between implied and express licenses and told that only the former are at issue in the case.  Otherwise, there is a real possibility that the jury will impermissibly base its decision on the express licenses.

On Sunday morning, September 12, 2021, BASF included the text in the position below that sets out for the first time an attempt to make a drastic and material change in its theory of liability without adequate time for Ingevity to respond.  Ingevity objects to any attempt by BASF to pursue this new theory.  Throughout this case, BASF argued tying based on "implied licenses and express licenses."  It only identified three express licenses – the written and signed agreements with Denso, KFTC and MAHLE, dated 2010, 2013, and 2015, respectively.  For example, BASF relied on specific allegedly onerous terms in the three express licenses—such as specific royalty terms, the way "Ingevity structured its license agreements," and the dates those license agreements came into existence, among others.  BASF Am. Answer And Counterclaims ¶¶ 40-50.  In response to Ingevity's summary judgment motion, BASF dropped reliance on the three express licenses and has thus, only argued about implied licenses.  D.I. 456 at 11 (stating that "BASF does not contest Ingevity's motion [for summary judgment based on patent enforcement and *Noerr-Pennington* ] with respect only to the DENSO, KFTC, and MAHLE license agreements," because it acknowledged these express licenses involved "petitioning the government" or were "incidental to any protected petitioning activity").  BASF advanced the same theories with respect to express licenses in Dr. Mathur's three expert reports.

"Implied license" is a term of art in patent law that has a well-known and understood meaning within the context of this case: a license that is conveyed by operation of law.  At no time did BASF ever explain that even though it was using "implied license" it really meant that term to mean something different than what it means in patent law and instead refers to an unwritten oral policy that was conveyed to customers.  This change in position speaks volumes about the flaws in BASF's case.  It is clear that an implied license (as that term is properly understood) is not a separate product from the product whose sale conveys that implied license by operation of law and that there are not therefore two separate products at issue here.  Moreover, BASF's new position

that it has now expressed for the first time has many serious flaws that Ingevity would have and could have challenged through summary judgment, Rule 50, and otherwise.

A policy is not a license, and BASF can only hope to confuse the jury, because—in light of BASF's theories actually disclosed throughout this litigation—the evidence has focused on implied licenses, and not the numerous unique issues implicated by BASF's new express unwritten license theory. For an unwritten agreement to be an express but unwritten "license," BASF would need to present evidence of contract formation for each supposed licensor-licensee relationship under the elements of the relevant jurisdiction. *See, e.g.*, 6 Del. Civ. Code § 2-204 (describing the elements of contract formation for the sale of goods under Delaware law). There is no such evidence (nor could there be, because none exists), and BASF does not even identify the jurisdictions in which these agreements arose, which presumably could range from Japan, Germany, Poland, and Korea to Illinois, Kentucky, and numerous others. And, an unwritten license would violate the statute of frauds for numerous reasons (including that it could not be performed within a year and because the value is more than $500). *See, e.g.*, *Sun Studs, Inc. v. Applied Theory Assocs., Inc.*, 772 F.2d 1557, 1563 (Fed. Cir. 1985) ("Moreover, the Supreme Court and the Ninth Circuit have applied the Statute of Frauds to oral agreements which grant a license under a patent whose remaining term is more than one year." (citing *Packet Co. v. Sickles*, 72 U.S. (5 Wall.) 580, 595 (1867); *Schick Service, Inc. v. Jones*, 173 F.2d 969, 975–77 (9th Cir.), *cert. denied*, 338 U.S. 819 (1949))); *Springob v. Univ. of S.C.*, 407 S.C. 490, 495 (2014) (applying the law of South Carolina, where Ingevity is headquartered, and stating "[t]he Statute of Frauds requires that a contract that cannot be performed within one year be in writing and signed by the parties" (citing S.C.Code § 32–3–10 (1991))); 6 Del. Civ. Code § 2714. Nor has BASF presented evidence of the terms of the purported agreements. If this is BASF's new theory, then its tying claims should be dismissed under Rule 50 because there is no evidence that would be sufficient to establish any of the foregoing terms of an unwritten license.

**BASF Position**:  Ingevity's proposal seriously misstates BASF's position in this case. BASF has consistently used the term "implied license" to denote that Ingevity's licenses were not express, written licenses, but instead arose from Ingevity's unwritten tying policy—a policy, that, as Mr. Woodcock testified, was consistently communicated to customers over a period of years. BASF has never conceded or contended that Ingevity's licenses are "implied" in the sense that they arise "by operation of law."  That is *Ingevity's* position: Ingevity contends that its licenses arise "by operation of law" because its carbon honeycombs are nonstaple goods the sale of which exhausts Ingevity's patent rights. Needless to say, BASF disputes that, and this dispute is a central issue in the case. An instruction defining "implied license" in the manner Ingevity suggests would be extremely prejudicial to BASF, as it would suggest to the jury that when BASF and its witnesses used the term "implied license" in connection with Ingevity's unwritten licenses, that means the licenses arose "by operation of law" rather than as a result of Ingevity's tying policy.

Ingevity's assertion that this represents a change in BASF's theory of liability—let alone a "drastic and material one"—is baffling.  As Ingevity notes, BASF has always distinguished between Ingevity's express written licenses and its "implied" or unwritten licenses.  Ingevity cannot possibly have thought BASF was taking the position that the licenses were "implied" in the sense that they arose by operation of law because Ingevity's honeycombs were nonstaple goods. BASF has always been clear about its view that the honeycombs are *staple* goods; the parties have repeatedly briefed that issue going back to Ingevity's motion to dismiss BASF's counterclaims in

32

2019.  If Ingevity thought BASF was contradicting itself by on the one hand denying that honeycombs were nonstaple goods, and on the other hand admitting that the licenses were "implied" by operation of law, one might have thought Ingevity would have pointed out that contradiction more than 48 hours before the prayer conference.

## 4.4    COMMON ISSUE –HONEYCOMB PRODUCTS AT ISSUE [DISPUTED]

You have heard discussion of different types of honeycombs with different dimensions and uses.  For purposes of BASF's claims in this case, the only honeycombs at issue are carbon honeycombs with 29 mm, 35 mm, or 41 mm diameters and 200 cells per square inch.  **[BASF Proposal: When these instructions refer to carbon honeycombs, they are referring]** **[Ingevity's Proposal: I will refer]** to those specific honeycombs **[BASF Proposal: (unless a different meaning is apparent from the context)]** **[Ingevity's Proposal: as the "200 CPSI honeycombs."]**[4]

**Ingevity's Position**: Having a defined term that focuses the jury on the specific honeycombs at issue here, as defined by the Court's summary judgment order is critical to the jury not getting confused about the testimony BASF introduced regarding irrelevant honeycombs used in air intake/induction systems, cabin air filtrations and kitchen hoods.  BASF's proposal to just use "carbon honeycombs" after this is not acceptable because it does not remind them each time the term appears with a defined term.  Ingevity's proposal for a defined term does that and would ensure that the jury is focused on the correct honeycombs in each instance.  Ingevity proposes 200 CPSI honeycombs, which addresses BASF's concern that "fuel vapor canister" honeycombs implies certain uses to the jury.

**BASF's Position**: BASF agrees that in light of the court's summary judgment order, it is appropriate to limit the honeycombs at issue to those with the specific dimensions noted (although BASF preserves its objection for appeal).  BASF objects to the defined term "Ingevity 200 CPSI honeycombs," which is both cumbersome and prejudicial.  Since BASF's proposal already limits the relevant honeycombs to those with 200 CPSI, repeating the term "200 CPSI honeycombs" dozens of times is gratuitous and needlessly clutters the instructions.  It also repeatedly highlights an aspect of the honeycombs (cell density) that Ingevity wishes to emphasize.  BASF invited Ingevity to propose a more neutral defined term, but Ingevity declined to do so.  BASF submits that informing the jury that the honeycombs at issue are those with the diameters and cell density specified in this instruction is sufficient.

---

[4]  BASF objects to this narrow definition of the products at issue and maintains, as it argued at summary judgment, that the inquiry should focus on carbon honeycombs in general rather than honeycombs with these particular dimensions.  BASF recognizes that the Court has decided otherwise (D.I. 525 at 2-3) but preserves its objection for appeal.

**4.5      COMMON ELEMENT – RELEVANT MARKET IN GENERAL**

You will see that each of BASF's antitrust claims requires you to analyze whether the accused conduct had anticompetitive effects.  These effects must occur with respect to a relevant market; BASF must prove the relevant market(s) by a preponderance of the evidence.

There are two aspects you must consider in determining whether BASF has met its burden to prove the relevant market(s).  The first is the relevant *product* market.  The second is the relevant *geographic* market.

**Source**: Final Jury Instruction 21, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**4.6      COMMON ELEMENT – RELEVANT PRODUCT MARKET**

BASF must prove, by a preponderance of the evidence, the existence of a relevant product market.  The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.

In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test based on the actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable so long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products would be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant sustained increase in the price of one product would result in a substantial number of consumers switching from that product to another.  In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant increase in price is approximately a 5% increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue.  If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and the sales of another; (3)

the presence or absence of specialized vendors; (4) the perceptions of either the industry or the

public as to whether the products are in separate markets; (5) the views of BASF and Ingevity

regarding which products compete against each other; (6) the existence or absence of different

customer groups or distribution channels; (7) disadvantages to using other products that might

deter customers from substituting to products outside of the market; and (8) differences in prices

for particular products.

**Source:**  Final Jury Instruction 23, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-
cv-01318-LPS (D. Del. Oct. 18, 2017).

**4.7    COMMON ELEMENT – RELEVANT GEOGRAPHIC MARKET**

In this case, the relevant geographic market is the United States and Canada.

**Source:**  Final Jury Instruction 22, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**4.8      COMMON ELEMENT – MARKET POWER [DISPUTED]**

In determining if Ingevity's challenged conduct substantially harmed competition, you should consider whether Ingevity had market power.

Market power is defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market.  A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.  The ability to charge higher prices for better products or services, however, is not market power.

In determining whether Ingevity has market power, you may consider Ingevity's share or portion of the relevant market; that is, its percentage of the products or services sold in the relevant market by all competitors.  The mere possession of market power is not unreasonable or illegal.  If you find that Ingevity possesses market power, you must still consider other elements of BASF's claims that I will discuss further below.

Factors you may consider in determining whether Ingevity has market power include whether there are any durable barriers to entry by new firms in the market, and evidence concerning the intensity of competition within that market.  In addition, if you decide that the buyers are sophisticated businesses themselves that have countervailing power in negotiating contracts, this may offset any market power Ingevity might otherwise have.  If BASF cannot show that Ingevity had the power to force buyers to enter into exclusive contracts or purchase **[Ingevity's Proposal: 200 CPSI]** honeycombs they did not want or would have preferred to purchase elsewhere, this would be an indication that Ingevity lacks market power.  You should consider whether the process in which Ingevity secured its supply contracts and sales of **[Ingevity's Proposal: 200 CPSI]** honeycombs itself involved competition.  If you determine that buyers considered purchasing products from other suppliers as substitutes for Ingevity's **[Ingevity's**

**Proposal: 200 CPSI]** honeycombs, and that other competitors had an equal opportunity to compete against Ingevity for sales of **[Ingevity's Proposal: 200 CPSI]** honeycombs, this is also evidence that Ingevity does not have market power.

**Source**:  Final Jury Instruction 25, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 21, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

**4.9    COMMON ELEMENT – RULE OF REASON [DISPUTED]**

In this case, BASF claims that Ingevity's alleged tying and exclusive dealing conduct was an unreasonable restraint of trade that resulted in an adverse effect on competition under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, which I will explain in more detail later.  **[BASF's Proposal: As I will explain later, some restraints of trade are unlawful "per se," which means that they are definitely unlawful and BASF does not have to offer specific proof of an adverse effect on competition.  For restraints that are not unlawful "per se," it]** **[Ingevity's Proposal: It]** is your job to determine whether the challenged conduct was unreasonable under what is known as the "rule of reason."

A restraint of trade **[BASF's Proposal: that is not unlawful "per se"]** is illegal only if it is found to be unreasonable.  In making this determination, you must first determine whether BASF has proven that the challenged restraint resulted in substantial harm to competition in the relevant market.  If you find that BASF has proven that the challenged restraint resulted in substantial harm to competition in the relevant market, then you must consider whether the restraint produced countervailing competitive benefits.  If you find that it did, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

**Source:**  Final Jury Instruction 27, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**Ingevity's Position**:  The jury should not be instructed on unlawful "per se" restraints of trade.  In *Illinois Tool Works Inc. v. Independent Ink, Inc.*, the Supreme Court made clear that "tying arrangements involving patented products should be evaluated under the standards applied in cases like *Fortner II* and *Jefferson Parish* rather than under the *per se* rule applied in *Morton Salt* and *Loew's*."  *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42-43 (2006).

BASF argues for the per se rule based on a footnote in *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 458 n.4 (2015), but *Kimble* did not even involve a tying arrangement.  The footnote simply points to *Illinois Tool Works* as the governing legal standard.  That case, as discussed above, rejected the per se rule in "tying arrangements involving patented products."  547 U.S. at 42-43.

BASF has not cited a single case in which a court has found liability where one of the products in a tying arrangement is an implied license to practice a patent. And the lack of authority is dispositive for the applicability of the per se rule, because "[t]he Supreme Court has applied the per se rule only when 'experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it ....'" *U.S. Philips Corp. v. ITC*, 424 F.3d 1179, 1185 (Fed. Cir. 2005) (quoting *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 344 (1982)); *see Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9–10 (1979) ("It is only after considerable experience with certain business relationships that courts classify them as per se violations.").

In *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), the Supreme Court recognized that tying may, at least in certain circumstances, be welfare enhancing. *Id.* at 11 ("It is clear, however, that every refusal to sell two products separately cannot be said to restrain competition."). In such circumstances, applying a strict *per se* approach is inappropriate since the *per se* rule condemns conduct as unlawful without regarding to whether there are procompetitive justifications or actual harm to competition. The Court in *Jefferson Parish* applied a modified per se rule approach that accounted for justifications and competitive effects. Subsequently, in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), the court applied the rule of reason to the alleged tying claim against Microsoft, stating "that integration of new functionality into platform software is a common practice and that wooden application of *per se* rules in this litigation may cast a cloud over platform innovation for PCs, network computers and information appliances." *Id.* at 95.

It is undisputed that exclusive dealing is evaluated under the rule of reason. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010); D.I. 525 at 3.

**BASF's Position:** It is well established in this Circuit that a tying arrangement is a per se antitrust violation if the defendant has market power in the tying product market. *See, e.g.*, *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998) ("Per se liability exists [for tying arrangements] where the defendant is found to have appreciable market power in the tying market. In such cases, the ability to leverage this power to restrain trade in the tied market is presumed and no inquiry need be made into the actual prevailing market conditions in that market."). At summary judgment, Ingevity did not dispute that this per se test applied to BASF's tying claim.

Contrary to Ingevity's new argument, *Illinois Tool Works* does not adopt a different rule for patent tying arrangements, but rather holds that they are subject to the same standard as other tying arrangements. Before *Illinois Tool Works*, courts held that a patent gave rise to a "presumption of market power" in the patent holder, so patent tying cases were *always* per se cases. In *Illinois Tool Works*, the Supreme Court rejected that presumption and held that because "a patent does not necessarily confer market power upon the patentee," "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." 547 U.S. at 46. But the Court did not displace the ordinary rule that tying is per se unlawful if the plaintiff proves that the defendant has market power in the tying product market. *See, e.g.*, *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 458 n.4 (2015) (after *Illinois Tool Works*, "patent tying agreements … are unlawful only if the patent holder wields power in the relevant market").

BASF agrees that exclusive dealing is evaluated under the rule of reason.

### 4.9.1   COMMON ELEMENT – RULE OF REASON – PROOF OF SUBSTANTIAL COMPETITIVE HARM

To prove that the challenged conduct unreasonably restrained competition, BASF first must demonstrate that it resulted in substantial harm to competition.  Although it may be relevant to the inquiry, harm that occurs merely to the individual business of BASF is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single competitor does not necessarily mean that there has been harm to competition.

A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, more product options, increased output, or higher product quality.  If the challenged conduct did not result in higher prices, fewer product choices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged conduct produced competitive harm, you may look at the following factors:

- the effect of the conduct on prices, output, product quality, and service;

- the purpose and nature of the conduct;

- the nature and structure of the relevant market, both before and after the conduct occurred;

- the number of competitors in the relevant market and the level of competition among them;

- whether new competitors entered the market, both before and after the conduct occurred; and

- whether Ingevity possesses market power.

**Source**:  Final Jury Instruction 28, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

### 4.9.2   COMMON ELEMENT – RULE OF REASON – EVIDENCE OF COMPETITIVE BENEFITS

If you find that BASF has proved that Ingevity's conduct resulted in substantial harm to competition in a relevant market, then you next must determine whether the conduct also benefited competition in other ways.  You may only credit benefits that are related to competition or that advantage consumers.  If you find that Ingevity has proved that the conduct did result in competitive benefits, then you also must consider whether the conduct was reasonably necessary to achieve the benefits.  If BASF proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the conduct.

**Source:**  Final Jury Instruction 29, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

### 4.9.3   COMMON ELEMENT – RULE OF REASON – BALANCING THE COMPETITIVE EFFECTS

If you find that the challenged conduct was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same conduct.

If the competitive harm substantially outweighs the competitive benefits, then the challenged conduct is unreasonable.  If the competitive harm does not substantially outweigh the competitive benefits, then the challenged conduct is not unreasonable.  In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor.

BASF bears the burden of proving that the anticompetitive effect of the conduct, if any, substantially outweighs its benefits.

**Source:**  Final Jury Instruction 30, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**5.    ANTITRUST CLAIMS – OVERVIEW**

Now that we have covered some of the common concepts and statutes that apply to BASF's

antitrust claims, I am going to turn to instructing you further on the specific elements of the claims.

For elements that are not covered by the common elements I just described, I will provide you

with the information you need in the following instructions.

**Source:**  Final Jury Instruction 31, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**5.1    SHERMAN ACT SECTION 1 – UNREASONABLE RESTRAINT OF TRADE – ELEMENTS [DISPUTED]**

BASF claims that Ingevity required customers to purchase **[Ingevity's Proposal: 200 CPSI]** honeycombs from Ingevity in order to receive a license to the '844 Patent and entered supply agreements that unreasonably restrained trade in violation of Section 1 of the Sherman Act. Ingevity denies these allegations.

Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade.  To establish a violation of Section 1 of the Sherman Act, BASF must prove the following by a preponderance of the evidence:

> ***First***, the existence of a contract or combination between or amongst at least two separate entities;

> ***Second***, that the contract or combination unreasonably restrained trade; and

> ***Third***, that the restraint caused BASF to suffer an injury to its business and property.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

**Source:**  Final Jury Instruction 32, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 16, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

**5.2     SHERMAN ACT SECTION 2 – MONOPOLIZATION – ELEMENTS [DISPUTED]**

BASF's second claim is that Ingevity unlawfully monopolized the North American and Canadian market for carbon adsorbents used in fuel vapor canisters in two ways: through (1) an alleged requirement that customers purchase honeycombs from Ingevity in order to receive a **[Ingevity's Proposal: implied]** license to the '844 Patent, and (2) three long-term supply agreements, in violation of Section 2 of the Sherman Act.  Ingevity denies these allegations.

To prevail on its monopolization claims under Section 2 of the Sherman Act, BASF has the burden of proving each of the following elements by a preponderance of the evidence:

*First*, that the alleged market is a valid relevant market;

*Second*, that Ingevity possessed monopoly power in that market;

*Third*, that Ingevity willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct; and

*Fourth*, that BASF was injured in its business or property because of Ingevity's anticompetitive conduct.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

**Source**:  Final Jury Instruction 33, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 23, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

### 5.2.1   SHERMAN ACT SECTION 2 – MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER

To prevail on its monopolization claims, BASF must prove by a preponderance of the evidence that Ingevity had monopoly power in the relevant market.  Monopoly power is the power to control prices or exclude competition in a relevant antitrust market.  More precisely, Ingevity is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  However, possession of monopoly power, in and of itself, is not unlawful.

If you do not find that Ingevity is able to profitably raise prices above those that would be charged in a competitive market, monopoly power can be alternatively established through circumstantial evidence in the form of Ingevity's market share, market share trends, entry and exit by other companies, and the number and size of other alleged competitors.  I will now discuss these types of circumstantial evidence of monopoly power.

**Market Share.**  The first factor you may consider is Ingevity's share of the relevant market.  Based on the evidence you have heard about Ingevity's market share, you may determine its market share as a percentage of total sales in the relevant market.  Ingevity must have a significant share of the market in order to possess monopoly power.  Market share alone is not sufficient to establish monopoly power.

**Market Share Trends.**  The trend in Ingevity's market share in the relevant market also is something you may consider.  A market share that increases over time may strengthen an inference that a company has monopoly power, particularly where that company has a high market share.  A decreasing market share may indicate the absence of monopoly power.

**Barriers to Entry.**  You may also consider whether there are durable barriers to entry into the relevant market.  Durable barriers to entry make it difficult for new competitors to enter the

relevant market in a meaningful and timely way.  Barriers to entry might include government regulations, the large financial investment required to build a plant, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of high barriers to entry along with high market share may support an inference that Ingevity had monopoly power.  By contrast, evidence of low or no entry barriers may be evidence that Ingevity did not have monopoly power, regardless of its market share, because new competitors could enter easily if Ingevity attempted to raise prices for a substantial period of time.

***Entry and Exit by Other Companies.***  The history of entry and exit in the relevant market may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that Ingevity lacked monopoly power.  On the other hand, departures from the market, or the failure of firms to enter the market, may support an inference that Ingevity has monopoly power.

***Number and Size of Competitors.***  You may consider whether Ingevity's competitors were capable of effectively competing.  In other words, you should evaluate whether the financial strength, market shares, and number of competitors in the relevant market acted as a check on Ingevity's ability to price its products.  If Ingevity's competitors were vigorous or had large or increasing market shares, this may be evidence that Ingevity lacked monopoly power.  On the other hand, if you determine that Ingevity's competitors were weak or had small or declining market shares, this may support an inference that Ingevity had monopoly power.

**Source:**  Final Jury Instruction 34, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

### 5.2.2   SHERMAN ACT SECTION 2 – MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER

The next element BASF must prove for its monopolization claim is that Ingevity willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The maintenance of monopoly power by supplying better products or services, possessing superior business skills, possessing a patent, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In this case, BASF contends that Ingevity had monopoly power and used it to enter into anticompetitive tying arrangements and exclusive long-term supply agreements to prevent or exclude competition or frustrate the efforts of other companies to compete in the relevant market.

In determining whether Ingevity's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

**Source:**  Final Jury Instruction 35, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**5.3** **CLAYTON ACT SECTION 3 CLAIM – ELEMENTS [DISPUTED]**

BASF's third claim is under Section 3 of the Clayton Act. BASF alleges that Ingevity used exclusive long-term supply agreements with customers to foreclose competition in a substantial portion of the relevant market, and that BASF was injured as a result of these exclusive dealing arrangements. Ingevity denies these allegations.

To succeed on this claim, BASF must prove the following elements by a preponderance of the evidence:

*First*, that Ingevity sold **[Ingevity's Proposal: 200 CPSI]** honeycombs, or entered into contracts for the sale of **[Ingevity's Proposal: 200 CPSI]** honeycombs;

*Second*, that in its sales or contracts for such **[Ingevity's Proposal: 200 CPSI]** honeycombs, Ingevity established an agreement or understanding that the customer would exclusively purchase Ingevity's products;

*Third*, the effect of such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in the relevant market;

*Fourth*, BASF was injured in its business or property as a proximate result of Ingevity's conduct.

As to the second element of BASF's Clayton Act Section 3 claim, you need not find that the agreement contained a specific, express agreement to use or purchase only Ingevity's products to conclude that it was an exclusive dealing arrangement because a condition, agreement or understanding may be either expressly stated or inferred from the circumstances.

Ingevity's agreements may be found to be exclusive dealing arrangements if they had the practical effect of substantially preventing the purchase of BASF's **[Ingevity's Proposal: 200 CPSI]** honeycombs. An agreement may be an exclusive dealing arrangement even if it does not require a 100% commitment to deal only in Ingevity's products.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim. If you find that BASF has proven

each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

**Source:**  Final Jury Instruction 40, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 33, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

### 5.3.1   CLAYTON ACT SECTION 3 CLAIM – SUBSTANTIAL LESSENING OF COMPETITION

If you find that BASF has proven that Ingevity entered into exclusive dealing contracts, you should then consider whether BASF has proven, by a preponderance of the evidence, that those contracts substantially lessened competition in the relevant market.  Only if you find that BASF has proven a substantial lessening of competition in a relevant market due to Ingevity's contracts can you find in favor of BASF on its Clayton Act Section 3 claim.

In deciding this issue, you should consider the structure of the relevant market and the percentage of the relevant market closed off by, or tied up because of, the contracts.  In this regard, you may consider how many companies were in the market and whether the contracts significantly limited the opportunities for competing sellers to enter or remain in the market.

You must consider the probable effect that the contracts had on competition in the market. If you find that Ingevity's contracts did not substantially lessen competition, then you must find in favor of Ingevity.

If you find that BASF has proven that Ingevity's contracts substantially lessened competition in the relevant market, then you must go on to consider whether there is any legitimate business justification for the contracts and whether they are reasonable.   Only unreasonable restraints of this type are unlawful.  In this regard, you should consider such factors as:

- The circumstances under which Ingevity set up these contracts and what reasons it had for doing so;

- The relative bargaining strength of the parties to the contracts.  If the parties had relatively equal bargaining strength, then the contracts are less likely to be unreasonable;

- How long in time the contracts were effective.  If the contracts lasted a relatively short time and did not significantly limit the opportunity for competing sellers to enter or remain in the market, then they were less likely to be unreasonable;

- Any favorable effects on competition that the contracts produce; and

56

■   Any alternative channels of distribution that may have been available to BASF.

If you find that the contracts foreclosed competition in a substantial portion of the relevant market, and that the anticompetitive effects of those contracts outweigh any procompetitive effects, you must consider whether BASF was injured as a result of these contracts, consistent with Instructions 6.1 and 6.2.

**Source:**   Final Jury Instruction 36, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009).

## 5.4     TYING – ELEMENTS [DISPUTED]

As I have mentioned, BASF's first and second claims depend, in part, on BASF's allegation that Ingevity engaged in an unlawful tying arrangement.  Ingevity denies this allegation.

A tying arrangement is one in which the seller will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product), or at least agree that they will not purchase the tied product from any other supplier.  In this case, BASF claims that licenses to the '844 Patent are the tying product and **[Ingevity's Proposal: 200 CPSI]** honeycombs are the tied product.

Not all tying arrangements are unlawful.  The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product to force buyers to purchase a tied product that buyers either did not want at all or might have preferred to purchase elsewhere.  To prevail on its claim that Ingevity's tying arrangement is a violation of the antitrust laws, BASF has the burden of proving each of the following elements by a preponderance of the evidence:

> *First*, **[Ingevity's Proposal: implied]** licenses to the '844 Patent and **[Ingevity's Proposal: 200 CPSI]** honeycombs are separate and distinct products;

> *Second*, Ingevity will grant licenses to the '844 Patent only on the condition that the customer also purchase **[Ingevity's Proposal: 200 CPSI]** honeycombs from Ingevity, or that the customer not purchase such **[Ingevity's Proposal: 200 CPSI]** honeycombs from any other supplier;

> *Third*, Ingevity has sufficient market power with respect to technologies to meet LEV III / Tier 3 regulations to enable it to restrain competition as to the **[Ingevity's Proposal: 200 CPSI]** honeycombs;

> *Fourth*, the alleged tying arrangement has affected a substantial volume of commerce as to the **[Ingevity's Proposal: 200 CPSI]** honeycombs; and

> *Fifth*, BASF was injured in its business or property because of the tying arrangement.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim. If you find that BASF has proven each of these elements by a preponderance of the evidence, **[BASF's Proposal: then the tying arrangement is "per se" unlawful—which means that the tying arrangement is definitely unlawful and you may not consider whether the tying arrangement also benefits competition to justify the restraint.**

**If you find that BASF has not proven that Ingevity has market power with respect to technologies to meet LEV III / Tier 3 regulations, but has proven the other elements, then you may still find the tying arrangement] [Ingevity's Proposal: then you must determine whether the tying arrangement is]** unlawful under the rule of reason. As I have previously explained, in making this determination, you must first determine whether BASF has proven that the contracts resulted in substantial harm to competition in the relevant markets. If you find that BASF has proven that the contracts resulted in substantial harm to competition in the relevant market, then you must consider whether the contracts produced countervailing competitive benefits. If you find that they did, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

**Ingevity's Position**: As discussed above relating to Instruction 4.9, the jury should not be instructed on "per se" unlawful tying. *See Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 41-43 (2006).

**BASF's Position:** As explained above, patent tying arrangements, like other tying arrangements, are per se antitrust violations when the plaintiff proves that the defendant has market power in the tying product market, without the need for further inquiry into the effect on competition. *See*, *e.g.*, *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998).

### 5.4.1   TYING – REQUIREMENT OF TWO PRODUCTS [DISPUTED]

**[Ingevity's Proposal:**

**BASF contends that Ingevity's 200 CPSI honeycombs are separate products from implied licenses to the '844 Patent.  Ingevity contends that any implied license to the '844 Patent is not a separate product because it is conveyed by operation of law, and even if licenses were implied under the law, they were not separate products from the 200 CPSI honeycombs.**

**You must first decide whether an implied license is a "product."  If you find that an implied license is not a product, you should return a verdict for Ingevity on BASF's tying claim.**

**If you determine the implied license is a product, you must then decide whether it is separate and distinct from 200 CPSI honeycombs.]**

**[BASF's Proposal:**

**BASF contends that honeycombs are separate products from licenses to the '844 Patent.  Ingevity disputes this.]**

In making this determination, you should consider whether there would be demand for each product if they were offered separately.  If there would be little demand for one of the products if sold by itself, then **[Ingevity's Proposal: implied]** licenses to the '844 Patent and **[Ingevity's Proposal: 200 CPSI]** honeycombs are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.  **[BASF Proposal: Two products are distinct if they are distinguishable in the eyes of buyers such that they could be provided separately, and could be selected by individual buyers, if the defendant did not insist on packaging them together.]**

**Ingevity's Position**:  A tying claim requires two products—a "tying" product and a "tied" product.  *See, e.g.*, *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir. 1992) ("Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)."); *McGee v. First Fed. Sav. & Loan Ass'n of Brunswick*, 761 F.2d 647, 648 (11th Cir. 1985) ("[T]o support a claim of an illegal tying arrangement, the law requires a showing of two distinct products: a tying product, in the market for which defendant has economic power, and a tied product, which defendant forces on consumers wishing to purchase the tying product.").  The very nature of a tying claim is the use of market power with respect to one product to restrain trade with respect to another product.  *See, e.g.*, *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953) ("[T]he essence of illegality in tying agreements is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next."); *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 200 (3d Cir. 1994) ("[T]he antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not.").

The implied license to the '844 Patent is merely the legal consequence of Ingevity selling its fuel vapor canister honeycombs, whose "only reasonable and intended use [is] to practice the patent."  *Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 631 (2008).  Ingevity maintains (and will argue in its Rule 50 motion) that the implied license is therefore not a "product."

Given this dispute over whether an implied license can constitute a product for purposes of a tying claim, the jury must be told it has to conclude that an implied license is a product in order to find for BASF on the tying claim.

Ingevity's additional proposed language closely tracks ABA Model Jury Instructions in Civil Antitrust Cases 2.E.5 (2016).  The Federal Circuit has identified the "consumer demand test for determining product separability" as a distinct and additional test from the staple article inquiry, which applies to the separate products inquiry when the alleged conduct is misusing a patent. *Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 670 (Fed. Cir. 1986); *see also Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363-64 (Fed. Cir. 2006); *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 576 (E.D. Pa. 1989); *Hodosh v. Block Drug Co.*, 833 F.2d 1575 (Fed. Cir. 1987); D.I. 525 at 3.

**BASF's Position:**  Ingevity's proposal presents a purely legal argument that might have been appropriate to raise with the Court, but which is guaranteed to mystify the jury.  Moreover, it is entirely superfluous.  Ingevity contends that because its honeycombs are nonstaple goods, their sale exhausts Ingevity's patent rights and conveys an "implied license" "by operation of law."  Ingevity further argues that because this license arises by operation of law, it is not a "product." This is superfluous, as the jury is already being instructed that if Ingevity's honeycombs are nonstaple goods, then Ingevity had the right to be the sole supplier of those honeycombs during the life of the patent (which would extinguish BASF's tying claim).  Ingevity's "not a product" argument appears to be nothing but a more convoluted way of arriving at the same conclusion.

BASF's proposal is necessary to avoid confusion about what it means for there to be "little demand for one of the products if sold by itself."  Without clarification, the instruction can be read to mean that the products are not separate unless consumers demand one product but not the other. But it cannot mean that, because that would contradict *Jefferson Parish*.  There, the Supreme Court held that surgery services and anesthesiology services are separate products because consumers

might wish to purchase them from different providers if given the opportunity to do so: "Unquestionably, the anesthesiological component of the package offered by the hospital could be provided separately and could be selected by the individual patient or by one of the patient's doctors if the hospital did not insist on including anesthesiological services in the package it offers to its customers." 466 U.S. at 21. The Court did not find that consumers demanded one of those products but not the other, nor could it have: There is no meaningful demand for surgery without anesthesia or anesthesia without surgery. The Court nonetheless held that the products were separate, even though they were guaranteed to be used together, because consumers could distinguish between them and might want to purchase them from separate sources. Here, Ingevity has argued that if its honeycombs have no significant use other than in connection with practicing the '844 patent (just as anesthesia has no significant use other than in connection with surgery), then they are not a separate product from licenses to practice the patent, even if consumers might want to buy them from someone else. *Jefferson Parish* makes clear that this is incorrect, and BASF's proposal seeks to ensure that the jury is not misled about the law.

### 5.4.2   TYING – PROOF OF CONDITIONING [DISPUTED]

You may find that a tying arrangement exists between licenses to the '844 Patent and **[Ingevity's Proposal: 200 CPSI]** honeycombs if Ingevity either refused to grant licenses to the '844 Patent unless purchasers also agreed to buy **[Ingevity's Proposal: 200 CPSI]** honeycombs from Ingevity (or not to buy **[Ingevity's Proposal: 200 CPSI]** honeycombs from another supplier), or effectively coerced purchasers into buying **[Ingevity's Proposal: 200 CPSI]** honeycombs from Ingevity in addition to licenses to the '844 Patent.  To prove coercion, BASF must prove by a preponderance of the evidence that Ingevity exploited its control over the market for technologies to meet LEV III / Tier 3 regulations to force the buyer into the purchase of **[Ingevity's Proposal: 200 CPSI]** honeycombs, which the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms**,** and that any appearance of choice was illusory.  Additionally, mere sales pressure or persuasion is not coercion.

If you find that BASF has not proven that Ingevity created a tying arrangement, you must find that Ingevity has not engaged in tying.

**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases 2.E.7 (2016).

### 5.4.3  TYING – FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT [DISPUTED]

[**Ingevity's Proposal**:

If you determine that licenses to the '844 Patent and 200 CPSI honeycombs are separate products that have been tied to one another and that Ingevity has market power for technologies to meet LEV III / Tier 3 regulations, then you must determine whether BASF has proven that Ingevity has foreclosed a substantial amount of interstate commerce with respect to 200 CPSI honeycombs.

In determining whether Ingevity has foreclosed a substantial amount of commerce with respect to 200 CPSI honeycombs, you should first consider the total dollar amount of Ingevity's sales of 200 CPSI honeycombs in interstate commerce achieved by the tying arrangement in absolute terms.

There is no substantial foreclosure if only a small percentage of sales in the market for 200 CPSI honeycombs were affected by the tying arrangement.  There also is no substantial foreclosure if you find that purchasers would not have bought 200 CPSI honeycombs at all in the absence of the tying arrangement.]

[**BASF's Proposal**:  BASF has the burden of proving that the alleged tying arrangement has affected a substantial volume of commerce.  In this case, I am instructing you that BASF has met its burden of proof on this element.]

**Ingevity's Position**:  ABA Model Jury Instructions in Civil Antitrust Cases 2.E.9 (2016). BASF effectively asks for summary judgment on the question of substantial foreclosure.  While the volume of commerce for carbon adsorbents used in fuel vapor canisters is indisputably substantial, the question of whether "*the alleged tying arrangement has affected* a substantial volume of commerce" is disputed, and BASF bears the burden of proving this element.  Even if the jury concludes that there are two separate products and there is a tying arrangement, the jury may nonetheless conclude that BASF's inability to enter the market is attributable to lawful causes, such as BASF's own sales efforts and choice of potential customers to target for sales, Ingevity's patent enforcement efforts, Ingevity's longstanding relationships with customers, Ingevity's proven track record, Ingevity's strong customer service and technical support, and customers' own

64

reluctance not to engage in the expensive, time-consuming validation and certification processes for a new product.

**BASF's Position**:  The only support the ABA cites for this model instruction is *Jefferson Parish*, which states that "we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby."  466 U.S. at 16.  *Jefferson Parish* cites *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969), which states that "the controlling consideration is simply whether a total amount of business, *substantial enough in terms of dollar volume so as not to be merely de minimis*, is foreclosed to competitors by the tie" (emphasis added).  The ABA agrees, noting in the comments to the model instruction that "courts have found the element satisfied by evidence of an effect on more than a de minimis volume."  ABA Model Jury Instructions in Civil Antitrust Cases 2.E.9 notes (2016).  Here there is no question that the alleged tying arrangement has foreclosed more than a de minimis amount of commerce, as it applied to customers that accounted for hundreds of millions of dollars in sales.  If the jury is to be instructed on this element at all, it should be instructed that BASF has met its burden.

**5.5**   **EXCLUSIVE DEALING – ELEMENTS**

BASF claims that Ingevity's three supply agreements with Delphi, Kayser, and KFTC constitute unlawful exclusive dealing.  Ingevity denies this allegation.

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time.  There are several forms of exclusive dealing arrangements.  The arrangement may take the form of a requirements contract committing the buyer to purchase at least a substantial share of its requirements of specific products or services from the supplier, which I will refer to as an "express" exclusive dealing contract.

If you find that BASF has proven that Ingevity entered into exclusive dealing contracts, you should then consider whether those contracts unreasonably restrained competition.  As I have previously explained, in making this determination, you must first determine whether BASF has proven that the contracts resulted in substantial harm to competition in the relevant markets.  If you find that BASF has proven that the contracts resulted in substantial harm to competition in the relevant market, then you must consider whether the contracts produced countervailing competitive benefits.  If you find that they did, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

**Source:**  ABA Model Jury Instructions in Civil Antitrust Cases 2.D.5 (2016).

66

### 5.5.1   EXCLUSIVE DEALING – PROOF OF SUBSTANTIAL COMPETITIVE HARM UNDER RULE OF REASON [DISPUTED]

To determine whether the supply agreements had a substantial harmful effect on competition, you should consider, with respect to the relevant market: the nature and history of the use of exclusive dealing contracts in the relevant market; whether customers had independent reasons for entering into exclusive dealing contracts or were coerced into entering into them; whether other competing suppliers also offered exclusive contracts; the extent of competition among competing suppliers for exclusive contracts with customers; Ingevity's position in the relevant market; the competitive alternatives to Ingevity's products or services; the reasons Ingevity and the customers entered into the long term agreements at issue; the effect of the use of long term agreements on the ability of new firms to enter the relevant market and on price and other competition in the relevant market; as well as whether Ingevity had market power.

[**<u>Ingevity's Proposal</u>: You may also consider:**

- **The circumstances under which Ingevity set up supply agreements and what reasons it had for doing so;**

- **The relative bargaining strength of the parties to the contracts.  If the parties had relatively equal bargaining strength, then the contracts are less likely to be unreasonable;**

- **How long in time the contracts were effective.  If the contracts lasted a relatively short time and did not significantly limit the opportunity for competing sellers to enter or remain in the market, then they were less likely to be unreasonable;**

- **Any favorable effects on competition that the contracts produce; and**

- **Any alternative channels of distribution that may have been available to BASF.]**

In determining the extent to which the supply agreements foreclosed competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure.  Where the exclusive dealing arrangements foreclose more than [**BASF's Proposal:**

40] **[Ingevity's Proposal: 50]** percent of the market, this is an indicator that the harm from the foreclosure of competition could be substantial.  Where the exclusive dealing arrangements foreclose less than 20 percent of the market, this tends to indicate that the harm from the foreclosure of competition is not substantial because alternatives are available.  Further, whether foreclosure is "substantial" depends on more than the percentage of foreclosure.  You must also consider other factors, such as the relative strength of the parties, and immediate and future effects on competition.  **[<u>Ingevity's Proposal</u>: If there are sufficient alternative ways for competing suppliers to effectively reach end users with their products, then a restraint does not foreclose competitors' access to the market.]**  The shorter the duration of the contract, the less likely it is to harm competition.  The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty.  In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

However, these are simply factors for you to consider, they are not dispositive.  In the end, the key question is whether it was practical for customers to terminate the exclusive dealing arrangement with Ingevity, and if it was not, whether the anticompetitive effects of that arrangement outweighed any competitive benefits.  In considering all these facts, you should determine whether the exclusive dealing contracts adversely affected the price paid by customers, the quality of the product offered in the relevant market, or output.

**Ingevity's Position:**  A key disputed issue in this case is whether BASF was foreclosed from a sufficient portion of the relevant market in light of the fact that there were other canister makers not subject to supply agreements with Ingevity who also sold canisters to the five car makers at issue.  Where foreclosure is at one level of distribution but there are other channels of distribution available, this is highly relevant to whether an antitrust plaintiff has met its burden of proving foreclosure.  *See Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1235 (8th Cir.1987)

("Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of 'substantial foreclosure.'"); Herbert Hovenkamp, Federal Antitrust Policy 391 (1st ed. 1994) (foreclosing even "a large percentage of one mode of distribution will have little anticompetitive effect if another mode is available").  Given the importance of this issue, it would be prejudicial to Ingevity if the jury were not instructed on it.

**BASF's Position:**  Ingevity's first proposal is repetitive as it appears almost verbatim in Instruction 5.3.1.  It is also repetitive within this proposed instruction.  Further, Ingevity's citations do not support its proposal to set the threshold for substantial foreclosure at "more than 50 percent of the market."  Instruction 26 in *Plantronics* uses 40%, as do *McWane* and *ZF Meritor*; other cases set the bar lower still.  The "more than 50 percent" figure appears to be a gerrymander designed for this case, since it is undisputed that Ingevity's exclusive contracts locked up canister manufacturers that together accounted for roughly 50% of honeycomb sales.  There is no fixed threshold percentage for market foreclosure to be considered "substantial" for purposes of exclusive dealing, and a lower amount is sufficient where an exclusive arrangement involves a monopolization claim under Section 2 of the Sherman Act or when the claim is brought under Section 3 of the Clayton Act.  S*ee Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1109868, at *8 (D. Del. Mar. 8, 2019) (citing *McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015)).  Whether foreclosure is "substantial" depends on more than the percentage of foreclosure.  Courts must also consider other factors, such as the relative strength of the parties, the volume of commerce involved in proportion to the total volume, and immediate and future effects on competition.  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3d Cir. 1975).

## 5.6    ANTITRUST INJURY AND CAUSATION

If you find that Ingevity violated the Sherman Act and/or the Clayton Act, then you must decide if BASF has been injured by Ingevity's conduct and, if so, if it is entitled to recover damages from Ingevity for that injury.

**Source:**  Final Jury Instruction 42, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

### 5.6.1    ANTITRUST INJURY AND CAUSATION – ELEMENTS

BASF is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation by a preponderance of the evidence:

*First*, that BASF was in fact injured as a result of the accused violation of the antitrust laws;

*Second*, that the alleged illegal conduct was a material cause of BASF's injury; and

*Third*, that BASF's injuries are injuries of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage."  For BASF to establish that it is entitled to recover damages, it must prove that it was injured as a result of the alleged violation of the antitrust laws.  Proving causation does not require BASF to prove the precise dollar value of its injury.  It requires only that BASF prove that it was in fact injured by the alleged antitrust violation.

If you find that BASF has established that it was in fact injured by an antitrust violation, you may then consider the amount of BASF's damages.  It is important to understand, however, that the fact of injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that BASF has established that it was in fact injured.

The second element requires BASF to offer evidence that establishes as a matter of fact and with a fair degree of certainty the alleged illegal conduct was a material cause of BASF's injury.  This means that BASF must prove that some damage occurred to it as a result of the alleged antitrust violation and not some other cause.  BASF is not required to prove that the accused conduct was the sole cause of its injury; nor is BASF required to eliminate all other possible causes of injury.  It is enough if BASF has proven that the alleged antitrust violation materially or substantially contributed to BASF's injury, even if other factors also contributed.

71

Under the third element, BASF must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If BASF's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then BASF's injuries are antitrust injuries.  On the other hand, if BASF's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then BASF's injuries are not antitrust injuries and BASF may not recover damages for those injuries under the antitrust laws.

**Source:**  Final Jury Instruction 42, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017); Final Jury Instruction 37, *ZF Meritor LLC v. Eaton Corp.*, C.A. No. 1:06-cv-00623-SLR (D. Del. Oct. 7, 2009); ABA Model Jury Instructions in Civil Antitrust Cases 6.A.1 (2016).

### 5.6.2   ANTITRUST INJURY AND CAUSATION – DEFINITION OF BUSINESS OR PROPERTY

BASF must establish that the injury it claims to have suffered was an injury to its "business or property."  The term "business" includes any commercial interest or venture, and you are instructed that BASF has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of Ingevity's alleged antitrust violation.  The term "property" includes anything of value BASF owns or possesses or in which BASF has a protectable legal interest.  You are instructed that BASF has been injured in its "business or property" if you find it has lost money as a result of Ingevity's alleged antitrust violation.

**Source:**  Final Jury Instruction 43, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

6.    **INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS [DISPUTED][5]**

In addition to BASF's claims under the antitrust laws, BASF alleges that Ingevity violated Delaware common law by intentionally interfering with BASF's prospective business relationship with Kayser.  Ingevity denies these allegations.

To prove its claim for intentional interference with a prospective business relationship with Kayser, BASF must prove each of the following elements by a preponderance of the evidence:

*First*, the existence of a prospective contractual or business relationship between BASF and Kayser;

*Second*, an intent on the part of Ingevity to harm BASF by interfering with that prospective relationship  **[Ingevity's Proposal: prior to that prospective business relationship becoming an actual contract]**;

*Third*, knowledge of the relationship or expectancy on the part of Ingevity;

*Fourth*, the absence of a privilege or justification on the part of Ingevity;

*Fifth*, actual damage to BASF caused by Ingevity's interference; and

*Sixth*, a reasonable likelihood that the prospective relationship between BASF and Kayser would have occurred if not for Ingevity's interference.

A "prospective" relationship is something less than an actual contract but more than just hope on BASF's part that it would enter into the relationship with Kayser.  The reasonable likelihood that a relationship would have formed cannot be met based merely upon evidence of an

---

[5] **Ingevity Argument:**  Ingevity objects to this instruction being given for the reasons expressed in its oral motion under Rule 50.  As explained there and set forth below, the conduct BASF asserts as the basis for its intentional interference claim occurred exclusively after the contract with Kayser was entered into.  That could only constitute an interference with *contract* claim, not an interference with *prospective* business relationships.

existing contractual relationship.  [**Ingevity's Proposal: If the prospective business relationship resulted in a contract, then you must find against BASF.**]

In determining whether Ingevity intentionally interfered with BASF's prospective contractual or business relationship with Kayser, you must consider whether the purpose of Ingevity's conduct was to protect a legitimate interest and evaluate that against BASF's interests. In evaluating these interests, you will consider:

- The expectations of Ingevity and BASF;

- The relations between Ingevity and BASF;

- The interest Ingevity sought to advance;

- Whether Ingevity's conduct was done for the purpose of causing the interference or whether it was merely incidental to another purpose; and

- Whether Ingevity's conduct is sanctioned by the "rules of the game" which society has adopted for business competition.

You cannot find in favor of BASF unless you find Ingevity employed "wrongful means" to interfere with BASF's prospective contractual or business relationship with Kayser.

Source: Final Jury Instruction IV.B, *AgroFresh Inc. v. Essentiv LLC.*, C.A. No. 1:16-cv-00662-MN (D. Del. Oct. 11, 2019)

**Ingevity's Position**: Intentional interference with *prospective* business relationships is unavailable under Delaware law where the business relationship alleged to be interfered with culminates in a contractual (and therefore not *prospective*) relationship. *Orthopaedic Assocs. of S. Delaware, P.A. v. Pfaff*, 2018 WL 822020, at *3 (Del. Super. Ct. Feb. 9, 2018) (dismissing tortious interference with prospective business relationships claim "because those patients [the allegedly prospective business relationships] did enter into a business relationship with [plaintiff]"); *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) ("To meet the reasonable probability of a business opportunity prong, a plaintiff 'must identify a specific party who was prepared to enter into a business relationship *but was dissuaded from doing so* by the defendant"); *see Int'l Constr. Prod. LLC v. Caterpillar Inc.*, No. CV 15-108-RGA, 2020 WL 4584354, at *5 (D. Del. Aug. 10, 2020) (dismissing tortious interference with prospective business relationships claim because the "only allegations of an agreement" are "the 'Hosted Services Agreement,' *which was not prospective but actually executed*….There are no allegations that another agreement was in development or that [plaintiff] was likely to form another relationship with [the third-party] 'in the future'").  The jury should be instructed on this essential element of BASF's claim.

In the alternative, and at the very least, the Court should instruct the jury that in order to be actionable, interference must have taken place before the BASF-Kayser contract was entered into.

**BASF's Position**: The Court rejected Ingevity's argument in its summary judgment order, holding that "BASF has alleged the right tort—tortious interference with a prospective business relationship." D.I. 525 at 2. Under Delaware law, "[t]ortious interference with business expectancy is largely the same as tortious interference with a contract, except a showing of an actual contract is not *required*." *Wagenhoffer v. VisionQuest Nat'l Ltd.*, 2016 WL 4053117, at *1 n.14 (Del. Sup. Ct. July 27, 2016) (emphasis added). The mere existence of a written—but unconsummated—contract (which the defendant may not have known about) does not preclude a claim for interference with a prospective business relationship (which the defendant did know about). *See Gunn*, 23 F. Supp. 3d at 436-37 (allowing claim for tortious interference with a prospective business relationship where defendant's conduct caused "potential buyer" to "not proceed with the closing of the sale of the property"). Ingevity's position also makes no practical sense: It would mean that if A knows about and intentionally interferes with B's prospective business relationship with C, A can avoid liability if unbeknownst to A, B and C happened to have signed a contract that was not consummated because of A's interference. There is no public policy justification for such an arbitrary rule, and Delaware law does not support it.

**6.1    INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS – "WRONGFUL MEANS"**

"Wrongful means" as used in these instructions can include conduct in violation of statutory provisions, such as the alleged tying and exclusive dealing that BASF alleges here, or other tortious or illegal actions.  If you find that Ingevity did not engage in such conduct, you should find in favor of Ingevity on the Intentional Interference With Prospective Business Relationships claim.  The common immunities I instructed you on under 4.1 and 4.2 apply to this claim as well.

**Source**:  Final Jury Instruction IV.C, *AgroFresh Inc. v. Essentiv LLC*, C.A. No. 1:16-cv-00662-MN (D. Del. Oct. 11, 2019); *ASDI, Inc. v. Beard Research., Inc.*, 11 A.3d 749, 751 n.4 (Del. 2010).

**7.      COMPENSATORY DAMAGES**

**7.1      COMPENSATORY DAMAGES – ANTITRUST**

### 7.1.1      COMPENSATORY DAMAGES – ANTITRUST– PURPOSE

If you find that Ingevity violated the Sherman Act and/or the Clayton Act and that this violation caused injury to BASF, then you must determine the amount of damages, if any, that BASF is entitled to recover.

The fact that I am giving you instructions concerning the issue of BASF's damages does not mean that I believe BASF should, or should not, prevail in this case. If you reach a verdict for Ingevity on the issue of liability on the antitrust claims, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that BASF should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of conduct you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible to the position in which it would have been if the alleged antitrust violation had not occurred. The antitrust laws do not permit you to award damages to punish a wrongdoer—what we sometimes refer to as "punitive damages"—or to deter a defendant from particular conduct in the future, or to provide a windfall to someone who has been the victim of an antitrust violation. This instruction is specific to a violation of the federal antitrust laws and punitive damages with regard to BASF's tortious interference with prospective business relations claim under Delaware common law will be addressed separately. You are also not permitted to award BASF an amount for attorneys' fees or the cost of maintaining this lawsuit.

**Source:** Final Jury Instruction 44, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

### 7.1.2   COMPENSATORY DAMAGES – ANTITRUST – CALCULATION

You are permitted to make just and reasonable estimates in calculating damages.  You are not required to calculate damages with mathematical certainty or precision.  However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates.  Damages may not be based on guesswork or speculation.  BASF must prove the reasonableness of each of the assumptions upon which the damages calculation is based.  If you find that a damages calculation cannot be based on evidence and reasonable inference, and instead can only be reached through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages.  So long as there is a reasonable basis in the evidence for a damages award, BASF should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.

If you find that BASF has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.  If you find that BASF has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

**Source:**  Final Jury Instruction 45, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

### 7.1.3   COMPENSATORY   DAMAGES – ANTITRUST – CAUSATION   AND DISAGGREGATION [DISPUTED]

If you find that Ingevity violated the Sherman Act and/or the Clayton Act and that BASF was injured by that violation, then BASF is entitled to recover damages for such injury that was the direct result or likely consequence of the illegal acts of Ingevity.  BASF bears the burden of showing that its injuries were caused by Ingevity's antitrust violation, as opposed to any other factors.  If you find that BASF's alleged injuries were caused in part by Ingevity's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of BASF's alleged injuries that was caused by Ingevity's alleged antitrust violation.

BASF claims that it suffered injury because it lost sales and profits as a result of Ingevity's tying of **[Ingevity's Proposal: 200 CPSI]** honeycombs to licenses to the '844 Patent and exclusive long-term supply agreements.  Ingevity contends that any profits or sales lost by BASF occurred as a result of other factors that have nothing to do with the tying arrangements or exclusive dealing agreements.  **[Ingevity's Proposal: These other factors include (1) customers' preference for Ingevity's products, and (2) Ingevity's assertions in litigation and in the marketplace that use of BASF's 200 CPSI honeycomb had violated and would violate Ingevity's patent rights and customers' resulting unwillingness to purchase from BASF.  BASF is not entitled to recover for changes in price that resulted solely from these or other causes arising from the normal course of business activity.  BASF may recover only for damages caused by the alleged antitrust violation – the alleged tying arrangements and exclusive dealing agreements.]**

BASF is not entitled to recover for lost profits that resulted solely from causes other than the tying arrangements and exclusive dealing agreements.  The presence of these factors does not

mean BASF did not suffer antitrust injury, but BASF is not entitled to recover any damages caused

by them.  BASF only may recover for damages caused by the alleged antitrust violation.

**[Ingevity's Proposal: BASF bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes.  If you find that there is no reasonable basis to apportion BASF's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.]**

**Ingevity's Position**: Ingevity's proposed language is taken directly from ABA Model Jury Instructions in Civil Antitrust Cases 6.B.4 (2016) and Final Jury Instruction 47, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).  The Supreme Court has made clear that although a "jury may make a just and reasonable estimate of the damage based on relevant data," it "may not render a [damages] verdict based on speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).  Rather, a plaintiff "has the burden of proving damages by a preponderance  of the evidence and is entitled only to damages that it has proven with 'reasonable certainty.'" *Intell. Ventures I LLC v. Symantec Corp.*, No. CV 10-1067-LPS, 2015 WL 307572, at *2 (D. Del. Jan. 23, 2015) (jury instruction on patent damages).  Accordingly, "[W]hen a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage" because that "is precisely the type of 'speculation or guesswork' not permitted for antitrust jury verdicts."  *MCI Commc'ns Corp. v. AT&T*, 708 F.2d 1081, 1162–63 (7th Cir. 1983); *see also Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 911 (2d Cir. 1962) (affirming exclusion of damages evidence that failed to apportion the effect of lawful competition from unlawful efforts to stifle competition); *ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423, 434 (N.D. Cal. 1978) (granting directed verdict for defendant because plaintiff did not apportion between lawful and unlawful acts and defendant offered evidence of five other factors "other than its allegedly illegal conduct that had an adverse effect on [plaintiff's] operations").

BASF cites *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996), but in that case the court granted a new trial on damages *on the ground that the plaintiff in its damages estimate had failed to separate the effects of lawful conduct from the effects of unlawful conduct. Id.* at *4 (citation omitted) ("Except in circumstances where disaggregation is shown to be impossible or impractical, an antitrust plaintiff challenging a variety of conduct is required to segregate damages attributable to particular business practices or, at a minimum, to distinguish between losses attributable to lawful competition and those attributable to unlawful anticompetitive conduct. Disaggregation is required because the antitrust laws are only intended to compensate plaintiffs for losses fairly caused by a defendant's unlawful anticompetitive behavior").

**BASF's Position**:  Ingevity's assertion that BASF cannot recover damages if "there is no reasonable basis to apportion BASF's alleged injury between lawful and unlawful causes" runs contrary to the "practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market" where "damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 123-24 (1969) (quoting *Bigelow v. RKO Pictures, Inc*., 327 U.S. 251, 264 (1946)); *see also Eastman Kodak Co. v. Southern Photo Materials Co*., 273 U.S. 359, 379 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."); *Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206, 211-13 (3d Cir. 1983).

The fact that a defendant engages in both lawful and unlawful conduct does not preclude damages.  *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1243 (7th Cir. 1982) ("Clearly, Spray-Rite is entitled to recover the lost profits caused by Monsanto's anticompetitive business practices.  We will not deprive Spray-Rite of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct."); *Litton Sys., Inc. v. Honeywell, Inc*., 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996) ("*Except in circumstances where disaggregation is shown to be impossible or impractical*, an antitrust plaintiff challenging a variety of conduct is required to segregate damages attributable to particular business practices.") (emphasis added).  Ingevity's contrary instruction would totally bar damages in countless cases in which there are multiple causes of a plaintiff's injury.  It would also allow antitrust violators to effectively "launder" their violations through parallel lawful conduct, thus making it impossible to precisely "disaggregate" the effects of lawful and unlawful causes.  Here, BASF has directly linked Ingevity's tying arrangements and long-term agreements to customers' inability to purchase competing honeycombs—a binary yes/no decision for each customer.  No "disaggregation" is practical or possible.

The cases cited by Ingevity deal with a different situation where certain alleged acts or counts are found to be lawful.  In *MCI Communications*, the damages study assumed that the plaintiff would prove liability on all 22 counts, but the jury found for the defendant on seven of the counts.  708 F.2d at 1163; *see also ILC Peripherals,* 458 F. Supp. 423, 434 (N.D. Cal. 1978) ("The way Memorex structured its damage claim there was no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful.").  In contrast, BASF's expert economist Dr. Mathur presents alternative, disaggregated damages calculations if Ingevity is only found liable on any one of the tying, exclusive dealing, and tortious interference counts.  Ingevity's other case is also distinguishable.  In *Herman Schwabe*, the district court granted a direct verdict against the plaintiff where the damages model was rife with defects unrelated to disaggregation.  297 F.2d at 907.

The ABA Model Jury Instructions are drafted by ABA members and sometimes contain incorrect or outdated statements of the law.  *See, e.g.*, Am. Antitrust Inst., Report on Model Jury Instructions in Civil Antitrust Cases at 1 (2018) ("the ABA instructions could be improved in many ways, including … increasing their fidelity to the law").  This is one such instance.

### 7.1.4   COMPENSATORY DAMAGES – ANTITRUST – LOST PROFITS

BASF claims that it was harmed because it lost profits as a result of Ingevity's alleged antitrust violation.  If you find that Ingevity committed an antitrust violation and that this violation caused injury to BASF, you now must calculate the profits, if any, that BASF lost as a result of Ingevity's antitrust violation.  To calculate lost profits, you must calculate net profits: the amount by which BASF's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.

BASF claims that, had it not been for Ingevity's alleged antitrust violation, BASF would have earned profits into the future; this is called "future lost profits."  You are not required to award future lost profits if you determine that they are too speculative.  But, if you award damages for future lost profits, the amount of the award must be discounted to its present value, as I will instruct you.

**Source**:  Final Jury Instruction 46, *GN Netcom, Inc. v. Plantronics, Inc.*, C.A. No. 1:12-cv-01318-LPS (D. Del. Oct. 18, 2017).

**7.2     COMPENSATORY DAMAGES – INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS**

BASF claims lost profits that BASF allegedly would have earned but for Ingevity's intentional interference with BASF's prospective business relations with Kayser.  To recover damages for lost profits, BASF must prove it is reasonably certain that it would have earned profits but for Ingevity's conduct.

To decide the amount of damages for lost profits, you must determine the gross amount BASF would have received but-for Ingevity's conduct and then subtract from that amount the expenses BASF would have had if Ingevity's conduct had not occurred.  You are not required to award future lost profits if you find that they are too speculative.  But, if you award damages for future lost profits, the amount of the award must be discounted to its present value, as I will instruct you.

The amount of lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.

**Source:**  Final Jury Instruction 11.13, *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, C.A. No. 1:09-cv-00598-LPS (D. Del. Apr. 11, 2014).

**7.3      COMPENSATORY DAMAGES – TIME VALUE OF MONEY**

When awarding future lost profits, the amount must be discounted to present value using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money.  For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year—you would then have something more than $1,000 in a year from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year.  This lower amount is known as an amount discounted to present value.

## 8.    PUNITIVE DAMAGES[6]

## 8.1    PUNITIVE DAMAGES – GENERALLY

If you find for BASF on the tortious interference claim, you must decide whether Ingevity

should be found liable for punitive damages and, if so, what the amount of punitive damages, if

---

[6]    **Ingevity's Argument**:  There is no basis for sending the punitive damages claim to the jury, and the Court should therefore not give these instructions and should omit the claim from the verdict form.  As reflected in these proposed instructions, the undisputed legal standard requires outrageous conduct—malice, oppression, or fraud.  There has not been a hint of such evidence admitted during the trial.

Inviting the jury to award punitive damages is especially inappropriate given the stigma attached to being branded a wrongdoer.  As Justice O'Connor explained in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 55 (O'Connor, J., dissenting), "there is a stigma attached to an award of punitive damages that does not accompany a purely compensatory award. The punitive character of punitive damages means that there is more than just money at stake. This factor militates in favor of strong procedural safeguards."  That is a bell the Court could not unring through Rule 50(b).

If the Court does send the punitive damages claim to the jury, Ingevity insists on this series of instructions being given.  The Supreme Court explained in *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), that "a court, upon request, must protect against th[e] risk" of an unconstitutional punitive damages award because "federal constitutional law obligates [courts] to provide *some* form of protection in appropriate cases."

**BASF's Argument**:    The punitive damages claim should be sent to the jury.  Contrary to Ingevity's contention, there is sufficient evidence for the jury to find that Ingevity's conduct was malicious, wanton, willful, or oppressive, or shows reckless indifference to the interests of others.  Importantly, the evidence shows that Ingevity was aware of BASF's business relationship with Kayser prior to the execution of the BASF-Kayser sales agreement in February 2018.  Moreover, the evidence shows that Ingevity imposed unprecedented price increases on Kayser in 2018 and 2019 with the goal of coercing Kayser into executing an unlawful exclusive agreement with Ingevity in January 2020 (which agreement was being negotiated throughout 2019 and was retroactive to the beginning of 2019; thus, Ingevity's conduct interfered with the BASF-Kayser relationship starting no later than the beginning of 2019).  First, in November 2018, following failed negotiations for a sales agreement with Kayser, Ingevity increased Kayser's prices for Ingevity honeycombs.  Second, in June 2019, Ingevity yet again increased Kayser's prices.  Because of Ingevity's conduct, BASF has never sold a single product to Kayser notwithstanding the sales agreement between the two parties. In other words, as a result of Ingevity's actions, including its imposition of unprecedented price increases on Kayser as a way of coercing Kayser to enter into an exclusive dealing arrangement that Ingevity knew or should have known violated federal antitrust laws, BASF has never

any, should be.  Punitive damages may be awarded only for the tortious interference claim, and you may not award punitive damages for the antitrust claims.

The purposes of punitive damages are to punish a wrongdoer that acts with fraud, oppression and/or malice in harming a plaintiff and to deter similar conduct in the future.  Punitive damages are not to make the plaintiff whole for its injuries.  A plaintiff is never entitled to punitive damages as a matter of right, and whether to award punitive damages against a defendant is entirely within your discretion.

If you find that Ingevity's conduct was outrageous, you may award punitive damages to punish Ingevity for its conduct and to deter Ingevity from committing similar acts in the future.  A person's conduct is outrageous when it is malicious, wanton, willful, or oppressive, or shows reckless indifference to the interests of others.

"Malice" means that Ingevity acted with intent to cause injury or that Ingevity's conduct was despicable and was done with a willful and knowing disregard for BASF's rights.  A person acts with knowing disregard when he or she is aware of the probable harmful consequences of his or her conduct and deliberately fails to avoid those consequences.

"Oppression" means that Ingevity's conduct was despicable and subjected BASF to cruel and unjust hardship in knowing disregard of BASF's rights.

"Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

"Fraud" means that Ingevity intentionally misrepresented or concealed a material fact and did so intending to harm BASF.

---

consummated its agreement with Kayser.  The jury should decide whether Ingevity's conduct in this matter rises to the level warranting punitive damages.

**Source**:    Del. Civil Pattern Jury Instructions § 22.27; Final Jury Instruction IX.A, *AgroFresh Inc. v. Essentiv LLC*, C.A. No. 1:16-cv-00662-MN (D. Del. Oct. 11, 2019); Final Jury Instruction 11.14, *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, C.A. No. 1:09-cv-00598-LPS (D. Del. Apr. 11, 2014).

## 8.2    PUNITIVE DAMAGES – BURDEN OF PROOF IS CLEAR AND CONVINCING EVIDENCE [DISPUTED]

[**Ingevity's Proposal**:

**A plaintiff's entitlement to punitive damages must be established by clear and convincing evidence.  Clear and convincing evidence is evidence that causes you to firmly believe, without hesitancy, each essential element of the claim to be highly probable.  Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence, but less than the beyond a reasonable doubt standard required in criminal cases.**]

**Ingevity's Position**:  *Kanaga v. Gannett Co.*, 1998 WL 729585, at *4 (Del. Super. Ct. July 10, 1998) (holding, including with respect to a "non-media defendant," that "[t]o be awarded punitive damages against any defendant, Dr. Kanaga must prove, by "clear and convincing" evidence, that [requirements for punitive damages]"), *aff'd in part, rev'd in part on other grounds*, 750 A.2d 1174 (Del. 2000).

**BASF's Position**:  As explained above in connection with Instruction 1.3, in Delaware, the burden of proof for awarding punitive damages is a preponderance of the evidence.  BASF has proposed that Instruction 1.3 state that the preponderance standard applies to all issues in this case.  If the Court agrees, then there is no need for a separate instruction on the burden of proof for punitive damages.

## 8.3   PUNITIVE DAMAGES – ERRORS AND MISTAKES INSUFFICIENT [DISPUTED]

Mere inadvertence, mistake, or errors of judgment that constitute mere negligence will not suffice.  It is not enough that a decision be wrong.  For conduct to give rise to punitive damages liability, it must result from a conscious indifference to the decision's foreseeable effect.

[**Ingevity's Proposal: If you decided that Ingevity acted based on an objectively reasonable belief that Ingevity's conduct was not unlawful, then you must not award any punitive damages.**]

**Ingevity's Position**:  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53-55, 68-71 (2007) ("disagree[ing]" with defendant's analysis of its legal obligations, but holding that because defendant's interpretation, "albeit erroneous, was not objectively unreasonable," defendant could not be said to have acted "willfully" or with "reckless disregard" such that plaintiff was entitled to statutory or punitive damages under the statute); *Eby v. Thompson*, 2005 WL 486850, at *3 (Del. Super. Ct. Mar. 2, 2005) ("But '[i]nadvertence, mistakes or errors of judgment which constitute mere negligence will not suffice'" for a punitive damages claim (quoting *Greenlee v. Imperial Homes Corp.*, 1994 WL 465556, at *9 (Del. Super. Ct. July 19, 1994))); *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987) ("The penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is 'outrageous,' because of 'evil motive' or 'reckless indifference to the rights of others.'  Mere inadvertence, mistake or errors of judgment which constitute mere negligence will not suffice.  It is not enough that a decision be wrong.  It must result from a conscious indifference to the decision's foreseeable effect.").

**BASF's Position**:  The Delaware pattern jury instructions deal with punitive damages in a single instruction (§ 22.27), yet Ingevity has proposed seven separate instructions on the subject. The first paragraph of this instruction is similar to language that appears in the Delaware pattern instruction.  Although BASF submits that this language could easily be incorporated into Instruction 8.1, to reduce the number of disputes, BASF does not oppose Ingevity's request to set it out as a separate instruction.  BASF opposes the second paragraph, which has no support in Delaware law.  For that paragraph, Ingevity cites only *Safeco*, a case about the meaning of "willfully fails" in the Fair Credit Reporting Act.  *Safeco* has nothing to do with either punitive damages or Delaware law.  Further, BASF objects to any suggestion that Ingevity can avoid punitive damages by claiming to have relied on its patent, since Ingevity persuaded the court to exclude as irrelevant evidence that Ingevity believed there was only a 50-50 chance its patent was valid (to say nothing of whether its conduct was within the patent's scope).  That evidence certainly would have been relevant to refuting a claim that Ingevity held a "reasonable belief that its conduct was not unlawful" because of the patent.

**8.4      PUNITIVE DAMAGES – FAIR NOTICE REQUIRED [DISPUTED]**

[<u>Ingevity's Proposal</u>: **Even if you find that punitive damages might be available, if you decide that at the time of the challenged conduct that Ingevity was not on reasonable and fair notice that its conduct was unlawful, then you must not award any punitive damages.]**

**Ingevity's Position**:  Whether Ingevity was on reasonable and fair notice that its conduct was unlawful is a separate issue from whether Ingevity's conduct was malicious, wanton, willful, or oppressive.  Constitutional jurisprudence "dictate[s] that a person receive fair notice . . . of the conduct that will subject him to punishment," including "the severity of the penalty."  *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (potential for liability must be clearly established at the time of the challenged conduct); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) (same); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) ("[E]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice . . . of the conduct that will subject him to punishment."); *Laymon v. Lobby House, Inc.*, 613 F. Supp. 2d 504, 512 (D. Del. 2009) ("As a basic element of fairness in our constitutional jurisprudence, 'a person is to be given fair notice of not only the conduct that will subject him to punishment, but also the severity of the penalty the state may impose.'").  Whether other courts have given this instruction is irrelevant to whether the jury should be instructed on this essential protection to which Ingevity is entitled.

**BASF's Position**:  Ingevity identifies no court that has ever given this or a similar jury instruction.  Instruction 8.1 already addresses the state of mind required for punitive damages by requiring the jury to find that Ingevity's conduct was malicious, wanton, willful, or oppressive.

**8.5    PUNITIVE DAMAGES – SPECIFIC HARM TO PLAINTIFF [DISPUTED]**

[**Ingevity's Proposal: Punitive damages may not be used to punish Ingevity for conduct or harm that was not proven at trial or based on harm to persons other than BASF. Rather, punitive damages must be limited to the specific harm suffered by BASF.**]

**Ingevity's Position**: BASF has argued countless times that Ingevity's customers, including Kayser, were harmed by Ingevity's allegedly uncompetitive conduct. For example, BASF's fact and expert witnesses have testified that the prices in BASF's contract with Kayser were lower than the prices in Ingevity's contract with Kayser, and that customers, such as Kayser, would have been able to use one BASF honeycomb instead of two Ingevity honeycombs. The jury must be instructed that any punitive damages may be based solely on harm to BASF. *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) ("the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation"); *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003) ("Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis"); *id.* at 422 ("conduct must have a nexus to the specific harm suffered by the plaintiff"). Whether other courts have given this instruction is irrelevant to whether the jury should be instructed on this essential protection to which Ingevity is entitled.

**BASF's Position**: Ingevity identifies no court that has ever given this or a similar jury instruction. Instruction 8.1 already states that punitive damages "may be awarded only for the tortious interference claim." This is not a case like *Philip Morris*, where an individual smoker sought punitive damages from a tobacco company based on injuries suffered by *other* smokers. BASF has not presented evidence that Ingevity tortiously interfered with anyone else's prospective business relationship, and it will not argue for punitive damages on any such basis. This instruction would therefore be superfluous and confusing.

**8.6      PUNITIVE DAMAGES – NO OUT OF STATE CONDUCT [DISPUTED]**

[Ingevity's Proposal: **You may not award BASF punitive damages for conduct that took place outside the state of Delaware. You may consider evidence of out of state conduct only with respect to the reprehensibility of a Ingevity's conduct and only to the extent the conduct is similar and bears a reasonable relationship to the Ingevity's conduct injuring BASF that warrants punitive damages in this case.]**

Ingevity's Position: If Ingevity is found liable for tortious interference with prospective business relations under Delaware, punitive damages can only be imposed for the portion of that tortious interference that took place in Delaware. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572-74 (1996); *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003); *Pichler v. UNITE*, 646 F. Supp. 2d 759, 763 (E.D. Pa. 2009) (*State Farm* "limit[s] the type of evidence about punitive damages that may be presented at trial, and what a jury may rely on in determining punitive damages," and requires that "[a] jury must be instructed ... that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred," or "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages").

BASF's Position:  Ingevity identifies no court that has ever given this or a similar jury instruction.  The instruction misstates the law and would be prejudicial, as it suggests that the jury cannot award punitive damages unless Ingevity's tortious acts took place within Delaware. Ingevity does not contest that Delaware law applies to it for purposes of the tortious interference claim, regardless of where the relevant conduct took place.  BASF has not presented evidence of, and will not argue for punitive damages on the basis of, any "out-of-state conduct" by Ingevity "that was lawful in the jurisdiction where it occurred" or any "dissimilar acts, independent from the acts upon which liability was premised."  This instruction would therefore be superfluous and confusing.

**8.7     PUNITIVE DAMAGES – AMOUNT**

There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages.  The amount, if any, is left to your sound discretion, to be exercised without passion or prejudice and in accordance with the following governing principles.

The amount of a punitive damage award is not to compensate BASF for harm suffered.  The compensatory damages have already made BASF whole.  Punitive damages should reflect what is reasonably necessary (in light of the defendants' financial condition) and fairly deserved (in light of the blameworthiness and harmfulness inherent in the defendants' conduct) to punish and deter defendants and others from engaging in conduct such as that warranting punitive damages in this case.  Your award cannot be more than otherwise warranted by the evidence in this case merely because of the wealth of the defendant.  Your award cannot either punish the defendant for conduct injuring others who are not parties to this litigation or financially annihilate or destroy the defendant in light of each defendant's financial condition.

You have heard evidence of Ingevity's financial condition.  You are not to consider Ingevity's financial condition in deciding whether to award punitive damages, but you may consider it in determining the amount of punitive damages to the extent that the actual damages are insufficient to justly punish Ingevity for its behavior or dissuade Ingevity or others from acting the same way in future, similar situations.

**9.      DELIBERATION AND VERDICT**

**9.1      DELIBERATION AND VERDICT – INTRODUCTION**

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence.  Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages:  Do not ever write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

**Source:**   Final Jury Instruction 7.1, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

## 9.2     UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form.  You will then return to the courtroom and your foreperson will give your verdict.

**Source:**   Final Jury Instruction 7.2, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

**9.3      DUTY TO DELIBERATE**

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.  Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that—your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

**Source**:   Final Jury Instruction 7.3, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

### 9.4     SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or website such as Facebook, Instagram, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.  In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

**Source**:  Final Jury Instruction 7.4, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).

**9.5** **COURT HAS NO OPINION**

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case yourselves based on the evidence presented.

**Source:**   Final Jury Instruction 7.5, *Alarm.com, Inc. v. Securenet Techs., LLC*, C.A. No. 1:15-cv-00807-RGA-CJB (D. Del. Feb. 7, 2019).