IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BASF CORPORATION,

      Plaintiff,

    v.

INGEVITY CORPORATION,

      Defendant.

C.A. No. 18-1391-RGA

## FINAL JURY INSTRUCTIONS

1.    GENERAL INSTRUCTION ...........................................................................1

    1.1    INTRODUCTION ...............................................................................1

    1.2    JURORS' DUTIES ..............................................................................2

    1.3    BURDEN OF PROOF .........................................................................3

    1.4    EVIDENCE DEFINED .......................................................................4

    1.5    CONSIDERATION OF EVIDENCE ...................................................5

    1.6    STATEMENTS OF COUNSEL ...........................................................6

    1.7    CREDIBILITY OF WITNESSES .......................................................7

    1.8    EXPERT WITNESSES .......................................................................8

    1.9    LAY OPINION TESTIMONY .............................................................9

    1.10    DEPOSITIONS AS SUBSTANTIVE EVIDENCE .............................10

    1.11    DEMONSTRATIVE EXHIBITS .......................................................11

2.    THE PARTIES AND THEIR CONTENTIONS ...............................................12

    2.1    SUMMARY OF CONTENTIONS.......................................................12

3.    ANTITRUST AND PATENT LAW ...............................................................13

    3.1    THE PURPOSE OF THE ANTITRUST LAWS...................................13

    3.2    THE PURPOSE OF THE PATENT LAWS.........................................14

4.    COMMON ELEMENTS – OVERVIEW .......................................................15

    4.1    COMMON IMMUNITY – PATENT ENFORCEMENT AND THE EXERCISE OF CONSTITUTIONAL RIGHTS ...................................16

    4.2    COMMON IMMUNITY – PATENTEE'S RIGHT TO CONTROL THE MARKET FOR NONSTAPLE GOODS.............................................17

    4.3    COMMON ISSUE –HONEYCOMB PRODUCTS AT ISSUE ...........19

    4.4    COMMON ELEMENT – RELEVANT MARKET IN GENERAL....................20

    4.5    COMMON ELEMENT – RELEVANT PRODUCT MARKET..........................21

    4.6    COMMON ELEMENT – RELEVANT GEOGRAPHIC MARKET..................23

4.7    COMMON ELEMENT – MARKET POWER........................................................24

4.8    COMMON ELEMENT – RULE OF REASON....................................................26

        4.8.1    COMMON ELEMENT – RULE OF REASON – PROOF OF SUBSTANTIAL COMPETITIVE HARM.................................................27

        4.8.2    COMMON ELEMENT – RULE OF REASON – EVIDENCE OF COMPETITIVE BENEFITS .......................................................28

        4.8.3    COMMON ELEMENT – RULE OF REASON – BALANCING THE COMPETITIVE EFFECTS ................................................29

5.    ANTITRUST CLAIMS – OVERVIEW ...........................................................30

    5.1    SHERMAN ACT SECTION 1 – UNREASONABLE RESTRAINT OF TRADE – ELEMENTS ........................................................31

    5.2    SHERMAN ACT SECTION 2 – MONOPOLIZATION – ELEMENTS ............32

        5.2.1    SHERMAN ACT SECTION 2 – MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER ...................................33

        5.2.2    SHERMAN ACT SECTION 2 – MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER...................................................35

    5.3    CLAYTON ACT SECTION 3 CLAIM – ELEMENTS........................................37

        5.3.1    CLAYTON ACT SECTION 3 CLAIM – SUBSTANTIAL LESSENING OF COMPETITION.............................................39

    5.4    TYING – ELEMENTS ........................................................41

        5.4.1    TYING – REQUIREMENT OF TWO PRODUCTS ...............................43

        5.4.2    TYING – PROOF OF CONDITIONING.....................................44

        5.4.3    TYING – FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT .................45

    5.5    EXCLUSIVE DEALING – ELEMENTS.............................................46

        5.5.1    EXCLUSIVE DEALING – PROOF OF SUBSTANTIAL COMPETITIVE HARM UNDER RULE OF REASON..........................47

    5.6    ANTITRUST INJURY AND CAUSATION ........................................................49

        5.6.1    ANTITRUST INJURY AND CAUSATION – ELEMENTS ..................50

    5.6.2   ANTITRUST INJURY AND CAUSATION – DEFINITION OF BUSINESS OR PROPERTY ...................................................52

6.    INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS ........................................................................53

    6.1   INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS – "WRONGFUL MEANS" ...................................55

7.    COMPENSATORY DAMAGES .......................................................56

    7.1   COMPENSATORY DAMAGES – ANTITRUST ...............................56

        7.1.1   COMPENSATORY DAMAGES – ANTITRUST– PURPOSE ..............56

        7.1.2   COMPENSATORY DAMAGES – ANTITRUST – CALCULATION ...................................................................57

        7.1.3   COMPENSATORY DAMAGES – ANTITRUST – CAUSATION AND DISAGGREGATION ....................................................58

        7.1.4   COMPENSATORY DAMAGES – ANTITRUST – LOST PROFITS.........................................................................59

    7.2   COMPENSATORY DAMAGES – INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS .....................................60

    7.3   COMPENSATORY DAMAGES – TIME VALUE OF MONEY .......................61

8.    DELIBERATION AND VERDICT ..................................................62

    8.1   DELIBERATION AND VERDICT – INTRODUCTION ...................................62

    8.2   UNANIMOUS VERDICT....................................................................63

    8.3   DUTY TO DELIBERATE .................................................................64

    8.4   SOCIAL MEDIA ..............................................................................65

    8.5   COURT HAS NO OPINION ..............................................................66

1.      **GENERAL INSTRUCTION**

1.1     **INTRODUCTION**

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

Please listen very carefully to everything I say.  In following my instructions, you must follow all of them and not single out some and ignore others.  They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 1.2    JURORS' DUTIES

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on any given issue.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly.  Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

## 1.3    BURDEN OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof."

BASF has the burden of proving its claims and the amount of damages, if any, by what is called a preponderance of the evidence. That means BASF has to provide evidence which, when considered in light of all the facts, leads you to believe that what BASF alleges is more likely true than not. To put it differently, if you were to put BASF's and Ingevity's evidence on the opposite sides of a scale, the evidence supporting BASF's claims would have to make the scales tip slightly on BASF's side. If the evidence is evenly balanced, the party has not proven the element by a preponderance of the evidence, and you must find against that party. If BASF fails to meet this burden, your verdict must be for Ingevity. If BASF tips the scale slightly in its favor and carries its burden, your verdict must be for BASF.

**1.4**   **EVIDENCE DEFINED**

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, deposition testimony that was presented to you, and the exhibits that I allowed into evidence.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all of these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

## 1.5    CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence.  Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

**1.6**   **STATEMENTS OF COUNSEL**

A further word about statements and arguments of counsel: The attorneys' statements and arguments are not evidence.  Instead, their statements and arguments are intended to help you review the evidence presented.  If you remember the evidence differently from the attorneys, you should rely on your own recollection.

## 1.7    CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility.  If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all.  But if you cannot do this, then it is your duty and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he or she gave at the trial.  You have the right to distrust such witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.  If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

This instruction applies to all witnesses, including expert witnesses.

**1.8    EXPERT WITNESSES**

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—called an expert witness—is permitted to state his or her opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness.  The fact that an expert states a fact or an opinion does not mean that the testimony is correct or supported by the factual evidence.  Expert testimony is a guide to interpreting the evidence.  What the facts are is for you to decide.

Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.  You are free to accept or reject the testimony of experts, just as with any other witness.

**1.9    LAY OPINION TESTIMONY**

Witnesses who were not testifying as experts may have given their opinions during the trial.  The fact that a witness has stated an opinion does not mean you are required to accept it.  You may give the opinion whatever weight you think appropriate.  Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion.  You must decide whether information on which the witness relied was true and accurate.  You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence.  You should remember that lay witnesses may not testify to hypothetical situations or respond to hypothetical questions, and you should therefore disregard any opinions relating to hypotheticals.

## 1.10   DEPOSITIONS AS SUBSTANTIVE EVIDENCE

Deposition testimony is entitled to the same consideration and is to be judged, as much as possible, in the same way as if the witness testified in person here in the courtroom.

**1.11   DEMONSTRATIVE EXHIBITS**

During the course of the trial, you have seen many exhibits.  Many of these exhibits were admitted as evidence.  You will have these admitted exhibits in the jury room for your deliberations.  The other exhibits (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses.  These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence.  Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

## 2.    THE PARTIES AND THEIR CONTENTIONS

## 2.1    SUMMARY OF CONTENTIONS

BASF alleges that Ingevity's tying of carbon honeycombs with 29 mm, 35 mm, or 41 mm diameters and 200 cells per square inch, which I will refer to as the "carbon honeycombs at issue," to licenses to the '844 Patent and Ingevity's entering into long-term supply agreements with Delphi, Kayser, and KFTC unreasonably restrained trade in violation of Section 1 of the Sherman Act. BASF asserts that Ingevity's conduct allowed it to acquire and maintain monopoly power in the market for carbon adsorbents used in LEV III/Tier 3-compliant fuel vapor canisters in the United States and Canada and to impede competition in that market in violation of Section 2 of the Sherman Act. BASF further alleges that the long-term supply agreements violate Section 3 of the Clayton Act. In addition to the antitrust claims, BASF alleges that Ingevity tortiously interfered with its prospective business relations with Kayser in violation of Delaware common law.

Ingevity denies the allegations. Ingevity contends that it has not restrained trade or unlawfully acquired or maintained monopoly power in any relevant market. Further, Ingevity contends that it did not tie implied licenses to the '844 Patent to the sale of its honeycombs, and that its supply agreements with Delphi, Kayser, and KFTC did not substantially foreclose competition or result in harm to competition, did not cause injury to BASF, and did not cause any alleged damages. Ingevity contends that its sales of honeycombs and resulting implied licensing from those sales and its supply agreements with customers promoted competition. Ingevity also contends that it did not know about or intentionally interfere in any improper way with BASF's prospective business relationship with Kayser.

3.      **ANTITRUST AND PATENT LAW**

3.1     **THE PURPOSE OF THE ANTITRUST LAWS**

The primary purpose of the antitrust laws is to preserve and promote our system of free and open competition and to secure everyone an equal opportunity to engage in business, trade, and commerce, by preventing unreasonable restraints or monopolization of any business or industry so that consumers may receive better goods and services at lower cost.  These laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not unlawful.  The antitrust laws do not prohibit, without more, colorful, vigorous or aggressive language; the law does not require polite or "commercially correct" speech within corporate memoranda and business plans.

## 3.2    THE PURPOSE OF THE PATENT LAWS

The primary purpose of the patent laws is to promote the progress of science and useful arts by securing for limited times to inventors the exclusive right to their respective discoveries. The patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.  Patent law seeks to foster and reward invention and to promote disclosure of inventions, to stimulate further innovation, and to permit the public to practice the invention once the patent expires.  A patent grants the patent owner the right to exclude others from profiting from use of that patent owner's patented invention and includes the right to allow a patent owner to exclude others from selling nonstaple goods.  You will be instructed separately on what constitutes a nonstaple good.

4.    **COMMON ELEMENTS – OVERVIEW**

I will now turn to the portion of my instructions that will guide you in assessing BASF's claims and applying the law to the facts you find.    Because BASF's claims have certain overlapping components, I am going to first instruct you on concepts that may appear as "common elements" so that you have the information you need in one place.

## 4.1    COMMON IMMUNITY – PATENT ENFORCEMENT AND THE EXERCISE OF CONSTITUTIONAL RIGHTS

Ingevity has the right under the patent laws to enforce its patents, including through licensing, through communications about its patent rights to customers and competitors, and through litigation.  Additionally, Ingevity has the right under the first amendment to the U.S. Constitution to file a lawsuit, to threaten litigation, and to communicate with customers about litigation.  Evidence of the exercise of such rights cannot form the basis for BASF's antitrust claims or BASF's tortious interference claim.

However, Ingevity has no right to engage in conduct, such as tying or exclusive dealing, that unlawfully restricts competition beyond the scope of the patent monopoly, and such conduct can form the basis for BASF's antitrust claims and its tortious interference claim.

**4.2    COMMON IMMUNITY – PATENTEE'S RIGHT TO CONTROL THE MARKET FOR NONSTAPLE GOODS**

A patent owner has the right to control the market for what are called "nonstaple goods." But a patent owner has no right to control the market for what are called "staple goods." Ingevity contends that the carbon honeycombs at issue are nonstaple goods, and that Ingevity's '844 patent therefore gives it the right to control the market for these honeycombs during the life of the patent. BASF contends that these honeycombs are staple goods, and that Ingevity therefore has no right to control the market for these honeycombs.

BASF bears the burden of proving by a preponderance of the evidence that the carbon honeycombs at issue are staple goods and therefore beyond the scope of Ingevity's right to exclude. To establish that the carbon honeycombs at issue are staple goods, BASF must prove that those honeycombs have actual and substantial non-infringing uses other than in fuel vapor canisters. A non-infringing use would be a use outside of fuel vapor canisters.

To qualify as a substantial non-infringing use, the product must have been actually (not hypothetically) used in a non-infringing manner. In addition, substantial noninfringing uses are those that are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental. In assessing whether an asserted noninfringing use is "substantial," you must consider the use's frequency, the use's practicality, the invention's intended purpose, and the invention's intended market; the occasional aberrant use of a product that is designed to be used in a particular manner does not qualify as a substantial noninfringing use. The asserted noninfringing use must be qualitatively and quantitatively significant.

If you determine that BASF has not met its burden to prove that the carbon honeycombs at issue are staple goods, you must find for Ingevity on the tying and tortious interference claims,

17

and should analyze BASF's exclusive dealing claims only after the expiration of the '844 Patent on March 18, 2022.

## 4.3     COMMON ISSUE –HONEYCOMB PRODUCTS AT ISSUE

You have heard discussion of different types of honeycombs with different dimensions and uses.  For purposes of BASF's claims in this case, the only honeycombs at issue are carbon honeycombs with 29 mm, 35 mm, or 41 mm diameters and 200 cells per square inch.  As noted, I refer to those honeycombs as the "carbon honeycombs at issue."

## 4.4    COMMON ELEMENT – RELEVANT MARKET IN GENERAL

You will see that each of BASF's antitrust claims requires you to analyze whether the accused conduct had anticompetitive effects. These effects must occur with respect to a relevant market; BASF must prove the relevant market(s) by a preponderance of the evidence.

There are two aspects you must consider in determining whether BASF has met its burden to prove the relevant market(s). The first is the relevant *product* market. The second is the relevant *geographic* market.

**4.5    COMMON ELEMENT – RELEVANT PRODUCT MARKET**

BASF must prove, by a preponderance of the evidence, the existence of a relevant product market.  The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.

In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test based on the actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable so long as they are reasonable substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products would be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant sustained increase in the price of one product would result in a substantial number of consumers switching from that product to another.  In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn?  Generally speaking, a small but significant increase in price is approximately a 5% increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue.  If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and the sales of another;

(3) the presence or absence of specialized vendors; (4) the perceptions of either the industry or the public as to whether the products are in separate markets; (5) the views of BASF and Ingevity regarding which products compete against each other; (6) the existence or absence of different customer groups or distribution channels; (7) disadvantages to using other products that might deter customers from substituting to products outside of the market; and (8) differences in prices for particular products.

**4.6     COMMON ELEMENT – RELEVANT GEOGRAPHIC MARKET**

In this case, the relevant geographic market is the United States and Canada.

**4.7    COMMON ELEMENT – MARKET POWER**

In determining if Ingevity's challenged conduct substantially harmed competition, you should consider whether Ingevity had market power.

Market power is defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market.  A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.  The ability to charge higher prices for better products or services, however, is not market power.

In determining whether Ingevity has market power, you may consider Ingevity's share or portion of the relevant market; that is, its percentage of the products or services sold in the relevant market by all competitors.  The mere possession of market power is not unreasonable or illegal.  If you find that Ingevity possesses market power, you must still consider other elements of BASF's claims that I will discuss further below.

Factors you may consider in determining whether Ingevity has market power include whether there are any durable barriers to entry by new firms in the market, and evidence concerning the intensity of competition within that market.  In addition, if you decide that the buyers are sophisticated businesses themselves that have countervailing power in negotiating contracts, this may offset any market power Ingevity might otherwise have.  If BASF cannot show that Ingevity had the power to force buyers to enter into exclusive contracts or purchase honeycombs they did not want or would have preferred to purchase elsewhere, this would be an indication that Ingevity lacks market power.  You should consider whether the process in which Ingevity secured its supply contracts and sales of honeycombs itself involved competition.  If you determine that buyers considered purchasing products from other suppliers as substitutes for

24

Ingevity's honeycombs, and that other competitors had an equal opportunity to compete against Ingevity for sales of honeycombs, this is also evidence that Ingevity does not have market power.

**4.8    COMMON ELEMENT – RULE OF REASON**

In this case, BASF claims that Ingevity's alleged tying and exclusive dealing conduct was an unreasonable restraint of trade that resulted in an adverse effect on competition under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, which I will explain in more detail later. As I will explain later, some restraints of trade are unlawful "per se," which means that they are definitely unlawful and BASF does not have to offer specific proof of an adverse effect on competition. For restraints that are not unlawful "per se," it is your job to determine whether the challenged conduct was unreasonable under what is known as the "rule of reason."

A restraint of trade that is not unlawful "per se" is illegal only if it is found to be unreasonable. In making this determination, you must first determine whether BASF has proven that the challenged restraint resulted in substantial harm to competition in the relevant market. If you find that BASF has proven that the challenged restraint resulted in substantial harm to competition in the relevant market, then you must consider whether the restraint produced countervailing competitive benefits. If you find that it did, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

### 4.8.1   COMMON ELEMENT – RULE OF REASON – PROOF OF SUBSTANTIAL COMPETITIVE HARM

To prove that the challenged conduct unreasonably restrained competition, BASF first must demonstrate that it resulted in substantial harm to competition.  Although it may be relevant to the inquiry, harm that occurs merely to the individual business of BASF is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single competitor does not necessarily mean that there has been harm to competition.

A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, more product options, increased output, or higher product quality.  If the challenged conduct did not result in higher prices, fewer product choices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged conduct produced competitive harm, you may look at the following factors:

- the effect of the conduct on prices, output, product quality, and service;

- the purpose and nature of the conduct;

- the nature and structure of the relevant market, both before and after the conduct occurred;

- the number of competitors in the relevant market and the level of competition among them;

- whether new competitors entered the market, both before and after the conduct occurred; and

- whether Ingevity possesses market power.

### 4.8.2  COMMON ELEMENT – RULE OF REASON – EVIDENCE OF COMPETITIVE BENEFITS

If you find that BASF has proved that Ingevity's conduct resulted in substantial harm to competition in a relevant market, then you next must determine whether the conduct also benefited competition in other ways.  You may only credit benefits that are related to competition or that advantage consumers.  If you find that Ingevity has proved that the conduct did result in competitive benefits, then you also must consider whether the conduct was reasonably necessary to achieve the benefits.  If BASF proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the conduct.

### 4.8.3   COMMON ELEMENT – RULE OF REASON – BALANCING THE COMPETITIVE EFFECTS

If you find that the challenged conduct was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same conduct.

If the competitive harm substantially outweighs the competitive benefits, then the challenged conduct is unreasonable.  If the competitive harm does not substantially outweigh the competitive benefits, then the challenged conduct is not unreasonable.  In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor.

BASF bears the burden of proving that the anticompetitive effect of the conduct, if any, substantially outweighs its benefits.

## 5.    ANTITRUST CLAIMS – OVERVIEW

Now that we have covered some of the common concepts and statutes that apply to BASF's antitrust claims, I am going to turn to instructing you further on the specific elements of the claims. For elements that are not covered by the common elements I just described, I will provide you with the information you need in the following instructions.

## 5.1    SHERMAN ACT SECTION 1 – UNREASONABLE RESTRAINT OF TRADE – ELEMENTS

BASF claims that Ingevity required customers to purchase the honeycombs at issue from Ingevity in order to receive a license to the '844 Patent and entered supply agreements that unreasonably restrained trade in violation of Section 1 of the Sherman Act.   Ingevity denies these allegations.

Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade.  To establish a violation of Section 1 of the Sherman Act, BASF must prove the following by a preponderance of the evidence:

*First*, the existence of a contract or combination between or amongst at least two separate entities;

*Second*, that the contract or combination unreasonably restrained trade; and

*Third*, that the restraint caused BASF to suffer an injury to its business and property.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

31

## 5.2     SHERMAN ACT SECTION 2 – MONOPOLIZATION – ELEMENTS

BASF's second claim is that Ingevity unlawfully monopolized the North American and Canadian market for carbon adsorbents used in fuel vapor canisters in two ways: through (1) an alleged requirement that customers purchase honeycombs from Ingevity in order to receive a license to the '844 Patent, and (2) three long-term supply agreements, in violation of Section 2 of the Sherman Act.  Ingevity denies these allegations.

To prevail on its monopolization claims under Section 2 of the Sherman Act, BASF has the burden of proving each of the following elements by a preponderance of the evidence:

*First*, that the alleged market is a valid relevant market;

*Second*, that Ingevity possessed monopoly power in that market;

*Third*, that Ingevity willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct; and

*Fourth*, that BASF was injured in its business or property because of Ingevity's anticompetitive conduct.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

### 5.2.1  SHERMAN ACT SECTION 2 – MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER

To prevail on its monopolization claims, BASF must prove by a preponderance of the evidence that Ingevity had monopoly power in the relevant market.  Monopoly power is the power to control prices or exclude competition in a relevant antitrust market.  More precisely, Ingevity is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  However, possession of monopoly power, in and of itself, is not unlawful.

If you do not find that Ingevity is able to profitably raise prices above those that would be charged in a competitive market, monopoly power can be alternatively established through circumstantial evidence in the form of Ingevity's market share, market share trends, entry and exit by other companies, and the number and size of other alleged competitors.  I will now discuss these types of circumstantial evidence of monopoly power.

*Market Share.*  The first factor you may consider is Ingevity's share of the relevant market.  Based on the evidence you have heard about Ingevity's market share, you may determine its market share as a percentage of total sales in the relevant market.  Ingevity must have a significant share of the market in order to possess monopoly power.  Market share alone is not sufficient to establish monopoly power.

*Market Share Trends.*  The trend in Ingevity's market share in the relevant market also is something you may consider.  A market share that increases over time may strengthen an inference that a company has monopoly power, particularly where that company has a high market share.  A decreasing market share may indicate the absence of monopoly power.

*Barriers to Entry.*  You may also consider whether there are durable barriers to entry into the relevant market.  Durable barriers to entry make it difficult for new competitors to enter the

relevant market in a meaningful and timely way.  Barriers to entry might include government regulations, the large financial investment required to build a plant, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of high barriers to entry along with high market share may support an inference that Ingevity had monopoly power.  By contrast, evidence of low or no entry barriers may be evidence that Ingevity did not have monopoly power, regardless of its market share, because new competitors could enter easily if Ingevity attempted to raise prices for a substantial period of time.

***Entry and Exit by Other Companies.***  The history of entry and exit in the relevant market may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that Ingevity lacked monopoly power.  On the other hand, departures from the market, or the failure of firms to enter the market, may support an inference that Ingevity has monopoly power.

***Number and Size of Competitors.***  You may consider whether Ingevity's competitors were capable of effectively competing.  In other words, you should evaluate whether the financial strength, market shares, and number of competitors in the relevant market acted as a check on Ingevity's ability to price its products.  If Ingevity's competitors were vigorous or had large or increasing market shares, this may be evidence that Ingevity lacked monopoly power.  On the other hand, if you determine that Ingevity's competitors were weak or had small or declining market shares, this may support an inference that Ingevity had monopoly power.

### 5.2.2   SHERMAN ACT SECTION 2 – MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER

The next element BASF must prove for its monopolization claim is that Ingevity willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The maintenance of monopoly power by supplying better products or services, possessing superior business skills, possessing a patent, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In this case, BASF contends that Ingevity had monopoly power and used it to enter into anticompetitive tying arrangements and exclusive long-term supply agreements to prevent or exclude competition or frustrate the efforts of other companies to compete in the relevant market.

35

In determining whether Ingevity's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

**5.3    CLAYTON ACT SECTION 3 CLAIM – ELEMENTS**

BASF's third claim is under Section 3 of the Clayton Act.  BASF alleges that Ingevity used exclusive long-term supply agreements with customers to foreclose competition in a substantial portion of the relevant market, and that BASF was injured as a result of these exclusive dealing arrangements.  Ingevity denies these allegations.

To succeed on this claim, BASF must prove the following elements by a preponderance of the evidence:

*First*, that Ingevity sold honeycombs, or entered into contracts for the sale of honeycombs;

*Second*, that in its sales or contracts for such honeycombs, Ingevity established an agreement or understanding that the customer would exclusively purchase Ingevity's products;

*Third*, the effect of such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in the relevant market;

*Fourth*, BASF was injured in its business or property as a proximate result of Ingevity's conduct.

As to the second element of BASF's Clayton Act Section 3 claim, you need not find that the agreement contained a specific, express agreement to use or purchase only Ingevity's products to conclude that it was an exclusive dealing arrangement because a condition, agreement or understanding may be either expressly stated or inferred from the circumstances.

Ingevity's agreements may be found to be exclusive dealing arrangements if they had the practical effect of substantially preventing the purchase of BASF's honeycombs.  An agreement may be an exclusive dealing arrangement even if it does not require a 100% commitment to deal only in Ingevity's products.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven

each of these elements by a preponderance of the evidence, then you must find for BASF and against Ingevity on this claim.

### 5.3.1 CLAYTON ACT SECTION 3 CLAIM – SUBSTANTIAL LESSENING OF COMPETITION

If you find that BASF has proven that Ingevity entered into exclusive dealing contracts, you should then consider whether BASF has proven, by a preponderance of the evidence, that those contracts substantially lessened competition in the relevant market. Only if you find that BASF has proven a substantial lessening of competition in a relevant market due to Ingevity's contracts can you find in favor of BASF on its Clayton Act Section 3 claim.

In deciding this issue, you should consider the structure of the relevant market and the percentage of the relevant market closed off by, or tied up because of, the contracts. In this regard, you may consider how many companies were in the market and whether the contracts significantly limited the opportunities for competing sellers to enter or remain in the market.

You must consider the probable effect that the contracts had on competition in the market. If you find that Ingevity's contracts did not substantially lessen competition, then you must find in favor of Ingevity.

If you find that BASF has proven that Ingevity's contracts substantially lessened competition in the relevant market, then you must go on to consider whether there is any legitimate business justification for the contracts and whether they are reasonable. Only unreasonable restraints of this type are unlawful. In this regard, you should consider such factors as:

- The circumstances under which Ingevity set up these contracts and what reasons it had for doing so;

- The relative bargaining strength of the parties to the contracts. If the parties had relatively equal bargaining strength, then the contracts are less likely to be unreasonable;

- How long in time the contracts were effective. If the contracts lasted a relatively short time and did not significantly limit the opportunity for competing sellers to enter or remain in the market, then they were less likely to be unreasonable;

- Any favorable effects on competition that the contracts produce; and

39

- Any alternative channels of distribution that may have been available to BASF.

If you find that the contracts foreclosed competition in a substantial portion of the relevant market, and that the anticompetitive effects of those contracts outweigh any procompetitive effects, you must consider whether BASF was injured as a result of these contracts, consistent with Instructions 6.1 and 6.2.

## 5.4    TYING – ELEMENTS

As I have mentioned, BASF's first and second claims depend, in part, on BASF's allegation that Ingevity engaged in an unlawful tying arrangement.  Ingevity denies this allegation.

A tying arrangement is one in which the seller will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product), or at least agree that they will not purchase the tied product from any other supplier.  In this case, BASF claims that licenses to the '844 Patent are the tying product and the carbon honeycombs at issue are the tied product.

Not all tying arrangements are unlawful.  The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product to force buyers to purchase a tied product that buyers either did not want at all or might have preferred to purchase elsewhere.  To prevail on its claim that Ingevity's tying arrangement is a violation of the antitrust laws, BASF has the burden of proving each of the following elements by a preponderance of the evidence:

*First*, licenses to the '844 Patent and the carbon honeycombs at issue are separate and distinct products;

*Second*, Ingevity will grant licenses to the '844 Patent only on the condition that the customer also purchase such honeycombs from Ingevity, or that the customer not purchase such honeycombs from any other supplier;

*Third*, Ingevity has sufficient market power with respect to technologies to meet LEV III / Tier 3 regulations to enable it to restrain competition as to such honeycombs;

*Fourth*, the alleged tying arrangement has affected a substantial volume of commerce as to such honeycombs; and

*Fifth*, BASF was injured in its business or property because of the tying arrangement.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Ingevity and against BASF on this claim.  If you find that BASF has proven

each of these elements by a preponderance of the evidence, then the tying arrangement is "per se" unlawful—which means that the tying arrangement is definitely unlawful and you may not consider whether the tying arrangement also benefits competition to justify the restraint.

If you find that BASF has not proven that Ingevity has market power with respect to technologies to meet LEV III / Tier 3 regulations, but has proven the other elements, then you may still find the tying arrangement unlawful under the rule of reason. As I have previously explained, in making this determination, you must first determine whether BASF has proven that the contracts resulted in substantial harm to competition in the relevant markets. If you find that BASF has proven that the contracts resulted in substantial harm to competition in the relevant market, then you must consider whether the contracts produced countervailing competitive benefits. If you find that they did, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

### 5.4.1   TYING – REQUIREMENT OF TWO PRODUCTS

Tying requires two separate products – a tying product and a tied product.

BASF contends that the carbon honeycombs at issue are separate and distinct products from licenses to the '844 Patent.  Ingevity disputes this.

In making the determination whether there are two separate and distinct products, you should consider whether there would be demand for each product if they were offered separately. Two products are separate if they are distinguishable in the eyes of buyers such that they could be provided separately, and could be selected by individual buyers, if the defendant did not insist on packaging them together.

### 5.4.2    TYING – PROOF OF CONDITIONING

You may find that a tying arrangement exists between licenses to the '844 Patent and the carbon honeycombs at issue if Ingevity either refused to grant licenses to the '844 Patent unless purchasers also agreed to buy honeycombs from Ingevity (or not to buy honeycombs from another supplier), or effectively coerced purchasers into buying honeycombs from Ingevity in addition to licenses to the '844 Patent.  To prove coercion, BASF must prove by a preponderance of the evidence that Ingevity exploited its control over the market for technologies to meet LEV III / Tier 3 regulations to force the buyer into the purchase of honeycombs, which the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms, and that any appearance of choice was illusory.  Additionally, mere sales pressure or persuasion is not coercion.

If you find that BASF has not proven that Ingevity created a tying arrangement, you must find that Ingevity has not engaged in tying.

### 5.4.3  TYING – FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT

If you determine that licenses to the '844 Patent and the honeycombs are separate products that have been tied to one another and that Ingevity has market power for technologies to meet LEV III / Tier 3 regulations, then you must determine whether BASF has proven that Ingevity has foreclosed a substantial amount of interstate commerce with respect to the honeycombs.

In determining whether Ingevity has foreclosed a substantial amount of commerce with respect to the honeycombs, you should first consider the total dollar amount of Ingevity's sales of honeycombs in interstate commerce achieved by the tying arrangement in absolute terms.

There is no substantial foreclosure if only a small percentage of sales in the market for honeycombs were affected by the tying arrangement.  There also is no substantial foreclosure if you find that purchasers would not have bought the honeycombs at all in the absence of the tying arrangement.

## 5.5    EXCLUSIVE DEALING – ELEMENTS

BASF claims that Ingevity's three supply agreements with Delphi, Kayser, and KFTC constitute unlawful exclusive dealing.  Ingevity denies this allegation.

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time.  There are several forms of exclusive dealing arrangements.  The arrangement may take the form of a requirements contract committing the buyer to purchase at least a substantial share of its requirements of specific products or services from the supplier, which I will refer to as an "express" exclusive dealing contract.

If you find that BASF has proven that Ingevity entered into exclusive dealing contracts, you should then consider whether those contracts unreasonably restrained competition.  As I have previously explained, in making this determination, you must first determine whether BASF has proven that the contracts resulted in substantial harm to competition in the relevant markets.  If you find that BASF has proven that the contracts resulted in substantial harm to competition in the relevant market, then you must consider whether the contracts produced countervailing competitive benefits.  If you find that they did, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

### 5.5.1    EXCLUSIVE DEALING – PROOF OF SUBSTANTIAL COMPETITIVE HARM UNDER RULE OF REASON

To determine whether the supply agreements had a substantial harmful effect on competition, you should consider, with respect to the relevant market: the nature and history of the use of exclusive dealing contracts in the relevant market; whether customers had independent reasons for entering into exclusive dealing contracts or were coerced into entering into them; whether other competing suppliers also offered exclusive contracts; the extent of competition among competing suppliers for exclusive contracts with customers; Ingevity's position in the relevant market; the competitive alternatives to Ingevity's products or services; the reasons Ingevity and the customers entered into the long term agreements at issue; the effect of the use of long term agreements on the ability of new firms to enter the relevant market and on price and other competition in the relevant market; as well as whether Ingevity had market power.

In determining the extent to which the supply agreements foreclosed competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing arrangements foreclose a significant percentage of the market, this is an indicator that the harm from the foreclosure of competition could be substantial. Where the exclusive dealing arrangements foreclose a small percentage of the market, this tends to indicate that the harm from the foreclosure of competition is not substantial because alternatives are available. Further, whether foreclosure is "substantial" depends on more than the percentage of foreclosure. You must also consider other factors, such as the relative strength of the parties, and immediate and future effects on competition. The shorter the duration of the contract, the less likely it is to harm competition. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short

notice without cause and without significant penalty. In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

However, these are simply factors for you to consider, they are not dispositive. In the end, the key question is whether it was practical for customers to terminate the exclusive dealing arrangement with Ingevity, and if it was not, whether the anticompetitive effects of that arrangement outweighed any competitive benefits. In considering all these facts, you should determine whether the exclusive dealing contracts adversely affected the price paid by customers, the quality of the product offered in the relevant market, or output.

**5.6     ANTITRUST INJURY AND CAUSATION**

If you find that Ingevity violated the Sherman Act and/or the Clayton Act, then you must decide if BASF has been injured by Ingevity's conduct and, if so, if it is entitled to recover damages from Ingevity for that injury.

### 5.6.1   ANTITRUST INJURY AND CAUSATION – ELEMENTS

BASF is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation by a preponderance of the evidence:

**First**, that BASF was in fact injured as a result of the accused violation of the antitrust laws;

**Second**, that the alleged illegal conduct was a material cause of BASF's injury; and

**Third**, that BASF's injuries are injuries of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage."  For BASF to establish that it is entitled to recover damages, it must prove that it was injured as a result of the alleged violation of the antitrust laws.  Proving causation does not require BASF to prove the precise dollar value of its injury.  It requires only that BASF prove that it was in fact injured by the alleged antitrust violation.

If you find that BASF has established that it was in fact injured by an antitrust violation, you may then consider the amount of BASF's damages.  It is important to understand, however, that the fact of injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that BASF has established that it was in fact injured.

The second element requires BASF to offer evidence that establishes as a matter of fact and with a fair degree of certainty the alleged illegal conduct was a material cause of BASF's injury.  This means that BASF must prove that some damage occurred to it as a result of the alleged antitrust violation and not some other cause.  BASF is not required to prove that the accused conduct was the sole cause of its injury; nor is BASF required to eliminate all other possible causes of injury.  It is enough if BASF has proven that the alleged antitrust violation materially or substantially contributed to BASF's injury, even if other factors also contributed.

Under the third element, BASF must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If BASF's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then BASF's injuries are antitrust injuries.  On the other hand, if BASF's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then BASF's injuries are not antitrust injuries and BASF may not recover damages for those injuries under the antitrust laws.

### 5.6.2   ANTITRUST INJURY AND CAUSATION – DEFINITION OF BUSINESS OR PROPERTY

BASF must establish that the injury it claims to have suffered was an injury to its "business or property."   The term "business" includes any commercial interest or venture, and you are instructed that BASF has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of Ingevity's alleged antitrust violation.   The term "property" includes anything of value BASF owns or possesses or in which BASF has a protectable legal interest.   You are instructed that BASF has been injured in its "business or property" if you find it has lost money as a result of Ingevity's alleged antitrust violation.

6.    **INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS**

In addition to BASF's claims under the antitrust laws, BASF alleges that Ingevity violated Delaware common law by intentionally interfering with BASF's prospective business relationship with Kayser.  Ingevity denies these allegations.

To prove its claim for intentional interference with a prospective business relationship with Kayser, BASF must prove each of the following elements by a preponderance of the evidence:

*First*, the existence of a prospective contractual or business relationship between BASF and Kayser;

*Second*, an intent on the part of Ingevity to harm BASF by interfering with that prospective relationship;

*Third*, knowledge of the relationship or expectancy on the part of Ingevity;

*Fourth*, the absence of a privilege or justification on the part of Ingevity;

*Fifth*, actual damage to BASF caused by Ingevity's interference; and

*Sixth*, a reasonable likelihood that the prospective relationship between BASF and Kayser would have occurred if not for Ingevity's interference.

A "prospective" relationship is something less than an actual contract but more than just hope on BASF's part that it would enter into the relationship with Kayser.  The reasonable likelihood that a relationship would have formed cannot be met based merely upon evidence of an existing contractual relationship.

In determining whether Ingevity intentionally interfered with BASF's prospective contractual or business relationship with Kayser, you must consider whether the purpose of Ingevity's conduct was to protect a legitimate interest and evaluate that against BASF's interests. In evaluating these interests, you will consider:

- The expectations of Ingevity and BASF;

- The relations between Ingevity and BASF;

- The interest Ingevity sought to advance;

- Whether Ingevity's conduct was done for the purpose of causing the interference or whether it was merely incidental to another purpose; and

- Whether Ingevity's conduct is sanctioned by the "rules of the game" which society has adopted for business competition.

You cannot find in favor of BASF unless you find Ingevity employed "wrongful means" to interfere with BASF's prospective contractual or business relationship with Kayser.

**6.1     INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS – "WRONGFUL MEANS"**

"Wrongful means" as used in these instructions can include conduct in violation of statutory provisions, such as the alleged tying and exclusive dealing that BASF alleges here, or other tortious or illegal actions.  If you find that Ingevity did not engage in such conduct, you should find in favor of Ingevity on the Intentional Interference With Prospective Business Relationships claim.  The common immunities I instructed you on under 4.1 and 4.2 apply to this claim as well.

**7.      COMPENSATORY DAMAGES**

**7.1      COMPENSATORY DAMAGES – ANTITRUST**

### 7.1.1    COMPENSATORY DAMAGES – ANTITRUST– PURPOSE

If you find that Ingevity violated the Sherman Act and/or the Clayton Act and that this violation caused injury to BASF, then you must determine the amount of damages, if any, that BASF is entitled to recover.

The fact that I am giving you instructions concerning the issue of BASF's damages does not mean that I believe BASF should, or should not, prevail in this case.  If you reach a verdict for Ingevity on the issue of liability on the antitrust claims, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that BASF should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of conduct you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible to the position in which it would have been if the alleged antitrust violation had not occurred.  The antitrust laws do not permit you to award damages to punish a wrongdoer—what we sometimes refer to as "punitive damages"—or to deter a defendant from particular conduct in the future, or to provide a windfall to someone who has been the victim of an antitrust violation.  You are also not permitted to award BASF an amount for attorneys' fees or the cost of maintaining this lawsuit.

### 7.1.2    COMPENSATORY DAMAGES – ANTITRUST – CALCULATION

You are permitted to make just and reasonable estimates in calculating damages.  You are not required to calculate damages with mathematical certainty or precision.  However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates.  Damages may not be based on guesswork or speculation. BASF must prove the reasonableness of each of the assumptions upon which the damages calculation is based.  If you find that a damages calculation cannot be based on evidence and reasonable inference, and instead can only be reached through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages.  So long as there is a reasonable basis in the evidence for a damages award, BASF should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.

If you find that BASF has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.  If you find that BASF has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

### 7.1.3 COMPENSATORY DAMAGES – ANTITRUST – CAUSATION AND DISAGGREGATION

If you find that Ingevity violated the Sherman Act and/or the Clayton Act and that BASF was injured by that violation, then BASF is entitled to recover damages for such injury that was the direct result or likely consequence of the illegal acts of Ingevity.  BASF bears the burden of showing that its injuries were caused by Ingevity's antitrust violation, as opposed to any other factors.  If you find that BASF's alleged injuries were caused in part by Ingevity's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of BASF's alleged injuries that was caused by Ingevity's alleged antitrust violation.

BASF claims that it suffered injury because it lost sales and profits as a result of Ingevity's tying of honeycombs to licenses to the '844 Patent and exclusive long-term supply agreements. Ingevity contends that any profits or sales lost by BASF occurred as a result of other factors that have nothing to do with the tying arrangements or exclusive dealing agreements.

BASF is not entitled to recover for lost profits that resulted solely from causes other than the tying arrangements and exclusive dealing agreements.  The presence of these factors does not mean BASF did not suffer antitrust injury, but BASF is not entitled to recover any damages caused by them.  BASF only may recover for damages caused by the alleged antitrust violation.

### 7.1.4   COMPENSATORY DAMAGES – ANTITRUST – LOST PROFITS

BASF claims that it was harmed because it lost profits as a result of Ingevity's alleged antitrust violation.  If you find that Ingevity committed an antitrust violation and that this violation caused injury to BASF, you now must calculate the profits, if any, that BASF lost as a result of Ingevity's antitrust violation.  To calculate lost profits, you must calculate net profits: the amount by which BASF's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.

BASF claims that, had it not been for Ingevity's alleged antitrust violation, BASF would have earned profits into the future; this is called "future lost profits."  You are not required to award future lost profits if you determine that they are too speculative.  But, if you award damages for future lost profits, the amount of the award must be discounted to its present value, as I will instruct you.

**7.2     COMPENSATORY DAMAGES – INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS**

BASF claims lost profits that BASF allegedly would have earned but for Ingevity's intentional interference with BASF's prospective business relations with Kayser.  To recover damages for lost profits, BASF must prove it is reasonably certain that it would have earned profits but for Ingevity's conduct.

To decide the amount of damages for lost profits, you must determine the gross amount BASF would have received but-for Ingevity's conduct and then subtract from that amount the expenses BASF would have had if Ingevity's conduct had not occurred.  You are not required to award future lost profits if you find that they are too speculative.  But, if you award damages for future lost profits, the amount of the award must be discounted to its present value, as I will instruct you.

The amount of lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.

**7.3    COMPENSATORY DAMAGES – TIME VALUE OF MONEY**

When awarding future lost profits, the amount must be discounted to present value using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money.  For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year—you would then have something more than $1,000 in a year from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year.  This lower amount is known as an amount discounted to present value.

## 8.    DELIBERATION AND VERDICT

## 8.1    DELIBERATION AND VERDICT – INTRODUCTION

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence.  Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages:  Do not ever write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

## 8.2    UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form.  You will then return to the courtroom and your foreperson will give your verdict.

**8.3     DUTY TO DELIBERATE**

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.  Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that—your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

64

**8.4    SOCIAL MEDIA**

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or website such as Facebook, Instagram, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.  In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

**8.5**    **COURT HAS NO OPINION**

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case yourselves based on the evidence presented.