<pre>
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4   INGEVITY CORPORATION and         )
     INGEVITY SOUTH CAROLINA, LLC.    )
 5                                    )
                     Plaintiffs,      )
 6                                    ) C.A. No. 18-1391(RGA)
     v.                               )
 7                                    ) Trial Volume I
     BASF CORPORATION,                )
 8                                    )
                     Defendant.       )
 9

10                                 J. Caleb Boggs Courthouse
                                   844 North King Street
11                                 Wilmington, Delaware

12                                 Tuesday, September 7, 2021
                                   9:03 a.m.
13                                 Jury Trial

14

     BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
15

16   APPEARANCES:

17           SHAW KELLER LLP
             BY:  KAREN E. KELLER, ESQUIRE
18
                       -and-
19
             GIBSON DUNN & CRUTCHER, LLP
20           BY:  JEFFREY T. THOMAS, ESQUIRE
             BY:  BRIAN M. BUROKER, ESQUIRE
21           BY:  NATHANIEL SCHARN, ESQUIRE

22                                 For the Plaintiffs

23

24

25
</pre>

1    APPEARANCES CONTINUED:

2             MORRIS NICHOLS ARSHT & TUNNELL LLP
              BY:  RODGER D. SMITH, II, ESQUIRE
3
                        -and-
4
              KING & SPALDING
5             BY:  THOMAS J. FRIEL, ESQUIRE
              BY:  CHRISTOPHER YOOK, ESQUIRE
6             BY:  NORMAN ARMSTRONG, JR., ESQUIRE
              BY:  EMILY T. CHEN, ESQUIRE
7             BY:  BRIAN EUTERMOSER, ESQUIRE
              BY:  PAUL ALESSIO MEZZINA, ESQUIRE
8
                              For the Defendant
9
              ***   PROCEEDINGS   ***
09:03:51 10

09:04:16 11           DEPUTY CLERK:  All rise.  Court is now in

09:04:17 12    session.  The Honorable Richard G. Andrews presiding.

09:04:22 13           THE COURT:  All right.  Be seated.

09:04:26 14           All right.  So what's on your minds this

09:04:59 15    morning?  I don't mean generally.

09:05:10 16           MR. SCHARN:  Good morning, Your Honor.

09:05:11 17           THE COURT:  You are?

09:05:12 18           MR. SCHARN:  Nathan Scharn of Gibson Dunn on

09:05:14 19    behalf of Ingevity.

09:05:15 20           THE COURT:  Okay.

09:05:17 21           MR. SCHARN:  There are a few objections to

09:05:19 22    documents and deposition designations that we wanted to

09:05:23 23    present to Your Honor.

09:05:24 24           THE COURT:  Sure.  Go ahead.

09:05:27 25           MR. SCHARN:  So the first -- we've got two

09:05:29 1   objections on documents.  The first one is to exhibit DX 87,

09:05:37 2   which BASF has indicated it will use with Mr. Abraham, and I

09:05:42 3   have copies of that, if you'd like me to pass those around.

09:05:45 4           THE COURT:  All right.  Well, before you do

09:05:46 5   that, what's the other document.

09:05:49 6           MR. SCHARN:  The other document -- sorry.  Going

09:05:52 7   back to the notes -- is -- I believe it's PX 137.

09:05:55 8           THE COURT:  Okay.  So DX 87 and PX 137?

09:06:00 9           MR. SCHARN:  Yes.

09:06:00 10           THE COURT:  Okay.  Why don't you hand them both

09:06:02 11   up.

09:06:11 12           MR. SCHARN:  And apologies, Your Honor.  It's

09:06:12 13   127, not 137.

09:06:14 14           THE COURT:  Okay.

09:06:40 15           MR. SCHARN:  I've got too many folders, Your

09:06:43 16   Honor.  Give me just a minute.

09:07:05 17           THE COURT:  All right.  I see three different PX

09:07:07 18   127 here.

09:07:09 19           MR. SCHARN:  Two of those were courtesy copies

09:07:11 20   for anyone else on your staff that might like to take a

09:07:14 21   look.

09:07:14 22           THE COURT:  Okay.  All right.  Well, I guess,

09:07:18 23   here staff.  I'm not sure what's what.

09:07:20 24           All right.  Well, go ahead.

09:07:22 25           MR. SCHARN:  So on the final paragraph of the

09:07:25  1   document is -- we believe contains speculation from Miss

09:07:33  2   Angelique Strong Marks at MAHLE regarding --

09:07:34  3            THE COURT:  So wait a second.  It's -- this

09:07:38  4   is -- so I'm looking at a multipage document.  Are you

09:07:44  5   saying the last paragraph on the second page or what?

09:07:46  6            MR. SCHARN:  On the first page.

09:07:47  7            THE COURT:  The one that begins "even more

09:07:49  8   concerning"?

09:07:50  9            MR. SCHARN:  That's the one, Your Honor.

09:07:51 10            THE COURT:  Okay.  And this is from MAHLE to

09:07:55 11   somebody at Ingevity --

09:07:56 12            MR. SCHARN:  That's correct.

09:07:57 13            THE COURT:  -- in April of 2019.

09:07:59 14            MR. SCHARN:  Right.  And so --

09:08:01 15            THE COURT:  Right.

09:08:02 16            MR. SCHARN:  So what you have in that paragraph

09:08:03 17   is Miss Strong Marks speculating about what others are doing

09:08:08 18   -- receiving in the industry in terms of pricing with

09:08:12 19   respect to Ingevity carbon, and we think that that lacks --

09:08:15 20            THE COURT:  Yeah, so hold on, Mr. Scharn, for a

09:08:15 21   second.

09:08:54 22            All right.  I've read the sentence.  Is that

09:08:56 23   what we're talking about, the sentence or the whole

09:08:58 24   paragraph?  Or I can't tell.  But okay.  What is your

09:09:03 25   objection to it?

09:09:04  1              MR. SCHARN:  The objection is that is

09:09:06  2      speculation about what's going on with other customers for

09:09:09  3      which there's a lack of foundation.

09:09:13  4              THE COURT:  This is MAHLE talking about what the

09:09:16  5      believes its customers -- its -- oh, its competitors.

09:09:20  6              MR. SCHARN:  Correct.

09:09:22  7              THE COURT:  All right.  What do you have to say,

09:09:24  8      BASF?

09:09:25  9              MR. SMITH:  Your Honor, if we might, Ms. Strick

09:09:27 10      was going to handle this on our side.  She, unfortunately,

09:09:30 11      was not -- oh, my apologies.  Mr. Yook will handle this.

09:09:37 12              THE COURT:  Okay.  Mr. Yook?

09:09:39 13              MR. YOOK:  The initial issue about this document

09:09:43 14      that Ingevity raises, in terms of MAHLE's foundation about

09:09:46 15      its understanding of the price increase that it received,

09:09:52 16      certainly that it has personal knowledge for and foundation

09:09:55 17      to discuss that, so we don't think that Ingevity's

09:10:00 18      foundation objection has much merit, Your Honor.

09:10:42 19              THE COURT:  Does somewhere else in its letter --

09:10:44 20      does it say that MAHLE thinks this is an extraordinary

09:10:48 21      year-over-year price increase?

09:10:50 22              MR. YOOK:  Your Honor, I believe it says -- yes,

09:11:04 23      Your Honor, it says, as on the second paragraph, in the

09:11:08 24      second paragraph of the letter, MAHLE writes, "As Ingevity

09:11:11 25      is aware, MAHLE immediately expressed concern because the

09:11:14  1   pricing letter increased prices from his 2018 to 2019 by ten

09:11:18  2   percent on certain carbon products, which was a significant

09:11:22  3   year-over-year increase.

09:11:37  4          THE COURT:  Well, so I'm going to overrule the

09:11:39  5   objection.  I think MAHLE has a reasonable basis for its

09:11:44  6   belief and the price over -- the price increase itself it is

09:11:51  7   commenting on in the second paragraph, so really all that

09:11:54  8   they're giving an opinion on is whether or not the

09:11:58  9   competitors are likely to receive such a price increase, and

09:12:05 10   so it seems like there's probably a pretty reasonable basis

09:12:09 11   to say that, so that is overruled.

09:12:11 12          What is the other one, Mr. Scharn?

09:12:13 13          MR. SCHARN:  Its other one is DX 87.

09:12:14 14          THE COURT:  Right.  Which I don't think you

09:12:16 15   handed up.  Oh, here it is.

09:12:21 16          So this is the email from BASF to somebody at

09:12:29 17   Kayser?

09:12:29 18          MR. SCHARN:  Yes.

09:12:30 19          THE COURT:  Is that how you pronounce it?

09:12:31 20          MR. SCHARN:  Kayser is what we say, unless you

09:12:34 21   all say something different.

09:12:35 22          THE COURT:  That would have been my original

09:12:37 23   idea.  Okay.

09:12:38 24          MR. SCHARN:  So in this one, I'd like to focus

09:12:41 25   the Court on the last paragraph in this document.  There's

09:12:46 1    communications in here about European patent proceedings and

09:12:53 2    the corollary -- what BASF says is the corollary to the '844

09:12:58 3    patent.  And it says that, you know, that European patent --

09:13:02 4          THE COURT:  This is the paragraph that starts

09:13:04 5    "specifically"?

09:13:05 6          MR. SCHARN:  That's correct.

09:13:06 7          THE COURT:  All right.  Hold on.  Let me just

09:13:08 8    read it.

09:13:09 9          MR. SCHARN:  Sure.  Yeah.

09:13:35 10          THE COURT:  Yeah, so what's -- all right.  So

09:13:37 11    what's BASF's position on this one?

09:13:39 12          MR. SMITH:  Your Honor, this is the document

09:13:41 13    Miss Strick was going to talk to.  Unfortunately, we haven't

09:13:44 14    had a chance to admit her pro hac vice.  We'll get that

09:13:47 15    taken care of today.

09:13:48 16          THE COURT:  Okay.  Well, consider it done.

09:13:50 17          MS. STRICK:  Thank you, Your Honor.  BASF's

09:13:54 18    position is that this is relevant as to information

09:13:59 19    customers had at the time in 2017, the evidence they had

09:14:04 20    regarding the state of play.

09:14:06 21          THE COURT:  Wait, so 2017.  This is a 20 -- oh,

09:14:09 22    I see.  It's the first one is 2017 and the reply is six

09:14:13 23    months later.  Okay.  So hold on.  So October of 2017,

09:14:25 24    Kayser -- Kayser has an email from the global product

09:14:33 25    manager BASF telling them about European patent proceedings,

09:14:38 1    and this would be information that's relevant to what?

09:14:40 2             MS. STRICK:  Well, the email concerns two

09:14:43 3    things.  First, the first paragraph is about the whether

09:14:49 4    there's any new patent claims that we infringed in the U.S.

09:14:53 5    in the EvapTrap XC and the second is about European claims

09:14:57 6    concerning a -- sorry -- the European counterpart to the

09:15:04 7    '844 patent in the United States.  This was evidence that

09:15:08 8    BASF gave to customers to help them make a decision about

09:15:12 9    the degree of risk there was concerning infringement, and,

09:15:16 10   for that reason, we believe they're relevant.

09:15:27 11            MR. SCHARN:  If I could briefly speak to that,

09:15:28 12   Your Honor.

09:15:29 13            THE COURT:  Yeah.

09:15:29 14            MR. SCHARN:  So you know, you can see what's

09:15:31 15   said there is -- you inquired about our legal opinion

09:15:34 16   regarding U.S. patent, and then gives the '844 patent.  It

09:15:37 17   says due to attorney-client privilege concerns, we cannot

09:15:40 18   share our legal opinion related to this patent, and it goes

09:15:43 19   onto talk about a foreign patent.

09:15:46 20            Your Honor may recall that even in the patent

09:15:48 21   proceedings, we had moved to exclude references to European

09:15:51 22   patent proceedings as prejudicial, where inarguably

09:15:55 23   invalidity was an issue.  We relied on cases like Edwards

09:15:55 24   Life Sciences v. Medtronic, which is from this district, and

09:16:01 25   I'm happy to give the Westlaw citation for that if useful.

09:16:04 1    You know, cases holding that foreign patent proceedings are

09:16:07 2    of limited probative value and can be highly prejudicial.

09:16:10 3    We think that that logic applies in even stronger force here

09:16:16 4    where validity is not actually something that the jury

09:16:19 5    should be considering.

09:16:22 6              THE COURT:  So I do think that the only thing

09:16:25 7    that's actually relevant is the legal opinion about the U.S.

09:16:30 8    patent, which they're not going to share.  You know, the

09:16:37 9    current status of the counterpart patent starts to lead into

09:16:43 10   explanation of issues that have got to be beyond the scope

09:16:45 11   of what we're doing in this case.  So I'm going to sustain

09:16:48 12   this objection and would just ask that you redact -- I take

09:16:53 13   it that what you want to redact, Mr. Scharn, is after the

09:16:56 14   first two sentences so that, basically, we can direct you,

09:17:05 15   basically, and then the rest of the letter?

09:17:07 16             MS. STRICK:  Your Honor?

09:17:08 17             THE COURT:  Yes.

09:17:09 18             MS. STRICK:  Could we actually redact after the

09:17:12 19   third sentence?  We can direct you to publicly available

09:17:16 20   information.

09:17:16 21             THE COURT:  Wait, so it's already redacted

09:17:19 22   starting at "as you may be aware"?

09:17:21 23             MS. STRICK:  Yes, we have a redaction.  I don't

09:17:25 24   believe the first sentence --

09:17:26 25             THE COURT:  Okay.  Well, I don't think that

09:17:28 1   third sentence makes any difference one way or another, so

09:17:30 2   once redacted --

09:17:31 3            And I'm sorry was it -- what's your name?

09:17:34 4            MS. STRICK:  Miss Strick.

09:17:36 5            THE COURT:  Strick?

09:17:37 6            MS. STRICK:  Yes.

09:17:38 7            THE COURT:  Okay.  Miss Strick.  So basically

09:17:42 8   from the "as you are aware" through the end of the sentence

09:17:50 9   or the end ever the paragraph?

09:17:51 10            MS. STRICK:  Can we have it to the

09:17:55 11   second-to-last sentence so that on the second line where it

09:17:58 12   ends at appeal?

09:18:03 13            MR. SCHARN:  The next sentence says, "Attached,

09:18:05 14   you'll find decision from the examining division to revoke

09:18:09 15   the patents."

09:18:10 16            THE COURT:  Right.  So the --

09:18:12 17            MS. STRICK:  No, it would be -- that would be

09:18:13 18   the last sentence we would redact and then it would be at

09:18:16 19   "your legal counsel may find these arguments helpful" is

09:18:19 20   then unredacted.

09:18:21 21            THE COURT:  All right.  Are you all right with

09:18:22 22   that, Mr. Scharn?

09:18:27 23            MR. SCHARN:  Yeah, I mean, that would just leave

09:18:32 24   that last sentence foundationless.  There's no context for

09:18:37 25   it, and it would invite a lot of speculation about what's

09:18:39 1    redacted.

09:18:41 2            THE COURT:  Well, it sort of completes the

09:18:44 3    thought, so I think that I don't think it's necessary to

09:18:51 4    redact that sentence.  And it is kind of -- you know, it's

09:19:00 5    of the same tenor as the first three sentences, so I'm going

09:19:05 6    to redact the sentence starting "as you may be aware"

09:19:12 7    through to the end of the sentence ending "the opposing

09:19:17 8    parties during appeal."   All right?

09:19:20 9            So that's two documents.  What else?

09:19:22 10           MR. SCHARN:  There were a few deposition

09:19:25 11   excerpts.

09:19:26 12           THE COURT:  All right.  Who's in the deposition

09:19:28 13   of?

09:19:29 14           MR. SCHARN:  So if we could start with Stefan

09:19:32 15   Schutte of Kayser, I have an excerpted transcript

09:19:35 16   highlighted to hand up to Your Honor.

09:19:38 17           THE COURT:  All right.  All right.  So I have a

09:19:51 18   highlighted in yellow --

09:19:53 19           MR. SCHARN:  Yes.

09:19:53 20           THE COURT:  -- Stefan Schutte January 14th,

09:19:57 21   2020, deposition.  And the stuff that's highlighted in

09:19:59 22   yellow, that's what is argued about or what?

09:20:02 23           MR. SCHARN:  So that is -- that is what we had

09:20:05 24   objected on as of when we printed this last night.  We were

09:20:08 25   able to resolve some of these this morning, so now it's down

09:20:11  1    to just --

09:20:11  2                    THE COURT:  Okay.

09:20:12  3                    MR. SCHARN:  -- Page 46 starting at Line 12.

09:20:15  4                    THE COURT:  All right.  I see Page 46.  And I

09:20:17  5    see Line 12.

09:20:18  6                    MR. SCHARN:  And the question there is about a

09:20:22  7    document, and when it says our HCA prices will likely

09:20:26  8    skyrocket unpredictably, it appears that -- and Kayser was

09:20:29  9    concerned about potential retaliation from Ingevity, so our

09:20:33  10   objection to that is that the question lacks foundation.

09:20:37  11   The document doesn't say anything about potential

09:20:41  12   retaliation that was --

09:20:42  13                    THE COURT:  Well, so let me see what the answer

09:20:44  14   is.

09:21:06  15                    All right.  What does somebody from BASF have to

09:21:09  16   say?

09:21:10  17                    MR. YOOK:  Yes, Your Honor.  Christopher Yook on

09:21:12  18   behalf of BASF.

09:21:14  19                    Your Honor, I think if you just read this

09:21:15  20   excerpt in isolation, it seems to call for speculation of

09:21:19  21   the witness as to what's going to happen in the future, but,

09:21:22  22   Your Honor --

09:21:22  23                    THE COURT:  Well, I think the objection is not

09:21:24  24   so much the answer that the witness gave but the way the

09:21:27  25   question was phrased; right, Mr. Scharn?

09:21:30 1            MR. SCHARN:  Yes, that's correct.

09:21:35 2            MR. YOOK:  Your Honor, the other thing to note

09:21:37 3   here is that there's no objection preserved within the

09:21:40 4   deposition as to the form of the question.

09:21:42 5            THE COURT:  I don't know.  It says objection,

09:21:45 6   form and foundation.  Those seem to be fairly close to what

09:21:48 7   Mr. Scharn is saying now.

09:21:50 8            MR. YOOK:  Your Honor, this -- the general

09:21:52 9   passage from which this excerpt comes from is discussing

09:21:56 10  Kayser's concern about potential retaliation from Ingevity,

09:22:01 11  and this -- this excerpt doesn't --

09:22:04 12           THE COURT:  So is there something else earlier

09:22:08 13  where there's something that sound like potential

09:22:10 14  retaliation?

09:22:11 15           MR. YOOK:  Yes, Your Honor so if you look to a

09:22:13 16  few lines down, I guess it would be the next line down, Your

09:22:15 17  Honor, Page 46, Line 23.  The question is, "And has Kayser

09:22:22 18  also had concerned about, aside from size, is Ingevity

09:22:25 19  withdrawing the supply of honeycombs?"  And Kayser answers

09:22:29 20  that question, Your Honor.  It's all related that topic.  We

09:22:32 21  weren't asking for Kayser's speculation just in the future.

09:22:35 22  It's about its present-tense concerns about Ingevity's

09:22:41 23  comment.

09:22:41 24           THE COURT:  All right.  Well, it seems to me

09:22:42 25  that even though there was an objection, that, as is the

09:22:49  1      case in depositions, the answer appears to be

09:22:57  2      unobjectionable, and you know, the -- I do see withdrawing

09:23:03  3      the supply of honeycomb, so I don't think potential

09:23:06  4      retaliation is so inflammatory or prejudicial that I

09:23:13  5      shouldn't allow it in, so I'm going to overrule that

09:23:16  6      objection.

09:23:16  7              What else, Mr. Scharn?

09:23:18  8              MR. SCHARN:  Next deposition of Miss Bethany

09:23:22  9      Toldo.

09:23:22 10              THE COURT:  Okay.

09:23:25 11              DEPUTY CLERK:  Thank you.

09:23:39 12              (Discussion held off the record.)

09:23:51 13              THE COURT:  All right.  So we should be ready

09:23:53 14      with the jury shortly.  When they come up, all the people

09:24:00 15      who are seated behind the bench or behind the bar are going

09:24:07 16      to need to leave the courtroom because we need all that

09:24:10 17      space for the jury.

09:24:13 18              But one more for Ms. Toldo.  December -- okay.

09:24:20 19      What is it -- what's the issue here, Mr. Scharn?

09:24:23 20              MR. SCHARN:  So first, at Page 28, lines 14

09:24:28 21      through 20.

09:24:28 22              THE COURT:  Page 28.

09:24:32 23              MR. SCHARN:  And --

09:24:32 24              THE COURT:  Yes, lines 14 through 20.  Hold on

09:24:35 25      just a minute.

09:24:36  1          MR. SCHARN:  Sure.

09:24:37  2          THE COURT:  All right.  I take it the question

09:25:00  3  is fine, but it's the last three lines of the answer that

09:25:05  4  are a problem.

09:25:06  5          MR. SCHARN:  That's correct, Your Honor.

09:25:08  6          THE COURT:  Why do -- what do have you to say

09:25:10  7  about that, Mr. Yook?

09:25:11  8          MR. YOOK:  Yes, Your Honor, I assume that

09:25:13  9  Ingevity's objection is on grounds of hearsay.

09:25:16 10          THE COURT:  Yeah, that would be what I would

09:25:18 11  assume.

09:25:18 12          MR. YOOK:  Yes, Your Honor.  So that's what we

09:25:20 13  understand as well.  So we would turn the Court's attention

09:25:24 14  to 803(3), a statement of declarant's then existing state of

09:25:29 15  mind, so, Your Honor, we're hearing from MAHLE about their

09:25:34 16  customers' concerns and impressions about the validity of

09:25:38 17  these price increases that were being imposed, and it's also

09:25:42 18  about the --

09:25:42 19          THE COURT:  Well, what does it matter what their

09:25:44 20  state of mind is?

09:25:47 21          MR. YOOK:  Their state of mind matters, Your

09:25:50 22  Honor, not necessarily their -- just their impression, but

09:25:52 23  their intent as to whether they're going to accept these

09:25:54 24  price increases passed on by MAHLE, Your Honor.

09:25:57 25          THE COURT:  All right.  Well, I don't think

09:25:59 1    their state of mind is actually relevant because the only

09:26:05 2    thing that you would actually be using it for is to prove

09:26:08 3    the truth of the matter asserted, not that this is what

09:26:12 4    they've seen or this is -- that this is what they've been

09:26:16 5    seeing but that, in fact, this is reality.  So I would --

09:26:22 6              MR. YOOK:  Your Honor, may I -- I'm sorry to

09:26:24 7    interrupt.  If I may, it's not only the fact that what

09:26:27 8    they're going to do with it, but also their impression that

09:26:29 9    it's inconsistent with what they themselves have been seeing

09:26:33 10   in the market, Your Honor.  So it is a present sense

09:26:37 11   impression of their -- of what's going on.

09:26:38 12             THE COURT:  It's not really present sense

09:26:41 13   impression because there's no underlying foundation where

09:26:44 14   you can tell exactly what it is that the witness, Ms. Toldo,

09:26:55 15   is talking about.  So I would direct that the answer,

09:27:05 16   because they said it was inconsistent, et cetera, that that

09:27:08 17   be redacted or not presented because I think it is only

09:27:12 18   offered for a hearsay purpose.

09:27:14 19             All right.  What else do you have, Mr. Scharn?

09:27:17 20             MR. SCHARN:  So the next one is at 35.

09:27:21 21             MR. YOOK:  Your Honor, if I may just for

09:27:22 22   precision, just to make sure that we're playing the correct

09:27:25 23   portions of that passage, so we would redact and not play

09:27:29 24   starting on Page 28, Line 18 where it says "because"?

09:27:33 25             THE COURT:  Yes.

09:27:34 1          MR. YOOK:  Thank you, Your Honor.

09:27:34 2          THE COURT:  Mr. Scharn.

09:27:36 3          MR. SCHARN:  So then it would say the recent

09:27:46 4   increases, we have not been able to get from our customers.

09:27:49 5          THE COURT:  Period.

09:27:52 6          MR. SCHARN:  Okay.  Then at Page 35, Line 21.

09:28:01 7          THE COURT:  Yeah.

09:28:02 8          MR. SCHARN:  So the question is:  "And my read

09:28:05 9   of it, and correct me if I'm wrong, is that these price

09:28:08 10  increases were fairly unprecedented in terms of how large

09:28:11 11  they were; right?"

09:28:12 12          And this is a deposition of a third party, so

09:28:15 13  we'd object to that question as leading and as attorney

09:28:19 14  commentary.

09:28:23 15          THE COURT:  Well, it is leading, but, you know,

09:28:26 16  the witness gave a narrative answer which shows that they,

09:28:32 17  at least to me, were not just mindlessly saying yes to a

09:28:37 18  leading question.  And so I'm going to overrule that

09:28:42 19  objection because I don't see any harm from the leading

09:28:45 20  question nature of it.

09:28:50 21          Is that it?

09:28:50 22          MR. SCHARN:  Okay.  There's just a couple more.

09:28:54 23          THE COURT:  Well, for Ms. Toldo, is that it?

09:28:57 24          MR. SCHARN:  That's it for Ms. Toldo.

09:28:59 25          THE COURT:  Okay.  I think we have jurors out

09:29:02  1    there, so -- but I don't see anybody -- Leigh, can you just

09:29:08  2    see if there's a person outside?

09:29:13  3              DEPUTY CLERK:  Sure.

09:29:14  4              THE COURT:  So why don't we get the people who

09:29:16  5    I've said you have to leave to leave.

09:29:33  6              Actually, Mr. Scharn, you can probably have a

09:29:36  7    seat.

09:29:36  8              MR. SCHARN:  Thank you, Your Honor.

09:30:18  9              MR. SMITH:  Your Honor, one quick question

09:30:19 10    before the jury comes in.  We have not received a list with

09:30:21 11    the numbers corresponding to the individuals.  I don't know

09:30:24 12    if that's coming.

09:30:25 13              THE COURT:  Yeah, that should be handed out, but

09:30:27 14    what's been happening is they have been randomized, so

09:30:30 15    they're going to seat in the order -- like Juror Number 1

09:30:33 16    will be there and they will get new numbers, but you should

09:30:36 17    get that before we go much further.

09:30:39 18              MR. SMITH:  Right.  To the extent that they're

09:30:41 19    going to be referring to number, we have no correlation as

09:30:44 20    to who they are.

09:30:47 21              THE COURT:  Right.

09:30:50 22              DEPUTY CLERK:  Nicole is out there right now

09:30:52 23    lining them up.

09:30:53 24              THE COURT:  And as Mr. Smith points out, we need

09:30:56 25    to be getting something that has their numbers and names.

09:30:59  1                    DEPUTY CLERK:  Yeah, I think Nicole is printing

09:31:01  2     that list.

09:31:01  3                    THE COURT:  Okay.  We think they're being

09:31:03  4     printed now.

09:31:05  5                    MR. SMITH:  Thank you, Your Honor.

09:31:07  6                    DEPUTY CLERK:  I'm going to check.

09:31:22  7                    (Jury pool entering the courtroom.)

09:37:05  8                    (Discussion held off the record.)

09:37:11  9                    THE COURT:  Good morning, everyone.  My name is

09:37:19 10     Richard Andrews.  I'm a judge of the District Court here.

09:37:24 11     We're going to select a jury in a civil case that is called

09:37:29 12     *BASF vs. Ingevity*.  This case arises under the antitrust

09:37:38 13     laws of the United States and the tort law of Delaware.  The

09:37:43 14     plaintiff in this case is BASF.  The defendant is Ingevity.

09:37:48 15     Both parties manufacture activated carbon products for use

09:37:53 16     in automobiles.

09:37:56 17                    For those of you who are selected as jurors to

09:37:59 18     serve as jurors, I will, of course, give you more detailed

09:38:02 19     instructions once you're sworn in as jurors.  But for now, I

09:38:06 20     will simply tell you that BASF claims that Ingevity engaged

09:38:12 21     in conduct that violated the antitrust laws and

09:38:15 22     intentionally interfered with BASF's business relations and

09:38:19 23     that BASF should be awarded money damages from Ingevity.

09:38:24 24     Ingevity denies it has violated the antitrust laws or

09:38:29 25     intentionally interfered with BASF's business relations.

09:38:32  1          I'm going to ask you a series of questions to

09:38:35  2   help the Court -- that's me -- and the attorneys in the jury

09:38:41  3   selection process.  But before I ask any questions, I'm

09:38:44  4   going to ask the deputy clerk to swear the jury panel to

09:38:47  5   answer any and all questions truthfully.

09:38:50  6          Could we please swear the panel.

09:38:52  7          DEPUTY CLERK:  Members of the jury panel, will

09:38:54  8   you please rise and raise your right hand.

09:38:56  9          You and each of you who do solemnly swear, those

09:39:02 10   of how swear, and you and each of you do affirm, those of

09:39:06 11   you who affirm, that you will true answer make to such

09:39:09 12   questions as may be asked you touching the matter now before

09:39:12 13   the Court, so help you God, those of you who swear, and you

09:39:15 14   do so affirm, those of you who do affirm?

09:39:18 15          The correct response is I do.

09:39:20 16          THE JURY:  I do.

09:39:21 17          DEPUTY CLERK:  Thank you.

09:39:22 18          THE COURT:  All right.  So when I start reading

09:39:26 19   the questions, if your answer to the question is yes, I want

09:39:32 20   you to raise your hand and I will try to go around and call

09:39:37 21   on you so I can write down the number, your jury number,

09:39:41 22   which is what I want you to tell me to make sure that I have

09:39:46 23   that you've answered that question yes.  When I've finished

09:39:50 24   with the questions that I ask of all of you, the lawyers and

09:39:55 25   I will talk to some of you about the questions to which you

09:39:58  1    answered yes.

09:40:00  2              So this case, the presentation of evidence is

09:40:04  3    expected to take five days, today, tomorrow, Thursday,

09:40:11  4    Friday and Monday of next week.  Closing arguments and jury

09:40:18  5    deliberations should extend your service into at least

09:40:20  6    Tuesday of next week.  The schedule that I expect to keep

09:40:25  7    during the days of evidence presentation will include a

09:40:28  8    morning break of 15 minutes, a lunch break of up to an hour,

09:40:32  9    and an afternoon break of 15 minutes.  We will start at

09:40:37 10    9:30 a.m. each day and finish no later than 5:00 p.m. each

09:40:41 11    day.

09:40:42 12              So the first question is:  Does the schedule

09:40:46 13    that I've just mentioned present a special hardship to you?

09:40:51 14    If so, raise your hand.

09:40:53 15              All right.  Well, let's start over here against

09:41:01 16    the wall.  You ma'am.

09:41:02 17              THE JUROR:  Yes, Juror Number 10.

09:41:04 18              THE COURT:  Ten?

09:41:07 19              No.  No.  You don't need to tell me why just say

09:41:09 20    yes.

09:41:13 21              THE JUROR:  Yes.

09:41:13 22              THE COURT:  And you, sir?

09:41:14 23              THE JUROR:  Juror 12.

09:41:16 24              THE COURT:  And you, sir?

09:41:18 25              THE JUROR:  13.

09:41:19  1          THE COURT:  And was there somebody in the back

09:41:22  2  row?  No, I don't see anyone.

09:41:25  3          Over on this side.  You, sir.

09:41:27  4          THE JUROR:  9.

09:41:28  5          THE COURT:  And in its back row, you, ma'am.

09:41:30  6          THE JUROR:  30.

09:41:32  7          THE COURT:  30?

09:41:33  8          THE JUROR:  Yes.

09:41:34  9          THE COURT:  Anybody else?

09:41:37 10          Oh, sorry.  I missed you because you're right

09:41:40 11  dead center.  Yes, what's your number?

09:41:42 12          THE JUROR:  26.

09:41:43 13          THE COURT:  Anybody else?

09:41:47 14          All right.  I don't see any further hands.

09:41:49 15          Have any of you heard or read anything about

09:41:53 16  this case?

09:41:56 17          By the way, it's important that jurors come not

09:42:02 18  knowing anything about the case, so if you have any

09:42:04 19  electronic devices on you, don't start trying to look up

09:42:08 20  something about the case.  All right?

09:42:12 21          All right.  So the third question is:  I'm going

09:42:16 22  to ask the lawyers to introduce themselves and the names of

09:42:20 23  their firms, starting with the plaintiff, BASF.

09:42:28 24          Mr. Smith.

09:42:29 25          MR. SMITH:  Good morning, ladies and gentlemen.

09:42:30  1    There's two law firms on our side of the case, on BASF's

09:42:35  2    side.  It's my law firm, Morris Nichols Arsht and Tunnel,

09:42:37  3    and also the King & Spalding firm.  The lawyers' names --

09:42:40  4    I'm Rodger Smith, Anthony Raucci, Thomas Friel, Norman

09:42:45  5    Armstrong, Brian Eutermoser, Paul Mezzina, Christopher Yook,

09:42:53  6    Mikaela Stone, Emily Chen, and Amanda Strick.

09:42:56  7                THE COURT:  All right.  Thank you, Mr. Smith.

09:42:58  8                Ms. Keller.

09:42:58  9                MS. KELLER:  Good morning, ladies and gentlemen.

09:43:00 10    My name is Karen Keller.  I'm with the law firm of Shaw

09:43:04 11    Keller in Wilmington, Delaware.  Also representing Ingevity

09:43:07 12    through this trial will be the law firm of Gibson Dunn,

09:43:13 13    Jeffrey Thomas, Brian Buroker, and Nate Scharn.

09:43:16 14                THE COURT:  All right.  Thank you, Ms. Keller.

09:43:20 15                So do you or, to your knowledge, anyone in your

09:43:23 16    immediate family, such as spouse, child, parents or sibling

09:43:23 17    know any of the attorneys or law firms that have just been

09:43:32 18    introduced?

09:43:32 19                THE COURT:  You, sir.

09:43:33 20                THE JUROR:  I know Mr. Smith.

09:43:35 21                THE COURT:  No, no, no.  What's your number.

09:43:38 22                THE JUROR:  Number nine.

09:43:38 23                THE COURT:  Number nine.  Thank you.

09:43:40 24                Anybody else?  I see no further hands.

09:43:47 25                Have any of you or anyone in your immediate

09:43:51 1   families had any business dealings with or been employed by

09:43:55 2   any of these attorneys or law firms?

09:43:59 3              I see no hands.

09:44:03 4             Have any of you or anyone in your immediate

09:44:06 5   families ever been employed by either BASF or Ingevity?

09:44:11 6             In the back row, ma'am.

09:44:13 7             THE JUROR:  27.

09:44:14 8             THE COURT:  And anybody else?

09:44:23 9             I see no further hands.

09:44:25 10            Have any of you or anyone in your immediate

09:44:30 11   families ever owned stock in BASF or Ingevity?

09:44:37 12            All right.  Is that Number nine?  No.

09:44:41 13           THE JUROR:  27.

09:44:42 14           THE COURT:  Number 27.

09:44:45 15           All right.  Anybody else?

09:44:47 16           All right.  I don't see any further hands.

09:44:49 17           Have any of you or anyone in your immediate

09:44:55 18   families ever had a business relationship with BASF or

09:45:00 19   Ingevity?

09:45:02 20           You, sir, what's your number?

09:45:04 21           THE JUROR:  23.

09:45:06 22           THE COURT:  And anybody else?  I see no further

09:45:12 23   hands.

09:45:13 24           Have any of you or anyone in your immediate

09:45:18 25   families ever had any experience, good or bad, with BASF or

09:45:23 1   Ingevity that might make it difficult for you to be a fair

09:45:27 2   and impartial juror in this case?

09:45:30 3          No response.

09:45:34 4          Do you possess any opinions about either BASF or

09:45:39 5   Ingevity that might make it difficult for you to be a fair

09:45:42 6   and impartial juror in this case?

09:45:44 7          27; right?

09:45:50 8          THE JUROR:  Yeah.

09:45:51 9          THE COURT:  Anybody else?

09:45:56 10         No further response.

09:45:58 11         All right.  So I'm going to read a list of

09:46:03 12  companies who may -- whose names may be mentioned during

09:46:11 13  testimony and sometimes quite a few times, and at the end of

09:46:17 14  it, I'm going to ask you whether you ever had any business

09:46:19 15  dealings or been employed by any of these companies.

09:46:24 16         All right.  So the companies are:  Delphi

09:46:27 17  Technologies, Kayser Automotive, Korea Fuel Technology

09:46:35 18  Company, MAHLE, Stant, Sterling Performance, SGS, IDIADA,

09:46:53 19  Westvaco, MeadWestvaco, or EnerG2.

09:46:59 20         So we've got number 27 there.  Anybody else?

09:47:13 21         I see no further response.

09:47:17 22         So now I'm going to list read you a list of

09:47:21 23  potential witnesses in this case.

09:47:29 24         To counsels' knowledge, do any of these

09:47:31 25  witnesses actually live in Delaware?

09:47:35  1                  MR. SMITH:  No, we don't believe so, Your Honor.

09:47:37  2                  MS. KELLER:  No, Your Honor.

09:47:38  3                  THE COURT:  All right.  So these are people from

09:47:41  4       outside of Delaware, and if you think you recognize that you

09:47:44  5       know one of them, I'm going to ask you at the end whether

09:47:48  6       that's the case.

09:47:49  7                  So the witnesses' names are or potential

09:47:52  8       witnesses are:  Edward Woodcock, Peter McCrae, Erik Ripple,

09:47:59  9       Divya Mathur, James Lyons, Akash Abraham, James Peterson,

09:48:12 10       Diana Rowe, Wolfgang Ruettinger, Robert Beckler, Kirill

09:48:26 11       Bramnick, Stefan Schutte, Bethany Toldo, Frank Gregor, Susan

09:48:35 12       LaBine, Kasih Listiawan, David Rockstraw, Mohan Rao, Roger

09:48:43 13       Williams, James Miller, Lawrence Hiltzik, Steven Chin,

09:48:53 14       Heather Widgren, Achim Rauber, Sebastian Bunzendahl, Scott

09:49:03 15       Garcia, Julie Bough.

09:49:06 16                  Do you think you're familiar with any of these

09:49:08 17       potential witnesses?

09:49:10 18                  I see no response.

09:49:16 19                  Have you ever been employed by an automotive

09:49:19 20       manufacturer?

09:49:22 21                  Sorry, was there a hand over there?  No, I guess

09:49:27 22       not.

09:49:28 23                  Yes, in its back corner, sir.

09:49:30 24                  THE JUROR:  31.

09:49:33 25                  THE COURT:  Anybody else?  Yes, you, sir.

09:49:38  1                THE JUROR:  2.

09:49:42  2                THE COURT:  Anyone else?  No further response.

09:49:46  3          Have you or any member of your immediate family

09:49:50  4  ever been employed by the United States Patent and Trademark

09:49:53  5  Office?

09:49:58  6          No response.

09:49:59  7          Have you or any member of your immediate family

09:50:03  8  ever applied for or obtained a United States or a foreign

09:50:07  9  patent?

09:50:10 10          Number 27.

09:50:17 11          Anyone else?  I see no further response.

09:50:23 12          Have you ever been involved in a dispute about

09:50:26 13  the antitrust laws, interference with a business

09:50:29 14  relationship, or patent rights?

09:50:34 15          No response.

09:50:37 16          Do you have any experience with emissions

09:50:42 17  controls in automobiles?

09:50:47 18          No response.

09:50:50 19          Have you had any past experience in a lawsuit

09:50:54 20  that would impact your ability to be a fair and impartial

09:50:57 21  juror in this case?

09:50:59 22          No response.

09:51:04 23          Have you heard or read anything about any other

09:51:09 24  case involving either BASF or Ingevity?

09:51:13 25          No response.

```
09:51:17   1              Have you served on a jury in a civil case within
09:51:23   2      the last 15 years or so?
09:51:27   3              No jury service?
09:51:32   4              Ah, yes.
09:51:33   5              THE JUROR:  15.
09:51:34   6              THE COURT:  15.
09:51:38   7              And I thought I saw another hand in the front.
09:51:40   8      Yes.
09:51:41   9              THE JUROR:  One.
09:51:42  10              THE COURT:  Is that one?
09:51:43  11              THE JUROR:  Four, sorry.
09:51:44  12              THE COURT:  Four.  Okay.
09:51:47  13              THE JUROR:  Is that just for civil, Your Honor?
09:51:48  14              THE COURT:  Civil, yes.
09:51:50  15              THE JUROR:  Oh, no.
09:51:51  16              THE COURT:  So you were on a criminal jury.
09:51:57  17              THE JUROR:   (Indicating.)
09:51:57  18              THE COURT:  Well, we'll talk to you about that
09:52:00  19      anyhow.
09:52:00  20              Do I see a hand in the back?  Okay.  I see no
09:52:03  21      further response.
09:52:04  22              If you're selected to sit as a juror in this
09:52:07  23      case, are you aware of any reason why you would be unable to
09:52:10  24      render a verdict based solely on the evidence presented at
09:52:13  25      trial?
```

09:52:16  1                No response.

09:52:18  2                If you are selected to sit as a juror in this

09:52:21  3  case, are you aware of any reason why you would not be able

09:52:24  4  to follow the law as I give it to you?

09:52:27  5                All right.  Is that two?

09:52:36  6                THE JUROR:  (Indicating.)

09:52:41  7                All right.  I see no further response.

09:52:46  8                Is there anything such as poor vision,

09:52:51  9  difficulty hearing, or difficulty understanding spoken or

09:52:56 10  written English that would make it difficult for you to

09:53:00 11  serve on this jury?

09:53:02 12                You, sir.

09:53:04 13                THE JUROR:  Sixteen.

09:53:11 14                THE COURT:  Anyone else?  All right.  I see no

09:53:18 15  further response.

09:53:19 16                Is there anything about serving on a jury during

09:53:24 17  the COVID pandemic that would make it difficult for you to

09:53:28 18  be a fair and impartial juror?

09:53:30 19                No response.

09:53:36 20                So this is the last question for the group.  Is

09:53:42 21  there anything else, including something that you may have

09:53:46 22  remembered in connection with one of the earlier questions,

09:53:50 23  that you think you would like to tell me about in connection

09:53:52 24  with your service as a juror in this case?

09:53:56 25                Yes.

| | | |
|---|---|---|
| 09:53:59 | 1 | THE JUROR:  Four. |
| 09:53:59 | 2 | THE COURT:  Four. |
| 09:54:03 | 3 | You, sir. |
| 09:54:06 | 4 | THE JUROR:  20. |
| 09:54:07 | 5 | THE COURT:  20? |
| 09:54:09 | 6 | THE JUROR:  (Indicating.) |
| 09:54:12 | 7 | THE COURT:  Anyone else? |
| 09:54:15 | 8 | All right.  So that completes the general |

09:54:21  9  questioning, and so myself and a few of the lawyers are

09:54:28 10  going to go back into my jury room, and we'll start talking

09:54:34 11  to jurors who answered one or more of the questions yes, and

09:54:42 12  my staff will take care of that.

09:54:45 13           So we'll be going back into that room.

09:54:52 14           DEPUTY CLERK:  All rise.

09:56:46 15           (Discussion held off the record.)

09:57:03 16           DEPUTY CLERK:  So you can either sit or stand in

09:57:05 17  this general area.  It's a lot of people.  Don't get

09:57:07 18  worried.

09:57:09 19           THE JUROR:  I'm not worried.

09:57:13 20           THE COURT:  And good morning.

09:57:14 21           THE JUROR:  Good morning.

09:57:14 22           THE COURT:  Off the record a second.

09:56:46 23           (Discussion held off the record.)

09:57:20 24           THE COURT:  Back on the record.

09:57:22 25           So you're Miss Easter; right?

09:57:24 1                THE JUROR:  Yes.

09:57:24 2                THE COURT:  Hi, so I think you didn't answer any

09:57:26 3  questions yes.  I just want to make sure if you get selected

09:57:29 4  for this jury, you're good with serving on it.

09:57:31 5                THE JUROR:  I'm okay with serving on it.

09:57:34 6                THE COURT:  Okay.  I take it that means that

09:57:39 7  there might be some other things you'd rather be doing, but

09:57:42 8  between your civic duty, you'll do your duty if called.

09:57:45 9                THE JUROR:  Right.

09:57:48 10                I would say I do work with children with

09:57:50 11  disabilities, and it does throw a little hiccup into their

09:57:56 12  treatment, so but, I could do it.

09:58:00 13                THE COURT:  Okay.  All right.

09:58:01 14                THE JUROR:  I hate to do that, but --

09:58:03 15                THE COURT:  All right.  Well, thank you.  Can

09:58:04 16  you retake your seat.

09:58:09 17                  (Juror leaving the room.)

09:58:12 18                THE COURT:  So basically once we get 14

09:58:14 19  qualified jurors, because they're already been randomized,

09:58:18 20  we're going to stop --

09:58:19 21                MS. KELLER:  Okay.

09:58:20 22                MR. SMITH:  Okay.

09:58:20 23                THE COURT:  -- because we don't need more than

09:58:22 24  14.

09:58:45 25                DEPUTY CLERK:  There's a few people back here.

09:58:51  1    You can stand or have a seat, whatever you're more

09:58:53  2    comfortable with.

09:58:54  3                   THE COURT:  Mr. Cornell, I assume.

09:58:56  4                   THE JUROR:  Yes.

09:58:56  5                   THE COURT:  So I think you answered two

09:58:58  6    questions yes.  One of them was that you worked for an auto

09:59:00  7    manufacturer.

09:59:01  8                   THE JUROR:  I did, probably back in college.

09:59:06  9    Tenneco out of northern Indiana.

09:59:08 10                   THE COURT:  And what did they make?

09:59:09 11                   THE JUROR:  They helped to make, like, Ford

09:59:12 12    products and stuff like that.

09:59:16 13                   THE COURT:  Emissions controls, was that part of

09:59:18 14    it?

09:59:19 15                   THE JUROR:  Mufflers.  Assembling mufflers and

09:59:24 16    how they, like, emit.

09:59:26 17                   THE COURT:  And what did you specifically

09:59:27 18    yourself do there, if you remember?

09:59:33 19                   THE JUROR:  I helped to construct all the

09:59:35 20    mufflers and then we helped to test the emissions of it.

09:59:40 21                   THE COURT:  And did you have a scientific

09:59:44 22    background for this, or was this something that was kind of

09:59:47 23    on-the-job training?

09:59:48 24                   THE JUROR:  On-the-job training more to do.

09:59:51 25                   THE COURT:  All right.  Do you think that would

09:59:52  1    make any difference based on the jury summary, what I

09:59:58  2    described this case as being about, to your ability to be

10:00:01  3    fair to both sides?

10:00:03  4              THE JUROR:  Yeah, I don't think it would make a

10:00:06  5    big deal about -- no.

10:00:09  6              THE COURT:  Okay.  Do you know whether Tenneco

10:00:13  7    had any business dealings with either BASF or Ingevity?

10:00:17  8              THE JUROR:  I do not.

10:00:18  9              THE COURT:  All right.  So then you also

10:00:19 10    answered a different question which was --

10:00:24 11              THE JUROR:  It was -- it's knowing --

10:00:27 12              THE COURT:  Oh, you know Mr. Smith.

10:00:29 13              THE JUROR:  No, no, no.  Knowing information.

10:00:31 14    It was like, I work for the news, the news out of Philly,

10:00:35 15    CBS 3.

10:00:37 16              THE COURT:  Okay.

10:00:38 17              THE JUROR:  So a lot of info comes, through not

10:00:40 18    only about cases and dealings going on, but, yeah, I was

10:00:46 19    just working for the news.

10:00:46 20              THE COURT:  Okay.  But you don't -- but you

10:00:49 21    haven't actually heard anything about this case; right?

10:00:51 22              THE JUROR:  Not to my recollection.  There's so

10:00:54 23    much.  I deal with, like, all, anything that the news puts

10:00:57 24    out.  You know, content, you know, any information or

10:01:01 25    dealing with producers about stories that we might do on the

10:01:06  1    nightly news.  So not to my recollection.

10:01:09  2              THE COURT:  Okay.  But -- and if you were

10:01:11  3    serving on this jury, you would be taking off from work, so

10:01:15  4    you wouldn't be exposed to more of this while you were here.

10:01:18  5              THE JUROR:  I would still have to be -- know

10:01:23  6    news and stuff and know content, so if there's ever any info

10:01:27  7    about the case that, like, came through because I still deal

10:01:31  8    with the producers and stuff about content even when I'm at

10:01:35  9    home.

10:01:36 10              THE COURT:  Okay.

10:01:37 11              THE JUROR:  But if they're -- if there was

10:01:39 12    anything about the case on the nightly news or anything,

10:01:43 13    then I wouldn't.

10:01:46 14              THE COURT:  All right.  So I don't think it will

10:01:48 15    actually be on the nightly news, but if something came

10:01:51 16    across and all of a sudden they started talking about BASF

10:01:54 17    and Ingevity, could you, like, turn off the TV or put down

10:01:57 18    the news feed or avoid hearing somebody else's summary of

10:02:01 19    what was going on here?

10:02:02 20              THE JUROR:  Yeah.  I still have to deal with --

10:02:06 21    you know, like, I'm emailed and stuff about it and stuff, so

10:02:09 22    like if I immediately saw like anything about it, I would

10:02:12 23    try to like, you know -- turn -- you know, turn off my

10:02:16 24    emails or whatever, but I think I could be impartial.

10:02:19 25              THE COURT:  Okay.  And though -- and your role

10:02:21  1   in the news operation is just general news.  You don't have

10:02:24  2   a specific beat or area of expertise?

10:02:27  3                  THE JUROR:  I'm a technical specialist, so I

10:02:29  4   deal with any content, and I'm more of a technical person,

10:02:35  5   technical director, floor director, technical operations,

10:02:40  6   basically any content that comes through the news station

10:02:45  7   that they might do a story about.

10:02:47  8                  THE COURT:  Okay.

10:02:48  9                  THE JUROR:  If that makes any sense.

10:02:50 10                  THE COURT:  I think it does.

10:02:50 11                  Mr. Smith, do you have any questions?

10:02:52 12                  MR. SMITH:  If I might, Your Honor.

10:02:53 13                  THE COURT:  Yes, go ahead.

10:02:54 14                  MR. SMITH:  What was the time period you would

10:02:55 15   have been working at Tenneco, if you remember?

10:02:58 16                  THE JUROR:  Okay, so I'm 31 now.  Back in

10:03:01 17   college.  Ten years ago.  10, 12 years ago.  Is that a good

10:03:06 18   ballpark?

10:03:07 19                  MR. SMITH:  Good enough.  And you were a

10:03:09 20   full-time employee?

10:03:10 21                  THE JUROR:  I worked for a little under a year,

10:03:13 22   a little -- about eight months.  Full-time employee,

10:03:17 23   40 hours a week.

10:03:18 24                  MR. SMITH:  Okay.  Nothing else.

10:03:20 25                  THE COURT:  Ms. Keller, anything?

10:03:22 1                MS. KELLER:  Yeah, just one quick question.   In

10:03:23 2     your time at -- I think you said Tenneco?

10:03:25 3                THE JUROR:  Tenneco, yeah.

10:03:27 4                MS. KELLER:  Working on the mufflers and that,

10:03:29 5     did you have any strong feelings one way or other about the

10:03:32 6     auto industry, the car manufacturers?

10:03:34 7                THE JUROR:  Do I have my own personal opinion

10:03:36 8     or --

10:03:37 9                MS. KELLER:  Yes.

10:03:39 10               THE JUROR:  Yeah.  Yes, I also -- I don't know

10:03:44 11    if this pertains, but when -- when I was in my after

10:03:51 12    college -- what's that called?  Like the jobs?  Internships.

10:03:56 13               MS. KELLER:  Mm-hmm.

10:03:56 14               THE JUROR:  I worked for the state of California

10:03:58 15    for green emission.  I don't know if that -- there wasn't

10:04:03 16    really any questions about that.  So I worked for that

10:04:07 17    probably a year and a half for green -- green emissions.

10:04:14 18    Oh, power, kind of wind, solar.  Internship.

10:04:23 19               THE COURT:  Okay.  Anything further?

10:04:24 20               MS. KELLER:  Nothing further, Your Honor.

10:04:25 21               THE COURT:  All right.  Mr. Cornell, can you

10:04:27 22    just step outside for a second.

10:04:30 23               THE JUROR:  I'll just --

10:04:31 24               THE COURT:  Follow Ms. Selmyer.

10:04:33 25               THE CLERK:  If you can stand in the hallway,

10:04:35  1    I'll be right back to get you.

10:04:37  2              THE COURT:  Okay.  He seems fine to me.  Do

10:04:39  3    either of you object?

10:04:40  4              MR. SMITH:  We do not, Your Honor.

10:04:41  5              MS. KELLER:  No objection.

10:04:42  6              THE COURT:  All right.  Tell him to go take his

10:04:44  7    seat and bring in number three.

10:04:46  8              THE CLERK:  Okay.

10:04:48  9              (Juror leaving the conference room.)

10:04:55 10              (Juror entering the conference room.)

10:05:47 11              THE CLERK:  Don't be startled by the size of the

10:05:51 12    group.  They're going to ask you a couple of follow-up

10:05:54 13    questions.

10:05:54 14              THE JUROR:  Sure.

10:05:55 15              THE CLERK:  And you can either have a seat here

10:05:57 16    or stand, whatever you're more comfortable with.

10:06:00 17              THE COURT:  Hi.  You're Mr. Brown, I presume?

10:06:03 18              THE JUROR:  I am.

10:06:03 19              THE COURT:  And so, basically, I just wanted to

10:06:05 20    check, because I think you didn't answer any of the

10:06:07 21    questions yes, so I wanted to make sure if you're selected

10:06:11 22    to serve for this jury, you're good with that?

10:06:13 23              THE JUROR:  Sure.

10:06:14 24              THE COURT:  Okay.  Well, thank you.  That's all

10:06:16 25    I wanted to ask.

10:06:21  1          THE JUROR:  Quick and easy.  Painless.

10:06:25  2              (Juror leaving the conference room.)

10:06:30  3              (Juror entering the conference room.)

10:07:08  4          THE CLERK:  Okay.  And you can either have a

10:07:11  5    seat here in this chair or stand, whatever you're more

10:07:13  6    comfortable with.

10:07:14  7          THE JUROR:  Okay.

10:07:15  8          THE COURT:  Hi.  You're Miss -- is it Pedrick?

10:07:18  9          THE JUROR:  Yes, Your Honor.

10:07:19 10          THE COURT:  So I think you answered two

10:07:21 11    questions yes.  One of them was that you had served on a

10:07:24 12    jury before.

10:07:25 13          THE JUROR:  Yes, federal grand jury.

10:07:27 14          THE COURT:  Okay.

10:07:27 15          THE JUROR:  In this building.  It would have

10:07:30 16    been during the Obama Administration because when I noticed

10:07:33 17    the President's picture on the wall, I was like, yeah.  I

10:07:35 18    don't remember which year it was, but it was for a full two

10:07:38 19    years, Tuesday and Wednesday, first of every month.

10:07:42 20          THE COURT:  Did you see me?

10:07:43 21          THE JUROR:  I didn't, no.  I did not, that I

10:07:45 22    remember.  It was a long time ago.

10:07:47 23          THE COURT:  I'm not very memorable.  Well, in

10:07:50 24    any event, federal grand jury.  That's pretty different than

10:07:53 25    this.  Is there anything about that experience, which is a

10:07:56  1    much different kind of experience than being on a jury, is

10:07:59  2    there anything that would make it difficult for you to be a

10:08:01  3    fair and impartial juror here?

10:08:03  4              THE JUROR:  No, I served in Superior Court way

10:08:06  5    back in, like, the early 2000s -- of Delaware -- on a jury

10:08:09  6    for that for, like, three weeks, but that was the only jury.

10:08:12  7              THE COURT:  Was that a criminal case?

10:08:13  8              THE JUROR:  No, it was a civil.

10:08:15  9              THE COURT:  What was that about, do you

10:08:17 10    remember?

10:08:18 11              THE JUROR:  A woman was suing another woman

10:08:22 12    because she had backed into her and she wore a neck brace,

10:08:25 13    et cetera.

10:08:25 14              THE COURT:  So what we would call personal

10:08:27 15    injury?

10:08:28 16              THE JUROR:  Yes.

10:08:28 17              THE COURT:  Okay.

10:08:29 18              THE JUROR:  It was actually in the old, old

10:08:30 19    building when Superior Court was up at Rodney Square.

10:08:33 20              THE COURT:  Okay.  That was quite awhile ago.

10:08:34 21              THE JUROR:  It was.

10:08:35 22              THE COURT:  All right.  So then the other thing

10:08:38 23    was you had, I think, the last question which is

10:08:41 24    basically --

10:08:41 25              THE JUROR:  Yes.

10:08:42  1          THE COURT:  -- something else you wanted to talk

10:08:43  2  about.  What was that?

10:08:44  3          THE JUROR:  So the litany of the different

10:08:47  4  businesses and the names that you had read off, I couldn't

10:08:51  5  remember if you had instructed if it was -- if I had a

10:08:54  6  personal relationship or if a member of our family.

10:08:57  7          THE COURT:  Well, let's take a broader --

10:08:59  8          THE JUROR:  Okay.

10:08:59  9          THE COURT:  -- view.  What were you thinking

10:09:01 10  about?

10:09:01 11          THE JUROR:  My brother actually worked for

10:09:06 12  Westvaco way back in the Newark plant before it shut down,

10:09:09 13  so I think that was like 15 years ago.  I don't know.  He

10:09:12 14  was a frontline worker, but that's the only thing.  I mean,

10:09:16 15  I don't know much about Westvaco other than he worked there

10:09:19 16  and they shut the building down and built a Lowe's.

10:09:25 17          THE COURT:  Okay.  Did your brother have an

10:09:28 18  opinion about Westvaco that you know whether he thought it

10:09:32 19  was a good place to work or a bad place to work or you don't

10:09:35 20  know?

10:09:37 21          THE JUROR:  He worked there the bulk of his

10:09:39 22  career before going to a new job when they shut the plant

10:09:42 23  down.  That was really it.  I mean, he -- he went to work.

10:09:45 24  He enjoyed it, and that was it.  He was a front line.  I

10:09:48 25  guess the line or whatever where they made boxes.

10:09:51  1          THE COURT:  Okay.

10:09:52  2          THE JUROR:  Pushing the boxes through.  That's

10:09:54  3    really -- I don't know what he did exactly.

10:09:56  4          THE COURT:  And the fact that Westvaco shut down

10:09:58  5    that plant, was that a source of -- did that cause any hard

10:10:07  6    feelings for your brother or his family?

10:10:10  7          THE JUROR:  No.  He went and got a job at

10:10:12  8    University of Delaware in maintenance and was able to put

10:10:15  9    his son through college free, so it wasn't.

10:10:17 10          THE COURT:  So it worked out for the best.

10:10:19 11          THE JUROR:  It did.  It did, yes.

10:10:21 12          THE COURT:  Okay.  Any questions, Mr. Smith?

10:10:22 13          MR. SMITH:  No, Your Honor.  Thank you.

10:10:26 14          THE COURT:  Ms. Keller?

10:10:27 15          MS. KELLER:  No.  Thank you, Your Honor.

10:10:30 16          THE COURT:  All right.  Miss Pedrick, you can go

10:10:32 17    and retake your seat.  Okay.

10:10:56 18          (Juror leaving the conference room.)

10:11:00 19          (Juror entering the conference room.)

10:11:12 20          DEPUTY CLERK:  So you can either stand or have a

10:11:14 21    seat here, whatever you like.

10:11:15 22          THE JUROR:  Okay.

10:11:16 23          THE COURT:  You are Mr. Lowry?

10:11:17 24          THE JUROR:  I am.

10:11:18 25          THE COURT:  And I believe that it's the case

10:11:19  1    that you didn't answer any questions yes; right?

10:11:22  2                THE JUROR:  That's correct.

10:11:23  3                THE COURT:  So really I just wanted to make sure

10:11:24  4    that if you end up getting selected for this jury that

10:11:27  5    you're good with serving.

10:11:28  6                THE JUROR:  I'm good.

10:11:29  7                THE COURT:  Okay.  Thank you very much.

10:11:30  8                THE JUROR:  Thank you.

10:11:31  9                (Juror leaving the conference room.)

10:11:39 10                (Juror entering the conference room.)

10:12:07 11                THE CLERK:  You can either stand or have a seat,

10:12:12 12    whatever you're more comfortable with.

10:12:13 13                THE JUROR:  Seat, if that's okay.

10:12:15 14                THE CLERK:  Yeah, sure.  Good morning.  Is it

10:12:19 15    Ms. Polizzi?

10:12:19 16                THE JUROR:  Polizzi.

10:12:21 17                THE COURT:  Polizzi.

10:12:22 18                THE JUROR:  Yes.

10:12:22 19                THE COURT:  So I think it's the case that you

10:12:24 20    didn't answer any questions yes; right?

10:12:25 21                THE JUROR:  Right.

10:12:26 22                THE COURT:  So I just wanted to make sure if

10:12:27 23    you're selected to serve on this jury, you're good with that

10:12:30 24    service.

10:12:31 25                THE JUROR:  Yeah.

10:12:31  1                    THE COURT:  Okay.  All right.  Thank you.  You

10:12:33  2     may go back to your seat.

10:12:35  3                    THE JUROR:  Thank you.

10:12:37  4                    (Juror leaving the conference room.)

10:12:43  5                    (Juror entering the conference room.)

10:13:27  6                    THE CLERK:  You can either stand or have a seat,

10:13:35  7     whatever you're more comfortable with.

10:13:37  8                    THE JUROR:  I'm fine.

10:13:38  9                    THE COURT:  Okay.  So Ms. Elkins -- you are

10:13:41 10     Ms. Elkins; right?

10:13:42 11                    THE JUROR:  Correct.

10:13:43 12                    THE COURT:  I think it's the case that you

10:13:45 13     didn't answer any question yes; is that right?

10:13:47 14                    THE JUROR:  That's correct.

10:13:47 15                    THE COURT:  And I just wanted to make sure that

10:13:49 16     if you're selected to serve on this jury, you're good with

10:13:53 17     that.

10:13:53 18                    THE JUROR:  I am.

10:13:54 19                    THE COURT:  Okay.  Well, thank you very much.

10:13:56 20                    THE JUROR:  Thank you.

10:14:21 21                    (Juror leaving the conference room.)

10:14:24 22                    (Juror entering the conference room.)

10:14:28 23                    THE CLERK:  All right.  We're going to come

10:14:50 24     back.  You can either stand or have a seat, whatever you're

10:14:53 25     more comfortable with.

10:14:54  1          THE JUROR:  I'll just stand.

10:14:55  2          THE COURT:  Hi.  Ms. Riley, is it?

10:14:57  3          THE JUROR:  Yes.

10:14:58  4          THE COURT:  So I believe it's the case that you

10:15:00  5   didn't answer any question yes; is that correct?

10:15:01  6          THE JUROR:  That is correct.

10:15:02  7          THE COURT:  And I just wanted to make sure that

10:15:04  8   if you are selected to serve on this jury, you're good with

10:15:08  9   that.

10:15:08 10          THE JUROR:  Yes.

10:15:08 11          THE COURT:  Okay.  All right.  You passed the

10:15:11 12   audition.

10:15:11 13          THE JUROR:  Thank you.

10:15:12 14          THE COURT:  You can return to your seat.  Thank

10:15:14 15   you.

10:15:14 16          THE JUROR:  Thank you.

10:15:15 17          (Juror leaving the conference room.)

10:15:15 18          (Juror entering the conference room.)

10:15:57 19          DEPUTY CLERK:  And you can either stand or sit,

10:15:59 20   whatever you're more comfortable with.  Okay.

10:16:01 21          THE COURT: All right.  Is it Mr. Qasim?

10:16:04 22          THE JUROR:  Yes, sir.

10:16:04 23          THE COURT:  So I think -- so good morning.

10:16:08 24          THE JUROR:  Good morning.

10:16:09 25          THE COURT:  I think you answered a couple

10:16:11 1  questions yes.  Let's start with the second one first which

10:16:15 2  is that you -- I think you were starting to say you knew

10:16:19 3  Mr. Smith.

10:16:20 4           MR. SMITH:  I do know Mr. Smith.  My son and his

10:16:23 5  daughter went to Tower Hill School together, and his firm

10:16:26 6  does a lot of work for my firm.

10:16:28 7           THE COURT:  Okay.  And your firm is which firm?

10:16:30 8           THE JUROR:  Wilmington Trust.

10:16:31 9           THE COURT:  Oh.  All right.  Do you personally

10:16:37 10 know Mr. Smith, or do you just kind of know him to recognize

10:16:40 11 him?

10:16:40 12          THE JUROR:  I know of him and I know his son --

10:16:44 13 my daughter and -- his daughter and my son went to school

10:16:47 14 together.

10:16:48 15          THE COURT:  And the firm Wilmington Trust,

10:16:50 16 they're obviously a big firm, and I see your job title or

10:16:55 17 job involves investment management.  Does Mr. Smith

10:16:58 18 personally do work for Wilmington Trust or is it other

10:17:01 19 members because he's in a large firm?

10:17:03 20          THE JUROR:  I don't know if he does or not.  I

10:17:05 21 know his colleague, Robert Russell, Jason Russell, does.

10:17:10 22          THE COURT:  Okay.  And would it -- would it make

10:17:13 23 it difficult for you to serve as a juror, knowing that the

10:17:19 24 company you work for hires the company -- or not the

10:17:22 25 company, but the law firm that he works for for various

10:17:27  1    things?

10:17:27  2              THE JUROR:  It does not.  I just wanted to make

10:17:29  3    sure that it was -- everyone was aware.

10:17:31  4              THE COURT:  Oh, okay.  All right.  Then the

10:17:35  5    other question was your schedule.  Or it was a hardship.

10:17:39  6    Tell me about that.

10:17:40  7              THE JUROR:  Someone at work is having a surgery

10:17:43  8    with irregular heartbeat after tomorrow on the 9th, so we're

10:17:47  9    a little short-staffed so that may pose a problem, but we'll

10:17:51 10    try on work around it, but it's a bit of a hardship.

10:17:54 11              THE COURT:  Okay.  But Wilmington Trust, they're

10:17:59 12    -- how many people work for them?

10:18:02 13              THE JUROR:  About -- subsidiary of M&T bank, so

10:18:06 14    it's about 15,000 people, but we are a little bit, I could

10:18:11 15    say, specialized in what we do.  Not everyone --

10:18:15 16              THE COURT:  Sure.  So you work in a very small

10:18:18 17    group that's part of this much larger organization?

10:18:21 18              THE JUROR:  Yeah.

10:18:21 19              THE COURT:  So if you were selected to serve,

10:18:23 20    would you be able to -- and it turned out that it caused a

10:18:28 21    little extra hardship due to your colleague having a

10:18:31 22    surgery, would that distract you from giving these parties

10:18:37 23    your best fair and impartial judgment?

10:18:40 24              THE JUROR:  I hope not, but it would just be a

10:18:42 25    bit of a difficulty, but I'd do the best I can to serve.

10:18:46  1                    THE COURT:  Okay.  Mr. Smith, do you want to ask

10:18:48  2    any questions?

10:18:49  3                    MR. SMITH:  I don't.  Thank you.

10:18:50  4                    THE COURT:  Ms. Keller, do you?

10:18:51  5                    MS. KELLER:  Nothing from me.

10:18:52  6                    THE COURT:  Mr. Qasim, could you step outside

10:18:54  7    for a minute.

10:18:54  8                    (Juror leaving the conference room.)

10:19:04  9                    THE COURT:  What's your view, Ms. Keller?  It

10:19:07 10    does seem a little problematic that he knows of Rodger and

10:19:10 11    knows of his firm.

10:19:11 12                    MR. BUROKER:  It does seem a little problematic

10:19:13 13    that he knows of Rodger and knows of his firm.

10:19:13 14                    MS. KELLER:  I see Rodger all the time at Tower

10:19:16 15    Hill.  Our kids go to school.  It's a small school, but the

10:19:19 16    fact that he -- his son knew his daughter.

10:19:21 17                    THE COURT:  All right.  I think that's good

10:19:23 18    enough.

10:19:24 19                    You're good with that?

10:19:26 20                    MR. SMITH:  No objection, Your Honor.

10:19:27 21                    THE COURT:  Bring him back for a second.

10:19:30 22                    THE CLERK:  Sir, you want to come back in.  They

10:19:33 23    just want to talk to you one last time.

10:19:35 24                    THE COURT:  Mr. Qasim, I just want to tell you I

10:19:37 25    am going to excuse you from service.  You know, being -- you

10:19:42 1    know, your offspring knowing Mr. Smith's offspring, we can

10:19:47 2    avoid that sort of thing.

10:19:48 3            THE JUROR:  This was years ago, but I just

10:19:50 4    wanted to make sure that you know.

10:19:51 5            THE COURT:  Yeah, yeah.  It's not that that --

10:19:54 6    anybody has any doubts that you would be fair and impartial,

10:19:56 7    just, you know, it looks -- it doesn't look as good as it

10:20:00 8    could, and so we're trying to do that.

10:20:01 9            THE JUROR:  I'm sorry.

10:20:02 10           THE COURT:  Do not worry about that.  Thank you

10:20:05 11   for disclosing it.  I would just ask that you go back and

10:20:08 12   sit with the group.  We'll be through, and you won't have to

10:20:17 13   wait around too much longer.  Okay?

10:20:19 14           (Juror leaving the conference room.)

10:20:26 15           (Juror entering the conference room.

10:20:52 16           THE CLERK:  They're just going to ask you a few

10:20:55 17   questions, and it will be easy.  You can either stand or you

10:20:58 18   can have a seat, whatever you're more comfortable with.

10:21:00 19           THE JUROR:  I can stand.

10:21:01 20           THE CLERK:  Okay.  All right.  So you're Miss

10:21:01 21   Foster-Brown.

10:21:04 22           THE JUROR:  Yes, I am.

10:21:04 23           THE COURT:  Hi, Good morning.

10:21:06 24           THE JUROR:  Good morning.

10:21:06 25           THE COURT:  So I think that you answered one

10:21:09  1    question yes, which was there would be some hardship

10:21:12  2    involved in service?

10:21:14  3                    THE JUROR:  Just -- I just have a doctor's

10:21:16  4    appointment on Friday, but it be rescheduled.  It's not a

10:21:19  5    big deal.

10:21:19  6                    THE COURT:  And that wouldn't upset you, to

10:21:21  7    reschedule it?

10:21:22  8                    THE JUROR:  No.

10:21:22  9                    THE COURT:  And that was your only concern?

10:21:25 10                    THE JUROR:  Yes.

10:21:26 11                    THE COURT:  All right.  So this kind of follows

10:21:29 12    up.  So if you're selected to serve on the jury, you'd be

10:21:32 13    good with that?

10:21:33 14                    THE JUROR:  Yes.

10:21:34 15                    THE COURT:  Okay.  Thank you very much.

10:21:35 16                    THE JUROR:  I do have one issue, though.  I live

10:21:37 17    in Dover, so, like, the traffic every day, if we're supposed

10:21:40 18    to go all the way to Tuesday.

10:21:42 19                    THE COURT:  Well, so we can take care of that if

10:21:43 20    you don't mind spending -- I mean, we can put you up in a

10:21:46 21    hotel here --

10:21:48 22                    THE JUROR:  All right.

10:21:49 23                    THE COURT:  -- if you get selected for the jury.

10:21:50 24                    THE JUROR:  Okay.  Okay.  Okay.

10:21:51 25                    THE COURT:  Nicole -- Ms. Selmyer will take care

10:21:53  1    of it for you.

10:21:54  2                    THE JUROR:  Okay.  Thank you.

10:21:55  3                    THE COURT:  All right.  Thank you.

10:21:56  4                    (Juror leaving the conference room.

10:22:01  5                    THE COURT:  All right.

10:22:50  6                    (Juror entering the conference room.)

10:22:53  7                    THE CLERK:  All right.  You can either stand or

10:22:56  8    you can have a seat, whatever you feel more comfortable

10:22:59  9    with.

10:22:59 10                    THE JUROR:  Good morning.

10:23:01 11                    THE COURT:  Good morning, Miss Tardiff.  So I

10:23:03 12    think it's the case that you didn't answer any question yes;

10:23:05 13    right?

10:23:05 14                    THE JUROR:  Yeah, I mean, I've got medical

10:23:07 15    appointments, but they can be changed.

10:23:09 16                    THE COURT:  Okay.  So I take it that means that

10:23:11 17    if you're selected to serve on this jury, you'll be good

10:23:13 18    with that?

10:23:14 19                    THE JUROR:  Yes.

10:23:15 20                    THE COURT:  Okay.  Well, thank you very much.

10:23:17 21                    THE JUROR:  Okay.

10:23:18 22                    (Juror leaving the conference room.)

10:23:32 23                    (Juror entering the conference room.)

10:24:03 24                    THE CLERK:  You can either stand or have a seat,

10:24:05 25    whatever you're more comfortable with.

| | |
|---|---|
| 10:24:08 | 1 |

THE COURT:  Good morning, Mr. Wood.

10:24:09  2    THE JUROR:  Hello.

10:24:09  3    THE COURT:  Are you Mr. Wood?

10:24:11  4    THE JUROR:  Yes, I am.

10:24:12  5    THE COURT:  So I think you answered one yes

10:24:13  6  question, which was that the schedule would present a

10:24:17  7  difficulty for you.

10:24:18  8    THE JUROR:  Yes.  Monday -- or Saturday, we're

10:24:20  9  supposed to go out of the country on vacation.

10:24:23 10    THE COURT:  That's a winner.  Okay.  So I'm

10:24:26 11  going to excuse you, but I would ask you to just take retake

10:24:31 12  your seat.  We'll be through this process pretty soon and

10:24:35 13  then you'll be able to go with the rest of the jurors who

10:24:37 14  are not selected.  Okay?

10:24:38 15    THE JUROR:  Okay.

10:24:39 16    THE COURT:  Thank you very much.

10:24:41 17    THE JUROR:  Thank you.

10:24:51 18    (Juror leaving the conference room.)

10:25:00 19    (Juror entering the conference room.)

10:25:03 20    THE CLERK:  And can you either stand or sit,

10:25:20 21  whatever you're more comfortable with.

10:25:22 22    THE JUROR:  Hello, everyone.

10:25:23 23    THE COURT:  Good morning.  Mr. Jarome, is it?

10:25:26 24    THE JUROR:  Yes, sir.  Mm-hmm.

10:25:27 25    THE COURT:  So I think you answered one yes

10:25:28  1     question, which was that the schedule presented difficulty

10:25:32  2     for you.  Can you tell me about that.

10:25:34  3                    THE JUROR:  Yeah, I'm embarrassed to tell you

10:25:36  4     all.  My daughter plays college volleyball, and I have never

10:25:39  5     missed a game, and she plays on this Friday and lots of

10:25:42  6     Fridays, and we do a lot of traveling, so if there's any way

10:25:47  7     I probably --

10:25:48  8                    THE COURT:  Okay.  Where does she play

10:25:50  9     volleyball at?

10:25:51 10                    THE JUROR:  At Towson.

10:25:52 11                    THE COURT:  Oh, okay.  And so the games are like

10:25:54 12     at 6:00 or 4:00?

10:25:56 13                    THE JUROR:  This Friday at 1:00 and 6:00 and

10:25:58 14     then Saturday and Sunday and then --

10:26:00 15                    THE COURT:  Okay.

10:26:02 16                    THE JUROR:  -- we travel a lot also, sir.

10:26:04 17                    THE COURT:  Can you step outside?

10:26:06 18            I take it it's very personally important to you

10:26:09 19     to keep up this streak.

10:26:10 20                    THE JUROR:  Well, yeah, I don't miss.  I'm

10:26:13 21     sorry.

10:26:13 22                    THE COURT:  Can you step out for a minute?

10:26:14 23                    THE JUROR:  Sure.

10:26:18 24                    THE CLERK:  Just step out in the hallway here,

10:26:19 25     and I'll be back to get you in just a minute.

10:26:22  1                THE COURT:  So I'd be inclined to excuse him.

10:26:24  2      Is there any objection?

10:26:25  3                MS. KELLER:  No objection.

10:26:26  4                MR. SMITH:  No.

10:26:26  5                THE COURT:  Okay.  Bring him back in.

10:26:35  6                DEPUTY CLERK:  I should have said don't sit

10:26:36  7      down.

10:26:36  8                THE COURT:  All right.  So, Mr. Jarome, it's

10:26:39  9      funny the personal things that sometimes will strike a chord

10:26:44 10      with everybody, so I'm going to excuse you.  Keep up the

10:26:46 11      streak.

10:26:47 12                THE JUROR:  Thank you.

10:26:48 13                THE COURT:  How many more years of college does

10:26:50 14      she have?

10:26:50 15                THE JUROR:  She's a senior this year.

10:26:52 16                THE COURT:  All right.  Well, sign up for a jury

10:26:54 17      next year.  All right?

10:26:55 18                THE JUROR:  If you want to do this in the fall

10:26:57 19      next year, I'm good after this.  So...

10:26:59 20                THE COURT:  All right.

10:27:00 21                THE JUROR:  I don't mind missing work, either.

10:27:03 22                THE COURT:  Thank you very much.

10:27:04 23                THE JUROR:  Take care, everybody.  Thank you.

10:27:06 24                (Juror leaving the conference room.)

10:27:09 25                (Juror entering the conference room.)

```
10:27:48  1              THE CLERK:  Okay.  You can either stand or have
10:27:50  2     a seat, whatever.
10:27:52  3              THE COURT:  Good morning.  Miss Wolfinger, is
10:27:57  4     it?
10:27:57  5              THE JUROR:  Wolfinger, yes, sir.
10:27:59  6              THE COURT:  And I believe it's the case that you
10:28:01  7     didn't answer any question yes; is that right?
10:28:03  8              THE JUROR:  I didn't answer any question yes.
10:28:04  9              THE COURT:  So does that mean that if you're
10:28:06 10     selected to serve on this jury, you'll be good with that?
10:28:08 11              THE JUROR:  Yeah.
10:28:10 12              THE COURT:  Okay.
10:28:11 13              THE JUROR:  I have a two-and-a-half-hour drive
10:28:14 14     up and back, but I can do it.
10:28:16 15              THE COURT:  Okay.  And you may want to talk --
10:28:18 16     if you are selected for the jury, because that is a long
10:28:20 17     drive, you may want to talk with Ms. Selmyer because it may
10:28:24 18     be possible or it is possible that you could spend some
10:28:29 19     nights up here if you wanted to do that.
10:28:31 20              THE JUROR:  Okay.
10:28:32 21              THE COURT:  Okay?
10:28:33 22              THE JUROR:  Okay.
10:28:33 23              THE COURT:  All right.  Well, thank you very
10:28:36 24     much.
10:28:37 25                   (Juror leaving the conference room.)
```

55

10:29:11 1                    (Juror entering the conference room.)

10:29:17 2                    THE CLERK:  So we're going to come up this way.

10:29:21 3    There's a few people, so don't be startled.  You can either

10:29:26 4    stand or have a seat, whatever you're more comfortable with.

10:29:30 5                    THE JUROR:  I'll stand if you don't mind.

10:29:31 6                    THE COURT:  Okay.  That's good.  So you are?

10:29:33 7                    THE JUROR:  Eva.  Number 15.

10:29:36 8                    THE COURT:  No, no.  Actually, your last name

10:29:38 9    is?

10:29:38 10                    THE JUROR:  Lulias.

10:29:40 11                    THE COURT:  Lulias.  Okay.  And so I believe you

10:29:42 12   answered one question yes?

10:29:44 13                    THE JUROR:  Yes.

10:29:44 14                    THE COURT:  Which was that you served on than a

10:29:46 15   jury before?

10:29:46 16                    THE JUROR:  I have.  I have.  It was a criminal

10:29:49 17   one, and I did calculate back.  It was a little bit more

10:29:52 18   than 15 years.  And then I was picked for another jury, and

10:29:55 19   they had settled before we even got together.

10:29:58 20                    THE COURT:  And do either of these experiences

10:30:02 21   affect your ability to be a fair and impartial juror in this

10:30:05 22   case at all?

10:30:06 23                    THE JUROR:  No.

10:30:07 24                    THE COURT:  Okay.  So -- and so if you're

10:30:11 25   selected for this jury, you'll be good to serve?

10:30:13  1                THE JUROR:  Yeah.  Yeah.

10:30:15  2                THE COURT:  All right.  All right:  Well, thank

10:30:18  3      you very much, you may return to your seat.

10:30:20  4                     (Juror leaving the conference room.)

10:30:28  5                     (Juror entering the conference room.)

10:31:04  6                THE CLERK:  We're going to come back this way.

10:31:14  7      You can either stand or have a seat, whatever you're more

10:31:16  8      comfortable with.

10:31:17  9                THE JUROR:  Anymore sitting, I'll fall asleep.

10:31:19  10               THE CLERK:  Stand up.

10:31:20  11               THE COURT:  So good morning.  You are

10:31:22  12     Mr. Thomas?

10:31:23  13               THE JUROR:  Yes, sir.

10:31:23  14               THE COURT:  And I think you answered one

10:31:25  15     question yes, which had to do with there might be something

10:31:29  16     that would make it difficult for you to be a juror in this

10:31:32  17     case.

10:31:32  18               THE JUROR:  I believe it was.  I only remember

10:31:35  19     the first sentence about sight.

10:31:37  20               THE COURT:  Yes.

10:31:38  21               THE JUROR:  I do have really bad sight, and

10:31:40  22     while you were saying that, I noticed I couldn't really make

10:31:43  23     out your face from that distance.  And I have a tendency to

10:31:48  24     fall asleep while sitting.

10:31:50  25               THE COURT:  Okay.  Well, that's not ideal for a

juror.

THE JUROR:  Yeah, I just thought I would let you know.

THE COURT:  Yeah, so the -- so let's just talk about the sight because one of the things that's probably going to happen in this case is there's going to be a lot of projecting on a screen of documents.

THE JUROR:  Okay.

THE COURT:  And the -- in my experience, the parties through a trial often do that, so you need, like, at least, you know, 20/20 vision, kind of, to be able to read it.

Do you think that stuff that most people could read at a distance, you would probably not be able to read?

THE JUROR:  Yeah.  I'm wearing an old prescription, sadly.  It's, like, from ten years ago.

THE COURT:  Okay.

THE JUROR:  I just got vision, so I'm going to be getting new glasses soon.

THE COURT:  Okay.  Why don't you step outside for a second.  Okay?

THE CLERK:  Just going to have you hang out in the hall.  I'll be back to get you in just a minute.  Okay?

THE COURT:  So neither of what he's mentioned makes him sound like a particularly promising juror, and

| | | |
|---|---|---|
| 10:33:05 | 1 | would you object if I excused him?  I think the vision thing |
| 10:33:08 | 2 | might be a bigger problem. |
| 10:33:09 | 3 | MS. KELLER:  Yeah. |
| 10:33:10 | 4 | MR. SMITH:  No objection. |
| 10:33:11 | 5 | MS. KELLER:  No objection. |
| 10:33:11 | 6 | THE COURT:  Okay.  So bring him back in. |
| 10:33:13 | 7 | THE CLERK:  Okay.  Sir, you're going to come |
| 10:33:17 | 8 | back in real quick. |
| 10:33:22 | 9 | THE COURT:  So, Mr. Thomas, I'm going to excuse |
| 10:33:25 | 10 | you.  Hopefully, the next time you're called for jury |
| 10:33:29 | 11 | service, you'll be at the front end of a ten-year |
| 10:33:33 | 12 | prescription. |
| 10:33:33 | 13 | THE JUROR:  I'm really sorry. |
| 10:33:35 | 14 | THE COURT:  You know, it's -- I understand.  If |
| 10:33:38 | 15 | you could go and sit back with the rest of the jurors, we'll |
| 10:33:41 | 16 | excuse all who are not selected shortly, but if you could do |
| 10:33:45 | 17 | that.  Okay? |
| 10:33:46 | 18 | (Juror leaving the conference room.) |
| 10:33:53 | 19 | (Juror entering the conference room.) |
| 10:34:43 | 20 | THE CLERK:  All right.  We're going to come back |
| 10:34:45 | 21 | here.  You can either stand or have a seat, whatever you are |
| 10:34:49 | 22 | more comfortable with. |
| 10:34:51 | 23 | THE JUROR:  How are you doing? |
| 10:34:51 | 24 | THE COURT:  Hi.  You are Mr. Rydel? |
| 10:34:54 | 25 | THE JUROR:  Yes. |

10:34:55  1                    THE COURT:  So I believe it's the case that you

10:34:56  2      answered no question yes; is that right?

10:34:58  3                    THE JUROR:  Yes.

10:34:58  4                    THE COURT:  So does that mean that if you're

10:35:00  5      selected to serve on this jury, that you're good with that?

10:35:03  6                    THE JUROR:  Yes.

10:35:04  7                    THE COURT:  All right.  Well, thank you very

10:35:06  8      much.

10:35:08  9                        (Juror leaving the conference room.)

10:35:14 10                        (Juror entering the conference room.)

10:35:45 11                    THE CLERK:  All right.  We're going to come back

10:35:48 12      this way.  You can either stand or have a seat, whatever

10:35:50 13      you're more comfortable with.

10:35:52 14                    THE JUROR:  Sure.  Thank you.

10:35:53 15                    THE CLERK:  Yeah.

10:35:53 16                    THE COURT:  Good morning.  You are Mr. Hill?

10:35:55 17                    THE JUROR:  Yes.

10:35:55 18                    THE COURT:  And I believe it's the case that you

10:35:57 19      didn't answer any questions yes; is that right?

10:36:00 20                    THE JUROR:  Correct.

10:36:00 21                    THE COURT:  Does that mean that if you're

10:36:02 22      selected to serve on this jury, you'll be good with that?

10:36:04 23                    THE JUROR:  Yes.

10:36:05 24                    THE COURT:  All right.  Well, thank you very

10:36:06 25      much.  You may return to your seat.

10:36:08 1                    THE JUROR:  Thank you.

10:36:12 2                    (Juror leaving the courtroom.)

10:36:21 3                    THE CLERK:  That was 14 people; right?

10:36:24 4                    MR. SMITH:  I think that's 13.

10:36:25 5                    THE COURT:  No, I think it's actually 14.  I

10:36:30 6     always like to do one more for luck, so let's bring in

10:36:34 7     Mr. or Ms. Fitzgerald-Collins.  But I do think we've done 18

10:36:40 8     and I've struck four, so I do think that adds up to --

10:36:45 9     subtracts up to 14.

10:36:46 10                    (Juror entering the conference room.)

10:37:10 11                    THE CLERK:  You can either stand, sit, whatever

10:37:14 12    you're more comfortable with.

10:37:16 13                    THE JUROR:  I'll stand.

10:37:16 14                    THE COURT:  Hi.  You are Ms. Fitzgerald-Collins?

10:37:20 15                    THE JUROR:  How are you?  I am.

10:37:21 16                    THE COURT:  And according to my notes, you

10:37:23 17    didn't answer yes to any of the questions; is that right?

10:37:25 18                    THE JUROR:  That is right.

10:37:26 19                    THE COURT:  So does that mean that if you're

10:37:28 20    selected to serve on this jury, you'll be good with that?

10:37:31 21                    THE JUROR:  Yeah, I'll be fine.

10:37:32 22                    THE COURT:  Okay.  Thank you very much.

10:37:34 23                    (Juror leaving the conference room.)

10:37:41 24                    THE COURT:  Okay.  So just to make sure everyone

10:37:44 25    knows, so the first person, whoever's the lowest number

10:37:49  1      juror who survives your peremptories, that's going to be the

10:37:54  2      foreperson of this jury, if it makes any difference to you.

10:37:57  3      So we've got enough so why don't we go and -- so we're just

10:38:01  4      going to leave them sitting in their seats because they're

10:38:04  5      in order, so you ought to be able to place the person with

10:38:09  6      the number, and you can use your three peremptories each,

10:38:14  7      and then the top eight will be put in the jury box.  And

10:38:20  8      I'll excuse -- swear them and I'll excuse the rest.

10:38:23  9               Okay?  Anything else?

10:38:24 10               THE CLERK:  I was just going to say there might

10:38:26 11      be some that are using the restroom, so I don't know if you

10:38:29 12      want to take a personal break and maybe the attorneys as

10:38:31 13      well.

10:38:32 14               THE COURT:  All right.  Well, we'll take a very

10:38:33 15      short break.

10:38:34 16               THE CLERK:  Okay.

10:38:35 17               THE COURT:  And I will come when people -- when

10:38:36 18      I'm told that they're ready to go.

10:38:38 19               THE CLERK:  Okay.

10:38:39 20               THE COURT:  All right.

10:43:01 21               (Recess was taken.)

10:47:23 22               DEPUTY CLERK:  All rise.

10:47:49 23               THE COURT:  All right.  Everyone be seated.  So

10:47:53 24      what's going to happen now is, basically, the jurors that

10:48:00 25      I've spoken to, unless something goes really wrong, the jury

10:48:05 1    is going to be drawn from that group, but I know there's a

10:48:08 2    lot of you that I didn't speak to, and because things

10:48:14 3    sometimes go wrong, I need you to stick around a little bit

10:48:17 4    longer.  But we'll be through this pretty soon.

10:48:21 5             Right now, there's a process by which the

10:48:24 6    lawyers get to sort of pick from the ones that I've actually

10:48:30 7    spoken to as to which ones would be on the jury.  So that

10:48:34 8    will just involve a little bit of passing paper back and

10:48:38 9    forth with my staff.  It shouldn't take too long, and then

10:48:42 10   we'll be ready to have an actual jury and to excuse the rest

10:48:47 11   of you.

10:48:47 12            All right?  Go ahead.

10:51:59 13            All right.  Well, go ahead.

10:52:03 14            THE CLERK:  Okay.  When I call your number, I'm

10:52:14 15   going to seat you, that person, in the jury box over here.

10:52:17 16   So Juror Number 1, you're going to be the first seat in the

10:52:22 17   first row.

10:52:24 18            Juror Number 3, you're going to be the third

10:52:34 19   seat in the first row.

10:52:40 20            Juror Number 6, I'm just going to direct you to

10:52:49 21   the seat in the first row, so the third one.  Just a seat

10:52:53 22   apart.  You're going to be come over this way as well, so

10:52:57 23   you're going to be sitting in this seat right here.  I think

10:53:00 24   it's number five.  Okay?  So just you're going to have a

10:53:03 25   seat between.

10:53:04  1          Number 7, you're going to be in the seventh seat

10:53:08  2   in the first row.

10:53:11  3          Juror Number 11, you're going to be the first

10:53:14  4   seat in the second row.

10:53:29  5          Number 14, you're going to be the third seat in

10:53:33  6   the second row, 14.

10:53:40  7          Number 15, you're going to be in the fifth seat

10:53:43  8   in the second row.

10:53:44  9          And then Juror Number 17, you're going to be the

10:53:50 10   7th seat in the second row.  So there's a seat between

10:54:16 11   everyone.   Perfect.

10:54:21 12          THE COURT:  First, we need to swear the jury.

10:54:24 13          DEPUTY CLERK:  Please rise and raise your right

10:54:33 14   hand.  You and each of you do swear, those of you who swear,

10:54:39 15   and you and each of you do affirm, those of you who affirm,

10:54:44 16   that you will well and truly try the issue joined wherein

10:54:48 17   and that you will hold a true verdict render according to

10:54:51 18   the evidence, so help you God, those of you who swear, and

10:54:54 19   you do so affirm, those of you who do affirm?

10:54:57 20          The correct response is I do.

10:55:01 21          THE JURY:  I do.

10:55:02 22          THE COURT:  All right.  Please be seated.

10:55:03 23          So the rest of the panel, we have our jury, and

10:55:08 24   so you're going to be excused in just a moment.  I do want

10:55:12 25   to express any appreciation that all of you are here this

10:55:15  1    morning.  You can never tell how many jurors you're actually

10:55:20  2    going to need, but in order to make sure the process runs

10:55:24  3    smoothly, sometimes we have extra jurors, and I appreciate

10:55:28  4    your taking time out of your busy schedules and lives to be

10:55:33  5    here.  And so, have a nice day.  You're all excused.

10:55:39  6                (Discussion held off the record.)

10:57:45  7                THE COURT:  All right.  So, members of the jury,

10:57:47  8    my staff has handed out some things.  I think one of them is

10:57:50  9    a book that's prepared by the parties, and it has some

10:57:55 10    papers in it that aren't -- that you don't need yet.  It

10:57:58 11    includes pictures of the witnesses so you'll be able to help

10:58:01 12    identify them later on.

10:58:03 13                But the first thing that we're going to do is I

10:58:06 14    have some preliminary jury instructions for you, and there

10:58:09 15    is a copy of them in, I believe, the expandable folder.  The

10:58:15 16    reason I give you a copy of them now is some people prefer

10:58:22 17    to read along while I'm talking.  I'm going to read them out

10:58:26 18    loud, but you don't have to read along.  You can just

10:58:29 19    listen.  You know, however it is you best absorb

10:58:33 20    information.

10:58:34 21                But the second point is there will be a lot of

10:58:38 22    jury instructions at the end of the case, and by giving some

10:58:42 23    of them now to you in writing, then I hope not to have to

10:58:47 24    give them to you again at the end of the case.

10:58:49 25                So members of the jury, now that you've been

10:58:54  1    sworn, I'm going to give you some preliminary instructions

10:58:57  2    to guide you in your participation in the trial.

10:59:01  3              You will hear the evidence, decide what the

10:59:03  4    facts are, and then apply those facts to the law that I will

10:59:07  5    give you.  You and only you will be the judges of the facts.

10:59:11  6    You will have to decide what happened.  I play no part in

10:59:15  7    judging the facts.  You should not take anything I may say

10:59:18  8    or do during the trial as indicating what I think of the

10:59:22  9    evidence or what your verdict should be.  My role is to be a

10:59:26 10    judge -- the judge of the law.  I make whatever legal

10:59:29 11    decisions have to be made during the course of the trial,

10:59:33 12    and I will explain to you the legal principles that must

10:59:36 13    guide you in your decisions.  You must follow the law that I

10:59:39 14    give you whether you agree with it or not.

10:59:41 15              So this is an action arising under the antitrust

10:59:48 16    laws of the United States and under Delaware common law.

10:59:52 17    The plaintiff is BASF.  The defendant is Ingevity.  The case

10:59:58 18    involves BASF's allegations that Ingevity engaged in

11:00:05 19    anticompetitive conduct involving carbon products used to

11:00:10 20    capture harmful emissions from automobiles called carbon

11:00:17 21    adsorbents.  Specifically, the carbon adsorbents at issue in

11:00:20 22    this action are carbon honeycombs used in automotive

11:00:24 23    components called fuel vapor canisters.  Ingevity owns the

11:00:30 24    patent that relates to fuel vapor canisters.  That patent is

11:00:34 25    identified by its Patent Office number, RE38,844, which, if

11:00:41 1    it's referred to, will probably just be called the '844

11:00:44 2    patent.

11:00:46 3         BASF and Ingevity manufacture carbon honeycombs,

11:00:52 4    but they don't manufacture fuel vapor canisters.  Fuel vapor

11:00:56 5    canisters are manufactured by companies that will be

11:00:59 6    referred to by the parties through out the trial as Tier 1

11:01:07 7    manufacturers.  Tier 1 manufacturers sell fuel vapor

11:01:11 8    canisters to car manufacturers that manufacture finished

11:01:16 9    vehicles and will be referred to throughout the trial as

11:01:23 10   OEMs, which, if it helps, I think that stands for original

11:01:27 11   equipment manufacturer.

11:01:30 12        BASF filed these claims against Ingevity for

11:01:37 13   antitrust violations and tortious interference with

11:01:43 14   prospective business relations.  BASF alleges that

11:01:47 15   Ingevity's tying of some of its carbon honeycomb products to

11:01:51 16   licenses to the '844 patent and Ingevity's entering into

11:01:57 17   long-term supply agreements with companies called Delphi,

11:02:03 18   Kayser, and KFTC, which I think stands for Korea Fuel

11:02:09 19   Technology Company, that those -- entering into those

11:02:13 20   agreements unreasonably restrained trade in violation of

11:02:17 21   Section 1 of the Sherman Act, which is an antitrust law.

11:02:21 22        BASF argues that Ingevity's conduct allowed it

11:02:27 23   to acquire and maintain monopoly power in the relevant

11:02:31 24   market for carbon adsorbents used in what's called Lev III/

11:02:37 25   Tier 3 compliant fuel vapor canisters in the United States

11:02:42  1   and Canada and to impede competition in violation of

11:02:47  2   Section 2 of the Sherman Act, another antitrust law.

11:02:52  3          BASF further alleges that the long-term supply

11:02:56  4   agreement violates Section 3 of the Clayton Act, a slightly

11:03:00  5   different antitrust law, and so in addition to these

11:03:03  6   antitrust claims, BASF alleges that Ingevity tortiously

11:03:11  7   interfered with its prospective business relations with

11:03:14  8   Kayser in violation of Delaware common law.

11:03:18  9          Ingevity denies the allegations.  Ingevity

11:03:22 10   contends it has the right under the patent laws to control

11:03:26 11   the market for non-staple goods that do not have substantial

11:03:31 12   uses other than to practice the '844 patent.  Ingevity

11:03:38 13   further contends it has a right under the patent laws to

11:03:41 14   enforce its patent, including through communications about

11:03:44 15   its patent rights, to customers and through litigation.

11:03:49 16   Additionally, Ingevity contends it has the right to petition

11:03:53 17   the government, such as through filing a lawsuit and

11:03:57 18   threatening litigation.

11:03:59 19          Ingevity further contends this that it has not

11:04:02 20   restrained trade or unlawfully acquired or maintained

11:04:06 21   monopoly power in any market.  Further, Ingevity also

11:04:09 22   contends it did not tie licenses to the '844 patent to the

11:04:13 23   sale of fuel vapor canister carbon honeycombs and that its

11:04:18 24   long-term supply agreements with Delphi, Kayser, and KFTC

11:04:23 25   did not substantially foreclose competition or result in

harm to competition, did not cause injury to BASF, and it did not cause any alleged damages.

Ingevity contends that its sale -- sales of fuel vapor canister carbon honeycombs and resulting implied licensing from those sales and its supply agreements with customers promoted competition.  Ingevity also contends it did not know about or intentionally interfere in any improper way with BASF's prospective business relationship with Kayser.

I will give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and decision.

So I have a few words about your conduct as jurors.  First, I instruct you that during the trial and until you have heard all of the evidence and retired to the jury room to deliberate, you are not to discuss the case with anyone, not even amongst yourselves.  If anyone should try to talk to you about the case, including a fellow juror, bring it to my attention promptly.  There are good reasons for this ban on discussions, the most important being the need for you to keep an open mind throughout the presentation of evidence.

I know that many, if not all, of you use cell phones; smartphones, such as iPhones and Android phones and other portable electronic devices; laptops; tablets and

11:05:57  1    other computers, both portable and fixed; and other tools of

11:06:00  2    technology to access the Internet and to communicate with

11:06:04  3    others.  You must not talk to anyone about this case through

11:06:07  4    any of those means.  You also must not talk the

11:06:11  5    old-fashioned way of just talking.  This includes your

11:06:14  6    family and friends.  You must not communicate with anyone

11:06:17  7    about the case on any kind of electronic device or through

11:06:21  8    email, text messaging, Twitter, Snapchat, Internet chat

11:06:25  9    rooms, blogs, or social networking sites such as Facebook.

11:06:30 10    You may not use any similar technology or social media to

11:06:33 11    either get or share information about this case even if I

11:06:36 12    have not specifically mentioned it here.

11:06:39 13           The lawyers, parties, and witnesses are not

11:06:43 14    supposed to talk to you outside of the testimony and

11:06:46 15    arguments that are presented in the courtroom.  If any

11:06:48 16    lawyer, party, or witness does not speak to you when you

11:06:51 17    pass in the hall, ride in the elevator, or the like, it is

11:06:56 18    because they are not supposed to talk with you, not because

11:06:59 19    they are rude.  That is why you are asked to wear your juror

11:07:03 20    tags.  It shows that you are someone who is not to be

11:07:06 21    approached in any way.

11:07:07 22           Second, do not read or listen to anything

11:07:11 23    related to the case that is not admitted into evidence.  By

11:07:14 24    that I mean if there are newspaper articles or radio or

11:07:17 25    television reports related to the case, or something on the

11:07:21  1   Internet, do not read the article or watch or listen to the

11:07:25  2   report.  In addition, do not try to do any independent

11:07:29  3   research or investigation on your own in any matters related

11:07:33  4   to the case or this type of case.  Do not do any research on

11:07:37  5   the internet, for example, about activated carbon

11:07:41  6   technology.  You are to decide the case based on the

11:07:44  7   evidence presented in trial.

11:07:46  8          You should not consult dictionaries or reference

11:07:50  9   materials such as the internet or any other electronic

11:07:53 10   sources to obtain information about this case or to help you

11:07:57 11   decide the case.  You probably already heard a few words

11:08:01 12   that, at best, you're unclear as to what they mean.  That's

11:08:05 13   part of the duty of the lawyers during the trial, either

11:08:09 14   through their witnesses, to educate you on things that are

11:08:12 15   not common knowledge, so don't worry about it if I said a

11:08:17 16   few things and you haven't quite understood just yet.

11:08:20 17          Do not try to find out any information from any

11:08:23 18   source outside what you hear in the courtroom.  Do not reach

11:08:27 19   any conclusion as to the claims or defenses until all the

11:08:30 20   evidence is in.  Keep an open mind until you start

11:08:34 21   deliberations at the end of the case.

11:08:37 22          During the trial, it may be necessary for me to

11:08:39 23   talk to the lawyers out of your hearing by having what we

11:08:43 24   call a side-bar, which is when we meet over here to my

11:08:49 25   right.  If that happens, and I hope it won't much, please be

11:08:54  1    patient.  We're not trying to keep important information

11:08:57  2    from you.  The side-bars are necessary, in my judgment, for

11:09:03  3    me to fulfill my responsibility, which is to be sure that

11:09:06  4    evidence is presented to you correctly under the law.

11:09:08  5              We will, of course, do what we can to keep the

11:09:12  6    number and length of these side-bars to a minimum.  While we

11:09:14  7    meet, I may invite you to stand up and stretch or take a

11:09:17  8    short break, and if we're actually meeting, you don't have

11:09:20  9    to wait for an invitation.  You can stand up and do

11:09:23 10    exercises or whatever.  Or you can just sit there, it's up

11:09:27 11    to you.  And if it seems to me like something that's going

11:09:32 12    to be lengthy, then we may call a recess and you'll go back

11:09:36 13    to the jury room.

11:09:37 14              I also may not always grants the attorney's

11:09:40 15    request for a side-bar.  Do not consider my granting or

11:09:43 16    denying a request for a side-bar as any indication of my

11:09:47 17    opinion of the case or what your verdict should be.

11:09:50 18              Now, only the lawyers and I are allowed to ask

11:09:55 19    questions of witnesses, and I don't tend to ask any

11:09:59 20    questions myself.  You, however, are not permitted to ask

11:10:02 21    questions of witnesses.

11:10:04 22              If you wish, you may take notes during the

11:10:06 23    presentation of evidence, and I think part of what's in the

11:10:09 24    white binder is notepaper or at least blank paper.  So you

11:10:14 25    can take notes if you want about the presentation of

11:10:18 1    evidence, the summation or arguments of the attorneys at the

11:10:22 2    end of the case, and during my instructions to you on the

11:10:24 3    law.  You will also get my instructions on the law in

11:10:27 4    writing as you have so far.  My courtroom deputy will

11:10:31 5    arrange for pens, pencils, and paper.  Any notes you take

11:10:36 6    are for your own personal use.  They are not to be given or

11:10:39 7    read to anyone else.

11:10:40 8            We also have, as you can see, a court reporter,

11:10:42 9    which is the woman in front of the bar here, who will be

11:10:50 10   transcribing the testimony during the course of the trial,

11:10:53 11   but you should not assume that the transcripts will be

11:10:55 12   available for your review during your deliberations nor

11:10:59 13   should you consider the notes that you and your fellow

11:11:01 14   jurors may take as any kind of a written transcript.

11:11:05 15   Instead, as you listen to the testimony, keep in mind that

11:11:08 16   you will be relying on your memory of that testimony during

11:11:11 17   your deliberations.

11:11:13 18           Here is a couple of other specific points to

11:11:16 19   keep in mind about note taking.  It is, as I said,

11:11:19 20   permitted, but not required.  Each of you may take notes but

11:11:24 21   no one is required to.

11:11:25 22           And the second thing is do not take your notes

11:11:28 23   away from court.  If you do take notes, take them with you

11:11:31 24   each time you leave the courtroom and leave them in the jury

11:11:34 25   room when you leave at night.  At the conclusion of the

11:11:37 1    case, after you had used your notes in the deliberations,

11:11:41 2    the court officer will collect and destroy them to protect

11:11:44 3    the secrecy of your deliberations.

11:11:48 4         So the evidence from which you are to find the

11:11:52 5    facts is going to consist of the following:  The testimony

11:11:55 6    of witnesses, documents and other things received as

11:11:59 7    exhibits, and any facts that are stipulated, that is,

11:12:03 8    formally agreed to by the parties.  The following things are

11:12:07 9    not evidence:  Statements, arguments, questions of the

11:12:11 10   lawyers or the parties in this case; objections by lawyers;

11:12:15 11   any testimony I tell you to disregard; and anything you may

11:12:19 12   see or hear about this case outside of the courtroom.

11:12:22 13        There are rules that control what can be

11:12:24 14   received into evidence.  So when a lawyer asks a question or

11:12:29 15   offers an exhibit into evidence and the lawyer on the other

11:12:32 16   side thinks it's not permitted by the rules of evidence,

11:12:35 17   that lawyer may object.  This simply means the lawyer is

11:12:39 18   requesting that I make a decision on a particular rule of

11:12:42 19   evidence.  You should not be influenced by the fact that an

11:12:46 20   objection is made.  Objections to questions are not

11:12:48 21   evidence.  Lawyers have an obligation to their client -- to

11:12:53 22   their clients to make objections when they believe the

11:12:55 23   evidence being offered is improper under the rules of

11:12:58 24   evidence.  You should not be influenced by the objection or

11:13:01 25   my ruling on it.  If the objection is sustained, ignore the

question.  If it is overruled, treat the answer like any other.

If you are instructed that some item of evidence you received is for a limited purpose only, you must follow that instruction.  Certain testimony or other evidence may be ordered struck from the record by me, and I may also instruct you to disregard that evidence.  Do not consider any evidence or other evidence that gets struck or excluded. Do not guess about what a witness might have said or what an exhibit might have shown.

There are two types of evidence that you may use in reaching your verdict, direct evidence and circumstantial evidence.  Direct evidence is direct proof of a fact such as testimony of an eyewitness.  An example of direct evidence is when the witness testifies about something the witness knows through his or her own senses, something the witness has seen, felt, touched, heard, or did.  If a witness testified that she saw it raining outside, that would be direct evidence that it was raining outside.

Circumstantial evidence is indirect proof, meaning proof of one or more facts from which you can infer or conclude another fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could infer that it was raining

11:14:24 1    outside.   You should consider all of the evidence, both

11:14:28 2    direct and circumstantial, that is presented to you.   The

11:14:31 3    law makes no distinction in the weight to be given to either

11:14:35 4    direct or circumstantial evidence.   You are to decide how

11:14:38 5    much weight to give any evidence.

11:14:39 6           In deciding what the facts are, you may have to

11:14:45 7    decide what testimony you believe and what testimony you do

11:14:47 8    not believe.   You are the sole judges of the credibility of

11:14:51 9    the witnesses.   Credibility means only whether a witness is

11:14:55 10   worthy of belief.   You should consider each witness's means

11:14:59 11   of knowledge, strength of memory, and opportunity to

11:15:03 12   observe; how reasonable or unreasonable the testimony is;

11:15:06 13   whether it's consistent or inconsistent; whether it has been

11:15:10 14   contradicted; the witness's biases, prejudices, or

11:15:16 15   interests; the witness's manner or demeanor on the witness

11:15:19 16   stand; and all circumstances that, according to evidence,

11:15:22 17   could affect the credibility of the testimony.   You may

11:15:25 18   believe everything a witness says or only part of it or none

11:15:28 19   of it.

11:15:31 20          You are also going to hear some testimony from

11:15:33 21   expert witnesses who have knowledge of a technical subject

11:15:37 22   matter that may be helpful to a jury.   A person who has

11:15:40 23   special training or experience in that technical field is

11:15:43 24   someone that we often refer to as an expert witness, and

11:15:47 25   that person is permitted to state his or her opinion on

11:15:50  1    those technical matters.  However, you are not required to

11:15:54  2    accept their opinion.  As with any other witness, it is up

11:15:57  3    to you to determine the credibility of an expert witness.

11:16:01  4            So the trial will begin shortly.  We will take a

11:16:07  5    break before it actually begins.  We'll start with the

11:16:12  6    opening statements of the lawyers.  But before we do that, I

11:16:17  7    want to explain the procedures that we will be following

11:16:20  8    during the trial and the format of the trial.  Like all jury

11:16:25  9    trials, it comes in six phases.  We've completed the first

11:16:29 10    phase, which was to select you as jurors.

11:16:32 11            The second phase is the opening statements.  The

11:16:35 12    opening statements of the lawyers are statements about what

11:16:38 13    each side expects the evidence to show.  The opening

11:16:41 14    statements are not evidence for you to consider in your

11:16:44 15    deliberations.  It's simply an opportunity for the lawyers

11:16:47 16    to explain what they expect the evidence will show.

11:16:52 17            In the third phase, the evidence will be

11:16:54 18    presented to you.  Witnesses will testify and documents will

11:16:57 19    be offered into and admitted into evidence.  BASF goes first

11:17:01 20    in presenting the evidence on its evidence on the issues for

11:17:04 21    which it bears the burden of proof.  Witnesses will be

11:17:07 22    questioned by BASF's counsel through what is called direct

11:17:12 23    examination.  After the direct examination of a witness is

11:17:15 24    completed, Ingevity has an opportunity to cross-examine the

11:17:18 25    witness.  After BASF has presented its evidence, Ingevity

11:17:24 1    will put on its evidence with regard to those issues and

11:17:28 2    also for the issues for which it bears the burden of proof.

11:17:32 3            The evidence often is introduced piecemeal,

11:17:38 4    meaning that all the evidence related to an issue may not be

11:17:41 5    presented all at one time but rather may be presented at

11:17:44 6    different times during the trial.  You are to wait until all

11:17:47 7    the evidence comes in before you make any decisions, so

11:17:52 8    that's one of the reasons I tell you that you must keep an

11:17:55 9    open mind throughout the entire trial.

11:17:58 10           In the fourth phase, I will read you the final

11:18:02 11   jury instructions.  I will instruct you on the law that you

11:18:05 12   must apply in this case.  I have already explained to you a

11:18:09 13   little bit about the law.  In the fourth phase, I will

11:18:12 14   explain the law to you in more detail.

11:18:15 15           In the fifth phase, lawyers will, again, have an

11:18:17 16   opportunity to talk to you in what's called closing

11:18:20 17   arguments.  As with the opening statements, what the lawyers

11:18:23 18   say in the closing arguments is not evidence for you to

11:18:25 19   consider in your deliberations.  It is merely an opportunity

11:18:29 20   for the lawyers to summarize and interpret the evidence for

11:18:32 21   you.

11:18:35 22           Finally, the sixth phase, the last phase, is the

11:18:38 23   time for you to deliberate and reach a verdict.  You will

11:18:41 24   evaluate the evidence, discuss the evidence among

11:18:43 25   yourselves, and decide the issues in this case.

11:18:46  1          All right.  So we are going to take a 15-minute

11:18:52  2     break.  We've been here practically two -- yeah, nearly two

11:18:58  3     hours just in the courtroom.  So if you need to call people

11:19:01  4     to tell them where you are, something like that, this is a

11:19:03  5     good time to do it.

11:19:05  6          You know, I'm going to be telling you every

11:19:08  7     evening, but I just want to remind you now.  Don't look up

11:19:11  8     anything about the case or the parties or anything, you

11:19:17  9     know, with your electronic devices.  And when you come back

11:19:20 10     in, if you have electronic devices on you, turn them off

11:19:23 11     before you come back in.  You know, you can use them in the

11:19:25 12     jury room for the rest of your life, but it would not be

11:19:31 13     good if they go off while the testimony is going on.

11:19:33 14          So can we take the jury out, please?

11:19:37 15          (Jury leaving the courtroom.)

11:20:20 16          THE COURT:  All right.  So we will take a break.

11:20:21 17     I expect it to last at least 15 minutes.  I do want to just

11:20:26 18     tell you, you know, there was some email traffic last night

11:20:29 19     about what to tell the jury about the patent infringement

11:20:34 20     suit.  You all can be seated.

11:20:38 21          This is what I think I want to say, and it

11:20:44 22     basically reflects the fact that I think they should be told

11:20:48 23     relatively as little as possible about it, that it's

11:20:53 24     irrelevant who sued whom first.  So what I was thinking of

11:20:57 25     saying is:  "During this trial, you may hear about a lawsuit

11:21:02 1    that Ingevity brought against BASF for infringement of the

11:21:06 2    '844 patent.  BASF denies infringement.  That lawsuit is

11:21:12 3    separate from this one and will be decided separately.  You

11:21:16 4    are not to speculate about who should win that lawsuit.

11:21:19 5    Indeed, who wins that lawsuit is irrelevant to the issues in

11:21:25 6    this case."  You can think about that.

11:21:27 7            One question I have is when did you have in

11:21:30 8    mind -- and maybe you think I have something in mind.  When

11:21:34 9    do you have in mind me giving this instruction?

11:21:36 10           MR. THOMAS:  Yeah, Your Honor.  We were thinking

11:21:39 11   it would be now or after the opening statements.  But I

11:21:45 12   think it really needs to be before evidence.

11:21:49 13           THE COURT:  Okay.  Do you agree with that?

11:21:52 14           MR. FRIEL:  I agree with that, Your Honor.

11:21:53 15           THE COURT:  Why don't we do this, because it

11:21:55 16   would be kind of -- it would probably mean more to them if

11:21:57 17   it comes after the opening statements than before, so I've

11:22:01 18   got it here, and that's when I will give it.

11:22:03 19           I think this is probably more in line with what

11:22:09 20   Ingevity requested from me.  Is there any problem with what

11:22:12 21   I proposed from the BASF point of view?

11:22:17 22           MR. FRIEL:  Yes, Your Honor.  We continue to

11:22:22 23   feel that the Court's ruling with respect to allowing

11:22:23 24   statements about the infringement to come in and about the

11:22:28 25   suit will invite the jury to speculate about the outcome of

11:22:32  1      that suit.

11:22:32  2                THE COURT:  Well, okay, so if that comes up,

11:22:35  3      maybe I can give a separate statement when I see what the

11:22:38  4      evidence is, but it's kind of hard to do it in the abstract.

11:22:41  5                MR. FRIEL:  I understand.

11:22:42  6                THE COURT:  Okay.  So I think we're -- but go

11:22:44  7      ahead.

11:22:44  8                MR. FRIEL:  I'm sorry.  The second issue we have

11:22:47  9      is -- and I think in the pretrial Your Honor mentioned that

11:22:51 10      you didn't want to give an instruction that was factually

11:22:54 11      incorrect.

11:22:54 12                THE COURT:  Yeah, I don't think that's factually

11:22:56 13      incorrect.

11:22:57 14                MR. FRIEL:  Well, the Court has ruled on the

11:23:00 15      validity of the patent.

11:23:01 16                THE COURT:  Yeah, you have to listen carefully,

11:23:03 17      which is what lawyers do.

11:23:04 18                MR. FRIEL:  I thought I had.

11:23:05 19                THE COURT:  I said "it will be decided

11:23:06 20      separately."  It's not over.

11:23:10 21                MR. FRIEL:  It's all over but the crying, and it

11:23:13 22      implies that --

11:23:14 23                THE COURT:  Well, it's actually not over

11:23:16 24      because, you know, there's room for appeal.  It's not over.

11:23:20 25                MR. FRIEL:  Federal judgments are final once

| | | |
|---|---|---|
| 11:23:23 | 1 | they are entered.  Appeal does not enter into it, and |
| 11:23:26 | 2 | that's -- |
| 11:23:26 | 3 | THE COURT:  Well, yeah, okay. |
| 11:23:28 | 4 | MR. FRIEL:  -- the problem we have.  It's not -- |
| 11:23:30 | 5 | it doesn't. |
| 11:23:30 | 6 | THE COURT:  All right.  So that one, I think, is |
| 11:23:33 | 7 | accurate, so that's overruled.  The first point, you know, |
| 11:23:37 | 8 | let's see how things go. |
| 11:23:38 | 9 | Okay? |
| 11:23:39 | 10 | MR. FRIEL:  Thank you, Your Honor. |
| 11:23:39 | 11 | THE COURT:  All right.  So we'll take a break |
| 11:23:41 | 12 | for 15 minutes. |
| 11:23:43 | 13 | DEPUTY CLERK:  All rise. |
| 11:26:30 | 14 | (Recess was taken.) |
| 11:40:08 | 15 | DEPUTY CLERK:  All rise. |
| 11:40:14 | 16 | THE COURT:  All right.  Everyone can be seated |
| 11:40:16 | 17 | and we'll get the jury. |
| 11:40:17 | 18 | And just remind me.  You are Mr. Friel? |
| 11:40:21 | 19 | MR. FRIEL:  I am, Your Honor. |
| 11:40:21 | 20 | THE COURT:  Okay.  And you are? |
| 11:40:24 | 21 | MR. THOMAS:  Thomas. |
| 11:40:26 | 22 | THE COURT:  Okay.  How long do you estimate your |
| 11:40:44 | 23 | opening will be? |
| 11:40:45 | 24 | MR. FRIEL:  About 35 minutes. |
| 11:40:47 | 25 | THE COURT:  Okay.  And what about you? |

11:40:50   1          MR. THOMAS:  Mine is probably around 50.

11:40:52   2          THE COURT:  Okay.

11:40:58   3          So we'll probably just do them and then break

11:41:00   4   for lunch, I hope.

11:41:09   5          (Jury entering the courtroom.)

11:41:15   6          THE COURT:  All right.  Members of the jury,

11:41:40   7   welcome back.

11:41:41   8          Everyone, you may be seated.

11:41:44   9          Mr. Friel.

11:41:46  10          MR. FRIEL:  Thank you, Your Honor.  Good morning

11:41:50  11   everyone.

11:41:51  12          THE JURY:  Good morning.

11:41:51  13          MR. FRIEL:  I'm here to give an opening

11:41:53  14   statement on behalf of BASF, and an opening statement is a

11:41:58  15   little bit like a book.  This is the opening statement.

11:42:03  16   It's just a guide to what the evidence will show, and it's

11:42:07  17   like the first chapter in the book.

11:42:11  18          I guess I've got to -- all right.  As a preview,

11:42:14  19   this case is about fair competition and consumer choice.

11:42:19  20   The case is really a tale of two different companies.  One

11:42:23  21   company innovated and brought a better product to the

11:42:27  22   market.  The other company responded with what?  Unfair

11:42:31  23   competition.  The evidence will expose that company's scheme

11:42:35  24   to stifle innovation and keep the better product off the

11:42:38  25   market.  That's the BASF product.

11:42:41 1          The evidence will show that the motive to do

11:42:44 2   this was to maintain large profit margins.  The evidence

11:42:48 3   will show the scheme was implemented to maintain pricing as

11:42:51 4   high as possible.  Moreover, the evidence will show that the

11:42:55 5   scheme was illegal.

11:42:57 6          Let's talk about the parties a little bit.

11:43:03 7   First, BASF.  I'm Tom Friel.  It's my privilege to represent

11:43:08 8   BASF.  With me are lawyers who will be speaking at this

11:43:12 9   trial, Rodger Smith, Paul Mezzina, Norm Armstrong, Chris

11:43:19 10  Yook, Brian Eutermoser, Emily Chen.  BASF is also

11:43:26 11  represented by Rukhsanah Singh.  She works for BASF.  She's

11:43:30 12  sitting back in the gallery.  She'll be here for the whole

11:43:33 13  trial as a corporate representative.

11:43:35 14         Now, what's BASF?  Well, it's four letters;

11:43:38 15  right?  It's a global company that offers many products

11:43:42 16  based on the company's expertise in chemistry.  It's more

11:43:48 17  than 110,000 people worldwide.  A very big company.

11:43:51 18         So the next slide, please.  This is a picture of

11:43:55 19  the corporate headquarters in -- of the U.S. subsidiary.

11:43:59 20  That's in New Jersey in Florham Park.  BASF is more than

11:44:04 21  17,000 people in the U.S.  It's a major supplier to car

11:44:09 22  manufacturers like Ford Motor.  It's -- it has designed and

11:44:15 23  sells thousands of parts for vehicles.  They're in virtually

11:44:18 24  every car manufacturer, probably in cars that you drive.

11:44:22 25         The case is about a product called the EvapTrap.

11:44:25  1   EvapTrap, and there's a two letters after it, XC.  Sometimes

11:44:30  2   it's just referred to as EvapTrap.  Sometimes it's referred

11:44:34  3   to as XC and sometimes by the full name.  It's a little bit

11:44:38  4   confusing.  There's also another product called EvapTrap MX,

11:44:42  5   and we'll talk about the differences, but in a little bit.

11:44:45  6         So in 2015, Ford asked BASF if it could build

11:44:53  7   better parts for its fuel vapor canisters that it puts in

11:44:58  8   its cars.  BASF saw an opportunity there, an opportunity to

11:45:02  9   make a better product than the existing products that were

11:45:06 10   offered on the market.  Those products were Ingevity's

11:45:09 11   products.

11:45:10 12         BASF then developed, at Ford's request, what

11:45:14 13   became known as the EvapTrap XC, a honeycomb that goes in

11:45:19 14   fuel vapor canisters.  The EvapTrap was designed to compete

11:45:24 15   with the existing product, the Ingevity honeycombs.  The

11:45:28 16   evidence will show that the EvapTrap XC is offered in the

11:45:32 17   same three sizes that Ingevity's honeycombs are offered in,

11:45:38 18   and size makes the EvapTrap a drop-in, quote/unquote, for

11:45:43 19   existing fuel vapor canisters that other companies design.

11:45:48 20   Neither BASF nor Ingevity makes these canisters.

11:45:53 21         The evidence will show that although the sizes

11:45:56 22   of these devices are the same and there are some superficial

11:46:00 23   similarities, the EvapTrap is very different on the inside.

11:46:04 24   It's very different from the competing product offered by

11:46:08 25   Ingevity, and, as a result, it performs better.  It does a

11:46:12 1    better job.

11:46:13 2              The evidence is going to show you that the

11:46:15 3    customers for these honeycombs from BASF were excited about

11:46:20 4    getting this product.  They wanted to buy these and put them

11:46:24 5    into their cars and trucks for all of us.

11:46:28 6              Next slide, please.

11:46:29 7              Well, what's Ingevity?  Like BASF, Ingevity is

11:46:34 8    also a large, global company.  Its sales exceeded over

11:46:39 9    $1 billion a year for the last several years, and its gross

11:46:43 10   profits approached half a billion, that's with a B, dollars

11:46:47 11   each of the last couple years.  Ingevity is headquartered in

11:46:52 12   South Carolina.  And I have a -- Ingevity manufacturers

11:46:57 13   activated carbon for the automotive industry.

11:47:01 14             This is a picture of one of their facilities.

11:47:03 15             It manufactures activated carbon in various

11:47:08 16   formats, so in granular, powdered, pelletized carbon, and

11:47:15 17   also in honeycomb form.  It is -- its carbons are used for

11:47:20 18   automobile engine air intake systems, also called AIS.  So

11:47:26 19   air intake systems, abbreviated sometimes AIS.  AIS systems

11:47:33 20   protect the environment from fuel evaporation from the

11:47:36 21   engine.  Ingevity carbons are also used in automobile fuel

11:47:42 22   vapor canisters.  Its canisters are used to protect the

11:47:44 23   environment from evaporation from fuel tanks, so one from

11:47:48 24   the engine, the other from fuel tanks.

11:47:50 25             Ingevity supplies nearly 100 percent of the

11:47:54  1    activated carbon used in fuel vapor canisters in cars in

11:47:59  2    North America.  It supplies nearly a hundred percent of the

11:48:03  3    carbon honeycombs used in these canisters, so its main parts

11:48:07  4    are activated carbon, usually in pellet form, and then

11:48:11  5    honeycombs, all in one box.

11:48:13  6            Now, the sizes are important for the case.

11:48:18  7    Ingevity sells honeycombs in three sizes, 29-millimeter, and

11:48:22  8    that's diameter, they're round; 35, slightly bigger; and

11:48:27  9    41-millimeter diameters, and the evidence is going to show

11:48:30 10    that these sized honeycombs were intended to drop in to

11:48:35 11    conventional fuel vapor canisters.

11:48:37 12            So let's talk about the customers Ingevity and

11:48:43 13    BASF share.  Now, here's a graphic showing you Ford,

11:48:49 14    Hyundai, Kia, other car manufacturers.  These are examples.

11:48:53 15    These are companies that buy fuel vapor canisters for the

11:48:57 16    cars that they build.  They buy them from various suppliers.

11:49:01 17            Ford is one exception.  It makes some of its own

11:49:04 18    fuel vapor canisters.  It buys others.  So Ford is a direct

11:49:10 19    customer for honeycombs for BASF and also for Ingevity.

11:49:15 20            Now, the other manufacturers and Ford, when it

11:49:18 21    buys fuel vapor canisters, it will buy them from suppliers.

11:49:23 22    Here are some examples of suppliers.  Kayser, on the upper

11:49:28 23    left; KFTC, that's Korea Fuel Technology Company; Delphi;

11:49:33 24    Stant; and MAHLE.  You may have heard of at least one of the

11:49:38 25    things in there.  And these companies are called Tier 1.

11:49:42   1   That's T-I-E-R with a number one.  That just means they're

11:49:45   2   the ones who deal directly with the automobile manufacturers

11:49:50   3   and sell parts to them in the supply chain.

11:49:53   4          Now, so they're customers for canisters, fuel

11:50:00   5   vapor canisters that go in the cars that we all buy.  Now,

11:50:04   6   what's the problem here?  It's about dirty air.

11:50:08   7          So vehicles are essential to us.  They transport

11:50:13   8   us.  They transport our goods, but there's a problem with

11:50:16   9   them.  We all know what that is.

11:50:18  10          Next slide, please.

11:50:19  11          It's air, smoggy air.  They're dirty; right?  So

11:50:24  12   when I think of pollution, I think that -- I think of, and

11:50:27  13   you may too -- tailpipe exhaust.  This one is pretty bad.  I

11:50:32  14   hope no one is driving a car like that.

11:50:34  15          Now, another kind of pollution is just as

11:50:37  16   serious as what comes out of a tailpipe -- and that's what

11:50:40  17   this case is about -- and it's called hydrocarbon emissions.

11:50:44  18   That's just a fancy name or engineering name for gasoline

11:50:48  19   smell.  It's gasoline fumes.  You smell them around the fuel

11:50:51  20   pump when you're pumping gas.

11:50:54  21          Now, gasoline, you will learn, is very volatile.

11:50:57  22   That means the gasoline evaporates easily when exposed to

11:51:02  23   the atmosphere, and so it mixes with air, goes up in the

11:51:06  24   atmosphere.  So if allowed, it will, in the atmosphere,

11:51:10  25   cause smog.  This is a picture of LA.  Smog is bad,

1    obviously.  We all don't want that.

2                    Next slide, please.

3                    Well, there are two major sources of gasoline

4    vapors that get in the atmosphere from automobiles.  First

5    is at the air intake and the other is at the fuel tank.

6    Both are relevant here.

7                    At the air intake, let's focus on that.  On the

8    screen you have on the left-hand side --

9                    Maybe can you blow that up.  If not, that's

10   okay.

11                   Well, gasoline engines need air to run.  They

12   burn a mixture of fuel and air.  So air intake systems, as I

13   mentioned, sometimes called AIS systems, are designed to

14   handle that.  But after the engine is turned off, sometimes

15   gas vapors can escape, and you can see in this graphic on

16   the left there's a piston from an engine.  You see unburned

17   fuel up above the piston.  You see potential leaks from fuel

18   injectors and so forth, so that's the kind of problem that

19   air intake systems can run into and are designed to handle.

20                   The second source of gasoline vapor, a focus in

21   this case, is at the other end of the car, assuming you have

22   a front end of the car, and that's the gas tank.  So we have

23   here a stylized picture of a gas tank from your car.  It's

24   usually in the back under the trunk.  It's that kind of

25   orange space that you see in an odd shape.  Darker orange

11:52:57  1    below is fuel, so it's sitting in there.  Above it is an

11:53:00  2    airspace.  You see a filler tube going up.  That's where you

11:53:03  3    put the gas in.  There's also a little line and two vents.

11:53:08  4              So in order for the gas tank to work and not be

11:53:12  5    pressurized when you fill it and get a vacuum when you take

11:53:15  6    fuel out, you have to vent it to the atmosphere; right?  So

11:53:19  7    fuel vapors can escape from the tank through these vents,

11:53:25  8    and there's a problem, too.  When you park a car for a

11:53:33  9    while, due to what's called the diurnal cycle, you can get

11:53:37 10    gasoline vapors entering into the atmosphere.  And diurnal

11:53:41 11    parking bleed is kind of -- maybe people don't understand,

11:53:45 12    but it's very simple.  It's caused by two everyday

11:53:48 13    phenomena.  The first is weather.

11:53:52 14              So if we can go to the next slide, please.

11:53:55 15    Thank you.

11:53:55 16              So I have a graphic here for you here.  It gets

11:53:58 17    warm during the day.  We all know that.  It gets colder at

11:54:01 18    night.  Engineers call this heating and cooling cycle the

11:54:07 19    diurnal cycle.  It happens every day as the sun rises and

11:54:09 20    sets, so you can see we have in the graphic as a high

11:54:13 21    temperature during the and day cooler at night.

11:54:15 22              So if we go to the go to the next slide, please.

11:54:22 23              Oh, there we go.

11:54:24 24              So there's the cycle.

11:54:25 25              So the second phenomena -- first phenomena was

11:54:29  1    weather, heating and cooling.  The second phenomena is that

11:54:32  2    air in fuel tanks just naturally contracts when it's cool,

11:54:36  3    and when it's warm, the air expands, so we have contraction

11:54:40  4    cycle and expansion cycle.

11:54:42  5         The expansion cycle during the day, as the gas

11:54:45  6    tank heats up, pushes some air mixed with gas vapors out

11:54:48  7    through the vent into the atmosphere.  Well, that's bad

11:54:51  8    because the fuel vapors contribute to smog.

11:54:55  9         So the evidence will show that a long-time -- a

11:55:01 10    long-time solution that's been used is fitting the gas tank

11:55:04 11    vent with the fuel vapor canisters I've talked about that

11:55:08 12    you've heard about already in the case.  On the left of your

11:55:12 13    screen up there, you'll see a picture of a carbon canister.

11:55:16 14    You will see some of those.  You'll see it's just a piece of

11:55:19 15    plastic that contains -- the long-term solution was it just

11:55:23 16    had activated carbon in there, and the air would pass

11:55:26 17    through there from the vent and then out to the atmosphere.

11:55:30 18    And inside that canister there's activated carbon.  And

11:55:35 19    activated carbon, you will learn, is something like a

11:55:39 20    sponge.  It soaks up hydrocarbons from the atmosphere and

11:55:42 21    takes them out so at the end, cleaner air exits, the

11:55:46 22    hydrocarbons are trapped inside the canister, and this is

11:55:49 23    good.  No smog.

11:55:50 24         So you might wonder sitting here, what happens

11:55:53 25    to the absorbed gas that that sponge -- the activated carbon

11:55:57 1    in there absorbs?  Well, they're stored in the activated

11:56:00 2    carbon.  Now, while driving, engineers figured out that we

11:56:04 3    can use the engine to -- the engine vacuum that every engine

11:56:09 4    has to suck clean air back through the carbon and the

11:56:12 5    canister and burn it in the engine.  So this is said to

11:56:18 6    purge the canister of hydrocarbons or gas vapors.  Valves in

11:56:22 7    the engine control the process, and we don't even know it's

11:56:25 8    happening when we're driving the car, but that has been the

11:56:28 9    long-term solution, route the fumes through this activated

11:56:33 10   carbon canister and when you're driving, clean it out by

11:56:36 11   purging.

11:56:37 12            Let's go to the next slide.

11:56:39 13            Well, there's a problem with the long-term

11:56:43 14   solution.  It got out most of the carbon.  I'm sorry.  The

11:56:46 15   hydrocarbons.  But when you park your car for a long time,

11:56:51 16   the carbon and the canister can become -- that sponge can

11:56:54 17   become too full, and when that happens and the carbon can no

11:56:58 18   longer capture the fuel vapors, they escape.  It's called

11:57:04 19   breakthrough.  This causes smog, and it's bad.

11:57:07 20            So to solve that, the evidence is going to show,

11:57:11 21   regulations addressed this problem.  There are two major

11:57:16 22   agencies that -- that regulate automobiles.  The first is

11:57:21 23   the EPA.  We've probably all heard about it, the

11:57:23 24   Environmental Protection Agency.  Regulates vehicle

11:57:27 25   pollution.  The EPA enacted stricter regulations.  The old

11:57:32 1    was just a canister filled with carbon.  The EPA enacted

11:57:36 2    strict regulations to address this long-term parking

11:57:40 3    problem, and instead of allowing some hydrocarbons to come

11:57:44 4    out after a few days, they said, well, we're not going to

11:57:47 5    allow hardly any, near zero, hydrocarbon emissions from

11:57:51 6    parked cars.  You'll hear about this.  This is called the

11:57:54 7    LEV, L-E-V, and then the Roman numeral III regulations, so

11:57:59 8    LEV III regulations.

11:58:00 9            Now, in California is another agency that

11:58:04 10   regulates automobiles.  These are new automobile sales.

11:58:08 11   They have what they call the California Air Resources Board,

11:58:12 12   also affectionately known as CARB, C-A-R-B.  There are a lot

11:58:17 13   of letters in his this case.  I'm sorry for that.

11:58:19 14           CARB enacted similarly strict regulations to

11:58:23 15   address this long-term parking problem or diurnal bleed

11:58:27 16   problem.  Their regulations are called CARB, and instead of

11:58:30 17   Roman numeral III, number 3.

11:58:32 18           So next slide, please.

11:58:34 19           So evidence is going to show that the auto

11:58:39 20   industry developed three solutions to meet these stricter

11:58:42 21   LEV III CARB 3 regulations.  First was sealed tank, so if we

11:58:47 22   seal the tank up, the air can't get out.  The second is

11:58:49 23   heating the canister and make it release more often, while

11:58:53 24   the car is parked, hydrocarbons.  And the third was -- now,

11:58:57 25   remember, you have a carbon canister.  The third was to add

11:59:00  1   more carbon.  But the decision was to -- the solution is to

11:59:04  2   add carbon in the form of a carbon honeycomb for various

11:59:08  3   technical reasons that we'll talk about.

11:59:09  4        And so the first two solutions weren't very

11:59:14  5   popular.  The leading solution, this existing fuel vapor

11:59:20  6   canister filled with carbon and then adding to it a carbon

11:59:23  7   honeycomb, has become the leading solution.  If you buy a

11:59:27  8   new car today, it's likely you'll have this combination of

11:59:32  9   canister from the old along with a honeycomb added to it to

11:59:37 10   meet regulations.

11:59:39 11        Now, honeycombs.  What are those?  I've talked

11:59:41 12   about that.  Well, a honeycomb, we all know what that shape

11:59:44 13   is.  The evidence is going to show that carbon honeycombs --

11:59:47 14   and this is made from activated carbon -- have been around a

11:59:50 15   long time.  They've been used for lots of purposes.

11:59:55 16        Take a look at the next slide.  For instance,

11:59:57 17   you'll see a patent that was -- you'll see a couple patents

12:00:03 18   in the case, but this is one of them, and this is the Park

12:00:07 19   patent.  You'll see on the second line over to the left.

12:00:10 20   That's one of the inventors.  His name is Park.

12:00:12 21        It was -- the date of the patent is on the

12:00:17 22   right.  Also highlighted June 22nd, 1999.  It's an old

12:00:20 23   patent.  The title is Adsorptive Monolith Including

12:00:25 24   Activated Carbon and Method for Making Said Monolith.

12:00:30 25        And then if you go to the next slide.  Thank

12:00:32  1    you.

12:00:33  2              It says that this invention's particularly

12:00:36  3    useful applications include adsorptive filters for

12:00:40  4    removing -- and then skip a little bit -- volatile organic

12:00:43  5    compounds -- that's hydrocarbons -- from automobile engine

12:00:46  6    air intake systems.  So this patent is -- shows that carbon

12:00:53  7    honeycombs have been around and used to remove carbons in

12:00:56  8    air intake systems.

12:00:58  9              And the next slide is a picture or a drawing of

12:01:00 10    one, I should say.  And you can see the crosshatching on the

12:01:04 11    front side of Figure 1 from the Park patent, and its

12:01:09 12    crosshatching, it looks like honeycombs.  That's why it has

12:01:12 13    that name.  And this one is an oval shape.  The ones in this

12:01:17 14    case are round.

12:01:20 15              And the Park patent also discloses a certain

12:01:24 16    kind of way to make these because they were known before

12:01:27 17    this.  And the way to make these was a mixture of carbon, so

12:01:32 18    activated carbon, ceramics, and glue, and they mix all that

12:01:37 19    up and then put it through a press and extrude it out.

12:01:41 20              So I tried to think of what that might be like

12:01:43 21    in common everyday, so on the right here, I have Ingevity

12:01:46 22    and there's a picture of a cookie press.  So the dough was

12:01:50 23    mixed, and it's pressed.  It's put into the cookie dough,

12:01:53 24    pressed down, and out comes a cookie in a particular shape,

12:01:57 25    complex shape.  Well, in essence, this is how extruded

12:02:01 1   honeycombs are made from this mixture.

12:02:04 2        Now, you'll turn -- I have on the left the BASF

12:02:08 3   method.  So their honeycombs are made by an entirely

12:02:12 4   different process.  Instead, BASF starts with a hard ceramic

12:02:18 5   honeycomb that has no active ingredients and BASF then coats

12:02:23 6   like paint, so you see in the diagram there's someone

12:02:26 7   painting the hard structure, coats that honeycomb with a

12:02:31 8   proprietary sauce of activated carbon made from an advanced

12:02:36 9   polymer.  The process is like applying paint to a hard

12:02:40 10  surface, as shown.

12:02:42 11       Some of the terms in the case are a little bit

12:02:44 12  interchangeable, like carbon, California air, and so forth.

12:02:50 13  Well, honeycombs have a number of different names.

12:02:52 14  Sometimes they'll called monoliths, as in the Park patent,

12:02:55 15  but I think you'll catch onto that pretty quickly.

12:02:59 16       Next slide, please.

12:03:02 17       So let's talk about what happened before

12:03:05 18  EvapTrap.  And no dispute, Ingevity was the only supplier of

12:03:09 19  activated carbon honeycombs to use in evaporative emissions

12:03:14 20  control in these canisters.  And Ingevity's policy for years

12:03:20 21  was to sell these activated carbon honeycombs on what's

12:03:26 22  called a purchase order or PO basis, and that means they

12:03:30 23  would -- it was on a "take it or leave it" basis.  When you

12:03:33 24  ordered it, Ingevity sets the price.  Its customers would

12:03:37 25  either accept Ingevity's price and terms when the purchase

12:03:40  1    order was placed or they couldn't get the honeycombs.

12:03:43  2    Ingevity's practice was also to impose annual increases on

12:03:48  3    its customers.

12:03:48  4            And the evidence will show that that's contrary

12:03:52  5    to what happens in the automotive industry.  Most,

12:03:56  6    overwhelming majority of situations, automobile companies

12:04:01  7    expect every year, as the platform is built, the prices to

12:04:05  8    go down, but Ingevity was able to raise prices every year.

12:04:09  9            So the next slide, please.

12:04:12 10            So you saw the Park patent before, and that's on

12:04:17 11    extruded honeycombs.  And Ingevity's predecessor, one of

12:04:21 12    Ingevity's predecessors, MeadWestvaco Company, owns -- owned

12:04:26 13    that patent and its inventors invented that.  But this is a

12:04:29 14    different patent.  This is a patent that covers evaporative

12:04:34 15    emissions systems and methods for making them, and this is a

12:04:38 16    copy of the first page of Ingevity's patent.  This is the

12:04:41 17    '844 patent that you heard about in the instructions.  It

12:04:45 18    was filed with United States Patent Office -- Patent and

12:04:49 19    Trademark Office on October 21st, 2003.

12:04:53 20            So let's go to the next one.

12:04:55 21            I want to highlight a few things about the

12:04:57 22    patent.  First, it was filed on -- I can't read it --

12:05:03 23    October 21st, 2003.  And because of that, you'll learn that

12:05:08 24    the patent expires on March 18th, 2022.  The patent, you'll

12:05:16 25    see it and you can read it.  It doesn't require honeycombs.

12:05:20  1    Ingevity requires all customers who want a license to this

12:05:23  2    patent so that they can practice the methods in it, to

12:05:27  3    purchase what?  All of their honeycombs from Ingevity.  They

12:05:30  4    say if you want a license, you can't buy from BASF or from

12:05:33  5    anyone else.  That's one of the key issues in the case.

12:05:37  6              So the next slide, please.

12:05:39  7              Well, technology doesn't stand still.  In 2016,

12:05:44  8    BASF introduced into the market the EvapTrap XC, its newly

12:05:52  9    designed activated carbon honeycomb for use in evaporative

12:05:57 10    emissions control canisters.  The evidence is going to show

12:06:02 11    you very clearly EvapTrap is newer and it's better than

12:06:06 12    Ingevity's honeycombs.

12:06:08 13              So BASF's honeycombs are made from a proprietary

12:06:15 14    polymer.  Okay.  What's that?  It's a fancy name for

12:06:18 15    plastics.  And it has advantages and it leads to better

12:06:22 16    activated carbon.  It does a better job of soaking up

12:06:26 17    hydrocarbons.  Ingevity's, however, are made from wood,

12:06:29 18    usually wood scraps, wood waste, like saw dust.

12:06:32 19              BASF's honeycombs coat this carbon, this special

12:06:41 20    sauce, if you will, onto a substrate.  That's a fancy name

12:06:44 21    for the -- the ceramic honeycomb that forms the basis for

12:06:51 22    the -- for the honeycomb that they offer.  The BASF product

12:06:57 23    is not extruded like the cookie example that you saw.

12:07:03 24              This process allows more precision in coating so

12:07:07 25    the coating in its BASF product can be very precise, and

12:07:11  1    you'll see why that's important.  And it also leads to a

12:07:15  2    product which is what?  More durable because it's stronger.

12:07:18  3    It's built on a solid ceramic base, and, as you'll learn,

12:07:23  4    that is important because these things have to last for the

12:07:26  5    life of the vehicle.

12:07:29  6            The BASF honeycombs are offered in sizes that

12:07:34  7    drop into customer-designed canisters.  So the customers

12:07:38  8    tell you what sizes they need for their canisters.

12:07:42  9            BASF refers to this product as an, air quotes,

12:07:46 10    drop-in replacement.  This is what the industry calls

12:07:50 11    drop-in replacement parts, a well-known term in the

12:07:53 12    industry.  And the evidence will show that as a result of

12:07:57 13    these advances and advantages in the BASF honeycomb design,

12:08:02 14    that it's not a surprise, the EvapTrap outperforms Ingevity

12:08:06 15    honeycombs over a number of metrics; right?  They're more

12:08:10 16    durable.  They lead to cleaner air.  The customers wanted

12:08:14 17    these.

12:08:15 18            And you say, well, what about the patent?  BASF,

12:08:20 19    well, the evidence will show BASF believes that the '844

12:08:24 20    patent does -- Ingevity's '844 patent does not bar sales of

12:08:27 21    its honeycombs, that it can sell honeycombs without a

12:08:31 22    license to the Ingevity patent and that it has freedom to

12:08:34 23    operate.  So, obviously, you're selling a product.

12:08:38 24            Next slide, please.

12:08:39 25            It's no secret.  Ingevity found out about it;

12:08:42 1   right?  So by 2016, Ingevity had found out about the

12:08:47 2   EvapTrap coming on the market.  It also found out that the

12:08:52 3   BASF product was better.  And you'll see Ingevity documents,

12:08:58 4   and don't take our word for it or even an expert's.

12:09:01 5   Ingevity documents recording that the Ingevity people

12:09:04 6   concluded that the EvapTrap appears, not my word, their

12:09:08 7   word, awesome.  In a January 19th -- sorry, January 2018

12:09:15 8   email, Ingevity -- one of Ingevity's business managers, a

12:09:19 9   Peter McCrae, said -- well, he said that the Kayser BASF HCA

12:09:28 10  appears awesome.  Just so there's no doubt here, HCA is

12:09:34 11  another one of those terms for carbon honeycomb.  It's a

12:09:38 12  honeycomb A activated carbon HCA, so they're referring to

12:09:42 13  the BASF newly -- new honeycombs, and Kayser, as I mentioned

12:09:48 14  earlier, is one of those suppliers, Tier 1 suppliers.  So

12:09:53 15  Mr. McCrae is referring to a Kayser BASF HCA because he saw

12:09:58 16  it at the Kayser offices.

12:10:01 17         And in the same document, Mr. McCrae concludes

12:10:05 18  that, wait a minute, so much better that one EvapTrap

12:10:09 19  replaces two Ingevity honeycombs.  So what does that mean?

12:10:14 20  Well, it means that EvapTraps are a lower cost alternative

12:10:19 21  to Ingevity.  You only need half as many parts; right?

12:10:22 22         And in the same email, Mr. McCrae also describes

12:10:26 23  the EvapTrap as extremely durable and then gives a colorful

12:10:31 24  reason why.  He writes of an EvapTrap that was smashed down

12:10:35 25  onto the desk with no resulting damage, and that's how

durable it was.

Next slide; please.

So what's tying?  The Court will instruct you as to that, but I'll give you an example.  It's where, in order to buy one product, you must buy another product that you may not want.  So you have to buy one product in order to get day -- you buy one product, but the manufacturer forces you to buy something else.

Let me give you an example.  Let's suppose that you want this printer because it's really good, the right size.  But this manufacturer says, well, wait a minute, if you want this, you have to buy paper, too.

If you go to the next slide.

So here he is.  You're forced to buy paper. Well, in this case, the printer is the tying product, so I want that; right?  But the manufacturer ties your purchasing the paper to the printer.  And you may not want the paper because maybe you want a paper of better quality or a different color or maybe because the manufacturer charges too much for the paper; right?  I just want the printer. But the manufacturer's trying -- sorry -- tying left you with no choice.

So here, the evidence is going to show that Ingevity tied sales of honeycombs to the licenses to its patents, so it said to its customers if you want a license,

12:12:01  1    you have to buy our honeycombs.  You can't buy anybody

12:12:04  2    else's, and you can't buy BASF's, even though it's better.

12:12:11  3    So customers who wanted to buy a license had to buy from

12:12:14  4    Ingevity, just like the printer and its paper.  The evidence

12:12:17  5    will show that this action took away freedom of choice for

12:12:21  6    manufacturers and their suppliers.  They could not buy

12:12:25  7    better performing, less expensive honeycombs from BASF.

12:12:29  8              Next slide, please.

12:12:30  9              Well, every case has the other side; right?

12:12:36 10    Here, we have excuses from Ingevity.  Let's go on there.

12:12:40 11              So Ingevity's first going to argue that the '844

12:12:45 12    patent gave it the right to tie honeycombs to the licenses

12:12:50 13    because it claims that honeycombs are non-staple -- you'll

12:12:56 14    be instructed on that.  That was mentioned in the

12:12:58 15    instructions -- that have no other use.  So while patents

12:13:01 16    may allow some restrictions on competition, they don't allow

12:13:05 17    patent owners to improperly extend that monopoly, and the

12:13:11 18    evidence will show that Ingevity has attempted to extend the

12:13:15 19    patent in two ways.

12:13:16 20              First, to cover components that are not patented

12:13:20 21    like the honeycombs.

12:13:21 22              And, secondly, a patent is for a term of years

12:13:24 23    only.  And I mentioned before there is a patent expiration

12:13:29 24    dates for the '844 patent.  Ingevity wanted to extend it

12:13:33 25    well past the expiration date of the patent.

12:13:35　1　　　　　　　So the evidence is going to show that the

12:13:41　2　Ingevity honeycombs for fuel vapor canisters are not covered

12:13:45　3　by the patent, not covered by the '844 patent.  Why?

12:13:50　4　Because they have other uses than in fuel canisters.  The

12:13:55　5　evidence will show that Ingevity's own financial documents

12:13:59　6　record sales of the same honeycombs that they sold for fuel

12:14:04　7　vapor canisters for another use.  What use is that?  I

12:14:08　8　already mentioned it.  AIS, air intake systems.

12:14:13　9　　　　　　　Remember the diagram that we saw.  Now, we're

12:14:17　10　going to see Ingevity business records, spreadsheets,

12:14:20　11　recording sales of their honeycombs to customers for air

12:14:28　12　intake systems.

12:14:28　13　　　　　　　Next slide, please.

12:14:29　14　　　　　　　I have it stylized here.  There are several

12:14:34　15　spreadsheets that they used.  These are business records

12:14:36　16　used by Ingevity to manage its business.  And what will they

12:14:40　17　show?

12:14:41　18　　　　　　　Next slide, please.

12:14:43　19　　　　　　　The records are going to show that thousands of

12:14:47　20　honeycombs were sold for AIS, air intake systems, including

12:14:51　21　to Toledo Molding and Die for use in the -- in these air

12:14:55　22　intake systems.  The records will also show the same types

12:14:58　23　of honeycombs were sold to two other companies, SumiRiko for

12:15:03　24　AIS and also sold to Stant for AIS.  These, again, are

12:15:09　25　suppliers to the automotive industry.

12:15:13  1          The evidence will show that the Ingevity's

12:15:15  2     patent excuse is a very poor excuse, one that just doesn't

12:15:18  3     justify its attempt to expand its patent to cover

12:15:22  4     honeycombs.

12:15:25  5          Now, the next excuse is Ingevity will claim that

12:15:28  6     the reason customers did not buy products from BASF was due

12:15:34  7     to lawsuits and threats of lawsuits to enforce that patent.

12:15:38  8     Well, the evidence is going to show that BASF offered to

12:15:41  9     indemnify all of its customers to cover the downside risks

12:15:46 10     to customers of getting sued by Ingevity.  And indemnity is

12:15:52 11     like insurance.  It says we'll pay your expenses and costs

12:15:55 12     if you have to defend a suit.  And you would think that if

12:15:58 13     your downside was covered, that you would still buy; right?

12:16:03 14     In other words, it takes that excuse off the table.  But the

12:16:05 15     evidence will show the customers still didn't buy, even

12:16:08 16     though there was indemnity available to them.

12:16:12 17          Next slide, please.

12:16:14 18          So Ingevity reacts to all this -- to the

12:16:17 19     competition.  The evidence will show that in response to

12:16:21 20     this competition, Ingevity made changes in its long-standing

12:16:25 21     pricing, sales, and contracting process.  I mentioned before

12:16:29 22     the purchase order terms.  Well, Ingevity changed course and

12:16:33 23     now wanted to tie up customers in exclusive supply

12:16:37 24     agreements.  That means you're only going to buy my

12:16:40 25     honeycombs or my carbon and nothing else for your needs.

12:16:43 1    And they wanted to have these agreements last a long time,

12:16:47 2    well after the patent expired.

12:16:50 3             So it set out in -- and I'll put it, again, in

12:16:53 4    quotes -- to convince customers to enter into exclusive

12:16:57 5    long-term supply agreements which effectively foreclosed

12:17:01 6    these customers from competition, prevented them from buying

12:17:05 7    BASF honeycombs.  The evidence is going to show, frankly,

12:17:08 8    the customers had no choice.

12:17:10 9             You'll hear testimony from a Mr. Schutte of

12:17:14 10   Kayser, and he will testify that Ingevity imposed multiple

12:17:21 11   price hikes in a given year and imposed additional fees on

12:17:26 12   Kayser in order to get the carbon supplies from Ingevity.

12:17:31 13   Mr. Schutte will testify Kayser had no choice.  It had no

12:17:35 14   choice whatsoever.  Had to accept these increases, and then

12:17:39 15   it was forced to accept a long-term agreement that Ingevity

12:17:42 16   wanted with an exclusive period.  So were two other

12:17:46 17   companies.  Together, they represent a large percentage of

12:17:49 18   the market for carbon honeycombs.  As a result, the EvapTrap

12:17:54 19   XC honeycomb sales were foreclosed.

12:17:58 20            Next slide, please.

12:17:59 21            Now, a supplier who requires a customer to buy

12:18:03 22   all of its needs is said to be exclusively dealing.  In

12:18:07 23   other words, I'll only buy from you.  Here, Ingevity's

12:18:11 24   long-term agreements required three major customers to buy

12:18:13 25   all honeycombs from Ingevity.  Those customers are Delphi,

12:18:18  1    and they were on the chart, Kayser, and Korea Fuel Tech,

12:18:23  2    also known as KFTC, and these agreements are very important

12:18:27  3    to this case.  With these three long-term agreements,

12:18:31  4    Ingevity locked up nearly half of the market for carbon

12:18:36  5    honeycombs, taken off, taken away.

12:18:39  6              Is that unfair?  Why is that unfair?  Exclusive

12:18:42  7    dealing squeezes out competitors.  It may deter companies

12:18:46  8    from seeking better and improved solutions.  It may stifle

12:18:49  9    innovation.  It may keep better performing products off the

12:18:53 10    market.

12:18:56 11              So first, Delphi, I mentioned.  Delphi is the

12:18:59 12    biggest supplier of canisters, evaporation control

12:19:04 13    canisters, in the North American market.  Ingevity and

12:19:06 14    Delphi, as I mentioned, signed a long-term supply agreement.

12:19:10 15    You'll see a copy of it.  It is JX-14.  It has a

12:19:16 16    January 1st, 2017, date.  It is a one year, two year, no

12:19:21 17    nine-year-long exclusive supply agreement.  The exclusivity

12:19:25 18    period doesn't end until the end of December 2025.  The

12:19:29 19    evidence will show that between January 1st, 2017, and

12:19:35 20    December 31st, 2025, Delphi will have no practical choice

12:19:40 21    other than to buy a hundred percent of its honeycombs from

12:19:43 22    Ingevity for sales in the North American market.  As a

12:19:47 23    result, Delphi can't buy, can't choose, EvapTrap XC.

12:19:52 24              So the second agreement, long-term agreement,

12:19:56 25    that we're complaining about is the Kayser agreement.

12:19:59 1    Kayser is the second biggest supplier of canisters in the

12:20:03 2    North American market.  Ingevity and Kayser signed a

12:20:07 3    long-term agreement that is made and executed as of

12:20:12 4    January 1st, 2019.  This is JX-25.  It will be introduced

12:20:18 5    into evidence.  So this agreement has an eight year

12:20:20 6    exclusive supply period.  It lasts even longer than the

12:20:24 7    Delphi exclusive agreement.  It doesn't end until 2026, the

12:20:28 8    end of 2026.  The evidence will show that like Delphi,

12:20:33 9    Kayser had no practical option other than to buy.  To buy

12:20:41 10   from Ingevity, sorry.

12:20:43 11            Now, the agreement covers -- the Delphi

12:20:46 12   agreement covered just honeycombs, but this agreement goes

12:20:49 13   further.  It covers honeycombs as well as all the carbon

12:20:52 14   that goes inside of the canister, so -- and the pellets.

12:20:56 15   So -- and so it restricts choice by Kayser of what they're

12:21:04 16   going to put inside of those canisters, and the active

12:21:07 17   ingredients, the carbon, a hundred percent have to be bought

12:21:10 18   from Ingevity.  And, of course.  Kayser couldn't choose any

12:21:17 19   EvapTrap.  They could only buy from Ingevity, as a practical

12:21:20 20   matter.

12:21:21 21            Next slide, please.

12:21:22 22            So the third agreement that you will see,

12:21:25 23   long-term agreement, is the Korea Fuel Tech agreement.  Now,

12:21:29 24   Korea Fuel Tech -- probably none of us have ever heard of

12:21:35 25   before -- it's the largest supplier of canisters in the

12:21:39  1    Korean market.  You'll hear that's Korean market or Korea

12:21:42  2    regulates like we do.  They have regulations that are very

12:21:45  3    strict like the OEM, LEV III, CARB 3 regulations, so they're

12:21:50  4    interested in a solution to this diurnal bleed problem long

12:21:54  5    term.  So there was a long-term agreement entered into

12:21:57  6    between Ingevity and KFTC, an agreement dated August 1st,

12:22:03  7    2019, and you'll see this is Joint Exhibit JX-28.  This one

12:22:10  8    doesn't expire, like the other one, until the end of 2026,

12:22:15  9    December 31st, 2026.  And the evidence will show that like

12:22:20 10    Kayser, this agreement gives KFTC no choice other than to

12:22:25 11    buy a hundred percent of the carbon honeycombs from

12:22:30 12    Ingevity, and, like the Kayser agreement, they also had to

12:22:34 13    buy a hundred percent of all of the other carbon that goes

12:22:37 14    in there pelletized, powder, whatever, granular.  So as a

12:22:41 15    result, KFTC could not choose to put BASF honeycombs in

12:22:48 16    their canisters.

12:22:50 17              Thank you.  Next, please.

12:22:52 18              So Ingevity offers some excuses.  First excuse,

12:22:57 19    oh, points to the patent again, same excuse it gave for

12:23:01 20    tying.  Ingevity will claim that the '844 patent permits

12:23:04 21    long-term agreements because its honeycombs have no other

12:23:08 22    use.  Again, the evidence will show that Ingevity's own

12:23:11 23    corporate records show sales of the same honeycombs used for

12:23:17 24    fuel vapor canisters for air intake systems or AIS.  We'll

12:23:22 25    show it made sales to Toledo Molding and Die company.  And

1    12:23:26  the two other companies I mentioned earlier.

2    12:23:28          The evidence will show a second problem with

3    12:23:32  Ingevity's patent excuse.  I mentioned that Ingevity wants

4    12:23:37  to expand its patent in terms of time as well, so I made a

5    12:23:41  graphic for you.  Let's take a look at it.

6    12:23:45          The patent, just have in mind, expires on

7    12:23:49  March 18th, 2022.  So have that in mind.

8    12:23:51          And now the next slide.

9    12:23:52          So on this slide, it depicts a timeline, and it

10   12:23:57  has the three agreements I've just mentioned, the Delphi

11   12:24:00  agreement, the Kayser agreement, and the KFTC agreement from

12   12:24:03  the top to the bottom.  The red line for each shows how long

13   12:24:07  the exclusivity period, the period you can't buy from BASF,

14   12:24:12  goes on for.  And there's a black line in the middle, and

15   12:24:17  it's at the early part of 2022.  If you follow it down up at

16   12:24:20  the top, that's the patent expiration date.  Now, as you

17   12:24:24  see, the exclusivity period goes well past that, and the

18   12:24:28  green arrow goes up to the end of the period.

19   12:24:30          So the evidence will show that Ingevity wanted

20   12:24:33  to push that patent to -- and require exclusivity -- let me

21   12:24:41  strike that.  Let's start again.

22   12:24:43          The evidence will show that Ingevity got

23   12:24:46  exclusivity for in many cases, four, four-and-a-half years,

24   12:24:50  after the patent expired by use of these agreements.  And

25   12:24:55  the evidence will show -- well, Ingevity offers a second

12:24:59 1  excuse.  They say well wait a minute, that extra four,

12:25:02 2  four-and-a-half years, the agreements have a clause called

12:25:06 3  meet-and-release clauses or inversion clauses which allow

12:25:10 4  the customer in each case to go elsewhere.  We'll provide

12:25:14 5  testimony from an expert, an expert economist, Dr. Mathur,

12:25:19 6  to help you understand the provisions and how they operate.

12:25:22 7  The evidence will show that as a practical matter, they

12:25:26 8  didn't allow any release at all.  They were so expensive and

12:25:29 9  so difficult to use that customers would not invoke them.

12:25:32 10         Ingevity's going to offer a third excuse as

12:25:36 11 well.  It's going to tell you, well, okay, you know, maybe

12:25:40 12 this, maybe that, but there are pro-competitive effects to

12:25:44 13 this agreement, and they would justify tying up customers

12:25:47 14 for this long period.  The evidence will show that the

12:25:50 15 long-term agreements have no pro-competitive effects and any

12:25:54 16 benefit would not outweigh the limiting of customer choice

12:25:58 17 and keeping better products off the market.

12:26:01 18         So market foreclosure.  Ingevity implemented

12:26:05 19 this plan, this pattern of targeted price increases that I

12:26:09 20 mentioned before, to encourage its customers to sign these

12:26:13 21 three long-term agreements.  In 2019 alone, varying from its

12:26:18 22 earlier practice, Ingevity imposed a series of unprecedented

12:26:24 23 price increases and fees on a select group of customers.

12:26:29 24 The evidence will show that customers purchased competing

12:26:32 25 carbon adsorbents were targeted by these price increases

12:26:38 1    that Ingevity put in, one of the targeted customers was

12:26:42 2    Kayser.  The evidence will show Kayser's CEO confirming in

12:26:47 3    testimony that Ingevity pricing drove Kayser to sign the

12:26:51 4    long-term agreement with Ingevity.  Put another way, he will

12:26:54 5    say Ingevity had no other choice.

12:26:57 6         The evidence will show that of course Ingevity

12:27:00 7    had market power.  It had the ability to do sustained price

12:27:05 8    increases over time.  It increased prices nearly every year,

12:27:10 9    sometimes more often.  As I mentioned, that was unusual in

12:27:13 10   the auto industry, which has a cost-down standard.

12:27:16 11        Ingevity dominates the automotive car market and

12:27:20 12   the honeycomb market.  It has 90 to a hundred percent of

12:27:23 13   both of those markets.  The long-term agreements foreclose a

12:27:28 14   significant percentage of the market.  The evidence will

12:27:31 15   show this was a deliberate choice made by Ingevity.

12:27:34 16        The evidence will also show that BASF had a

12:27:41 17   reasonable probability of getting business with Kayser.  In

12:27:45 18   fact, they ended up signing an agreement with Kayser.  In

12:27:49 19   February of 2018, the agreement was signed.  Kayser planned

12:27:53 20   to use the EvapTrap XC, this better product, in several

12:27:57 21   vehicles.  Ingevity became aware that Kayser was interested

12:28:02 22   in EvapTrap.  It developed a plan -- you'll hear the

12:28:05 23   evidence.  We'll show this -- to disrupt the relationship

12:28:07 24   between Kayser and BASF.  Ingevity imposed a series of

12:28:12 25   unprecedented price increases on Kayser and also imposed new

12:28:18  1    fees on all carbon adsorbents Kayser purchased from Ingevity

12:28:22  2    starting in 2019.  The increases gave -- you'll hear

12:28:28  3    evidence from Mr. Schutte -- no choice but to accept the

12:28:31  4    long-term exclusive treatments agreements with Ingevity.

12:28:35  5    Kayser never bought any EvapTraps as a result.  Kayser's

12:28:39  6    locked up, as you saw in that timeline, until the end of

12:28:43  7    2026.

12:28:43  8               Next slide.

12:28:46  9               So evidence will show that Ingevity's conduct

12:28:50 10    has damaged BASF.  No sales have been made as a result of

12:28:54 11    this.  Expert economists will come in and provide evidence

12:29:00 12    that BASF would have captured up to 50 percent of this

12:29:04 13    market for honeycombs without these actions, improper

12:29:09 14    actions of Ingevity.  Dr. Mathur, the economist, has

12:29:14 15    calculated the damages caused by BASF losing that market

12:29:18 16    share.  She will explain this in detail.  She has determined

12:29:23 17    the amount of damages, and you will hear from her.  She's

12:29:27 18    calculated that the harm to BASF has caused it to lose in

12:29:31 19    the range of $39 million to $48 million.  We are going to

12:29:35 20    ask you to award damages in the range of $39 million to

12:29:41 21    $48 million.

12:29:41 22               Next slide, please.  Next slide.  Thank you.

12:29:48 23               So as the trial unfolds, the evidence will fill

12:29:52 24    in the details of what's in this book.  I thank you for your

12:29:55 25    attention.

12:30:02 1          THE COURT:  All right.  Thank you, Mr. Friel.

12:30:07 2          Because when somebody makes an opening

12:30:10 3  statement, it's good for them to not be interrupted and

12:30:13 4  because I don't think that, in fact -- I think that Ingevity

12:30:21 5  is probably going to be talking long enough, so it's getting

12:30:24 6  kind of late for lunch, so I think we're going to break for

12:30:28 7  lunch now.

12:30:30 8          You know, the rest of the day this week, when

12:30:33 9  there's testimony, I will expect to go closer to 1:00 before

12:30:36 10  we break for lunch.  But we'll resume at 1:30 and if we can

12:30:43 11  take the jury out, that will be good.

12:30:45 12          (Jury leaving the courtroom.)

12:31:16 13          THE COURT:  All right.  You know, and I'm not

12:31:21 14  being critical, but Mr. Friel's opening went, you know, 15

12:31:26 15  or 20 minutes longer than anticipated, which is the reason

12:31:29 16  why I called it off.  I hope that's okay.

12:31:33 17          MR. THOMAS:  No problem, Your Honor.

12:31:34 18          THE COURT:  All right.  So we'll resume with

12:31:36 19  openings when we get back.

12:31:38 20          Is there something else, Mr. Smith?

12:31:39 21          MR. SMITH:  Your Honor, I just wanted to alert

12:31:40 22  Your Honor.  I know you don't like to take objections over

12:31:43 23  lunch.  There are some of those deposition designations that

12:31:46 24  are likely will be called or played this afternoon, and

12:31:49 25  there are still objections.  I don't know if you what to

12:31:51  1    deal with it now or come back early.  I just want to alert

12:31:55  2    to you to that fact.

12:31:56  3              THE COURT:  How much is there?

12:31:57  4              MR. YOOK:  Your Honor, if I may approach.

12:31:59  5              THE COURT:  Yeah, yeah.

12:31:59  6              MR. YOOK:  Your Honor, the parties have been

12:32:01  7    able to eliminate a lot of the objections.  We've resolved

12:32:05  8    them.  There is one more overarching issue in terms of --

12:32:09  9    that will affect the practicalities of how the videos will

12:32:12 10    be played going forward in this case.  Might be helpful to

12:32:15 11    get some guidance, Your Honor.

12:32:16 12              THE COURT:  What's that?

12:32:17 13              MR. YOOK:  Your Honor, in sum, as you know,

12:32:19 14    there was a detailed order for the pretrial proceedings

12:32:23 15    leading up to today.  That included exchanging deposition

12:32:27 16    designations between the parties in advance.  So each party,

12:32:32 17    by May 27th, had to provide their affirmative designations

12:32:36 18    that would be the an add-on to their direct.

12:32:39 19              THE COURT:  May 27th?

12:32:40 20              MR. YOOK:  May 27th, 2021, Your Honor.

12:32:43 21              THE COURT:  Yeah, okay.

12:32:44 22              MR. YOOK:  So those are affirmative depositions

12:32:45 23    that would be like analog of the direct examination from

12:32:50 24    these witnesses, and then the other party had until July 1st

12:32:54 25    to make counter-designations which, again, would be

12:32:57 1    analogous to cross-examination if it were done live.

12:32:59 2            On Sunday, we received Ingevity's

12:33:04 3    counter-designations to BASF's affirmative designations of

12:33:08 4    three witnesses that will be played later this afternoon,

12:33:12 5    Your Honor.  We do have a concern because it seems like

12:33:17 6    Ingevity's counter-designations were never disclosed as

12:33:21 7    counter-designations to us, Your Honor.

12:33:23 8            For one of the witnesses, Ms. Toldo, there's ten

12:33:26 9    instances spanning several pages where those were designated

12:33:32 10   by Ingevity as counters on Sunday but had never previously

12:33:36 11   been disclosed as counter-designations, Your Honor.  In

12:33:39 12   fact, these actually have been designated initially by

12:33:43 13   Ingevity as affirmative.  So essentially what's happening

12:33:46 14   here, Your Honor, is that Ingevity's mixing and matching the

12:33:49 15   affirmatives and counters and basically what they're doing

12:33:52 16   is that they're injecting their direct testimony into our

12:33:57 17   videos so that it confuses the jury in terms of what they're

12:34:00 18   going to hear, Your Honor.

12:34:01 19           THE COURT:  So the objection here is not that

12:34:04 20   you're surprised by these designations, but that you want

12:34:08 21   them to play excerpts of the deposition during their case

12:34:13 22   rather than with your case?

12:34:15 23           MR. YOOK:  That's correct, Your Honor.  And this

12:34:17 24   goes to just the basic rule as we know it, Rule 611, in

12:34:20 25   terms of just its presentation of evidence, Your Honor, but

12:34:22 1    I think here with Ms. Toldo is a good example.  This is not

12:34:27 2    an insubstantial confusion, Your Honor.  So for Ms. Toldo,

12:34:32 3    we had designated ten minutes on direct.  And Ingevity on

12:34:36 4    Sunday designated 13 minutes additional of testimony, so

12:34:39 5    they are basically doubling what the jury is going to hear.

12:34:43 6    And in the jury's mind, they're not going to be able to tell

12:34:45 7    what's being presented from Ms. Toldo as BASF's case versus

12:34:49 8    Ingevity's affirmative case in chief.

12:34:51 9        So Your Honor, I do think that there's some

12:34:53 10   material prejudice.  We have wouldn't want to bother the

12:34:55 11   Court with this unless it were a material and substantive

12:34:58 12   issue, we do have concerns with, again, the conflation of

12:35:01 13   the evidence that the jury will hear.

12:35:03 14        THE COURT:  You know, my general practice is to

12:35:06 15   encourage a witness only appearing once, whether it's live

12:35:11 16   or by deposition.  It doesn't come up that much in

12:35:14 17   depositions because most of the time it's relatively less.

12:35:20 18   That's reason why it's by deposition in the first place.

12:35:30 19        So what is your thought, Mr. Scharn?

12:35:33 20        MR. SCHARN:  So sure.  So there's kind of a

12:35:35 21   number of issues implicated by what Mr. Yook was just

12:35:40 22   discussing.  We have some deposition counter-designations

12:35:42 23   for Ms. Toldo that are not objected to as being outside the

12:35:47 24   scope.  They have some that they object to as being outside

12:35:50 25   the scope.  So I think if we're going to deal with those,

12:35:53 1   we'd have to go through and see are these really outside the

12:35:56 2   scope, and if the answer -- we think that they're within the

12:35:59 3   scope of direct, but if we have to do that exercise, then

12:36:03 4   what -- and we want to divide up the deposition videos, then

12:36:07 5   what we would end up with is whatever clips are outside the

12:36:10 6   scope of direct, that Your Honor may determine would then

12:36:14 7   be, you know, maybe we'd get a three-minute video out of

12:36:17 8   context later in the case.

12:36:20 9        We think that that's not an efficient way to

12:36:23 10  present that evidence.  The best thing is what the parties

12:36:26 11  agreed, that the depo testimony would be played is

12:36:29 12  conventionally as it occurred in the deposition regardless

12:36:32 13  of who designated it or counter-designated it.

12:36:36 14        And with respect to -- you know, the arguments

12:36:39 15  that Mr. Yook raised with respect to Ms. Toldo do not apply

12:36:44 16  to the other two depositions that are in queue for today in

12:36:47 17  terms of, you know, the procedure for the pretrial order to

12:36:51 18  the extent that it's something that is persuasive to the

12:36:55 19  Court.

12:36:58 20        THE COURT:  But the pretrial order only has to

12:37:01 21  do with the fact that you originally called some of these

12:37:03 22  things your designations as opposed to calling them your

12:37:07 23  counter-designations.

12:37:08 24        MR. SCHARN:  Correct.  It's formal, not a

12:37:11 25  substantive distinction.

12:37:15  1          THE COURT:  So I don't know.  I've never -- you

12:37:19  2  know, I will tell the jury when we do the first deposition

12:37:24  3  that, you know, essentially both sides are putting into it

12:37:31  4  things of one kind or another.  I would offer that if --

12:37:37  5  well, I won't offer, actually.

12:37:39  6          So I'm going to sort of --

12:37:42  7          MR. YOOK:  Your Honor, if I may, if you are

12:37:45  8  inclined to just play the videos once, which we understand

12:37:48  9  there's efficiencies there, we just ask for a little bit of

12:37:51 10  ground rules in terms of how that's done.  Your Honor, I

12:37:54 11  would -- I think, first of all, just the guidance that these

12:37:57 12  videos are, in fact, only going to be played once and

12:38:00 13  Ingevity won't try to play it again later in the case.

12:38:03 14          THE COURT:  Well, I mean, if it's played once --

12:38:05 15          I mean, yeah.  Right, Mr. Scharn?  If they do

12:38:07 16  say Ms. Toldo, everything that's in Ms. Toldo ought to be

12:38:11 17  played the first time; right?

12:38:13 18          MR. SCHARN:  That's correct, Your Honor.

12:38:14 19          MR. YOOK:  Your Honor the other thing -- and

12:38:16 20  this may be a moot point because there's not that many

12:38:18 21  videos left for video -- or excuse me, BASF to start

12:38:22 22  designating -- but we would ask for those affirmative

12:38:25 23  designations two days in advance instead of the night before

12:38:28 24  that it's going to be played because right now we're just

12:38:31 25  getting it last yesterday.

12:38:32  1          THE COURT:  No, I understand there's a practical

12:38:35  2   problem of --

12:38:35  3          So Mr. Scharn, what about that.

12:38:38  4          MR. SCHARN:  So we haven't actually established

12:38:41  5   that anything is outside of the scope of the direct.  We

12:38:43  6   think these are all proper counters.  If we want to go, you

12:38:47  7   know, line-by-line on the deposition testimony, I suppose we

12:38:50  8   could do that, but the procedure is two nights before they

12:38:54  9   give us their affirmative designations.  One night before,

12:38:58 10   we give our -- actually, no, the same night, we give our

12:39:02 11   counter-objections.  We actually only have three hours to

12:39:05 12   give our counter-objection counter-designations.

12:39:08 13          THE COURT:  So hold on there.  Is that the right

12:39:10 14   time?  So how can they do it any quicker than they're

12:39:14 15   already doing it?

12:39:14 16          MR. YOOK:  It is, Your Honor, so if we just

12:39:16 17   exchange it at the same time, that would probably be the

12:39:19 18   most --

12:39:19 19          THE COURT:  But it's hard -- I mean because not

12:39:21 20   only do they have their affirmative designations but they

12:39:25 21   may actually have counter-designations.  So I'm saying

12:39:28 22   exchange at the same time doesn't really accomplish

12:39:31 23   anything, so why don't we just stick what it is, is you made

12:39:34 24   your designations at D Day and they make it a D Day plus

12:39:38 25   three hours.

12:39:39  1                    MR. YOOK:  Yes, Your Honor.

12:39:40  2                    THE COURT:  Okay?

12:39:40  3                    MR. YOOK:  Thank you.

12:39:42  4                    THE COURT:  All right.  So did that resolve what

12:39:44  5   you need to have resolved in order to do this afternoon?

12:39:46  6                    MR. YOOK:  It does, Your Honor.  We had some

12:39:48  7   other objections, but we resolved those.

12:39:51  8                    THE COURT:  Okay.

12:39:52  9                    MR. YOOK:  Thank you.

12:39:52 10                    THE COURT:  All right.  Well, thank you.  So

12:39:54 11   we'll -- I'll see you again at 1:30.

12:39:57 12                    DEPUTY CLERK:  All rise.

12:39:59 13                       (Luncheon recess was taken.)

01:30:13 14                    DEPUTY CLERK:  All rise.

01:30:14 15                    THE COURT:  All right.  Are we ready to go?

01:30:17 16                    MR. THOMAS:  Yes, Your Honor.

01:30:18 17                    MR. FRIEL:  Yes, Your Honor.

01:30:18 18                    THE COURT:  All right.  Well, let's get the

01:30:20 19   jury.  Everyone be seated.

01:30:22 20                       (Jury entering the courtroom.)

01:31:48 21                    THE COURT:  All right.  Members of the jury,

01:31:59 22   welcome back.

01:32:00 23                    Everyone, you may be seated.

01:32:01 24                    Mr. Thomas.

01:32:06 25                    MR. THOMAS:  Thank you, Your Honor.  I'm going

01:32:08  1    to stand back here because I'm old fashioned.  I use paper,

01:32:11  2    so I need to be back here so I can see the screen.

01:32:13  3            Hi, everybody.  My name is Jeff Thomas, and it

01:32:18  4    is my honor to represent Ingevity here today.  Before we get

01:32:22  5    started, as Mr. Friel did, let me make a couple of

01:32:26  6    introductions.  The lawyers you will primarily be hearing

01:32:30  7    from at the trial for Ingevity are myself, Karen Keller and

01:32:35  8    Brian Buroker.

01:32:37  9            I also want to introduce Ed Woodcock.  Ed is the

01:32:40 10    president of the division at Ingevity that makes the carbon

01:32:45 11    products, and he'll be with us here for the whole trial.

01:32:48 12            I also would be remiss if I didn't acknowledge

01:32:52 13    and thank our great team members who are sitting back here.

01:32:56 14            Now, as the judge explained, the opening

01:32:59 15    statement is an opportunity for Mr. Friel and I to tell you

01:33:03 16    what the evidence in this case is going to show.  The crux

01:33:07 17    of the case is BASF's claim that Ingevity has forced

01:33:13 18    customers to enter into agreements with it that preclude

01:33:18 19    BASF from making sales, and that's the reason why BASF has

01:33:23 20    failed to make even a single sale to a single customer.

01:33:26 21            The evidence you will hear will show that's just

01:33:30 22    not true.  It will show that customers voluntarily entered

01:33:34 23    into agreements with Ingevity to get a great product at a

01:33:39 24    fair price; importantly, rights to Ingevity's patent; and

01:33:44 25    help from the Ingevity engineers to work with their own

01:33:47  1    engineers to design fuel vapor canisters.

01:33:51  2             And you will hear that many customers have not

01:33:55  3    entered into any agreement of any kind with Ingevity and yet

01:34:00  4    BASF has not been able to make a single sale to any of them.

01:34:06  5             So let's see if I can sum up.  The evidence is

01:34:09  6    going to show four key points here.  It's going to show

01:34:14  7    Ingevity has been successful and gained significant market

01:34:17  8    share for perfectly legitimate reasons.  BASF's lack of

01:34:21  9    sales was not caused by the conduct that BASF is accusing.

01:34:27 10    Customers voluntarily entered into long-term agreements for

01:34:32 11    the benefits they received.  And BASF's damages are

01:34:37 12    speculative and unrealistic.

01:34:39 13             So let's start with number one.  Ingevity has

01:34:44 14    been successful for good reasons.  Let me just tell you a

01:34:48 15    little bit about Ingevity.  Its roots go back to 1889, when

01:34:53 16    the Piedmont Pulp and Paper Company was formed in Piedmont,

01:34:58 17    West Virginia, to make paper from trees.  A few years later,

01:35:01 18    it began making paper for those old printing presses.  And

01:35:06 19    then for many years, it made paper.  And it started making

01:35:10 20    cardboard containers and other kinds of products out of

01:35:13 21    paper and the trees.

01:35:16 22             But it was not just a paper company.  It began

01:35:20 23    doing research and looking for ways to use the byproducts

01:35:24 24    from its paper work to make other kinds of products, and it

01:35:30 25    started doing a lot of research and development in that

01:35:32  1    area.   Now, one of the byproducts of making paper is

01:35:39  2    sawdust, and the company discovered that you could make

01:35:42  3    activated carbon out of sawdust.   Now, activated carbon has

01:35:47  4    a lot of different uses, but what the company discovered was

01:35:51  5    that one use was to -- was in these emission systems because

01:35:56  6    if you make it the right way, gasoline vapor will stick to

01:36:01  7    the surface of the activated carbon.

01:36:04  8              So in the late '60s and '70s, the company, now

01:36:07  9    called Westvaco, which was a shortening of West Virginia

01:36:12 10    Pulp and Paper Company, began selling activated carbon for

01:36:16 11    use in these fuel vapor emission canisters.   It spent lot of

01:36:21 12    time and money on research and development to ensure it was

01:36:24 13    able to provide customers with the top-of-the-line products

01:36:27 14    for use in those emission systems.

01:36:30 15              Now, by then, the EPA had started to regulate

01:36:34 16    carmakers' emissions, and Westvaco was right there to solve

01:36:39 17    that problem for the car makers.   It was one of the first

01:36:41 18    companies in the country to start making these carbon

01:36:45 19    products that could be put into the fuel canisters to meet

01:36:48 20    the government regulations.

01:36:51 21              And in 1995, it announced a plan to spend

01:36:54 22    $80 million to build an activated carbon plant next to its

01:36:58 23    paper mill in Kentucky.   In 2016, the company spun off

01:37:06 24    Ingevity.   It created Ingevity because it realized it should

01:37:09 25    have a separate company that only made the non-paper

01:37:13  1   products.   Ingevity is based in South Carolina.

01:37:18  2            Since it was formed, Ingevity has built new

01:37:21  3   manufacturing and research and development facilities in

01:37:24  4   Georgia, Kentucky, and South Carolina.   All the honeycombs

01:37:29  5   Ingevity makes are made right here in the United States.

01:37:37  6   Not the case for BASF.   What BASF is trying to do is they're

01:37:40  7   buying honeycombs made from somebody else, we don't know

01:37:43  8   who, and then shipping them to China to be coated with the

01:37:46  9   carbon there in China.

01:37:49 10            Now, Mr. Friel showed a picture of a BASF office

01:37:53 11   building and a picture of an Ingevity plant.   He didn't show

01:37:57 12   you a picture of that factory in China, so let's now talk

01:38:01 13   about the products and technology that's relevant here.   As

01:38:05 14   you heard, one particular kind of emissions are evaporative

01:38:10 15   emissions.   As Mr. Friel started to explain, those emissions

01:38:13 16   happen when the gasoline in your gas tank evaporates and

01:38:17 17   turns into vapors.   And when it gets hot outside, those

01:38:22 18   vapors can rise and get out into the atmosphere if there

01:38:26 19   isn't some solution in the car to capture them.   That's

01:38:31 20   especially true when you fuel up your car and the gas fills

01:38:34 21   up.   It pushes the vapors up, and they can get out into the

01:38:38 22   atmosphere.

01:38:39 23            Now, working with its customers, Ingevity helped

01:38:42 24   to develop new and better products to capture those fuel

01:38:46 25   vapors.   As I said, it turns out if you do the carbon in the

01:38:50 1    right way, then the vapors will actually stick to that

01:38:54 2    carbon and not get out into the air.  Ingevity is the best

01:38:58 3    in the world at making these carbon products.  It has spent

01:39:02 4    decades and millions of dollars in research and development

01:39:05 5    and building special manufacturing facilities for these

01:39:10 6    products.

01:39:11 7            Now, let's back up and just quickly go over how

01:39:14 8    these fuel vapor canisters work because it's not all that

01:39:17 9    easy to understand.  So what we're showing you here is you

01:39:21 10   have a gas tank and somebody's filling it up with gas.  As I

01:39:24 11   mentioned, as that happens, it pushes the vapors up.  The

01:39:28 12   vapors then go up into the canister, what you're seeing

01:39:32 13   right here through that tube.  They go into the canister.

01:39:36 14   They go through the activated carbon and then what comes out

01:39:40 15   into the air is purified air.  The vapors get caught in the

01:39:47 16   carbon and out comes just air.

01:39:50 17           Then what happens when you're turning your car

01:39:53 18   back on?  What it does is it sucks air from the outside.  It

01:39:59 19   goes back through the carbon and carries the vapors back

01:40:05 20   down into the car and into the engine.  And once they're in

01:40:09 21   the engine, they actually burn, and they -- it's like power

01:40:13 22   for your car, just like gasoline.

01:40:15 23           Now, Mr. Friel showed you tailpipe emissions,

01:40:22 24   you know, the pollution coming out of a tailpipe.  Just to

01:40:25 25   be clear, that has absolutely nothing to do with this case.

01:40:28  1    It is not tailpipe emissions at all.  It's about these types

01:40:31  2    of emissions.

01:40:32  3              So these fuel vapor canisters were developed to

01:40:35  4    try to solve this problem.  The early versions of the

01:40:39  5    canisters were not perfect.  They were okay.  They were an

01:40:42  6    improvement, but they didn't capture all of the vapors.

01:40:46  7              Let's take a look at what one of those canisters

01:40:50  8    looked like.  This is what's called a pellet carbon

01:40:54  9    canister.  So the only carbon that is in this canister are

01:40:58 10    these pellets that you're seeing there on the left.  That's

01:41:03 11    an old style of canister, and, like I said, they would

01:41:06 12    capture some of the vapor, but not all of it.  And in the

01:41:11 13    late 1990s, both the United States EPA and California said,

01:41:16 14    that's not good enough.  We're going to pass regulations so

01:41:19 15    that you have to build canisters that capture more of the

01:41:24 16    vapors.

01:41:25 17              Ingevity's predecessor company went to work on

01:41:29 18    that.  Its scientists, some of whom have Ph.D.s in

01:41:34 19    chemistry, began working on a better solution.  And what

01:41:38 20    they discovered was that a canister would work better if

01:41:42 21    some of the carbon in the canister was -- were these pellets

01:41:46 22    and some of it was carbon made into the shape of a

01:41:50 23    honeycomb.

01:41:51 24              Let's take a look at what this looks like.  This

01:41:54 25    is a new -- a second generation, new canister.  And what

01:42:01 1   you're seeing on the left, that's what the honeycomb

01:42:03 2   actually looks like, and on the right is the canister.  And

01:42:06 3   in the body of the canister, that's where the pellets go.

01:42:09 4   And in that tube hanging off the side, that's where the

01:42:14 5   honeycomb goes.

01:42:16 6           Okay.  And the honeycomb has to be exactly

01:42:19 7   right.  And you see all these little squares in the end.

01:42:22 8   Those little things those are called cells; right?  And it's

01:42:26 9   crucial to have a lot of cells in one of these honeycombs.

01:42:30 10  This honeycomb, this is an Ingevity honeycomb, has 200 cells

01:42:35 11  or 200 of those little holes in every square inch.  And

01:42:39 12  that -- Ingevity figured out that's the right design for

01:42:44 13  this type of honeycomb and this type of canister.

01:42:49 14          Now, Ingevity's team worked with one of the

01:42:53 15  major canister companies you've heard about, Delphi.  They

01:42:57 16  worked to build canisters using Ingevity's honeycomb and

01:43:01 17  test them, and it turned out they worked.  By making the

01:43:05 18  canisters this way, the emissions were drastically reduced,

01:43:10 19  almost down to zero.

01:43:13 20          So let's look again at how this works.  You have

01:43:18 21  the canister, pellet canister, pellets in the body, and, as

01:43:22 22  I explained, the honeycomb in the second -- what we call the

01:43:27 23  second stage, that tube hanging off the side.  And these

01:43:31 24  resulted in near zero emissions.  And so starting in 2002,

01:43:39 25  Ingevity began selling these honeycombs to the fuel vapor

canister companies, and it pretty quickly became clear that they were the gold standard and that, importantly, that they would meet these new government regulations that required the emissions to be near zero.

And Ingevity was the only company that began selling the product.  As I said, they had spent hundreds of millions of dollars developing the right manufacturing facility, doing the research and development to meet this requirement, and other companies just did not make that investment.

Now, let's stop for a minute and get a timeline going because you're going to hear a lot of dates.  And I understand this can be, you know, hard to keep track of that.  So I'm going to have a timeline, and we're going to build a little bit as we go through this to keep the dates straight.

In the late 1990s was when the government starting announcing that that they were going to adopt these new regulations, and Ingevity began work to try to figure out how to meet them.  And by 2002, they figured it out. And they started selling the -- selling the honeycombs to the customers.

Now, in the meantime, Ingevity's predecessor filed a patent application for a discovery it made while it was working on these honeycombs.  It filed that patent

01:45:10  1  application with the United States Patent and Trademark

01:45:14  2  Office back in 2001 after its team of three Ph.D.'s and one

01:45:20  3  Master's degree chemist made a discovery.  One of those

01:45:24  4  inventors was a gentleman named Roger Williams.  He's one of

01:45:28  5  the inventors on the patent, and you will hear from him

01:45:30  6  during the trial.

01:45:32  7          The inventors determined that there was a

01:45:35  8  special chemical property to the carbon that had to be taken

01:45:40  9  into account in designing these honeycombs, and the term is

01:45:45  10  called incremental adsorption capacity.  What it really

01:45:51  11  means is how much gas vapors a certain kind of carbon can

01:45:57  12  capture; right.  If you have carbon that can capture and

01:46:00  13  hold a lot of the vapors, that's high IAC.  If you have a

01:46:06  14  different kind of carbon that only captures and holds a

01:46:09  15  little bit of the vapors, that's called low IAC, and that

01:46:15  16  became very crucial to figuring out how to develop these

01:46:20  17  fuel vapor canisters.

01:46:21  18          Let's just look at a slide to understand that.

01:46:24  19  What we're looking at here is a drawing in the middle from

01:46:28  20  the '844 patent.  We'll talk some more about the '844 patent

01:46:32  21  in a minute, but what it taught was that if you take the

01:46:37  22  pellets, which are high IAC, and put them in the body of the

01:46:43  23  canister, and you put in a honeycomb that has the right

01:46:48  24  number of cells in the -- in the second stage of the

01:46:53  25  canisters, so you have a high IAC and a low IAC together,

01:46:58  1    that's the key to getting down to new zero missions.  Those

01:47:06  2    two together work better.

01:47:07  3                  So let's put that on our timeline.  In October

01:47:11  4    of 2005, the United States Patent and Trademark Office

01:47:15  5    awarded that patent to Ingevity's predecessor, and let's

01:47:20  6    take a look at the patent itself.  That's just the

01:47:24  7    certificate issued by the Patent and Trademark Office, and

01:47:28  8    then this is the first page of the patent.

01:47:35  9                  And if we could just quickly take a look at the

01:47:38 10    inventors, so there were four folks who worked on this

01:47:42 11    patent and made this invention, and they all worked for

01:47:46 12    MeadWestvaco Corporation, which was Ingevity's predecessor,

01:47:50 13    so MeadWestvaco owned the patent.  As you can see, it was

01:47:54 14    issued in October of 2005.  And it's called the '844 patent

01:47:59 15    just because those are the last three numbers in the number

01:48:02 16    that the Patent Office assigned to the patent.

01:48:07 17                  Now, because this patent is very important, I

01:48:11 18    should stop for just a minute and talk about the patent

01:48:14 19    process.  If you make an invention, you can submit an

01:48:18 20    application to the United States Patent Office.  If they --

01:48:23 21    if the office decides that it qualifies for a patent, it

01:48:27 22    will issue the patent to the person who made the invention,

01:48:32 23    and that gives the owner of the patent the right to keep

01:48:37 24    other people from using the invention until the patent

01:48:40 25    expires.  If someone else does use the invention before the

01:48:45 1   patent expires, that's called infringement, and then once

01:48:50 2   the patent expires, the invention is dedicated to the public

01:48:54 3   and anybody can use the invention.

01:48:56 4            Now, before Ingevity made this invention;

01:49:02 5   everyone thought that if you wanted to make a better fuel

01:49:06 6   vapor canister, you needed to have -- add more carbon that

01:49:11 7   was more adsorbent, more high IAC carbon.  If you think

01:49:17 8   about it like a sponge, if you want to soak up more water,

01:49:21 9   you need a bigger, better sponge.  So that was the

01:49:24 10  conventional thinking, was, all right, if we're going to

01:49:28 11  remove, you know, reduce the emissions, let's add more high

01:49:32 12  adsorbent carbon.

01:49:35 13           Ingevity believed -- discovered, no that's not

01:49:38 14  right.  The best thing to do is put in the high adsorbent,

01:49:42 15  but then have a second stage right before that catches the

01:49:46 16  vapors at the end of the process that is a low IAC, and,

01:49:52 17  again, that was a surprise.  It sort of counterintuitive,

01:49:56 18  but the testing turned out that was the case, and because it

01:49:59 19  was a new idea, Ingevity got the patent.

01:50:03 20           Now, the patent, as I've shown you, also

01:50:06 21  explained that one way to do this second stage with the low

01:50:12 22  adsorbent carbon was to do it with a honeycomb.  The patent

01:50:18 23  doesn't just say have a low IAC -- high IAC stage and a low

01:50:23 24  IAC stage.  It also teaches the idea of using the honeycomb

01:50:28 25  for that second stage.

01:50:31 1          Let's take a look at that.  This, again, is the

01:50:34 2  '844 patent, and it teaches that the method claimed here --

01:50:41 3  and these are kind of fancy words, but it says a method

01:50:44 4  claimed herein includes an embodiment where the volumetric

01:50:47 5  dilution -- that's referring to the second low IAC stage --

01:50:52 6  is accomplished by forming the adsorbent into a honeycomb or

01:50:56 7  monolith.  Then it gave a very specific example of the type

01:51:00 8  of honeycomb that could be used, a 200-cell-per-square-inch

01:51:06 9  honeycomb.  And it said, one of the places you could put it

01:51:10 10  was in this second stage, the tube we have at the top.

01:51:17 11          And that's exactly what happened in the real

01:51:21 12  world.  Ingevity started making the honeycombs with 200

01:51:25 13  cells per square inch, worked with the canister companies to

01:51:32 14  build these two stages and put it into the second stage.  So

01:51:35 15  what ended up happening in the real world was exactly what

01:51:38 16  the '844 patent taught.

01:51:42 17          Let me stop for a minute and -- because there is

01:51:47 18  one very important thing I should explain about these

01:51:49 19  honeycombs that Ingevity sells to the customers that make

01:51:54 20  the canisters.  Those honeycombs can only be used to make

01:52:01 21  canisters of the type described in the '844 patent.  You --

01:52:07 22  it's an important question you are going to be asked at the

01:52:11 23  end of this trial is, can these honeycombs that Ingevity

01:52:15 24  sells to the canister makers, can they be used for other

01:52:18 25  things other than the fuel vapor canisters?  And the

01:52:23   1    evidence is going to show clearly that they cannot.

01:52:28   2                There's other kinds of honeycombs used for other

01:52:31   3    things.  There are other types of carbon honeycombs, but

01:52:35   4    that's not the question.  The question is whether the

01:52:39   5    200-cell-per-square-inch honeycombs that Ingevity sells to

01:52:44   6    its customers, can they be used for something other than

01:52:49   7    fuel vapor canisters?

01:52:51   8                They cannot.  In fact, Mr. Friel referred to air

01:52:56   9    induction systems.  If you put one of those

01:52:59  10    200-cell-per-square-inch honeycombs into an air induction

01:53:04  11    system, the car would shut down.  They don't work.  That's

01:53:07  12    not what they were designed for.

01:53:09  13                Now, Mr. Friel said, but wait a minute.  There

01:53:17  14    are Ingevity financial documents that show they can be used

01:53:24  15    for air induction systems.  Let me explain to you what

01:53:29  16    happened.  Ingevity has a massive recordkeeping financial

01:53:35  17    system.  And every time a salesman, every time a sales rep,

01:53:40  18    goes out and makes a sale, that sales rep is required to,

01:53:44  19    you know, punch in the information into this electronic

01:53:48  20    system.  You know, the name of the customer, what they

01:53:51  21    bought, how much they bought, what they're using it for, all

01:53:54  22    of that; right?

01:53:55  23                And one of the codes you have to put in is the

01:54:00  24    final use code, what's the customer going to use it for, and

01:54:03  25    there's a code for air induction systems, for other kinds of

honeycombs that Ingevity makes, and there's a code for the
fuel vapor canister systems.  And these, you know, ladies
and gentlemen who are calling on the customers are doing
this, making sales, entering the information every day, and
there's massive amounts of information in the system.  It
turns out that over about a 16-year period, three times a
sales rep made a mistake and punched in the wrong code, so
it showed that a fuel vapor canister honeycomb was used in
an air induction system.  It was a mistake.  Punched the
wrong button, put in the wrong code.  99.9 percent of the
time that the sales reps entered that information, they got
it right.  And when they sold a fuel vapor canister
honeycomb, they put in that it was being used in a fuel
vapor canister.  But a couple mistakes were made in a
16-year period, .01 percent of the time, three times, total.
The mistake was made.

        And yet that's the evidence that BASF is
presenting to show that these fuel vapor canister honeycombs
can be used for some other purpose.  And by the way, I
should mention BASF has never tried to market its fuel vapor
canister honeycombs for anything else.

        All right.  Let's get back on track.  Ingevity
did three key things.  First, it did the research and
development to discover that honeycombs are the best way to
go.

01:55:52  1        Second, it invested heavily in manufacturing

01:55:55  2  facilities to make those honeycombs.

01:55:57  3        And, third, it got the patent that taught that

01:56:01  4  those honeycombs are the right way to go.

01:56:04  5        And so today, Ingevity's honeycombs are used on

01:56:08  6  most vehicles in North America.  For many years, the car

01:56:14  7  companies and the companies that make the canisters for the

01:56:16  8  car companies respected Ingevity's patent.  They understood

01:56:20  9  how well the honeycombs worked, and they knew Ingevity had

01:56:23 10  the patent, and that led to a lot of success.  Until BASF

01:56:30 11  came along, everyone in the industry respected the '844

01:56:36 12  patent.  As a result, of course, Ingevity had a high share

01:56:39 13  of the market.  It was the only company that had spent the

01:56:42 14  time and the money to develop the product and the

01:56:45 15  manufacturing facilities and to get the patent, so let's put

01:56:50 16  that on our timeline.

01:56:51 17        From 2002 to 2016, Ingevity was the only company

01:56:59 18  making these honeycombs for the fuel vapor canisters because

01:57:04 19  the industry realized how good the product was and

01:57:08 20  understood the key patent.  And it's important to understand

01:57:13 21  that throughout this entire time, not a single Ingevity

01:57:19 22  honeycomb ever failed.  The one thing the car companies hate

01:57:24 23  are recalls.  When they have to recall one of their cars

01:57:28 24  because there's been a part failure, that costs them

01:57:32 25  millions of dollars and, of course, causes you and me to

01:57:36  1    trust that car company less, and so they don't like to take

01:57:41  2    risks.  They want to use proven products.

01:57:44  3              And over a billion vehicles have Ingevity carbon

01:57:50  4    of some kind in them, and over 90 million honeycombs have

01:57:54  5    been put into cars and trucks over the years, and not a

01:57:59  6    single one has ever failed.

01:58:04  7              Another very important reason that Ingevity has

01:58:06  8    been successful is it doesn't just sell products to its

01:58:11  9    customers.  Its engineers work hand-in-hand with the

01:58:15 10    engineers of the car companies and the canister makers.

01:58:21 11    They work together to design the fuel vapor canisters, to

01:58:25 12    troubleshoot them in case there's any problems, and to test

01:58:28 13    them to see how well they work.  Even though Ingevity

01:58:32 14    doesn't sell anything directly to the car companies, it has

01:58:35 15    very close relationships with them because the engineers are

01:58:38 16    working together.  And even though Ingevity doesn't make

01:58:42 17    fuel vapor canisters, it helps their customers to design

01:58:47 18    them.  And the engineers at Ingevity who do this work are

01:58:52 19    the best in the world.  Given the number of years of

01:58:56 20    experience they have, they have way more expertise and

01:58:59 21    experience than anyone at BASF.

01:59:02 22              Now, Mr. Friel said that along the way, while

01:59:10 23    Ingevity was having this success, it drove prices up.  You

01:59:14 24    know, it took advantage of the customers by raising pricing.

01:59:19 25    Now, over the years, has Ingevity announced price increases?

01:59:23  1  Sure.   Its costs have gone up, and it's obviously trying to

01:59:28  2  get the best price it can for its product.   But let's look

01:59:31  3  at the real data for the relevant time period here for when

01:59:36  4  BASF came along.

01:59:38  5           These are not my numbers.   These are not our

01:59:42  6  numbers.   These numbers come out of a report from the expert

01:59:47  7  BASF hired for this case.   And what you can see is that

01:59:54  8  29-by-100-millimeter honeycomb is the most popular one.

01:59:58  9  That's the one that Ingevity sells the most of.   And what

02:00:01  10  happened over this 2016 to 2019 time, prices didn't go up.

02:00:06  11  Prices stayed essentially flat.   Did Ingevity try to raise

02:00:11  12  its list prices over this time?   Sure.   But in reality, it

02:00:14  13  has to negotiate with its customers.   And so the real price,

02:00:19  14  the average price that it actually got per honeycomb was

02:00:23  15  flat.   Now, obviously the customers who were buying millions

02:00:27  16  of honeycombs got a lower price than the customers who were

02:00:30  17  buying not as many, but we all understand, you know, that's

02:00:34  18  just business.

02:00:34  19           Okay.   Let's move on to the second key point I

02:00:39  20  want to talk about.   BASF's lack of sales was not caused by

02:00:43  21  the accused conduct, these agreements that they claim that

02:00:48  22  Ingevity forced customers to enter into.   These were not the

02:00:52  23  reason why they haven't made any sales.

02:00:56  24           Let's talk about what BASF is for a minute.

02:00:59  25  It's part of a German conglomerate, one of the biggest

02:01:03  1      companies in the world.  Ms. Rowe, a BASF employee who

02:01:08  2      you're going to hear testify at the trial, described it as

02:01:11  3      "the largest and most diversified chemical company in the

02:01:15  4      world."  She also testified, "We like to describe ourselves

02:01:21  5      as an essentially anything you touch, we probably have a

02:01:25  6      product in it."

02:01:27  7              Its sales revenue.  Mr. Friel mentioned that

02:01:32  8      Ingevity has a billion dollars a year in sales.  BASF has

02:01:38  9      $70 billion a year in sales.  It has almost limitless

02:01:41 10      resources to do engineering and sales.

02:01:47 11              Now, sometime in 2015, BASF learned about

02:01:52 12      Ingevity's honeycomb product and that it had a pretty good

02:01:55 13      profit margin.  It does.  And Mr. Friel admitted this.  It

02:01:59 14      developed what it was called a drop-in replacement.  This is

02:02:03 15      an Ingevity -- excuse me -- a BASF internal document talking

02:02:07 16      about Ford and their attempt to try to get business from

02:02:11 17      Ford.  And it says that their honeycomb is designed as a

02:02:16 18      drop-in replacement for existing and new platforms.  Well,

02:02:20 19      Ford was using the Ingevity honeycomb.  It was just pull out

02:02:26 20      the Ingevity honeycomb and drop in a BASF honeycomb.  That

02:02:30 21      was their plan.

02:02:33 22              And the honeycombs look pretty similar.  Let's

02:02:37 23      take a look at that.  What you see on the left is the

02:02:40 24      Ingevity honeycomb.  What you see on the right is the BASF

02:02:44 25      honeycomb.  And remember, crucially, the 200 cells per

02:02:49  1   square inch, which was discovered to be the optimal number

02:02:52  2   and the number that was taught by the '844 patent, BASF just

02:02:57  3   adopted that and made their honeycombs look pretty much the

02:03:02  4   same.

02:03:03  5            Now, Mr. Friel talked a little bit about, oh,

02:03:08  6   yeah, but our honeycomb is better, even though what I just

02:03:13  7   showed you is the case.  It's better.  One thing is we don't

02:03:21  8   know.  BASF's honeycomb has never been put on a car.  What

02:03:27  9   you will hear is that until you put a honeycomb in a fuel

02:03:31 10   vapor canister and put it on a car, you don't really know

02:03:35 11   how well it's going it to perform, and BASF has never tested

02:03:39 12   its honeycomb, actually on a car.  It's only tested it in

02:03:44 13   the lab.

02:03:46 14            The other thing to understand is that the

02:03:50 15   government regulations, Mr. Friel is a hundred percent right

02:03:52 16   when he told you those are very, very exacting.  The new

02:03:56 17   ones are very exacting regulations.  They basically allow

02:03:59 18   next to zero emissions, and there's no question that

02:04:03 19   Ingevity's honeycomb meets those regulations, so I'm not

02:04:08 20   quite sure how you get better than that.

02:04:10 21            And then he also said, yeah, but we could use

02:04:14 22   one BASF honeycomb instead of two Ingevity.  And he said,

02:04:20 23   you know, so there's Ford testing.  Well, one of the Ford

02:04:24 24   tests that they rely on, the fuel vapor canister that was

02:04:29 25   tested had three BASF honeycombs in it.

02:04:36  1           Okay.  So after they started making their

02:04:39  2    product, they began approaching the customers that Ingevity

02:04:43  3    had been doing business with and supporting for over a

02:04:47  4    decade, and you're going to hear those names, you already

02:04:51  5    have, you know, MAHLE, Stant, Futaba, Leehan, Kayser.  You

02:04:57  6    know the canister makers.  And they have been buying their

02:05:00  7    honeycombs from Ingevity for about 15 years, and during all

02:05:06  8    that time, their engineers had been working hand in hand

02:05:10  9    with the Ingevity engineers.  They knew each other well.

02:05:15 10    They worked together well.

02:05:17 11           As you heard, despite all these sales efforts,

02:05:22 12    BASF did not have much success.  They have not sold a single

02:05:26 13    honeycomb to a single customer, and that was not for lack of

02:05:30 14    resources.  I mean, as I said, they're 70 times bigger than

02:05:35 15    Ingevity, but the Ingevity customers stayed with Ingevity

02:05:38 16    because of the great track record for their products, fair

02:05:41 17    prices, all the R&D help that Ingevity engineers provided,

02:05:47 18    and, of course, because of Ingevity's patent.

02:05:52 19           Now, along the way, BASF also had some missteps

02:05:56 20    that had nothing to do with Ingevity.  First of all, the

02:06:00 21    fact that they chose to make their honeycomb look exactly

02:06:04 22    the same as the Ingevity honeycomb caused the customers some

02:06:10 23    concern.  They said, wait, Ingevity has a patent, and your

02:06:14 24    product looks exactly the same.  Shouldn't we be concerned

02:06:17 25    about that?

1      Next, BASF didn't really offer lower prices.

2  The prices on some of their honeycombs were a little higher,

3  some were a little lower, but they didn't really come to

4  market with substantially lower prices, and what they were

5  asking the car companies to do was a lot of testing and a

6  lot of risks.  When a car company decides to change its

7  product, the government regulations require lots of testing

8  to -- on that product before it can be used.  That testing

9  takes a long time.  It's very expensive, and the car

10  companies expect their car-part makers to do it.  So in this

11  case, the car companies would have told the canister

12  companies, if you're going to change, you have to do all

13  this expensive testing.  And a lot of the canister makers

14  just didn't want to do that.  There was no upside for them

15  to switch because of that time and effort.

16      And let's look at that.  Let's look at some

17  testimony from customers.  This is not BASF.  It's not

18  Ingevity.  These are customers.

19      Mr. Gregor is from Stant, one of the companies

20  you've heard about, and he was asked, "Has Stant considered

21  other potential suppliers of activated carbon besides

22  Ingevity?"

23      "To the best of my knowledge, no."

24      "Why not?"

25      "Honestly, testing, getting on validation,

02:07:46 1    longevity, overall cost."

02:07:47 2            That's the reason they didn't switch.

02:07:50 3            Let's look at another one of these.  Ms. Toldo

02:07:52 4    works at MAHLE, one of the very big canister makers.  She

02:07:56 5    was deposed in this case.

02:07:57 6            She was asked, "Now, I believe you testified

02:08:00 7    earlier that MAHLE has not seriously considered purchasing,

02:08:04 8    or at least had discussions with BASF about purchasing,

02:08:07 9    BASF's activated honeycomb product; right?"

02:08:12 10           "Yeah.  I think in terms of discussions, I know

02:08:15 11   from a trade show or maybe one of the auto shows that there

02:08:17 12   was at least awareness of the product.  But in terms of a

02:08:21 13   serious consideration, you know, I think the risks are too

02:08:24 14   high for us at this point in time."

02:08:26 15           And lastly, the biggest of all the canister

02:08:30 16   makers, Delphi, Dr. LaBine from Delphi testified.

02:08:36 17           "What did that documentation show you about the

02:08:38 18   BASF honeycomb versus the Ingevity honeycomb, if anything?"

02:08:42 19           "That it had some potential."

02:08:45 20           "Do you still believe that BASF honeycomb has

02:08:47 21   some potential?"

02:08:47 22           "Based on their presentation, yes.  We -- we

02:08:51 23   still need to, obviously, do some evaluation."

02:08:54 24           "And you're not doing that, given the pendency

02:08:57 25   of the lawsuit; is that fair?"

02:08:59  1                    "The reality is we're not doing it, cause we

02:09:02  2      don't have time right now."

02:09:06  3                    Those are the real reasons why customers said.

02:09:09  4      We have a great product from Ingevity.  Why are we going to

02:09:13  5      put in all the time and effort to switch in.

02:09:15  6                    Now, of course, the fact that Ingevity had the

02:09:18  7      '844 patent, which was well known throughout the industry,

02:09:21  8      was also very important.  And, and this is important, in

02:09:27  9      2018, Ingevity sued BASF for infringing the '844 patent and

02:09:37 10      let everybody now that they know that they had sued.  So

02:09:42 11      many car companies and canister makers shied away from

02:09:45 12      buying BASF's drop in replacement for this reason.

02:09:49 13                    In fact, the evidence will show that one of the

02:09:52 14      big reasons customers have not bought from BASF, not the

02:09:56 15      only reason, but a big one, was because they were concerned

02:10:00 16      that BASF was infringing the '844 patent, just as Ingevity

02:10:06 17      claimed in its lawsuit.  And BASF knew that was the reason

02:10:13 18      that customers weren't buying.

02:10:15 19                    Let's look at that.  I have three emails from

02:10:19 20      Ms. Rowe, who you will hear from, and, first of all, she's

02:10:23 21      talking about Ford.  And she says in discussions with Ford

02:10:26 22      on how to proceed given the Ingevity lawsuit.  And with

02:10:31 23      regard to Kayser, Kayser's in wait-and-see mode given the

02:10:35 24      Ingevity lawsuit.  That's one of her emails.  Let's look at

02:10:39 25      another one.

02:10:39  1    She wrote to others at BASF.  GM -- GM will not

02:10:45  2    allow the scrubber -- scrubber was another name they used

02:10:47  3    for their honeycomb -- on GM property until legal issues

02:10:51  4    have been closed or reviewed and cleared by the GM legal

02:10:55  5    team.  And then she sent this one.  See the EvapTrap XC?

02:11:02  6    That's their honeycomb.  She wrote the impacts of the legal

02:11:05  7    proceedings have significantly slowed our pace with

02:11:09  8    commercialization.  If we do not settle -- settle the

02:11:13  9    lawsuit -- I do not see a clear path to market before Q3

02:11:21 10    2022 -- the third quarter of 2022.  And one of the reasons

02:11:24 11    why she said that, we'll learn, the '844 patent expires next

02:11:28 12    year.  March of next year, the '844 patent goes away.

02:11:32 13         And customers said the same thing.  The

02:11:35 14    gentleman from Kayser was asked "And do you know where

02:11:39 15    things stand right now with Kayser's potential outreach to

02:11:42 16    other customers about using of the BASF honeycomb?"

02:11:46 17         "Since the beginning of the lawsuit, we are

02:11:49 18    basically on hold."

02:11:51 19         And in fact, you'll see evidence that when the

02:11:57 20    people running the BASF honeycomb business reported to their

02:12:02 21    bosses back in Germany about what was happening, the only

02:12:05 22    reason they gave for their lack of sales was the Ingevity

02:12:10 23    lawsuit, and it's really important for you to understand

02:12:14 24    that BASF's claims here in this case are not based on that

02:12:21 25    lawsuit.  They're not based on BASF talking -- excuse me --

02:12:26  1    to Ingevity enforcing its patent or suing them.  That's not

02:12:30  2    the conduct they're complaining about.

02:12:33  3            So if that lawsuit and the patent was the reason

02:12:38  4    that the customers did not buy, then that shows that BASF

02:12:45  5    has not failed because of the things it is complaining

02:12:48  6    about.  But what BASF is complaining about is, as you heard,

02:12:53  7    is Ingevity's agreements with its customers.  You heard

02:12:57  8    Mr. Friel talk about the three supply agreements with the

02:13:01  9    customers, and we'll talk about those three supply

02:13:03 10    agreements in a minute.

02:13:05 11            But it's important for you to understand there's

02:13:08 12    lots of customers who did not enter into any supply

02:13:12 13    agreement with Ingevity.  Let's take a look at that.  These

02:13:17 14    are all very significant canister makers.  None of them have

02:13:22 15    entered into any agreement with Ingevity.  And yet, none of

02:13:29 16    them have bought a honeycomb from BASF.

02:13:34 17            Why not?  As I've explained, several reasons.

02:13:38 18    Ingevity had an excellent track record, never had a failure,

02:13:42 19    and, of course, it had the crucial patent.  So how is BASF

02:13:48 20    including these customers, who have no agreements with

02:13:52 21    Ingevity, in this case?  That's where this tying claim comes

02:13:58 22    in.  They say that Ingevity forced customers to buy both a

02:14:08 23    license to the patent and the honeycomb.  Remember the paper

02:14:12 24    and printer example that he gave?  The fact is these

02:14:18 25    customers were not forced to buy licenses to the patent.  In

02:14:22  1   fact, they didn't buy licenses to the patent, and Ingevity

02:14:26  2   never charged them a dime for a license to the patent.

02:14:30  3          What they did is they talked to their customers

02:14:34  4   and they told them that there was the patent.  And they

02:14:36  5   said, look, if you buy honeycombs from somebody else and

02:14:41  6   then you put them into a canister that infringes our patent,

02:14:46  7   there's going to be a problem.  But they said, if you buy

02:14:50  8   your honeycombs from us and make canisters that cover the

02:14:55  9   patent, then why would we do anything about it?  You're

02:14:58 10   buying from us.  It's not going to be a problem.

02:15:00 11          And it also told them if you buy honeycombs from

02:15:05 12   somebody else and put them in a canister that does not

02:15:09 13   infringe the '844 patent, that's fine, too.  But it was

02:15:14 14   never this tying.  Oh, you have to buy both products.  It

02:15:19 15   didn't remotely happen.  Customers didn't buy licenses.

02:15:23 16   They just didn't have a problem with Ingevity if they bought

02:15:28 17   their honeycombs from Ingevity, so this whole notion the

02:15:42 18   evidence is going to show that customers were forced to buy

02:15:44 19   two products, a license and the honeycombs, it's going to

02:15:49 20   show they only bought one product.  They bought the

02:15:52 21   honeycombs and because they were buying the honeycombs,

02:15:56 22   Ingevity was fine with them using the patent rights.

02:16:00 23          Okay.  Let me go back to the three customers

02:16:03 24   that did choose to enter into the three supply agreements.

02:16:07 25   As you heard, those customers are Delphi, KFTC, and Kayser.

02:16:12   1      But you have to understand under its claim, its exclusive

02:16:18   2      dealing claim based on those three agreements, BASF admits

02:16:22   3      that it was not harmed and didn't -- didn't suffer any

02:16:25   4      damages as a result of the Delphi or KFTC agreements.  You

02:16:31   5      will hear that when their damages expert testifies.  She

02:16:34   6      will say, no, I don't have any damages based on those two

02:16:37   7      supply agreements.  So it's all about Kayser.

02:16:41   8             So let's focus on Kayser.  What happened here is

02:16:46   9      in 2018, Kayser actually signed an agreement with BASF to

02:16:53  10      buy a lot of honeycombs from BASF.  And when Mr. Friel said,

02:16:57  11      oh, Kayser didn't have any choice.  They had to enter into

02:17:00  12      an agreement with Ingevity.  It's not what happened.  They

02:17:03  13      entered into a contract with BASF and they agreed on pricing

02:17:07  14      and they agreed to buy thousands and thousands of

02:17:10  15      honeycombs, and Ingevity didn't even know about that.

02:17:20  16             Now, although Kayser signed this contract with

02:17:24  17      BASF, it didn't move forward.  It didn't actually buy any

02:17:31  18      honeycombs under that contract from BASF.  Instead, in 2020,

02:17:41  19      about a year and a half later, at a time when Ingevity still

02:17:46  20      didn't know about the BASF-Kayser contract, Kayser changed

02:17:50  21      its mind and signed an agreement with Ingevity.  So -- and

02:17:59  22      the facts will show that Ingevity had been trying to get a

02:18:02  23      contract with Kayser way back in 2016 but Kayser was saying,

02:18:07  24      no, no, no.  And then in 2018 it signs its agreement with

02:18:12  25      BASF.

02:18:14  1          So what happened?  What happened was Ingevity

02:18:20  2  sued BASF for patent infringement.  Let's put these dates up

02:18:24  3  on our timeline so we can follow them.  As I said, way back

02:18:27  4  in May of 2016, Ingevity was proposing a supply agreement

02:18:32  5  with Kayser.  Kayser said no, no, thank you.

02:18:36  6          In December of 2017, Ingevity learns for the

02:18:40  7  first time that BASF -- there was rumors going around at

02:18:43  8  that time about BASF's honeycomb, so Ingevity started

02:18:47  9  seeking this agreement with Kayser at a time when it didn't

02:18:50 10  know anything about BASF.

02:18:52 11          Then, BASF signed this agreement with Kayser.

02:18:56 12  It chooses Kayser over Ingevity.  But in July of 2018,

02:19:03 13  Ingevity filed that patent lawsuit, and, like many other

02:19:07 14  customers, Kayser said, hmm, I'm not sure I want to buy from

02:19:12 15  BASF if they're infringing the '844 patent.  And so then

02:19:17 16  they decided in January of 2020 to sign a similar agreement

02:19:22 17  with Ingevity.

02:19:24 18          There's one other factor about this whole

02:19:29 19  Ingevity -- excuse me -- Kayser situation that I should

02:19:34 20  mention, and that is that Kayser was actually required under

02:19:39 21  the contract to buy a lot of honeycombs from BASF.  But when

02:19:44 22  they told BASF we're not going to do it, we're not going to

02:19:49 23  buy from you, BASF didn't sue Kayser.  Instead, it's trying

02:19:53 24  to get damages from Ingevity in this case based on Kayser's

02:19:59 25  decision.

02:20:01 1          Okay.  Let's move onto the next key point.

02:20:04 2   Customers voluntarily entered into these long-term

02:20:07 3   agreements for the benefits that they received.  Before we

02:20:14 4   talk about those agreements, let me just say again, there

02:20:18 5   are a whole bunch of customers who didn't sign these

02:20:21 6   agreements, and so the whole notion that -- the evidence

02:20:24 7   will show that Ingevity didn't have the power to force these

02:20:28 8   customers to enter into these agreements.  Most of them

02:20:32 9   didn't.  Most of them said no, thank you.  In fact, Ingevity

02:20:35 10  talked to a couple other customers about having a long-term

02:20:38 11  agreement and they said no, we're not interested.

02:20:41 12          Now, the first thing I should say about the

02:20:45 13  three agreements that were signed is they had absolutely

02:20:50 14  nothing to do with BASF.  Ingevity didn't enter into those

02:20:54 15  agreements because of BASF.  In fact, they didn't even know

02:20:58 16  BASF was planning to get into the business when they started

02:21:01 17  negotiating and signed those contracts.

02:21:04 18          Let me give you one example.  Delphi agreement.

02:21:07 19  Let's pull up the facts on Delphi -- the dates on that.  So

02:21:11 20  what happened with Delphi is in May of 2016, the

02:21:15 21  negotiations with Delphi began.  They were long, hard

02:21:20 22  negotiations going back and forth.  And in September-October

02:21:23 23  time frame, Ingevity signed it.  Ingevity and Delphi signed

02:21:28 24  their agreement, and it wasn't until later that year that

02:21:31 25  Ingevity even heard the rumors about BASF getting into the

business, so there's no link between Ingevity's desire to enter into these long-term agreements and BASF.

Another thing that I should explain to you is because, you know, obviously BASF is claiming, well, we were harmed that you -- by you entering into these three agreements with three canister makers.  The truth is that the -- and the evidence will show that it's the car makers who have the final decision about which canister is going to go on their cars and which carbon is going to go into their canisters.  When a car company starts designing a new car -- and you'll hear the word platform.  What that means is a car like -- or a truck like an F-150, and they'll design a new version of the F-150, and they'll sell that for five years.  That's called a platform.  And when a car company starts designing a platform, they go out to bid.  They go to several canister makers and they say give me bids for your canister for my new platform and then they'll decide which one that they're going to buy.  So the car companies actually have the final decision.

And you will hear that BASF is claiming it lost damages for lost sales to five car companies.  They have identified five car companies where they say they lost sales.  You'll hear that Ingevity had no agreements with any of those five car companies, and you will hear that every single one of those car companies bought canisters from

02:23:21 1    canister makers that Ingevity had no agreement with.

02:23:24 2              I want to walk you through this quickly, if I

02:23:27 3    can.  So the five car makers are in the middle.  Those are

02:23:30 4    the ones where BASF says they lost sales.  The three

02:23:34 5    canister makers where Ingevity had supply agreements,

02:23:39 6    Delphi, Kayser, and KFTC, are on the right and then all of

02:23:43 7    the canister makers that Ingevity had no agreements with of

02:23:47 8    any kind are on the right.  So who does Ford -- who does

02:23:51 9    Ford buy their canisters from?  They buy them from Delphi

02:23:56 10   and Kayser.  They also buy them from MPC.  They use their

02:23:59 11   own canisters that they make themselves and they buy it from

02:24:02 12   MAHLE.  And of course, Ingevity has no agreements with MPC,

02:24:07 13   Ford, or MAHLE.

02:24:08 14             What about GM?  GM buys from the three on the

02:24:11 15   left, but it also buys from Stant and MAHLE.

02:24:15 16             What about Fiat Chrysler?  It buys from Stant

02:24:19 17   and MAHLE and only Kayser on the left.

02:24:22 18             Honda.  Honda doesn't even buy canisters from

02:24:25 19   any of the three companies that Ingevity has its agreements

02:24:30 20   with, and yet BASF is including Honda in their damages

02:24:34 21   claim.

02:24:35 22             And Volkswagen, it buys from Kayser but it also

02:24:39 23   buys from MPC and Leehan.

02:24:42 24             So the point here, ladies and gentlemen, is that

02:24:45 25   BASF always had a clear path to all of these car companies

02:24:50  1   and did not need to go through any of the three canister

02:24:53  2   makers that Ingevity had its agreements with, and you're

02:25:00  3   going to hear from these three companies that they did enter

02:25:03  4   into agreements with.  They're not going to say they were

02:25:05  5   forced to enter into the agreements.  They're going to say

02:25:09  6   they entered into them because they were good deals for

02:25:12  7   them.  These customers -- these three customers got very

02:25:15  8   good pricing, and they got guarantees of supply for a long

02:25:19  9   time.  That's why they entered into the agreements.

02:25:22 10          Let's look at just one example quickly.  Again,

02:25:25 11   Dr. LaBine from Delphi.  She was asked:  "Why was it in

02:25:29 12   Delphi's best financial interest to enter into a contract

02:25:33 13   like this?"  She's talking about the Delphi Ingevity

02:25:36 14   agreement.

02:25:36 15          "It gave us money back in 2017, 2018."

02:25:40 16          "Why was that so important at that time?"

02:25:42 17          "Cause my company likes to make money."

02:25:45 18          That's why these car -- these canister makers

02:25:48 19   entered into these agreements.  And you will hear that these

02:25:54 20   agreements -- one thing Mr. Friel didn't mention.  You will

02:25:57 21   hear that these agreements all gave all three of the

02:26:01 22   customers the right to terminate them when the '844 patent

02:26:04 23   expires.  Remember, Mr. Friel showed how they all went out

02:26:09 24   past the expiration date of the patent?  All three of them

02:26:13 25   give the canister makers the option to terminate the

02:26:16 1    agreements, walk away from them when the '844 patent

02:26:21 2    expires, and they also give the customers the right -- and

02:26:26 3    Mr. Friel did mention this -- called meet or release.  They

02:26:30 4    also, even if they didn't terminate, they also, once the

02:26:33 5    '844 patent expired, if they didn't want to terminate they

02:26:38 6    had the right to go out to the whole market, go out and

02:26:41 7    negotiate with anybody they wanted, BASF, whoever, get the

02:26:45 8    absolute lowest price they could get, and then bring that

02:26:49 9    price to Ingevity.  And if Ingevity didn't match that price,

02:26:53 10   Ingevity lost the business.  That's in all three of these

02:26:57 11   agreements as well.

02:26:58 12            Okay.  Let's go to just our last theme quickly.

02:27:05 13   BASF's damages are speculative and unrealistic.  And in

02:27:11 14   looking at this, obviously, the first question is:  How?

02:27:15 15   How is BASF claiming they were harmed by what Ingevity did?

02:27:23 16   And they're claiming they were harmed for two reasons.

02:27:25 17            The time.  In other words, they were harmed by

02:27:30 18   Ingevity telling the customers that there might be a problem

02:27:35 19   if they made infringing canisters with somebody else's

02:27:40 20   honeycombs.  That's the first way they say they were harmed.

02:27:43 21            And the second was these three supply

02:27:46 22   agreements.  But it's not actually three supply agreements.

02:27:49 23   It's really just Kayser because they don't claim damages for

02:27:52 24   the other two.  And the evidence will show there's no

02:27:55 25   connection between these two things, the Kayser agreement

02:27:58  1    and BASF -- excuse me, Ingevity talking to its customers

02:28:02  2    about the patent, and the damages that BASF is seeking.

02:28:08  3    Nevertheless, BASF's damages expert is saying those two

02:28:12  4    things, those two things are a hundred percent of the reason

02:28:17  5    why BASF's sales have been zero.

02:28:21  6              Okay.  With that understanding, let's look at

02:28:25  7    the damages, and they're seeking both past and future

02:28:29  8    damages.  Okay.  They say to date, as we sit here today,

02:28:34  9    their damages are $3.84 million.  Let's think about that for

02:28:41 10    a minute.  These are damages that they say that they would

02:28:46 11    have made sales despite the fact that the '844 patent hasn't

02:28:51 12    expired yet, so they're saying that customers would have

02:28:55 13    bought from them, taking the risk of infringement, and

02:29:03 14    they've lost those sales, and so as a result, they've lost

02:29:07 15    $3.84 million.

02:29:10 16              But the evidence will show that customers didn't

02:29:13 17    buy from them for all of the reasons that I've already

02:29:17 18    talked about, not because of any of these bad things that

02:29:21 19    they're accused of, and if those other reasons -- if the

02:29:26 20    lawsuit was the reason they didn't buy or not wanting to do

02:29:29 21    the testing was the reason that customers didn't buy or they

02:29:33 22    just didn't want to switch, if those were the reasons to

02:29:36 23    date the customers haven't bought from BASF, then the

02:29:40 24    damages are zero.

02:29:43 25              Now let's talk about the future damages.  The

02:29:45 1    evidence will show a couple of important points.  First of

02:29:50 2    all, as I mentioned, the '844 patent expires in March of

02:29:53 3    next year.  There will be no reason why BASF can't go after

02:29:59 4    every single customer starting next year.

02:30:04 5            And as we've seen, the supply agreements that

02:30:08 6    Ingevity has, the customers all have the right to terminate

02:30:11 7    those when the '844 patent expires.  So if BASF had done a

02:30:16 8    good job getting ready to enter the market at that time,

02:30:19 9    they can hit the ground running, go after every single

02:30:22 10   customer, and make whatever sales they can make.

02:30:28 11           The second thing about these future damages is

02:30:31 12   they go all the way out to 2032.  And the evidence is going

02:30:38 13   to show that trying to predict who will be making honeycombs

02:30:42 14   and how many they're going to be selling that far out is

02:30:46 15   just guesswork.  I mean, first, we all know the auto

02:30:50 16   industry is going through tremendous upheaval.  The switch

02:30:54 17   to the electric cars is being pushed harder and harder.  We

02:30:57 18   all saw President Biden's announcement recently about that,

02:31:01 19   and auto makers are moving to electric cars, which do not

02:31:05 20   use fuel vapor canisters.  No one really knows how fast

02:31:08 21   that's going to happen and how many electric cars are going

02:31:11 22   to be sold three years from now, five years from now, ten

02:31:14 23   years from now.

02:31:15 24           Second, BASF's honeycomb has never been put on a

02:31:19 25   car.  No one really knows how well it's going to do.  Will

02:31:23  1    the -- will the factory in China do a good job?  And so

02:31:28  2    customers -- you know, trying to predict ten years out how

02:31:33  3    well the BASF honeycomb is going to be adopted is a little

02:31:37  4    tricky.

02:31:38  5              Third, once the '844 patent expires, there's

02:31:43  6    going to be a third honeycomb company, a fourth honeycomb

02:31:45  7    company, a fifth honeycomb company.  There's going to be a

02:31:48  8    lot of new competition.  Ingevity knows that and is trying

02:31:52  9    to deal with it.

02:31:53 10              But how many?  Who?  And how successful will

02:31:57 11    they be?  There's just a tremendous uncertainty about who's

02:32:00 12    going to be making them and how well they're going to do 5

02:32:02 13    or 10 years from now.

02:32:04 14              And finally, despite how big BASF is, Ingevity

02:32:08 15    could just beat it out in the market based on price, quality

02:32:11 16    of its products, its services, its long track record.

02:32:17 17              Now, the one other thing about future damages

02:32:22 18    that -- about the damages claim that I just wanted to

02:32:25 19    mention is, you know, as we've seen, as I just showed you,

02:32:33 20    the damages are all based on those five car companies, and

02:32:40 21    this is how they break down.  This is the same damages I

02:32:44 22    just showed you, past and future, but just broken down by

02:32:49 23    car company.  This is how they calculate their damages.  And

02:32:55 24    as I've shown you, every single one of these car companies

02:32:59 25    buy from canister makers that Ingevity has never had any

02:33:05 1   kind of agreement with, and Ingevity has no agreement with

02:33:09 2   any of the car companies themselves.  So except for these

02:33:15 3   companies being careful about the patent, BASF has always

02:33:21 4   had a clear path to sell to all five of them.

02:33:25 5               And finally, on damages, for two out of their

02:33:29 6   three claims, you know, they have tying but then they also

02:33:32 7   have exclusive dealing and interference.  For the second

02:33:36 8   two, for exclusive dealing and tortious interference,

02:33:41 9   100 percent of their damages are based on Kayser, and we've

02:33:46 10  already talked about and covered what happened with Kayser.

02:33:50 11              We look forward to presenting all of the

02:33:54 12  evidence that I just described to you, and I thank you very

02:33:57 13  much for your time and attention.

02:34:00 14              THE COURT:  All right.  Thank you, Mr. Thomas.

02:34:03 15  So members of the jury, before BASF calls the first witness

02:34:09 16  I did want to sort of give you an instruction about

02:34:12 17  something which is this:  During the trial, you're going to

02:34:17 18  hear evidence about the lawsuit that Ingevity brought

02:34:23 19  against BASF for infringement of the '844 patent, and BASF,

02:34:32 20  in that lawsuit, denies any liability.  That lawsuit is

02:34:37 21  separate from this case, this lawsuit, and it will be

02:34:43 22  decided separately.  You're not to speculate about who

02:34:49 23  should win that lawsuit.  You're, for one thing, not going

02:34:52 24  to be given the information that would allow you to

02:34:54 25  intelligently assess that, but the other and more important

Abraham - Direct

02:34:59  1    reason is who wins that lawsuit is irrelevant to the issues

02:35:03  2    in this case, so I wanted you to bear that in mind.

02:35:08  3                    All right.  BASF.

02:35:12  4                    MR. FRIEL:  Yes, Your Honor.  We call our first

02:35:15  5    witness.  His name is Akash Abraham.

02:35:17  6                    THE COURT:  Okay.

02:35:30  7                    MR. FRIEL:  Your Honor, should I examine the

02:35:33  8    witness from the podium?

02:35:34  9                    THE COURT:  Sure.

02:35:35 10                    MR. FRIEL:  Okay.  Your Honor, the witness is

02:36:38 11    here.

02:36:38 12                    THE COURT:  Yeah.  So he should go up there to

02:36:43 13    the witness stand.

02:36:46 14                    THE WITNESS:  Pardon me.

02:36:49 15                    DEPUTY CLERK:  Please state and spell your full

02:36:55 16    name for the record.

02:36:56 17                    THE WITNESS:  Akash Abraham, A-K-A-S-H.  Last

02:36:59 18    name Abraham, A-B-R-A-H-A-M.

02:37:03 19                    DEPUTY CLERK:  Do you affirm that the testimony

02:37:05 20    you are about to give to the Court and the jury in the case

02:37:08 21    now pending will be the truth, the whole truth and nothing

02:37:10 22    but the truth, do so affirm.

02:37:12 23                    THE WITNESS:  I do.

02:37:13 24                    DEPUTY CLERK:  Thank you.

02:37:16 25                            DIRECT EXAMINATION

Abraham - Direct

02:37:16  1          MR. FRIEL:  Thank you, Your Honor.

02:37:17  2   BY MR. FRIEL:

02:37:17  3   Q.      Good afternoon, Mr. Abraham.

02:37:19  4   A.      Good afternoon.

02:37:20  5   Q.      Thank you for being here.

02:37:21  6           Where do you live?

02:37:22  7   A.      Brooklyn, New York.

02:37:25  8   Q.      How long have you lived there?

02:37:26  9   A.      About 12 years.

02:37:29 10   Q.      Do you hold any degrees?

02:37:30 11   A.      I do.

02:37:32 12   Q.      Can you tell us about those?

02:37:33 13   A.      I have an undergraduate degree from Denison

02:37:36 14   University.

02:37:37 15   Q.      Oh, you can take your mask off.  I'm sorry.

02:37:40 16   A.      A little harder.  That's better.

02:37:44 17           An undergraduate degree from Denison University,

02:37:47 18   and I have a graduate degree as well.

02:37:49 19   Q.      All right.  What is the undergraduate degree from

02:37:51 20   Denison in?

02:37:52 21   A.      Physics and math.

02:37:54 22   Q.      And mathematics?

02:37:55 23   A.      And mathematics, yes.

02:37:57 24   Q.      And your advanced degree, what is that in?

02:37:59 25   A.      It's in science entrepreneurship.  So kind of like a

Abraham - Direct

02:38:04  1    tech MBA, to make it simple.

02:38:06  2    Q.      All right.  Now, you worked for BASF starting in

02:38:12  3    2014; is that correct?

02:38:12  4    A.      That is correct.

02:38:13  5    Q.      And that is for the U.S. subsidiary in Florham Park,

02:38:17  6    New Jersey; correct?

02:38:18  7    A.      Yes.

02:38:18  8    Q.      What was your title there?

02:38:20  9    A.      Global product manager.

02:38:21 10    Q.      Now, were you in charge of the EvapTrap XC honeycomb

02:38:25 11    project; is that right?

02:38:26 12    A.      I was.

02:38:27 13    Q.      Okay.  Well, what's BASF?  I want to ask you a few

02:38:31 14    questions about that.

02:38:32 15    A.      Sure.

02:38:32 16    Q.      Is it a global company?

02:38:33 17    A.      Yes, absolutely.

02:38:34 18    Q.      What does that mean?

02:38:36 19    A.      Well, they operate in regions throughout the world,

02:38:39 20    both from a sales, marketing, also from manufacturing

02:38:42 21    perspective.

02:38:43 22    Q.      How long has BASF been in business?

02:38:45 23    A.      Over 150 years.

02:38:47 24    Q.      What is that business?

02:38:48 25    A.      Well, they're a chemical company.  They create all

Abraham - Direct

02:38:53 1   sorts of different types of things, different types of

02:38:55 2   paints, coatings, all sort of things that help clean the air

02:38:58 3   you breathe.

02:38:59 4   Q.      How many products does the company make?

02:39:01 5   A.      A lot.  I couldn't count them.  There are too many.

02:39:06 6   Q.      All right.  So how many employees does BASF have --

02:39:11 7   I'm sorry.  I'm having trouble saying it now -- BASF have

02:39:14 8   worldwide?

02:39:15 9   A.      Roughly a hundred thousand.

02:39:17 10  Q.      And now the subsidiary you work for, this is the

02:39:20 11  North American subsidiary of BASF; that correct?

02:39:23 12  A.      That is correct.

02:39:24 13  Q.      How many employees does BASF have in the United

02:39:28 14  States?

02:39:28 15  A.      I'd say roughly 20 percent.

02:39:31 16  Q.      Is BASF a supplier of components to the automotive

02:39:37 17  industry?

02:39:37 18  A.      Absolutely.

02:39:37 19  Q.      Is that an important part of its business?

02:39:40 20  A.      Absolutely.

02:39:40 21  Q.      Is it one of the largest suppliers of components to

02:39:44 22  the automotive industry?

02:39:44 23  A.      Absolutely.

02:39:45 24  Q.      Does BASF have engineers who call on the automotive

02:39:48 25  industry daily?

Abraham - Direct

02:39:49 1    A.      Absolutely.  Yeah.  Yeah.  We have people in Detroit

02:39:52 2    every day and actually sometimes sit in the offices of major

02:39:56 3    customers like Ford or GM or Chrysler.

02:40:00 4    Q.      Is customer support by BASF engineers necessary as

02:40:04 5    part of selling products?

02:40:05 6    A.      Yeah, I mean, most of the products we sell are

02:40:08 7    technical in nature, so you have to understand the customer

02:40:12 8    needs and how your product or technology can help solve that

02:40:16 9    problem.

02:40:17 10   Q.      Okay.  So back in 2014 when you joined BASF, you were

02:40:22 11   put in charge of a carbon product -- activated carbon

02:40:25 12   product for fuel vapor emissions for air intake systems; is

02:40:29 13   that correct?

02:40:29 14   A.      That is correct.

02:40:30 15   Q.      What was the product?

02:40:31 16   A.      That was our EvapTrap MX product.  It was designed to

02:40:37 17   capture any gaseous vapors that came out of the car when the

02:40:41 18   car was parked.

02:40:43 19   Q.      Do engineers call that AIS systems as well?

02:40:47 20   A.      We do.

02:40:48 21   Q.      That's for air intake system; correct?

02:40:50 22   A.      Absolutely.  That's correct.

02:40:51 23   Q.      Now, this case is about something else called

02:40:53 24   EvapTrap, the EvapTrap XC.  What is that product?

02:40:57 25   A.      Sure.  The EvapTrap XC is a -- what we would call a

Abraham - Direct

honeycomb scrubber that is part of the canister system and helped OEMs meet the LEV III and Tier 3 regulations in the U.S.

Q.    How did the XC development begin?  How did you get the idea to have this project?

A.    Sure.  We were -- we were at a customer meeting at Ford, and we were presenting to a group of engineers.  We had gone over the EvapTrap MX technology, and one of the engineers, Dawn Woodring, said that, you know, this is really interesting technology.  I have another problem that you might be able to solve.  Can you look at whether you can help us meet these regulations that are coming up.

Q.    What regulations were the Ford engineers referring to?

A.    As I previously mentioned, the LEV III and Tier 3 regulations.

Q.    Was Ford looking for an alternative?

A.    Yes.

Q.    Please explain.

A.    Sure.  You know, they only had one supply option currently, so the minimum, they wanted to have at least another option to help meet that.  And they knew that this technology was likely going to be used across the board across multiple vehicles, so they knew there might be some vehicles that the current technology may have a challenge

Abraham - Direct

02:42:13  1   on.

02:42:13  2   Q.      So at the time of this 2015 meeting, the regulations

02:42:17  3   that you referred to, were they -- had they been phased in

02:42:23  4   yet?

02:42:23  5   A.      No, the regulations started in 2018.

02:42:27  6               MR. BUROKER:  Objection.  Objection.

02:42:27  7               THE COURT:  Hold on.

02:42:28  8               MR. BUROKER:  Foundation.

02:42:29  9               THE COURT:  All right.  Well, so, no, that's

02:42:34 10   overruled.

02:42:37 11   BY MR. FRIEL:

02:42:37 12   Q.      The question was pending, I think, but at the time of

02:42:41 13   the -- of this 2015 meeting, had the LEV III regulations,

02:42:46 14   these more stringent regulations, had they been phased in

02:42:49 15   yet?

02:42:49 16   A.      No, they started in 2018, and they fully phased in

02:42:53 17   2022.

02:42:54 18   Q.      So by -- what you're saying is carmakers were not yet

02:42:57 19   required to meet LEV III requirements.  That didn't kick in

02:43:01 20   until 2018?

02:43:03 21   A.      Correct.

02:43:03 22   Q.      So at in 2015, there was -- the carmakers didn't

02:43:07 23   require honeycombs in order to meet the LEV III regulations;

02:43:11 24   is that right?

02:43:12 25   A.      That's correct.

Abraham - Direct

Q.      Thank you.

        Now, part of your job duties include determining
what products customers wanted; right?

A.      Yes, that's correct.

Q.      And did you also consider part of your job duties
determining why customers wanted a particular product?

A.      Yeah, absolutely.  I mean, I think the number one job
we have as commercial professionals is to understand
customer needs and to figure out if there's a good way to
solve it with the technologies that we have in our
portfolio.

Q.      How do you go about -- how did you go about
determining customer needs and how to solve those needs?

A.      Sure.  Obviously, when we learned about the potential
opportunity in the canister, we started to do a market study
to try and assess whether those leads were part of the
entire market widely, whether they applied to all vehicles,
and how those might change over time; right?  We knew that
the phase ones were happening, but we also knew that there
was a some powertrains, and by "powertrains," I mean engines
that would, potentially, you know, behave differently for
the canister test.

Q.      You testified that Ford was looking for an
alternative.  An alternative to what?

A.      The Ingevity honeycomb scrubber.

Abraham - Direct

02:44:27 1   Q.      What reasons did Ford give for wanting an alternative

02:44:30 2   to the Ingevity scrubber?

02:44:33 3   A.      Well, as I mentioned before, one, they at least

02:44:37 4   wanted to have another source.  They also knew that there

02:44:39 5   were potential places where there would be a challenge to

02:44:42 6   meet the regulations, and they wanted to see if there was

02:44:45 7   potential for better technology.

02:44:48 8   Q.      Okay.  You used the term "scrubber."  Is that the

02:44:51 9   same thing as a honeycomb?

02:44:52 10  A.      Yes.  Sorry.  I'm using them together just to make

02:44:55 11  sure there's no --  I flip terms.

02:44:58 12  Q.      You also used the term or see the term occasionally

02:45:01 13  "monolith" applied to the same thing?

02:45:03 14  A.      That's correct.

02:45:04 15  Q.      All right.  Thank you.

02:45:04 16          Did you discuss these regulations while you were

02:45:09 17  at Ford?

02:45:09 18  A.      Yes.

02:45:11 19  Q.      Now, did you study up on the LEV III regulations?

02:45:15 20  A.      I spend a lot of time with it.

02:45:16 21  Q.      Okay.  Now, the previous regulations before in

02:45:20 22  effect, before LEV III were called LEV II; is that right?

02:45:24 23  A.      That's correct.

02:45:25 24  Q.      All right.  And LEV II was an in effect in 2015;

02:45:29 25  correct?

Abraham - Direct

02:45:29  1   A.      That's correct.

02:45:30  2   Q.      So in fact, it was in effect until 2018 when the LEV

02:45:35  3   III regulations started to phase in; is that right?

02:45:38  4   A.      That's right.

02:45:38  5   Q.      Just so I understand the timing.

02:45:40  6   A.      Yeah.

02:45:40  7   Q.      So in 2015 up to 2018, how did cars meet the LEV II

02:45:46  8   regulations?

02:45:47  9   A.      Most of the LEV II regulations were able to be met by

02:45:50 10   carbon pellets -- I don't know if we've gone over the

02:45:53 11   difference between pellets and scrubbers, but they're -- you

02:45:57 12   know, it's exactly like they sound.  Small, little pellets

02:46:00 13   of activated carbon.  They do the main workout, of course,

02:46:03 14   for adsorbing those gaseous vapors from the car.

02:46:06 15   Q.      You raise a good question.  So what's activated

02:46:09 16   carbon?

02:46:09 17   A.      Activated carbon is usually processed from an organic

02:46:14 18   material.  It goes to a carbonization process and then it

02:46:20 19   becomes an adsorbent so can absorb different chemicals,

02:46:23 20   different bad particulates, et cetera.

02:46:26 21   Q.      Does it act like a sponge?

02:46:27 22   A.      Yes, absolutely.  I think it's the best way to think

02:46:29 23   about activated carbon, is it's like a sponge.

02:46:32 24   Q.      Now, activated carbon has various forms that are

02:46:36 25   relevant in the automotive industry; is that correct?

Abraham - Direct

02:46:38  1    A.      That's correct.

02:46:39  2    Q.      What forms are those?

02:46:40  3    A.      So there's typically pellets.  You think of pellets

02:46:43  4    as kind of the big sponge that does the bulk of work, and

02:46:46  5    then, as we mentioned and focused on here, at least in the

02:46:49  6    case of these automotive applications, the hydrocarbon

02:46:52  7    scrubber or the kind of honeycomb that is used to do the

02:46:57  8    fine filtration of any of the vapors that go off.

02:47:01  9    Q.      So honeycombs are a form of carbon; right?

02:47:03 10    A.      Well, the -- it's formed into a shape that's in that.

02:47:07 11    Q.      Thank you.

02:47:08 12    A.      Yes.

02:47:09 13    Q.      Now, were the LEV III requirements stricter than LEV

02:47:13 14    II?

02:47:13 15    A.      Yes, they were.

02:47:14 16    Q.      Please explain.

02:47:15 17    A.      Near zero is what you would call that in the

02:47:18 18    industry.  Is it's very snippety.

02:47:20 19    Q.      I'm sorry.  I talked over you.

02:47:21 20    A.      Yeah.

02:47:21 21    Q.      You said -- could you answer again.

02:47:22 22    A.      Sure.  Yes.  Near zero was the standard that most

02:47:26 23    companies would call that.

02:47:28 24    Q.      Okay.  And near zero what?

02:47:30 25    A.      Evaporative emissions.

Abraham - Direct

1  Q.      All right.  So hydrocarbon molecules; correct?

2  A.      Yes, correct.

3  Q.      Okay.  What was its schedule, the phase-in schedule,

4  for car manufacturers to comply with LEV III?

5  A.      If I remember correctly, 2018 it was 60 percent of --

6  2020 was 80 percent, and then 2022 a hundred percent.

7  Q.      So next year it will be a hundred percent?

8  A.      Absolutely.

9  Q.      All right.  How did car makers in 2015, how would

10 they comply with the LEV III regulations once they came into

11 force in 2018?

12 A.      We talked to multiple different customers.  All of

13 the customers said they would need a honeycomb scrubber to

14 meet the regulations for LEV III/Tier 3.  There were a

15 couple other ideas, sealed canisters, which were very, very

16 expensive, and there was also a heated canister where,

17 essentially, they would heat the carbon and try to help get

18 clean, which sounds like a very bad idea with gaseous vapors

19 nearby, so we didn't see a lot of viable alternatives in the

20 marketplace.

21 Q.      All right.  Thank you.

22         Now, did your company at BASF prepare

23 presentations explaining internally and to customers how

24 carbon activated carbon canisters work?

25 A.      Absolutely.

Abraham - Direct

02:48:54  1    Q.      I'd like to have you turn to your book and take a
02:48:56  2    look at an exhibit that's marked DX-0068 for reference.
02:49:01  3             Is this a BASF presentation explaining how
02:49:09  4    carbon canisters work?
02:49:11  5    A.      Yes.
02:49:13  6    Q.      Who prepared this presentation?
02:49:15  7    A.      This was likely one of our technical team members
02:49:19  8    that was preparing it.
02:49:20  9    Q.      Thank you.  This is a BASF business document; is that
02:49:23 10    correct?
02:49:23 11    A.      That is correct.
02:49:25 12             MR. FRIEL:  Your Honor, we move to enter this
02:49:27 13    into evidence, DX-0068.
02:49:31 14             MR. BUROKER:  No objection.
02:49:32 15             THE COURT:  All right.  Admitted without
02:49:33 16    objection.
02:49:34 17             (DX Exhibit No. 68 was admitted into evidence.)
02:49:35 18             MR. FRIEL:  Could you please put the first page
02:49:37 19    up.
02:49:37 20    BY MR. FRIEL:
02:49:48 21    Q.      While that's being done, I'll direct you to the first
02:49:51 22    page --
02:49:52 23    A.      Sure.
02:49:52 24    Q.      -- and ask you.  There's some names at the bottom.
02:49:55 25    Oh, here we go.  We'll have to flip it.  Thank you.

Abraham - Direct

02:49:58   1          There's some names on the bottom of the page.

02:50:00   2   Are these members of your team at the time?

02:50:03   3   A.      Yep.

02:50:03   4   Q.      All right.  And there's a dates on the bottom that

02:50:07   5   that's from 2018; correct?

02:50:09   6   A.      That's correct.

02:50:10   7   Q.      All right.  Please turn to the second page of this.

02:50:16   8   Now, there's a drawing of a car here on this page; right?

02:50:19   9   A.      That's correct.

02:50:20  10   Q.      Maybe we can -- can we cut that out?  Make it a

02:50:25  11   little bigger so it's easier to see?  Thank you.

02:50:27  12          So we have a diagram of a car here; is that

02:50:32  13   right?

02:50:32  14   A.      That's correct.

02:50:34  15   Q.      All right.  And what is the -- what does its drawing

02:50:38  16   show?  What does it depict?

02:50:38  17   A.      It's a graphic of the engine and how that connects to

02:50:42  18   both the fuel tank and also the carbon canister that we've

02:50:47  19   been looking at as an application.

02:50:50  20   Q.      So we see the fuel tank in the back of the car

02:50:53  21   marked; right?

02:50:54  22   A.      That's correct.

02:50:54  23   Q.      And then we see a charcoal canister.

02:50:57  24          Do you see that?

02:50:58  25   A.      I do.

Abraham - Direct

02:50:58  1    Q.      What does that refer to?

02:50:59  2    A.      The charcoal canister is the device that we were

02:51:02  3    talking about that helps prevent evaporative emissions go

02:51:06  4    out into the atmosphere.

02:51:08  5    Q.      So is this equate then -- charcoal equate to

02:51:12  6    activated carbon?

02:51:14  7    A.      Yes.

02:51:15  8    Q.      Please explain that.

02:51:15  9    A.      Yeah, sorry.  Apologies.  Charcoal and activated

02:51:19  10   carbon were kind of used interchangeably, but similar

02:51:24  11   nomenclature.

02:51:24  12   Q.      And then there are -- there's -- coming out of the

02:51:27  13   charcoal canister or the evaporation canister, there are two

02:51:31  14   lines, one going to the fuel tank.  Can you explain what

02:51:33  15   that is?

02:51:34  16   A.      Sure.  So the fuel tank line is -- you know, so as

02:51:38  17   you drive your car, you use up gasoline.  It needs air come

02:51:41  18   into the system so you have a vacuum.  That's the line that

02:51:46  19   is going to the fuel tank, and the other line is going to

02:51:50  20   the engine.

02:51:52  21   Q.      All right.  And then in green there's a feature

02:51:56  22   called a purge valve.  Can you tell us what that is.

02:51:59  23   A.      Sure.  Purge valve switches between when you're

02:52:02  24   driving and when you're parked so that you either allow for

02:52:05  25   vapor to come into the engine or do not.

Abraham - Direct

02:52:07  1    Q.      All right.  Now, can you turn to Page 3 of this

02:52:12  2    document.

02:52:13  3                 That's DX 68.003.  I'm sorry.  Four.  I

02:52:20  4    misspoke.

02:52:24  5                 Can you tell us what this -- just generally what

02:52:27  6    this document, this page, depicts?

02:52:28  7    A.      Sure.  So the diagram we're seeing here is a

02:52:32  8    cross-section of what would be a typical LEV III canister.

02:52:37  9    And indicating where all -- not only the features of the

02:52:41 10    canister, but the fuel lines and ports to air mentioned

02:52:45 11    before.

02:52:45 12    Q.      At the top of the page, it says trap/purge cycle of

02:52:49 13    carbon canister.  So what is the trap/purge cycle?  What

02:52:54 14    does that refer to?

02:52:54 15    A.      Sure.  So this also is talking about the two

02:52:56 16    operating modes of the carbon canister.  One while it is

02:53:00 17    parked and you're trying to trap vapors that could

02:53:04 18    potentially go out into the atmosphere and one during the

02:53:07 19    purge cycle, which is when you're driving your vehicle and

02:53:10 20    air is flowing through the carbon canister and squeezing out

02:53:15 21    that sponge to make it clean and ready for the next time

02:53:18 22    that you park your car.

02:53:19 23    Q.      Okay.  Can you explain the left-hand -- the diagram,

02:53:22 24    maybe walk us through the flow?

02:53:25 25    A.      Sure.  Blown up; right?

02:53:27  1        On this picture on the right, the line with the

02:53:30  2    X over it is the line to the engine.  And then as you kind

02:53:36  3    of go down, the things that look a little bit like confetti

02:53:38  4    are carbon pellets or activated carbon pellets.  They made a

02:53:42  5    mention between the prior -- the two different types that

02:53:45  6    we're kind of looking at.

02:53:46  7        And then if you look to the right, there's a

02:53:48  8    cylinder.  It's got some crosshatches on the top.  This is

02:53:52  9    what the hydrocarbon scrubber looks like.  And then you see

02:53:56 10    the arrow flowing to the external air where you have clean

02:54:01 11    air.

02:54:02 12    Q.    So this would correspond to what's happening in the

02:54:05 13    gas tank as the gas -- car is parked and gasoline begins to

02:54:09 14    warm up and expand?

02:54:10 15    A.    Exactly.  So yeah, your car is parked.  It starts to

02:54:14 16    get warm.  Gas expands.  It goes through that yellow line at

02:54:17 17    the top.  It flows through all of the activated carbon

02:54:21 18    pellets.  That sponge absorbs most of that bad pollutants,

02:54:26 19    and then as it goes out towards the lead element there or

02:54:30 20    the -- sorry -- the honeycomb, you will see it clean off the

02:54:34 21    last bits of hydrocarbons to make sure you have clean air

02:54:36 22    coming out to the outside.

02:54:37 23    Q.    Okay.  Let's focus on the purge cycle, the right half

02:54:41 24    of this.  So is this what happens when you turn the engine

02:54:44 25    on?

Abraham - Direct

A.      Yes, that's correct.  So once you turn on the engine,
you're pulling gasoline from its fuel tank.  You're trying
to bring air from the outside, and what's important here is
this is when you're actually squeezing out the sponge, and
it's super important if you what than to make meet the
regulations that you squeeze out the on sponge very cleanly
so it's available and ready to take on new pollutants the
next time you park.

Q.      Okay.  Can we put down the -- just the blow up and go
back to the main document, please.

        All right.  Right under the title, it says -- or
part of the title -- Fast Desorption Is More Critical for HC
trap applications.  Now, does that refer to carbon
honeycombs?

A.      That's correct.

Q.      All right.  So what's desorption?

A.      So again, we're look at that purge cycle on the
right-hand side, and we're squeezing out the sponge.  We're
trying to make that as clean as possible and to meet the LEV
III/Tier 3 regulations, which were near zero evaporative
emissions.  You really want that scrubber to be as clean as
possible so it can capture those last bits of gasoline when
you park it again.

Q.      Is activated carbon widely used?

A.      Yes, it's used in a lot of different applications.

Abraham - Direct

02:55:56  1   Q.      Can you give us some example of the use of activated

02:56:00  2   carbon in the automotive industry.

02:56:01  3   A.      Sure.   There is activated carbon in the air intake

02:56:05  4   systems of vehicles.   That's trying to catch the vapors

02:56:09  5   coming out of the air intake system.

02:56:12  6           You can also say water filtration, air

02:56:15  7   filtration, these are all applications that are used for

02:56:19  8   activated carbon.

02:56:20  9   Q.      Is use of activated carbon for air filtration, is

02:56:25 10   that sometimes referred to as cabin air filtration?

02:56:28 11   A.      It can be, yes.   So, obviously, we've seen filters

02:56:31 12   that go into your automotive cabin and that clean the air

02:56:34 13   that's coming in.   Those are -- those sometimes have

02:56:36 14   activated carbon to improve the air quality within the

02:56:39 15   cabin.

02:56:41 16   Q.      You mentioned the different forms of activated carbon

02:56:43 17   used in the automotive industry.   Why would an engineer

02:56:47 18   choose one type of or one form of activated carbon over

02:56:51 19   another, just generally speaking?

02:56:53 20   A.      Yeah, sure.   We look -- they look at it from a

02:56:56 21   performance perspective.   So one is how much capacity it has

02:56:59 22   to hold on to whatever particular pollutant is; right?   So

02:57:02 23   in this case, its activated carbons are engineered to pick

02:57:05 24   up the vapors associated with gasoline.   And they also look

02:57:09 25   at what the -- how quickly or cleanly it will desorb or

02:57:14  1   squeeze out that air, that pollutant, when you look at the

02:57:18  2   purge cycle, for instance.  So that that's why we look at

02:57:21  3   different types of carbon for the honeycomb as opposed to

02:57:26  4   the main body of the pellet carbon.

02:57:28  5   Q.      Okay.  So let's go back to the design of the EvapTrap

02:57:32  6   XC.  So you had a business possibility from Ford; correct?

02:57:38  7   So what did you do next?

02:57:39  8   A.      Sure.  So we studied the market, as I had mentioned

02:57:43  9   previously, and talked to multiple customers to understand

02:57:45 10   is this a true problem in the industry and did they have

02:57:49 11   viable alternatives.  Then we, obviously, had the EvapTrap

02:57:54 12   MX technology, so we started to test and understand whether

02:57:58 13   that technology would work well in this particular

02:58:01 14   application at or better than the competitor's standard.

02:58:05 15   Q.      Okay.  Now, you mentioned the EvapTrap MX product,

02:58:12 16   and that was for air intake systems.  Why would that have

02:58:15 17   any application to EvapTrap for the fuel tanks or what

02:58:19 18   became the XC project?

02:58:21 19   A.      Sure.  We had spend a lot of time engineering the

02:58:25 20   activated carbon for this particular application, so when we

02:58:29 21   studied the market, we looked at different types of carbon,

02:58:33 22   and BASF had created a special type of carbon based off of

02:58:38 23   polymers.

02:58:39 24           And just for general reference, you know, you

02:58:42 25   would say most carbons are created from sawdust or coconut

Abraham - Direct

02:58:46  1    shells, and those have natural impurities in them.  The

02:58:50  2    polymer carbon gave us a very repeatable and consistent

02:58:54  3    stock to -- or base material to make our activated carbon

02:58:58  4    off, and it had very good performance characteristics that

02:59:03  5    were consistent with the needs of this application.

02:59:06  6    Q.    So you used the phrase "engineering activated

02:59:10  7    carbon."  Can you explain that in English.

02:59:11  8    A.    Sure.  Absolutely.

02:59:14  9          You -- you know not all activated carbons would

02:59:19 10    be the same; right?  So they have different -- different

02:59:22 11    holes or different places to which to catch, you know, as a

02:59:26 12    part of the sponge, just like different sponges have

02:59:28 13    different uses.  You can think of, you know, the sponge

02:59:31 14    that's being used on the left-hand side or on the pellets as

02:59:34 15    when you do your bulk work with and the sponge that is on

02:59:37 16    the right-hand side as one that you are doing that fine

02:59:40 17    cleaning to polish either, let's say, your silverware or

02:59:43 18    your glassware, et cetera.  So there's differences in that,

02:59:48 19    and you have to select the right type of material when

02:59:50 20    you're thinking about engineering a product like this.

02:59:53 21    Q.    All right.  So you had this engineered activated

02:59:55 22    carbon for the EvapTrap MX product.  Did it have a name?

02:59:59 23    A.    Sure.  EvapTrap XC.

03:00:02 24    Q.    Okay.  Did it the carbon itself have a name?

03:00:06 25    A.    Oh, sorry, yes.  That was also P2 carbon was that --

Abraham - Direct

03:00:10  1    the name of the carbon we used.

03:00:12  2    Q.     Okay.  And so did -- you thought to use the P2 carbon

03:00:18  3    from the MX project for the XC; is that correct?

03:00:21  4    A.     That's correct.

03:00:21  5    Q.     Did that give you some advantages in terms of

03:00:24  6    development?

03:00:24  7    A.     Well, it gave us a starting point.  We had already

03:00:27  8    developed a core coating technology and then we just had to

03:00:31  9    think about the right form factor -- what form factor --

03:00:34 10    what was the best way to put it into this particular

03:00:36 11    application to meet the customer -- to meet the regulatory

03:00:40 12    standards.

03:00:41 13    Q.     In developing the EvapTrap XC, did you test other

03:00:44 14    carbons as well?

03:00:45 15    A.     Yeah, we tested everything.  We tested zeolites,

03:00:48 16    which are another type of adsorbent material that's not like

03:00:53 17    activated carbon.  We tested all of the commercially

03:00:56 18    available carbons, and we tested multiple variants of the

03:01:00 19    carbon that we produced.

03:01:02 20    Q.     And in the end, what was the one you chose?

03:01:04 21    A.     The P2 carbons still performed the best, which we

03:01:08 22    expected.

03:01:09 23    Q.     Now, while your team was developing the EvapTrap XC,

03:01:13 24    did they have -- did the team have access to the competing

03:01:17 25    Ingevity honeycomb?

Abraham - Direct

03:01:17 1   A.      We were able to commercially buy the product on the

03:01:20 2   marketplace.

03:01:21 3   Q.      What use did your team make of that honeycomb?

03:01:23 4   A.      So it's pretty standard practice when you can

03:01:27 5   commercially buy a product on the marketplace to benchmark

03:01:30 6   or to test it relative to the product that you're creating

03:01:33 7   to see if your product is better or worse in different uses.

03:01:38 8   It's standard practice in the automotive industry.

03:01:41 9   Q.      All right.  And from your examination of Ingevity

03:01:43 10  honeycombs, did you determine how they were made?

03:01:46 11  A.      So they are extruded honeycomb product, whereas ours

03:01:53 12  was a coated product.

03:01:55 13  Q.      Okay.  Were there any other differences?

03:02:00 14          Was the carbon different?

03:02:01 15  A.      Yes.  Yes, absolutely.

03:02:02 16  Q.      How was their carbon made?

03:02:04 17          MR. BUROKER:  Objection, foundation.  I mean,

03:02:06 18  he's asking how.

03:02:07 19          THE COURT:  Yeah, okay.  All right.  So explain

03:02:10 20  how he knows.  Ask another appropriate question.

03:02:14 21          MR. FRIEL:  Sure.

03:02:15 22  BY MR. FRIEL:

03:02:15 23  Q.      Did you investigate how the Ingevity carbon -- or

03:02:18 24  what kind of carbon was used in the Ingevity honeycomb?

03:02:21 25  A.      Yes, we did.

Abraham - Direct

03:02:22   1    Q.      And what did you learn from that investigation?

03:02:24   2    A.      That the Ingevity carbon was made from sawdust.

03:02:27   3    Q.      All right.  Now, you mentioned that the Ingevity

03:02:31   4    honeycombs are extruded.  What does that mean?

03:02:34   5    A.      So think of it like your kid's or grandkid's Play-Doh

03:02:39   6    machine where you pull the lever down and the Play-Doh comes

03:02:42   7    out in a fun shape that they get to play with.  It's a

03:02:46   8    similar type of similar fashion.  They're putting a slurry

03:02:50   9    of materials, the ceramic component and their active

03:02:55  10    material, into some one sort of Play-Doh, so to speak, and

03:02:58  11    they extrude it and try it to make it hard to -- in the

03:03:01  12    shape that is like a honeycomb.

03:03:03  13    Q.      Okay.  Did your team consider alternatives to

03:03:09  14    honeycombs in order to meet this need that Ford identified

03:03:13  15    for an alternative to the Ingevity honeycomb?

03:03:15  16    A.      Yeah, absolutely.

03:03:16  17    Q.      What alternatives did your team consider?

03:03:19  18    A.      We tried everything.  We tried coated foams, we

03:03:22  19    looked at coated papers that were folded.  We really wanted

03:03:26  20    to make the best product possible to meet those regulations,

03:03:30  21    especially on those challenging applications like large

03:03:33  22    trucks and SUVs.

03:03:35  23    Q.      We know the team eventually chose honeycombs over

03:03:39  24    pumps and papers; correct?

03:03:39  25    A.      That's correct.

03:03:40  1   Q.      And why did that happen?

03:03:42  2   A.      There was a number of factors.  One of the factors

03:03:45  3   was we learned that when you coat the ceramic -- one, BASF

03:03:50  4   has been coating ceramics for your tailpipe emissions for

03:03:54  5   what we'd call -- what we call catalytic converter for

03:03:59  6   almost 50 years, so we have a lot of expertise in taking

03:04:02  7   ceramic substrates and coating them with an active material.

03:04:07  8   So we knew that that was one potential route that we

03:04:10  9   could -- we should pursue because there's performance

03:04:13 10   benefits to having it coated versus extruded.

03:04:17 11             The other reason that we looked at was that in

03:04:22 12   some cases, customers have already designed their canister.

03:04:25 13   And so there's an existing space where they wanted to put

03:04:29 14   something to meet those regulations, and it being what we

03:04:32 15   call a drop in, i.e. they don't have to redesign their

03:04:35 16   canister, was attractive to customers.  So we wanted to be

03:04:39 17   able to create something that could fit into existing spaces

03:04:43 18   so we could start commercially selling the product line.

03:04:47 19   Q.      Who specified the size of the spaces that your

03:04:50 20   honeycombs were designed to drop into?

03:04:51 21   A.      The customers did.

03:04:55 22   Q.      Now, the EvapTrap XC has a honeycomb with 200 cells

03:05:03 23   per square inch or CPSI; is that correct?

03:05:06 24   A.      That's correct.

03:05:06 25   Q.      That means the crosshatching, if you counted them up,

Abraham - Direct

03:05:09  1   it would be 200 of them in every square inch; correct?

03:05:11  2   A.      That's correct.

03:05:12  3   Q.      All right.  And why did your team choose 200 CPSI for

03:05:18  4   your honeycomb?

03:05:19  5   A.      Sure.  We had tested multiple different cells per

03:05:23  6   square inch.  We went from a hundred up to 300, and that

03:05:26  7   seemed to be a good sweet spot to -- for our product to

03:05:30  8   perform.

03:05:30  9   Q.      So what do you mean by a sweet spot?

03:05:32 10   A.      It had the best balance of performance where we put

03:05:36 11   it in the blue emission test protocol, and it was able to

03:05:41 12   clean purge without a lot of pressure drop, and that means

03:05:45 13   restriction of the flow of air going through the system.

03:05:49 14   Q.      Now, you mentioned extruded honeycombs before in

03:05:52 15   reference to the Ingevity honeycomb.  So how is the XC

03:05:57 16   honeycomb made?

03:05:58 17   A.      It's a coated monolith honeycomb, as I had mentioned

03:06:02 18   before and --

03:06:03 19   Q.      So what is a coated monolith or coated honeycomb?

03:06:09 20   How is that?

03:06:09 21   A.      It looks very similar; right?  So in the extruded

03:06:12 22   product that you would see, it looked very similar, but the

03:06:16 23   active material is essentially coated on the -- it's sucked

03:06:20 24   up through those pores so that you coat the interior.  And

03:06:24 25   then it's blown out to create a very consistent layer of

Abraham - Direct

03:06:28  1    coating of the active material.

03:06:29  2    Q.    By coating, do you mean painted?

03:06:31  3    A.    It's painted, yeah.  That's a good word for it.

03:06:33  4    Q.    So I understand what you do is you take an existing

03:06:38  5    ceramic honeycomb.

03:06:40  6    A.    Yeah.

03:06:40  7    Q.    All right.  And you essentially coat it or paint it

03:06:43  8    with your slurry or your carbon; right?

03:06:47  9    A.    Correct.

03:06:47 10    Q.    Okay.  I mentioned slurry.  What's a slurry?

03:06:50 11    A.    Sure.  In making this, we put took our activated

03:06:54 12    carbon.  We put some glue in there and some other chemicals

03:06:57 13    to make sure that it can coat properly, and that's how we

03:07:00 14    came up with the formulation to coat onto the product or

03:07:03 15    paint onto the ceramic substrate.

03:07:05 16    Q.    So why did you decide to coat a ceramic honeycomb

03:07:13 17    rather than build an extruded one?

03:07:16 18    A.    We would never look into extruded products.  One,

03:07:20 19    our -- you're taking -- with an extruded product, you're

03:07:24 20    mixing the active material with the ceramic itself, and so

03:07:28 21    it distributes that active material throughout the entire

03:07:31 22    body.  So not all of it comes in contact with gaseous vapor,

03:07:36 23    so it would be a waste of very good active material.

03:07:41 24            Two, when you have a lot of active material

03:07:44 25    through the bulk of the product, it can absorb material and

Abraham - Direct

03:07:48 1    later they can bleed off, making it harder for you to meet

03:07:52 2    these regulations, so as it gets warm, some of those -- some

03:07:55 3    of the stuff that's in the -- that's been caught deeper into

03:07:58 4    the matrix, it can come off.  So it was it was worse from a

03:08:04 5    performance perspective.  And also very importantly, it was

03:08:07 6    very costly to put an extruded line together.  It was very

03:08:12 7    expensive.  There was a lot of equipment required to extrude

03:08:15 8    those honeycombs.

03:08:16 9            I could buy something that was off the shelf,

03:08:20 10   buy a ceramic honeycomb that was already made, and I could

03:08:23 11   coat it with my technology and I could have better

03:08:25 12   performance at a lower cost.

03:08:27 13   Q.    Now, you mentioned buying parts off the shelf.  Can

03:08:30 14   you explain what you mean by that?

03:08:31 15   A.    Sure.  That means it's commercially available.  There

03:08:34 16   was nothing special about honeycomb or the ceramic substrate

03:08:39 17   that we bought.  They're already used in other applications,

03:08:42 18   sometimes for motorcycle catalysts or motorcycle tailpipe

03:08:48 19   emission control device.

03:08:50 20   Q.    Now, you chose to offer honeycombs in 29-, 35-, and

03:08:55 21   41-millimeter round -- diameter round sizes; is that right?

03:08:59 22   A.    Yes.

03:09:00 23   Q.    Okay.  The ceramic honeycombs that you coat with the

03:09:06 24   active ingredients, are those readily available in those

03:09:09 25   sizes?

Abraham - Direct

03:09:09  1    A.      Yeah.  They're commercially available in all those

03:09:12  2    sizes.  We did nothing custom to make those.

03:09:15  3    Q.      Okay.  How did you go about ordering those?

03:09:17  4    A.      Just placed a PO with a subsupplier or purchase

03:09:21  5    order.

03:09:21  6    Q.      Now, did your choice of going with a coated

03:09:27  7    ceramic-based product as opposed to an extruded product have

03:09:30  8    any effects on the strength on the resulting honeycomb or

03:09:34  9    durability?

03:09:34 10    A.      Yes.  It was more durable than the competitive

03:09:37 11    product because when you mix that active material, you,

03:09:39 12    essentially, are creating -- making that ceramic substrate a

03:09:42 13    little bit weaker.

03:09:47 14    Q.      Now, you are mentioned that you could make coated

03:09:53 15    honeycombs in any of these commercially available sizes.  Is

03:09:56 16    that an advantage for your product?

03:09:58 17    A.      Yeah.  Because --

03:09:59 18    Q.      Please explain.

03:10:00 19    A.      -- customers can request any size they wanted, and

03:10:03 20    for relatively low costs, we could change and buy a material

03:10:08 21    of their substrate size that they wanted for their specific

03:10:11 22    canister design.

03:10:13 23    Q.      Did some customers express a desire for different

03:10:16 24    sizes?

03:10:16 25    A.      Absolutely.

Abraham - Direct

Q.      Please explain.

A.      So some customers were looking at new platforms or new vehicles, and in those cases, they could make any size they wanted to shape to fit where that sat.  As you saw, if you recollect, in the vehicle, where it sits, there's sometime as constraints for space.  So sometimes customers would want something in the specific -- specific size to fit within that area, so that was an advantage.

Q.      In summary, what are the differences between the BASF XC product and the competing Ingevity honeycombs?

A.      Sure.  One, we have a coated product versus they have an extruded product.  And we had a much more active absorber that was higher performing for this application.

        Two, we had complete flexibility in creating different sizes and being able to meet customers' design requirements.

        And lastly, you know, we had a better product overall when we tested it in the actual application.

Q.      You mean it performed better?

A.      It performed better, yes.

Q.      Okay.  So let's go into performance.  Did BASF test the EvapTrap XC against the Ingevity honeycombs?

A.      Yes, it did.

Q.      What kind of tests were done?

A.      So we did a variety of tests.  Some of them were

03:11:48  1    testing them in a canister just to show that it met the

03:11:51  2    regulations.  Some of it showed kind of what that -- how big

03:11:55  3    the sponge was or how active its sponge was from the raw

03:12:00  4    material, and then a lot of durability tests which were very

03:12:04  5    important to customers because this had to be part of the

03:12:07  6    vehicle for the life of the vehicle, which is 15 years or

03:12:12  7    150,000 miles by the regulatory body.  And those durability

03:12:15  8    tests were temperature cycling, extreme agitation, et

03:12:24  9    cetera.

03:12:24 10    Q.    If the honeycomb failed in an automobile, would the

03:12:26 11    driver know about it?

03:12:27 12    A.    No, it would not.  They would not, sorry.

03:12:30 13    Q.    And what would happen after the failure?

03:12:32 14    A.    You could be potentially polluting more in the

03:12:35 15    vehicle.

03:12:36 16    Q.    Can you summarize the test of or the results of the

03:12:39 17    testing that BASF did.

03:12:41 18    A.    In all cases, we either met or beat the competitive

03:12:46 19    standard with respect to its performance in a canister as

03:12:51 20    well as its durability relative to the common.

03:12:56 21    Q.    Were Ingevity honeycombs used during the development

03:12:59 22    of the EvapTrap XC for any purpose other than this benchmark

03:13:04 23    testing?

03:13:04 24    A.    No.

03:13:06 25    Q.    How long did it take BASF to develop the EvapTrap XC?

Abraham - Direct

03:13:10 1    A.       It was roughly about 18 months.

03:13:16 2    Q.       Did using the P2 special carbon for the EvapTrap MX

03:13:22 3    help speed the development for the XC?

03:13:25 4    A.       Absolutely.  We had already done a large body of work

03:13:28 5    to support that this was a great absorber for these types of

03:13:31 6    applications.  It was just validating that this was the

03:13:33 7    right carbon for that material -- for that application.

03:13:36 8    Q.       Did BASF's special expertise in coating material such

03:13:40 9    as ceramics speed the development of the EvapTrap XC?

03:13:45 10   A.       Absolutely.  We had been coating ceramic substrates

03:13:50 11   like the one we're talking about for 50 years, so we have

03:13:55 12   very strong coating expertise and our existing equipment to

03:14:00 13   make those products.

03:14:02 14   Q.       Now, potential customers and potential end-users of

03:14:07 15   customers, such as the car manufacturers, is what I have in

03:14:10 16   mind, did testing of your EvapTrap XC; is that right?

03:14:13 17   A.       That's correct.

03:14:14 18   Q.       Which ones tested the XC?

03:14:16 19   A.       Sure.  End-manufacturer Ford tested the EvapTrap XC.

03:14:23 20   GM tested it as well as a number of what we would call

03:14:29 21   sub-suppliers or Tier 1, including Kayser, including Stant,

03:14:36 22   including among others.

03:14:41 23   Q.       Okay.  And generally, if you could describe, what

03:14:44 24   kind of tests were done by either car manufacturers or done

03:14:48 25   on their behalf?

Abraham - Direct

A.      Sure.  They would test it in what they called the bleed emission test that it per the regulatory body.   They would also do testing where they would put it through environmental conditioning and cycling and then test it in the bleed emission tests after.

Q.      Can you describe in more detail what a bleed emissions test is?

A.      Sure.  So if you remember back in the diagram, the vehicle with the fuel tank, so to certify a vehicle for sale, they do a bleed emissions tests where they certify that it can meet these new regulations.  So there's a very, like, defined test protocol that they use, and the canister that's being going to be used in the vehicle is hooked up to a gasoline tank and they measure the hydrocarbon emissions coming out of that canister during that cycling.  So it kind of emulates what it's like to have a parked car for 48 hours, and so it cannot get above 20 milligrams per day as a part of it.

Q.      In that testing, is your honeycomb included in a canister that's actually in a car?

A.      It's driven beforehand and then it's put with a fuel tank in a chamber to measure the fine hydrocarbon.

Q.      So I understand, so your product was actually placed in a car and -- for testing purposes and the car driven; right?

Abraham - Direct

03:16:17  1    A.       That's correct.

03:16:18  2    Q.       And you mentioned fleet.  Does that mean more than

03:16:20  3    one car was tested?

03:16:22  4    A.       So as far as --

03:16:25  5    Q.       Okay.  How many cars were tested, do you know?

03:16:28  6    A.       They were tested with the vehicles' gas tank on it.

03:16:32  7    Q.       Right.

03:16:32  8    A.       So multiple -- multiple different platforms or

03:16:35  9    vehicles.

03:16:36 10    Q.       So many cars were tested?

03:16:37 11    A.       Yes, multiple platforms were tested.

03:16:40 12    Q.       And many of those cars and multiple platforms had

03:16:45 13    your product in them; right?

03:16:46 14    A.       That's correct.

03:16:47 15    Q.       Okay.  Now, you mentioned other testing.  Is SHED

03:16:53 16    testing included in the testing that was done of your

03:16:56 17    product?

03:16:56 18    A.       Yes.  This is a SHED test that we're referring to.

03:17:00 19    Q.       What is SHED testing?

03:17:02 20    A.       It's -- it's same thing that we're talking about in

03:17:04 21    this instance.

03:17:05 22    Q.       So set the table for us here.

03:17:07 23    A.       Sure.  Sure.

03:17:08 24    Q.       So there would be a car?

03:17:09 25    A.       So for a SHED test, you take a gas tank and you

Abraham - Direct

03:17:15  1    attach an evaporative emissions canister to it, as I

03:17:19  2    previously discussed.  And you place it into a very

03:17:22  3    sensitive box that measures hydrocarbons coming off of it,

03:17:26  4    and temperature of the chamber then cycles to, essentially,

03:17:33  5    mimic what it's like going from daytime to nighttime.

03:17:36  6               So in daytime, it's going to be -- hot gaseous

03:17:39  7    vapors are going to come out and it's going to flow through

03:17:43  8    the canister, and the SHED would measure the emissions from

03:17:46  9    the vehicle.

03:17:47 10               During nighttime, it's getting cool.  There's a

03:17:51 11    contraption and you have some flow back as a result of that,

03:17:54 12    and they measure the hydrocarbons over that period.

03:17:56 13    Q.    Was there any testing done to measure compliance with

03:18:00 14    LEV III?

03:18:00 15    A.    Yes.

03:18:00 16    Q.    Please describe that.

03:18:01 17    A.    And those are the tests that we would do.  So we did

03:18:05 18    that for -- we did that multiple times, both at third-party

03:18:10 19    labs that were independent as well as key customers such as

03:18:14 20    Ford who did testing on their own.

03:18:15 21    Q.    Tell us how one of those tests would be done.  Well,

03:18:22 22    is there an automobile?

03:18:24 23    A.    It would be -- it would be for that, the vehicles,

03:18:30 24    that platform, the gasoline, the fuel tank that's used on

03:18:34 25    that platform.

Abraham - Direct

03:18:35  1    Q.      Okay.  I got it.  Thank you.  Yes.

03:18:37  2            So, again, what were the results of all this

03:18:38  3    testing?

03:18:39  4    A.      In all cases, we either were consistent with or

03:18:43  5    better than the competitive standard.

03:18:45  6    Q.      Now, you -- you tested the XC you mentioned for

03:18:49  7    durability?

03:18:51  8    A.      Yes.

03:18:52  9    Q.      Did customers also test for durability?

03:18:55 10    A.      They did test vibrational testing in a canister.

03:19:00 11    Q.      And what were the results of that testing?

03:19:02 12    A.      Those tests came back positive.  They passed all of

03:19:05 13    them.

03:19:06 14    Q.      Now, once the test results were back and the

03:19:09 15    customers had them, did you get reactions from them about

03:19:13 16    your product?

03:19:13 17    A.      Everyone was excited about the product.  From a

03:19:16 18    technical perspective, it performed better than the current

03:19:19 19    standard.  We were -- we were -- competitive product

03:19:24 20    offering that offered value relative to the others.

03:19:26 21    Q.      Okay.  So did Ford test the EvapTrap XC on the F-150

03:19:32 22    truck?

03:19:32 23    A.      Yes.  They did.

03:19:33 24    Q.      So I'd like you to turn to PX-55.

03:19:45 25    A.      Yeah.

Abraham - Direct

03:19:45  1    Q.      Is this an email thread between you and other BASF

03:19:50  2    employees reporting about the Ford F-150 testing?

03:19:53  3    A.      That's correct.

03:19:54  4    Q.      Okay.  I'd like to move this into evidence, Your

03:19:57  5    Honor?

03:19:57  6                    MR. BUROKER:  No objection.

03:19:57  7                    THE COURT:  Admitted without objection.

03:19:59  8                    (PX Exhibit No. 55 was admitted into evidence.)

03:20:00  9                    MR. FRIEL:  Thank you.

03:20:00 10    BY MR. FRIEL:

03:20:04 11    Q.      So if you turn to the first email on this thread,

03:20:09 12    which is on the bottom of the first page, PX 55.001, this is

03:20:15 13    a September 15th, 2017 email from Dawn Woodring at Ford; is

03:20:21 14    that correct?

03:20:21 15    A.      That is correct.

03:20:22 16    Q.      And it's the same Miss Woodring you testified about

03:20:25 17    earlier; right?

03:20:26 18    A.      That's correct.

03:20:27 19    Q.      And she writes to you and others; right?

03:20:31 20    A.      That's correct.  Yes.  There's members from both my

03:20:34 21    team and also Ford colleagues that are on the evaporative

03:20:39 22    emission team.

03:20:40 23    Q.      All right.  And then if we turn to the second page of

03:20:42 24    that document, it says Subject:  Bleed Emissions Test

03:20:45 25    Results - BASF Hydrocarbon Scrubber; right?

Abraham - Direct

03:20:49 1    A.      That's correct.

03:20:50 2    Q.      That's a reference to the EvapTrap XC; correct?

03:20:54 3    A.      That's correct.

03:20:55 4    Q.      And this is reporting on Ford's test results of your

03:21:00 5    product; is that right?

03:21:01 6    A.      Yes.

03:21:02 7    Q.      Can you read the -- there's a -- she writes All, and

03:21:06 8    then there's a first paragraph that says, "We segregated."

03:21:09 9    But the next paragraph says, "First test is complete."

03:21:11 10             Can you read that?

03:21:12 11   A.      Sure.   "First test is complete.   Bleed emissions

03:21:16 12   testing will continue at lower purge levels.   We expected

03:21:19 13   this level purge to perform well and it did.   Bleed

03:21:23 14   emissions on these canisters were lower than bleed emissions

03:21:26 15   using Ingevity scrubbers in the same quantity and

03:21:29 16   configuration."

03:21:30 17   Q.      Thank you.

03:21:31 18             And then if we could go back to the first page

03:21:34 19   of that, in the middle, there's an email from you dated

03:21:40 20   September 15th, 2017; is that correct?

03:21:42 21   A.      That's correct.

03:21:43 22   Q.      And that's to James Peterson and Joel Johnson; is

03:21:48 23   that correct?

03:21:49 24   A.      That's correct.

03:21:49 25   Q.      And who was James Peterson?

Abraham - Direct

03:21:52  1   A.      Sure.  James Peterson was my direct manager.

03:21:56  2   Q.      All right.  And Joel Johnson, who was he?

03:21:58  3   A.      Joel Johnson was my second level boss.  He was James

03:22:02  4   Peterson's manager and vice president of our North American

03:22:06  5   operations.

03:22:06  6   Q.      So you were passing on the Ford results to your

03:22:09  7   immediate superiors; right?

03:22:11  8   A.      Absolutely.

03:22:12  9   Q.      All right.  And could you read what you wrote to

03:22:14 10   them?

03:22:14 11   A.      Sure.  "Dear Joel and Jim, I do not want to raise the

03:22:19 12   victory flag as of yet, but I do want to celebrate this

03:22:22 13   milestone.  The Ford team gave their first set of test

03:22:25 14   results on the F-150 using our EvapTrap XC.  EvapTrap XC

03:22:30 15   passed at three different loading levels.  We beat the

03:22:34 16   competitive standard on their most challenging application.

03:22:37 17   I am very happy with this initial result and wanted to share

03:22:41 18   this.  I will meet with the Ford team next week to determine

03:22:45 19   next steps and receive feedback on our engineering

03:22:49 20   estimate."

03:22:51 21   Q.      Did you meet with the Ford team after that?

03:22:52 22   A.      Yes, I did.

03:22:54 23   Q.      What happened?

03:22:54 24   A.      They were very happy with the results.  They wanted

03:22:57 25   to proceed with the next step in trying to commercialize the

Abraham - Direct

03:23:01  1    product, which is a process that we go through when we

03:23:04  2    launch a product with a customer.

03:23:06  3    Q.      Did you discuss pricing with Ford?

03:23:08  4    A.      Yes.  We did.

03:23:09  5    Q.      Did you reach an agreement as to price?

03:23:11  6    A.      Yes, we had a verbal agreement on price.

03:23:13  7    Q.      Okay.  We can take that one down.  Thank you?

03:23:16  8            THE COURT:  So let's take the afternoon break,

03:23:20  9    15 minutes here.  So if we can take the jury out and we'll

03:23:23 10    resume again in about 20 minutes of 4:00.

03:23:27 11            (Jury leaving the courtroom.)

03:24:03 12            THE COURT:  All right.  We'll take a 15-minute

03:24:05 13    break.

03:24:05 14            DEPUTY CLERK:  All rise.

03:24:07 15            (Recess was taken.)

03:40:04 16            DEPUTY CLERK:  All rise.

03:40:10 17            THE COURT:  All right.  We're ready to continue?

03:40:14 18            Mr. Abraham, come on back and sit down.

03:40:17 19            Let's get the jury.  Everyone else can be

03:40:19 20    seated.

03:40:44 21            (Jury entering the courtroom.)

03:41:28 22            THE COURT:  All right.  Members of the jury,

03:41:29 23    welcome back.

03:41:30 24            Everyone, you may be seated.

03:41:32 25            Mr. Friel, you may continue.

Abraham - Direct

MR. FRIEL:  Thank you, Your Honor.

BY MR. FRIEL:

Q.      What was BASF's strategy for selling the EvapTrap XC,
if you can summarize it?

A.      Sure.  Our general commercial strategy was, one, to
price its value relative to our performance in the canister
application, and, two, to drive that with a technical
qualification as an OEM and sell it directly to Tier 1
manufacturers.

Q.      Who were other -- so you mentioned efforts at Ford;
correct?

A.      Yeah.

Q.      Who were the other potential customers you planned to
sell the XC to?

A.      We were excited to sell them to multiple different
customers, Ford, GM, Chrysler, as well as the
corresponding -- and the corresponding tiers that support
that.

Q.      Did you expect to sign contracts with any OEMs other
than Ford?

A.      We did not expect to sign direct contracts with any
OEMs other than Ford, and that's because Ford makes some of
its own canisters, and we knew it would be selling them
directly.  And maybe just as a point of order, when I say we
tried to technically qualify the OEM, that means we'd work

Abraham - Direct

03:42:51 1   with the OEM or Ford, GMs, of the world to make sure that

03:42:56 2   they approved the technology and felt it was fit for the

03:42:59 3   application, and then we would sell directly to Delphi,

03:43:04 4   Kayser, or Stant, who provides those full canisters.

03:43:09 5   Q.      What were the suppliers that you met with, like

03:43:13 6   Delphi, Kayser and Stant, what were their reactions to the

03:43:17 7   XC product?

03:43:18 8   A.      In all cases, they were very excited about the

03:43:21 9   technology and the opportunity to have an alternative

03:43:26 10  source.  And they had some -- you know, certain points had

03:43:31 11  some reservations with respect to competitive IP.

03:43:36 12  Q.      All right.  So what were their concerns about

03:43:40 13  competitive IP?

03:43:41 14  A.      Sure.  There was an existing patent in the -- that

03:43:48 15  Ingevity had.  BASF had done a prior art study and had --

03:43:54 16           MR. BUROKER:  Objection, Your Honor.

03:43:56 17           THE COURT:  Yeah, so what -- so I'm going to

03:44:05 18  sustain the objection.  What BASF did doesn't really matter.

03:44:11 19  What you told other people might be important.

03:44:15 20           MR. FRIEL:  Thank you.

03:44:16 21  BY MR. FRIEL:

03:44:17 22  Q.      What did you tell the customers about your position

03:44:20 23  with respect to IP?

03:44:23 24  A.      Sure.

03:44:23 25  Q.      Or the EvapTrap XC?

Abraham - Direct

03:44:25  1   A.      Sure.  Sure.  We made an offer of indemnification

03:44:28  2   against any litigation or any lawsuit that Ingevity might

03:44:31  3   leverage against them.

03:44:32  4   Q.      Did you tell customers that you felt you had freedom

03:44:34  5   to operate?

03:44:35  6   A.      Yes.

03:44:36  7   Q.      Is that abbreviated sometimes?

03:44:38  8   A.      Yes, as FTO.

03:44:41  9   Q.      Okay.  Did -- were customers satisfied with your

03:44:44 10   telling them that you had FTO, freedom to operate?

03:44:47 11   A.      Customers took that and continued to test.  They took

03:44:51 12   that -- that guidance and they continued to test and

03:44:53 13   evaluate our products and tried to look at places to

03:44:56 14   commercialize it.

03:44:58 15   Q.      Now, did you offer indemnity from any suit that

03:45:03 16   Ingevity might bring to customers?

03:45:05 17   A.      Yes.

03:45:05 18   Q.      Why did you do that?

03:45:06 19   A.      We wanted to commercially sell the product, and we

03:45:10 20   were comfortable that we had the right to sell that product

03:45:12 21   in the marketplace.

03:45:14 22   Q.      What's indemnity?  What does that mean?

03:45:16 23   A.      It means that we would say we'd hold them harmless.

03:45:19 24   It's kind of like insurance.  We said, hey, if someone comes

03:45:22 25   after you, we'll take care of it.

Abraham - Direct

03:45:24  1    Q.      Okay.  And what was customer -- how many customers

03:45:27  2    did you -- or potential customers did you offer that to?

03:45:30  3    A.      We offered that to --

03:45:36  4    Q.      Well, let me ask --

03:45:37  5    A.      -- a select number, a handful.

03:45:39  6    Q.      Did you offer it to everyone who asked?

03:45:41  7    A.      No, we did not.

03:45:42  8    Q.      Okay.  What was the customer reaction that you

03:45:48  9    offered indemnity to?

03:45:50 10    A.      They were generally pleased and in many cases

03:45:53 11    continued testing, evaluating the product, and looking at

03:45:56 12    applications where they could commercialize it.

03:45:59 13    Q.      Now, Kayser was interested in the EvapTrap XC; is

03:46:02 14    that correct?

03:46:02 15    A.      That is correct.

03:46:03 16    Q.      Did Kayser share any concerns with you about the

03:46:05 17    product?

03:46:05 18    A.      They had similar concerns about the threat of the

03:46:10 19    litigation.

03:46:12 20    Q.      All right.  I'd like you to turn to exhibit DX-87.

03:46:21 21            Is this two emails that you sent to Mr. Fabian

03:46:29 22    Glasing who's with Kayser?

03:46:30 23    A.      That is correct.

03:46:32 24            MR. FRIEL:  We'd like to offer this into

03:46:34 25    evidence, Your Honor, DX-87.

Abraham - Direct

03:46:37  1          MR. BUROKER:  No objection.

03:46:37  2          THE COURT:  All right.  DX-87 is admitted

03:46:40  3  without objection.

03:46:41  4          (DX Exhibit No. 87 was admitted into evidence.

03:46:42  5  BY MR. FRIEL:

03:46:42  6  Q.      Please, thank you.

03:46:43  7          I want to -- this is two emails; right?  Both

03:46:48  8  from you?

03:46:48  9  A.      That's correct.

03:46:49 10  Q.      All right.  So let's focus on the lower one first.

03:46:52 11  This is an October 16, 2017, email from you to Mr. Glasing;

03:46:59 12  correct?

03:46:59 13  A.      That's correct.

03:47:00 14  Q.      Who's Mr. Glasing ahead?

03:47:00 15  A.      Mr. Glasing is one of the purchasing agents at

03:47:04 16  Kayser.

03:47:04 17  Q.      What's a purchasing agent?

03:47:06 18  A.      He's responsible for working with their suppliers and

03:47:11 19  issuing purchase orders and making selections about the

03:47:15 20  suppliers.

03:47:17 21  Q.      Now, what's the purpose of this second email in

03:47:21 22  Exhibit 87, DX-87?

03:47:23 23  A.      This is to address specific concerns on intellectual

03:47:27 24  property.

03:47:31 25  Q.      Can you read what you wrote to Mr. Glasing in the

Abraham - Direct

03:47:34 1    first paragraph?

03:47:36 2    A.    Sure.  "Dear Mr. Glasing, A search and analysis was

03:47:39 3    conducted of the active and pending patents relating to the

03:47:42 4    use of the EvapTrap XC product in fuel canister systems

03:47:46 5    designed for evaporative emissions control.  BASF is not

03:47:51 6    aware of any valid, active, or pending patent claims that

03:47:54 7    would be infringed using the EvapTrap XC product in a fuel

03:47:59 8    canister system designed for evaporative emission control.

03:48:03 9    Specifically, you inquired about our legal opinion regarding

03:48:06 10   U.S. Patent Number RE38,844.  Due to attorney-client

03:48:12 11   privilege concerns, we cannot share our legal opinion

03:48:15 12   related to this patent.  We can direct you to publicly

03:48:18 13   available information that will help you in your analysis of

03:48:20 14   the patent.

03:48:22 15           "Your legal counsel" -- and there's a part

03:48:24 16   that's blacked out, obviously.  "Your legal counsel may find

03:48:30 17   these arguments helpful in their analysis of the U.S.

03:48:35 18   RE38,844 patent.

03:48:36 19   Q.    So you send this email on October 16th, 2017, and

03:48:39 20   what did Kayser do after that?

03:48:41 21   A.    After the 2017 email, they continued to test and

03:48:45 22   evaluate our product and continued down their pathway of

03:48:48 23   evaluation.

03:48:49 24   Q.    I'd like to you turn to PX-77.

03:48:59 25   A.    Yeah.

Abraham - Direct

| | | |
|---|---|---|
| 03:49:00 | 1 | Q.      Can you tell us what this document is, just |
| 03:49:02 | 2 | generally? |
| 03:49:02 | 3 | A.      Sure.  This is a contract that was signed between |
| 03:49:04 | 4 | Kayser and BASF for the EvapTrap XC product. |
| 03:49:07 | 5 | MR. FRIEL:  Your Honor, I'd offer PX-77 into |
| 03:49:10 | 6 | evidence at this time. |
| 03:49:10 | 7 | MR. BUROKER:  No objection. |
| 03:49:11 | 8 | THE COURT:  Admitted without objection. |
| 03:49:13 | 9 | (PX Exhibit No. 77 was admitted into evidence.) |
| 03:49:15 | 10 | MR. BUROKER:  Did you say PX or DX? |
| 03:49:17 | 11 | MR. FRIEL:  Sorry, it's confusing.  PX.  P as in |
| 03:49:20 | 12 | Paul. |
| 03:49:22 | 13 | BY MR. FRIEL: |
| 03:49:28 | 14 | Q.      So this contract was signed on or is dated -- I'm |
| 03:49:31 | 15 | sorry -- February 26th, 2018; is that correct? |
| 03:49:35 | 16 | A.      That's correct. |
| 03:49:35 | 17 | Q.      That's using a European dating system? |
| 03:49:39 | 18 | A.      That is correct. |
| 03:49:40 | 19 | Q.      Where they put the month second? |
| 03:49:41 | 20 | A.      Yes.  Day, month, year. |
| 03:49:43 | 21 | Q.      All right.  Thank you.  And this was how long after |
| 03:49:49 | 22 | you had sent Mr. Glasing -- strike that.  Rhetorical |
| 03:49:49 | 23 | question. |
| 03:49:55 | 24 | This was after your October 2017 email to |
| 03:49:59 | 25 | Mr. Glasing telling him about your views on the patent; is |

Abraham - Direct

03:50:04  1    that right?

03:50:04  2    A.        That is correct.

03:50:07  3    Q.        And can you turn to the second page?  Actually, I'd

03:50:16  4    like to go to Page 4, PX-77.004.  And does this have the

03:50:23  5    signatures of Kayser and BASF -- BASF representatives?

03:50:29  6    A.        It does.

03:50:29  7    Q.        One name is Bunzendahl; is that right.

03:50:33  8    A.        That's Sebastian Bunzendahl, director of purchasing

03:50:37  9    at Kayser.

03:50:38 10    Q.        And from BASF, Joel Johnson signed?

03:50:40 11    A.        That is correct.

03:50:41 12    Q.        That's your boss's boss?

03:50:42 13    A.        That is correct.

03:50:43 14    Q.        All right.  This was your first EvapTrap XC sales

03:50:48 15    contract; is that right?

03:50:49 16    A.        Yes, it was.

03:50:50 17    Q.        And you understood that BASF agreed to supply

03:50:53 18    honeycombs that Kayser ordered; right?

03:50:55 19    A.        That is correct.

03:50:55 20    Q.        Was this an exclusive supply contract?

03:50:58 21    A.        No, it was not exclusive.

03:51:00 22    Q.        Are long-term exclusive supply contracts common in

03:51:03 23    the automotive industry?

03:51:05 24               MR. BUROKER:  Objection.

03:51:05 25               THE COURT:  I'm going to sustain the objection.

Abraham - Direct

BY MR. FRIEL:

Q.    Do you have experience with supply contracts in the automotive industry?

A.    Yes.

Q.    Please explain.

A.    I've been in the automotive industry for over 15 years, and I would say that, typically, we would not see an exclusive supply agreement.  Customers always want a second source option.  One, to have competitive pricing, and, two, to ensure that if there is an issue with the initial supplier, for, you know, continuity reasons, they have another option so that they can continue to produce automobiles.  In automotive, it's very important that you're always keeping the manufacturing line running, and they will not stop the line for lack of supply for any reason.

Q.    So after the agreement with Kayser was signed in February 2018, did Kayser contact you with more concerns or concerns about the contract?

A.    Yes.

Q.    What happened?

A.    Two weeks after we had signed the contract, I received a call from Sebastian, and he said that there was a problem and that the CEO of Ingevity had visited him and threatened legal action if they executed the contract.

Q.    So let's go back to Exhibit DX-87 and to the first

03:52:37 1   page.   This has been admitted.

03:52:40 2            At the top, there's an email from you to, again,

03:52:45 3   Fabian Glasing.   This one is dated March 8th, 2018.

03:52:50 4            Do you see that?

03:52:51 5   A.      Yes, I do.

03:52:52 6   Q.      Okay.   So that's how many days after the contract?

03:52:54 7   A.      That is just a couple weeks.

03:52:59 8   Q.      How about a couple weeks?   Yeah.   Thank you.

03:53:02 9            And how long after your call with Mr. Glasing

03:53:07 10  was this?

03:53:08 11  A.      I would say this couldn't have been more than a day

03:53:11 12  or so.

03:53:12 13  Q.      Thank you.

03:53:12 14           And can you summarize what you were doing in

03:53:18 15  this email?

03:53:19 16  A.      This was legal verbiage that was given to me by our

03:53:25 17  attorneys to -- for our indemnification letters, and I was

03:53:29 18  making the offer of indemnification to help ease their

03:53:33 19  concerns around the intellectual property.

03:53:35 20  Q.      In the subject, it says forward discussion on IP

03:53:38 21  Kayser; right?

03:53:39 22  A.      Correct.

03:53:39 23  Q.      And that's referring to Ingevity IP; is that correct?

03:53:42 24  A.      That is correct.

03:53:43 25  Q.      And you write, "Dear Kayser Team."   That's all the

Abraham - Direct

03:53:47 1  people that you've copied.  Is that who you're referring to?

03:53:49 2  A.      That is correct.  That includes the CEO, the director

03:53:52 3  of purchasing, as well as a number of other people of the

03:53:57 4  Kayser team.

03:53:57 5  Q.      Can you read the first paragraph, please.

03:53:59 6  A.      Sure.  "In response to today's inquiry on RE38,844,

03:54:05 7  our legal department prepared the following response as

03:54:07 8  attached and was sent to Kayser.  BASF" --

03:54:11 9  Q.      Stop there, please.  So RE38,844, that's a reference

03:54:15 10 to the Ingevity patent; right?

03:54:17 11 A.      Yes.

03:54:18 12 Q.      Does this refresh your recollection when you talked

03:54:20 13 to Mr. Glasing?

03:54:21 14 A.      With Mr. Bunzendahl, yes.

03:54:24 15 Q.      I'm sorry.  Mr. Bunzendahl.

03:54:26 16 A.      Yes, very close to that date.

03:54:28 17 Q.      And the second paragraph, can you read that, please.

03:54:30 18 A.      "BASF can offer indemnification to Kayser to solve

03:54:34 19 this issue.  The following language is approved by our legal

03:54:37 20 and executive team."

03:54:39 21 Q.      Thank you.

03:54:39 22         What was Kayser's reaction to this email

03:54:42 23 offering indemnity to Kayser?

03:54:44 24 A.      They thought this was positive and continued with the

03:54:48 25 program.

Abraham - Direct

03:54:49  1   Q.      How did they continue with the program?

03:54:51  2   A.      I visited them.  They were continuing to test the

03:54:54  3   product and look at platforms for them to commercialize the

03:54:58  4   technology.

03:54:59  5   Q.      Did Kayser ever bring up indemnity to you again?

03:55:02  6   A.      Not to my knowledge.

03:55:04  7   Q.      Did they bring up the IP situation again?

03:55:07  8   A.      Not to my knowledge.

03:55:10  9   Q.      So in your view, how were things left with Kayser?

03:55:14 10   A.      We solved the problem, and we were moving forward to

03:55:18 11   commercialization in line with our contract.

03:55:19 12   Q.      Thank you.

03:55:20 13           I want to change topics.  Are you familiar with

03:55:23 14   a company called Toledo Molding and Die?

03:55:27 15   A.      Yes, they had reached out to me at one point during

03:55:30 16   my tenure there.

03:55:31 17   Q.      So they reached out to you.  What do you mean by

03:55:34 18   that?

03:55:34 19   A.      They -- we had talked directly to one of the OEMs, I

03:55:38 20   believe it was General Motors, and given that -- their

03:55:40 21   appreciation of the technology, they had suggested Toledo

03:55:45 22   Molding and Die reach out to us to talk to us about some of

03:55:48 23   theirs as well.

03:55:50 24   Q.      Do you recall approximately when this call occurred

03:55:52 25   approximately?

Abraham - Direct

03:55:52  1   A.      I would have to say -- my memory is a little -- a

03:55:57  2   little light on that.  It might have been sometime in 2016.

03:55:59  3   Q.      Thank you.

03:56:00  4          What did you learn about Toledo Molding and Die

03:56:04  5   during the call?

03:56:04  6   A.      They were a manufacturer of air intake systems and

03:56:07  7   they were looking for hydrocarbon trapping technology for

03:56:10  8   the air intake.

03:56:11  9   Q.      What product -- well, let me ask.  Was Toledo Molding

03:56:15 10   and Die interested in your EvapTrap XC for its air intake

03:56:19 11   systems?

03:56:19 12   A.      They were open to both the MX technology that we had

03:56:23 13   developed as well as the XC.

03:56:25 14   Q.      And what application was Toledo Molding and Die

03:56:29 15   considering for the EvapTrap XC?

03:56:31 16   A.      They were only looking at the air intake system.

03:56:35 17   Q.      Did Toledo Molding and Die ask if any modifications

03:56:38 18   needed to be made to the XC for use in their air induction

03:56:42 19   or AIS systems?

03:56:43 20   A.      We didn't discuss any modifications of the product.

03:56:46 21   Q.      Did they bring up anything about the cells per square

03:56:49 22   inch?

03:56:49 23   A.      They did not bring anything up on it, no.

03:56:52 24   Q.      So after the call, what did you do to follow up on

03:56:55 25   the Toledo Molding and Die sales lead?

Abraham - Direct

| | | |
|---|---|---|
| 03:56:58 | 1 | A.      To be honest, it was a smaller opportunity, so we |
| 03:57:02 | 2 | weren't super focused on that one, so it did not progress |
| 03:57:06 | 3 | commercially. |
| 03:57:06 | 4 | Q.      Okay.  Did you do any research to determine that? |
| 03:57:08 | 5 | A.      We did look at the website.  It was -- we looked and |
| 03:57:14 | 6 | reviewed to see what type of products they were selling. |
| 03:57:16 | 7 | They sold air intakes.  We were not hyper focused on air |
| 03:57:20 | 8 | intakes at that moment. |
| 03:57:21 | 9 | Q.      Did you learn Toledo Molding and Die makes fuel vapor |
| 03:57:25 | 10 | canisters? |
| 03:57:25 | 11 | A.      They did not market fuel canisters on their website. |
| 03:57:31 | 12 | Q.      Thank you.  Just a few final questions.  Now, you're |
| 03:57:33 | 13 | no longer employed by BASF; is that correct? |
| 03:57:36 | 14 | A.      That's correct. |
| 03:57:36 | 15 | Q.      When did you leave? |
| 03:57:37 | 16 | A.      Right around April of 2018. |
| 03:57:41 | 17 | Q.      Do you own any BASF stock? |
| 03:57:43 | 18 | A.      No. |
| 03:57:44 | 19 | Q.      Do you have any financial interest in BASF? |
| 03:57:46 | 20 | A.      No, I don't. |
| 03:57:48 | 21 | Q.      Do you have any financial interest in the outcome of |
| 03:57:51 | 22 | this lawsuit? |
| 03:57:51 | 23 | A.      No. |
| 03:57:52 | 24 | Q.      Are you appearing tearily? |
| 03:57:54 | 25 | A.      Yeah, I'm taking vacation from my day job to come and |

Abraham - Cross

03:57:57 1   see you and sit here.

03:57:59 2   Q.     We thank you for that.  Why are you taking vacation

03:58:02 3   from your day job to come down and testify voluntarily?

03:58:04 4   A.     Sure.  It's a great product, and I think it has a

03:58:08 5   fair place in the market, and I appreciate clean air.  I

03:58:12 6   hope we can have more clean air.

03:58:14 7              MR. FRIEL:  Thank you.

03:58:14 8              I pass the witness, Your Honor.

03:58:16 9              THE COURT:  All right.  Cross-examination,

03:58:18 10  Mr. Buroker.

03:58:20 11             MR. BUROKER:  Your Honor, I do have some binders

03:58:23 12  for the witness.  May we approach?

03:58:24 13             THE COURT:  Sure.

03:58:52 14                    CROSS-EXAMINATION

03:58:52 15             THE WITNESS:  Thank you.

03:58:54 16  BY MR. BUROKER:

03:58:54 17  Q.     Good afternoon, Mr. Abraham.  How are you?  My name

03:58:57 18  is Brian Buroker, and I have some questions to ask you to

03:59:00 19  follow up on the questions from Mr. Friel.

03:59:01 20  A.     Sure.

03:59:03 21  Q.     I want to clarify the timeline because I'm not sure I

03:59:06 22  am clear on it.  When you first started developing EvapTrap

03:59:09 23  XC, that was not a honeycomb, was it?

03:59:11 24  A.     No, it was not.

03:59:13 25  Q.     In fact, it was a foam product; is that correct?

Abraham - Cross

A.      That's correct -- was the first.

Q.      And that was the approach that you took for several

years; isn't that correct?

A.      No, we took that for the initial period, got some

test results that said we might need to think of a different

offering.

Q.      Because it failed; correct?

A.      It failed certain tests, correct.

Q.      So the first attempt using the EvapTrap technology

was not a success; correct?

A.      Well, that's very usual when you're developing a

product and you're first learning about what the application

is, that you may try some things that work and don't work

and you learn to optimize.

Q.      And you were using that technology up through about

2017; correct?

A.      No, that's not correct.

Q.      So you weren't trying to test the efficacy of a foam

product in September of 2017 with Delphi?

A.      We continued to use the foam as part of our portfolio

of products because we knew there was multiple different

options that customers may require.  In some cases, we

looked at a ceramic honeycomb in conjunction with a foam to

help meet the regulations.  And funnily, though, we still

considered that an active product through a large part of

Abraham - Cross

04:00:27 1    our development with the technology.

04:00:28 2    Q.      Well, even in early 2017, you had sent foam product

04:00:33 3    to one of the canister makers known as Leehan; correct?

04:00:36 4    A.      Correct.

04:00:37 5    Q.      And that failed?

04:00:38 6    A.      Correct.

04:00:39 7    Q.      And in September of 2017, you sent both foam and

04:00:43 8    ceramic examples to Delphi to test.  Do you recall that?

04:00:47 9    A.      Yes, I did.

04:00:48 10   Q.      And so up through September of 2017, just six months

04:00:55 11   before you left the company, you were still trying to test

04:00:58 12   both the foam and the honeycomb version; correct?

04:01:00 13   A.      As I mentioned, it was part of a portfolio of

04:01:04 14   products that could be used in conjunction with each other.

04:01:07 15   Q.      And you had a number of fits and starts with Leehan;

04:01:09 16   is that fair?

04:01:10 17   A.      We had tried some things with Leehan, sure.

04:01:14 18   Q.      You sent them the wrong samples?

04:01:16 19   A.      There was an issue with one of the samples that came

04:01:19 20   out of our lab.

04:01:20 21   Q.      And you sent them some samples that -- where the

04:01:23 22   coating wasn't even applied correctly?

04:01:25 23   A.      Mm-hmm.

04:01:26 24   Q.      And you had some other issues with Leehan along the

04:01:29 25   way; correct?

Abraham - Cross

04:01:30  1    A.      I'm not sure what you're referring to.

04:01:32  2    Q.      Other than the coating, there were no other issues

04:01:35  3    that you recall having issues with Leehan?

04:01:37  4    A.      It's been three years.   I can't verbatim recall every

04:01:41  5    issue we had.

04:01:42  6    Q.      If you can look in your binder, I think there's a

04:01:45  7    document.   This is marked as DX-444.   They should be in

04:01:52  8    order from DX, JX, and PX to help you organize it.

04:01:57  9    A.      This one is 148.   Okay.   444.

04:02:05 10    Q.      And do you recognize this document?   This is a Delphi

04:02:11 11    document?

04:02:22 12    A.      Correct, this is a Delphi document.

04:02:24 13    Q.      Do you recall receiving this when you worked at BASF

04:02:27 14    back in 2017?

04:02:28 15    A.      Correct.

04:02:30 16    Q.      And, Your Honor, I'd like to move this document into

04:02:32 17    evidence, please.

04:02:35 18            MR. FRIEL:   No objection.

04:02:36 19            THE COURT:   All right.   It's admitted without

04:02:38 20    objection.

04:02:38 21            (DX Exhibit No. 444 was admitted into evidence.)

04:02:40 22    BY MR. BUROKER:

04:02:40 23    Q.      Okay.   If you could go to the pages at the bottom

04:02:46 24    line, the third page, which is .003.   So this table

04:02:55 25    identifies the samples that were sent off to Delphi for

Abraham - Cross

04:02:58  1    testing; is that correct?

04:02:59  2    A.     I'm sorry.  I'm just trying to get the page.  You

04:03:03  3    said .003?

04:03:04  4    Q.     Yes, sir.

04:03:05  5    A.     Okay.  Sure.

04:03:06  6    Q.     And you see the table.  It's also on your screen,

04:03:08  7    whatever is easiest, but, certainly, you can look at the

04:03:11  8    document.

04:03:11  9    A.     Sure.  Perfect.

04:03:12 10    Q.     These are the samples that were sent off to Delphi

04:03:16 11    for testing?

04:03:16 12    A.     That is -- that's correct.

04:03:17 13    Q.     So the first sample was foam?

04:03:19 14    A.     Yeah.

04:03:19 15    Q.     So you were still testing the foam in 2017.  If you

04:03:22 16    could go to the last page of the document, and this is in

04:03:34 17    Section 4.3.4.  It's the discussion.  This is their synopsis

04:03:40 18    of the report.

04:03:41 19    A.     Mm-hmm.

04:03:42 20    Q.     There's a highlighted section there.  I didn't

04:03:44 21    highlight it.  That's the way it was provided to us.

04:03:46 22           Do you recall receiving this report from Delphi?

04:03:52 23    A.     Yeah, that's correct.

04:03:55 24    Q.     And it says -- the second highlighted sentence says

04:03:58 25    Delphi -- well, Delphi says it is not sure if monolith with

Abraham - Cross

04:04:03  1    such low BWC can be effective in a canister application.

04:04:08  2         Do you see that?

04:04:09  3    A.    Mm-hmm.

04:04:10  4    Q.    So this is Delphi telling you and your company that

04:04:13  5    they are not sure that the honeycomb or monolith is going to

04:04:18  6    work in a canister; correct?

04:04:19  7    A.    Well, this is specific test result where you take --

04:04:23  8    where you tested the butane working capacity of multiple

04:04:27  9    different variants of the EvapTrap XC product.  This was --

04:04:32 10    Q.    Right.

04:04:33 11    A.    -- at their request so that they could look at and

04:04:35 12    understand how to potentially use the product in the

04:04:37 13    canister.  Delphi was probably our least commercially

04:04:41 14    developed trading partner during this time, and we had

04:04:45 15    canister tests that predate this --

04:04:47 16    Q.    But as --

04:04:48 17    A.    -- that passed the regulations.

04:04:50 18    Q.    Well, but as of late 2017, somebody at Delphi's

04:04:54 19    reported to you that they do not believe that a monolith of

04:04:58 20    that BWC can be effective in canister application; correct?

04:05:04 21    A.    That is their commentary, but we, obviously, have

04:05:07 22    technical results that differ.

04:05:08 23    Q.    So you didn't believe them?

04:05:09 24    A.    I didn't -- I would say that they -- I agree with

04:05:13 25    them that our BWC is lower and that's by design so that we

Abraham - Cross

04:05:18  1    can meet the regulations of that canister.  It works

04:05:21  2    effectively in conjunction in a system.

04:05:24  3    Q.      You were also asked in your direct examination about

04:05:26  4    a document that was PX-55.  And that's going to be in your

04:05:31  5    other binder that Mr. Friel gave you, probably.

04:05:33  6    A.      Sure.

04:05:34  7    Q.      Sorry.  I'm going to have to have you go back and

04:05:37  8    forth.  That's just the way it works.

04:05:38  9    A.      Sure.  Not a problem.

04:05:40 10    Q.      And this is an email exchange reporting about the

04:05:43 11    Ford tests.  Do you recall that?

04:05:45 12    A.      Yes, I do.

04:05:47 13    Q.      And this was something you said you were excited

04:05:49 14    about because it was a positive result.

04:05:51 15    A.      Yeah, that's correct.

04:05:53 16    Q.      To -- this specific test, though, involved three

04:05:56 17    honeycombs, not just one; is that correct?

04:05:59 18    A.      That's correct, but the configuration was the same

04:06:02 19    for both Ingevity and EvapTrap XC.

04:06:05 20    Q.      But it didn't -- you didn't ask Ford or Ford didn't

04:06:08 21    test the three-honeycomb configuration of BASF against any

04:06:12 22    other honeycomb configuration of Ingevity; right?

04:06:15 23    A.      I'm not sure I followed the question.

04:06:17 24    Q.      You said it was the exact same configuration from

04:06:20 25    Ingevity compared to the configuration from BASF; right?

04:06:23  1   A.      That's correct.

04:06:25  2   Q.      But you're aware that in cars, in canisters in actual

04:06:30  3   use, there are a number of different configurations of

04:06:32  4   Ingevity honeycombs; correct?

04:06:34  5   A.      Yeah.  That's -- there's different configurations,

04:06:39  6   sure.

04:06:39  7   Q.      All right.  In fact, are you aware of a canister or a

04:06:42  8   car that has Ingevity products that don't meet the

04:06:45  9   environmental standards?

04:06:46 10   A.      I have not tested every Ingevity product, so I can't

04:06:53 11   comment on it.

04:06:53 12   Q.      Are you aware of any as you sit here today?

04:06:55 13   A.      As I mentioned, I have not -- I can't comment on the

04:06:59 14   likeliness of Ingevity products to meet regulations.

04:07:02 15   Q.      So there must be configurations of Ingevity's that

04:07:05 16   meet environmental regulations; correct?

04:07:07 17   A.      Well, people are selling vehicles, yeah, that's

04:07:11 18   right.  We're in 2021; right?  So yeah, people are selling

04:07:15 19   vehicles, so.

04:07:17 20   Q.      Thank you.

04:07:18 21           And you're aware that carmakers are very worried

04:07:21 22   about recalls; correct?

04:07:22 23   A.      Certainly, a carmaker doesn't want a recall.

04:07:27 24   Q.      And that's -- is that one of the reasons why all this

04:07:30 25   testing is required before your part can go on a vehicle?

Abraham - Cross

04:07:32  1    A.      Well, it's an emission compliance part.  We have to

04:07:36  2    test it properly, and that's why we do thorough testing.

04:07:38  3    Q.      Right.  And all the testing you did was in a lab;

04:07:41  4    correct?

04:07:41  5    A.      We did the testing in accordance with the regulatory

04:07:47  6    body's test requirements.

04:07:48  7    Q.      And that's in a lab; right?

04:07:50  8    A.      Mm-hmm.

04:07:50  9    Q.      You didn't ever have your products road-tested; is

04:07:54 10    that fair?

04:07:54 11    A.      In the sense that -- what type of road test are you

04:08:00 12    discussing?

04:08:00 13    Q.      Your product has never been placed in an automobile

04:08:03 14    out on the road; is that fair?

04:08:05 15    A.      No, it is not in the EvapTrap XC, but we did test the

04:08:10 16    EvapTrap MX technology in a vehicle that was driven across

04:08:13 17    America and looked at weight gain and weight loss and any

04:08:18 18    indication of particles being -- coming off of the

04:08:21 19    technology.

04:08:21 20    Q.      Okay.  That's fair.  I meant to ask specifically

04:08:24 21    about the EvapTrap XC product.  That product has never been

04:08:26 22    placed on a vehicle and performed any actual road testing;

04:08:30 23    correct?

04:08:31 24    A.      There is no road test requirement for this product,

04:08:34 25    but you are correct.

Abraham - Cross

04:08:35  1    Q.      And you did a bunch of durability testing.  Why did

04:08:38  2    you do those durability tests?

04:08:40  3    A.      Durability tests are an important part to make sure

04:08:43  4    that the coating was sticking to the ceramic substrate.

04:08:45  5    It's very standard when you have any adhesive.  I've worked

04:08:49  6    at Avery Dennison in the past.  Everybody does durability

04:08:52  7    testing on adhesive.

04:08:53  8    Q.      And that's, in part, because your product has never

04:08:56  9    been used -- the EvapTrap XC has never actually been used on

04:09:00 10    a car; is that correct?  The durability testing?

04:09:02 11    A.      I don't think it's because it hasn't been used on a

04:09:05 12    car.  It's because it was in a normal process in trying to

04:09:08 13    develop a product.

04:09:10 14    Q.      Okay.  Actually, I wanted to ask more about the

04:09:14 15    development process that you talked about with Mr. Friel.

04:09:16 16    A.      Sure.

04:09:17 17    Q.      I want to be clear.  When you started to develop the

04:09:21 18    BASF honeycomb, you were aware that Ingevity produced the

04:09:25 19    standard honeycomb that was used in the industry; right?

04:09:27 20    A.      That's correct.

04:09:28 21    Q.      And you obtained samples and used them for

04:09:31 22    comparative testing purposes?

04:09:33 23    A.      Commercially bought samples on the market.

04:09:35 24    Q.      You ended up making a honeycomb that's the exact same

04:09:38 25    diameter and length and cells per square inch as many of the

Abraham - Cross

04:09:44  1    Ingevity honeycombs that you wanted to compete with;

04:09:46  2    correct?

04:09:47  3    A.      We made something at customers' requirements for

04:09:50  4    potential drop-ins or running changes, as it's sometimes

04:09:53  5    used in the industry.

04:09:54  6    Q.      Customers did not require the cells per square inch

04:09:56  7    could be the same, though, did they?

04:09:57  8    A.      They didn't specify the cells per square inch to be

04:10:00  9    the same, no.

04:10:01 10    Q.      And, in fact, you told Mr. Friel that you tested a

04:10:03 11    number of different varieties and you ended up with the

04:10:05 12    exact same number of cells per square inch that Ingevity

04:10:08 13    uses; correct?

04:10:12 14    A.      That's correct.

04:10:12 15    Q.      And you were aware of Ingevity's patent when you

04:10:14 16    started this whole process; right?

04:10:16 17    A.      That's correct.

04:10:17 18    Q.      You learned about the '844 patent in 2016 at the

04:10:20 19    early, early stages of the process?

04:10:22 20    A.      That's correct.

04:10:23 21    Q.      And you said you read it many times or were aware of

04:10:26 22    the contents?

04:10:27 23    A.      Read it many times in the past, that's correct.

04:10:31 24    Q.      And in fact, when you started to approach customers

04:10:33 25    to try to make sales, they brought the '844 patent up to

Abraham - Cross

04:10:37  1    you; right?

04:10:38  2    A.      It's certainly a conversation.

04:10:41  3    Q.      Well, we've already seen some conversations you had

04:10:43  4    with Kayser; right?  They were concerned about the '844

04:10:46  5    patent; right?

04:10:46  6    A.      Mm-hmm.

04:10:47  7    Q.      And you saw -- you talked about the communication

04:10:51  8    with Mr. Glasing at Kayser, I think that was DX -- sorry,

04:10:57  9    yeah, well, I want you to look at DX-86.  This one should be

04:11:01 10    in your -- the binder that I provided to you.

04:11:22 11    A.      Okay.

04:11:24 12    Q.      And do you recognize this document?

04:11:27 13            It won't be on the screen until I get it

04:11:29 14    admitted, sir.

04:11:30 15    A.      Sure.  Yes.

04:11:32 16    Q.      And this is an email to you from Mr. Glasing?

04:11:36 17    A.      That's correct.

04:11:37 18            MR. BUROKER:  Your Honor, I'd like to move into

04:11:38 19    evidence DX 86.

04:11:40 20            MR. FRIEL:  No objection, Your Honor.

04:11:41 21            THE COURT:  All right.  Admitted without

04:11:43 22    objection.

04:11:43 23            (DX Exhibit No. 86 was admitted into evidence.)

04:11:44 24    BY MR. BUROKER:

04:11:44 25    Q.      So now it should be on your screen if you'd like to

Abraham - Cross

04:11:46  1     look there if that's easier.

04:11:48  2     A.     I just want to make it sure it was the right

04:11:51  3     document.

04:11:51  4     Q.     Do you recall the communication that Mr. Glasing sent

04:11:53  5     to you on February 12th of 2018?

04:11:56  6     A.     Yes, that's correct.

04:11:57  7     Q.     And this was right before the contract was signed

04:12:00  8     with Kayser; correct?

04:12:02  9     A.     That's correct.

04:12:03 10     Q.     So that contract was signed on the 26th of February

04:12:06 11     and this is just two weeks earlier; right?

04:12:09 12     A.     Yeah.

04:12:09 13     Q.     And here Mr. Glasing is telling you under the first

04:12:15 14     bullet point, the second line, it says, "As you know, we

04:12:19 15     need to solve the problem with the Ingevity patent."  That

04:12:22 16     was his concern just two weeks before entering the contract

04:12:25 17     with you; right?

04:12:25 18     A.     Correct.

04:12:27 19     Q.     And then you signed the contract, which was in -- on

04:12:31 20     February 26th, 2018, which was admitted as PX-77.  Did you

04:12:39 21     force Kayser to sign that contract?

04:12:40 22     A.     I can't force anyone to sign contracts.

04:12:42 23     Q.     They did that of their own free will and volition?

04:12:46 24     A.     Yeah.

04:12:47 25     Q.     They wanted to enter into a contract with BASF?

Abraham - Cross

A.    That's correct.  They invited me to their premises for that signature.

Q.    And everybody intended to move forward on that contract when it was signed in February of 2018?

A.    Absolutely.

Q.    And BASF was going to fulfill or require that Kayser fulfilled the minimum requirements in that contract?

A.    I mean, we had minimum requirements, but, you know, we always -- in the automotive industry, you base it on the number of vehicle that are sold, and that can change.

Q.    Just a few weeks later, I think you testified earlier that Kayser reached out again about the '844 patent; correct?

A.    That's correct.

Q.    And then I think you looked at DX-87 with Mr. Friel, if we could pull that up.  It's probably going to be in the other binder.

A.    Yeah.

Q.    So you read part of this in your discussion with Mr. Friel, but I want you to focus on its indemnification language, if you would.

A.    Mm-hmm.

Q.    It's the third paragraph there.

A.    Yeah.

Q.    This proposed indemnification doesn't actually give

Abraham - Cross

04:13:59  1  them full protection from a lawsuit, does it?

04:14:02  2  A.    Let me read it again.  It's been some time.

04:14:02  3              (Witness reading.)

04:14:37  4              There was there's an aggregate amount that we

04:14:40  5  would -- a cap on the liability.

04:14:42  6  Q.    There's a catch.  You were only going to offer to

04:14:45  7  indemnify them up to some monetary amount; correct?

04:14:48  8  A.    Correct.

04:14:49  9  Q.    And you hadn't agreed on an amount?

04:14:51 10  A.    No, not before my departure, no.

04:14:54 11  Q.    So you actually hadn't offered Kayser full

04:14:56 12  indemnification if they were to be sued on the '844 patent

04:15:01 13  at any time, did you?

04:15:02 14  A.    We offered an indemnification based on its cap --

04:15:07 15  based on a contract cap.

04:15:09 16  Q.    But that you never agreed to?

04:15:11 17  A.    True.

04:15:12 18  Q.    And you also offered Leehan indemnification without

04:15:17 19  agreeing to -- with a cap as well; correct?

04:15:20 20  A.    That's correct.  This is pretty standard practice

04:15:23 21  when we offer indemnification.

04:15:26 22  Q.    To give the customer less than full assurance is

04:15:29 23  standard practice?

04:15:29 24  A.    I mean, typically, when you have a contract, this

04:15:33 25  is -- there's some types of gap to the value that they can

Abraham - Cross

1   claim on.

2   Q.    So if this company were sued and incurred losses of

3   $15 million and you were only willing to pay them $5

4   million, they would have to come out of pocket for the

5   difference, wouldn't they?

6   A.    I can't comment on the amounts or the exact -- the

7   exact agreement there that would be.

8   Q.    Okay.  And you had other problems with Leehan.  You

9   had the coating problem with Leehan?

10  A.    Again, that was just one set of samples.

11  Q.    And you also had them requesting indemnification, but

12  BASF was not willing to provide full indemnification?

13  A.    The commercial development of Leehan was not at a

14  point where we were at a commercial contract.

15  Q.    And didn't Leehan ask you to share your freedom to

16  operate opinion?

17  A.    I'm sure there might be an email where they requested

18  that.

19  Q.    But you didn't provide it; right?

20  A.    Per my lawyers, I did not provide it.  I did as

21  instructed.

22  Q.    So the communication to the customer was we have a

23  freedom to operate, but we won't provide it to you; correct?

24  A.    I followed the requirements that my legal team

25  presented to me with respect to sharing the freedom to

Abraham - Cross

04:16:53 1 operate.

04:16:53 2 Q.      Okay.

04:16:54 3 A.      And that was outlined in the language that was sent

04:16:56 4 to customers.

04:17:00 5 Q.      And just for clarification, at no time did BASF ever

04:17:03 6 approach Ingevity and ask for a license to the '844 patent?

04:17:09 7 A.      We did not approach Ingevity during my time.

04:17:12 8 Q.      And there were other customers that, during your time

04:17:17 9 at BASF, you never even approached for business; right?

04:17:21 10 A.      It's common practice when you're developing a product

04:17:23 11 that we don't approach every customer because you have to

04:17:27 12 have development time.

04:17:28 13 Q.      And one of the big car companies, Honda, BASF never

04:17:32 14 talked directly to them; right?

04:17:34 15 A.      We had spoken to MAHLE, who has, I believe, a hundred

04:17:37 16 percent share in Honda, but MAHLE was building its own

04:17:41 17 competitive product, so that wasn't a priority for us.

04:17:44 18 Q.      MAHLE wasn't interested in BASF's product at all;

04:17:47 19 correct?

04:17:47 20 A.      They were building their own competitive product, so

04:17:51 21 we chose not to develop with them.

04:17:53 22 Q.      And then one of the canister makers, Korea Fuel Tank

04:17:57 23 that we've heard about today, you never sent them samples to

04:18:01 24 test; right?

04:18:02 25 A.      There was -- they had some prior experience and they

Abraham - Cross

04:18:07  1    were -- it was not a commercial avenue that we were pursuing

04:18:10  2    heavily.

04:18:11  3    Q.      Well, they're never going to buy your product if they

04:18:14  4    don't test it first; right?

04:18:15  5    A.      Certainly, you weren't going to purchase a product if

04:18:18  6    you don't test it.

04:18:21  7    Q.      So in going into this development process, you knew

04:18:24  8    that at some point there would be additional competitors

04:18:27  9    beyond Ingevity with honeycomb sales; correct?

04:18:30 10    A.      It's something we would have assumed may happen.

04:18:34 11    Q.      And you thought it would be a company called Cabot?

04:18:38 12    A.      I didn't particularly think it was Cabot.

04:18:43 13    Q.      And what about Helsa?  Did you think Helsa would be

04:18:47 14    one of the competitors?

04:18:49 15    A.      I know that Helsa makes activated carbon products in

04:18:52 16    a honeycomb.

04:18:55 17    Q.      One of the advantages you thought that BASF would

04:18:59 18    have over Ingevity was the fact that it had an outsourced

04:19:03 19    solution; is that fair?

04:19:04 20    A.      So for the foam product, we were outsourcing some of

04:19:12 21    the manufacturing components of it.  But we held within

04:19:16 22    house our proprietary carbon manufacturing and the formation

04:19:21 23    of the paint, as I had mentioned described before.

04:19:26 24    Q.      And you also were outsourcing part of the process in

04:19:29 25    the -- when you went -- moved to the honeycomb version;

Abraham - Cross

04:19:32  1    isn't that true?

04:19:32  2    A.      We have a facility in China that was doing the

04:19:38  3    coating.

04:19:41  4    Q.      You mentioned earlier that you had a carbon, a P2, I

04:19:46  5    think you called it, with Mr. Friel; is that correct?

04:19:48  6    A.      It's correct.

04:19:49  7    Q.      And that was provided by a company called EnerG2; is

04:19:53  8    that correct?

04:19:53  9    A.      That's correct.

04:19:54 10    Q.      And you had an exclusive contract with EnerG2, didn't

04:19:57 11    you?

04:19:58 12    A.      We had acquired EnerG2.

04:20:00 13    Q.      But your contract with EnerG2 was an exclusive supply

04:20:04 14    agreement, wasn't it?

04:20:05 15    A.      I don't have the supply agreement with me.

04:20:07 16    Q.      You don't recall one way or the other?

04:20:08 17    A.      We didn't have a signed supply agreement.

04:20:12 18    Q.      Okay.  If you could look at DX-48.

04:20:27 19    A.      DX-48?

04:20:28 20    Q.      That's going to be in the white -- the white binder?

04:20:33 21    A.      Yeah.  Got it.

04:20:34 22    Q.      Got it?

04:20:35 23    A.      Got it.

04:20:35 24    Q.      I guess they're both white.  Can you tell me if you

04:20:38 25    recognize this document?

Abraham - Cross

04:20:39 1    A.      Yes.

04:20:41 2    Q.      And what is this?

04:20:42 3    A.      This is a presentation that I put together.  This

04:20:49 4    looks like an internal presentation, most likely for our

04:20:55 5    management team.

04:20:58 6              MR. BUROKER:  Your Honor, I'd like to move DX-48

04:21:00 7    into evidence, please.

04:21:02 8              MR. FRIEL:  No objection.

04:21:03 9              THE COURT:  All right.  DX-48 admitted without

04:21:06 10   objection.

04:21:07 11             (DX Exhibit No. 48 was admitted into evidence.)

04:21:08 12   BY MR. BUROKER:

04:21:08 13   Q.      Sir, if you can look at the third page of the

04:21:10 14   document.

04:21:10 15   A.      Sure.

04:21:12 16   Q.      So in this -- so there's three columns here.  These

04:21:17 17   are products that you were managing at the time; is that

04:21:19 18   correct?

04:21:20 19   A.      That's correct.

04:21:21 20   Q.      And we're focused on EvapTrap XC, so let's look at

04:21:24 21   the middle column.  The unit pricing of 5 to 7 Euros, was

04:21:31 22   that just your estimate, or what was that based upon?

04:21:33 23   A.      The unit pricing was based upon scenario analysis.  I

04:21:42 24   kind of looked at potential scenarios if competitors

04:21:46 25   entered, if we didn't have the full value, et cetera.

Abraham - Cross

| | | |
|---|---|---|
| 04:21:49 | 1 | Q.      Had you finalized a price at that point? |
| 04:21:52 | 2 | A.      I need to recall what date this was.  If you happen |
| 04:22:00 | 3 | to have the metadata on this one. |
| 04:22:02 | 4 | Q.      I don't.  Just in 2018, had you established a price? |
| 04:22:05 | 5 | A.      That's correct.  We had established a price at least |
| 04:22:09 | 6 | at one customer. |
| 04:22:10 | 7 | Q.      And was it between 5 to 7 Euros? |
| 04:22:13 | 8 | A.      Yes. |
| 04:22:14 | 9 | Q.      And then under the competitive intensity row -- |
| 04:22:18 | 10 | A.      Mm-hmm. |
| 04:22:19 | 11 | Q.      -- it says "low."  Why does it say low? |
| 04:22:21 | 12 | A.      There weren't many competitors.  Ingevity was the |
| 04:22:25 | 13 | only formidable competitor in the segment. |
| 04:22:27 | 14 | Q.      And you also identified Helsa; correct? |
| 04:22:29 | 15 | A.      They were someone who could potentially make a profit |
| 04:22:32 | 16 | like this. |
| 04:22:33 | 17 | Q.      If I could ask you to look at Page 13 of the |
| 04:22:36 | 18 | document, please.  And this is a slide you prepared |
| 04:22:43 | 19 | regarding where you were with Ford at this time; is that |
| 04:22:47 | 20 | correct? |
| 04:22:47 | 21 | A.      Correct. |
| 04:22:48 | 22 | Q.      Oh, 13.  Are you on the right page? |
| 04:22:50 | 23 | A.      I am, yeah. |
| 04:22:51 | 24 | Q.      Okay.  Thank you. |
| 04:22:52 | 25 |          And the second bullet point there under the box, |

Abraham - Cross

04:22:57  1    it says, "Ford does have a strong relationship with Ingevity

04:23:01  2    on the technical side.  Rob needs to feel that BASF can be a

04:23:05  3    technical partner.  Technical service is key for him."

04:23:10  4            Do you see that?

04:23:11  5    A.    I do.

04:23:11  6    Q.    That's a reference to Ingevity providing technical

04:23:15  7    assistance and to Ford engineers and in designing canisters;

04:23:19  8    correct?

04:23:20  9    A.    That's -- yes, it's -- I don't know the exact

04:23:23 10    technical service, but, yeah, that's right.

04:23:26 11    Q.    And they had been doing that for many, many years

04:23:28 12    before?

04:23:28 13    A.    Yes, to my knowledge.

04:23:35 14    Q.    If you can turn to Page 17.  And this is a slide you

04:23:48 15    prepared regarding the status of the relationship with

04:23:52 16    Leehan; correct?

04:23:53 17    A.    Correct.

04:23:54 18    Q.    And that's one of the canister makers that you were

04:23:56 19    trying to sell your product to; right?

04:23:58 20    A.    Correct.

04:24:00 21    Q.    Under its relationship, it says, "challenged but

04:24:03 22    still at working level."  That was the status as of the

04:24:06 23    preparation of this document?

04:24:07 24    A.    Mm-hmm.

04:24:09 25    Q.    And then under BASF execution, it said early samples

Abraham - Cross

04:24:14  1   issued including -- or let me start over.  It says, "early

04:24:18  2   sample issues including miscoated, incomplete coated, and

04:24:22  3   slow response times have damaged our reputation."

04:24:25  4           Do you see that?

04:24:25  5   A.     I do see that.

04:24:26  6   Q.     So BASF damaged its own reputation through these

04:24:33  7   missteps with Leehan; correct?

04:24:34  8   A.     So this was an internal document, and, you know, in

04:24:37  9   any major corporate culture, you have different technical

04:24:41 10   teams, commercial teams, et cetera.  Sometimes you try to

04:24:44 11   drive a response out of your technical team.  This was meant

04:24:48 12   to help get our technical team to push harder and work

04:24:52 13   faster.  That's all.

04:24:54 14   Q.     But you had sent miscoated, incomplete coated, and

04:24:58 15   also provided slow response times with Leehan; correct?

04:25:01 16   A.     These are based on real issues, but it was more about

04:25:05 17   focusing on getting our technical team to provide the

04:25:07 18   appropriate level of service so that we can build that

04:25:10 19   relationship.

04:25:11 20   Q.     So if you go to slide 18.  This is your status of the

04:25:21 21   relationship with MAHLE as of the date this document was

04:25:24 22   created.

04:25:24 23           Do you see that?

04:25:25 24   A.     Mm-hmm.

04:25:28 25   Q.     Under relationship, it says "focused on internal

04:25:32  1    technology, worried about IP."  Do you see that?

04:25:34  2    A.      Yeah.

04:25:35  3    Q.      And that's a reference to MAHLE being worried about

04:25:37  4    the '844 patent of Ingevity; right?

04:25:40  5    A.      Many customers were worried about the '844 patent.

04:25:43  6    Q.      And if you go down under the first bullet, it says,

04:25:47  7    "Strategy:  Opportunistically drive programs based on OEM

04:25:51  8    direction."

04:25:52  9    A.      Mm-hmm.

04:25:53 10    Q.      You see that?

04:25:54 11    A.      Yeah.

04:25:54 12    Q.      That means you were going to try to get business from

04:25:57 13    MAHLE by getting the OEM to direct them to buy from you; is

04:26:02 14    that correct?

04:26:02 15    A.      No, this was just if there was an OEM that wanted to

04:26:05 16    use our product, I thought it was a good idea.  We could

04:26:09 17    opportunistically work with MAHLE for specific platforms.

04:26:12 18    Q.      Ultimately --

04:26:13 19    A.      Sorry.

04:26:13 20    Q.      Sorry.

04:26:14 21    A.      It's not uncommon for if, let's say, you if you

04:26:17 22    qualify a product with a specific OEM, they like that

04:26:20 23    technology, they may be interested in designing it for a

04:26:23 24    particular application where they're having a problem.  And

04:26:26 25    then, you know, that becomes its technically released

Abraham - Cross

04:26:30  1    product, so we wouldn't have a problem selling this product

04:26:32  2    to MAHLE, was basically what I'm communicating.

04:26:34  3    Q.    But, ultimately, the OEMs are the ones that make the

04:26:36  4    decision about what carbons and what canisters go in their

04:26:39  5    vehicles; correct?

04:26:40  6    A.    They make a decision on the canister.  The Tier 1

04:26:45  7    does the technical engineering and design work.  In fact,

04:26:48  8    multiple times, OEMs did not want us to do what is often

04:26:52  9    called directed by where they said you must use the BASF

04:26:55 10    product in a canister.  Canister manufacturers have a

04:26:59 11    choice.

04:26:59 12    Q.    But they have a choice between which canister to put

04:27:02 13    on the vehicle, and if they don't want to use its BASF

04:27:05 14    product in the -- in a canister they can choose a different

04:27:07 15    canister for their product or for their cars; correct?

04:27:10 16    A.    They certainly have a choice in who they purchase

04:27:13 17    materials from or components from.

04:27:16 18    Q.    The third bullet says that they, MAHLE, will require

04:27:19 19    indemnification on any programs.  Was that the status as you

04:27:22 20    understood it?

04:27:23 21    A.    That was the status.

04:27:24 22    Q.    Did you offer indemnification to MAHLE.

04:27:27 23    A.    As I mentioned before, we weren't commercially

04:27:29 24    pursuing MAHLE.

04:27:30 25    Q.    So you didn't offer them indemnification?

Abraham - Cross

04:27:32  1    A.      No.

04:27:33  2    Q.      If you could turn over to the Slide 19.

04:27:39  3    A.      Sorry.

04:27:40  4    Q.      This is the relationship with Stant, which is another

04:27:43  5    canister manufacturer; right?

04:27:45  6    A.      Yeah.

04:27:48  7    Q.      The relationship says, "leveraged BASF to improve

04:27:51  8    Ingevity price."  Was that correct?

04:27:53  9    A.      That was our perception.

04:27:56 10    Q.      So they didn't buy from -- excuse me.  Stant did not

04:27:59 11    buy from BASF; correct?

04:28:01 12    A.      That's correct.  They did not buy.

04:28:03 13    Q.      And your perception was that all they did was try to

04:28:05 14    get a better price from Ingevity?

04:28:07 15    A.      Again, that was perception.  This was an internal

04:28:10 16    document.  It was not meant to be.

04:28:14 17    Q.      And then in the third bullet point, the second

04:28:17 18    sentence, this also mentions IP issues, so Stant was also

04:28:20 19    worried about the '844 patent; correct?

04:28:22 20    A.      That's correct.

04:28:27 21    Q.      If we go to slide 20.  And this is the status with a

04:28:35 22    number of Asian potential customers; is that right?

04:28:38 23    A.      Mm-hmm.  That's correct.

04:28:39 24    Q.      And the FT in the bottom left, that's a reference to

04:28:42 25    Korea Fuel Technologies; is that right?

Abraham - Cross

04:28:45  1   A.      I believe so.  It's been awhile since I've seen these

04:28:51  2   documents.  Oh, yeah, this is in Korea, so, yeah, that would

04:29:00  3   be correct.

04:29:00  4   Q.      And, again, under the key notes for Korea Fuel

04:29:04  5   Technology, it says, "IP is critical roadblock."  That was

04:29:07  6   the status with Korea Fuel Technologies?

04:29:10  7   A.      That's correct.

04:29:14  8   Q.      So BASF had a roadblock related to the '844 patent

04:29:18  9   with Kayser, Stant, KFTC, MAHLE, Ford, and Leehan; is that

04:29:23 10   fair?

04:29:23 11   A.      As mentioned, we offered indemnity to each of those

04:29:28 12   customers, and they were progressing in certain customers,

04:29:30 13   right, such as Kayser and Ford.  They were progressing with

04:29:34 14   development of the technology by the time I left.

04:29:36 15   Q.      And you never even talked to Honda about selling

04:29:38 16   products to Honda; correct?

04:29:40 17   A.      As I mentioned, Honda was a hundred percent supplied

04:29:45 18   by MAHLE.

04:29:46 19   Q.      And you didn't send any samples for testing to KFTC?

04:29:51 20   A.      To my recollection, I do not believe we sent samples

04:29:54 21   to them.

04:29:55 22   Q.      And your reputation with Leehan was damaged due to

04:29:58 23   some of your own missteps; correct?

04:30:00 24   A.      As I mentioned before, this is an internal document

04:30:03 25   where we were looking to get the technical team to step up

Abraham - Redirect

04:30:06 1   their game.  It wasn't -- the Leehan team was progressing

04:30:10 2   with the product line, albeit slowly.

04:30:14 3              MR. BUROKER:  Okay.  Thank you.  I have no

04:30:15 4   further questions.

04:30:16 5              THE COURT:  All right.  Any redirect?

04:30:18 6              MR. FRIEL:  I'll be brief, Your Honor.

04:30:20 7              THE COURT:  Okay.

04:30:22 8                    REDIRECT EXAMINATION

04:30:22 9   BY MR. FRIEL:

04:30:23 10  Q.    I'd like to draw your attention to DX-87, the first

04:30:28 11  page.  This has been admitted.

04:30:32 12  A.    Yeah.

04:30:38 13  Q.    Now, you were asked on cross-examination about the

04:30:42 14  indemnity provision that is in the upper email.  That's the

04:30:46 15  March 8th, 2018, email.

04:30:48 16            Do you see that?

04:30:48 17  A.    Yes.

04:30:50 18  Q.    Okay.  So noted that there's a dollar sign XXXXX so

04:30:54 19  the amount of the indemnity wasn't specified; correct?

04:30:57 20  A.    That's correct.

04:30:57 21  Q.    So did Kayser ever ask you to negotiate the amount of

04:31:00 22  that?

04:31:01 23  A.    No, they did not.

04:31:03 24  Q.    So rather Kayser proceeded to continue on with

04:31:05 25  testing the EvapTrap XC; is that correct?

Abraham - Redirect

04:31:08  1   A.        That's correct.

04:31:09  2                   MR. FRIEL:   Thank you.   No further questions.

04:31:10  3                   THE COURT:   All right.   Mr. Abraham, thank you

04:31:12  4   very much.   You may step down.   You're excused.

04:31:15  5                   THE WITNESS:   Appreciate it.

04:31:35  6                   MR. YOOK:   Your Honor, next for BASF we have a

04:31:38  7   video deposition to be played, Your Honor.

04:31:39  8                   THE COURT:   So all right.   So members of the

04:31:43  9   jury, Mr. Yook there has just said that there's going to be

04:31:47 10   a video deposition played, so there's two things I want to

04:31:50 11   tell you about depositions.

04:31:53 12                   First, what they are.   Basically before trial,

04:32:00 13   the parties can question potential witnesses under oath.

04:32:08 14   And at such an event, the witness is sworn just like they

04:32:10 15   are in Court.   A lawyer for both BASF and Ingevity is there.

04:32:17 16   They can both ask questions, and so it produces a statement

04:32:22 17   under oath.   And so it -- and there's some rules about when

04:32:29 18   they're admissible in Court, but when they're admissible in

04:32:31 19   Court like this one is, you're to consider it to be as close

04:32:35 20   to having the person actually testify as if they were

04:32:38 21   actually here and testifying in person.

04:32:42 22                   So that's what a deposition is.

04:32:45 23                   Now, the second thing about it is that in terms

04:32:51 24   of preparing for the trial, the parties, by agreement, cut

04:32:58 25   out lots of the deposition.   They -- so you'll see when you

04:33:06  1    watch it that it's clear it's got parts that are missing.

04:33:11  2    But that's by the agreement of the parties to essentially

04:33:17  3    save time and to focus on what's important to one party or

04:33:20  4    the other, so don't be concerned about the fact that things

04:33:23  5    are omitted.

04:33:25  6                And then -- and kind of related to that is

04:33:31  7    sometimes one party wants to put certain statements in the

04:33:36  8    deposition for their case and then the other party wants to

04:33:41  9    put in certain statements for their case.  And so my general

04:33:45 10    practice is get all the statements that either side wants

04:33:50 11    in, and so they're all going to be in what BASF is now going

04:33:54 12    to play.  But some of that -- some of what's in there is

04:33:58 13    because Ingevity wanted it in, not because -- or they are

04:34:04 14    the ones who thought you should be hearing it.

04:34:08 15                So bear in mind that basically for convenience,

04:34:14 16    everything that either side wants is going to be played, in

04:34:19 17    this case, as part of BASF's case.

04:34:21 18                All right.  Go ahead, and who is the witness

04:34:24 19    here?

04:34:25 20                MR. YOOK:  Thank you, Your Honor.  Good

04:34:27 21    afternoon, Your Honor.  You'll be hearing from Mr. Peter

04:34:29 22    McCrae, who is an Ingevity employee, and you'll hear that

04:34:32 23    he's a salesperson employed by Ingevity.

04:34:34 24                Permission to approach with binders, Your Honor.

04:34:38 25                THE COURT:  Sure.  Yes.

04:34:40  1          MR. YOOK:  Thank you.  Your Honor, and I don't

04:35:04  2  know what the Court's preference is in terms of moving these

04:35:07  3  exhibits into evidence.  We can do it now or after the

04:35:10  4  video.

04:35:11  5          THE COURT:  Well, is there any objection to

04:35:13  6  either of the exhibits?  I assume there isn't.

04:35:15  7          MR. BUROKER:  There's not, Your Honor.

04:35:16  8          THE COURT:  All right.  Well, then, just

04:35:18  9  consider them admitted.  So that's going to be Joint

04:35:23  10  Exhibit 19 and Plaintiff's Exhibit 30.

04:35:23  11          (JX Exhibit No. 19 and PX Exhibit No. 30 were

04:35:25  12  admitted into evidence.)

04:35:25  13          MR. YOOK:  Yes, Your Honor.  That's correct.

04:35:27  14          THE COURT:  Okay.  Well, why don't you play the

04:35:29  15  video.

04:35:29  16          (Video playing.)

04:35:31  17  Q.     Good morning, Mr. McCrae.  Could you please state

04:35:33  18  your full name for the record?

04:35:34  19  A.     Peter David Andrew McCrae.

04:35:36  20  Q.     And you're employed by Ingevity Corp., correct?

04:35:39  21  A.     Yes.

04:35:40  22  Q.     And what's your current title?

04:35:42  23  A.     Business manager for EMEA:  Europe, Middle East, and

04:35:47  24  Africa.

04:35:47  25  Q.     Okay.  And that's what you refer to as EMEA; correct?

04:35:51  1    A.      Yes.

04:35:51  2    Q.      So for pelletized carbon, are there any customers who

04:35:55  3    have not seen price increases year over year?

04:35:59  4    A.      Not to my recollection.

04:36:02  5    Q.      Okay.  For honeycombs, are there customers who have

04:36:05  6    not received price increases?

04:36:08  7    A.      In the past two years, I know of one customer who has

04:36:14  8    not received honeycomb price increases.

04:36:24  9    Q.      Okay.  And which customer is that?

04:36:25 10    A.      Delphi.

04:36:27 11    Q.      Any others?

04:36:28 12    A.      Not to my knowledge.

04:36:30 13    Q.      What is the -- at a high level, what is the price --

04:36:33 14    the process for price changes?  Is it -- does it occur in

04:36:37 15    set times of the year?  Is it an annual process?  Is it more

04:36:42 16    frequent?  Less frequent?

04:36:46 17    A.      Until recently, it was typically an annual process

04:36:53 18    that occurred in the third -- sorry, the fourth quarter of

04:36:57 19    the year.

04:36:58 20    Q.      Has that changed?

04:36:59 21    A.      We announced to the market this year that we were

04:37:08 22    reevaluating that strategy.

04:37:10 23    Q.      And what is the contemplated new strategy?

04:37:20 24    A.      Potentially multiple price increases per year.

04:37:29 25    Q.      Has that strategy been implemented yet?

04:37:33  1    A.      In this year, we've had two price increases for

04:37:38  2    several products, not all products.

04:37:41  3    Q.      Okay.   What products are those?

04:37:42  4    A.      The majority of pelletized carbons and honeycombs.

04:37:55  5    Q.      What prompted the change in strategy to multiple

04:37:59  6    price increases per year?

04:38:01  7    A.      I'm not privy to that information.

04:38:05  8    Q.      Do you happen to know who was responsible for making

04:38:11  9    those -- that decision?

04:38:13 10    A.      Upper management.

04:38:15 11    Q.      Do you know when that decision was made or at least

04:38:17 12    when you heard about the decision?

04:38:19 13    A.      I heard about the decision in July.

04:38:22 14    Q.      Of --

04:38:23 15    A.      To the best of my recollection, this year.

04:38:26 16    Q.      Of 2019?

04:38:27 17    A.      Yes.

04:38:29 18    Q.      Do you know which customers have received these

04:38:32 19    multiple price increases?

04:38:34 20    A.      All of them, to my knowledge.   All of my customers

04:38:38 21    were sent letters, the price increases, in August, I

04:38:44 22    believe.

04:38:53 23    Q.      How did you feel about the -- the change in strategy

04:38:55 24    where your customers are now receiving multiple price

04:38:58 25    increases a year?

A.      That's never nice to put customers in that situation,
but business is business.

Q.      Have any customers suggested to you that they're
going to take their business elsewhere?

A.      Yes.

Q.      Do you know who they would turn to for their supply?

A.      There is plenty of competition out there.   So there's
-- I'm not privy to their business decisions.

Q.      Is it your understanding that within the auto
industry, it's standard practice for suppliers to institute
price changes once a year?

A.      That's my understanding.

Q.      Okay.   In your time in sales to automotive customers,
have you seen Ingevity institute multiple price increases
prior to this new strategy?

A.      In the period of time that I have been involved in
sales, no.

Q.      Okay.

A.      To my recollection.   To the best of my recollection.

Q.      Okay.   During your time at Ingevity, what -- in terms
of annual price increases, what is the percentage increase
usually?

A.      The -- to the best of my recollection, the -- the --
the price increases have ranged from three to five percent.

Q.      How does Ingevity justify those price increases?

04:40:32 1    A.      We don't.

04:40:37 2    Q.      Do customers not ask for the reason why they are

04:40:41 3    receiving a price increase?

04:40:42 4    A.      We reserve the right to confidentiality in our

04:40:46 5    processes.

04:40:48 6    Q.      Do you ever reveal the cost structure for these

04:40:51 7    products you sell?

04:40:52 8    A.      No.

04:40:55 9    Q.      Do you agree that for a new producer, carbon

04:40:59 10   producer, it would take about four to seven years from plant

04:41:02 11   construction to market?

04:41:03 12   A.      In my experience, this is correct.

04:41:07 13   Q.      So by kilograms, who is the largest producer of

04:41:11 14   automotive carbons?

04:41:13 15   A.      To the best of my knowledge, Ingevity.

04:41:17 16   Q.      Are there other companies aside from Ingevity

04:41:20 17   currently that offers a honeycomb scrubber for automotive

04:41:25 18   applications?

04:41:26 19   A.      To my knowledge, the only other company that I have

04:41:30 20   come across that has offered the honeycomb solution is BASF.

04:41:39 21   Q.      So, again, my original question was, isn't it true

04:41:42 22   that customers have to accept Ingevity's prices because

04:41:46 23   there's no alternatives other than BASF?

04:41:49 24   A.      No.

04:41:52 25   Q.      Again, and why do you disagree?

04:41:55 1   A.      There's other solutions other than canisters that can

04:41:57 2   be used to control emissions from vehicles.

04:42:00 3   Q.      What are the -- what are those other solutions?

04:42:02 4   A.      Sealed tanks, for example.

04:42:05 5   Q.      Any others?

04:42:05 6   A.      Purge pumps.

04:42:10 7   Q.      Any others?

04:42:11 8   A.      Any method to reduce those emissions via insulation,

04:42:20 9   for example.

04:42:23 10  Q.      You said via insulation?

04:42:24 11  A.      Yes.

04:42:27 12  Q.      Any other solutions?

04:42:27 13  A.      Not that I know of.

04:42:32 14  Q.      Well, I understand.  But do you -- you -- you must

04:42:35 15  know something about the '844 patent; correct?

04:42:37 16  A.      I know the general term of it.

04:42:44 17  Q.      Uh-huh.  And what is that?

04:42:45 18  A.      That you have a higher capacity carbon at the front

04:42:50 19  with an incremental adsorption capacity of a certain amount

04:42:56 20  followed by a lower capacity carbon or one or more, et

04:43:00 21  cetera, with a lower incremental adsorption capacity, and

04:43:05 22  those values are less than -- greater than 35 and less than

04:43:09 23  35.

04:43:11 24  Q.      Okay.  And below that it says:  As examples, the

04:43:15 25  subsequent volume can be any type of adsorbent, such as

04:43:21 1   honeycomb, pellet, granular, fabric-containing adsorbents.

04:43:28 2           Do you see that?

04:43:29 3   A.     Yes.

04:43:29 4   Q.     And so is it your understanding that the -- that

04:43:32 5   adsorbent itself may be different types of adsorbent?  It

04:43:39 6   doesn't have to be a honeycomb; correct?

04:43:40 7   A.     It's my understanding that it doesn't have to be a

04:43:43 8   honeycomb.

04:43:44 9   Q.     On -- if you can turn to page ending in 898, please.

04:43:48 10  A.     Okay.

04:43:49 11  Q.     At the top, it says:  "LEV III bleed segment,

04:43:54 12  Ingevity technology initiative."

04:43:56 13          Do you see that?

04:43:56 14  A.     Yes.

04:43:57 15  Q.     And the bottom bullet says:  "Educate regulators on

04:44:01 16  deficiencies of sealed tank systems"; correct?

04:44:03 17  A.     Yes.

04:44:05 18  Q.     Do you know what is preferred -- what's meant by

04:44:08 19  that?

04:44:08 20  A.     My understanding of that is we -- we gave a

04:44:10 21  presentation on Tank Tech in Munich three years ago or four

04:44:18 22  years ago, probably around about this time, where we talked

04:44:21 23  about sealed tank systems and defined a microhole as enough

04:44:26 24  to release all of the vapors.

04:44:31 25  Q.     Okay.  And a microhole is just a very small hole?

04:44:36 1   A.      Very small hole, yeah.

04:44:37 2   Q.      In the tank?

04:44:38 3   A.      In the tank or in the lines, anywhere.  Then your

04:44:42 4   whole system is compromised and all of the emissions will go

04:44:45 5   out to the atmosphere.

04:44:46 6   Q.      If you can turn back to Exhibit 155, Exhibit

04:44:51 7   Number 155.  Okay.

04:44:54 8           Do you have that in front of you?

04:44:55 9   A.      Yes.

04:44:55 10  Q.      If you can turn to page ending in 318.

04:45:01 11  A.      Okay.

04:45:01 12  Q.      Okay.  And you mentioned this before, but you

04:45:05 13  understand that the '844 patent is set to expire in 2022;

04:45:09 14  right?

04:45:09 15  A.      I believe so.

04:45:11 16  Q.      Okay.  Has -- have you been part of any conversations

04:45:13 17  with Ingevity as to what your commercial strategy is going

04:45:18 18  to be post-patent expiration for honeycombs?

04:45:21 19  A.      Yes.

04:45:23 20  Q.      To your knowledge, has Ingevity ever increased prices

04:45:26 21  of the base carbons because of a customer using a

04:45:31 22  non-Ingevity honeycomb?

04:45:32 23  A.      Not to my knowledge.

04:45:33 24  Q.      Okay.  And you've never discussed that possibility

04:45:37 25  with anyone of your customers?

04:45:38  1    A.      No, not that I recall at this moment.

04:45:48  2    Q.      Aside from these four strategies laid out in this

04:45:52  3    slide, without revealing any privileged discussions, are you

04:45:57  4    aware of any other of Ingevity's strategies to maintain

04:46:02  5    sales volumes following expiration of the '844 patent?

04:46:09  6    A.      We have, to my knowledge, some long-term agreements

04:46:14  7    with Delphi, and there may be another one with Aisan.

04:46:22  8    That's to the extent.

04:46:28  9    Q.      And when you say "long-term agreement," what do you

04:46:31 10    mean by long-term?

04:46:31 11    A.      An agreement that runs for several years.

04:46:36 12    Q.      Is it standard practice, in your experience, for

04:46:39 13    supply agreements to be on an annual basis?

04:46:42 14    A.      We do not have supply agreements, to my knowledge.

04:46:49 15    Q.      So would you say that those long-term agreements with

04:46:51 16    Delphi and potentially Aisan, are those exceptions to the

04:46:56 17    typical practices?

04:46:57 18    A.      They're exceptions because, to my knowledge, they're

04:47:00 19    the only long-term agreements that I know of --

04:47:02 20    Q.      Okay.

04:47:03 21    A.      -- that exist at the moment.

04:47:04 22    Q.      I'm showing what's been marked Exhibit 160.  And for

04:47:09 23    the record, it's NGVT0029816.

04:47:17 24    A.      Okay.

04:47:19 25    Q.      Okay.  And you agree, it appears to be an email -- a

04:47:23  1   series of email exchanges in which you were either the

04:47:28  2   sender or recipient?

04:47:29  3   A.       Yes.

04:47:35  4   Q.       Okay.  And you've taken a look through the document.

04:47:37  5   Can you summarize the discussion there.

04:47:40  6   A.       This was a simple exchange after I had a meeting at

04:47:46  7   Kayser where they presented me with a honeycomb, which,

04:47:50  8   after a series of questions, I discovered it was from BASF.

04:47:59  9   I then discovered that the trainer team had known about a

04:48:03 10   BASF honeycomb, and I had, obviously, missed the email or

04:48:12 11   hadn't been on the email.  So that's the basis of it.

04:48:23 12   Q.       Okay.

04:48:23 13   A.       I was just a little bit concerned that there was a

04:48:25 14   lack of communication in the technical team.

04:48:28 15   Q.       Okay.  And is that -- is that what you're referring

04:48:31 16   to when you wrote on, looks like, January 18, 2018, the

04:48:40 17   second page, it says:  "I personally was embarrassed at

04:48:44 18   Kayser this week because I did not know where the HCA they

04:48:52 19   presented came from and was left guessing, even though I got

04:48:56 20   it right via a process of elimination"?

04:48:59 21   A.       Yes.

04:49:00 22   Q.       We've always been the leader, aware of our threats?

04:49:03 23   A.       Yes.

04:49:03 24   Q.       Do you have any recollection at all about that

04:49:05 25   meeting?

04:49:05  1    A.      I remember being presented with a honeycomb and

04:49:08  2    taking a picture of it.

04:49:10  3    Q.      Okay.  And how did you figure out that it was a BASF

04:49:16  4    honeycomb?

04:49:16  5    A.      I basically went through, and I said, did this come

04:49:22  6    from X, Y?  And the person in question said it came from the

04:49:26  7    American company with the -- the -- the German father, kind

04:49:37  8    of thing.

04:49:41  9    Q.      So it wasn't -- it wasn't a, you know, a very

04:49:44 10    difficult guess then?

04:49:45 11    A.      No, it wasn't a very difficult guess, but -- but it

04:49:52 12    wasn't a very difficult guess.

04:49:53 13    Q.      And it looks like on January 18th, Roger Williams

04:49:56 14    responded to your message, and it says:  "I certainly agree

04:50:03 15    that we need to respond and then get ahead of the game here.

04:50:08 16    Just met with Jim to discuss this.  We are very dependent on

04:50:12 17    information from the field for most competitive issues such

04:50:15 18    as this."

04:50:16 19            Do you see that?

04:50:16 20    A.      Yes.

04:50:18 21    Q.      Okay.  I'm showing you what's been marked as

04:50:21 22    Exhibit 162.

04:50:22 23    A.      Thank you.

04:50:24 24    Q.      And this is Ingevity -- excuse me, NGVT0085400.  I'll

04:50:32 25    only be asking you about the call report section.

A.      Okay.

Q.      So at the very top of the document, it says:  "Kayser meeting, May 10th, 2016, Covington, Virginia."

        Do you see that?

A.      Yes.

Q.      And this appears to be a report of a meeting between Kayser and Ingevity; correct?

A.      Yes.

Q.      Okay.  And Kayser attendees look like Roger Lieser and Detlef Wolf?

A.      Roger Lieser and Detlef Wolf, yes.

Q.      Okay.  And for Ingevity, it looks like a couple of participants, including yourself, Jim, Dr. Miller, Erik Ripple and Dennis McHenry; correct?

A.      Yes.

Q.      And Covington, Virginia, is that one of your manufacturing facilities?

A.      Yes.

Q.      And do you recall this meeting?

A.      I recall the note.

Q.      Okay.  And under general, the first bullet point says:  "This meeting was at the request of Kayser to" -- "to discuss meeting the commercial issues."

        Do you see that?

A.      Yes.

04:51:35 1    Q.      And under the current business and competition

04:51:38 2    heading, the last bullet point, it says:  "In general,

04:51:42 3    Kayser stated that Euro OEMs are demanding that alternative

04:51:47 4    carbon suppliers be sourced.  Due to our current/past

04:51:51 5    pricing strategy, we can expect more competitive pressure

04:51:55 6    worldwide."

04:51:57 7              What does that refer to?

04:51:57 8    A.      It refers to the fact that European OEMs are pushing

04:52:07 9    their canister suppliers to find alternative sources for

04:52:11 10   carbon because of Ingevity's pricing strategy.

04:52:16 11   Q.      Okay.  And are you aware of, in fact, your European

04:52:22 12   OEMs pushing their manufacturers to find alternative carbon

04:52:26 13   sources?

04:52:27 14   A.      Explain to me, what do you mean, am I aware?

04:52:31 15   Q.      Are -- in your interactions with your canister

04:52:35 16   manufacturers, have you heard that European OEMs are pushing

04:52:38 17   them to look for alternative carbons?

04:52:40 18   A.      Yes.

04:52:41 19   Q.      Okay.  And when it says:  Due to current, past

04:52:44 20   pricing strategy, what does that mean?

04:52:47 21   A.      In the past -- you asked earlier what our typical

04:52:51 22   price increase was, 3 to 5 percent per year.  That's what

04:52:57 23   this is referring to.

04:52:59 24   Q.      Okay.  So OEMs are -- appears unhappy with Ingevity's

04:53:06 25   price increases; correct?

04:53:07  1    A.      Yes.

04:53:08  2    Q.      Why are OEMs concerned about the pricing of carbon?

04:53:11  3    Doesn't the man -- canister manufacturer have to deal with

04:53:17  4    that?

04:53:17  5    A.      I can only speculate that the canister manufacturer

04:53:21  6    goes to the OEM and asks for relief when we raise prices,

04:53:25  7    and it means that for new programs when they're quoting

04:53:30  8    them, they will quote them at the higher prices.

04:53:36  9    Q.      Do you know whether OEMs do, in fact, provide relief

04:53:41 10    to the canister manufacturers?

04:53:42 11    A.      I know some do, and some don't.  The specifics of it,

04:53:47 12    no.

04:53:49 13    Q.      Okay.  When Kayser mentioned alternative carbon

04:53:52 14    suppliers, do you -- did you understand them to discuss

04:53:54 15    specific suppliers?

04:53:56 16    A.      No, but -- you're referring to that same bullet

04:54:02 17    point?

04:54:02 18    Q.      Correct.

04:54:02 19    A.      It was a general statement from the OEMs that they

04:54:06 20    had to go out and find alternative suppliers.  The OEMs in

04:54:10 21    Europe are well aware of Norit, Cabot, et cetera.

04:54:18 22    Q.      Do you recall if Ingevity ever sent a written

04:54:21 23    proposal for a long-term HCA agreement?

04:54:24 24    A.      Yes.

04:54:26 25    Q.      Okay.  Was that sent in -- some time in 2016?

04:54:31  1    A.      To the best of my recollection, yes.

04:54:36  2    Q.      Okay.  And what happened to those negotiations in

04:54:40  3    2016?

04:54:41  4    A.      They did not come to fruition in 2016.

04:54:46  5    Q.      Okay.  And were you involved in those negotiations?

04:54:53  6    A.      I was.

04:54:54  7    Q.      Okay.  And what was your involvement?

04:54:56  8    A.      I was key code manager for Kayser.  I was involved in

04:55:03  9    setting up the meetings and taking part in some of the

04:55:05 10    discussions.

04:55:08 11    Q.      And it appears that some time in 2017, Ingevity and

04:55:12 12    Kayser took up the discussion of a long-term agreement

04:55:16 13    again; correct?

04:55:17 14    A.      Correct.

04:55:20 15    Q.      Do you recall those negotiations?

04:55:21 16    A.      Yes.

04:55:24 17    Q.      Okay.  Who --

04:55:26 18    A.      Based on the documentation that you have just

04:55:29 19    provided to me.

04:55:31 20    Q.      Do you recall why the parties decided to reopen

04:55:34 21    negotiations?

04:55:35 22    A.      I do not recall at this moment.

04:55:40 23    Q.      And the -- the short story here is that Ingevity and

04:55:45 24    Kayser were not able to agree to a long-term agreement;

04:55:50 25    correct?

04:55:50  1   A.       Correct.

04:55:51  2   Q.       In 2017.

04:55:53  3   A.       Yes.

04:55:53  4   Q.       And what was the reason that the negotiations fell

04:55:56  5   apart?

04:56:03  6   A.       The main -- as I recall it, and again, to the best of

04:56:08  7   my recollection, and my memory being refreshed by these

04:56:11  8   emails, was the inclusion of, on Page 631, buyers reversion

04:56:20  9   election and buyers reversion may call payment.

04:56:32 10   Q.       And who was -- who had proposed inclusion of those

04:56:37 11   terms?

04:56:38 12   A.       Ingevity.

04:56:44 13   Q.       Okay.  And do you know what those terms were intended

04:56:51 14   to do?

04:56:52 15   A.       Without those terms, there was nothing in there to

04:56:55 16   stop Kayser taking the four times three percent price

04:57:00 17   reduction and then just walking away after saying bye.  That

04:57:05 18   was its main reason, yes.

04:57:07 19   Q.       Okay.  And again --

04:57:08 20   A.       And the fact that if they wanted to walk away, they

04:57:11 21   had to pay back all of the money.

04:57:13 22   Q.       Right.

04:57:13 23   A.       But that's -- that's the buyer's reversion, may call

04:57:18 24   payment.

04:57:18 25   Q.       And it seems like if Kayser were to walk away in the

04:57:22  1    middle of that agreement, they would have to pay back all

04:57:25  2    rebates they had received; correct?

04:57:28  3    A.      Correct.

04:57:30  4    Q.      And from Ingevity's position, this long-term

04:57:33  5    agreement was to make sure that you're ensuring sales for a

04:57:41  6    long period; correct?

04:57:41  7    A.      The idea was to maintain sales volume, yes.

04:57:46  8    Q.      Okay.  And Kayser was not amenable to that -- those

04:57:49  9    provisions?

04:57:49 10    A.      Correct.  I believe the term they used was, these two

04:57:53 11    clauses could be the job stopper for our contract, and they

04:57:57 12    were.

04:58:04 13                (Conclusion of video.)

04:58:06 14                MR. YOOK:  Your Honor, may I approach?

04:58:09 15                THE COURT:  Sure.

04:58:10 16                MR. YOOK:  I'll just provide Your Honor with the

04:58:14 17    correlation for the record between the deposition exhibit

04:58:16 18    numbers and the trial exhibit numbers so that the record is

04:58:20 19    clear, Your Honor.

04:58:20 20                THE COURT:  Okay.

04:58:21 21                MR. YOOK:  So deposition exhibit number McCrae

04:58:25 22    160 correlates to Trial Exhibit Number JX-19.  Deposition

04:58:32 23    number McCrae Exhibit Number McCrae 162 correlates to PX-30.

04:58:39 24                THE COURT:  All right.  Thank you, Mr. Yook.

04:58:41 25                All right.  So members of the jury, we're

04:58:44 1    finished for the day.  Before you leave, I think I have

04:58:47 2    three things that I need to say.

04:58:49 3            One is I'm going to remind you of the

04:58:54 4    instruction I gave about don't communicate with anyone about

04:58:57 5    the case.  Don't talk to each other about the case.  Don't

04:59:04 6    let anyone talk to you about the case or litigation or

04:59:07 7    anything relating to this.  You want to make sure that you

04:59:16 8    just don't get impacted by anybody else.

04:59:19 9            The second thing is don't do any research.

04:59:24 10   Don't -- you know, this is not like school where you get an

04:59:28 11   A for doing homework.  You -- this is like school in

04:59:35 12   kindergarten where everything is it happens in kindergarten

04:59:39 13   and then you're free for the rest of the day.  So don't do

04:59:43 14   any research.  Don't look anything up.  Make sure that

04:59:46 15   everything you have or you learn about the case you learn in

04:59:49 16   court in the presence of the lawyers and with your fellow

04:59:52 17   jury members.  And, you know, that's the way we'll get a

04:59:57 18   fair verdict at the end of the day.

04:59:59 19           And then the third and the last thing is I

05:00:02 20   expect that we'll start tomorrow at 9:30.  You know, I meet

05:00:06 21   with the lawyers in advance of that to try to work out

05:00:09 22   issues so that we're ready to go at 9:30.  And, you know,

05:00:15 23   make sure you allow enough time to get yourself here, figure

05:00:18 24   out the code to get in and get comfortable so that we can

05:00:24 25   start on time.

05:00:25  1          All right.  Thank you for your attention today.

05:00:27  2  It's been a long day.  Have a good evening, and I'll see you

05:00:30  3  tomorrow.

05:00:33  4          THE JURY:  Thank you.

05:00:36  5          (Jury leaving the courtroom.)

05:01:00  6          THE COURT:  All right.  Everyone can be seated.

05:01:03  7          So just a couple things, at least at my end

05:01:09  8  here, which is you are in a better position to say this than

05:01:15  9  me.  Do you want to meet tomorrow morning at 9:00 or should

05:01:19 10  we be meeting at 8:30?

05:01:27 11          MR. THOMAS:  Your Honor, tomorrow, I'm not aware

05:01:29 12  of any long list of things to cover tomorrow, so I think

05:01:33 13  9:00 will be fine.

05:01:34 14          MR. FRIEL:  Well, it's not the length of the

05:01:37 15  list, but I'm not aware of any long issues to discuss.

05:01:41 16          THE COURT:  We'll meet at 9:00 tomorrow, but if

05:01:43 17  you foresee large issues coming up, I'd rather meet earlier.

05:01:47 18  I won't charge you for the time.  And you know, keep the

05:01:52 19  jury starting at 9:30.

05:01:55 20          All right.  So then the other thing that I have

05:01:58 21  on my list here, I think we addressed this at the pretrial

05:02:04 22  conference, but I didn't see it written down in the things

05:02:06 23  that I looked at.  When -- a revised version of final jury

05:02:13 24  instructions is going to be submitted when?

05:02:15 25          MR. BUROKER:  We, late last night, sent proposed

05:02:18 1    revision to both the verdict form and its final jury

05:02:21 2    instructions.  They need time to review that.

05:02:23 3                    THE COURT:  Sure.

05:02:24 4                    MR. BUROKER:  So we can submit them when you

05:02:26 5    want, but I just wanted to give you an update on the status.

05:02:29 6                    THE COURT:  Mr. Smith.

05:02:30 7                    MR. SMITH:  Your Honor I don't believe you set a

05:02:32 8    time at the pretrial conference.  I think you may have said

05:02:35 9    you expected a prayer conference Monday with closings

05:02:38 10   Tuesday morning.

05:02:39 11                   THE COURT:  Yeah, I did say that.  I was hoping

05:02:41 12   that the revised version of the jury instructions would come

05:02:43 13   in this week, and I guess I was looking at them a little

05:02:53 14   over the weekend, because even in the realm of what the

05:03:00 15   range of normal amounts of disputes are -- and I'm guessing,

05:03:04 16   Mr. Smith and Ms. Keller, you could confirm this, there seem

05:03:08 17   to be a lot more in this case.  Now, some of it is cosmetic

05:03:12 18   because, you know, there's 4,000 times where Ingevity has

05:03:16 19   put "implied" in front of "license."  So why don't you take

05:03:20 20   out those 4,000 and that will resolve a lot of disputes.

05:03:24 21   And then I think somebody wants to put in "fuel vapor

05:03:27 22   canister" a lot of times, and take that out and that will

05:03:30 23   resolve those disputes.

05:03:31 24                   But the thing that I think -- and I think I may

05:03:34 25   have mentioned this at the pretrial conference -- the thing

05:03:36  1    that is daunting to me is you submit your different

05:03:40  2    proposals and then there's just this long laundry list of

05:03:45  3    cases with no clue as to which ones actually support one

05:03:48  4    side or the other.  And it would be a lot more helpful to me

05:03:52  5    if you didn't cite more than one case and somebody actually

05:03:55  6    said, you know, why one case supports, you know, whether

05:04:03  7    it's just a cosmetic dispute or whether there's actually

05:04:06  8    something of substance.

05:04:08  9             So you know, as long as you're making progress,

05:04:12 10    I would -- you know, it's better that you keep working on it

05:04:17 11    and you probably -- or Ms. Keller and Mr. Smith have

05:04:25 12    probably seen before that even when I give a deadline, if

05:04:28 13    the parties tell me they're making progress, I will continue

05:04:32 14    the deadline because I'd rather you resolve as many issues

05:04:35 15    as possible.  So basically just keep working on it.  You

05:04:40 16    know, let me know maybe at the end of tomorrow or the

05:04:45 17    beginning of Thursday, you know, how things are going, but

05:04:51 18    I'm not going to -- maybe I should -- give it a deadline.

05:04:55 19    But I'm not going to do that right now on the representation

05:04:58 20    that you're working at it.

05:05:00 21             Okay?

05:05:02 22             MR. SMITH:  That is fine, Your Honor.

05:05:03 23             MR. BUROKER:  Understood.  And the proposal that

05:05:05 24    we sent over last night does remove many of the case cites.

05:05:08 25    I think you made that comment at the pretrial.

05:05:09  1                THE COURT:  Okay.

05:05:10  2                MR. BUROKER:  So that's what we're trying to do

05:05:12  3   and we, I believe, hopefully, will resolve some of the

05:05:15  4   additional issues other than the two that you just

05:05:17  5   mentioned.

05:05:17  6                THE COURT:  Okay.  Is there anything else you

05:05:19  7   want to talk about tonight, BASF?

05:05:23  8                MR. FRIEL:  No, Your Honor.

05:05:23  9                THE COURT:  Ingevity?

05:05:24 10                MR. THOMAS:  No, Your Honor.  Thank you.

05:05:26 11                THE COURT:  All right.  Well, you all have a

05:05:27 12   good evening, too, or good evening tonight, and I will see

05:05:33 13   you tomorrow at nine o'clock.

05:05:35 14                DEPUTY CLERK:  All rise.

05:05:43 15                THE COURT:  And go about your business because

05:05:44 16   it takes me a minute to clean up.

05:05:49 17                (Court was recessed at 5:05 p.m.)

         18                I hereby certify the foregoing is a true and

         19   accurate transcript from my stenographic notes in the

         20   proceeding.

         21                <u>/s/ Heather M. Triozzi</u>
                          Certified Merit and Real-Time Reporter
         22               U.S. District Court

         23

         24

         25