1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF DELAWARE

3

4   INGEVITY CORPORATION and          )
    INGEVITY SOUTH CAROLINA, LLC.     )
5                                     )
                    Plaintiffs,       )
6                                     ) C.A. No. 18-1391(RGA)
    v.                                )
7                                     ) Trial Volume V
    BASF CORPORATION,                 )
8                                     )
                    Defendant.        )
9

10                                    J. Caleb Boggs Courthouse
                                      844 North King Street
11                                    Wilmington, Delaware

12                                    Monday, September 13, 2021
                                      8:58 a.m.
13                                    Jury Trial

14

    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
15

16  APPEARANCES:

17          SHAW KELLER LLP
            BY:  KAREN E. KELLER, ESQUIRE
18
                    -and-
19
            GIBSON DUNN & CRUTCHER, LLP
20          BY:  JEFFREY T. THOMAS, ESQUIRE
            BY:  BRIAN M. BUROKER, ESQUIRE
21          BY:  NATHANIEL SCHARN, ESQUIRE

22                          For the Plaintiffs

23

24

25

1    APPEARANCES CONTINUED:

2                    MORRIS NICHOLS ARSHT & TUNNELL LLP
                     BY:  RODGER D. SMITH, II, ESQUIRE
3
                                -and-
4
                     KING & SPALDING
5                    BY:  THOMAS J. FRIEL, ESQUIRE
                     BY:  CHRISTOPHER YOOK, ESQUIRE
6                    BY:  NORMAN ARMSTRONG, JR., ESQUIRE
                     BY:  EMILY T. CHEN, ESQUIRE
7                    BY:  BRIAN EUTERMOSER, ESQUIRE
                     BY:  PAUL ALESSIO MEZZINA, ESQUIRE
8
                                         For the Defendant
9
                        ***   PROCEEDINGS   ***
10

11            DEPUTY CLERK:  All rise.  Court is now in

12    session.  The Honorable Richard G. Andrews presiding.

13            THE COURT:  All right.  Good morning, everyone.

14    Please be seated.

15            Do we have any issues to discuss?

16            MR. SCHARN:  We do, Your Honor.

17            THE COURT:  All right.

18            MR. SCHARN:  So the primary reason for most of

19    our objections is they relate to Dr. Mathur's anticipated

20    rebuttal testimony.  Some exhibits identified to go there

21    with as well as the demonstrative exhibit that BASF

22    disclosed to us last night for that purpose.

23            The main reason for objecting is that these

24    contain numerous materials that were not disclosed or cited

25    in Dr. Mathur's report, her expert reports.  And I can list

08:59:19  1    what we're objecting to for the record and then we can

08:59:23  2    discuss them, if that's useful.

08:59:24  3                    PX-59, PX-62, PX-70, and then on the

08:59:30  4    demonstrative, PDX-3, Slide eight, Slide ten, Slide 19, and

08:59:36  5    Slide 22.

08:59:38  6                    THE COURT:  Okay.  Is there more?

08:59:41  7                    MR. SCHARN:  No, that's it.  Those are the ones

08:59:43  8    that I have.

08:59:44  9                    THE COURT:  All right.  So is all the objection

08:59:48 10    entirely that these are not in the expert report or is there

08:59:51 11    some other objection?

08:59:51 12                    MR. SCHARN:  There is some other objection,

08:59:53 13    particularly with respect to Slide 22, and I have a copy of

08:59:56 14    the slide deck to hand up to Your Honor.  I don't have the

08:59:59 15    slides on our -- we just have a PDF of them right now.

09:00:04 16                    THE COURT:  Yeah, okay.  Well, hand it up.  And

09:00:06 17    why don't we just get BASF's position as to whether or not

09:00:12 18    these things are in the expert report or not.

09:00:18 19                    MR. MEZZINA:  Good morning, Your Honor.  There

09:00:20 20    are a handful of exhibits that are referenced on the

09:00:23 21    demonstrative that were not in the expert report but were

09:00:25 22    presented at trial.  Dr. Mathur was here at trial.  Under

09:00:28 23    Rule 703, she can comment to them as they relate directly to

09:00:32 24    opinions that were expressed in her report, and they're

09:00:35 25    similar to other evidence she relied on.  I believe Dr. Rao

09:00:39  1    did the same thing.

09:00:40  2                THE COURT:  So wait a minute.  These exhibits,

09:00:42  3    59, 69, and 70, they're already in evidence?

09:00:45  4                MR. MEZZINA:  They're in evidence.

09:00:46  5                THE COURT:  All right.  So why doesn't someone

09:00:48  6    show me 59.

09:00:49  7                But so I understand, she didn't say anything

09:00:52  8    about it in her report.  They're in evidence, and you think

09:00:54  9    she can now say something about it, and you're saying it's

09:00:57 10    related to something she did say in her report, so let's see

09:01:02 11    -- or first, because you've just handed me up the PDX deck,

09:01:06 12    can I see one of these exhibits we are talking about.

09:01:08 13                MR. MEZZINA:  Your Honor, I think the easiest

09:01:10 14    way might be to look in the demonstrative where they're

09:01:13 15    used.

09:01:13 16                THE COURT:  Okay.  Where, Mr. Mezzina?

09:01:14 17                MR. MEZZINA:  So I think the first two are --

09:01:18 18    and I'm sorry, Mr. Scharn, if I get these wrong.  This is PX

09:01:18 19    59 and 62 are both on Slide 19.

09:01:26 20                THE COURT:  Okay.  Hold on a minute.

09:01:30 21                Okay.  Slide 19 appears to be the Delphi

09:01:33 22    agreement and what I guess is presumably either more Delphi

09:01:36 23    agreement or some other part -- some -- they're all the

09:01:40 24    Delphi agreement; is that right?

09:01:41 25                MR. MEZZINA:  These are actually three Ingevity

09:01:44  1    documents that comment on the Delphi agreement.  As you can

09:01:47  2    see, they all say, essentially, the same thing.

09:01:49  3                    THE COURT:  Well --

09:01:50  4                    MR. MEZZINA:  Dr. Mathur --

09:01:50  5                    THE COURT:  Well, I can't see it, but it's

09:01:53  6    vague.

09:01:54  7                    MR. MEZZINA:  We're only relying --

09:01:55  8                    THE COURT:  I can.  I see, but you've got the

09:01:57  9    call-outs.

09:01:58 10                    MR. MEZZINA:  Right.

09:02:03 11                    THE COURT:  Well, so didn't Dr. Mathur already

09:02:07 12    talk about the word "guarantee" appearing somewhere?

09:02:11 13                    MR. MEZZINA:  Yes, she -- I believe she talked

09:02:13 14    about it in her opening testimony and Dr. Rao talked in

09:02:18 15    response.

09:02:18 16                    THE COURT:  Didn't she already talk about

09:02:19 17    "guarantee"?

09:02:20 18                    MR. SCHARN:  She did, Your Honor.  That was

09:02:21 19    another basis for our objections on pretty much everything.

09:02:24 20    We're not fighting about everything, just for the sake of

09:02:28 21    efficiency, but we had asked, you know what is this rebuttal

09:02:32 22    to from our case?  Unfortunately, no answers were provided

09:02:35 23    to us, and we still haven't heard an explanation.

09:02:38 24                    THE COURT:  All right.  Mr. Mezzina.

09:02:40 25                    MR. MEZZINA:  Your Honor, this is rebuttal to

09:02:43 1   Dr. Rao's testimony about its reversion election.

09:02:46 2                THE COURT:  And what in particular?

09:02:47 3                MR. MEZZINA:  In particular, the role that the

09:02:49 4   reversion election plays and whether customers actually can

09:02:53 5   get out of these contracts using the reversion election.

09:02:59 6                So the point here, Your Honor, is just that

09:03:02 7   Ingevity internally talking about this provision always

09:03:05 8   understood it was a guarantee that customers would continue

09:03:07 9   to buy, which is -- which is inconsistent with the notion

09:03:11 10  that they presented.

09:03:15 11               THE COURT:  So you can could cross -- maybe not

09:03:17 12  you individually, but somebody could cross Dr. Rao about

09:03:21 13  these three documents and the word "guarantee" while he's on

09:03:27 14  the stand for cross-examination, which hasn't occurred yet;

09:03:31 15  right?

09:03:33 16               MR. MEZZINA:  I'm sorry, Your Honor.

09:03:35 17               THE COURT:  Anybody?

09:03:37 18               MR. SCHARN:  Yes, they can, Your Honor.  And the

09:03:40 19  other thing about --

09:03:40 20               THE COURT:  Well, so wait a second.

09:03:41 21               Right, Mr. Mezzina?

09:03:43 22               MR. MEZZINA:  I'm sorry, Your Honor.  Are you

09:03:44 23  asking me if we could cross Dr. Rao about those these?

09:03:47 24               THE COURT:  Yeah, you could.

09:03:48 25               MR. MEZZINA:  We could, sure.  Yes.

09:03:59  1                    THE COURT:  So this is -- I'm sorry.  These were

09:04:03  2      Exhibits 59 and 62?

09:04:06  3                    MR. SCHARN:  And the demonstrative that we

09:04:08  4      object to.

09:04:10  5                    THE COURT:  What's your issue on 70?

09:04:13  6                    MR. SCHARN:  70 is that it wasn't cited in the

09:04:15  7      report.

09:04:16  8                    THE COURT:  But I'm sorry, Mr. Mezzina had the

09:04:19  9      helpful idea that I could see what 70 was by going to

09:04:23 10      somewhere in the demonstratives or the 59 and 62.  Can I

09:04:26 11      also do that for 70?

09:04:28 12                    MR. MEZZINA:  Yes, if you flip to Slide 22.

09:04:30 13                    And by the way, Your Honor, it's my

09:04:32 14      understanding that this was cited in Dr. Mathur's report,

09:04:33 15      PX-70.

09:04:36 16                    THE COURT:  So this is a timeline?

09:04:39 17                    MR. MEZZINA:  That's right, yes.

09:04:41 18                    MR. SCHARN:  So we have a whole lot of other

09:04:43 19      reasons that we object to this one, Your Honor.

09:04:45 20                    THE COURT:  What you're showing me, there

09:04:47 21      doesn't look like --

09:04:48 22                    MR. SCHARN:  No, we don't have their slides,

09:04:49 23      Your Honor.  That's just the underlying exhibit.

09:04:52 24                    THE COURT:  All right.  Well, show me the

09:04:54 25      underlying exhibit again.  I'm sorry.  Okay.  It's an email.

1113

```
09:04:57   1              So the thing that I'm looking at and Mr. Mezzina
09:05:01   2   cites -- and if you don't have it, Mr. Mezzina, why don't
09:05:03   3   you show it to Mr. Scharn.
09:05:07   4              MR. MEZZINA:  I'm sorry, what?
09:05:08   5              MR. SCHARN:  The slide deck.
09:05:10   6              THE COURT:  Yeah.
09:05:10   7              MR. SCHARN:  I have it, Your Honor.
09:05:11   8              THE COURT:  What is it you don't -- never mind.
09:05:17   9   So what is the objection here?
09:05:18  10              MR. SCHARN:  So the objection here, so PX-113 is
09:05:23  11   another thing identified here that's also not cited in the
09:05:27  12   expert reports, but they've withdrawn it as a formal
09:05:31  13   exhibit, I believe unless, I am misremembering.  But in any
09:05:34  14   case, that's not something she considered.
09:05:36  15              The broader objection, Your Honor, is that this
09:05:38  16   is -- this appears to be a response to our point that arose
09:05:43  17   in connection with the jury instructions that they haven't
09:05:46  18   put on any evidence to support, you know, malice or any of
09:05:52  19   the underlying requirements for punitive damages.  She
09:05:55  20   doesn't discuss the underlying conduct as purportedly
09:05:59  21   tortious, but this seems like a last-minute attempt to try
09:06:03  22   to put on evidence of tortious conduct through an economic
09:06:07  23   expert.
09:06:07  24              THE COURT:  So what's on demonstrative Page 22,
09:06:11  25   these are all exhibits that are already in evidence; right,
```

09:06:13  1    or it's citing --

09:06:16  2              MR. MEZZINA:  That's right, Your Honor.

09:06:17  3              THE COURT:  -- to things that have already been

09:06:19  4    said?  So, you know, this doesn't really seem to me like

09:06:23  5    proper rebuttal.  If she had wanted to do this, she could

09:06:26  6    have done it on direct.  And so now she's just making what

09:06:30  7    should be somebody's closing argument, BASF's, again.  So

09:06:37  8    I'm going to --

09:06:38  9              MR. MEZZINA:  Your Honor, can I just respond to

09:06:40 10    that briefly because we're actually using this to respond to

09:06:43 11    something very specific in Dr. Rao's testimony.

09:06:45 12              THE COURT:  Which is?

09:06:46 13              MR. MEZZINA:  So Dr. Rao testified that

09:06:48 14    Dr. Mathur did not adequately consider the patent

09:06:53 15    infringement lawsuit in its role in causation relative to

09:06:57 16    the anticompetitive active.

09:06:58 17              THE COURT:  Okay.  She did say that.  I remember

09:07:01 18    that.

09:07:01 19              MR. MEZZINA:  Right.  And she has an opinion in

09:07:02 20    her reply report where she specifically talks about this

09:07:05 21    point in response.  What she's going to do with this slide

09:07:07 22    is talk about how she evaluated the role of Ingevity's suit,

09:07:11 23    which is noted there in the timeline, relative to some of

09:07:13 24    these other events that took place subsequent and how that

09:07:16 25    affected her opinion on causation.  This is directly in her

09:07:19 1    reply report.

09:07:20 2              MR. SCHARN:  So, Your Honor, we asked about that

09:07:22 3    on cross-examination, and she said she hadn't factored in

09:07:27 4    the lawsuit into her damages.  They had a chance to ask her

09:07:31 5    about that on redirect and they did not.  Or if they did,

09:07:33 6    you know, they're just trying to bolster that, so this is

09:07:36 7    not rebuttal.

09:07:36 8              THE COURT:  If she said one thing on the last

09:07:39 9    time and now she's going to say something different, you can

09:07:42 10   cross-examine her about that.  So I'm going to allow her to

09:07:46 11   testify about what goes along with PDX 3-2.2.

09:07:53 12             And, you know, I'm not going to let her testify

09:07:59 13   about all these guarantees unless you first cross-examine

09:08:03 14   Dr. Rao about it because part of, you know, the deal here

09:08:09 15   is, essentially, you know, you can't hold back to get the

09:08:15 16   last word.  And so she said "guarantees" at least once.  You

09:08:20 17   can get the same impact by asking Dr. Rao.

09:08:24 18             If for some reason or another he denies all

09:08:27 19   this, well, then you can put her on, but you know,

09:08:32 20   otherwise, this is just beating a point that, you know,

09:08:36 21   added to something that she's already made.  And so I'm

09:08:39 22   going to say, yeah, you can cross-examine Dr. Rao about it.

09:08:44 23   But unless something happens there, you can't put her back

09:08:48 24   on the stand to say it.

09:08:51 25             MR. MEZZINA:  Understood, Your Honor.  And this

09:08:52  1       is in relation to Slide 19; right?

09:08:54  2                  THE COURT:  Yes.

09:08:56  3                  MR. MEZZINA:  Understood.  Thank you.

09:08:57  4                  THE COURT:  What else do we have, Mr. Scharn?

09:08:59  5                  MR. SCHARN:  So we have PDX 3.8 and the

09:09:03  6       pagination could look a little confusing because this is an

09:09:07  7       annotation on one of our demonstratives so --

09:09:08  8                  THE COURT:  Okay.

09:09:09  9                  MR. SCHARN:  But it should be the eighth page in

09:09:12 10       the document.

09:09:13 11                  THE COURT:  I'm looking at PDX 3.8, which has

09:09:17 12       lots of red circles with percentages in it.

09:09:20 13                  MR. SCHARN:  That's correct, Your Honor.  So

09:09:21 14       those percentages are not disclosed in Dr. Mathur's experts

09:09:24 15       reports, either.  It's also confusing and would mislead the

09:09:28 16       jury because these are not percentages based on Dr. Mathur's

09:09:31 17       market definition.  This is a much narrower definition that

09:09:34 18       then inflates the numbers.  So if you actually took the

09:09:39 19       percentages -- so you recall that Dr. Mathur said 33 percent

09:09:42 20       of the foreclosure is attributable to the exclusive-dealing

09:09:46 21       arrangements that she calls them.  Well, you can see that

09:09:49 22       the numbers on the left do not add up to 33 percent.  In

09:09:52 23       fact, those numbers would be 16, 10, and 6.  And then the

09:09:56 24       numbers on the right tell a very incomplete story because

09:10:00 25       those don't come anywhere close to adding up to -- you get

09:10:04  1    51 percent if you add up the numbers on the left.  Those

09:10:06  2    don't come anywhere close to adding to the 49 percent on the

09:10:09  3    right.

09:10:09  4              THE COURT:  So what --

09:10:10  5              MR. SCHARN:  And they also could have covered

09:10:13  6    this in their direct.

09:10:14  7              THE COURT:  What are those percentages supposed

09:10:15  8    to represent?

09:10:16  9              MR. MEZZINA:  Your Honor, these are the percent

09:10:17 10    of the carbon honeycomb market.  This is something

09:10:21 11    Dr. Mathur talked about throughout the case.  She said I

09:10:23 12    looked at the carbon adsorbents market and I also looked

09:10:26 13    more narrowly at the carbon honeycomb market because that's

09:10:28 14    Dr. Rao's definition of the market.

09:10:29 15              THE COURT:  And so when you're saying the carbon

09:10:31 16    honeycomb market, is this that -- the carbon honeycombs of

09:10:36 17    the relevant kind --

09:10:38 18              MR. MEZZINA:  Yes.

09:10:38 19              THE COURT:  -- that Ingevity sells whoever's

09:10:42 20    under 25 percent by one quarter of them?

09:10:45 21              MR. MEZZINA:  That's correct.

09:10:46 22              THE COURT:  And so why do those these things not

09:10:49 23    add up to a hundred percent?

09:10:50 24              MR. MEZZINA:  This is -- so, Your Honor, if you

09:10:52 25    flip to the previous slide, this is Dr. Rao's slide.  He

09:10:57  1    chose --

09:10:57  2                    THE COURT:  I see it.

09:10:58  3                    MR. MEZZINA:  -- which companies to put on it,

09:11:00  4    so we're responding to that slide by superimposing the

09:11:03  5    market share of each of the companies that Dr. Rao chose to

09:11:05  6    do that.  So if they don't add up, that means Dr. Rao didn't

09:11:10  7    include all the companies.

09:11:11  8                    THE COURT:  I am sorry.  If they don't add up

09:11:14  9    what?

09:11:14 10                    MR. MEZZINA:  If they don't add up to a hundred

09:11:16 11    percent, this is just reflecting we didn't choose which

09:11:18 12    companies to include on the slide.  And I don't think

09:11:20 13    anything about the point we're making here requires them to

09:11:23 14    add up to a hundred percent.

09:11:29 15                    MR. SCHARN:  I'll add, Your Honor, that

09:11:30 16    foreclosure and solely the carbon honeycomb fuel vapor

09:11:36 17    canister market, I don't believe that's an issue that has

09:11:39 18    come up in our case, so this is not rebuttal.

09:11:41 19                    Excuse me.

09:11:47 20                    MR. MEZZINA:  I guess I'd just say to that, Your

09:11:49 21    Honor, this is directly responsive to Dr. Rao's slide.

09:11:52 22    We're clarifying the market shares of the companies on

09:11:55 23    Dr. Rao's slides.  I'm not sure how that could be improper

09:11:58 24    rebuttal.

09:11:58 25                    THE COURT:  All right.  Well, I'll -- it seems

09:12:02  1    to me to be a reasonable response and not something, really,

09:12:08  2    that could have been done in Dr. Mathur's first go-around,

09:12:13  3    so I'll allow that.

09:12:14  4              What else?

09:12:15  5              MR. SCHARN:  We had the same objection to Slide

09:12:18  6    10, Your Honor.

09:12:18  7              THE COURT:  All right.  Well, then I guess I'll

09:12:23  8    make the same ruling.

09:12:26  9              MR. SCHARN:  And that's all we had, Your Honor.

09:12:27 10              THE COURT:  Okay.  Do you have anything,

09:12:29 11    Mr. Mezzina?

09:12:29 12              MR. MEZZINA:  No.  Thank you, Your Honor.

09:12:31 13              THE COURT:  Okay.  All right.

09:12:35 14              So it's possible that I will be sending you the

09:12:40 15    proposed jury instructions in the next 15 minutes.  I

09:12:44 16    actually have them ready.  I'm just having trouble attaching

09:12:48 17    them to an email.  So in any event, I'll be back at 9:30,

09:12:52 18    assuming the jury is here.

09:12:54 19              Okay?

09:12:56 20              DEPUTY CLERK:  All rise.

09:22:09 21              (Recess was taken.)

09:29:53 22              DEPUTY CLERK:  All rise.

09:29:59 23              THE COURT:  All right.  Let's be seated.  The

09:30:01 24    jury is here.  Dr. Rao, why don't you come on forward.

09:30:04 25    Let's get the jury.

09:30:46   1                    (Jury entering the courtroom.)

09:31:18   2              THE COURT:  All right.  Members of the jury,

09:31:20   3    welcome back.  Everyone, you may be seated.

09:31:24   4              Mr. Yook -- or who's doing --

09:31:27   5              Oh, Mr. Thomas, I forgot.  Yes, all right.

09:31:31   6    Mr. Thomas.

09:31:32   7              MR. THOMAS:  Thank you.

09:31:34   8    BY MR. THOMAS:

09:31:37   9    Q.        Good morning, Dr. Rao.

09:31:38  10    A.        Good morning.

09:31:39  11              Good morning, everyone.

09:31:40  12    Q.        Okay.  And let's pick up where we left off on Friday.

09:31:44  13    We were looking at this slide, and you already explained it

09:31:48  14    to the jury, so I don't want to take more time on it, but

09:31:50  15    just to wrap up, is your point here that Dr. Mathur was

09:31:56  16    assuming that sales start earlier than that would have been

09:32:01  17    possible even in her but-for world?

09:32:04  18    A.        That is correct.  Simply, if we are looking at a

09:32:07  19    delay model and she says she hasn't accounted for any

09:32:13  20    slowdown because of the patent infringement lawsuit and --

09:32:16  21    or this lawsuit and, literally, after the lawsuit if BASF

09:32:20  22    were to pick up after this trial in September 2021, in the

09:32:26  23    -- in this world, the first sale would take 30 months

09:32:29  24    because they would have to do some types of testing.  But in

09:32:32  25    her but-for world, from first discussion, she's only

09:32:36 1   assuming that it's 22 months.  So what accounts for the

09:32:39 2   difference?  As I said, in a delay model, either they should

09:32:42 3   be the same or there should be some explanation for -- for

09:32:45 4   why it would be different.

09:32:48 5   Q.     And does this -- two of the other carmakers that she

09:32:51 6   included were Honda and Volkswagen; is that right?

09:32:53 7   A.     That is correct.

09:32:54 8   Q.     Does this same timing problem exist for those

09:32:59 9   carmakers?

09:32:59 10  A.     It's the same logic as well.  In the actual world,

09:33:02 11  what we're terming the actual world, which is post-trial,

09:33:06 12  she's assuming it would take at least 42 months for Honda

09:33:09 13  and Volkswagen to go to first actual sale.  Whereas in the

09:33:14 14  but-for world, that is just much, much sooner.  You know,

09:33:18 15  24 months.  And so -- so that's basically the point here is

09:33:22 16  that it's not clear why her but-for sale would be faster or

09:33:29 17  shorter than the actual world.

09:33:30 18         And this has a consequence for damages because

09:33:33 19  as I mentioned on Friday, in a delay model, the first

09:33:38 20  but-for sale that you see in this case, January 2021, and

09:33:42 21  then the first actual sale, April, 2025, the wider apart

09:33:47 22  they are, the bigger the delay and therefore more damages.

09:33:49 23  So that's the -- the importance of these timelines.

09:33:55 24  Q.     So for Volkswagen and Honda, when does Dr. Mathur

09:34:01 25  assume sales start in her but-for world?

09:34:05   1    A.      In January of 2021.

09:34:07   2    Q.      And when is the earliest -- given the timing that

09:34:10   3    these tests take, what is the earliest they could possibly

09:34:14   4    have begun?

09:34:15   5    A.      So in the actual world, she says they would be April

09:34:19   6    2025.

09:34:20   7    Q.      Now, does this same problem exist, to some extent,

09:34:26   8    with Ford and GM as well?

09:34:28   9    A.      That is correct.

09:34:30  10    Q.      Okay.   Does Dr. Mathur provide any alternative damage

09:34:35  11    calculations if we conclude that the sales in the but-for

09:34:42  12    world actually start later than what she's claiming?

09:34:45  13    A.      She does not.

09:34:48  14    Q.      Okay.   That takes care of the timing assumption in

09:34:53  15    Dr. Mathur's report.   Let's move on to the next one.

09:34:57  16            And the next assumption she makes is with regard

09:35:01  17    to the prices BASF would -- BASF would charge; is that

09:35:05  18    right?

09:35:05  19    A.      That is correct.

09:35:07  20    Q.      And what is the source of Dr. Mathur's pricing

09:35:09  21    assumptions?

09:35:10  22    A.      As she explained, she has two pricing scenarios.   One

09:35:15  23    is entirely based on BASF's projection and the other one is

09:35:19  24    a combination of BASF projections and Ingevity projections,

09:35:24  25    and she says she takes the lowest of those two.   Those are

09:35:27  1    her two pricing scenarios.

09:35:28  2    Q.      And do you agree with that?

09:35:30  3    A.      I do not.

09:35:30  4    Q.      Why not?

09:35:31  5    A.      I explained this on Friday in a slightly different

09:35:37  6    context.  While the patent is in place, the pricing also

09:35:43  7    needs -- if BASF sells in that world, that pricing also

09:35:48  8    needs to have Ingevity's license fee in it; right?  Either

09:35:52  9    Ingevity can sell its carbon honeycombs at the prices that

09:35:56 10    it did or it does, or, alternatively, if it could not sell

09:36:01 11    that and its alternative was to license, there would be a

09:36:04 12    license fee.

09:36:05 13            As I mentioned, if you think of, from Ingevity's

09:36:08 14    perspective, how would you set that license fee?  If you

09:36:11 15    could not sell carbon honeycombs and provide an implied

09:36:15 16    license, how would you set the license fee?  You would set

09:36:18 17    it to be whatever profit you were going to make from selling

09:36:20 18    carbon honeycombs.  That's how a businessperson would think.

09:36:23 19    Right.  So if I'm making $5 profit from selling a carbon

09:36:26 20    honeycomb, but I can't, you know, and give an implied

09:36:31 21    license, I would just, you know, ask for $5 for that license

09:36:34 22    fee, and -- which means whatever the BASF price is in that

09:36:38 23    world, have you to add the license fee to it.

09:36:41 24            Now, what's interesting here is it's not clear

09:36:44 25    from Dr. Mathur who should be paying that.  Because

09:36:49 1    normally, someone like BASF would go get that license and

09:36:54 2    then pay the license fee.  In her case, BASF doesn't pay

09:36:58 3    that.  Supposedly somebody else in the system should be

09:37:01 4    paying for it, maybe the consumer, but whatever it is, the

09:37:04 5    consumer now has a different price if you were to tack on

09:37:06 6    the BASF honeycomb price and the license fee.  So in some

09:37:10 7    ways the prices that she's using are not appropriate.

09:37:12 8             Now, post-patent expiration, obviously, there's

09:37:15 9    going to be a lot of competition.  Ingevity itself expects

09:37:19 10   potentially up to, you know, ten entrants into this

09:37:21 11   marketplace, as you would expect, because there's no longer

09:37:25 12   a patent protection on these honeycombs.  And then you're

09:37:28 13   going to have much more aggressive pricing across -- and

09:37:32 14   that happens, you know, all industries with or when there's

09:37:36 15   a patent.  You see pharmaceuticals where brand name

09:37:39 16   pharmaceuticals are much more expensive because they have

09:37:42 17   the patent protection.  Once the patent expires and generics

09:37:45 18   enter, as we all know, the prices go down.  And so either

09:37:47 19   world, she has the pricing wrong, so these are not the

09:37:50 20   relevant prices.

09:37:51 21   Q.     Okay.  Let's break that down and talk about the

09:37:54 22   period when the '844 patent is still in effect.  Is she

09:37:59 23   essentially saying that for that period of time, the

09:38:03 24   canister makers buy honeycombs from BASF, make infringing

09:38:09 25   canisters, and Ingevity essentially allows that to happen in

return for nothing?

A.      Because in her pricing -- that's exactly the

implication of her pricing because there is no way for BASF,

in that world, to make its sale at the price that she

charges without adding the license fee.  And so it doesn't

matter what that price is, if you don't have the license

fee, that's not the price that is going to prevail in the

marketplace, and so that's a key point.  During the patent

period, this isn't -- the prices she uses are not realistic

prices.  You have to add on the license fee as well.

Q.      Okay.  And for the period after the patent expires,

does she factor in prices being driven down by all the new

competition?

A.      She only assumes that in that world, the prices she

looks at are the BASF pricing and Ingevity pricing but

doesn't take into account that there could be more stringent

of price wars.  As other entrants come in -- because so far,

the lack of those entrants is because of the patent.  Once

other entrants come in, you would expect that to be a

different world in terms of pricing, and especially when

you're projecting out to 11 years from now.  You would

expect that there should be a lot more competition in that

world for pricing.

Q.      Okay.  That takes care of pricing.  Let's move on to

the fourth assumption that she made on what profits BASF

1126

09:39:41  1   would receive.  How did she do that?

09:39:45  2   A.     So the profits are what fall from these earlier

09:39:52  3   stages; right?  So in order for calculating profits, you

09:39:55  4   need to figure out the unit sales, and we discussed on

09:40:00  5   Friday all of the issues with the unit sale projections

09:40:03  6   where she gets her starting projections from Ms. Rowe for

09:40:07  7   those introductory platforms.  They're all hypothetical

09:40:11  8   platforms -- we don't actually see any specific cars, car

09:40:13  9   models -- and then projects that out to 11 years.

09:40:16 10           And then of course, you know, it's price

09:40:18 11   times -- it's quantity times price.  We just discussed

09:40:22 12   price.  So if your quantity is wrong and your prices are

09:40:25 13   wrong, then your revenues are wrong.  And then we have the

09:40:29 14   timing issues.  So if --

09:40:31 15           So as a result, if there is any -- if there are

09:40:35 16   any issues with unreliability on these earlier stages, then,

09:40:41 17   of course, the profits are just simply an arithmetic

09:40:44 18   calculation, so they have to be, by definition, wrong as

09:40:47 19   well.  In other words, if you find that the prices or the

09:40:53 20   units sales are not reliable, then the profit calculation

09:40:58 21   has to be found unreliable as well.  Just simply arithmetic.

09:41:01 22   Q.     Okay.  So we've now covered the four assumptions, and

09:41:04 23   the assumptions were your second major critique of what

09:41:09 24   Dr. Mathur did.  Let's move to your third.

09:41:12 25           And if we could pull that up, please.

09:41:14  1          This is -- assumes a hundred percent probability

09:41:17  2   of success by BASF.  What is your opinion on this?

09:41:20  3   A.      So this is a really important one.  You know, I

09:41:24  4   mentioned the causation was my very first point, right,

09:41:28  5   fails to account for the patent infringement lawsuit.  And I

09:41:31  6   said that is that is really fatal to the analysis, but this

09:41:35  7   probability of success is another one that's really fatal to

09:41:40  8   the analysis, and it's a really interesting one from an

09:41:43  9   economical perspective.

09:41:45 10          What she's assuming is that Ingevity -- that

09:41:48 11   BASF spoke to five carmakers, and based on that, with

09:41:54 12   hundred percent certainty, it would get all of those sales.

09:41:59 13   So that's effectively like us going and interviewing five

09:42:03 14   jobs and then assuming with hundred percent certainty that

09:42:08 15   we would get five offers.  Now, unless we're really, really

09:42:11 16   confident or delusional, we wouldn't expect that; right?  We

09:42:15 17   would think, okay, that job interview went well.  Maybe

09:42:18 18   80 percent.  That one was awful, you know, there's no way

09:42:20 19   I'm going to get that.  Maybe, you know, that was okay.

09:42:22 20   50-50.  You know, so that's what the probability of success

09:42:25 21   means.  It's simply -- just because, you know, there was

09:42:29 22   interest from a carmaker does not mean that Ingevity would

09:42:34 23   not compete, you know, to retain those sales because it's

09:42:37 24   making sales to all those car makers at this point in time.

09:42:40 25   And so assuming that a hundred percent probability of

09:42:44  1    success is just really, really aggressive.

09:42:46  2              But she says she's discounting the future by

09:42:51  3    seven and a half percent.  And the reason it's seven and a

09:42:54  4    half percent is because that's what BASF uses, and that's

09:42:57  5    the entire basis for why she says it's seven and a half

09:43:01  6    percent.  And that is a measure of risk.  So why?  It's

09:43:04  7    actually -- each of us has a discount rate as well.  We just

09:43:09  8    don't think about it, you know.  For example, you may be

09:43:11  9    charged a credit card interest rate of 12 percent.  I may be

09:43:16 10    charged 15 percent.  You may be charged a market rate of

09:43:20 11    four and a half percent.  I may be charged five percent.

09:43:23 12    Why?  That's because the creditors think of our risk as

09:43:28 13    being different.  If they think I'm more risky in my

09:43:31 14    payback, then they charge me a higher rate.  That is what is

09:43:35 15    called the rated average cost of capital, and that's what,

09:43:40 16    essentially, this seven and a half percent is.

09:43:42 17              But now -- so and each of us has a weighted

09:43:46 18    average cost of capital or the discount rate, so if you're

09:43:48 19    thinking about how big the discount is, that's how we do

09:43:51 20    that.  This is a major discovery or invention in economics.

09:43:55 21    It won Nobel Prizes for components of it.

09:43:57 22              Now think about the job interview.  If I said,

09:44:00 23    "Hey, what's your probability you are going to get that job

09:44:02 24    you just interviewed?"  you wouldn't say, "Oh, my discount

09:44:05 25    rate from my credit card is 12 percent, and therefore my

09:44:08  1    probability of getting that job is 12 percent."  Right?  You

09:44:12  2    know, or the reverse of that 12 percent, 88 percent.  You

09:44:16  3    wouldn't say that.  That's crazy.

09:44:17  4          We would we would still apply on top of that

09:44:20  5    have 12 percent -- or in this case, seven and a half

09:44:23  6    percent -- we'd still apply the probability of success.

09:44:26  7    We'd say maybe there's a 50-50 chance we'll get another sale

09:44:29  8    from Ford or sales from Volkswagen or Fiat.  That's what she

09:44:33  9    does not do.  Whatever the probability is, she just

09:44:38 10    literally assumes 100 percent, and that is fatal because

09:44:42 11    anything less than a hundred percent means, you know,

09:44:44 12    linearly, you know, the damages will be lower.  You know,

09:44:47 13    whatever that percent is.

09:44:48 14          So -- so this is a very, very aggressive

09:44:50 15    assumption, and the discount rate she uses, seven and a half

09:44:54 16    percent just because BASF uses, is not sufficient because in

09:44:57 17    this case, she's asking the jury to provide a check, a

09:45:00 18    damages check, with certainty for all the risks that BASF

09:45:06 19    would take over the next 11 years as a business just like

09:45:09 20    Ingevity does.  And you cannot -- that's not a proper thing

09:45:14 21    to do unless you take into account probability of success.

09:45:17 22    Q.    Does Dr. Mathur assume that BASF would get exactly

09:45:21 23    50 percent share from all five of the car companies?

09:45:26 24    A.    That is correct, over time.  So she -- the main

09:45:31 25    adjustment she makes to Ms. Rowe's numbers are she starts

09:45:35  1   off at the introductory platforms but then she ramps it up

09:45:40  2   over the ten-year period to 50-50.  So, effectively, she

09:45:43  3   assumes that for these five carmakers, BASF has 50 percent

09:45:48  4   of all the carbon honeycombs that they would see, and

09:45:53  5   everybody else in the marketplace, including Ingevity, which

09:45:56  6   today sells to all of them, would have the remaining

09:45:59  7   50 percent.

09:46:00  8   Q.    And did she factor into her calculations in any way

09:46:04  9   the risk or possibility that BASF might not get 50 percent

09:46:10 10   from one or more of these car companies?

09:46:13 11   A.    She does not.  And that's exactly this probability of

09:46:16 12   success.  She just assumes with hundred percent certainty

09:46:19 13   just because BASF had a conversation with Honda that they're

09:46:25 14   going to get 50 percent of Honda's sales.  Just because they

09:46:27 15   had a conversation with Ford, they're going to get

09:46:30 16   50 percent of Ford's sales.

09:46:32 17   Q.    Okay.  Let's move on to your fourth and final

09:46:37 18   big-picture critique which is that she fails to account for

09:46:42 19   changes in the automotive industry, and could you explain

09:46:45 20   that to the jury?

09:46:47 21   A.    Now, this is a tricky one for any economist because

09:46:50 22   when we are projecting out into the future, we all

09:46:53 23   recognize, you know, there's a lot of uncertainty, and

09:46:56 24   businesses still have to make projections in its normal

09:46:59 25   course of business to plan.  But that's different, again,

09:47:02  1    compared to damages where, with certainty, you know, if the

09:47:07  2    jury finds liability, you know, then Ingevity would have to

09:47:11  3    cut a check to BASF with certainty; right?

09:47:14  4            So now, despite that, you know, we try to make

09:47:18  5    projections, but it's very hard when the industry is in flux

09:47:22  6    or there's a lot of turbulence.  Here, as we shift to

09:47:27  7    electric vehicles, there would be no need for these carbon

09:47:31  8    honeycombs.  And the LMC automotive projections that she

09:47:36  9    uses is an industry standard one.  In fact, I've used it in

09:47:40 10    the past as well.  Except when you have these rapid changes,

09:47:43 11    even LMC gets it wrong.  In fact, we already know since the

09:47:48 12    last projection that she has used from LMC, some major

09:47:51 13    things have changed.  You know, GM, which is one of her five

09:47:57 14    customers potentially for BASF, has come up with a statement

09:48:01 15    that by -- they want in five years' time, they want

09:48:07 16    40 percent of their fleet to be electric.  By 2040, they

09:48:10 17    want all of them to have zero emissions.  In other words, an

09:48:16 18    electric vehicle.  President Biden has put a target of

09:48:19 19    50 percent of U.S. vehicles shifting to electric by 2040.

09:48:23 20    And then even -- in fact, even as recently as just a few

09:48:26 21    days ago, we have in the New York state coming up with an

09:48:29 22    aggressive plan.

09:48:30 23            So of course LMC would not have all of those

09:48:33 24    policy changes.  They wouldn't be part of their forecasts.

09:48:35 25    Even though the general trend toward electric could be

09:48:38 1    captured by LMC, but these specific new targets cannot, and

09:48:42 2    they all happen, literally, within the last, you know, last

09:48:45 3    12 months, since, you know, the last LMC data.

09:48:48 4             So as a result, projecting out 11 years into the

09:48:51 5    future is much harder in an industry like -- like this,

09:48:57 6    compared to some others where you can sort of foresee that

09:49:01 7    that 10 or 11 years' future in a somewhat better way, not

09:49:05 8    that we have crystal ball, but this is the opposite of a

09:49:10 9    crystal ball.

09:49:11 10   Q.    Now, you mentioned that after the '844 patent expires

09:49:15 11   next year, there's going to be a lot more competition.  Does

09:49:19 12   that also make it more difficult to project -- to make these

09:49:23 13   forecasts out all the way to 2032?

09:49:25 14   A.    I mean, it certainly does.  So we're now talking

09:49:28 15   about two levels of forecasts.  So the forecast that we're

09:49:31 16   talking about, the automotive industry, is the aggregate

09:49:34 17   demand for carbon honeycombs.  But then when you have

09:49:38 18   competition, it makes it harder to forecast how much

09:49:42 19   Ingevity would retain or BASF would get; right?  Because as

09:49:47 20   you have others, you know, like MAHLE and Helsa and others

09:49:51 21   come into the marketplace, you know, we do not know what

09:49:54 22   that is going to look like.  We do not know what their

09:49:57 23   carbon honeycombs are going to look like, how they're going

09:49:59 24   to price, and the relationships that they have.  And so all

09:50:03 25   of that makes it much harder, now, to project at an

09:50:08  1    individual canister maker level or a carbon honeycomb maker

09:50:11  2    level.

09:50:12  3    Q.     And if the jury were to find that these future

09:50:14  4    damages are too speculative, what are Dr. Mathur's damages

09:50:20  5    to date, like the damages that she claims have already been

09:50:23  6    suffered?

09:50:23  7    A.     So in fact, I think I have that on a slide.

09:50:27  8    Q.     30?

09:50:28  9    A.     And it's less than ten percent of her total damages

09:50:33 10    that she has.

09:50:36 11    Q.     Let me see if we can get that slide.

09:50:38 12           Is this what you're referring to?

09:50:40 13    A.     Yes.  You heard her testify that the total damages

09:50:44 14    are $39.2 million to $47.8 million, and -- but then if you

09:50:51 15    now split it into past and her two future scenarios, the

09:50:55 16    past damages are only $3.84 million of the total.  In other

09:51:00 17    words, roughly about ten percent or less of the total.

09:51:04 18    Q.     And by the way, if we -- and these are based on

09:51:07 19    both -- on all of her -- all of BASF's claims; right?

09:51:11 20    A.     That is correct.  As you can see here, this is based

09:51:15 21    on tying and exclusive dealing and so -- and then as she

09:51:21 22    indicated, even if you have tortious interference, you

09:51:25 23    cannot add all of these, but this top level range is

09:51:28 24    everything included, all the claims.

09:51:29 25    Q.     Let's assume that -- set aside the tying claim.

09:51:33  1   Assume it has no merit, the jury doesn't buy it.  Does it

09:51:37  2   make any sense to have exclusive dealing damages for the

09:51:44  3   past or up until today?

09:51:45  4   A.     It does not.  In fact, this was one of the things I

09:51:48  5   was puzzled when I first read it, read her report.  Now,

09:51:53  6   tying, I understand.  She says affects, you know, a hundred

09:51:56  7   percent of the market because Ingevity should not have sold

09:52:01  8   carbon honeycombs and provided an implied license.  She says

09:52:05  9   they should have licensed the '844 patent.

09:52:08  10             But suppose the jury does not find that there

09:52:13  11  was tying, that, basically, only one product here and

09:52:16  12  there's no tying.  Then the exclusive dealing claims come

09:52:21  13  solely from the long-term agreements.  But the long-term

09:52:27  14  agreements -- the first instance when the long-term

09:52:32  15  agreements have any meaningful effect for BASF would be upon

09:52:36  16  patent expiration because prior to patent expiration, BASF

09:52:39  17  cannot sell a honeycomb if there's no tying claim.  And so

09:52:42  18  which means the first date BASF would be able to sell would

09:52:47  19  be after the patent expiration in March of 2022, but in her

09:52:52  20  world, because of these long-term agreements, it's going to

09:52:54  21  take them some while because the long-term agreements

09:52:57  22  prevent BASF from selling to Delphi or Kayser or KFTC.  But

09:53:03  23  there should be no past damages because that's the first

09:53:06  24  point where there should be any damage, theoretically, for

09:53:10  25  BASF.  So past damages don't make any sense for exclusive

1135

09:53:13  1    dealing.  They would make sense for tying, but they would

09:53:17  2    not make sense for exclusive dealing.

09:53:19  3    Q.    Okay.  One last subject on damages.  If we could look

09:53:24  4    at PX-121, please.

09:53:38  5            Do you recall, Dr. Rao, that Ms. Rowe did a

09:53:43  6    spreadsheet with forecasts for the sales of honeycombs and

09:53:51  7    Dr. Mathur used those forecasts in doing her damages

09:53:53  8    calculations?

09:53:54  9    A.    That is correct.

09:53:55 10    Q.    Okay.  Let's see if we can take a look at that.

09:54:05 11    Okay.

09:54:05 12            Now, we see, Dr. Rao, that for Ford, for

09:54:13 13    example, let's look at those, and let's look at the first

09:54:17 14    five years out to, say, 2023.

09:54:23 15            You see Ms. Rowe forecasts the number of

09:54:28 16    honeycombs that BASF would sell to Ford for three different

09:54:36 17    platforms; right?  For platform A, it's a hundred thousand,

09:54:40 18    starting in 2019 for those five years.  For platform B, she

09:54:46 19    has a number, and see all those numbers for the first five

09:54:51 20    years?

09:54:51 21    A.    That is correct.  Would you blow this up just a

09:54:54 22    little bit more, please?  So zoom in so I can see the

09:54:57 23    numbers.

09:54:57 24            So what you're referring to is on Row 20.  For

09:55:03 25    platform A, she has 100,000 repeated for the first five

09:55:08  1    years, so that's the introductory platform A.

09:55:12  2    Q.      Okay.  And did -- in her damages calculations, did

09:55:17  3    Dr. Mathur take these exact numbers for these first five

09:55:21  4    years and just plug them into her calculation?

09:55:24  5    A.      That is correct.  She starts out with exactly the

09:55:28  6    same numbers that Ms. Rowe has for these introductory

09:55:32  7    platforms A, B, and C that Ms. Rowe has.  She only adjusts

09:55:38  8    to get to this 50 percent market share based on the

09:55:42  9    introductory platforms for the purposes and then adds the

09:55:44 10    LMC forecasts to ramp up.  But the starting point is exactly

09:55:48 11    the same as Ms. Rowe.

09:55:50 12    Q.      And did she do the same thing for GM for those first

09:55:53 13    five years?  She just took Ms. Rowe's forecasts for how many

09:55:57 14    honeycombs BASF would sell to GM and plugged them into her

09:56:02 15    calculations?

09:56:03 16    A.      That is correct.  Again, you can see that the

09:56:06 17    introductory platform for GM is on Row 32 and that's 50,000

09:56:12 18    units and then she just simply takes that in and -- as a

09:56:17 19    starting point in her analysis as well, in Dr. Mathur's

09:56:21 20    analysis.

09:56:21 21    Q.      Now, if we could scroll down, please, there's two

09:56:24 22    alternative sets of forecasts here.  There's one called

09:56:28 23    pre-lawsuit and one called post-lawsuit.

09:56:31 24            Do you see that?

09:56:31 25    A.      I do.

09:56:32 1    Q.      And is it your understanding that pre-lawsuit are the
09:56:35 2    forecasts that Ms. Rowe did before the lawsuit was filed?
09:56:39 3    A.      That is my understanding.
09:56:41 4    Q.      And the post-lawsuit are her forecasts after the
09:56:44 5    lawsuit was filed?
09:56:45 6    A.      That is correct.   So the patent infringement lawsuit.
09:56:48 7    Q.      Now --
09:56:48 8    A.      -- was filed.
09:56:49 9    Q.      Now, this is the important question:   The numbers
09:56:52 10   that Dr. Mathur used from this spreadsheet for Ms. Rowe, are
09:57:01 11   those in the pre-lawsuit numbers?
09:57:04 12   A.      They are.   They are from the pre-lawsuit number, not
09:57:07 13   the post-lawsuit numbers.
09:57:09 14   Q.      Okay.   And as -- so the exact numbers, exact numbers
09:57:16 15   of honeycombs that Dr. Mathur plugged in are the numbers
09:57:19 16   that Ms. Rowe used in her forecasts before the lawsuit?
09:57:24 17   A.      That is correct.   The introductory platforms are
09:57:27 18   exactly the same as what Ms. Rowe had pre-lawsuit.   And as I
09:57:31 19   said then to that, Dr. Mathur modifies and then ramps up to
09:57:38 20   get to the 50 percent share for each of these OEMs or the
09:57:43 21   carmakers.
09:57:43 22   Q.      And we see the numbers in the forecasts she did after
09:57:47 23   the lawsuit was filed are much, much lower; right?
09:57:51 24   A.      In fact, this is the interesting thing.   So if you
09:57:53 25   look at Row 49, which is the volume that Ms. Rowe was

09:57:59 1   projecting pre-patent infringement lawsuit, and compare that

09:58:02 2   to Row 56, which is the volume she's projecting after the

09:58:07 3   patent infringement lawsuit, the volume after the lawsuit is

09:58:12 4   only about a third of the pre-lawsuit.  In other words,

09:58:15 5   she's assuming because of the patent infringement lawsuit

09:58:19 6   some almost two-thirds of the volume that BASF was expecting

09:58:22 7   to make would now be lost because of the patent infringement

09:58:26 8   lawsuit, and so it goes from something like 35 million units

09:58:30 9   that Ms. Rowe projects to something like, you know, about 50

09:58:34 10  million units.

09:58:34 11  Q.      And so did Dr. Mathur use any of the data from the

09:58:39 12  forecasts that Ms. Rowe did after the lawsuit was filed?

09:58:43 13  A.      No, she -- she still uses the pre-lawsuit

09:58:47 14  introductory platforms as opposed to the post-lawsuit

09:58:51 15  introductory platform.

09:58:52 16  Q.      Is that a problem?

09:58:54 17  A.      It is because this is -- this was my point number one

09:58:58 18  related to causation, which is even if you believe that

09:59:04 19  anti-competitive conduct, it has to be separated out.  The

09:59:07 20  effect of that has to be separated out from simply the

09:59:11 21  patent infringement lawsuit that Ingevity filed against

09:59:14 22  BASF.  And so to the extent that the projections are lower

09:59:19 23  for BASF because of the patent infringement lawsuit and you

09:59:23 24  do not separate those out, then effectively what you're

09:59:26 25  doing is calculating damages for the patent infringement

09:59:28 1  lawsuit, not the antitrust conduct.  And that's the

09:59:32 2  causation issue that I flagged, and you can actually see

09:59:35 3  this here through the projections that Ms. Rowe has put

09:59:38 4  together, and Dr. Mathur uses the pre-lawsuit projections as

09:59:42 5  opposed to the post-lawsuit projections for the introductory

09:59:46 6  platforms.

09:59:46 7  Q.    And just one little point here.  In projections that

09:59:54 8  Ms. Rowe did after the lawsuit was filed, what does she show

09:59:59 9  for sales during 2019?

10:00:01 10 A.    So her damages actually start in January of 2019.

10:00:06 11 This is -- Dr. Mathur's damages start in January of 2019.

10:00:10 12 Q.    No, no, I'm sorry.  I maybe screwed up my question.

10:00:14 13 My question is:  In Ms. Rowe's spreadsheet here, what -- in

10:00:18 14 the forecasts she did after the lawsuit was filed, what does

10:00:22 15 she show for sales during 2019?

10:00:25 16 A.    So column B here that you see -- and if you go to the

10:00:29 17 top, you'll see that's for 2019.  And if you now go down to

10:00:33 18 the pre- and post-lawsuit and you look at in the pre-lawsuit

10:00:38 19 world in Row 49, Ms. Rowe was projecting 210,000 units of

10:00:44 20 sales.  But in the post-lawsuit world, she's now projecting

10:00:47 21 no sales in 2019 at all because of the lawsuit, and so it's

10:00:53 22 zero.  But as I said, nonetheless, Dr. Mathur still assumes

10:00:57 23 that BASF would have made sales in 2019 despite Ms. Rowe

10:01:02 24 herself assuming that because of the lawsuit they would not

10:01:05 25 make any sales in 2019.

10:01:06 1    Q.      Okay.  While we have PX-121 up, let's cover one other

10:01:12 2    topic.  And if we could go up to the top, please, Stu.

10:01:19 3            And you see she has here projections for

10:01:26 4    honeycomb sales to Kayser; right?

10:01:32 5    A.      That is correct.

10:01:33 6    Q.      And she calls them the minimum value, so that's like

10:01:36 7    the minimum number that she was expecting, BASF was

10:01:40 8    expecting to sell to Kayser?

10:01:42 9    A.      That is correct.

10:01:43 10   Q.      Okay.  And we all know that the patent is going to

10:01:48 11   expire in 2022; right?  So if we could go to the right a

10:01:53 12   little bit so we could see all the years, it goes out.  And

10:01:57 13   so what is -- what was BASF projecting for the number of

10:02:04 14   honeycombs through, you know, until the end of this forecast

10:02:08 15   period that BASF was using?  What does it show for the

10:02:11 16   number of honeycombs they expected to sell to Kayser

10:02:16 17   starting in 2022?

10:02:18 18   A.      So in fact, you can actually see this very simply.

10:02:22 19   You know, so if you add up all of Row 15, that's about 15

10:02:27 20   million honeycombs.  And so if you would -- but as you can

10:02:31 21   see, the 2019, 2020, and 2021 are a relatively small portion

10:02:36 22   of that, less than half a million, so which means the rest

10:02:39 23   of the period is about 14 and a half million honeycombs.

10:02:42 24   Q.      So if BASF were -- and we know that there is an

10:02:49 25   agreement between Ingevity and Kayser.

10:02:52 1   A.      That is correct.

10:02:52 2   Q.      And you've looked at the prices in that agreement.

10:02:55 3   A.      I did.

10:02:56 4   Q.      Okay.  And if you were to assume that BASF offered

10:03:02 5   Kayser $2 less than the Ingevity price over this time,

10:03:11 6   period, how much would Kayser save?

10:03:14 7   A.      So in fact, we actually know that that $2 is roughly

10:03:17 8   the difference between the -- the Ingevity pricing to Kayser

10:03:21 9   and then what we see as the BASF pricing to Kayser, and so

10:03:26 10   if you have roughly 14 and a half million units and then $2

10:03:31 11   difference, you know, you're getting to almost $30 million,

10:03:34 12   just under that, right?  About $29 million would be the

10:03:37 13   savings.

10:03:38 14   Q.      Yeah.  This $2 less is not a hypothetical number;

10:03:42 15   right?  What is the difference between the prices in the

10:03:49 16   BASF-Kayser agreement and the prices in the Ingevity-Kayser

10:03:56 17   agreement?

10:03:56 18   A.      Roughly about two and a half -- roughly about $2

10:04:00 19   because Ingevity pricing is roughly around eight and a half

10:04:04 20   dollars and then you can see here on Row 15 the BASF pricing

10:04:09 21   is roughly around six and a half dollars, so it's roughly $2

10:04:13 22   difference.

10:04:14 23   Q.      So if Kayser were to decide to buy their honeycombs

10:04:19 24   from BASF instead of Ingevity, based on the actual prices in

10:04:25 25   the two contracts, Kayser would save about $30 million?

10:04:31  1    A.      That is correct, through the -- through the 2030

10:04:34  2    period.  So if you were to start in 2022 and through the

10:04:37  3    2030 period, that would be just under $30 million.

10:04:41  4    Q.      And what is the payment Kayser would have to make if

10:04:47  5    it decides to terminate its agreement with Ingevity?

10:04:52  6    A.      It would have to pay back approximately $10 million

10:04:56  7    in rebates.

10:04:58  8    Q.      So what does that tell you about whether the

10:05:01  9    termination option in these supply agreements is realistic?

10:05:08 10    A.      In fact, from here, you can see that if they --

10:05:14 11    there's nothing that prevents them -- prevents Kayser from

10:05:17 12    switching to BASF because if they were to switch to BASF,

10:05:21 13    they would save almost $30 million through 2030.  They only

10:05:26 14    have to pay back the rebates of approximately $10 million,

10:05:29 15    which is what Dr. Mathur put up.  And in fact, the $10

10:05:34 16    million requires that $2 savings, only 5 million units, and

10:05:37 17    you can just get that from 2022 to 2026.  In other words, if

10:05:43 18    you look at Row 15, 2022, so next year when patent expires,

10:05:48 19    is about half a million units.  And then, you know, by 2026

10:05:51 20    you already get well over 5 million units.  And so, in fact,

10:05:57 21    you get to about 7 million units, you know, during that

10:05:59 22    period.  So it doesn't take very long for those -- for

10:06:04 23    whatever rebate needs to be paid back to be made up by

10:06:09 24    switching to BASF.  But moreover, if they continued, then

10:06:13 25    the savings would be in excess of that, so this buyer's

10:06:17  1    reversion provision is not particularly an onerous

10:06:21  2    provision.  It can be somebody -- switching to BASF,

10:06:25  3    somebody would be able to pay back those rebates and switch

10:06:27  4    over.

10:06:28  5    Q.      Okay.  By the way, sir, did you hear Dr. Mathur say

10:06:35  6    that BASF could not offer Kayser a price that was low enough

10:06:42  7    to incentivize Kayser to terminate its Ingevity agreement

10:06:48  8    without pricing below its costs?

10:06:50  9    A.      That is what she -- that is what I heard her say.

10:06:53 10    Q.      Okay.  And this number that's in the BASF-Kayser

10:07:02 11    agreement that's $2 less than the Ingevity prices that you

10:07:08 12    just used to explain this to us, what is BASF's profit

10:07:14 13    margin if it charged that price to Kayser?

10:07:20 14    A.      In fact, Ms. Rowe has modeled that in this

10:07:25 15    spreadsheet, so you can actually see it.  So if you go a

10:07:28 16    little bit to the right on this spreadsheet, we saw that the

10:07:32 17    pricing is in Row 15 -- sorry, Row 16, so that's the one

10:07:36 18    that, in 2022, is about $6.61 goes to $6.35.

10:07:42 19    Q.      And that's the price that's $2 lower than Ingevity's?

10:07:45 20    A.      That's correct.  And then if you look at it's Row 17

10:07:51 21    and column P, those are the variable costs that Ms. Rowe

10:07:56 22    projects, $1.88.  And so, you know, which means against a

10:08:00 23    six -- roughly six and a half dollar price, Ms. Rowe is

10:08:03 24    projecting a variable cost, incremental cost, of $1.88.

10:08:07 25           So what does that mean in terms of incremental

10:08:10  1    margin or gross margin?  And she actually calculated that if

10:08:14  2    you go down.  There is a row here and -- that says -- it's

10:08:21  3    Row 59 -- you know, that has the contribution margin, and as

10:08:26  4    you can see, the contribution margin is 73 percent and goes

10:08:30  5    down to 67 percent, on average 70 percent.  So in other

10:08:37  6    words, BASF's incremental margin, gross margin, is about

10:08:41  7    70 percent.  In fact, Dr. Mathur flagged that Ingevity's

10:08:43  8    margin, you know, is in the 70s and therefore that's just

10:08:47  9    excessive.  Well, BASF's margin is not all that different

10:08:51 10    from Ingevity's.

10:08:52 11            Now, Dr. Mathur did add some additional costs in

10:08:55 12    her report compared to Ms. Rowe for approximately another

10:08:58 13    dollar.  So she said instead of $1.88, her numbers are just

10:09:02 14    around $2.80.  And -- but even at that, there's a very

10:09:08 15    substantial margin, gross margin, that BASF is making.  Now,

10:09:11 16    I realize gross margins are not the same as net margins, but

10:09:15 17    you know, that is the comparison that she was providing with

10:09:17 18    respect to Ingevity.

10:09:19 19    Q.     So BASF could charge Kayser $2 less than the Ingevity

10:09:25 20    price and still make a 50, 60 percent profit margin?

10:09:30 21    A.     Precisely.

10:09:31 22    Q.     Okay.  Okay.  One other thing on 121 before we move

10:09:37 23    on.  This also shows what Ms. Rowe was expecting their share

10:09:46 24    of sales to each of these car makers to be; correct?

10:09:51 25    A.     That is correct.

10:09:52 1    Q.      Okay.  And she has Ford and she has GM and then she

10:09:55 2    has the others; right?  And would the others include the

10:09:59 3    other three carmakers that Dr. Mathur has included?

10:10:02 4    A.      That is true.  So, you know, we saw the specific

10:10:07 5    blocks for Fords and GM, so Ford starts on Row 14; GM starts

10:10:12 6    on Row 31.  But then if you see Row 40, again, it may need

10:10:16 7    to be zoomed.

10:10:19 8            And you know there are other OEMs, and OEMs are

10:10:23 9    carmakers.  And, again, Ms. Rowe is assuming that it's the

10:10:27 10   carmakers that are going to be getting these platforms, and

10:10:32 11   so she has a projection for all the other carmakers.

10:10:37 12   Dr. Mathur takes three of them, Fiat and Honda and

10:10:41 13   Volkswagen, as the basis for her --

10:10:44 14   Q.      Yeah.

10:10:44 15   A.      -- other carmaker calculation.

10:10:46 16   Q.      Let's look at this, in this Line 42, where it says

10:10:51 17   once you get out to the end of the time period where the

10:10:55 18   market share for those three -- for those other carmakers

10:10:59 19   works its way up to 14 percent as the highest?

10:11:02 20   A.      That is correct.

10:11:03 21   Q.      And that would include all -- all carmakers except

10:11:06 22   for Ford and GM?

10:11:07 23   A.      That is correct.

10:11:08 24   Q.      Okay.  But for the other three carmakers that

10:11:13 25   Dr. Mathur includes, what does she assume the market share

10:11:17  1    would get to be?

10:11:18  2    A.        She assumes the same 50 percent market share.  You

10:11:22  3    know, so you can see Ms. Rowe has assumed that eventually,

10:11:28  4    BASF would get to 50 percent for Ford and GM, but only

10:11:33  5    14 percent for the others.  Dr. Mathur assumes 50 percent

10:11:36  6    for all of them, all five of them, so it's more aggressive

10:11:40  7    than Ms. Rowe's own assumption.

10:11:42  8    Q.        So even though Dr. Mathur used Ms. Rowe's forecasts

10:11:45  9    and Ms. Rowe forecast 14 percent from these other car

10:11:49 10    companies, she used 50 percent?

10:11:51 11    A.        That is correct.  In fact, her 50 percent is coming

10:11:54 12    from, in part, from you know, Ms. Rowe.  But she deviates

10:11:59 13    from Ms. Rowe for the other and increases 14 percent to

10:12:03 14    50 percent.

10:12:04 15    Q.        Okay.  Thank you, Doctor.  One last thing before we

10:12:07 16    wrap up.

10:12:08 17                 Could we have Dr. Mathur's slide 16, please.

10:12:21 18    Sir, you were -- no, that's not it.  The comparing the

10:12:28 19    investments.

10:12:36 20                 MR. THOMAS:  One minute, Your Honor.  I'm sorry.

10:12:38 21                 THE COURT:  Sure.

10:12:45 22                 MR. THOMAS:  It's 16 in the slide deck that we

10:12:48 23    got.

10:12:49 24    BY MR. THOMAS:

10:12:50 25    Q.        Sir, you were here for Dr. Mathur's testimony?

10:12:53 1    A.        Yes.

10:12:54 2    Q.        And you recall she was comparing what she called one

10:12:59 3    year of Ingevity profits with investments, and she showed

10:13:05 4    this slide?

10:13:06 5    A.        Yes.

10:13:06 6    Q.        Is this fair?

10:13:07 7    A.        This is probably the most misleading of her slides

10:13:13 8    that she has put forward, and I'm happy to explain.

10:13:19 9    Q.        Please go ahead.

10:13:19 10   A.        So on the right-hand side, she has what she

10:13:25 11   characterizes as $70 million of investments over a 17-year

10:13:31 12   period.  This is, in part, coming from my report, and it is

10:13:35 13   specific to R&D expenses and, you know, costs related to the

10:13:41 14   '844 patent.  But Ingevity also undertook investments in its

10:13:46 15   Waynesboro plant for another $50-plus-million.  In fact,

10:13:51 16   Mr. Woodcock testified they substantially added more people

10:13:55 17   and the capacity for some additional 13-plus-million

10:13:59 18   honeycombs and so on.

10:14:00 19            So the actual investments are much, much larger,

10:14:02 20   much greater on -- over this period, but let's take, for the

10:14:05 21   moment, the $70 million.  Almost all of this $70 million is

10:14:07 22   for the carbon honeycombs and carmaker '844 patent.  It's

10:14:11 23   related to the R&D for that.  Now, first question is, okay,

10:14:15 24   what is BASF's investment?  And Ms. Rowe -- Dr. Mathur

10:14:19 25   identified that to be approximately a million and a half.

10:14:23  1          So even if you assume that these investments

10:14:26  2   that Ingevity made are $50 million, now we're talking about,

10:14:31  3   you know, a 35-time difference.  In other words, Ingevity

10:14:35  4   spent, invested 35 times more than BASF did, you know, in

10:14:41  5   terms of investments.  Okay.  So set that aside for the

10:14:43  6   moment.

10:14:44  7          Now, let's go to the left-hand side.  She then

10:14:48  8   takes one year of gross profits on carbon adsorbent sales.

10:14:54  9   That's what the title says.  Okay.  But that's an

10:14:57 10   apples-to-oranges comparison because if you're looking at

10:15:00 11   carbon honeycombs and the '844 patent related investments --

10:15:03 12   and it says that's in their $50 million -- you should be

10:15:06 13   comparing that to the honeycomb sales.  Okay.

10:15:12 14          If you look at the honeycomb gross profits,

10:15:14 15   those are approximately half of this, about $132 million.

10:15:17 16   Even from her own report, which also is in my report, the

10:15:21 17   honeycomb sales in one year in 2019 were approximately 166

10:15:25 18   million.  And if you look at the operating profit on it, not

10:15:29 19   the gross profits, that's about $235 million.  So in other

10:15:32 20   words not only has Ingevity invested 35 times more in

10:15:38 21   innovation than BASF on honeycombs based on her own data,

10:15:42 22   when you compare it to profits, net income or operating

10:15:47 23   profits, you know, we're talking about $25 million in

10:15:50 24   profits for one year for honeycombs.

10:15:51 25          So this 4X is a completely misleading

10:15:56  1    comparison, and it's also meaningless because the intention

10:16:00  2    is not anybody who invents and innovates and comes up with a

10:16:05  3    patent protection, that is a dominant, you know, the

10:16:08  4    solution to these emissions.   The intention is not you

10:16:13  5    make -- you know, you recoup your investment and then after

10:16:16  6    that you're down.   Normally, when businesses invest, they

10:16:19  7    know that, you know, to recoup investment you know through

10:16:22  8    their expiration of the patent, and so -- and so even that

10:16:27  9    benchmark itself is not a meaningful one, but the numbers

10:16:30 10    here are all very misleading.

10:16:32 11    Q.      So let's make sure we understand.   If you look at the

10:16:38 12    annual operating profits from just the honeycomb business,

10:16:42 13    which is what we're here to talk about, the number on the

10:16:46 14    left would be $35 million?

10:16:47 15    A.      It would be about $25 million.

10:16:49 16    Q.      $25 million.   I'm sorry.

10:16:50 17    A.      So it's a tenth of when she has on the bar chart.

10:16:53 18    Q.      Right.   And now let's look at the right.   You've said

10:16:56 19    that's research and development spending at -- only at

10:17:04 20    Ingevity related to the honeycombs and carmaker '844 patent.

10:17:08 21    A.      So the research -- the innovation specific to the

10:17:11 22    '844 patent, research and development for carbon honeycombs,

10:17:15 23    and the investment in the Waynesboro plant all add up to

10:17:20 24    roughly $50 million, $52 million.

10:17:23 25    Q.      We know that the honeycombs were made in the

10:17:27  1   Waynesboro plant.

10:17:27  2   A.      That is correct.

10:17:28  3   Q.      And does she -- and Mr. Woodcock testified to all the

10:17:32  4   money that was spent to make that plant bigger so it could

10:17:36  5   meet the demand for the honeycombs.  Is Dr. Mathur including

10:17:41  6   those investments here?

10:17:42  7   A.      She's not.

10:17:43  8   Q.      Okay.  And Mr. Woodcock also explained that they

10:17:49  9   doubled their employment, that they went from about a 120

10:17:53 10   employees working at that Waynesboro plant up to about 240.

10:17:58 11   Is Dr. Mathur including any of those labor expenses here?

10:18:03 12   A.      I don't believe so.

10:18:04 13   Q.      Okay.  And those expenses, having twice as many

10:18:07 14   people working for you, those are expenses that are going to

10:18:10 15   be incurred every single year; right?

10:18:13 16   A.      That is correct.  Any investment in capacity, you

10:18:17 17   know, could potentially be an ongoing investment, not

10:18:20 18   necessarily a one-time investment.

10:18:21 19   Q.      Okay.  All right, Doctor I think we're done.  Could

10:18:25 20   you just please sum up your opinions for the jury.

10:18:28 21   A.      So there are four areas we discussed.  You know, the

10:18:33 22   first tying.  In order for tying, there has to be two

10:18:37 23   separate markets.  That is critical.  And here, that means

10:18:41 24   there has to be a separate demand for the carbon honeycombs

10:18:45 25   other than to be used in fuel canisters to practice the '844

patent.  There crystal-clearly is no evidence of that.  The only reason somebody uses these specific carbon honeycombs of the size and dimension is to use them in fuel canisters to practice the '844 patent.  That is kind of like the left shoe-right shoe example.  In other words, you know, customer demand is for that, you know for those honeycombs for one purpose.  There are no two products.  So as a result, tying fails just based on, you know, based on lack of distinct demand.

Exclusive dealing is entirely based on those three long-term agreements with Delphi, Kayser, and KFTC. But there is no exclusive dealing prior to the patent expiration because an infringing honeycomb can't be sold during that period anyway.  It is after the patent expiration, but as we saw, after the patent expiration, there are two provisions that no longer make it exclusive. In other words, buyer's reversion allows Delphi or Kayser or KFTC to get out of the deal.  Meet and -- meet or release allows for the customer, you know, like Kayser, to still get a competitive price that Ingevity either has to match or release.

We have to have harm to competition at the end of the day, even if there's tying and exclusive dealing, antitrust economics is focused on harm to competition.  That requires, for instance, harm to competition in terms of

10:20:24  1   higher prices in the but-for world as opposed to the actual

10:20:28  2   world.  And for that, Dr. Mathur needs to show that in the

10:20:33  3   but-for world, without the alleged anticompetitive conduct,

10:20:39  4   the price of a carbon honeycomb would have been lower than

10:20:43  5   Ingevity's price.  But that common-sensically doesn't make

10:20:46  6   any sense because the difference between the Ingevity price

10:20:50  7   and the BASF price is not that huge.  You know, we saw with

10:20:54  8   Kayser it's $2.  If Ingevity merely added two and a half

10:20:59  9   dollars for its license fee, now the but-for world pricing

10:21:03 10   would be higher than the actual world pricing.  And

10:21:07 11   Dr. Mathur hasn't told us what Ingevity should be able to

10:21:10 12   charge.  And so -- and in fact, in any instance where they

10:21:15 13   had, you know, something related to potential patent

10:21:18 14   infringement settlement, those rates have been much, much

10:21:22 15   higher.  Okay.  So there is no harm to competition.

10:21:25 16           And then, finally, of course, those have to be

10:21:29 17   met before we can get to damages, but as I discussed, there

10:21:33 18   are a number of issues with her damages.  Most importantly,

10:21:37 19   the causation is wrong.  She's calculating damages for the

10:21:40 20   patent infringement lawsuit rather than anticompetitive

10:21:43 21   conduct.  She does not take into account probability of

10:21:46 22   success.  She assumes just because Ingevity -- BASF had some

10:21:50 23   conversations with these five auto makers, or in some

10:21:53 24   instances potentially testing, that is the same as

10:21:57 25   automatically getting 50 percent of their sales.  That's a

10:22:01  1    very aggressive assumption.  And then of course, as I also

10:22:04  2    discussed, the inputs and the timing are also speculative

10:22:08  3    along with a very turbulent industry.  So for all of these

10:22:11  4    reasons, I think her analysis is a little bit aggressive and

10:22:16  5    then is unreliable.

10:22:19  6              MR. THOMAS:  Nothing further, Your Honor.

10:22:20  7              THE COURT:  All right.  Thank you, Mr. Thomas.

10:22:23  8              Mr. Yook.

10:22:24  9              MR. YOOK:  Thank you, Your Honor.

10:22:26 10    BY MR. YOOK:

10:22:26 11    Q.      Good morning, Dr. Rao.

10:22:28 12    A.      Good morning.  It's good to meet you in person.

10:22:30 13    Q.      Yeah, good to see you.

10:22:31 14    A.      Last time we were on video.

10:22:32 15    Q.      That's right?  So you're here on behalf -- testifying

10:22:36 16    on behalf of Ingevity; right?

10:22:38 17    A.      That is correct.  I was asked to provide analysis on

10:22:41 18    behalf of Ingevity.

10:22:42 19    Q.      Okay.  And you're part of an economic consulting

10:22:44 20    company?

10:22:45 21    A.      That is correct.

10:22:46 22    Q.      Okay.  And what's the name that have company, again?

10:22:49 23    A.      Epsilon Economics.

10:22:51 24    Q.      And how much is Ingevity paying Epsilon Economics for

10:22:54 25    your testimony here?

10:22:55 1    A.      They're not paying anything for the testimony per se,

10:22:58 2    but we charge for our time.  And I don't have an exact

10:23:02 3    estimate for you.  I may have given that during the

10:23:05 4    deposition, but -- but it would be --

10:23:07 5    Q.      Does $950 an hour sound right to you?

10:23:11 6    A.      That is what my company, Epsilon Economics, charges

10:23:14 7    for my time.  That's correct.

10:23:15 8    Q.      Okay.  What's your title at Epsilon Economics?

10:23:17 9    A.      I'm their chief executive officer.

10:23:20 10   Q.      Okay.  And you said you've testified in other legal

10:23:23 11   cases before; right?

10:23:24 12   A.      That is correct.

10:23:26 13   Q.      How many cases?

10:23:26 14   A.      Over a hundred times.

10:23:29 15   Q.      Okay.  Do you know exactly?

10:23:31 16   A.      I think in deposition and trial, maybe 125 times.

10:23:37 17   Q.      125.  Okay.

10:23:39 18           And, Dr. Rao, I just want to make sure that I

10:23:42 19   understand your testimony here today correctly.  You're

10:23:46 20   testifying as an economist; right?

10:23:48 21   A.      That is correct.

10:23:49 22   Q.      And so you're not testifying and offering any expert

10:23:51 23   opinions on engineering issues?

10:23:54 24   A.      That is correct.

10:23:55 25   Q.      So you have no expert opinion about what honeycombs

10:23:58  1    can and can't be used for?

10:23:59  2    A.     I mean, I'm not providing any engineering expertise

10:24:04  3    despite having an engineering background.  That is right.

10:24:07  4    Q.     Right.  And you have no expert opinion about what

10:24:10  5    other products, other honeycombs, can go into fuel vapor

10:24:13  6    canisters?

10:24:13  7    A.     I don't have an expert opinion as an engineering

10:24:19  8    expert.  That's correct.

10:24:19  9    Q.     Okay.  And you're also not offering any legal

10:24:22 10    opinions to the jury here today; right?

10:24:23 11    A.     Absolutely not.  I've not gone to law school even for

10:24:27 12    one day.

10:24:27 13    Q.     Right.  Probably a good choice.

10:24:29 14           So no expert opinion about what the patent

10:24:31 15    covers or doesn't cover; right?

10:24:33 16    A.     That's fair.

10:24:34 17    Q.     And so you have no expert opinion that a patent

10:24:37 18    involving canisters also covers honeycombs or not?

10:24:40 19    A.     I mean, it's easy to agree.  No.

10:24:47 20    Q.     Okay.  Thank you.

10:24:48 21           Dr. Rao, real quick.  You mentioned -- you put

10:24:53 22    up this slide again where Dr. Mathur had calculated the

10:24:56 23    total investments versus the total profits in one year in

10:25:01 24    2019; correct?

10:25:02 25    A.     That is correct.

10:25:03   1   Q.      And you took some issue with that calculation; is

10:25:05   2   that -- am I hearing correctly?

10:25:07   3   A.      That is correct.

10:25:08   4   Q.      Okay.  So I think part of your issue was that the

10:25:11   5   $263,000,000 profit in one year you think is inflated

10:25:16   6   because it covers both carbon adsorbents and honeycombs; is

10:25:20   7   that right?

10:25:20   8   A.      It covers carbon adsorbents, so it's broader than

10:25:26   9   honeycombs.  Right.  It has pelletized carbon and other

10:25:29  10   things in there.

10:25:29  11   Q.      All right.  So focusing on just honeycomb for a

10:25:32  12   minute, if I heard you correctly, you said Ingevity earns

10:25:35  13   $25 million per year in just honeycomb profits; correct?

10:25:40  14   A.      In net income, that's correct.  In overrated profits.

10:25:44  15   Q.      And the total investments that you had calculated,

10:25:46  16   that was actually from your report; correct?

10:25:48  17   A.      That is correct.

10:25:50  18   Q.      And that was spread out over 17 years of Ingevity's

10:25:52  19   investments?

10:25:53  20   A.      That is correct.

10:25:54  21   Q.      So okay.  So let's take 17 years of profit.  I was

10:25:57  22   trying to do some math, so I think it's rough, but 17 times

10:26:01  23   -- 17 years times $25 million in profits per year seems --

10:26:05  24   it's about $425 million; right?

10:26:07  25   A.      So that doesn't make any sense, and here's why.

10:26:11  1    You're assuming -- I mean, these carbon honeycombs

10:26:13  2    largely -- these specific ones we're talking about are

10:26:17  3    designed to meet LEV III/Tier 3 standards, but those

10:26:21  4    standards start kicking in, you know, only in the last few

10:26:24  5    years.  So for you just simply to assume just because the

10:26:27  6    investment went that back that they would have exactly the

10:26:31  7    same profits for 17 years, doesn't make any sense.

10:26:34  8    Q.    But wait a second.  Didn't you try to justify

10:26:38  9    Ingevity's long-term agreements with its investments over

10:26:42 10    17 years?

10:26:42 11    A.    No.  I was pointing out particularly -- I have

10:26:47 12    flagged this, but I was pointing out particularly the

10:26:49 13    investment in the Waynesboro plant, which I understand there

10:26:53 14    was another expert, you know, who had done those

10:26:57 15    calculations, was approximately $50-plus-million.  So I was

10:27:01 16    focused on that as a basis, you know, for discussing the

10:27:06 17    long-term agreements, not solely the $17 million.  In other

10:27:10 18    words, the same place in my report discusses the Waynesboro

10:27:14 19    plant.

10:27:14 20    Q.    Okay.  Let's put the Waynesboro investments aside.

10:27:17 21    You, in your report, calculated $70 million in R&D

10:27:23 22    investments over 17 years; correct?  Yes or no.

10:27:26 23    A.    That is correct.

10:27:27 24    Q.    Okay.  So you took 17 million -- 17 years of R&D

10:27:32 25    investments as justifying Ingevity's conduct here, no?

10:27:35  1    A.       No.

10:27:37  2    Q.       Oh, so you didn't use 17 years?

10:27:38  3    A.       Just because I said they spend $70 million over

10:27:43  4    17 years doesn't mean that that's the basis for justifying

10:27:46  5    any conduct.  That is just simply to recognize how much they

10:27:50  6    had spent, particularly in contrast to what BASF had spent,

10:27:54  7    which I understand is only a million and a half.  But more

10:27:56  8    importantly, when I was discussing the long-term agreements

10:28:00  9    and the supply commitments and the expansion, I was talking

10:28:04 10    about its Waynesboro plant.  It's actually in the same place

10:28:06 11    of the report.  If you have the report, you can put that up.

10:28:08 12    Q.       Sure.

10:28:08 13    A.       You know, the discussion is on the same page.

10:28:10 14    Q.       So -- so you're not justifying the long-term

10:28:13 15    agreements with the $70 million in R&D?

10:28:15 16    A.       I'm not solely trying to justify.  I'm not even sure

10:28:23 17    what that means.  The $70 million is what they spent, and in

10:28:29 18    addition to that, they spent more; right?  So when I was

10:28:32 19    discussing the long-term agreement, one of the things a

10:28:36 20    patent owner wants to do is prevent free riding; right?

10:28:40 21    Because think of what Dr. Mathur is suggesting.  She says

10:28:44 22    despite this patent, BASF should be able to sell carbon

10:28:49 23    honeycombs and then somebody else needs to pay this patent

10:28:51 24    license fee.  That's exactly the free riding; right?  So I

10:28:55 25    was using the discussion on the -- on the investment as a

10:29:00  1    basis for the incentive a patent owner has to prevent free

10:29:05  2    riding and therefore protect its patent.

10:29:07  3    Q.      Okay.  So how much are you actually saying that

10:29:10  4    Ingevity has invested that justifies its long-term

10:29:13  5    agreements here today?  Is it $50 million?  Is it

10:29:19  6    $70 million?  How much is it?

10:29:20  7    A.      So if you focus just on the '844 patent and related

10:29:28  8    R&D and the capital investments in its Waynesboro plant, I

10:29:32  9    believe those were approximately $52 million, which I

10:29:35 10    already testified earlier.

10:29:36 11    Q.      Okay.  So you're saying $52 million justifies all the

10:29:40 12    profits that Ingevity makes off of these carbon honeycombs?

10:29:45 13    A.      I'm not sure -- I'm not sure how to answer the

10:29:49 14    question.

10:29:49 15    Q.      It's a pretty clear question.

10:29:50 16    A.      Nothing justifies any profits.  That's the investment

10:29:53 17    that somebody made, in this case, Ingevity.  And so anyone

10:29:57 18    who is a patent owner who makes that investment for

10:30:00 19    innovation wants to protect that invention.  And protect

10:30:05 20    that innovation.  In this case, the patent provides the

10:30:08 21    patent owner the right to exclude others from making the

10:30:12 22    same thing.  It's a government-granted right.  And so all I

10:30:16 23    was saying is, look, they have invested substantial amounts

10:30:19 24    in innovation, so you would expect them to want to stop free

10:30:24 25    riding from other participants through the life of the

10:30:27 1    patent.

10:30:28 2    Q.      And they've earned a lot more than that; right?

10:30:31 3    That's the key point; right?

10:30:32 4    A.      Of course.  I mean, that the expectation of any

10:30:34 5    business --

10:30:34 6    Q.      Right.

10:30:35 7    A.      -- is to earn more than you invest, not just break

10:30:37 8    even.

10:30:37 9    Q.      Okay.  Dr. Rao, were you with us all of last week?

10:30:40 10   A.      No.

10:30:40 11   Q.      Okay.  So respectfully, this case isn't about left

10:30:44 12   shoes and right shoes; right?

10:30:45 13   A.      That's correct.  It's not about left shoes and right

10:30:48 14   shoes.

10:30:49 15              MR. YOOK:  Okay.  No further questions.

10:30:50 16              THE COURT:  All right.  Any redirect?

10:30:53 17              MR. THOMAS:  No, Your Honor.

10:30:54 18              THE COURT:  All right.  Dr. Rao, thank you.  You

10:30:56 19   may step down.  Watch your step.

10:31:00 20              THE WITNESS:  Thank you, Your Honor.

10:31:06 21              MR. THOMAS:  One moment, please, Your Honor.

10:31:08 22              THE COURT:  Yeah.

10:31:17 23              MR. THOMAS:  Ingevity rests its case, Your

10:31:20 24   Honor.

10:31:20 25              THE COURT:  All right.

10:31:22  1                 MR. MEZZINA:  Your Honor, BASF has a motion to

10:31:25  2      make.

10:31:25  3                 THE COURT:  All right.  We can deal with that

10:31:27  4      later.

10:31:27  5                 Do you -- do you have any redirect case?

10:31:31  6                 MR. FRIEL:  Yes, Your Honor.

10:31:32  7                 THE COURT:  All right.  Sorry.  Rebuttal, I

10:31:37  8      meant.

10:31:37  9                 MR. FRIEL:  Yes, we call Dr. Mathur.

10:31:39 10                 THE COURT:  All right.  Dr. Mathur, you're still

10:32:08 11      sworn from when you testified before.

10:32:09 12                 THE WITNESS:  Okay.

10:32:26 13                 MR. MEZZINA:  Your Honor, may we approach?

10:32:29 14                 THE COURT:  Yes.

10:32:51 15      BY MR. MEZZINA:

10:32:54 16      Q.    Dr. Mathur, welcome back.  Have you been in Court

10:32:57 17      here for the entire trial?

10:32:58 18      A.    I have, since last Tuesday.

10:33:00 19      Q.    Did you hear all the testimony that Dr. Rao gave last

10:33:04 20      week and this morning?

10:33:05 21      A.    I did.

10:33:06 22      Q.    What did you think?

10:33:07 23      A.    Well, Dr. Rao mischaracterized both the economic

10:33:12 24      principles.  He also mischaracterized my testimony, and he

10:33:16 25      seems to have not fully considered all of the testimony

1162

10:33:19 1  we've heard both from BASF but also from Ingevity.  So it

10:33:25 2  was a bit difficult to hear, especially without being able

10:33:27 3  to respond.

10:33:29 4  Q.     All right.  Well, we'll give you a chance to respond.

10:33:31 5         So let's start with the tying claims.

10:33:35 6  Dr. Mathur, can you just remind us what a tying arrangement

10:33:38 7  is?

10:33:38 8  A.     Yes.  Tying occurs when a seller provides a product

10:33:43 9  on the condition that a buyer purchases another product from

10:33:48 10 that seller.

10:33:50 11 Q.     Okay.  Can you remind us how Ingevity created an

10:33:54 12 improper tying arrangement?

10:33:55 13 A.     Yes.  Ingevity went to canister makers and said that

10:33:59 14 if they wanted to get authorization to practice the '844

10:34:04 15 patent, they had to purchase all their carbon adsorbents

10:34:07 16 from Ingevity.  That's a classic tying arrangement.

10:34:12 17 Q.     Now, Dr. Rao said the authorization of the license to

10:34:17 18 practice the patent, that's not a product because it's not a

10:34:20 19 physical object.  Maybe -- maybe it was Mr. Thomas who made

10:34:23 20 that suggestion.  I'm not sure, but the suggestion was made

10:34:25 21 that it's not a physical objects you can hold in your hand.

10:34:28 22 What do you say about that?

10:34:29 23 A.     As a matter of economics, you know, intangible

10:34:34 24 assets, like a license to a patent or a trademark, they all

10:34:37 25 have value, even services like you choose to purchase a

10:34:42  1    movie and stream it on your television or you go to the

10:34:45  2    dentist.   There's no physical product necessarily involved.

10:34:49  3    That doesn't matter.

10:34:52  4    Q.    Did you hear Dr. Rao say licenses and honeycombs

10:34:56  5    aren't two products, they're actually one product like a

10:34:59  6    pair of shoes?

10:34:59  7    A.    Yes.

10:35:05  8    Q.    Do you agree with that?

10:35:06  9    A.    Absolutely not.

10:35:08 10    Q.    Why not?

10:35:08 11    A.    Well, a pair of shoes is one product.   Dr. Rao

10:35:14 12    himself says consumers don't demand one shoe and another

10:35:19 13    shoe separately.   Don't go to Nike to try to purchase a

10:35:23 14    right shoe and go to Reebok to purchase a left shoe.   It's

10:35:26 15    one product.

10:35:27 16              But this case is completely different.   This

10:35:30 17    case, there were two products, and we know that based on how

10:35:36 18    consumers view these products as distinct and based on how

10:35:40 19    consumers demands these products distinctly.   That's why

10:35:44 20    they're two products.

10:35:46 21    Q.    So we have here some of Mr. Schutte's testimony.   Is

10:35:50 22    this an example of the kind of evidence you've considered

10:35:52 23    about how customers view these products?

10:35:54 24    A.    Correct.   I mean, as Mr. Schutte at Kayser is

10:35:58 25    explaining, Kayser wants to purchase BASF's carbon

10:36:03  1    honeycombs, because they perform better and have different

10:36:06  2    characteristics, and put them in a fuel canister for which

10:36:09  3    it wants to get a license to practice the '844 patent.  So

10:36:14  4    it wants one carbon honeycomb from BASF and it wants a

10:36:19  5    license from Ingevity.  It's making -- it's expressing

10:36:23  6    distinct demands for two different products.  That's why

10:36:26  7    these are two different products.

10:36:27  8    Q.    So what's wrong with the way Dr. Rao approached this

10:36:31  9    question?

10:36:31 10    A.    Well, Dr. Rao said that you should look at customer

10:36:35 11    demands, and he's right.  You should look at customer

10:36:37 12    demands, but then he didn't actually look at customer demand

10:36:41 13    because when you look at customer demands, what you see is

10:36:43 14    Kayser, for example, wants a BASF carbon honeycomb to put in

10:36:47 15    a fuel canister for which it's trying to get a license from

10:36:51 16    Ingevity.  Two different products.

10:36:53 17    Q.    Thank you.

10:36:54 18          Did anything else Dr. Rao said affect your

10:36:58 19    opinion about Ingevity's improper tying?

10:37:00 20    A.    No.

10:37:04 21    Q.    All right.  Let's move onto exclusive dealing.  So

10:37:07 22    you also concluded that Ingevity was guilty in this case of

10:37:10 23    improper exclusive dealing; is that correct?

10:37:12 24    A.    Yes.

10:37:14 25    Q.    And can you remind us how you reached that

10:37:16  1    conclusion?

10:37:16  2    A.    That conclusion is based on the three exclusive

10:37:19  3    long-term agreements that Ingevity entered into with Delphi,

10:37:23  4    Kayser, and KFTC, and these agreements require these

10:37:27  5    customers to purchase all of their carbon honeycombs

10:37:31  6    exclusively from Ingevity for a long period of time and

10:37:35  7    several years after the expiration of the patent.

10:37:39  8    Q.    Now, Dr. Rao said that even though these three

10:37:42  9    customers we see here have these exclusive contracts with

10:37:45 10    Ingevity, lots of other customers don't, so I guess what's

10:37:48 11    the big deal.  And he put up this slide.  Do you remember

10:37:51 12    seeing this slide?

10:37:52 13    A.    I do.

10:37:53 14    Q.    What's your response to this?

10:37:54 15    A.    I mean, the slide is both extremely misleading and

10:37:59 16    also incomplete because it ignores a very critical point,

10:38:02 17    which is the size of the canister makers.  The size of the

10:38:07 18    customers.

10:38:07 19    Q.    And do you have a slide to illustrate that?

10:38:09 20    A.    I do.

10:38:11 21    Q.    Let's take a look.  So tell us about this.

10:38:13 22    A.    Well, what you see on the left side are the canister

10:38:17 23    makers with whom Ingevity has entered into an exclusive

10:38:20 24    arrangement.  BASF cannot sell to these customers, and these

10:38:24 25    are big.  These are three of the four largest customers.

10:38:28  1    Dr. Rao and Ingevity are trying to suggest that, oh, but

10:38:31  2    there are these other customers that you could sell to.

10:38:34  3                Let's look at them.  The list might extend

10:38:37  4    really long, but when you start to look at how big they are,

10:38:40  5    what you see is that this list includes an entity like MTC,

10:38:44  6    which is .5 percent, actually less than .5 percent, of all

10:38:49  7    of the canisters -- excuse me -- of all of the carbon

10:38:54  8    honeycombs in the marketplace.  So to try to justify that,

10:38:58  9    oh, BASF can still sell to these other customers ignores the

10:39:03 10    very substantial handicap and burden that is being imposed

10:39:08 11    on BASF, both by foreclosing it from half the market, but

10:39:15 12    also by foreclosing it from three of the four largest

10:39:18 13    customers.

10:39:20 14    Q.    So if you add up those numbers, what portion of the

10:39:23 15    overall sales of carbon honeycombs is represented by those

10:39:26 16    three customers that Ingevity locked into these exclusive

10:39:30 17    agreements?

10:39:30 18    A.    I believe it's over 50 percent.  Approximately

10:39:34 19    50 percent.

10:39:34 20    Q.    And is a little bit over 50 percent, is that

10:39:38 21    substantial?

10:39:39 22    A.    That is substantial foreclosure, yes.

10:39:43 23    Q.    Does that -- does locking up a little bit more than

10:39:45 24    half the market, does that affect competition?

10:39:47 25    A.    It affects competition substantially.  And as I

10:39:51  1    mentioned, it's not -- the 50 percent is a very large

10:39:54  2    portion.  It's also what portion of the market based on

10:39:57  3    these large customers.  It's also important to remember that

10:39:59  4    that is -- this is in a market where there is only currently

10:40:03  5    one supplier and there are barriers to entry which makes it

10:40:07  6    difficult for other suppliers to enter.

10:40:09  7             So all together, this is extremely substantial

10:40:13  8    foreclosure which is going to have a substantial impact on

10:40:16  9    competition.

10:40:17 10    Q.    Now, the companies on this slide, these are canister

10:40:20 11    manufacturers; right?

10:40:21 12    A.    That's correct.

10:40:21 13    Q.    This is what we've also heard people call Tier 1

10:40:24 14    manufacturers?

10:40:25 15    A.    Yes.

10:40:25 16    Q.    And I think Dr. Rao, after he showed this slide, he

10:40:28 17    also said that it's a mistake to look at these canister

10:40:31 18    manufacturers.  He said we should look at the carmakers

10:40:34 19    instead, and then he put up this chart.  Do you remember

10:40:37 20    seeing this?

10:40:37 21    A.    Yes.

10:40:38 22    Q.    So we've seen this chart displayed multiple times by

10:40:41 23    Ingevity.  So first of all, what is Dr. Rao, Ingevity, what

10:40:46 24    are they saying with this chart?

10:40:48 25    A.    Well, this chart is also both very misleading and

10:40:51  1    also incomplete.  I think what they're trying to say, or

10:40:54  2    what Dr. Rao is trying to say, is that somehow it's the

10:40:56  3    carmakers that are the customers and therefore we should

10:40:59  4    look at that.

10:41:01  5    Q.     And do you have a slide to illustrate how you --

10:41:05  6    well, you know what, well, yeah.

10:41:07  7            Let's put up your slide.  You have a slide to

10:41:09  8    illustrate your thoughts on this?

10:41:10  9    A.     Yes.

10:41:12 10    Q.     All right.  So can you explain the adjustments you

10:41:15 11    made here.

10:41:15 12    A.     Yes.  Again, as I said, there are at least two very

10:41:19 13    fundamental issues with these charts.  One is the size point

10:41:23 14    that I just made; right?  The canister makers on left are

10:41:26 15    the ones that BASF -- that BASF is foreclosed from, Ingevity

10:41:31 16    has entered into exclusive agreements with.  They're large,

10:41:33 17    and I've tried to make the size of the box proportionate to

10:41:36 18    how large they are, and you can see together they're half

10:41:39 19    the market.

10:41:40 20            And then there are the canister makers with whom

10:41:43 21    Ingevity has apparently not entered into an exclusive

10:41:47 22    license arrangement with -- excuse me, exclusive supply

10:41:50 23    arrangement with -- and as you can see, they're small.

10:41:55 24            The second issue is, as I explained, a

10:42:00 25    misunderstanding of who the customer is.  And I believe I

10:42:02  1    have a chart that describes the supply chain issue.

10:42:07  2    Q.      Yes.  So -- so can you tell us tell us about the

10:42:10  3    supply chain.

10:42:11  4    A.      Well, first, you know, I want to emphasize that what

10:42:13  5    I'm saying about the supply chain is what BASF and Ms. Rowe

10:42:17  6    has explained to us as well as what Mr. Woodcock from

10:42:20  7    Ingevity had explained to us.  And that is the simple point

10:42:23  8    that BASF and Ingevity's customers for the carbon

10:42:29  9    honeycombs, they're the canister manufacturers; right?  It's

10:42:32 10    the Kayser and Delphi and KFTC, the canister makers, that

10:42:36 11    purchase the carbon honeycombs to put in their canisters.

10:42:40 12    Those are the customers.  And that red box around it is just

10:42:43 13    to emphasize that that is the part of the supply chain that

10:42:47 14    we are interested in here in this case.

10:42:49 15    Q.      Now, I think we've heard testimony that when BASF was

10:42:52 16    trying to sell its honeycombs, it talked to the carmakers as

10:42:56 17    well as to the canister makers.

10:42:58 18    A.      Correct.  It did talk to the carmakers and needed to

10:43:01 19    do that because the carmakers outlined the technical

10:43:04 20    specifications for the products to make sure that they work

10:43:06 21    on their cars.  They want to make sure that, you know, all

10:43:09 22    the emission standards are being met, but none of that

10:43:12 23    changes the key point, which, like I said, both Ingevity and

10:43:16 24    BASF have both explained to us and testified to that.  It's

10:43:19 25    the canister makers that purchase the carbon honeycombs from

10:43:23  1   BASF and Ingevity.

10:43:25  2   Q.      And by the way, Dr. Mathur, when you calculated

10:43:28  3   BASF's damages, you used information about the number of

10:43:32  4   cars that would be sold by the carmakers; correct?

10:43:34  5   A.      Yes, because that was the third-party independent

10:43:37  6   data I had that allowed me to accurately estimate how many

10:43:41  7   carbon honeycombs will be sold that will eventually make it

10:43:45  8   on the cars of these carmakers.  But BASF, just like

10:43:48  9   Ingevity, is going to be selling these carbon honeycombs to

10:43:52 10   the canister makers, as this chart shows.

10:43:56 11   Q.      Thank you.

10:43:56 12           So Dr. Rao also says that these exclusive

10:44:00 13   long-term agreements that Ingevity entered into are actually

10:44:03 14   good for customers and competition and put up this slide.

10:44:07 15   A.      Yes.

10:44:08 16   Q.      So he lists three benefits here:  Lower prices,

10:44:11 17   supply guarantees, and purchase commitments.  And I guess,

10:44:15 18   first, what's your overall assessment of the claim that

10:44:18 19   Dr. Rao is making here?

10:44:19 20   A.      I mean, I've listened to the testimony during this

10:44:22 21   trial very carefully.  I've paid great attention to the

10:44:25 22   points that Dr. Rao has raised and Mr. Thomas raised, and

10:44:29 23   I've thought a lot about it.  At the end, these criticisms

10:44:33 24   are not valid.  They're mischaracterizing my testimony, and

10:44:36 25   they're mischaracterizing the testimony that we heard over

10:44:38 1    the last week.  I don't agree with -- I don't agree with

10:44:42 2    these criticisms.

10:44:44 3    Q.      Okay.  Well, let's go through them.  What's your

10:44:46 4    response to the first claim, that customers got lower prices

10:44:49 5    by entering into these exclusive long-term contracts with

10:44:53 6    Ingevity?

10:44:53 7    A.      I mean, it's simply wrong.  Customers did not get

10:44:56 8    lower prices by entering into those long-term arrangements,

10:45:01 9    and there are many reasons for that.  The simplest reason,

10:45:05 10   the way to think about this is, you know, Ingevity, as we

10:45:07 11   heard, year over year has been increasing prices.  Three

10:45:11 12   percent, and then in 2019, 10 percent.  So that's how the

10:45:14 13   prices are going.  And then Ingevity, through these

10:45:17 14   arrangements, was ostensively offering a few percentage

10:45:21 15   points of a discount.  So on these prices that are

10:45:24 16   increasing like that, that makes the price a little bit

10:45:27 17   lower, that's not a lower price because that discount is

10:45:30 18   being applied to a price that has already been inflated to

10:45:34 19   anticompetitive levels by Ingevity's monopoly in this

10:45:39 20   market.

10:45:40 21           So claiming that we gave a discount on prices

10:45:42 22   that we already jacked up is not going to result in lower

10:45:46 23   prices, and, in fact, we know from the charts that I

10:45:51 24   described as well as Dr. Rao's own testimony, BASF's prices

10:45:55 25   were lower.  They were several dollars per canister, per

| | |
|---|---|
| 10:45:59 | 1 |
| 10:46:03 | 2 |
| 10:46:07 | 3 |
| 10:46:10 | 4 |
| 10:46:15 | 5 |
| 10:46:16 | 6 |
| 10:46:17 | 7 |
| 10:46:21 | 8 |
| 10:46:21 | 9 |
| 10:46:24 | 10 |
| 10:46:27 | 11 |
| 10:46:33 | 12 |
| 10:46:37 | 13 |
| 10:46:38 | 14 |
| 10:46:42 | 15 |
| 10:46:45 | 16 |
| 10:46:48 | 17 |
| 10:46:49 | 18 |
| 10:46:51 | 19 |
| 10:46:53 | 20 |
| 10:46:53 | 21 |
| 10:46:55 | 22 |
| 10:46:58 | 23 |
| 10:47:01 | 24 |
| 10:47:03 | 25 |

carbon honeycomb, lower.  So to claim that customers were somehow getting lower prices is just simply wrong.

Q.     So those jacked-up or inflated Ingevity prices that you mentioned, did those reflect Ingevity's power in this market?

A.     Absolutely.

Q.     Mr. Serp, could you play the clip of Mr. McCrae's testimony?

              (Video playing.)

Q.     How does Ingevity justify those price increases?

A.     We don't.

Q.     Do customers not ask for the reason why they are receiving a price increase?

A.     We reserve the right to confidentiality in our processes.

Q.     Do you ever reveal the cost structure for these products you sell?

A.     No.

              (Conclusion of video.)

BY MR. MEZZINA:

Q.     So, Dr. Mathur, how does testimony like that affect your thinking about whether Ingevity was giving these customers a good bargain?

A.     It supports what we've been talking about.  These customers aren't getting lower prices, and Ingevity is not

10:47:06 1   even justifying why it's increasing its prices because it

10:47:09 2   doesn't need to.  It's the only game in town.

10:47:12 3   Q.     So let's -- so that's --

10:47:16 4          Sorry, Mr. Serp.  Thank you.

10:47:20 5          So that's lower prices.  What about the second

10:47:24 6   claim, that by signing exclusive contracts with Ingevity,

10:47:27 7   customers got guaranteed supply of the honeycombs?

10:47:30 8   A.     I mean, that's also a mischaracterization of how the

10:47:34 9   economics of this works.  You know, to get a supply

10:47:37 10  guarantee, customers and Ingevity don't need to enter into

10:47:40 11  exclusive long-term agreements.  They could enter into

10:47:44 12  long-term agreements like the kind that BASF offered Kayser.

10:47:48 13  It's long-term.  It outlines the volumes that Kayser can be

10:47:51 14  assured to get without locking Kayser into purchasing only

10:47:55 15  from one customer, so you certainly don't need an exclusive

10:48:00 16  long-term agreement to be able to get that benefit.

10:48:02 17          And in fact, you know, all of the testimony

10:48:05 18  we've heard across multiple customers, across everybody, is

10:48:11 19  that what these canister makers want, the OEMs want, what

10:48:15 20  everybody wants is multiple sources of supply.  It's access

10:48:20 21  to multiple suppliers that assure these canister makers that

10:48:23 22  they will have the product that they need, that there will

10:48:26 23  be no problem if anything, you know, anything happens.  So

10:48:29 24  it's just -- you know, it's not right to argue that a supply

10:48:34 25  guarantee is somehow the benefit of an exclusive agreement.

1174

```
10:48:38  1    Q.      And so what about the -- what about the third point
10:48:41  2    here, purchase commitments?  You know, I think Dr. Rao
10:48:44  3    didn't talk much about this, so do you understand what he
10:48:46  4    meant by that?
10:48:47  5    A.      The purchase commitments -- and I think the point
10:48:50  6    that Dr. Rao and Ingevity is making there is just really odd
10:48:53  7    because off the bat, the purchase commitment, that is a
10:48:58  8    benefit to Ingevity for Ingevity to know and get the
10:49:01  9    commitment of the purchase.  It's not a benefit at all to
10:49:05 10    the canister maker.
10:49:09 11    Q.      Why isn't that a pro-competitive benefit, a benefit
10:49:15 12    to it to Ingevity?
10:49:16 13    A.      You know, taking a step back, you know, benefits to
10:49:20 14    competition is what matters, and that means benefits to
10:49:23 15    customers.  You know, Ingevity wants these purchase
10:49:26 16    commitments ostensibly to be able to justify the investments
10:49:31 17    it's made, and I know Dr. Rao spent a lot of time talking
10:49:34 18    about that.  And I'm sure we will come back to the chart
10:49:37 19    that he claims I mischaracterized, but the reality is
10:49:41 20    Dr. Rao's own numbers -- and this $70 million comes from
10:49:45 21    Dr. Rao's report -- show that Ingevity doesn't need purchase
10:49:49 22    commitments to cover its investments or even to earn healthy
10:49:53 23    profit margins because its profit margins are huge.  You
10:49:57 24    know, the $263 million in profits -- again, that's a number
10:50:02 25    that's in my report that Dr. Rao hasn't disputed -- this is
```

10:50:05  1   for one year.  Carbon honeycomb profits, even if they're

10:50:08  2   half of this because this includes all carbons, that's in

10:50:12  3   one year.  And this is over 17 years.  So you know, we're

10:50:17  4   talking about numbers that are just off by a number of

10:50:21  5   magnitude.

10:50:22  6   Q.    So Dr. Rao talked about this chart.  He said it was

10:50:25  7   misleading, and I'm sure you heard a lot of numbers got

10:50:29  8   thrown around.  Did any of those numbers affect your

10:50:32  9   thoughts about whether this chart is fair?

10:50:34 10   A.    This chart is 100 percent fair and based on numbers

10:50:38 11   that are both in Dr. Rao's report and my report.  There

10:50:41 12   aren't any new numbers here.

10:50:43 13   Q.    On the other product it sells, does Ingevity require

10:50:47 14   exclusive agreements with customers to enable Ingevity to

10:50:49 15   make investments?

10:50:50 16   A.    No.  As we've heard in the testimony, these are the

10:50:53 17   only products for which Ingevity is trying to enter into --

10:50:57 18   has entered into exclusive agreements.  For others, there

10:51:01 19   are typically purchase orders.  There aren't even

10:51:04 20   necessarily long-term supply agreements.

10:51:06 21   Q.    Okay.  So, Dr. Mathur, to sum up, in your opinion,

10:51:09 22   did Dr. Rao identify any valid pro-competitive benefits to

10:51:14 23   customers or competition from these long-term exclusive

10:51:17 24   agreements?

10:51:18 25   A.    No, no valid benefits.

10:51:20 1   Q.      Okay.  Dr. Rao also said that customers were free to
10:51:23 2   leave the contracts because of what's called the reversion
10:51:25 3   election.  And we've talked about the reversion election a
10:51:29 4   number of times in this trial.
10:51:30 5           Can you remind us what it is.
10:51:31 6   A.      The reversion election is a provision in the
10:51:34 7   exclusive agreement that theoretically gives the customer
10:51:38 8   the ability to exit from the agreement.
10:51:42 9   Q.      And you said that even though it theoretically gives
10:51:45 10  this option, it's not a real exit option for customers.  Why
10:51:48 11  is that?
10:51:49 12  A.      That's exactly right, and, again, as we've discussed,
10:51:51 13  you know, the provision has several elements to it that make
10:51:54 14  it, in practice, economically infeasible for the customer to
10:51:59 15  be able to exit.  The one that's been discussed extensively,
10:52:04 16  both by Dr. Rao and by me, is these payments, these
10:52:07 17  penalties, that the customers would need to pay back to
10:52:10 18  Ingevity.
10:52:12 19  Q.      So we've seen these payments before.  This is --
10:52:15 20  Mr. Woodcock testified $32 million for Delphi.  Dr. Mathur,
10:52:20 21  $32 million might be a lot of money for you and me, but is
10:52:23 22  it a lot of money for Delphi?
10:52:24 23  A.      $32 million is a lot of money even for Delphi, and
10:52:28 24  let's just put it in context.  In 2019, Delphi purchased
10:52:32 25  from Ingevity approximately $41 million worth of carbon

10:52:36  1    honeycombs.  If Delphi needed to return this -- pay this

10:52:41  2    penalty of $32 million, that would be like doubling Delphi's

10:52:46  3    payments to Ingevity in one year.  That's a very significant

10:52:50  4    amount, all of which has to be borne today, immediately.

10:52:54  5    Q.    Now, you've been calling this a penalty and Dr. Rao,

10:52:58  6    in his testimony, said that it's puzzling that you call it a

10:53:01  7    penalty.  So why do you call it a penalty?

10:53:03  8    A.    Well, first of all, I call it a penalty because

10:53:07  9    Ingevity itself calls it a penalty, and we've seen testimony

10:53:11 10    on that.

10:53:12 11            MR. MEZZINA:  Why don't we look at that.

10:53:13 12            Mr. Serp, can you play Mr. Ripple, please.

10:53:13 13            (Video played.)

10:53:16 14    A.    They wanted to be able to exit the agreement and pay

10:53:18 15    nothing back.  They didn't want any strings attached.

10:53:23 16    Q.    And you could have agreed to that; correct?

10:53:27 17    A.    Yeah, but that wouldn't be very smart of us to do

10:53:29 18    that.  Why -- why have an agreement at all if they can exit

10:53:33 19    at any time they want to with no penalty?

10:53:41 20            (Conclusion of video.)

10:53:41 21            MR. MEZZINA:  Thank you, Mr. Serp.

10:53:42 22    BY MR. MEZZINA:

10:53:42 23    Q.    So, Dr. Mathur, we know Ingevity considered this

10:53:45 24    $32 million payment a penalty, but why do you consider it a

10:53:49 25    penalty?

10:53:49  1    A.      Well, as I explained earlier, you know, Ingevity's

10:53:54  2    increasing prices year over year over year.  Customers are

10:53:58  3    already paying those high prices.  And now what the

10:54:02  4    customers are being told is that if you want to exit, you

10:54:05  5    have to not only pay the high prices you've already paid but

10:54:09  6    also pay to Ingevity these very substantial amounts.  That's

10:54:14  7    a penalty as much as anything can be.

10:54:18  8    Q.      And Dr. Rao, I think, said one reason it might not be

10:54:22  9    a penalty is because customers are just paying back the

10:54:25 10    benefits they got from Ingevity.  What's your response to

10:54:28 11    that?

10:54:28 12    A.      It is exactly what we just discussed.  These are not

10:54:31 13    benefits.  These are these inflated prices that you're

10:54:36 14    ostensibly reducing a bit.  I mean, those are not benefits

10:54:38 15    to begin with because the discounts are being applied to

10:54:41 16    prices that have already been jacked up over time.  There's

10:54:45 17    no benefit here.

10:54:46 18    Q.      And does this penalty payment, does it only include

10:54:48 19    the discounts or price reductions in the contracts?

10:54:52 20    A.      No, as we discussed when we reviewed the contracts in

10:54:55 21    detail, there are also retroactive price increases that are

10:55:00 22    reflected in these and then we also know that Ingevity's at

10:55:03 23    liberty to be able to increase the price and take away all

10:55:06 24    rebates going forward for the several months before the

10:55:09 25    patent expiration.

10:55:10  1    Q.    And I think Dr. Rao just testified this morning that

10:55:12  2    even if a customer had to pay this penalty to be able to

10:55:17  3    leave and deal with BASF, they might be able to eventually,

10:55:22  4    over several years, make that money back by getting lower

10:55:25  5    prices from BASF.  What's your response to that?

10:55:27  6    A.    I mean, again, that's just mischaracterization of how

10:55:31  7    economics works.  As we spoke about last week, you know, a

10:55:35  8    dollar today is worth much, much more than a dollar in the

10:55:39  9    future.  And benefits that these customers are going to get

10:55:42 10    5, 8, 10 years in its future are helpful, yes, but today,

10:55:47 11    they're worth much, much less.  So if a company like Delphi

10:55:51 12    has to pay $32 million, which almost doubles its total

10:55:56 13    payments to Ingevity today, it can't be offset by benefits

10:56:00 14    well out in the future.

10:56:02 15    Q.    Now, we've talked about the fact that this is a

10:56:05 16    one-time exit option, and you understand that the window for

10:56:09 17    customers to exercise this option and leave the exclusive

10:56:12 18    agreement, that's open now; right?

10:56:14 19    A.    That's right.  I think they have six months between

10:56:16 20    June and the end of this year to exit and that's it.

10:56:19 21    Q.    Okay.  Now, you've been here the whole trial, you

10:56:22 22    said.  Have you seen or heard any evidence that any of these

10:56:25 23    three customers is planning to actually make this payment

10:56:28 24    and get out of their exclusive deal?

10:56:30 25    A.    No.

10:56:31  1    Q.      Does that surprise you?

10:56:32  2    A.      No, that's not surprising at all because that's how

10:56:35  3    these contracts were designed, and Ingevity knew that these

10:56:40  4    contracts would give a guarantee to volumes.  You're not

10:56:44  5    going to think that you have a guarantee in a contract if

10:56:48  6    you actually think people are going to be exiting.  They

10:56:50  7    can't exit.

10:56:52  8    Q.      All right.  Thank you, Dr. Mathur.  So let's move on

10:56:55  9    to damages.

10:56:55 10            Dr. Rao also had some criticisms about the way

10:56:59 11    you calculated damages, so I'll put up another one of his

10:57:02 12    slides.

10:57:03 13            So Dr. Rao lists four complaints here.  Let's

10:57:06 14    talk about each of them, but, first, what was your overall

10:57:09 15    reaction to Dr. Rao's comments?

10:57:12 16    A.      I've been working on this case, I think, for two

10:57:15 17    years.  I have spent a lot of time and effort and very

10:57:19 18    holistically assessed all of the evidence, and there is a

10:57:22 19    lot of evidence.  We have a lot of data and documents from

10:57:25 20    Ingevity.  We have a lot of data and documents from BASF, a

10:57:28 21    lot of testimony from customers, and also access to

10:57:33 22    third-party outside data.  I have reviewed all of that very,

10:57:37 23    very thoroughly.  I've also attended all of the testimony

10:57:40 24    and heard it.  I think, you know, at the end of the day the

10:57:45 25    criticisms that Dr. Rao and Mr. Thomas raised, they're not

10:57:50  1  valid, in my opinion.

10:57:52  2  Q.      All right.  Well, let's talk about them.  So let's

10:57:55  3  start with the first point.  It says here "fails to account

10:57:57  4  for Ingevity's patent infringement lawsuit."  That's the

10:58:00  5  lawsuit that Ingevity filed against BASF?

10:58:03  6  A.      That's right.

10:58:04  7  Q.      Did you fail to account for that lawsuit?

10:58:05  8  A.      Absolutely not.  I considered that lawsuit, and I

10:58:09  9  concluded that it may have been one reason for customers

10:58:15 10  delaying and not being able to make purchases from BASF, but

10:58:19 11  all of my analysis indicates that the anticompetitive

10:58:24 12  conduct through these tying arrangements and through the

10:58:26 13  exclusive dealing were a very substantial cause and reason

10:58:30 14  why customers were not able to go purchase BASF's products,

10:58:35 15  even though its carbon honeycomb were cheaper and better.

10:58:39 16  Q.      Now, Mr. Thomas showed Dr. Rao some statements where

10:58:44 17  Ms. Rowe, who we heard from about BASF, had said that she

10:58:48 18  thought customers weren't buying because of the lawsuit.

10:58:51 19  Did you consider those statements?

10:58:52 20  A.      Yes, and as Ms. Rowe explained, you know, at the

10:58:57 21  time, she didn't have access to all complete information.

10:59:00 22  You know, so much information has emerged since then that we

10:59:04 23  now know that we can now unpack, and it's not surprising at

10:59:09 24  all that customers wouldn't necessarily, at that time, be

10:59:12 25  able to tell her, you know, everything that was driving

10:59:15  1    their decision.  You know, for example, I believe Ms. Rowe

10:59:18  2    testified that at the time, she didn't know that Ingevity

10:59:21  3    had entered into an exclusive arrangement with Kayser.

10:59:26  4    Q.    So what about those customers?  I think we also heard

10:59:29  5    about Mr. Schutte from Kayser saying that his relationship

10:59:34  6    with BASF was on hold because of the lawsuit.  Did you

10:59:37  7    consider that?

10:59:37  8    A.    I did consider that, and, again, based on all of the

10:59:41  9    testimony we've heard, we know that at that point in time,

10:59:43 10    that was not the complete story.  It was just one piece of

10:59:47 11    the story.

10:59:48 12    Q.    Do you have a slide to illustrate that?

10:59:49 13    A.    I do.

10:59:51 14    Q.    All right.  So can you explain your thinking here.

10:59:54 15    A.    Yes.  And there are a lot of dates here and I won't

10:59:57 16    try to go through all of them.  But at a high level, you

11:00:00 17    know, we know from all of the testimony we've heard that by

11:00:04 18    2018, Ingevity knew that BASF had a carbon honeycomb that

11:00:09 19    was performing really well and Kayser was interested in

11:00:12 20    purchasing it.  You know, there was that email from

11:00:16 21    Mr. McRae saying that BASF's carbon honeycombs are awesome.

11:00:21 22           We also know that by the middle of 2018, so

11:00:25 23    that's July 2018, Ingevity filed this patent infringement

11:00:29 24    lawsuit against BASF.  What's important, though, is after

11:00:34 25    that patent lawsuit, so for the rest of 2018 and all of

11:00:38  1    2019, Ingevity still tried to get Kayser to enter into an

11:00:43  2    exclusive contract.  And as we heard from Mr. Schutte, you

11:00:47  3    know, those negotiations broke down and they continued to

11:00:50  4    break down until in 2019, we saw that for the first time

11:00:55  5    Ingevity imposed two price increases, one of which was ten

11:00:58  6    percent as opposed to its usual three percent.  All of this

11:01:02  7    was happening after the patent infringement lawsuit, so if

11:01:07  8    you think that somehow the patent infringement lawsuit was

11:01:10  9    driving everything, that's inconsistent with what we're

11:01:14 10    seeing in the timing on what Ingevity's doing in all of 2019

11:01:18 11    after the patent infringement lawsuit.

11:01:20 12              And, you know, to cut the long story short, then

11:01:23 13    when we hear in January 2020 from Mr. Schutte that -- you

11:01:27 14    know, the testimony that he gave, it doesn't reflect all of

11:01:30 15    these other things that we now know happened when and how

11:01:33 16    they did.

11:01:35 17    Q.     Dr. Mathur, thank you for that explanation.  So what

11:01:38 18    did you conclude from looking at this timeline and this

11:01:41 19    evidence?  What did you conclude about causation?

11:01:43 20    A.     What I've concluded about causation is that the

11:01:46 21    patent infringement lawsuit could have been a reason for

11:01:50 22    customers not moving forward with BASF's product, but,

11:01:53 23    certainly, it's the anticompetitive conduct and these

11:01:56 24    agreements and the tying arrangements that are the

11:02:00 25    substantial cause for BASF not being able to make sales to

11:02:04  1    these customers.

11:02:06  2    Q.    Let's assume, as you said, that maybe the lawsuit

11:02:09  3    might be a reason.  Can you then disentangle the different

11:02:15  4    factors that contributed to BASF's injury and say how much

11:02:18  5    of the damages are due to the lawsuit and how much are due

11:02:21  6    to other conduct?

11:02:21  7    A.    That is, quite literally, impossible to do, and

11:02:25  8    there's a simple reason for it.  You know, customers make a

11:02:29  9    binary decision.  Should I buy from BASF or not?  But what's

11:02:33 10    driving that decision is many factors.  You can't get into

11:02:38 11    the customer's mind to be able to allocate, oh, it's a

11:02:42 12    little bit of this, a little bit of that, X percent of this.

11:02:45 13    That's literally impossible to do, and you don't need to do

11:02:48 14    that because here what we know is that even if the patent

11:02:51 15    infringement lawsuit was a reason, it's the anticompetitive

11:02:55 16    conduct and these arrangements and agreements that are the

11:02:58 17    substantial reason.

11:03:01 18    Q.    So let's talk about -- we talked about the patent

11:03:05 19    infringement lawsuit.  Let's talk about the second claim on

11:03:07 20    Dr. Rao' slide.  He says that your damages model is based on

11:03:10 21    unsupported assumptions.  What's your reaction to that?

11:03:13 22    A.    It isn't.  As I explained, I've spend a lot of time

11:03:17 23    very carefully and holistically assessing the evidence, and,

11:03:21 24    as I noted, there's a lot of evidence, and the advantage of

11:03:24 25    that also is I don't necessarily have to rely only on one

11:03:27 1   single input.  I can cross-validate and corroborate to

11:03:31 2   ensure that what I'm seeing, you know, in one set of data,

11:03:34 3   is that consistent with the other testimony?  Is it all sort

11:03:38 4   of lining up?  And that is what I have done.  You know, when

11:03:41 5   there has been some uncertainty, I've tried to provide a

11:03:44 6   range.  So my analysis is, you know, as reliable and as

11:03:48 7   accurate as it's possible to be.

11:03:51 8   Q.     All right.  I think Dr. Rao and Mr. Thomas, maybe,

11:03:53 9   were trying to suggest that you had put too much faith or

11:03:56 10  reliance on Ms. Rowe from BASF.  What about that?

11:04:00 11  A.     That's simply not right.  You know, BASF and Ms. Rowe

11:04:06 12  are in a position to be able to provide some information and

11:04:10 13  some inputs because they are the ones who know that

11:04:13 14  information the best.  They're not in a position to be able

11:04:16 15  to provide other inputs, and, therefore, I look at other

11:04:19 16  data sources for those inputs.

11:04:21 17          I should also note that the spreadsheet that I

11:04:25 18  believe Dr. Rao spent a lot time on that Ms. Rowe prepared,

11:04:28 19  I think it's very important to recognize that spreadsheet

11:04:31 20  was prepared for a very different purpose than my

11:04:35 21  assignment.  As Ms. Rowe explained, she prepared it because

11:04:37 22  she was asked to prepare it over a few days, and she had

11:04:41 23  access only to the information that was available to her

11:04:43 24  then.

11:04:44 25          I've worked on this for almost two years.  I

11:04:47  1   have access to much, much more information, and, therefore,

11:04:51  2   it's not surprising at all that, as an economist in this

11:04:56  3   damages expert role, my conclusions are going to be

11:04:58  4   different from Ms. Rowe's because the underlying question

11:05:02  5   itself is different.  For certain inputs, I have taken

11:05:06  6   information from that spreadsheet because BASF is in the

11:05:09  7   best position to be able to provide that information.

11:05:13  8   Q.      Thank you.

11:05:13  9           So Dr. Rao spent some time talking specifically

11:05:17 10   about the sales that you predict BASF would make for what

11:05:20 11   are called introductory platforms.

11:05:23 12           First of all, can you remind us what those are.

11:05:25 13   A.      Yes.  These are the small, initial test platforms on

11:05:28 14   which carmakers, you know, track -- check and ensure that

11:05:32 15   their products are working.

11:05:34 16   Q.      Okay.  And so we see the introductory platforms there

11:05:37 17   on the slide.  And Dr. Rao, I think, said that the numbers

11:05:40 18   you used for BASF's sales for the introductory platforms are

11:05:44 19   were exactly the same as Ms. Rowe's numbers.

11:05:47 20           Can you explain that.

11:05:47 21   A.      Yes.  You know, these introductory platform sales are

11:05:52 22   based on BASF's testing and extensive discussions directly

11:05:57 23   with the OEMs.  Ford discusses with BASF what size of

11:06:02 24   introductory platform it expects.  And so for that one

11:06:06 25   input, BASF is in the best position to be able to know what

11:06:10 1    size of introductory platform Ford and GM and others will be

11:06:14 2    interested in, and, therefore, for that input, BASF and

11:06:18 3    Ms. Rowe are the reliable source.

11:06:22 4    Q.      Thank you.

11:06:22 5            You know -- you know Dr. Rao spent a lot of time

11:06:26 6    on his introductory platforms.  He talked about them on

11:06:29 7    Friday and again today, and, as you mentioned, Mr. Thomas

11:06:33 8    put up that spreadsheet and zoomed in on introductory

11:06:36 9    platforms, so I just want to ask you.  How significant are

11:06:38 10   the introductory platforms in your calculation of damages?

11:06:41 11   A.      They're just not.  They're a small portion of the

11:06:45 12   total damages.  And in fact, the carbon honeycombs that are

11:06:48 13   covered by the introductory platform are around two percent

11:06:52 14   of a carmaker's total demands for carbon honeycombs over the

11:06:56 15   ten-year period that I cover.  It's two percent.  So if the

11:06:59 16   introductory platform size is a little bit higher or a

11:07:03 17   little bit lower, it simply doesn't have an important impact

11:07:06 18   on the damages that I've calculated.

11:07:08 19   Q.      So most of the damages come from this period that's

11:07:12 20   shown on the chart after the introductory platform when BASF

11:07:15 21   sales are gradually increasing?

11:07:18 22   A.      That is correct.  I should also note --

11:07:21 23   Q.      No, please finish your answer.  Didn't mean to

11:07:23 24   interrupt.

11:07:24 25   A.      I should also note that Dr. Rao somehow seemed to

11:07:26  1    suggest that the rest of the damages that are the bulk of

11:07:30  2    the damages are somehow tied to the introductory platform.

11:07:34  3    They're not.  The starting point for that is the third-party

11:07:38  4    LMC data that Dr. Rao explained he himself has used.  So

11:07:42  5    they're not connected starting out with the introductory

11:07:46  6    platforms.

11:07:46  7    Q.      Thank you for pointing that out.

11:07:48  8            So these the numbers that contribute to the vast

11:07:51  9    majority of damages, you said those don't come from

11:07:54 10    Ms. Rowe?

11:07:54 11    A.      No, not at all.

11:07:56 12    Q.      Or from BASF?

11:07:56 13    A.      That's correct.

11:07:58 14    Q.      They come from LMC?

11:07:59 15    A.      Yes.

11:08:00 16    Q.      And tell us again a little bit about what LMC is and

11:08:04 17    what they do.

11:08:05 18    A.      Yes.  You know, LMC is an independent, third-party

11:08:09 19    market intelligence provider of information of forecasts and

11:08:13 20    other projections in the marketplace.  They're very widely

11:08:16 21    used and very well-respected in the industry.  You know, a

11:08:19 22    lot of carmakers and Tier 1 canister makers rely on those --

11:08:24 23    on their projections.  People pay a lot of money to buy

11:08:27 24    their data and use that for their decision-making.

11:08:30 25    Q.      Did you hear Dr. Rao testify that he has relied on

11:08:33  1    this LMC data in his own work?

11:08:35  2    A.      That's right.

11:08:37  3    Q.      So, Dr. Mathur, Dr. Rao also criticized some of the

11:08:40  4    dates that you used in your calculations about delay.  And I

11:08:44  5    think this was similar to what Mr. Thomas did last week when

11:08:46  6    he was writing on the easel, and you and I talked about that

11:08:50  7    on your redirect, and you explained, I think, that

11:08:53  8    Mr. Thomas was misreading your report; is that right?

11:08:55  9    A.      That's correct.

11:08:56 10    Q.      Do you remember if Dr. Rao was in the courtroom for

11:08:58 11    that?

11:08:58 12    A.      I don't -- I don't recall.  I believe he was there.

11:09:02 13    Yes.

11:09:04 14    Q.      When he was testifying about this on the stand, did

11:09:06 15    you hear him acknowledge in any way what you had said in

11:09:10 16    correcting Mr. Thomas?

11:09:11 17    A.      No, he did not acknowledge my testimony.

11:09:14 18    Q.      So did they mischaracterize your testimony and your

11:09:17 19    findings?

11:09:17 20    A.      Yes.

11:09:18 21    Q.      Can you explain.

11:09:18 22    A.      Yes.  As I tried to explain to Mr. Thomas during the

11:09:24 23    discussion on Friday, you know, BASF has been engaged in

11:09:29 24    discussions with these carmakers for a long time.  As

11:09:33 25    Ms. Rowe explained, you know, both employees of BASF before

11:09:38  1   she joined BASF as well as she, they constantly engaged with

11:09:42  2   customers.   They tried to meet them every two weeks.

11:09:44  3   Ms. Rowe traveled to China and Germany.   This was what they

11:09:48  4   did.   And so the expectations that BASF has about when they

11:09:54  5   will be able to make these sales to these carmakers -- or

11:09:57  6   excuse me, to the canister makers for the platforms for

11:10:00  7   these carmakers is based on that collective set of

11:10:04  8   discussions.

11:10:05  9          And so artificially pinning something to the

11:10:08 10   date of one email or one document completely

11:10:12 11   mischaracterizes and misunderstands the process of how this

11:10:14 12   occurs because there are many conversations and discussions

11:10:17 13   that have occurred prior to that one email.   I think

11:10:21 14   Ms. Rowe also explained and I tried to explain that a lot of

11:10:25 15   these discussions aren't necessarily written up in an email.

11:10:28 16   It's part of what BASF does in order to stay in touch and

11:10:34 17   understand what its customers need.

11:10:37 18   Q.    Thank you.

11:10:37 19          So Dr. Rao also talked about the prices that you

11:10:41 20   predicted BASF would charge for its honeycombs, and he

11:10:45 21   said -- I think he said that your analysis didn't consider

11:10:49 22   whether BASF could have charged those same prices if

11:10:52 23   customers also had to pay Ingevity for a license.   What do

11:10:56 24   you say about that?

11:10:56 25   A.    That criticism is completely invalid and really

11:11:00  1    mischaracterizes both my reports and my analyses and my

11:11:04  2    testimony.

11:11:06  3    Q.      Well, can you -- tell us more.

11:11:09  4    A.      Yes.  So you know, Dr. Rao is alleging that if

11:11:17  5    Ingevity did not engage in this anticompetitive conduct, it

11:11:22  6    would charge a license to give access to customers to the

11:11:27  7    patent.  And as I explained, there are many things that

11:11:31  8    Ingevity could have done that would have represented fair

11:11:33  9    competition, and that's certainly one of them.  It could

11:11:36 10    have chosen to do that.

11:11:37 11            So then the question becomes:  Well, what price

11:11:40 12    could they have charged?  Because Dr. Rao seems to suggest

11:11:43 13    that they could charge any price that they want for their

11:11:45 14    royalty, such that they can exclude customers from being

11:11:50 15    able to access other carbon honeycombs.  What I determined

11:11:54 16    and I tried to explain to Mr. Thomas was the data don't show

11:11:59 17    that Ingevity would be able to charge such a high license

11:12:05 18    fee for the patent such that BASF would not be able to come

11:12:10 19    sell its products.  As we've seen, BASF's products are

11:12:14 20    cheaper, and, you know, in addition to being cheaper,

11:12:17 21    they're much better quality.  So even if customers had to

11:12:20 22    pay a dollar or so of royalty to Ingevity in order to be

11:12:25 23    able to access the license, they would certainly have been

11:12:30 24    able to and wanted to purchase BASF's products because of

11:12:35 25    all of these benefits that they offered.

11:12:37  1   Q.      So the data that you've seen regarding this issue

11:12:41  2   about the royalty you think is consistent with your

11:12:44  3   conclusion about BASF's prices?

11:12:45  4   A.      That's exactly right.

11:12:48  5   Q.      Okay.  So we talked about these supposed unsupported

11:12:54  6   assumptions.  Let's talk about Dr. Rao's third claim.  He

11:12:58  7   said that you assumed a 100 percent probability of success

11:13:01  8   by BASF.  Dr. Mathur, is that true?

11:13:04  9   A.      That is not true.  I did not assume a 100 percent

11:13:08 10   probability of success by BASF.

11:13:10 11   Q.      Why is he wrong?

11:13:11 12   A.      I think we've discussed this extensively, but, you

11:13:15 13   know, here's what I assumed.  Based on all of the

11:13:19 14   discussions and the testing that BASF had done for its

11:13:22 15   carbon honeycombs, it expected to be able to make sales to

11:13:27 16   five carmakers.  Those, right off the bat, are a subset of,

11:13:33 17   a portion, of the entire market.

11:13:35 18           Next, even for those carmakers, I'm not assuming

11:13:40 19   100 percent probability.  I'm assume that over a 7- to

11:13:44 20   10-year period, they will reach 50 percent.  You put all of

11:13:49 21   that together, and it's completely unclear to me how that

11:13:53 22   suggests that I am assuming a 100 percent probability of

11:13:56 23   success.

11:13:58 24           I'd also like to note that Dr. Rao had an

11:14:02 25   example where if I go for five different job interviews, you

11:14:06 1    know, I don't expect with 100 probability of success to get

11:14:10 2    all five jobs.  That example is completely irrelevant here

11:14:14 3    because if you go for job interviews, you ultimately get one

11:14:18 4    job.  That's not what's happening here.  These companies,

11:14:21 5    like Ingevity and BASF, they're selling to many canister

11:14:25 6    makers.  They're selling to many car companies.  You know,

11:14:28 7    Ms. Rowe said and Mr. Abraham, I believe, testified that

11:14:33 8    they hoped to eventually go out there and make sales to all

11:14:36 9    carmakers.  Those have not been reflected in my

11:14:39 10   calculations.

11:14:39 11            I've chosen a subset of the carmakers and even

11:14:42 12   for those, over a ten-year period, 50 percent of sales.

11:14:46 13   That just doesn't get us to a hundred percent probability of

11:14:50 14   success in any way.

11:14:52 15   Q.    All right.  Thank you.

11:14:52 16            So what about Dr. Rao' last point here?  He says

11:14:58 17   that you didn't account for changes in the automotive

11:15:00 18   industry.  Is that true?

11:15:02 19   A.    That's not true, either.

11:15:04 20   Q.    Why not?

11:15:04 21   A.    As I explained in my initial testimony, you know, the

11:15:09 22   data that I rely on comes from LMC and it comes from the

11:15:13 23   last, I believe 9 to 12 months, and it already reflects

11:15:17 24   first, the impact of the pandemic.  You already see that

11:15:21 25   they've changed their forecasts because, you know, for the

11:15:24  1    short term, maybe people won't buy that many cars because

11:15:27  2    we're all struggling with the pandemic.

11:15:30  3              You know, that data already reflects a lot of

11:15:32  4    these regulatory changes.  You know, we've been hearing

11:15:35  5    about the move to clean air and green vehicles for a while,

11:15:39  6    and LMC's data reflects that.  Have there been recent

11:15:44  7    announcements?  Yes, but they're not really a surprise.  And

11:15:47  8    even the recent announcements are talking about what the

11:15:50  9    goals are well into the future.  They're not necessarily

11:15:54 10    talking about what the goal is tomorrow or the next year.

11:15:57 11              And in addition to some of the announcements

11:16:00 12    that Dr. Rao and, I believe, Mr. Thomas indicated, we've

11:16:05 13    also heard announcements from companies like GM saying, you

11:16:09 14    know, we'd like to move, eventually, to car -- to green

11:16:12 15    cars.  It's going to take us some time.  Some of these goals

11:16:16 16    are aspirational because overnight or in a short time

11:16:19 17    period, an industry doesn't completely transform.

11:16:24 18    Q.    Dr. Rao also talked about the discount rate.  Is the

11:16:26 19    discount rate one part of your calculations that helps you

11:16:30 20    account for possible uncertainty about the future?

11:16:32 21    A.     Absolutely, it does.  As I explained, what a

11:16:37 22    7.5 percent discount rate does is, you know, changes

11:16:41 23    profits.  Anything that's ten years out, let's say $100 a

11:16:45 24    profit ten years from now, it's worth less than $50 today.

11:16:49 25    And these changes that we're talking about in terms of

11:16:52 1    uncertainty and risk of what will happen with the auto

11:16:55 2    industry, that's all going to happen well in the future, and

11:16:58 3    the discount rate already reflects that risk and that

11:17:03 4    uncertainty, and it reflects that for this particular

11:17:06 5    industry and for this particular carbon honeycomb business.

11:17:10 6    Q.      Thank you.

11:17:10 7            So, Dr. Mathur, is it fair to say the world is

11:17:13 8    always changing, to some extent?

11:17:15 9    A.      Yes.  The world is always changing, and, you know,

11:17:19 10   these are companies that are very experienced and

11:17:21 11   sophisticated.  You know, they've been in the auto industry

11:17:24 12   for decades, as we have heard.  They continue to engage in

11:17:29 13   long-range planning and continue to anticipate what will

11:17:32 14   happen.  That's why LMC and companies like it try to provide

11:17:36 15   the forecasts they do.

11:17:37 16           You know, can you predict anything with

11:17:40 17   100 percent certainty?  No.  Nobody has a crystal ball.  But

11:17:44 18   can you predict it to a very reasonable degree of certainty?

11:17:47 19   Yes.  Because these companies, including, for example,

11:17:50 20   Ingevity, make million-dollar decisions based on these

11:17:54 21   forecasts.  I mean, I think we heard some testimony that --

11:17:57 22   I think from Mr. Woodcock and others that Ingevity is

11:18:00 23   investing and building capacity and building factories.

11:18:04 24   That -- if Ingevity expected the carbon honeycomb market to

11:18:08 25   disappear, it wouldn't be doing that.  It's using these

11:18:11  1    projections and making those decisions.

11:18:14  2    Q.      Thank you.

11:18:14  3            So just to -- finally, Dr. Mathur, you provided

11:18:17  4    your main damages number in this case, and it was $39 to

11:18:21  5    $48 million; is that right?

11:18:22  6    A.      That's correct.

11:18:23  7    Q.      And I think you also provided, and we walked through

11:18:27  8    in your testimony, a bunch of alternative damages numbers.

11:18:30  9    Do you remember that?

11:18:30 10    A.      Yes.

11:18:31 11    Q.      So why did you do that?

11:18:32 12    A.      Well, for several reasons.  One, I was requested by

11:18:38 13    the attorneys to make calculations for various

11:18:43 14    alternative-like scenarios and that just means from that a

11:18:46 15    legal perspective, not really an economics perspective, from

11:18:50 16    a legal perspective, there's certain decisions about what

11:18:53 17    the patent covers and what it doesn't cover and which

11:18:56 18    arrangements are problematic or not.  The jury should be

11:18:59 19    able to have numbers available to it.

11:19:02 20    Q.      Now, so you gave the jury those numbers in case they

11:19:06 21    disagreed with some part of your analysis or some part of

11:19:08 22    BASF's case?

11:19:09 23    A.      That's correct.

11:19:11 24    Q.      Now, Dr. Rao, I understand, says the jury shouldn't

11:19:14 25    award any damages.  But in his testimony here at trial, did

11:19:17  1    you hear Dr. Rao put forward any of his own numbers in case

11:19:20  2    the jury disagrees with his conclusions?

11:19:22  3    A.      No, he merely broke my numbers out by, you know,

11:19:28  4    before in the past and in the future, but he didn't provide

11:19:32  5    any of his own numbers.  And I should also note that

11:19:35  6    breaking them out by past and the future, again, is very

11:19:39  7    misleading because, you know, I think we talked about this

11:19:42  8    last week, too.  Why does BASF not have more past sales?

11:19:48  9    Why are their damages stemming from sales in the future that

11:19:52 10    they haven't been able to make?  It's because of the

11:19:54 11    misconduct.  So to say that, oh, the damages are in the

11:19:59 12    future and that gives Ingevity, somehow, a free pass to not

11:20:04 13    be held accountable for its conduct just doesn't make any

11:20:08 14    sense.

11:20:09 15              MR. MEZZINA:  Thank you, Dr. Mathur.

11:20:11 16              Pass the witness.

11:20:11 17              THE COURT:  All right.  So, members of the jury,

11:20:14 18    we need to take a mid-morning break.  So can we take the

11:20:18 19    jury out for 15 minutes?

11:20:21 20              (Jury leaving the courtroom.)

11:20:42 21              THE COURT:  Mr. Thomas, how long do you think

11:20:52 22    you're going to be?

11:20:54 23              MR. THOMAS:  Well, I'm not going to be longer

11:20:56 24    than -- I think about 50 minutes because that's all I have

11:20:59 25    left.

```
11:20:59   1              THE COURT:  Did you say 15?
11:21:01   2              MR. THOMAS:  Fifty.  5-0.
11:21:03   3              THE COURT:  All right.  And I am correct in
11:21:08   4    thinking that when we're finished with Dr. Mathur, you have
11:21:11   5    no more witnesses; right?
11:21:12   6              MR. FRIEL:  That's correct, Your Honor.
11:21:13   7              THE COURT:  Okay.  Well, so I'll see you again
11:21:16   8    at 25 to 12:00.
11:21:19   9              DEPUTY CLERK:  All rise.
11:21:21  10                 (Recess was taken.)
11:36:50  11              DEPUTY CLERK:  All rise.
11:36:55  12              THE COURT:  All right.  We ready to go.
11:36:56  13              MR. THOMAS:  Yes, Your Honor.
11:36:57  14              THE COURT:  So let's get the jury.
11:36:59  15              Dr. Mathur, come on back.
11:37:01  16                 (Jury entering the courtroom.)
11:37:21  17              THE COURT:  All right.  Welcome back, everyone.
11:37:36  18    Everyone be seated.
11:37:38  19              Mr. Thomas, you may proceed.
11:37:41  20              MR. THOMAS:  Thank you, Your Honor.
11:37:43  21    BY MR. THOMAS:
11:37:46  22    Q.    Good morning, Dr. Rao.  How are you?
11:37:49  23    A.    Dr. Mathur.
11:37:50  24    Q.    Oh, Mathur.  You know, it's just -- there's something
11:37:54  25    about it.  Okay.  Dr. Mathur.  I apologize.
```

11:37:56  1            How are you this morning?

11:37:57  2  A.     Doing well.  I hope you're well, too.

11:37:59  3  Q.     Great.  I'd like to start with your Slide 3, if we

11:38:03  4  could.

11:38:13  5            You talked about this slide a little bit ago.

11:38:17  6  As I understand it, your point is there's no use for a left

11:38:22  7  shoe without a right shoe; right?

11:38:25  8  A.      No, my point is slightly different.  That customers

11:38:27  9  don't demand a left shoe and a right shoe from different

11:38:32 10  stores.

11:38:32 11  Q.     Okay.  So there's no customer demand for a left shoe

11:38:35 12  without a right shoe.  That's your point; right?

11:38:38 13  A.     Customers don't go to a store to buy a left shoe and

11:38:41 14  then a different store to go to buy a right shoe.

11:38:44 15  Q.     So let's talk about the honeycomb and the patent.  Is

11:38:49 16  there any use for this kind of a honeycomb other than to

11:38:58 17  make fuel vapor canisters that are covered by the '844

11:39:01 18  patent?

11:39:01 19  A.      I'm not offering an opinion on that.  I understand

11:39:04 20  that that is a matter that the parties are discussing and

11:39:07 21  other experts have testified to.

11:39:09 22  Q.      Is there any customer demands for this kind of

11:39:12 23  honeycomb for any purpose other than to make fuel vapor

11:39:16 24  canisters that are covered by the '844 patent?

11:39:19 25  A.      Yes, there is customer demand, for example, by

1200

11:39:23  1    Kayser, for a BASF honeycomb, and there is customer demand

11:39:27  2    for the license for the authorization to practice the '844

11:39:31  3    patent.

11:39:32  4    Q.      Now, but what I'm asking is:  For the Ingevity

11:39:36  5    honeycombs, the 200-cell-per-square-inch Ingevity

11:39:43  6    honeycombs, is there any customer demand for those products

11:39:47  7    for any purpose other than to make fuel vapor canisters

11:39:52  8    covered by the '844 patent?

11:39:54  9    A.      I already answered that question.  I understand that

11:39:57 10    other experts are testifying to that point.  I'm not

11:40:00 11    offering an opinion on that point.

11:40:01 12    Q.      Okay.  You can't -- you can't tell us this morning

11:40:09 13    that there is customer demand for this kind of honeycomb for

11:40:16 14    any purpose other than to make fuel vapor canisters covered

11:40:19 15    by the '844 patent; fair?

11:40:21 16    A.      As I said, I understand that others are opining on

11:40:24 17    this.

11:40:25 18    Q.      Okay.  Let's take a look at your Slide eight.  And I

11:40:35 19    want to make sure I understand this.  These percentages are

11:40:39 20    the -- are percentages of Ingevity's honeycomb sales; right?

11:40:45 21    A.      These percentages are in 2019 and because Ingevity is

11:40:49 22    the only sole supplier of carbon honeycombs, these represent

11:40:53 23    the percentages of the share of carbon honeycombs that each

11:40:57 24    of these canister makers purchased.

11:40:59 25    Q.      So the answer to my question is yes, these are the

11:41:01 1    percentages of Ingevity's honeycomb sales?

11:41:05 2    A.    Yes, they're based in 2019.   Ingevity was the only

11:41:08 3    company in 2019.

11:41:09 4    Q.    Right.   Right, and that's a good point.   But these

11:41:11 5    are just before we get to that.   These are not market shares

11:41:15 6    of either of the two markets you have said are relevant.

11:41:19 7    You have a market for carbon adsorbents and you have a

11:41:25 8    market for technology -- LEV III technology.   These are not

11:41:31 9    market shares of either one of those two markets, are they?

11:41:34 10   A.    No, they're not.   They're just telling you the size

11:41:37 11   of the canister makers based on the slide that Dr. Rao

11:41:41 12   himself presented.   Yes.

11:41:42 13   Q.    And they're also not percentages of the sales of fuel

11:41:50 14   vapor canisters to the carmakers, are they?

11:41:52 15   A.    No, they're not.   They're simply trying to show that

11:41:57 16   if BASF is foreclosed from making sales of carbon honeycombs

11:42:04 17   to the car -- to the canister makers on the left, Dr. Rao

11:42:08 18   appears to be claiming that there's no problem because they

11:42:10 19   can look at the others on the right.   And what I'm trying to

11:42:14 20   explain is that those are small, many of them are really

11:42:17 21   small.   And this imposes a pretty substantial handicap and

11:42:22 22   cripples BASF from truly being able to avail of the market

11:42:26 23   opportunity.

11:42:26 24   Q.    But in terms of percentages of the market for the

11:42:32 25   sale of fuel vapor canisters to carmakers, in other words,

11:42:37 1    which of these companies sells the most canisters to the

11:42:44 2    carmakers, in fact, MAHLE is the biggest if you measure it

11:42:49 3    that way; right?

11:42:50 4    A.    I don't recall one way or another because, again, to

11:42:53 5    bring it back to what matters in this case.

11:42:55 6    Q.    Well, I want to ask you -- I want to ask you that

11:42:58 7    question?

11:42:58 8              MR. MEZZINA:  Your Honor, objection.

11:42:59 9              THE COURT:  No, actually.  I'm going to sustain

11:43:02 10   or I'm going to overrule the objection.

11:43:05 11             And, Dr. Mathur, answer the question that's

11:43:10 12   asked.

11:43:10 13            THE WITNESS:  Could you repeat the question,

11:43:12 14   please.

11:43:12 15   BY MR. THOMAS:

11:43:13 16   Q.    Yeah, do you recall -- do you recall Ms. Toldo from

11:43:15 17   MAHLE?

11:43:16 18   A.    Yes.

11:43:16 19   Q.    Testified by video here.

11:43:18 20   A.    Yes.

11:43:19 21   Q.    And do you recall her saying that MAHLE is actually

11:43:22 22   the biggest canister maker if you measure it in terms of

11:43:26 23   what percentage of the canisters sold to carmakers?

11:43:32 24   A.    Yes, in terms of canisters sold to carmakers, I

11:43:37 25   recall that.

11:43:38  1   Q.      MAHLE is the biggest; right?

11:43:40  2   A.      That's what I recall her testimony to be, yes.

11:43:42  3   Q.      Okay.  Thank you.

11:43:43  4           And we've heard from BASF that their honeycomb

11:43:49  5   is better and cheaper; right?

11:43:52  6   A.      From BASF and from customers who have tested BASF's

11:43:57  7   carbon honeycomb, yes.

11:43:57  8   Q.      Right.  So once the '844 patent expires and there's

11:44:04  9   no more infringement concern, these numbers tell us nothing

11:44:10 10   about how many honeycombs BASF is going to sell to Ford or

11:44:18 11   to MAHLE or to Leehan, do they?

11:44:20 12   A.      No, they do.  Again, the point of this chart that

11:44:24 13   Dr. Rao put up is to say that BASF can easily access the

11:44:29 14   market.  But the point here is that the customers on the

11:44:32 15   left, with whom Ingevity has entered into contracts with,

11:44:36 16   those contracts extend well past patent expiration.  So yes,

11:44:43 17   BASF can try to access the market through the canister

11:44:45 18   makers on the right, but the ones on the left, the big ones,

11:44:49 19   are locked up for several years after the expiration of the

11:44:53 20   patent.

11:44:54 21   Q.      Well, but these are based exclusively, as you've told

11:44:58 22   us, on Ingevity sales in 2019 when Ingevity had the patent;

11:45:04 23   right?

11:45:04 24   A.      Yes.

11:45:06 25   Q.      Yes.  And what I'm saying is next year, BASF is going

| | |
|---|---|
| 11:45:11 | 1 |
| 11:45:16 | 2 |
| 11:45:19 | 3 |
| 11:45:23 | 4 |
| 11:45:28 | 5 |
| 11:45:32 | 6 |
| 11:45:34 | 7 |
| 11:45:37 | 8 |
| 11:45:40 | 9 |
| 11:45:44 | 10 |
| 11:45:47 | 11 |
| 11:45:55 | 12 |
| 11:45:57 | 13 |
| 11:45:57 | 14 |
| 11:46:01 | 15 |
| 11:46:02 | 16 |
| 11:46:05 | 17 |
| 11:46:09 | 18 |
| 11:46:14 | 19 |
| 11:46:19 | 20 |
| 11:46:19 | 21 |
| 11:46:20 | 22 |
| 11:46:24 | 23 |
| 11:46:29 | 24 |
| 11:46:32 | 25 |

1  to be able to sell without worrying about infringing.  It

2  says it has a better honeycomb.  It says it has a cheaper

3  honeycomb.  And so that doesn't tell us anything about

4  whether MAHLE is going to say, you know what, I'm going to

5  buy from BASF instead of Ingevity.  It doesn't -- it doesn't

6  tell us anything about that; right?

7  A.     I think I've already answered your question.  You

8  know, the customers on the right, BASF may be able to

9  access.  But even after the patent expiration, the date that

10  you're talking about, customers on the left are still locked

11  up, and BASF cannot access three of the four largest.

12  Q.     But let's take Ford for example.

13  A.     Yes.

14  Q.     Okay.  Ford has a company that makes its own

15  canisters; right?

16  A.     That's right.  It's the only OEM that does that.

17  Q.     And if BASF's honeycomb is really better and it's

18  really cheaper, then why isn't Ford just going to go buy all

19  of the honeycombs it needs from BASF and use those to

20  provide to Ford?

21  A.     It could.

22  Q.     Yeah.  What I'm saying is these -- after the patent

23  expires and after BASF is able to go to all these companies,

24  including all of them on the right, and say we have a better

25  cheaper honeycomb, we have no idea what these numbers are

11:46:35  1    going to look like; right?

11:46:36  2    A.    No, that's not right.  Because as I've said already,

11:46:39  3    the companies on the left are being locked up even after the

11:46:43  4    patent expiration.  So, yes, after the patent expiration,

11:46:47  5    BASF can go try its luck with less than half of the

11:46:50  6    honeycomb sales and go after each of these much smaller

11:46:53  7    customers, but the ones on the left, the ones that are

11:46:56  8    locked up, stay locked up after the patent expiration as

11:47:00  9    well for several years.

11:47:01 10    Q.    But let's -- let's take Delphi for an example.  Let's

11:47:06 11    say they don't terminate and they stay with Ingevity.

11:47:09 12    They're going to compete for canister bids with the

11:47:15 13    carmakers with other canister makers; right?

11:47:17 14    A.    I would expect so.

11:47:19 15    Q.    And if MAHLE, which is not locked up, decides it's

11:47:26 16    going to get a better and cheaper honeycomb from BASF and

11:47:33 17    it's going to compete with Delphi to get that carmaker's

11:47:39 18    business, it's going to have an advantage, right, because

11:47:43 19    it's going to have a better cheaper honeycomb?  And that's

11:47:46 20    going to affect any how many honeycombs end up getting

11:47:49 21    bought.

11:47:49 22    A.    We don't know how many honeycombs will be bought by

11:47:52 23    whom because BASF has not been able to enter the market, and

11:47:56 24    we don't have insight on how the competition will unfold

11:48:00 25    because Ingevity is the sole supplier.  That could happen,

11:48:03  1    but there are other things that could happen.  We just don't

11:48:05  2    know because of the conduct that has prevented anybody else

11:48:08  3    from entering the marketplace.

11:48:10  4    Q.    Yes, that's exactly right.  We don't know what's

11:48:14  5    going to happen with these numbers once the patent expires.

11:48:18  6          So let me move on.

11:48:21  7          Is that right?  Is that right?

11:48:23  8    A.    No, it's not.

11:48:24  9    Q.    You think -- you think that after the patent expires

11:48:29 10    and BASF is able to aggressively market its -- what it

11:48:34 11    claims is better, cheaper honeycomb, these numbers are all

11:48:37 12    just going to stay the same?  Is that your testimony?

11:48:39 13    A.    That's not my testimony.

11:48:41 14    Q.    Okay.

11:48:41 15    A.    My testimony is that the customers on the left that

11:48:44 16    are the largest customers are going to be locked up even

11:48:48 17    after the patent expiration, and we know that the penalties

11:48:52 18    they would have to pay in order to try to get out of the

11:48:55 19    agreement are very substantial.

11:48:57 20    Q.    Okay.  Fine.

11:48:58 21          Let's move on.  You spoke about Ingevity's

11:49:04 22    prices being high.  Do you recall that?

11:49:06 23    A.    Yes.

11:49:06 24    Q.    Okay.  And we talked about for many years Ingevity

11:49:11 25    has had the '844 patent; right?

11:49:14  1    A.     Yes.

11:49:15  2    Q.     And as a result, other companies have not tried to

11:49:18  3    enter the honeycomb market; right?

11:49:21  4    A.     There are many reasons why the market looks like the

11:49:23  5    way it does, including the barriers to entry and the efforts

11:49:27  6    that are required to enter the market.  I wouldn't say that

11:49:29  7    it's only necessarily because of the '844 patent.

11:49:33  8    Q.     You told us last week that there's nothing wrong with

11:49:36  9    getting a patent; right?

11:49:37 10    A.     Absolutely.

11:49:39 11    Q.     And there's nothing -- and if all of the buyers in a

11:49:44 12    market believe the patent covers the best product, there's

11:49:50 13    nothing wrong with the owner of the patent having a high

11:49:53 14    market share; right?

11:49:54 15    A.     I want to be clear on what you mean by the best

11:49:56 16    product.  The patent covers a method for meeting emission

11:50:01 17    standards using a fuel canister as we have.  As we've heard

11:50:04 18    from the various experts, including Ingevity's testimony,

11:50:06 19    the patent does not cover the use of carbon honeycombs or

11:50:10 20    any carbon adsorbents by itself.  The patent covers a design

11:50:14 21    for the fuel canister to meet these LEV III standards.

11:50:17 22    Q.     But you're not offering any opinion that the

11:50:22 23    honeycombs are used by the customers for any way other than

11:50:28 24    to make the canisters covered by the patent.  We've already

11:50:32 25    covered that; right?

11:50:32  1    A.        Yes, there are other experts opining on that.  I'm

11:50:35  2    just clarifying that you've heard both from Ingevity and

11:50:38  3    BASF's experts that the patent doesn't cover the use of

11:50:43  4    carbon honeycombs or any carbon adsorbents by itself.

11:50:46  5    Q.        Now, as a matter of economics, does it surprise you

11:50:51  6    that the owner of a patent which the customers believe cover

11:50:59  7    the products that they're making can enjoy premium prices

11:51:04  8    while that patent is in effect?

11:51:06  9    A.        I still want to clarify what you mean by the product.

11:51:10 10    Are you referring to the fuel canister?

11:51:12 11    Q.        Yes, I am.  The customers make fuel canisters; right?

11:51:16 12    A.        Correct.

11:51:17 13    Q.        And the patent covers fuel canisters; right?

11:51:19 14    A.        Yes.

11:51:20 15    Q.        Okay.

11:51:20 16    A.        Well, a method for meeting LEV III standards, yes.

11:51:24 17    Q.        Now, but I'm asking as a matter of economics, does it

11:51:28 18    surprise you that an owner of a patent that covers the

11:51:35 19    customer's product, does it surprise you that the owner of a

11:51:40 20    patent would be able to enjoy some premium pricing as a

11:51:43 21    result?

11:51:43 22    A.        Again, I think you're confusing the products.  Let me

11:51:49 23    just make sure I understand.

11:51:50 24    Q.        I'm not asking about the product.  I'm asking you

11:51:52 25    about a matter of economics.

11:51:54  1   A.      Yes.

11:51:54  2   Q.      Put products aside.  As a matter of economics, does

11:51:59  3   it -- would it surprise you that the owner of a patent that

11:52:06  4   covers the products made by its customers would enjoy some

11:52:13  5   premium pricing because of the patent?  Yes or no?

11:52:17  6   A.      I can't answer that in yes or no.

11:52:19  7   Q.      Okay.

11:52:19  8   A.      I can tell you that it's not surprising at all that

11:52:22  9   an owner of a patent enjoys a large market share for the

11:52:27 10   technology that the patent covers.  That's exactly right.

11:52:30 11   That's what the patent gives you, the right to exclude.  It

11:52:32 12   would surprise me and concern me, as it has in this matter,

11:52:36 13   if the owner of the patent tries to extend the market power,

11:52:43 14   the legitimate market power it has in the technology to a

11:52:46 15   different product.

11:52:47 16   Q.      That's not my question, Doctor.  Not my question.

11:52:50 17   Okay.  Let's move on.

11:52:52 18           Now, on these higher prices, I'm trying to

11:52:58 19   figure out the relevance of them.  Would your opinion on

11:53:04 20   tying be any different if in the real world Ingevity's

11:53:10 21   prices would have been any higher or lower than what they

11:53:13 22   were?

11:53:13 23   A.      I'm not sure I understand.  That's a hypothetical

11:53:19 24   question, and I think it depends on how much higher or how

11:53:22 25   much lower.  So this is very open ended.  Can you clarify a

11:53:24  1    bit more what you mean?

11:53:25  2    Q.      No, I mean it's a very -- you pointed out that

11:53:28  3    Ingevity has high prices.  I'm just saying, would your

11:53:31  4    opinion on tying be any different if the prices had -- in

11:53:37  5    the real world if the prices had been any higher or lower

11:53:39  6    than what they actually were?

11:53:41  7    A.      It depends.  I mean, as I've also explained, the

11:53:45  8    competition and the harm to competition is not just because

11:53:47  9    of prices.  Competition in this marketplace has several

11:53:51 10    dimensions.  There's prices, and so that would matter

11:53:54 11    whether they're higher or lower.  There's also quality.

11:53:57 12    We've heard that customers are not being able to access the

11:54:00 13    better quality carbon honeycombs that BASF offers.

11:54:04 14    Q.      Let me --

11:54:04 15    A.      There's also choice.  And so I --

11:54:06 16    Q.      Let me ask a more specific question.  Let's say

11:54:10 17    Ingevity -- in the real world, Ingevity's prices had been

11:54:15 18    20 percent lower than they actually were.  Okay.  Everything

11:54:19 19    else being equal.  Would your opinion on tying be any

11:54:22 20    different?

11:54:22 21    A.      I can't answer that.  I'd have to assess all of the

11:54:26 22    information.  These types of analyses take a lot of time and

11:54:29 23    effort.  Sitting here right now, I can't do just that one

11:54:32 24    hypothetical, given how many other factors would also

11:54:35 25    change.

11:54:36  1    Q.      So it's possible that if Ingevity's prices had been

11:54:43  2    20 percent lower than they were, there was no tying?

11:54:45  3    A.      I'm telling you I can't answer your question because

11:54:49  4    there are other factors that would also change, and I can't

11:54:52  5    just assess, hypothetically, sitting here right now.

11:54:56  6    Q.      Can you answer the question with regard to exclusive

11:54:58  7    dealing?  If you assume that Ingevity's prices were

11:55:01  8    20 percent less in the real world, would your opinion on

11:55:05  9    exclusive dealing be any different?

11:55:06 10    A.      I think I already answered it.  The competition and

11:55:10 11    the harm to competition is on multiple dimensions.  Price is

11:55:14 12    one of them.  Quality is another one.  And choice of

11:55:16 13    suppliers is another one.  So unless you can explain to me

11:55:19 14    what happens along all of those dimensions, I can't tell you

11:55:23 15    whether there's harm to competition or not.

11:55:25 16    Q.      I'm saying everything else is the same.  Everything

11:55:28 17    that happened in the real world is exactly the same except

11:55:32 18    Ingevity's prices were 20 percent lower than they really

11:55:36 19    were.  Would your opinions on tying or exclusive dealing be

11:55:40 20    any different?

11:55:41 21    A.      They may be.  They may not be.  I'm sorry.  I can't

11:55:44 22    answer that.

11:55:45 23    Q.      Okay.  Now, you said a few minutes ago that you did

11:55:49 24    take into account the lawsuit that Ingevity filed against

11:55:56 25    BASF; right?

11:55:56  1    A.      Yes.

11:55:58  2    Q.      But you said you didn't do it quantitatively because

11:56:02  3    that would be impossible to do?

11:56:05  4    A.      It's not quite what I said.  I'm happy to rephrase.

11:56:08  5    What I explained was that I did assess the role of the

11:56:13  6    lawsuit and I concluded that may be a reason, but in my

11:56:18  7    opinion and based on my analyses, the anticompetitive

11:56:21  8    conduct was the substantial reason.

11:56:22  9    Q.      You didn't quantitatively reduce your damages in any

11:56:27 10    way to take into account the BASF lawsuit; right?

11:56:32 11    A.      No, I did not.

11:56:33 12    Q.      And I think you explained this morning you didn't

11:56:36 13    because that would be -- I think your words were impossible

11:56:38 14    to do.

11:56:39 15    A.      There are many reasons I didn't do it.  That was one

11:56:41 16    of them.

11:56:41 17    Q.      Okay.  But Ms. Rowe did just that; right?

11:56:46 18    A.      I beg your pardon?

11:56:47 19    Q.      Ms. Rowe did just that.  She adjusted her numbers

11:56:51 20    based on the lawsuit; right?

11:56:53 21    A.      I mean, as I explained, Ms. Rowe, in that one

11:56:57 22    spreadsheet, had a different assignment, a different

11:57:00 23    request, access to limited data at that point in time.  And

11:57:04 24    you know, candidly, the degree of certainty that she needs

11:57:07 25    to have as a business executive, you know, responding to

11:57:12  1    requests from her boss is very, very different than the

11:57:15  2    degree of certainty that I, as an economist and an expert,

11:57:19  3    needs to have.

11:57:20  4    Q.    Yeah, and we're going to talk about that in a minute.

11:57:23  5    But if we could have PX-121 and go down to the - - towards

11:57:27  6    the bottom.

11:57:29  7          She does have two analyses, two forecasts here.

11:57:33  8    One she did before the lawsuit, and one she did after the

11:57:37  9    lawsuit; right?

11:57:37 10    A.    I see these rows that say pre-lawsuit and

11:57:44 11    post-lawsuit.  I think as I explained to you last Friday,

11:57:47 12    this is not relevant for my analysis.

11:57:49 13    Q.    I know.

11:57:50 14    A.    And so, you know, I believe that for the purpose, she

11:57:53 15    was asked to do -- based on the information she had

11:57:55 16    available, she did what she was asked to do.  That's not

11:57:59 17    what I'm doing here.

11:58:01 18    Q.    Doctor, I'm begging you.  I'm just trying to make a

11:58:04 19    simple point.  The pre-lawsuit was the analysis she did

11:58:08 20    before the lawsuit was filed, and the second one was what

11:58:11 21    she did after the lawsuit was filed; right?

11:58:13 22    A.    Sir, I don't know one way or another.

11:58:15 23    Q.    Okay.

11:58:16 24    A.    I didn't prepare this spreadsheet.

11:58:17 25    Q.    Okay.

11:58:17  1    A.      And it didn't inform my calculations.

11:58:21  2    Q.      Okay.  But you certainly did not use any of the data

11:58:26  3    that's here in the post-lawsuit analysis; right?

11:58:29  4    A.      The data that I used from this spreadsheet, as I

11:58:35  5    explained previously, is the size of the introductory

11:58:37  6    platforms for Ford and GM for the first five years.

11:58:41  7    Q.      Right.  Right, exactly.  The honeycomb -- the

11:58:43  8    projections for honeycomb sales to the carmakers or for the

11:58:50  9    carmakers that are in this spreadsheet for the first five

11:58:54 10    years, you used those in your analysis; right?

11:58:56 11    A.      No, only for the introductory platforms.

11:59:01 12    Q.      Right.  For the first -- the first five years.  If

11:59:04 13    you look at your honeycomb sales for the first five years,

11:59:09 14    just the introductory platforms, not further out.  I

11:59:12 15    understand things changed, but the first five years for

11:59:15 16    those introductory platforms, you used Ms. Rowe's forecast

11:59:20 17    from the spreadsheet.

11:59:24 18    A.      For just the Ford and GM introductory platforms for

11:59:27 19    the size of those platforms, the data that Ms. Rowe put in

11:59:31 20    this spreadsheet is what I relied on.

11:59:33 21    Q.      Right.

11:59:33 22    A.      As I explained, it reflects both her understanding

11:59:37 23    and BASF's understanding, based on its discussions with Ford

11:59:39 24    and GM, as to the size of those introductory platforms.  I

11:59:44 25    just want to be very clear to make sure the jury also

11:59:47  1    understands those introductory platforms are about two

11:59:49  2    percent of the total carbon honeycomb demands.  And the rest

11:59:52  3    of the sale --

11:59:54  4    Q.    You're --

11:59:55  5    A.    -- is based on LCM.

11:59:56  6    Q.    You're going way beyond my question again,

11:59:59  7    Dr. Mathur.  Please.  And the -- the honeycomb forecasts

12:00:04  8    that are in here for GM and the Ford and the other OEMs,

12:00:08  9    those are used to do -- used in the pre-lawsuit analysis,

12:00:13 10    not the post-lawsuit analysis; right?

12:00:15 11    A.    Sir, I don't know that.

12:00:17 12    Q.    Okay.

12:00:17 13    A.    Because I didn't use or construct the pre-lawsuit and

12:00:20 14    post-lawsuit, so I don't know what inputs Ms. Rowe used.  I

12:00:25 15    don't know what questions she was asked by her bosses and

12:00:29 16    what information she had available.  That was not my

12:00:31 17    assignment.

12:00:33 18    Q.    Didn't you interview Ms. Rowe?  But you didn't ask

12:00:39 19    her about this pre- and post-lawsuit analysis?

12:00:42 20    A.    No.  I asked Ms. Rowe for the inputs that I thought

12:00:45 21    she was able to provide me and BASF was able to provide me

12:00:49 22    for my calculations.  My calculations require many inputs,

12:00:53 23    and, as an expert economist, I don't expect Ms. Rowe to be

12:00:57 24    able to do my assignment.  She's not who I am.  She doesn't

12:01:00 25    have access to the information that I do.

12:01:02  1    Q.      But she's the only person at BASF you interviewed;

12:01:06  2    right?

12:01:06  3    A.      Yes, based on her discussions with BASF, other

12:01:11  4    witnesses, including Mr. Abraham and others, she provided me

12:01:13  5    the information that I asked.  She was the corporate

12:01:16  6    representative, and her information reflected all of the

12:01:19  7    information that she got from other people at BASF, as she

12:01:23  8    herself testified.

12:01:24  9    Q.      But you only talked to Ms. Rowe.

12:01:26 10    A.      That's right.  I spoke to Ms. Rowe.

12:01:29 11    Q.      Okay.  And you mentioned that this spreadsheet and

12:01:32 12    the work you did were done for different purposes; right?

12:01:35 13    A.      Yes.

12:01:37 14    Q.      And that is right, isn't it?  Because this was done

12:01:41 15    for real business purposes and yours was done for

12:01:48 16    litigation; right?

12:01:48 17    A.      Sir, I don't know what this was done for.

12:01:51 18    Q.      Oh, well, then how do you know it was done for a

12:01:54 19    different purpose than yours?

12:01:55 20    A.      Well, it was not done for the purpose of writing an

12:01:57 21    expert report, as I did over the last two years, to present

12:02:00 22    to the jury.

12:02:01 23    Q.      Do you know whether this was done in the regular

12:02:04 24    course of business by Ms. Rowe to provide real-world

12:02:08 25    information to her bosses?

12:02:09 1     A.     I don't know one way or another what Ms. Rowe was

12:02:14 2     specifically asked to do and what the purpose was.  Like I

12:02:17 3     said, the only piece of input that I needed from Ms. Rowe

12:02:21 4     and BASF was what the size of an introductory, small

12:02:25 5     platform was going to be.

12:02:29 6     Q.     Okay.  Let's move on.

12:02:34 7            You were asked some questions this morning about

12:02:36 8     the effect of customers, if they bought from BASF, having to

12:02:46 9     pay a royalty for the patent to Ingevity, and you said it

12:02:51 10    would be no problem if they had to just pay a dollar or so

12:02:55 11    per honeycomb to Ingevity.  Do you recall that?

12:02:58 12    A.     Yes.

12:02:59 13    Q.     Okay.  Where did you come up with the dollar or so

12:03:03 14    for a royalty?

12:03:04 15    A.     It's based on Ingevity's own estimated prices,

12:03:08 16    information.

12:03:09 17    Q.     Okay.  What is Ingevity's profit -- dollar profit

12:03:15 18    margin per honeycomb?

12:03:17 19    A.     Are you talking about a particular year?

12:03:19 20    Q.     Let's take -- I'll pick -- take any year you like.

12:03:25 21    Let's do 2019.  What is -- not percentages.  In terms of

12:03:30 22    dollars, what is a good estimate for Ingevity's profit

12:03:37 23    margin on a honeycomb?

12:03:38 24    A.     It's very difficult to do it precisely for one carbon

12:03:42 25    honeycomb because, as I describe in my report, Ingevity sold

1218

12:03:45  1   carbon honeycombs to different customers at different

12:03:47  2   prices, and so what I can tell you is averages, unless you

12:03:51  3   have a question about a specific customer.

12:03:52  4   Q.      Sure.

12:03:53  5   A.      On average, as I've explained before, they made

12:03:57  6   approximately 80 percent profit margins on all carbon

12:04:00  7   adsorbents, that includes pelletized carbon and for --

12:04:05  8   excuse me for -- oh, actually I misspoke.  Their profit

12:04:08  9   margin for carbon honeycombs is approximately 80 percent.

12:04:12 10   But like I said, it varies by customer and by size.

12:04:17 11   Q.      And I think we -- you're familiar with the Kayser

12:04:21 12   Ingevity agreement?

12:04:23 13   A.      Yes.

12:04:23 14   Q.      And it shows that the April 2019 pricing, which that

12:04:31 15   agreement was based on, for a 29 by 100 honeycomb was about

12:04:35 16   $10.  Do you recall that?

12:04:37 17   A.      I don't.  That sounds a little bit higher than I

12:04:40 18   recall.  I'm happy to look at the agreement.  I believe

12:04:42 19   you're referring to the BASF Kayser agreement, or are you --

12:04:45 20   Q.      No.  No.  No.  I'm referring to the Ingevity-Kayser

12:04:49 21   agreement, which is pegged to 2019 pricing, and that

12:04:54 22   agreement says that pricing in 2019 before the discounts

12:05:00 23   kicked in for 29 by 100 was about $10 for a honeycomb.

12:05:05 24   A.      I don't recall the precise number, so we could look

12:05:08 25   at the agreement, if you like.  Sitting here right now, I

12:05:11  1    don't know if it's exactly $10.

12:05:13  2    Q.      Okay.

12:05:20  3            Can you pull up JX-25, please, and go to

12:05:27  4    Page 10.

12:05:31  5            And this is from the Ingevity-Kayser agreement.

12:05:37  6    Okay?  We can show you the front page if you'd like.

12:05:41  7    A.      I believe you, yes.  It looks familiar.  I just --

12:05:43  8    there's lots of agreements and lots of price schedules.

12:05:46  9    Q.      And you see the August 1st, 2019, pricing for the 29

12:05:49 10    by 100 is about $10?

12:05:52 11    A.      Yes, $10.09 for the full pallet and then next to it

12:06:02 12    $12.61 for what I assume is not a full, but a subsection of

12:06:08 13    the pallet, subsection pallet.

12:06:09 14    Q.      To sell them a full pallet of honeycombs, the price

12:06:13 15    back then was $10 per honeycomb; right?

12:06:16 16    A.      That's right.

12:06:17 17    Q.      And so using your 80 percent profit margin, that's $8

12:06:22 18    of profit; right?

12:06:23 19    A.      On average.

12:06:24 20    Q.      On average.  But it's your testimony that Ingevity

12:06:30 21    would give up that -- while it has its patent, while it has

12:06:35 22    its patent, it's going to give up that $8 per honeycomb and

12:06:41 23    let customers buy from BASF in return for a $1 royalty?

12:06:47 24    A.      That's what Ingevity's expected prices over time

12:06:52 25    indicate.  I'm happy to walk you through the calculation if

12:06:54  1    that would be helpful.

12:06:55  2    Q.    No I'm just trying to understand the logic of it.

12:06:59  3    You're suggesting that Ingevity would allow its customers to

12:07:04  4    buy from BASF, make canisters that are covered by the '844

12:07:13  5    patent, give up the $8 per honeycomb in return for a $1

12:07:16  6    royalty.  That's what you're suggesting?

12:07:18  7    A.    That's not what I'm suggesting, and that's not a fair

12:07:21  8    comparison because these prices are reflecting the prices in

12:07:25  9    the market that's being monopolized by Ingevity because of

12:07:28 10    the agreements it's entered into.  So you can't compare this

12:07:32 11    to what I'm explaining about a scenario where Ingevity is

12:07:36 12    not able to engage in anticompetitive conduct.

12:07:39 13    Q.    I'm just understanding this scenario you gave us this

12:07:42 14    morning, that there wouldn't be any problem if customers had

12:07:46 15    to pay a royalty when they bought from BASF because the

12:07:51 16    royalty would only be about a dollar and Ingevity would be

12:07:55 17    giving up $8 for every honeycomb.

12:07:58 18    A.    I'll help to explain to you the basis of the $1, but,

12:08:02 19    again the question that you're posing is invalid because

12:08:05 20    these prices already reflect the monopolistic prices and the

12:08:10 21    market power that Ingevity has.  And I'm talking about a

12:08:12 22    world in which Ingevity's not able to engage in

12:08:16 23    anticompetitive conduct.

12:08:17 24    Q.    Okay.

12:08:18 25    A.    And, yes, the conclusion is that it would make lower

12:08:21  1    profits because customers would get lower prices.

12:08:24  2    Q.      Okay.  I'm sorry.  I was talking about the real

12:08:27  3    world.  Okay.

12:08:33  4            And then you were asked some questions about

12:08:36  5    this, about the fact that you're assuming that every -- that

12:08:42  6    BASF got 50 percent market share at all five of the

12:08:47  7    carmakers; right?

12:08:48  8    A.      By the end of a ten-year period.

12:08:51  9    Q.      Right.

12:08:52 10    A.      In the earlier years, it's much less than 50 percent.

12:08:54 11    Q.      Right.  And you said that you were not assuming a

12:08:58 12    hundred percent probability that that might happen because,

12:09:02 13    in fact, it might be 60 or 70 percent.

12:09:07 14    A.      That's not what I said.

12:09:08 15    Q.      Okay.  Well, let me put it this way:  Did you

12:09:14 16    quantitatively reduce your damages in any way to take into

12:09:21 17    account the possibility that at the end of that time frame

12:09:29 18    BASF's market share at any of those carmakers would be less

12:09:32 19    than 50 percent?

12:09:33 20    A.      And what end of the time frame are you referring to?

12:09:37 21    Q.      I'm asking you whether you assumed that by the end of

12:09:41 22    the time period, the market share, all five of the

12:09:47 23    carmakers, would be 50-50 percent; right?

12:09:50 24    A.      Yes.

12:09:50 25    Q.      What I'm asking you is did you look at what damage --

12:09:57 1   what the damages would be?  Did you come up with any

12:09:58 2   alternative numbers if, in fact, it turned out that

12:10:05 3   Volkswagen or Honda or for one of those companies -- in

12:10:09 4   fact, BASF only got to 30 percent.  Did you do that

12:10:13 5   alternative analysis?

12:10:14 6   A.     I did do an alternative analysis, but first I want to

12:10:18 7   be very clear that my analysis doesn't anticipate or

12:10:22 8   contemplate BASF getting 50 percent market share of these

12:10:26 9   five carmakers over night.  For the vast majority of that

12:10:30 10  time, it is slowly ramping up, so it's 7 percent and

12:10:34 11  10 percent and 15 percent.  By the end, it gets to

12:10:37 12  50 percent.  So in the aggregate -- I just want to clarify

12:10:41 13  to make sure that the jury understands what I did.

12:10:43 14  Q.     Thank you.

12:10:44 15  A.     And the other point that I would like to make is that

12:10:47 16  not only is this consistent with BASF's own expectations,

12:10:52 17  this actually gives BASF a lower share than what Ingevity

12:10:55 18  was expecting to lose.

12:10:57 19  Q.     Okay.  Your Honor -- I mean, Dr. Mathur, I'm going to

12:11:01 20  ask you to try to focus on my question.  Okay.

12:11:04 21         You're assuming at the end of the period -- I

12:11:07 22  know it ramps up -- but you're assuming at the end of the

12:11:10 23  period, BASF is going to have 50 percent market share at all

12:11:16 24  five-car companies?

12:11:17 25  A.     Yes.

12:11:18  1   Q.      Yes.   What I'm asking you is did you quantitatively

12:11:22  2   do any analysis to say what would the damages be if it

12:11:27  3   turned out that at the end of that time period, BASF only

12:11:35  4   had 30 percent at some of these carmakers?

12:11:39  5   A.      I believe as I testified last week, you know, BASF

12:11:42  6   contemplated a best-case scenario of 80 percent, a

12:11:46  7   worst-case scenario of 20 percent and an expected scenario

12:11:50  8   of 50 percent.   I did also calculate the damages for the

12:11:54  9   worse-case scenario of 20 percent, and I believe I presented

12:11:56 10   those numbers.

12:11:56 11   Q.      Okay.   Other than that 20 percent scenario, have you

12:12:03 12   calculated any what the damages would be if at two or three

12:12:09 13   of the carmakers, it was something other than 50 percent at

12:12:13 14   the end of the period?

12:12:14 15   A.      I've calculated the damages based on the evidence

12:12:18 16   I've seen and the data that I've received, so that's what my

12:12:22 17   calculations are based on.

12:12:23 18   Q.      Yes or no.   Other than this 20 percent scenario, have

12:12:26 19   you done any analysis, quantitative analysis, as to what the

12:12:30 20   damages would be if it turns out that at the end of the

12:12:34 21   period, BASF does not get 50 percent at every single one of

12:12:40 22   the carmakers?

12:12:40 23   A.      My analysis reflects the 50 percent scenario and the

12:12:45 24   20 percent scenario.

12:12:46 25   Q.      And that's it?

12:12:47  1    A.        That's correct.

12:12:48  2    Q.        Okay.

12:12:48  3    A.        Well, again, to clarify, under the different pricing

12:12:52  4    scenarios, I have two, but I believe you're focusing right

12:12:55  5    now on the -- on the market share.

12:12:58  6    Q.        Okay.  One last thing, Doctor.  If we could pull up

12:13:01  7    Slide 22.  We talked about this a bit earlier; right?  I

12:13:09  8    want to understand something.  In February 26, 2018, BASF

12:13:15  9    and Kayser entered into their agreement; right?

12:13:18 10    A.        Yes.

12:13:19 11    Q.        That was a seven-year agreement; right?

12:13:21 12    A.        I recall it was long-term, so that's probably

12:13:24 13    correct.  I recall it was several years.  I don't recall if

12:13:27 14    it was exactly seven.  I'm happy to look at it, but that

12:13:30 15    sounds right.

12:13:31 16    Q.        You heard it, or did you read it?

12:13:33 17    A.        I have reviewed the BASF-Kayser agreement, yes.

12:13:36 18    Q.        Okay.  And we can look at it, if you'd like.  Would

12:13:41 19    you like to look at it to confirm it's seven years?

12:13:43 20    A.        If you're saying it's seven years, I believe you.

12:13:47 21    Q.        Okay.

12:13:48 22    A.        Like I said, I understand it was a long-term

12:13:49 23    agreement.

12:13:49 24    Q.        Fair enough.  Okay.

12:13:51 25            And that locked in the prices that Kayser would

12:13:55  1   have to pay to BASF over those seven years; right?

12:13:58  2   A.      It stipulated the prices at which BASF would sell to

12:14:02  3   Kayser at different levels of volume.

12:14:04  4   Q.      Right.  But the prices called for -- yeah, you're 100

12:14:10  5   percent right, Doctor.  The prices -- the more Kayser buys,

12:14:15  6   the lower the price; right?

12:14:17  7   A.      Yes.

12:14:17  8   Q.      And nothing wrong with that.

12:14:19  9   A.      That's correct.

12:14:21 10   Q.      But it does lock in what the prices would be for that

12:14:25 11   entire seven-year term.

12:14:27 12   A.      It outlines what the prices would be, yes.

12:14:30 13   Q.      Yes.  Now, do you have any reason to believe that

12:14:35 14   after that contract was signed that BASF would have been

12:14:40 15   unable to supply all the honeycombs that Kayser needed?

12:14:45 16   A.      Again, are we talking about a setting with Ingevity's

12:14:50 17   misconduct going on?  Are we talking about in the absence of

12:14:53 18   the misconduct?  What?

12:14:54 19   Q.      No.  This has absolutely nothing to do with the

12:14:57 20   misconduct.  My question is if after that agreement was

12:15:00 21   signed Kayser said, you know what, we want to go forward, we

12:15:05 22   want to buy all of our honeycombs from BASF in the real

12:15:10 23   world, okay.  Do you have any reason to believe that BASF

12:15:14 24   would have been unable to meet Kayser's needs?

12:15:17 25   A.      The contract doesn't contemplate Kayser buying all of

12:15:22  1    its carbon honeycombs from BASF.  It's not an exclusive

12:15:25  2    contract.  It outlines the volumes that BASF expects to be

12:15:30  3    able to sell to Kayser and Kayser expecting to want to buy

12:15:34  4    from BASF.  So for the volumes that are outlined in the

12:15:37  5    contract, those are based on BASF's expectations.

12:15:41  6    Q.      Yeah.  There's minimums.  There's no maximums, right,

12:15:46  7    in the agreement?  It doesn't -- it doesn't say BASF will

12:15:52  8    supply this many honeycombs, but no more; right?

12:15:55  9    A.      That's right.  I don't think it contemplates --

12:15:57 10    Q.      Okay.

12:15:58 11    A.      It contemplates minimums.  Correct.

12:16:00 12    Q.      Right.  Right.  So my question is a very

12:16:03 13    straightforward one, Doctor.  If, after they signed this

12:16:06 14    agreement, Kayser said we want to go forward, right, we want

12:16:12 15    to buy all of our honeycombs from you, BASF, if that had

12:16:16 16    happened in the real world, my only question is:  Do you

12:16:19 17    have any reason to believe that BASF would have been unable

12:16:23 18    to meet Kayser's needs?

12:16:25 19    A.      My understanding is that BASF would be able to meet

12:16:29 20    Kayser's needs based on the volumes that are contemplated in

12:16:33 21    the agreement.

12:16:34 22    Q.      Okay.

12:16:34 23    A.      That's why it wanted to enter into the agreement.

12:16:37 24    That's what it stipulated to.

12:16:39 25    Q.      And you heard that BASF designed its honeycombs so it

1227

12:16:44 1   could be a drop-in replacement for Ingevity's; right?  So

12:16:48 2   that if a canister maker is making a canister using

12:16:51 3   Ingevity's honeycomb, they can just drop in the BASF

12:16:57 4   honeycomb to replace it; right?

12:16:58 5   A.      That's not right.  I recall Mr. Abraham explaining

12:17:01 6   that that was considered at the beginning and that was a

12:17:04 7   possibility, but thereafter, it may have evolved because as

12:17:09 8   canister makers design canisters for new platforms -- I

12:17:13 9   don't know one way or another if it was only or solely

12:17:15 10  designed to be a drop-in the way you're describing it.

12:17:18 11  Q.      Do you know whether the BASF honeycombs are exactly

12:17:23 12  the same size as the Ingevity honeycombs?

12:17:25 13  A.      Sir, I understand there's been a lot of testimony

12:17:29 14  back and forth on that.  I do know that there are some

12:17:32 15  standard sizes of carbon honeycombs, including we've all

12:17:36 16  been talking about the 29-by-100-millimeter, but I don't

12:17:39 17  have an engineering or technical opinion on that.

12:17:42 18  Q.      So you don't know?  You don't know whether BASF makes

12:17:44 19  any honeycomb that isn't identical in size to the Ingevity

12:17:50 20  honeycomb?

12:17:51 21  A.      Size is one characteristic.  I do know, as I've

12:17:55 22  testified --

12:17:55 23  Q.      Dr. Mathur, I'm asking you -- I'm asking you about

12:17:58 24  size, please.  Does BASF make any honeycomb in a size that

12:18:08 25  is different from any Ingevity honeycomb?

12:18:11 1    A.      I don't believe so.

12:18:12 2    Q.      Okay.  And they're both 200 cells per square inch;

12:18:16 3    right?

12:18:16 4    A.      Again, I'm not an engineer, so I'm not offering the

12:18:20 5    engineering specifications of what they are or they're not.

12:18:23 6    Q.      Okay.  But so after this contract gets signed, Kayser

12:18:29 7    could get all the honeycombs it needs from BASF, and those

12:18:34 8    honeycombs would be the same size and the same cells per

12:18:38 9    square inch as the honeycombs it was buying from Ingevity;

12:18:41 10   right?

12:18:41 11   A.      Sir, you're misstating what I just said.  I

12:18:45 12   understand that the contract stipulates the volumes that

12:18:49 13   BASF anticipated to sell and Kayser anticipated to buy.

12:18:52 14   You're referring to all of Kayser's volume.  I don't know.

12:18:55 15   That's not what the contract says, so I'm unable to answer

12:18:59 16   your question.

12:18:59 17   Q.      Well, I thought -- I thought we got past that.  I

12:19:02 18   thought you said you had no reason to believe that BASF

12:19:05 19   would be unable to sell Kayser all the honeycombs it needed;

12:19:12 20   right?

12:19:12 21   A.      You're -- I did not say that.  I said that I have no

12:19:16 22   reason to believe that BASF would not be able to sell the

12:19:19 23   volumes that are outlined in the contract.  That's what it

12:19:22 24   agreed to sell.  You're referring to "all."  I don't know

12:19:25 25   what "all" are.  I'm referring to the volumes that are

| | |
|---|---|
| 12:19:29 | 1 |

listed in the contract.

12:19:32  2    Q.    Are you saying that the contract limits the number of

12:19:37  3    honeycombs BASF agreed to sell to Kayser?

12:19:41  4    A.    No.

12:19:42  5    Q.    There's minimums; right?

12:19:44  6    A.    Correct.

12:19:45  7    Q.    Okay.  So I guess we have to go back.  Are you -- and

12:19:49  8    I'm not talking what the contract says, doctor.  I'm asking

12:19:52  9    you whether in the real world, do you have any reason to

12:19:54 10    believe that BASF would have been unable to meet whatever

12:20:00 11    purchase orders it received from Kayser?

12:20:04 12    A.    I don't know that, one way or mother.

12:20:06 13    Q.    Okay.

12:20:07 14    A.    My opinion is based on what's in the contract.

12:20:09 15    Q.    Okay.  Fair enough.

12:20:10 16          So if when Kayser received these price increases

12:20:21 17    from Ingevity that you're referencing here, one option it

12:20:25 18    had, because it already had the contract in place with BASF,

12:20:30 19    one option it had was to say, you know what, we don't like

12:20:35 20    the Ingevity prices.  We're just going to buy our honeycombs

12:20:38 21    from BASF, and we're going to pay the prices that are in our

12:20:43 22    contract with BASF.  That would have been an option for

12:20:47 23    Kayser; right?

12:20:48 24    A.    Well, I don't think it was an option for Kayser.

12:20:51 25    Q.    Why not?

12:20:52  1   A.       They're -- as the testimony has indicated, that

12:20:55  2   Kayser was concerned about all sorts of reactions and

12:21:00  3   responses from Ingevity.

12:21:02  4   Q.       What responses?

12:21:03  5   A.       Both the price increases that are outlined here as

12:21:07  6   well as other concerns that Mr. Schutte described in his

12:21:11  7   testimony.

12:21:11  8   Q.       Well, that's -- if it's the price concern, if Kayser

12:21:17  9   was concerned that Ingevity was raising its prices, my point

12:21:22 10   is they could deal with that concern by just saying, you

12:21:26 11   know what, we're just going to buy all of our honeycombs

12:21:28 12   from BASF and pay the prices we have in our agreement.  That

12:21:33 13   was an option; right?

12:21:34 14   A.       The contract stipulates to certain volumes.  So I'm

12:21:40 15   not quite clear on where you're trying to go.  The BASF

12:21:44 16   Kayser contract has some volumes listed.

12:21:47 17   Q.       Yeah, we've already talked about that, Doctor.  There

12:21:50 18   are minimums in the contract, but no maximums.  And so my

12:21:54 19   question is:  Isn't it true that if Kayser was really

12:22:01 20   unhappy about these price increases it was getting from

12:22:04 21   Ingevity, an option, an obvious option, was just to say,

12:22:09 22   look, we just signed a contract with BASF.  Let's buy our

12:22:13 23   honeycomb from them and pay the good prices that we have in

12:22:16 24   that contract.  That was an option; right?

12:22:19 25   A.       It wasn't a credible option, given all of the

12:22:21 1    concerns that Mr. Schutte of Kayser testified to that he had

12:22:25 2    about Ingevity's ability to retaliate and control and --

12:22:31 3    Q.    Well, other than pricing, what concerns?

12:22:34 4    A.    I'm happy to go back to the Kayser testimony and

12:22:37 5    review it with you, but Mr. Schutte testified to concerns.

12:22:41 6    Q.    Well, you put up this slide to try to make this

12:22:44 7    point, and I'm asking you:  Other than the price increases

12:22:49 8    that you've highlighted here, what other concerns did Kayser

12:22:55 9    have that would cause it to not buy from BASF?  I don't

12:23:01 10   understand.

12:23:02 11   A.    This slide is not intending to outline all of the

12:23:05 12   concerns that Kayser had.  The purpose of the slide was to

12:23:07 13   show a timeline for key events that occurred.  I'm happy to

12:23:11 14   review with you or we can put up the Kayser testimony that

12:23:14 15   outlines the concerns that Kayser had.

12:23:16 16   Q.    But you can't tell me what they are?

12:23:18 17   A.    I'm happy to turn to my report or review the

12:23:21 18   testimony with you.  We've reviewed and seen so much

12:23:23 19   testimony over the last week.  I'm not going to try to quote

12:23:26 20   it.

12:23:26 21   Q.    Okay.  Well, let me just go back to my question.  Are

12:23:29 22   you saying that when Kayser got price increases from

12:23:38 23   Ingevity, are you saying it did not have the option to turn

12:23:45 24   to BASF, say, hey, we signed a contract.  I'm going to buy

12:23:50 25   my honeycombs from you and pay the prices that are in that

12:23:53 1    contract?  Is that your testimony?

12:23:55 2    A.    Yes, my testimony is that Kayser faced severe

12:24:00 3    concerns about what would happen if it purchased carbon

12:24:04 4    honeycombs from a source other than Ingevity.

12:24:08 5    Q.    But you can't tell me what those concerns are?

12:24:10 6    A.    As I said, we can review Mr. Schutte and other

12:24:15 7    testimony to review his exact words and what he said.

12:24:18 8    Q.    Okay.  One concern, the real concern was, Dr. Mathur,

12:24:22 9    that if Kayser started buying from BASF and making canisters

12:24:33 10   that are covered by the '844 patent, it would be infringing

12:24:38 11   the patent.  That was really Kayser's concern; right?

12:24:42 12   A.    No, we don't know that.  As I explained, that may

12:24:45 13   have been one concern, but there were many other concerns.

12:24:48 14   And in fact, my analysis shows that the concern about

12:24:51 15   anticompetitive conduct by Ingevity was a substantial reason

12:24:55 16   why Kayser didn't move forward with the contract that it

12:24:58 17   signed with BASF.

12:24:59 18   Q.    Okay.  We don't know that.  So you don't know whether

12:25:05 19   the reason Kayser did not buy from BASF was because of its

12:25:14 20   concerns about patent infringement and litigation.  We don't

12:25:18 21   know that; right?

12:25:19 22   A.    That's not right.  We do know, as I explained, that

12:25:23 23   one important reason was because of the anticompetitive

12:25:28 24   conduct.  There may have been other reasons.  As I

12:25:31 25   explained, all of these decisions are based on multiple

12:25:33  1    factors, so there may have been other factors.  But my

12:25:36  2    analysis indicates that the conduct, the agreements and the

12:25:39  3    arrangements, were an important reason why Kayser didn't

12:25:42  4    move forward.

12:25:42  5    Q.      So Kayser didn't move forward between February of

12:25:47  6    2018 and January of 2020 because of the agreement it signed

12:25:53  7    in January of 2020?

12:25:55  8    A.      Sir, I think, first, we've talked -- I think -- I

12:26:01  9    think you're referring to the agreement between Ingevity and

12:26:03 10    Kayser, and I believe that's back to January of 2019.

12:26:07 11    Q.      It was signed -- I know you have BASF has -- well, it

12:26:13 12    was signed in January of 2020; right?

12:26:15 13    A.      I understand that the contract was effective January

12:26:19 14    of 2019.

12:26:20 15    Q.      It was signed in January of 2020; correct?

12:26:23 16    A.      Yes.

12:26:24 17    Q.      Okay.  And the -- so that agreement, that wasn't

12:26:33 18    signed until January of 2020, couldn't possibly have been

12:26:37 19    the reason that Kayser did not go forward with BASF between

12:26:42 20    February of 2018 and the end of 2019; right?

12:26:46 21    A.      That's not right.

12:26:49 22    Q.      Somehow a contract that Kayser didn't even sign until

12:26:56 23    January of 2020 was the reason it didn't buy from BASF in

12:27:05 24    2018 and 2019?

12:27:07 25    A.      Sir, this timeline shows and Mr. Schutte's testimony

12:27:11 1   shows that all during 2019 and before, the negotiations

12:27:16 2   about this contract were failing.  Kayser hadn't signed the

12:27:20 3   contract because it was concerned about what it was getting

12:27:23 4   into.  And then once it received these price increases and

12:27:27 5   two price increases in one year and a ten percent price

12:27:30 6   increase, that's when it signed the contract.  So -- but it

12:27:36 7   was also effective a year earlier, so I think I've already

12:27:39 8   answered your question here.

12:27:40 9   Q.     Getting back to those price increases, again, before

12:27:45 10  it got those price increases from Ingevity, it had already

12:27:50 11  locked in a seven-year supply agreement with BASF with

12:27:56 12  prices locked in that was in place between those two

12:28:02 13  parties; right?  We can agree on that?

12:28:04 14  A.     It had signed an agreement with BASF, yes.

12:28:09 15  Q.     Right.  And -- but just so I'm crystal clear on your

12:28:19 16  testimony, it's your testimony that despite the fact that

12:28:23 17  they signed -- they negotiated that contract, they signed

12:28:27 18  that contract, it was for seven years.  Despite that, buying

12:28:34 19  its honeycombs from BASF under that contract instead of from

12:28:41 20  Ingevity was not a viable option for Kayser; right?

12:28:46 21  A.     All of the conduct and the -- excuse me.  All of the

12:28:51 22  testimony from Mr. Schutte explains that he had many, many

12:28:55 23  concerns about Ingevity's conduct.  There was several

12:28:58 24  factors that were driving Kayser's eventual decision to not

12:29:03 25  purchase from BASF.  You know, as I've explained, my

12:29:07 1    analysis shows that the anticompetitive conduct was a

12:29:10 2    substantial reason.  Could there had been other reasons?

12:29:12 3    Yes, potentially.  There is multiple factors to drive

12:29:18 4    decisions.

12:29:18 5    Q.      So I just want to see if I can get a yes-or-no

12:29:21 6    answer.  It's your testimony that, despite having signed

12:29:26 7    this contract in 2018, it was not a viable option for Kayser

12:29:33 8    to start buying honeycombs from BASF; right?

12:29:39 9    A.      Yes.

12:29:40 10   Q.      Okay.

12:29:40 11           MR. THOMAS:  Nothing further.

12:29:41 12           THE COURT:  All right.  Thank you.

12:29:43 13           Any redirect?

12:29:44 14           MR. MEZZINA:  Yes, briefly, Your Honor.

12:29:46 15   BY MR. MEZZINA:

12:29:47 16   Q.      Dr. Mathur, I think you'll be happy to hear that I

12:29:49 17   only have a very few questions.

12:29:52 18   A.      I hope the jury is not tired of me talking at this

12:29:55 19   point.

12:29:56 20   Q.      So just on the topic we were just talking about, so

12:29:59 21   you had this timeline that showed Ingevity kept raising

12:30:04 22   prices on Kayser, jacking up these prices, to try to get

12:30:07 23   Kayser to enter into a long-term agreement with Ingevity and

12:30:10 24   not deal with BASF which eventually happened, and I think

12:30:13 25   Mr. Thomas was trying to suggest, well, what does Ingevity

12:30:16  1    care -- I'm sorry -- what does Kayser care about Ingevity's

12:30:19  2    price increases because they could just go to BASF.

12:30:22  3              Dr. Mathur, were the price increases that

12:30:24  4    Ingevity was imposing only on carbon honeycombs, or were

12:30:27  5    they also on other carbon products?

12:30:29  6    A.    I believe we recall from Mr. Schutte's testimony that

12:30:34  7    Ingevity was threatening pricing increases on all of the

12:30:38  8    carbon products, including carbon honeycombs as well as

12:30:40  9    other carbon products.

12:30:42 10    Q.    So if Kayser said, okay, I don't like these price

12:30:46 11    increases.  I'm going to buy my honeycombs from BASF, would

12:30:48 12    they still have been subject to retaliation from Ingevity on

12:30:51 13    all of these other products?

12:30:54 14    A.    Yes, and that's exactly the type of concerns that

12:30:57 15    Kayser had about being able to purchase from BASF.

12:31:01 16    Q.    Thank you.

12:31:01 17              So just to wrap up, I guess, Dr. Mathur.  You

12:31:05 18    know, you've been here for the entire trial.  You testified

12:31:09 19    twice, and I think you said it was your first time

12:31:11 20    testifying, so congratulations.  You've been cross-examined

12:31:14 21    for several hours.  Has anything you've heard changed your

12:31:17 22    opinions in this case?

12:31:18 23    A.    I've assessed all of the evidence over a long period

12:31:21 24    of time and listened carefully to the testimony.  There have

12:31:25 25    been some questions that raised -- that have been raised and

12:31:28   1    I've spend a lot of time thinking about it, but, no.  I've

12:31:32   2    done my very best to reach conclusions that are fair and

12:31:37   3    reasonable and as accurate as possible.  I stand by

12:31:41   4    conclusions.

12:31:43   5    Q.      You are still confident in your conclusions?

12:31:45   6    A.      I am.

12:31:45   7               MR. MEZZINA:  Thank you.  No further questions.

12:31:47   8               THE COURT:  All right.  Thank you.

12:31:53   9               So, Dr. Mathur, can you step down.  Watch your

12:31:56  10    step.

12:31:57  11               All right.  Thank you.

12:31:57  12               THE WITNESS:  Thank you.  Thank you.

12:32:02  13               MR. FRIEL:  Your Honor, Dr. Mathur is our last

12:32:04  14    witness.

12:32:04  15               THE COURT:  All right.  So --

12:32:07  16               MR. FRIEL:  We rest our case.  Thank you.

12:32:09  17               THE COURT:  Okay.  All right.  And you're done,

12:32:14  18    right?

12:32:15  19               MR. THOMAS:  Yes, Your Honor.

12:32:15  20               THE COURT:  Okay.  So, members of the jury,

12:32:19  21    we're done for the day with you all.  I think I told you on

12:32:23  22    Friday that, well, I estimated it would be less than a full

12:32:27  23    day.  So basically, I'm going to let you go.  I understand

12:32:34  24    you're going to have lunch, but, basically, you're done in

12:32:37  25    Court.

12:32:38   1        So tomorrow morning, the plan would be that

12:32:41   2   we're going to have closing arguments, and I've been talking

12:32:47   3   to the attorneys and the jury instructions in an antitrust

12:32:54   4   case are -- which I will be giving you, basically, before

12:32:57   5   the closing arguments, they are lengthy.  The amount of time

12:33:04   6   the lawyers have said they need to present the arguments,

12:33:09   7   I'm not going to give you nightmares by telling you how long

12:33:12   8   they've said.  I'll just tell you that it's a long time.

12:33:16   9        So I'm not sure exactly how the schedule will go

12:33:21  10   tomorrow because all these times are somewhat uncertain, but

12:33:27  11   it seems to me reasonable that what I might plan on doing is

12:33:31  12   to deliver my instructions, have the plaintiff, BASF's,

12:33:39  13   closing argument.  We may break for lunch then and then have

12:33:43  14   the Ingevity closing argument after lunch, and then you'll

12:33:51  15   get the case shortly thereafter.  So in any event, do

12:33:56  16   whatever you do in the morning to be alert during the day.

12:33:59  17        So there are a couple of other things.  Until

12:34:04  18   you actually guess get the case for deliberations, you can't

12:34:07  19   discuss it amongst yourselves.  So -- so don't start now

12:34:13  20   discussing it, and, of course, don't discuss it with anybody

12:34:16  21   else.  You know, people you live with, people on the

12:34:21  22   Internet.  Don't let anyone talk to you about the case.

12:34:26  23        Second, don't do any research about the case.

12:34:29  24   Don't look anything up on the Internet.  You know, part of

12:34:33  25   the closing argument is that that's when the lawyers try

12:34:37  1    to -- or one of the things they try to do is to present what

12:34:43  2    you've heard to sort of tie it together from the point of

12:34:46  3    view of whichever party they represent.  But in any event,

12:34:50  4    that's, you know -- the rule is you still can't do any

12:34:53  5    research.  And in fact, you can't do any research on the

12:34:56  6    case even once you get it for deliberations.  You're limited

12:34:59  7    to what you hear here in court.

12:35:01  8            And I would -- you know, I think it's best

12:35:07  9    because we've been starting at 9:30 that we start at 9:30

12:35:11 10    tomorrow morning, too.  You know, and you were here on time

12:35:15 11    this morning, so please try to be here on time tomorrow.

12:35:18 12            One thing is if you're deliberating on the case

12:35:24 13    into Wednesday, you know, you'll be able to, as a group, set

12:35:30 14    your own schedule.  And indeed, tomorrow at the -- you know,

12:35:38 15    you also can set your leaving schedule.  You know, you don't

12:35:42 16    have to go at 5:00.  Maybe you do because one or more of you

12:35:45 17    have commitments.  You can, in fact, leave before 5:00 if

12:35:49 18    you want.  But also, if you think like, oh, jeez, maybe we

12:35:55 19    ought to stay until 6:00, you can do that.  The court staff,

12:35:58 20    the lawyers, we will accommodate whatever schedule you want

12:36:00 21    to keep.

12:36:03 22            All right.  I think that's all I want to tell

12:36:05 23    you right now, so -- but you're done for the day.  Go have

12:36:09 24    lunch, and we'll see you tomorrow morning.

12:36:12 25            All right.  Can we take the jury out.

12:36:14 1                    (Jury leaving the courtroom.)

12:36:31 2                    THE COURT:  All right.  So why don't you all be

12:36:47 3        seated.

12:36:49 4                    Did somebody, Mr. Friel, on your side want to

12:36:52 5        follow up on this motion that you mentioned when the defense

12:36:56 6        closed their case?

12:36:57 7                    MR. FRIEL:  Yes, sir.  Mr. Mezzina will do that.

12:37:00 8                    THE COURT:  All right.

12:37:01 9                    MR. MEZZINA:  Your Honor, should I go to the

12:37:02 10       podium?

12:37:03 11                   THE COURT:  That's fine.

12:37:05 12                   MR. MEZZINA:  So, Your Honor, we're moving for

12:37:06 13       judgment as a matters of law under Rule 50(a).  And I'll be

12:37:10 14       brief.

12:37:10 15                   On two issues, first is the staple non-staple

12:37:15 16       issue, that honeycombs are a staple good.  And there's a

12:37:19 17       couple of aspects to that.  First, you know, Your Honor has

12:37:22 18       noted that it's undisputed that honeycombs, in general, are

12:37:26 19       a staple.  We understand Your Honor's ruling about size.  We

12:37:31 20       are just preserving our position on that.

12:37:31 21                   THE COURT:  Okay.

12:37:32 22                   MR. MEZZINA:  Second, on the essential to the

12:37:34 23       advance requirement, the evidence has shown this was a

12:37:38 24       preexisting product.  Ingevity neither developed a new

12:37:41 25       honeycomb nor discovered a new property of existing

honeycombs.  As Dr. Rockstraw admitted, the discovery that led to the '844 patent was made without reference to honeycomb adsorbents at all.  The testimony has all been consistent.  The invention is combining components that were already known in the art to produce a new result from the combination, and even with respect to dimensions, Ingevity didn't invent those.  The testimony from Mr. Woodcock was that the dimensions were just dictated by customers based on the size of the canisters, so that's not an aspect of Ingevity's invention.

And second, Your Honor, we also move for judgment as a matter of law on tying.  We understand we have the burden, and, of course, that usually makes it harder to show you're entitled to judgment of matter of law.  You have to show that there's only one result the jury could reach, but here, as we talked about in summary judgment, the facts related to tying really are undisputed.  The conditioning aspect of tying is not in dispute nor is the market power.

All of Ingevity's responses on tying really are legal arguments that flow from the staple good issue, and so because we think we're entitled to judgment on that issue, we also think we're entitled judgment on tying.

THE COURT:  And since you recognize that I'm not going to grant judgment as a matter of law on the staple good issue, I take it that it follows that I'm not going to

12:39:02  1    grant judgment as a matter of law on the tying issue; right?

12:39:02  2            MR. MEZZINA:  That's correct, Your Honor.

12:39:03  3            THE COURT:  All right.  And so the one thing

12:39:04  4    that I -- that you mentioned that wasn't one of those two

12:39:09  5    things was the -- what you described as the essential to

12:39:15  6    advance argument, and I wasn't sure that I was actually

12:39:18  7    placing exactly what you were trying to telling me there.

12:39:20  8            MR. MEZZINA:  Sure.  So Your Honor, under Rohm &

12:39:24  9    Haas, there are two requirements to qualify as a non-staple

12:39:28 10    good that Ingevity has the right to be the sole supplier for

12:39:31 11    during the life of the patent.  One, it has to do with the

12:39:33 12    non-infringing uses which we talked about.  And the second

12:39:36 13    is the product has to be an essential aspect of the claimed

12:39:40 14    advance in the invention.

12:39:41 15            THE COURT:  In a later case, hasn't the Federal

12:39:44 16    Circuit described that as material to the invention?

12:39:47 17            MR. MEZZINA:  Are you -- is Your Honor referring

12:39:51 18    to the Hodosh case?

12:39:51 19            THE COURT:  I might be.

12:39:52 20            MR. MEZZINA:  I don't believe Hodosh

12:39:55 21    specifically addresses this requirement.  I don't think

12:39:58 22    there's discussion in Hodosh that really sheds light on this

12:40:03 23    issue without talking about a different issue which there it

12:40:05 24    was the toothpaste and it was are we just looking at an

12:40:07 25    ingredient to the toothpaste or are we actually looking at

the toothpaste.

THE COURT:  Yeah.  Yeah.  In terms of the staple good and the essential to advance, the essential to advance -- to the extent that the staple good issue is the mirror image of the contributory infringement issue, the essential to advance, that's not part of contributory infringement, is it?

MR. MEZZINA:  Two points.  First, as Your Honor knows, we don't think it is a perfect mirror, but to the extent it is a mirror, I think you can look at the material part of the invention aspect to infer infringement.  Again, we don't think they are -- have to be identical but, you know, there's support for the idea that you're not contributorily infringing if you're selling a product that's not really essential to the -- to what is the claimed invention.  That's just something that exists outside of the invention can be used to practice it, so I think there is a parallel there in those two requirements, but, again, we don't think that Rohm and Haas says that it should be a perfect mirror.

THE COURT:  Okay.  Well, as you've noted, I am going to deny it on it things that I've already said I'm going to deny it on or I denied it on at summary judgment.

And you know, I don't necessarily understand the essential to advance the argument the same way that you've

12:41:36  1    been presenting it, so I'm, basically, going to deny your

12:41:39  2    motion entirely.  All right.  Thank you.

12:41:42  3                 MR. MEZZINA:  Thank you.

12:41:44  4                 THE COURT:  Is there anything else in the world

12:41:45  5    of motions, or are we done with motions?

12:41:49  6                 MR. THOMAS:  No, Your Honor.

12:41:50  7                 THE COURT:  All right.  All right.  So I did

12:41:56  8    send out, before 9:00, the final jury instructions proposed,

12:42:05  9    which was based on the submission I got yesterday from you

12:42:08 10    all, and so we need to get together at some later point to

12:42:14 11    discuss them.  And I want to give you enough time to think

12:42:21 12    about them just because there are lots and lots of pages.

12:42:29 13                 What time would you like to meet?  2:00?

12:42:33 14                 MR. BUROKER:  That should be fine, Your Honor.

12:42:34 15                 MR. FRIEL:  Yes, Your Honor.

12:42:35 16                 THE COURT:  Okay.  I looked at the verdict form

12:42:40 17    just this morning.  It appeared to me that there was almost

12:42:44 18    no substantial difference in the two submissions.  The only

12:42:48 19    real difference was, I guess, Ingevity wanted to put the

12:42:53 20    staple good question first, and you all wanted to put it --

12:42:57 21    BASF wanted to put it fourth.

12:42:59 22                 MR. MEZZINA:  Your Honor, I think there are a

12:43:01 23    couple of other differences related to it, not just the

12:43:03 24    placement, but we didn't think this that it needed to be

12:43:06 25    charged at all, and I think particularly -- I think in the

12:43:08 1  jury instructions that Your Honor's ruling is something we

12:43:10 2  have the burden on.  And if it's just an element of our

12:43:13 3  case, then I don't think it needs to be charged if other

12:43:16 4  elements aren't being charged individually.

12:43:18 5          And the second point is if it is going to be

12:43:20 6  charged individually, I think Ingevity's proposal was

12:43:23 7  written in a way that suggested that a finding for Ingevity

12:43:26 8  on the staple issue ends the case which, of course, is not

12:43:30 9  true.  We still have our claims related to post-patent

12:43:35 10 Daubert issue.

12:43:35 11         THE COURT:  All right.  Well, I'll take a --

12:43:38 12 more look at that, a better look at that, and see what I can

12:43:43 13 figure out from that.

12:43:46 14         All right.  So I guess I'll see you at 2:00.

12:44:13 15 All right?

12:44:14 16         DEPUTY CLERK:  All rise.

12:44:17 17         (Recess was taken.)

02:03:34 18         DEPUTY CLERK:  All rise.

02:03:43 19         THE COURT:  All right.  Please be seated.  If

02:03:50 20 you're vaccinated, you can take your mask off, but you don't

02:03:54 21 have to.  All right.  So I was trying to think of the most

02:04:02 22 efficient way to do this, and it seemed to me that it might

02:04:12 23 make more sense rather than doing a method which works

02:04:16 24 pretty well most of the time and just turning the pages and

02:04:19 25 seeing as we go in each one whether there's any objection,

02:04:22  1    if I said why don't we try first to see what big things you

02:04:29  2    want to object to.  And I was thinking maybe, you know, BASF

02:04:37  3    could make three objections and then Ingevity could make

02:04:42  4    three.  And then maybe that would take care of the big

02:04:45  5    things and we just go through the little things.

02:04:51  6              But I never tried that before, so maybe that's

02:04:55  7    not the best way to do this.  But I think -- so why don't we

02:05:03  8    start with BASF, at least, and tell me what's on your mind

02:05:06  9    in terms of objections.

02:05:08 10              MR. MEZZINA:  Sure.

02:05:09 11              THE COURT:  But before you do that, let me just

02:05:14 12    get logged on here.  All right.  So why don't you go ahead,

02:05:35 13    Mr. Mezzina.

02:05:36 14              MR. MEZZINA:  Would you like me to do it from

02:05:38 15    here or the podium?

02:05:39 16              THE COURT:  I can hear you fine from there.  Why

02:05:41 17    don't you do it from there, but if it's more convenient

02:05:44 18    because you don't want to be holding it, you can come to the

02:05:46 19    podium.

02:05:47 20              MR. MEZZINA:  Thank you.

02:05:48 21              THE COURT:  Not trying to make this an endurance

02:05:50 22    contest.

02:05:50 23              MR. MEZZINA:  I appreciate it, Your Honor.  So I

02:05:52 24    think the system that Your Honor proposed will work well for

02:05:55 25    us because I'm not even sure we have objections.

02:05:57  1                THE COURT:  Okay.

02:05:58  2                MR. MEZZINA:  One of our objections, which is

02:06:00  3   one of very few, is the definition of honeycombs at issue.

02:06:02  4   Your Honor knows we're just preserving that issue.

02:06:04  5                THE COURT:  Okay.

02:06:06  6                MR. MEZZINA:  And all of our other concerns go

02:06:08  7   to Instruction 4.2, the instruction about staple and

02:06:12  8   non-staple.

02:06:13  9                THE COURT:  All right.  Hold on a minute.

02:06:25 10                Yeah.  Okay.  Hold on one minute.

02:06:27 11                All right.  Go ahead.

02:06:35 12                MR. MEZZINA:  Okay.  So, Your Honor, you

02:06:37 13   probably won't be surprised to know that our first concern

02:06:39 14   is with not instructing on essential to the advance.  This

02:06:43 15   is something that appears in the controlling Supreme Court

02:06:48 16   case twice.  Until very recently, Ingevity had conceded it

02:06:51 17   was a critical element and the parties have litigated it

02:06:53 18   throughout the case.

02:06:55 19                And, you know, we think it's an important

02:06:58 20   requirement, and it's important in part because, you know, I

02:07:02 21   said, Your Honor, we don't think this is a perfect mirror of

02:07:05 22   contributory, and the reason for that is in contributory

02:07:09 23   infringement, it makes sense.  You're looking at the alleged

02:07:12 24   infringer's product; right?  So it makes sense to sort of in

02:07:15 25   that context.

02:07:16   1        But in its antitrust context, you have to be

02:07:20   2   concerned about the possibility that the patent owner is

02:07:23   3   going to manipulate the product in order to gain power in a

02:07:27   4   market that it really doesn't have a right to control.  And

02:07:30   5   I think essential to the advance is one important way of

02:07:34   6   getting to that.  Is this really part of the inventor's

02:07:37   7   contribution through this patent and through this claimed

02:07:40   8   invention, or is it something that's just being used in the

02:07:42   9   invention but it's not really in any way essential to what

02:07:46  10   the patent owner has developed.

02:07:48  11        So that's been our position on that, and, you

02:07:50  12   know, until recently, I think, the parties agreed that was

02:07:52  13   an important issue, you know, so we'd like to have the jury

02:07:56  14   instructed on that, and I guess if Your Honor is not

02:07:58  15   inclined to instruct on that, then I have a couple of

02:08:00  16   alternative suggestions.

02:08:02  17        THE COURT:  All right.  So hold on a second,

02:08:04  18   Mr. Mezzina.  I'm just -- okay.

02:08:30  19        Well, why don't you say what your alternative

02:08:36  20   suggestions are.  That's not to say that -- I think that

02:08:44  21   would just be better and then I can hear whatever Ingevity

02:08:46  22   wants to say about this topic.

02:08:48  23        MR. MEZZINA:  Understood, Your Honor, and to be

02:08:49  24   clear, these are alternatives to our preferred instruction,

02:08:52  25   but, you know, one thought that we had is, I think, in

02:08:56  1    discussing Rohm and Haas and what Rohm and Haas means in

02:08:59  2    saying this, that Ingevity itself, you know, doesn't say

02:09:02  3    that this is irrelevant.  It says this is one factor or one

02:09:04  4    reason that -- to consider the Rohm and Haas.  I think if

02:09:08  5    Your Honor wasn't inclined to say this is a requirement, the

02:09:10  6    instruction could say "in determining whether it's a staple

02:09:12  7    or non-staple, you may consider whether the honeycombs at

02:09:16  8    issue are essential to the claimed advanced," so

02:09:18  9    consistently being one.

02:09:20 10            THE COURT:  Sorry.  Can you repeat that.

02:09:21 11            MR. MEZZINA:  In making the determination as to

02:09:24 12    whether the honeycombs at issue are a staple or non-staple

02:09:28 13    good, you may consider whether the honeycombs are essential

02:09:32 14    to the claimed advance.  That would treat it as a factor,

02:09:36 15    but not a requirement, which I think is consistent with what

02:09:40 16    Ingevity suggested in some of its comments.

02:09:47 17            And I have a second alternate.

02:09:48 18            THE COURT:  Well, what's your second one?

02:09:50 19            MR. MEZZINA:  My second is more going to Your

02:09:52 20    Honor's comments, so I think Your Honor has suggested, you

02:09:54 21    know, a few times that -- that you might view this as a

02:09:59 22    mirror of contributory infringement, and, you know, in

02:10:02 23    contributory infringement, we have the model instructions on

02:10:05 24    that.  From its patent side, the jury's instructed it has to

02:10:08 25    find the product is a material part of the invention.  So if

02:10:11  1    that's how Your Honor views this, that it should mirror the

02:10:13  2    contributory infringement inquiry, then I think it might be

02:10:17  3    appropriate to instruct the jury that they have to find same

02:10:19  4    material part of the invention, the honeycombs at issue.

02:10:23  5              THE COURT:  Do you happen to have the

02:10:30  6    contributory infringement instruction in front of you right

02:10:33  7    now?

02:10:34  8              MR. MEZZINA:  I should.  I did until very

02:10:41  9    recently.

02:10:52 10              THE COURT:  That's all right.  I have the same

02:10:54 11    issue.

02:10:56 12              MR. MEZZINA:  I'm not sure where it got to, but

02:10:59 13    we had found it at lunch.  Oh, here it is, Your Honor.

02:11:03 14              THE COURT:  Can you just -- if you don't have

02:11:05 15    too much of your handwriting on it, can you just hand it up.

02:11:08 16    I'd like to see what it says.

02:11:10 17              MR. MEZZINA:  Sure.  This is the AIPLA.  That's

02:11:13 18    the American Intellectual Property Law Association.

02:11:17 19              THE COURT:  Right.

02:11:18 20              MR. MEZZINA:  I've just underlined a couple of

02:11:20 21    things.

02:11:28 22              THE COURT:  So that actually sounded a lot like

02:12:17 23    what I said that I thought that Hodosh said; right?

02:12:21 24              MR. MEZZINA:  I think that's right, Your Honor.

02:12:54 25              THE COURT:  If you take the Page 22, which is

02:12:56 1    the proposal that I sent out, and you were going to put this

02:13:00 2    in, where would you put it in, Mr. Mezzina?

02:13:02 3              MR. MEZZINA:  So this is -- my second

02:13:09 4    alternative?

02:13:11 5              THE COURT:  Yes.  Yes.

02:13:12 6              MR. MEZZINA:  Sorry.  I think I'm looking at the

02:13:14 7    wrong Instruction 4.2.  Let me see.

02:13:20 8              So I think it would say to establish -- and, you

02:13:23 9    know, I'll come back.  We also have an issue on the

02:13:26 10   burden -- but it would say to establish carbon honeycombs at

02:13:29 11   issue are staple goods -- and I'm reading in the second full

02:13:32 12   paragraph.

02:13:32 13             THE COURT:  Yes.

02:13:33 14             MR. MEZZINA:  -- BASF must prove those

02:13:34 15   honeycombs have actual and substantial non-infringing uses

02:13:36 16   other than in fuel vapor canisters and that they are not a

02:13:39 17   material part of the invention.

02:13:51 18             THE COURT:  And does, then, the following

02:13:53 19   sentence --

02:13:53 20             MR. MEZZINA:  I think the following sentence

02:13:55 21   would still work.  It would still refer back to

02:13:57 22   non-infringing uses in the previous sentence.

02:14:01 23             THE COURT:  They have a -- I'm sorry, because I

02:14:04 24   don't write that fast.  BASF must prove that those

02:14:07 25   honeycombs have actual and substantial non-infringing uses

02:14:10 1    other than fuel vapor canisters, and that they have.

02:14:15 2              MR. MEZZINA:  And I apologize, Your Honor.  I

02:14:16 3    said it should be "or" given the way this is set up now.  If

02:14:20 4    we proved either of these things, it would mean that they

02:14:22 5    are staple.

02:14:24 6              THE COURT:  Or that they have substantial or

02:14:27 7    what, no material?

02:14:28 8              MR. MEZZINA:  Or that they are not a material

02:14:32 9    part of the invention.  We could say the claimed invention.

02:14:47 10             THE COURT:  All right.  So why don't you hold

02:14:50 11   that thought.  Who's --

02:14:54 12             Mr. Buroker.  What do you have to say about that

02:14:59 13   objection and various proposals?

02:15:02 14             MR. BUROKER:  Well, Your Honor, it's pretty

02:15:04 15   clear that Rohm and Haas does not require the essential to

02:15:07 16   the advance.  I think Your Honor's initial reaction did not

02:15:12 17   include it is correct and that both of the alternatives have

02:15:15 18   a problem.  It's not a factor at all.  It's not mentioned in

02:15:19 19   271(d) that you have to also be essential to the advance in

02:15:23 20   order to be outside of the patent misuse concept of 271(d).

02:15:28 21             So that is just not what any case says, and your

02:15:33 22   reading of Hodosh is exactly correct.  When they do an

02:15:36 23   analysis for contributory infringement, this essential to

02:15:38 24   the advance is not part of the analysis.  And that's what

02:15:43 25   Rohm and Haas is trying to say.

02:15:44  1          THE COURT:  But the material part of the

02:15:45  2   invention, isn't that, as evidenced by this contributory

02:15:56  3   infringement construction from the AIPLA, isn't the material

02:16:02  4   part of the claimed invention -- why isn't that part of the

02:16:08  5   law?

02:16:08  6          MR. BUROKER:  That's part of 271(c), not part of

02:16:11  7   271(d).  But even if you were to agree with them that

02:16:16  8   material part from 271(c) should be brought in to this

02:16:20  9   analysis, all that means in the case law is that the product

02:16:26 10   satisfies one element of the claim, and there was no

02:16:29 11   testimony from anybody that the honeycombs here don't

02:16:33 12   satisfy the low IAC component in the claim.  So you're

02:16:36 13   sending an issue to the jury upon which there was zero

02:16:39 14   testimony or evidentiary support.  They did not show that

02:16:43 15   the honeycombs were not a material part of the invention in

02:16:46 16   the sense that the case law requires, which is all it needs

02:16:49 17   to do, is be an element.  It doesn't require that --

02:16:52 18          I know their arguments are that their honeycombs

02:16:55 19   are prior art.  Well, that was the case in Rohm and Haas as

02:16:58 20   well.  That's not the question.  This should not be turned

02:17:00 21   into another invalidity argument, and that's what they're

02:17:03 22   really trying to get at here, is to try to say just because

02:17:05 23   it was in the prior art, it can't be a material part of the

02:17:08 24   invention, and that's just not what any of these cases say.

02:17:11 25   "Material part" just means that it is one of the elements of

02:17:14  1    the claim.

02:17:16  2                THE COURT:  All right.  What do you have to say

02:17:18  3    about that, Mr. Mezzina?

02:17:20  4                MR. BUROKER:  And that is the Arris case that we

02:17:22  5    put it in the footnote, many footnotes from last evening.

02:17:25  6    That was one of the cases that we cited, Arris v British

02:17:30  7    Telecom.  Sorry.

02:17:30  8                MR. MEZZINA:  So, Your Honor, I guess I'm not

02:17:32  9    sure that the case law is quite that clear about what it

02:17:36 10    means to be material part.  I mean, I think in Mr. Buroker's

02:17:39 11    definition, that would just be a part of the invention as

02:17:42 12    opposed to material part.  What does it have to be to be

02:17:45 13    material?  We cited the Enthone case which said that the

02:17:48 14    product at issue there was not a material part of the

02:17:52 15    invention because it was not necessary.

02:17:55 16                THE COURT:  Hold on one second.  You said you

02:17:58 17    cited the Enthone case.

02:18:00 18                MR. MEZZINA:  Enthone, yes, Your Honor.

02:18:01 19                THE COURT:  All right.  So --

02:18:02 20                MR. MEZZINA:  We cited it.

02:18:04 21                THE COURT:  I'm looking through.  Oh, I see

02:18:07 22    Enthone, Northern District of New York, 2015.

02:18:11 23                Actually, that's not you citing it.  That's

02:18:16 24    Ingevity citing it.

02:18:17 25                MR. MEZZINA:  I think that may be in response to

02:18:19  1    our recitation of it.

02:18:21  2            THE COURT:  Oh, all right.  No, I just --

02:18:24  3            MR. MEZZINA:  It's cited at the end of the first

02:18:26  4    paragraph under BASF's position.

02:18:27  5            THE COURT:  Yeah, I'm just getting there.

02:18:39  6            MR. MEZZINA:  Coincidentally, it was also a case

02:18:42  7    against BASF.

02:18:43  8            THE COURT:  Well, you know, just taking the

02:19:24  9    blurb -- so just taking the blurb of the Northern District

02:19:34 10    of New York case, the accused product must be necessary to

02:19:37 11    fulfill the patented process.  It does seem, more or less,

02:19:43 12    like what Ingevity says is you can't do the patented process

02:19:46 13    unless you have a low IAC component where the honeycomb

02:19:54 14    would go.  And the honeycomb is that component; right?

02:19:57 15            MR. MEZZINA:  I don't think that's right, Your

02:19:59 16    Honor.  Respectfully, I think the -- in Enthone, the point

02:20:04 17    was not that you didn't need something where this part was

02:20:08 18    going to go.  The question was:  Did you need this product

02:20:11 19    as opposed to some other product?  And here, it's undisputed

02:20:14 20    that you don't need carbon or a honeycomb, let alone a

02:20:17 21    carbon honeycomb, to practice this patent.  You can use all

02:20:19 22    kinds of things.

02:20:21 23            THE COURT:  That can't be right because in that

02:20:23 24    case, then, any time there was two alternative ways of doing

02:20:26 25    things, it wouldn't be necessary, because you could always

02:20:28  1    use the other alternative.

02:20:29  2           MR. MEZZINA:  Well, unless they were separately

02:20:31  3    claimed, I guess, Your Honor, which they could be.

02:20:45  4           Your Honor, I think what this is really -- what

02:20:48  5    the Supreme Court, I understand, is getting at in Rohm and

02:20:50  6    Haas, you know, they say a few times the heart of the patent

02:20:53  7    holder's invention -- that's the phrase they used -- was the

02:20:57  8    discovery of this new property of propanol that nobody knew

02:21:01  9    about before; right?  And that's why propanol was, they

02:21:04 10    said, essential to the advance.

02:21:06 11           The idea is if you're doing what Ingevity did,

02:21:09 12    basically saying, here's this old product, we haven't done

02:21:12 13    anything with it, we haven't developed a new -- we haven't

02:21:14 14    discovered something about it or improved it in any way but

02:21:18 15    we've invented this sort of a machine that you can use this

02:21:21 16    existing product as one component, that's really not

02:21:24 17    essential to the advance in any way.  And it would be -- it

02:21:27 18    would be strange, and I think bad for public policy, if the

02:21:30 19    patent holder then gained the right to control the market in

02:21:34 20    this pre-existing component.

02:21:36 21           And of course we talked about the dimensions,

02:21:38 22    but I think Mr. Woodcock's testimony was clear the

02:21:40 23    dimensions are not any part of Ingevity's invention.

02:21:43 24    They're dictated by carmakers.  So you've got this

02:21:49 25    preexisting product, you know, honeycombs.  You say what

02:21:52  1    size would you like it in?  We'd like it in this size.

02:21:55  2              THE COURT:  All right.  Well, you know, I think

02:22:02  3    that while you make an argument that you certainly will be

02:22:08  4    able to make another day, if it comes to it, Mr. Mezzina, I

02:22:14  5    think that it's my understanding that the honeycombs are a

02:22:23  6    material part of the claimed invention, which is a method

02:22:27  7    that requires something such as the honeycombs in order for

02:22:33  8    it to work.  So I'm going to not add to the instruction

02:22:40  9    there.  You certainly made a record of what I should add, if

02:22:45 10    you're right.  And so I'm going to stick with what I have,

02:22:52 11    but it's certainly something that can be argued another day.

02:22:56 12              So what else?

02:22:59 13              MR. MEZZINA:  Thank you, Your Honor.  I think

02:23:00 14    the only other issue we have here is with the burden.  And

02:23:04 15    so Your Honor knows, we think the burden here should be on

02:23:07 16    Ingevity, and I think there's a few reasons for that, you

02:23:11 17    know, maybe sort of a legal reason and a practical reason.

02:23:14 18              You know, legally, the party asserting an

02:23:17 19    exemption from the antitrust law normally bears the burden

02:23:20 20    of showing it comes within that exemption.  This is also

02:23:23 21    true in contributory infringement.  Contributory

02:23:25 22    infringement case, it's the patent holder that bears the

02:23:28 23    burden of proof on the staple issue.  This is the Golden

02:23:32 24    Blount case or Golden Blount.  I know don't know how it's

02:23:35 25    pronounced.  Both parties cited from the Federal Circuit.

02:23:37  1          What that case is, in that context, the

02:23:39  2   allegedly infringing party has a burden of production to

02:23:43  3   come forward with evidence of non-infringing uses, which

02:23:45  4   we've done, but the ultimate burden of proof for persuasion

02:23:48  5   always rests on the patent holder and the practical reason

02:23:51  6   that makes sense is because it's their product; right?

02:23:54  7   They -- especially in this context where it's antitrust so

02:23:58  8   you're actually looking at the product they sold.  They

02:24:01  9   controlled all of the evidence and all of the information

02:24:02 10   that could be produced about how this product was used.  So

02:24:06 11   it's almost asking us to prove a negative, you know, given

02:24:10 12   that in the contributory infringement context, they would

02:24:12 13   bear the burden.

02:24:13 14          THE COURT:  But the difference is they are the

02:24:15 15   plaintiff in the contributory infringement context.

02:24:17 16          MR. MEZZINA:  That's right, but here they're

02:24:20 17   asserting this as an exemption from a generally actionable

02:24:22 18   law they would otherwise be subject to.

02:24:25 19          THE COURT:  But it's not as though -- there are

02:24:28 20   two sets of law here, both antitrust and patents.  So

02:24:32 21   whatever the general rule might be, you know, I think it's

02:24:37 22   your burden of proof, and I think that means that you've got

02:24:43 23   to prove it's a non-staple good.  So I take it that in all

02:24:54 24   of this --

02:24:56 25          I take it, actually, part of the reason why

02:24:58 1   there's so many disputes here is this is a really relatively

02:25:03 2   rare situation to be litigated.  So that is that's the

02:25:11 3   reason why most of the arguments are by analogy to other

02:25:14 4   things as opposed to saying, well, here, you know, here's

02:25:17 5   the answer.  Is that the reason why we are we have so many

02:25:22 6   disputes?

02:25:22 7           MR. MEZZINA:  I think that's absolutely right,

02:25:24 8   Your Honor.  Although, I guess with just the one caveat I'd

02:25:27 9   add is, you know, we do have Rohm and Haas, and usually if I

02:25:30 10  have the language I want in the controlling Supreme Court

02:25:34 11  decision, I feel good about that, but you're absolutely

02:25:36 12  right that post Rohm and Haas, this is not an issue that we

02:25:39 13  found a lot of case law on.

02:25:42 14          THE COURT:  All right.  Well, I think the burden

02:25:44 15  of proof ought to be on the plaintiff, and there's certainly

02:25:56 16  disputed evidence to make it an issue, and so I'm going to

02:26:06 17  not sustain that objection, either.

02:26:08 18          MR. MEZZINA:  Thank you, Your Honor.  And I

02:26:09 19  think that does it for our objections.

02:26:12 20          THE COURT:  All right.  Well, let's see what

02:26:15 21  Ingevity has to say.  Thank you, Mr. Mezzina.

02:26:17 22          MR. MEZZINA:  Thank you.

02:26:18 23          MR. BUROKER:  First, Your Honor, thank you.

02:26:22 24  It's my understanding that we've preserved a number of

02:26:25 25  issues by making the submissions, Your Honor.  You've

02:26:27 1    overruled all of those, but let me highlight a few.

02:26:30 2              THE COURT:  Well, I think it's -- I think -- and

02:26:37 3    if Mr. Mezzina is operating under a different set of

02:26:41 4    assumptions, I'll let him make more objections, but I think

02:26:44 5    if there's an objection that you think you have made because

02:26:47 6    it was somewhere in the hundred pages you gave me yesterday,

02:26:51 7    I think you need to state it again.

02:26:53 8              MR. BUROKER:  Okay.

02:26:54 9              THE COURT:  As part of doing -- -- to me, that's

02:26:56 10   part of doing this exercise, which is that it's -- that I've

02:27:10 11   kind of given a target to shoot at, and it's hard for me,

02:27:14 12   when I'm going through a hundred pages, to figure out, you

02:27:20 13   know, which objections you actually care about, which ones

02:27:23 14   that, even if you don't care about, you think are

02:27:26 15   significant.  So I think that -- and in fact, I mean, I know

02:27:33 16   there was one objection that I saw in the jury instructions

02:27:36 17   and I said, well, I haven't seen this anywhere before, so

02:27:39 18   I'm just going to ignore it.

02:27:40 19             So I think you should tell me what you object

02:27:46 20   to.

02:27:46 21             MR. BUROKER:  Okay.  Understood, Your Honor.

02:27:48 22             So I'll go in order, not necessarily in

02:27:50 23   sequence, then.  There's a lot of testimony about what an

02:27:54 24   implied license is or is not, and we'd ask for a specific

02:27:57 25   instruction to tell the jury what an implied license is.

02:28:00  1    And that is one that is clear, that is arises by operation

02:28:04  2    of law.

02:28:05  3              Dr. Mathur on the stand, very late in this case,

02:28:07  4    they're trying to change what that means.  I think she's

02:28:10  5    basically now trying to say it's some sort of unwritten oral

02:28:13  6    agreement.  That is not what an implied license is, and she

02:28:16  7    chose to define what the alleged tying product was.  She

02:28:19  8    should be stuck with what the law says.  And that's why we

02:28:22  9    asked for some instruction on what an implied license is

02:28:25 10    because the jury is not going to know.  It's not an issue

02:28:28 11    that if you went down the street and asked what is an

02:28:30 12    implied license they will have any clue about.  And that's

02:28:33 13    why we have proposed Instruction 4.3 to clarify the issue

02:28:36 14    for them.  So we do object to it not being put in.

02:28:40 15              THE COURT:  Excuse me.  Sorry.  Excuse me a

02:28:44 16    second.

02:28:44 17              MR. BUROKER:  It was 4.3.

02:28:46 18              THE COURT:  That's part of the problem.  The

02:28:49 19    reason why I had both your original -- yeah, I think I may

02:28:55 20    have gotten rid of that one.  Let me see here.

02:29:14 21              Yeah, so I'm not -- so my view is I'm not really

02:29:25 22    responsible for what a -- the witnesses testify about, and

02:29:31 23    if the witness says -- and I don't think they necessarily

02:29:34 24    did, but I could be wrong -- said an implied license is this

02:29:39 25    or implied license is that, I think that becomes a factual

02:29:43   1   question, and if they didn't say what it is then it's a

02:29:47   2   factual question with not a lot of information being

02:29:50   3   supplied.  But I don't think it's -- I don't think it's

02:29:53   4   proper for me to define a term that the parties -- the

02:29:59   5   witnesses might have been using.  So that's the reason why I

02:30:02   6   didn't put that in.  It seemed to me that was not -- it

02:30:13   7   seemed to me that was -- that was -- whatever the witnesses

02:30:16   8   meant by what they said, that was a factual matter, not

02:30:19   9   something for me to supply as a jury instruction.

02:30:21  10            MR. BUROKER:  Okay.  So long as the parties in

02:30:23  11   closing argument can make their argument based --

02:30:27  12            THE COURT:  You can make the argument based on

02:30:29  13   whatever the evidence is.

02:30:30  14            MR. BUROKER:  Fair enough.  Fair enough.

02:30:32  15            Okay.  And I just want to register the objection

02:30:35  16   to the use of the per se standard for tying.  We think. --

02:30:44  17            THE COURT:  That's another pretty close issue.

02:30:48  18   But, yeah, go ahead.  Tell me -- I mean, basically it had to

02:30:53  19   do with Brokerage.

02:31:02  20            MR. BUROKER:  Well, our view of it, Your Honor,

02:31:04  21   is that from what we've seen from the case is where

02:31:06  22   there's -- the kind of arrangement that's very common, that

02:31:08  23   the courts have seen a lot of, that they know has

02:31:12  24   anticompetitive effects this apply the per se rule, but many

02:31:15  25   others, like the D.C. Circuit case, the Microsoft case,

02:31:18  1    where it's a new kind of issue.  And as Your Honor just

02:31:20  2    highlighted, this is not your ordinary kind of

02:31:24  3    patent/antitrust case, so it's a situation in which the

02:31:27  4    Court hasn't seen a lot of these, and so to impose a per se

02:31:30  5    violation standard in that circumstance, we think, is

02:31:33  6    inconsistent with what the Supreme Court has said about, you

02:31:37  7    know, when you use per se versus a rule of reason, and

02:31:39  8    that's why we wanted to make that clear for the jury.

02:31:42  9            THE COURT:  Yeah, so, you know, one of the

02:31:52 10    things that's -- so this is what I thought when I was

02:32:03 11    looking at this, that BASF cited Brokerage Concept versus

02:32:10 12    U.S. Healthcare, 140 F3d. 494, 511 Third Circuit 1998, as

02:32:20 13    showing a tying arrangement where defendant has market power

02:32:26 14    as being per se unlawful.  But that wasn't a case that

02:32:31 15    involved a patent.

02:32:34 16            And then you had Illinois Tool Works versus

02:32:41 17    Independent Inc., 547 U.S. 28 at 42 to 43, 2006, which was

02:32:48 18    talking about a patented product -- okay -- which was the

02:32:54 19    printer case.  And it seemed to me that what I got out of

02:33:05 20    this -- maybe I looked at something else, too, but I didn't

02:33:07 21    write it down -- it looked to me like if there is market

02:33:12 22    power then it's a per se violation.  So that's the reason

02:33:21 23    why I didn't put in the rule of reason or I put in the per

02:33:31 24    se.  But I have to say, again, this is something that

02:33:35 25    certainly didn't seem to be 100 percent clear from the cases

02:33:38  1    that I looked at.

02:33:39  2            MR. BUROKER:  Okay.  And then we also cited in

02:33:42  3    the second, third paragraph, I guess, of our submission that

02:33:47  4    we -- about the U.S. Philips case where it says the Supreme

02:33:51  5    Court has applied per se only when experience with a

02:33:53  6    particular kind of restraint enables the Court to predict

02:33:56  7    with confidence that the rule of reason will condemn it.

02:33:59  8            And, again, this is one of those unusual cases,

02:34:02  9    like the Microsoft case that we cited, where the Court

02:34:05 10    hasn't seen a lot of them, so it's not clear that they can

02:34:10 11    predict with confidence that the rule of reason will condemn

02:34:12 12    it.  So that's why, in addition to Illinois Tool Works, we

02:34:16 13    think that the per se rule should not apply in this case.

02:34:19 14            THE COURT:  All right.  Well, I -- you know, I

02:34:23 15    remember can't say for sure that I'm positive that you're

02:34:28 16    wrong, but on balance, I'm going to stick with what I have

02:34:47 17    here.

02:34:48 18            MR. BUROKER:  Okay.  Thank you, Your Honor.

02:34:49 19            So the next issue is really just more of a

02:34:54 20    clarification, but we also would object if the clarification

02:34:58 21    isn't made, which is you've defined the carbon honeycombs

02:35:03 22    with the term carbon honeycombs at issue.

02:35:06 23            THE COURT:  Yeah.  Yeah.  That -- that was what

02:35:08 24    I could think of.  You know, I didn't want to be hung up on

02:35:10 25    that, but I didn't think 200 CPSI was a good way to define

02:35:15   1    them.

02:35:15   2                 MR. BUROKER:  Yeah, and I think we're fine with

02:35:17   3    that terminology.

02:35:19   4                 THE COURT:  Okay.  Sorry.

02:35:20   5                 MR. BUROKER:  The issue is that it was -- there

02:35:21   6    are a number of other places in the instructions where we

02:35:24   7    had thought that that term should be used rather than just

02:35:26   8    the term "honeycomb," and those weren't all substituted.  So

02:35:30   9    that's why we wanted to clarify.

02:35:32  10                 THE COURT:  Well, and so that's something

02:35:34  11    that -- you know, part of what I do on jury instructions

02:35:39  12    generally is I try to strike a balance between

02:35:45  13    belt-and-suspenders lawyers who want to, you know, have

02:35:50  14    things defined --

02:35:51  15                 MR. BUROKER:  Right.

02:35:52  16                 THE COURT:  -- in ways that turn it into then

02:35:56  17    a -- that it's not like any way that you would actually

02:35:59  18    speak if you were trying to make a point.

02:36:01  19                 MR. BUROKER:  Right.

02:36:02  20                 THE COURT:  And so there may be some places

02:36:07  21    where it would benefit from having "the honeycombs at issue"

02:36:10  22    or something like that.  I just haven't -- I just didn't

02:36:15  23    necessarily think every place you had put it, which honestly

02:36:18  24    seemed a bit excessive, you know, that the only honeycombs

02:36:22  25    you were actually talking about were the ones at issue;

```
02:36:25  1    right?
02:36:25  2              MR. BUROKER:  Right.  There are a couple places
02:36:28  3    we thought, for example, like -- well, in 5.4.
02:36:33  4              THE COURT:  Are you using 5.4 under my numbering
02:36:36  5    now?
02:36:36  6              MR. BUROKER:  I don't know.  I think that's
02:36:38  7    still the same.  It's the tying elements --
02:36:40  8              THE COURT:  Okay.  Hold on --
02:36:42  9              MR. BUROKER:  -- section.
02:36:43 10              THE COURT:  -- a minute.  Yes, it is still.  I
02:36:45 11    don't know whether it's the same, but 5.4 is the tying
02:36:48 12    elements.
02:36:48 13              MR. BUROKER:  Yes.  So I think the last sentence
02:36:51 14    of the second paragraph in which you're describing what
02:36:54 15    their claim is --
02:36:55 16              THE COURT:  Yes.
02:36:55 17              MR. BUROKER:  -- that's one where I think it
02:36:57 18    really would be more accurate to say that they're claiming
02:37:00 19    that licenses to the '844 patent are the tying product and
02:37:05 20    carbon honeycombs -- that the carbon honeycombs at issue are
02:37:08 21    the tied product.  Because right now it just says
02:37:11 22    honeycombs, and that's not the tied product.  Their
02:37:14 23    definition is not --
02:37:15 24              THE COURT:  I'm good with that change.  Okay.
02:37:17 25              MR. BUROKER:  And then I think it applies in
```

02:37:19  1    each of the several first, second, third, fourth, fifth in

02:37:23  2    this same section because this is really defining what their

02:37:26  3    claim, tying claim, is.  But at least in the place I pointed

02:37:29  4    out, it seems like it should be.  So under first where it

02:37:39  5    says --

02:37:39  6                THE COURT:  Yeah, yeah.  Hold on a second.

02:37:41  7                MR. BUROKER:  Oh, sorry.

02:38:01  8                THE COURT:  Yeah, so I was trying to think of

02:38:03  9    some way because I prefer not to say carbon honeycombs at

02:38:07 10    issue five times in that paragraph, but I do understand your

02:38:22 11    point.

02:38:27 12                Do have you any comment on this, Mr. Mezzina?

02:38:28 13                MR. MEZZINA:  Sure, Your Honor.  I don't think

02:38:30 14    there's any disagreement here in principles.  I guess my

02:38:32 15    suggestion would be once you've said the carbon honeycombs

02:38:35 16    at issue once, if later in the paragraph you refer either to

02:38:38 17    the honeycombs, these honeycombs, such honeycombs, you're

02:38:41 18    getting the point across.

02:38:43 19                MR. BUROKER:  Maybe such honeycombs.

02:38:49 20                THE COURT:  All right.  I can do that.

02:38:50 21                MR. BUROKER:  Let me just -- and --

02:38:51 22                THE COURT:  Hold on a second.  And such

02:38:53 23    honeycombs.  Oh, I see.

02:39:34 24                So right.  So the first one on Page 45, I'll say

02:39:37 25    licenses to the '844 patent and the honeycombs at issue are

02:39:40  1    separate and distinct products and then the next thing I'll

02:39:44  2    say such honeycombs and I think then I can just say the

02:39:51  3    honeycombs for the third and fourth?

02:39:58  4              MR. BUROKER:  As opposed to such again?

02:40:11  5              THE COURT:  Yeah, all right.  I'm just put in

02:40:13  6    such.  Who cares.

02:40:15  7              MR. BUROKER:  Same number of words, the and

02:40:18  8    such.

02:40:19  9              THE COURT:  All right.  All right.  We've

02:40:22 10    such'ed it up.

02:40:23 11              MR. BUROKER:  And there's a similar issue and

02:40:25 12    two others of these, 5.1 where.

02:40:27 13              THE COURT:  Wait.  Wait.  I'm sorry.

02:40:29 14              MR. BUROKER:  Oh, sorry.

02:40:29 15              THE COURT:  No.  No. the only point is just to

02:40:40 16    make sure that Mr. Smith, who I think is the designated

02:40:43 17    scribe for this, are you aware of that?

02:40:47 18              MR. SMITH:  I'm happy to designated scribe, but

02:40:50 19    I don't believe I have a Word version.

02:40:52 20              THE COURT:  Oh, no, I can supply that.  As long

02:40:54 21    as you're marking up the version, I will give you the Word

02:40:57 22    version we're working from.

02:40:58 23              MR. SMITH:  Okay.

02:40:59 24              THE COURT:  Okay?  But I just wanted to make

02:41:01 25    sure that you're getting all of this.

02:41:04  1                    MR. SMITH:  Right.

02:41:05  2                    THE COURT:  All right.  Go ahead.  What's next,

02:41:07  3      Mr. Buroker?

02:41:07  4                    MR. BUROKER:  Well, the same, and I understand

02:41:08  5      you don't want to do it every place but the ones that I

02:41:11  6      thought were more important because it's describing their

02:41:13  7      claim --

02:41:13  8                    THE COURT:  Yeah.

02:41:13  9                    MR. BUROKER:  -- is 5.1.

02:41:14 10                    THE COURT:  Okay.  Hold on.  5.1, so we're going

02:41:18 11      in the other direction.

02:41:19 12                    MR. BUROKER:  Yeah, I missed it by accident.

02:41:21 13                    THE COURT:  That's all right.  I'm just giving

02:41:24 14      you a hard time.

02:41:25 15                    MR. BUROKER:  Backtracking.

02:41:26 16                    THE COURT:  Oh, and the first, second, third

02:41:29 17      part?

02:41:29 18                    MR. BUROKER:  No, up top.  The BASF claims that

02:41:32 19      Ingevity requires require customers to purchase?

02:41:34 20                    THE COURT:  Okay.  That's the honeycombs at

02:41:36 21      issue?

02:41:37 22                    MR. BUROKER:  Correct.

02:41:38 23                    MR. MEZZINA:  I showed that as being already

02:41:40 24      there.

02:41:41 25                    MR. BUROKER:  Oh.

02:41:42 1                    THE COURT:  "At issue" is there.

02:41:43 2                    MR. BUROKER:  That's why I skipped it.  Sorry.

02:41:45 3     My notes are not great.  It's already there.

02:41:47 4                    And is it already there in 5.4.1?  Anybody help

02:41:55 5     me with that one?  Where it says BASF contends that

02:41:59 6     honeycombs are separate products?

02:42:01 7                    MR. SCHARN:  It's not in that one.

02:42:03 8                    MR. BUROKER:  It's not in that one.

02:42:04 9                    THE COURT:  The honeycombs at issue are separate

02:42:07 10    products?

02:42:07 11                   MR. BUROKER:  The carbon honeycombs at issue,

02:42:09 12    yes.  And I think you had added and distinct; right?

02:42:16 13                   THE COURT:  I did add distinct.

02:42:17 14                   MR. BUROKER:  Okay.  That's fine.

02:42:21 15                   THE COURT:  All right.  What else?

02:42:23 16                   MR. BUROKER:  And it's in the next one, 5.4.2.

02:42:35 17    The very -- unless I'm wrong and that got changed.

02:42:39 18                   THE COURT:  The word honeycombs appears about

02:42:49 19    five times in the first paragraph.

02:42:51 20                   MR. BUROKER:  I was looking at the first

02:42:52 21    sentence.  You may find the entire arrangement exists

02:42:55 22    between licenses to the '844 patent -- and that's one where

02:43:00 23    it should say the carbon honeycombs at issue.

02:43:05 24                   THE COURT:  Okay.

02:43:06 25                   MR. BUROKER:  And I think the rest I think it

02:43:08  1    can just stay.

02:43:09  2                    THE COURT:  All right:  You got some more?

02:43:12  3                    MR. BUROKER:  I think that's the last one.

02:43:13  4                    THE COURT:  Okay.  So what other objections?

02:43:18  5                    MR. BUROKER:  I guess, Your Honor, we just want

02:43:24  6    to register, just for the record, an objection to the

02:43:26  7    issuance of the punitive damages instructions.

02:43:29  8                    THE COURT:  Okay.

02:43:29  9                    MR. BUROKER:  The preponderance of the evidence

02:43:31 10    standard and the -- that basically the absence of the

02:43:36 11    additional instructions we proposed because we think that

02:43:39 12    this is not a case that warrants punitive damages, so I want

02:43:42 13    to just make that on the record.

02:43:44 14                    THE COURT:  All right.  So what is the evidence

02:43:46 15    of -- that there should be any punitive damages instructions

02:43:50 16    here, Mr. Mezzina?  You know, I'm reading things like

02:43:55 17    Ingevity's conduct was despicable, cruel, and unjust

02:44:00 18    hardship and knowing disregard to BASF's right, so vile,

02:44:06 19    base, or contemptible that they be would looked down on and

02:44:09 20    despised by reasonable people and fraud.  I'm guessing fraud

02:44:12 21    is not actually in this case?

02:44:14 22                    MR. MEZZINA:  No, Your Honor.  I agree there's

02:44:17 23    certainly -- you know, there's a number of definitions here

02:44:21 24    presented in the disjunctive, and I would agree that not all

02:44:23 25    of them apply here, but I think, for example, "malice" means

02:44:27  1    that Ingevity acted with intent to cause injury, and

02:44:31  2    everything that follows that is or.  So I certainly think we

02:44:34  3    presented evidence that Ingevity acted with intent to cause

02:44:37  4    injury to BASF with respect to the tortious interference

02:44:42  5    with BASF's relationship with Kayser.  And I also --

02:44:55  6                THE COURT:  So hold on.  Sorry, Mr. Mezzina.

02:44:57  7    Let me just check one thing here.  So how was that any

02:45:24  8    different than the second element of intentional

02:45:27  9    interference with prospective business relationships, which

02:45:30 10    is page 57, and I quote, and intent on the part of Ingevity

02:45:35 11    to harm BASF by interfering with that prospective

02:45:38 12    relationship."

02:45:41 13                MR. MEZZINA:  Your Honor, I -- so I guess what I

02:45:43 14    would say, Your Honor, is my reading of the punitive damages

02:45:47 15    instruction is that it's a bit of a nebulous standard.

02:45:51 16    They're using a lot of words here to gets across to the jury

02:45:53 17    the idea that Ingevity acted with a particularly wrongful

02:45:57 18    intend, for example, or shows reckless indifference to the

02:46:01 19    interest of others.  I'm not sure that you can sort of parse

02:46:04 20    this down to the very fine level of, you know, the

02:46:06 21    individual words.  What we're trying to convey to the jury

02:46:08 22    is did they act with a -- you know, a high level about of

02:46:12 23    outrageousness, maliciousness, wantonness, willfulness.

02:46:16 24                THE COURT:  All right.  Well, so I don't think

02:46:18 25    there's any actual evidence that Ingevity did, so I'm going

02:46:22  1    to treat the reference in the jury instructions disputes

02:46:27  2    that asks that these instructions not be given, essentially,

02:46:32  3    as a request for a judgment as a matter of law.  In any

02:46:37  4    event, there would be no basis to sustain punitive damages

02:46:40  5    if they were awarded and so rather than --

02:46:44  6              MR. MEZZINA:  Your Honor, can I respond to the

02:46:46  7    motion for judgment in that case?

02:46:48  8              THE COURT:  Sure.

02:46:48  9              MR. MEZZINA:  So just briefly, Your Honor, I

02:46:50 10    think what we presented -- and a lot of it was on that

02:46:52 11    timeline that we saw earlier today -- is that Ingevity

02:46:56 12    learned of this relationship with BASF and Kayser.  Within

02:46:59 13    two weeks of that, their CEO visited, threatened the

02:47:02 14    customer, continued to threaten the customer over the course

02:47:04 15    of about a year and a half, until the customer finally

02:47:07 16    entered into a contract which we have alleged and --

02:47:10 17              THE COURT:  And how did the CEO threaten the

02:47:12 18    customer?

02:47:13 19              MR. MEZZINA:  He threatened retaliatory price

02:47:15 20    increases, both on honeycombs and other products, if the

02:47:19 21    customer dealt with BASF.

02:47:20 22              THE COURT:  Who said that he did that?

02:47:22 23              MR. MEZZINA:  I'm sorry, Your Honor.  I'm not

02:47:24 24    sure if the CEO said that in the visit.  We know this is the

02:47:27 25    course of conduct following that visit over the next

02:47:30  1    18 months or so, is a series -- Mr. Abraham testified the

02:47:35  2    CEO visited Kayser, said you're going to face consequences

02:47:38  3    if you deal with BASF.  Subsequent to that, you have this

02:47:41  4    series of escalating price increases across all products

02:47:44  5    that, I think, is very clear designed to say you will be,

02:47:48  6    essentially, punished if you deal with our competitor.

02:47:50  7                THE COURT:  Which were also given to a bunch of

02:47:53  8    other of Ingevity's customers; right?

02:47:55  9                MR. MEZZINA:  In the same retaliatory spirit.  I

02:47:58 10    think that's clear from the evidence.  Even Ingevity's own

02:48:00 11    witnesses testified, we were targeting our price increases

02:48:03 12    at people who were not willing to commit to not dealing with

02:48:06 13    our competitors.

02:48:09 14                THE COURT:  All right.  Well, I don't think

02:48:11 15    there's any case here for punitive damages, so I'm going to

02:48:19 16    take that away from the jury, and I will say that the

02:48:25 17    instructions that are currently on pages 66 to 70 should be

02:48:27 18    removed.

02:48:33 19                Let's see.  All right.  Do you have anything

02:48:36 20    more, Mr. Buroker?

02:48:37 21                MR. BUROKER:  Just one final note, Your Honor,

02:48:42 22    on that implied license versus expressed unwritten license

02:48:45 23    that there's just no -- it's unclear how a jury can

02:48:49 24    understand what an express unwritten license is, which is

02:48:51 25    what their expert seems to be saying, without us explaining

02:48:55  1      that that would require contract, formation, and

02:48:58  2      consideration.  So --

02:49:00  3                  THE COURT:  Well, there's no way he can do that

02:49:03  4      because there's no evidence about that.  I mean, you're

02:49:06  5      limited to what the evidence is.  If you can't make the

02:49:08  6      argument based on the evidence that was presented, then you

02:49:10  7      can't make the argument.

02:49:11  8                  MR. BUROKER:  Okay.  All right.  Understood.  I

02:49:13  9      just wanted to make that clear.  Thank you.

02:49:15 10                  THE COURT:  Okay.

02:49:15 11                  MR. BUROKER:  I think that's it in terms of our

02:49:17 12      objections.

02:49:18 13                  THE COURT:  All right.  So, Mr. Mezzina, is

02:49:21 14      there anything you wanted to -- given what I told

02:49:25 15      Mr. Buroker about make your objections now -- that you

02:49:28 16      wanted to add that you -- or are you content to rest on the

02:49:35 17      papers, so to speak?

02:49:36 18                  MR. MEZZINA:  Nothing, Your Honor.  Obviously,

02:49:37 19      we object to not charging on punitive damages, but other

02:49:40 20      than that, nothing to add.

02:49:41 21                  THE COURT:  All right.  So I was -- because this

02:49:49 22      is really a massive amount of jury instructions, there were

02:49:53 23      some things at the beginning which I didn't get around to

02:49:57 24      yesterday that I wanted to just suggest that we take out

02:50:02 25      because they're duplicative or -- well, mostly duplicative.

1276

02:50:10  1              So on the Page 1, the second paragraph that says

02:50:16  2    here's what I'm going to do, can we just take that out?  I'd

02:50:20  3    rather just do it.

02:50:21  4              MR. BUROKER:  The part that says I will start by

02:50:23  5    explaining?

02:50:24  6              THE COURT:  Yes.

02:50:24  7              MR. BUROKER:  Yes.  No objection.

02:50:26  8              MR. MEZZINA:  No objection.

02:50:27  9              THE COURT:  Okay.  On the fourth page, the

02:50:34 10    second paragraph.

02:50:37 11              MR. MEZZINA:  Your Honor, I apologize.  I'm

02:50:38 12    looking at a red line, so if you wouldn't mind giving the

02:50:41 13    number of the instruction.

02:50:42 14              THE COURT:  Oh, okay.  All right.  So 1.4,

02:50:44 15    evidence defined.  And the second paragraph, the last line

02:50:52 16    about and any other evidence that I have judicial noticed.

02:50:56 17    I haven't judicially noticed any evidence, so cross that out

02:51:00 18    and put an "and" before the exhibits on the second line.

02:51:04 19              Then on the same page, the next to last

02:51:09 20    paragraph, which is in that lovely conditional if I have

02:51:14 21    instructed you that I admitted certain testimony or certain

02:51:17 22    exhibits for a limited purpose, blah, blah, blah, I don't

02:51:20 23    think I did that.  So I suggest we get rid of that, too.

02:51:24 24              MR. BUROKER:  That is acceptable, Your Honor.

02:51:26 25              MR. MEZZINA:  No objection, Your Honor.

02:51:26  1              THE COURT:  Okay.  And then the next paragraph

02:51:31  2  it says you must not seek out or rely upon any other

02:51:33  3  materials from those received here in Court.  I've said that

02:51:36  4  at least five times.  I'd like to get rid of that one, too,

02:51:41  5  that paragraph.

02:51:42  6              MR. BUROKER:  No objection.

02:51:42  7              MR. MEZZINA:  No objection.

02:51:43  8              THE COURT:  Okay.  And so then the last

02:51:46  9  sentence, we'll just -- you know, we'll keep that.

02:51:54 10              Okay.  On the Page 1.6, direct and

02:52:01 11  circumstantial evidence, I basically gave that instruction

02:52:05 12  in the preliminary instructions.  So I would like to strike

02:52:11 13  this.  You can refer to the preliminary instructions if you

02:52:15 14  want to argue about circumstantial versus direct evidence.

02:52:18 15              MR. BUROKER:  No objection.

02:52:19 16              MR. MEZZINA:  No objection.

02:52:19 17              THE COURT:  Okay.  Thank you.

02:52:20 18              So on page -- the next one, 1.7, statements of

02:52:29 19  counsel.  The first paragraph, yeah, I would keep that.  But

02:52:38 20  the second one talking about your job to zealously and

02:52:41 21  effectively advance claims, argue all reasonable -- you

02:52:45 22  know, the first part of that, that is just -- I don't know

02:52:50 23  why I would be telling them that.

02:52:52 24              But -- and then the last sentence about what an

02:52:55 25  attorney -- what an attorney personally thinks or believes

02:52:58  1   is not relevant, and you're instructed to disregard any

02:53:01  2   personal opinion or belief concerning testimony or evidence

02:53:06  3   as offered during opening or closing statements or at any

02:53:09  4   other time during the course of the trial, it occurs to me,

02:53:13  5   I was going to say let's strike that, too, and then object

02:53:16  6   if somebody does that in closing argument, but if you want

02:53:20  7   because you think maybe it's already occurred, I could keep

02:53:27  8   that sentence if one or the other of wants it.

02:53:31  9              Does somebody want it?

02:53:32  10             MR. BUROKER:  I don't think it's particularly

02:53:34  11  necessary, Your Honor.

02:53:35  12             MR. MEZZINA:  Agreed, Your Honor.

02:53:36  13             THE COURT:  All right.  So then let's just

02:53:38  14  strike the second paragraph in the whole on that page.

02:53:45  15             So the next Instruction, 1.8, the first

02:53:48  16  paragraph, after "you are the sole judges of each witness's

02:53:53  17  credibility," which I think should stay, the rest of that

02:53:56  18  paragraph is stuff I told them at Page 7 in the opening

02:53:59  19  instructions and I would suggest getting rid of that and

02:54:03  20  just going from you are the sole judges of each witness's

02:54:06  21  credibility to a new paragraph that says if you find the

02:54:09  22  testimony to be contradictory.  All right?

02:54:12  23             MR. BUROKER:  Yes, Your Honor.

02:54:13  24             MR. MEZZINA:  No objection.

02:54:13  25             THE COURT:  Okay.  Thank you.

02:54:15  1          Page 10, the number of witnesses.  One more

02:54:21  2   point about witnesses.  Sometimes jurors wonder if the

02:54:24  3   number of witnesses who testify makes any difference.  I've

02:54:29  4   never heard of that in a long time of being involved in

02:54:35  5   cases with juries.  And what's more, I think I told them

02:54:40  6   that just because someone called a witness doesn't mean it

02:54:43  7   doesn't have both sides' stuff in it, so I'm just wondering.

02:54:46  8   Do we need this?

02:54:48  9          MR. BUROKER:  I don't believe so, Your Honor.

02:54:49 10          THE COURT:  All right.

02:54:50 11          MR. MEZZINA:  Agreed.

02:54:51 12          THE COURT:  All right.  Thank you.

02:54:53 13          So the paragraph one -- or Instruction 1.12,

02:54:59 14   depositions and substantive evidence, I essentially gave

02:55:02 15   this instruction when the first deposition was played, and

02:55:10 16   I'm just wondering if there's any need to have it here.

02:55:20 17          MR. BUROKER:  I don't think so.  Just re-reading

02:55:22 18   it, but I don't think there's any reason to read it.

02:55:24 19          MR. MEZZINA:  I guess, Your Honor, I agree with

02:55:27 20   that.  I think the only part that I'm not sure if you said

02:55:29 21   before is the last paragraph, entitled to the same

02:55:34 22   consideration.  You may have.  I just don't recall.

02:55:37 23          THE COURT:  I think I did, and I'm not entirely

02:55:40 24   sure why.  So, you know what, why don't we just strike the

02:55:46 25   first and the second paragraphs and I'll read the one

02:55:49  1    sentence "Deposition testimony is entitled to the same

02:55:52  2    consideration and is to be judged, et cetera."  All right?

02:55:56  3              MR. BUROKER:  Yes, Your Honor.

02:55:56  4              THE COURT:  That way in case I didn't give it,

02:56:00  5    it will be given.

02:56:01  6              Okay.  Thank you.

02:56:02  7              And then do you want me to give the instruction

02:56:13  8    at 1.14, the use of notes?  I have a note here that says

02:56:18  9    it's a lot like what I gave on page 5 of the opening

02:56:22 10    instructions, though it's not exactly the same.

02:56:31 11              MR. MEZZINA:  Your Honor, I don't have your

02:56:33 12    opening instructions in front of me, but if it's duplicative

02:56:36 13    then I don't think we would object to removing it.

02:56:39 14              MR. BUROKER:   I think we feel the same way, Your

02:56:41 15    Honor.  No objection.

02:56:41 16              THE COURT:  All right.  Well, then, let's get

02:56:43 17    rid of it.

02:56:43 18              Okay.  And there were one or two places,

02:56:49 19    Mr. Smith, where when I was working on this yesterday, the

02:56:53 20    word processing skills that I had were not up to the task

02:56:57 21    of, you know, getting things on the right page, but I

02:57:00 22    presume you have better resources for that than I did.

02:57:03 23              MR. SMITH:  We do, Your Honor, and Ms. Chen is

02:57:06 24    actively scribbling and scribing here.

02:57:09 25              THE COURT:  Well, in any event, that's all that

```
02:57:11  1   I have on the jury instructions.
02:57:22  2              Can I ask that by a certain time, which maybe
02:57:30  3   you can agree between yourselves, when we're finished here,
02:57:34  4   that you -- that Plaintiff pretty this up and that you share
02:57:41  5   it back and forth and then you report to me that both sides
02:57:46  6   agree that we have a final set of instructions?  And then
02:57:54  7   you know, bring about 20 copies tomorrow.
02:57:57  8              MR. SMITH:  That's fine, Your Honor.  We're
02:57:58  9   happy to do that.
02:57:59 10              And verdict form.  We're going to talk about
02:58:01 11   that now or --
02:58:02 12              THE COURT:  Yeah, yeah.  Yes.  Thank you,
02:58:04 13   Mr. Smith.
02:58:05 14              Yeah, I was looking at the verdict form, which,
02:58:10 15   as I said earlier, I have not spent this much time on.  One
02:58:17 16   of -- so looking at them, what I was inclined to do, other
02:58:23 17   than striking the punitive damages, yeah, striking questions
02:58:39 18   7 and 8, was I -- I was wondering why -- I guess this is a
02:58:50 19   question for Ingevity.  Why you wanted to have the
02:58:56 20   non-staple goods interrogatory, which seems -- I don't --
02:59:21 21   I'm thinking of trying to think of some equivalent to odd
02:59:25 22   without saying odd.  You know, it's kind of out of the flow
02:59:30 23   of the way that other questions are being presented, tying,
02:59:36 24   exclusive dealing, intentional interference.  Why do you
02:59:42 25   want the question about staple or non-staple goods?  It
```

02:59:46  1    seems to me -- well, why do you want that question?

02:59:53  2              MR. BUROKER:  Why do we want the question at

02:59:56  3    all?

02:59:56  4              THE COURT:  Yes.

02:59:57  5              MR. BUROKER:  Because, Your Honor, it was the

02:59:59  6    fundamental basis of the summary judgment order upon which

03:00:01  7    you said that you would then be able to determine the

03:00:03  8    immunity, and if we don't ask the separate question of

03:00:06  9    whether they find it's a staple good, then I don't know how

03:00:09 10    Your Honor is going to answer the other question about

03:00:11 11    whether there is immunity.

03:00:12 12              THE COURT:  Well, so when you say "immunity,"

03:00:17 13    because I do -- I do remember you said or both sides said

03:00:24 14    the Noerr-Pennington issue was something you wanted me to

03:00:27 15    decide.  What -- and so to some extent, maybe it's in the

03:00:34 16    jury instructions because there's talk at some place, I

03:00:38 17    forget where it was, but there was -- you know, somewhere in

03:00:43 18    the force there was something about common immunity and

03:00:48 19    there's a sentence that says Ingevity has the right under

03:00:52 20    the patent laws to do A, B, and C.  And then it says

03:00:57 21    Ingevity has the right under petitioning the government to

03:01:03 22    do A, B, and C where there was a pretty thin line between

03:01:09 23    the A, B, and C, that you've got to do under the patent laws

03:01:12 24    of the A, B and C that you have to do under the petition

03:01:15 25    laws -- so I thought that was kind of the -- isn't that the

03:01:24   1    Noerr-Pennington question, is what is the scope of your

03:01:29   2    rights under the petitioning laws?

03:01:32   3              MR. BUROKER:  Well, Your Honor, our view of the

03:01:34   4    cases -- and maybe we didn't go a very good job at summary

03:01:37   5    judgment of explaining this -- is even if Ingevity was wrong

03:01:40   6    and this is a staple good, that under the petition laws in

03:01:44   7    Noerr-Pennington, we still had a belief that we were -- what

03:01:47   8    we were doing was correct and our enforcement of the patent

03:01:51   9    in telling customers they had to buy from us is still,

03:01:54  10    nevertheless, protected.

03:01:56  11              But we read your summary judgment order as

03:01:58  12    saying that that issue also all boils down to the issue of

03:02:02  13    whether there is -- whether the good is staple and so that

03:02:06  14    seems to me, if that's the analysis, then we need to know

03:02:10  15    the answer from the jury, did they find it to be a staple

03:02:13  16    good or not?

03:02:18  17              THE COURT:  Okay.

03:02:20  18              MR. BUROKER:  So in other words, we would say if

03:02:23  19    you agree with us, in which case even if we were wrong and

03:02:27  20    it is a staple good and everything we did was nevertheless

03:02:30  21    protected, in theory, might not need an answer to the

03:02:33  22    question.  But under BASF's theory and the way we read your

03:02:36  23    opinion, if it is central to that immunity question then we

03:02:41  24    should have a separate answer from the jury because there's

03:02:44  25    -- you know, if they -- we won't know exactly why they found

03:02:48  1    tying or if they didn't find tying, et cetera, unless you

03:02:51  2    ask separately on this particular issue.  It seems to be the

03:02:56  3    core of the case.

03:02:57  4              THE COURT:  So -- okay.  So basically you're

03:03:02  5    wanting to ask it for -- not really for the what the jury is

03:03:07  6    being directly asked to decide, but as a sort of factual

03:03:10  7    finding that I would then do something with if necessary

03:03:16  8    afterwards?

03:03:17  9              MR. BUROKER:  I believe that's correct.

03:03:18 10              THE COURT:  All right.  Let me see what

03:03:20 11    Mr. Mezzina says about that.

03:03:22 12              MR. MEZZINA:  So, Your Honor, I guess I'm not

03:03:24 13    really sure I follow the argument, what Your Honor would do

03:03:27 14    with it afterwards.  The jury is going to be instructed, as

03:03:29 15    part of Your Honor's instructions, that we bear the burden

03:03:33 16    of proof on this issue and that if we don't meet it, then we

03:03:36 17    haven't proven unlawful tying, we haven't proven unlawful

03:03:39 18    conduct, and so the questions on the verdict form that ask

03:03:41 19    the jury, has Ingevity unlawfully done X, Y, and, Z, we have

03:03:45 20    to prove all of our elements.  But if the jury finds yes, we

03:03:48 21    have proven that, that would necessarily mean they made a

03:03:52 22    finding on our favor on this issue.  I'm not sure what Your

03:03:55 23    Honor would do with this finding that the jury wouldn't do

03:03:59 24    with it.

03:04:00 25              THE COURT:  All right.  Mr. Buroker.

03:04:01  1           MR. BUROKER:  Yeah, my colleagues pointed out

03:04:03  2  the other reason.  Collective team effort on this one,

03:04:06  3  obviously.

03:04:08  4           It's also important because if there is a

03:04:12  5  finding on this question, the answer to tying should be no,

03:04:16  6  the answer to exclusive dealing up through patent expiration

03:04:19  7  should be no, and the answer to tortious interference should

03:04:22  8  be no.  But it still would then require them, potentially,

03:04:26  9  under their theory to answer the question about post-patent

03:04:2910  expiration exclusive dealing.  So as it's currently

03:04:3311  formulated there's just a question is there exclusive

03:04:3512  dealing or not?  And we don't know whether or not that that

03:04:3813  means pre-expiration, post-expiration, or both.  Because

03:04:4314  under our theory, Ingevity had every right to control

03:04:4715  honeycomb purchases up through expiration at least, and,

03:04:5016  therefore, there cannot be any exclusive dealing up through

03:04:5517  patent expiration.

03:04:5618           Now, as to post-patent expiration, there's a

03:05:0019  whole issue there.  The reason we didn't think that they

03:05:0220  should be able to seek separate damages is because they're

03:05:0421  seeking an injunction, and if they got an injunction, there

03:05:0722  won't be any damages post-patent expiration, and that's why

03:05:1023  our form was if you find that we met the burden of proof

03:05:1524  this is staple, sign the form and turn it in because it

03:05:1925  eliminates all three causes of action in their entirety.

03:05:22  1    And that -- but at a minimum, we need no know for purposes

03:05:26  2    of whether they are finding post-expiration exclusive

03:05:30  3    dealing or not.  That wouldn't be answered by just a

03:05:33  4    yes-or-no question the way it's currently framed by both

03:05:36  5    parties.

03:05:38  6                    MR. MEZZINA:  Your Honor, I don't think that's

03:05:40  7    right.  The question on exclusive dealing says has -- I

03:05:43  8    believe it says has Ingevity engaged in unlawful exclusive

03:05:46  9    dealing, so the jury will be instructed that Ingevity has a

03:05:48 10    right to control the market for non-staple goods during the

03:05:52 11    life of the patent, and the parties, obviously, in closing

03:05:54 12    could argue, you know, that means that if you find it's a

03:05:59 13    non-staple good, any exclusive dealing won't be unlawful

03:06:01 14    through the life of the patent.

03:06:22 15                    THE COURT:  Well, Mr. Mezzina, earlier, when we

03:06:24 16    were -- when I mentioned the jury verdict form, you said --

03:06:33 17    and maybe this is consistent with what Mr. Buroker just

03:06:36 18    said -- that the answer -- if the answer to the honeycomb

03:06:44 19    question is a finding for Ingevity, that would, in your

03:06:58 20    view, knock out how much of the rest of the case?  It would

03:07:02 21    knock out the tying?

03:07:04 22                    MR. MEZZINA:  I think it would -- I think it

03:07:06 23    would be -- the tying was not unlawful, so the answer to

03:07:09 24    that question would be no.  I think it would mean there was

03:07:12 25    no tortious interference, but it would leave exclusive

03:07:15 1  dealing post expiration of the patent.  I think that's all

03:07:18 2  encompassed --

03:07:18 3              THE COURT:  Okay, I think that's what

03:07:20 4  Mr. Buroker said.

03:07:20 5              MR. BUROKER:  Yes, Your Honor, which I know you

03:07:30 6  didn't agree with, but we argued was not ripe in our summary

03:07:33 7  judgment papers.

03:07:33 8              THE COURT:  No, no.

03:07:34 9              MR. BUROKER:  You understand me.

03:07:35 10              THE COURT:  I haven't forgotten that or I

03:07:38 11  haven't forgotten that you argued that.  Yes.

03:08:22 12              And so, Mr. Buroker, in your verdict form, given

03:08:28 13  that -- what you and Mr. Mezzina both said, isn't the

03:08:33 14  question -- isn't it the case that if I used your staple

03:08:37 15  goods question then the direction that follows it saying if

03:08:42 16  you answered no, sign the verdict and inform the court

03:08:46 17  security officer that the case -- that you've reached a

03:08:49 18  verdict and the case is over, wouldn't -- and he objected to

03:08:52 19  that earlier saying, well, that doesn't -- it doesn't

03:08:56 20  resolve the post-patent expiration exclusive dealing claim.

03:09:05 21  You agree with that; right?

03:09:06 22              MR. BUROKER:  Well, for the reasons we've

03:09:08 23  expressed, we think that those post-expiration claims

03:09:11 24  shouldn't be brought.  That's what we presented in the form.

03:09:13 25              THE COURT:  Yeah.  Yeah, right.  Right.  But

03:09:15  1    since I've ruled against you, it would mean that there would

03:09:20  2    have to be a -- you would have to, say, skip the tying of

03:09:25  3    the intentional interference questions and go to -- wait a

03:09:29  4    second.

03:09:30  5             MR. BUROKER:  I think what we had talked about

03:09:31  6    internally is to skip the three questions that are written

03:09:34  7    and then go to a question that just asks about

03:09:37  8    post-expiration exclusive dealing and then if they answered

03:09:41  9    that, then the damages question would only apply to the

03:09:43 10    post-expiration exclusive dealing.  But there needs to be a

03:09:48 11    way that when they answer the exclusive dealing question,

03:09:51 12    they're understand that if they found for us in Rohm and

03:09:54 13    Haas issue that they're only evaluating the post-expiration

03:09:58 14    exclusive deal.  So the question as presented would be

03:09:59 15    incomplete if it's not a separate question that they go to.

03:10:09 16             THE COURT:  It seems to me like you're trying to

03:10:12 17    complicate things.

03:10:13 18             MR. BUROKER:  Trying not to complicate things,

03:10:16 19    but be precise.

03:10:25 20             THE COURT:  So just using your form,

03:10:27 21    Mr. Buroker, your team's form.

03:10:32 22             MR. BUROKER:  You'd have to add another

03:10:35 23    question.

03:10:41 24             THE COURT:  So what you would say is if the

03:10:47 25    answer to the question is yes, then proceed to questions 2,

03:10:50 1    3 and 4.  If the answer to the question is no, then proceed

03:10:53 2    to question 5, exclusive dealing after the expiration of the

03:11:00 3    patent.

03:11:01 4             MR. BUROKER:  Correct.  And then the antitrust

03:11:04 5    damages question -- the numbers will have to change, but the

03:11:07 6    antitrust damages question would still be the same.  What

03:11:11 7    compensatory damages, if any, isn't BASF entitled to.  That

03:11:15 8    would still be correct.

03:11:17 9             THE COURT:  All right.  Mr. Mezzina.

03:11:19 10            MR. MEZZINA:  Your Honor, I think that

03:11:21 11   needlessly complicates the form.  Your Honor has ruled this

03:11:25 12   is not an affirmative defense.  When we said it was an

03:11:28 13   affirmative defense, there was a certain logic on to having

03:11:30 14   it broken out.  Your Honor's ruled that it's an element to

03:11:32 15   our claims.  Our claim have lots of element that aren't

03:11:35 16   being separately charged.  I think the instructions in

03:11:37 17   combination with the parties' arguments will tell the jury

03:11:39 18   how to deal with this, and I think having sort of a

03:11:43 19   branching verdict form is just going to confuse them.

03:11:46 20            THE COURT:  Do you think the jury instructions,

03:11:52 21   as finalized now, do they tell -- do they say anything about

03:12:02 22   post-expiration exclusive dealing or is that pretty much all

03:12:06 23   just Dr. Mathur during her testimony?

03:12:11 24            MR. MEZZINA:  I'm not sure that they speak

03:12:13 25   specifically to that, Your Honor, but what they say is a

03:12:15  1    patent owner has the right to control the market for

03:12:18  2    non-staple goods during the life of the patent, and I

03:12:21  3    assume -- I assume both sides, but especially Ingevity, will

03:12:25  4    argue in closing, well, that means, obviously, we have this

03:12:28  5    right then -- and Dr. Mathur agreed with that.  She said in

03:12:32  6    her testimony if you find that they have the right during

03:12:34  7    the life of the patent, she gave an alternatives damages

03:12:38  8    figure for after the patent expiration.  So I think the

03:12:41  9    parties are in the same place on this, and I think they'll

03:12:44 10    make it clear to the jury.

03:12:46 11            MR. BUROKER:  I don't believe -- Your Honor, to

03:12:47 12    your question specifically, I don't think there's anything

03:12:49 13    in these jury instructions that say if you find for Ingevity

03:12:54 14    on this Rohm and Haas question, however it's framed, then

03:12:57 15    you need to assess exclusive dealing only for the

03:13:01 16    post-expiration period.  So if it's not in the jury

03:13:03 17    instructions, that's why we suggested it be in the verdict

03:13:06 18    form.

03:13:35 19            MR. MEZZINA:  Your Honor, the only thing I'd add

03:13:37 20    is I do think, given that it's being treated as just one

03:13:39 21    element of or our claims, you know, breaking it out,

03:13:42 22    especially on the verdict form, gives it, I think, undue

03:13:44 23    emphasis relative to the rest of the case.  Especially if

03:13:49 24    it's going to be first.

03:13:52 25            THE COURT:  Well, you know, so two things, one

03:13:56   1       of which is I prefer to have the jury instructions doing the

03:14:07   2       jury instructing and not to be instructing them through the

03:14:11   3       verdict form.

03:14:21   4              And then the second thing is, as I'm thinking

03:14:23   5       about it, if the burden -- if the -- so if there's no

03:14:29   6       question about staple goods at all, and the jury -- the jury

03:14:36   7       comes back for BASF on tying, we're going to know what their

03:14:41   8       answer to the staple good question was; right?  And if they

03:14:45   9       come back in favor of Ingevity, I think we're still going to

03:14:53  10       know what the answer to their question was, though perhaps

03:14:56  11       there's more room for argument because, obviously, BASF had

03:15:02  12       to prove everything they had to prove whereas you can win by

03:15:06  13       just by -- by a failure of proof on their part, the one,

03:15:11  14       two, however many other things there are.

03:15:15  15              MR. MEZZINA:  And I think in that sense, Your

03:15:19  16       Honor, it won't matter what their finding was on this

03:15:21  17       specific element.

03:15:22  18              MR. BUROKER:  If we go back to exclusive

03:15:23  19       dealing, that's not true for exclusive dealing because of

03:15:27  20       the post-expiration -- post-expiration problem.

03:15:30  21              THE COURT:  I think, actually, I think I agree

03:15:32  22       with Mr. Mezzina here.  I think the attorneys are going to

03:15:35  23       make this pretty clear in their arguments as to what they're

03:15:38  24       doing, and I do think the question says unlawful exclusive

03:15:47  25       dealing.  There's no time frame given, so they could -- the

03:15:53  1    plaintiff could check this -- or the jury could check this

03:15:55  2    question yes.  I mean, if they check it no, there's no

03:16:01  3    issue, but if they check it yes, you know, it's possible

03:16:11  4    there could end up being some inconsistency in the verdict

03:16:14  5    at the end of the day.

03:16:16  6          But generally speaking, inconsistency in the

03:16:19  7    verdict is the jury's prerogative.  So actually what I think

03:16:24  8    I want to do -- because I did prefer, generally speaking,

03:16:29  9    the way BASF phrased the three claims, which I thought was

03:16:41 10    simpler than the way Ingevity phrased them.  So what I think

03:16:46 11    I want to do is go with the BASF questions 1, 2, 3, get rid

03:16:54 12    of question 4 and renumber.  Just have what are now

03:17:00 13    questions 5 and 6 as questions 4 and 5.

03:17:06 14          MR. BUROKER:  We still believe that you should

03:17:08 15    give the Rohm and Haas argument.  The instruction, we

03:17:12 16    understand you're not agreeing with it, but their question 1

03:17:14 17    has the same issue we spoke about earlier.  It just says

03:17:16 18    Ingevity's carbon honeycombs.  At a minimum that should say

03:17:20 19    carbon honeycombs at issue or something because, again --

03:17:23 20          THE COURT:  Well, see, but that's where the jury

03:17:26 21    verdict form is not like a second set of jury instructions.

03:17:31 22    I mean, if I tell them many times what the carbon honeycombs

03:17:37 23    are at issue, you know, it doesn't have to repeat that

03:17:42 24    language in the tying claim because they're presumed to

03:17:46 25    follow the jury instructions.

03:18:00  1          So I understand what you're saying, Mr. Buroker,

03:18:03  2     but I don't think that needs to be done.  And, yeah, I mean,

03:18:24  3     there's only one set of Ingevity carbon honeycombs that are

03:18:27  4     going to be at issue here, so I really don't even think it's

03:18:30  5     going to be at all unclear in context, even if there's a

03:18:35  6     bunch of would-be lawyers parsing language on the verdict

03:18:41  7     form.  So I think I'm going to just say let's go with the

03:18:44  8     BASF form without -- essentially, without questions 4, 7 and

03:18:49  9     8.  And presumably, the parties can go back and forth, make

03:18:56 10     sure that all the cross-referencing is correct.

03:19:04 11          So one thing I would like, Mr. Smith or

03:19:12 12     Ms. Chen, but I guess really Mr. Smith, is when the parties

03:19:15 13     have gone back and forth and they've got -- you're all in

03:19:19 14     agreement with everything, can you email to me PDF copies of

03:19:26 15     the verdict form and the jury instructions and give me a

03:19:33 16     half an hour or so to, like, read them one more time before

03:19:37 17     I tell you to print them?

03:19:39 18          MR. SMITH:  That's fine, Your Honor.  However

03:19:41 19     long you need, just give us the thumbs up, and then we'll go

03:19:44 20     about printing.

03:19:44 21          THE COURT:  Okay.

03:19:45 22          MR. BUROKER:  Your Honor.

03:19:46 23          THE COURT:  Yes, Mr. Buroker.

03:19:47 24          MR. BUROKER:  Can we have a time?  We've had

03:19:48 25     issues back and forth.  It would help both parties.  By what

03:19:52  1    time would you like them?

03:19:53  2              THE COURT:  Tell me what's a reasonable time for

03:19:59  3    me to suggest and, you know, 1:00 a.m. is not a reasonable

03:20:04  4    time.

03:20:04  5              MR. BUROKER:  Correct.  I don't know.  I wasn't

03:20:06  6    taking down all the notes.

03:20:08  7              MR. SMITH:  Your Honor, I think this is

03:20:10  8    ministerial.  Can we have it to you by 6:00?

03:20:12  9              THE COURT:  Yeah, that would be fine.

03:20:14 10              MR. BUROKER:  So that's great.  So you'll have

03:20:15 11    it to us by 5:30?

03:20:17 12              MR. SMITH:  We'll have it to you earlier than

03:20:19 13    that.

03:20:19 14              THE COURT:  Yeah, if I get them by 6:00, I will

03:20:21 15    get them back to you by 7:00.

03:20:23 16              MR. SMITH:  Thank you, Your Honor.

03:20:23 17              THE COURT:  Okay.  All right.

03:20:25 18              Do you want, Mr. Mezzina, your two pages from

03:20:32 19    the AIPLA back?

03:20:35 20              MR. MEZZINA:  Thank you, Your Honor.

03:20:37 21              THE COURT:  All right.  I don't suppose

03:20:43 22    Mr. Friel and Mr. Thomas told you that they were rethinking

03:20:47 23    spending an hour and a half arguing?  No, I didn't think so.

03:20:51 24              All right.  Well, we'll be in recess.  And you

03:20:58 25    should be here at 9:00 tomorrow, even though I'm

1295

03:21:01  1   anticipating that you're not going to have any objections,

03:21:06  2   but it would be better to just make sure.  Yeah, I mean, you

03:21:15  3   want to be comfortable.

03:21:18  4              You know, Mr. Thomas and Mr. Friel, they don't

03:21:22  5   necessarily have to be here at 9:00, but I want somebody to

03:21:25  6   be here so I can check and make sure that everything's okay.

03:21:30  7              MR. BUROKER:  Your Honor, we are exchanging

03:21:31  8   demonstratives for closings this evening, so there is a

03:21:34  9   remote possibility of objections, just to warn Your Honor.

03:21:38 10              THE COURT:  Okay.  Well, thank you.

03:21:40 11              All right.  Have a good evening.  I will be

03:21:42 12   looking for an email at six o'clock or thereabouts.

03:21:47 13              DEPUTY CLERK:  All rise.

03:21:48 14              THE COURT:  Or earlier if you get it done

03:21:50 15   earlier.

03:21:53 16              (Court was recessed at 3:21 p.m.)

         17              I hereby certify the foregoing is a true and

         18   accurate transcript from my stenographic notes in the

         19   proceeding.

         20                    /s/ Heather M. Triozzi
                              Certified Merit and Real-Time Reporter
         21                   U.S. District Court

         22

         23

         24

         25