IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INGEVITY CORPORATION and INGEVITY SOUTH CAROLINA, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> BASF CORPORATION, <br><br> Defendant. | Civil Action No. 18-1391-RGA |

MEMORANDUM OPINION

Karen E. Keller, John W. Shaw, Nathan R. Hoeschen, Emily S. DiBenedetto, SHAW KELLER LLP, Wilmington, DE; Jeffrey T. Thomas, Frank P. Coté, Blaine H. Evanson, Nathaniel R. Scharn, Brian Yang, GIBSON, DUNN & CRUTCHER LLP, Irvine, CA; Brian M. Buroker (argued), Vladimir J. Semendyai, GIBSON, DUNN & CRUTCHER LLP, Washington, DC; Rod J. Stone, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, CA; Stuart M. Rosenberg, GIBSON, DUNN & CRUTCHER LLP, Palo Alto, CA; Rustin K. Mangum, Spencer W. Ririe, MANGUM RIRIE LLP, Ladera Ranch, CA,

    Attorneys for Plaintiffs.

Rodger D. Smith II, Anthony D. Raucci, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Thomas J. Friel, Jr., KING & SPALDING LLP, Palo Alto, CA; James P. Brogan, Brian Eutermoser, Angela C. Tarasi, Mikaela Stone, KING & SPALDING LLP, Denver, CO; Norman Armstrong, Jr., Paul Alessio Mezzina (argued), Christopher C. Yook, Amanda Morrow Strick, KING & SPALDING LLP, Washington, DC; Joseph D. Eng, Jr., Emily T. Chen, KING & SPALDING LLP, New York, NY,

    Attorneys for Defendant.

February 13, 2024

1

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me is Ingevity's renewed motion for judgment as a matter of law and motion for a new trial. (D.I. 593). The motions have been fully briefed (D.I. 594, 603, 604), and the parties submitted supplemental letters (D.I. 608, 609). I heard oral argument on December 14, 2023. (D.I. 610).[1]

For the reasons set forth below, I will **DENY** Ingevity's motions.

## I. BACKGROUND

Plaintiffs Ingevity Corporation and Ingevity South Carolina filed a patent case against Defendant BASF, alleging infringement of U.S. Patent No. RE38,844 ("the '844 patent"). (D.I. 1). The '844 patent claimed a technology for reducing evaporative emissions. (*Id.* ¶ 14). On November 17, 2020, I invalidated all asserted claims of the '844 patent based on prior invention. (D.I. 419 at 14).[2]

Prior to the claims being invalidated, BASF filed counterclaims, alleging that Ingevity: (1) unlawfully leveraged, or tied, the '844 patent by requiring customers wishing to license the patent to also purchase unpatented carbon honeycombs from Ingevity; (2) unlawfully restrained competition by entering into exclusive supply agreements with Delphi, KFTC, and Kayser; and (3) tortiously interfered with a prospective business relationship between BASF and Kayser. (D.I. 65 at 16–37; D.I. 549 at 12). Ingevity filed a motion for judgment as a matter of law (D.I. 547), which I did not grant (D.I. 568 at 969:11–20; *see also* D.I. 562 at 1).

---

[1] Citations to the transcript of the argument (D.I. 610) are in the format "Hearing Tr. at ___."

[2] The Federal Circuit later affirmed an ITC decision reaching similar conclusions. *See Ingevity Corp. v. ITC*, 2021 WL 3440786 (Fed. Cir. July 21, 2021).

2

The jury returned a verdict finding that BASF proved by a preponderance of the evidence that (1) Ingevity unlawfully tied licenses to the '844 patent to sales of Ingevity's honeycombs; (2) Ingevity engaged in unlawful exclusive dealing; and (3) Ingevity knew about and unlawfully interfered with a prospective business relationship between BASF and Kayser. (D.I. 553 at 1–2). I entered a judgment in favor of BASF on May 18, 2023. (D.I. 585). Ingevity thereafter filed the motions now at issue.

## II. LEGAL STANDARD

### A. Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue." Fed. R. Civ. P. 50(a)(1). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, 'granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citations omitted).

"To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied by the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (cleaned up). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in [its] favor and, in general, view the record in the light most favorable to [it]." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court "must not determine credibility of witnesses, and must not substitute its choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer*, 732 F.2d at 893. Rather, the Court must determine whether the evidence supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party.").

### B. Motion for a New Trial

Federal Rule of Civil Procedure 59(a)(1)(A) provides:

> The court may, on motion, grant a new trial on all or some of the issues–and to any party–as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .

Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Zarow–Smith v. N.J. Transit Rail Operations, Inc.*, 953 F. Supp. 581, 584 (D.N.J. 1997).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (reviewing district court's grant or denial of new trial motion under deferential "abuse of discretion" standard). Although the standard for granting a new trial is less rigorous than the standard for granting judgment as a matter of law—in that the court need not view the evidence in the light most favorable to the verdict winner—a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352–53.

## III. DISCUSSION

At oral argument, Ingevity conceded it is not arguing that there were errors in the jury instructions. (Hearing Tr. at 4:3–5). Nor is Ingevity arguing about overruled objections. (*Id.*). I also note that BASF does not argue Ingevity failed to preserve any of the arguments made in the present motion. (*Id.* at 5:3–10). I therefore consider whether there was substantial evidence for the jury to conclude what it concluded.

Broadly speaking, Ingevity raises two sets of arguments that are global challenges to the verdict, and then individual challenges to each of the three counts BASF pursued.

### A. Staple Goods

Ingevity argues I should enter judgment for it on all of BASF's claims because no reasonable juror could find that Ingevity's honeycombs are staple goods used in actual and substantial non-infringing ways. (D.I. 594 at 3; *see also* Hearing Tr. at 9:24–10:5). BASF contended at trial that the Ingevity honeycombs were used in air intake systems, which would have been a non-infringing use. (D.I. 603 at 1). Ingevity contends there is no evidence that: (1)

5

Ingevity intended its honeycombs to be used outside of fuel vapor canisters (which are part of an automobile's exhaust system); (2) anyone actually used Ingevity's honeycombs in air intake systems; and (3) any non-infringing uses were substantial. (D.I. 594 at 3–4).

BASF responds that Ingevity merely reiterates the arguments it made at trial. (D.I. 603 at 2). BASF contends the jury was properly instructed on the staple goods issue—a factual question—and was not required to accept Ingevity's position. (*Id.*; *see also* Hearing Tr. at 34:22–35:1 ("Ingevity's asking [the Court] to reweigh the evidence, resolve conflicts in the evidence, resolve credibility issues in a way that's different from what the jury reasonably decided.")).

### 1. Sales for Non-Infringing Use

Ingevity argues there is no evidence that its honeycombs were intended to be sold for non-infringing uses in air intake systems. (D.I. 594 at 4).

Ingevity notes that BASF relied on Ingevity's spreadsheets to show that Stant, SumiRiko, and Toledo Molding & Die—three automotive suppliers—ordered Ingevity's honeycombs for use in air intake systems. (*Id.*). Ingevity contends the testimony of Mr. Woodcock, the president of Ingevity's performance materials division and the person handling honeycomb sales, shows that these spreadsheet entries were erroneous. (*Id.* at 5; *see also* Hearing Tr. at 10:16–19 ("[T]hose were mistakes, that when the person put the sale into the data entry system, they just put the wrong field, and those were actually sales for fuel vapor canisters.")).

At oral argument, Ingevity stated that spreadsheets for "all of the years," including data for 2010, were produced during discovery. (Hearing Tr. at 71:6–13). I asked Ingevity whether the trial record shows that these spreadsheets were available. (*Id.* at 71:14–15). I permitted Ingevity to file a letter identifying the record evidence. (*See id.* at 72:5–9). In the letter, Ingevity

6

states Mr. Woodcock testified that data was available from at least 2004 until 2020. (D.I. 608 (citing D.I. 566 at 456:5–19)).³ Ingevity's letter refers to sales for the years 2010, which purportedly show that Toledo Molding & Die bought honeycombs for infringing uses in fuel vapor canisters, and 2014, which purportedly show that Toledo Molding & Die stopped buying any of the honeycombs at issue. (*Id.*). BASF contends I should not consider these data entries for the purpose of the present motion because the entries were not introduced as evidence at trial. (D.I. 609).⁴

Ingevity further argues that honeycombs do not work in air intake systems due to their small diameters, small cells, and tubular shape. (D.I. 594 at 5). Honeycombs used in air intake systems, Ingevity contends, have relatively large diameters, relatively large cells, and a hockey puck shape. (*Id.* at 5–6). Ingevity also contends that Stant and SumiRiko could not have ordered honeycombs from Ingevity because those companies do not make air intake systems. (*Id.* at 6). Ingevity contends the evidence further shows that any honeycombs sold to Toledo Molding & Die were not used in air intake systems. (*Id.* at 6–7).

BASF argues Ingevity did not submit any evidence to support Mr. Woodcock's testimony. (D.I. 603 at 4). The jury, BASF contends, was entitled to disbelieve him. (*Id.*; *see also* Hearing Tr. at 35:15–20 (stating that Ingevity's spreadsheet entries showed "multiple sales, repeated purchases by three different customers in four different years, total of more than 10,000 separate units purchased"); *id.* at 39:25–40:3 (noting that Mr. Woodcock was Ingevity's president, and the jury "certainly could have taken that into account in weighing credibility")).

---

³ BASF seems to dispute whether Ingevity produced the additional sales data during discovery. (*See* D.I. 609).

⁴ Ingevity contends it did not introduce these data entries at trial "because they were duplicative of Mr. Woodcock's testimony . . . ." (D.I. 608).

7

BASF also argues that the jury could rely on Ingevity's records to infer that Ingevity's honeycombs work in air intake systems, "or else customers would not have bought thousands of them for that purpose." (D.I. 603 at 5). BASF points to the Park patent and the testimony of Mr. Abraham, a former BASF employee, as support. (*Id.* at 5–6; *see also* Hearing Tr. at 38:19–39:14; *id.* at 43:14–22).

Regarding Toledo Molding & Die, BASF contends that Ingevity's sales records, in addition to other Ingevity documents, show that the honeycombs were sold for non-infringing uses. (*Id.* at 2–4; *see also* Hearing Tr. at 36:8–12 ("It's also significant that for all of the sales to Toledo Molding & Die, the salesperson is . . . . Ingevity's global head of the air intake business."); *id.* at 37:2–38:11 (describing "multiple documents identifying [Toledo Molding & Die] as making air intake systems")). BASF contends that Ingevity's records show similar sales to Stant and SumiRiko. (D.I. 603 at 3).

I conclude the record contains substantial evidence for the jury to have reasonably found that Ingevity intended to sell its honeycombs for non-infringing uses in air intake systems. The record contains spreadsheets showing various Ingevity sales in 2013, 2014, 2018, and 2019. (D.I. 603 at 2–3 (citing JX-5A; D.I. 566 at 349:4–351:7; PX-158A; D.I. 566 at 356:14–357:5)). According to the spreadsheets, more than 10,000 units of Ingevity honeycombs were sold to Toledo Molding & Die for an "end use" of "CC-AIR INDUCTION SYS." (*Id.* (citing JX-5A; D.I. 566 at 349:4–351:7)). Some of these entries covered five different months in 2013. (Hearing Tr. at 15:5–11). The spreadsheets also indicate that more than 8,000 units were sold to Stant and SumiRiko for an "end use" of "CC-AIS Honeycombs." (D.I. 603 at 3 (citing PX-158A; D.I. 566 at 356:14–357:5)). The record further contains to a 2010 Ingevity document that is consistent with these spreadsheets. (D.I. 603 at 3 (citing PX-12 at 7; D.I. 566 at 360:14–23)).

8

Although Mr. Woodcock testified that the spreadsheet entries were errors, it was not unreasonable for the jury to rely on the written record over the trial testimony of an interested party like Mr. Woodcock. The spreadsheet entries and other documents thus could have led the jury to conclude that Stant, SumiRiko, and Toledo Molding & Die make air intake systems and bought Ingevity's honeycombs for that purpose. The jury was entitled not to credit Mr. Woodcock's testimony. Determining the credibility of witnesses is a quintessential jury function. Since there was a basis for the jury's determination, it would be error for me to overrule that determination. *See Marra*, 497 F.3d at 300 (Judgment as a matter of law is "sparingly" granted, and courts "must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury.").[5]

The parties also disputed whether Ingevity's tubular honeycombs work in air intake systems. Neither party's retained experts testified about the suitability of these tubes for air intake systems. (Hearing Tr. at 13:13–25). Mr. Woodcock and Mr. Williams, one of the '844 patent's inventors, testified that the Ingevity honeycombs would not work in air intake systems. (*See, e.g.*, D.I. 594 at 6 (citing D.I. 568 at 1031:10–19; D.I. 566 at 444:9–20); D.I. 603 at 5 (citing D.I. 566 at 351:15–17)). On the other hand, BASF relied on the Park patent and the testimony of Mr. Lyons, its technical expert, to argue otherwise. (*See* D.I. 603 at 5 (citing D.I. 567 at 721:7–722:10, 724:6–725:22; D.I. 568 at 1001:17–1003:8; JX-1 at 6–7, 9)). BASF further relied on Mr. Abraham, who testified that Toledo Molding & Die contacted him about using BASF honeycombs, which had the same shape, size, and cell density as Ingevity's

---

[5] I also note that Ingevity's supplemental letter is unpersuasive to the extent that it references documents that were not introduced as exhibits at trial. *See Dupree v. Younger*, 598 U.S. 729, 731–32 (2023) ("[D]istrict courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record.").

9

honeycombs. (*See* D.I. 603 at 5–6 (citing D.I. 565 at 209:14–23)). The dispute over suitability, like the spreadsheet issue, also rests on the credibility of witnesses and the weight of the evidence. I note that Ingevity cross-examined Mr. Lyons at trial. (Hearing Tr. at 24:10–13). The jury was entitled to credit BASF's evidence over that of Ingevity and determine that the honeycombs work in air intake systems.

As is required on a motion for judgment as a matter of law, I must give BASF the benefit of all logical inferences that can be made from the evidence in the record. I conclude there was substantial evidence for the jury to reasonably find that Ingevity intended to sell its honeycombs for non-infringing uses in air intake systems.

### 2. Actual Use

Ingevity argues that the spreadsheet entries, even if they show an anticipated use, are not evidence of actual use. (D.I. 594 at 7). Ingevity contends, "BASF did not identify a single vehicle that used an FVC Honeycomb in an air intake system application." (*Id.*).

BASF responds, "Evidence that a customer repeatedly purchased thousands of honeycombs for use in air intake systems lets a jury infer that the customer put the honeycombs to the non[-]infringing use for which it repeatedly purchased them." (D.I. 603 at 6; *see also* Hearing Tr. at 44:16–22 ("This is clearly circumstantial evidence of actual use. This isn't just one isolated purchase. . . .")). BASF contends that circumstantial evidence must be given the same weight as direct evidence. (D.I. 603 at 6; Hearing Tr. at 44:23–45-4).

I conclude there is substantial evidence in the record to support the jury's finding that Ingevity's honeycombs were actually used in non-infringing ways. As BASF points out, the jury could have relied on evidence that customers bought thousands of Ingevity's honeycombs for use in air intake systems as circumstantial evidence that customers actually used the honeycombs.

*See United States v. Donley*, 878 F.2d 735, 738 (3d Cir. 1989) ("Statements admitted . . . to show the declarant's intent or plan may be used to show that the declarant acted in accord with that plan.").

### 3. Substantial Use

Ingevity argues that even if BASF can show actual non-infringing uses of Ingevity's honeycombs, those uses are not substantial. (D.I. 594 at 8–9; *see also* Hearing Tr. at 17:9–12 ("At best, the jury could have concluded that this was an occasional, aberrant use of the honeycomb in an air intake system . . . .")). Ingevity contends that the spreadsheet entries do not show substantial use because they indicate "at most 0.017% of Ingevity's total FVC Honeycomb sales since 2004." (D.I. 594 at 9). Ingevity further contends that sales of its honeycombs for air intake systems are "impractical," and thus insubstantial, because its honeycombs do not work in air intake systems. (*Id.*).

BASF argues that whether a non-infringing use is substantial is a factual question for the jury. (D.I. 603 at 7; Hearing Tr. at 46:20–22). The Federal Circuit, BASF contends, does not mandate a proportionality approach to substantiality, and the jury was permitted to consider absolute terms instead of percentages. (D.I. 603 at 7). BASF also notes that the jury instructions "did not define substantiality in terms of a percentage of Ingevity's overall sales." (*Id.* at 8).[6]

I conclude the jury could have reasonably found that the non-infringing uses of Ingevity's honeycombs were substantial. As BASF notes, substantial uses are not analyzed by reference to percentage thresholds. The substantiality question instead relies on a variety of factors. *See,*

---

[6] Ingevity contends that any use was insubstantial even if one considers absolute terms instead of percentages. (Hearing Tr. at 21:8–10 ("10,000 is a small percentage of the overall use. Even if you go with that number, there have been millions of these honeycombs sold and used.")).

11

*e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010) ("In assessing whether an asserted non[-]infringing use was 'substantial,' the jury was allowed to consider not only the use's frequency, but also the use's practicality, the invention's intended purpose, and the intended market."). The jury could have reasonably concluded that 0.017% of sales—more than 10,000 honeycombs—constitute a substantial use. Given the evidence contradicting Ingevity's assertion that its honeycombs do not work in air intake systems, the jury also could have found that these uses were not impractical. The jury similarly could have reasonably concluded that the uses were not occasional in light of the spreadsheet evidence covering multiple months of sales across multiple years.

Thus, drawing all logical inferences in favor of BASF, as I am required to do on a motion for judgment as a matter of law, there was substantial evidence in the record supporting the jury's determination that Ingevity's honeycombs are staple goods. I will deny the motion for judgment as a matter of law on the staple good issue.

### B. Damages

Ingevity argues that I should grant judgment of no damages or, alternatively, order a new trial on damages. (D.I. 594 at 10).

First, Ingevity argues that BASF failed to disaggregate damages caused by unlawful conduct from damages caused by lawful conduct. (*Id.*; *see also* Hearing Tr. at 27:7–11). Ingevity contends that Dr. Mathur, BASF's expert, "did not consider the effect of Ingevity's lawful patent enforcement activity on BASF's purported lost profits." (D.I. 594 at 13–14). Ingevity contends that Dr. Mathur "did not reduce her damages figure in any way" to reflect Ingevity's efforts to enforce its patents. (*Id.* at 13). The evidence, Ingevity argues, shows that prospective customers decided not to buy from BASF in part because Ingevity had sued BASF

12

for patent infringement. (*Id.* at 12). Ingevity argues that the evidence does not show that any unlawful conduct led customers to decide not to buy from BASF. (*Id.*).

Second, Ingevity contends there is insufficient evidence to support Dr. Mathur's opinion that BASF, but for Ingevity's conduct, would have acquired 50% market share and sold millions of its honeycombs over thirteen years. (D.I. 594 at 14). Ingevity contends that BASF has not sold any honeycombs, and its product is not certified for use in vehicle platforms. (*Id.*). Dr. Mathur's opinion, Ingevity argues, is thus based "almost exclusively" on a sales projection spreadsheet made after commencement of this suit. (*Id.*).

BASF contends that it did not need to disaggregate its damages. (D.I. 603 at 9). It refers to the jury instructions, which stated that BASF was "not required to prove that the accused conduct was the sole cause of its injury." (*Id.* (citing D.I. 549 at 50, 58)). BASF instead contends it needed to prove "the alleged antitrust violation materially or substantially contributed to [its] injury." (*Id.* (citing D.I. 549 at 50, 58)).[7] BASF contends it did not seek damages for any losses not substantially caused by unlawful conduct. (*Id.* at 12). Because customers made a binary decision—whether to buy from BASF or not—BASF argues that further disaggregation was impossible. (*Id.* at 13).

BASF also argues that Dr. Mathur's damages calculations were not speculative. (*Id.* at 14). BASF contends that Dr. Mathur's projection—50% market share—was reasonable based on evidence that (1) BASF's honeycombs were cheaper and performed better; (2) each carmaker at issue had either tested BASF honeycombs or expressed interest in them; and (3) Ingevity's own documents showed that Ingevity expected competition to lower its share of the market by 50% or

---

[7] Ingevity replies that even under a materiality standard, "the jury needs to be given enough information to be able to determine what the material cause of the[] harm is," but BASF failed to submit such information. (Hearing Tr. at 28:4–10).

13

more. (*Id.* at 15). BASF further notes that Dr. Mathur presented an alternative calculation of 20% market share to the jury. (*Id.*). The jury's damages award, BASF contends, is closer to 20% market share than 50% market share. (*Id.* at 15–16).

I do not think that Ingevity is entitled to judgment as a matter of law of no damages. To establish an antitrust injury, BASF was not required to show that the accused conduct was the sole cause of its injury; BASF needed to show that Ingevity's conduct was a material or substantial cause of its injury. *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, 2016 WL 3610155, at *9 (D. Del. July 1, 2016). The jury instructions, to which Ingevity does not object, are consistent with this requirement. (D.I. 549 at 50 ("BASF is entitled to recover damages for an injury to its business or property if it can establish . . . that the alleged illegal conduct was a material cause of BASF's injury . . . ."), 58).

Dr. Mathur concluded that Ingevity's unlawful conduct was the substantial cause of BASF being unable to sell honeycombs to canister makers for use in five carmakers' vehicles. (D.I. 603 at 10 (citing D.I. 569 at 1181:2–15, 1183:20–1184:1)). There is substantial evidence in the record to support that conclusion. The record contains: (1) evidence that BASF's honeycombs were cheaper and performed better (*id.* (citing D.I. 566 at 316:22–317:7, D.I. 567 at 562:16–19, PX-106 at 1)); (2) evidence that the five carmakers "expressed interest in BASF's honeycomb and/or performed validation testing" (*id.* (citing D.I. 565 at 164:23–165:7, D.I. 566 at 312:16–24, D.I. 567 at 578:12–581:11, PX-55, JX-18 at 1)); (3) comments from Ingevity employees (*id.* (citing PX-70 at 1)); (4) evidence that Ingevity viewed BASF's honeycombs as a "threat" (*id.* (citing D.I. 566 at 404:20–405:3, JX-19 at 2)); (5) evidence that Ingevity acted by "selectively increasing prices to pressure customers into exclusivity" (*id.* (citing D.I. 567 at 567:10–18, 568:13–25, 571:20–572:18, 658:9–659:3, PX-113, PX-126, PX-134)); and (6)

evidence that Ingevity affected BASF's potential sales by requiring customers to buy Ingevity's honeycombs if the customers wanted to get a license to the '844 patent (*id.* at 10–11 (citing D.I. 566 at 372:22–25, 373:10–19, 377:1–4, JX-14, JX-25, JX-28)). I therefore think there is substantial evidence for a jury to have reasonably concluded that Ingevity's conduct was a material cause of BASF's injury.

Dr. Mathur testified about quantifying BASF's injury, opining that it would be impossible to separate damages caused by lawful conduct from damages caused by unlawful conduct. (D.I. 603 at 13 (citing D.I. 569 at 1184:7–17)). In light of this testimony, the burden shifted to Ingevity to show that disaggregation was possible. *See Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1242–43 (7th Cir. 1982) ("A plaintiff claiming injury caused by more than one of the defendant's unlawful practices need not prove the amount of damage caused by each illegal practice if the plaintiff shows that disaggregation is impracticable. If the plaintiff shows that such proof is impracticable, the burden shifts to the defendant to demonstrate the contrary."). Ingevity argued that Ms. Rowe's testimony shows disaggregation was possible. (*See* Hearing Tr. at 29:7–30:3). BASF disputes this. (*See* Hearing Tr. at 53:12–21 ("What [the] spreadsheet did not do is try to disaggregate lawful and unlawful conduct because, again, [Ms. Rowe] didn't know about the unlawful conduct.")). The jury could reasonably have believed BASF over Ingevity and thus concluded that disaggregation was impossible. I therefore deny Ingevity's motion with respect to disaggregation of damages. *See Spray-Rite*, 684 F.2d at 1243 ("We will not deprive Spray-Rite of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct."); *accord, ZF Meritor*

15

*LLC v. Eaton Corp.*, 2013 WL 6729509, at *2–3 (D. Del. Dec. 20, 2013) (denying a motion to exclude expert testimony and "find[ing] disaggregation unnecessary, if not impossible").

I do not think that the evidence shows Dr. Mathur's damages calculations were speculative. The record indicates that Dr. Mathur's opinion did not rely solely on a sales projection spreadsheet. Dr. Mathur considered internal Ingevity documents and testified that Ms. Rowe's information played a small role in her analysis. (*See* D.I. 603 at 15 (citing PX-45 at 3, D.I. 567 at 803:2–804: 17, D.I. 568 at 909:13–23, 958:15–959:5, D.I. 569 at 1217:3–5 ("[T]he only piece of input that I needed from Ms. Rowe and BASF was what the size of an introductory, small platform was going to be."))). Dr. Mathur's opinion was supported by sufficient facts, and I deny Ingevity's JMOL motion with respect to damages.

Ingevity alternatively argues a new trial is required because Dr. Mathur "failed to disaggregate damages attributable to lawful conduct and relied heavily on Ms. Rowe's speculative projections of customer demand and market share." (D.I. 594 at 15). Ingevity contends, "Each flaw independently should have resulted in her testimony being excluded." (*Id.*). Because I already rejected both of the disaggregation and improper-reliance-on-Rowe arguments with respect to Ingevity's motion for judgment as a matter of law, I conclude that the arguments do not provide a basis for granting a new trial.[8]

---

[8] Ingevity's requests for a new trial in headings do not always correspond to arguments in the text. One heading states, "Several Other Flaws in BASF's Case Warrant Judgment or at Least a New Trial." (D.I. 594 at 15). Although this portion of Ingevity's brief addresses the tying, exclusive dealing, and tortious interference claims, Ingevity only argues for a new trial on exclusive dealing. (*See id.* at 15–20). When there is no argument in the text, the argument is forfeited. *See In re: Niaspan Antitrust Litig.*, 67 F.4th 118, 135–36 (3d Cir. 2023).

## C. Tying Arrangement

Ingevity contends there is no evidence that it engaged in unlawful tying or tortious interference. (D.I. 594 at 16). Ingevity argues that customers "declined to purchase FVC Honeycombs from BASF due to Ingevity's patent infringement lawsuit against BASF, concerns about patent infringement liability, or other innocent reasons." (*Id.* at 15–16). Ingevity contends that it merely made statements to convey that it would enforce its patents against conduct it believed infringed the patents. (*Id.* at 16). Both the patent laws and the First Amendment, Ingevity contends, protect such communications from antitrust and tort liability. (*Id.* at 15–16). Ingevity thus argues that BASF did not suffer any antitrust harm, for "the alleged 'tying' conduct is immune." (*Id.* at 16 n.2).

Ingevity further argues that "the alleged coercive conduct must relate to the 'tying' product" for there to be tying. (D.I. 594 at 17). BASF contends that licenses to the '844 patent are the tying product, but Ingevity argues that BASF's evidence on "punitive price increases and supply reductions relate solely to carbon products," which are the tied product. (*Id.*). Ingevity thus argues that the evidence does not support a tying claim. (*Id.*).[9]

BASF argues the jury found liability for conduct other than protected communications. (D.I. 603 at 16). BASF notes that I previously held "neither the *Noerr-Pennington* doctrine nor the patent laws immunize Ingevity's conduct." (*Id.* (citing D.I. 583 at 7)). BASF contends, "It is undisputed that Ingevity told customers that if they wanted Ingevity's authorization to practice the '844 patent (*i.e.*, a license), they had to buy honeycombs from Ingevity." (*Id.*). BASF contends this is a "textbook tying arrangement." (*Id.* at 17; *see also* Hearing Tr. at 61:15–24).

---

[9] At oral argument, Ingevity also argued that BASF's tying claim fails because it does not involve two separate products. (*See* Hearing Tr. at 80:20–21 ("Implied license comes with the purchase of a non-staple good.")).

17

BASF further argues that the tying arrangement enables price increases, but that the price increases themselves do not prove that a tying arrangement exists. (D.I. 603 at 17 n.3).

I conclude there is substantial evidence in the record supporting the jury's finding that a tying arrangement existed, with licenses to the '844 patent as the tying product and Ingevity's honeycombs as the tied product. The jury could reasonably have found a classic tying arrangement based in part on Mr. Woodcock's testimony. (*See* D.I. 603 at 16–17 (citing D.I. 566 at 373:10–19, 377:1–4); *id.* at 17 (citing D.I. 567 at 766:16–23)). Ingevity's argument about price increases does not disturb this finding. Ingevity's contention that it did not sell two separate products also fails in light of the jury's finding that Ingevity's honeycombs are staple goods. If the honeycombs are staple goods, they necessarily do not carry an implied license. Thus, I will deny the motion for judgment as a matter of law on tying.

### D. Exclusive Dealing

Because I have concluded there was substantial evidence for the jury to find a tying arrangement, I do not need to decide the exclusive dealing issue. Dr. Mathur opined that if the jury found Ingevity liable for tying only, the total damages would be the same as if the jury found Ingevity liable for all of the conduct at issue. (*See* D.I. 568 at 823:12–824:13 ("[T]he tying arrangements through the licenses affected the entire marketplace including these five OEM car makers for whom I've calculated damages. And that's why in a scenario just the tying, the total damages are the same.")). The portions of Ingevity's motion for judgment as a matter of law and motion for a new trial that address exclusive dealing are thus dismissed as moot.

### E. Tortious Interference

Ingevity argues BASF's tortious interference claim fails because there is no evidence that Ingevity interfered with a prospective business relationship. (D.I. 594 at 19). Ingevity contends

18

that BASF only relied on a binding contract it executed with Kayser before the alleged tortious conduct. (*Id.* at 19–20). Because BASF and Kayser entered into a contractual relationship, Ingevity argues that no reasonable jury could find the business relationship was "prospective." (*Id.* at 20).

Even if a prospective business relationship existed, Ingevity argues there is no evidence that Ingevity knew about the Kayser contract at the time Ingevity purportedly interfered. (*Id.*). Ingevity contends the evidence shows that it learned about the BASF-Kayser contract in mid-2021, which is more than one year after the final act of purported interference. (*Id.*). Ingevity thus argues that BASF's tortious interference claim fails. (*Id.*).

BASF argues that its tortious interference claim is not barred by the existence of a contract. (D.I. 603 at 20). BASF instead contends that a contract "may be a basis for greater protection" because it shows that a prospective business opportunity was not speculative. (*Id.* (citation omitted)). BASF also argues it is not relevant whether Ingevity knew about the BASF-Kayser contract, as Ingevity "indisputably knew about and sought to thwart BASF's prospective business relationship with Kayser." (*Id.* n.5).

I agree with BASF that the jury could have reasonably found a prospective business relationship even though BASF and Kayser had entered into a contract. *See Upjohn Co. v. Riahom Corp.*, 650 F. Supp. 485 (D. Del. 1986) ("[A] contract is not a necessary precondition to maintaining a successful action for tortious interference with business relations. . . . 'The added element of a definite contract may be a basis for greater protection . . . .'" (quoting Restatement (Second) of Torts § 766 cmt. C)). I think there is substantial evidence for the jury to have found tortious interference. BASF submitted evidence that Ingevity knew about BASF's prospective business relationship with Kayser and that Ingevity sought to interfere with that prospective

19

relationship. (*See* D.I. 603 at 20 (citing JX-18; JX-19; PX-70; D.I. 566 at 393:23–402:18 (testimony of Mr. Woodcock); D.I. 567 at 663:16–665:25 (video deposition of Ingevity employee Erik Ripple))). The jury was entitled to credit that evidence over Ingevity's evidence. Thus, I will deny the motion for judgment as a matter of law on tortious interference.

## IV. CONCLUSION

For the foregoing reasons, I **DENY** Ingevity's renewed motion for judgment as a matter of law, and I **DENY** Ingevity's motion for a new trial.

An appropriate order will issue.