# Exhibit 3

# BASF

# v.

# Ingevity

Divya Mathur, Ph.D.

PDX-002.1

# Assignment

**1** Identify the relevant antitrust markets

**2** Evaluate whether Ingevity has market power in these markets

**3** Evaluate the impact of Ingevity's conduct with respect to its sales of carbon honeycombs used in LEV III / Tier 3-compliant fuel canisters

**4** Estimate economic damages suffered by BASF

# Summary of Opinions

PDX-002.3

Summary of Opinions

 **1** Two relevant antitrust markets—Technology and Carbon Adsorbents

PDX-002.4

# Summary of Opinions

**1** Two relevant antitrust markets—Technology and Carbon Adsorbents

**2** Ingevity has market power in both markets

# Summary of Opinions

**1** Two relevant antitrust markets—Technology and Carbon Adsorbents

**2** Ingevity has market power in both markets

**3** Ingevity obtained market power in Carbon Adsorbents market through tying arrangements and exclusive contracts

PDX-002.6

# Summary of Opinions

**1** Two relevant antitrust markets—Technology and Carbon Adsorbents

**2** Ingevity has market power in both markets

**3** Ingevity obtained market power in Carbon Adsorbents market through tying arrangements and exclusive contracts

**4** Ingevity's conduct harmed competition and customers

PDX-002.7

# Summary of Opinions

**1** Two relevant antitrust markets—Technology and Carbon Adsorbents

**2** Ingevity has market power in both markets

**3** Ingevity obtained market power in Carbon Adsorbents market through tying arrangements and exclusive contracts

**4** Ingevity's conduct harmed competition and customers

**5** BASF suffered $39 to $48 million in lost profits

PDX-002.8

# Evaluating Anticompetitive Conduct

PDX-002.9

# Steps to Evaluating Ingevity's Conduct

**1** Identify the relevant antitrust markets

**2** Evaluate whether Ingevity has market power in these markets

**3** Evaluate the impact of Ingevity's conduct



PDX-002.10

# Defining an Antitrust Market



"In the most general terms, a product market…consists of all goods or services that buyers view as close substitutes."

# Relevant Market #1: Technology Market

- Strict regulations require car makers to use technology that meets vehicle emissions standards

- Technologies include:
  1. fuel canisters with multiple stages of activated carbon   | Most widely used |
  2. sealed tanks
  3. purge pumps
  4. heated canisters
  5. insulated tanks
  6. insulated canisters

# Relevant Market #2: Carbon Adsorbents Market

- Components used in the development of fuel canisters compliant with LEV III/Tier 3 regulations

- Adsorb vehicle emissions

- Common types of carbon adsorbents:
  - Pelletized carbon
  - Carbon honeycombs

PDX-002.13

# Carbon Adsorbents Market is Distinct from the Technology Market

1. Multiple technologies available to meet regulations

**Example**  Toyota sealed tanks

2. One component of fuel canister, among many

**Example**



Additional Components

Carbon Adsorbents

# Market Power Defined



"More appropriately, market power is the power to raise prices above competitive levels without losing so many sales that the price increase is unprofitable. A firm that can make more money by selling its output at a higher-than-competitive price has a certain amount of market power."

Hovenkamp, H. Principles of Antitrust (2017), p. 61.

PDX-002.15

# Determining a Firm's Market Power

**1** Ability to earn high profits

**2** Market share

# Determining a Firm's Market Power

**1** Ability to earn high profits

Price of product
— Incremental cost of product

Seller's Profit from Sale

**2** Market share

PDX-002.17

# Determining a Firm's Market Power

**1** Ability to earn high profits

Price of product
— Incremental cost of product
———————————
Seller's Profit from Sale

**2** Market share



"If the market share of the firm (or firms) under analysis is high, the suggestion is that market power exists."

Carlton, D. and Perloff, J. Modern Industrial Organization (2005), p. 644.

PDX-002.18

# Market Share As An Indicator of Market Power

PRINCIPLES OF
Antitrust

HOVENKAMP

"All other things being equal, ==a firm with a large market share has a greater ability to increase price profitably than a firm with a smaller share==. When A's market share is 10%, the effect of A's unilateral price increase would likely be the *immediate* loss of most sales. ==When A's market share is 80%, however, A may be able to make sales at the higher price for quite some time.== This correlation of market power and market share has permitted courts to use market share as a qualified proxy for market power in antitrust cases."

Hovenkamp, H. Principles of Antitrust (2017), p. 63.

WEST ACADEMIC PUBLISHING

PDX-002.19

# Ingevity's Market Power

PDX-002.20

# Ingevity's Market Power in the Technology Market

Ingevity owns the '844 Patent



Patent allegedly covers preferred method to meet regulations



Ingevity captured dominant share of the Technology Market

PDX-002.21

# Ingevity Has a Dominant Share of the Technology Market



"&gt;90% bleed solution market share."

# Ingevity Has Market Power in the Carbon Adsorbents Market

**1** Nearly 100% of sales in the market

**2** High profit margins on sales

**3** Significant barriers to entry

PDX-002.23

# Ingevity's Near 100% Share of the Carbon Adsorbents Market



**Ed Woodcock Jr.**
EVP and President of
Performance Materials
Jul. 9, 2019

**ingevity**

Q.  For the U.S. market for **pelletized carbons** that are used in fuel vapor canisters, can you give me an estimate of what **Ingevity's share of that market** is?

…

A.  Today it should be **close to 100 percent, definitely above 95 percent.**

**ingevity**

Q.  Are there other companies aside from Ingevity currently that offers a honeycomb scrubber for automotive applications?

…

A.  To my knowledge, **the only other company that I have come across that has offered the honeycomb solution is BASF**.



**Peter McCrae**
Business Manager
for EMEA
Oct. 17, 2019

# Ingevity Has High Profit Margins on Sales of Carbon Adsorbents



**Pelletized Carbon Revenues (2018-19)**

46% Costs

54% Profits

**Carbon Honeycomb Revenues (2018-19)**

20% Costs

80% Profits

# Ingevity's Conduct

# Ingevity's Conduct

**1** **Tying Arrangements:**
Licensing practices with respect to the '844 Patent

**2** **Exclusive Dealing:**
Exclusive long-term supply agreements

PDX-002.27

# What is a Tying Arrangement?



"A tie-in, or tying arrangement, is a sale or lease of one product or service on the ==condition that the buyer take a second product== or service as well."

Hovenkamp, H. Principles of Antitrust (2017), pp. 378 and 396.

PDX-002.28

# Tying Arrangement: Ingevity's Licensing Practices

**ingevity**

Ed Woodcock Jr.
September 2019 Witness Statement

Q141.  How would an OEM or Tier 1 manufacturer know whether it had authorization to practice the claims of the '844 Patent?

A141.  Until the past year, we told our customers that if they wanted to practice the claims of the '844 Patent with our authorization, they needed to purchase all of the activated carbon products used as initial and subsequent adsorbent volumes in a fuel vapor canister from Ingevity.  This was explained to our customers through presentations and via interactions with our sales personnel.  If they purchased all of the initial and subsequent adsorbent volumes of activated carbon adsorbents from Ingevity, then they would have an implied license to practice the claims of the '844 Patent.

---

CONTAINS CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER

Q139.  Do any other OEMs or Tier 1 manufacturers practice the claims of the '844 Patent without a written license agreement?

A139.  Yes—they do with our implicit authorization.

Q140.  Which OEMs and Tier 1 manufacturers practice the claims of the '844 Patent without a license agreement?

A140.  Other than Toyota, who uses sealed fuel tank technology to satisfy Tier 3 regulations rather than the method and system claimed by the '844 Patent, it is Ingevity's understanding that all other OEMs and Tier 1 manufacturers make, sell, and offer for sale fuel vapor canisters in the United States or for the United States that use our high-IAC BAX pellet products in combination with our low-IAC honeycomb products without using any other carbons. It is our understanding that those canisters that use that combination of carbons practice the claims of the '844 Patent but they are authorized by Ingevity and have an implied license. The accused MAHLE products that include MPC-1 are not authorized by Ingevity.

Q141.  How would an OEM or Tier 1 manufacturer know whether it had authorization to practice the claims of the '844 Patent?

A141.  Until the past year, we told our customers that if they wanted to practice the claims of the '844 Patent with our authorization, they needed to purchase all of the activated carbon products used as initial and subsequent adsorbent volumes in a fuel vapor canister from Ingevity. This was explained to our customers through presentations and via interactions with our sales personnel. If they purchased all of the initial and subsequent adsorbent volumes of activated carbon adsorbents from Ingevity, then they would have an implied license to practice the claims of the '844 Patent.

Q142.  What customers, if any, has Ingevity ever sued for infringing the '844 Patent if the customer used activated carbon products purchased only from Ingevity?

A142.  Ingevity has never sued a customer for infringing the '844 Patent if they used activated carbon adsorbents purchased only from Ingevity to practice the claims of the patent. Ingevity also has never accused any such customer that purchased only Ingevity carbons for its fuel vapor canisters of infringement.

Q143.  Why did you qualify your answer about implied licenses and authorization to practice the patent by saying "until the past year"?

A143.  In the past year, we have changed our message to customers, and we no longer require that customers purchase all of their activated carbon adsorbents from Ingevity in order to practice the claims of the '844 Patent with an implied license. Instead, we now require that OEMs and Tier 1 manufacturers purchase all of the subsequent adsorbent volumes used in a canister from Ingevity in order to have authorization and an implied license from Ingevity. In other

31

CX-0911C.0032

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS ONLY

NGVT0498756

# Ingevity's Carbon Adsorbent Sales are Driven by Its Licensing Practices



## Risks from patent expiration

- Ingevity has benefited from having premium carbon properties that do not exist on honeycombs
- We know of several honeycomb manufacturers that can replicate our product (Helsa, Kuraray, Nagamine)
- A broader range of carbons can be used in a honeycomb because it is at the atmosphere port and has clean air to fully purge
- The honeycomb manufacturing process is much simpler than activated carbon

- **We expect to lose at least 50% of our volume and 50% of our price when the patent expires**

- We expect to lose at least 50% of our volume and 50% of our price when the patent expires

PX-0045.002

PDX-002.30

# What Is Exclusive Dealing?



"An exclusive dealing arrangement is a contract under which a buyer promises to buy its requirements of one or more products ==exclusively from a particular seller.=="

Hovenkamp, H. Principles of Antitrust (2017), p. 409.

PDX-002.31

# Exclusive Dealing: Ingevity's Long-Term Supply Agreements



PDX-002.32

# Exclusive Long-Term Supply Contract with Kayser



**LBE PRODUCTS – SUPPLY AGREEMENT**

**THIS SUPPLY AGREEMENT** is made and executed as of January 1, 2019, by and between Ingevity Corporation, a Delaware corporation, having a place of business at 5255 Virginia Avenue, Charleston, SC 29406 (the "*Seller*"), and Kayser Automotive Systems GmbH, having its principal place of business at Hullerser Landstraße 43D-3754 Einbeck Germany (the "Buyer"),

WHEREAS, the Seller is a manufacturer of products that are used within a canister system to address gasoline evaporative emissions, including products for low bleed emission control, which are designed and manufactured to meet strict environmental standards, including "life of the vehicle" requirements;

WHEREAS, Seller has implemented price increases for its base carbon and LBE Products (as hereafter defined), and the Buyer desires to secure pricing concessions in return for entering into a long term LBE Product supply arrangement as well as to ensure that Seller has appropriate inducement to maintain or increase capacity necessary to supply the market for the long term;

WHEREAS, the Buyer and the Seller have agreed to enter into this long term supply arrangement, with Seller agreeing to provide certain favorable and declining pricing effective as of August 1, 2019 through 2022 and the parties agreeing to certain stable pricing thereafter through 2026 in consideration of this longer term arrangement, and the Buyer agreeing to source requirements from Seller on that basis, subject to the further terms and conditions set forth herein;

WHEREAS, the parties have negotiated certain modified "meet or release and product alteration" terms from the original proposal in order to meet Buyer's request for improved pricing 2019-2022, in return for an enhanced volume commitment long term;

WHEREAS, the parties have further agreed on certain reversion provisions in order to ensure that Buyer is able to participate in a potentially more favorable pricing environment after the expiration of the Seller's United States Patent No. RE38,844 (the "Existing Patent") and otherwise in the case of outside the North American market;

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions hereinafter set forth, and the premises set forth above, the Seller and the Buyer mutually agree as follows:

1. **LBE Products: Requirements.** Subject to and pursuant to the terms of this Agreement, during the Term (as hereafter defined) the Buyer shall order and purchase from the Seller 100% of the Buyer's and the Buyer Group's global requirements of LBE Products for use in gasoline evaporative emission control. Seller shall have the obligation to supply all such requirements provided that Buyer is in compliance with the terms and conditions of this Agreement. "LBE Products" means the adsorbent component or adsorbent material used to capture bleed emissions, whether a honeycomb (also called a monolith), bed of particulate material, sheet, or other material used for that function.

2. **Term; Termination.** This Agreement shall commence on the date hereof and continue until December 31, 2026 (the "*Term*"). This Agreement may be renewed upon the mutual written agreement of the parties.

3. **Pricing; Forecasts.** The following pricing shall apply to honeycomb LBE Products through December 31, 2026. Pricing for other, non-honeycomb LBE Products shall be based on Seller's generally available pricing as established by Seller from time to time for such LBE Products.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS ONLY

NGVT0543176
PX-0119.001

- Purchase 100% of carbon honeycombs from Ingevity from Jan. 2019 – Dec. 2026

JX-0025

PDX-002.33

# Exclusive Long-Term Supply Contract with Kayser



**LBE PRODUCTS – SUPPLY AGREEMENT**

**THIS SUPPLY AGREEMENT** is made and executed as of January 1, 2019, by and between Ingevity Corporation, a Delaware corporation, having a place of business at 5255 Virginia Avenue, Charleston, SC 29406 (the "*Seller*"), and Kayser Automotive Systems GmbH, having its principal place of business at Hullererr Landstraße 43D-3754 Einbeck Germany (the "Buyer");

WHEREAS, the Seller is a manufacturer of products that are used within a canister system to address gasoline evaporative emissions, including products for low bleed emission control, which are designed and manufactured to meet strict environmental standards, including "life of the vehicle" requirements;

WHEREAS, Seller has implemented price increases for its base carbon and LBE Products (as hereafter defined), and the Buyer desires to secure pricing concessions in return for entering into a long term LBE Product supply arrangement as well as to ensure that Seller has appropriate inducement to maintain or increase capacity necessary to supply the market for the long term;

WHEREAS, the Buyer and the Seller have agreed to enter into this long term supply arrangement, with Seller agreeing to provide certain favorable and declining pricing effective as of August 1, 2019 through 2022 and the parties agreeing to certain stable pricing thereafter through 2026 in consideration of this longer term arrangement, and the Buyer agreeing to source requirements from Seller on that basis, subject to the further terms and conditions set forth herein;

WHEREAS, the parties have negotiated certain modified "meet or release and product alteration" terms from the original proposal in order to meet Buyer's request for improved pricing 2019-2022, in return for an enhanced volume commitment long term;

WHEREAS, the parties have further agreed on certain reversion provisions in order to ensure that Buyer is able to participate in a potentially more favorable pricing environment after the expiration of the Seller's United States Patent No. RE38,844 (the "Existing Patent") and otherwise in the case of outside the North American market;

NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter set forth, and the premises set forth above, the Seller and the Buyer mutually agree as follows:

1. **LBE Products; Requirements.** Subject to and pursuant to the terms of this Agreement, during the Term (as hereafter defined) the Buyer shall order and purchase from the Seller 100% of the Buyer's and the Buyer Group's global requirements of LBE Products for use in gasoline evaporative emission control. Seller shall have the obligation to supply all such requirements provided that Buyer is in compliance with the terms and conditions of this Agreement. "LBE Products" means the adsorbent component or adsorbent material used to capture bleed emissions, whether a honeycomb (also called a monolith), bed of particulate material, sheet, or other material used for that function.

2. **Term; Termination.** This Agreement shall commence on the date hereof and continue until December 31, 2026 (the "*Term*"). This Agreement may be renewed upon the mutual written agreement of the parties.

3. **Pricing; Forecasts.** The following pricing shall apply to honeycomb LBE Products through December 31, 2026. Pricing for other, non-honeycomb LBE Products shall be based on Seller's generally available pricing as established by Seller from time to time for such LBE Products.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS ONLY

NGVT0543176
PX-0119.001

- Purchase 100% of carbon honeycombs from Ingevity from Jan. 2019 – Dec. 2026

- Provisions that effectively eliminate competition and prevent switching suppliers

  - "Meet or Release"

  - "Buyer's Reversion Election"

# Anticompetitive Terms of the Kayser Supply Contract

| "Meet or Release" | "Buyer's Reversion Election" |
|---|---|
| • Only applicable to new platforms after patent expiration | |
| • No competition on quality | |
| • Prevents back-and-forth bidding | |

JX-0025

PDX-002.35

# Anticompetitive Terms of the Kayser Supply Contract

| "Meet or Release" | "Buyer's Reversion Election" |
|---|---|
| • Only applicable to new platforms after patent expiration | • One-time right to terminate agreement at patent expiration |
| • No competition on quality | • Requires return of all rebates and retroactive price increases |
| • Prevents back-and-forth bidding | • Ingevity will stop providing rebates and can raise prices going forward |

JX-0025

PDX-002.36

# "Make Whole" Payments Would Be Substantial

| | |
|---|---|
| **Delphi** | **$32 million** |
| **Kayser** | **$10 million** |
| **KFTC** | **$11 million** |

# Ingevity Knew the Long-Term Agreements Would Lock Up Customers After Patent Expiration



April 2017
Ingevity Presentation
"Competitive Update -
Automotive Carbon"



## Risk Mitigation

Long–term commercial agreements and innovation will ==protect a portion of Ingevity's honeycomb volume,== but price erosion is certain

### Long–Term Agreements

- ==Guarantee volume and price stability with key customers for 9 years==
- Delphi (31% of 2017 volume)
- Kayser (12% of 2017 volume)

PX-0048.017

PDX-002.38

# Effect on Competition and Customers

PDX-002.39

# Ingevity's Conduct Has Harmed Competition

Ingevity has market power
in Technology Market

**Tying Arrangements:**
Customers forced to purchase 100%
of carbon adsorbents from Ingevity

**Exclusive Long-term Contracts:**
Customers locked into Ingevity carbon
honeycombs beyond patent expiration

Deprived manufacturers of
BASF's higher quality and lower
priced carbon honeycombs

PDX-002.40

# BASF's Carbon Honeycombs Are Higher Quality

- Ford canisters:
  BASF had **lower bleed emissions**

- Peter McCrae of Ingevity:
  **"BASF HCA appears awesome—1 vs our 2 in series for low bleed and extremely durable"**

# BASF's Carbon Honeycomb Prices per Kayser Contract



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

PX-0077.002

## 29x100mm Carbon Honeycomb

| Volume Level | Bonus | 2018 Launch |
|---|---|---|
| < 60,000 | $7.75 | |
| 60,000 | $7.36 | $6.99 |
| 150,000 | $7.11 | $6.75 |
| 250,000 | $6.86 | $6.52 |
| 500,000 | $6.61 | $6.50 |
| 1,000,000 | $6.45 | $6.45 |
| 1,500,000 | $6.35 | $6.35 |

Case 1:18-cv-01391-RGA   Document 620-3   Filed 03/12/24   Page 44 of 95 PageID #: 35118



## Average 2018 Price for 29x100mm Carbon Honeycombs Sold to Kayser

ingevity $8.94

BASF $6.69

Assuming same volume of sales as Ingevity

$0.00   $1.00   $2.00   $3.00   $4.00   $5.00   $6.00   $7.00   $8.00   $9.00   $10.00

PX-0166; PX-0158; PX-0077

PDX-002.43

# BASF's Carbon Honeycombs are Priced Lower than Ingevity's



■ Ingevity (Delphi Contract)    ■ BASF (Kayser Contract)

| Year | Ingevity (Delphi Contract) | BASF (Kayser Contract) |
|------|-----------------------------|-------------------------|
| 2018 | $8.37 | $7.75 |
| 2019 | $8.12 | $7.36 |
| 2020 | $7.88 | $7.11 |
| 2021 | $7.88 | $6.86 |
| 2022 | $7.88 | $6.61 |
| 2023 | $7.88 | $6.45 |
| 2024 | $7.88 | $6.35 |

JX-0014; PX-0077

PDX-004.

# No Procompetitive Benefits

PDX-002.45

# Ingevity's Claimed Procompetitive Benefits of the Conduct

**1** Provides Ingevity incentive to make investments in carbon honeycomb manufacturing

**2** Prevents free-riding on Ingevity's investments

# Ingevity's Investments and Profits from Carbon Adsorbent Sales



One Year of Profits — $263,000,000 (2019 Profits)

4x >

17 Years of Investments — $70,000,000 (2002-2018 Investments)

PX-0173; PX-0169

PDX-002.47

# Ingevity's Claimed Procompetitive Benefits of the Conduct

**1** Provides Ingevity incentive to make investments in carbon honeycomb manufacturing 

**2** Prevents free-riding on Ingevity's investments

# Ingevity's Claimed Procompetitive Benefits of the Conduct

**1** Provides Ingevity incentive to make investments in carbon honeycomb manufacturing 

**2** Prevents free-riding on Ingevity's investments 

# Market Foreclosure

PDX-002.50

# Ingevity's Conduct Foreclosed BASF from Making Carbon Honeycomb Sales



# Ingevity's 2019 Sales in the Carbon Adsorbents Market



**Carbon Honeycomb Sales:**   **$166M**

   **Pelletized Carbon Sales:**   **$88M**

   **Total Carbon Adsorbent Sales:**   **$254M**

# Foreclosed Customers and Carbon Honeycomb Sales

| | Total Ingevity Sales | Tying Arrangement | Exclusive Contract |
|---|---|---|---|
| DELPHI | $41 million | ✓ | ✓ |
| KAYSER | $27 million | ✓ | ✓ |
| KFTC | $14 million | ✓ | ✓ |
| MAHLE | $16 million | ✓ | |
| LEEHAN | $14 million | ✓ | |
| Ford | $9 million | ✓ | |

Total: **$121 million**

# Ingevity's Tying and Exclusive Dealing Foreclosed BASF



**All Carbon Adsorbents**

- 52% $133 million Other customers
- 48% $121 million Foreclosed customers

Total sales: $254 million

**Carbon Honeycombs**

- 27% $45 million Other customers
- 73% $121 million Foreclosed customers

Total sales: $166 million

PX-0166; PX-0158

PDX-002.54



# Ingevity's Exclusive Dealing Foreclosed BASF

**All Carbon Adsorbents**

33%
$83 million
Foreclosed customers

67%
$171 million
Other customers

Total sales:
$254 million

**Carbon Honeycombs**

50%
$83 million
Foreclosed customers

50%
$83 million
Other customers

Total sales:
$166 million

PX-0166; PX-0158

PDX-002.55

# Damages Suffered By BASF

# BASF Has Suffered Lost Profits Damages

Ingevity's anticompetitive conduct has foreclosed BASF from the market and prevented it from selling its carbon honeycombs

BASF has suffered lost
profits damages totaling
**$39 million – $48 million**

# Damages Model: BASF's Lost Profits from Delayed Entry

| **Step 1** | Timing and duration of delay |

| **Step 2** | BASF's unit sales |

| **Step 3** | BASF's revenues |

| **Step 4** | BASF's incremental costs |

| **Step 5** | BASF's discounted lost profits |

# Damages Model: BASF's Lost Profits from Delayed Entry



**Step 1** — Timing and duration of delay

**Step 2** — BASF's unit sales

**Step 3** — BASF's revenues

**Step 4** — BASF's incremental costs

**Step 5** — BASF's discounted lost profits

# Timing and Duration of Delayed Entry



# Timing and Duration of Delayed Entry – Ford and GM



**Start of BASF's Sales Absent Ingevity's Anticompetitive Conduct**

**Start of BASF's Sales After Anticompetitive Conduct Ceases**

Ford and GM
April 2023

18 months for platform-specific testing

Ford and GM
Jan 2019

2019    2020    2021    2022    2023    2024    2025    2026

Anticompetitive conduct ceases September 2021

PX-0177

PDX-002.61

# Timing and Duration of Delayed Entry – FCA



# Timing and Duration of Delayed Entry – Honda and VW



# Damages Model: BASF's Lost Profits from Delayed Entry

| Step 1 | Timing and duration of delay |
|--------|------------------------------|
| **Step 2** | **BASF's unit sales** |
| Step 3 | BASF's revenues |
| Step 4 | BASF's incremental costs |
| Step 5 | BASF's discounted lost profits |

# Damages Model: BASF's Unit Sales



**Step 1** — Timing and duration

a) Vehicle sales projections

**Step 2** — BASF's unit sales

b) Carbon honeycombs per vehicle

c) BASF's portion of those sales

**Step 3** — BASF's revenues

**Step 4** — BASF's incremental costs

**Step 5** — BASF's discounted lost profits

# BASF's Unit Sales: Vehicle Sales Projections from LMC



# BASF's Unit Sales: Carbon Honeycombs per Vehicle





| Scenario | Conventional | MAV | Pickup | Sporty | SUV | Van |
|---|---|---|---|---|---|---|
| Low | 1 | 1 | 2 | 2 | 1.5 | 1.5 |
| Expected | 1 | 1 – 1.5 | 2 – 2.25 | 2 – 2.5 | 1.5 – 2 | 1.5 – 2 |
| High | 1 – 2 | 1 – 1.75 | 2 – 3 | 2 – 3 | 1.5 – 2 | 1.5 – 2 |

**Ford, GM & VW: "Low" estimate per vehicle**
**Honda and FCA: 1 carbon honeycomb/vehicle**

PX-0159

PDX-002.67



# Damages Model: BASF's Lost Profits from Delayed Entry

| Step 1 | Timing and duration of delay |
|--------|------------------------------|

| Step 2 | BASF's unit sales |
|--------|-------------------|

| Step 3 | BASF's revenues |
|--------|-----------------|

| Step 4 | BASF's incremental costs |
|--------|---------------------------|

| Step 5 | BASF's discounted lost profits |
|--------|---------------------------------|

# BASF's Revenues



**BASF's unit sales**

 **Price per unit**

Two pricing scenarios:

- BASF's expected prices
- Minimum of BASF and Ingevity's expected prices

**BASF's revenues**

PDX-002.70

# BASF's Revenues: Pricing Scenario #1

## Kayser contract prices





**Decreasing from $7.36 to $6.35 based on volume**

## BASF's expected prices for other customers



**Decreasing from $7.00 to $5.75 over time**

# BASF's Revenues: Pricing Scenario #2

## Assume BASF's prices will be the minimum of:

- BASF's expected price
- Ingevity's expected price

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026-2027 | 2028-2032 |
|---|---|---|---|---|---|---|---|---|---|
| **ingevity** | $8.92 | $8.81 | $8.81 | $7.92 | $6.50 | $6.50 | **$5.00** | **$5.00** | **$5.00** |
| **BASF** | **$7.00** | **$7.00** | **$6.79** | **$6.59** | **$6.50** | **$6.45** | $6.35 | $6.00 | $5.75 |

## Prices:

- **GM: decreasing from $7.36 to $5.00**
- **Other customers: decreasing from $7.00 to $5.00**

# Damages Model: BASF's Lost Profits from Delayed Entry



Step 1 — Timing and duration of delay

Step 2 — BASF's unit sales

Step 3 — BASF's revenues

Step 4 — BASF's incremental costs

Step 5 — BASF's discounted lost profits

# BASF's Incremental Costs



JX-0033

PDX-002.74

# Damages Model: BASF's Lost Profits from Delayed Entry

| Step 1 | Timing and duration of delay |
|--------|------------------------------|

| Step 2 | BASF's unit sales |
|--------|-------------------|

| Step 3 | BASF's revenues |
|--------|-----------------|

| Step 4 | BASF's incremental costs |
|--------|--------------------------|

| Step 5 | BASF's discounted lost profits |
|--------|--------------------------------|

Case 1:18-cv-01391-RGA   Document 620-3   Filed 03/12/24   Page 77 of 95 PageID #: 35151

BASF's revenues

— BASF's incremental costs

---

**BASF's profits**

# Illustration: Lost Profits from Delayed Entry



# Illustration: Lost Profits from Delayed Entry



# Illustration: Lost Profits from Delayed Entry



# BASF's Lost Profits Need to be Discounted to Date Economic Harm Began

# BASF's Lost Profits Need to be Discounted to Date Economic Harm Began





BASF internally used a **7.5% discount rate** when modeling the risk of cash flows from carbon honeycomb sales

# BASF's Lost Profits Damages

## Pricing Scenario #1 – BASF's expected prices

| Vehicles made by: | Lost Profits |
|---|---|
| Ford | $17,543,231 |
| GM | $18,167,529 |
| FCA | $6,289,538 |
| Honda | $3,894,855 |
| VW | $2,107,926 |
| **Total*** | **$47,842,057** |

## Pricing Scenario #2 – Minimum of BASF / Ingevity expected prices

| Vehicles made by: | Lost Profits |
|---|---|
| Ford | $15,806,694 |
| GM | $13,789,342 |
| FCA | $4,977,198 |
| Honda | $3,064,218 |
| VW | $1,718,775 |
| **Total*** | **$39,195,207** |

\* After subtracting BASF's costs to expand production capacity

PX-0177

PDX-002.82

# Damages Reflect Substantially Less than 50% of Total Carbon Honeycomb Sales



**Number of Carbon Honeycombs Sold**

■ Expected sales by Ingevity and other suppliers

■ BASF's expected sales absent Ingevity's anticompetitive conduct

At least 66% of sales are expected to be made by Ingevity or other suppliers for any given year

No more than **34%** of sales are expected to be made by BASF in any year

PX-0159

PDX-002.83

# Ingevity's Carbon Adsorbent Sales are Driven by Implied Licenses to Its Patent



## Risks from patent expiration

- Ingevity has benefited from having premium carbon properties that do not exist on honeycombs
- We know of several honeycomb manufacturers that can replicate our product (Helsa, Kuraray, Nagamine)
- A broader range of carbons can be used in a honeycomb because it is at the atmosphere port and has clean air to fully purge
- The honeycomb manufacturing process is much simpler than activated carbon
- When we were selling 3M pieces/year, our patent and this product were not material to customers
- At 15M pieces/year worldwide, it has become material (in MAHLE's Carbon X case, it also requires a license fee that they cannot recoup from Honda)
- **We expect to lose at least 50% of our volume and 50% of our price when the patent expires**

PX-0045.002

PDX-002.84

# Liability Scenarios

# Liability Scenarios

| | Damages |
|---|---|
| Liable for all conduct at issue | **$39,195,207 - $47,842,057** |

| Alternative Liability Scenarios | Damages |
|---|---|
| Tying arrangements only | |
| Exclusive dealing only | |
| Tortious interference only | |
| No damages through life of '844 Patent (until March 2022) | |

PX-0166; PX-0177

PDX-002.86

# Liability Scenarios

| | Damages |
|---|---|
| Liable for all conduct at issue | $39,195,207 - $47,842,057 |

| Alternative Liability Scenarios | Damages |
|---|---|
| Tying arrangements only | **$39,195,207 - $47,842,057** |
| Exclusive dealing only | |
| Tortious interference only | |
| No damages through life of '844 Patent (until March 2022) | |

PX-0166; PX-0177

PDX-002.87

# Liability Scenarios

| | Damages |
|---|---|
| Liable for all conduct at issue | $39,195,207 - $47,842,057 |

| Alternative Liability Scenarios | Damages |
|---|---|
| Tying arrangements only | |
| Exclusive dealing only | **≥ $16,483,475** |
| Tortious interference only | |
| No damages through life of '844 Patent (until March 2022) | |

PX-0166; PX-0177

PDX-002.88

# Liability Scenarios

|  | Damages |
| --- | --- |
| Liable for all conduct at issue | $39,195,207 - $47,842,057 |

| Alternative Liability Scenarios | Damages |
| --- | --- |
| Tying arrangements only | |
| Exclusive dealing only | |
| Tortious interference only | **$16,483,475** |
| No damages through life of '844 Patent (until March 2022) | |

PX-0166; PX-0177

PDX-002.89

# Liability Scenarios

| | Damages |
|---|---|
| Liable for all conduct at issue | $39,195,207 - $47,842,057 |

| Alternative Liability Scenarios | Damages |
|---|---|
| Tying arrangements only | |
| Exclusive dealing only | |
| Tortious interference only | |
| No damages through life of '844 Patent (until March 2022) | **$7,443,769 - $13,928,543** |

# Liability Scenarios: No Damages Through '844 Patent Life



# Liability Scenarios

| | Damages |
|---|---|
| Liable for all conduct at issue | $39,195,207 - $47,842,057 |

| Alternative Liability Scenarios | Damages |
|---|---|
| Tying arrangements only | |
| Exclusive dealing only | |
| Tortious interference only | |
| No damages through life of '844 Patent (until March 2022) | **$7,443,769 - $13,928,543** |

PX-0166; PX-0177

PDX-002.92

# Liability Scenarios

|  | Damages |
|---|---|
| Liable for all conduct at issue | **$39,195,207 - $47,842,057** |

| Alternative Liability Scenarios | Damages |
|---|---|
| Tying arrangements only | $39,195,207 - $47,842,057 |
| Exclusive dealing only | ≥ $16,483,475 |
| Tortious interference only | $16,483,475 |
| No damages through life of '844 Patent (until March 2022) | $7,443,769 - $13,928,543 |

PX-0166; PX-0177

PDX-002.93

# Conclusion

**1** Ingevity has market power in Technology and Carbon Adsorbents markets

**2** Ingevity obtained market power in Carbon Adsorbents market through tying arrangements and exclusive contracts

**3** Ingevity's conduct harmed competition and customers

**4** BASF suffered $39 to $48 million in lost profits

PDX-002.94